# DECLARATION OF GEORGES C. BENJAMIN, MD,

I, Georges C. Benjamin, M.D., declare as follows:

1. I am the Executive Director of the American Public Health Association ("APHA"). I work in APHA's principal place of business in Washington, D.C. I have been the Executive Director of APHA since December 2002. In my role as Executive Director, I am responsible for developing, implementing, and managing the organization's programs and activities in furtherance of APHA's goals. My work requires that I be familiar with APHA's purposes and activities, as well as the public health interests and concerns of APHA's members.

2. APHA is a national nonprofit corporation, and is organized and existing under the laws of Massachusetts. By virtue of my position, history, and experience with APHA, and based on my own personal knowledge, I am aware that APHA has more than 24,000 members in all 50 states, the District of Columbia and Puerto Rico. APHA also has 51 state and regional affiliates. APHA's members include public health researchers, health service providers, administrators, teachers, and other health workers, and public health advocates. I am also aware that APHA's members include women of child-bearing age, pregnant or nursing women, and parents of infants or young children.

3. APHA's mission is to champion the health of all people and all communities, strengthen the profession of public health, share the latest research and information, promote best practices, and advocate for public health issues and policies grounded in research. APHA is the only organization that combines a 150-year perspective, a broad-based member community, and the ability to influence federal policy to improve the public's health.

4. In furtherance of APHA's goals, APHA has actively participated in, and been a party to, proceedings to strengthen and enforce regulations that affect public health standards, including those involving regulations under the federal Clean Air Act. In particular, APHA, for many years, has actively participated in proceedings related to the regulation of hazardous air pollutant emissions from coal-fired and oil-fired power plants. APHA and our state and regional affiliates have members who live and work in communities that are located in close enough proximity to be adversely affected by emissions of hazardous air pollutants from coal-fired and oil-fired power plants.

5. APHA intervened on behalf of petitioners to challenge the attempt by the U.S. Environmental Protection Agency ("EPA") in 2005 to remove coal-fired and oil-fired power plants from the list of sources that are

subject to the Clean Air Act's hazardous air pollution provisions and to challenge EPA's so-called "Clean Air Mercury Rule," a cap-and-trade scheme that EPA proposed as a substitute for regulating power plants under the Act's hazardous air pollution provisions. The D.C. Circuit struck down EPA's actions in *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008).

6. I am familiar with EPA's final national emissions standards for hazardous air pollutants emitted by coal-fired and oil-fired power plants, known as the Mercury and Air Toxics Rule, or MATS Rule. APHA, along with other public health organizations, submitted written comments to EPA on the proposed rule on August 4, 2011. The EPA Administrator signed the final MATS Rule on December 16, 2011, and it was published in the Federal Register on February 16, 2012, at 77 Fed. Reg. 9,304. APHA also actively supported EPA's proposed and final MATS Rule before Congress, and APHA participated in litigation to oppose efforts to repeal or weaken the MATS Rule as well as efforts to eliminate or curtail EPA's authority to issue and implement the Rule.

7. I am aware that coal-fired power plants have long been the largest industrial sources of mercury air pollution in the United States. Mercury is a potent neurotoxicant, and mercury contamination in the food chain and mercury "hotspots" adversely affect the health and well-being of

developing fetuses, infants, and young children—all of whom are particularly vulnerable to adverse and irremediable health impacts. Mercury can also damage the kidneys and liver and cause cardiovascular disease in adults.

8. In addition to mercury, coal-fired and oil-fired power plants emit other hazardous metals and metalloids, such as arsenic, beryllium, and chromium, which are known or probable carcinogens. Hazardous acid gases, including hydrogen chloride and hydrogen fluoride, that are emitted by coal-fired and oil-fired power plants, can irritate and inflame the skin, eyes, nose, throat, and respiratory system. Many of the hazardous organic air pollutants that coal-fired and oil-fired power plants release, such as dioxins and furans, polycyclic aromatic hydrocarbons, and volatile organic compounds, are known or probable carcinogens. In addition, many of these toxicants attach to fine particulate matter and penetrate deep into the lungs, which can exacerbate the harmful effects of these pollutants.

9. I am also familiar with EPA's 2016 Supplemental Finding, reaffirming that it is "appropriate and necessary" under the Clean Air Act to regulate hazardous air pollutants through the MATS Rule, 81 Fed. Reg. 24,420 (April 25, 2016); EPA's subsequent reversal of that position, 85 Fed. Reg. 31,286 (May 22, 2020); and EPA's later reaffirmation of the

appropriate and necessary finding, 88 Fed. Reg. 13,956 (Mar. 6, 2023). APHA participated 1) in the public comment process in support of the Supplemental Finding and in subsequent litigation over the Supplemental Finding as an Intervenor-Respondent; 2) in the public comment process opposing EPA's 2020 reversal of the 2016 Supplemental Finding and in subsequent litigation challenging that reversal; and 3) in the public comment process in support of EPA's 2023 reaffirmation of the appropriate and necessary finding.

10. The MATS Rule has been one of the most important regulations for protecting people's health and well-being. I understand that the MATS Rule in fact has resulted in greatly decreased emissions of mercury and other hazardous air pollutants from coal-fired and oil-fired power plants. I am also aware that EPA estimated that the 2012 MATS Rule, when fully implemented, would avoid up to 11,000 premature deaths, 2,800 cases of chronic bronchitis, 4,700 nonfatal heart attacks, 130,000 aggravated asthma attacks, and 5,700 hospital and emergency room visits, among other impacts, every year. I understand that more recent scientific research shows that the benefits of the MATS Rule are far greater than EPA's initial estimates and have been implemented at much lower cost than anticipated.

11. I am aware that EPA has now finalized a rule titled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," which was published in the Federal Register on May 7, 2024, at 89 Fed. Reg. 38508 [hereinafter referred to as the "2024 MATS Rule"], and which strengthens the 2012 MATS Rule in certain important respects. APHA was fully involved in the public comment process on the proposed rule, having submitted written comments, along with other health professionals, urging EPA to finalize the strongest and most protective health limits on emissions of mercury and other hazardous air pollutants from coal- and oil-fired power plants.

12. APHA in its comments supported tightening the mercury emissions standard for coal-fired power plants that burn lignite to match the standard that non-lignite burning power plants must meet. I generally understand that lignite-fired coal plants are more polluting that other types of coal plants. APHA also supported a more stringent limit for filterable particulate matter ("fPM"), which, as I understand, serves as a surrogate for non-mercury hazardous air pollutant metals. APHA had advocated for a stronger limit than EPA ultimately adopted, but the new standard is still an improvement. In addition, APHA supported the requirement in the 2024

MATS Rule that power plants must employ continuous emissions monitoring systems, which will enable power plants to identify non-compliance issues and spikes in pollution more effectively, and thereby result in improved protection of public health.

13. I am aware that several states have filed a petition for judicial review of the 2024 MATS Rule, *State of North Dakota, et al., v. EPA*, Case No. 24-1119 (D.C. Cir. Filed May 8, 2024). Compliance with, and enforcement of, the more stringent Rule is critical to those who are most at risk and vulnerable, including children and the elderly, and low-income and minority communities who are disproportionately burdened by pollution from coal-fired and oil-fired power plants.

14. APHA and its members have a direct and concrete interest in promoting and protecting public health, including the health of APHA members and their families. The challenge to the 2024 MATS Rule, if successful, would directly harm APHA's members and their families, and those for whom APHA health professionals provide health care. Therefore, the rejection of the challenge by the State of North Dakota, et al., will directly promote the mission and interests of APHA, as well as redress the harm to the individual and professional interests of APHA's members arising from the litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 5/24/2024

Georges C. Benjamin, MD

**DECLARATION OF MATTHEW BEREZWICK FOR CITIZENS FOR PENNSYLVANIA'S FUTURE**

I, Matthew Berezwick, hereby declare and state as follows:

1. This declaration is based on my personal knowledge. I am over the age of eighteen (18) and suffer no legal incapacity.

2. I am a member of Citizens for Pennsylvania's Future ("PennFuture") and have been a member since 2024.

3. I submit this declaration in support of PennFuture's intervention in litigation to defend the National Emissions Standards for Hazardous Air Pollutants: Coal and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review ("MATS Update Rule"), which was finalized by the U.S. Environmental Protection Agency ("U.S. EPA") to improve and strengthen limits on air toxics emissions from power plants.

4. I am 68 years old.

5. I have had squamous cell cancer that was removed last year.

6. I currently reside in Schuylkill County, Pennsylvania at 125 Bridge Street, Mahanoy Plane, PA, 17949, which is 2.5 miles from the John B. Rich Memorial coal-fired power plant, 4.25 miles from the Schuylkill Energy Resources coal-fired power plant, 11 miles from the Foster Wheeler Mt Carmel Cogen coal-fired power plant, and about 15 miles from the Westwood Generation LLC coal-

fired power plant. I have lived at 125 Bridge Street since we built our home in 1985.

7. I often spend time outside including taking a daily 5-7 mile hike.

8. I plan to continue being active outdoors in the future.

9. I have been involved with local air quality advocacy for a long time and am particularly concerned about the plants that are just a few miles from my home and the impact that those coal-fired power plants have had on my and my family's health. When the wind blows, I can see fly ash in the air and when the rain falls hard, the creek that runs past my house runs black from the pollution. I have contacted both the DEP division of mining and EPA in the past to stop the pollution and, at the very least, get some kind of monitoring installed at these local plants, to no avail. I have concerns about the safety of our drinking water which is sourced from local reservoirs that are likely being impacted by the pollution from these local coal-fired power plants. I have serious concerns that the pollution from these local coal-fired power plants is the cause of the significant amount of cancer that has impacted my community over the past 15-20 years.

10. As a member of PennFuture, I understand that PennFuture engages in education, advocacy, and legal action to protect Pennsylvania's air, water, and land. PennFuture's current activities include efforts to reduce emissions of air

pollutants to protect and improve air quality in Pennsylvania through enforcement of environmental laws and transformation of public policy.

11. I understand that PennFuture seeks to intervene in litigation challenging U.S. EPA's updated standards for hazardous air pollutant emissions from power plants, and that a successful challenge could result in undermining or delaying implementation of these stronger standards.

12. I understand that petitioners in these cases seek to block implementation of the updated standards. Delaying implementation of the updated standards would allow higher emissions of air pollutants that affect local air quality, including from the John B. Rich Memorial, Foster Wheeler Mt Carmel Cogen, and Westwood Generation LLC coal-fired power plants in Schuylkill County.

13. I am aware that hazardous air pollutants pose serious risks to human health, as mercury is a potent neurotoxin and a number of air toxics are associated with cancer risk. I also understand that particulate matter, which is emitted by power plants, is associated with heart attacks and premature death.

14. I understand that U.S. EPA finalized the MATS Update Rule to address and reduce the emissions of these particularly dangerous pollutants. I understand that this rule includes a tighter limit on particulate matter from coal-fired power plants, which contains significant amounts of hazardous air pollutants, and that the John B. Rich Memorial, Foster Wheeler Mt Carmel Cogen, and

Westwood Generation LLC coal-fired power plants are some of the plants EPA has identified that may need to upgrade its controls in order to comply with the new limit. Upgrades to controls are expected to result in reduced emissions of various hazardous air pollutants, including mercury and other metal hazardous air pollutants from the John B. Rich Memorial, Foster Wheeler Mt Carmel Cogen, and Westwood Generation LLC coal-fired power plants, reducing the levels of this pollution in the air in local communities, including Mahanoy Plane where I live.

15. I also understand that EPA is requiring coal and oil-fired power plants to use continuous emissions monitoring systems to comply with the rule, and that this would mean significantly more information about power plant emissions will be available in real time, including from the John B. Rich Memorial, Foster Wheeler Mt Carmel Cogen, and Westwood Generation LLC coal-fired power plants, which I and other members of my local community will be able to access and use for our own benefit, such as making decisions and taking actions that reduce our exposure to these pollutants.

16. I am concerned that if implementation of the MATS RTR is delayed or if the rule is vacated by successful challenges, power plants, particularly the John B. Rich Memorial, Foster Wheeler Mt Carmel Cogen, and Westwood Generation LLC coal-fired power plants, will be allowed to emit excess air pollution that affects

air quality and hazardous air pollutant levels in Schuylkill County where I live, and contributes to my family's and my communities' exposure to harmful pollution.

17. I am also aware that mercury accumulates in fish, and that Pennsylvania has a statewide fish consumption advisory to limit fish consumption in part due to potential mercury exposure.

18. Implementation of the MATS RTR will benefit my interest in breathing cleaner air when I engage in my life and my daily outdoor hiking activities. I therefore support PennFuture's intervention to defend and ensure timely implementation of the MATS Update Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 30, 2024.

/s/ Matthew Berezwick

Matthew Berezwick

**DECLARATION OF ROBERT BYRON**

I, Robert Byron, declare as follows:

1. I am over 18 years of age and competent to give this declaration. I have personal knowledge of the following facts, and if called as a witness could testify competently to them. As to those matters which reflect an opinion, they reflect my personal experience, opinion and judgment on the matter.

2. I have been a resident of Montana for the past 36 years. My wife and I lived in Hardin, Montana for about 35 years before moving to Red Lodge, Montana.

3. I am a lifetime member of the Sierra Club and a member of the Montana Environmental Information Center.

4. Prior to my retirement in 2022, I was a physician for about 34 years, serving the community of southeastern Montana. I practiced internal medicine on the Crow Indian Reservation for over two decades. After my time there, I helped found the Bighorn Valley Health Center – now called One Health – to improve access to healthcare in Hardin, Montana. I also worked as a hospitalist at Intermountain Health St. Vincent Regional Hospital.

5. During my time as a physician I treated patients, presenting with a variety of symptoms, across a variety of age groups. I have treated patients with cardiovascular or respiratory conditions, such as asthma and heart disease. When I first started practicing medicine in the 1980s, doctors would advise patients in higher risk categories to avoid going outside during extreme heat events. However, as time went on, the literature on cardiovascular and respiratory health was growing and becoming more robust. There were studies done on the interaction of heat, smoke, and chronic illness which showed that exposure to poor air quality, especially during heat events, can exacerbate the health conditions people experience. In

accordance with this medical research, I would advise patients with respiratory and cardiovascular conditions to avoid the outdoors during smoke or heat events to minimize the risk of flare ups.

6. I even follow this advice myself. As a retiree with high blood pressure, I know that exposure to elevated levels of particulate matter is linked with increased risk for developing more serious cardiovascular complications, such as heart attacks. I avoid doing strenuous outdoor activity when the air quality is in the "orange" or "red zones," and use HEPA air filters in our home to mitigate exposure to particulate matter.

7. In addition to people already diagnosed with health conditions, there are classes of people who are more at risk of developing health complications from air pollution, including pregnant women, children, and the elderly. Epidemiological studies on pregnant women suggests a relationship between air pollution exposure and poor birth coutcomes such as preterm birth, low birth weight, miscarriage and preeclampsia. Children, whose lungs are still developing, may have impacted respiratory health from breathing in polluted air. For older adults, air pollution can increase the risk of heart attacks and may increase the risk of dementia. There is demonstrated data that air pollution is not simply benign for community members.

8. I am aware that the Colstrip power plant operates without proper pollution control, emitting particulate matter, mecury, sulfur dioxide, nitrogen oxides, toxic metals and a host of other pollutants that are linked to health impacts. Even though I do not reside in Colstrip, the data is clear and strong – the people who live in Colstrip are living within extreme proximity to a massive source of toxic emissions which increases their risk of developing or worsening health complications down the line. I worry about pregnant women and their fetuses, children,

elderly folks, people with other chronic health conditions, and everyone in between who is breathing in polluted air.

9. I am aware that the EPA — through the Mercury and Air Toxics Standards ("MATS") — set standards to reduce toxic pollution from coal-fired power plants, which reduces the impact of this pollution. I also understand that EPA has recently updated those standards in a new Technology Review for coal-fired power plants. As a result of that review EPA has, among other things, set lower standards for particulate matter, as a surrogate for toxic metals, emitted by Colstrip and other coal-fired power plants.

10. I strongly believe that if the Colstrip power plant were required to install pollution controls as a result of EPA's updates to the MATS there would be massive gains in the protection of public health for the residents of Colstrip as well as the surrounding and downwind areas. The risk Colstrip residents face of developing and worsening health conditions would be significantly reduced. As a physician, it seems obvious to me that we should realize these health benefits and limit the amount of toxic air pollution people are inhaling when the pollution control technology is readily available.

11. For these reasons, I support Sierra Club and MEIC's efforts to protect the standards EPA has recently set through its updated Technology Review for the MATS standards against attempts to weaken or eliminate it.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th day of May, 2024, in Red Lodge, Montana.

/s/ [signature]
Robert Byron

**DECLARATION OF BRIAN CAMPBELL, Ph.D.**

I, Brian Campbell, Ph.D., declare as follows:

1. I am the Executive Director of Physicians for Social Responsibility ("PSR"). I have been the Executive Director of PSR since November 2023, and I am responsible for developing, implementing and managing the organization's programs and activities in furtherance of PSR's goals. My work requires that I be familiar with PSR's purpose and activities, as well as the public health interests and concerns of PSR's members.

2. PSR is a national nonprofit organization, organized and existing under the laws of Massachusetts and the District of Columbia. PSR's goals and mission include working to protect and strengthen public health and the health of children, protecting the environment, and promoting federal policies and programs that safeguard clean air.

3. By virtue of my position, history, and experience with PSR, and based on my own personal knowledge, I am aware that PSR has approximately 30,000 members and activists throughout the country. PSR's members include medical and public health professionals and public health advocates. I am also aware that PSR's members include women of child-bearing age, pregnant or nursing women, and parents of infants or young

children.

4. In furtherance of PSR's goals, PSR has actively participated in, and been a party to, proceedings to strengthen and enforce regulations that affect public health standards, including proceedings to enforce regulations under the Clean Air Act. In particular, PSR has actively participated in proceedings and litigation related to the regulation of hazardous air pollutant emissions from coal-fired and oil-fired power plants.

5. I am generally familiar with the 2012 Mercury and Air Toxics Standards Rule ("2012 MATS Rule") that the United States Environmental Protection Agency ("EPA") promulgated over a decade ago. *See* 77 Fed. Reg. 9304 (Feb. 17, 2012). The 2012 MATS Rule established nationwide regulations that have led to a sharp curtailment of emissions of hazardous air pollutants from coal-fired and oil-fired power plants, greatly benefitting public health. PSR was deeply involved in the regulatory advocacy and litigation that led to the 2012 MATS Rule. PSR has also participated in EPA rulemakings and related judicial proceedings following the 2012 MATS Rule concerning EPA's supplemental finding that it is appropriate and necessary to regulate hazardous air pollutants under Section 112 of the Clean Air Act when considering the cost of such regulation, EPA's reversal of that finding in 2020, and its subsequent reaffirmation of its "appropriate and

necessary" finding in 2023.

6. I am aware that EPA has now finalized an update to the 2012 MATS Rule that strengthens the rule in several important ways. *See* National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508 (May 7, 2024) ("2024 MATS Rule"). PSR was fully involved in the public comment process on the proposal that became the 2024 MATS Rule. PSR submitted comments urging EPA to finalize the strongest and most protective health limits on emissions of mercury and other hazardous air pollutants from coal- and oil-fired power plants.

7. PSR supported tightening the mercury emissions standard for coal-fired power plants that burn lignite to match the standard for non-lignite burning power plants. PSR also supported a more stringent limit for filterable particulate matter (fPM), which serves as a surrogate for non-mercury hazardous air pollutant metals under the rule. While EPA did not adopt the fPM limit that PSR urged, EPA did adopt a new and stronger limit for fPM that represents an improvement. In addition, PSR fully supported the requirement in the 2024 MATS Rule that power plants utilize continuous emissions monitoring systems for fPM to identify non-compliance issues

more quickly and effectively and better protect communities near power plants from dangerous spikes in pollution.

8. The 2012 MATS Rule is one of the most important regulations put in place for protecting people's health. I am aware that EPA estimated that the 2012 MATS Rule, when fully implemented, would avoid up to 11,000 premature deaths, 2,800 cases of chronic bronchitis, 4,700 nonfatal heart attacks, 130,000 aggravated asthma attacks, and 5,700 hospital and emergency room visits—among other impacts— every year. I also am aware that the 2012 MATS Rule in fact has resulted in greatly decreased emissions of mercury and other hazardous air pollutants from coal-fired and oil-fired power plants and with even more far-reaching benefits, all at a much lower cost than EPA originally anticipated.

9. The 2024 MATS Rule makes crucial progress in the fight against hazardous air pollutant emissions from coal- and oil-fired power plants. I understand that EPA estimates the 2024 MATS Rule, once implemented, would, among other things, reduce mercury emissions by 9,500 pounds in its first ten years, fine particulate matter emissions by 5,400 tons over the same period, and non-mercury metal hazardous air pollutant emissions such as arsenic and selenium by 49 tons. These emissions reductions are expected to result in reduced exposure to these pollutants, with corresponding benefits

for human health and the environment. For example, there is no level of exposure to fine particulate matter pollution that is known to be safe, so any reduction in exposure confers a concrete benefit.

10. The improvements in the 2024 MATS Rule are critical to the health and well-being of those who are most at risk and vulnerable, including children and the elderly, and low-income and minority communities who are disproportionately burdened by pollution from coal-fired and oil-fired power plants.

11. I also understand that several states, including the State of North Dakota, have filed a petition for judicial review challenging the 2024 MATS Rule. *See* Petition for Review, *North Dakota et al. v. EPA*, No. 24-1119 (D.C. Cir. May 8, 2024).

13. PSR and its members have a direct and concrete interest in promoting and protecting public health, including the health of members and their families, and, with respect to PSR members who are health care professionals, the health of their patients. PSR members would therefore be directly and adversely affected by any weakening, lack of enforcement or compliance, or rescission of the 2024 MATS Rule. The pending challenge to the 2024 MATS Rule, if successful, would directly harm PSR and its members, staff, and volunteers. A judgment dismissing or denying the

pending petition for review in *North Dakota v. EPA*, or any other similar petitions that may be filed challenging the 2024 MATS Rule, would redress these harms to PSR and its members, staff, and volunteers.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on: May 24, 2024

Brian Campbell, Ph.D.

**DECLARATION OF ADELITA G. CANTU**

I, Adelita G. Cantu, hereby declare and state as follows:

1. This declaration is based on my personal and professional knowledge, information, and belief. I am over the age of eighteen (18) and suffer no legal incapacity.

2. I was born in 1955. I currently reside in San Antonio, Texas.

3. The J.K. Spruce Station, a coal-fired power plant in San Antonio, is located 20 miles from my home, and the San Miguel Electric Cooperative plant, a lignite coal plant in Jourdanton, is located 59 miles from my home.

4. I submit this declaration in support of the Alliance of Nurses for Healthy Environments' (ANHE) intervention in support of the U.S. Environmental Protection Agency (EPA) in litigation challenging EPA's National Emissions Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38,842 (April 18, 2024) (the "MATS Update Rule"). The MATS Update Rule revises the requirements in the original Mercury and Air Toxics Standards ("MATS"), which limit hazardous air pollutant ("air toxics") emissions from coal- and oil-fired power plants.

5. I have been a member of ANHE since 2010. I joined ANHE because I was looking for an organization that gave nurses a platform to speak out about

environmental issues and their impact on health. I understand from my involvement with ANHE that the organization is committed to addressing environmental health issues—including harms from air pollution and climate change—through "environmental nursing," the theory that it is the role of care providers to examine environmental factors that contribute to health harms and consider precautionary ways to reduce environmental harms.

6. I have been meaningful involved with our local public utility, CPS Energy, to raise awareness about the public health harms of air pollution and to work to create plans to reduce harmful toxins from the environment.

7. I am aware that the power sector is among the largest anthropogenic sources of air toxics in the United States. Coal-fired power plants have historically been among the largest sources of mercury emitted to the environment in the United States, and among the largest stationary sources of particulate matter containing non-mercury toxic metals like chromium, arsenic, and lead.

8. I understand that U.S. EPA finalized the MATS Update Rule to address and further reduce the emissions of these particularly dangerous pollutants. I understand that this rule includes a tighter limit on particulate matter from coal-fired power plants, which contains significant amounts of metal air toxics. I also understand that this rule tightens the limit on mercury emissions from coal plants that burn lignite coal, and that the San Miguel Electric Cooperative plant is one of a

number of plants EPA has identified that may need to upgrade its controls in order to comply with this new mercury limit. Upgrades in response to this rule are expected to result in reduced emissions of various hazardous air pollutants, including mercury from the San Miguel Electric Cooperative plant.

9. According to EPA, both the San Miguel Electric Cooperative and the J.K. Spruce Station use stack testing, not continuous emissions monitoring systems, for compliance with the particulate matter metal air toxics standard. The MATS Update Rule requires these plants to use continuous emissions monitoring systems to comply with this standard, which could significantly reduce emissions of this pollution by improving compliance assurance and enabling problems with controls to be caught and fixed by operators quickly, potentially resulting in lower levels of pollution in the environment and local communities, including in San Antonio.

10. I also understand that requiring coal- and oil-fired power plants like the San Miguel Electric Cooperative and the J.K. Spruce Station to use continuous emissions monitoring systems to comply with the rule will result in significantly more information about power plant emissions being made available in real time, which I and other members of local communities will be able to access and use for our own benefit, such as making decisions and taking actions that reduce our outdoor exposure to these pollutants.

11. I am concerned that if implementation of the MATS Update Rule is delayed or if the rule is vacated by successful challenges, power plants, including the San Miguel Electric Cooperative Plant and the J.K. Spruce Station, will be allowed to emit excess air pollution that affects air quality and hazardous air pollutant levels in San Antonio where I live, and contribute to my family's and communities' exposure to harmful pollution.

12. I am aware of reports of incidences of heart attacks, asthma attacks, and premature death due to the J.K. Spruce Station. I am also concerned that this plant is located in a vulnerable part of San Antonio in terms of socioeconomic status.

13. I am also aware that mercury accumulates in fish, and that Texas has Freshwater Consumption Advisories, including at Canyon Lake near where I live, which advise limiting consumption of certain fish due to mercury. I do not fish there and would not want to consume freshwater fish and would discourage family and friends, particularly those with children, from consuming fish caught there because I am concerned about mercury in fish near where I live.

14. I also pay attention to air quality alerts in San Antonio and when air pollution is high, I often forgo normal outdoor activities and stay indoors.

15. Implementation of the MATS Update Rule will benefit my interest in breathing cleaner air when I engage in routine outdoor activities, such as running errands, working in the yard. I would also benefit from breathing cleaner air when

I engage in my exercise routine, such as walking and cycling.I therefore support ANHE's intervention to defend and ensure timely implementation of the MATS Update Rule.

16. Through my work I see my patients and community members suffer from acute and chronic pulmonary conditions, particularly asthma. Asthma is a chronic lung disease that leads to inflammation of the airways, wheezing, chest tightness, shortness of breath, and coughing. Asthma is a life-threatening respiratory condition, which can range from mild to severe. Patients with asthma sometimes suffer asthma attacks, which cause worsening symptoms and can even be fatal. One in twelve children in the U.S. has asthma. Children of color have higher rates of asthma than non-Hispanic white children.

17. I am concerned about how air pollution will impact my patients and community. In particular, I worry about the exposure to particulate matter pollution. Many of my patients are more vulnerable to the impacts of air pollution due to certain life circumstances or medical conditions.

18. I believe that addressing air pollution from power plants is essential to protect public health, particularly for local and vulnerable populations. For this and many other reasons, I support the MATS Update Rule and ANHE's intervention in litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of May 2024.

Adelita G. Cantu, PhD, RN, FAAN
Board Member, Alliance of Nurses for Healthy Environments
414 North Dr.
San Antonio, TX 78201

**DECLARATION OF STEPHANIE COATES**

I, Stephanie Coates, declare as follows:

1. I submit this declaration on behalf of Environmental Defense Fund ("EDF") to support its motion to intervene on behalf of the U.S. Environmental Protection Agency ("EPA") in proceedings to review EPA's final rule: National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 86 Fed. Reg. 38508 (May 7, 2024) ("Final Rule").

2. I am a Climate & Health Project Manager at, and a member of, EDF. I work out of Houston, Texas, where I have lived since 2013. In my role as Climate & Health Project Manager I oversee a project that seeks to characterize concentrations of air toxics in Houston through mobile air monitoring and use these data in conjunction with health data from community health centers to assist community partners in creating disaster response plans. Prior to this role, I was a Community Air Quality Fellow with EDF working directly with grassroots, community-based organizations on their environmental justice priorities – with air quality being a concern among all the groups we work with in Houston. EDF also worked with the City of Houston and the community groups to create an automated air quality report that is generated weekly using data from the community networks and local and state monitors to identify areas with the most National Ambient Air

Quality Standards ("NAAQS") exceedances and pinpoint locations with readings above thresholds. The report also includes weather data to identify the likeliest source of the pollution at the time of exceedance. Additionally, EDF engaged with community-based organizations to inform the development of the Climate Vulnerability Index[1] – a tool combining 184 different datasets to rank more than 70,000 census tracts to see which communities face the greatest challenges from the impacts of a changing climate. Harris County ranks in the 85th national vulnerability percentile. Census tracts for the community groups we work with in Harris County rank among the top 10% most vulnerable in the nation. Environmental data included in the Climate Vulnerability Index give an indication of a census tract's proximity to transportation sources and exposures to and health risks from other stationary air pollutant sources. As a Fellow, I also supported the community groups in their successful application for an EPA Community Air Quality Monitoring Grant. The main goal of that award will be to conduct mobile monitoring for ethylene oxide, 1,3-butadiene, formaldehyde and acrolein.[2]

---

[1] *See*, U.S. Climate Vulnerability Index, Overall Climate Vulnerability for Tract 4820121250, https://map.climatevulnerabilityindex.org/map/cvi_overall/tract-48201212500-northeast-houston-houston-tx?mapBoundaries=Tract&mapFilter=9&reportBoundaries=Tract&geoContext=State (showing data for the Houston area).

[2] *See*, EPA, EPA Awards Nearly $500,000 to Texas Organization to improve Air Quality in the Houston Area (Nov. 29, 2023), https://www.epa.gov/newsreleases/epa-awards-nearly-500000-texas-organization-improve-air-quality-houston-area#:~:text=The%20main%20goal%20is, butadiene%2C%20formaldehyde%2C%20and%20acrolein.

3. I understand that the Final Rule addresses toxic pollution from coal-fired power plants by (1) lowering the mercury emission standard for coal plants burning lignite coal; (2) lowering the emission standard for toxic metals such as chromium, nickel, arsenic, lead and others for coal plants; (3) requiring coal plants to use continuous emissions monitoring systems to demonstrate compliance with the standard for non-mercury toxic metals; and (4) updating the definition of "startup" to require coal plants to turn on pollution controls more quickly upon startup.

4. EDF is deeply engaged in efforts to use monitoring data to inform the public about air pollution, and as explained above, I have been involved in some aspects of this work.

5. EDF has also assisted community groups in Pleasantville, Fifth Ward and Sunnyside to install community-owned air sensor networks measuring particulate matter 2.5 ($PM_{2.5}$), nitrous dioxide ($NO_2$), and volatile organic compounds. Even though these neighborhoods are overburdened by sources of air pollution such as concrete batch plants/crushers, freeways, metal recyclers, refineries and other industrial activities, the nearest regulatory air monitors are several miles away. By installing their own sensor networks, they are able to identify concerning trends of particulate pollution above NAAQS and dangerous peaks affecting public health. With EDF's support, community-based organizations

in Fifth Ward and Pleasantville were able to successfully advocate for additional state regulatory air monitors to be sited in their neighborhood and increased monitoring and enforcement by County and City officials.

6. EDF has been working with the community of Sunnyside on the southside of Houston since 2020. After a community assessment and asset mapping, residents recognized that the abundance of pollution sources nearby was directly impacting their health. Zip codes in Sunnyside are considered to have "high asthma burden" due to high utilization of emergency services to treat asthma attacks. EDF encouraged community leaders to join the City of Houston Asthma Coalition to educate residents on asthma management practices. EDF assisted community leaders in Sunnyside to install their air sensor network in 2021 and EDF has provided technical assistance to help residents understand and use the data, which show average $PM_{2.5}$ concentrations in 2023 measuring above NAAQS of 9 $\mu g/m^3$ 62% of the time. EDF is supporting Sunnyside's request that the Texas Commission on Environmental Quality include deployment of a new regulatory monitor in their neighborhood as part of the 2024 Air Monitoring Network Plan. Having information about emissions is essential to understanding public health impacts in these communities. Monitoring data from facilities is essential to ensuring that there is information about the air pollution communities are exposed to.

7. I am aware that sources that are major under Clean Air Act Section 112 are subject to the Clean Air Act's Title V permitting requirements. Title V requires that "a copy of each permit application, compliance plan including the schedule of compliance), emissions or compliance monitoring report, certification, and each permit. . . shall be available to the public." 42 U.S.C. § 7661b(e).

8. Prior to the Final Rule, coal plants that are major could choose to submit only quarterly stack testing results to EPA to demonstrate their compliance with the limits on toxic metals. With the Final Rule's requirement for plants to use continuous emissions monitoring systems, plants will submit hourly compliance data instead of being allowed to submit data from just four test days per year. I understand EPA requirements will further compel coal plants to report their continuous emissions monitoring data to the Emissions Collection and Monitoring Plan System, allowing the public to easily locate, review, and download emissions data using simple, user-directed inquiries. This provides a vital benefit to communities by enabling their access to more comprehensive pollution exposure data that can be used to evaluate individual and community health impacts. This also benefits EDF in its organizational goals to understand and increase awareness of exposure to air toxics and to limit those exposures.

9. Communities are often concerned about emissions from nearby sources of pollution such as coal plants. Having access to hourly source-specific

monitoring data that is required to be made available under the Final Rule and Clean Air Act Title V helps reveal the air pollution communities are exposed to and whether additional measures need to be taken in order to reduce pollution from these sources. For example, this data may reveal that a facility is having difficulty with their pollution controls, or that they are not adequately maintaining their facility as needed to control emissions. Communities can use this data to advocate for better enforcement and compliance by local and state regulatory agencies. Additionally, continuous emissions monitoring will provide residents with more granular information about emissions from nearby coal plants, information they can use to make decisions to better protect their health, for example, whether or not to spend time outdoors, or if it is necessary to use personal protective equipment or air filters in homes and schools.

10. I understand that EPA determined that continuous emissions monitoring could further reduce emissions of non-mercury metals by providing power plant operators with more frequent emissions data, allowing them to quickly identify and address issues with pollution control devices not functioning as expected.[3] EPA determined that this would likely reduce exposures to people living

[3] EPA, National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508, 38536-37 (May 7, 2024).

near coal-fired power plants subject to the updated non-mercury toxic metal standard.[4]

11. EDF frequently uses information about sources of air pollution to inform blog posts, reports, fact sheets, and other materials to increase public awareness of threats of air pollution from particular facilities.[5]

12. EDF's ability to carry out its organizational mission to build a vital Earth for everyone is greatly benefited by the Final Rule's new monitoring requirements. The Final Rule allows EDF to expend fewer resources towards obtaining information about sources of air pollution in order to communicate threats about air pollution exposures to the public.

---

[4] *Id.*

[5] *See, e.g.*, EDF, Making the invisible visible: A guide for mapping hyperlocal air pollution to drive clean air action (Oct. 1, 2019), https://www.edf.org/sites/default/files/content/making-the-invisible-visible.pdf; Matt Tresaugue, Houston neighborhood maps decades-old pollution problem, paving way for communities nationwide (Oct. 26, 2018), https://www.edf.org/blog/2018/10/26/houston-neighborhood-maps-decades-old-pollution-problem-paving-way-communities; Jeremy Proville, Understanding how communities are vulnerable to climate change is key to improving equity and justice (Mar. 29, 2023), https://blogs.edf.org/markets/2023/03/29/understanding-how-communities-are-vulnerable-to-climate-change-is-key-to-improving-equity-and-justice/; EDF Business, How Houston's model could change the way cities map air pollution, https://business.edf.org/insights/how-houstons-model-could-change-the-way-cities-map-air-pollution/; EDF, EPA Finds Valero Energy "Significantly Underestimated" Release of Pollution in Houston (Sep. 4, 2017), https://www.edf.org/media/epa-finds-valero-energy-significantly-underestimated-release-pollution-houston; EDF, Finding pollution – and who it impacts most – in Houston (Jun. 3, 2020), https://www.edf.org/airqualitymaps/houston/findings; EDF, Texas Explosion Underscores Need to Hold Polluters Accountable, Protect Community Health (May 6, 2023), https://www.edf.org/media/texas-explosion-underscores-need-hold-polluters-accountable-protect-community-health; Jolie Villegas, We Need to Close a Mercury Pollution Loophole for Lignite Coal Plants (Apr. 12, 2024), https://blogs.edf.org/climate411/2024/04/12/we-need-to-close-a-mercury-pollution-loophole-for-lignite-coal-plants.

13. If the Final Rule is prevented from being implemented or if implementation is delayed, EDF will be harmed by the loss of access to this monitoring data.

14. As someone who lives and works in Houston, Texas, I have concerns about my exposure to pollution from coal plants, including mercury, which I understand is associated with harms to the nervous system, kidney, and cardiovascular system, and from toxic metals like selenium, chromium, nickel, cobalt, cadmium, beryllium, lead, and manganese which I understand are associated with a variety of health effects including the potential to cause cancer. From my work I know that Houston air quality is harmed by the heavy presence of polluting industry, including coal-fired power plants.

15. I am concerned about my exposure to air pollution when my family and I spend time outdoors. My family only has one car, which is primarily used by my partner. When I need to run errands or go to appointments during the day, I usually walk or bike. My family and I regularly walk to the park, coffee shop or to family's house on the weekends. My daughter walks to school every day. As children grow, their developing lungs and brains make them especially vulnerable to air pollution since they breathe more rapidly and inhale more air relative to their size than adults. I receive air quality alerts from the Texas Commission on Environmental Quality and have the Air Quality Index on my smartwatch face, so I

am always aware of conditions. If the air quality is unhealthy for sensitive groups such as children, we limit our time outdoors. When there have been air pollution incidents like chemical fires in our region, I use the Clarity openmap and EDF Air Tracker tools to try to understand the threat to my area. I'm grateful that I am aware of such tools so that I can make decisions to protect my and my family's health.

16. We have several coal plants in the surrounding area. The closest coal plant to my home is the W.A. Parish Coal Plant. It is 25 miles from my home. Outside of Houston are also the Martin Lake plant in Tatum; the Oak Grove plant in Petteway; and the San Miguel plant in Christine. I am aware that these plants burn lignite coal, one of the dirtiest types of coal that produces high amounts of mercury emissions. I understand the Final Rule will place a more stringent emissions limit for non-mercury toxic metals for these plants, require them to use continuous emissions monitoring to demonstrate compliance with the limit on non-mercury toxic metals, and require them to abide by more stringent startup conditions. I understand the Final Rule will require the Martin Lake, Oak Grove, and San Miguel plants to reduce their emissions of mercury.

17. I believe these new requirements will lead to improved air quality in the Houston area where I live, work, and raise my children and prevent significant pollution increases that could occur in the absence of these new, more stringent

standards. I would thus be harmed if the Final Rule were not implemented or were delayed in being implemented.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Houston, TX on May 22, 2024.

Stephanie Coates

**DECLARATION OF CARA COOK**

I, Cara Cook, declare and state as follows:

1. This declaration is based on my personal and professional knowledge, information, and belief. I am over the age of eighteen (18) and suffer no legal incapacity.

2. I submit this declaration in support of the Alliance of Nurses for Healthy Environments' (ANHE) intervention in support of Respondent U.S. Environmental Protection Agency (EPA) in challenges to EPA's National Emissions Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38,508 (May 7, 2024) (MATS Update Rule). The MATS Update Rule revises the Mercury and Air Toxics Standards, which is the rule limiting hazardous air pollutant emissions from coal- and oil-fired power plants.

3. I am the Director of Programs for ANHE, and I have been in this role since March 2021. I am responsible for the overall management and operation of programs at ANHE. In that capacity, I am required to be familiar with the organization's structure, function, purpose, and membership.

4. I have a bachelor's degree in nursing and a masters in community public health nursing. Before I started working at ANHE in 2017, I worked in a hospital from 2009 to 2016. There, I worked in critical care nursing settings

(caring for people with life-threatening injuries or illnesses), specifically the medical intensive care unit and trauma intensive care unit. From 2016 to 2017, I did care coordination at a primary care office.

5. ANHE is incorporated in Maryland with headquarters in Maryland. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. ANHE has supporters in all fifty states and the District of Columbia. ANHE's members and supporters mainly include nurses across various specialties, including nurse educators, researchers, acute care, public health, but also includes other healthcare professionals and environmental and community advocates.

6. ANHE believes that all humans have the right to healthy and safe environments and that when the environment is healthy and robust, it promotes the health of all people. ANHE is committed to addressing environmental health issues, including harms from air pollution and climate change. ANHE's work centers around "environmental nursing," which is the theory that it is the role of care providers to examine environmental factors that contribute to health harms and consider precautionary ways to reduce environmental harms. To achieve its goals, ANHE educates the nursing profession, advances research, incorporates evidence-based practice, and influences policy.

7. The purpose of my declaration is to provide organizational information regarding the ANHE's support of the MATS Update Rule. In 2023, ANHE submitted comments[1] with other health and medical organizations urging EPA to adopt a stronger rule for hazardous air pollutant emissions from coal-fired power plants. The comments explained that "[t]hroughout the process of burning coal and oil, a long list of dangerous chemicals and pollutants are released" including "acid gases such as hydrogen chloride and hydrogen fluoride; carcinogens such as formaldehyde and benzene; carbon-based toxins like dioxins; metals like arsenic and beryllium; neurotoxins (mercury and lead); and radioactive materials." As the comments noted, "these toxics pose serious threats to health" with some having "immediate impacts on the communities located near power plants" while others "are transported long distances and can impact communities much further from the source." The comments further stressed that "[w]ith a long list of health harms, there is also the opportunity for immense health benefits" and that "[a]ny delay in implementing stronger limits on mercury and other hazardous air pollution means accruing risks of health harms to babies and fetuses that could follow them into adulthood." Taking legal action in support of the MATS Update Rule is well within our organizational mission and interests.

[1] Comment submitted by All. of Nurses for Healthy Env'ts, *et al*., (June 23, 2023), https://www.regulations.gov/comment/EPA-HQ-OAR-2018-0794-5997.

8. Our support for the MATS Update Rule has its basis in scientific research that shows that hazardous air pollutants pose serious threats to health. Power plants are among the largest sources of hazardous air pollutants like arsenic, mercury, and lead.

9. I understand from my training, experience, and work with ANHE that exposure to pollution from power plants, including hazardous air pollutants, is associated with a variety of health harms. Mercury is a potent neurotoxin that can cause developmental birth defects and interfere with neurological development. Mercury can also damage the kidneys, liver, and nervous system of both children and adults. Also, four of the hazardous air pollutants emitted by power plants have been classified as human carcinogens, and five have been classified as probable human carcinogens. And exposures to higher ozone levels and/or higher levels of particulate matter increase the risk of developing respiratory illnesses, increase the likelihood that existing respiratory conditions will worsen, and can increase the risk of premature death, among other serious harms.

10. Harms from air pollution are affecting ANHE's members and supporters, their family members, and their patients across the country. For example, someANHE members live and work near coal-fired power plants that are regulated by this rule.

11. ANHE also has members, supporters, and patients of those members and supporters throughout the country who are or could become pregnant or have young children. These members, supporters, patients, and children could be at risk of health effects due to mercury and other hazardous air pollutant exposures.

12. Risks to ANHE members are reduced by strict power plant emissions standards, and by finalizing strong requirements in the MATS Update Rule, EPA is addressing this pollution directly.

13. The MATS Update Rule is expected to reduce emissions of mercury and other harmful air toxics, as well as nitrogen oxides and fine particulate matter that come from power plants, which can have a range of negative health impacts including asthma attacks, strokes, and premature death.

14. ANHE's members and supporters across the country have a strong interest in supporting the MATS Update Rule and will benefit from its positive effect on air quality, respiratory health, and toxic pollution levels in the environment. If the MATS Update Rule were struck down, weakened, or delayed, they would lose these benefits. For all of these reasons, ANHE supports the MATS Update Rule.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 30th day of May, 2024.

Cara Cook

______________________________

Cara Cook
2901 Shephard Street
Mount Rainier, MD 20712

**DECLARATION OF MARK DEL MONTE**

I, Mark Del Monte, declare as follows:

1. I am the Chief Executive Officer and the Executive Vice President of the American Academy of Pediatrics ("AAP"). I work in the AAP headquarters office in Itasca, Illinois. I am responsible for the overall strategic management and operation of the AAP, including overseeing the AAP's core work of education, policy development, and advocacy. My work requires that I be familiar with the AAP's policy and programmatic work and the current concerns of pediatricians and the families for whom they care.

2. The AAP is incorporated in Illinois, with its principal office in Itasca, Illinois. The AAP is a national nonprofit organization under section 501(c)(3) of the United States Internal Revenue Code. The AAP represents approximately 67,000 pediatricians, pediatric medical sub-specialists, and pediatric surgical specialists. The AAP's mission is to attain the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults through the support of the professional needs of AAP members.

3. In furtherance of the AAP's mission, the AAP has actively participated in proceedings to strengthen and enforce regulations that affect public health, including especially the health, safety, and well-being of infants, children, adolescents, and young adults, and has been a party to proceedings to enforce the Clean Air Act on behalf of AAP members and their patients.

4. In particular, for nearly two decades, the AAP has actively engaged in proceedings related to the regulation of hazardous air pollutant emissions from coal- and oil-fired power plants under the Mercury and Air Toxics Standards ("MATS Rule"). For example, in 2005 the U.S. Environmental Protection Agency ("EPA") attempted to remove coal- and oil-fired power plants from the list of sources subject to section 112, the hazardous air pollutant provision of the

Clean Air Act, and to adopt instead a cap and trade scheme. The AAP submitted comments opposing EPA's action and subsequently joined in a lawsuit challenging the rule. The D.C. Circuit subsequently struck down EPA's action in *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008).

5. Thereafter, the AAP submitted comments in support of EPA's proposed MATS Rule, and submitted testimony before the U.S. Senate Committee on the Environment and Public Works in support of the final rule. The final MATS Rule was published in the Federal Register on February 16, 2012, at 77 Fed. Reg. 9,304. In addition, the AAP was an Intervenor-Respondent defending the MATS Rule in litigation challenging the Rule. I am aware that the MATS Rule has resulted in greatly decreased emissions of mercury and other hazardous air pollutants from coal-fired and oil-fired power plants.

6. I also generally understand that the legal underpinning to the MATS Rule is EPA's finding under the Clean Air Act that it is "appropriate and necessary" to regulate hazardous air pollutants emitted from coal-fired and oil-fired power plants. I am aware that, EPA, following the U.S. Supreme Court's decision in *Michigan v. EPA*, issued a supplemental finding reaffirming that it is appropriate and necessary to regulate hazardous air pollutants through the MATS Rule, 81 Fed. Reg. 24,420 (April 25, 2016). The AAP participated in the public comment process in support of the 2016 Supplemental Finding and in subsequent litigation over the Rule, as an Intervenor-Respondent. In 2020, the EPA Administrator reversed course and concluded that it was not "appropriate and necessary" to regulate hazardous air pollutants emitted by coal-fired and oil-fired power plants. That rule was published in the Federal Register on May 22, 2020, at 85 Fed. Reg. 31,286 (the "2020 Final Rule"); the AAP submitted written comments and provided testimony at the public hearing opposing such reversal, and the AAP joined in litigation

challenging EPA's 2020 Final Rule. In 2023, EPA again reversed course and reaffirmed the appropriate and necessary finding, 88 Fed. Reg. 13,956 (Mar. 6, 2023), and the AAP submitted public comments in support of EPA's position.

7. The MATS Rule is one of the most important regulations for protecting the health of children and infants from emissions of hazardous air pollutants. Coal-fired power plants have long been the largest industrial source of mercury and other toxic air pollutants in the United States. I am aware that mercury, in the form of methylmercury, is a potent neurotoxicant that can result in permanent brain impairment in children and infants, and in developing fetuses whose mothers consume fish contaminated with mercury. Since implementation of the MATS Rule, emissions of hazardous air pollutants from coal-fired and oil-fired power plants have decreased markedly—by approximately 85% to 95%—in significant part because of the MATS Rule. In addition, I am aware that control technologies used to reduce hazardous air pollutant emissions to comply with MATS also necessarily result in additional reductions of fine particulate matter ($PM_{2.5}$), a significant health benefit for children who suffer from asthma and other respiratory conditions.

8. I am aware that EPA has now finalized a rule titled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," which was published in the Federal Register on May 7, 2024, at 89 Fed. Reg. 38508 [hereinafter referred to as the "2024 MATS Rule"], and which strengthens the 2012 MATS Rule in certain important respects. The AAP was fully involved in the public comment process on the proposed rule, having submitted written comments, along with other public health and medical professionals, urging EPA to finalize the strongest and most protective health standards on emissions of mercury and other hazardous air

pollutants from coal- and oil-fired power plants.

9. The AAP in its comments supported tightening the mercury emissions standard for coal-fired power plants that burn lignite to match the standard that non-lignite burning power plants must meet. I generally understand that lignite-fired coal plants are more polluting than other types of coal plants. The AAP also supported a more stringent limit for filterable particulate matter ("fPM"), which, as I understand, serves as a surrogate for non-mercury hazardous air pollutant metals. The AAP had advocated for a stronger limit than EPA ultimately adopted, but the new standard is still an improvement. In addition, the AAP supported the requirement in the 2024 MATS Rule that power plants must employ continuous emissions monitoring systems, which will enable power plants to identify non-compliance issues and spikes in pollution more effectively, and thereby result in improved protection of public health.

10. I am aware that several states have filed a petition for judicial review of the 2024 MATS Rule, *State of North Dakota, et al., v. EPA,* Case No. 24-1119 (D.C. Cir. Filed May 8, 2024). Compliance with, and enforcement of, the more stringent MATS Rule, is critical to the health of children, developing fetuses, and infants, all of whom are especially vulnerable to hazardous air pollutant emissions. I am also generally aware that minorities and children from low-wealth communities are disproportionately impacted by pollution from coal-fired and oil-fired power plants.

11. The AAP and its members have a direct and concrete interest in protecting the health of children, including those children and infants for whom AAP members provide medical care. The challenge to the 2024 MATS Rule, if successful, would directly harm those children and infants, as well as children and infants of AAP members. Therefore, the rejection of the challenge by the State of North Dakota, et al., (or any other challenge) will directly promote the

mission and interests of the AAP, as well as redress the harm to the individual and professional interests of the AAP's members arising from the litigation. Therefore, the rejection of the State of North Dakota's challenge (or any other challenge) will directly promote the mission and interests of the AAP.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: ___5/28/2024__________

Mark Del Monte

**DECLARATION OF ANTHONY D'SOUZA**

I, Anthony D'Souza, hereby state as follows:

1. My name is Anthony D'Souza. I reside in Fort Bend County, Texas, in the City of Richmond. I live in the Mission Bend neighborhood. I am a citizen of the United States and am over 18 years of age. I am an employee of Air Alliance Houston (AAH).
2. In 2018, I earned an associate degree in physics from Lone Star College, and in 2021, I earned a B.S. in environmental science from Rice University. A few months after graduating from Rice, I accepted a job with Air Alliance Houston. I have been working with Air Alliance Houston for the last three years.
3. I am currently the Research and Policy Coordinator for Air Alliance Houston. My responsibilities include creating research reports on the impacts of air pollution in the Houston area, data visualization and analysis, and assisting campaigns opposing permits for polluters. One of my main responsibilities is supporting a program in which AAH monitors air pollution for communities in close proximity to major sources of pollution (e.g., refineries or major freeways). To help run this program, I collect pollution data from our air monitoring devices—which we install by request in local communities—analyze the data, and present results to community members.
4. As a result of my background in environmental science and my work with AAH, I am aware of the negative impacts that air pollution can have on public health. I keep up with issues related to air pollution in the news and stay up to date on the latest developments in this field.
5. When I first moved to Mission Bend in 2017, I enjoyed participating in outdoor activities. I ran outdoors on a regular basis, and I spent time in my backyard to garden and enjoy the weather.

6. Soon after moving to Mission Bend, however, I became aware of the WA Parish coal-fired power plant, located only about 13 miles from my neighborhood. I saw news articles explaining that the plant emitted toxic air pollution that is harmful to public health and describing the plant as the dirtiest coal plant in Texas. I was alarmed to find out the large quantity of pollution coming from Parish and that this pollution could potentially travel large distances.
7. Later, I came across a study from researchers at Rice University—published in 2019—that modelled annual deaths attributable to the Parish facility's emissions. This study found that the plant caused around 180 annual deaths, deepening my concerns about harmful emissions from the Parish facility.
8. I live northeast of the plant, and I am aware that the prevailing winds blow in my general direction from the Gulf of Mexico. I know that being downwind of the plant puts me at greater risk.
9. As a result of my personal research, my background in environmental science, and my work with AAH, I am aware that coal-fired power plants such as Parish emit harmful pollutants such as mercury and toxic metals, as well as particulate matter, sulfur dioxide, nitrogen oxides, and other pollutants. I am also aware that exposure to these sorts of pollutants can cause asthma, cardiovascular disease, neurological disorders, and cancer.
10. Because I know that the Parish facility emits harmful pollutants in close proximity to my neighborhood, I now refrain from outdoor activities that involve physical exertion, including running and gardening. Although I love spending time outdoors, I no longer garden in my backyard, and I only exercise indoors at a gym. I have been paying $30 per month to use the gym for the last three years.

11. I understand that EPA has issued Mercury and Air Toxics Standards (MATS) that limit toxic air pollution from coal and oil-fired power plants, and that EPA recently issued a final rule strengthening MATS ("MATS Update Rule") that will further reduce toxic air pollution from these plants. I am aware that the MATS Update Rule will require all plants, including Parish, to install a continuous emissions monitoring system for particulate matter (called PM CEMS). This new monitoring system will replace infrequent stack testing at the Parish facility and provide up to date information on particulate matter emissions to the public.
12. I understand EPA has demonstrated that plants may sometimes emit particulate matter well above levels captured by intermittent stack testing. It is possible that improved monitoring at Parish would reveal that the plant is emitting pollution in greater quantities than previously known. The plant will have to reduce emissions if they exceed the limits set in the MATS Update Rule.
13. I understand that short-term spikes in particulate matter emissions can be harmful to human health. PM CEMS would allow such short-term spikes to be detected and controlled, improving public health.
14. I also understand that PM CEMS allows for faster correction of problems with pollution control technologies. If a plant such as Parish malfunctions, PM CEMS will allow for faster detection of these issues and reduce the time that the plant is emitting above legal limits.
15. If PM CEMS is implemented at Parish, I will be able to access emissions data from the plant online and determine which times of day are better to be outdoors. Because of my experience monitoring air quality data with AAH, I will know how to read the data provided by PM CEMS and determine the safest times of day to engage in outdoor activities.

16. As a result of the advantages of PM CEMS, including quicker detection of malfunctions, public access to emissions data, and even potential reductions in particulate matter emissions, I would be more likely to engage in outdoor activities such as running and gardening if the MATS Update Rule is allowed to take effect.
17. I would also be more likely to engage in outdoor activities because PM CEMS would provide greater certainty that Parish is emitting under allowable limits.
18. The installation of PM CEMS at Parish would not only benefit me personally. It would also assist me in my work with Air Alliance Houston and would help the organization implement its core work, including raising public awareness of air pollution in the Houston area, expanding air pollution monitoring in the area, and dramatically reducing harmful emissions from the Parish facility.
19. As Research and Policy Coordinator for AAH, I have assisted with the Close Parish Coal Campaign, a campaign aimed at dramatically reducing harmful emissions from the Parish facility. As part of this campaign, I monitor Parish's applicable Clean Air Act permits, including its operating permit and new source review permits, to determine when they are eligible for renewal and help AAH participate in permit renewal processes. Participation by AAH can include increasing public awareness of and participation in the permitting process, requesting regulators to hold public hearings, participating in public hearings, and opposing permits in the rulemaking process and/or in court.
20. As part of my work with the Close Parish Campaign, I have contributed to an AAH research report titled Close Parish Coal: How the Dirtiest Coal Plant in Texas Harms Public Health and the Environment; and the Alternatives for Fort Bend. I contributed data to this report on the types of pollutants that Parish emits and their public health impacts.

21. If the Parish facility is required by the MATS Update Rule to install PM CEMS, I would be able to access continuously reported emissions data from Parish online and use it to advance AAH's mission, including the Close Parish campaign. If Parish applies to renew or amend any of its Clean Air Act permits, I would be able to use PM CEMS data to determine the facility's historical emissions, including any dangerous spikes in emissions and instances of pollution control malfunctions. My findings would then help AAH educate members of the public about the desirability of permit renewal or amendment and inform the organization's participation in the permit renewal process.
22. If I am asked by AAH to conduct further data analysis on the Parish facility, including to assist with new research reports on the facility, I would be able to use PM CEMS data to assist me in this work.
23. Because of the lack of continuous emissions monitoring at Parish, it can be challenging to educate the Fort Bend community about their risk of public health harms related to the facility. The Texas Commission on Environmental Quality (CEQ) does not currently have air monitors stationed in the area near Parish, creating a knowledge gap for emissions in that area. With publicly available PM CEMS data, my colleagues and I at AAH would be able to determine if the Parish facility regularly experiences any spikes in emissions, obtain more certainty about the facility's compliance with emissions standards, and learn quickly of any potential violations of emissions standards. This additional data would help us determine if we should advocate for more air monitoring by Texas CEQ in the Fort Bend area and if so, inform that advocacy.
24. The additional data that PM CEMS would provide would also allow my colleagues and I at AAH to raise awareness about air pollution at the Parish facility. With PM CEMS data, I

would be able to assist AAH with data analysis, data visualization, and community outreach related to any issues with the Parish facility, including dangerous spikes in emissions or instances of pollution control malfunction. AAH would be able to improve its community outreach by providing more granular emissions data that may help community members determine when it is safest to go outdoors and gain a more accurate picture of Parish emissions.

25. I am aware that various parties have challenged the MATS Update Rule and that AAH will defend it through this lawsuit.
26. If the MATS Update Rule were to be struck down, or the PM CEMS requirement was struck down, I would not personally experience the benefits of PM CEMS and would continue to avoid running or gardening outdoors.
27. In addition, if the MATS Update Rule was struck down, or the PM CEMS requirements was struck down, I would not experience the benefits of PM CEMS in my professional capacity with AAH. Without PM CEMS data, AAH would not be able to improve its core programmatic work in the manner described above.
28. For these reasons, I support AAH's efforts to protect the MATS Update Rule against attempts to weaken or eliminate it.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on – May 29, 2024

_/s/ Anthony D'Souza_
Anthony D'Souza

**DECLARATION OF JENNIFER DUGGAN**

I, Jennifer Duggan, declare and state as follows:

1. My name is Jennifer Duggan, and I am currently the Deputy Director of the Environmental Integrity Project ("EIP"). Beginning May 25, 2024, I will be EIP's Executive Director.

2. EIP is a non-profit organization based in Washington, D.C., dedicated to ensuring the effective enforcement of state and federal environmental laws to protect public health and the environment. EIP's offices are currently located at 1000 Vermont Avenue, NW, Suite 1100, Washington D.C., 20005 and 1206 San Antonio Street, Austin, TX 78701. As of June 1, 2024, EIP's D.C. office will be located at 888 17th St NW, Suite 810, Washington, DC 20006.

3. EIP was specifically founded to advocate for the effective enforcement of environmental laws pertaining to large sources of air pollution, such as power plants, due to their significant impacts on public health and the environment and the political pressures that can come into play in regulating and enforcing against these facilities.

4. As part of its mission to protect public health and the environment from the negative effects of air pollution, EIP has invested substantial time and effort documenting how air pollution from large sources threatens human health and the environment. For example, in June 2012, EIP published a report (and distributed it

to the public) with Professor Jonathan Levy of the Boston University School of Public Health, detailing how the social costs associated with the premature deaths of citizens living near certain coal-fired power plants outweigh the value of the energy these plants produce.[1] EIP frequently issues similar reports on large sources of air pollution. A more recent example is EIP's March 2024 report explaining that subsidies for the 50 plastics plants built or expanded in the U.S. since 2012 are depriving local communities of tax revenues, while the plants are also breaking pollution limits.[2] EIP uses information like this to educate the public and help ensure large pollution sources comply with state and federal environmental laws.

5. In addition to informing the public about air pollution from large sources through reports, EIP represents, on a pro bono basis, individuals and groups whose recreational, health, aesthetic, and other environmental interests are harmed by major sources of air pollution. In this representation, EIP reviews permits required under the Clean Air Act (such as "Title V" operating permits for power plants in Texas, Maryland and Pennsylvania) and challenging them when necessary, and by bringing enforcement actions when plants violate their limits.

---

[1] *See* https://environmentalintegrity.org/reports/net-loss/.
[2] *See* https://environmentalintegrity.org/reports/feeding-the-plastics-industrial-complex/.

6. EIP has also invested substantial time and effort participating in EPA's rulemakings for major sources of air toxics—including EPA's Mercury and Air Toxics Standards ("MATS") for power plants. For example, after EPA revised MATS in November 2014 to provide a loophole during the first four hours of electricity generation when power plants could choose to comply with weak work practice standards instead of numeric limits for air toxics, EIP invested significant resources in drafting a petition for administrative reconsideration of the revised startup provisions. For this reconsideration petition, EIP analyzed publicly-available emissions data to determine that EPA's revised startup provisions did not comply with the Clean Air Act. EIP also spent significant resources commenting on EPA's February 2015 proposed "technical corrections" to MATS, which dealt with (among other things) the work practice standards that certain power plants must comply with during startup periods. Further, EIP commented on EPA's 2019 proposed "residual risk and technology review" for MATS (which was finalized in 2020), as well as EPA's 2023 proposed review of the 2020 technology review.

7. Along with other environmental groups, EIP has also participated in extensive litigation over MATS. For example, EIP and other groups previously challenged (as not sufficiently stringent), in the U.S. Court of Appeals for the D.C. Circuit, certain monitoring and other provisions of the original 2012 rule promulgating MATS. In November 2014, EIP filed a complaint in federal district

court in D.C. to cure EPA's unreasonable delay in responding to a petition to reconsider certain lax monitoring provisions from MATS. In addition, in January 2015 in the D.C. Circuit, EIP filed a petition for judicial review of EPA's final startup loophole for MATS. Further, in June 2016, EIP filed a petition for judicial review of EPA's final technical corrections to MATS. And in October 2016, EIP filed a petition for judicial review of EPA's denial of the petition for administrative reconsideration of the agency's final action establishing the startup loophole. This last challenge resulted in an opinion from the D.C. Circuit vacating EPA's reconsideration denial. *See Chesapeake Climate Action Network v. EPA*, 952 F.3d 310 (D.C. Cir. 2020). And in July 2020, EIP joined a D.C. Circuit petition for judicial review of the 2020 residual risk and technology review.

8. I understand that, in May 2024, EPA finalized its review of the 2020 technology review for MATS—and that this new final rule (referred to below as the "MATS update rule") strengthens MATS in important ways, including by removing the startup loophole mentioned above, tightening the limit for particulate matter (as a surrogate for non-mercury metals) from coal-burning power plants, requiring continuous monitoring of particulate matter (again as a surrogate for non-mercury metals) at all coal- and oil-burning power plants, and tightening the mercury limit for lignite-burning plants. I further understand that 23 states have petitioned in the D.C. Circuit for judicial review of the MATS update rule. Among

those petitioners is the State of Texas, where EIP has an office and works to, among other things, reduce air pollution from power plants. Among the power plants that EPA estimates may need to update their pollution controls to meet the 2024 rule's tightened limits for particulate matter and mercury are three in Texas—the Martin Lake, Oak Grove, and San Miguel power plants.

9. If these 23 states (or any other party later challenging the MATS update rule) were successful in their challenge to the strengthened standards, this would greatly hinder EIP's organizational interests in strong and effective enforcement of the Clean Air Act and reducing air toxics and other pollution from power plants to protect public health and the environment.

10. From working in environmental law at EIP and with other nonprofit and governmental entities for approximately 17 years, I know that power plants can emit massive amounts of air toxics. If the strengthened standards from the MATS update rule were reversed, this would expose the members of the community and environmental groups that EIP represents to greater air toxics — and would harm their health, recreational, aesthetic and other interests.

11. Because power plants that have taken advantage of the MATS startup loophole (now removed by the 2024 rule) have not been required to count emissions from the first four hours of electricity generation when determining compliance with the MATS limits, the loophole has deprived EIP and our clients

and partner organizations of information regarding the effect these emissions would have on power plants' compliance with MATS during these four hours. This lack of information on startup emissions has reduced EIP's ability to disseminate—to the public —accurate information about power plant emissions during these four hours and the effect the emissions have on compliance with MATS' numeric limits.

12. While plants that have chosen the startup loophole have been required to report certain information regarding their emissions during the first four hours of generation, the information has been reported in a different format than MATS' numeric limits. Converting this startup information (reported in a different format than MATS' numeric limits) to the format of the numeric limits would require significant resources on EIP's part. And even if accurate conversion were possible, it would be impossible to determine for sure the effect these emissions would have on compliance for the plants that choose to use the startup loophole. Removing the startup loophole, on the other hand, will allow EIP to better determine plants' emissions during these four hours and the effect of those emissions on compliance.

13. In addition, MATS currently allows power plants to determine compliance with limits for non-mercury metals through quarterly stack tests for particulate matter. Quarterly stack testing cannot ensure that plants are meeting the MATS

limits during the months in between tests. This has deprived EIP and our partner and client groups of accurate information regarding power plant emissions of non-mercury metals (and particulate matter) during the many days in between tests—and has reduced EIP's ability to disseminate to the public accurate information regarding plants' emissions of these pollutants in between tests. On the other hand, the MATS update rule's requirement for continuous monitoring of particulate matter will allow EIP to better determine plants' emissions of non-mercury metals (and particulate matter) and determine whether plants are actually complying with their MATS (and other) limits.

14. If the strengthened standards from the MATS update rule were vacated, this would cause EIP to invest considerably more of its own limited resources to, among other things:

a. analyze emissions of air toxics from power plants during the first four hours of electricity generation in the format they are reported and try to convert them into the format of MATS' numeric limits; and

b. pursue other means to limit and better monitor the emissions of air toxics (and thus gain information on those emissions) from power plants, including (but not limited to) reviewing, commenting on, petitioning on, and litigating over Clean Air Act Title V operating

permits in the hope of obtaining meaningful and enforceable permit conditions, including monitoring and reporting provisions.

15. If the strengthened standards from the MATS update rule were to stand, this would allow EIP to use its limited resources to continue other work to ensure effective enforcement of environmental laws, educate the public on pollution from large stationary sources, and represent communities harmed by pollution from these sources. The MATS update rule's stronger standards for air toxics from power plants would also greatly support EIP's efforts to protect the public and the environment from toxic air pollution.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 20th day of May, 2024.

Jennifer Duggan, Deputy Director
Environmental Integrity Project

# DECLARATION OF ANNIE FOX

I, Annie Fox, declare and state as follows:

1. This declaration is based on my personal and professional knowledge, information, and belief. I am over the age of eighteen (18) and suffer no legal incapacity.

2. I submit this declaration in support of the Motion to Intervene in Support of Respondent U.S. Environmental Protection Agency ("EPA") by Clean Air Council ("CAC" or "the Council") in challenges to EPA's National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38,508 (May 7, 2024) (the "Final Rule"). The Final Rule establishes new emissions limits for filterable particulate matter from coal-fired power plants and requires that they use continuous emissions monitoring systems for particular matter ("PM CEMS)" to demonstrate compliance with emissions limits. It also establishes new emissions limits for mercury from coal-fired power plants burning lignite coal.

3. I am currently a Law Clerk for CAC, as I have been since January 2022. My duties include regularly meeting with our members and supporters who suffer health and other injuries from air pollution; researching and drafting

comments on proposed federal, state, and local regulations related to air quality, environmental health, and environmental justice; and supporting CAC's community advocacy, regulatory work, and litigation with the goal of improving Pennsylvania's air quality and the health of those in the region, including CAC's members. I also participated in the development of CAC's Strategic Plan. My duties have required me to be familiar with the organization's structure, function, purpose, and membership.

4. CAC is incorporated in Pennsylvania with headquarters in Philadelphia, Pennsylvania. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

5. CAC has thousands of members throughout Pennsylvania and the Mid-Atlantic Region. CAC's members and supporters include people who live and work near coal-fired power plants and residents of environmental justice communities that have long been overburdened with the cumulative effects of air pollution from industrial and vehicular sources, many of whom seek to protect themselves and their families from health burdens caused by air pollution.

6. CAC is dedicated to protecting and defending everyone's right to a healthy environment, including everyone's right to breathe clean air. The Council works through a broad array of sustainability and public health initiatives using

public education, community action, government oversight, and enforcement of environmental laws.

7. CAC works to achieve its mission through advocacy and legal action. CAC's programmatic activities include advocating for clean air and stringent emissions standards for power plants. CAC's work includes a focus on ensuring that national standards for health-damaging air pollutants, like fine particulate matter ("$PM_{2.5}$"), are met.

8. The purpose of my declaration is to provide organizational information regarding CAC's support of the Final Rule. The Council has a long and extensive history of advocating for stronger local, state, and federal regulations to reduce air pollution in the form of $PM_{2.5}$, ozone, nitrogen oxides, sulfur dioxide, volatile organic compounds, greenhouse gasses, and hazardous air pollutants ("HAPs"). The Council has also regularly been a plaintiff or intervenor in litigation to challenge inadequate air pollution permits or support regulations that protect public health and air quality. For example, in 2013 the Council intervened in support of the EPA in challenges to EPA's Reconsideration of Certain New Source Issues: National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units, 78 Fed. Reg.

24,703 (April 24, 2013). Taking legal action in support of the Final Rule is well within CAC's organizational mission and interests.

9. The Council's support for the Final Rule is firmly rooted in science. Exposures to higher levels of particulate matter increase the risk of developing respiratory and cardiovascular illnesses, may increase dementia risk, and has a causal relationship to an increased risk of premature death, among other serious harms. These effects are keenly felt by the Council's members and their families, perhaps most acutely in environmental justice communities where the health injuries are often compounded by inadequate access to health care and the cumulative pollution from a concentration of polluting industrial facilities.

10. From my work at the Council, I know that these fine particles, less than 2.5 microns in diameter, are small enough to penetrate the lungs and may pass into the bloodstream. Multiple peer-reviewed studies have found that there is no safe exposure threshold and that there is a causal relationship between chronic $PM_{2.5}$ exposure levels and childhood asthma and impeded lung development. Even short-term spikes of a few hours are associated with increased hospitalizations, emergency room visits, cardiac arrests, blood pressure spikes, and other cardiovascular injuries.

11. The Final Rule is projected to significantly decrease emissions of $PM_{2.5}$ and HAPs from coal-fired power plants that can have a range of negative health impacts including asthma attacks, lung cancer, strokes, and premature death.

12. Additionally, CAC has many members with respiratory and cardiovascular conditions, including asthma, who face increased risk of asthma attacks, heart attacks, hospitalizations, and missed work because of elevated concentrations of particulate matter, including from coal-fired power plants.

13. Just in Pennsylvania, the Final Rule will most likely result in (1) more stringent emissions limits for filterable $PM_{2.5}$ and non-mercury metals at six power plants, (2) the installation of PM CEMS at three power plants, and (3) both measures being required at an additional three power plants.

14. The standards will have tangible benefits for people at risk of adverse health effects from these pollutants.

15. PM CEMS at the Pennsylvania coal-fire power plants will have multiple benefits for CAC's members, including increased transparency regarding the emissions from the plants, and, more significantly, PM CEMS would make it clear when PM controls are not performing properly. This would allow the controls to be repaired more quickly and reduce the harmful exposure that injures our members' health.

16. The Final Rule will thus directly reduce the health impacts by establishing stronger emission standards and indirectly through the increased compliance and enforcement made possible through the installation of PM CEMS.

17. CAC also has members and supporters throughout the Mid-Atlantic region who are over age 65 or who have children under age 18. Additionally, part of the Council's work is to encourage people to bicycle and walk more frequently, including by commuting to work and by enjoying hiking on nature trails. The scientific community warns that elevated $PM_{2.5}$ concentrations present a greater risk of harm to individuals in the above-referenced age groups and people who regularly engage in outdoor exercise. This means that elevated $PM_{2.5}$ levels directly interfere with the Council's goal of reducing pollution and promoting health by spurring our members and the public to spend more time walking and biking outdoors.

18. CAC's members and supporters throughout the Mid-Atlantic region have a strong interest in supporting the Final Rule and its positive effect on air quality and respiratory health. For all these reasons, the Council supports the Final Rule.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 31st day of May 2024.

Annie Fox

Annie Fox

1617 JFK Boulevard, Suite 1130
Philadelphia, PA 19103

**DECLARATION OF STEVE GILBERT**

I, Steve Gilbert, hereby state as follows:

1. My name is Steve Gilbert. I reside in Helena, Montana. I am a citizen of the United States and am over 18 years of age. I am a member of the Montana Environmental Information Center (MEIC) and Sierra Club.
2. I have been a Montana resident since 1967. For forty-one of these years I have worked as a biological consultant. For twenty-five years I was part-owner and president of an environmental consulting company that specialized in wildlife, aquatic/fisheries, soils, vegetation, forestry, range, and hydrology. Separate from my business, I worked in Yellowstone and Glacier National Parks studying grizzly bears and cliff-nesting falcons, respectively. I am an associate with the Montana Peregrine Institute, and have conducted neo-tropical bird and raptor surveys in Montana and other parts of the west nearly every year since 1971.
3. I am a longtime environmental advocate and have served for a number of years on the boards of various conservation groups in Montana, including MEIC, the Northern Plains Resource Council, Great Old Broads for Wilderness, and the Western Lands Council. I am currently a board member of MEIC. I was chosen as the MEIC Community Activist of the Year in 2003. In 2013, I was awarded the Len and Sandy Sargent award for meritorious service award by MEIC. In 2017, I was awarded the Conservationist of the Year award.
4. I have testified before the Montana Legislature and the U.S. Senate on water and air quality, soils, aquatics, and wildlife habitat issues relating to irresponsible energy development, coal, and hard-rock mines.
5. I was a professional licensed Montana fly fishing guide for 20 years. During those years, I guided on nearly every trout stream of note in Montana. I was an Orvis endorsed guide for many

years and was named Orvis National Guide of the Year in 1990. I am no longer a guide, but still enjoy fishing on my own in streams and rivers around the state.

6. I have worked and/or recreated in all 56 Montana counties and every mountain range, wilderness area, and national park in the state. I have skied and walked through the Bob Marshall and Scapegoat Wilderness, the Mission Mountain Wilderness, Bitterroot-Selway Wilderness, Absaroka-Beartooth Wilderness, and into every corner of Yellowstone and Glacier Parks. I have paddled thousands of miles in Montana's spectacular canoe waters.

7. I retired in early 2012 as the state non-motorized trails specialist for Montana Fish, Wildlife, and Parks. As such, I helped administer the federally-funded $1.5 million Recreational Trails Program and inspected trails projects funded by the program, walking many miles a year in the backcountry. I also worked part-time with the Land and Water Conservation Fund and inspected projects that were supported by the Fund in every county of the state.

8. In the past ten years, I have inspected 15-20 different projects for the Land and Water Conservation Fund in and around Colstrip, MT, where the Colstrip Coal-fired Power Complex is located. I also visit the Colstrip area at least once a year for recreation or for my work as a board member of conservation organizations. I expect to continue to visit the Colstrip area at least on an annual basis in the coming years. There is some exceptionally beautiful country near Colstrip, including the West Fork Armells Creek drainage.

9. My enjoyment of the Colstrip area is negatively impacted by the Colstrip power plant, which is a major source of toxic air pollution in Montana. Though two of the units at the plant recently shut down, two are still operating.

10. I am aware that coal-fired power plants like Colstrip emit dangerous pollutants such as mercury, toxic metals, and acid gases, as well as particulate matter, sulfur dioxide, nitrogen oxides, and

other pollutants. I am also aware that exposure to these sorts of pollutants can cause asthma, cardiovascular disease, neurological disorders, and cancer. Because of my awareness of the pollution emitted from the plant and its potential health effects, it is extremely difficult for me to have positive recreational experiences in the outdoors near Colstrip.

11. I also know that coal-fired power plants such as Colstrip deposit significant quantities of mercury into nearby water bodies which bio-accumulates in fish. As an avid hunter and fisherman, I am deeply concerned about the impacts that the plant's mercury emissions have on fish and wildlife in the area.

12. I understand that EPA—through the Mercury and Air Toxics Standards (MATS Rule)—set standards to reduce toxic pollution from coal-fired power plants and limit the impact of this pollution on the health of those who are exposed to it.

13. If the MATS Rule were weakened or eliminated, toxic air emissions from the Colstrip plant would likely increase. This, in turn, would increase my level of concern about the ecological and health impacts caused by the plant's emissions and would make me less likely to recreate in the area.

14. If EPA were to strengthen the MATS Rule to require greater emissions reductions, then many of my concerns would be alleviated.

15. For these reasons, I support MEIC's effort to protect the MATS Rule against attempts to weaken or eliminate it. I also support MEIC's effort to strengthen the MATS Rule to further reduce dangerous emissions from coal-fired power plants.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 14, 2020.

Steve Gilbert

**DECLARATION OF BERNARD D. GOLDSTEIN, MD**

I, Bernard D. Goldstein, hereby declare and state as follows:

1. I am a resident of Anchorage, Alaska. I also maintain apartments in which I periodically reside in Pittsburgh, Pennsylvania, and Brooklyn, New York. I submit this declaration in support of the American Public Health Association's ("APHA") Motion to Intervene as a respondent in the Petition for Review filed by the State of North Dakota, et al., (D.C. Cir. #24-1119), and consolidated cases. The Petition for Review challenges the final rule promulgated by the U.S. Environmental Protection Agency ("EPA") updating and strengthening the Mercury and Air Toxics Standards. I understand that the updated rule was published in the Federal Register at 89 Fed. Reg. 38,508 (May 7, 2024) (the "2024 MATS Rule"). This declaration is based on my personal knowledge, information, and belief.

2. I have been a member of APHA for many years. As a longstanding member, I support APHA's efforts to advance the health of all people and all communities, to promote wellness, and to advocate for public health issues and policies that are well-grounded in scientific research.

3. I received an M.D. from the School of Medicine of New York University in 1962. I did my internship and residency training in Internal Medicine at Bellevue Hospital in New York, and from 1965-1966, I was a National Institutes of Health Post-Doctoral Fellow in Hematology at Bellevue Hospital. I was Board certified in Internal Medicine, in Hematology, and in Toxicology, before I retired as a practicing physician. I currently am Professor Emeritus of Environmental and Occupational Health at the University of Pittsburgh Graduate School of Public Health, and a Clinical Professor in the Department of Environmental and Occupational Health at Rutgers School of Public Health. I have written numerous articles in peer-reviewed

journals on various topics regarding the intersection of public health and environmental issues. Earlier in my career, I was the Assistant Administrator for Research and Development at EPA, from 1983-1985, and was appointed to this position by former President Ronald Reagan. Before joining EPA, I also chaired the Clean Air Scientific Advisory Committee.

4. I am aware that the initial MATS Rule, which EPA adopted in 2012, established national limits on emissions of mercury and other hazardous air pollutants from coal-fired and oil-fired power plants. I also am aware that coal-fired power plants emit scores of hazardous air pollutants that are linked to numerous adverse health conditions, including impacts on respiratory and cardiovascular systems. In addition, I understand that, before EPA adopted the MATS Rule in 2012, coal-fired power plants accounted for the largest U.S. source of mercury, among other hazardous air pollutants, and that they were also a major source of non-mercury metallic and metalloid hazardous pollutants, including arsenic, chromium, and others.

5. I am generally aware that the 2024 MATS Rule tightens the filterable matter ("fPM") standard—which serves as a surrogate for non-mercury hazardous air pollutants ("HAP") metals—from 0.030 lb/MMBtu to 0.010 lb/MMBtu. I understand that EPA estimates that, as a result of the 2024 MATS Rule, emissions of fine particulate matter ($PM_{2.5}$) from coal-fired power plants will be reduced by 5,400 tons within the first decade.

6. I also understand that the 2024 Rule requires power plants to employ continuous emissions monitoring systems ("CEMS") for fPM, which will provide more accurate data that, in turn, will allow any non-compliance issues to be more effectively detected and corrected. I am aware that available technology now makes these new requirements feasible and practicable—representing a vast improvement over earlier techniques—that will help to better protect public health.

7. Fine particulates are particularly harmful to human health because they are small enough to enter deep into one's lungs and may, in some instances, even enter the blood stream, from where they can reach every organ of the human body. I also am aware that fine particulate matter can travel hundreds of miles from the source of the pollution, such that emissions from coal-fired power plants in Pennsylvania, Indiana, and West Virginia, for example, can be carried across state lines into New York and New England as well as to Arctic areas particularly putting Native Alaskan seafood gatherers at risk.

8. In addition to my professional interests, I have a personal stake in ensuring that the 2024 MATS Rule, and the concomitant reduction of emissions of $PM_{2.5}$ from coal-fired power plants, is upheld. My son, who lives in Brooklyn, N.Y., recently was operated on to remove a lesion in his lung, which also necessitated the removal of a whole lobe of his lung. As a result, my son will have some permanent impairment of his lungs, making him more vulnerable to emissions of $PM_{2.5}$ from coal-fired power plants.

9. Exposure to $PM_{2.5}$ can result in not only reduced lung function but also permanent lung damage. Multiple studies have demonstrated long-term reductions in lung function in both healthy patients—and in those, like my son, with underlying lung impairment—that correlate with exposure to $PM_{2.5}$. The adverse effects from fine particulate matter are also cumulative. I am concerned that if the stricter standard for $PM_{2.5}$ emissions from coal-fired power plants is overturned as a result of the ongoing litigation, my son's health may be further compromised. I thus have a concrete, personal interest in the outcome of the litigation.

10. I am also familiar with studies demonstrating that air pollution (including fine particulate matter) disproportionately affects lower income and minority populations, in part because industries, including coal-fired power plants, often are located either in close proximity or

that hazardous air emissions from coal-fired power plants will continue to seriously affect public health and disproportionately impact communities that are already historically overburdened by air pollution.

11. I also am aware that the 2024 MATS Rule strengthens the mercury emissions standards for coal-fired power plants that burn lignite, by requiring such plants to meet the same standards as those that apply to non-lignite-burning power plants. EPA's tighter limits on mercury emissions from lignite-fired power plants will provide vital protections to infants, children, and developing fetuses, whose brains and nervous systems are highly vulnerable to damage by toxic chemicals, including mercury. When coal is burned, mercury is released into the atmosphere and is then returned to the earth through precipitation, and eventually is deposited in streams, lakes, rivers, and oceans, including into Arctic areas. Once mercury enters a waterway, it is converted into methylmercury, a potent neurotoxin. Methylmercury persists in the environment, and it bioaccumulates in the aquatic food chain. The main route of human exposure to methylmercury is through consumption of fish contaminated with methylmercury.

12. I believe that the tighter limits in the 2024 MATS Rule on mercury emissions from lignite-fired power plants is long overdue to protect public health.

13. My stepdaughter is an Alaskan resident of child-bearing years, and, like many people living in Alaska, a large part of her diet consists of commercially and recreationally caught fish. Given the amount of fish that she eats, the stronger limits for mercury emissions from lignite-fired power plants set forth in the 2024 MATS Rule will provide important additional protections for my stepdaughter's health.

14. I am concerned that a reversal or weakening of the 2024 MATS Rule as a result of the litigation will mean that hazardous air emissions from coal-fired and oil-fired power plants will

14. I am concerned that a reversal or weakening of the 2024 MATS Rule as a result of the litigation will mean that hazardous air emissions from coal-fired and oil-fired power plants will continue to seriously affect public health and the health of my family. I have a direct and concrete personal interest and professional interest in protecting public health and the health of my family from these dangerous emissions. A court decision fully upholding EPA's 2024 MATS Rule will redress these concerns.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 5/26/2024

Bernard D. Goldstein, M.D.

**DECLARATION OF JENNIFER HADAYIA**

1. My name is Jennifer Hadayia. I reside in Houston, Texas. I am a citizen of the United States and am over 18 years of age.

2. I am the Executive Director of Air Alliance Houston (AAH), founded in 1988, and I have served in this role since November 15, 2021. I have a master's degree in public policy and administration. Previously, I worked for Legacy Community Health Services, Inc., the largest Federally Qualified Health Center in the state of Texas, as the director of their public health department. Before that, I oversaw health equity initiatives for Harris County Public Health. Through this work, I gained knowledge of the impacts of air pollution on health as well as experience working with communities concerned about health inequities.

3. AAH is a non-profit advocacy organization whose mission is to reduce the public health impacts of air pollution in Harris County and Houston, Texas. This includes the health impacts of toxic power plant emissions. We pursue our mission by conducting applied research on air pollution, educating the community about the harms of air pollution and its sources, and advocating for improvements at the local, state, and national levels. We work closely with constituents to provide the training and technical assistance they need to address air pollution in their daily lives. AAH is the only organization in the greater Houston area that is solely dedicated to improving air quality in the region.

4. In addition to our work in Harris County and Houston, AAH has campaigns in Fort Bend County, as well as across the Gulf Coast, from Corpus Christie to Port Arthur. The organization regularly engages with Fort Bend community members, partnering with other organizations to circulate petitions, canvass, hold town halls, and conduct other forms of outreach. These outreach efforts have been welcomed by community members, who want more transparency around their exposure to harmful emissions in their communities.

5. AAH currently has about 2,000 people who have signed up to be on the organization's communications distribution list. These individuals receive AAH communications online and participate in AAH-hosted events.

6. Through our research, we have observed that air pollution exposure is concentrated in communities in Harris County and Houston that are predominantly people of color and lower income. This is due to the presence of multiple air pollution sources being historically and consistently located in these communities, such as refineries and major roadways. Disproportionately minority and lower income populations are also more susceptible to the health effects associated with poor air quality and have less access to health care. Working to remedy this type of unfairness is a core part of AAH's mission.

7. An important part of our work, related to both reducing air pollution and correcting injustice, is monitoring air pollution in disproportionately impacted communities. AAH hosts a network of air monitors in communities suffering from disproportionate exposure to harmful air pollution; these monitors routinely find harmful levels of particulate matter, volatile organic compounds, ozone, and nitrogen oxides. AAH uses the data gathered by these air monitors to educate communities on their exposure to pollution and advocate for more stringent protections. For example, AAH uses its monitoring data to create interactive air pollution dashboards on its website; the public can view these dashboards to learn of air pollution concerns in their area.

8. In 2022, AAH started the Close Parish Coal campaign, after a chemical disaster at the WA Parish coal-fired power plant hospitalized six plant employees and exposed more than one hundred employees to harmful chemicals. The campaign aims to dramatically reduce harmful emissions from the Parish facility.

9. As part of the Close Parish Coal campaign, AAH authored a report titled, "Close Parish Coal: How the Dirtiest Coal Plant in Texas Harms Public Health and the Environment; and the Alternatives for Fort Bend." This report explained that the Parish facility emits harmful pollutants including mercury, non-mercury metals, particulate matter, sulfur dioxide, and nitrogen oxides. The report proposed decommissioning the coal-burning units at the Parish facility and converting them to natural gas or solar units.

10. The "Close Parish Coal" report also described the toll that Parish emissions take on Fort Bend County, where the plant is located. On average, the Fort Bend community experiences higher average annual particulate matter pollution than both Texas and the United States. In addition, heart and lung disease are among the leading causes of death in Fort Bend, and particulate matter pollution can cause or worsen both of these conditions.

11. The "Close Parish Coal" report notes that, according to the Environmental Protection Agency's EJScreen mapping system, about 70% of the population in Fort Bend County are people of color, 22% are low-income, and 39% are vulnerable due to their age (under 18 or over 65). Emissions from Parish impact about 83,000 students in nearby school systems.

12. AAH routinely participates in public rule-making processes to address air pollution, including power plant emissions, in the Houston and Harris County area. We regularly testify on proposed rules and regulations that may have impacts on air quality and, subsequently, public health. We participate on regional air quality committees and weigh in at the federal and state levels on plans to limit power plant emissions and other forms of air pollution. We also engage in permitting processes for power plants by submitting public comments. I am usually the person providing such testimony at public hearings.

13. The organization is planning on participating in permitting processes for Parish as early as this year. Parish is currently seeking to renew its federal operating permit under the Clean Air Act, and the draft permit is expected to be released later this year. Parish is also requesting an amendment to its new source review permit because the plant is going to install a new water processing facility that will cause an increase in emissions. We plan to participate in both proceedings.

14. As a result of my work, I am aware that coal-fired power plants such as Parish emit harmful pollutants such as mercury and toxic metals, as well as particulate matter, sulfur dioxide, nitrogen oxides, and other pollutants. I am also aware that exposure to these sorts of pollutants can cause asthma, cardiovascular disease, neurological disorders, and cancer.

15. As a result of my work, I am aware that EPA has issued Mercury and Air Toxics Standards (MATS) that limit toxic air pollution from coal and oil-fired power plants, and that EPA recently issued a final rule strengthening MATS ("MATS Update Rule") that will further reduce toxic air pollution from these plants. I am aware that the MATS Update Rule will require all plants, including Parish, to install a continuous emissions monitoring system for particulate matter (called PM CEMS). This new monitoring system will replace infrequent stack testing at the Parish facility and provide up to date information on particulate matter emissions to the public.

16. I understand EPA has demonstrated that plants may sometimes emit particulate matter well above levels captured by intermittent stack testing. It is possible that improved monitoring at Parish would reveal that the plant is emitting pollution in greater quantities than previously known. The plant will have to reduce emissions if they exceed the limits set in the MATS Update Rule.

17. I understand that short-term spikes in particulate matter emissions can be harmful to human health. PM CEMS would allow such short-term spikes to be detected and controlled, improving public health.

18. I also understand that PM CEMS allows for faster correction of problems with pollution control technologies. If a plant such as Parish malfunctions, PM CEMS will allow for faster detection of these issues and reduce the time that the plant is emitting above legal limits.

19. The installation of PM CEMS would help AAH implement its core work, including raising public awareness of harmful emissions from the Parish facility, expanding air pollution monitoring in the Harris County and Houston areas, and dramatically reducing harmful emissions from the Parish facility. If Parish reduces emissions, or takes steps to limit harmful spikes in emissions, as a result of installing PM CEMS, such reductions would directly further AAH's mission of minimizing the public health impacts of air pollution in the greater Houston area.

20. Continuously reported and publicly available PM CEMS data would help AAH participate in permitting processes related to the Parish facility. When Parish applies to renew or amend any of its air pollution permits, AAH would be able to use PM CEMS data to educate members of the public about the plant's historical emissions, any dangerous spikes in emissions, and instances of pollution control malfunctions. This information would assist AAH and its constituents determine whether to oppose any permit amendments or renewals and, if so, inform any opposition efforts.

21. PM CEMS data would also assist AAH in its research mission. With access to PM CEMS data, AAH would be able to more easily determine the plant's level of compliance with emissions standards and the threat that the plant's emissions pose to public health. AAH would

be able to use this information to produce updated fact sheets and talking points educating the public on the Parish facility.

22. Because of the lack of continuous emissions monitoring at Parish, it can be challenging to educate the Fort Bend community about their risk of public health harms related to the facility. The Texas Commission on Environmental Quality (CEQ) does not currently have air monitors stationed in the area near Parish, creating a knowledge gap for emissions in that area. With publicly available PM CEMS data, AAH would be able to determine if the Parish facility regularly experiences any spikes in emissions, obtain more certainty about the facility's compliance with emissions standards, and learn quickly of any potential violations of emissions standards. This additional data would help us determine if we should advocate for more air monitoring by Texas CEQ in the Fort Bend area and if so, inform that advocacy.

23. The additional data that PM CEMS would provide would also allow AAH to raise more awareness about air pollution at the Parish facility. With PM CEMS data, AAH would be able to perform community outreach related to potential problems with the Parish facility, including dangerous spikes in emissions or instances of pollution control malfunction. AAH would be able to improve its community outreach with respect to Parish by providing more granular emissions data that may help the Fort Bend community determine when it is safest to go outdoors, as well as generally gain a more accurate picture of Parish emissions.

24. I am aware that various parties have challenged the MATS Update Rule and that AAH will defend it through this lawsuit.

25. If the MATS Update Rule were struck down, or the PM CEMS requirement were struck down, AAH would not be able to improve its core programmatic work in the manner described above.

26. For these reasons, I support AAH's efforts to protect the MATS Update Rule against attempts to weaken or eliminate it.

I declare under the penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: May 29, 2024

Jennifer Hadayia

Jennifer M. Hadayia, MPA

**DECLARATION OF DAVID G. HILL, MD, FCCP**

I, David G. Hill, hereby declare and state as follows:

1. I am a resident of Middlebury, Connecticut. I submit this declaration in support of the American Lung Association's Motion to Intervene as a respondent in the litigation filed by the State of North Dakota, et al., (D.C. Cir. #24-1119), challenging the final rule promulgated by the U.S. Environmental Protection Agency ("EPA") updating and strengthening the Mercury and Air Toxics Standards, 89 Fed. Reg. 38,508 (May 7, 2024) (the "2024 MATS Rule"). This declaration is based on my personal knowledge, information, and belief.

2. I have been actively involved with ALA for nearly thirty years, and I currently serve on several of ALA's Boards, including ALA's Board of Directors. I am also chair-elect of the Board of Directors and chair of ALA's Public Policy Committee. I fully support ALA's vision of a world free of lung disease and its mission to save lives by improving lung health and preventing lung disease through research, education, and advocacy, including legal actions when necessary.

3. I received an M.D. from the Medical College of Pennsylvania in 1991. I am Board certified in Internal Medicine, in Pulmonary Medicine, and in Critical Care Medicine. I am a practicing pulmonologist and critical care physician with the Waterbury Pulmonary Associates in Waterbury, Connecticut, and I am also the Director of Clinical Research there. In addition, I am an assistant clinical professor of medicine both at the Yale University School of Medicine and at the Quinnipiac University School of Medicine in North Haven, Connecticut. I have also been the principal investigator for more than 125 clinical research studies, including both inpatient and outpatient trials related to lung diseases.

4. In my practice I see patients who suffer from acute and chronic pulmonary conditions, including, among other diseases, asthma and chronic obstructive pulmonary disease ("COPD"). Asthma is a chronic lung disease in which a patient's airways narrow and become inflamed, leading to tightness of the chest, coughing, wheezing, and shortness of breath. Some patients with asthma also suffer from acute asthma attacks that may result in emergency room visits and require hospitalization. COPD is a chronic inflammatory lung disease that causes obstructed airflow. Symptoms can include chronic coughing, difficulty in breathing or shortness of breath, and wheezing. Patients with COPD may also experience episodes during which their symptoms get significantly worse—referred to as exacerbations. The disease can lead to serious long-term disability or premature death. As a critical care physician, I also see substantial numbers of patients with cardiovascular disease. My patients come from among the populations that ALA serves.

5. I am aware that the initial MATS Rule, which I understand EPA adopted in 2012, established national limits on emissions of mercury and other hazardous air pollutants from coal-fired and oil-fired power plants. I am aware that coal-fired power plants emit scores of hazardous air pollutants that are linked to numerous adverse health conditions, including impacts on respiratory and cardiovascular systems. I also understand that, before the MATS Rule was adopted in 2012, coal-fired power plants accounted for the largest U.S. source of mercury, among other hazardous air pollutants, and that they were also a major source of non-mercury metallic and metalloid hazardous pollutants, including arsenic, chromium, and others. I am generally aware that most power plants have been in compliance with the 2012 MATS limits for several years now.

6. I am aware of certain improvements in the 2024 MATS Rule. The Rule tightens the filterable particulate matter (fPM) standard—which serves as a surrogate for non-mercury hazardous air pollutants (HAP) metals—from 0.030 lb/MMBtu to 0.010 lb/MMBtu. As a result, EPA estimates that the 2024 MATS Rule will reduce fine particulate matter ($PM_{2.5}$) emissions by 5,400 tons within the first decade. There is no level of exposure to $PM_{2.5}$ that is known to be safe, even where the National Ambient Air Quality Standards are not violated. The Rule's tighter limit will therefore better protect the health of my patients, my own health, and the health of my family. Any rule that lessens $PM_{2.5}$ emissions protects my concrete personal and professional interests. Conversely, any attempt to weaken or undo limits on $PM_{2.5}$ emissions threatens those same concrete interests.

7. I also understand that the 2024 Rule requires power plants to employ continuous emissions monitoring systems (CEMS) for fPM. I am generally aware that the use of CEMS will provide more accurate data that in turn will allow any non-compliance issues to be more effectively detected and corrected. I generally understand that available technology now makes these new requirements feasible and practicable, and thus will help to better protect public health. I also generally understand that the 2024 MATS Rule strengthens the mercury emissions standards for coal-fired power plants that burn lignite by requiring such plants to meet the same standards as those that apply to non-lignite-burning power plants.

8. I am aware that several states, including the State of North Dakota, et al., have filed a petition for judicial review challenging the 2024 MATS Rule, Case No. 24-1119 (D.C. Cir. filed May 8, 2024). I am concerned that a reversal of the 2024 MATS Rule will mean hazardous air emissions from coal-fired power plants will continue to seriously affect public health, the health of my patients and their families, and my own health and the health of my family.

9. I understand that the control technologies used to reduce hazardous air pollutant emissions by their very nature necessarily result in concomitant reductions of $PM_{2.5}$. Fine particulate matter can travel hundreds of miles from the source of the pollution, such that emissions of $PM_{2.5}$ from coal-fired power plants located in other states, including Pennsylvania, Indiana, and West Virginia, are carried across state lines into Connecticut. The further reduction of $PM_{2.5}$ is vital to the numerous patients I treat who have asthma, COPD, and other lung diseases, because inhalation of fine particulate matter can lead to and exacerbate these and other respiratory conditions. Exposure to $PM_{2.5}$ can result in not only reduced lung function but also permanent lung damage. Multiple studies have demonstrated long-term reduction in lung function in both healthy patients and those with underlying lung disease that correlate with exposure to $PM_{2.5}$.. The adverse effects from fine particulate matter are also cumulative, and long-term exposure has been linked to increased risk for developing COPD.

10. I am also familiar with studies demonstrating that air pollution (including fine particulate matter) disproportionately affects lower income populations, in part because industries often are located in close proximity to areas where individuals with lower incomes live and because lower income communities are more likely to be located downwind from sources of air pollution. A substantial number of my patients have lower incomes. I am very concerned that without the long overdue ratcheting down of emissions of hazardous air pollution from coal-fired power plants, my patients' health will continue to suffer, potentially leading to increases in trips to the emergency room and hospitalizations.

11. In addition to my personal and professional concerns for my patients, I also would be personally and adversely affected by the overturning or weakening of EPA's 2024 MATS Rule. I have exercise-induced asthma, and I sometimes must use an inhaler when engaging in outdoor

activities that I enjoy. The stricter standards for the emissions of hazardous air pollutants, and of fine particulate matter from coal-fired power plants in particular, better protects my health, while the reversal of the 2024 MATS Rule will only lead to the continued exacerbation of the health impacts I currently suffer and may require that I curtail some of my normal outdoor activities. In addition, I am concerned about the health of my family. My elder daughter, who enjoys outdoor recreational activities such as running, also has exercise-induced asthma, and she has to use an inhaler before she runs. I am concerned that any reversal of the 2024 MATS Rule will harm my daughter's health by potentially making the asthma attacks she endures more frequent and more severe.

12. While EPA indicates that the monetized benefits from the 2024 MATS Rule are less than the costs, the non-monetized benefits that are a direct result of the MATS Rule, including in particular the benefits from the reductions in fine particulate matter—specifically $PM_{2.5}$—far outweigh the costs of the tightened rule in my opinion.

13. I have a direct and concrete professional and personal interest in protecting the health of my patients, my family's health, and my health that will be harmed by any weakening or reversal of EPA's 2024 MATS Rule. A court decision upholding EPA's 2024 MATS Rule will redress these concerns.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 5/24/2024

David G. Hill, M.D.

USCA Case #24-1119 Document #2057679 Filed: 06/03/2024 Page 92 of 223

**DECLARATION OF DERF JOHNSON**

I, Derf Johnson, declare as follows:

1. I am over 18 years of age and competent to give this declaration. I have personal knowledge of the following facts, and if called as a witness could testify competently to them. As to those matters which reflect an opinion, they reflect my personal experience, opinion and judgment on the matter.

2. I am a lifelong resident of Montana, and currently reside in Helena, Montana.

3. I have been a member of the Sierra Club since 2018. I am also a member and an employee of the Montana Environmental Information Center ("MEIC"), at which I currently serve as Deputy Director and am responsible for overseeing and supporting programs seeking to maintain a clean and healthful environment for all Montanans. In those capacities, I have worked to address the environmental problems associated with natural resource extraction, with a specific focus on fossil fuel development and climate change.

4. I am a graduate of the University of Montana School of Law. I chose to stay in Montana after law school and begin my career in environmental and natural resources law. I regularly testify before the Montana legislature, state boards, and commissions, on the environmental impacts associated with energy development in Montana, including testimony on the pollution associated with such development. I feel strongly that Montana is one of the most beautiful and spectacular landscapes on Earth and must be protected.

5. I enjoy a variety of outdoor recreational activities. In particular, my hobbies include fishing, swimming, floating on water bodies and riverways, and hunting. I also find great joy in observing the state's abundant wildlife, including bald eagles, elk, and grizzly bears. I spend a majority of my leisure time outdoors, and regularly travel around the state.



(Page 92 of Total)

USCA Case #24-1119 Document #2057679 Filed: 06/03/2024 Page 93 of 223

6. I have regularly visited the Colstrip area for over a decade for both work and leisure purposes. When I first started working at MEIC, I would travel to the Colstrip area once every few months to meet with our members and assess the ecological and policy issues in the area. Since 2016, I travel to the Colstrip area at least one to two times a year. My most recent visit to Colstrip was in December 2023 where I witnessed and photographed devastating ecological damage from the expansion of the Rosebud mine, the coal mine directly adjacent to the Colstrip plant that exclusively supplies its coal. I will continue visiting Colstrip and the surrounding area for both work and pleasure, and I am currently planning a trip to Colstrip in mid-summer.

7. I've always had an appreciation for the beautiful landscape of Eastern Montana with its sandstone cliffs, grasslands, rolling hills, and Ponderosa Pine stands. Southeastern Montana in particular is one of the more beautiful and majestic places that I've had the good fortune of visiting. However, on my trips to Colstrip over the past decade, it is really shocking to have watched the landscape continue to degrade because of the Colstrip power plant and associated mining operations. It is disconcerting to see the billowing smokestacks of toxic chemicals in the midst of an otherwise beautiful town with abundant wildlife. The damage I have witnessed, caused by the Colstrip plant, significantly degrades my experience visiting southeastern Montana. At times, I've seen Colstrip's pollution billowing into the sky on the horizon from thirty or forty miles away.

8. I am aware that coal-fired power plants, including Colstrip, emit mercury, toxic metals, particulate matter, sulfur dioxide, nitrogen oxides, and other pollutants which have been linked to serious health complications. I am also aware that these pollutants can be significantly mitigated with pollution controls which the Colstrip plant operators have for decades refused to



(Page 93 of Total)

USCA Case #24-1119 Document #2057679 Filed: 06/03/2024 Page 94 of 223

install. I also know that certain populations are at higher risk for these complications and it disgusts me that despite evidence on the public health impacts of pollution, modern industry standard pollution controls are not in place at the Colstrip facility. It's alarming that Colstrip knowingly emits harmful pollutants that are linked to illness and death when there are proven technologies to reduce emissions at most (if not all) coal fired power plants in the same class as the Colstrip plant.

9. I have also visited and hunted in the Tongue River Valley on a private ranch about 40 miles as the crow flies from the Colstrip plant. I have every intention to continue visiting the ranch in the future. However, I am deeply concerned about my health and the health of the wildlife that live in this region. Wildlife breathe air and drink water just like people, and I am worried about what kinds of ailments may result from living downwind of the ongoing pollution from the Colstrip plant. I am also aware of the poisoning risks associated with consuming wildlife with bioaccumulated toxics in their tissues. My worry ultimately diminishes my enjoyment of hunting and outdoor recreation in the area, but especially when I am skeptical of being able to safely consume my game.

10. I am aware that the EPA — through the Mercury and Air Toxics Standards ("MATS") — set standards to reduce toxic pollution from coal-fired power plants, which reduces the impact of this pollution. I also understand that EPA has recently updated those standards in a new Technology Review for coal-fired power plants. As a result of that review EPA has, among other things, set lower standards for particulate matter, as a surrogate for toxic metals, emitted by the Colstrip and other coal-fired power plants.

11. I wholeheartedly believe that clean air is absolutely critical for sustaining life in the region. I also do not enjoy being exposed to these pollutants when I travel to the Colstrip area



(Page 94 of Total)

USCA Case #24-1119 Document #2057679 Filed: 06/03/2024 Page 95 of 223

for work or when I am traveling through the town to other locations. I am concerned about the ongoing pollution from the Colstrip power plant from an environmental and public-health perspective.

12. I am confident that I would be harmed if EPA's strengthened MATS Rule was eliminated or weakened. Emissions of particulate matter (including toxic metals) from Colstrip and other existing coal plants would continue at high levels, therefore prolonging and increasing the amount of air pollution to which I, my family, and my friends are exposed. If this level of pollution were to continue at the current harmful levels, I would feel less safe on my work and recreational trips to the area, and my enjoyment in doing so would be reduced. If the Colstrip plant were required to reduce its pollution levels, I would feel much more comfortable visiting the area knowing that I'm less likely to be exposed to toxic pollution, and would consider visiting the Colstrip area more often.

13. For these reasons, I support Sierra Club and MEIC's efforts to protect the standards EPA has recently set through its updated Technology Review for the MATS standards against attempts to weaken or eliminate it. I believe that if the MATS Rule is preserved my concerns about air pollution will be reduced and enjoyment of the outdoors would be improved.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16 day of May, 2024, in Helena, Montana.

/s/
Derf Johnson



(Page 95 of Total)

**DECLARATION OF ABIGAIL M. JONES FOR CITIZENS FOR PENNSYLVANIA'S FUTURE**

I, Abigail M. Jones, hereby declare and state as follows:

1. This declaration is based on my personal and professional knowledge, information, and belief. I am over the age of eighteen (18) and suffer no legal incapacity.

2. I submit this declaration in support of Citizens for Pennsylvania's Future's ("PennFuture") motion to intervene in litigation to defend the U.S. Environmental Protection Agency's ("U.S. EPA") National Emissions Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38,508 (May 7, 2024) ("MATS Update Rule"), which revises the standards for hazardous air pollutant emissions from power plants.

3. I am the Vice President of Legal and Policy at PennFuture, a statewide public interest membership organization organized and existing under the laws of the Commonwealth of Pennsylvania. As Vice President of Legal and Policy, my responsibilities include working with PennFuture's members and my position allows me access to data regarding PennFuture's members.

4. PennFuture works to aid the transition to a clean energy economy in Pennsylvania and beyond; to protect our air, water, and land; and to empower

citizens to build sustainable communities for future generations. PennFuture advocates for and advances legislative action at the state and federal levels; educates and provides advocacy opportunities for the public; enforces environmental laws; and advocates for the transformation of public policy.

5. Limiting our members' exposure to toxic air pollution is a major component of PennFuture's mission and work. At least 20 members of PennFuture live within 20 miles of a coal-fired power plant.

6. I am aware of the harmful effects of mercury on human health and the environment, which are well-documented in scientific literature and government publications. Methylmercury, the most common organic mercury compound, bioaccumulates in fish, and fish consumption poses the most significant route of human and wildlife exposure. At high doses, methylmercury has caused severe human health effects, including death. Methylmercury poses particular risks of neurological problems to developing fetuses and nursing infants. It is estimated that more than 75,000 newborns in the U.S. each year may have increased risk of learning disabilities associated with methylmercury exposure. In the environment, methylmercury also has harmful impacts on fish and on birds and mammals that consume fish.

7. Other hazardous air pollutants from coal-fired power plants are also associated with a variety of adverse health issues, including cancer. Particulate

matter—which when emitted by coal-fired power plants can contain hazardous air pollutants and is regulated as a surrogate for certain air toxics—is also a pollutant associated with serious health issues including heart attacks and premature death.

8. In Pennsylvania, state agencies have posted a statewide fish consumption advisory recommending that Pennsylvanians eat no more than one meal each week of fish caught in Pennsylvania waters. This advisory is intended in part to help protect children from developmental problems resulting from exposure to mercury. The state agencies recommend even lower levels of consumption—one or two meals per month—for particular species of fish caught in specified Pennsylvania water bodies (lakes, reservoirs, or reaches of rivers or streams).

9. I am aware that many coal-fired power plants, which have been among the largest anthropogenic emitters of mercury and other hazardous air pollutants in the country, are located in Pennsylvania, and that based on the data in EPA's 2020 National Emissions Inventory, Pennsylvania ranked eighth among the states in the emission of toxic mercury from the power sector.

10. In 2004 PennFuture, along with several other organizations, responded to the high emissions of mercury from coal-fired power plants and the absence of federal or state regulation thereof, by petitioning the Pennsylvania Environmental Quality Board under 25 Pa. Code Chapter 23 to develop a rule that would reduce mercury emissions from coal-fired power plants. That petition ultimately resulted

in the promulgation of a final rule ("PA Mercury Rule") by the Environmental Quality Board at its meeting of October 17, 2006, which was published in the Pennsylvania Bulletin on February 17, 2007, 37 Pa. Bull. 883, and codified at 25 Pa. Code Chapter 123.201-215.

11. Several owner-operators of coal-fired electric generating units located in Pennsylvania challenged the PA Mercury Rule. In an unreported decision dated January 30, 2009, the Commonwealth Court of Pennsylvania declared the PA Mercury Rule invalid, reasoning that the decision in *New Jersey v. Environmental Protection Agency*, 517 F.3d 574 (D.C. Cir. 2008), removed the authority of the Environmental Quality Board to promulgate the PA Mercury Rule under Pennsylvania's Air Pollution Control Act. On appeal, the Commonwealth Court's decision was upheld by the Supreme Court of Pennsylvania in *PPL Generation, LLC v. Dep't of Envtl. Prot.*, 604 Pa. 326, 986 A.2d 48 (2009).

12. PennFuture also filed a petition for review in 2020 with other parties challenging an EPA action under the previous administration that found regulation of these emissions from the power sector under section 112 of the Clean Air Act was not appropriate and necessary. *Am. Acad. of Pediatrics v. Wheeler*, No. 20-01221 (D.C. Cir. June 19, 2020).

13. Through my work at PennFuture, I understand that a final rule updating the standards for hazardous air pollutant emissions from power plants was

published in the Federal Register on May 7, 2024, titled "National Emissions Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review" ("MATS Update Rule"), and will go into effect on July 8, 2024. 89 Fed. Reg. 38,508 (May 7, 2024). This rule strengthens the emissions standards for mercury from lignite plants, strengthens emissions standards for filterable particulate matter as a surrogate for metal hazardous air pollutants from all coal plants, and requires the use of continuous emissions monitoring systems for compliance with the filterable particulate matter surrogate standard.

14. Through my work at PennFuture, I am aware that EPA anticipates that five coal plants in Pennsylvania may need to update controls to comply with the MATS Update Rule, specifically the Colver Power Plant, the Mount Carmel Cogeneration Power Plant, the John B. Rich Memorial Power Station, the St. Nicholas Cogeneration Plant, and the Westwood Generating Station. Based on their past emissions rates, these units may need to update their controls to reduce emissions of filterable particulate matter. Also, the requirement that coal plants use continuous emissions monitoring systems for compliance is expected to produce significantly more information regarding emissions, improving transparency, and providing the ability to quickly detect and correct potential control problems, potentially reducing excess emissions due to malfunctioning controls. Compared to

periodic stack testing, continuous emissions monitoring significantly increases the amount and timeliness of information available regarding power plant particulate matter emissions.

15. I understand that changes to practices or controls that reduce emissions of particulate matter from coal-fired power plants would reduce emissions of various hazardous air pollutants, include particulate-bound mercury and non-mercury metal hazardous air pollutants. Reducing these emissions would benefit members of PennFuture who live near or downwind of a coal-fired power plant by reducing their exposure to persistent and bioaccumulative air toxics pollution in the air and their food. I also understand that providing greater transparency and more timely information about emissions through continuous monitoring can benefit local communities and support PennFuture's efforts to advocate and educate the public about air pollution.

16. I am concerned that a successful challenge could undermine or delay implementation of the MATS Update Rule, and that if the rule does not remain in effect PennFuture's members will not receive the benefits of stricter hazardous air pollution limits on power plants and greater transparency regarding emissions in Pennsylvania and in other states, and will therefore be exposed to more pollution than they would have been exposed to under the rule.

17. I therefore make this declaration in support of PennFuture's intervention in this matter for the benefit of its members, and with the goal of upholding the MATS Update Rule.

I declare under penalty of perjury that the forgoing is true and correct. Executed on May 29, 2024.

Abigail M. Jones

**DECLARATION OF RYAN KELLY**
**Submitted in Support of Clean Wisconsin**

I, Ryan Kelly, declare as follows:

1. My name is Ryan Kelly, and this declaration is based on my personal and professional knowledge, information, and belief. I am over the age of eighteen (18) and suffer no legal incapacity.

2. I submit this declaration in support of Clean Wisconsin's intervention in litigation to defend the U.S. Environmental Protection Agency's ("EPA") rulemaking titled "National Emissions Standards for Hazardous Air Pollution: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review" ("MATS Update Rule"), signed on April 24, 2024.

3. I am the Development Director at Clean Wisconsin, a public interest membership organization organized and existing since 1970 under the laws of the State of Wisconsin and recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

4. My work at Clean Wisconsin includes responsibility for major gifts, outreach, and member engagement, including ensuring that members engage with Clean Wisconsin's mission in a manner they value. Specifically, my duties at Clean Wisconsin require me to communicate with Clean Wisconsin's

membership, by, among other things, preparing materials for distribution to members and to prospective members concerning Clean Wisconsin's mission and history as well as discussing environmental issues of concern to Wisconsinites. Those issues include clean air and climate change and public health and environmental impacts in Wisconsin.

5. When an individual becomes a member of Clean Wisconsin, their name and address is entered into our membership database, which is updated each time a member renews membership or donates to Clean Wisconsin. I am responsible for tracking that information.

6. My work at Clean Wisconsin therefore requires me to be familiar with the organization's mission, which is to be a voice for Wisconsin's environment, working to preserve and protect Wisconsin's clean air, clean water, and natural heritage, including by engaging on a wide range of issues and in a number of venues, including state and federal courts, on matters that support and protect our natural resources and the health of all Wisconsinites.

7. Litigation and advocacy seeking cleaner air in Wisconsin, including through the abatement of air pollution that adversely affects our members and all Wisconsinites, falls squarely within Clean Wisconsin's mission.

8. Through my work at Clean Wisconsin, I understand that fossil fuel power plants emit fine particulate matter as well as nitrogen oxides and sulfur

dioxide, both of which form secondary particulate matter. Fine particulate matter has well established connections to respiratory and cardiovascular health impacts.

9. Through my work at Clean Wisconsin, I am aware of the harmful effects of mercury on human health and the environment, which are well-documented in scientific literature and government publications. Methylmercury, the most common organic mercury compound, bioaccumulates in fish, and fish consumption poses the most significant route of human and wildlife exposure. At high doses, methylmercury has caused severe human health effects, including death. Methylmercury poses particular risks of neurological problems to developing fetuses and nursing infants. It is estimated that more than 75,000 newborns in the U.S. each year may have increased risk of learning disabilities associated with methylmercury exposure. In the environment, methylmercury also has harmful impacts on fish and on birds and mammals that consume fish.

10. Through my work at Clean Wisconsin, I understand that EPA is revising the standards for hazardous air pollutant emissions from coal-fired power plants, and that a range of benefits to Wisconsinites are expected to result from the tighter limits on mercury from lignite plants, the tighter limits on filterable particulate matter from all coal plants, and the requirement that plants use continuous emissions monitoring systems. Specifically, benefits to communities in Wisconsin—including Clean Wisconsin's members—are expected from

reductions in harmful particulate matter emissions and the hazardous metals contained in those emissions, as well as more real-time information and increased transparency regarding power sector emissions.

11. Clean Wisconsin submitted comments in support of these standards. The comments provided recommendations on ways EPA could improve the proposal to achieve even greater public health benefits.

12. Through my work at Clean Wisconsin, I understand that this rule will have immediate and local health benefits in Wisconsin from reduced air pollution. In addition to local benefits from reductions within Wisconsin, I also understand that emissions from neighboring states affect Wisconsin air and environmental quality, and that in response to the MATS Update rule a half dozen lignite plants in North Dakota are expected to take measures to reduce their mercury pollution, and coal plants in Illinois and Missouri are expected to take measures to reduce their particulate matter emissions. I also understand that units across the country will be required to use continuous emissions monitoring systems for particulate matter, and that this requirement can help quickly identify problems with controls that might otherwise remain undiscovered for significant periods of time between periodic stack tests. Fixing these problems quickly may result in significant reductions in emissions through better compliance assurance. By reducing particulate matter emissions, these plants can reduce their emissions of particulate-bound mercury and

other hazardous air pollutants that are emitted as particulate matter that affect Wisconsin's environment. I am aware that the Great Lakes region has been dealing with mercury and other toxic chemical contamination, and that significant deposition is due to emissions from coal-fired power plants.

13. Through my work at Clean Wisconsin, I can say that the organization has members who engage in activities that would be affected by reductions in hazardous air pollutant emissions from coal-fired electric generation units and the resulting benefits to air quality and other environmental impacts, and who would not receive those benefits if these limits were delayed or not in effect. I can also say that more transparency and information about pollution including emissions of hazardous air pollutants from the power sector can support Clean Wisconsin's work to protect Wisconsin's environment.

14. Timely implementation of the MATS Update Rule is also relevant to Clean Wisconsin's organizational purpose. A successful challenge could undermine or delay implementation of the MATS Update Rule, and Clean Wisconsin and its members would not enjoy the rule's benefits to the environment and our mission.

15. I therefore make this declaration in support of Clean Wisconsin's intervention in this matter for the benefit of its members, and with the goal of upholding the MATS Update Rule.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 22nd day of May, 2024.

Ryan Kelly

**DECLARATION OF PHILIP J. LANDRIGAN, MD, MSc, FAAP**

I, Philip J. Landrigan, hereby declare and state as follows:

1. I am a resident of Newton, Massachusetts. I submit this declaration in support of Physicians for Social Responsibility's ("PSR") Motion to Intervene as a respondent in the Petition for Review filed by the State of North Dakota, et al., (D.C. Cir. #24-1119), and consolidated cases. The Petition for Review challenges the final rule promulgated by the Environmental Protection Agency ("EPA") updating and strengthening the 2012 Mercury and Air Toxics Standards, and the updated rule was published in the Federal Register at 89 Fed. Reg. 38,508 (May 7, 2024) (the "2024 MATS Rule"). This declaration is based on my personal knowledge, information, and belief.

2. I have been a member of PSR for over 30 years. I served on PSR's Board of Sponsors in 1994-95, and on PSR's Board of Directors in 1996-1999. I fully support PSR's mission, which includes working to protect public health, the health of children, and the environment from toxic chemicals, as guided by the values and expertise of medicine and public health.

3. I am a pediatrician, epidemiologist, and public health physician. I received an A.B. from Boston College in 1963 and an M.D. from Harvard Medical School in 1967. I completed my residency in pediatrics at the Children's Hospital Medical Center in Boston, Massachusetts, and I received a Master of Science in Occupational Medicine from the London School of Hygiene & Tropical Medicine of the University of London in 1977. I am board certified in three specialties: Pediatrics, General Preventive Medicine, and Occupational Medicine.

4. Since 2018, I have held the following positions at Boston College: Director of the Program for Global Public Health and the Common Good (the "Program for Global Health"); Director of the Global Observatory on Planetary Health (the "Global Observatory"), the research

arm of the Program for Global Health; and Professor of Biology, Schiller Institute for Integrated Science and Society. The Program for Global Health is committed to the creation of a healthier and more equitable society and to protection of the environment, through education, research and service. The Global Observatory analyzes global trends in environmental pollution and pollution-related diseases. Part of the Global Observatory's focus is on the impact of pollution on children's health caused by toxic pollutants, such as mercury, that permanently impair brain function in children.

5. I also am an adjunct professor in the Department of Global Health and Social Medicine at Harvard Medical School; in the Department of Environmental Health at the Harvard T.H. Chan School of Public Health; and in the Department of Public Health and Community Medicine at Tufts University School of Medicine. I was an active member of the faculty at the Icahn School of Medicine at Mount Sinai from 1985 to 2018 as a Professor of Preventive Medicine and Pediatrics, as Chair of the Department of Preventive Medicine (1990 to 2015), and as Dean for Global Health (2010 to 2018). I am currently Professor Emeritus of Preventive Medicine and Pediatrics at Mount Sinai.

6. For more than four decades, I have conducted research in pediatrics and public health, and I have published this research in leading peer-reviewed journals, including *The New England Journal of Medicine*, *The Lancet*, and *Environmental Health Perspectives*. My research has focused on understanding the impacts of environmental pollutants on the health of children and infants, and, more specifically, on understanding how environmental pollution and toxic chemicals injure the developing brains and nervous systems of children. I co-edited the "Textbook in Children's Environmental Health," which was published in 2014 and was the first American textbook of its kind.

7. I am familiar with the MATS Rule, which I understand EPA finalized in 2012, and that establishes national limits on emissions of mercury and scores of other hazardous air pollutants from coal-fired and oil-fired power plants. MATS is one of the most important public health protections ever put in place by EPA to reduce hazardous air emissions and thus safeguard human health. I am also aware that, before the Mercury and Air Toxics Standards were implemented, power plant emissions were by far the single largest source of mercury emissions in the United States, and a significant source of other hazardous air pollutants. I am aware that hazardous air pollutants from coal-fired and oil-fired power plants contribute to or cause numerous adverse health impacts, including, for instance, cardiovascular conditions, respiratory illnesses, cancer (with respect to certain pollutants), and neurological impairment in infants and children. I am generally aware that most power plants have been in compliance with these standards for several years now. I also understand, as EPA has acknowledged, that emissions of hazardous air pollutants from coal-fired and oil-fired power plants have decreased substantially—by approximately 85% to 95%—in significant part because of the installation of emission controls required to meet the 2012 MATS Rule.

8. I am aware that the 2024 MATS Rule tightens the filterable particulate matter ("fPM") standard—which serves as a surrogate for non-mercury hazardous air pollutants ("HAP") metals—from 0.030 lb/MMBtu to 0.010 lb/MMBtu. As a result, EPA estimates that the 2024 MATS Rule will reduce fine particulate matter ($PM_{2.5}$) emissions by 5,400 tons within the first decade.

9. I also understand that the 2024 Rule requires power plants to employ continuous emissions monitoring systems ("CEMS") for fPM, which will provide more accurate data that in turn will allow any non-compliance issues to be more effectively detected and corrected. I am

aware that available technology now makes these new requirements feasible and practicable, and thus will help to better protect public health. I also understand that the 2024 MATS Rule strengthens the mercury emissions standards for coal-fired power plants that burn lignite by requiring such plants to meet the same standards as those that apply to non-lignite-burning power plants.

10. I fully support EPA's tightening of the fPM standard in the 2024 MATS Rule. The controls that utilities use to comply with the MATS Rule necessarily also result in decreased emissions of $PM_{2.5}$, greatly to the benefit of public health. Fine particulates are especially dangerous because they are small enough to enter deep into the lungs and even in some instances to enter the blood stream from where they can reach every organ of the human body and cause harm. Multiple clinical and epidemiological studies have shown that $PM_{2.5}$ affects children at the beginning of their lives and across their entire lifespans. $PM_{2.5}$ air pollution can cause premature birth and low birth weight; it slows the growth of the developing lungs; and it exacerbates and contributes to asthma and other diseases.

11. Emerging epidemiologic evidence suggests that $PM_{2.5}$ air pollution is linked also to neurologic dysfunction. Grandjean P, Landrigan PJ. Neurobehavioural effects of developmental toxicity. *The Lancet Neurology.* 2014;13(3):330-338. Associations in adults between chronic exposure to $PM_{2.5}$ air pollution and increased risk of dementia have been reported. *See*, *e.g.*, Sram RJ, Veleminsky M, et al. The impact of air pollution to central nervous system in children and adults. *Neuroendocrinology Letters.* 2017;38(6):389-396. In children, exposures to $PM_{2.5}$ and to other components of air pollution *in utero*, and in the first years after birth, have been linked to IQ loss, memory deficits, behavioral dysfunction, reductions in brain volume and increased risks of attention deficit/hyperactivity disorder ("ADHD") and autism spectrum

disorder ("ASD"). *See*, *e.g.*, Sunyer J, Esnaola M, Alvarez-Pedrerol M, et al. Association between traffic-related air pollution in schools and cognitive development in primary school children: a prospective cohort study. *PLoS Med.* 2015;12(3):e1001792.

12. I am aware that fine particulate matter can travel hundreds of miles from the source of the pollution such that emissions of $PM_{2.5}$ from coal-fired power plants located in other states, including, for example, Pennsylvania, Indiana, and West Virginia, are carried across state lines into Massachusetts where I live and work. I am concerned that my own health and the health of family members will be adversely affected from any increases in $PM_{2.5}$, arising from increases in hazardous air pollutant emissions. I suffer from Paroxysmal Atrial Fibrillation, a cardiac condition that has been shown in epidemiological studies to be exacerbated by fine particulate air pollution. I am currently in remission and under medical treatment, but I am concerned that if the stricter limits in $PM_{2.5}$ air pollution levels are overturned as a result of the pending litigation, I could experience a recurrence of this potentially very serious cardiac arrhythmia. I thus have a direct and concrete personal interest in protecting my health and my family's health that will be harmed from any reversal or weakening of the 2024 MATS Rule.

13. Regarding EPA's more stringent limits on mercury emissions from lignite-fired plants, Infants, children, and developing fetuses are uniquely vulnerable to mercury and other pollutants emitted from coal-fired power plants. Mercury, in the form of methylmercury, is a highly potent neurotoxicant that damages children's brains. Consumption of fish contaminated with methylmercury is the main route of human exposure to methylmercury. When coal is burned, it releases mercury into the atmosphere; this mercury returns to the earth through precipitation and eventually enters rivers, lakes, streams, and other waterways where it is converted into methylmercury by microorganisms. Methylmercury is persistent in the environment, and it

bioaccumulates in the aquatic food chain, meaning that concentrations of methylmercury are highest in predatory fish at the top of the food chain, such as tuna, striped bass, and bluefish, because these larger fish contain the methylmercury that was present in the tissue of the many smaller fish below them in the food chain that the larger fish have eaten.

14. A child's brain, *in utero* and throughout childhood, is changing and developing very rapidly, making the brain of the unborn child exquisitely susceptible to damage by toxic chemicals. Infants in the womb are exposed to methylmercury when a pregnant mother eats mercury-contaminated fish. The methylmercury from the fish is absorbed into the mother's body, enters her bloodstream, and from there it crosses the placenta, enters the body of her baby and concentrates in the infant's brain. While pediatricians counsel pregnant women to avoid eating fish that may be contaminated with mercury, physician guidance is not enough to protect children. Physician advice is not always heeded or remembered by busy parents. Physician guidance is a far less effective safeguard of children's health than regulations that keep mercury from entering the food chain in the first place. I am aware that Massachusetts, as well as New York where I spent most of my professional career, have fish consumption advisories in effect for mercury, warning women of childbearing age and children especially, to limit or avoid consumption of several species of fish caught in numerous rivers, streams, and ponds, and in coastal waters.

15. As a pediatrician and public health physician, I am concerned about public health and the health of children as a result of the higher levels of mercury emissions from lignite-fired power plants, and the unequal burden placed on those living near such plants. I therefore believe that the tightening of emissions limits from lignite-fired plants set forth in the 2024 MATS Rule is long overdue.

16. I have devoted much of my professional life and career to understanding the impacts of environmental pollutants on the health of children and infants, with the ultimate goal of protecting children's health and improving their lives. The significant reductions of mercury and other hazardous air pollutant emissions from coal-fired and oil-fired power plants, and the concomitant decreases in fine particulate matter as a result of the MATS Rule, have had, and will continue to have, tremendous benefits for the health of all Americans and especially for the health of America's children—born and unborn.

17. I am concerned that a reversal or weakening of the 2024 MATS Rule as a result of the challenge to the Rule will mean that hazardous air emissions from coal-fired and oil-fired power plants will continue seriously to affect public health, my own health, and the health of my family. I have a direct and concrete personal and professional interest in protecting public health, the health of children, my own health and that of my family from these dangerous air pollutants. A court decision fully upholding EPA's 2024 MATS Rule will redress my concerns.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 24, 2024

Philip J. Landrigan, M.D., MSc., FAAP

**DECLARATION OF THELISA LAVERGNE**

I, Thelisa Lavergne, hereby state as follows:

1. My name is Thelisa Lavergne. I reside in Fort Bend County, Texas, and I have lived in this area for about 15 years. I am a citizen of the United States and am over 18 years of age. I am an employee of Air Alliance Houston (AAH).
2. I have a master's degree in organizational management, a bachelor's degree in training and development, and a bachelor's degree in counseling.
3. I am the Climate Justice Program Manager for AAH. I have been working for AAH in this role since November 2023.
4. In my role as Climate Justice Program Manager, I oversee three program coordinators, each of whom help oversee a different AAH campaign. My portfolio includes the Close Parish Coal campaign, an AAH campaign dedicated to dramatically reducing harmful emissions at the WA Parish coal-fired power plant.
5. I first learned of the Parish facility around the time that my child was diagnosed with asthma. The doctors told me that poor air quality in the Fort Bend area may have helped cause his asthma.
6. My child's experience with asthma led me to learn more about the public health impacts of air pollution and ultimately to join AAH. I am now aware that coal-fired power plants such as Parish emit harmful pollutants such as mercury and other toxic metals, as well as particulate matter, sulfur dioxide, nitrogen oxides, and other pollutants. I am also aware that exposure to these sorts of pollutants can cause asthma, cardiovascular disease, neurological disorders, and cancer.

7. At the time my child was diagnosed with asthma, I was living in close proximity to the Parish facility, about 15-20 miles away. In part because I wanted better air quality for my family, I moved farther from the facility and am now located about 33 miles away.
8. Although there are nice stores and restaurants in the area closer to Parish that I would like to visit, I avoid visiting this area because of my concerns about Parish emissions.
9. I understand that EPA has issued Mercury and Air Toxics Standards (MATS) that limit toxic air pollution from coal and oil-fired power plants, and that EPA recently issued a final rule strengthening MATS ("MATS Update Rule") that will further reduce toxic air pollution from these plants. I am aware that the MATS Update Rule will require all plants, including Parish, to install a continuous emissions monitoring system for particulate matter (called PM CEMS). This new monitoring system will replace infrequent stack testing at the Parish facility and will provide up to date information on particulate matter emissions to the public.
10. I understand EPA has demonstrated that plants may sometimes emit particulate matter well above levels captured by intermittent stack testing. It is possible that improved monitoring at Parish would reveal that the plant is emitting pollution in greater quantities than previously known. The plant will have to reduce emissions if they exceed the limits set in the MATS Update Rule.
11. I understand that short-term spikes in particulate matter emissions can be harmful to human health. PM CEMS would allow such short-term spikes to be detected and controlled, improving public health.
12. I also understand that PM CEMS allows for faster correction of problems with pollution control technologies. If a plant such as Parish malfunctions, PM CEMS will allow for

faster detection of these issues and reduce the time that the plant is emitting above legal limits.

13. As a result of the advantages of PM CEMS, including quicker detection of malfunctions, public access to emissions data, and even potential reductions in particulate matter emissions, I would be more likely to visit the area around the Parish facility if the MATS Update Rule takes effect.
14. The installation of PM CEMS at Parish would not only benefit me personally. It would also assist me in my work with AAH and would help the organization implement its core work, including raising public awareness of air pollution in the greater Houston area and dramatically reducing emissions from the Parish facility.
15. PM CEMS would assist me as Climate Justice Program Manager—responsible for efforts to reduce emissions at Parish—to further the organization's advocacy, education, and outreach efforts.
16. PM CEMS would increase transparency for the Fort Bend community members that I and the organization serve. It would help the community make educated decisions about how they engage in advocacy related to the Parish facility.
17. I am aware that various parties have challenged the MATS Update Rule and that AAH will defend it through this lawsuit.
18. If the MATS Update Rule were to be struck down, or the PM CEMS requirement were struck down, I would not personally experience the benefits of PM CEMS and would continue to avoid visiting the area around Parish.

19. In addition, if the MATS Update Rule were struck down, or the PM CEMS requirement were struck down, I would not experience the benefits of PM CEMS in my professional capacity with AAH.

20. Without PM CEMS data, AAH would not be able to improve its core programmatic work in the manner described above.

21. For these reasons, I support AAH's efforts to protect the MATS Update Rule against attempts to weaken or eliminate it.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on ---May 29, 2024

Thelisa Lavergne

Thelisa Lavergne

**DECLARATION OF ABBY NERLINGER, MD, MPH, FAAP**

I, Abby Nerlinger, hereby declare and state as follows:

1. I live in Wilmington, Delaware. I am a Fellow of the American Academy of Pediatrics ("AAP"), and I submit this declaration in support of the AAP's motion to intervene in *North Dakota et al. v. Environmental Protection Agency*, No. 24-1119 (D.C. Cir.), and any other cases challenging the final rule promulgated by the Environmental Protection Agency ("EPA") entitled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 89 Fed. Reg. 38,508 (May 7, 2024) ("2024 MATS Rule"). This declaration is based on my personal knowledge.

2. I am a pediatric hospitalist at Nemours Children's Hospital, Delaware ("Nemours") in Wilmington, Delaware. I practice in the Division of General Academic Pediatrics and serve as the Program Director for the Pediatric Hospital Medicine Fellowship at Nemours. I am also an Assistant Professor of Pediatrics at the Sidney Kimmel Medical College at Thomas Jefferson University. The statements in this declaration reflect my own views and do not represent the views of Nemours or any other institution with which I am affiliated.

3. I received a B.S. in Biology from the University of Notre Dame in 2005, an M.D. from the Yale University School of Medicine in 2010, and an M.P.H. in Health Policy from the George Washington University Milken Institute School of Public Health in 2016. I completed my residency in pediatrics at the Children's Hospital of The King's Daughters in Norfolk, Virginia and completed a fellowship in pediatric hospital medicine at the Children's National Health System in Washington, D.C. I am certified by the American Board of Pediatrics in both General Pediatrics and Pediatric Hospital Medicine.

4. In addition to being a Fellow of the AAP, I also serve on the AAP's Council on Environmental Health and Climate Change ("Council"). The Council focuses on educating pediatricians about, developing the AAP policy pertaining to, and advocating around issues regarding toxic exposures and children's environmental health—issues that are of particular concern to me and that directly impact the health of my patients. I fully support the AAP's mission to attain optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults.

5. I am aware that EPA promulgated a rule commonly known as the Mercury and Air Toxics Standards in 2012 ("2012 MATS Rule"), which established important limits on emissions of hazardous air pollutants from coal-fired and oil-fired power plants. Coal-fired power plants emit significant amounts of toxic air pollutants, including, among numerous others, mercury, lead, and arsenic. These and other toxic pollutants have been shown to cause respiratory illnesses, neurological damage, heart disease, strokes, cancer, and premature death. Those impacts are particularly pronounced in children, including those for whom I care. I understand that, before the 2012 MATS Rule was adopted, coal-fired power plants were the largest domestic source of mercury, and a substantial source of other hazardous air pollutants. I am generally aware that most power plants have been in compliance with the 2012 MATS Rule for several years now and that mercury and other hazardous emissions from power plants have decreased substantially in part because of the controls required to meet the 2012 MATS Rule.

6. I am also aware that the 2024 MATS Rule makes certain important improvements to the pollution control requirements of the 2012 MATS Rule, providing better protection from hazardous air pollutant emissions. Among other things, I understand that the 2024 MATS Rule sets a more stringent limit for emissions of filterable particulate matter ("fPM") as a surrogate for

emissions of non-mercury metal hazardous air pollutant metals like arsenic, lead, and chromium, and that will cut allowable fPM emissions by two-thirds. I am aware that EPA predicts the new fPM standard will reduce fine particulate matter ("$PM_{2.5}$") emissions by 5,400 tons over ten years and non-mercury metal hazardous air pollutant metals by 49 tons over the same period.

7. I strongly support the more stringent fPM limit in the 2024 MATS Rule. There is no level of exposure to $PM_{2.5}$ that is known to be safe. There is a wealth of data documenting the adverse impacts on public health from inhaling fine particulate matter. $PM_{2.5}$ is particularly concerning because I care for children and families with health issues to which $PM_{2.5}$ pollution contributes, such as asthma, premature birth, and learning and behavioral problems. In my medical experience, one of the most common pediatric conditions requiring hospital admission is asthma, and in my clinical practice I observe more hospital admissions for asthma on days with poor air quality. I am aware that fine particulate matter can travel hundreds of miles from the source of the pollution, such that emissions of $PM_{2.5}$ from coal-fired power plants located in states like Pennsylvania and West Virginia can be carried across state lines into Delaware where I live and work. I also treat patients from Pennsylvania who seek care at Nemours.

8. Infants and children are particularly vulnerable to the health effects of air pollution for many reasons, including the fact that critical phases of lung development begin in the fetal period and continue through the teenage years. Children are not little adults. They face higher exposure to air pollutants, breathe more air per pound of body weight than adults, and face greater health impacts from those pollutants than adults. Emerging scientific data indicate that childhood exposure to fine particulate pollution from coal-fired power plants affects brain development: such exposure, even prenatally, is associated with impairment in cognition, attention, learning, and sleep function. While there are many factors that impact early childhood development, air

pollution is, unequivocally, a major determinant. I often care for patients who demonstrate suboptimal readiness for school, and display symptoms of inattention, hyperactivity, and learning difficulties. While we can support these children through educational interventions and behavioral therapies, these treatments are imperfect, and the effects of these conditions have lifelong impacts. That is why it is essential to address root causes of neurodevelopmental problems, including by reducing $PM_{2.5}$ and other air pollution.

9. One of the most pernicious impacts of air pollution is that it tends to disproportionately harm people in communities of color and low-wealth communities. For example, children living in poorer areas of Wilmington and New Castle County have higher rates of asthma and are admitted to the hospital more frequently. One recent study found "clear associations between air pollutants and asthma rates, which were especially pronounced among Delaware's low-income and minority populations."[1] The harmful effects of exposure to air pollution like $PM_{2.5}$ can also have synergistic negative consequences with other health conditions. For example, we advise families of children with asthma to limit outside play on days with poor air quality. However, when those children also suffer from obesity, limiting their outdoor play and exercise can worsen their obesity, which can in turn worsen their asthma and perpetuate a vicious cycle.

10. I also understand that the 2024 MATS Rule requires plants to demonstrate compliance with the new fPM standard using "continuous emissions monitoring systems," which are intended to enable further reductions in $PM_{2.5}$ through more rapid detection of malfunctions in pollution controls. I strongly support this change because my patients will benefit from any measure that reduces their exposure to fine particulate matter.

---

[1] Vecchione, Rachel et al. "Geographic Patterns of Asthma Rates and Air Quality in Delaware." Delaware Journal of Public Health vol. 5,1 30-38. 15 Feb. 2019, doi:10.32481/djph.2019.02.009

11. I understand that the 2024 MATS Rule also sets a more stringent standard for mercury emissions from coal-fired power plants that burn lignite. I strongly support this change. Mercury, in the form of methylmercury, is a potent neurotoxicant. It is particularly harmful to infants, developing fetuses, and young children, and can cause permanent neurological damage. The primary means of exposure to methylmercury is through consumption of mercury-contaminated fish. Mercury, once emitted from coal-fired power plants into the atmosphere, is then deposited into waterways and wetlands (through precipitation and runoff), where it is converted to methylmercury. In turn, methylmercury is taken up by aquatic organisms, and it persists in the environment and bioaccumulates. I know that Delaware has fish consumption advisories for mercury for several species of fish, including in the Lower Delaware River, Delaware Bay, and coastal waters. These advisories recommend that people—and, especially pregnant women, women of childbearing years, and children—limit their consumption of recreationally-caught fish. When my patients' environmental histories suggest they may eat recreationally caught fish, I will advise their families about the risks of mercury contamination. However, I am aware that not all those whom I treat are aware of these fish consumption advisories, or may not adhere to them for cultural, economic, or other reasons.

12. My life's work as a pediatrician is to try to improve the health and well-being of children. However, it is more difficult to do my job, to ensure the optimal physical and psychological health of patients, if they are exposed to hazards such as air pollution that impair their health and development. The 2024 MATS Rule advances my concrete personal and professional interests in the health and well-being of my patients by setting standards that will reduce their exposure to harmful pollutants like toxic metals, $PM_{2.5}$, and mercury.

13. I am very concerned about the challenge to the 2024 MATS Rule in the *North Dakota* case and any other cases challenging the rule. Any vacatur, weakening, or delay of the effectiveness of the emissions standards in the 2024 MATS Rule would directly injure my concrete interests by harming public health and the health of my patients. Furthermore, as a mother with two young children, I am concerned about anything that would increase the amount of fine particulate pollution to which they are exposed. A court decision rejecting the challenges in *North Dakota* and any other cases challenging the 2024 MATS Rule would redress my injuries.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 5/29/24

Abby Nerlinger, MD, MPH, FAAP

Scanned with CamScanner

**DECLARATION OF SONDA M.R. OPPEWAL**

I, Sonda Maye Oppewal, hereby declare and state as follows:

1. This declaration is based on my personal and professional knowledge, information, and belief. I am over the age of eighteen (18) and suffer no legal incapacity.

2. I was born in 1957. I currently reside in Durham, North Carolina.

3. I have hypertension and seasonal allergies, both of which can be affected by exposure to air pollution. My seasonal allergies or hay fever occurred seasonally prior to moving to Durham, NC in 2016. It now occurs year-round.

4. The Mayo Plant, a coal-fired power plant in Roxboro, NC, is located 33 miles from my home, and the Roxboro Plant, a coal-fired power plant in Semora, NC, is located 31 miles from my home. Both of these coal-fired power plants are located in Person County.

5. I submit this declaration in support of the Alliance of Nurses for Healthy Environments' (ANHE) intervention in support of the U.S. Environmental Protection Agency (EPA) in litigation challenging EPA's National Emissions Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38,842 (April 18, 2024) (the "MATS Update Rule"). The MATS Update Rule revises and strengthens the requirements in the original Mercury and Air Toxics

USCA Case #24-1119    Document #2057679    Filed: 06/03/2024    Page 127 of 223

Scanned with CamScanner

Standards ("MATS"), which limit hazardous air pollutant ("air toxics") emissions from coal- and oil-fired power plants.

6. I have been a member of ANHE for more than 15 years. I fully supported, promoted, helped plan, and provided continuing education credit review for the environmental nursing sessions held by the Public Health Section at several annual conferences in my role as Chair of the Program Committee and as Nurse Planner for the American Public Health Association. I was looking for an organization that gave nurses a platform to speak out about environmental issues and one that would promote environmental nursing education. I understand from my involvement with ANHE that the organization is committed to addressing environmental health issues—including harms from air pollution and climate change—through "environmental nursing," the specialty practice of nursing that promotes healthy environments and intervenes to prevent and reduce risks from environmental harms to individuals, families, groups, workers, and communities. I believe strongly in the precautionary principle that espouses caution and action to prevent harm when there is concern that environmental harms exist.

7. As a nursing faculty member who taught the public health nursing course or served as faculty for undergraduate nursing students in the public health nursing clinical course for 30 years, I taught students the importance of environmental health and integrated examples of how the environment impacts

USCA Case #24-1119 Document #2057679 Filed: 06/03/2024 Page 128 of 223

health in clinical work and in post-conferences. Some of my students focused their work on environmental issues such as how the capping of a landfill affected a rural county, how to conduct environmental assessments in various workplace settings, and how to improve the indoor air quality of schools using a tool provided by the EPA. I exposed my students to educational resources on ANHE's website related to air and water pollution and used their resources to update any lectures that I provided on environmental nursing.

8. I am aware that the power sector is among the largest anthropogenic sources of air toxics in the United States. Coal-fired power plants have historically been among the largest sources of mercury emitted to the environment in the United States, and among the largest stationary sources of toxic metals like chromium, arsenic, and lead, which are emitted as particulate matter.

9. I understand that the U.S. EPA finalized the MATS Update Rule to address and further reduce the emissions of these particularly dangerous pollutants. I understand that this rule includes a more stringent limit on mercury from coal plants that use lignite coal and a more stringent limit on filterable particulate matter—which contains significant amounts of metal air toxics—from all coal-fired power plants. I understand that the Mayo Plant and the Roxboro Plant have been identified by EPA as coal plants that may need to upgrade their controls to reduce filterable particulate matter emissions in order to comply with the new limit.



Scanned with CamScanner

USCA Case #24-1119 Document #2057679 Filed: 06/03/2024 Page 129 of 223

Scanned with CamScanner

Upgrades in response to this rule are expected to result in reduced emissions of various hazardous air pollutants, including metal air toxics from these plants.

10. I am concerned that if implementation of the MATS Update Rule is delayed, or if the rule is vacated by successful challenges, power plants, including the Mayo and Roxboro plants, will be allowed to emit air pollution in excess of the new limits, which will affect air quality and hazardous air pollutant levels in Durham where I live, and contribute to my exposure to harmful pollution, and that of my family, my neighbors, and my surrounding community members.

11. I am aware of and concerned about vulnerable communities in Person County who may be affected by pollution from the Mayo and Roxboro plants. Rural community members and communities with greater proportions of people of color are more likely to be impacted by harmful exposure to environmental pollutants. I am aware that people in Person County experience environmental injustice because of their heightened exposure to pollution and I am aware that county members in Person experience higher rates of illness and mortality in part due to environmental harms.

12. I am also aware that mercury accumulates in fish, and that North Carolina has a statewide mercury advisory for fish, which advises limiting consumption of certain fish due to mercury. I do not fish in North Carolina and would not want to consume freshwater fish and I discourage family and friends, particularly

USCA Case #24-1119 Document #2057679 Filed: 06/03/2024 Page 130 of 223

Scanned with CamScanner

women who are pregnant and those with children, from consuming fish caught here because I am concerned about mercury.

13. I enjoy walking for daily exercise, hiking, gardening, playing pickleball, and spending time at the Eno River State Park, but I pay attention to air quality alerts in Durham, and when air pollution is high, I forgo normal outdoor activities and stay indoors.

14. Implementation of the MATS Update Rule will benefit my interest in breathing cleaner air as I will be able to better achieve my fitness goals that in turn will help improve my health and the quality of my life. It is vital for me to be outdoors daily where I appreciate the beautiful nature near me as this helps me cope as caregiver for my husband who was diagnosed with early-stage Alzheimer's Disease in 2012. With less air quality alerts in Durham, I will be able to walk more outdoors while enjoying nature, play pickle ball more often, and take more hikes in nearby nature preserves and parks. As a long-time public health nurse concerned with the health of communities, I appreciate that reducing harmful environmental exposures will ultimately help improve the health of communities. I therefore support ANHE's intervention to defend and ensure timely implementation of the MATS Update Rule.

15. I currently volunteer at a Wellness Clinic, and I have seen patients suffer from acute and chronic pulmonary conditions, particularly asthma. Asthma

USCA Case #24-1119    Document #2057679    Filed: 06/03/2024    Page 131 of 223

Scanned with CamScanner

is a chronic lung disease that leads to inflammation of the airways, wheezing, chest tightness, shortness of breath, and coughing. Asthma is a life-threatening respiratory condition, which can range from mild to severe. Patients with asthma sometimes suffer asthma attacks, which cause worsening symptoms and can even be fatal. One in twelve children in the U.S. has asthma. Many children who come to the Wellness Clinic already have an asthma diagnosis and will need to manage this disease for the rest of their lives. Almost every adult patient who I have cared for at the Wellness Clinic has a diagnosis of hypertension and are at risk of cardiovascular disease.

16. I am concerned about how air pollution will impact my patients. In particular, I worry about the patients' exposure to particulate matter pollution. Many of my patients are already vulnerable to the impacts of air pollution due to certain circumstances or conditions. Our clinic serves low-resourced patients and families who face cumulative risks that are difficult to manage.

17. I believe that addressing air pollution from power plants is essential to protect public health, particularly for local and vulnerable populations. For this and other reasons, I support the MATS Update Rule and ANHE's intervention in litigation to defend the rule.

I declare under penalty of perjury that the foregoing is true and correct.



(Page 131 of Total)

USCA Case #24-1119 Document #2057679 Filed: 06/03/2024 Page 132 of 223

Executed this 30th day of May 2024.

Sonda Maye Oppewal

Sonda Maye Oppewal
2108 Greenwich Place
Durham, NC 27705



Scanned with CamScanner

**DECLARATION OF MISTI O'QUINN**

I, Misti O'Quinn, hereby declare as follows:

1. I am a board member of Downwinders at Risk. I joined the board in 2017. Downwinders at Risk is incorporated under the laws of Texas as a non-profit organization. Downwinders at Risk was organized to reduce air pollution that harms North Texas, particularly the Dallas-Fort Worth area.
2. I am also a Sierra Club member and work for the Club as an organizer. I have been a member since 2017, but I volunteered for Sierra Club before I joined as a member.
3. I live in Plano, TX in Collin County. I grew up in the Dallas-Fort Worth area and have lived here all my life. I have three children, ages 11, 17, and 20. They live with me.
4. I currently suffer from asthma. I sometimes have to treat my asthma with an inhaler or nebulizer when my chest gets tight and it gets harder to breathe.
5. I am very concerned about the impact of air pollution on my and my family's health and well-being. Once I started getting data on air quality and the links between air pollution and respiratory illnesses, it lit a fire under me.
6. I have a family history of asthma. For example, two of my children—my 11-year-old son and 17-year-old daughter—have asthma. They've had to go to the doctor so often that my 17-year-old knows the details of the routine at the hospital. When she was about 5, she was in the ER about once a month because of asthma attacks. We've been largely able to control it now, but there are flare-ups. She still has to stay home from school a lot because of her asthma. My son loves to play baseball, but bad air days make it difficult for him to play without discomfort or trouble breathing.
7. As an organizer for Sierra Club, I am deeply involved in issues related to the Martin Lake

power plant located in Tatum, Texas. I work to raise public awareness about harmful emissions from the plant, advocate for emissions reductions at the plant, and help empower communities to organize and press for the plant to reduce its emissions. I regularly visit the area around the plant to work with impacted communities.

8. When I visit the area around Martin Lake for work, I always take my inhaler with me and make sure that I have access to the proper breathing apparatus in case I have any asthma-related complications. When I visit the area on bad air days, I can feel my chest tightening.

9. My concerns about asthma decrease my enjoyment of my trips to the Martin Lake area.

10. Through my work with Downwinders at Risk and Sierra Club, I am aware that coal-fired power plant such as Martin Lake emit harmful pollutants such as mercury and toxic metals, as well as particulate matter, sulfur dioxide, nitrogen oxides, and other pollutants. I am also aware that exposure to these sorts of pollutants can cause asthma, cardiovascular disease, neurological disorders, and cancer.

11. As a result of my work, I am aware that EPA has issued Mercury and Air Toxics Standards (MATS) that limit toxic air pollution from coal and oil-fired power plants, and that EPA recently issued a final rule strengthening MATS ("MATS Update Rule") that will further reduce toxic air pollution from these plants. I am aware that the MATS Update Rule will require Martin Lake to reduce its emissions of particulate matter (as a surrogate for non-mercury metals) and mercury.

12. I am aware that various parties have challenged the MATS Update Rule and that Downwinders at Risk will defend it through this lawsuit.

13. If the MATS Update Rule were struck down, I would continue to fear for my health when I visit the area around Martin Lake. If the MATS Update Rule is allowed to take effect and Martin

Lake reduces its emissions, that would make my trips to the area around Martin Lake more enjoyable. It would also reduce the likelihood that I would suffer asthma-related symptoms and complications during my visits to the area.

14. For these reasons, I support Downwinders at Risk's efforts to protect the MATS Update Rule against attempts to weaken or eliminate it.

I declare under the penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: May 29th, 2024

Misti O'Quinn

**DECLARATION OF JEREMY PROVILLE**

I, Jeremy Proville, declare as follows:

1. I am a Director in the Economics department at the Environmental Defense Fund ("EDF"). I have worked as an economic and geospatial analyst for EDF for over 12 years. I hold a Master of Science and a Bachelor of Commerce from McGill University.

2. My duties at EDF include performing demographic and spatial analyses, including assessing how EDF's membership and broader populations are impacted by pollution and affected by environmental policies. My work requires me to be familiar with EDF's policy positions, analytical methods, scientific research, and membership database.

3. I have published works on the impacts of air pollution and other environmental externalities on people and vulnerable communities.[1] Over the

[1] Spiller, E., Proville, J et al., *Mortality Risk from PM 2.5: A Comparison of Modeling Approaches to Identify Disparities across Racial/Ethnic Groups in Policy Outcomes*, 129 Envtl. Health Persp. 127004 (2021), https://ehp.niehs.nih.gov/doi/full/10.1289/EHP9001 (evaluating benefits from reduced mortality risk as a result of the Mercury and Air Toxics Standards); Lewis, P. G. T., Chiu, W. A., Nasser, E., Proville, J. et al., *Characterizing Vulnerabilities to Climate Change Across the United States*, 172 Env't Int'l 107772 (2023); Proville, J. et al., *The Demographic Characteristics of Populations Living Near Oil and Gas Wells in the USA*, 44 Population & Env't 1-14 (2022); Envtl. Def. Fund, *Federal Methane Map* (2021), https://www.edf.org/federalmethanemap; EDF, *New Mexico Oil & Gas Data* (2021), https://www.edf.org/nm-oil-gas/map; Kritee, K., Nair, D., Zavala-Araiza, D., Proville, J. et al., *High Nitrous Oxide Fluxes from Rice Indicate the Need to Manage Water for Both Long-and Short-Term Climate Impacts*, 115 Proc. Nat'l Acad. Sci. 9720-9725 (2018),

course of my career I have trained and developed skills as a researcher and academic, which includes (but is not limited to) understanding scientific literature and conducting rigorous analysis.

4. EDF is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

5. EDF is one of the world's leading environmental organizations. EDF's mission is to secure a vital earth for everyone. For more than 50 years, EDF has been a pioneer in working to make the environment safer and healthier for us all. Guided by science and economics, EDF finds practical and lasting solutions to the most serious environmental problems. EDF employs hundreds of scientists, economists, engineers, business school graduates, lawyers, and other professionals to help solve environmental problems in a scientifically sound, cost-effective, and pragmatic way.

6. EDF's work covers climate, air pollution, and energy, as well as ecosystems, public health, and resilience. Since these topics are intertwined, we take a multidisciplinary, solutions-based approach, working alongside other organizations—as well as with businesses, governments, and communities.

---

https://www.pnas.org/doi/10.1073/pnas.1809276115; Proville J. et al., *Night-Time Lights: A Global, Long Term Look at Links to Socio-Economic Trends*, 12 PLoS ONE e0174610 (2018).

7. EDF's energy and climate teams seek to bend the curve on global greenhouse gas emissions from fossil fuel production and use by 2030, cleanly and equitably. We do this through a defined set of strategies targeted at 1) reducing emissions from fossil fuel production, delivery, and use, and 2) decarbonizing power generation, transportation, buildings, and industry. EDF's clean air and health teams focus on protecting both people and the environment from pollution and toxic chemicals. This is achieved via cutting-edge research and advocacy, wide-ranging partnerships, and a focus on strengthening laws and policies that protect health, air, water, and make food and household products safer.

8. Reducing climate and other health-harming air pollution is one of EDF's top organizational priorities. EDF seeks to achieve this by leveraging scientific data and economic analysis to support policy actions that reduce climate and local air pollution including from stationary sources in the United States. EDF has long advocated for protective standards to reduce air pollution under the Clean Air Act, including to address mercury pollution from coal power plants. EDF's advocacy has also extended to ensuring appropriate regulatory timelines and processes for implementing pollution controls under the Mercury and Air Toxics Standards ("MATS").

**The EPA Mercury and Air Toxics Standards ("MATS rule")**

9. It is my understanding that the U.S. Environmental Protection Agency ("EPA") recently finalized revisions to the Mercury and Air Toxics Standards, National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508 (May 7, 2024). I understand these revisions were made pursuant to EPA's obligation to conduct a technology review of the hazardous air pollution emissions controls under section 112(d)(6) of the Clean Air Act. It is my understanding that the final rule revisions reflect EPA's assessment of developments in hazardous air pollutant control technologies and the real-world performance of coal- and oil-fired power plants since the original MATS rule was promulgated in 2012. I understand that EPA has established more stringent emissions limits for non-mercury metallic hazardous air pollutants from existing coal-fired electric utility steam generating units. Additionally, I understand EPA has lowered the mercury emissions standard for existing lignite-fired units to align with the level achieved by other coal-fired units under the current MATS requirements. It is also my understanding that the final rule strengthens monitoring and compliance assurance provisions by requiring continuous emission monitoring systems ("CEMS") for hazardous air pollution from covered sources, and that EPA has determined the new CEMS requirements could further reduce emissions of

non-mercury toxic metals by allowing power plant operators to quickly identify and correct issues with pollution control equipment. Further, I understand EPA has revised startup provisions within MATS to ensure better control of emissions during these operating periods.

10. I understand that EPA found the rule would lead to reductions of emissions of mercury and non-mercury metallic hazardous air pollutants such as nickel, arsenic, and lead from coal-fired power plants, thereby improving air quality and delivering health benefits to the public. The rule will thus benefit EDF members who live, work, and recreate near coal-fired power plants.

11. EDF has a strong organizational interest, and a strong interest that is based in its members' recreational, aesthetic, professional, educational, public, health, environmental, consumer, and economic interests, in swiftly reducing harmful stationary source pollution, such as that from coal-fired power plants. EDF has shown its commitment to reducing stationary source pollution through its longstanding participation, advocacy, and litigation concerning federal rulemaking and state planning governing various stationary source categories. In addition, EDF's work includes helping the public understand pollution exposures and making information about pollution more accessible.

12. EDF engaged in significant litigation and advocacy to obtain and protect the MATS.[2] When EPA attempted to "delist" power plants as a source category under Clean Air Act § 112 to avoid regulating power plant hazardous air pollutant emissions, EDF joined the lawsuits challenging that action. After the court held that the "delisting" had in fact been unlawful, EDF sued EPA to secure a binding timetable for the issuance of the MATS regulations. EDF representatives have testified before Congress and in public hearings regarding the need for the original MATS program as well as the importance of its strengthening, and have submitted extensive written comments during the MATS rulemaking as well as in

[2] *See, e.g., Murray Energy Corp. v. EPA*, Motion of Conservation Law Foundation et al. to Intervene on Behalf of Respondents, No. 16-1127 (D.C. Cir. May 25, 2016) (motioning to intervene in defense of EPA's supplemental appropriate and necessary finding); *Michigan v. EPA*, Brief of Respondents American Academy of Pediatrics et al., U.S. Nos. 14-46, 14-47, 14-49 (Feb. 25, 2015); Petition for Reconsideration Submitted by Air Alliance Houston et al. of EPA's May 2020 Reconsideration of Supplemental Finding and Residual Risk and Technology Review Final Rule (July 23, 2020); Mark MacLeod et al., Setting the Record Straight on Mercury and Air Toxics Standards (Dec. 21, 2011), https://www.edf.org/media/setting-record-straight-mercury-and-air-toxics-standards (press release); EDF, Meeting the Mercury and Air Toxics Standards for Power Plants: Greater Benefits, Lower Costs (fact sheet), https://www.edf.org/sites/default/files/content/EDF%20MATS%20compliance%20fact%20sheet%20FINAL.pdf; Kritee, America's Leading Mercury Scientists Call for Strong Air Pollution Standards (EDF blog) (Dec. 14, 2011), https://blogs.edf.org/climate411/2011/12/14/america%E2%80%99s-leading-mercury-scientists-call-for-strong-air-pollution-standards/; EDF, Power Companies' Declining Estimates of the Compliance Costs of the Mercury & Air Toxics Standards (MATS) (May 2014), https://blogs.edf.org/climate411/wp-content/blogs.dir/7/files/2014/05/Declining-costs-of-MATS-compliance.pdf; EDF Joins Broad Coalition to Support EPA's Proposal About the Mercury and Air Toxics Standards (press release) (Apr. 12, 2022), https://www.edf.org/media/edf-joins-broad-coalition-support-epas-proposal-about-mercury-and-air-toxics-standards-0;Joanna Foster, New Hope in Fight Against Mercury (Mar. 22, 2023), https://www.edf.org/article/new-hope-fight-against-mercury.

later EPA actions.[3] Supporters of EDF interested in stringent standards for power plant HAP emissions submitted more than 82,000 comments to EPA in the original MATS rulemaking.

13. EDF has participated as a stakeholder through the rulemaking process for the MATS rule, submitting extensive written comments[4] and providing oral testimony on the proposed regulations.[5]

14. If EDF successfully defends the final MATS rule against legal challenges, it will benefit EDF's members and communities at large by ensuring more protective pollution limits for mercury emissions at lignite-fired power plants and for non-mercury metallic hazardous air pollutants at all covered coal plants, and by limiting coal plant startup emissions. In addition, if EDF defends the CEMS requirement against challenges, the organization and its members will gain access

---

[3] *See, e.g.*, Comments of EDF on EPA's Proposal for National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units (Aug. 4, 2011), https://www.regulations.gov/comment/EPA-HQ-OAR-2009-0234-18438; Comments of Public Health and Environmental Groups on U.S. EPA's Proposed Supplemental Finding that it is Appropriate and Necessary to Regulate HAPs from Coal Power Plants (Jan. 15, 2016), https://www.regulations.gov/comment/EPA-HQ-OAR-2009-0234-20558; Comments of Public Health and Environmental Organizations on EPA's Proposed Revocation of the Appropriate and Necessary Finding (Apr. 11, 2022), https://www.regulations.gov/comment/EPA-HQ-OAR-2018-0794-4962.

[4] Comments of Public Health and Environmental Organizations on Proposed Rule: National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review (June 23, 2023), https://www.regulations.gov/comment/EPA-HQ-OAR-2018-0794-5996.

[5] Richard Yates, Comments of Environmental Defense Fund at EPA's Public Hearing on Technology Review Proposed Rule (May 9, 2023), https://blogs.edf.org/climate411/wp-content/blogs.dir/7/files/2023/05/5-9-23-EDF-Hearing-Testimony-MATS-strengthening-proposed-rule.pdf.

to more information about emissions of toxic metals from coal plants—helping EDF achieve its mission—and its members will benefit from the additional pollution reductions EPA predicts may occur as a result.

**Impacts of Mercury and Air Toxics Pollution**

15. From my work at EDF and from contributing to studies on air pollution impacts, I am aware that scientific research has linked air pollution from coal plants to a variety of health impacts. I am aware that coal-fired power plants are significant sources of mercury air pollution, which poses serious health risks to both the environment and human populations. Literature I have reviewed indicates that mercury emitted from these plants can transform into methylmercury in the environment, a potent neurotoxin which accumulates in fish and, through biomagnification, affects the health of animals and humans consuming these fish.[6] The literature further indicates that exposure to methylmercury can result in severe neurological and developmental deficits, particularly affecting fetuses and young

[6] Al-Sulaiti, M.M., Soubra, L. & Al-Ghouti, M.A, The Causes and Effects of Mercury and Methylmercury Contamination in the Marine Environment: A Review, 8 Curr Pollution Rep 249–272 (2022), https://doi.org/10.1007/s40726-022-00226-7.

children, leading to impaired cognitive thinking, memory, attention, language, and fine motor and visual spatial skills.[7]

16. I am further aware, based on the scientific and public health literature, that mercury pollution is linked to cardiovascular problems in adults and is considered a risk factor for heart diseases. From my work at EDF, I am familiar with studies that have shown that mercury exposure can lead to increased risks of myocardial infarction, hypertension, and general cardiovascular diseases.[8] The environmental impact of mercury pollution extends to wildlife as well, with numerous studies documenting decreased reproductive success in birds and mammals due to mercury exposure.[9] A study by Li et al. (2022)[10] highlights the widespread contamination of mercury in vegetables and grains near coal-fired power plants, indicating the pervasive nature of this pollutant and its ability to infiltrate the food chain. Additionally, EDF's article on the top mercury-emitting

---

[7] *See* Díez, S., Human health effects of methylmercury exposure, Rev Environ Contam Toxicol. 198, 111-32 (2009), https://pubmed.ncbi.nlm.nih.gov/19253038; Saavedra, S., Fernández-Recamales, A., Sayago, A., Cervera-Barajas, A., González-Domínguez, R., & Gonzalez-Sanz, J.D. (2022); Impact of dietary mercury intake during pregnancy on the health of neonates and children: a systematic review, Nutrition Reviews, 80(2), 317–328, https://doi.org/10.1093/nutrit/nuab029.

[8] Genchi, G., Sinicropi, M.S., Carocci, A., Lauria, G., & Catalano, A., Mercury Exposure and Heart Diseases, Int J Environ Res Public Health 14(1):74 (2017), https://pubmed.ncbi.nlm.nih.gov/28085104.

[9] Varian-Ramos, C.W., Swaddle, J.P., & Cristol, D.A, Mercury reduces avian reproductive success and imposes selection: an experimental study with adult- or lifetime-exposure in zebra finch, PLoS One 9(4):e95674 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3997408.

[10] Li, R., Wu, H., Ding, J., Fu, W., Gan, L., & Li, Y, Mercury pollution in vegetables, grains and soils from areas surrounding coal-fired power plants, *Scientific reports 7*(1), 1-9 (2017), https://www.nature.com/articles/srep46545.

power plants in the United States underscores the ongoing threat these emissions pose to public health, despite existing regulations.[11] These findings underscore the critical need for more stringent regulatory measures to control mercury emissions from coal-fired power plants to mitigate their profound impacts on public health and the environment.

17. I am aware that coal-fired power plants emit a variety of non-mercury metallic hazardous air pollutants, including arsenic, cadmium, chromium, and nickel. Scientific research indicates that these metals are integral components of fine particulate matter which, when released into the atmosphere, can have significant adverse health and environmental impacts.[12] I understand that exposure to these metals can lead to serious health issues, such as cancers, reproductive and development anomalies, neurologic and neurobehavioral disorders, diabetes, hearing loss, hematologic disorders and more, as documented in various epidemiological studies.[13] Furthermore, I am aware that these pollutants contribute

---

[11] *See* Jolie Villegas, We Need to Close a Mercury Pollution Loophole for Lignite Coal Plants, Environmental Defense Fund (Apr. 12, 2024), https://blogs.edf.org/climate411/2024/04/12/we-need-to-close-a-mercury-pollution-loophole-for-lignite-coal-plants/.

[12] *See* Tchounwou, P.B., Yedjou, C.G., Patlolla, A.K., & Sutton, D.J, Heavy metal toxicity and the environment, Exp Suppl 101, 133-164 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4144270; He, Z.L., Yang, X.E., & Stoffella, P.J, Trace elements in agroecosystems and impacts on the environment, J Trace Elem Med Biol. 19(2–3), 125–140 (2005).

[13] *See* Tchounwou, P.B., Patlolla, A.K., & Centeno, J.A., Carcinogenic and systemic health effects associated with arsenic exposure-a critical review, Toxicol Pathol. 31(6), 575–588 (2003), https://pubmed.ncbi.nlm.nih.gov/14585726; International Agency for Research on Cancer (IARC) Monographs – Cadmium, Lyon, France (1993); Waalkes, M.P., Berthan, G.,

to environmental degradation through the acidification of water bodies and soil, which can harm aquatic life and disrupt ecosystems.[14] The literature shows that bioaccumulation of these toxic metals in the food chain can lead to decreased biodiversity and the contamination of food sources for humans and wildlife alike.[15] In addition to health and environmental impacts, I understand that these emissions can cause economic damage by degrading crop quality and reducing agricultural productivity.[16] The societal costs associated with health care, environmental cleanup, and lost agricultural revenue are substantial, emphasizing the need for stringent regulatory measures to control emissions from these sources.

18. To date, the MATS rule has been successful in reducing mercury pollution in the environment across the U.S.: atmospheric deposition from

---

editors, Handbook on Metal-Ligand Interactions of Biological Fluids, Vol. 2, New York: Marcel Dekker, 471–482 (1995); Costa, M., Toxicity and carcinogenicity of Cr(VI) in animal models and humans, Critical Reviews in Toxicology 27, 431–442 (1997), https://pubmed.ncbi.nlm.nih.gov/9347224; Nishijo, M., Tawara, K., Honda, R., Nakagawa, H., Tanebe, K., & Saito, S., Relationship between newborn size and mother's blood cadmium levels, *Arch Environ Health* 59(1), 22–25 (2004), https://pubmed.ncbi.nlm.nih.gov/16053205; Landolph, J., Molecular mechanisms of transformation of CH3/10T1/2 C1 8 mouse embryo cells and diploid human fibroblasts by carcinogenic metal compounds, *Environ Health Perspect* 102, 119–125 (1994), https://pubmed.ncbi.nlm.nih.gov/7843085.

[14] Zhang, J., Du, J., Zhang, S., Yang, S., & Xu, Q, The effects of acidification on arsenic concentration and speciation in offshore shallow water system, Marine Pollution Bulletin 181, 113930 (2022), https://doi.org/10.1016/j.marpolbul.2022.113930.

[15] Jamil Emon, F., Rohani, M.F., Sumaiya, N., Tuj Jannat, M.F., Akter, Y., Shahjahan, M., Abdul Kari, Z., Tahiluddin, A.B., & Goh, K.W., Bioaccumulation and Bioremediation of Heavy Metals in Fishes-A Review, Toxics 11(6), 510 (2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10302055.

[16] Vasilachi, I.C., Stoleru, V. & Gavrilescu, M, Analysis of Heavy Metal Impacts on Cereal Crop Growth and Development in Contaminated Soils, Agriculture 13(10) (2023), https://doi.org/10.3390/agriculture13101983.

domestic power plants decreased by 91% across the contiguous U.S. from 6.4 Mg in 2010 to 0.55 Mg in 2020.[17] Nonetheless, additional reductions are needed and studies have shown the degree to which these mercury pollutants adversely and disproportionately affect vulnerable populations.[18] In particular, Spiller et al., (2021)[19] highlight how the health benefits to older Black Americans and other racial/ethnic groups from improvements in air quality associated with the MATS rule have been chronically underestimated and are even more substantial than EPA estimates.

**EDF Members Affected by Coal Power Plants**

19. EDF currently has more than 330,000 members in the United States, and we have members in all 50 states and the District of Columbia. These members have a strong interest in protecting human health and the environment from hazardous air pollution. Many of EDF's members live in and near areas affected by hazardous air pollution.

20. EDF members are among those directly affected by pollution caused by coal power plants and associated operations. EDF has conducted an analysis of

---

[17] Dai, M. Q., Geyman, B. M., Hu, X. C., Thackray, C. P., & Sunderland, E. M, Sociodemographic disparities in mercury exposure from United States coal-fired power plants, *Environmental Science & Technology Letters*, 10(7), 589-595 (2023).
[18] *Id.*
[19] Spiller, E., Proville, J., Roy, A., & Muller, N.Z, Mortality Risk from PM2.5: A Comparison of Modeling Approaches to Identify Disparities across Racial/Ethnic Groups in Policy Outcomes, Environmental Health Perspectives 129(12), 127004 (2021), https://doi.org/10.1289/EHP9001.

where our members live across the U.S. to determine how many reside within 5 kilometers of a coal power plants. EDF collected data from EPA's Clean Air Markets Program Data,[20] current as of February 5, 2024, showing 252 coal-fired plants in operation in the U.S. The 5-kilometer radius is predicated on Dai et al. (2023)[21] and used for consistency with similar studies on demographic impacts of mercury pollution. It represents an appropriate distance within which health impacts have most clearly been correlated with the presence of coal power plants. Nonetheless, we anticipate that this estimate understates the full impact of mercury and non-mercury metallic hazardous air pollution on our members, and the U.S. populace, given that research and analysis indicates coal power plants have been linked to air pollution at distances much greater than 5 kilometers. For that reason, we also include a select set of estimates associated with a 10-kilometer proximity.

21. I understand from our membership department that when an individual becomes a member of EDF, their current residential address is recorded in our membership database. The database entry reflecting the member's residential address is verified or updated as needed. The database is maintained in the regular course of business, and each entry reflecting a member's residential

---

[20] EPA, Clean Air Markets Program Data, https://campd.epa.gov/.
[21] Dai, M. Q., Geyman, B. M., Hu, X. C., Thackray, C. P., & Sunderland, E. M., Sociodemographic disparities in mercury exposure from United States coal-fired power plants, *Environmental Science & Technology Letters* 10(7), 589-595 (2023).

address and membership status is promptly updated to reflect changes. I obtained the information about our membership discussed below from our membership database.

22. EDF research analyst Katherine Roberts and I performed our analysis using this EDF membership data and geographic information systems ("GIS") to assess the proximity of the geographic coordinates of members' addresses to coal power plant facilities, both in general and those fired using lignite coal. Katherine Roberts holds a Master of Engineering degree from Stanford University and has over six years of experience in geospatial analysis.

23. Additionally, we performed analysis to assess the number of people living within 5 kilometers of these facilities, irrespective of whether they are EDF members. These calculations were also performed in GIS and relied on the most recent American Community Survey 5-year estimates (2016-2021) at the census tract level. Estimates within a 5-kilometer radius overlapping multiple census tracts were adjusted using the areal apportionment method, the most common and prevalent technique in demographic studies of this nature.

24. Our analysis determined that EDF has over 2,000 members who live within 5 kilometers of a coal-fired power plant. These members will realize the benefits EPA has determined will occur as a result of the rule's reductions in mercury and other toxic metal pollution. In addition, since CEMS provides greater

transparency about toxic emissions from these plants, it contributes to EDF's efforts to make air pollution information more publicly available.

25. We also performed analysis to assess the number of EDF members living within 5 kilometers of more than one coal power plant, which presents a much more substantial degree of (cumulative) pollution exposure. Cumulative air pollution burdens are problematic because long-term exposure to multiple air pollutants, even at low levels, can compound to significantly increase the risks of chronic diseases like cardiovascular and respiratory illnesses, leading to reduced life expectancy and disproportionately impacting disadvantaged communities. We find that there are 93 EDF members living within a 5-kilometer proximity of multiple coal-fired power plants.

26. We further assessed the number of EDF members living within a larger radius of 10 kilometers. We find that 11,300 EDF members live within that distance of a coal plant, and six members live within 10 kilometers of one of the 12 lignite coal plants covered under the MATS program. 531 members live within 10 kilometers of more than one coal plant.

27. Beyond EDF membership, a large share of people across the United States live in proximity to coal-fired power plants and are exposed to their pollution. Our analysis finds that nationally, 2.4 million people live within 5

kilometers of one of the 252 coal power plants, and that 4,600 people live within the same distance of one of the 12 lignite-fired facilities.

28. Without a strengthened MATS rule, EDF's members are at increased risk of the pollution impacts of coal-fired power plants. Our members, and EDF as an organization, have a strong interest in ensuring the final MATS rule goes into effect and is implemented in a swift and protective manner so that pollution reductions from coal-fired power plants are realized.

I declare under penalty of perjury that the foregoing is true and correct.

Jeremy Proville

Executed on May 29, 2024.

**DECLARATION OF CHRISTINE RESCH**

I, Christine Resch, hereby declare and state:

1. I am a member of Clean Air Council ("CAC").

2. I currently reside in Whitehall, Pennsylvania. I have lived in Whitehall for over 30 years.

3. I live approximately four miles from the Northampton Generating Plant which burns coal refuse.

4. Through my membership with CAC, I am aware the Northampton Generating Plant emits large amounts of fine particulate matter ("$PM_{2.5}$"), mercury, and other hazardous air pollutants ("HAPs") into the air which I, my family, and my community breathe and to which our eyes are exposed, particularly when we go outdoors.

5. As a member of CAC, I am aware that the Northampton Generating Plant violated the Clean Air Act multiple times in 2023, including by failing to submit required reports to the United States Environmental Protection Agency ("EPA").

6. As a member of CAC, I am also aware that EPA signed updated mercury and air toxics standards to reduce and better monitor emissions of air pollutants from power plants on April 24, 2024 ("MATS Update Rule"). As part of the MATS Update Rule, the Northampton Generating Station is required to install continuous emissions monitoring systems for $PM_{2.5}$ ("PM CEMS").

7. PM CEMS at the Northampton Plant will have multiple benefits, including increased transparency regarding the emissions from the plant, and, more significantly, PM CEMS would make it clear when PM controls are not performing properly. This would allow the controls to be repaired more quickly, reducing my risk of exposure to $PM_{2.5}$.

8. Through my membership in CAC, I am aware that multiple peer-reviewed studies have found that exposure to $PM_{2.5}$ pollution is detrimental to eye health, with effects that include damage to the ocular surface, inflammation, and oxidative stress.[1]

9. I have diabetes, and one of the primary ways I control it and maintain my health is by going for multiple long walks outdoors each day. I regularly experience substantial eye irritation during my walks. On those days, after I return home my eyes continue to burn significantly and water for most of the day.

10. I understand that industry lawsuits challenging EPA's MATS Update Rule, if successful, could cause the Rule to be vacated, weakened, or delayed. These outcomes would prevent or delay the pollution protections that the MATS Update Rule will provide and, thus, prolong and increase my exposure to pollution from power plants and the adverse health effects that such pollution causes, such as eye pain, irritation, and other potential damage. Vacating, weakening, or staying MATS would also prolong and increase the harm that pollution from power plants causes to my aesthetic and recreational interests, including enjoying my time outdoors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 30th day of May, 2024.

*/s/ Christine Resch*
Christine Resch

[1] https://www.sciencedirect.com/science/article/abs/pii/S0269749124002021.

**DECLARATION OF NANCY RETANA**
**Submitted in Support of Clean Wisconsin**

I, Nancy Retana, do hereby affirm and state:

1. I am currently a member of Clean Wisconsin. I have been a member of Clean Wisconsin for over a year and have been involved in and tracking its advocacy ever since.

2. I became a member of Clean Wisconsin because I am a strong supporter of its mission to protect Wisconsin's natural heritage, and because I am passionate about its work to center community voices.

3. I live in Glendale, a suburb of Milwaukee. I live near the Oak Creek Power Plant, a base load coal- and natural gas-fired power plant.

4. I am aware that We Energies, the utility that owns the Oak Creek Power Plant, has announced plans to retire the facility's coal units, but that retirement dates have been pushed back in the past and could be delayed in the future.

5. I understand that coal-fired power plants are among the largest anthropogenic sources of hazardous air pollutants, including mercury, chromium, lead, and other metals that are emitted as particulate matter.

6. I am aware of the harmful effects of mercury on human health and the environment, which are well-documented in scientific literature and government

publications. Methylmercury, the most common organic mercury compound, bioaccumulates in fish, and fish consumption poses the most significant route of human and wildlife exposure. At high doses, methylmercury has caused severe human health effects, including death. Methylmercury poses particular risks of neurological problems to developing fetuses and nursing infants. It is estimated that more than 75,000 newborns in the U.S. each year may have increased risk of learning disabilities associated with methylmercury exposure.

7. Other hazardous air pollutants from coal-fired power plants are also associated with a variety of adverse health risks, including cancer. Particulate matter—which when emitted by coal-fired power plants can contain hazardous air pollutants—is also associated with serious health issues, including heart attacks and premature death.

8. I suffer from asthma and have many close family members with asthma. Smoke from wildfires has increased the number of poor air quality days in my area. Milwaukee's air quality is also negatively impacted by localized emissions from the Oak Creek Power Plant. I have personally experienced negative health effects during poor air quality days.

9. My work involves outdoor projects with community members to install green infrastructure such as rain gardens.

10. I am chair of the Milwaukee Estuary Area of Concern Community Advisory Committee that serves as the voice of the community in the process of cleaning up Milwaukee's Area of Concern. The work in the Area of Concern focuses on the rehabilitation of the Milwaukee Estuary which is impaired due to several pollutants, including mercury, lead, and chromium, which are hazardous air pollutants emitted by coal-fired power plants and regulated by the Mercury and Air Toxics Standards.

11. In the course of my work, I have had to cancel or reschedule meetings with organizational partners due to poor air quality. On one occasion, poor air quality meant that I was unable to have a planned outdoor meeting with an elderly person.

12. Pollution from the Oak Creek Power Plant impacts my health and the health of my community. I have been on the plant's site. There is a playground located very close to the power plant, and the playground equipment is sometimes covered with soot from the power plant. I do not believe it is safe for children in my community to play there.

13. Particulate matter from the Oak Creek Power Plant and other power plants travels long distances and harms my health and the health of others in the areas where I live and work. I find it daunting to think about the effects of this particulate matter pollution.

14. The Great Lakes have also struggled with contamination from pollutants including mercury in the environment and particularly in fish.

15. As an active member of my community and as an organizer, I regularly talk to individuals who are experiencing health issues because of poor air quality, or who have concerns about their health or the health of their children in the face of air pollution. Through outreach work on the Community Advisory Committee, I have often come into contact with recreational users of the local waterways concerned over beneficial use impairments, specifically contaminated fish and ecosystems affected by mercury and other toxins.

16. I have chosen on occasion to refrain from outdoor activities including hiking, walking, and not eating fish caught nearby when local air pollution or water toxin concerns are particularly acute.

17. My health has been affected by extreme temperatures caused by climate change, as high temperatures exacerbate the effects of poor air quality and can worsen my asthma symptoms. Increasing temperatures and extreme weather associated with climate change have also been connected to increasing mercury levels.

18. I recently became pregnant and am worried about my health and my child's health due to the risks of exposure to air toxics in the environment. Given my knowledge of local toxin advisories in the Milwaukee Estuary, I refrain from

consuming fish caught in local waterways to prevent consumption of polluted food that may affect my unborn child.

19. Along with power plants' impacts on local air pollution and climate change, I am aware of and concerned about the energy cost burden on Milwaukee residents, particularly in Black and Latine neighborhoods that are disproportionately affected by rate increases.

20. I understand that, in April 2024, the U.S. Environmental Protection Agency ("EPA") finalized a rule that tightens emissions limits for mercury from plants that burn lignite coal; tightens emissions limits for lead, chromium, and other metal hazardous air pollutants from all coal plants; and requires continuous emissions monitoring for filterable particulate matter as a way to ensure compliance with the limit addressing metal hazardous air pollutants from coal-fired power plants.

21. I support EPA's rule. I understand that the power sector is among the largest sources of hazardous air pollutant emissions from power plants, and therefore it is important to reduce these emissions.

22. EPA's rule will benefit my work, my community, and me by lessening the health and environmental impacts of air pollution from power plants. The tighter limits on mercury and other metal hazardous air pollutants have the potential to significantly reduce emissions and the continuous monitoring

requirement can provide significantly more information about emissions to local communities than periodic testing, enabling them to take actions to reduce their exposure, and could also enable plant owners and operators to quickly catch and fix faulty controls, which could further reduce emissions of metal hazardous air pollutants.

23. I would not receive these benefits if the rule's implementation is delayed or if the rule is overturned.

24. It is my understanding that Clean Wisconsin is seeking to join a lawsuit to defend EPA's rule revising the limits and requirements for hazardous air pollutant emissions from coal- and oil-fired power plants. I support Clean Wisconsin joining this lawsuit.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 29 day of May, 2024.

___*Nancy Retana*____

Nancy Retana

**DECLARATION OF PATRICIA SCHUBA**

I, Patricia Schuba, hereby declare as follows:

1. I am an adult resident of Missouri and I reside at 2322 Highway 100, Labadie, Missouri 63055. I make these statements based upon personal knowledge.

2. I have been a member of Sierra Club since 1992.

3. My family farm is located about 3 miles from the Labadie coal-fired power plant, which is in Franklin County, Missouri and is owned and operated by Ameren Missouri. The farm has been in the family since 1870 and has a special designation as a Century Farm. We had every intention to keep the property in our family for generations to come, but now my family is having conversations questioning the safety of raising future generations here. My family owns four farms in the immediate area where we raise our own food, cattle and sheep, and sell and grow crops.

4. I and my family once fished the lakes, streams, and ponds of our farm and enjoyed eating the fish we would catch. When I was a child, my father and I would routinely fish on our property. As an adult, however, I learned that mercury accumulates in fish, posing risks of neurological damage to those who consume such fish; we no longer fish on our farm.

5. I also understand that coal-fired power plants like the Labadie plant emit dangerous air pollutants in addition to mercury, such as toxic metals, and acid gases, as well as particulate matter, sulfur dioxide, nitrogen oxides, and other pollutants. I know that these pollutants can cause or contribute to a wide range of health problems, including asthma, respiratory and cardiovascular disease, and cancer.

6. I have many concerns about the impacts of the pollution from the Labadie plant on our farm. All of our crops and animals are exposed to the plant's pollution. We are worried about the safety of the food that we eat and the impacts of the pollution on the property that the next generation will inherit. My family used to live off the food grown on the farm. We never used pesticides on the farm, and we always thought that we had healthy and safe food. Now, because we wonder about the safety of the food, we buy organic produce to supplement the food we eat from the farm.

7. Everything my family owns is on the farm. I worry about the impacts of the pollution from the Labadie plant on the value of the property. I would like to see the air pollution from the plant further reduced because I believe it would increase the value of our family farm, and the health of our land, water, crops and animals.

8. I have concerns about the impacts of the pollution from the plant on my health and the health of my family. I do not want to be exposed to air pollution nor do I wish my family and friends to be exposed to such pollution. I am concerned about my exposure to plant's particulate matter emissions (including the toxic substances that may be contained in particulate matter) because I know particulate matter can penetrate deep into the lungs and can lead to a range of respiratory problems. I also understand that the toxics contained in particulate matter from coal plants may be carcinogenic or otherwise harmful. Because of these concerns, we keep the house windows closed even in summertime. We also operate standing air filters for the house to help improve air quality.

9. I used to enjoy hiking along the Missouri botanical preserve arboretum, which is located a few miles away from the plant. I also used to go running around the farm. I no longer hike or run in the area because of my concerns about how the pollution from the plant is impacting my health. I try not to travel anywhere close to the plant unless I have to, and when I do, I spend as little time outdoors as possible.

10. I am aware that the EPA — through the Mercury and Air Toxics Standards ("MATS Rule") — set standards to reduce toxic pollution from coal-fired power plants and limit the impact of this pollution on my

health. I also understand that EPA has recently updated those standards, reviewing the agency's Risk and Technology Review for coal-fired power plants. As a result of that review EPA has, among other things, set lower standards for particulate matter, as a surrogate for toxic metals, emitted by the Labadie and other coal-fired power plants.

11. I fear that Labadie's pollution harms my health, my family's and friends' health, as well as the health of the public and the environment. EPA's newly adopted and stricter limits on particulate matter (including toxic metals) from coal-fired power plants will reduce toxic pollution from the Labadie plant, lessening the amount of air pollution to which I, my family, and my friends are exposed. This would also make me feel safer using my property and nearby areas.

12. I believe that I would be harmed if EPA's strengthened MATS standards were eliminated or weakened. If the standards were weakened or revoked, emissions of particulate matter (including toxic metals) from Labadie and other existing coal plants would increase, therefore increasing the amount of air pollution to which I, my family, and my friends are exposed. This increase in pollution would make me feel less safe using my property and nearby areas, and reduce both my use of that property and my enjoyment in doing so.

13. For these reasons, I support Sierra Club's effort to protect the standards EPA has recently set through its Risk and Technology Review for the MATS standards against attempts to weaken or eliminate it. I am participating in this case because I believe that if the MATS standards were preserved my own use and enjoyment of the outdoors surrounding my home would be improved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 26, 2024

Patricia Schuba

**DECLARATION OF THOMAS J. SEDOR**

I, Thomas J. Sedor, hereby declare and state:

1. I am a member of Clean Air Council ("CAC").

2. I currently reside in Northampton, Pennsylvania. I have lived in Northampton for over 30 years.

3. I live approximately one mile from the Northampton Generating Plant which burns coal refuse.

4. I am aware the Northampton Generating Plant emits large amounts of fine particulate matter ("PM2.5"), mercury, and other hazardous air pollutants ("HAPs") into the air which I, my family, and my community breathe.

5. As a member of CAC, I am aware that the Northampton Generating Plant emitted approximately 248 pounds of mercury compounds in 2022 alone, and that it violated the Clean Air Act multiple times in 2023, including by failing to submit required reports to the United States Environmental Protection Agency ("EPA").

6. As a member of CAC, I am also aware that EPA signed updated mercury and air toxics standards to reduce and better monitor emissions of air pollutants from power plants on April 24, 2024 ("MATS Update Rule"). As part of the MATS Update Rule, the Northampton Generating Station is required to install continuous emissions monitoring systems for PM2.5 ("PM CEMS").

7. PM CEMS at the Northampton Plant will have multiple benefits, including increased transparency regarding the emissions from the plant, and, more significantly, PM CEMS would make it clear when PM controls are not performing properly. This would allow the controls to be repaired more quickly.

8. When PM controls are not operating properly, mercury emissions may also increase. Therefore, CEMS lowers the risk of the Northampton Generating Plant exposing me and my family to higher than anticipated levels of mercury in addition to PM2.5.

9. My son, who I raised in Northampton, lives next door to me, where he is raising his son who has severe autism spectrum disorder ("ASD"). On my block alone, five families have children with ASD.

10. I am aware that recent studies have shown that people with ASD tend to have significantly higher blood levels of mercury compared to their neurotypical counterparts, which may make them more susceptible to health injuries and developmental delays from mercury exposure.[1]

11. I also have trouble with my lungs, including coughing and wheezing. There are days when I can smell the air pollution from the Northampton Generating Plant. On those days, my breathing is worse when I am outdoors, and so I am forced to stay inside.

12. I understand that industry lawsuits challenging EPA's MATS Update Rule, if successful, could cause the Rule to be vacated, weakened, or delayed. These outcomes would prevent or delay the pollution protections that the MATS Update Rule will provide and, thus, prolong and increase my exposure to pollution from power plants and the adverse health effects that such pollution causes, such as aggravating my breathing problems. Vacating, weakening, or staying MATS would also prolong and increase the harm that pollution from power plants causes to my aesthetic and recreational interests, including spending time outdoors.

---

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10741416/

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 30th day of May, 2024.

_*/s/ Thomas J. Sedor*_______________
Thomas J. Sedor

**DECLARATION OF WADE SIKORSKI**

I, Wade Sikorski, Ph.D, declare under penalty of perjury that the following is true and correct and within my personal knowledge.

1. I am over eighteen (18) years old, am competent to testify, and have personal knowledge of the matters set forth herein.

2. I am a fourth generation rancher, and I live on my ranch in Fallon County, Montana, half way between Baker and Ekalaka. My ranch is my primary source of income. My family has owned and operated a ranch in Fallon County for more than a century. Aside from the years I went to college at Montana State University in Bozeman, the years I went to the University of Massachusetts for graduate school, and the year I was an Assistant Professor at New Mexico State University, I have lived on the ranch all of my life. I expect to live in Montana for the rest of my life.

3. I have been a member of the Montana Environmental Information Center (MEIC) since 1995. MEIC is a Montana nonprofit corporation founded in 1973 by Montanans concerned about protecting and restoring Montana's natural environment. MEIC has worked extensively on addressing the impacts of air pollution in Montana.

4. As a rancher, I routinely do general farm and ranch work. This requires me to regularly be outdoors, where I do such things as planting crops, putting up hay, fencing pastures, moving animals between pastures, and harvesting.

5. I am also an avid jogger, and will jog distances of approximately 5 miles six times per week. I maintain a strict jogging routine to manage chronic Lyme disease symptoms and look after my health.

6. While I have lived in Montana, I have become very concerned about air pollution. I developed these concerns from reading a great deal of scientific and philosophical literature on the harm humans are doing to the environment, and thinking about it has given me a strong environmental ethic. I believe in caring for the environment and protecting the land and its people from harm. I believe that we humans are a part of a larger biological community, and that harm to this community is ultimately harm to ourselves.

7. My family's ranch is located approximately 100 miles east of Colstrip, MT, where the Colstrip Coal-fired Power Complex is located. Though two of the plant's units were shut down, two are still in operation. Because the prevailing winds in the region blow east, I am very concerned about the air pollution coming from the Colstrip plant. I am aware that mercury, for example, emitted into the air from coal-fired power plants can travel for many miles in the atmosphere before it is deposited on land or into water bodies via precipitation, according to the U.S. Environmental Protection Agency.

8. I have reason to believe that the emissions from the Colstrip power plant do indeed reach my ranch. I still remember the dismay I felt several decades ago, during the 1980s, when I saw with my own eyes exactly what the Colstrip power plant was doing to the region. My uncle and I had taken my grandmother to the airport in Billings in the ranch's Cessna 172. It was late in the year when we went up, and the ground was bare and brown, but when we came back in the morning, a fresh layer of snow had fallen during the night. As we returned to the ranch, we flew past the Colstrip plant, and I saw it from the air. We continued on flying downwind of the smoke stacks, and I noticed an unnaturally straight line extending out from the Colstrip plant. We had gained more altitude by then, and it seemed to go all the way to the North Dakota border, which I could see looming on the horizon, a few miles past our ranch. On one side of the line, the snow

was sparkling white, as it should be, but inside a shadow covered the land. I looked out the other side of the plane, and I could see another line. Together, they formed a cone of soot that extended out from the Colstrip plant. Our ranch was right in the middle, about 100 miles downwind of the plant. Perhaps the metrological conditions were just right that day, with a fresh layer of snow, a low pressure system that brought the smoke back down to the ground, and a steady gentle wind from the northwest. Maybe the shadow would not have been noticed from the ground, but from my vantage point in the sky, high over southeastern Montana, the reach of the emissions from the Colstrip power plant was clearly visible.

9. As another example of the reach and effect of the Colstrip plant's emissions: about 15 years later, I was trying to figure out what was causing what I believed to be a childhood leukemia cluster in my county. So, I went surfing through the Montana Department of Public Health's web page. I discovered that 26% of the births in Fallon County, which is where I live, had some sort of birth abnormality. Trying to get perspective on how large Fallon County's problem with birth defects were relative to other counties, I started looking at the health profiles of all the other counties in Montana, one by one, and writing down the results. When I finished with all the counties, and checked to see where they were located, I was amazed. There were 10 counties with high incidences of birth defects, and all but 1 of them, Liberty County, which is up by the Canadian border, were clustered around each other in southeastern Montana, around Colstrip. Some of them even had worse incidences of birth defects than Fallon County did. These are the counties in southeastern Montana that had elevated birth abnormality rates: Bighorn 16%, Carter 21%, Custer 34%, Dawson 17%, Fallon 26%, Garfield, 31%, Powder River 25%, Prairie 34%, and Rosebud 20%. Except for Liberty, which had 15%, all of the other counties in Montana were either 10% or lower, with most of them coming in around 7%. All of the counties

that are immediately downwind of the Colstrip power plant had about 3 times as many abnormal births as counties in the other 3 quadrants of Montana.

10. In June 2006, the Montana Board of Environmental Review held hearings on a rule to regulate mercury emissions from coal fired plants that would exceed federal minimum standards. These hearings were about Colstrip, as no other coal plant in Montana even remotely approaches Colstrip's emissions. At the hearing, as I remember it, one of the biggest causes of disagreement was whether mercury emissions would land locally or spread globally. Trying to discredit a state rule that would exceed federal standards, representatives from the Colstrip power plant insisted that their mercury emissions did not land in Montana, and that they were a global problem, not a local one. The tall smoke stacks and the chemical properties of mercury ensured it would land far from its source. The company argued that there was, as a consequence, no need for state regulation, and that Federal regulation more appropriately addressed the harm. I couldn't believe my ears. I saw the soot from Colstrip leaving a shadow on the land with my own eyes. There really is no reason not to assume that the soot had absorbed some of the mercury emissions. Mercury from Colstrip had to be contaminating the local environment, including my family's ranch, and yet there the executives and engineers from Colstrip were, saying, in effect, that my eyes were lying to me. I felt that the executives from Colstrip were lying like a tobacco company to the board. The reason was obvious. According to Gordon Criswell, the environmental manager at the plant, it would cost a half billion dollars to cut mercury emissions by 90%, as the rule proposed to do. Colstrip would rather sacrifice the health of babies than pay the costs to prevent it.

11. I have followed stories on the impacts of toxic air pollution in the news and in scientific reports for several years. I have specifically read news reports on the pollution caused by the

Colstrip Power Plant, and accessed scientific information online regarding the pollution caused by Colstrip. I understand that hazardous air pollutants, such as mercury, nickel, lead, and acid gases, and particulate matter from coal-fired power plants can cause asthma, cardiovascular disease, neurological conditions, and cancer.

12. I am concerned that the pollution from the Colstrip plant impairs the health and wellbeing of myself and my family. I am also concerned about the harm it is doing to the domestic livestock and the wildlife on our ranch.

13. Although I continue to jog regularly to maintain my health and manage complications from chronic Lyme disease, my awareness of emissions from Colstrip impairs my ability to enjoy running outdoors. I experience anxiety as a result of my potential exposure to toxic emissions while I am running.

14. I am worried about the effects that mercury emissions from Colstrip may have on local food sources and on my health. As a child, I helped my parents plant crops on our ranch, and we treated our seeds with commercially available substances containing mercury. Because I know I was exposed to this source of mercury in childhood, I am especially concerned about the cumulative effects on my health of additional mercury exposure in the local environment. I regularly take a Vitamin C supplement, in part for the purpose of mitigating the effects of potential exposure to toxic metals like mercury.

15. I am aware that EPA recently issued a final rule strengthening the Mercury and Air Toxics Standards ("MATS Update Rule"), which will reduce toxic pollution from coal and oil-fired power plants, including Colstrip.

16. If the MATS Update Rule is allowed to take effect, the Colstrip facility will have to install additional pollution controls to reduce the amount of toxic non-mercury metals emitted from the facility. The installation of new pollution controls may also reduce mercury emissions from the facility. This would have a positive impact on my health, my family's health, and my business. I believe that my family and I should be able to breathe clean air and that the cattle and wildlife on our property should be able to breathe clean air. I also believe that we have a moral and spiritual responsibility to take care of the planet and nurture the health of the ecosystem.

17. I am aware that the MATS Update Rule has been challenged in court.

18. If the MATS Update Rule were weakened or eliminated, emissions of mercury and particulate matter (including toxic non-mercury metals) from existing coal-fired power plants, including Colstrip, would continue at present levels, and I would continue to worry about the health and welfare of myself, my family, and my community.

19. For these reasons, I support the Montana Environmental Information Center's effort to protect the MATS Update Rule against attempts to weaken or eliminate it.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May15, 2024.

/s/ *Wade Sikorski*

Wade Sikorski

**DECLARATION OF DELORES STACHURA**

I, Delores Stachura, hereby declare as follows:

1. I am currently a member of the Natural Resources Defense Council ("NRDC") and have been for about 25 years.

2. I live in Herrin, Illinois. I have lived at my current residence for 16 years and in the area for the same amount of time.

3. I am regularly outside. I like to bicycle, walk, hike, garden, swim in my backyard pool, and overall enjoy relaxing in my yard.

4. I track the air quality index online. I have gone through periods of time when I check it daily, like during the wildfires last year that originated in Canada. In the recent past, I have noticed there is a grey soot-like material in my yard. It got everywhere, including my pool, car, yard, and plants. The plants and trees in my yard and neighborhood are not nearly as healthy as they used to be. It took a lot of work to remove, particularly from my pool and the concrete around my home, which I have to power wash regularly now. Additionally, I often notice a black substance that has a metallic quality on the sidewalks, especially after it has rained. It is a pain to remove and has gotten worse over the past 5 years. I notice it across my entire neighborhood.

5. I live around 20 miles from the Marion coal-fired plant, and I also have property about 7 miles from the plant. I am on guard about how polluted air and water affects me in Herrin and my property south of the plant.

6. Though I consider myself to be in good health, I am concerned about how my health might change as I age, and how air pollution in my area is likely to make things worse.

7. I used to notice my neighbors spending more time outside. I see now that they cough more than they used to. I also notice that fewer and fewer people keep their windows open throughout the day and particularly at night.

8. I'm aware that the U.S. EPA has finalized new, stronger standards for toxic soot pollution and mercury pollution from power plants. Stronger standards will go a long way to help my community. I fully support NRDC's lawsuit supporting EPA's decision to strengthen national standards for toxic air pollution from power plants.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on May 31, 2024.

Signature: Delores Stachura

Name: Delores Stachura

# DECLARATION OF MOLLY JO STANLEY FOR THE OHIO ENVIRONMENTAL COUNCIL

I, Molly Jo Stanley, hereby declare and state as follows:

1. This declaration is based on my personal knowledge. I am over the age of eighteen (18) and suffer no legal incapacity.

2. I am a member of the Ohio Environmental Council ("the OEC").

3. I submit this declaration in support of the OEC's intervention in litigation to defend the National Emissions Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, which was finalized by the U.S. Environmental Protection Agency ("U.S. EPA") to address hazardous air pollutant emissions from the power sector.

4. I am 38 years old.

5. I have environmental allergies.

6. I currently reside in Athens County, Ohio at 13255 Liars Corner Rd., Millfield, OH 45761. I have lived in Athens County from 2005-2017, and from 2022-2024. I live 37 miles from the General James M. Gavin Power Plant ("Gavin Power Plant").

7. I spend time outdoors engaging in various activities, including farming, bicycling, hunting and foraging, and trail running.

8. I plan to continue being active outdoors in the future.

9. I have been involved with public health issues for a long time and am most recently concerned about my neighbors and community members – including the most vulnerable: children, adults over the age of 65, people experiencing poverty, pregnant individuals, and people of color – who are all at increased risk due to the air quality in Athens County (according to the American Lung Association).

10. As a member of the OEC, I understand that the OEC engages in advocacy and legal action to protect Ohio's air, land, and water. The OEC's current activities include efforts to reduce emissions of air pollutants to protect and improve air quality, and working to reduce Ohioans' exposure to harmful air pollution is a core part of the OEC's mission.

11. I understand that the OEC seeks to intervene in a lawsuit challenging U.S. EPA's rule updating limits and requirements regarding emissions of hazardous air pollutants from coal-fired power plants.

12. I am aware that hazardous air pollutants like mercury are particularly concerning because of their potential to cause harm even in small amounts.

13. It concerns me that the air where I live may make me vulnerable to respiratory problems when I am active outdoors.

14. I am aware through my involvement with the OEC that on May 7, 2024, the EPA published a final rule in the Federal Register titled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Risk and Technology Review." 89 Fed. Reg. 38,508 (May 7, 2024) ("MATS Update Rule"), and that this MATS Update Rule strengthens the original Mercury and Air Toxics Standards ("MATS") by tightening the mercury standard for plants that burn lignite coal, tightening the filterable particulate matter standard for metal air toxics from all coal plants, and requiring continuous emissions monitoring systems for compliance with the filterable particulate matter standard. I am aware that the MATS Update Rule is being challenged in litigation, and that the OEC seeks to intervene to defend the rule.

15. I further understand that the U.S. EPA's rule would affect power plants in Ohio that emit air toxics and affect local air quality.

16. I am aware through my involvement with the OEC that the Gavin Power Plant has been using stack testing for regulatory compliance but would be required to use continuous emissions monitoring under the MATS Update Rule. Continuous monitoring will provide more information to the public about emissions from the Gavin Power Plant and could reduce emissions by enabling problems with the plant's controls to be identified and fixed more quickly.

17. I am concerned that without this rule, power plants like the Gavin Power Plant will emit more air pollution that affects air quality and contributes to harmful effects in Athens County. I am also concerned that local communities may have less information about emissions if continuous monitoring is not required at coal plants.

18. This rule will benefit my interest in breathing cleaner air when I work on my Land, spend time in our State and National Forests, visit with neighbors, or spend time with my friends and family. I therefore support the OEC's intervention to defend the National Emissions Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review.

I declare under penalty of perjury that the forgoing is true and correct.

Executed on May 29, 2024.

M.J.S.

Molly Jo Stanley

**DECLARATION OF CHRIS TAVENOR**
**FOR THE OHIO ENVIRONMENTAL COUNCIL**

I, Chris Tavenor, declare as follows:

1. This declaration is based on my personal and professional knowledge, information, and belief. I am over the age of eighteen years and suffer from no legal incapacity. I submit this declaration in support of the Ohio Environmental Council's ("the OEC") intervention in litigation to defend the National Emissions Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review ("MATS Update Rule"), which was finalized by the U.S. Environmental Protection Agency ("U.S. EPA") to update the Mercury and Air Toxics Standards ("MATS") emissions of hazardous air pollutants from power plants.

2. I am the General Counsel for the OEC, which is a nonprofit organization, organized and existing under the laws of the State of Ohio. In that capacity I am familiar with the OEC's mission, which is to secure healthy air, land, and water for all who call Ohio home. Working to reduce Ohioans' exposure to harmful pollution is a core part of the OEC's mission.

3. My work at the OEC includes responsibility for the legal programs of the Ohio Environmental Council, supporting all our attorneys and policy staff

on their programs. I also coordinate all internal legal work for the organization, from compliance to contract review. I am familiar with all areas of our work and engage regularly with our membership and board of directors.

4. As General Counsel, I am responsible for the legal oversight and compliance of the organization, and I am the chief legal analyst and advocate for the OEC's Democracy policy program. I have held these responsibilities since 2022. In that capacity, I am required to be familiar with the OEC's purpose, organization, and activities, as well as environmental interests and related activities and concerns of the OEC's members.

5. The OEC is a statewide, non-partisan, non-profit, charitable organization comprised of a network of nearly 100 affiliated member groups and over 3,000 individual members—the vast majority of whom presently reside in Ohio.

6. As a result of my work at the OEC, I am aware that Ohio has issued a fish advisory for all of the freshwater lakes and streams in Ohio because of the degree to which fish in those waters are likely to be contaminated with mercury, warning all persons to eat no more than one meal a week of fish caught in freshwaters of Ohio unless a lesser advisory has been issued.

7. As a result of my work at the OEC, I am aware that coal-fired electric power plants, including those located in the Ohio River Valley near the

homes of OEC's members, have been among the largest anthropogenic sources of emissions of hazardous air pollutants in the United States. These plants have historically been among the largest sources of mercury emitted to the environment in the United States, and among the largest stationary sources of particulate matter containing non-mercury toxic metals like chromium, arsenic, and lead.

8. As a result of my work with the OEC, I am aware that our members, who include women of childbearing age and children, live, work, and engage in recreational activities in areas of Ohio that are in proximity to large coal-fired power plants. The OEC's members' recreational pursuits include engaging in recreational fishing in freshwater lakes and streams in Ohio, including areas in which there are advisories regarding consuming the fish they catch, and that simply living and engaging in recreational activities near a coal-fired power plant exposes them to other air toxics, like metals attached to particulates and acid gases, which are the product of burning coal to generate electricity.

9. Should the MATS Update Rule be vacated in this litigation, I understand that updated limits and requirements for coal-fired power plants in or upwind of Ohio would not be implemented, potentially allowing significantly larger amounts of toxic air emissions, including mercury, than would be allowed under the rule. I am aware through my study and work that portions of the Ohio

River Valley have been considered "hot spots," or geographic areas of greater concentrations of air toxics like mercury. I am therefore interested in defending against any threat to the MATS Update Rule in order to ensure that the coal-fired power plants in and upwind of Ohio take measures, including maintaining and upgrading controls they have installed to comply with the MATS Rule, so that the OEC's members, including myself and my family, will not be denied the benefits of the rule.

10. I also understand that the MATS Update Rule requires units to use continuous emissions monitoring systems for compliance, and that EPA anticipates that continuous monitoring will confer significant benefits, including transparency regarding emissions for the surrounding communities and enabling facilities to identify and fix problems with control technologies more quickly. This is a potential benefit to local communities in the form of potentially lower emissions as well as information that they can use to make decisions to potentially lower their own exposures. This continuous monitoring requirement applies to almost all coal plants covered by the rule and has the potential to significantly reduce actual emissions and exposure to hazardous air pollutants for communities near those plants, including plants in Ohio.

11. Through my work at the OEC, I am aware that the OEC has members near coal plants in Ohio, including members in Gallia and Meigs

County, within thirty miles of the Gavin coal plant, and in Jefferson County, within thirty miles of the Cardinal coal plant.

12. Through my work at the OEC, I understand that on May 7, 2024, a final rule to address emissions of hazardous air pollutants from power plants was published in the Federal Register, and that rule goes into effect on July 8, 2024.

13. I am concerned that a successful challenge to the MATS Update Rule would result in excess air pollution from power plants that affects local air quality and harms residents of Ohio, including the OEC's members.

14. The OEC supports this review and update of the hazardous air pollutant standards for power plants and opposes any attempt to prevent or delay the required steps toward full implementation. I therefore support the OEC's intervention in this litigation to defend this rule, which would address hazardous air pollutant emissions from sources in and outside of Ohio.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 31st day of May, 2024.

Christopher D Tavenor

Chris Tavenor

**DECLARATION OF AMANDA THEBERGE**
**FOR THE NATURAL RESOURCES COUNCIL OF MAINE**

I, Amanda Theberge, hereby declare and state:

1. This declaration is based on my personal knowledge, information, and belief. I am over the age of eighteen years and suffer from no legal incapacity. I submit this declaration in support of the Natural Resources Council of Maine's ("NRCM's") intervention in this case to defend the U.S. Environmental Protection Agency's ("U.S. EPA's") National Emissions Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review ("MATS Update Rule") revising the Mercury and Air Toxics Standards ("MATS"), the federal rule regulating mercury and other hazardous air pollutants emitted by coal- and oil-fired power plants.

2. I am the Outreach Director at NRCM, which is located at 3 Wade Street, Augusta, Maine 04330. I have held this position for more than fifteen years, since 2008. I am also a member of NRCM. Because of my position, responsibilities, and membership with NRCM, I am familiar with NRCM's mission, organization, and activities, and with the environmental interests and concerns of NRCM's members. I am also familiar with the nature and scope of

NRCM's membership, its membership records, and the manner in which information on members can be retrieved.

2. NRCM is a non-profit membership organization whose mission is protecting, restoring, and conserving Maine's environment, now and for future generations. NRCM works to improve the quality of Maine's rivers, reduce poisonous chemicals threatening human and wildlife health, decrease air and climate-changing pollution, and conserve Maine lands. NRCM has more than 30,000 members and supporters statewide and beyond.

3. NRCM's membership records include the address of each member. These records are regularly updated to add new members, reflect address changes, and remove the names of persons who are no longer members. The records are maintained on a computer database, and the membership information provided below is from this database. NRCM has nearly 11,000 members, including nearly 4,000 living in the counties (Cumberland, Sagadahoc and York counties) closest to the Wyman Station, an older oil-fired power plant located in Yarmouth, Maine. In addition, most of NRCM's members live downwind from two coal-fired power plants, the Merrimack Station and the Schiller Station in the state of New Hampshire.

4. As a result of my work at the NRCM, I am aware that coal-fired power plants have historically been among the largest anthropogenic emitters of mercury, and also emit other air toxics including arsenic, lead, and dioxins. I am also aware that oil-fired power plants emit nickel, a known carcinogen. I am further aware that exposure to these chemicals by breathing them can be hazardous to human health.

5. As a result of my work at NRCM, I am aware that, when deposited, mercury transforms into methylmercury, which bioaccumulates in fish tissue. I am also aware that the primary pathway for human exposure to methylmercury is the consumption of contaminated fish. Methylmercury can affect human neurological, cardiovascular, and immune systems. The State of Maine warns people, particularly women of childbearing age, pregnant women, nursing mothers, and young children to strictly limit their consumption of certain types of freshwater fish caught within the state because of the likelihood that such fish are contaminated with methylmercury or other toxic chemicals at levels that present human health risks. The U.S. Food and Drug Administration and the U.S. EPA also have issued a joint fish consumption advisory, warning people to check local advisories about the safety of fish caught in local lakes, rivers, and coastal areas, and, the Safe Eating Guidelines from the Maine Department of Inland Fisheries &

Wildlife advise pregnant and nursing women, women who may become pregnant, and children under the age of 8 not to eat any freshwater fish from Maine's inland waters except for brook trout and landlocked salmon, of which 1 meal per month is safe.

6. I have been and continue to be personally affected by mercury and other air pollution in the State of Maine. I have lived in Maine all of my life. I am 38 years old and have two children (ages 5 and 6). While I was pregnant and nursing, I was unable to eat freshwater fish from Maine waters. I do not allow my children to eat freshwater fish from Maine waters. Growing up, I primarily resided at my parents' house (with the exception of my time at college) which is approximately 10 miles from the Wyman Station. I currently reside at 4 Vine Street, Hallowell, Kennebec County, Maine 04347. I enjoy fly fishing and ice fishing throughout the State of Maine, including in the counties closest to the Wyman Station. However, because of the mercury contamination in fish, I heavily restrict eating the fish that I catch.

7. As a result of my work at NRCM, I am further aware that NRCM's members are adversely affected by breathing in the non-mercury hazardous air pollutant emissions from power plants, including nickel (a known carcinogen) from oil-fired power plants like the Wyman Station. NRCM's members also live

in areas with high levels of methylmercury contamination in freshwater fish. As a result, many of NRCM's members, including those who are of childbearing years and who are anglers or would otherwise eat freshwater fish caught in Maine, are adversely impacted by these high levels of contamination.

8. As a result of my work at NRCM and my experience as an NRCM member, I am aware that EPA's MATS Rule established the first ever national regulations requiring coal- and oil-fired electricity generating units to use the "maximum achievable control technology" to control emissions of mercury and other hazardous air pollutants. *See* 77 Fed. Reg. 9,304 (Feb. 16, 2012). I understand that the MATS Rule has limited emissions of mercury, particulate matter (as a surrogate for non-mercury toxic metals like chromium, arsenic, and lead), and hydrogen chloride from coal- and oil-fired power plants, as well as set a work-practice standard to reduce emissions of dioxins, formaldehyde, and other organic air toxics generated by coal- and oil-fired power plants.

9. I am aware through my involvement with NRCM that on May 7, 2024, the EPA published a final rule in the Federal Register titled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Risk and Technology Review." 89 Fed. Reg. 38,508 (May 7, 2024). I also am aware that the MATS Update Rule

strengthens the MATS Rule by tightening the mercury standard for lignite coal plants, tightening the filterable particulate matter standard for all coal plants, and requiring continuous emissions monitoring systems for compliance with the filterable particulate matter standard. I am aware that the MATS Update Rule is being challenged in litigation, and that NRCM seeks to intervene to defend the rule.

10. As a result of my work at NRCM, I understand that should the MATS Update Rule be overturned in the current round of litigation, the Schiller, Merrimack, and Wyman Stations, as well as other upwind power plants in other states, could be allowed to operate without the more stringent limits and transparent requirements in the MATS Update Rule. Not having the MATS Update Rule in place could result in greater emissions of air toxics, including mercury—and nickel in the case of the Wyman Station—adversely impacting NRCM's members living downwind of these sources. Local communities may also be deprived of useful real-time information about air toxics emissions from a nearby plant, which they could use to make behavioral changes to reduce their exposures to hazardous air pollutants.

11. Given the organization's mission and the interests of its members, NRCM has a particular interest in defending this important rule. In fact, NRCM

was a major contributor to litigation that led to EPA's promulgation of the original MATS rule. NRCM was part of the plaintiff coalition that sued EPA for a violation of its mandatory duty under 42 U.S.C. §7412(d) to timely promulgate emissions standards for hazardous air pollutants from coal- and oil-fired power plants. *American Nurses Ass'n v. Jackson*, Case No. 08-2198 (D.D.C. April 15, 2010). As a result of my work with NRCM, I am further aware that EPA agreed to perform this duty under a consent decree, the ultimate result of which was the MATS Rule.

12. NRCM is therefore highly interested in strengthening and improving the regulation of air toxics emissions form power plants, and I personally am concerned that coal- and oil-fired power plants will be allowed to emit more hazardous air pollutants without a strengthened rule, and that NRCM members and their families could be exposed to higher levels of such pollutants from coal- and oil-fired power plants.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on May 29, 2024.

Amanda Theberge
4 Vine Street
Hallowell, Maine 04347

# DECLARATION OF GINA TRUJILLO

I, Gina Trujillo, declare as follows:

1. I am the managing director of membership at the Natural Resources Defense Council, Inc. ("NRDC"). I have worked in NRDC's membership office for over 30 years.

2. My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission.

3. NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

4. NRDC's mission statement declares that "The Natural Resources Defense Council's purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." The mission statement goes on to declare that NRDC works "to restore the integrity of the elements that sustain life – air, land, and water – and to defend endangered natural places."

5. When an individual becomes a member of NRDC, his or her current residential address is recorded in NRDC's membership database. When a member renews his or her membership or otherwise makes a contribution to NRDC, the database entry reflecting the member's residential address is verified or updated.

6. NRDC currently has approximately 470,000 members. There are NRDC members residing in each of the fifty United States and in the District of Columbia and Puerto Rico. Currently there are more than 800 members in Wyoming, 19,900 in Illinois, and 6,000 in Missouri.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief. Executed on: March 31, 2024

Signed: *Gina Trujillo*
Gina Trujillo

# DECLARATION OF LAURA TUCKER

I, Laura Tucker, hereby declare as follows:

1. I am currently a member of the Natural Resources Defense Council ("NRDC") and have been for about two or three years.

2. I live in Eureka, Missouri. I have lived at my current residence for seven years and in the area for the same amount of time. I am originally from Piedmont, a few hours south of here.

3. I spend a significant amount of time outside. We walk our dog every day, like to sit out on the patio to enjoy a meal, and my husband likes to ride his motorcycle and bicycle. When he bicycles he goes over to Route 66 since it's less hilly there than in our area. We also like to kayak on occasion.

4. I used to have asthma and it has gotten better over the years, but both of my kids were born prematurely so I have continued to be aware of and consider air quality. We had air purifiers in the house when my kids were young, though we don't run them anymore.

5. I keep track of the air quality and take note when there are messages about poor air quality days on the highway monitors, for example. We bought an electric mower since it's not good for air quality to mow in the middle of the day, and we try to limit our driving when the air quality is poor as well.

6. Air pollution isn't good for anyone and we try to limit our exposure just like anyone else. For example, I try to walk the dog earlier in morning to avoid more pollution later in the day.

7. As a general matter, I believe that these big corporations and companies have too much leeway to do whatever they want and are causing health risks for the rest of us that they should be held accountable for. It is not right that companies do not consider human or animal life.

8. We sometimes go over to Labadie, so I'm aware of the power plant over there. We will ride my husband's motorcycle there at times. Labadie is west of us and so everything blows our way from the power plant in Labadie. A couple of years ago we did notice a particularly hazy day that at the time we attributed to the power plant, though of course I can't be sure. If there is something the power plant can be doing to offset their air pollution and particles, then they should be doing it. They would ideally be doing it without even being told.

9. I'm aware that the U.S. EPA has finalized new, stronger standards for toxic soot pollution and mercury pollution from power plants. Stronger standards will go a long way to help the people of Eureka, including my family, who are already breathing in too much air pollution. I fully support NRDC's lawsuit supporting EPA's decision to strengthen national standards for toxic air pollution from power plants.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on May 31, 2024.

Signature: [signature]
Name: Laura Tucker

**DECLARATION OF MICHELLE UBERUAGA**

I, Michelle Uberuaga, declare as follows:

1. I submit this declaration on behalf of Environmental Defense Fund ("EDF") to support its motion to intervene on behalf of the U.S. Environmental Protection Agency ("EPA") in proceedings to review the EPA's final rule: National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508 (May 7, 2024) ("Final Rule").

2. I care deeply about protecting the health of communities, and I believe that clean air and water are fundamental human rights. I support many organizations that advocate for environmental justice at the state, local and federal level, and I am a member of EDF. Since 2015, I have been the Montana state coordinator for Moms Clean Air Force. I am also the executive director of Park County Environmental Council, a community-based conservation group.

3. I live in Livingston, Montana with my husband and three children, ages 3, 10, and 12. I have lived here since 2004. My family, like many Montana families, loves spending time outside together all year round. We fish, hunt, and camp on the banks of the Yellowstone River. My children spend hours outside playing soccer, building forts and riding their bikes around town. In the summer we mountain bike and our kids attend summer camp where they are outside all day

long. In the winter, we ski at Bridger Bowl. My husband and son also antelope hunt in Eastern Montana near Alzada.

4. In my roles with Moms Clean Air Force and Park County Environmental Council, I participate in state-wide coalitions and organize events to educate Montana communities, especially families, about the deadly impacts of air pollution. I regularly partner with local doctors from the American Academy of Pediatrics and thus know that toxic air pollution from coal plants is linked to a variety of health concerns.

5. We live less than 200 miles from the Colstrip Power Plant in Colstrip, Montana. I have serious concerns about the impact of toxic metal pollution from this coal plant on my and my family's health. I know from information shared by the Environmental Protection Agency that the Colstrip plant is one of the nation's most contaminating coal plants. When the State of Montana tightened mercury air pollution regulations in 2010, the owners of the Colstrip plant installed upgrades to control mercury emissions; however, they did not install modern pollution controls that would reduce other airborne toxins like other coal plants in the state did. I have reviewed EPA documents and know that over the last decade, the plant has emitted several tons of lead, arsenic, chromium, manganese, nickel, and selenium. From my review of health literature as part of my work with Moms Clean Air Force, I know there can be severe, often irreversible, health impacts of chronic

exposure to these toxic pollutants including damage to the cardiac, neural, and pulmonary systems. I use data and information shared from the American Lung Association and the Department of Environmental Quality to understand air quality in Montana and the potential health concerns from unhealthy air quality. Young children, the elderly, and those with chronic health conditions are most at risk for life-long health impacts from air pollution.

6. My kids play competitive soccer all over the state and we frequently travel to Billings for games and spend time in Miles City, in even closer proximity (about 50 miles) to the Colstrip plant. On game days, the whole family is outside all day, and the kids spend the day running intensely.

7. I have organized presentations with pediatricians in my community and have learned that children are more vulnerable to the impacts of air pollution because their airways are small and still developing, they breathe more rapidly and they spend more time outside playing than adults. I worry about the air pollution my children are exposed to when they are outside playing soccer so close to the Colstrip plant. We know that growing up breathing high levels of air pollution can impact how children's lungs develop, putting them at greater risk of lung disease as they get older, and that's why we need to do everything we can to ensure all children breathe clean air.

8. In my role with Moms Clean Air Force, I have advocated for strengthened Mercury and Air Toxics Standards for coal power plants. I understand that the Final Rule will require the Colstrip plant to install modern pollution controls to reduce its emissions of hazardous toxic metals. I believe that this strengthened standard will lead to improvement in air quality in Montana in the areas my family spends time in outdoors and reduce our exposure to these toxic metals.

9. I also have serious concerns about mercury emitted from coal plants. From my advocacy work, I know that mercury from coal plants can travel long distances before being deposited on land and in water. I know that humans can be exposed to mercury from consuming fish that have high levels of mercury and that mercury exposure is linked to many health risks like impaired brain function and damage to the kidneys and liver. I also know mercury exposure is most dangerous for children whose brains are still developing and that pregnant and nursing women and all women of childbearing age are advised to limit consumption of fish that may contain higher levels of mercury. I learned about the impacts of mercury in my 20s and the importance of limiting my exposure to mercury from fish in order to protect any future children. I have almost entirely eliminated many types of fish, including tuna, from my diet as a result. My first job in public health organizing was with the Public Interest Research Group in Salt Lake City, Utah. In

that role I educated the community about the harmful impacts of mercury and even organized events where people could test the mercury in their bodies.

10. My family loves to fish but given the widespread mercury contamination in water bodies across Montana, we must be careful to screen what we catch and limit what we eat to protect ourselves from excessive mercury exposure. The Montana Department of Environmental Quality issues Sport Fish Consumption Guidelines,[1] a true and correct copy of which is attached to this declaration as Exhibit A, which I review to determine what is safe to eat in Montana. One of our favorite fish to catch and eat is yellow perch. Statewide, it is recommended that all people limit consumption of yellow perch between 10-14 inches in length to one meal per week and yellow perch less than 10 inches to two meals per week.[2] Children six and under and women who are pregnant or might become pregnant are advised to be even more conservative.

11. We predominately fish on the Yellowstone River, but also frequently fish on Dailey Lake, Georgetown Lake, and Flathead Lake. Each of these waterbodies has current guidelines advising women of childbearing age and

[1] Montana Department of Environmental Quality, Montana Sport Fish Consumption Guidelines, https://fwp.mt.gov/binaries/content/assets/fwp/fish/fish-consumption-guide_2021_fnl_selchedited_2022.pdf.
[2] *Id.* at 4.

children to limit consumption of certain fish species due to their high concentration of mercury.[3]

12. We understand the impacts of eating certain fish species and therefore we limit our consumption as a family. We would love to be able to eat more wild fish. We are fortunate to have the financial ability to buy other types of protein for our diet from the store. We also rely on wild game, like antelope, deer and elk to ensure our family has enough healthy protein.

13. I know that the Final Rule limits allowable mercury emissions from lignite-fired coal plants. From my work on these standards, I am aware that lignite coal is some of the dirtiest coal and that lignite coal plants emit high amounts of mercury pollution. I am also aware that there are a cluster of lignite coal plants in our neighboring state of North Dakota. EPA expects this rule to reduce mercury concentrations in fish[4] and I believe this rule will have health benefits for my family and I as frequent consumers of fish from waterbodies known to be contaminated with mercury.

14. I am aware that the Final Rule will require facilities, including the Colstrip plant, to use continuous emissions monitoring systems to demonstrate compliance with the new standards for toxic metal pollution instead of the current

---

[3] *Id.* at 8-9.

[4] EPA, National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508, 38556 (May 7, 2024).

requirement of quarterly stack testing. This will give me more information about emissions from the coal plant nearest my home. I believe it is important that communities have access to information about their exposure levels. As an advocate, I believe having access to more frequent monitoring data will allow communities to hold power plants accountable for emissions exceedances and further result in emissions decreases that benefit my family and others across the country.

15. I understand that EPA also determined that continuous emissions monitoring could further reduce emissions of non-mercury metals by providing power plant operators with more frequent emissions data, allowing them to quickly identify and address issues with pollution control devices not functioning as expected.[5] EPA determined that this would likely reduce exposures to people living near coal-fired power plants subject to the updated non-mercury toxic metal standard.[6]

16. Finally, I am aware that the Final Rule sets more stringent requirements for startup operations requiring coal plants to control their pollution more quickly upon startup than was previously required.

[5] *Id.* at 38536-37.
[6] *Id.*

17. In sum, EPA's Final Rule benefits my family and I by reducing emissions that harm our health. If the rule were prevented from being implemented or if implementation was delayed, my family and I would be harmed by the resulting prevention or delay of these emissions reductions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Livingston, Montana on May 29, 2024

Michelle Uberuaga

**DECLARATION OF MICHELLE UBERUAGA**

**EXHIBIT A**

# Montana Sport Fish Consumption Guidelines



FWP/Trevor Selch Photo

## What you need to know about Mercury, PCBs, and other contaminants when fishing in Montana.

**This guide provides information about how to enjoy healthy meals from wild fish caught in Montana. It provides specific scientific data about the water bodies which have been tested, plus more general information for areas that have not yet been tested.**

- For information on collection and laboratory testing of fish from Montana waters, call MT Fish, Wildlife and Parks at 406-444-2449.
- For information on the health risks of eating fish, call MT Health & Human Services 406-444-2837 or email: HHSFCS@mt.gov.
- This on-line version of the brochure will be updated as new data is gathered: fwp.mt.gov/fishing

DEQ Montana Department of Environmental Quality

MONTANA DPHHS Healthy People. Healthy Communities. Department of Public Health & Human Services

MONTANA FISH, WILDLIFE & PARKS



FWP/Kenton Rowe Photo

## What Are Sport Fish Consumption Guidelines?

These guidelines provide recommendations on the amount and type of sport fish to eat. They also tell you how to prepare your catch to minimize health risks, and what precautions should be taken by high-risk individuals.

On the other side of this brochure is a detailed chart listing all waters in Montana that have been tested for the presence of certain environmental contaminants. It gives recommendations for eating fish caught in those waters.

Although these guidelines are not regulatory standards, by using them you'll help ensure that the fish you catch can be a safe part of your diet.

These guidelines are generally designed to protect pregnant women, women of childbearing age, children, and anglers who regularly consume larger quantities of fish caught in Montana waters over long periods of time.

## What Are the Health Benefits of Eating Fish?

When properly prepared, fish provide a diet high in protein and low in saturated fats. Many researchers suggest that eating a half-pound of fish each week helps to prevent heart disease.

Almost any kind of fish can have real health benefits if eaten as an alternative to high-fat protein in your diet. You can get the health benefits of fish and reduce unwanted contaminants by following the guidelines in this pamphlet.

## What Are the Health Risks of Eating Contaminated Fish?

**PCBs & METHYL MERCURY** build up in the body tissue over time. It may take months or years of regularly eating contaminated fish to accumulate levels that could become a health concern.

**METHYL MERCURY —** Our bodies can safely metabolize small amounts of consumed methyl mercury, but larger amounts may cause damage to the nervous system. It most severely affects developing fetuses in pregnant women. It is recommended that women of childbearing age avoid those species of fish and seafood known to contain high concentrations of mercury.

**PCBs —** Dietary exposure to PCBs has been linked to infant development problems in children whose mothers were exposed to PCBs before becoming pregnant. The consumption advice for PCBs is intended to protect children from developmental problems and damage to their immune systems. In addition, PCBs are known to cause cancer in laboratory animals and may cause cancer in humans.

# What Contaminants Are Found in Montana's Wild Fish?

**MERCURY** is a widespread and naturally occurring element that concentrates in many soils and rocks. Mercury may also enter Montana waters via household refuse, batteries, mining and industrial wastes, and from burning fossil fuels. Once in a lake, mercury is converted to methyl mercury by bacteria and other processes. Fish absorb methyl mercury into their tissues from their food and from water. There is no method of cooking or cleaning fish that will reduce the amount of mercury in a meal.

**POLYCHLORINATED BIPHENYLS (PCBs)** are a group of man-made chemicals once used as lubricants, coolants, and in ink and paint additives. The manufacture of PCBs in the United States was banned in 1977, yet trace levels of PCBs remain in the environment. Everyone is exposed to some PCBs, as they are found everywhere. Fish absorb PCBs from water, sediments, and food. PCBs concentrate in the fat of fish, and other animals. Cleaning and cooking fish to remove fat will lower the amount of PCBs in a fish meal.

**CADMIUM** is released into the environment from mining operations and is used in the manufacturing of paints, alloys, batteries, and plastics. Cadmium is a known carcinogen that has been shown to cause renal dysfunction and a degenerative bone disease.

**ARSENIC** is a naturally occurring element that has increased in the environment due to industrial emissions from coal burning facilities and as a byproduct of mining operations. Only the inorganic fraction of arsenic found in fish tissues is considered toxic to humans, but it can still accumulate to levels of concern.

**SELENIUM** is an essential micro-nutrient for humans, but becomes toxic at slightly higher concentrations. Selenium is found in all fish species, but is not considered a carcinogen.

**DIOXINS** are a group of synthetic organic chemicals that contain 210 structurally related individual polychlorinated dibenzopdioxins (PCDDs) and polychlorinated dibenzofurans (PCDFs). Dioxins are primarily produced as byproducts of chlorine bleaching in pulp and paper mills, industrial waste incineration, combustion of fossil fuels and wood, and as contaminants in the manufacture of certain organic chemicals. Dioxins are also natural products of forest fires and other natural processes.

**OTHER** metals, pesticides, and organic compounds are present in Montana's fish, but are less common, or a health concern has not been established at this time.

## EAT LESS OFTEN



Smallmouth Bass



Lake Trout



Walleye



Northern Pike

## EAT MORE FREQUENTLY



Bluegill



Perch



Black Crappie



Brook Trout



Smaller Rainbow

## Meal Advice for Individuals at Increased Risk

Children age six and younger, nursing mothers, and women who are pregnant, or might become pregnant, are at greatest risk of adverse health effects, and should be more conservative in their fish-eating habits.

**These guidelines apply to fish species in waterbodies where contaminant data has not yet been collected and is not listed on the next pages of this pamphlet.**

| AVOID | ONE MEAL PER MONTH | ONE MEAL PER WEEK | TWO MEALS PER WEEK |
|---|---|---|---|
| Walleye over 22" | Walleye less than 22" | | |
| Northern Pike over 28" | Northern Pike 20-28" | Northern Pike less than 20" | |
| Lake Trout over 28" | Lake Trout 20-28" | Lake Trout 15-20" | Lake Trout less than 15" |
| Bass over 15" | Bass 13-15" | Bass 11-13" | Bass less than 11" |
| | Brown Trout over 20 " | Brown Trout 15-20" | Brown Trout less than 15" |
| | | Yellow Perch 10-14" | Yellow Perch less than 10" |
| | | Whitefish over 18" | Whitefish less than 18" |
| | | Rainbow Trout over 18" | Rainbow Trout less than 18" |
| | | | Cutthroat Trout, Kokanee, Brook Trout, Sunfish, Arctic Grayling |

## Reduce Your Health Risk

1. **KEEP SMALLER FISH FOR EATING.** Contamination increases as fish get larger and older. Predatory fish, such as lake trout, walleye, smallmouth bass and northern pike often accumulate more contaminants because they eat other fish. Smaller panfish such as bluegill, crappies, brook trout, yellow perch and smaller rainbow trout usually have low levels of contamination.
2. **CLEAN AND COOK YOUR FISH PROPERLY.** Certain contaminants build up in a fish's fat deposits and just underneath the skin.
3. **TO REDUCE CONTAMINANT LEVELS:**
   Fillet the fish & remove the skin.
   Cut away the fat from back, side & belly.
   Bake or broil the trimmed fish on a rack,or grill it, so the remaining fat drips away.
4. **SERVING SIZE MATTERS.** Adult serving size is 8 oz. uncooked or 6 oz. cooked. It is about the size and thickness of your hand (large oval in photo below). A child's serving is 3 oz. or 2.25 oz. cooked (small oval, or about the size of an adult's palm).



Sharon McLane Photo



# Montana Sport Fish Consumption Chart

Montana Fish, Wildlife & Parks has analyzed fish for contaminants from many of Montana's lakes and streams. The chart on the following pages will help you plan how many fish meals you can safely eat per month, based on fish size and measured concentrations of contaminants found in the fish.

These guidelines are based on an 8-ounce serving (weight before cooking) for a 176-pound man, and a 3-ounce serving for women of childbearing age or for children age six and younger.

## How to use the chart on the following pages:

1. Find the lake or river in which the fish was caught (listed in alphabetical order).
2. Determine the species & length of the fish.
3. If your fishing location or species isn't listed here, follow the "Reduce Your Health Risk" guidelines on page 4.

| | |
|---|---|
| ALL | = Everyone |
| M | = Men & Women (not childbearing age) |
| WC | = Women (childbearing age) & Children |
| (fish icon) | = Fish are safe to eat |
| 1 | = Number of safe meals per month |
| (dark fish icon) | = Fish should be avoided |
| (blank box) | = Fish have not been analyzed |
| PCBs | = Polychlorinated biphenyls |
| D/F | = Dioxins/Furans |
| As | = Arsenic |
| Hg | = Mercury |
| Se | = Selenium |
| Cd | = Cadmium |

Sharon McLane Photo

# 2021 Montana Sport Fish Consumption Guidelines

Updated May 26, 2021 Page 6

**These charts will help you plan meals, with advice for individuals at increased risk**

Children age six and younger, nursing mothers, and women who are pregnant, or might become pregnant, are at greatest risk of adverse health effects, and should be more conservative in the fish-eating habits.

Cooking tips plus general guidelines for waterbodies not yet tested for contaminants can be found on page 4.

| | | | Size (*Length in inches*) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Location** | **Species** | **Person** | **6-10** | **10-14** | **14-18** | **18-22** | **22-26** | **26-30** | **30+** | **Contaminant** |
| **Ackley Lake** South of Hobson | Rainbow trout | M | | 🐟 | 🐟 | | | | | Hg |
| | | WC | | 8 | 6 | | | | | Hg |
| **Alder Gulch** | Rainbow trout | M | 4 | 7 | | | | | | Hg |
| Vigilante Pond at Virginia City | | WC | 2 | 3 | | | | | | Hg |
| Above Virginia City | Rainbow trout | M | 🐟 | | | | | | | Hg |
| | | WC | 7 | | | | | | | Hg |
| **Bair Reservoir** | Rainbow trout | M | | 6 | | | | | | Hg |
| East of White Sulphur Springs | | WC | | 3 | | | | | | Hg |
| **Basin Creek** Near Basin | Rainbow trout | M | 🐟 | | | | | | | Hg |
| | | WC | 12 | | | | | | | Hg |
| **Basin Creek Reservoir** | Cutthroat trout | M | 11 | 7 | 6 | | | | | As |
| | | WC | 5 | 3 | 3 | | | | | As |
| **Belt Creek** Near Belt | Brown trout | ALL | | 🐟 | | | | | | Hg |
| Between Neihart & Monarch | Brown trout | M | 4 | 4 | 4 | | | | | As/Hg |
| | | WC | 2 | 2 | 2 | | | | | As/Hg |
| | Rainbow trout | M | | | 🐟 | | | | | Hg |
| | | WC | | | 8 | | | | | Hg |
| Upstream of Neihart | Brook trout | M | 6 | 7 | | | | | | Hg |
| | | WC | 3 | 3 | | | | | | Hg |
| | Cutthroat trout | M | 🐟 | 🐟 | | | | | | Hg |
| | | WC | 10 | 11 | | | | | | Hg |
| **Big Casino Creek Reservoir** | Yellow Perch | M | | 🐟 | | | | | | Hg |
| | | WC | | 9 | | | | | | Hg |
| **Big Spring Creek** | Brown trout | ALL | | | 4 | | | | | PCBs |
| Upstream of East Fork Big Spring Ck | Rainbow trout | ALL | | 4 | | | | | | PCBs |
| Downstream of East Fork Big Spring | Brown trout | ALL | | | 🐟 | | | | | PCBs |
| Creek to Hwy 191 Bridge | Rainbow trout | ALL | | 🐟 | | | | | | PCBs |
| Downstream of Hwy 191 Bridge | Brown trout | ALL | | | 🐟 | | | | | PCBs |
| | Rainbow trout | ALL | | 🐟 | | | | | | PCBs |
| **Bighorn Reservoir** | Brown trout | M | 🐟 | 🐟 | 6 | 2 | 1 | 1 | | Hg |
| | | WC | 9 | 8 | 2 | 1 | ⊘ | ⊘ | | Hg |
| | Burbot | M | | | 3 | 2 | 2 | 2 | | Hg |
| | | WC | | | 1 | 1 | 1 | 1 | | Hg |
| | Channel catfish | M | 2 | 2 | 2 | 1 | 1 | | | Hg |
| | | WC | 1 | 1 | ⊘ | ⊘ | ⊘ | | | Hg |
| | Rainbow trout | M | | 🐟 | 🐟 | 5 | | | | Hg |
| | | WC | | 11 | 6 | 2 | | | | Hg |
| | Sauger | M | 4 | 2 | 2 | 1 | ⊘ | | | Hg |
| | | WC | 2 | 1 | 1 | ⊘ | ⊘ | | | Hg |
| | Smallmouth bass | M | | 2 | ⊘ | | | | | Hg |
| | | WC | | 1 | ⊘ | | | | | Hg |
| | Walleye | M | 6 | 3 | 1 | ⊘ | ⊘ | ⊘ | | Hg |
| | | WC | 3 | 1 | ⊘ | ⊘ | ⊘ | ⊘ | | Hg |
| **Bitterroot River** | Northern pike | M | | | 8 | 3 | 4 | ⊘ | ⊘ | D/F, PCBs |
| | | WC | | | 3 | 1 | 2 | ⊘ | ⊘ | D/F, PCBs |
| | Rainbow trout | M | | 7 | 2 | | | | | D/F, PCBs |
| | | WC | | 3 | 1 | | | | | D/F, PCBs |
| **Blacktfoot River** | Rainbow trout | M | | 🐟 | | | | | | D/F, PCBs |
| | | WC | | 10 | | | | | | D/F, PCBs |
| **Blacktail Creek** Butte | Brook trout | M | | 4 | 6 | | | | | As/Hg |
| | | WC | | 1 | 3 | | | | | As/Hg |
| **Boulder Creek** Trib to Flint Creek | Brown trout | M | 🐟 | 8 | | | | | | Hg |
| Downstream South Boulder Creek | | WC | 🐟 | 3 | | | | | | Hg |
| | Cutthroat trout | M | 🐟 | 🐟 | | | | | | Hg |
| | | WC | 12 | 9 | | | | | | Hg |
| Upstream Princeton Gulch | Brown trout | M | 🐟 | 7 | | | | | | Hg |
| | | WC | 🐟 | 3 | | | | | | Hg |
| | Cutthroat trout | M | 🐟 | 🐟 | | | | | | Hg |
| | | WC | 🐟 | 8 | | | | | | Hg |
| **Boulder River** Near Bernice | Rainbow trout | M | 🐟 | 5 | | | | | | Hg |
| | | WC | 7 | 2 | | | | | | Hg |
| **Bowman Lake** Glacier National Park | Lake trout | M | | | 5 | 4 | 1 | 2 | 2 | Hg |
| | | WC | | | 2 | 2 | ⊘ | 1 | 1 | Hg |

## 2021 Montana Sport Fish Consumption Guidelines



| | | | Size (*Length in inches*) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Location** | **Species** | **Person** | **6-10** | **10-14** | **14-18** | **18-22** | **22-26** | **26-30** | **30+** | **Contaminant** |
| **Browns Gulch** Near Rocker | Brook trout | M |  | 1 | | | | | | As/Hg |
| | | WC |  |  | | | | | | As/Hg |
| | Cutthroat trout | M | 1 | 1 | | | | | | As/Hg |
| | | WC |  |  | | | | | | As/Hg |
| **Bynum Reservoir** | Walleye | M | 2 | 1 | 1 | 1 | | | | Hg |
| | | WC | 1 |  |  |  | | | | Hg |
| **Cabinet Gorge Reservoir** | Brown trout | M | | 8 | 3 | 1 | | | | Hg |
| | | WC | | 4 | 1 |  | | | | Hg |
| | Crayfish (all sizes) | M | 3 | | | | | | | Hg |
| | | WC | 1 | | | | | | | Hg |
| | Cutthroat trout | M | |  | | | | | | Hg |
| | | WC | | 6 | | | | | | Hg |
| | Lake whitefish | M | | 5 | 3 | 7 | | | | Hg |
| | | WC | | 2 | 1 | 3 | | | | Hg |
| | Northern pike | M | | | 5 | 4 | 2 | 1 | 1 | Hg |
| | | WC | | | 2 | 2 | 1 |  |  | Hg |
| | Smallmouth bass | M | | 1 | 1 | | | | | Hg |
| | | WC | |  |  | | | | | Hg |
| | Walleye | M | | 2 | 2 | 1 |  | | | Hg |
| | | WC | | 1 |  |  |  | | | Hg |
| | Yellow perch | M | 5 | | | | | | | Hg |
| | | WC | 2 | | | | | | | Hg |
| **Canyon Ferry Reservoir** | Burbot | M | | | 5 | | | | | Hg |
| | | WC | | | 2 | | | | | Hg |
| | Rainbow trout | M | 9 | 9 | | 3 | | | | Hg |
| | | WC | 4 | 4 | | 1 | | | | Hg |
| | Walleye | M | 7 | 5 | 4 | 2 | 2 | 2 | 1 | Hg |
| | | WC | 3 | 2 | 2 | 1 | 1 | 1 |  | Hg |
| | Yellow perch | M | 9 | 5 | | | | | | Hg |
| | | WC | 4 | 2 | | | | | | Hg |
| **Carpenter Creek** Near Belt Creek | Brook trout | M | 4 | | | | | | | As/Hg |
| | | WC | 2 | | | | | | | As/Hg |
| | Cutthroat trout | ALL |  | | | | | | | As/Hg |
| | Rainbow trout | M | 2 | 2 | | | | | | As/Hg |
| | | WC | 1 | 1 | | | | | | As/Hg |
| **Castlerock Lake** Colstrip | Black crappie | M | | 7 | | | | | | Hg |
| | | WC | | 3 | | | | | | Hg |
| | Largemouth bass | M | | 4 | | | | | | Hg |
| | | WC | | 2 | | | | | | Hg |
| | Northern pike | M | | | | 3 | 3 | | | Hg |
| | | WC | | | | 1 | 1 | | | Hg |
| | Walleye | M | | 7 | 5 | 2 | | | | Hg |
| | | WC | | 3 | 2 | 1 | | | | Hg |
| **Cataract Creek** Near Basin | Rainbow trout | M | | 8 | | | | | | Hg |
| | | WC | | 4 | | | | | | Hg |
| **Chrome Lake** Above Stillwater Mine | Cutthroat trout | M | | | 6 | | | | | Hg |
| | | WC | | | 3 | | | | | Hg |
| | Arctic grayling | M | | 8 | | | | | | Hg |
| | | WC | | 4 | | | | | | Hg |
| **Clark Canyon Reservoir** | Brown trout | M | | | | 4 | | | | Hg |
| | | WC | | | | 2 | | | | Hg |
| | Burbot | M | | | | 8 | | | | Hg |
| | | WC | | | | 4 | | | | Hg |
| | Rainbow trout | M | |  | 8 | 6 | | | | Hg |
| | | WC | | 6 | 4 | 3 | | | | Hg |
| **Clark Fork River** | Brown trout | M | |  | | | | | | Hg |
| Below Warm Springs Ponds to Galen | | WC | | 8 | | | | | | Hg |
| | Mountain whitefish | M | |  | 9 | | | | | Hg |
| | | WC | | 7 | 4 | | | | | Hg |
| Gold Creek to Flint Creek | Brown trout | M | | 4 | | | | | | Hg |
| | | WC | | 2 | | | | | | Hg |
| | Mountain whitefish | M |  | 6 | | | | | | Hg |
| | | WC | 5 | 3 | | | | | | Hg |
| Flint Creek to Rock Creek | Mountain whitefish | M | | 5 | 2 | | | | | Hg |
| | | WC | | 2 | 1 | | | | | Hg |
| Rock Creek to Blackfoot River | Rainbow trout | M | | 5 | 12 | | | | | D/F, PCBs |
| | | WC | | 2 | 6 | | | | | D/F, PCBs |

# 2021 Montana Sport Fish Consumption Guidelines

Updated May 26, 2021



| Location | Species | Person | Size (*Length in inches*) 6-10 | 10-14 | 14-18 | 18-22 | 22-26 | 26-30 | 30+ | Contaminant |
|---|---|---|---|---|---|---|---|---|---|---|
| **Clark Fork River *continued ...*** Blackfoot River to Bitterroot River | Northern pike | M | | | | | | 10 | | D/F, PCBs |
| | | WC | | | | | | 5 | | D/F, PCBs |
| | Rainbow trout | M | | 1 | 2 | | | | | D/F, PCBs |
| | | WC | | (do not eat) | 1 | | | | | D/F, PCBs |
| Bitterroot River to Flathead River | All species | M | (do not eat) | (do not eat) | (do not eat) | (do not eat) | (do not eat) | (do not eat) | (do not eat) | D/F, PCBs |
| | | WC | (do not eat) | (do not eat) | (do not eat) | (do not eat) | (do not eat) | (do not eat) | (do not eat) | D/F, PCBs |
| **Clear Lake** South of Superior | Brook trout | M | 11 | | | | | | | Hg |
| | | WC | 5 | | | | | | | Hg |
| **Cliff Lake** Jewel Basin | Cutthroat trout | M | | | | (fish) | | | | Hg/PCBs |
| | | WC | | | | 7 | | | | Hg/PCBs |
| **Cooney Reservoir** | Rainbow trout | M | (fish) | (fish) | (fish) | | | | | Hg |
| | | WC | 7 | 10 | 10 | | | | | Hg |
| | Walleye | M | (fish) | 11 | | 2 | 2 | | | Hg |
| | | WC | 6 | 5 | | 1 | 1 | | | Hg |
| **Crystal Lake** Tobacco Root Mtns | Cutthroat trout | M | | (fish) | | | | | | Hg |
| | | WC | | 12 | | | | | | Hg |
| **Culver Pond** Red Rocks NWR | Brook trout | ALL | (fish) | (fish) | | | | | | Hg |
| **Dailey Lake** | Rainbow trout | ALL | | | (fish) | | | | | Hg |
| | Walleye | M | | | (fish) | | | | | Hg |
| | | WC | | | 8 | | | | | Hg |
| | Yellow perch | M | | (fish) | | | | | | Hg |
| | | WC | | 10 | | | | | | Hg |
| **Douglas Creek** Near Hall | Brown trout | ALL | (fish) | | | | | | | Hg |
| | Cutthroat trout | ALL | (fish) | | | | | | | Hg |
| **Dry Fork Belt Creek** Near Monarch | Brook trout | M | 1 | | | | | | | As/Hg |
| | | WC | (do not eat) | | | | | | | As/Hg |
| | Cutthroat trout | M | 1 | | | | | | | As/Hg |
| | | WC | (do not eat) | | | | | | | As/Hg |
| | Rainbow trout | M | (do not eat) | 2 | | | | | | As/Hg |
| | | WC | (do not eat) | 1 | | | | | | As/Hg |
| **East Fork Reservoir** Lewistown | Northern pike | M | | | | | 9 | | | Hg |
| | | WC | | | | | 4 | | | Hg |
| | Yellow perch | M | | (fish) | | | | | | Hg |
| | | WC | | 9 | | | | | | Hg |
| **Ennis Lake** | Brown trout | M | | (fish) | (fish) | | 10 | | | Hg |
| | | WC | | 6 | 8 | | 4 | | | Hg |
| | Rainbow trout | M | | (fish) | | | | | | Hg |
| | | WC | | 8 | | | | | | Hg |
| **Firehole River** Yellowstone National Park near Lower Geyser | Brown trout | M | 1 | 1 | | | | | | Hg |
| | | WC | (do not eat) | (do not eat) | | | | | | Hg |
| | Rainbow trout | M | 2 | 1 | | | | | | Hg |
| | | WC | 1 | (do not eat) | | | | | | Hg |
| Yellowstone National Park near Madison Jct. | Brown trout | M | 2 | (do not eat) | | | | | | Hg |
| | | WC | 1 | (do not eat) | | | | | | Hg |
| | Rainbow trout | M | 4 | | 3 | | | | | Hg |
| | | WC | 2 | | 1 | | | | | Hg |
| **Flathead Lake** | Lake trout | M | 12 | 12 | 7 | 6 | 4 | 1 | (do not eat) | Hg/PCBs |
| | | WC | 6 | 5 | 3 | 2 | 1 | (do not eat) | (do not eat) | Hg/PCBs |
| | Lake whitefish | M | | | 7 | 2 | | | | Hg/PCBs |
| | | WC | | | 3 | 1 | | | | Hg/PCBs |
| **Flint Creek** South of Drummond Upstream of Fred Burr Creek | Brown trout | M | (fish) | 4 | 6 | | | | | Hg |
| | | WC | 7 | 2 | 2 | | | | | Hg |
| Fred Burr Creek to Boulder Creek | Brown trout | M | 5 | 2 | 1 | | | | | Hg |
| | | WC | 2 | 1 | (do not eat) | | | | | Hg |
| Boulder Creek to Lower Willow Creek | Brown trout | M | 6 | 5 | (fish) | | | | | Hg |
| | | WC | 3 | 2 | 6 | | | | | Hg |
| | Mountain whitefish | M | | 4 | 2 | | | | | Hg |
| | | WC | | 2 | 1 | | | | | Hg |
| Lower Willow Creek to Clark Fork | Brown trout | M | (fish) | (fish) | 5 | | | | | Hg |
| | | WC | (fish) | 6 | 2 | | | | | Hg |
| | Mountain whitefish | M | | 4 | 2 | | | | | Hg |
| | | WC | | 2 | 1 | | | | | Hg |
| **Fort Peck Reservoir** | Chinook salmon | M | | | | | | 2 | 2 | Hg |
| | | WC | | | | | | 1 | 1 | Hg |
| | Lake trout | M | | | | | 3 | 2 | 1 | Hg |
| | | WC | | | | | 1 | 1 | (do not eat) | Hg |
| | Northern pike | M | | | | 3 | 3 | 2 | 1 | Hg |
| | | WC | | | | 1 | 1 | 1 | (do not eat) | Hg |
| | Walleye | M | | 3 | 3 | 3 | 1 | | | Hg |
| | | WC | | 1 | 1 | 1 | (do not eat) | | | Hg |

## 2021 Montana Sport Fish Consumption Guidelines

Updated May 26, 2021 Page 9

| Location | Species | Person | Size (*Length in inches*) 6-10 | 10-14 | 14-18 | 18-22 | 22-26 | 26-30 | 30+ | Contaminant |
|---|---|---|---|---|---|---|---|---|---|---|
| **Fred Burr Creek** Below Rumsey Mill to Swimming Hole | Brown trout | M | 3 | | | | | | | Hg |
| | | WC | 1 | | | | | | | Hg |
| Downstream of Swimming Hole | Brown trout | M | 2 | | | | | | | Hg |
| | | WC | 1 | | | | | | | Hg |
| **Frenchman Reservoir** Malta | Northern pike | M | | 🐟 | | | | | | Hg/PCBs |
| | | WC | | 7 | | | | | | Hg/PCBs |
| **Fresno Reservoir** | Black crappie | M | 8 | 1 | | | | | | Hg |
| | | WC | 4 | 🚫 | | | | | | Hg |
| | Northern pike | M | | | | 3 | 3 | 3 | 1 | Hg |
| | | WC | | | | 1 | 1 | 1 | 🚫 | Hg |
| | Walleye | M | | 2 | 2 | 1 | 1 | | | Hg |
| | | WC | | 1 | 1 | 🚫 | 🚫 | | | Hg |
| | Yellow perch | M | 5 | 3 | | | | | | Hg |
| | | WC | 2 | 1 | | | | | | Hg |
| **Georgetown Lake** | Brook trout | M | | 🐟 | 🐟 | | | | | Hg |
| | | WC | | 6 | 6 | | | | | Hg |
| | Kokanee salmon | M | | 🐟 | | | | | | Hg |
| | | WC | | 10 | | | | | | Hg |
| **Gibbon River** Yellowstone National Park | Brown trout | M | 2 | 1 | 3 | 2 | | | | Hg |
| | | WC | 1 | 🚫 | 1 | 1 | | | | Hg |
| | Rainbow trout | M | | 2 | 3 | 4 | | | | Hg |
| | | WC | | 1 | 1 | 2 | | | | Hg |
| **Harrison Lake** Glacier National Park | Lake trout | M | | | | 3 | 2 | 2 | 2 | Hg |
| | | WC | | | | 1 | 1 | 1 | 🚫 | Hg |
| **Hauser Reservoir** | Brown trout | M | | | 🐟 | 🐟 | | | | Hg |
| | | WC | | | 7 | 7 | | | | Hg |
| | Kokanee salmon | M | 🐟 | 🐟 | 🐟 | 🐟 | | | | Hg |
| | | WC | 10 | 10 | 🐟 | 🐟 | | | | Hg |
| | Rainbow trout | M | | | 🐟 | 🐟 | | | | Hg |
| | | WC | | | 8 | 9 | | | | Hg |
| | Walleye | M | | 10 | 10 | 5 | | | | Hg |
| | | WC | | 4 | 4 | 2 | | | | Hg |
| | Yellow perch | M | 🐟 | 🐟 | | | | | | Hg |
| | | WC | 🐟 | 6 | | | | | | Hg |
| **Hebgen Reservoir** | Brown trout | M | | 6 | 4 | 2 | 1 | | | Hg/PCBs |
| | | WC | | 3 | 1 | 1 | 🚫 | | | Hg/PCBs |
| | Rainbow trout | M | | 5 | 3 | 3 | | | | Hg |
| | | WC | | 2 | 1 | 1 | | | | Hg |
| **Holter Reservoir** | Kokanee salmon | M | | 🐟 | 🐟 | 🐟 | | | | Hg |
| | | WC | | 7 | 7 | 10 | | | | Hg |
| | Rainbow trout | M | | 🐟 | 🐟 | 9 | 🐟 | | | Hg |
| | | WC | | 6 | 8 | 4 | 9 | | | Hg |
| | Walleye | M | | 8 | 7 | 3 | 2 | | | Hg/PCBs |
| | | WC | | 4 | 3 | 1 | 1 | | | Hg/PCBs |
| | Yellow perch | M | 5 | 4 | | | | | | Hg |
| | | WC | 2 | 1 | | | | | | Hg |
| **Hyalite Lake** South of Bozeman | Cutthroat trout | M | 🐟 | 🐟 | | | | | | Hg |
| | | WC | 12 | 7 | | | | | | Hg |
| **Island Lake** Southeast of Libby | Northern pikeminnow | ALL | | 🐟 | | | | | | Hg |
| | Yellow perch | M | 4 | | | | | | | Hg |
| | | WC | 2 | | | | | | | Hg |
| **Judith River** Below Big Spring Creek | Brown trout | ALL | 🐟 | | | | | | | Hg |
| | Rainbow trout | M | 🐟 | 🐟 | | | | | | Hg |
| | | WC | 🐟 | 8 | | | | | | Hg |
| **Kootenai River** Libby Dam to Troy | Bull trout | M | | | 9 | | | | | Hg |
| | | WC | | | 4 | | | | | Hg |
| | Kokanee salmon | M | 🐟 | 🐟 | | | | | | Hg |
| | | WC | 10 | 8 | | | | | | Hg |
| | Largescale sucker | M | 🐟 | | 🐟 | 8 | | | | Hg |
| | | WC | 🐟 | | 6 | 4 | | | | Hg |
| | Mountain whitefish | M | | 🐟 | 🐟 | | | | | Hg |
| | | WC | | 7 | 8 | | | | | Hg |
| Libby Dam to Troy | Northern pikeminnow | M | 4 | 2 | | | | | | Hg |
| | | WC | 2 | 1 | | | | | | Hg |
| | Peamouth | M | 9 | 🐟 | | | | | | Hg |
| | | WC | 4 | 6 | | | | | | Hg |
| | Rainbow trout | M | | 🐟 | 6 | | | | | Hg |
| | | WC | | 12 | 3 | | | | | Hg |

# 2021 Montana Sport Fish Consumption Guidelines

Updated May 26, 2021



| Location | Species | Person | Size (*Length in inches*) 6-10 | 10-14 | 14-18 | 18-22 | 22-26 | 26-30 | 30+ | Contaminant |
|---|---|---|---|---|---|---|---|---|---|---|
| **Kootenai River *continued* ...** Troy to MT/ID border | Cutthroat trout | M | 🐟 | | 🐟 | | | | | Hg |
| | | WC | 🐟 | | 8 | | | | | Hg |
| | Kokanee salmon | M | | 🐟 | | | | | | Hg |
| | | WC | | 7 | | | | | | Hg |
| | Largescale sucker | M | | | 9 | 6 | | | | Hg |
| | | WC | | | 4 | 3 | | | | Hg |
| | Mountain whitefish | M | 🐟 | 12 | | | | | | Hg |
| | | WC | 10 | 5 | | | | | | Hg |
| | Northern pikeminnow | M | | 8 | 8 | | | | | Hg |
| | | WC | | 3 | 3 | | | | | Hg |
| | Peamouth | M | | 9 | | | | | | Hg |
| | | WC | | 4 | | | | | | Hg |
| | Rainbow trout | M | 🐟 | 🐟 | | | | | | Hg |
| | | WC | 🐟 | 🐟 | | | | | | Hg |
| **Krieder Reservoir** Near Sand Springs | Rainbow trout | M | | 5 | | | | | | Hg |
| | | WC | | 2 | | | | | | Hg |
| **Lake Frances** | Northern pike | M | 8 | 5 | 4 | 3 | 2 | | | Hg |
| | | WC | 3 | 2 | 2 | 1 | 1 | | | Hg |
| | Walleye | M | 7 | 3 | 2 | 1 | [🐟] | | | Hg |
| | | WC | 3 | 1 | 1 | [🐟] | [🐟] | | | Hg |
| | Yellow perch | M | 4 | 3 | 2 | | | | | Hg |
| | | WC | 1 | 1 | 1 | | | | | Hg |
| **Lake Helena** | Walleye | M | | 🐟 | 10 | 3 | [🐟] | | | As/Hg |
| | | WC | | 7 | 5 | 1 | [🐟] | | | As/Hg |
| **Lake Koocanusa** | Bull trout | M | | 11 | 12 | 5 | 6 | | | As/Hg |
| | | WC | | 5 | 5 | 2 | 2 | | | As/Hg |
| | Burbot | M | | | 🐟 | 6 | 5 | 4 | 3 | Hg |
| | | WC | | | 8 | 3 | 2 | 2 | 1 | Hg |
| | Cutthroat trout | M | | 🐟 | | | | | | As |
| | | WC | | 7 | | | | | | As |
| | Kokanee salmon | M | 🐟 | 🐟 | | | | | | As/Hg |
| | | WC | 8 | 9 | | | | | | As/Hg |
| | Largescale suckers | M | | 🐟 | 6 | 7 | | | | As/Hg |
| | | WC | | 6 | 3 | 3 | | | | As/Hg |
| | Longnose suckers | M | | 🐟 | 8 | | | | | Hg |
| | | WC | | 9 | 3 | | | | | Hg |
| | Mountain whitefish | M | | 4 | | | | | | As/Hg |
| | | WC | | 2 | | | | | | As/Hg |
| | Northern pikeminnow | M | | 6 | 5 | 4 | 3 | | | As/Hg |
| | | WC | | 3 | 2 | 1 | 2 | | | As/Hg |
| | Peamouth | M | 🐟 | 🐟 | | | | | | As/Hg |
| | | WC | 8 | 10 | | | | | | As/Hg |
| | Rainbow trout | M | 10 | 🐟 | 6 | | | | | As/Hg |
| | | WC | 5 | 10 | 3 | | | | | As/Hg |
| | Yellow perch | M | 11 | 6 | | | | | | Hg |
| | | WC | 5 | 3 | | | | | | Hg |
| **Lake Mary Ronan** | Kokanee salmon | M | 🐟 | 🐟 | | | | | | Hg |
| | | WC | 7 | 5 | | | | | | Hg |
| | Rainbow trout | ALL | | 🐟 | 🐟 | | | | | Hg |
| | Yellow perch | M | 10 | 4 | | | | | | Hg |
| | | WC | 5 | 2 | | | | | | Hg |
| **Lake McDonald** Glacier National Park | Bull trout | M | | | 5 | 7 | 6 | | | Hg |
| | | WC | | | 2 | 3 | 3 | | | Hg |
| | Lake trout | M | | 10 | 5 | 3 | 2 | | | Hg |
| | | WC | | 5 | 2 | 1 | 1 | | | Hg |
| | Lake whitefish | M | | | 🐟 | 7 | | | | Hg |
| | | WC | | | 6 | 3 | | | | Hg |
| **Lee Metcalf National Wildlife Refuge** Whistlers Pond | Largemouth bass | M | 🐟 | 9 | 3 | | | | | Hg |
| | | WC | 6 | 4 | 1 | | | | | Hg |
| **Leigh Lake** Cabinet Mountains | Brook trout | M | 3 | | | | | | | Hg/PCBs |
| | | WC | 1 | | | | | | | Hg/PCBs |
| **Libby Ponds** Fifth Street | Brook trout | ALL | | [🐟] | [🐟] | | | | | Hg/PCBs |
| | Largescale suckers | ALL | | [🐟] | [🐟] | | | | | Hg/PCBs |
| Stimpson Fire | Largescale suckers | ALL | | 🐟 | 🐟 | | | | | Hg/PCBs |
| **Lower Stillwater Lake** | Northern pike | M | | | 7 | 9 | | | | Hg |
| | | WC | | | 3 | 4 | | | | Hg |
| | Yellow perch | M | 🐟 | | | | | | | Hg |
| | | WC | 7 | | | | | | | Hg |

# 2021 Montana Sport Fish Consumption Guidelines

Updated May 26, 2021



| Location | Species | Person | Size (*Length in inches*) 6-10 | 10-14 | 14-18 | 18-22 | 22-26 | 26-30 | 30+ | Contaminant |
|---|---|---|---|---|---|---|---|---|---|---|
| **Lower Willow Creek** Near Drummond | Brown trout | M | 5 | 1 | | | | | | Hg |
| | | WC | 2 | [crossed fish icon] | | | | | | Hg |
| **Lower Willow Creek Reservoir** Near Drummond | Cutthroat trout | M | 1 | [crossed fish icon] | [crossed fish icon] | | | | | Hg |
| | | WC | [crossed fish icon] | [crossed fish icon] | [crossed fish icon] | | | | | Hg |
| **Lump Gulch** Prickly Pear Drainage | Brook trout | ALL | [fish outline icon] | | | | | | | Hg |
| **Madison River** Above Hebgen Lake | Brown trout | M | 3 | | 1 | | | | | Hg |
| | | WC | 1 | | [crossed fish icon] | | | | | Hg |
| | Rainbow trout | M | 5 | 3 | | 3 | | | | Hg |
| | | WC | 2 | 1 | | 1 | | | | Hg |
| Hebgen Lake to Quake Lake | Rainbow trout | M | | 5 | | | | | | Hg |
| | | WC | | 2 | | | | | | Hg |
| Quake Lake to Ennis Lake | Brown trout | M | | [fish outline icon] | 9 | | | | | Hg |
| | | WC | | 8 | 4 | | | | | Hg |
| | Rainbow trout | M | | [fish outline icon] | 11 | | | | | Hg |
| | | WC | | 10 | 5 | | | | | Hg |
| Below Ennis Lake | Brown trout | M | | 9 | 4 | | | | | Hg |
| | | WC | | 4 | 2 | | | | | Hg |
| | Rainbow trout | M | | [fish outline icon] | 11 | | | | | Hg |
| | | WC | | 6 | 5 | | | | | Hg |
| **Martinsdale Reservoir** | Brown trout | M | | | | 4 | 4 | 4 | 4 | Hg |
| | | WC | | | | 1 | 1 | 1 | 1 | Hg |
| | Rainbow trout | M | | 9 | 8 | | | | | Hg |
| | | WC | | 4 | 4 | | | | | Hg |
| **McGregor Lake** Near Kalispell | Crayfish (all sizes) | M | 5 | | | | | | | Hg |
| | | WC | 2 | | | | | | | Hg |
| | Lake trout | M | | 9 | 6 | 6 | 3 | | | Hg |
| | | WC | | 4 | 3 | 2 | 1 | | | Hg |
| **Medicine Lake National Wildlife Refuge** | Northern pike | M | | | | 8 | 7 | 2 | | Hg |
| | | WC | | | | 4 | 3 | 1 | | Hg |
| **Missouri River** Headwaters to Toston Dam | Brown trout | M | | 7 | | | | | | Hg |
| | | WC | | 3 | | | | | | Hg |
| | Northern pike | M | | | 5 | | | | | Hg |
| | | WC | | | 2 | | | | | Hg |
| | Rainbow trout | M | | 8 | | | | | | Hg |
| | | WC | | 3 | | | | | | Hg |
| Below Toston Dam | Rainbow trout | M | | [fish outline icon] | | | | | | Hg |
| | | WC | | 6 | | | | | | Hg |
| Upstream Black Eagle Dam | Brown trout | M | [fish outline icon] | 6 | 7 | | | | | As/Hg |
| | | WC | 8 | 2 | 3 | | | | | As/Hg |
| | Crayfish (all sizes) | ALL | [crossed fish icon] | | | | | | | As |
| | Mountain whitefish | M | | | 8 | | | | | Hg |
| | | WC | | | 4 | | | | | Hg |
| | Mussels (all sizes) | ALL | [crossed fish icon] | | | | | | | As |
| | Rainbow trout | M | 4 | 9 | 6 | | | | | As/Hg |
| | | WC | 2 | 4 | 3 | | | | | As/Hg |
| | Stonecat | M | 4 | 3 | | | | | | Hg |
| | | WC | 2 | 1 | | | | | | Hg |
| | White sucker | M | | 4 | 6 | | | | | As/Hg |
| | | WC | | 2 | 3 | | | | | As/Hg |
| | Yellow perch | M | 9 | [fish outline icon] | | | | | | As/Hg |
| | | WC | 4 | 9 | | | | | | As/Hg |
| Downstream Black Eagle Dam | Brown trout | M | | 11 | 7 | 3 | | | | As/Hg |
| | | WC | | 5 | 3 | 1 | | | | As/Hg |
| | Crayfish (all sizes) | ALL | [crossed fish icon] | | | | | | | As |
| | Mountain whitefish | M | 11 | 7 | | | | | | As/Hg |
| | | WC | 5 | 3 | | | | | | As/Hg |
| | Mussels (all sizes) | ALL | [crossed fish icon] | | | | | | | As |
| | Rainbow trout | M | 8 | [fish outline icon] | 7 | 4 | | | | As/Hg |
| | | WC | 4 | 7 | 3 | 2 | | | | As/Hg |
| | Stonecat | M | 7 | | | | | | | Hg |
| | | WC | 3 | | | | | | | Hg |
| | Walleye | M | 10 | 11 | 5 | | | | | As/Hg |
| | | WC | 5 | 5 | 2 | | | | | As/Hg |
| | White sucker | M | | 7 | 8 | | | | | As/Hg |
| | | WC | | 3 | 4 | | | | | As/Hg |
| | Yellow perch | M | 7 | | | | | | | As/Hg |
| | | WC | 3 | | | | | | | As/Hg |
| **Mountain View Lake** Stillwater drainage | Brook trout | M | | 7 | 1 | | | | | Hg |
| | | WC | | 3 | [crossed fish icon] | | | | | Hg |

## 2021 Montana Sport Fish Consumption Guidelines

Updated May 26, 2021



| Location | Species | Person | Size (*Length in inches*) 6-10 | 10-14 | 14-18 | 18-22 | 22-26 | 26-30 | 30+ | Contaminant |
|---|---|---|---|---|---|---|---|---|---|---|
| **Mystic Lake** South of Bozeman | Brook trout | M | | 🐟 | 🐟 | | | | | Hg |
| | | WC | | 8 | 8 | | | | | Hg |
| | Cutthroat trout | M | | 8 | 8 | | | | | Hg |
| | | WC | | 3 | 3 | | | | | Hg |
| | Lake trout | M | | | | | 7 | | | Hg |
| | | WC | | | | | 3 | | | Hg |
| **Nelson Reservoir** | Black crappie | M | 9 | | | | | | | Hg |
| | | WC | 4 | | | | | | | Hg |
| | Lake whitefish | M | | 🐟 | | 2 | 🐟 | | | Hg |
| | | WC | | 7 | | 1 | 8 | | | Hg |
| | Northern pike | M | | | | | 7 | 6 | 4 | Hg |
| | | WC | | | | | 3 | 3 | 2 | Hg |
| | Walleye | M | | 6 | 5 | 6 | 1 | | | Hg |
| | | WC | | 3 | 2 | 3 | 🚫🐟 | | | Hg |
| | Yellow perch | M | 10 | 9 | | | | | | Hg |
| | | WC | 5 | 4 | | | | | | Hg |
| **Ninepipe National Wildlife Refuge** | Largemouth bass | M | 6 | 5 | 2 | 1 | | | | Hg |
| | | WC | 3 | 2 | 1 | 🚫🐟 | | | | Hg |
| **North Fork Lower Willow Creek** | Cutthroat trout | ALL | 🐟 | | | | | | | Hg |
| **Noxon Rapids Reservoir** | Crayfish (all sizes) | M | 5 | | | | | | | Hg |
| | | WC | 2 | | | | | | | Hg |
| | Lake trout | M | | | | | | 1 | | Hg |
| | | WC | | | | | | 🚫🐟 | | Hg |
| | Lake whitefish | M | | 9 | 9 | | | | | Hg |
| | | WC | | 4 | 4 | | | | | Hg |
| | Largemouth bass | M | | 4 | | | | | | Hg |
| | | WC | | 2 | | | | | | Hg |
| | Northern pike | M | | 5 | 5 | 3 | 2 | 1 | 1 | D/F, Hg |
| | | WC | | 2 | 2 | 1 | 1 | 🚫🐟 | 🚫🐟 | D/F, Hg |
| | Smallmouth bass | M | | 2 | 1 | 🚫🐟 | | | | Hg |
| | | WC | | 1 | 🚫🐟 | 🚫🐟 | | | | Hg |
| | Walleye | M | 1 | 1 | 1 | 1 | 1 | 1 | 🚫🐟 | D/F, Hg |
| | | WC | 🚫🐟 | 🚫🐟 | 🚫🐟 | 🚫🐟 | 🚫🐟 | 🚫🐟 | 🚫🐟 | D/F, Hg |
| | Yellow perch | M | 3 | 2 | | | | | | Hg |
| | | WC | 1 | 1 | | | | | | Hg |
| **Park Lake** Southwest of Helena | Arctic grayling | ALL | 🐟 | 🐟 | | | | | | Hg |
| | Cutthroat trout | ALL | 🐟 | 🐟 | | | | | | Hg |
| **Petrolia Reservoir** South of Winnett | Northern pike | M | | | | | 5 | | | Hg |
| | | WC | | | | | 2 | | | Hg |
| **Piedmont Pond** Whitehall | Cutthroat trout | M | 2 | 1 | | | | | | As/Hg |
| | | WC | 1 | 🚫🐟 | | | | | | As/Hg |
| **Pishkun Reservoir** | Northern pike | M | | 4 | 3 | 2 | 2 | 1 | | Hg |
| | | WC | | 2 | 1 | 1 | 🚫🐟 | 🚫🐟 | | Hg |
| | Rainbow trout | M | | | 4 | 4 | 2 | | | Hg |
| | | WC | | | 2 | 2 | 1 | | | Hg |
| | Yellow perch | M | 3 | | | | | | | Hg |
| | | WC | 1 | | | | | | | Hg |
| **Prickly Pear Creek** | Brown trout | ALL | 🐟 | 🐟 | | | | | | Hg |
| Upstream of ASARCO | Rainbow trout | ALL | 🐟 | | | | | | | Hg |
| Downstream of ASARCO | Brown trout | M | | 1 | 1 | | | | | As |
| | | WC | | 🚫🐟 | 🚫🐟 | | | | | As |
| | Rainbow trout | M | | 3 | | | | | | As |
| | | WC | | 1 | | | | | | As |
| **Rock Creek** Near Alberton | Brown trout | M | | 8 | 4 | | | | | Hg |
| | | WC | | 4 | 2 | | | | | Hg |
| **Seeley Lake** | Bull trout | ALL | | 🐟 | 🐟 | | | | | Hg |
| | Mountain whitefish | M | 🐟 | 11 | | | | | | Hg |
| | | WC | 🐟 | 5 | | | | | | Hg |
| | Northern pike | M | | | | | 8 | 9 | | Hg |
| | | WC | | | | | 3 | 4 | | Hg |
| | Yellow perch | ALL | | 🐟 | | | | | | Hg |
| **Silver Bow Creek** | Brook trout | M | | 7 | | | | | | As/Hg |
| Lower Area One (near lagoons) | | WC | | 3 | | | | | | As/Hg |
| Rocker | Cutthroat trout | M | | 11 | 11 | | | | | As |
| | | WC | | 5 | 5 | | | | | As |
| Ramsey | Cutthroat trout | M | | 7 | 7 | | | | | As/Hg |
| | | WC | | 3 | 3 | | | | | As/Hg |
| Durant Canyon | Cutthroat trout | M | | 2 | 4 | | | | | As/Hg |
| | | WC | | 1 | 2 | | | | | As/Hg |

# 2021 Montana Sport Fish Consumption Guidelines

Updated May 26, 2021 Page 13

| Location | Species | Person | Size (*Length in inches*) 6-10 | 10-14 | 14-18 | 18-22 | 22-26 | 26-30 | 30+ | Contaminant |
|---|---|---|---|---|---|---|---|---|---|---|
| **Silver Creek** North of Helena | Cutthroat trout | M | 3 | 1 | [do-not-eat symbol] | [do-not-eat symbol] | | | | Hg |
| | | WC | 1 | [do-not-eat symbol] | [do-not-eat symbol] | [do-not-eat symbol] | | | | Hg |
| **Smart Creek** Near Hall | Cutthroat trout | ALL | [fish symbol] | | | | | | | Hg |
| **Snow Creek** Trib to Carpenter Creek | Cutthroat trout | ALL | [do-not-eat symbol] | [do-not-eat symbol] | | | | | | As/Hg |
| **Soda Butte Creek** Cooke City | Brook trout | ALL | [fish symbol] | [fish symbol] | | | | | | Hg |
| | Cutthroat trout | ALL | [fish symbol] | [fish symbol] | | | | | | Hg |
| **South Fork Lower Willow Creek** Near Drummond | Cutthroat trout | M | 11 | | | | | | | Hg |
| | | WC | 5 | | | | | | | Hg |
| **South Sandstone Reservoir** North of Baker | Northern pike | M | | | 2 | | 1 | | | Hg |
| | | WC | | | 1 | | [do-not-eat symbol] | | | Hg |
| | Walleye | ALL | | | | | [do-not-eat symbol] | | | Hg |
| | Yellow perch | M | 4 | | | | | | | Hg |
| | | WC | 2 | | | | | | | Hg |
| **Spring Meadow Lake** Helena | Cutthroat trout | M | | 2 | | | | | | As |
| | | WC | | 1 | | | | | | As |
| | Largemouth bass | M | 6 | 5 | | | | | | As/Hg |
| | | WC | 3 | 2 | | | | | | As/Hg |
| | Pumpkinseed | M | 5 | | | | | | | As |
| | | WC | 2 | | | | | | | As |
| | Rainbow trout | M | | [fish symbol] | | | | | | Hg |
| | | WC | | 7 | | | | | | Hg |
| | Yellow perch | M | | 9 | | | | | | As/Hg |
| | | WC | | 4 | | | | | | As/Hg |
| **St. Mary Lake** Glacier National Park | Bull trout | M | | | | | 2 | | | Hg |
| | | WC | | | | | 1 | | | Hg |
| | Burbot | M | | | 6 | 3 | 3 | | 2 | Hg |
| | | WC | | | 3 | 1 | 1 | | [do-not-eat symbol] | Hg |
| | Lake trout | M | | | 3 | 2 | 4 | 3 | | Hg |
| | | WC | | | 1 | 1 | 2 | 1 | | Hg |
| | Lake whitefish | M | | | 7 | 7 | | | | Hg |
| | | WC | | | 3 | 3 | | | | Hg |
| **Sun River** Near Great Falls | Rainbow trout | M | | | 7 | | | | | Hg |
| | | WC | | | 3 | | | | | Hg |
| **Swan Lake** | Bull trout | M | | 8 | 3 | 2 | 3 | 2 | 2 | Hg |
| | | WC | | 3 | 1 | 1 | 1 | 1 | 1 | Hg |
| | Kokanee salmon | M | 11 | [fish symbol] | [fish symbol] | | | | | Hg |
| | | WC | 5 | 7 | 6 | | | | | Hg |
| | Lake trout | M | 9 | 6 | 5 | 3 | 3 | 2 | 1 | Hg |
| | | WC | 4 | 3 | 2 | 1 | 1 | 1 | [do-not-eat symbol] | Hg |
| | Northern pike | M | | | 6 | 3 | 4 | | 2 | Hg |
| | | WC | | | 3 | 1 | 2 | | [do-not-eat symbol] | Hg |
| **Tenmile Creek** West of Helena | Brown trout | M | [fish symbol] | [fish symbol] | | | | | | Hg |
| | | WC | 12 | 12 | | | | | | Hg |
| | Rainbow trout | M | [fish symbol] | [fish symbol] | | | | | | Hg |
| | | WC | 10 | 10 | | | | | | Hg |
| **Thompson Falls Reservoir** | Northern pike | M | | | 5 | 7 | 6 | 5 | 3 | Hg |
| | | WC | | | 2 | 3 | 3 | 2 | 1 | Hg |
| | Rainbow trout | M | | | 11 | | | | | Hg |
| | | WC | | | 5 | | | | | Hg |
| | Smallmouth bass | M | | 5 | | | | | | Hg |
| | | WC | | 2 | | | | | | Hg |
| | Yellow perch | M | 7 | | | | | | | Hg |
| | | WC | 3 | | | | | | | Hg |
| **Tiber Reservoir** | Northern pike | M | | 3 | | 2 | 2 | 1 | [do-not-eat symbol] | Hg |
| | | WC | | 1 | | 1 | [do-not-eat symbol] | [do-not-eat symbol] | [do-not-eat symbol] | Hg |
| | Walleye | M | | 1 | 1 | 1 | 1 | | | Hg |
| | | WC | | [do-not-eat symbol] | [do-not-eat symbol] | [do-not-eat symbol] | [do-not-eat symbol] | | | Hg |
| | Yellow perch | M | 5 | 3 | | | | | | Hg |
| | | WC | 2 | 1 | | | | | | Hg |
| **Tongue River Reservoir** | Northern pike | M | | | | | 6 | 6 | | Hg |
| | | WC | | | | | 3 | 3 | | Hg |
| | Smallmouth bass | M | 8 | 4 | | | | | | Hg |
| | | WC | 4 | 2 | | | | | | Hg |
| | Walleye | M | | 5 | 4 | 3 | 2 | | | Hg |
| | | WC | | 2 | 1 | 1 | 1 | | | Hg |
| | White crappie | M | 4 | | | | | | | Hg |
| | | WC | 2 | | | | | | | Hg |
| **Upper Cold Lake** Mission Mountains | Cutthroat trout | M | | 6 | | | | | | PCBs |
| | | WC | | 3 | | | | | | PCBs |

# 2021 Montana Sport Fish Consumption Guidelines

Updated May 26, 2021



| Location | Species | Person | Size (*Length in inches*) 6-10 | 10-14 | 14-18 | 18-22 | 22-26 | 26-30 | 30+ | Contaminant |
|---|---|---|---|---|---|---|---|---|---|---|
| **Upper Two Medicine Lake** Glacier National Park | Lake trout | M | | | 7 | | | | | Hg |
| | | WC | | | 3 | | | | | Hg |
| **Warm Springs Creek** Near Clancy | Brook trout | ALL | [fish] | | | | | | | Hg |
| **Warm Springs Ponds** Near Anaconda | Rainbow trout | M | | | [fish] | [fish] | [fish] | [fish] | | Hg |
| | | WC | | | [fish] | [fish] | 12 | [fish] | | Hg |
| **Waterton Lakes** Glacier National Park | Lake trout | M | | 6 | 4 | 3 | 1 | | 1 | Hg |
| | | WC | | 3 | 2 | 1 | [no fish] | | [no fish] | Hg |
| | Lake whitefish | M | [fish] | [fish] | 8 | 7 | 6 | | 7 | Hg |
| | | WC | 9 | 7 | 4 | 3 | 3 | | 3 | Hg |
| **West Fork Madison River** Downstream of Lobo Creek | Brown trout | M | | [fish] | | | | | | Hg |
| | | WC | | 7 | | | | | | Hg |
| | Rainbow trout | M | | [fish] | [fish] | | | | | Hg |
| | | WC | | [fish] | 7 | | | | | Hg |
| Upstream of Lobo Creek | Rainbow trout | M | | [fish] | | | | | | Hg |
| | | WC | | 10 | | | | | | Hg |
| **Whitefish Lake** | Cutthroat trout | M | | [fish] | [fish] | | | | | Hg |
| | | WC | | [fish] | [fish] | | | | | Hg |
| | Lake trout | M | | 10 | 10 | 5 | 3 | | | Hg |
| | | WC | | 5 | 4 | 2 | 1 | | | Hg |
| | Lake whitefish | M | | [fish] | [fish] | 5 | | | | Hg |
| | | WC | | 9 | 8 | 2 | | | | Hg |
| | Northern pike | M | | | [fish] | [fish] | 9 | [fish] | 8 | Hg |
| | | WC | | | 9 | 8 | 4 | 6 | 4 | Hg |
| **Willow Creek Reservoir** Near Augusta | Rainbow trout | M | [fish] | [fish] | [fish] | [fish] | | | | Hg |
| | | WC | 8 | 8 | 8 | 6 | | | | Hg |
| **Woody Creek** Near Cooke City | Cutthroat trout | ALL | [fish] | [fish] | | | | | | Hg |
| **Yellowstone River** Near Powder River | Channel catfish | M | | | | | 1 | | | Hg |
| | | WC | | | | | [no fish] | | | Hg |

# DECLARATION OF HAROLD P. WIMMER

I, Harold P. Wimmer, declare as follows:

1. I am the President and Chief Executive Officer for the American Lung Association ("ALA"). I work in ALA's national headquarters, in Chicago, Illinois, and am responsible for the overall management and operation of the organization. In that capacity, I am required to be familiar with the organization's structure, function, and purpose and mission.

2. ALA is incorporated in Maine and has its headquarters in Chicago, Illinois. ALA is a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. ALA has supporters in all fifty states and in the District of Columbia. ALA's board members, volunteers, and supporters include healthcare professionals, researchers, and educators who share a commitment to reducing the burden of lung disease on patients and their families, and on communities.

3. ALA has a vision of a world free of lung disease. Its mission statement is "to save lives by improving lung health and preventing lung disease." ALA is committed to improving lung health and preventing lung disease through research, advocacy, and education. ALA's educational efforts include the publication of information on air quality, such as that provided in ALA's annual *State of the Air* report (http://www.lung.org/sota/).

4. In furtherance of ALA's mission, ALA has actively participated in proceedings to promote, strengthen, and enforce regulations that affect the health and well-being of children, adults, and people with lung disease, including proceedings to enforce and strengthen regulations under the Clean Air Act. Scientific research has shown that air pollution is a major contributor to the worsening of lung disease. As a result, ALA, for many years, has engaged in advocacy and litigation to promote full implementation of the Clean Air Act.

5. In particular, ALA has actively participated in proceedings and litigation related to the regulation of hazardous air pollutant emissions from coal-fired and oil-fired power plants. I am familiar with the Mercury and Air Toxics Standards ("MATS") Rule that EPA finalized and that was published in the Federal Register on February 16, 2012, at 77 Fed. Reg. 9,304. The 2012 MATS Rule established nationwide regulations that have led to a sharp curtailment of emissions of hazardous air pollutants from coal-fired and oil-fired power plants, greatly to the benefit of public health. ALA was fully involved in the public comment process for the Rule, having submitted written comments and provided testimony at public hearings on the proposed rule.

6. ALA also has a long history of engaging in EPA rulemakings and related judicial proceedings regarding EPA's finding that it is "appropriate and necessary" under the Clean Air Act to regulate hazardous air pollutants through

the MATS Rule, *see* 81 Fed. Reg. 24,420 (April 25, 2016); EPA's reversal of that position, *see* 85 Fed. Reg. 31,286 (May 22, 2020); and, finally, EPA's subsequent reaffirmation of the "appropriate and necessary" finding, *see* 88 Fed. Reg. 13,956 (Mar. 6, 2023).

7. I am aware that EPA has now finalized a rule titled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," which was published in the Federal Register on May 7, 2024, at 89 Fed. Reg. 38508 [hereinafter referred to as the "2024 MATS Rule"], and which strengthens the 2012 MATS Rule in certain important respects. ALA was fully involved in the public comment process on the proposed rule, having submitted written comments and provided testimony at the public hearing, urging EPA to finalize the strongest and most protective health limits on emissions of mercury and other hazardous air pollutants from coal- and oil-fired power plants. In particular, ALA supported tightening the mercury emissions standard for coal-fired power plants that burn lignite so as to match the standard for non-lignite burning power plants, given, as I generally understand, that lignite-fired coal plants are more polluting that other types of coal plants.

8. ALA also supported a more stringent limit for filterable particulate matter (fPM), which serves as a surrogate for non-mercury hazardous air

pollutant metal. While EPA did not adopt the stronger limit that ALA urged, the new limit for fPM does represent an improvement. In addition, ALA fully supported the requirement in the 2024 MATS rule that power plants conduct continuous emissions monitoring systems for fPM so as to identify non-compliance issues more effectively and thereby better protect communities near power plants from dangerous spikes in pollution.

9. The MATS Rule is one of the most important regulations for protecting people's health and well-being from what has long been one of the nation's largest industrial sources of hazardous air pollution. I am aware that mercury, in the form of methylmercury, is a potent neurotoxicant that is particularly harmful to developing fetuses, infants, and young children. I am also familiar with EPA's initial estimate that the MATS Rule, when fully implemented, would prevent up to 11,000 premature deaths, 130,000 childhood asthma attacks, and 5,700 hospital and emergency room visits every year. In addition, I am aware that more recent scientific research shows that the benefits of the MATS Rule are far greater than EPA's initial estimates and that emissions of hazardous air pollutants from coal-fired and oil-fired power plants have decreased substantially—by approximately 85% to 95%—in significant part because of the controls implemented to meet the MATS Rule.

10. I also understand that several states, including the State of North

Dakota, et al., have filed a petition for judicial review challenging the 2024 MATS rule, Case No. 24-1119 (D.C. Cir. filed May 8, 2024).

9. ALA has a direct interest in promoting and protecting public health, especially lung health, and preventing lung disease. The MATS 2024 Rule provides national emissions standards that protect public health— including the health of ALA supporters across the country, the health of their families, and the health of their patients—from emissions of hazardous air pollutants from coal-fired power plants. Compliance with, and the enforcement of, the 2024 MATS Rule is critical to those who are most at risk and vulnerable to hazardous air pollutants, including children and the elderly; people with lung diseases, cardiovascular diseases, and diabetes; those who work or exercise outdoors; and low-income and minority communities, who are disproportionately burdened by pollution from coal-fired power plants.

10. The challenge to the 2024 MATS Rule, if successful, would directly harm ALA's supporters and their families, and those for whom ALA health professionals provide health care. Therefore, the rejection of the challenge by the State of North Dakota, et al., to the 2024 MATS Rule will directly promote the mission and interests of ALA, as well as redress the harm to the individual and professional interests of ALA's board members, supporters, and volunteers arising from the litigation.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: 5/23/24

________________________________

Harold P. Wimmer