# United States Court of Appeals
# For the District of Columbia Circuit

STATE OF NORTH DAKOTA, STATE OF WEST VIRGINIA, et al.,

Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

On Petition for Judicial Review of Final Agency Actions of the United States
Environmental Protection Agency, 89 Fed.Reg. 38508 (May 7, 2024)

## MOTION FOR STAY

PATRICK MORRISEY
Attorney General

LINDSAY S. SEE
Solicitor General
MICHAEL R. WILLIAMS
Principal Deputy Solicitor General
Office of the Attorney General of
West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
lindsey.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

DREW H. WRIGLEY
Attorney General

PHILIP AXT
Solicitor General
600 E Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: 701.328.2210
pjaxt@nd.gov

NESSA HOREWITCH COPPINGER
DAVID M. FRIEDLAND
Special Assistant Attorneys General
1900 N Street NW, Suite 100
Washington, DC 20036
ncoppinger@bdlaw.com
dfriedland@bdlaw.com

*Counsel for State of North Dakota*

*Additional Counsel Listed in Signature Block*

Date: **June 07, 2024**

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 18(a)(4), 27, and 28(a)(1)(A), Petitioners certify:

## A. Parties, Intervenors, and *Amici* to this Case (No. 24-1119)

Petitioners: State of North Dakota, State of West Virginia, State of Alaska, State of Arkansas, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, and State of Wyoming.

Respondent: The United States Environmental Protection Agency.

Proposed Intervenors: (1) Air Alliance Houston, Alliance of Nurses for Healthy Environments, American Academy of Pediatrics, American Lung Association, American Public Health Association, Chesapeake Climate Action Network, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Montana Environmental Information Center, Natural Resources Council of Maine, Natural Resources Defense Council, the Ohio Environmental Council, Physicians for Social Responsibility, and Sierra Club moved to Intervene on June 3, 2024; (2) State of Massachusetts, State of Minnesota, State of Connecticut, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of New Jersey, State of New York, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Wisconsin, District of Columbia, City of Baltimore, City of Chicago, City of New York moved to intervene on June 6, 2024.

Proposed *Amici*: None at present.

## B. Rulings Presented for Review

Final rule entitled *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*. 89 Fed.Reg. 38508 (May 7, 2024).

**C.     Parties, Intervenors, and Amici in Related Cases in this Circuit**

Consolidated cases: (1) *NACCO Natural Resources Corp. v. EPA and Michael S. Regan*, No. 24-1154; (2) *National Rural Electric Cooperative Association, Lignite Energy Council, National Mining Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative Inc., Basin Electric Power Cooperative, and Rainbow Energy Center, LLC v. EPA and Michael S. Regan,* No. 24-1179; and (3) *Oak Grove Management Company LLC and Luminant Generation Company LLC v. EPA and Michael S. Regan*, No. 24-1184.


*/s/ Philip Axt*
PHILIP AXT
Solicitor General of North Dakota

## CERTIFICATE OF COMPLIANCE WITH RULES 18(A)(1) AND (A)(2)

The undersigned certifies that this motion complies with Fed. R. App. P. and D.C. Cir. R. 18(a)(1). On May 14, 2024, Petitioners submitted to EPA a Request for Administrative Stay Pending Judicial Review of the *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, published in the Federal Register at 89 Fed.Reg. 38508 (May 7, 2024). EPA acknowledged receipt of this request on May 21, 2024, but has not otherwise responded.

In accordance with Fed. R. App. P. and D.C. Cir. R. 18(a)(2), counsel for Petitioners notified EPA's counsel by voicemail and email on June 3, 2024, that Petitioners planned to file this motion. EPA opposes this motion.

*/s/ Philip Axt*
PHILIP AXT
Solicitor General of North Dakota

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................v

TABLE OF AUTHORITIES ................................................................. vi

GLOSSARY OF KEY ABBREVIATIONS AND ACRONYMS ...........................x

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................2

ARGUMENT ....................................................................................5

I.     Petitioners Are Likely to Prevail on the Merits...............................6

       A.     The Rule Violates Clean Air Act Section 112(d)(6) Because Revising the MATS Standard Is Not "Necessary"................................6

       B.     The Rule is Arbitrary and Capricious for Multiple Reasons ...............8

II.    Petitioners Will Suffer Imminent and Irreparable Harm Absent a Stay .......17

       A.     Petitioner States Will Suffer Irreparable Economic Harm..................17

       B.     The Rule's Compliance Costs and Infeasible Standards Risk Catastrophic Consequences for the Power Grid .................................18

III.   The Balance of Harms and the Public Interest Favor a Stay........................22

CONCLUSION ...................................................................................23

CERTIFICATE OF COMPLIANCE.......................................................30

CERTIFICATE OF SERVICE .............................................................30

# TABLE OF AUTHORITIES

## Cases

*Ass'n of Battery Recyclers v. EPA*,
 716 F.3d 667 (D.C. Cir. 2013)..............................................................8

*California v. Azar*,
 911 F.3d 558 (9th Cir. 2018) ..............................................................17

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
 785 F.3d 1 (D.C. Cir. 2015)................................................... 11, 12

*Dep't of Commerce v. New York*,
 139 S. Ct. 2551 (2019)........................................................... 14, 16

*La. Envtl. Action Network v. EPA*,
 955 F.3d 1088 (D.C. Cir. 2020)............................................................6

*Mexican Gulf Fishing Co. v. U.S. Dep't of Comm.*,
 60 F.4th 956 (5th Cir. 2023) ..............................................................10

\*Michigan v. EPA*,
 576 U.S. 743 (2015)..................................................... 1, 9, 10, 18, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
 463 U.S. 29 (1983)..........................................................................8, 12

*Nat. Res. Def. Council v. EPA*,
 529 F.3d 1077 (D.C. Cir. 2008)................................................. 7, 8, 9

*Portland Cement Ass'n v. EPA*,
 665 F.3d 177 (D.C. Cir. 2011)...........................................................13

*Sierra Club v. EPA*,
 895 F.3d 1 (D.C. Cir. 2018)................................................................2

*Sierra Club v. Ga. Power Co.*,
 180 F.3d 1309 (11th Cir. 1999) .........................................................22

\*Texas v. EPA*,
 829 F.3d 405 (5th Cir. 2016) .............................. 12, 19, 21, 22, 23

*West Virginia v. EPA*,
    597 U.S.697, 735 (2022)............................................................. 14, 15

*West Virginia v. EPA*,
    90 F.4th 323 (4th Cir. 2024) ...............................................22

*Wyoming v. Dep't of Interior*,
    493 F. Supp. 3d 1046 (D. Wyo. 2020).....................................9

**<u>Statutory Authorities</u>**

<u>Clean Air Act § 112</u>
    42 U.S.C. § 7412.......................................................................2

    42 U.S.C. § 7412(c)(9)(B)(i)......................................................8

    42 U.S.C. § 7412(d)(6) ...................................................... 3, 6, 7

    42 U.S.C. §§7412(f)(2)...............................................................3

**<u>Rules and Regulations</u>**

Executive Order No. 13990, Protecting Public Health and the Environment and
    Restoring Science to Tackle the Climate Crisis,
    86 Fed. Reg. 7037 (Jan. 25, 2021).............................................. 3, 4, 14

National Emission Standards for Coke Oven Batteries,
    69 Fed. Reg. 48338 (Aug. 9, 2004) .........................................4

National Emission Standards for Organic Hazardous Air Pollutants From the
    Synthetic Organic Chemical Manufacturing Industry,
    71 Fed. Reg. 76603 (Dec. 21, 2006).........................................4

National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-
    Fired Electric Utility Steam Generating Units and Standards of Performance for
    Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small
    Industrial-Commercial-Institutional Steam Generating Units,
    77 Fed. Reg. 9304 (Feb. 16, 2012) ..............................................3, 12

National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired
    Electric Utility Steam Generating Units—Reconsideration of Supplemental
    Finding and Residual Risk and Technology Review,
    85 Fed. Reg. 31286 (May 22, 2020).........................................3

National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review,
88 Fed. Reg. 24854 (Apr. 24, 2023) .................................................................4, 5

National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review,
89 Fed. Reg. 38508 (May 7, 2024) ............... 2, 5, 6, 7, 8, 9, 10, 11, 14, 17, 20, 22

D. C. Cir. R. 18(a)(1) ........................................................................................... iv, 5

D. C. Cir. R. 18(a)(2) ............................................................................................... iv

## Docketed Materials

Coal Conversion Counties Ass'n Comment,
EPA-HQ-OAR-2018-0794-6003 .........................................................................11

Lignite Energy Council Comment,
EPA-HQ-OAR-2018-0794-5957 .........................................................................11

Minnkota Power Coop. Inc. Comment,
EPA-HQ-OAR-2018-0794-5978 .........................................................................12

Nat'l Min. Ass'n Comment,
EPA-HQ-OAR-2009-0234-20531 .......................................................................13

Nat'l Mining Ass'n Comment,
EPA-HQ-OAR-2018-0794-5986 .........................................................................11

Power Generators Air Coalition Comment,
EPA-HQ-OAR-2018-0794-5994 .........................................................................12

Rainbow Energy Center Comment,
EPA-HQ-OAR-2018-0794-5990 .........................................................................12

Westmoreland Mining Holdings Comment,
EPA-HQ-OAR-2018-0794-5935 ................................................................. 10, 11

**<u>Additional Authorities/Scientific Studies/Additional Materials</u>**

2023 Technology Review for the Coal- and Oil-Fired EGU Source Category ("2023 Tech Review") .......................................................................4, 5

2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category ("2024 Tech Update") ...................................4, 5

Black's Law Dictionary (11th ed. 2019) .................................................6

Cass, R. *Staying Agency Rules: Constitutional Structure and Rule of Law in the Administrative State*, 69 Admin. L. Rev. 225, 254-57 (2017)................................2

EPA, *Biden-Harris Administration Finalizes Suite of Standards to Reduce Pollution from Fossil Fuel-Fired Power Plants* (Apr. 25, 2024).........................13

FERC-NERC-Regional Entity Staff Report: *The February 2021 Cold Weather Outages in Texas and the South Central United States* (Nov. 16, 2021).............18

Geman, *EPA floats path on electricity CO2 emissions—with an asterisk*, Axios (Mar. 11, 2022)..............................................................15

Milman, *New US climate rules for pollution cuts 'probably terminal' for coal-fired plants*, Guardian (May 2, 2024)............................................16

PBS, EPA Administrator Michael Regan discusses Supreme Court ruling on climate change, YouTube (June 30, 2022) ............................................16

Power Sector Strategy: Climate, *Public Health, Environmental Justice, Briefing for Gina McCarthy and Ali Zaidi* (Feb. 4, 2021) ....................................15

Pratson et. al., *Fuel Prices, Emission Standards, and Generation Costs for Coal v Natural Gas Power Plants*, Am. Chem. Soc'y, Env'l Sci. & Tech., 4929 (Mar. 2013)....................................13

U.S. Energy Info. Admin., *Planned coal-fired power plant retirements continue to increase* (Mar. 20, 2014) ................................................................13

White House, *Press Gaggle by Principal Deputy Press Secretary Karine Jean-Pierre & Env't Prot. Agency Adm'r Michael Regan* (Feb. 17, 2022).........16

*Authorities on which Petitioners chiefly rely are marked with asterisks.

# GLOSSARY OF KEY ABBREVIATIONS AND ACRONYMS

| Abbreviation Or Acronym | Defined |
|---|---|
| CAA | Clean Air Act |
| EGU | Electric Utility Steam Generating Units |
| EPA | Environmental Protection Agency |
| fPM | Filterable Particulate Matter |
| HAP | Hazardous Air Pollutant |
| Hg | Mercury |
| MATS | Mercury and Air Toxics Standards |
| RIA | Regulatory Impact Analysis |

**INTRODUCTION**

With this Rule, EPA is ratcheting down the Mercury and Air Toxics Standards (MATS) for coal-fired power plants by 66-70%. The implementation costs will be substantial, power plants may be forced onto early retirement tracks, and power grid reliability will be threatened. Conversely, there is no relevant public health benefit from the mandated reduction in hazardous air pollutant (HAP) emissions. None. EPA recognizes that the 2012 MATS rule already reduced HAP emissions **well below** any threshold that would impact public health.

Petitioners will establish multiple legal infirmities on the merits requiring the Rule be set aside. But that victory will be meaningless absent a stay, because to comply with the Rule's three-year deadline for implementing the mandated changes (or retiring if they cannot), power plants need to take action immediately. EPA knows this. The last time the MATS Rule was litigated, the Supreme Court held EPA acted "unreasonably when it deemed cost irrelevant to the decision to regulate power plants." *Michigan v. EPA*, 576 U.S. 743, 760 (2015). But the victory proved hollow, because without a stay while the merits were heard, power plants were forced to make compliance and retirement decisions, resulting in billions expended and many plant closures in response to an unlawful regulation. The last time the MATS Rule was litigated is a textbook example for when agency rules should be

stayed.  *E.g.*, Ronald Cass, *Staying Agency Rules: Constitutional Structure and Rule of Law in the Administrative State*, 69 Admin. L. Rev. 225, 254-57 (2017).

While EPA claims this Rule will have no impact on the power grid or energy prices, Petitioners have included with this motion an array of declarations from power plants and State regulators attesting that is not the case.  And EPA has an established record of grossly understating the effect its rules will have on the power grid.  The last time the MATS Rule was litigated, EPA assured the country that it would only cause about 5,000 MW to go offline.  EPA was wrong.  The number ended up being closer to 60,000 MW.  Our power grids do not have the same buffer of dispatchable energy that they did a decade ago.  If EPA is wrong to the same degree that it was last time, the impact to our power grids will be substantial.

Petitioners ask the Court to preserve the status quo by staying the Final Rule until the merits of this dispute are resolved.  An expedited briefing schedule will limit the duration of any such stay.

## BACKGROUND

Section 112 of the Clean Air Act (CAA) (codified at 42 U.S.C. § 7412) provides EPA statutory authority to set emission levels for certain HAPs enumerated in Section 112(b)(1).  *Sierra Club v. EPA*, 895 F.3d 1, 7 (D.C. Cir. 2018).  As EPA acknowledges, "Congress intended for CAA Section 112 to achieve significant reductions in HAP."  89 Fed.Reg. at 38535.

EPA issued the original MATS rule for HAP emissions from coal- and oil-fired electric generating units (EGUs) in 2012. 77 Fed.Reg. 9304 (Feb. 16, 2012). That rule identified different achievable control standards for mercury from EGUs that use lignite coal compared to other types of coal. The distinction was based on science: lignite is more variable than other types of coal and available technologies cannot consistently achieve the same control levels. 77 Fed.Reg. at 9393.

Eight years after a HAP emission level is set, EPA must evaluate if any "residual risks" remain to public health from those HAP emissions and whether there have been any developments in available control technologies. 42 U.S.C. §§7412(f)(2), (d)(6). EPA calls these the Residual Risk and Technology Reviews.

In 2020, EPA conducted those reviews for the MATS Rule. For the Residual Risk Review, EPA "determined that the current [standard] provides an ample margin of safety to protect public health and prevent an adverse environmental effect." 85 Fed.Reg. 31286, 31314 (May 22, 2020). And for the Technology Review, EPA determined there were no developments in emission control technologies, practices, or processes that warranted revising the MATS Rule. *Id*. at 31298.

But six months later there was a change in presidential Administration and Executive Order 13990, entitled "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," which directed EPA to consider "suspending, revising, or rescinding" the 2020 Residual Risk and Technology

Reviews for the MATS Rule. 86 Fed.Reg. 7037 (Jan. 25, 2021). That was so despite the fact that EPA's authority for promulgating the MATS Rule under CAA Section 112 has nothing to do with climate change—it is about protecting the public from specified HAPs, not greenhouse gases.

Following Executive Order 13990, EPA reconsidered its 2020 Residual Risk and Technology Reviews for the MATS Rule. For public health, EPA reached the same conclusion. 88 Fed.Reg. 24854, 24895 (Apr. 24, 2023) ("the residual risk assessment showed all modeled exposures to HAP to be below thresholds for public health concern."). That should have been the end of it. In other Section 112(d)(6) rulemakings, EPA has taken the position that if its standards already "provide an ample margin of safety to protect public health and prevent adverse environmental effects, one can reasonably question whether further reviews of technological capability are 'necessary.'" 69 Fed.Reg. 48338, 48351 (Aug. 9, 2004); *see also* 71 Fed.Reg. 76603, 76608 (Dec. 21, 2006). But EPA pressed on.

For its technology re-review, EPA again found "no new practices, processes, or control technologies" for the relevant HAP emissions. 88 Fed.Reg. at 24868. The control technologies used in 2012 are the same as today. *See* 2023 Technology Review for the Coal- and Oil-Fired EGU Source Category ("2023 Tech Review") at 1; 2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-

Fired EGU Source Category ("2024 Tech Update") at 17, 50.[1]  Undeterred, to justify

revising the standards, EPA points to alleged cost efficiencies for using those

technologies, concluding those alleged efficiencies mean that all coal-fired plants,

regardless of configuration or coal type, can now meet a 66% lower surrogate fPM

emission standard for non-mercury HAPs.  89 Fed.Reg. at 38530.[2]  For mercury,

EPA concludes lignite is now capable of meeting the same control standard as other

types of coal, dropping the emission standard by 70%.  89 Fed.Reg. at 38586.  Coal-

fired power plants must meet the new standards in three years or be on a retirement

track.  89 Fed.Reg. at 38519.

## ARGUMENT

The Court should stay the Rule while the merits are resolved because

Petitioners are likely to prevail on the merits of their claims, Petitioners will suffer

irreparable harm in the absence of a stay, and the balance of harms and public interest

favor a stay.  D.C. Cir. R. 18(a)(1).

---

[1] For non-mercury HAPs, the control technology remains electrostatic precipitators and fabric filters, and for mercury the control technology remains activated carbon injection.  2023 Tech Review at 16–18; 2024 Tech Update at 30–32.

[2] The Final Rule uses filterable particulate matter (fPM) as a surrogate for measuring the non-Hg metal HAP emissions. 89 Fed.Reg. at 38508.

## I. Petitioners Are Likely to Prevail on the Merits

### A. The Rule Violates Clean Air Act Section 112(d)(6) Because Revising the MATS Standard Is Not "Necessary"

EPA issued this Rule under CAA Section 112(d)(6), which permits revising HAP emission standards only as "necessary (taking into account developments in practices, processes, and control technologies)." 42 U.S.C. § 7412(d)(6). The operative phrase is "revise as necessary," and "EPA must consider practical and technological advances" when determining whether revision is "necessary." *La. Envtl. Action Network v. EPA,* 955 F.3d 1088, 1097-98 (D.C. Cir. 2020).

The Rule's revisions are not "necessary" for several reasons.[3] For one, there is no relevant public health benefit. EPA acknowledges current HAP emission standards provide an ample margin of safety to protect public health and does not identify *any* quantifiable health benefit from the Rule's further reduction in HAPs. 89 Fed.Reg. at 38558-59. The alleged health "benefits" EPA purports to quantify—reducing criteria pollutants and greenhouse gases, *id.* at 38561-62—cannot serve as a basis for exercising Section 112(d)(6) authority.

Absent any relevant public health benefits from the Rule, EPA claims the revisions are "necessary" due to "developments" in controlling HAP emissions. *Id.* at 38518. But even if a "development" in control technologies could make revising

---

[3] Black's Law Dictionary (11th ed. 2019) (*Necessary*: "needed for some purpose or reason; essential.").

a HAP emission standard that provides no relevant health benefits "necessary" under Section 112(d)(6), EPA identified no new technologies, practices, or processes that would justify revising the MATS Rule. 42 U.S.C. § 7412(d)(6). The primary control technologies used today are the same as they were the last two times EPA undertook a technology review. 89 Fed.Reg. at 38517-18.

Rather than pointing to any new technology, EPA interprets "development" to mean cost-efficient compliance with already-existent technology. *Id.* at 38510. That interpretation of "development" is an atextual attempt to expand EPA's regulatory reach. *Cf. Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1084 (D.C. Cir. 2008) (Section 112(d)(6) rulemaking revises "*technology-based* standards in light of *technological* developments" and requires identification of "*technological innovations*") (emphases added).

EGUs are *required* to comply with HAP emission standards after they are issued, and they must comply with a margin that accounts for fuel variability to consistently meet the emission standard 100% of the time. EPA's interpretation of such compliance as a "development" warranting further rulemaking constitutes a significant power grab—ignoring Section 112(d)(6)'s constraint to only revise the standards as "necessary," and empowering EPA to drive any disfavored source out of the market by tightening HAP emission limits until an emission source with a variable fuel supply is unable to comply *at all times*.

## B.     The Rule is Arbitrary and Capricious for Multiple Reasons

A rule is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem…or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  This Rule is arbitrary and capricious for many reasons, each of which warrants vacating it.

*First*, EPA's cost-benefit analysis is indefensible.   Section 112(d)(6) rulemaking requires reasonable consideration of cost. *See Ass'n of Battery Recyclers v. EPA,* 716 F.3d 667, 673-74 (D.C. Cir. 2013) (rejecting argument cost is irrelevant to emission standard revisions under Section 112(d)(6)).  Yet EPA candidly admits the Rule has a "negative net monetized benefit."  89 Fed.Reg. at 38511.  Under the standards already in place, EPA found the lifetime cancer risk of the person most exposed to coal-fired HAP emissions is 0.344-in-a-million—significantly less than the Clean Air Act's one-in-a-million threshold where EPA can stop regulating a source entirely.  42 U.S.C. § 7412(c)(9)(B)(i); *see also Nat. Res. Def. Council*, 529 F.3d at 1082 (one-in-one million standard is the CAA's "aspirational goal").

Even EPA's qualitative generalizations don't evidence any meaningful health benefits from the mandated reduction in HAPs.  EPA admits the benefits of Hg reduction associated with the Rule are so small they can't be reliably extrapolated to

the broader population of fish consumers. RIA 4-5. And where risk to subsistence fishers located near lignite-fired plants has been studied, fisherman are already not exposed at a level associated with appreciable risk—and that is before the further reductions associated with this Rule. RIA 4-4. EPA's analysis of non-Hg HAP emissions is much the same, with EPA acknowledging "cancer risk was … within the acceptable range for multipathway exposure to the persistent and bioaccumulative non-Hg HAP metals." RIA 4-7. Likewise, noncancer risks did not exceed current thresholds for adverse health effects. *Id*.

To the extent EPA identified any quantifiable "benefits" of the Rule, they are *all* ancillary to the Rule's reduction in HAP emissions and cannot drive a Section 112 cost-benefit analysis. *E.g.,* 89 Fed.Reg. at 38561 (pointing to alleged particulate matter, ozone, and "climate" benefits). As Chief Justice Roberts noted during oral argument in *Michigan v. EPA,* it is improper for EPA to use Section 112 authority to "get at the criteria pollutants that you otherwise would have to go through a much more difficult process to regulate. In other words, you can't regulate the criteria pollutants through the HAP program…" Transcript of Oral Argument at 59:19–60:5, *Michigan v. EPA*, 576 U.S. 743 (2015). *Cf. Wyoming v. Dep't of Interior*, 493 F. Supp. 3d 1046, 1079 (D. Wyo. 2020) (agency "cannot rationally claim the Rule's objective is waste prevention while justifying its considerable costs almost entirely on climate change benefits").

In exchange for zero relevant public health benefits, the Rule will impose tremendous costs on coal-fired EGUs and electricity consumers. Under EPA's own calculations, the estimated cost-per-ton of HAP removed exponentially exceeds cost-benefit ratios that EPA has rejected for other Section 112 rulemakings. For surrogate fPM emissions, by EPA's own math, the cost effectiveness is $10.5 million per ton of HAP removed. 89 Fed.Reg at 38532-33. That is orders of magnitude higher than cost-benefit ratios EPA has explicitly *rejected* as being excessive. *E.g.,* Westmoreland Mining Holdings Cmt. at 4, EPA-HQ-OAR-2018-0794-5935 (compiling examples). EPA admits as much. 89 Fed.Reg. at 38523 ("EPA acknowledges that the cost-effectiveness values for these standards are higher than cost-effectiveness values that the EPA concluded were not cost-effective…for some prior rules.") 89 Fed.Reg. at 38523. These costs will likely force power plant retirements and threaten grid reliability, *see infra*, but, even if they didn't, they will increase the price of electricity for consumers. Just as it is arbitrary and capricious for EPA to impose significant economic costs "for a few dollars" of benefit, *Michigan,* 576 U.S. at 752, so too where EPA imposes substantial costs with "no meaningful benefit." *Mexican Gulf Fishing Co. v. U.S. Dep't of Comm.,* 60 F.4th 956, 966 (5th Cir. 2023).

**Second,** even assuming cost-efficient compliance using existing technology can lawfully be considered a "development" in practices, processes or control

technologies warranting further restrictions under Section 112(d)(6), EPA has not provided a reasoned explanation to support its conclusion that coal-fired EGUs are capable of consistently meeting the Rule's new emission standards with available control technologies. Comment after comment put EPA on notice that the Rule's conclusions regarding compliance feasibility were flawed.[4] But to support its contrary conclusion, the Final Rule relies almost entirely on a single comment (the "Andover Report") that largely parrots EPA's conclusions from the proposed rule without sufficient factual basis or explanation and is woefully inadequate to support EPA's conclusions. *E.g.,* 89 Fed.Reg. at 38523, 38528, 38530, 38538.

*Third,* EPA failed to adequately consider the Rule's foreseeable impact on our nation's already-precarious power grids. Where, as here, EPA promulgates a Rule under Section 112(d) that will foreseeably impact grid reliability, it must thoroughly address the concern. *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015) ("'Costs' can mean many different things, including the cost associated with increased risk" of grid unreliability).

EPA's perfunctory conclusion that the significant costs the Rule imposes on coal-fired EGUs will have <u>no</u> effect on the power sector, 89 Fed.Reg. at 38555-56,

---

[4] *E.g.,* Lignite Energy Council Cmt. at 8-9, EPA-HQ-OAR-2018-0794-5957; Nat'l Mining Ass'n Cmt. at 10-15, EPA-HQ-OAR-2018-0794-5986; Westmoreland Mining Holdings Cmt. at 16-17 (proposed fPM standard is not achievable or feasible); Coal Conversion Counties Ass'n Cmt. at 8, EPA-HQ-OAR-2018-0794-6003 (proposed mercury standard is not achievable or feasible).

does not reflect reasoned analysis entitled to any degree of deference. "EPA has no expertise on grid reliability," *Texas v. EPA*, 829 F.3d 405, 432 (5th Cir. 2016), and comment after comment put EPA on notice that the Rule will foreseeably have significant impacts on power grid reliability.[5] Nonetheless, the Final Rule does not reflect any attempt by EPA to seek input from the Federal Energy Regulatory Commission (FERC), the North American Electric Reliability Corporation (NERC), or any similar entity that could have apprised it of the Rule's likely impact on grid reliability. EPA also failed to address power outages or grid reliability in its Regulatory Impact Analysis. *See* RIA Section 3. EPA's failure to adequately consider one of the Rule's most important impacts was arbitrary and capricious. *State Farm*, 463 U.S. at 43; *see also Del. Dep't of Nat. Res.*, 785 F.3d at 18 (encouraging EPA to solicit input from FERC).

Moreover, as noted *supra*, the last time the MATS Rule was litigated, EPA claimed it would only cause about 5,000 MW to go offline. 77 Fed.Reg. at 9407 ("…expected retirements of coal-fueled units as a result of this final rule (4.7 GW) are fewer than was estimated at proposal and much fewer than some have

---

[5] *E.g.,* Rainbow Energy Center Cmt. at 4, EPA-HQ-OAR-2018-0794-5990; *see also id.*, Attachment A at 3-4 (MISO Cmt. on Docket ID Nos. EPA-HQ-OLEM-2021-0283, EPA-HQ-OLEM-2021-0282, EPA-HQ-OLEM-2021-0280); Minnkota Power Coop. Inc. Cmt. at 3, EPA-HQ-OAR-2018-0794-5978; Power Generators Air Coalition Cmt. at 12, EPA-HQ-OAR-2018-0794-5994.

predicted"). EPA was wrong. It ended up being closer to 60,000 MW.[6] That

dramatic difference represents a profound failure on EPA's part to analyze the rule's

impacts on power generation. Consequently, EPA's perfunctory conclusion that this

Rule (dropping emission standards by 66-70%) will not cause a single retirement,

RIA at 3-16, should be viewed with extreme skepticism given the number of

comments and declarations attesting EPA has gotten it profoundly wrong again.

EPA's analysis of the Rule's grid impacts also fails to "acknowledge and

account for" the impacts of "contemporaneous and closely related rule[s]." *Portland

Cement Ass'n v. EPA,* 665 F.3d 177, 187 (D.C. Cir. 2011). EPA expressly issued

this Rule as part of a "suite" of rules targeting coal power plants with retirement-

inducing costs. *See* EPA, *Biden-Harris Administration Finalizes Suite of Standards

to Reduce Pollution from Fossil Fuel-Fired Power Plants* (Apr. 25, 2024).[7] EPA's

---

[6] *See, e.g.,* U.S. Energy Info. Admin., *Planned coal-fired power plant retirements continue to increase* (Mar. 20, 2014), bit.ly/4dbYwfM (between 2012 and 2020, "about 60 gigawatts of coal-fired capacity is projected to retire … assum[ing] implementation of the MATS standards"); Pratson et. al., *Fuel Prices, Emission Standards, and Generation Costs for Coal v Natural Gas Power Plants*, Am. Chem. Soc'y, Env'l Sci. & Tech., 4929 (Mar. 2013), bit.ly/3w7yLN2 (most coal-fired EGU retirements in the wake of the original MATS Rule were due to "stronger regulations," not unrelated market forces); *see also* Nat'l Min. Ass'n Cmt. at 2 & n.4, EPA-HQ-OAR-2009-0234-20531 (for the nearly 60 gigawatts of coal-fired EGU retirements announced between 2012 and 2016, "virtually all" stated the closures were "either fully or partially attributable to MATS and other EPA regulations").

[7] Available at https://tinyurl.com/y5u92sx3.

failure to meaningfully assess how the confluence of these (and many other) rules targeting coal-fired power plants will affect the power grid further cements its arbitrary and capriciousness.

**Fourth,** the Rule is arbitrary and capricious because EPA's stated reasons for it are pretextual. When an agency promulgates a rule, it must truthfully "disclose the basis of its action," and courts must set aside rulemaking when "the evidence tells a story that does not match the explanation." *Dep't of Commerce v. New York,* 139 S. Ct. 2551, 2575-76 (2019). Despite claiming it engaged in this rulemaking to protect the public from specified HAP emissions, 89 Fed.Reg. at 38509-10, available evidence—not least of which is the Executive Order *on climate change* which EPA admits spurred this rulemaking—indicates EPA is using its Section 112(d)(6) authority as part of an effort to force a nationwide transition away from coal for putative climate change reasons. *Contra West Virginia v. EPA*, 597 U.S.697, 735 (2022) (declaring it "not plausible" the CAA empowers EPA to "force a nationwide transition away from the use of coal to generate electricity").

Internal documents produced through FOIA indicate EPA and the White House Climate Office contrived revising the MATS Rule as a means of reducing power plant emissions for climate change reasons. For example, in February 2021, EPA prepared a presentation for the White House <u>Climate Advisor</u>. *See* Power Sector Strategy: Climate, Public Health, Environmental Justice, Briefing for Gina

McCarthy and Ali Zaidi (Feb. 4, 2021). Ex.15 (Chang Decl.) ¶¶3-5. While heavily redacted, the document evidences EPA's intent to use its regulatory authority under various programs, including the MATS Rule, for reducing power plant emissions to implement the Administration's climate agenda. *Id.* ¶¶6-7.

Those internal documents match public comments from the EPA Administrator, who repeatedly stated EPA would issue a "suite of rules" designed to close fossil fuel-fired power plants, with the co-benefit of combating climate change. *E.g.*, Geman, *EPA floats path on electricity CO2 emissions—with an asterisk*, Axios (Mar. 11, 2022).[8]

As just one example, Administrator Regan said his agency would "couple" climate regulations with "health-based" regulations to regulate greenhouse gases and get around the *West Virginia v. EPA* decision.

> **PBS**: How much of a setback is [the *West Virginia v. EPA* decision] to your efforts to regulate greenhouse gases?
>
> **Regan**: …We still will be able to regulate climate pollution. And we're going to use all of the tools in our toolbox. …
>
> **PBS**: Well, can you give us a couple of examples of the kind of tools that you believe you still can use to regulate this industry?
>
> **Regan**: …We also have a suite of regulations that are facing the power sector. And so, *as we couple the regulation of climate pollution with the regulation of health-based pollution*, we are providing the power

---

[8] Available at https://www.axios.com/2022/03/11/epa-electricity-co2-emissions.

sector with a very clear picture of what regulations they're facing so
that they can make the right investment decisions.

PBS, *EPA Administrator Michael Regan discusses Supreme Court ruling on climate change*, YouTube (June 30, 2022) (emphasis added);[9] *see also, e.g.*, White House, *Press Gaggle by Principal Deputy Press Secretary Karine Jean-Pierre & Env't Prot. Agency Adm'r Michael Regan* (Feb. 17, 2022) (stating if the Supreme Court limits EPA's ability to regulate greenhouse gas emissions, EPA will respond with "bread-and-butter regulations," such as "regulating mercury").[10]

EPA's public statements and documents evidence this Rule was not promulgated to protect the public from exposure to the regulated HAPs. The purpose for EPA's recent "suite" of rules targeting coal-fired plants is recognized around the world,[11] and courts are "'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Commerce*, 139 S. Ct. at 2575 (citation omitted).

---

[9] Available at https://www.youtube.com/watch?v=Ic_1UxwsXj8 (accessed May 7, 2024).

[10] Available at https://tinyurl.com/bddpr22j.

[11] *E.g.,* Milman, *New US climate rules for pollution cuts 'probably terminal' for coal-fired plants*, Guardian (May 2, 2024), https://www.theguardian.com/us-news/2024/may/02/us-climate-rules-coal-plants-pollution.

## II. Petitioners Will Suffer Imminent and Irreparable Harm Absent a Stay

### A. Petitioner States Will Suffer Irreparable Economic Harm

Petitioner States will suffer irreparable economic harm if the Rule is not stayed during the pendency of litigation.

EPA's claim that the Rule will have almost no impact on electricity prices, 89 Fed.Reg. at 38555-56, does not reflect reasoned decision-making. EPA acknowledges that complying with the Rule will impose millions in costs (presuming plants are able to comply at all). 89 Fed.Reg. at 38561. Those costs must be borne somewhere, and Petitioners have provided declaration after declaration attesting that implementing the Rule will inevitably require prices to increase. Ex.2 (Fedorchak Decl.) ¶¶25-33; Ex.3 (Lane Decl.) ¶23; Ex.7 (Huston Decl.) ¶¶16-17; Ex.8 (Bohrer Decl.) ¶¶18-21; Ex.9 (McLennan Decl.) ¶43; Ex.10 (Tschider Decl.) ¶29; Ex.11 (McCollam Decl.) ¶¶33-35; Ex.16 (Purvis Decl.) ¶11. Any increase in retail electric rates will impose unrecoverable costs on Petitioner States and their residents, including the States as consumers of electricity. *E.g.*, *California v. Azar,* 911 F.3d 558, 581 (9th Cir. 2018) (economic injury sustained by states due federal agency action "is irreparable … because the states will not be able to recover monetary damages").

Moreover, absent a stay of the Final Rule during the pendency of litigation, State regulators will need to expend substantial resources overseeing

implementation of the Final Rule and attempting to mitigate its deleterious effects. Ex.2 (Fedorchak Decl.) ¶7; Ex.3 (Lane Decl.) ¶¶29-31.

**B.  The Rule's Compliance Costs and Infeasible Standards Risk Catastrophic Consequences for the Power Grid**

Even more concerning than the imposition of unrecoverable economic costs, the Rule also threatens irreparable harm by undermining power grid reliability, as power outages are frequently paid for with human lives. *E.g.,* FERC-NERC-Regional Entity Staff Report: The February 2021 Cold Weather Outages in Texas and the South Central United States (Nov. 16, 2021) (over 200 fatalities during weather event "with most of the deaths connected to the power outages").

Although the Rule includes a three-year implementation period, absent a stay during the pendency of litigation, complying with that deadline (or commencing retirement plans if they cannot) requires EGUs to make decisions and take requisite actions *now*. Power plants cannot start and stop instantaneously; actions taken now will be irreversible and will affect power grids for years to come. Ex.8 (Bohrer Decl.) ¶¶24-28; Ex.9 (McLennan Decl.) ¶58; Ex.10 (Tschider Decl.) ¶¶25-30; Ex.11 (McCollam Decl.) ¶¶34-43; Ex.12 (Friez Decl.) ¶¶16-17; Ex.16 (Purvis Decl.) ¶¶15-19. As discussed *supra*, that is precisely what happened the last time the MATS Rule was litigated. Even though the Supreme Court ultimately held EPA acted unreasonably in promulgating the last MATS rule, *Michigan*, 576 U.S. at 743,

regulated EGUs had already been required to spend billions in compliance costs (or begin shutdown operations).

Power plants are again saying this Rule will result in substantial costs and may result in plant closures. Ex.8 (Bohrer Decl.) ¶¶21-24; Ex.9 (McLennan Decl.) ¶¶34-39, 70 ("Recent test data suggest that Minnkota will not be able to meet the New Mercury Limitation even at the higher PAC injection rates that EPA assumed to be sufficient to meet the New Mercury Limitation."); Ex.10 (Tschider Decl.) ¶¶21-23; Ex.11 (McCollam Decl.) ¶¶34-43; Ex.16 (Purvis Decl.) ¶¶24-25 (upgrades to comply "will certainly fail, despite best engineering and maintenance practices, due to the lack of any margin to meet the aggressively low new fPM limitation"). That injury will be irreparable. *Texas v. EPA*, 829 F.3d at 434 (potential closures threatened "the very existence of some of Petitioner's businesses and, even assuming, *arguendo*, that the plant operators could recover their costs from…their consumers, this would not be a recovery made in the course of the litigation").

EPA's perfunctory conclusion this Rule will not affect the power grid at all, 89 Fed.Reg. at 38519, should not be trusted. "EPA has no expertise on grid reliability." *Texas v. EPA,* 829 F.3d at 433. That expertise resides in FERC and NERC, yet EPA did not consult either before finalizing the Rule. Nor does EPA's Regulatory Impact Analysis reflect a long-term assessment of grid reliability, despite receiving comment after comment that the Rule would have significant impacts on

the power grid.  *See* RIA at 3-23–3-24.  And EPA's feasibility determinations are supported almost entirely by a single comment that is woefully inadequate to support EPA's conclusions.  *See* Ex.13 (Holmes Decl.) ¶11 (summarizing EPA's reliance on the Andover Report as "bootstrapping at its worst").[12]  State and grid regulators attest the foreseeable impacts of this Rule on power grid reliability will be significant. Ex.1 (Vigesaa Decl.) ¶¶11-26; Ex.2 (Fedorchak Decl.) ¶¶7-24; Ex.3 (Lane Decl.) ¶¶18-34; Ex.4 (Rickerson Decl.) ¶¶13-15; Ex.5 (Nowakowski Decl.) ¶¶7-12; Ex.6 (Webb Decl.) ¶¶6-10; Ex.7 (Huston Decl.) ¶12.

In a telling section, EPA dismisses widespread concerns about the Rule's foreseeable impact on power grid reliability by assuming that State or regional regulators will be able to use emergency powers to prop up the power grid if the Final Rule makes EGUs no longer commercially viable.  89 Fed.Reg. at 38526. EPA's reliance on such emergency, stopgap powers to prevent the Rule from breaking the power grids is the epitome of arbitrary and capricious agency action.

According to a study commissioned by the North Dakota Transmission Authority, if the Rule causes any of North Dakota's lignite-fired EGUs to retire, it will risk causing the entire MISO grid to experience black-outs resulting in economic damages ranging from $29 million to over $1 billion.  Ex.1 (Vigesaa Decl.) ¶¶22-

---

[12] Further, an author of one of the few other studies EPA relies upon for its feasibility determination attests EPA is also misusing that study.  Ex.14 (Benson Decl.) ¶¶6-8.

25.  Given that the Rule will likely have the effect—if not the deliberate goal—of setting HAP emission standards that coal-fired EGUs in North Dakota and elsewhere will be unable to comply with, undermining long-term grid reliability is a foreseeable impact of the Rule that EPA failed to take seriously.

Furthermore, as noted *supra*, EPA's conclusion the Rule will have no impact on power plant operations should be viewed with skepticism given EPA's history of woefully underestimating the impact that its rules—and the MATS Rule specifically—will have on power plant operations.  The last time EPA promulgated the MATS Rule, its claim that it would impact only about 5,000 MW of power ended up being wrong by over a factor of ten.  The power grids today do not have the same buffer of dispatchable power that they had a decade ago, and an error on the same magnitude as EPA's last profound error would likely have catastrophic results.  Ex.1 (Vigesaa Decl.) ¶11-12; Ex.3 (Lane Decl.) ¶¶12-13; Ex.7 (Huston Decl.) ¶¶8-14.

In similar circumstances, the Fifth Circuit stayed an EPA rule that a state plausibly alleged would result in grid instability due to the likely closure of coal-fired power plants during the pendency of litigation.  *Texas v. EPA*, 829 F.3d at 434. In that case, Texas argued that the changes mandated by the challenged rule would cost power plants upwards of "$2 billion, rendering them uneconomical and forcing the plants to close" potentially "remov[ing] 3,000 MW to 8,400 MW of generating

capacity." *Id.* at 416. Consequently, the court held that "the threat of grid instability and potential brownouts alone constitute irreparable injury." *Id.*

## III. The Balance of Harms and the Public Interest Favor a Stay

Staying the Rule while Petitioners' challenge is heard on the merits will maintain the status quo, and EPA acknowledges the status quo already protects public health. 89 Fed.Reg. at 38508 (existing standards already provide an "ample margin of safety").

The public interest also favors a stay when that rule would potentially threaten the public's access to affordable electricity. *Texas v. EPA*, 829 F.3d at 435 (granting stay where "public interest in ready access to affordable electricity" outweighed "inconsequential" emissions reductions that rule implementation would have achieved during the pendency of the litigation); *see also, e.g.*, *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999) (denying preliminary injunction where it threatened to reduce power generation, as "[a] steady supply of electricity … especially … [for] the elderly, hospitals and day care centers, is critical."); *West Virginia v. EPA,* 90 F.4th 323, 332 (4th Cir. 2024) ("the public [] has an interest in the efficient production of electricity and other industrial activity in the State, even as such production is balanced with environmental needs").

And courts have found "unconvincing" the suggestion that the public will be injured from a stay pending litigation where, as here, complying with the rule "would

not reduce emissions for at least three years." *Texas v. EPA,* 829 F.3d at 434. That is particularly the case where, as here, the existing conditions already far exceed federal safety or environmental goals. *Id.* at 434–35.

## CONCLUSION

Petitioners ask the Court to stay implementation of the Final Rule.

Respectfully submitted,

DREW H. WRIGLEY
Attorney General

By: */s/ Philip Axt*
    PHILIP AXT
    Solicitor General
    600 E Boulevard Ave., Dept. 125
    Bismarck, ND 58505
    Phone: 701.328.2210
    pjaxt@nd.gov

    NESSA HOREWITCH COPPINGER
    DAVID M. FRIEDLAND
    Special Assistant Attorneys General
    1900 N Street NW, Suite 100
    Washington, DC 20036
    Phone: 202.789.6053
    ncoppinger@bdlaw.com
    dfriedland@bdlaw.com

*Counsel for State of North Dakota*

PATRICK MORRISEY
Attorney General

*/s/ Lindsay S. See*
LINDSAY S. SEE
Solicitor General
MICHAEL R. WILLIAMS
Principal Deputy Solicitor General
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*


TIM GRIFFIN
Attorney General

*/s/ Nicholas J. Bronni*
NICHOLAS J. BRONNI
Solicitor General
DYLAN L. JACOBS
Deputy Solicitor General
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
nicholas.bronni@arkansasag.gov

*Counsel for State of Arkansas*

TREG TAYLOR
Attorney General

*/s/ Garrison Todd*
GARRISON TODD
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Ave. Ste. 200
Anchorage, AK 99501
(907) 269-5100
Garrison.Todd@alaska.gov

*Counsel for State of Alaska*


CHRISTOPHER M. CARR
Attorney General

*/s/ Stephan J. Petrany*
STEPHEN J. PETRANY
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

RAÚL R. LABRADOR
Attorney General

*/s/ Joshua N. Turner*
JOSHUA N. TURNER
Chief of Constitutional Litigation and
Policy
ALAN M. HURST
Solicitor General
Office of Idaho Attorney General
P.O. Box. 83720
Boise, Idaho 83720
(208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@aga.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
Attorney General

*/s/ James A. Barta*
JAMES A. BARTA
Solicitor General
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

BRENNA BIRD
Attorney General

*/s/ Eric H. Wessan*
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

KRIS W. KOBACH
Attorney General

*/s/ Anthony J. Powell*
ANTHONY J. POWELL
Solicitor General
Office of Kansas Attorney General
120 SW 10thAvenue, 2ndFloor
Topeka, Kansas 66612
(785) 368-8539
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

RUSSELL COLEMAN
Attorney General

*/s/ Matthew F. Kuhn*
MATTHEW F. KUHN
Solicitor General
JACOB M. ABRAHAMSON
Assistant Solicitor General
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for Commonwealth of Kentucky*

ELIZABETH B. MURRILL
Attorney General

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General
Louisiana Department of Justice 1885
N. Third Street
Baton Rouge, Louisiana 70802
(225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW T. BAILEY
Attorney General

*/s/ Samuel C. Freedlund*
SAMUEL C. FREEDLUND
Deputy Solicitor General
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, Missouri 63101
(314) 340-4869
Samuel.Freedlund@ago.mo.gov

*Counsel for State of Missouri*

AUSTIN KNUDSEN
Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406)444-2707
Christian.Corrigan@mt.gov

*Counsel for State of Montana*


GENTNER DRUMMOND
Attorney General

*/s/ Garry M. Gaskins, II*
GARRY M. GASKINS, II
Solicitor General
JENNIFER L. LEWIS
Deputy Attorney General
Office of the Attorney General of
Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*


MICHAEL T. HILGERS
Attorney General

*/s/ Grant D. Strobl*
GRANT D. STROBL
Assistant Solicitor General
Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
grant.strobl@nebraska.gov

*Counsel for State of Nebraska*


ALAN WILSON
Attorney General

*/s/ Thomas T. Hydrick*
THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*

Marty J. Jackley
Attorney General

*/s/ Steve Blair*
Steve Blair
Deputy Attorney General
Office of the Attorney General of
South Dakota
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
(605) 773-3215
atgservice@state.sd.us
steven.blair@state.sd.us

*Counsel for State of South Dakota*


Ken Paxton
Attorney General

*/s/ John R. Hulme*
John R. Hulme
Assistant Attorney General
Brent Webster
First Assistant Attorney General
James Lloyd
Deputy Attorney General for Civil
Litigation
Kellie E. Billings-Ray
Chief, Environmental Protection
Division
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
John.hulme@oag.texas.gov

*Counsel for State of Texas*


Jonathan Skrmetti
Attorney General

*/s/ Whitney Hermandorfer*
Whitney Hermandorfer
Director of Strategic Litigation
Matthew Rice
Solicitor General
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Matthew.Rice@ag.tn.gov

*Counsel for State of Tennessee*


Sean Reyes
Attorney General

*/s/ Stanford Purser*
Stanford Purser
Solicitor General
Office of the Utah Attorney General
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(385) 366-4334
Spurser@agutah.gov

*Counsel for State of Utah*

JASON MIYARES
Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER
Principal Deputy Solicitor General
BRENDAN T. CHESTNUT
Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Commonwealth of Virginia*

BRIDGET HILL
Attorney General

*/s/ D. David DeWald*
D. DAVID DEWALD
Deputy Attorney General
Wyoming Attorney General's Office
Water & Natural Resources Division
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 phone
david.dewald@wyo.gov

*Counsel for State of Wyoming*

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), (f) and (g) and Circuit Rule 32(e)(1), because it contains 5,193 words, excluding exempted parts, according to the count of Microsoft Word 2010. I further certify that the foregoing brief also complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared using Microsoft Word 2010 in 14-point proportionally spaced Times New Roman font.

*/s/ Philip Axt*
PHILIP AXT
Solicitor General of North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2024, the foregoing Motion for Stay was served electronically on all registered counsel through the Court's CM/ECF system.

/s/ Philip Axt
PHILIP AXT
Solicitor General of North Dakota

# INDEX OF DECLARATIONS

| Exhibit | Description |
|---------|-------------|
| 1 | Declaration of Claire Vigesaa, Executive Director, North Dakota Transmission Authority |
| 2 | Declaration of Julie Fedorchak, Commissioner, North Dakota Public Service Commission |
| 3 | Declaration of Charlotte R. Lane, Chairman, West Virginia Public Service Commission |
| 4 | Declaration of D.W. Rickerson, P.E., Senior Vice President and Chief Operating Officer, Electric Reliability Council of Texas, Inc |
| 5 | Declaration of Sonja Nowakowski, Administrator, Montana Department of Environmental Quality, Air, Energy, and Mining Division |
| 6 | Declaration of Doyle Webb, Chairman, Arkansas State Public Service Commission |
| 7 | Declaration of James F. Huston, Chairman, Indiana Utility Regulatory Commission |
| 8 | Declaration of Jason Bohrer, President and Chief Executive Officer, Lignite Energy Council |
| 9 | Declaration of Robert McLennan, President and Chief Executive Officer, Minnkota Power Cooperative |
| 10 | Declaration of Stacy L. Tschider, Chief Executive Officer, Rainbow Energy Center, LLC |
| 11 | Declaration of Gavin McCollam, Senior Vice President and Chief Operating Officer, Basin Electric Power Cooperative |
| 12 | Declaration of Christopher D. Friez, Vice President-Land, Associate General Counsel and Assistant Secretary, NACCO Natural Resources Corporation |
| 13 | Declaration of Mike Holmes, Director and Technical Advisor, North Dakota Lignite Research, Development, and Marketing Program |
| 14 | Declaration of Steven Benson, President, Microbeam Technologies Incorporated |
| 15 | Declaration of Frank H. Chang, Attorney, Consovoy McCarthy PLLC, counsel for State of North Dakota |

| 16 | Declaration of Jerry Purvis, Vice President of Environmental Affairs, East Kentucky Power Cooperative, Inc. |

# EXHIBIT 1

| | |
|---|---|
| STATE OF NORTH DAKOTA, STATE OF WEST VIRGINIA, STATE OF ALASKA, STATE OF ARKANSAS, STATE OF GEORGIA, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF UTAH, COMMONWEALTH OF VIRGINIA, AND STATE OF WYOMING, | Case No.  24-1119 |
| *Petitioners*, | |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, | |
| *Respondent*. | |

**DECLARATION OF CLAIRE VIGESAA
IN SUPPORT OF PETITIONERS' MOTION TO STAY FINAL RULE**

I, Claire Vigesaa, hereby declare and state under penalty of perjury that the following is true and correct to the best of my knowledge and is based on my personal knowledge or information available to me in the performance of my official duties:

1. My name is Claire Vigesaa, and my business address is 600 East Boulevard Ave Dept 405 Bismarck, ND 58505-0840. I am over the age of 18, have personal knowledge of the subject matter, and am competent to testify concerning the matters in this declaration.

2. I have served as Executive Director of the North Dakota Transmission Authority (NDTA) since July 2023. I have a Bachelor of Science degree in engineering from North Dakota State University and held leadership roles in the electric utility industry for 39.5 years, my last 10 years as General Manager/CEO of an electric transmission cooperative utility. As Executive Director of the NDTA, my responsibilities include working with the North Dakota Industrial Commission (NDIC) to facilitate the development and maintenance of electric transmission infrastructure in North Dakota and coordinating with regional transmission organizations to provide for a reliable and resilient electrical grid.

3. The NDTA was created by the North Dakota legislature in 2005. The NDTA was established to serve as a catalyst for new investment in transmission by facilitating, financing, developing, or acquiring transmission to accommodate energy production. NDTA is actively engaged in seeking ways to improve North Dakota's energy export and transmission capabilities within the state. NDTA is also involved with planning and studying grid reliability, resilience, and congestion issues. To that end, NDTA has funded several studies that examine the likely impacts of EPA's proposed air quality regulations on electric grid reliability and resilience in North Dakota and surrounding regions.

4. I am submitting this declaration in support of Petitioners' Motion to Stay the Final Rule published by the U.S. Environmental Protection Agency (EPA) on May 7, 2024, entitled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric

Utility Steam Generating Units Review of the Residual Risk and Technology Review," 89 Fed. Reg. 38508 (Final Rule).

5.    As Director of the NDTA, I have significant concerns that the Final Rule will fundamentally undermine the reliability and resiliency of the electric grids upon which the State of North Dakota and its people rely.

North Dakota's Power Generation Environment

6.    North Dakota has a diverse portfolio of power generation resources, including wind, coal, hydroelectric, and natural gas. The combined total capacity of all types of utility-scale generation in North Dakota is approximately 8,863 MW, and almost half of that (4,048 MW) comes from 10 coal-firing power plants operating within the State.

7.    Over thirty percent of the electricity generated in North Dakota is exported out of the State through the two Regional Transmission Organizations that service the State and surrounding regions—the Midcontinent Independent System Operator (MISO) and the Southwest Power Protocol (SPP).

8.    Studies commissioned by the NDTA project a 10,000 GWhr increase in energy demand in North Dakota over the next two decades, requiring approximately 2200 to 2500 MW of additional capacity to meet the anticipated growth in demand.

9.    The projected growth in renewable resources over the next two decades will not be enough to meet the projected demand in growth, especially if existing dispatchable fossil generation is forced into early retirement by this Final Rule or other federal rules.

10.    Dispatchable energy is energy that is available on demand. Energy sources such as wind and solar are considered non-dispatchable. When demand for electricity exceeds the dispatchable supply, the foreseeable result will be blackouts or energy rationing.

<u>The Final Rule Threatens an Already Vulnerable Power Grid</u>

11.  The power grids providing electricity to North Dakota (and much of the country) are already stretched dangerously thin, and they do not have the resiliency or the buffer of excess dispatchable generation that they had ten or even five years ago.

12.  Prior to 2016, MISO had <u>no</u> instances requiring the use of emergency procedures, but since then, there have been <u>48</u> Maximum Generation events.[1] Maximum Generation events are a multi-tiered process to respond to generation resource shortages. A graphic from MISO shows this tiered process.[2]



---

[1] North Dakota Industrial Commission and North Dakota Transmission Authority, "Analysis of Proposed EPA MATS Residual Risk and Technology Review and Potential Effects on Grid Reliability in North Dakota," at 9 (Apr. 2, 2024) (MATS Study), *available at* https://www.ndic.nd.gov/sites/www/files/documents/Transmission-Authority/Publications/MATS_Analysis_Report.pdf.

[2] Midcontinent Independent System Operator, "Overview of June 10, 2021 Maximum Generation Event," (July 8, 2021) *available at* https://cdn.misoenergy.org/20210708%20MSC%20Item%2006%20Review%20of%20Max%20Gen%20Event%20-%20June%2010567565.pdf

13.     Since 2022, MISO has been operating near the level of minimum reserve margin requirements.[3] This means that there is little to no excess capacity in the grid.

14.     In 2023, both the MISO and SPP grid operators issued warnings about the adequacy of generation resources to meet peak demand situations.[4]

15.     National organizations charged with monitoring the nation's regional power grids are reporting the same thing. The North American Electric Reliability Corporation (NERC)'s 2023 Long-Term Reliability Assessment, identified MISO as one of the two regions in the country most at risk of capacity shortfalls due to the retirement of thermal resources with inadequate reliable generation coming online to replace them.[5]

16.     As soon as 2028, the MISO grid is projected to have capacity shortfalls even during normal weather. And much of the rest of the country is projected to have capacity shortfalls during severe weather events, when it is needed the most (and when renewable energy is at its least reliable). These are not historically normal projections and are a significant source of concern. And that is without this Final Rule and other federal rules forcing even more reliable, dispatchable, fossil fuel generation sources to retire.

17.     A graphic from NERC's 2023 Long-Term Reliability Assessment illustrates the gravity of current projections for our national power grids.[6] Areas in red are not projected to have sufficient capacity during normal weather events.  As described above, MISO, which

---

[3] Midcontinent Independent System Operator, "MISO'S Response to the Reliability Imperative," at 6 (Feb. 2024), *available at* https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20Final 504018.pdf?v=20240221104216.
[4] MATS Study at 9.
[5] North American Electric Reliability Corporation, "2023 Long-Term Reliability Assessment," (Dec. 2023), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf.
[6] North American Electric Reliability Corporation, "2023 Long-Term Reliability Assessment," Dec. 2023, *available at* https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf.

includes much of North Dakota, is in red. Areas in orange are not projected to have sufficient capacity in severe weather events.



Figure 1: Risk Area Summary 2024–2028[8]

18.    On February 26, 2024, MISO released "MISO's Response to the Reliability Imperative," a report that addresses the disturbing outlook for electric reliability in its footprint. The main reasons for this warning are the pace of premature retirements of dispatchable fossil generation and the resulting loss of accredited capacity and reliable energy production sources.[7]   In that report, MISO states that "[w]idespread retirements of dispatchable resources, lower reserve margins, more frequent and severe weather events and increased reliance on weather-dependent renewables and emergency-only resources have altered the

---

[7] Midcontinent Independent System Operator, "MISO'S Response to the Reliability Imperative" (Feb. 2024),  https: //cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20Final504018.pdf?v=202402 21104216.

region's historic risk profile, creating risks in non-summer months that rarely posed challenges in the past."

19.    That February 2024 Report from MISO contains a section titled, "EPA Regulations Could Accelerate Retirements of Dispatchable Resources," which states:

> While MISO is fuel- and technology-neutral, MISO does have a responsibility to inform state and federal regulations that could jeopardize electric reliability. *In the view of MISO, several other grid operators, and numerous utilities and states, the U.S. Environmental Protection Agency (EPA) has issued a number of regulations that could threaten reliability in the MISO region and beyond*.

20.    If the Final Rule forces even more coal generation sources to shut down, there can be little doubt that it will significantly impact grid reliability and the provision of reliable electricity to the people of North Dakota and surrounding regions.

21.    Even if the Final Rule does not cause plants do not shut down, implementation of the Rule's low emissions standards will necessitate operational modifications within lignite power plants. Such operational changes can compromise the inherent flexibility of lignite power plants to respond effectively to fluctuating load conditions and grid demands. The need for continuous operation of emission control systems, coupled with potential limitations in responsiveness, may impede the plant's ability to ramp up or down quickly in response to changes in electricity demand or supply. Consequently, the reliability of lignite power plants to maintain grid stability and meet grid operator requirements may be compromised, raising concerns about their ability to ensure consistent and secure electricity supply.

Potential Impact of the MATS Rule to the MISO Grid and North Dakota

22.    Due to its very serious concerns about the impact the MATS Rule will have on power grid reliability for the people of North Dakota, NDTA engaged the Center of the American Experiment to model the reliability and cost impacts of the Rule in the MISO subregions

as it relates to eliminating the subcategory for lignite-fired power plants. That report is available at: https://www.ndic.nd.gov/sites/www/files/documents/Transmission-Authority /Publications/MATS_Analysis_Report.pdf ("NDTA MATS Study").

23. The NDTA MATS Study applied EPA's own capacity factor assumptions to the projected future demand growth for electricity in the MISO region, but also accounted for seasonality and timing of generation and demand based on historical use in the MISO region. *See* NDTA MATS Study at 49-50, 58-59.

24. After applying EPA's own capacity factor assumptions to projected future demand, and accounting for seasonality and timing of generation and demand, the NDTA MATS Study concluded that if lignite-fired facilities in North Dakota that serve the MISO market are forced to retire in the near future as a result of the Rule (or otherwise), it will increase the severity of future projected capacity shortfalls in the MISO region, resulting in economic damages from the ensuing blackouts ranging from $29 million to $1.05 billion over the next decade, and imposing replacement generation costs that will be passed onto ratepayers of approximately $1.9 billion to $3.8 billion. *See* NDTA MATS Study at 1, 31-32, 48.

25. Moreover, NDTA's MATS Study notes that in exchange for those projected capacity shortfalls in the MISO Region, the Final Rule will not provide any meaningful or quantifiable benefit to public health or the environment from the reductions in mercury and other air toxins that are mandated by the Rule. EPA acknowledges those levels of emission are already well below any level that would meaningfully affect public health. Indeed, as the Study notes, there is substantially more mercury emitted annually from the cremation of people with dental fillings than is emitted from all coal-fired power plants in the U.S. combined. EPA's decision to risk the reliability of our nation's power grids by imposing

a Final Rule that will not provide any meaningful public health benefit should be a cause for concern. *See* NDTA MATS Study at 16-18.

26.     In summary, the long-term reliability of the power grids serving North Dakota and the surrounding regions are already in a precarious position, with demand projected to exceed supply for significant amounts of time, even under normal weather conditions. And the reason is not a mystery. Reliable, dispatchable generation sources are being pushed into premature retirement before replacement sources are projected to be online with sufficient capacity to meet demand projections. A reliable power grid is important for meeting the basic needs of modern society, therefore alarm bells should be going off. Grid reliability is vital for ensuring continuous access to essential services, such as food production and military operations. Dispatchable, reliable generation forms the backbone of grid stability, enabling the balancing of supply and demand fluctuations. Now is not the time to be forcing even more dispatchable sources onto retirement tracks for a Final Rule that will not even create any meaningful or quantifiable public health benefit.

Executed in Bismarck, North Dakota, on May 25, 2024.

_Claire Vigesaa_

_____
Claire Vigesaa
Executive Director
North Dakota Transmission Authority

# EXHIBIT 2

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| STATE OF NORTH DAKOTA, STATE OF WEST VIRGINIA, STATE OF ALASKA, STATE OF ARKANSAS, STATE OF GEORGIA, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF UTAH, COMMONWEALTH OF VIRGINIA, AND STATE OF WYOMING,<br><br>*Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>*Respondent*. | Case No. 24-1119 |

## DECLARATION OF JULIE FEDORCHAK
## IN SUPPORT OF PETITIONERS' MOTION TO STAY FINAL RULE

I, Julie Fedorchak, hereby declare and state under penalty of perjury that the following is true and correct to the best of my knowledge and is based on my personal knowledge or information available to me in the performance of my official duties:

1.  My name is Julie Fedorchak, and my business address is 600 E. Boulevard Ave. Dept 408, Bismarck, ND 58505. I am over the age of 18, have personal knowledge of the subject matter, and am competent to testify concerning the matters in this declaration.

2.  I have served as one of three commissioners on the North Dakota Public Service Commission (NDPSC) since 2013. I am currently President of the National Association of Regulatory Utility Commissioners (NARUC), the state's liaison to the Midcontinent Independent System Operator (MISO), and on the advisory board of the Electric Power Research Institute. I have previously served in numerous leadership roles including President of the Organization of MISO States (OMS), vice-chair of the NARUC Gas Committee, and vice president of the Gas Technology Institute's advisory board.

3.  The NDPSC is a state agency created under the Constitution of North Dakota and is vested with, among other things, jurisdiction for the economic regulation of electric and gas public utilities, telecommunications, the siting of energy plants and electric and natural gas transmission facilities, reclamation of active and abandoned mine lands, and railroad safety. The Commission also actively participates in the governance of MISO through OMS and Southwest Power Pool (SPP) through the Regional State Committee (RSC).

4.  The NDPSC is responsible for ensuring safe, affordable, and reliable electric and gas services for North Dakota ratepayers. It oversees the orderly development of capital-intensive infrastructure of investor-owned utilities within the state, including generation resource planning. Furthermore, the NDPSC serves as the siting authority for energy generation, gas processing, and pipeline and electric transmission within the state.

5.  I am submitting this declaration in support of Petitioners' Motion to Stay the Final Rule, published by the U.S. Environmental Protection Agency (EPA) on May 7, 2024, entitled

"National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 89 Fed. Reg. 38508 (Final Rule).

6.    The NDPSC has consistently highlighted risks associated with the transition from traditional thermal generation and has serious concerns that the Final Rule will further undermine the reliability of the power grids in North Dakota and around the country.  I recently highlighted our concerns to Congress and FERC, expressing the critical need to extend the lives of existing thermal resources to allow time for new technology to "bridge the gap" between "reliability attributes of wind and solar megawatts versus thermal megawatts."[1]  Since then, trends and forecasts have called for considerable load growth, making it abundantly clear that this is not an energy transition at all.  We are in a period of energy expansion heightening the risks to which I testified to.

7.    The NDPSC has already expended significant amounts of staff time and resources trying to determine and mitigate the impacts that the Final Rule will have on the ability of the people of North Dakota to have access to reliable, affordable electricity.  Absent a stay of the Final Rule while litigation challenging it is pending, NDPSC anticipates further dedicating thousands of hours of staff time and hundreds of thousands of dollars attempting to understand and mitigate the adverse effects the Final Rule will have on the power grids providing electricity to North Dakota's citizens.  Those costs will not be recoverable if the Final Rule is ultimately held unlawful.  Staff time and resources that NDPSC must dedicate

---

[1] *See Pathways to Lowering Energy Prices: Hearing Before S. Comm. on Energy & Nat. Res.*, 117th Cong. (July 13, 2022) (testimony of Comm'r J. Fedorchak, Chair, N.D. Pub. Serv. Comm'n). AD23-9 Annual Reliability Technical Conference, Tr. at 239: 1 (Nov. 9, 2023) (Comm'r Fedorchak).
<https://www.energy.senate.gov/services/files/E565FF3C-3B1B-42CD-A4C0-68ED082CC280>. *See also* AD23-9 Annual Reliability Technical Conference, Tr. at 239: 1 (Nov. 9, 2023) (Comm'r Fedorchak).

to understanding and trying to mitigate the effects of this Final Rule detract from the NDPSC's ability to fulfill its obligations to the people of the State.

8.     The NDPSC has very serious concerns that the Final Rule will undermine the reliability of the power grids that provide electricity for the people of North Dakota. An unreliable power grid would cause the State to experience blackouts and would result in significantly higher prices for electricity in North Dakota. The seriousness of these concerns cannot be overstated.

9.     The NDPSC is not alone in its reliability concerns. FERC, NERC, and other entities charged with overseeing the reliability of our power grids all around the country have in recent years been shouting warnings about the long-term reliability of our nation's power grids for anyone willing to listen. NERC recently stated that the bulk power system has reached an "inflection point" in which the risk profile to customers is steadily deteriorating due to the retirement of valuable generation resources outpacing the addition of new dispatchable generation.[2]

10.     In its *2023 Long Term Reliability Assessment*, NERC identified that the SPP region will be at an "elevated risk" of shortfall in extreme conditions, such as the recent winter storms. This risk is more prevalent when high demand coincides with low wind or above normal generator outages.[3] As recent as this past January, North Dakota experienced record-breaking cold temperatures during which SPP declared extended cold weather and conservation operation advisories. Concurrently, the weather prevented many generators from running. The combination resulted in multiple severe reliability emergencies.

---

[2] The Reliability and Resiliency of Electric Service in the United States in Light of Recent Reliability Assessments and Alerts: Hearing Before the Committee on Energy and Natural Resources (June 1, 2023) (Statement of James B. Robb, North American Electric Reliability Corporation).
[3] *Id.* at 8.

4

11.     NERC has identified even more risk in MISO, a regional transmission organization (RTO) serving parts of North Dakota, projecting a "high risk" level indicating insufficient resource adequacy for areas.[4] This indicates that the electricity supply for these areas is more likely to be insufficient in the forecast period and more firm resources are needed. While MISO has trended up in installed capacity, accredited capacity that can be relied upon to meet peak system needs is moving in the opposite direction. MISO's recent accreditation reforms have shown that this trend is likely to worsen.[5]

12.     MISO released the following statement regarding long term grid reliability:

> There are urgent and complex challenges to electric system reliability in the MISO region and elsewhere. This is not just MISO's view; it is a well-documented conclusion throughout the electric industry. ...
>
> Many dispatchable resources that provide critical reliability attributes are retiring prematurely due to environmental regulations and clean-energy policies. ...
>
> The new weather-dependent resources that are being built, such as wind and solar, do not provide the same critical reliability attributes as the conventional dispatchable coal and natural gas resources that are being retired. While emerging technologies such as long duration battery storage, small modular reactors and hydrogen systems may someday offer solutions to this issue, they are not yet viable at grid scale.[6]

13.     Warnings of this nature are not typical from RTOs like MISO, which are generally policy and politics neutral. However, they have a responsibility to ensure our country's power grid remains reliable. This warning from MISO should be taken seriously.

---

[4] *Id.*

[5] Midcontinent Independent System Operator (MISO), *Managing Reliability Risk in the MISO Footprint* (June 16, 2022), *available at* https://cdn.misoenergy.org/20220616%20Board%20of%20Directors%20Item%2008a%20 Reliability%20Imperative625168.pdf.

[6] Midcontinent Independent System Operator, "MISO's Response to the Reliability Imperative," at 2 (Feb. 2024), *available at* https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20 Final504018.pdf?v=20240221104216.

14. To underscore our concerns, the loss of a single thermal plant could be the difference between a stable grid and load shedding or brownouts in North Dakota and the surrounding regions. During Winter Storms Uri and Elliott, Coal Creek Station, a unit capable of dispatching 1,150 MW of power into the MISO market, operated at maximum capacity during both winter storms. This resulted in a higher capacity rating due to Coal Creek's value in maintaining reliability. Any negative impact to this one generator's capacity for generating electricity for the grid has the potential for an immediate and significant impact on the MISO North Region and North Dakota customers.

Impact of the Final Rule on North Dakota's Power Plants and Power Grids

15. The Final Rule will require lignite-fired electric generation units (EGUs) in North Dakota to determine whether to spend an extraordinary amount of money to come into compliance with the Final Rule, or to close their units either because compliance with the new standards is not technologically feasible or compliance with the standards would render their operations no longer economically viable. The NDPSC's review of the State's EGUs has provided merit to our concerns that the economics and technical infeasibility created by the Final Rule makes power plant closures a likely reality. This will have a profound impact on the citizens of North Dakota. There will also be regional impacts across the MISO and SPP systems at times when people and communities are most vulnerable to life threatening weather events.

16. The forced, premature retirement of dispatchable fossil fuel generation in North Dakota will increase reliance on intermittent sources of power (e.g., wind and solar). An increased reliance on intermittent resources will result in a markedly lower accredited capacity value

for those resources in the future, signaling that such resources will increasingly have difficulty serving load during all hours.

17. Regional Transmission Organizations, Public Service Commissions, and similar entities across the country have been warning that projected increases in intermittent generation resources will be unable to resolve the reliability issues that result from the forced retirement of dispatchable generation resources.

18. MISO recently reiterated that warning in its "MISO Region Reliability Imperative" report:

> Wind resources can experience "fuel" availability challenges in the form of highly variable wind speeds. Consequently, the energy output of wind can fluctuate significantly on a day-to-day and even an hour-by-hour basis — including multi-day periods when output drops far below average.
>
> For example, over 60 consecutive days in January-February 2020, hourly wind output in MISO averaged more than 8,000 MW. However, … for 40 consecutive hours in the middle of that 60-day block, average hourly wind output dropped to less than 47 MW, and only once exceeded 200 MW in any single hour.
>
> An even longer and broader "wind drought" occurred during Winter Storm Uri in 2021 when the MISO, Southwest Power Pool, Electric Reliability Council of Texas and PJM regions all experienced 12 consecutive days of low wind output.[7]

19. The forced retirement of reliable, dispatchable power generation sources has already significantly threatened the reliability and resilience of the power grids even in states like North Dakota where we invest heavily in dispatchable resources — especially during severe weather events. High load growth magnifies this problem. Implementation of the Final Rule will foreseeably make an already precarious situation even worse.

---

[7] Midcontinent Independent System Operator, "MISO's Response to the Reliability Imperative," at 11 (Feb. 2024), *available at* https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20 Final504018.pdf?v=20240221104216.

20.    The NDPSC has also determined that in North Dakota, intermittent generation resources like wind and solar, while providing value as energy and capacity resources, are energy limited and cannot replace attributes from coal-fired EGUs that will be affected by the Final Rule, including on-demand dispatchability.   Coal-fired plants provide essential reliability services such as frequency support and spinning reserves, along with voltage regulation.   The grid operators use these services to operate reliably under an array of system conditions, generally without the concern of having too few of these services available.   Merely having capacity does not equate to having necessary reliability services or ramping capability to balance generation and load.

21.    Furthermore, MISO has flagged that voltage instability challenges within the next five years are strongly correlated with today's aggressive pursuit of weather-dependent resources by many states.[8]   MISO's Renewable Integration Impact Assessment study determined that stability-related challenges are projected to reach a tipping point when a 30% renewable threshold is reached, which is projected to occur around 2027.   The grid stability-related challenges from increased renewable integration will also drive mitigation capital cost.

22.    A lack of voltage stability could result in loss of load in an area or protective system tripping of transmission lines or system components, leading to cascading outages. Voltage collapse, one potential result from voltage instability, has been identified as a contributing factor in large scale blackouts across the globe, including Scandinavia (2003), Northeastern U.S. (2003), Athens, Greece (2004), and Brazil (2009).   During the Northeastern U.S. event in 2003, voltage stability resulted from multiple line tripping

---

[8] Pg 36 of https://cdn.misoenergy.org/2023%20Attributes%20Roadmap631174.pdf.

contingencies, causing voltage fluctuations, reactive power deficiencies, and the tripping or malfunctioning of generators and transformers.

23.    The State's lignite coal plants have the capability to respond to frequency and voltage changes and actively provide these services to the market.[9]  North Dakota's lignite resources also have fuel supply reserves in near proximity to the plant, and in many cases are mine-mouth, protecting them from supply chain disruption.

24.    In short, the forced retirement of reliable, dispatchable power generation resources has already significantly threatened the reliability of the power grids that provide electricity to the people of North Dakota, especially during extreme weather events.  Implementation of the Final Rule will foreseeably make an already precarious situation even worse.

Impact of the Final Rule on North Dakota's Electricity Pricing

25.    EPA's claims that the Final Rule will not affect the price of electricity in the nation are not true for North Dakota.  If a stay is not granted, North Dakota lignite EGUs will immediately incur significant investment cost to become compliant or be forced to begin winding down operations.  The economic or technical infeasibility of complying with the Final Rule will inherently subject ratepayers to stranded costs pancaked with replacement generation and transmission infrastructure investment.

26.    Using just one North Dakota coal-fired power plant as an example, if Coyote Station can successfully implement necessary technology for compliance with the Final Rule, that plant alone is anticipated to pass through over 2 million dollars of additional annual revenue requirements onto consumers, resulting in at least a 0.5 percent increase in rates to North Dakota customers.  That is just the compliance costs associated with one plant.

---

[9] NERC 2022 Long-Term Reliability Assessment, pg 19 *in document*. December 2022. https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2022.pdf.

9

Similar rate impacts are anticipated for Northern States Power customers for the state's jurisdictional allocation of costs for upgrades to their existing coal facilities. It is also worth noting that implementation of the necessary technology to meet compliance for Coyote Station is far from a sure thing. In the event that compliance cannot be met for that plant, NDPSC estimates that the cost for replacement generation will increase rates by 5-10 percent for many North Dakota ratepayers.

27. Replacement generation will likely require billions of dollars of investment in gas generation and transmission infrastructure.[10] Firm service contracts will also be necessary. The increased reliance and demand for natural gas will put upward pressure on the commodity, increasing the price of the fuel supply for both electricity and natural gas utility service for ratepayers, and increase price volatility during times of extreme weather.[11]

28. For example, during the 2021 Storm Uri, excess demand in our region created extreme competition that caused high spot pricing resulting in a total of 45.9 million dollars of under collection and notable rate impacts to North Dakota gas customers over amortization periods of 16 to 24 months.[12] During this period, the NDPSC received an abundance of calls from struggling residential customers and industrial customers having difficulty maintaining operations. And this was a far cry from the natural gas turmoil experienced in states like Oklahoma, where the Corporation Commission required securitization to

---

[10] Basin Electric recently announced construction of a 1,400 MW gas-fired generation facility in North Dakota that will require billions of dollars of investment and would use about 7% of the natural gas currently produced in North Dakota. *See* https://northdakotamonitor.com/2024/05/15/utility-plans-another-gas-fired-power-plant-for-north-dakota/.

[11] *See Great Plains Natural Gas Co.*, Cost of Gas 2021, Application for Variance, Case No. PU-21-10, *available at* https://www.psc.nd.gov/database/documents/21-0010/028-020.pdf; *Montana-Dakota Utilities Co.*, Cost of Gas 2021, Application for Variance, Case No. PU-21-8, *available at* https://www.psc.nd.gov/database/documents/21-0008/029-020.pdf; and *Northern States Power Company*, Cost of Gas 2021, Application for Variance, Case No. PU-21-9, *available at* https://www.psc.nd.gov/database/documents/21-0009/055-020.pdf.

[12] Montana-Dakota 12.8 million; Great Plains Natural Gas 593k, and Northern States Power Company 32.5 million.

amortize $675 million in fuel costs over 20 years to reduce what would have been an estimated $476 residential charge per month per customer to a more manageable rate.[13]

29.    Furthermore, closure of the thermal generation and the replacement with intermittent renewable resources will drive down accredited capacity values of current renewable generation units owned by our regulated utilities — driving down the value of existing renewable generation and requiring additional investment in resources with capacity value to meet reserve margin requirements. The foreseeable cascading cost impacts and grid reliability risks associated with the Final Rule are unacceptable if ensuring access to reliable and affordable power is one of the most important imperatives of government.

30.    The closure of thermal generation units in North Dakota would also foreseeably have immediate and negative impacts on the price of energy to electricity customers in the region. The existing transmission system was designed and built to ensure delivery of power from all North Dakota generation units primarily to customers within the state, with approximately 35% of energy generated within the state currently exported outside of our borders.

31.    Our neighboring states have relied upon the energy generated in North Dakota for many decades, and do not currently have available resources to serve both their own needs and North Dakota's needs if North Dakota's coal-fired plants are forced into early retirement by the Final Rule. This scenario would result in significant congestion across the transmission system of both MISO and SPP, which would significantly drive up energy prices for customers in both RTOs.

---

[13] *See* https://oklahoma.gov/occ/news/news-feed/2022/commission-approves-order-on-pso-february-2021-storm-costs.html. Final Financing Order, Order No. 723434, https://imaging.occ.ok.gov/AP/Orders/occ30453173.pdf.

32.     One very recent example of how dramatic the cost of congestion can be is a very localized

        transmission constraint in northwest North Dakota. Due to a relatively small (200MW)

        load addition in the area, the congestion pricing in the region over the course of six months

        totaled up to $18 million to customers of Montana-Dakota Utilities Co. alone.[14] Comparing

        the impact of that event to the Final Rule potentially removing nearly four thousand

        megawatts of thermal generation, the pricing impacts on North Dakota electricity

        consumers can foreseeably be anticipated to be severe.

33.     In short, the Final Rule will have a clear and dramatic impact on rates and risks to North

        Dakota ratepayers, even if all North Dakota power plants are able to comply with the Rule

        and remain economically viable in the long-term, which is far from a certainty.  As with

        all rate impacts, the most significant impact will be on low-income North Dakotans, as

        high energy prices operate like a regressive tax.  But the impact will be felt by all North

        Dakotans, who will have no choice but to retain service at higher rates.  For people and

        businesses, electricity and natural gas heating is a requirement, it is not a luxury that can

        be set aside if the Federal Rule causes energy prices to increase dramatically.

34.     The Final Rule also recklessly interjects the EPA into areas traditionally reserved for

        States, FERC, and RTOs.  State utility commissions have traditionally had a reserved

        authority to establish their own energy and environmental policies, including the authority

        to determine their own preferred generation mixes, as long as they do not interfere with

        wholesale markets.[15]  This rule mutes the NDPSC's careful consideration of rates, utility

---

[14] *See Montana-Dakota Utilities Co. v. Midcontinent Independent System Operator, Inc. and Southwest Power Pool*,
Docket No. EL-24-61-000 (Jan. 23, 2024).
[15] *See, e.g.*, *Hughes v. Talen Energy Mktg., LLC*, 570 U.S. 150, 154 (2016) ("The States' reserved authority includes
control over in-state 'facilities used for the generation of electric energy.'" (quoting 16 U.S.C. § 824b(1)) (citing
*Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 205 (1983) ("Need for new
power facilities, their economic feasibility, and rates and services, are areas that have been characteristically
governed by the States.")); *id.* at 166 ("Nothing in this opinion should be read to foreclose Maryland and other

investments, and its vested role in ensuring the orderly development of generation and transmission infrastructure within North Dakota.[16]

35. Indeed, to the extent that the Final Rule creates disruptions in electricity reliability—brownouts or blackouts—the Final Rule will have far reaching direct, indirect, and tertiary impacts throughout the State.

36. Any changes to the electricity generation portfolio caused by implementation of the Final Rule will be immediate, irreversible, and will likely impact North Dakotans for decades, even if the Final Rule is overturned in litigation.

\* \* \* \* \*

37. In summary, NDPSC has significant concerns with implementation of the Final Rule that cannot be overstated. The Final Rule will likely have lasting and severe impacts with no discernable benefit. If the Final Rule is not stayed while the legal challenges against it proceed, there will foreseeably be serious and irreparable harm to the State and people of North Dakota. North Dakota power plants will likely be forced to retire, North Dakota ratepayers will pay more for electricity, and the reliability of the grids servicing North Dakota will be significantly threatened.

38. NDPSC strongly encourages the Court to stay implementation of the Final Rule.

---

States from encouraging production of new or clean generation through measures "untethered to a generator's wholesale market participation." … So long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable.").
[16] *See, e.g., Hughes*, 578 U.S. at 166; *accord, e.g., PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241, 255 (3d Cir. 2014) ("The states may select the type of generation to be built—wind or solar, gas or coal—and where to build the facility[,] [o]r states may elect to build no electric generation facilities at all."); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 478-80 (2014); *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 97 (3d Cir. 2014)

Executed in Bismarck, North Dakota, on May 28, 2024.

Julie Fedorchak
Commissioner
North Dakota Public Service Commission

# EXHIBIT 3

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF NORTH DAKOTA, STATE OF WEST VIRGINIA, STATE OF ALASKA, STATE OF ARKANSAS, STATE OF GEORGIA, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF UTAH, COMMONWEALTH OF VIRGINIA, AND STATE OF WYOMING,

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

Case No. 24-1119

## DECLARATION OF CHARLOTTE R. LANE
## IN SUPPORT OF PETITIONERS' MOTION TO STAY FINAL RULE

I, Charlotte R. Lane, make the following declaration pursuant to 28 U.S.C. §

1746 and state under penalty of perjury that the following is true and correct to the

1

best of my knowledge and is based on my personal knowledge or information available to me in the performance of my official duties:

1.  I am the Chairman of the Public Service Commission of West Virginia (PSCWV) I have held this position from July 1, 2019, to present and from 1997 to 2001. I served as Commissioner from 1985 to 1991. I served on the International Trade Commission from 2003 to 2011. I also served for several years in the West Virginia House of Delegates. I served as President of the Mid-Atlantic Conference of Regulated Utility Commissioners as well as a member of the Board of Directors of the National Association of Utility Regulatory Commissioners. I practiced law in State and Federal Courts in West Virginia for many years. I was awarded the Justitia Officium Award from the West Virginia College of Law and the Distinguished Alumnus Award from Marshall University. I am also a Fellow of the American Bar Foundation and the West Virginia Bar Foundation. I am over the age of 18, have personal knowledge of the subject matter, and am competent to testify concerning the matters in this declaration.

2.  The PSCWV is responsible for regulating the service and rates of utilities, including vertically integrated electric utilities serving retail customers in West Virginia. As Chairman and a member of the PSCWV, I am charged with the responsibility for evaluating and balancing the interests of current

and future utility service customers, the general interests of the State's economy, and the interests of the utilities subject to PSCWV jurisdiction in its deliberations and decisions, including matters relating to PJM Interconnection, LLC (PJM) and the Federal Energy Regulatory Commission.

3.  I am submitting this declaration in support of Petitioners' Motion to Stay the Final Rule published by the U.S. Environmental Protection Agency (EPA) on May 7, 2024, entitled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 89 Fed. Reg. 38508 (Final Rule).

4.  As Chairman of the PSCWV, I have significant concerns that the Final Rule will contribute to the undermining of the reliability and resiliency of the electric grids upon which the State of West Virginia and its citizens, as well as citizens in all States, rely. This undermining is accelerated by the inability of regulators and utilities to rely on consistent and fair treatment of baseload, dispatchable coal-fired power plants with on-site multi-month fuel supplies. The EPA has clearly launched a war on coal-fired generation by its various recent rulemakings. While the EPA attempts to focus on what it believes will be a limited impact of the Final Rule, it fails to see that the Final Rule is one more nail in the coffin for baseload, dispatchable coal-fired power plants and,

as such, severely impedes the goal of a reliable, resilient, always-available power supply. Coal-fired power plants offer unique on-site, secure fuel supplies that make them invaluable as reliable and resilient electric generation resources. When the highly reliable, on-site fuel-secure baseload, dispatchable, coal-fired plants are laid to rest in the near future by EPA's efforts under rules such as the Final Rule, West Virginia and our entire region will be left dangerously over-reliant on intermittent, non-dispatchable electricity resources that cannot be called upon when needed, twenty-four hours per day, three hundred and sixty-five days per year.

5. West Virginia utilizes a variety of power generation sources, including wind, coal, hydroelectric, and natural gas. In addition, West Virginia exports a large amount of energy resources in the form of coal, oil, and natural gas. These resources are critical to the economy and security of the entire United States.

6. Beyond just its immediate impacts, the Final Rule will have further-reaching negative implications because of the message it sends that the EPA will continue its war on coal until it has buried our last coal-fired power plant. Yet the EPA's mission to kill coal-fired power generation is not supported by the agency's own benefit/cost analysis. In fact, the EPA benefit/cost analysis shows that the net benefits of the rule are negative. As a utility regulator that relies on accurate and supportable benefit/cost analyses when considering

utility investments, I am not comfortable with the EPA's efforts to whitewash

its poor benefit/cost ratio by claiming that it is likely under-stating benefits of

the Rule because of externalities that it believes are benefits, but it cannot

quantify. EPA does this while at the same time admitting that "the estimates

of compliance costs used in the net benefits analysis may provide an

incomplete characterization of the true costs of the rule."[1]

7.  Based on our analysis, we believe that the magnitude of the EPA's

understatement of compliance costs is significant. However, just accepting

the EPA benefit/cost analysis, the EPA calculates that the rule's health

benefits over the next ten years will have a $300 million net present value at

a 2 percent discount rate, while the net present value of the costs (which we

believe are understated) will be $860 million. Thus, even by the EPA's own

analysis, the ratio of benefits to the increased costs of compliance is an

uneconomical 0.35 times.[2] The EPA attempts to improve its benefit to cost

analysis by adding what it calls a "climate benefit" to its models. For one

---

[1] EPA, *Regulatory Impact Analysis for the Final National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review* ES-22 (Apr. 2024).

[2] A ratio less than 1.0 indicates an uneconomic investment; a ratio of 1.0 indicates an investment whose benefits or savings just equal its costs; and a ratio greater than 1.0 indicates an economic project. Rosalie T. Ruegg & Harold E. Marshall, BENEFIT-TO-COST RATION (BCR) AND SAVINGS-TO-INVESTMENT RATIO (SIR) 48-46 (1990).

thing, such a supposed benefit is inconsistent with its projection that there will be little to no generation or capacity reductions as a result of the MATS rule. However, even accepting the existence of a nebulous "climate benefit," the EPA's adjusted benefit to cost ratio changes only to 430/860 which is an improved, but still inefficient, benefit to cost ratio of only 0.5 times.

8. The Final Rule and all EPA actions related to energy are important to West Virginia. West Virginia is the nation's fifth largest energy producer.[3] The total capacity of all fuel-resource utility-scale generation in West Virginia is approximately 15,000 MW. About 13,000 MW of that comes from nine coal-fired power plants operating within the State.

9. The EPA's continually accumulating restrictions appear designed to drive coal-fired generation out of business and will not only negatively affect the cost and reliability of electricity supply in West Virginia, but the restrictions will also be economically devastating to the economy of the State which relies heavily on energy production. The West Virginia coal industry employs about 13,000 workers.[4] West Virginia has a population of about 1.77 million people,[5] with only 736,000 households.[6] The loss of West Virginia's coal

---

[3] EIA, West Virginia Profile Analysis (January 2024).
[4] EIA, Annual Coal Report 2022.
[5] US Census Bureau, West Virginia data.
[6] EIA, West Virginia Profile Analysis, (January 2024).

industry would have a severely disproportionate effect on the State's residents and economy. It is also important to note that the additional costs of complying with the new rules, which will be paid by so few households, will be crushing at a time when power plant jobs, coal jobs, and thousands of jobs in the related supply chain decline.

10. West Virginia has historically exported a large percentage of the power it produces. As a result, West Virginia is a net supplier of electricity to the regional grid and is historically near the top of all States in the percentage of its power generation that is exported to neighboring states. In fact, West Virginia has historically been the State with the second-highest percentage of its power generation being exported to neighboring States. On average, over the last five years, only Wyoming exported a larger percentage of its in-state electricity generation to neighboring states. Thus, the need to seriously consider premature retirement of West Virginia coal-fired generation that will be encouraged and accelerated by the EPA Rule has a significant impact on the reliability and resilience of electrical supply not only in West Virginia, but also in neighboring States, which rely on the interconnected bulk power system.

11. The EPA data which shows a significant projected growth in renewable resources over the next two decades will not be enough to reliably meet the

projected demand in growth, especially if existing dispatchable fossil generation is forced into early retirement by this Final Rule heaped on top of other fossil-fuel targeting EPA rules.

12.  Dispatchable energy is energy that is available on demand and that can be increased or decreased to maintain balance in the interconnected alternating current electrical system.   Energy sources such as wind and solar are considered non-dispatchable.   Even when these non-dispatchable resources exceed the immediate demand for electricity, without dispatchable resources running to take up the slack in wind and solar generation when the wind decreases, even momentarily, or skies cloud up in the middle of the day, the electric system will become unstable and unreliable.   This will lead to unacceptable drops or fluctuations in voltages which can damage electrical equipment and can eventually lead to rolling blackouts or energy rationing.

13.  The power grids providing electricity to West Virginia (and much of the country) are already stretched dangerously thin, and they do not have the resiliency or the buffer of excess dispatchable generation that they had ten or even five years ago.

14.  Without steam-powered generation to provide the dispatchable baseload power supply to assure constant and consistent electricity supplies twenty-four hours a day, three hundred and sixty-five days per year, the entire

interconnected electrical system will be relying on unreliable intermittent generation sources that cannot be dispatched because the sun does not shine and the wind does not blow twenty-four hours per day, three hundred and sixty-five days per year. Because of the ability to store many days of fuel supply on-site, coal-fired power plants are important resiliency and reliability protectors for the power grids. Only nuclear power plants can match the fuel security and reliable dispatchability offered by coal-fired power plants. But there is no chance that sufficient new nuclear plants can be planned, sited and built in time to pick up the slack as EPA rules targeting fossil-fuel fired plants—and specifically coal-fired ones—force regulators to shut down fossil-fuel fired power plants rather than spend the hundreds of millions of dollars to chase the ever-changing EPA Rules.

15. In addition to being less reliable, solar and wind resources are not less expensive relative to thermal resources. First, the coal-fired resources that are affected by the Final Rule are legacy, up-and-running generation units that have embedded ratemaking values that are much lower than the cost of new capacity. And second, it will take multiple times as much replacement generation capacity to replace thermal generation capacity with intermittent and limited-duration wind and solar generation resources. PJM has quantified the ability of wind and solar resources to serve load for delivery years 2026/27

through 2034/35 and that ability is not a one-to-one replacement. According to PJM, replacing 1,000 MW of coal-fired capacity will require either 4,200 MW of onshore wind, 2,500 MW of more expensive offshore wind, 21,400 MW of fixed solar, or 15,500 MW of more expensive tracking solar.[7]

16. Thus, even if a megawatt of new wind or solar capacity is "cheaper" to construct than a thermal facility, that advantage is offset by the need to construct "multiple megawatts of wind or solar resources to replace one [megawatt] of thermal generation."[8] And, again, these multiple MW are still not consistent and certain—they produce energy only when the wind is blowing or the sun is shining. From the perspective of a regulatory body responsible for assuring that adequate, reliable, safe and affordable utility services are available to the citizens of West Virginia, I cannot imagine a worse plan for providing adequate, reliable, safe and affordable electricity service than the premature retirement of reliable baseload dispatchable steam-driven power plants and substituting for that lost capacity and energy with up to ten time more megawatts of less reliable intermittent power supplies as will result from the Final Rule.

---

[7] *See* PJM, *Preliminary ELCC Class Ratings for period Delivery Year 2026/27 – Delivery Year 2034/35*, https://bit.ly/4dxOrKq.
[8] *Energy Transition in PJM: Resource Retirements, Replacements & Risks*, 1, 10, 16 (Feb. 24, 2023), https://bit.ly/3D0BRlP.

17.     EPA likely projects that the Final Rule will not lead to early retirement of the coal-fired, baseload, dispatchable generation that is necessary to maintain the reliability and resilience of the electric power grid. While the EPA may have experience as an environmental regulator, it is not well versed in economic regulation of utilities and integrated resource planning. As a utility regulator, before approving major utility investments that may appear cost-effective, I must take the likelihood of compounding EPA required compliance costs in future years into consideration as the EPA constantly moves the goalposts. To prevent throwing good money after bad, economic regulators such as PSCWV must consider the historical and likely future accumulation of EPA's attacks on coal-fired and other fossil-fired generation resources when considering how to spend money on compliance.

18.     If the Final Rule goes into effect, West Virginia will likely face the potential shutdown of 2,000 MW of utility-owned coal-fired power capacity, or, in the alternative commit to an estimated $300 to $400 million in compliance investment and approximately $40 million dollars per year in increased utility rates to cover costs to comply with the Rule.

19.     The shutdown of even one large power plant will have a noticeable negative impact on West Virginia's economy and a much more noticeable and

debilitating negative impact on the communities near the plant and on coal mines that supply the fuel.

20.   Moreover, to meet the needs of generation plants, coal mines supplying those plants must plan on huge capital expenditures to maintain existing production capability and open new mines. The supplying coal mines will take note of the possibility of premature closure of coal-fired power plants. Such closure will become a possible alternative as we consider the likely loss of value of current compliance expenditure to comply with the present Rule due to possible continued creep in EPA guidelines. Those coal mines will be disincentivized from maintaining and expanding their coal production capabilities if they believe that serious consideration of premature retirement is a viable Commission action.

21.   I cannot overstate the problems that will accompany the loss of baseload, fuel-secure, dispatchable coal-fired power plants. Those problems, particularly with regard to reliability and resilience of power supply, are real and unmistakable. Wind and solar facilities require significant growth in capacity before they are able to replace these more reliable plants. Switching to them prematurely will significantly impact grid reliability and the provision of reliable electricity to the people of West Virginia and surrounding regions,

rendering the State and regional grid vulnerable to brownouts and blackouts it otherwise would not face.

22. The EPA seems to believe that more restrictions on coal-fired generation are fine due to its expectation that coal-fired generation is going the way of the dinosaurs with or without its heavy-handed and unjustified rules. The EPA report on the impact of its Rule states that it expects the U.S. electricity generation capacity in 2028 to be 1,282,700 MW, of which 394,100 MW, or 31 percent, are intermittent resources. It further projects that by 2035 the U.S. electricity generation capacity will be 1,592,400 MW, of which 698,500 MW, or 45 percent, are intermittent resources. Over the same period, EPA shows an expectation that the most fuel-reliable fossil-fuel generation resources, coal, will drop from 105,800 MW, or 8.2 percent of total capacity.[9]

23. While the EPA believes this reduced availability of baseload, dispatchable, fuel secure generation capacity is not related to its MATS Rule, I disagree. In West Virginia, we will be faced with a decision to either spend hundreds of millions of dollars on compliance investment, which will cost West Virginia customers nearly $40 million in added rates, or to simply throw in the towel and close plants prematurely. When coupled with other accumulated costs directly related to new EPA rules, preserving our reliable, resilient power

---

[9] EPA, *Regulatory Impact Analysis*, *supra* at n.1 3-18, Table 3-9.

supply to benefit not only West Virginia customers but customers in the surrounding states is becoming less and less a viable option. If compliance costs continue to mount, not only is the EPA projected future of dangerously increasing reliance on intermittent power supply likely, it is also likely that the retirements of coal-fired power plants will come sooner than expected.

24. This future is alarming considering the well-documented warnings coming from the Regional Power Market and Transmission Planners (PJM for West Virginia and twelve other Mid-Atlantic and Midwestern states plus the District of Columbia) and the North American Reliability Corporation (NERC). These organizations have recently issued reports that intermittent power supply resources such as wind and solar facilities cannot reliably replace dispatchable, baseload steam power plants.

25. Indeed, PJM has recently warned in a February 2023 report on the risks relating to energy resource transitions that a movement away from baseload dispatchable generation will cause capacity deficiencies and reliability degradation as dispatchable thermal plants are retired prematurely. In that report, PJM stated:

> The composition of the PJM Interconnection Queue has evolved significantly in recent years, primarily increasing in the amount of renewables, storage, and hybrid resources and decreasing in the amount of natural gas-fired resources entering the queue…

By the 2028/2029 Delivery Year and beyond, at Low New Entry scenario levels, projected reserve margins would be 8%, as projected demand response may be insufficient to cover peak demand expectations, unless new entry progresses at levels exhibited in the High New Entry scenario. This will require the ability to maintain needed existing resources, as well as quickly incentivize and integrate new entry[.] …

Thermal generators are retiring at a rapid pace due to government and private sector policies as well as economics …

PJM's interconnection queue is composed primarily of intermittent and limited-duration resources. Given the operating characteristics of these resources, we need multiple megawatts of these resources to replace 1 MW of thermal generation.[10]

26.     The replacement of thermal generation with new generators that are not at the same locations as the prematurely retiring plants will require extensive costly transmission system modeling and ultimately billions of dollars of new transmission built in the PJM footprint alone.  For example, the recent announcement of a shutdown of two relatively small generation plants in eastern PJM resulted in the need for a multi-billion-dollar upgrade of the transmission system that could not possibly be accomplished in the limited timeline for those plant shutdowns.  PJM determined that reliability needs could not allow the shutdown and directed the plants to plan for being placed

---

[10] *Energy Transition, supra* at n.8.

into a "must-run" status. This micro-scenario of the problems with the shutdown of baseload dispatchable coal-fired generation plants will be played out at critical macro levels in the immediate future if the EPA coal-targeting MATS Final Rule is allowed to go into effect and more and more baseload, dispatchable generation announces that the cumulative EPA restrictions require premature retirement. PJM described the pervasive and severe reliability violations in Maryland and throughout the PJM network of a relatively small shutdown of dispatchable generation:

> [T]he retirement of the Brandon Shores and Wagner facilities introduces reliability concerns that are present even at today's load levels, let alone in 2025 or even 2028 when the system overall load is expected to grow by an additional 7,500 MW within the greater area of concern surrounding and including the BGE system. …

> The reliability violations are pervasive and severe in nature, which could lead to a potential voltage collapse in the entire BGE system as well as multiple overloads throughout the BGE system and the larger PJM network. The analysis also indicates that without a transmission solution, both Brandon Shores and Wagner will be required to maintain reliability prior to complete energization of the planned transmission reinforcements in the area.[11]

27. Decisions about whether plants can continue to operate efficiently or should shut down prematurely cannot be delayed. If the Final Rule is not stayed, the

---

[11] PJM, *BESS Technical Viability – Wagner and Brandon Shores Retirements PJM Transmission and Operations Planning*, May 3, 2024, https://bit.ly/3UUm8yu.

hope, or even expectation for a favorable future court ruling will not delay the need to begin planning for either compliance or premature retirements. Without a stay the installation of equipment and construction timelines require immediate decisions that will have long-term debilitating consequences for ratepayers even if the Rule is eventually overturned by the courts.

28. Alternative decisions to forgo the installation of equipment required to comply with the Final Rule will likewise have to be made quickly and once made will have long-term consequences that cannot be reversed. If the decision is made to retire the plants prematurely, generation owners must notify PJM of the planned retirement and plan for replacement capacity. Generators in PJM have already committed the generation units in a three-year forward capacity market. When PJM is notified of the pending retirement (presently only 90 days' notice) PJM will conduct a retirement study to determine whether transmission system upgrades will be needed due to the redistribution of electricity flows across the PJM system. If transmission upgrades are required, they could be very expensive and involve transmission construction in surrounding states.

29. The PSCWV and West Virginia electric generators will not have the luxury of waiting for future developments before making decisions that will lead to expensive construction of compliance equipment or the acquisition of

replacement capacity for a prematurely retired unit. Evaluation of alternatives, filings with the PSCWV, evidentiary proceedings and decisions by the PSCWV, and implementation of the selected compliance strategies will take time and cannot be delayed.

30. Further, the PSCWV's substantial expenditure of human and fiscal resources associated with implementing the Final Rule will immediately distract the PSCWV from serving its full regulatory mission, as directed by the West Virginia Legislature.

31. West Virginia has approved plans to allow utility-owned thermal resources to comply with other EPA rules in place prior to this Final Rule that, although expensive, were determined to be necessary to preserve the availability of baseload coal-fired thermal generation units which are the critically needed units that can provide electricity reliability and resilience with an onsite, multi-month fuel source. The Final Rule, if not stayed, could pull the rug out from under those efforts and render investments made to comply with other EPA rules related to coal-fired power plants as unnecessary white elephants burdening the ratepayers of West Virginia for no good reason other than the EPA being intent on shutting down coal-fired generation plants well in advance of the end of their useful, productive lives.

32.  The effects of EPA's unjustified and excessively expensive MATS rule will be real and lasting.  Its benefits are unjustified by its costs, which will disproportionately harm West Virginia's ratepayers, workers, tax revenues, education facilities dependent on those tax revenues, and government supplied infrastructure and services dependent on those tax revenues.  It will hit households in a State with some of the lowest average incomes and most elderly populations in the United States.  And the negative impact will not be limited to rate impact, negative employment impact, and negative impact on the general economy in West Virginia.  We will also be facing degraded, unreliable electric service.

33.  The Final Rule is inappropriate and would force retirement of the very resources needed for reliability in the face of accelerated growth in less reliable intermittent solar and wind resources.[12]

34.  The mandates in the Final Rule frustrate the authority of the PSCWV and constrain its ability (and duty under West Virginia law) to serve the citizens of West Virginia.  Unless a stay is immediately granted, the Final Rule will result in significant and irreparable harm to the State of West Virginia and its citizens through direct and immediate financial means and a loss of sovereign

---

[12] *See generally Energy Transition, supra* at n.8 (PJM report discussing the risks from the pace of additions intermittent resources and accelerated retirements of thermal resources).

authority—including that held by the PSCWV pursuant to West Virginia and federal law.

Executed in Charleston, West Virginia, on May 24, 2024.

_Charlotte R. Lane_
Charlotte R. Lane
Chairman
West Virginia Public Service Commission

# EXHIBIT 4

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA, *et al.*, | § | |
| | § | |
| **Petitioners,** | § | |
| | § | |
| v. | § | **No. 24-1119** |
| | § | |
| UNITED STATES ENVIRONMENTAL | § | |
| PROTECTION AGENCY, *et al.* | § | |
| | § | |
| **Respondents.** | § | |

## DECLARATION OF D. W. RICKERSON, P.E., SENIOR VICE PRESIDENT AND CHIEF OPERATING OFFICER FOR ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.

I, D. W. Rickerson, P.E., declare as follows:

1.     I am the Senior Vice President and Chief Operating Officer for Electric Reliability Council of Texas, Inc. (ERCOT), where I am responsible for overseeing grid and market operations, system planning, and weatherization. I am providing this declaration on behalf of ERCOT.

2.     ERCOT is the independent system operator (ISO) designated by the Public Utility Commission of Texas (PUCT) for the purposes of managing the operation and planning of the ERCOT transmission grid, which serves the majority of customers in the State of Texas. ERCOT is also responsible for operating the wholesale market for electricity in the ERCOT region and facilitating customers' choices of retail providers of electricity.

3.     Texas law assigns ERCOT a number of critical functions, including the fundamental responsibility to ensure the reliability and adequacy of the bulk power system in the ERCOT region. ERCOT's most basic function in ensuring system reliability is to individually dispatch hundreds of generators located across the system to match the system demand at every moment of every day while observing both the physical and stability limits of the transmission network that transfers power from generators to consumers.

4.     In its role as ISO, ERCOT also conducts forward-looking assessments to evaluate the adequacy of generation resources to serve future system demand and to identify and plan transmission lines and other facilities to ensure that power from generation facilities can be reliably transported to serve customer demand.

5.     It is my understanding that the U.S. Environmental Protection Agency (EPA)'s final rule revising the National Emission Standards for Hazardous Air Pollutants for Coal- and Oil-Fired Electric Utility Steam Generating Units (EGUs) (hereinafter, "the rule") was published in the Federal Register on May 7, 2024 and will become effective on July 8, 2024.

6.     It is also my understanding that the rule reduces the level of allowable emissions of filterable particulate matter (fPM) from coal-fired power plants by two thirds and reduces the level of allowable emissions of mercury from lignite-fired

power plants by 70 percent. Further, it is my understanding that these lower emissions limits would apply beginning July 6, 2027.

7. I am providing this declaration to express my concerns that the rule could lead to retirements of lignite-fired EGUs and potentially other coal-fired EGUs, which could impair ERCOT's ability to ensure reliable electric service for the citizens of Texas.

8. In recent years, the ERCOT region has experienced significant growth of renewable generation, including wind and solar technologies. As of today's date, ERCOT is the national leader in utility-scale solar and wind generating capacity, with approximately 24,000 MW of solar capacity and 39,000 MW of wind capacity installed.

9. While solar and wind generation technologies provide significant amounts of low-marginal-cost power, they are not dependable sources because they produce power only in proportion to the amount of available sunlight and wind. ERCOT cannot dispatch solar generators at nighttime or wind generators when the wind is not blowing. ERCOT must rely on other dispatchable generation resources to serve the system demand that cannot be consistently served by renewable sources of power.

10. One relatively new form of dispatchable power is electric energy storage, which typically exists in the form of utility-scale batteries. As with

3

renewable energy, ERCOT has experienced a significant growth in the amount of battery storage in recent years, growing from approximately 150 MW in 2019 to over 6,000 MW today, with another 10,000 MW of batteries expected to be added by the end of summer 2025. ERCOT expects this long-term trend in battery storage growth to continue. However, unlike gas-fired and coal-fired generation sources, energy storage systems are inherently duration-limited because they can store only a finite amount of power. Even with a tripling of the current capacity, batteries will only be capable of supplying a small portion of the grid's energy needs for a few hours at a time. Consequently, ERCOT will continue to need to rely on electricity from all available gas-fired and coal-fired EGUs to generate electricity when energy from renewable sources and battery storage is insufficient to serve the grid.

11.     While the rule does not prohibit operation of lignite-fired EGUs, the rule's lowering of allowed mercury emissions effectively requires owners of these EGUs to install technologies to limit emissions of mercury. I am concerned that owners of lignite-fired EGUs may choose to retire those EGUs rather than pay the significant cost for the plant controls required to comply with the rule.

12.     Similarly, I am concerned that the reduced level of allowable fPM could lead coal-unit owners, including owners of lignite-fired EGUs that are subject to the lower mercury threshold, to retire those units rather than install the technologies needed to comply with the rule.

4

13. Because a material risk exists that coal-fired EGUs—and especially lignite-fired EGUs—in the ERCOT region could retire as a result of the rule, I believe the rule increases the risk that the ERCOT region will experience energy shortages in the future.

14. ERCOT has already identified significant challenges in meeting its future demand without the additional impacts of the rule. ERCOT is in the midst of an explosion of new electricity demand, with average summer peak demand growth of 7.8% since 2021, far exceeding average historical annual peak demand growth rates of approximately 1.5%. And load growth is now expected to rise even higher in the future. Based on recent utility demand forecasts, ERCOT now anticipates its peak load to exceed 152,000 MW by 2030, significantly outpacing its all-time peak demand record of 85,500 MW set in 2023 with an average annual rate of growth of 11.1% between now and 2030.

15. With these significant rates of anticipated demand growth, the ERCOT region will require even more dispatchable, unlimited-duration generation resources in the future, along with associated transmission infrastructure, to fill in gaps when sufficient renewable generators and battery storage systems are not available to produce energy. Even at this time, ERCOT is uncertain whether it will have enough generation resources to serve this future load. However, eliminating lignite-fired EGUs—which currently constitute about 6,500 MW—or potentially all coal-fired

5

power plants—which currently constitute about 14,000 MW—would only further impair ERCOT's ability to ensure sufficient generation supply to meet demand at all times. If insufficient generation is available at any time, ERCOT must direct utilities to disconnect customers from the grid. This can have significant consequences for consumers who depend on electricity for critical, life-sustaining functions during periods of extreme weather.

16.    For these reasons stated above, I believe the rule poses an unacceptable risk to the reliability of the ERCOT System.

17.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 24, 2024.

D. W. Rickerson, P.E.
Senior Vice President and Chief Operating Officer
Electric Reliability Council of Texas, Inc.

6

# EXHIBIT 5

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| STATE OF NORTH DAKOTA, et al. | |
| *Petitioners*, | |
| v. | Case No. 24-1119 |
| U.S. ENVIRONMENTAL PROTECTION AGENCY | |
| *Respondent*. | |

**DECLARATION OF**
**SONJA NOWAKOWSKI**

Pursuant to 28 U.S.C. § 1746, I, Sonja Nowakowski, duly affirm under penalty of perjury as follows:

1.     I am over 18 years of age, have personal knowledge of the matters set forth herein, and am competent to make this sworn declaration.  The facts contained in this sworn declaration are true and accurate and are based on my personal knowledge.

2.     I am the Administrator of the Montana Department of Environmental Quality ("DEQ") Air, Energy, and Mining Division, and have personal knowledge of the facts herein in this Declaration. Prior to

1

joining DEQ in 2021, I worked for the Montana Legislature for 15 years. I served in a nonpartisan capacity as a research analyst in the Legislative Environmental Policy Office and as the Research Director for the Office of Research and Policy Analysis. My nonpartisan work for the Legislature focused on environment and energy policy.

3. As the Administrator of DEQ's Air, Energy, and Mining Division, I am familiar with DEQ permitting processes for coal mining, natural gas fueled electricity generators, coal fueled electricity generators, petroleum refineries, and oil pipelines under their respective substantive permitting statutes. I am also familiar with the requirements for energy planning and procurement in Montana, renewable energy programs in Montana, and Montana's transitioning energy marketplace.

4. Additionally, I am familiar with the U.S. Environmental Protection Agency's National Emission Standards for Hazardous Air Pollutants for Coal- and Oil-Fired Electric Utility Steam Generating Units, also known as the Mercury and Air Toxics Standards or MATS, including the recent revision of these standards, published April 25, 2024.

5. DEQ has a particular interest in averting the disruptive impacts of the Rule on Montana's electricity supply. DEQ houses the state energy bureau, see ARM 17.1.101(3)(c)(iii), which means DEQ has administrative and information sharing obligations concerning Montana's energy supply emergency powers, see §§ 90-4- 301 to -319, MCA; ARM 14.8.401–412; Mont. Disaster and Emergency Services Division, Montana Emergency Response Framework, 35 (April 2022), https://des.mt.gov/Preparedness/MERF-ESF1/MERF_2022/2022-MERF-final.pdf (DEQ is designated the "Primary Agency" for Emergency Support Function 12, which is responsible for coordinating "the state's efforts in the restoration and protection of Montana's critical electricity…systems during and following a disaster or significant disruption.") DEQ is also required to provide comment on Montana public utilities' long term electricity supply planning before the Montana Public Service Commission, § 69-3-1205(3), MCA, which entails an evaluation "of cost-effective means for the public utility to meet the service requirements of its Montana customers[,]" § 69-3-1204(2)(a)(i), MCA.

6. The Rule introduces significant economic uncertainty for important electricity generating units ("EGUs") in the portfolio of electricity resources serving Montana residents and businesses and underpinning the export of electricity to utilities across the pacific northwest region of states. Specifically, the Rule requires upgrades of emission control systems at Colstrip Units 3 and 4 ("Colstrip") in Rosebud County, Montana, and the Yellowstone Energy Limited Partnership (YELP) EGU in Yellowstone County by mid-2027. Colstrip Units 3 and 4 have a combined nameplate generating capacity of 1,480 MW and currently serve residential and commercial customers of NorthWestern Energy in Montana, Montana large industrial customers of Talen Energy, as well as electricity customers across Idaho, Washington, and Oregon. The YELP plant is a 52 megawatt petroleum coke-fueled EGU located in Yellowstone County, Montana. The EGU sells energy to NorthWestern Energy.

7. In comments submitted to the EPA regarding the draft Rule, Colstrip operator Talen Energy cited the capital cost of Rule, noting that upgrading Colstrip to comply with the Proposed Rule is cost-prohibitive, resulting in at least $350,000,000 in capital costs, plus an additional $15

million in annual operating costs. Talen found "the cost effectiveness for Colstrip to install the various controls are significantly higher than EPA's estimate of $39,192/ton, ranging from $73,156/ton to $133,104/ton and from $68,114/ton to $168,132/ton ... The high costs associated with installing, testing, and implementing new controls, coupled with limited time and electric generation for the recovery of such costs, may cause Colstrip to shut down prematurely if the owners deem that it is not economically feasible to install the necessary controls to comply with the proposed fPM standard. A premature shutdown of Colstrip would have significant economic impacts on Montana and beyond and raises serious concerns about grid reliability and transmission, factors that were not considered by EPA in setting the proposed fPM standard." NorthWestern Energy, a 20 percent owner of Colstrip Unit 4, noted that the Rule compliance costs would result in significant costs to Montana customers. NorthWestern Energy also finds, "In addition, if Colstrip is closed in the near term, NorthWestern cannot provide adequate and reliable electrical service for its Montana customers without new replacement baseload capacity. Colstrip currently plays an essential role in baseload capacity for NorthWestern…"

5

8.      EPA dismisses the potential impacts to electric system reliability caused by closure of EGUs that are unable to justify the economic impact of Rule compliance costs by mid-2027. In dismissing those concerns, EPA does not adequately account for direct impacts of the Rule in Montana and the NorthWestern Energy Balancing Authority that would be caused by potential closure of impacted EGUs. Colstrip Units 3 and 4 generated forty one percent of the electricity generated in Montana in 2022, and represented twenty three percent of total installed generating capacity, see Electricity Statistics Tables, Mont. Department of Environmental Quality, accessed at https://deq.mt.gov/files/Energy/Documents/Energy_Statistics/Electricit yTables2023-Updated.xlsx. Colstrip's generating capacity in high load events varies depending on maintenance schedules, and the availability and price of other supply resources. However, during the peak of record setting electricity demand in the NorthWestern Balancing Authority driven by a severe cold weather event in January 2024, coal fired EGUs within the balancing authority generated seventy five percent of the customer electricity demand, see Hourly Electric Grid Monitor, U.S. Energy                        Information                        Administration,

https://www.eia.gov/electricity/gridmonitor/dashboard/electric_overview/balancing_authority/NWMT (accessed May 8, 2024). Peak electricity demand for that event hit on January 13, 2024, a day when temperatures dropped below minus 30 degrees Fahrenheit in major population centers served by NorthWestern.

9.     The retirement by mid-2027 of Colstrip Units 3 and 4 would require replacing the generating capacity and energy output of those EGUs with a mix of resources capable of reliably meeting comparable energy and capacity requirements, while continuing to meet the growing demand for electricity in Montana. A timeline of three years to conduct the siting, development, construction and commissioning of the energy supply resources, demand side resources, and/or transmission assets required to meet those energy and capacity demands, in accordance with local, state, and federal permitting and interconnection requirements, is inadequate. By comparison, the development by NorthWestern Energy of Yellowstone County Generating Station, a 175 MW natural gas-fueled, reciprocating internal combustion engine generating facility was initiated by NorthWestern in a December 2019 submittal to the Montana Public Service Commission of an RFP for Capacity Resources,

see Montana Public Service Commission, Docket 2019.93.011. The EGU is expected to begin service four and a half years later in mid-2024. The requirement to replace the output of the Colstrip units would come at a time when the Western Electricity Coordinating Council has assessed that, "(s)upply chain disruptions, increasing costs, production obstacles, and an overwhelmed interconnection queue threaten industry timelines to build new resources," see 2023 Western Assessment of Resource Adequacy, Western Electricity Coordinating Council (accessed May 8, 2024),

https://www.wecc.org/Administrative/2023%20Western%20Assessment%20of%20Resource%20Adequacy.pdf. The Rule's three-year, mid-2027 compliance timeline threatens the ability of Montana utilities to meet customer demands in accordance with other legal requirements, such as North American Electric Reliability Corporation ("NERC") Standards. See NERC, Reliability Standards (last visited May 3, 2024), https://www.nerc.com/pa/Stand/Pages/ReliabilityStandards.aspx.

10.  Import transmission capacity to serve loads in Montana is severely constrained during peak load events and would likely be insufficient to serve Montana customers absent the output of EGUs

threatened by the Rule. Relying on existing import transmission capacity to serve peak loads, even if Montana industrial customers and utilities were able to identify adequate out-of-state energy supply, risks the reliability of electricity service in Montana. NorthWestern Energy, which serves as the transmission provider for much of the state, assessed in its comments on the draft Rule: "Relying on transmission lines and interconnections to import the electricity needed to serve such a large portion of our Montana load inherently increases the risk of outages and the resulting failure to serve customers during times of greatest electricity demand," see NorthWestern Corporation Comments, Docket ID No. EPA–HQ–OAR–2018–0794, June 23, 2023, page 14. Furthermore, the development, siting, and permitting of significant new interstate transmission capacity, while essential to serving Montana's long term energy needs and access to markets, is a notoriously complex and time intensive undertaking. New transmission development typically requires acquisition of right of way across public and private land, Tribal government consultations, as well as the coordination of federal, state, and local permitting agencies. At this time, DEQ, which implements the Major Facility Siting Act (MFSA) has not granted a

MFSA certificate for any new interstate transmission projects. New import transmission capacity should not be relied upon as a resource to replace the output of EGUs affected by the Rule within the three-year compliance timeline prescribed by EPA.

11. EPA seems to appreciate the need for potential extensions of the compliance deadline to accommodate the reliability requirements of utilities served by EGUs undertaking compliance activities; the Rule provides for up to a one-year extension of the compliance period for EGUs that are making steps towards compliance. However, no allowance for extensions appears to be provided for EGUs facing retirement due to the uneconomic impact of compliance costs. This approach is inconsistent with regard to the EPA's consideration of electricity reliability impacts from the Rule and further penalizes customers served by impacted EGUs where utilities may be forced to procure or construct alternate energy supply resources on a very tight timeline.

12. Risks to electricity system reliability, driven in part by retirement of dispatchable, high-capacity factor thermal EGUs, is a matter of significant concern. WECC reports that current utility

resource plans in the western interconnect "are not sufficient to meet future demand over each of the next 10 years," and that "starting in 2026, the number and magnitude of demand-at-risk hours increase by orders of magnitude." WECC attributes the growing risks to reliability to increasing variability, "driven primarily by the addition of non-dispatchable variable energy resources (VER), the retirement of dispatchable resources, and the increase in load uncertainty due to extreme weather events," see 2023 Western Assessment of Resource Adequacy, Western Electricity Coordinating Council (accessed May 8, 2024),

https://www.wecc.org/Administrative/2023%20Western%20Assessment%20of%20Resource%20Adequacy.pdf.

*Sonja Nowakowski*
_____
SONJA NOWAKOWSKI
Dated: May 20, 2024

11

# EXHIBIT 6

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF NORTH DAKOTA, STATE OF WEST VIRGINIA, STATE OF ALASKA, STATE OF ARKANSAS, STATE OF GEORGIA, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF UTAH, COMMONWEALTH OF VIRGINIA, AND STATE OF WYOMING,

        *Petitioners*,

    v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

        *Respondent*.

Case No. 24-1119

## DECLARATION OF DOYLE WEBB
### IN SUPPORT OF PETITIONERS' MOTION TO STAY FINAL RULE

I, Doyle Webb, hereby declare pursuant to 28 U.S.C. § 1746 and state under penalty of perjury that the following is true and correct to the best of my knowledge and is based on my personal knowledge or information available to me in the performance of my official duties:

1

1.      I am the Chairman of the Arkansas State Public Service Commission (Commission or PSC).  I have held this position since January 17, 2023.  I am over the age of 18 and am competent to testify concerning the matters in this declaration based on my personal knowledge, my experience with the PSC, and information provided to me by PSC personnel.

2.      The PSC is responsible for regulating the service and rates of utilities, including electric and gas utilities serving retail customers in Arkansas.  As Chairman of the PSC, I am charged with the responsibility for appraising and balancing the interests of current and future utility service customers, the general interests of the State economy and the interests of the utilities subject to Commission jurisdiction in its deliberations and decisions.  The Commission actively participates in the governance of two Regional Transmission Organizations: the Midcontinent Independent System Operator (MISO), through the Organization of MISO States, and Southwest Power Pool (SPP), through the Regional State Committee.

3.      I am submitting this declaration in support of Petitioners' Motion to Stay the Final Rule, published by the U.S. Environmental Protection Agency (EPA) on May 7, 2024, entitled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 89 Fed. Reg. 38508 (Final Rule).

4.      I am aware that the EPA published the Final Rule following EPA's proposed Rule issued on April 24, 2023.  See 89 Fed. Reg. 24854.

5.      The Final Rule will negatively impact Arkansas, its ratepayers, and its utilities that own and operate generation facilities.

6. The Final Rule will make electricity less reliable in Arkansas and throughout the grid by forcing the retirement of base load resources, only serving to exacerbate the threat of brownouts and blackouts, as well as long-term negative cost impacts.

7. The Federal Energy Regulatory Commission, the North American Electric Reliability Corporation (NERC), and entities charged with overseeing the reliability of our power grids have warned about the long-term reliability of our nation's power grids. NERC recently stated that the bulk power system has reached an "inflection point" in which the risk profile to customers is steadily deteriorating due to the retirement of valuable generation resources outpacing the addition of new dispatchable generation.[1]

8. In its *2023 Long Term Reliability Assessment*, NERC identified that the SPP region will be at an "elevated risk" of shortfall in extreme conditions.

9. NERC has also identified risk in MISO, projecting a "high risk" level indicating insufficient resource adequacy for the majority of Arkansas.[2] This indicates that the electricity supply for these areas is more likely to be insufficient in the forecast period and more firm resources are needed. While MISO has seen an upward trend in installed capacity, accredited capacity to meet system needs is moving in the opposite direction. MISO's recent accreditation reforms around direct loss of load indicate that this trend is likely to worsen.[3]

10. MISO released the following statement:

---

[1] The Reliability and Resiliency of Electric Service in the United States in Light of Recent Reliability Assessments and Alerts: Hearing Before the Committee on Energy and Natural Resources (June 1, 2023) (Statement of James B. Robb, North American Electric Reliability Corporation).

[2] *Id.*

[3] Midcontinent Independent System Operator (MISO), *Managing Reliability Risk in the MISO Footprint* (June 16, 2022), *available at* https://cdn.misoenergy.org/20220616%20 Board%20of%20Directors%20Item%2008a%20Reliability%20Imperative625168.pdf.

There are urgent and complex challenges to electric system reliability in the MISO region and elsewhere. This is not just MISO's view; it is a well-documented conclusion throughout the electric industry. …

Many dispatchable resources that provide critical reliability attributes are retiring prematurely due to environmental regulations and clean-energy policies. …

The new weather-dependent resources that are being built, such as wind and solar, do not provide the same critical reliability attributes as the conventional dispatchable coal and natural gas resources that are being retired. While emerging technologies such as long duration battery storage, small modular reactors and hydrogen systems may someday offer solutions to this issue, they are not yet viable at grid scale[4]

11.    In summary, the Final Rule will likely have lasting negative impacts.  Unless a stay is immediately granted, the Final Rule will impose significant and irreparable harm on Arkansas and its citizens.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed in Little Rock, Arkansas, on May 22, 2024.

Doyle Webb
Chairman
Arkansas Public Service Commission

---

[4] Midcontinent Independent System Operator, "MISO's Response to the Reliability Imperative," at 2 (Feb. 2024), *available at* https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20Final504018.pdf?v=20240221104216.

# EXHIBIT 7

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF NORTH DAKOTA, STATE OF
WEST VIRGINIA, STATE OF ALASKA,
STATE OF ARKANSAS, STATE OF
GEORGIA, STATE OF IDAHO, STATE OF
INDIANA, STATE OF IOWA, STATE OF
KANSAS, COMMONWEALTH OF
KENTUCKY, STATE OF LOUISIANA, STATE
OF MISSISSIPPI, STATE OF MISSOURI,
STATE OF MONTANA, STATE OF
NEBRASKA, STATE OF OKLAHOMA,
STATE OF SOUTH CAROLINA, STATE OF
SOUTH DAKOTA, STATE OF TENNESSEE,
STATE OF TEXAS, STATE OF UTAH,
COMMONWEALTH OF VIRGINIA, AND
STATE OF WYOMING,

Case No. 24-1119

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY,

*Respondent.*

## DECLARATION OF JAMES F. HUSTON
## IN SUPPORT OF PETITIONERS' MOTION TO STAY FINAL RULE

I, James F. Huston, hereby declare and state under penalty of perjury that the following is true and correct to the best of my knowledge and is based on my personal knowledge or information available to me in the performance of my official duties:

1.    My name is James F. Huston, and my business address is 101 W. Washington St., Suite 1500 E, Indianapolis, Indiana, 46204. I am over the age of 18, have personal knowledge of the subject matter, and am competent to testify concerning the matters in this declaration.

1

2.     I have served as Chairman of Indiana Utility Regulatory Commission (IURC) since March 2018 and served as a Commissioner since November 2014. I also serve on the National Association of Regulatory Utility Commissioners (NARUC) Committee on Gas and on the Gas Technology Institute's Public Interest Advisory Committee. I was recently appointed to the Member Representatives Committee of the North American Electric Reliability Corporation (NERC). I earned my Bachelor of Science and Master of Arts degrees from Ball State University.

3.     The IURC is responsible for ensuring safe and reliable service at just and reasonable rates for the utilities it regulates, including electric utilities, serving retail customers in Indiana. As Chairman and a member of the IURC, I have responsibility over proceedings before the IURC, working with staff in reviewing the evidence presented, and making determinations based on the applicable laws and the public interest, as well as establishing rules and guidelines requiring appropriate short-term and long-term planning. Because of the potential impact on resource reliability and retail rates, IURC Commissioners and staff also review and participate in the stakeholder processes of the two regional transmission organizations ("RTOs") that have Indiana electric utilities as members, the Mid-continent Independent System Operator, Inc. ("MISO") and the PJM Interconnection, LLC ("PJM"), and in the related regional state committees, the Organization of MISO States ("OMS") and the Organization of PJM States, Inc. ("OPSI"). In addition, the IURC monitors filings affecting Indiana utilities and intervenes and provides comments to the Federal Energy Regulatory Commission ("FERC").

4.     I am submitting this declaration in support of Petitioners' Motion to Stay the Final Rule published by the U.S. Environmental Protection Agency (EPA) on May 7, 2024, entitled

"National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 89 Fed. Reg. 38,508 (Final Rule), which sets a more stringent standard for filterable particulate matter ("PM") emissions from existing coal-fired power plants (going from 0.030 lbs/MMBtu to 0.010 lbs/MMBtu) and revises start-up requirements.

5. Continued reliability of the electric generation and transmission systems must be an important consideration as the U.S. EPA moves forward with this rule. The Indiana General Assembly established a balanced approach to electric generation regulatory decisions in Indiana Code section 8-1-2-0.6, which declares that it is the continuing policy of the State of Indiana "that decisions concerning Indiana's electric generation resource mix, energy infrastructure, and electric service ratemaking constructs must consider" the following attributes (commonly referenced as the "Five Pillars"):

   a. Reliability,

   b. Affordability,

   c. Resiliency,

   d. Stability, and

   e. Environmental sustainability

6. While the U.S. EPA's main concern is environmental and climate, the elimination of too much electric generation too quickly may cause even greater issues, affecting the other key attributes needed for electric generation and the affordability of electricity generally.

7. As Chairman, I have concerns that the Final Rule will undermine the reliability and resiliency of the electric grids upon which the State of Indiana and its citizens rely and could result in significantly higher prices for electricity in Indiana.

The Final Rule Threatens an Already Vulnerable Power Grid

8.   The power grids providing electricity to Indiana are already stretched thin and do not have the resiliency or the buffer of excess dispatchable generation that they had ten or even five years ago.

9.   MISO's reserve margins "have been exhausted through load growth and unit retirements," and the entire region will experience a 4.7 GW shortfall beginning in 2028 if "currently expected generator requirements actually occur." And this shortfall, caused in part by early retirements of Electric Generating Units (EGUs), will compromise grid reliability. *MISO's Response to the Reliability Imperative*, 6, 11–12, (updated February 2024), https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021 %20Final504018.pdf?v=20240221104216.

10.  PJM recently warned of capacity deficiencies and reliability degradation as dispatchable thermal plants are retired prematurely. In a February 2023 report on the risks relating to energy resource transitions that a movement away from base load dispatchable generation will cause PJM stated:

> The composition of the PJM Interconnection Queue has evolved significantly in recent years, primarily increasing in the amount of renewables, storage, and hybrid resources and decreasing in the amount of natural gas-fired resources entering the queue . . .
>
> By the 2028/2029 Delivery Year and beyond, at Low New Entry scenario levels, projected reserve margins would be 8%, as projected demand response may be insufficient to cover peak demand expectations, unless new entry progresses at levels exhibited in the High New Entry scenario. This will require the ability to maintain needed existing resources, as well as quickly incentivize and integrate new entry. . .

> Thermal generators are retiring at a rapid pace due to government and private sector policies as well as economics . . .
>
> PJM's interconnection queue is composed primarily of intermittent and limited-duration resources. Given the operating characteristics of these resources, we need multiple megawatts of these resources to replace 1 MW of thermal generation.

*Energy Transition in PJM· Resource Retirements & Replacements & Risks,* 1, 10, 16 (Feb. 24, 2023), https://bit.ly/3DOBR1P.

11. These power grids are interdependent, so a reduction in EGUs anywhere in the RTOs to which Indiana belongs will likely affect all members.

12. If the Final Rule forces even more coal generation sources to shut down prematurely, it could impact grid reliability and the provision of reliable electricity to the people of Indiana and all MISO and PJM member regions.

13. While Indiana does not operate any lignite power plants, these plants are essential for grid reliability. The plants are able to respond to fluctuating grid demands, either ramping up or decreasing production as necessary.

14. The Final Rule may cause coal plants in the MISO and PJM grids to close. Given the current regulatory landscape, MISO and PJM will have to move towards even more intermittent resources, such as wind or solar, and will need more online reserve resources to provide the constant balance of supply to load when wind and solar resources are intermittent; that is, when the wind is not blowing (or blowing unevenly) or the sun is not shining (or shining unevenly). Both MISO's and PJM's generation interconnection queues are overloaded and slow moving, so getting sufficient generation interconnected in time is also an issue.

<u>Impact of the Final Rule on Indiana's Electricity Pricing</u>

15.     Indiana has a diverse portfolio of power generation resources, including wind, coal, solar, hydroelectric, and natural gas. Once accounting for more than 90% of Indiana's electricity, coal-fired electricity generation is now less than half of the State's total energy generation. Electricity prices have risen in Indiana, changing Indiana's ranking from the 4th lowest in prices in 2002 to 29th lowest in 2022, according to the U.S. Energy Information Administration.

16.     EPA's claims that the Rule will not affect the price of electricity is not true in Indiana. If a stay is not granted, Indiana's existing coal-fired power plants will have to comply with more stringent filterable particulate matter emission requirements and unit start-up requirements, and at least four facilities will, at minimum, have to install PM Continuous Emissions Monitoring Systems.

17.     The costs for these installations are passed on to consumers through rate changes for cost recovery as required by law. For example, from 2013 to 2015, the IURC approved over $1 billion in cost recovery due to compliance costs of federally mandated environmental requirements, including costs for compliance with the original MATS rule.

Executed in Indianapolis, Indiana, on May 29, 2024.

James F. Huston
Chairman
Indiana Utility Regulatory Commission

# EXHIBIT 8

# DECLARATION OF JASON BOHRER

I, Jason Bohrer, declare as follows:

1.      I am over eighteen years of age, suffer from no disability that would preclude me from giving this declaration, and make this declaration based upon personal knowledge or information available to me in the performance of my professional duties.

2.      I am President and Chief Executive Officer of the Lignite Energy Council (LEC).

3.      I have been employed by the LEC for 11 years and held my current title for that entire time. My responsibilities include directing and coordinating the policy work and research and development priorities of the LEC.

4.      The LEC is a trade association that represents various lignite mines, lignite-fired power plants and conversion facilities, as well as the businesses that contribute goods and services to the industry. Its members produce electricity and also gasify lignite coal, which is then turned into synthetic natural gas and other valuable byproducts.

5.      LEC members provide electricity to two Regional Transmission Organizations: the Midcontinent Independent Systems Operator and the Southwest Power Pool.

6.      I am providing this declaration in support of the motion to stay the rule promulgated by the U.S. Environmental Protection Agency ("EPA") entitled *National*

*Emission Standards for Hazardous Air Pollutants: Coal-and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 89 Fed. Reg. 38,508 (May 7, 2024) ("MATS RTR").

7.      The MATS RTR threatens the viability of North Dakota's lignite-fired power plants and coal mines. The MATS RTR also endangers the reliability and resilience of the power grids in North Dakota and the surrounding regions.

8.      LEC members have extensive experience in operating electric generating units (EGUs) powered by lignite coal while using a variety of emission control technologies.

9.      North Dakota contains the world's largest deposit of lignite coal. Lignite coal is a geologically young form of coal and lacks the homogeneity found in older types of coal.

10.     In North Dakota, lignite coal is mined adjacent to the EGUs and conversion facilities where it is used in a "mine-to-mouth" operation. Each EGU contracts with an individual lignite mine for its supply of lignite, and these EGUs have been geographically sited based on the availability of lignite coal. Neither market economics nor coal transportation logistics allow for fuel switching or coal blending. Should an associated lignite EGU close, the mine providing coal for it would have no reasonable or viable market alternative.

11.     The total number of EGU employees in North Dakota is 7,725, and the total number of mining jobs is 3,250. This ratio suggests that for each employee at a mine there are two employees at a power plant.

12.     Emission control solutions are not interchangeable and are crafted on an EGU-by-EGU basis due to the differences in coal composition, power plant technology and operational needs at each facility.

13.     Particularly for lignite-firing EGUs, the variability in chemical composition of lignite coal, along with mine-to-mouth operations, requires that EGUs maintain an emission control compliance margin that accounts for variability in coal composition and required operational conditions.

14.     The lignite subcategory created by the EPA in the 2012 MATS rule reflected the reality that the chemical makeup and characteristics of lignite not only cause different emissions profiles than bituminous or sub-bituminous coals, but also reflect the lower homogeneity of lignite coal compared to other types of coal.

15.     The lignite subcategory therefore reflected basic chemical truths, such as the mechanism by which the higher sulfur content of lignite reduces the effectiveness of sorbent mercury reduction solutions and the interplay between the formation of SO3 and potential mercury reduction technologies.

16.     LEC is not currently aware of any verified or demonstrated technology that will consistently allow all of North Dakota's lignite-firing EGUs to comply with the MATS RTR's newly lowered Hg requirement of 1.2 lb/TBtu.

17.     Illustrating that point, testing performed by LEC member Minnkota Power Cooperative verified that the increased utilization of sorbents, even at significantly elevated levels, would not result in consistent compliance with the newly reduced Hg limit.

**The new limit will cause immediate and irreparable harm to LEC Members.**

18.     LEC's members are actively trying to determine if they will be able to comply with the MATS RTR's reduced emission requirements and still remain commercially viable.  Testing alone to accurately quantify the requirements specific to each unique EGU is estimated at more than $1,000,000.00 per unit.

19.     Even if such further testing indicated the new emission limitations could be met (and it is not currently clear that they could be), the construction costs necessary to update or replace existing technologies and optimize operation would be expensive and time consuming.

20.     New expenses would be added to those one-time construction expenditures (estimated at a minimum of $5,000,000.00 by Minnkota Power Cooperative for a single facility to between $55,000,000 and $500,000,000 for Basin Electric Cooperatives' generating fleet) by requiring additional sorbents or other

control materials. These new expenses would continue in perpetuity along with increased operating costs.

21.     Each EGU in North Dakota is unique, but they share in the difficulty of establishing the feasibility of a path to compliance, and, if one is achievable, the expenses incurred in implementation, as well as the continual ongoing costs. For example, a baghouse is estimated to cost $282,715 per fPM ton removed while an ESP retrofit is estimated at $67,262 per fPM ton removed. Operators will be forced to pass along those costs to ratepayers or other end users to continue to operate.

22.     Moreover, should feasibility testing indicate compliance is possible, the substantial modifications required by the MATS RTR would need to be implemented immediately.

23.      For example, electrostatic precipitator upgrades carry a three-year timeline from start of construction to implementation. For the EPA's assessment to be accurate that no facilities will close due to the MATS RTR, at least 26 impacted EGUs in the country would be competing for the 4 vendors capable of performing the work. And based on historical performance, it is unlikely the four contractors could perform the work needed for all 26 plants in that 3-year period.

24.     The alternative to compliance is to shut down or operate at such a reduced level that end of life will occur prematurely for the EGU. For every two jobs

lost at a power plant due to premature shut down, a worker in a lignite mine who will also lose their job.

**The MATS RTR Rule will harm North Dakotans**

25.     The elimination of the lignite subcategory will impact North Dakota and North Dakotans in multiple ways. Lignite provides most of the electricity consumed in North Dakota, and it provides the backbone of reliability and resilience.

26.     Should testing indicate compliance with the MATS RTR's new emission limits is possible for every EGU in North Dakota, the implementation of new control technologies at each EGU would require multiple EGUs be taken offline for extended periods of time, concentrating the danger of an unstable, unreliable grid on North Dakota and its residents.

27.     As a recent study commissioned by the North Dakota Transmission Authority confirmed, the power grids serving the people of North Dakota are already operating on dangerously thin margins of dispatchable power. Available at https://www.ndic.nd.gov/sites/www/files/documents/Transmission-Authority/ Publications/MATS_Analysis_Report.pdf. Consequently, even if Noth Dakota plants are capable of complying with the MATS RTR's new standards (which, as noted above, remains entirely uncertain), complying with the Rule would require taking multiple units offline for an extended duration to make necessary upgrades, removing load from power grids that are not projected to have capacity to spare.

28.     Winters in North Dakota require consistently available power for homes, hospitals and businesses to provide care and services for families. Previous blackouts in other parts of the country associated with Winter Storm Uri have demonstrated that death and health impacts can follow blackouts even in relatively mild weather.

29.     Consequently, the MATS RTR will impose significant regulatory burdens and cost on coal-fired EGUs in North Dakota and create serious risks to the health and welfare of people in the region.

30.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 3rd day of June 2024.



Jason Bohrer
President and Chief Executive Officer
Lignite Energy Council

# EXHIBIT 9

## ROBERT MCLENNAN
## DECLARATION OF HARM IN SUPPORT OF MOTION FOR A STAY PENDING REVIEW

1.      My name is Robert McLennan.  I am the President and Chief Executive Officer at Minnkota Power Cooperative, Inc. (Minnkota).  I am over the age of 18 years, and I am competent to testify concerning the matters in this declaration. I have personal knowledge of the facts set forth in this declaration, and if called and sworn as a witness, could and would competently testify to them.

2.      I have more than 29 years of experience in electricity generation. I have been employed at Minnkota since 2011. I hold dual bachelor's degrees in history and political science, and psychology from the University of Jamestown. As President and CEO at Minnkota, my responsibilities include ensuring access to safe, reliable, affordable and sustainable electricity for 11 member-owner cooperatives in eastern North Dakota and northwestern Minnesota. This includes oversight of more the 400 employees and a budget of more than $450 million annually.

3.      I am providing this Declaration in support of the motions to stay challenging the U.S. Environmental Protection Agency's (EPA) National Emission Standards for Hazardous Air Pollutants: Coal and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508 (May 7, 2024), known as the Mercury and Air Toxics Standards Risk and Technology Review (the Final Rule or the MATS RTR).

4.      Minnkota is a not-for-profit electric generation and transmission cooperative headquartered in Grand Forks, North Dakota.  Minnkota provides wholesale electric energy to 11 member-owner distribution cooperatives located in eastern North Dakota and northwestern Minnesota. Minnkota also serves as the operating agent for the Northern Municipal Power Agency (NMPA), headquartered in Thief River Falls, MN.

5.      Electricity generated by Minnkota is distributed through the Midcontinent Independent System Operator (MISO) regional transmission organization (RTO). MISO "operates the transmission system and centrally dispatched market" in fifteen states ranging from Canada down to the Gulf

Coast. Across those states, it serves more than 42 million customers.[1]

Minnkota and its system partners (Northern Municipal Power Agency and Square Butte Cooperative) have the capability of generating 1,425 MWs, which may be provided to MISO for scheduling and reliability purposes. Over half of the electricity generated by Minnkota is dispatchable power from coal sources, meaning it is available on demand, unlike power from wind and solar resources, which do not have on-demand capabilities. Dispatchable power is critical for MISO because MISO has small reserve margins, which is the amount of power needed to ensure demand is met and avoid failure of the grid.

      6.      Minnkota is a member of the Lignite Energy Council (LEC). LEC represents the regional lignite industry in North Dakota, an $18 billion industry critical to the economy of the Upper Midwest and the reliability of its electrical grid.  The primary objective of LEC is to maintain a viable lignite coal industry and enhance development of the region's lignite

---

[1] FERC, MISO, https://www.ferc.gov/industries-data/electric/electric-power-markets/miso.

resources. Members of LEC include mining companies, utilities that use lignite to generate electricity, synthetic natural gas and other valuable byproducts, and businesses that provide goods and services to the lignite industry. LEC has advocated for its members since 1974 to protect, maintain, and enhance development of our region's abundant lignite resources. LEC is committed to environmental stewardship and understands the importance of protecting North Dakota's natural beauty.

7.      Minnkota is a member of the National Rural Electric Cooperative Association (NRECA). NRECA represents the interests of rural electric cooperatives across the country.

8.      Minnkota is a member of America's Power (AP). AP is a national trade organization that advocates at the federal and state levels on behalf of the U.S. coal fleet and its supply chain.

9.      North Dakota contains the world's largest known deposit of lignite and is the fifth-largest coal producing state, accounting for 5% of total U.S. coal production. Most of that lignite is utilized at mine-mouth power generation facilities, which are coal-fired power plants built near a

coal mine that use coal from that mine as fuel. As a result of this plentiful

natural resource, coal provides the majority of the electric power generated

and consumed in North Dakota.

10.     The MATS RTR threatens the viability of North Dakota's

lignite-powered plants. It also threatens the reliability of the entire grid

across the region, places burdens on the power sector as a whole, and

causes harm to industries dependent on a reliable electric grid.

## MILTON R. YOUNG STATION

11.     Minnkota is the operator and a partial owner of the Milton R.

Young Station (the Young Station or MRY), a two-unit (the Units or MRY 1

and MRY 2), cyclone lignite coal-fired power plant located near the town of

Center, North Dakota.

12.     MRY 1 and 2 are well-controlled electric generating units

(EGUs), which provide energy to the MISO system.  MRY Units 1 and 2

have substantially reduced NOx and SO2 emissions, which have been

documented in the context of the Regional Haze program.  MRY 1 has

reduced $SO_2$ emissions by 96% since 2002, and MRY 2 has reduced $SO_2$ by

75% since 2002. Both Units have reduced NOx emissions approximately

60% since 2002.

13.     MRY 1 is a cyclone lignite-fired unit with a 235 MW nominal

net rating. The Unit controls NOx with advanced separated over-fire air

(ASOFA) and selective non-catalytic reduction (SNCR).  A wet scrubber

controls $SO_2$. An electrostatic precipitator (ESP) controls particulate matter

(PM).

14.     MRY Unit 2 is also a cyclone lignite-fired unit, with a larger

capacity (440 MW nominal net rating).  It also is equipped with a SNCR,

wet scrubber, and an ESP.

15.     The MRY Units have different configurations.  Although

Minnkota uses the same control devices for the Units, operation and

emissions output differs based on a number of factors.  The Units vary in

capacity and control device design.  MRY 2 has a different ductwork

configuration between the air heater and the electrostatic precipitator than

MRY 1.  MRY 1 has shorter ductwork and a smaller outlet for measurement

of mercury emissions. The ductwork configuration affects the amount of

residence time for the flue gas to be exposed to the injection of powder activated carbon (PAC), also known as activated carbon injection (ACI) in the Final Rule.

16.     Minnkota uses the same mercury control strategies for both Units. Minnkota currently uses a fuel additive system to apply a Potassium Iodide fuel additive sorbent known as M-Prove procured from ARQ (formerly ADA). Minnkota injects non-halogenated PAC post-combustion. The fuel additive system was designed to meet the original 2012 MATS limitation for lignite units of 4.0 lb/TBtu, with a margin for compliance due to the variability of lignite coals.

17.     MRY 1 and 2 at the Young Station combust lignite coal. The Young Station's lignite supply comes exclusively from BNI Coal Inc. (BNI), which is in close proximity to the plant. The lignite supplied by BNI is run-of-mine (ROM) coal that contains impurities and does not conform to a single mineral content or heat value specification. For this reason, the ROM supply currently varies in mercury content from 4.9 lb/TBtu to 18.6 lb/TBtu, based on recent mercury content testing. *See* Sargent & Lundy, "Mercury

Testing Results for the MATS Residual Risk and Technology Review," at

Table 2-5 (May 22, 2024) [hereinafter Mercury Testing 2024 Report],

**Attachment A**. The broad range of variability is projected to continue into

the future.  *See id.* at Table 2-4.

## MATS RTR RULE REVISIONS

18.     The MATS RTR eliminates the low rank coal subcategory for

lignite-powered facilities and changes the limit for mercury from lignite-

fired power plants from 4.0 lb/TBtu to 1.2 lb/TBtu (the New Mercury

Limitation). EPA assumes this limit can be met using brominated ACI to

achieve greater than 90% mercury removal by lignite-burning units.  89

Fed. Reg. 38508, 38547 (May 7, 2024).

19.     The MATS RTR decreases the limit for filterable particulate

matter (fPM) to 0.010 lbs/MMBtu (the New fPM Limitation).

20.     Compliance with the New Mercury and fPM Limitations is

required on or before three years after the effective date of the Final Rule.

21.     The MATS RTR provides that Continuous Emission Monitoring Systems (CEMS) are the only method to demonstrate compliance with the fPM limit.

**LIGNITE COMBUSTION**

22.     Lignite varies in composition and the distribution of mercury within individual coal samples is not uniform, unlike other types of coals. The amount of mercury within one seam of coal can vary drastically, not to mention mercury content fluctuations between seams at the same mine.[2] Minnkota's units see this large degree of variability within a 24-hour operating period. *See* **Attachment A**, at Tables 2-4, 2-5.

23.     An important difference between mine-mouth coal plants and typical coal-fired power plants is the control over fuel composition.  Non-mine-mouth facilities purchase coal of a specified quality to be delivered to the facility.  Unlike other types of facilities that may be able to blend coals to achieve greater consistency in the character of their fuel, many North

---

[2] LEC Comments filed June 23, 2024, https://downloads.regulations.gov/EPA-HQ-OAR-2018-0794-5957/attachment_1.pdf

Dakota lignite units are located at mine-mouth facilities without access to other coal types.  MRY does not have access to alternate coal supplies. It has no rail spur or barge access to transport the coal to the facility. Therefore, MRY depends entirely on the fuel extracted from the neighboring BNI mine, and without incurring substantial economic cost and significant waste of resources, MRY has no means to control coal quality.

24.     When high mercury batches of coal are combusted, the original 2012 MATS mercury emission limitation provided lignite power plants enough margin in their percentage of mercury removal to account for higher mercury emissions due to the mercury content in the coal. 77 Fed. Reg. 9304, 9490 (Feb. 16, 2012).

25.     It is well-known and consistent with Minnkota's experience that lignite deposits vary significantly in quality, including fuel combustion performance and mineral content. Mercury content in the lignite varies because different seams within the mine yield lignite with diverse attributes (including mercury) on a day-to-day basis.  Minnkota currently

maintains continuous emission controls to accommodate for the changing

lignite quality to assure compliance with existing MATS mercury

limitations. The variability of the lignite results in a much broader design

range of controls and the equipment operation must account for the

maximum mercury ROM and in turn must have a greater performance

design standard for removal percentage removal. A compliance margin in

the performance design standard for percentage removal is critical to allow

for controls to adjust in response to changing lignite content, assuring

continuous compliance with the MATS RTR Rule. *See* **Attachment A**, at

Table 2-4.

## ELIMINATION OF THE MERCURY SUBCATEGORY FOR LIGNITE CAUSES IMMEDIATE AND IRREPARABLE HARM TO THE NORTH DAKOTA LIGNITE INDUSTRY AND TO MINNKOTA

26. EPA established the lignite subcategory for mercury because

lignite units have different characteristics than units designed to combust

bituminous and subbituminous coals. 77 Fed. Reg. at 9378. Lignite has a

higher mercury content in many instances and presents greater variability

than other coals. *See* E.J. Cichanowicz, "Technical Comments on MATS

RTR," EPA-HQ-OAR-2018-0794-5956, at Section 6.3.1 EIA Hg-Sulfur

Relationship (June 19, 2024) [hereinafter Cichanowicz Technical Report],

**Attachment B**.  The higher sulfur content found in lignite fuels inhibits the

ability of injected sorbents to reduce mercury emissions at lignite plants.

The mercury content also results in higher levels of $SO_3$ formed, which

significantly limits the mercury emission reduction potential of emission

controls at lignite plants.  *Id.*

27.    Minnkota has used the same technology (combination of

sorbent injection plus a chemical additive (oxidizing agent)) as its primary

mercury control strategy since the MATS rule came into effect. While there

are many variations of PAC on the market, in Minnkota's experience with

these products, no PAC product has been identified as more successful

than the others at MRY.  Therefore, Minnkota has continued to use

activated carbon injection as its primary mercury control system. Minnkota

is not aware of any new developments in practices, processes, and control

technologies in mercury control since the original MATS rule's technology

evaluation.

28.     Minnkota is unaware of any verified testing or evidence that demonstrates that lignite units can meet the New Mercury Limitation of 1.2 lb/TBtu at full load. EPA finds that by using brominated activated carbon, without regard for equipment performance design, "greater than 90 percent Hg control can be achieved at lignite-fired units," 89 Fed. Reg. at 38547, and cites for support a beyond-the-floor memorandum from the 2012 MATS rule, Kevin Culligan, SPPD/OAQPS to EPA-HQ-OAR-2009-0234, "Emission Reduction Costs for Beyond-the-floor Mercury Rate for Existing Units Designed to Burn Low Rank Virgin Coal" (Dec. 16, 2011) [hereinafter Beyond-the-Floor Memorandum], **Attachment C.** EPA concludes that "units could meet the final, more stringent, emission standard of 1.2 lb/TBtu by utilizing brominated activated carbon at the injection rates suggested in the beyond-the-floor memorandum from the 2012 MATS Final Rule." 89 Fed. Reg. at 38547. To support this removal rate, the Beyond-the-Floor Memorandum cites a technical publication: Sjostrom, "Activated carbon injection for mercury control: Overview," Fuel Vol. 89, Issue 6, at 1320-22 (June 2010) [hereinafter ACI Fuel 2010 Article], **Attachment D.**

The ACI Fuel 2010 Article presents a chart that compiles mercury removal test results from Department of Energy (DOE) mercury control systems. The ACI Fuel 2010 Article scatterplot presents a variety of results under different conditions and equipment configurations. The ACI Fuel 2010 Article dataset contains only one lignite datapoint, which is a unit equipped with a fabric filter. Fabric filters aid in mercury removal because of increasing resonance time and temperature differential. The raw testing data from the ACI Fuel 2010 Article is not available in the docket. Given that the dataset (1) uses a single lignite data point (containing Fabric Filter controls), (2) fails to include the backup testing data, and (3) lacks data from ESP-equipped units like the MRY Units, the scatterplot in the ACI Fuel 2010 Article does not support the conclusion that a emissions standard based on 90% mercury removal can be achieved across the lignite industry, particularly with respect to lignite-fired units that are not equipped with a fabric filter.

29.    Concluding that mercury removal over 90% is possible and equates to meeting the New Mercury Limitation, EPA calculates the removal

percentages for various lignite units across the country. EPA reports that lignite plants would need to remove up to 95% of mercury in the flue gas to meet the new limit based on 2022 data. 89 Fed. Reg. at 38547.

30.     After the release of the proposed MATS RTR, Minnkota performed testing to evaluate the capability of its current mercury reduction system at MRY 1 and to examine the feasibility of EPA's mercury removal assumptions as applied to MRY 1. *See* **Attachment A**. Minnkota used its existing mercury control system to apply PAC and M-Prove sorbent, both of which MRY uses routinely for mercury control. Minnkota added as much PAC and Potassium Iodide sorbent as the MRY conveyors, injection lances, and associated components would allow, based on their maximum performance design capabilities and consistent with good engineering practices. As described in more detail in the Mercury Testing 2024 Report (**Attachment A)** the test results showed:

| MRY Unit | Average Hourly Mercury Emissions Value Achieved at Full Load (Sorbent Trap Data) 18 ppm MProve and Non-Brominated PAC |
|---|---|
| Unit 1 | 2.17 |
| Unit 2 | 1.61 |

31.     The Final Rule solely relies on the conclusion that brominated PAC improves mercury removal. 89 Fed. Reg. at 38547 (citing the Beyond-the-Floor Memorandum).  Consequently, MRY purchased brominated PAC for the purpose of determining if that product would achieve improved mercury removal as compared to non-brominated PAC.  Minnkota selected MRY 1 for this trial because its mercury emissions baseline rate was higher than MRY 2 in the results identified above.  As shown below, the MRY 1 average mercury emissions rate was higher when injecting brominated PAC as compared with non-brominated PAC.

| MRY Unit | Average Hourly Hg Emissions Value Achieved at Full Load (Sorbent Trap) Brominated PAC | Average Hourly Hg Emissions Value Achieved at Full Load (Sorbent Trap) Non-Brominated PAC |
|---|---|---|
| Unit 1 | 2.57 | 2.17 |

32.     With existing equipment, the recent testing results demonstrate that MRY is unable to achieve the New Mercury Limitation on an hourly basis at full load.  Further, Minnkota has no information or data supporting the conclusion that MRY 1 or MRY 2 could achieve the New Mercury Limitation on a 30-day rolling basis while operating at full load. The short-term testing data suggest that even a longer-term averaging period would not result in compliance.

33.     In fact, Minnkota plotted the recent test results to project the removal rate at a brominated PAC injection rate of 3.0 lb/MMacf, which is a higher injection rate than the existing MRY equipment can achieve, but is consistent with EPA's achievability conclusion in the Beyond-the-Floor Memorandum and Final Rule.  The trend line shows an estimated maximum mercury removal rate of less than 80%. The plotted trend line, based on the test values, is far below EPA's conclusion (consistent with the ACI Fuel 2010 Article) that injection of brominated PAC at the rate of 3.0 lb/MMacf will result in a 90% removal rate.  Rather, the trend line levels off, demonstrating that increasing the amount of brominated PAC injected

into MRY Unit 1 is not an adequate control strategy to achieve the New

Mercury Limitation and that EPA ignored and erroneously omitted

limitations of ACI in its achievability conclusion.  **Attachment A**, at Figure

2-1.  The scatterplot from the Report is presented below.

**Figure** Error! No text of specified style in document.**-1 — MRY Unit 1
Existing System Mercury Removal Performance Capabilities using
Brominated PAC**



34.      Mercury testing and analysis of data at MRY confirms and

supports Minnkota's belief that numerous variables affect its mercury

emissions rate.  Specifically, Minnkota observed mercury emissions rate

fluctuations based on unit load, mercury content in lignite, and normal

variability in unit operation and control equipment function. Some hourly

mercury emissions increases were not directly traceable to a cause, even

upon data analysis.

35.     One of Minnkota's conclusions, based on recent testing

experience, is that known and unknown variables cause mercury emissions

fluctuation, such that a standard for mercury must include a minimum

compliance margin of 25%.

36.     Minnkota is irreparably harmed by the final MATS RTR

because MRY's existing mercury controls cannot achieve the New Mercury

Limitation of 1.2 lb/TBtu on an hourly or sustained basis at full load. In

fact, the MRY testing data predicts that increased injection of brominated

PAC beyond the capabilities of the existing mercury control system will not

achieve the New Mercury Limitation due to the leveling off of mercury

removal at less than an 80% removal rate.

37.     The Final Rule places Minnkota in an urgent and untenable

position, given the Rule's impending compliance date.  Noncompliance

with the Clean Air Act is not an option.  Therefore, prior to making a

shutdown decision regarding critical assets, Minnkota would determine

what mercury emission rate the MRY units can achieve.  That would

require significant additional investment in testing that, along with existing

testing costs, will exceed $600,000.00.

38.     To achieve lower mercury emissions, MRY must install and

operate advanced pollution control equipment to replace its existing

equipment, such as an ACI system with a higher injection rate.  Even

though the New Mercury Limitation is not shown to be feasible, Minnkota

must complete this installation project to improve the emission rate and

avoid the only other option of derating the units for compliance.  The

installation costs and ongoing operation expenses are significant.

Specifically, these technologies will require an estimated minimum of

$5,000,000.00 capital expenditure upfront, as well as increased labor costs

for installation, operation, and maintenance of the technology, and

equipment and associated training, and will result in increased operating

costs over the long term.  This expenditure must take place expeditiously

and certainly before the resolution of this case.

39.     Without the ability to meet the New Mercury Limitation, the Final Rule provides no other option but to force Minnkota to ultimately shut down MRY Unit 1 and Unit 2. Shutting down MRY substantially harms Minnkota by entirely eliminating its ability to generate dispatchable electricity for its cooperative members and end users.

40.     EPA failed to take into consideration the actual costs of compliance and had a significantly flawed calculation. *See* **Attachment A**, at Section 3 EPA Cost Validity.

41.     Further, EPA underestimates the cost of the Final Rule to Minnkota by using incorrect fuel additive costs for MRY 1 and for MRY 2. EPA's underestimate results in $487,747 and $1,347,383 that should have been included in the cost analysis for MRY Units 1 and 2, respectively.

42.     The magnitude of EPA's underestimation of cost is apparent when actual compliance costs are used to calculate cost effectiveness. Compared to EPA's hypothetical 800 MW unit, the cost for just one 250 MW lignite unit is nearly 80% EPA's estimate—and this fails to include equipment upgrades necessary to achieve an injection rate unproven to

meet a 90% removal rate on lignite. Note the table <u>does not</u> include or account for any costs associated with MRY 1 mercury system upgrades.

**Example MRY Unit 2 Cost Underestimations Summary Table** Error! No text of specified style in document.**-1**

| Parameter | EPA Example Hypothetical 800 MW | EPA Assumed MRY U2 Costs 447 MW | Est. Actual MRY U2 Costs 447 MW |
|---|---|---|---|
| Current Hg Compliance (4.0 lb/TBtu) Cost [1] | $2.6 M | $0.3 M | $1.9 M |
| Current Hg Removed | 1,295 lb | 77 lb | 149 lb |
| Current C/E ($ per lb Hg Removed) | 2,004 | 3,845 | 12,754 |
| Hg Control System Annualized Capital Cost | Not included | Not included | $472k [2] |
| BPAC Cost @ 5 lb/MMacf | $7.5 M | $0.6 M | $1.3 M [3] |
| M-Prove Cost | Not included | $0.2 M | $1.6 M [4] |
| Future Hg Compliance (@ 5 lb/MMacf) Cost | $7.5 M | $0.8 M | $3.4 M |
| Future Hg Removed (EPA Assumed @ 1.2 lb/TBtu) | 1,447 lb [5] | 110 lb | 216 lb |
| Future C/E ($ per lb Hg Removed) | 5,083 | 7,040 | 15,678 |
| Incremental C/E ($ per lb Hg Removed) | 28,176 | 14,360 | 22,217 |

Note 1 – EPA example only based on sorbent. EPA assumed current compliance cost includes sorbent and chemical fuel additive. Est. actual cost based on 2023 MRY Unit 2 usage rate & pricing for both sorbent and chemical additive.
Note 2 – Cost of $5.0 million dollars from S&L project database was annualized using a capital recovery factor calculated based on annual interest rate of 7% (pre-tax marginal rate of return on private investment, EPA Cost Manual Section 5) and 20 year evaluation period (EPA Cost Manual Section 6).
Note 3 – Cost based on EPA assumed rate but using 2023 MRY BPAC pricing.
Note 4 – Cost based on 2023 MRY Unit 2 usage rate & pricing instead of assuming same as sorbent costs.
Note 5 – Based on calculated value for EPA example inlet Hg of 1,542 lbs (current Hg coal content) – 95 lbs (future emitted amount). However, the EPA example identifies 1,468 lb for the incremental cost effectiveness calculation.

43.    Costs to comply with the New Mercury Limitation are exorbitant and damage Minnkota.  Many costs may be passed along to its member cooperatives and end users who are harmed via higher electricity

prices. The capital and operational costs to Minnkota, its member cooperatives, and end users cannot be recouped.

44.     At a minimum, compliance with the new standard for mercury is estimated to cost $22,217 per pound of incremental emission removed for Unit 2. The significant cost of reducing mercury emissions is overly burdensome for Minnkota as a small entity and as a not-for-profit electric cooperative.

45.     Minnkota's harm due to the New Mercury Limitation is immediate. Minnkota must immediately begin mercury testing to determine maximum mercury removal rates and capabilities.

46.     The MATS RTR sets a mercury limitation for lignite units without any technical basis or data demonstrating its achievability. In summary, the New Mercury Limitation is defective due to the following flawed assumptions:

    a.  EPA assumes that greater than 90% mercury control can be
        achieved at lignite-fired units at a < 2.0 lb/MACF injection rate
        for units with installed fabric filter and using brominated PAC

and greater than 90% mercury control can be achieved at lignite-fired units at < 3.0 lb/MACF injection rate for units with installed ESPs and using brominated PAC. Yet, MRY's testing data demonstrates that EPA's assumptions that greater than 90% mercury control can be achieved is in error. EPA's Beyond-the-Floor Memorandum and its supporting data also demonstrates that EPA's achievability conclusions around application of ACI are clearly erroneous.

b. EPA finds that no lignite units will need to achieve a removal rate higher than 95% mercury control to meet the New Mercury Limitation of 1.2 lb/TBtu, based on EPA's unit-by-unit calculations, and finds MRY would need 87% removal in the Final Rule. Yet, Minnkota's calculations for MRY show that greater than 90% removal would be required when combusting high mercury content lignite based on test results at the mercury inlet.

47.     Minnkota is harmed by having to comply with a New Mercury

Limitation that is not achievable and is based on flawed and unsupported

technical conclusions.

**THE NEW fPM LIMITATION WILL CAUSE IMMEDIATE AND
IRREPARABLE HARM TO THE NORTH DAKOTA UTILITIES AND
TO MINNKOTA**

48.     EPA's new fPM limit of 0.010 lb/MMBtu will require either the

installation of a baghouse (fabric filter technology) or complete retrofit of

electrostatic precipitators at MRY.  *See* Sargent & Lundy, "Particulate &

Mercury Control Technology Evaluation & Risk Assessment for Proposed

MATS Rule Report," EPA-HQ-OAR-2018-0794-5978 (June 2023)

[hereinafter MATS 2023 Study], **Attachment E**.

49.     ESP improvements may result in fPM reductions. These

upgrades would require substantial modifications, including structural

support modification, and would represent substantial expenditures in cost

per ton removed.  **Attachment E**, at Section 2.3.

50.     Minnkota's harm is immediate. Minnkota would need to begin constructing an ESP upgrade as soon as possible to have any opportunity to meet the new compliance date for the MATS RTR.

51.     For MRY 2, an ESP upgrade may achieve the New fPM Limitation with adequate margin.  However, the MATS 2023 Study finds that vendors would have to complete a more detailed qualitative study and baseline testing to determine whether an ESP rebuild can achieve a low enough fPM rate based on ESP inlet and outlet emissions. **Attachment E**, at Section 2.1.6.  Otherwise, a baghouse would be required. MRY would need 48 months to convert to baghouse technology.  *Id*. at Table 2-2.

52.     ESP upgrades take 36 months to complete. There are 26 units in the country that would need ESP upgrades for a new limitation of 0.010 lb/mmBtu.  *Id*.  Only 4 vendors in the United States can undertake these projects. It is likely that the 36-month estimate will be further protracted due to the dearth of contractors available to perform the work.

53.     Costs of compliance with the New fPM Limitation are overly burdensome, for the following reasons.

54.     Baghouse installation is extremely costly. It is estimated to cost $282,715 per fPM ton removed. *See* **Attachment B**.

55.     ESP retrofits are expensive. NRECA's technical consultant estimates $67,262 per fPM ton removed.  *See* **Attachment B**.

56.     Electric cooperatives have limited financial resources to undertake projects of this magnitude in general and especially when coincident with other environmental compliance projects.

57.     Minnkota is harmed by having to comply with a New fPM Limitation that may not be achievable prior to the compliance deadline, is based on flawed and unsupported technical conclusions, and is very costly.

58.     To comply with the MATS RTR, Minnkota is forced to take measures that immediately increase compliance and operational costs. The MATS RTR impacts Minnkota's ability to supply affordable, reliable energy to its customers. Added costs will place upward pressure on rates for rural customers, particularly when combined with the effects of EPA's other recent electric utility sector-focused rules.

## THE MATS RTR CREATES GRID RELIABILITY CONCERNS
## DUE TO EARLY RETIREMENTS OF COAL-FIRED UNITS

59.     Lignite coal provides the majority of the electric power generated and consumed in North Dakota.  Lignite power plants play a significant role in the regional economy.

60.     Thus, this rule, with its reversal of EPA's position on lignite-fired sources, impacts North Dakota more profoundly than other areas of the country.  These concentrated impacts affect the ability of the North Dakota utilities to maintain adequate generation resources.

61.     Most (if not all) of the lignite plants in North Dakota must make some changes as result of this rule. There will be a marked impact on grid stability and reliability. In addition, increased maintenance needs of new pollution control technology will continue to affect reliability in the longer term.

62.     Units will retire due to the inability to meet the New Mercury or fPM Limitations.

63.     Existing generation resources are unlikely to be adequate in North Dakota to sustain the grid with multiple unit retirements in a short

time frame. Multiple environmental regulations that EPA promulgated this month directly and profoundly impact generation resources in North Dakota.[3] This Final Rule is part of those cumulative reliability and cost impacts on coal-fired generation.

64.     The North American Electric Reliability Corporation (NERC) has predicted continued future shortfalls in North Dakota.[4] The MATS RTR intensifies an already tenuous, overburdened grid in transition.



---

[3] New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions From Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule, 89 Fed. Reg. 39798 (May 9, 2024); Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; Legacy CCR Surface Impoundments, 89 Fed. Reg. 38950 (May 8, 2024); Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category, 89 Fed. Reg. 40198 (May 9, 2024); National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508 (May 7, 2024).
[4] NERC, 2024 Summer Reliability Assessment (May 2024), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2024.pdf.

65.     Dramatic repercussions would flow from the loss of North

Dakota generation units due to the Final Rule. North Dakota Transmission

Authority (NDTA), "Analysis of Proposed EPA MATS Residual Risk and

Technology Review and Potential Effects on Grid Reliability in North

Dakota" (Apr. 3, 2024) [hereinafter NDTA Analysis], **Attachment F**.

66.     The MATS RTR will cause the loss of tax revenue and a decrease

in economic activity for the region if units must shut down.  Retirements

not only economically impact local communities, jobs, and industries, but

put more strain on existing resources to provide reliable and affordable

energy.

67.     The interruption of power delivery from a grid failure would

cause damage to public health.  North Dakotans rely on electricity to heat

their homes during the extreme winter temperatures of the long winter

season.  Affordable and consistent power allows for medical providers to

provide essential services to the elderly, infirm, and to vulnerable

individuals with chronic health conditions.  Evidence from grid failures in

other areas of the country in winter storms Uri and Elliott show the

documented health impacts and morbidity caused by those events.[5]  The

MATS RTR places the portion of the grid serving North Dakota in jeopardy

of failure and resulting consequences.

68.     With respect to MRY, Minnkota would anticipate a loss of jobs.

Minnkota employs approximately 200 people in the vicinity of Center,

North Dakota.  In addition, subcontractors provide services to the plant on

a regular basis.  The nearby BNI Coal mine would be impacted or possibly

close because it sells lignite to MRY. On information and belief, BNI

employs approximately 178 persons at the mine.  In total, the direct cost to

the community from the loss of employment would be staggering. Impacts

from the loss of jobs in the area would have a ripple effect on ancillary

industries, such as nearby service stations, reduced demand for customer

services, and the social and psychological impacts of job loss on the

affected individuals and their families. Premature retirement of units

---

[5] *See, e.g.*, Hanchey, "Mortality Surveillance During Winter Storm Uri, United States – 2021," Disaster Med Public Health Prep (Dec. 2023), https://pubmed.ncbi.nlm.nih.gov/37974501/; Sharma, "Winter Storm Elliott death toll climbs to 56 as thousands still without power in -40 temperatures," Yahoo News (Dec. 26, 2022), https://www.yahoo.com/news/winter-storm-elliot-power-outages-154557710.html.

results in irreversible harm that economically damages Minnkota and impacts the entire region.

69.     EPA failed to account for the costs due to a grid failure in the rulemaking.  In its service area, Minnkota would anticipate that grid failures would cause end users to suffer economic damages such as food spoilage, property damage, lost labor productivity, and loss of life.  The NDTA Analysis discusses these damages in more detail in Section D (Modeling Results).

**SUMMARY OF HARM TO MINNKOTA**

70.     With respect to the New Mercury Limitation, MRY is unable to meet the new limit with its existing technology at full load.  Recent test data suggest that Minnkota will not be able to meet the New Mercury Limitation even at the higher PAC injection rates that EPA assumed to be sufficient to meet the New Mercury Limitation.  Further testing and analysis would need to be performed to identify MRY's emission reduction rate.  If either no feasible technology exists, or if a technology cannot be installed to meet the compliance deadline, the MRY units will be forced to

ultimately cease operation immediately upon the Final Rule compliance date.

71.    With respect to the fPM limitation, Minnkota is unable to meet the New fPM Limitation with its existing technology at full capacity at MRY Unit 2.

72.    An ESP rebuild project must take place at a minimum.  If further study indicates that an ESP upgrade is not sufficient, Minnkota must install a baghouse.  If Minnkota cannot commence these projects – either due to cost or timing – then MRY would be forced to cease operation beginning on the MATS compliance date.

73.    Minnkota is immediately harmed because it must expend financial resources to commence testing and project development to lower its fPM and mercury emissions and even have an opportunity to meet the MATS RTR compliance deadline.

74.    In summary, the Rule may force MRY off-line due to control infeasibility, cost, or project timing. The Rule would cause this dispatchable,

reliable generating resource to operate differently at a substantial cost and permanent loss to Minnkota.

75.     Minnkota's member cooperatives and end users will also be economically impacted.  If MRY must prematurely retire, Minnkota would not have time to construct replacement generation prior to the compliance date for the Final Rule in 2027.  Minnkota would be faced with increased exposure and reliance on an often volatile and constrained MISO market. Past market pricing demonstrates the extraordinary costs to purchase power from the market. The costs of purchasing power off the MISO market may expose Minnkota's membership to a current cap of $3,500 per MWh. A four-day exposure to the MISO market cap (half of the total days of the market conditions resulting from Winter Storm Uri) would result in a total exposure of $236,888,000 to replace the megawatts that MRY 1 and MRY 2 generate (705 MWns cumulatively), thereby eliminating the entire annual operating revenues of MRY. In fact, these staggering costs have bankrupted a small utility recently (Brazos Electric Power

Cooperative) due to power purchases during Winter Storm Uri from the

ERCOT market.

76.    The following Tables compile of all of the harms identified

herein that Minnkota will suffer due to the Final Rule.

## Table A: MRY 1 and 2 Mercury Compliance Costs

| Activity | Cost | Notes |
|----------|------|-------|
| **MRY Unit 2 Capital Costs:** | | |
| Future mercury testing to determine lowest achievable rate | $600,000 | This is a minimum value. |
| Inlet Hg Monitor | $150,000 | To track coal quality |
| WFGD Additive Dosing System | $750,000 | To attempt to reduce mercury emissions further |
| WFGD Oxidizing Reduction Potential (ORP) Monitoring System | $7,500 | For WFGD dosing system feedback |
| Mercury New PAC Silo and injection equipment capital cost to reach the lowest achievable rate | $5,000,000 | Based on industry data from similar projects; This is the total project cost without financing costs. |
| **MRY Unit 2 Operating & Maintenance (O&M) Costs:** | | |
| WFGD Additive costs (based on annual operation) | $1,412,000 | Based on MRY usage rate and supplier pricing |
| Mercury control additional PAC costs (based on annual operation) | $1,300,000 | Based on EPA hypothetical 5.0 lb/MMacf injection rate for 800 MW unit |

| Activity | Cost | Notes |
|---|---|---|
| Mercury control additional Potassium Iodide costs (based on annual operation) | $1,600,000 | Cost based on 2023 MRY Unit 2 usage rate & pricing instead of assuming same as sorbent costs. Cost is $1.4 million more than estimated by EPA. |
|    Incremental Mercury Control O&M cost | $2,412,000 | This is the cost in excess of the current O&M costs. This estimate is based on current compliance of approximately $1.9 million. |
| **Capital & O&M Costs:** | | |
| **Total MRY 2 Costs** | **$8,919,500** | Per MW (440MW) = $18,978 |
| **MRY 1 Projected Costs** | **$4,880,000** | MRY has 235 MW. Based on the cost per MW from itemized costs for MRY 2 |
| **Total for MRY 1 and MRY 2** | **$13,799,500** | |

## Table B: MRY 2 fPM Compliance Costs

| Activity | Cost | Notes |
|---|---|---|
| fPM Feasibility Study | $175,000 | Based on roughly budgetary estimates from Southern Environmental , Inc. |
| Low cost: MRY 2 ESP Rebuild Capital Cost | $36,326,000 | Based on S&L's conceptual cost estimates and inputs from Southern Environmental, Inc. |

| Activity | Cost | Notes |
|---|---|---|
| Low cost: MRY 2 ESP Rebuild Incremental O&M Cost | $530,000 | Incremental costs accounts for costs incurred above what is currently paid for by station for existing PM compliance (i.e. ESP power consumption, fly ash disposal, etc.) |
| Low cost: MRY 2 ESP Rebuild Outage Cost | $1,421,000 | |
| High cost: New MRY 2 Baghouse | $242,083,000 | Based on S&L's conceptual cost estimating |
| Low cost: MRY 2 Baghouse Incremental O&M Cost | $4,047,000 | Incremental costs accounts for costs incurred above what is currently paid for by station for existing PM compliance (i.e. ESP power consumption, fly ash disposal, etc.) |
| Low cost: MRY 2 Baghouse Outage Cost | $507,000 | |
| Total fPM Cost Range: | High – $246,812,000 Low – $38,452,000 | |

### Table C: Minnkota's Total MRY Mercury and fPM Compliance Costs

| Activity | Cost | Notes |
|---|---|---|
| MRY Total Mercury Costs for MRY 1 and MRY 2 | $13,799,500 | From Table above, O&M based on 1 year |
| MRY Total fPM Costs for MRY 2 | High – $246,812,000 Low – $38,452,000 | From Table above, O&M based on 1 year |

| Activity | Cost | Notes |
|---|---|---|
| Total Compliance Cost to MRY | High – $260,611,500<br>Low – $52,251,500 | |

77.     The compliance cost estimates for MRY to comply with the

MATS RTR (assuming its possible for the New Mercury Limit), presented

in the above Tables A, B, and C, equate to between 15% (low fPM

compliance option) to 60% (high fPM compliance option) of Minnkota's

total annual operating revenue. Such expenditures will severely and

permanently harm Minnkota's membership.

78.     Even if the MATS RTR is overturned, the direct costs to

Minnkota, its member cooperatives, and end users cannot be recouped

once spent. These damages are permanent.

* * * *

[Signature Follows on Next Page]

\*   \*   \*

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this ___9___ day of ___June___, 2024, in ___Grand Forks, ND___.


_____
Robert McLennan

# ATTACHMENT A



**Minnkota Power Cooperative, Inc.**
**Milton R. Young Station Units 1 and 2**

# Mercury Testing Results for the MATS Residual Risk and Technology Review

**Rev. 1**

**May 22, 2023**

**Project No.: A14559.013**

S&L Nuclear QA Program Applicable:

☐ Yes

☒ No

55 East Monroe Street

Chicago, IL 60603-5780 USA

312-269-2000

www.sargentlundy.com



# 1. I N T R O D U C T I O N

## 1.1. PURPOSE

Sargent & Lundy (S&L) was retained by Minnkota Power Cooperative, Inc. (Minnkota) to support the evaluation of mercury (Hg) emissions reductions in response to the pre-published rule to amend the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Coal-and Oil-Fired Electric Utility Steam Generating Units (EGUs), commonly known as Mercury and Air Toxics Standards (MATS) published on April 24, 2023 that would require additional Hg emissions reductions on the Milton R. Young (MRY) Station Units 1 and 2. As part of this evaluation, S&L assisted Minnkota in the coordination of a Hg control test campaign to determine if it is feasible to achieve incremental Hg emission reduction on a lignite-fired unit without a fabric filter that is sufficient to meet a 1.2 lb/TBtu Hg emission rate on a continuous basis.

## 1.2. FACILITY BACKGROUND

The MRY station is located approximately seven (7) miles southeast of Center, North Dakota or forty (40) miles northwest of Bismarck, North Dakota on ND Highway 25 at 3401 24th Street SW, Center, North Dakota 58530. MRY station provides energy to the Midcontinent Independent System Operator (MISO) system. MRY station consists of two (2) units. Both MRY units are lignite-fired Babcock and Wilcox (B&W) cyclone boilers. Both boilers fire North Dakota lignite coal supplied from BNI Coal, Ltd.'s Center Mine located in close proximity to the plant. The MRY Unit 1 single wall cyclone boiler (Caroline type, radiant natural circulation) was placed into service in 1970 and has a typical output capacity rating of 257 MWg (gross). The MRY Unit 2 opposed wall cyclone boiler (Carolina type, radiant pump assisted natural circulation) was placed into service in 1977 and has a typical output capacity rating of 470 MWg (gross). Both units utilize selective non-catalytic reduction (SNCR) and separated overfire air (SOFA) systems for NOx control, fuel additive (or halide) injection system and non-halogenated (or non-brominated) powdered activated carbon (PAC) for Hg control, dry electrostatic precipitators (ESP) for PM emissions control, and wet flue gas desulfurization (WFGD) systems for sulfur dioxide ($SO_2$) control.

### 1.2.1. Current Hg Control System Specifications

The existing Hg control system is designed to control Hg emissions below 4.0 lb/TBtu using a combination of M-Prove halide injection and non-halogenated PAC. The M-Prove is directly applied on the coal belt prior to reaching coal silos, whereas the non-halogenated PAC is injected into the duct downstream of the air pre-heater (APH). Additional information on the design of the existing fuel additive and PAC injection systems for MRY Units 1 and 2 are summarized below:

- MRY Common Non-brominated PAC Storage Silo:
    - PAC Utilized: Cabot DARCO® Hg-H non-halogenated PAC
    - Single storage silo with three (3) outlet cones or discharge connections. Each cone is connected to a feeder train (A, B, and C).
    - Feeder Train A is dedicated to MRY Unit 1
    - Feeder Trains B and C are dedicated to MRY Unit 2
    - Storage Volume: 4,200 cu.ft. (Nominal)
    - Capacity: 105,000 lbs. (based on PAC density of 25 lbs/cu.ft.)



- o Storage duration: Approximately 18 days based on silo capacity of 105,000 lbs. and total combined PAC consumption rate of 244 lb/hr (MRY Unit 1 at 86 lb/hr and MRY Unit 2 at 158 lb/hr)

- MRY Unit 1 (257 MWg)
  - o Fuel Additive: ARQ (formerly ADA) M-Prove
    - Average M-Prove application rate: 6.0 ppm
    - Maximum M-Prove dosage pump rate: 18.0 ppm
  - o Non-brominated PAC Injection:
    - Maximum Train A PAC injection at 100% feeder rate: 1.43 lb/min (approximately 86 lb/hr or 1.06 lb/MMacf)
    - Transport piping limited to 192 lb/hr (2.37 lb/MMacf) to avoid pluggage issues
    - PAC injected into flue gas using eight (8) lances located across the APH outlet duct.
    - The lance depths vary from 18" – 54" to provide even distribution of PAC into the flue gas stream

- MRY Unit 2 (470 MWg)
  - o Fuel Additive: ARQ (formerly ADA) M-Prove
    - Average M-Prove application rate: 8.0 ppm
    - Maximum M-Prove dosage pump rate: 18.0 ppm
  - o Non-brominated PAC Injection:
    - Maximum Train B and C PAC injection at 100% feeder rate: 2.64 lb/min (approximately 158 lb/hr or 1.12 lb/MMacf)
    - PAC injected into flue gas using eight (8) lances located across each of the North and South APH outlet ducts for a total of sixteen (16) lances.
    - The lance depths vary from 15" – 78" to provide even distribution of PAC into the flue gas stream

# 2. TEST CAMPAIGN SUMMARY

The MRY Units 1 and 2 test campaign was completed in phases to control testing variables and to accommodate vendor availability, and scheduled outages. Testing included:

- November 23, 2023 to November 24, 2023: Maximizing MRY Unit 1 capabilities of the existing M-Prove fuel additive system and non-halogenated PAC injection (at 100% feeder rate) to evaluate if the current system can meet 1.2 lb/TBtu.

- December 19, 2023 to December 20, 2023: Maximizing MRY Unit 2 capabilities of the existing M-Prove fuel additive system and non-halogenated PAC injection (at 100% feeder rate) to evaluate if the current system can meet 1.2 lb/TBtu.

- March 19, 2024 to March 23, 2024: Utilizing a rental bulk bag unloading (BBU) system provided by Motus Group tied into the existing MRY Unit 1 PAC conveying lines and injection lances to inject brominated PAC (or BPAC), ARQ's FastPAC Platinum®, at varied injection rates ranging from 100 lb/hr (or 1.23 lb/MMacf) to a maximum of 185 lb/hr (2.28 lb/MMacf) to stay below the transport piping pluggage limit. The majority of this testing also included maximizing MRY Unit 1 capabilities of the existing M-Prove fuel additive system; however, test runs on March 22 and March 23 included BPAC injection with no fuel additive usage. Individual coal samples were taken and analyzed by a 3rd party lab for determination of inlet Hg coal content.

- March 28, 2024 to April 1, 2024: Individual coal samples were taken and analyzed by a 3rd party lab for determination of inlet Hg coal content.

This testing was not able to be completed during the proposed rule's short comment period of only 60 days. Due to timing of boiler cleaning outages, time required to develop a test protocol and schedule, and coordination with multiple vendors, rental equipment availability, various site activities, and unplanned unit upsets/outages, a much longer duration was needed.

## 2.1. INCREMENTAL HG REMOVAL TEST RESULTS

The Hg emissions achievable based on maximizing current design capabilities using non-brominated PAC and M-Prove <u>without any modifications</u> is summarized below for both MRY Units 1 and 2.

### Table 2-1 — MRY Units 1 and 2 Existing System Capabilities

| Parameter | Units | MRY Unit 1 18 ppm M-Prove and 100% Non-brominated PAC | MRY Unit 2 18 ppm M-Prove and 100% Non-brominated PAC |
|---|---|---|---|
| Unit Load during testing | MWg | 242 | 469 |
| PAC Injection Rate | lb/MMacf | 1.06 | 1.12 |
| Avg. Sorbent Trap Hg Emissions | lb/TBtu | 2.17 | 1.61 |

Based on maximizing injection capabilities of the existing systems (<u>without any modifications</u>), the test results show that MRY Unit 1 and MRY Unit 2 cannot achieve the proposed MATS limit of 1.2 lb/TBtu.



## 2.2. BROMINATED PAC PERFORMANCE

The proposed rule assumes a 90% Hg removal efficiency is feasible from all lignite units, even those equipped with an ESP.

- In the Beyond-the-Floor memo (Docket ID No. EPA-HQ-OAR-2009-0234), it states that "[g]reater than 90 percent control can be achieved at lignite-fired units at a 2.0 lb/MMacf injection rate for units with installed fabric filter and using treated (*i.e.,* brominated) activated carbon or at an injection rate of 3.0 lb/MMacf for units using treated activated carbon with installed ESPs."

- According to the proposed MATS rule, EPA reiterates that "[i]n the beyond-the-floor analysis in the final MATS rule, we noted that the results from various demonstration projects suggest that greater than 90 percent Hg control can be achieved at lignite-fired units using brominated activated carbon sorbent at an injection rate of 2.0 lb/MMacf for units with installed FFs for PM control and at an injection rate of 3.0 lb/MMacf for units with installed ESPs for PM control."

The Final Rule relies on the same assumption. In EPA's 2024 Technology Memorandum, EPA finds, "In the beyond-the-floor analysis in the final MATS rule, we noted that the results from various demonstration projects suggest that greater than 90 percent Hg control can be achieved at lignite- fired units using brominated activated carbon sorbent at an injection rate of 2.0 lb/MMacf for units with installed Fabric Filters for PM control and at an injection rate of 3.0 lb/MMacf for units with installed ESPs for PM control. . . all units (in 2022) would have needed to control their Hg emissions to less than 95 percent to meet an emission standard of 1.2 lb/TBtu. Based on this, we expect that the units could meet the proposed, more stringent, emission standard of 1.2 lb/TBtu by utilizing brominated activated carbon at the injection rates suggested in the beyond-the-floor memorandum from the final MATS rule."

During the MRY Unit 1 March testing, MRY secured a temporary rental injection skid. The materials of construction of the existing PAC silo (common to MRY Units 1 and 2) is not currently compatible to store halogenated PAC. The silo would require an internal coating to prevent corrosion (but could otherwise be reused). The temporary rental injection skid avoided corrosion to the existing silo, but also allowed for decoupling MRY Unit 1 from the common PAC storage silo to prevent interfering with MRY Unit 2 Hg control operation.

To achieve a dosage rate of 3.0 lb/MMacf, an injection rate of 245 lb/hr would be required which would exceed the existing MRY Unit 1 Train A PAC injection/transport system limit of 192 lb/hr (2.37 lb/MMacf). The maximum BPAC injection rate tested was limited to 185 lb/hr (2.28 lb/MMacf) to avoid line pluggage.

The Hg emissions reductions achievable based on maximizing the use of BPAC (without any fuel additives) supplied via a temporary rental injection system tied into the existing transport piping/lances is summarized below for MRY Unit 1. A higher PAC injection rate was not possible due to maximum capability of the existing transport piping while preventing pluggage.

**Table 2-2 — MRY Unit 1 Existing System Capabilities using Brominated PAC**

| Parameter | Units | MRY Unit 1<br>185 lb/hr BPAC |
|---|---|---|
| Unit Load during testing | MWg | 257.1 |
| PAC Injection Rate | lb/MMacf | 2.28 |
| Avg. Sorbent Trap Hg Emissions | lb/TBtu | 2.57 |

At the current injection capabilities of the existing system (i.e. requiring minimal modifications/retrofit of the existing equipment), BPAC cannot be applied to reduce Hg emissions to 1.2 lb/TBtu.

## 2.3. MRY MERCURY REMOVAL EFFICIENCY

### 2.3.1. Lignite Coal Mercury Content

To calculate an overall mercury removal efficiency needed to control to 1.2 lb/TBtu, the coal Hg inlet must be defined.

- EPA reported the "Hg Inlet" level based on the maximum Hg content of the range of feedstock coals that the EPA assumes is available to each of the plants in the Integrated Planning Model (IPM).
    - With respect to MRY, EPA reported "Hg inlet":
        - MRY Units 1 and 2: 7.81 lb/TBtu

- According to the proposed rule, EPA estimated the 2021 Hg inlet concentration from actual 2021 fuel usage and 2021 Hg emissions reported to the EPA. However, based on the 2024 Technical Memo, EPA updated the information based on 2022 information.
    - With respect to MRY, EPA "Estimated Hg inlet" content documented in 2023 and 2024 Technical Memo is summarized in the table below:

**Table 2-3 — EPA Estimated North Dakota Lignite Coal Hg Inlet**

| Parameter | Units | 2023 Technical Memo<br>(Estimated 2021 Hg Inlet) | 2024 Technical Memo<br>(Estimated 2022 Hg Inlet) |
|---|---|---|---|
| MRY Unit 1 | lb/TBtu | 7.78 | 9.70 |
| MRY Unit 2 | lb/TBtu | 7.79 | 9.70 |

- However, recent test information and other resources for the North Dakota lignite fired at MRY has indicated that significantly higher inlet Hg is experienced at MRY:
    - Within the BNI Coal, Ltd.'s Center Mine, the Kinneman Creek (KC) and Hagel (HA) beds are targeted for the coal supply for MRY. Based on the 2021 BNI coal data (constructed from Carlson reports), the avg. coal Hg content is approximately 16 lb/TBtu for KC and 15 lb/TBtu for HA.
    - The variability of the projected lignite coal quality received from the Center Mine from 2025 through 2036 is shown in the following table.



**Table 2-4 — Forecasted 2025 – 2036 Center Mine Ultimate Coal Analyses (As-Received)**

| Fuel Parameter | Units | Average | Minimum | Maximum |
|---|---|---|---|---|
| Mercury Content | ppm | 0.091 | 0.053 | 0.184 |
| Higher Heating Value (HHV) | Btu/lb | 6,625 | 6,489 | 6,739 |
| Estimated Hg Emission | lb/TBtu | 8.41 | 4.79 | 17.42 |

o   Industry experience has shown that lignite coal deposits vary significantly in quality, including fuel combustion performance, mineral content, and Hg content, resulting in a coal that can change on a day-to-day basis depending on the coal seam being mined at the time. This variability was demonstrated by the range of coal analyses from MRY Unit 1 recent short-term testing in 2024 (average = 10.1 lb/TBtu, with individual results ranging from 4.9 – 18.6 lb/TBtu over the course of five (5) days of testing). Individual coal samples and how they varied across coal feeders, per day are shown in following table.

**Table 2-5 — MRY Unit 1 Coal Sampling Analysis**

| Date | Sample | Coal Hg Inlet (lb/TBtu) | | | | |
|---|---|---|---|---|---|---|
| | | Feeder #1 | Feeder #3 | Feeder #4 | Feeder #5 | Feeder #7 |
| 19-Mar-24 | #1@ 0730 hrs | 14.5 | 13.0 | - | - | - |
| | #2@ 1600 hrs | - | - | 11.1 | 8.2 | 8.0 |
| 20-Mar-24 | #3@ 0100 hrs | 12.5 | 10.5 | - | - | - |
| 20-Mar-24 | #1@ 0730 hrs | 6.2 | 7.9 | - | - | - |
| | #2@ 1600 hrs | - | - | 7.2 | 10.1 | 18.5 |
| 21-Mar-24 | #3@ 0100 hrs | 10.9 | 8.1 | - | - | - |
| 21-Mar-24 | #1@ 0730 hrs | 14.1 | 7.9 | - | - | - |
| | #2@ 1600 hrs | - | - | 18.6 | 4.9 | 7.1 |
| 22-Mar-24 | #3@ 0100 hrs | 7.2 | 7.1 | - | - | - |
| 22-Mar-24 | #1@ 0700 hrs | 10.4 | 13.4 | - | - | - |
| | #2@ 1600 hrs | - | - | 6.9 | 11.0 | 11.4 |
| 23-Mar-24 | #3@ 0100 hrs | 9.2 | 7.8 | - | - | - |
| 28-Mar-24 | #1@ 1030 hrs | 10.2 | 8.3 | - | - | - |
| | #2@ 1500 hrs | - | - | 14.9 | 11.9 | 9.5 |
| 1-Apr-24 | #1@ 0930 hrs | 16.3 | 8.0 | - | - | - |
| | #2@ 1300 hrs | - | - | 6.0 | 12.1 | 12.3 |
| | #3@ 1500 hrs | 10.2 | 6.9 | - | - | - |

### 2.3.2. Required Mercury Removal Based on Lignite Coal Mercury Content

Based on the recent Hg fuel analyses, Hg control higher than 90% would actually be required based on the range of inlet coal Hg content expected to control to 1.2 lb/TBtu (i.e. keeping the outlet value calculated by the EPA constant). Note that control to this value does not offer any operating margin for potential exceedances that may occur due to response delays associated with coal variability. The following table identifies the required Hg control needed based on several different coal Hg content references. Based on these estimations, any Hg control approach would need to be able to accommodate a wide range of inlet Hg in order to optimize operating costs long-term.

**Table 2-6 — Hypothetical Hg Emissions and Control Performance Based on Coal Analyses**

| Fuel Hg Content Reference | Coal Hg Inlet (lb/TBtu) | Est. Hg Control at 4.0 lb/TBtu (%) | Est. Hg Control at 1.2 lb/TBtu (%) |
|---|---|---|---|
| **EPA Technical Memo** | | | |
| 2023 Table 11 Docket ID. No: EPA-HQ-OAR-2018-0794[1] | 7.81 | 48.8 | 84.6 |
| 2024 Table 10 Docket ID. No: EPA-HQ-OAR-2018-0794[2] | 9.70 | 58.6 | 87.6 |
| **2024 MRY Unit 1 Test Campaign** | | | |
| Average | 10.1 | 60.4 | 88.1 |
| Maximum | 18.6 | 78.5 | 93.5 |
| Minimum | 4.9 | 18.4 | 75.5 |
| **Center Mine Forecast** | | | |
| Average | 8.41 | 52.4 | 85.7 |
| Maximum | 17.42 | 77.0 | 93.1 |
| Minimum | 4.79 | 16.5 | 75.0 |

### 2.3.3. Projected Mercury Removal Based 3.0 lb/MMacf BPAC

Based on the maximum BPAC rate that MRY Unit 1 was able to test due to current system limitations (185 lb/hr or 2.28 lb/MMacf), the figure below plots the estimated percent removal at the higher injection rate of 3.0 lb/MMacf BPAC using all measurements from the MRY Unit 1 March testing (with and without fuel additive usage). The plotted values demonstrate a trend line in which BPAC cannot even achieve 80% Hg removal efficiency.

---

[1] Benish S. et al. (January 2023). *2023 Technology Review for the Coal- and Oil-Fired EGU Source Category.* Environmental Protection Agency.

[2] Benish S. et al. (January 2024). *2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category.* Environmental Protection Agency.



**Figure 2-1 — MRY Unit 1 Existing System Mercury Removal Performance Capabilities using Brominated PAC**



This result is contrary to EPA's assumption that BPAC at a rate of 3.0 lb/MMacf can be used to result in a 90% removal efficiency. The plotted curve shown in the figure shows a leveling off such that increasing the amount of sorbent results in diminishing improvement in Hg control. The projected curve based on the test campaign results shows this leveling off taking place somewhere less than 80% capture.

Although the plotted values do not support a conclusion that the new Hg 1.2 lb/TBtu limit can be met, further investigation into other Hg control options in combination with upgrading/optimizing existing Hg control equipment would be required to determine the lowest mercury emission rate in lb/TBtu that can be achieved on a long-term basis, considering the range of fuel Hg variability and other technological challenges inherent in capturing Hg resulting from lignite that have been documented to occur. Some proposed options for additional Hg control include:

- Increased fuel additive rate

- Improved reliability of fuel additive concentration in relation to real-time coal firing rates

- Implementation of inlet Hg monitor for improved feedback control of Hg control systems

- Improved lance design to achieve ideal distribution of PAC at all typical unit operating conditions

- Application of WFGD re-emission control additive



Further analysis, engineering, testing and equipment modifications would be necessary to determine if these options would improve Hg control. However, it is clear that adding more brominated PAC, as was assumed in the Final Rule, is not adequate, given the properties of lignite, compliance margin necessary, and limitation of mine mouth facilities in regards to fuel staging (i.e. must use coal received from mine; unable to fire only certain coals that have a more ideal or predictable range of Hg content during a 30-day rolling average).

It should be noted that the achievable Hg emission rate should not be construed to represent an enforceable regulatory or proposed permit limit. Corresponding permit limits must consider normal operating fluctuations and coal variability and take into account a minimum additional 20% margin for these fluctuations. Since a combination of new and/or upgraded control systems would be expected to be required, obtaining a guarantee from a single vendor to ensure that the unit achieves compliance below the permit limit will be challenging.

# 3. EPA COST VALIDITY

## 3.1.1. Current Hg Compliance Cost Effectiveness (4.0 lb/TBtu)

With respect to MRY, EPA estimated the cost effectiveness for current 2021 Hg emissions is shown below in an excerpt from Table 12 in 2023 Technology Review for the Coal- and Oil-Fired EGU Source Category (Docket ID. No: EPA-HQ-OAR-2018-0794).

TABLE 12. ESTIMATED COST-EFFECTIVENESS FOR CONTROL OF MERCURY IN 2021 AT LIGNITE-FIRED EGUS

| Plant Name | PM Control | Est Hg Inlet (lb/TBtu) | Est Hg In (lb) | 2021 Hg Out (lb) | Est Hg Out (lb) | Avg Sorbent injection (lb/MMacf) | Avg Sorbent (lb/hr) | Sorbent Cost ($/lb) ** | Est 2021 Sorbent Used (lb) | Est 2021 Sorbent Cost ($) | Est 2021 Additive Cost ($) * | 2021 C/E ($/lb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spiritwood Station 1 | FF | 5.03 | 21.3 | 1.9 | 7.9 | 4.0 | 13.2 | $0.83 | 111,662 | $92,680 | $92,680 | $13,776 |
| Leland Olds 1 | ESPC | 7.79 | 91.8 | 2.5 | 29.6 | 3.9 | 45.0 | $0.97 | 299,689 | $290,699 | $290,699 | $9,343 |
| Leland Olds 2 | ESPC | 7.79 | 142.2 | 3.0 | 55.1 | 2.5 | 55.0 | $0.97 | 294,762 | $285,919 | $285,919 | $6,563 |
| Milton R Young 2 | ESPC | 7.79 | 130.1 | 3.2 | 53.5 | 1.6 | 43.0 | $0.83 | 177,431 | $147,267 | $147,267 | $3,844 |
| Milton R Young 1 | ESPC | 7.78 | 255.5 | 3.2 | 106.2 | 1.3 | 19.0 | $0.83 | 273,988 | $227,410 | $227,410 | $3,046 |
| Major Oak Power 1 | FF | 14.62 | 193.6 | 1.2 | 16.4 | 1.9 | - | $0.83 | 161,759 | $134,260 | $134,260 | $1,515 |
| Major Oak Power 2 | FF | 14.65 | 207.0 | 1.3 | 18.5 | 1.9 | - | $0.83 | 172,603 | $143,261 | $143,261 | $1,519 |
| Red Hills Generating Facility 1 | FF | 12.40 | 192.7 | 1.3 | 20.7 | 2.6 | 36.0 | $0.76 | 259,600 | $197,296 | $197,296 | $2,293 |
| Red Hills Generating Facility 2 | FF | 12.40 | 209.4 | 1.4 | 22.9 | 2.4 | 36.0 | $0.76 | 262,834 | $199,754 | $199,754 | $2,141 |
| Oak Grove 1 | FF | 14.60 | 980.0 | 2.0 | 134.9 | 0.1 | 8.0 | $1.15 | 65,331 | $75,131 | $75,131 | $178 |
| Martin Lake 1 | ESPC | 8.22 | 392.7 | 2.3 | 111.0 | 1.0 | 39.0 | $0.97 | 313,150 | $303,755 | $303,755 | $2,156 |
| Oak Grove 2 | FF | 14.88 | 882.2 | 2.6 | 154.2 | 0.3 | 17.0 | $1.15 | 126,484 | $145,456 | $145,456 | $397 |
| San Miguel 1 | ESPC | 14.62 | 346.6 | 2.8 | 66.7 | 2.7 | 59.5 | $0.97 | 418,050 | $405,509 | $405,509 | $2,897 |
| Martin Lake 2 | ESPC | 8.13 | 331.1 | 3.0 | 121.7 | 3.0 | 117.0 | $0.97 | 809,959 | $785,660 | $785,660 | $7,504 |
| Martin Lake 3 | ESPC | 7.85 | 372.8 | 3.0 | 144.1 | 3.4 | 126.0 | $0.97 | 1,046,260 | $1,014,872 | $1,014,872 | $8,877 |

\* Additive costs are unknown. For this analysis, the EPA assumed the additive costs are the same, annually, as the sorbent costs.
\*\* Bolded costs are those that were provided to the EPA in the 2022 CAA section 114 information survey

**Response:** Flaws in EPA's cost analysis for current compliance:

- Est. Hg In (lb) & Hg Out (lb)
  - Table 12 would appear to have flipped MRY Unit 1 and Unit 2 in the table, utilizing the higher MRY Unit 2 operating conditions (heat input, hg loading, etc.) for the smaller sized Unit 1 and vice versa.

- PAC Injection Rate:
  - Table 12 Avg. Sorbent (lb/hr) – EPA noted MRY Unit 1: 19.0 lb/hr and MRY Unit 2: 43.0 lb/hr to achieve controlled Hg rate of 3.2 lb/TBtu.
  - Minnkota PAC sorbent injection rates to achieve controlled Hg rate of 3.85 lb/TBtu for MRY Unit 1 is expected to be 86 lb/hr and for MRY Unit 2 is 158 lb/hr.

- Cost of PAC:
  - Table 12 non-brominated PAC sorbent cost – EPA assumed a cost of $0.83/lb.
  - In the 2024 Technical Memo, EPA adjusted this cost down to $0.80/lb.
  - Based on MRY operational costs for 2023, non-brominated PAC sorbent cost is $0.86/lb.
  - Based on MRY operational costs for 2023, actual non-brominated PAC costs for achieving current compliance with 4.0 lb/TBtu indicated MRY Unit 1: $119,813 and MRY Unit 2: $329,328



- Cost of Fuel Additive:
  - Table 12 Est. 2021 Additive Cost – EPA noted that "Additive costs are unknown. For this analysis, the EPA assumed the additive costs are the same, annually, as the sorbent costs." And lists costs as MRY Unit 1: $227,410 and MRY Unit 2: $147,267
  - Based on MRY operational costs for 2023, actual fuel additive costs for achieving current compliance with 4.0 lb/TBtu indicated MRY Unit 1 $715,157 and MRY Unit 2: $1,574,793.
  - Based on the actual 2023 fuel additive usage rates and costs, EPA's underestimate results in $487,747 and $1,347,383 that should have been included in the cost analysis for MRY Units 1 and 2, respectively.

### 3.1.2. Future Hg Compliance Cost Effectiveness (1.2 lb/TBtu)

EPA calculated unit-level cost-effectiveness to meet the proposed, more stringent, emissions standard using brominated activated carbon at an injection rate of 5.0 lb/MMacf for units with an ESP for PM control or at an injection rate of 2.5 lb/MMacf for units with fabric filter for PM control.

With respect to MRY, the EPA estimated the cost effectiveness (assuming 2021 operational characteristics) is shown below in an excerpt from Table 13 in 2023 Technology Review for the Coal- and Oil-Fired EGU Source Category (Docket ID. No: EPA-HQ-OAR-2018-0794):

TABLE 13. ESTIMATED COST-EFFECTIVENESS TO MEET A REVISED MERCURY OF 1.2 LB/TBTU AT LIGNITE-FIRED EGUS (ASSUMING 2021 OPERATIONAL CHARACTERISICS)

| Plant Name | PM Control | Est Hg Inlet (lb/TBtu) | Est Hg In (lb) | Hg Out (lb) | Br-ACI rates (lb/MMacf) | Est Br-AC Sorbent Used (lb) | Br-AC cost ($) | C/E ($/lb) assuming no chemical additives | C/E ($/lb) assuming previous chemical additives |
|---|---|---|---|---|---|---|---|---|---|
| Spiritwood Station 1 | FF | 5.03 | 21.3 | 5.09 | 3.0 | 83,123 | $95,592 | $5,884 | $11,589 |
| Leland Olds 1 | ESPC | 7.79 | 91.8 | 14.15 | 5.0 | 385,175 | $442,951 | $5,702 | $9,444 |
| Leland Olds 2 | ESPC | 7.79 | 142.2 | 21.90 | 5.0 | 595,945 | $685,337 | $5,695 | $8,071 |
| Milton R Young 2 | ESPC | 7.79 | 130.1 | 20.05 | 5.0 | 545,753 | $627,616 | $5,702 | $7,040 |
| Milton R Young 1 | ESPC | 7.78 | 255.5 | 39.42 | 5.0 | 1,072,786 | $1,233,703 | $5,709 | $6,761 |
| Major Oak Power 1 | FF | 14.62 | 193.6 | 15.89 | 3.0 | 259,507 | $298,433 | $1,679 | $2,434 |
| Major Oak Power 2 | FF | 14.65 | 207.0 | 16.96 | 3.0 | 276,903 | $318,439 | $1,675 | $2,429 |
| Red Hills Generating Facility 1 | FF | 12.40 | 192.7 | 18.65 | 3.0 | 304,496 | $350,170 | $2,011 | $3,145 |
| Red Hills Generating Facility 2 | FF | 12.40 | 209.4 | 20.26 | 3.0 | 330,893 | $380,526 | $2,011 | $3,067 |
| Oak Grove 1 | FF | 14.60 | 980.0 | 80.56 | 3.0 | 1,315,485 | $1,512,808 | $1,682 | $1,765 |
| Martin Lake 1 | ESPC | 8.22 | 392.7 | 57.35 | 5.0 | 1,560,741 | $1,794,852 | $5,352 | $6,257 |
| Oak Grove 2 | FF | 14.88 | 887.2 | 71.55 | 3.0 | 1,168,333 | $1,343,583 | $1,647 | $1,826 |
| San Miguel 1 | ESPC | 14.62 | 346.6 | 28.45 | 5.0 | 774,167 | $890,292 | $2,798 | $4,073 |
| Martin Lake 2 | ESPC | 8.13 | 331.1 | 48.90 | 5.0 | 1,330,919 | $1,530,557 | $5,423 | $8,207 |
| Martin Lake 3 | ESPC | 7.85 | 372.8 | 56.99 | 5.0 | 1,550,850 | $1,783,478 | $5,647 | $8,861 |

EPA's underlined_incremental cost-effectiveness per the 2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category (Docket ID. No: EPA-HQ-OAR-2018-0794) is based on a model 800 MW Gulf Coast lignite-fired EGU with a heat rate of 11,000 Btu/kWh operating at an 80% capacity factor and a Hg concentration of 25.0 lb/TBtu, resulting in an incremental cost-effectiveness of $28,176 per pound of Hg controlled. It assumes that the unit currently meets a Hg emission standard of 4.0 lb/TBtu using an injection rate of 2.5 lb/MMacf of non-brominated activated carbon at a sorbent cost of $0.80/lb and that the

unit can meet a Hg emission standard of 1.2 lb/TBtu using an injection rate of 5.0 lb/MMacf of brominated activated carbon at a sorbent cost of $1.15/lb.

- Note that the example does not include fuel additives or any equipment upgrade costs.
- EPA made following changes to the calculations between 2023 and 2024 Technical Memo's:
  - EPA updated the Gulf Coast Hg concentration from 14.9 lb/TBtu (2023) to 25.0 lb/TBtu (2024). This resulted in the baseline annual uncontrolled Hg emissions to change from 919 lb Hg to 1,542 lb Hg.
  - EPA corrected the formula for conversion of sorbent injection rate from lb/MMacf to lb/hr by adjusting the conversion factor from (520 R / 785 R) to (785 R / 520 R). The conversion factor was applied incorrectly in 2023 Technical Memo.
  - EPA added an additional factor to update the formula for conversion of sorbent injection rate from lb/MMacf to lb/hr which was not previously accounted for in 2023 Technical Memo.
- For comparison with the values calculated by the EPA in Table 13, it should be noted that the 2024 calculated cost effectiveness of the 800 MW example used by the EPA to meet 1.2 lb/TBtu, without fuel additives, is $5,083 per pound of Hg controlled.

**Response:** Flaws in EPA's cost analysis for future compliance with 1.2 lb/TBtu:
- Est. Hg In (lb) & Hg Out (lb)
  - See previous responses on Table 12 for flipped MRY Unit 1 and MRY Unit 2 unit information/sizing and cost of fuel additive.

- BPAC Injection Rate:
  - EPA's cost analysis assumes lignite units with an ESP can achieve 1.2 lb/TBtu, which has not been demonstrated. The injection level has a direct bearing on the operational costs because it dictates the amount of BPAC necessary to reduce Hg emissions. Therefore, cost calculations are hypothetical because no project data demonstrates what the injection level would be, if 1.2 lb/TBtu is feasible.
  - Although the overall feasibility of complying with the proposed Hg limit is undetermined, the testing confirms that based on maximizing injection capabilities of the existing systems, MRY's current equipment configuration cannot achieve 1.2 lb/TBtu.

- Cost of BPAC:
  - Table 13 brominated PAC sorbent cost – EPA assumed of $1.15/lb.
  - MRY Unit 1 test campaign brominated PAC cost = $1.25/lb.

- Missing capital costs:
  - Irrespective of feasibility, EPA calculated cost-effectiveness shown in Table 13 does not include capital costs for modifying, upgrading and/or adding new equipment that would be necessary for the MRY Station due to limitations of existing equipment.
  - Modification to the existing PAC injection system, would include, but not be limited to, the following:
    - The materials of construction of the existing PAC silo (common to MRY Units 1 and 2) is not currently compatible to store halogenated PAC. The silo would require an internal coating to prevent corrosion in order to store brominated PAC.

- New feeding equipment, transport piping and injection lances would be required to accommodate a higher injection rate.

- As the existing PAC storage silo is shared by MRY Units 1 and 2, the higher injection rate required for achieving 3.0 lb/MMacf for both units would reduce the total storage duration to less than seven (7) days of storage. Due to the weather experienced at the site and the remote location, seven (7) days of storage is recommended for each unit. Improved equipment redundancy would also likely be required to accommodate the range of coal Hg expected to be experienced in the future. Therefore, it is likely that the existing equipment would be dedicated to MRY Unit 1, and a separate silo would be required for MRY Unit 2 to ensure adequate supply, turndown flexibility, and reliability is achieved to maintain compliance with a defined Hg emission limit.

  o As such, a new MRY Unit 2 system would be required to achieve higher injection rates of PAC. An analogous project to install Hg control equipment at a 500 MW coal-fired unit in 2021 costs roughly $5.0 million dollars, based on S&L internal mercury control database, actual project costs from recent relevant projects, and adjusted for MRY specific design.

Overall, the cost-effectiveness calculated is still a substantial under-estimation for the incremental Hg control on MRY Units 1 and 2.

- To provide an example, hypothetical MRY Unit 2 costs are summarized in the following table to underscore the magnitude of dollars that EPA failed to include in its calculations and that must be expended by Minnkota.

- Note the table below does not include or account for any costs associated with MRY Unit 1 system upgrades.

**Table 3-1 — Example MRY Unit 2 Cost Underestimations Summary**

| Parameter | EPA Example Hypothetical 800 MW | EPA Assumed MRY U2 Costs 447 MW | Est. Actual MRY U2 Costs 447 MW |
|---|---|---|---|
| Current Hg Compliance (4.0 lb/TBtu) Cost [1] | $2.6 M | $0.3 M | $1.9 M |
| Current Hg Removed | 1,295 lb | 77 lb | 149 lb |
| Current C/E ($ per lb Hg Removed) | 2,004 | 3,845 | 12,754 |
| Hg Control System Annualized Capital Cost | Not included | Not included | $472k [2] |
| BPAC Cost @ 5 lb/MMacf | $7.5 M | $0.6 M | $1.3 M [3] |
| M-Prove Cost | Not included | $0.2 M | $1.6 M [4] |
| Future Hg Compliance (@ 5 lb/MMacf) Cost | $7.5 M | $0.8 M | $3.4 M |
| Future Hg Removed (EPA Assumed @ 1.2 lb/TBtu) | 1,447 lb [5] | 110 lb | 216 lb |
| Future C/E ($ per lb Hg Removed) | 5,083 | 7,040 | 15,678 |
| Incremental C/E ($ per lb Hg Removed) | 28,176 | 14,360 | 22,217 |

Note 1 – EPA example only based on sorbent. EPA assumed current compliance cost includes sorbent and chemical fuel additive. Est. actual cost based on 2023 MRY Unit 2 usage rate & pricing for both sorbent and chemical additive.

Note 2 – Cost of $5.0 million dollars from S&L project database was annualized using a capital recovery factor calculated based on annual interest rate of 7% (pre-tax marginal rate of return on private investment, EPA Cost Manual Section 5) and 20 year evaluation period (EPA Cost Manual Section 6).

Note 3 – Cost based on EPA assumed rate but using 2023 MRY BPAC pricing.

Note 4 – Cost based on 2023 MRY Unit 2 usage rate & pricing instead of assuming same as sorbent costs.

Note 5 – Based on calculated value for EPA example inlet Hg of 1,542 lbs (current Hg coal content) – 95 lbs (future emitted amount). However, the EPA example identifies 1,468 lb for the incremental cost effectiveness calculation.

# ATTACHMENT B

Technical Comments on
National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-fired
Electric Utility Steam Generating Units Review of Residual Risk and Technology

*Prepared by*

J. Edward Cichanowicz
Consultant
Saratoga, CA

James Marchetti
Consultant
Washington, DC

Michael C. Hein
Hein Analytics, LLC
Whitefish, MT

*Prepared for the*

National Rural Electric Cooperative Association
American Public Power Association
America's Power
Midwest Ozone Group
NAACO
National Mining Association
Power Generators Air Coalition

June 19, 2023

## Table of Contents

1.   Summary of Flaws in EPA's Approach ...................................................................................... 1

2.   Introduction.............................................................................................................................. 3

3.   Description of EPA Reference PM Database ............................................................................. 5
     3.1    Coal Fleet Inventory ...................................................................................................... 5
     3.2    Database Characteristics ............................................................................................... 6
            3.2.1   Selection of Sample Year, Quarter................................................................... 6
            3.2.2   Number of Samples .......................................................................................... 7
            3.2.3   PM Data Selection and Analysis........................................................................ 8
            3.2.4   Example Cases .................................................................................................. 9
     3.3    Conclusions ................................................................................................................. 10

4.   Coal Fleet PM Emissions Characteristics ............................................................................... 12
            4.1.1   PM Rate of 0.015 lbs/MBtu ........................................................................... 13
            4.1.2   PM Rate of 0.010 lbs/MBtu ........................................................................... 13
            4.1.3   PM Rate of 0.006 lbs/MBtu ........................................................................... 13

5.   CRITIQUE OF COST-EFFECTIVENESS CALCULATIONS................................................................14
     5.1    EPA Evaluation ............................................................................................................ 14
            5.1.1   EPA Study Inputs............................................................................................. 14
            5.1.2   EPA Results ..................................................................................................... 16
     5.2    Industry Study............................................................................................................. 17
            5.2.1   Revised Cost Inputs ........................................................................................ 17
            5.2.2   Cost Effectiveness Results .............................................................................. 19
     5.3    Conclusions ................................................................................................................. 21

6.   Mercury Emissions: Lignite Coals ..........................................................................................22
     6.1    North Dakota Mines and Generating Units ................................................................. 22
     6.2    Texas Gulf Coast Mines and Generating Units ........................................................... 27
     6.3    Role of Flue Gas SO3 ................................................................................................... 30
            6.3.1   EIA Hg, Sulfur Relationship ............................................................................ 30
            6.3.2   $SO_3$: Inhibitor to Hg Removal ...................................................................... 31
     6.4    EPA Cost Calculations Ignore FGD............................................................................... 32
     6.5    Conclusions ................................................................................................................. 33

7.   Mercury Emissions: Non-Low Rank Fuels ..............................................................................34
     7.1    Hg Removal ................................................................................................................. 34
     7.2    Role of Fuel Composition and Process Conditions ...................................................... 36
            7.2.1   Coal Variability............................................................................................... 36
            7.2.2   Process Conditions.......................................................................................... 37
     7.3    Conclusions: Mercury Emissions - Non-Low Rank Coals ............................................. 38

8.   EPA IPM RESULTS: EVALUATION AND CRITIQUE....................................................................39
     8.1    IPM 2030 Post-IRA 2022 Reference Case: A Flawed Baseline ..................................... 39
            8.1.1   Analytical Approach........................................................................................ 39

*8.1.2*    Coal Retirements ....................................................................................................40

8.1.3    Coal CCS ...............................................................................................................44

*8.1.4*    Coal to Gas Conversions (C2G) .........................................................................44

**8.2     Summary** ..................................................................................................................**44**

**Appendix A: Additional Cost Study Data .............................................................45**

**Appendix B: Example Data Chart .........................................................................48**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

List of Tables

Table 5-1. Summary of EPA Results................................................................................ 16

Table 5-2.  ESP Rebuild Costs: Four Documented Cases .............................................. 18

Table 5-3. Summary of Results: Industry Study ............................................................ 20

Table 6-1. Hg Variability for Select North Dakota Reference Stations ........................ 26

Table 6-2. Hg Variability for Select Texas Reference Stations..................................... 29

Table 8-1. Coal Retirement Errors................................................................................. 40

Table 8-2.  IPM Coal Retirement Errors: 2028 Post-IRA 2022 Reference Case Run................. 41

Table 8-3. IPM Coal Retirement Errors: 2030 Post IRA 2022 Reference Case Modeling Run... 42

Table 8-4 Units in the NEEDS to Be Operating in 2028................................................ 42

Table 8-5  Units IPM Predicts CCS By 2030 ................................................................ 43

Table 8-6  Units IPM Erroneously Predicts Switch to Natural Gas ............................. 43

Table A-1. Technology Assignment for 0.010 lbs/MBtu PM Rate: Industry Study ................... 46

Table A-2  Technology Assignment for 0.006 lbs/MBtu PM Rate: Industry Study ................... 47

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

 List of Figures

Figure 3-1.  Inventory of EPA-Project 2028 Fleet by Control Technology Suite ......................... 6

Figure 3-2. Numbers of Quarters Sampled by EPA for Use in PM Database ............................... 7

Figure 3-3. Coronado Generating Station: 20 Operating Quarters ............................................. 10

Figure 4-1. Fraction of Units Exceeding Three PM Rates:  By Control Technology ................. 12

Figure 6-1. Mercury Content Variability for Eight North Dakota Lignite Mines ...................... 23

Figure 6-2. Fuel Sulfur Content Variability for Eight North Dakota Lignite Mines................... 23

Figure 6-3. Fuel Alkalinity/Sulfur Ratio for Eight North Dakota Mines .................................... 24

Figure 6-4. Spatial Variation of Hg in a Lignite Mine ................................................................ 25

Figure 6-5. Mercury Variability for Two Gulf Coast Sources: Mississippi, Texas..................... 27

Figure 6-6. Sulfur Variability for Mississippi, Texas Lignite Mines19.1 ................................... 28

Figure 6-7. Fuel Alkalinity/Sulfur Ratio for Mississippi, Texas Lignite Mines......................... 28

Figure 6-8. Lignite Hg and Sulfur Content Variability: 2021 EIA Submission ........................... 30

Figure 6-9. Sorbent Hg Removal in ESP in Lignite-Fired Unit: Effect of Injection Location..... 32

Figure 7-1. Mean, Standard Deviation of Annual Hg Emissions: 2018 ....................................... 35

Figure 7-2. Mean, Standard Deviation of Annual Hg Emissions: 2018 ....................................... 35

Figure 7-3. Annual Average of Fuel Hg, Sulfur Content in Coal................................................. 36

Figure A-1.  Unit ESP Investment (per EPA's Cost Assumptions): PM of 0.010 lbs/MBtu ....... 45

1.  Summary of Flaws in EPA's Approach

The following is a summary of flaws in EPA's analysis, further described in detail in this report.

Particulate Matter (PM) Database

EPA's database of PM emissions is inadequate. EPA attempts to capture typical PM emissions by acquiring samples from 3 years – 2017, 2019, and 2021. For the vast majority of the units – 80% - EPA uses only 2 of the potentially available 12 quarters (in those 3 years; up to 20 quarters from 2017 to 2021) of data to construct the PM database. Further, of these limited samples. EPA cites the lowest to reflect a target PM emissions rate. EPA cites the use of the "99th percentile" PM rate in lieu of the average compensates for variability; but this approach accounts for variability within a single ("the lowest") quarter. It fails to account for long-term variability, which is affected by changes in fuel and process conditions, among others.

Lack of Design and Compliance Margin

EPA recognizes the need for margin in both design and operation (for compliance) of environmental control equipment, but ignores this concept in developing this proposed rule. The need for design margin is recognized in a 2012 OAQPS memo[1] addressing the initial developments of this very same rule, while margin for operation is considered in evaluating CEMS calibration[2] for this proposed rule. Neither design nor operating margin is considered in setting target PM standards, resulting in underestimation of number of units affected and total costs to deploy control technology. For some owners of fabric filter-equipped units, the revised rate of 0.010 lbs/MBtu eliminates any operating margin.

Inadequate Cost for ESP Rebuild

Of three categories of ESP upgrades considered by EPA, the cost for the most extensive – a complete rebuild to add collecting plate area – is inadequate. Four such major ESP rebuild projects have been implemented for which costs are reported in the public domain – and not acknowledged by EPA. Incorporating these results elevates the range of cost from EPA's estimate of $75-100/kW to $57-213/kW. Consequently, the "average" cost for this action used in the cost per ton ($/ton) evaluation increases from $87/kW to $133/kW.

---

[1] Hutson, N., National Emission Standards for Hazardous Air Pollutants (NESHAP) Analysis of Control Technology Needs for Revised Proposed Emission Standards for New Source Coal-fired Electric Utility Steam Generating Units, Memo to Docket No. EPA-HQ-OAR—2009-0234, November 16, 2012. Hereafter Hutson 2012.

[2] Parker, B., PM CEMS Random Error Contribution by Emission Limit, Memo to Docket ID No. EPA-HQ-OAR-2018-0794, March 22, 2023. Hereafter Parker 2023.

Inadequate $/ton Removal Cost

As a consequence of under-predicting capital required for ESP "rebuild," and not recognizing the need for a design and operating margin, EPA under-predicts the number of units requiring retrofit and incurred cost. As a result, in contrast to the annual cost of $169.7 M projected by the Industry Study described in this report, EPA estimates a range from $77.3 to $93.2 M. Further, the Industry Study estimates the cost per ton ($/ton) of fPM to be $67,400, 50% more than the maximum cost estimated by EPA - $44,900 /ton.

Faulty Lignite Hg Rate Revision

EPA's proposal to lower the Hg emission rate for lignite-fired units to 1.2 lbs/TBtu is based on improper interpretation of Hg emissions data – both in terms of the mean rate and variability. EPA's projection that 85 and 90% Hg removal would be required for the proposed rate is incorrect, with up to 95% Hg removal required for some units – a level of Hg reduction not feasible in commercial systems. In addition to the variability of Hg content in lignite, EPA ignores the deleterious role of flue gas $SO_3$ in lignite-fired units, which compromises sorbent performance and effectiveness – even though this latter barrier is recognized and cited by EPA's contractor for the IPM model.[3]

Faults in IPM Modeling

IPM creates a flawed Baseline scenario that does not adequately measure the impacts of the proposed rule. Most notably, IPM err in the number of coal units that would be retired in both 2028 and 2030; as a consequence, EPA underestimates the number of units subject to the proposed rule. Also, IPM unrealistically retrofitted 27 coal units with carbon capture and storage (CCS) in 2030. Consequently, IPM modeling results of the Baseline likely understate the compliance impacts of the proposed rule.

---

[3] IPM Model – Updates to Cost and Performance for APC Technologies: Mercury Control Cost Development Methodology, Prepared by Sargent & Lundy, Project 12847-002, March 2013.

## 2.   Introduction

The Environmental Protection Agency (EPA) is proposing to amend the National Emissions Standards for Hazardous Air Pollutants (NESHAP) for Coal- and Oil-fired Electric Utility Steam Generating Units (EGUs), otherwise known as the Mercury and Air Toxics Standards (MATS). The specific emissions limits being revised address the filterable particulate matter (fPM) standard (which is the surrogate standard for non-mercury (Hg) metal HAPs); the Hg standard for lignite-fired units; fPM measurement methods for compliance; and the definition of startup. This report provides a review and evaluation of EPA's approach to selecting the revised fPM standard, the capital and annual costs for achieving the proposed revised standard, and the cost per ton ($/ton) to control non-Hg metal HAPs; and a critique of EPA's basis for proposing an Hg limit of 1.2 lbs/TBtu for lignite-fired units. This document also provides information supporting EPA's decision to retain the present Hg limit for bituminous and subbituminous coal.

The proposal to lower fPM and Hg limits is premised on EPA's interpretation of data related to the cost and capabilities of PM and Hg emission control technologies.  EPA reports to have conducted realistic assessments of PM and Hg emissions and control technology capabilities in support of their analysis. EPA's assumptions are reported in the MATS_RTR_Proposal_Technology Review Memo[4] where EPA describes the PM database they developed, the cost and control capabilities of upgrades to electrostatic precipitators (ESPs) and fabric filters, and their understanding of the key factors that affect Hg emissions in bituminous, subbituminous, and lignite coal - and how the latter are alike or differ.

Many of EPA's assumptions are contrary to data in their possession or strategies previously adopted by EPA, but not considered. EGUs have been reporting fPM compliance data to EPA since MATS became applicable to them – i.e., for the vast majority of EGU, April 2015 or April 2016 for units that obtained a one-year extension. However, EPA's effort to "mine" fPM emissions data from prior years provides a sparse, inadequate database that does not reflect operating duty nor account for inevitable variability; further EPA misinterprets this information. No design or operating margins are considered in setting fPM (the same is true for lignite Hg emission rates). The cost to upgrade ESPs to meet the proposed limits is inadequate for the most significant modification EPA envisions – the complete ESP Rebuild. The cost to deploy enhanced operating and maintenance (O&M) actions on existing fabric filers is inadequate. Regarding revised Hg limits for lignite coal, EPA does not recognize the differences in lignite versus Powder River Basin (PRB) subbituminous coal that effect Hg control.  EPA draws an incorrect analogy between PRB and lignite, improperly assuming the Hg removal by carbon sorbent observed with PRB can be replicated on lignite.

---

[4] Benish, S. et. al., 2023 Technology Review for the Coal- and Oil-Fired EGU Source Category, Memo to Docket ID No. EPA-HQ-OAR-2018-0794. January 2023.  Hereafter RTR Tech Memo.

The remaining sections of this report detail the findings summarized in Section 1, and are as follows:

- Section 3 describes EPA's approach to assembling their fPM database, and the flaws and weaknesses in their approach.
- Section 4 evaluates the fPM rates assigned by the database for the EPA analysis.
- Section 5 evaluates EPA's cost bases for the proposed fPM revised standard, and compares these to the realistic assumptions used in the Industry Study described in the paper.
- Section 6 addresses EPA's proposal to lower Hg from lignite-fired units to 1.2 lbs/TBtu, delineating the shortcomings in EPA's approach and assumptions.
- Section 7 provides historical data for Hg emission from non-low rank fuels, showcasing the inherent variability in the 30-day rolling average.
- Section 8 reviews the IPM modeling analysis conducted by EPA to support this rule.
- Appendix B presents examples of PM emission timelines for a limited number of units[5] that show how EPA's sparse database does not capture the authentic "PM signature" of the units.

---

[5] We reviewed data for a limited number of units because the comment period was very short and did not allow adequate time to undertake a more thorough review. EPA has all the data and in our opinion should have conducted such an analysis for every unit at issue.

## 3.     Description of EPA Reference PM Database

Section 3 describes the PM database assembled by EPA which serves as the basis for the proposed NESHAP rule. Section 3 first describes the coal fleet inventory reflected, and then identifies shortcomings of this database concerning (a) selection of the sample year and quarter, (b) number of samples considered, and (c) data analysis.

### 3.1  Coal Fleet Inventory

EPA projects that a total of 275 generating units will be operating at the compliance date of January 1, 2028, representing a reduction from the present (2023) operating inventory of approximately 450 units.  EPA identified the 275 units based on their estimate of unit retirements and units planning to switch to natural gas by the compliance date. EPA accounted for these assets not as individual units, but in terms of the number of reporting monitors to the Clean Air Markets Division. As 27 units employ common stack reporting, the data presented by EPA in the draft rule and RTR Tech Memo consider 248 discrete data points that reflect the 275 units.  This analysis will adopt the same reporting methodology.

EPA's selection of 275 units contains 22 units that have publicly disclosed plans to retire or switch to natural gas by the compliance date of January 1, 2028. For the purposes of this analysis, these units are retained in the database so the results can be more readily compared.

Figure 3-1 depicts the installed inventory projected by EPA, presented according to the suite of control technology. The first two bars (from the left) report units equipped with ESPs as the primary PM control device in the following configurations: a total of 54,116 MW for an ESP followed by a wet FGD; and a total of 16,346 MW with an ESP only. The next 3 bars describe the total inventory equipped with a fabric filter in the following three configurations: 12,194 MW with the fabric filer as the sole device; 20,206 MW with a fabric filter followed by a wet FGD, and 19,995 MW where the fabric filter is preceded by a dry FGD process. Consequently, the bulk of the inventory (70,462 MW) will employ an ESP as part of the control scheme, with 52,395 MW employing a fabric filter for PM. Given the role of wet FGD in PM emissions – in most cases such devices will reduce PM by approximately 50% - more than half (74,322 MW) employ wet FGD as the last control step.



Figure 3-1. Inventory of EPA-Project 2028 Fleet by Control Technology Suite

## 3.2 Database Characteristics

Several characteristics of EPA's database severely compromise the quality of the analysis. These are the (a) selection of sampling year and quarter and (b) number of samples used.

### 3.2.1 Selection of Sample Year and Quarter

EPA does not describe the rationale for the limited data selected. The selection of three reference years (2017, 2019, and 2021) from at least 5-6 years of data readily available to EPA, and the sampling periods within each year (typically the 1st or the 3rd quarter even though all quarters are generally available) are not discussed. EPA extracts data from the year 2021 using a different approach from the years 2019 and 2017 without explanation. EPA states for 2021 that 2 quarters of data are utilized (always the 1st and the 3rd). For 2019, EPA reports utilizing data from "quarters three and occasionally four" while for 2017 EPA reports data acquired from "variable quarters."[6]

The rationale for the irregular selection of quarters is not stated. For 2021, the first and third quarters are selected with no technical basis. For 2019, the selection of quarters three and "occasionally" four does not replicate the time periods selected for 2021. For 2017, there is no description of the quarters or selection criteria.

EPA ignores a rich field of data that could support a much more robust and reasonable analysis.

---

[6] RTR Tech Memo, page 2.

### 3.2.2   Number of Samples

The number of discrete data points in EPA's Reference Database – defined by the number of operating quarters – is extremely limited. EPA's description of the sampling approach[7] is as follows:

*Quarterly data from 2017 (variable quarters) and 2019 (quarters three and occasionally four) were first reviewed because data for all affected EGUs subject to numeric emission limits had been previously extracted from CEDRI. In addition, the EPA obtained first and third quarter data for calendar year 2021 for a subset of EGUs with larger fPM rates (generally greater than 1.0E-02 lb/MMBtu for either 2017 or 2019).*

Figure 3-2 shows most monitor locations — 193 of the 245 — are characterized by only 2 quarters of data, which is inadequate compared to the 16 or 20 EPA has access to.  The distribution of quarters selected by EPA according to either CEMS or stack test measurement for all 245 locations is shown. The second largest category is 33 units characterized by 4 quarters.



Figure 3-2. Numbers of Quarters Sampled by EPA for Use in PM Database

---

Additional depictions of the data (not shown) reveal that only nine units are described by data in 2017, and 187 units by data from 2019. Only 41 units are described by data in 2021; the lack of data in 2021 was intentional as EPA considered this year only if data from 2017 or 2019 showed the unit exceeding the 0.010 lbs/MBtu proposed limit.[8] In other words, EPA looked at 2021 only when it was trying to find an emission rate less than 0.010 lbs/MBtu for a unit.

### 3.2.3    PM Data Selection and Analysis

EPA does not explain the methodology chosen to reflect each quarters' emission rate, using at least two methods, depending on the year. EPA followed a four-step process to construct its database to select the "base rate" for each unit. The process is described as follows:

Step 1: Quarter Selection. EPA looked at 2-4 (usually 2) quarters for each unit. EPA states: "Quarterly data from 2017 (variable quarters) and 2019 (quarters three and occasionally four) were first reviewed …. In addition, the EPA obtained first and third quarter data for calendar year 2021 for a subset of EGUs with larger fPM rates (generally greater than 1.0E-02 lb/MMBtu for either 2017 or 2019)."[9]

As noted previously, EPA considered Q1 and Q3 2021 data solely to find a PM rate lower than 0.010 lb/MMBtu, and further explained: "The quarterly 2021 data summarizes recent emissions and also reflect the time of year where electricity demand is typically higher and when EGUs tend to operate more and with higher loads."[10]

Step 2. Select Single Quarter. From the candidate quarters identified in Step 1, EPA selected a single value, using criteria specific for each tests methodology:

- *PM CEMS*: for quarters in 2017 and 2019, EPA selected the 30-day average observed on the last day of the quarter; for quarters in 2021, EPA determined the average of the 30-day rolling averages observed in that quarter.
- *Stack Tests*: EPA took the average of the multiple (usually 3) test runs.

Step 3. Select Lowest Quarter. EPA selected the "lowest quarter" PM rate from the quarters selected in Step 2.

Step 4. Determine PM of  99th Percentile. For this lowest quarter per Step 3, EPA calculated the statistical percentile values as observed over the entire quarter. The methodology varied on whether PM CEMS or stack test data was provided. For PM CEMS, the percentiles were calculated for all 30-day rolling averages in the quarter. For stack tests, the percentiles were calculated for the typically 3 test runs.

---

[8] Personal communication: Sarah Benish to Liz Williams, April 28, 2023. "*Data for 2021 was mined only for the EGUs that showed 2017 or 2019 fPM data above 1.0E-02 lb/MMBtu. We did not mine 2021 PM data for EGUs not expected to be impacted by the proposed fPM limit.*"

[9] RTR Memo, page 2.

[10] Ibid.

The results are reported in Appendix B of the Technology Review Memo. The 99th percentile rate was chosen as the "base rate," supposedly to account for variability within the "lowest quarter."

EPA does not describe why data selected was restricted to the years 2017, 2019, and 2021. EPA does not explain why 2021 data was limited to the 1st and 3rd quarters, 2019 data was limited to the 3rd and occasionally the 4th quarter, while 2017 data from variable quarters could be utilized.

Of concern is the limited subset of data used for this analysis – Figure 3-2 showed that for 80% of the units the lowest is selected from only two samples. EPA states "By using the lowest quarter's 99th percentile as the baseline, the analyses account for actions individual EGUs have already taken to improve and maintain PM emissions."[11] EPA states employing the PM rate at the 99th percentile –reflecting approximately the highest data within that quarter – remedies any bias.[12]

There is no basis for this statement. EPA is assuming that because a unit emitted fPM during a single quarter at a particular level, the lowest such level must necessarily reflect "actions individual EGUs have already taken to improve and maintain PM emissions," and therefore each EGU must be able to replicate that rate in every quarter going forward, indefinitely. Also, EPA ignores the unavoidable variability in emission rates: the "actions individual EGUs have already taken to improve and maintain PM emissions" are not the only factor that determines fPM emissions rate. The factors that affect fPM rates are numerous and include but are not limited to the following: coal quality (e.g., chemical composition and ash content) which varies within a single mine; variation in temperature within an ESP; content of $SO_3$ and trace constituents that determine ash electrical resistivity; physical conditions (spacing) of collecting plates and emitting electrodes; effectiveness of the rapping "hammers" that dislodge collected ash from the collecting plates; and physical properties of the collected ash layer that define ash re-entrainment. Further, boiler operation will influence ESP performance, most notably unit duty (i.e., relatively stable operating level for a "baseload" unit versus more load changes for an intermediate unit or a unit operating in peaking mode), operating level, and load "ramp" rate. Achieving the "least emission" rate observed during a quarter that EPA selected is not necessarily feasible at other times and under other conditions.

### 3.2.4   Example Cases

Figure 3-3 presents an example that demonstrate the shortcomings of EPA's approach. Figure 3-3 presents PM data from Coronado Generating Station Units 1 and 2 reflecting all operating quarters from 2017 through 2021. Both the average PM rate and the 99th percentile from each quarter are presented for 20 quarters of operation over the 4-year period. Figure 3-3 also identifies the two samples EPA selected from 2017 Q3 and 2019 Q3 as representative of low fPM rate, with the latter as the "least" – and the 99th-percentile reporting 0.0086 lbs/MBtu. Figure 3-3 shows EPA's two samples do not capture the full character of Coronado operating duty (with the red dotted line denoting the PM rate selected as representative of the units'

---

[11] RTR Tech Memo, page 4.

[12] Ibid.

capabilities to control PM). These quarters as selected by EPA are far from representative of unit operations or capabilities: among 20 quarters for which data are available, the units' 90th percentile fPM rates exceed the 0.0086 lbs/MBtu rate EPA selected for 16 quarters. Ten out of 20 quarters showed 90th percentile fPM rates exceeded the proposed standard of 0.010 lb/MBtu.



Figure 3-3. Coronado Generating Station: 20 Operating Quarters

Coronado Units 1/2 show how selecting the least PM rate of any quarter, and adopting the 99th percentile PM rate within that quarter, does not capture the variability in fPM emission rates, which are affected by the variability of coal and operating conditions, among others. These examples demonstrate that EPA used best-case fPM data from both compliance measures (continuous monitor and performance test data).

Additional examples are presented in the Appendix B to this report.

## 3.3   Conclusions

- EPA's database is sparse and does not fully capture operating duty. Of the 275 units and approximately 250 monitoring locations, the vast majority – 80% - are characterized by only two samples.

- Selecting the lowest quarter  - "one" of what in most cases are "two" samples - fails to capture the operating profile of the unit, and presents a serious deficiency in representing

operations. EPA's approach of considering the 99th percentile within a quarter is inadequate to assess variability, particularly that induced by fuel composition, as such fuel changes are observed over a characteristic time of years and not several months.

- The use of statistical means within one quarter does not capture the multi-month variances in coal composition, seasonal load, and process conditions that are not constrained to 3-month events.

- An improved, robust database would allow observing variation between– as opposed to within – operating quarters, to better reflect variations and uncertainties in operating duty and fuel supply.

## 4. Coal Fleet PM Emissions Characteristics

Section 4 characterizes the coal-fired fleet selected to represent the PM emissions

The emission control technologies on the 275 units projected by EPA to be operating in 2028 present a variety of approaches to lower fPM emission limits – with implications for upgrades and actions that would be required to meet a revised standard for fPM. This subsection presents the distribution of control technology by ability to operate below the revised PM limits for the units in EPA's database. By necessity, this analysis uses EPA's database (both for a discussion of expected or achievable fPM emission rates and the units projected to operate in 2028 and later), and such use does not represent an endorsement or acceptance of EPA's approach. As discussed above, EPA's analysis of expected/achievable fPM emission rates is inadequate. And as discussed later in this report, EPA's selection of units that would continue to operate after 2028 is flawed: it contains multiple errors; and EPA's post-IRA IPM analysis is inaccurate.

Figure 4-1 is used to present our analysis.



Figure 4-1. Fraction of Units Exceeding Three PM Rates: By Control Technology

Figure 4-1 presents for five control technology configurations the percentage of units that emit (according to EPA's chosen "base rate") above the following PM emission limits: 0.015 lbs/MBtu, 0.010 lbs/MBtu, and 0.006 lbs/MBtu. The control technologies are (a) dry FGD with a fabric filter, (b) ESP followed by a wet FGD, (c) fabric filter alone (employing low sulfur coal or multi-unit station-averaging to meet an $SO_2$ limit), (d) wet ESP as the last control device, (e) ESP

alone (employing low sulfur coal or multi-unit station-averaging to meet an $SO_2$ limit), and (f) fabric filter followed by a wet FGD.

In Figure 4-1, the proportion of units in the inventory that exceed the contemplated fPM rate is proportional to the height of the bar; a higher bar implies a greater fraction of units in the inventory exceed the contemplated fPM rate. Thus:

### 4.1.1    PM Rate of 0.015 lbs/MBtu

Units in three categories exceed this highest contemplated rate – those with an ESP alone, a dry FGD followed by a fabric filter, and an ESP followed by a wet FGD. The latter category of ESP/wet FGD benefits in that actions within the absorber tower – although not designed to removed fPM – can under some conditions remove fPM. Data describing PM removal via wet FGD is sparse but suggests 50% removal can be observed.

### 4.1.2    PM Rate of 0.010 lbs/MBtu

The number of units in each of the three preceding categories exceeding this rate increases – there is no change for the category of ESP-alone, but the number of units exceeding this rate more than triple for dry FGD/fabric filter and ESP/wet FGD. No units with fabric filter/wet FGD or a wet ESP emit at greater than this rate.

### 4.1.3    PM Rate of 0.006 lbs/MBtu

The number of units exceeding a rate of 0.006 lbs/MBtu increases with this most stringent contemplated rate. More than 1/3 of the units with ESP/wet FGD and ¼ of ESP- only cannot meet this rate, with fabric filters either operating with dry FGD (20%) or alone (16%) not achieving this target. Almost 20% of those with fabric filter/wet FGD units emit greater than this value.

In conclusion, within six major categories of control technology, units equipped with fabric filters achieve the lowest PM rates. Units with ESPs – either operating alone or with a wet FGD- represent the highest fraction of their population that exceed the strictest contemplated rate. Units with fabric filters – operating alone, or as part of a wet or dry FGD arrangement – are among the lowest exceeding the strictest contemplated PM rate. As noted previously, this analysis used EPA's database (as reflected in Appendix B of the RTR Tech Memo) out of necessity, and such use does not represent an endorsement or acceptance of EPA's approach.

## 5. CRITIQUE OF COST-EFFECTIVENESS CALCULATIONS

Section 5 addresses the cost effectiveness ($/ton basis) estimated to reduce the PM emission rate to EPA's proposed limit of 0.010 lbs/MBtu, and the alternative limit of 0.006 lbs/MBtu. EPA has conducted this calculation with inputs based on analysis by Sargent & Lundy (S&L)[13] and Andover Technology Partners (ATP).[14] EPA's results are presented in both Table 3 of the proposed rule and in Table 7 of the RTR Tech Memo.

This section reviews EPA's calculation methodology, critiques inputs of the EPA Study, and presents results of an Industry Study that utilizes realistic costs. Results from EPA's evaluation and the Industry Study addressing the 0.010 lbs/MBtu and 0.006 lbs/MBtu PM rates are compared.

## 5.1   EPA Evaluation

### 5.1.1   EPA Study Inputs

The EPA study used both the PM database described in Section 3 and cost and technology assumptions derived by the above-mentioned S&L and ATP references. As noted in Section 2, EPA's sparsely-populated database is inadequate from which to base a revised PM rate that represents a significant reduction in PM emissions but is achievable in long-term duty.

The analyses by S&L and ATP provide capital cost for three categories of ESP upgrades, improvements to fabric filter operating and maintenance (O&M) and associated costs, capital requirement for fabric filter retrofit and associated O&M cost. Most of the analysis is premised on the costs and PM removal performance of ESP upgrades as defined by S&L. It should be noted S&L did not provide specific projects with publicly available data as the basis of their assumptions.

The most significant shortcoming of EPA's assumptions is low capital estimates for the most significant ESP upgrade - the "ESP Rebuild" scenario. In contrast to the generalizations of the S&L memo, Table 5-2 reports publicly documented costs incurred for "ESP Rebuild." Equally significant, EPA ignores the inherent variability of fPM and FGD process equipment by not utilizing a design or operating margin in selecting the value of fPM rates that would require operator action. This is counter to EPA's prior acknowledgement of the use of margin in the initial rulemaking for MATS[15] and recent observations as to CEMS calibration.[16] It is also contrary to basic operation goals: no source operates at the applicable standard; a compliance

---

[13] PM Incremental Improvement Memo, Project 13527-002, Prepared by Sargent & Lundy, March 2023. Hereafter S&L PM Improvement Memo.

[14] Analysis of PM Emission Control Costs and Capabilities, Memo from Jim Staudt (Andover Technology Partners) to Erich Eschmann, March 22, 2023. Hereafter ATP 2023.

[15] Hutson 2012.

[16] Parker 2023.

margin is always necessary, at least to account for unavoidable variability of performance in the real world. By ignoring the need for margin, EPA's evaluation under-predicts the number of units that would be retrofit with new or upgraded control technology to meet the target rate.

These and other critiques of EPA's approach are discussed subsequently.

Shortcomings in EPA inputs compromise the results of their analysis. These shortcomings, as well as other observations, are summarized as follows:

ESP Upgrade. Three categories of ESP upgrade are proposed by EPA. The most significant shortcoming relates to the "ESP Rebuild" category in which - as described by S&L – additional plate area is added to the ESP. The addition of collecting surface area will require major changes to – or demolition and complete rebuilding of – the gas flow confinement that houses the existing collecting plates. Also, these process changes require specialized labor for fabrication and installation that may be limited in availability. The costs suggested by S&L (without citation of references) - $75-100/kW –are low when compared to publicly disclosed costs from similar projects.

Fabric Filter O&M. Fabric-filter-equipped units that emit greater than 0.010 lbs/MBtu are assumed to adopt enhanced O&M practices. These enhanced practices consist of (a) upgrading filter material to higher quality fabrics, such PTFE, and (b) increasing the replacement frequency so that filters are replaced on a 3-year basis. The cost premium for this action, based on analysis by ATP, does not consider the additional manpower costs for the more frequent replacement.

Fabric Filter Construction. EPA's range of capital cost for retrofit of fabric filter technology is consistent with industry experience.

Design/Compliance Margin. A premise of environmental control system design is accounting for variability due to many factors, including, for example, variations in fuel composition, operating load, and process conditions. Such variability is generally addressed by a design/compliance margin – selecting a target emission rate less than mandated by a standard. The concept of design/compliance margin is broadly applied in the industry, and was acknowledged in a 2012 EPA memo summarizing the range of margin adopted by various process suppliers, with a minimum cited as 20-30%.[17] EPA did not adopt a design/compliance or operating margin in selecting fPM emission rates for a revised fPM standard in this evaluation, despite the fact that elsewhere in the record of this proposal EPA acknowledges a typical "operational target" of 50% of the limit.[18] Because of its assumption of no design/compliance margin whatsoever, EPA presumes that units that report an operating fPM of 0.010 lbs/MBtu – based on EPA's sparse database - require no investment to meet the proposed standard of 0.010 lb/MBtu.

---

[17] Hutson, N., National Emission Standards for Hazardous Air Pollutants (NESHAP) Analysis of Control Technology Needs for Revised Proposed Emission Standards for New Source Coal-fired Electric Utility Steam Generating Units, Memo to Docket No. EPA-HQ-OAR—2009-0234, November 16, 2012.

[18] Parker 2023.

Separate from the preceding issues, EPA did not disclose the capacity factors assumed in the analysis. The capacity factor can be inferred from the tons of PM removed as reported in Appendix B of the RTR Tech Memo; this requires acquiring heat input and net plant heat rate from AMPD and EIA data.

### 5.1.2    EPA Results

Table 5-1 presents results of EPA's evaluation.

Table 5-1. Summary of EPA Results

| EPA Study | | | | | |
|---|---|---|---|---|---|
| Unit Affected | Tons fPM Removed | Annual Cost ($M/y) | $/ton fPM (average) | Non-Hg metallic HAPS Removed (tons) | $/ton non-Hg metallic HAP ($000s) |
| **Target: 0.010 lbs/MBtu** | | | | | |
| **20** | 2,074 | 77.3-93.2 | 37,300-44,900 | 6.34 | 12,200-14,700 |
| **Target: 0.006 lbs/MBtu** | | | | | |
| **65** | 6,163 | 633 | 103 | 24.7 | 25,600 |

Proposed Limit: 0.010 lbs/MBtu. EPA estimates 20 units in the entire inventory are required to retrofit some form of ESP upgrade. The number of units with existing fabric filters required to enhance O&M is not identified, nor is their cost. EPA estimates a range in annual cost to implement the ESP and fabric filter O&M enhancement of $77.3 to 93.2 M/yr, with the range determined by the range in cost and performance of each option as described by S&L.[19] This total annualized cost translates into an average fPM removal cost effectiveness of $37,300 - $44,900 per ton of fPM and $12.2M -$14.7 M per ton of total non-Hg metallic HAPs. These steps remove a total of 2,074 tons of fPM (6.34 tons of total non-Hg metallic HAPs) annually.

EPA did not consider in its analysis the potential impact of the capital cost of major controls construction or upgrades (i.e., ESP rebuilds for most of the 20 units; new Fabric Filters for the two Colstrip units) on the viability of the units at which such rebuilds would occur. Appendix Figure A-1 presents the capital required for each unit as designated by EPA for upgrade – requiring an investment likely prohibitive for continued operation.

Potential Limit: 0.006 lbs/MBtu. EPA estimates 65 units in the entire inventory are required to retrofit a fabric filter or deploy enhanced O&M to an existing fabric filter. EPA estimate an annual cost of $633 M/yr will be incurred, at an average cost effectiveness of $103,000 per ton

---

[19] S&L PM Improvement Memo.

of fPM and $25.6 M per ton of total non-Hg metallic HAPs. These steps remove a total of 6,163 tons of fPM (24.7 tons of total non-Hg metallic HAPs) annually.

## 5.2   Industry Study

The Industry Study alters several assumptions to reflect actual, documented cost data and the necessity of a design/compliance margin.  Table 5-2 presents these results.

### 5.2.1   Revised Cost Inputs

The modified cost inputs necessary to reflect authentic conditions ESP upgrade and fabric filter operation are discussed as follows.

ESP Upgrades. The three categories of ESP upgrades are assessed as follows.

*Minor Upgrades (Low Cost).* Both the cost range and PM removal efficiency for this activity as estimated by S&L are adopted for this analysis. ESPs requiring Minor Upgrade are assigned a $17/kW cost to derive an average of 7.5% removal of fPM.

*Typical Upgrades (Average Cost).* Both the cost range and PM removal efficiency for this activity as estimated by S&L are adopted for this analysis. ESPs requiring Typical Upgrade are assigned a $55/kW cost to derive an average of 15% fPM removal.

*ESP Rebuild (High Cost).* The cost range for this activity as estimated by S&L does not reflect that reported publicly for four projects that represent the "ESP Rebuild" category.  Two projects were completed at the AES Petersburg station – the complete renovation of the ESPs on Units 1 and 4[20] for which S&L provided engineering services.  The cost for this work has been publicly reported in 2016-dollar basis.  Two additional major ESP upgrades were implemented by Ameren at the Labadie station unit in 2014 – with costs publicly reported.[21]

Table 5-2 summarizes the cost incurred for the four major ESP retrofits, including costs in the year incurred and escalated (using the Chemical Engineering Process Cost Index[22] to 2021. Table 5-1 shows a cost range of $57-209/kW, with 3 of the 4 units incurring a cost exceeding $100/kW.  These costs significantly exceed EPA's maximum for this range.

---

[20] State of Indiana – Indian Public Utility Commission, Cause No. 44242, August 14, 2013. See Appendix, electronic page 50 of 51.

[21] Ameren Missouri Installs Clean Air Equipment at its Labadie Energy Center; https://ameren.mediaroom.com/news-releases?item=1351

[22] https://www.chemengonline.com/pci-home#:~:text=Since%20its%20introduction%20in%201963,from%20one%20period%20to%20another.

Table 5-2.  ESP Rebuild Costs: Four Documented Cases

| Owner/Station | Unit | Basis Year | 2021 ($/kW) |
|---|---|---|---|
| **AES/Petersburg** | 1 | 2016 | 117 |
| **AES/Petersburg** | 4 | 2016 | 57 |
| **Ameren Labadie** | 1 | 2014 | 192 |
| **Ameren Labadie** | 2 | 2014 | 209 |

Consequently, the range of ESP rebuild costs is adjusted to $57-209/kW, and the mean value of $133/kW (2021 basis) selected to represent this category of upgrade.[23]

FF O&M. A fabric filter O&M cost was derived for existing units, based on the assumption by S&L that filter material will be upgraded, as well as the frequency of filter replacement. An increase in cost – reflected as fixed O&M – of $515,000 is estimated for a 500 MW unit.  This cost premium is comprised of higher material cost of $425,000 to upgrade filter material to PTFE fabric and an additional $90,000 for installation labor. This cost premium as is assigned to existing units based on generating capacity, and using a conventional "6/10th" power law.

The revised Industry Study costs are based on (a) gas flow volume treated, (b) surface area of filter required based on the unit design, (c) unit cost of filter (e.g. $ per $ft^2$ of cleaning surface), and (d) replacement rate of filter material.  Gas flow treated for each unit was determined using the quantitative relationships derived by S&L for fabric filter cost evaluation developed for the IPM model.[24]  Filter surface area was not defined for each unit as dependent on the specific air/cloth ratio; rather a fleet air/cloth ratio of 5 – a mean value between conventional and pulse-jet design concepts – is selected.  The unit cost for fabric was selected (at $4.00/$ft^2$) per ATP analysis. Per S&L's IPM fabric filter costing procedure[25] and the EPA-sponsored review of filter material cost,[26] the increase in cost for enhanced O&M is derived. The cost to upgrade material, accelerate filter replacement (from 5 to 3 years) and supporting cages (from 9 to 6 year) intervals is estimated as $425K per year for a reference 500 MW unit.

Fabric Filter Capital Cost. EPA proposed a capital cost to retrofit a fabric filter as $150-$360/kW. The cost range offered by EPA is consistent with industry experience and is used in this study.

EPA did not share the incremental operating cost incurred by the retrofit fabric filters. The Industry Study adopted fixed and variable operating costs from the previously cited S&L fabric filter cost estimating procedure. For the assigned inputs, the S&L evaluation projects a fixed

---

[23] Colstrip Units 3 and 4 are equipped with legacy FGD that combine removal of SO2 and PM in a wet venturi; there is not an ESP option to upgrade.  Fabric filer retrofit is the only option; as Colstrip represents an atypical case the costs are reported in the category of Major ESP upgrade.

[24] IPM Model – Updates to Cost and Performance for APC Technologies: Particulate Control Cost Development Methodology, Project 13527-001, Sargent & Lundy, April 2017.  Hereafter S&L Fabric Filter 2017.

[25] Ibid.

[26] ATP report.

O&M of $0.27/kW-yr and a variable operating cost of 0.48 $/MWh. The variable O&M cost is mostly comprised of filter replacement at the accelerated rate described, and auxiliary power.

Design/Compliance Margin. EPA in two public documents address – and apparently recognize – the need for design/compliance margin.[27] The use of design/compliance margin was acknowledged in a 2012 EPA memo summarizing the range adopted by various suppliers, citing a minimum of 20-30%.[28] For the proposed limit of 0.010 lbs/MBtu, the minimum of 20% is used as a design target for ESP upgrades. Thus, the Industry Study applied ESP upgrade and fabric filter O&M enhancements to attain 0.008 lbs/MBtu, in lieu of EPA's target of 0.010 lbs/MBtu. It should be noted this 20% margin is the least of those considered; if the highest operating margin of 50% suggested by EPA in the record of this rule was used the units requiring upgrade and the cost would have been even higher.

As noted by EPA, the sole reliable compliance means for a 0.006 lbs/MBtu PM rate is a fabric filter. Fabric filters historically exhibit low variability due to their inherent design; thus, the operating margin is slightly relaxed to 0.005 lbs/MBtu. Consequently, the Industry Study assumed ESP-equipped units emitting greater than 0.005 lbs/MBtu will retrofit a fabric filter to insure 0.006 lbs/MBtu is attained. Units with existing fabric filters operating at greater than 0.005 lbs/MBtu will adopt improved operation and maintenance, as previously described.

### 5.2.2    Cost Effectiveness Results

Revised costs from the Industry Study are projected for the proposed fPM limit of 0.010 lbs/MBtu, and the alternative rate of 0.006 lbs/MBtu. Table 5-4 presents these results.

Proposed Limit: 0.010 lbs/MBtu. Results derived in the Industry Study are reported for all three categories of ESP upgrade in Table 5-1. A total of 26 units are required to upgrade ESPs – 11 deploying *Minor*, 7 deploying *Typical*, and 8 deploying *Major* upgrades.[29] In addition, 11 units equipped with fabric filters are required to enhance O&M activities. The totality of these actions each year incur an operating cost of $169.7 M/yr, and remove 2,523 tons of PM.

---

[27] Hutson, 2012 and Parker, 2023.

[28] Hutson, N., National Emission Standards for Hazardous Air Pollutants (NESHAP) Analysis of Control Technology Needs for Revised Proposed Emission Standards for New Source Coal-fired Electric Utility Steam Generating Units, Memo to Docket No. EPA-HQ-OAR—2009-0234, November 16, 2012. at 1 (discussing mercury); 2 (discussing PM).

[29] The two Colstrip units are equipped with an early generation FGD process which does not include an ESP, thus the concept of an ESP upgrade is irrelevant. Consistent with EPA's assumption, the Colstrip units are assumed to retrofit a fabric filter as the only option to meet a limit of 0.010 lbs/MBtu.

Table 5-3. Summary of Results: Industry Study

| Technology (Units Affected) | Annual Cost ($M/y) | Tons fPM Removed | $/ton fPM average | Non-Hg metallic HAPS Removed (tons) | $/ton non-Hg metallic HAP ($000s) |
|---|---|---|---|---|---|
| **Target: 0.010 lbs/MBtu** | | | | | |
| **ESP Minor (11)** | 20.9 | 100 | 209,340 | 0.31 | 67,470 |
| **ESP Typical (7)** | 34.7 | 282 | 122,926 | 0.86 | 40,216 |
| **ESP Major † (8)** | 113.6 | 1,665 | 68,228 | 5.1 | 21,662 |
| **FF O&M (11)** | 0.4 | 475 | 869 | 1.45 | 284 |
| **Total or Average** | 169.7 | 2,523 | 67.3 | 7.71 | 22,000 |
| **Target: 0.006 lbs/MBtu** | | | | | |
| **FF O&M (23)** | 1.23 | 652 | 1,887 | 2.61 | 617 |
| **FF Retrofit (52)** | 1,955.4 | 6,269 | 311,900 | 25.13 | 102,000 |
| **Total or Average** | 1,956.6 | 6,921 | 282,715 | 27.74 | 92,470 |

*† Includes 2 fabric filters retrofit to Colstrip Units 3 and 4. See footnote #23.*

The incurred cost per ton varies significantly by ESP upgrade category. For the ESP *Minor* upgrade, the average cost effectiveness is approximately $67,470,000 per ton of non-Hg metal HAP for 0.31 of tons removed ($209,340 per ton of fPM for 100 tons of fPM removed). The cost-effectiveness cost effectiveness for the ESP *Typical* upgrade average $40,216,000 per ton of non-Hg metal HAP for 0.86 tons removed ($122,956 tons of fPM for 282 tons of fPM removed). The *Major* upgrade removes the most non-Hg metal HAP – 5.1 tons – (1,665 tons of fPM) for an average cost effectiveness of $21,662,000 per ton of non-Hg metal HAP ($68,228 per ton of fPM). The most cost-effective control evaluated is enhanced fabric filter O&M, which removes 1.45 tons of non-Hg metal HAP at a cost-effectiveness of $284,230/ton (475 tons of fPM at a cost-effectiveness of $869/ton).

These actions cumulatively remove a total of 2,523 tons of PM for an average cost <u>effectiveness</u> of 22,000,000 per ton of non-Hg metal HAP ($67,262 per ton of fPM) removed, a 50% increase compared to the cost estimated by EPA.

Appendix Table A-1 reports the units to which the Industry Study assigned ESP upgrades, and defines the category of upgrade to meet the proposed fPM limit of 0.010 lbs/MBtu.

<u>Possible Lower Limit: 0.006 lbs/MBtu</u>. The Industry Study projects 52 ESP-equipped units would be required to retrofit a fabric filter, removing 25.13 tons of non-Hg metal HAP (6,269 tons of fPM) for an average cost effectiveness of $102,000,000 per ton of non-Hg metal HAP ($311,900 per ton of fPM). In addition, 23 existing units equipped with fabric filters would have to adopt enhanced O&M, removing an additional 2.61 tons of non-Hg metal HAP (652 tons of fPM) for an average of cost of $617,195/ton of non-Hg metal HAP ($1,887/ton of fPM). These actions cumulatively remove a total of 27.74 tons of non-Hg metal HAP (6,921 tons of fPM) for an average cost effectiveness of $92,470,000/ton non-Hg metal HAP ($282,715/ton of fPM) removed. These costs are a factor of almost three times that projected by EPA.

Appendix Table A-2 reports the units to which the Industry Study assigned fabric filter retrofits and enhancements of operating and maintenance procedures, to meet the alternative fPM limit of 0.006 lbs/MBtu.

## 5.3  Conclusions

- EPA's cost study is deficient in terms of the number of ESP-equipped units required to retrofit improvements, the capital cost assigned for the most significant *Major* ESP improvement, and estimates of $/ton cost-effectiveness incurred. EPA, by ignoring the need for a design and operating margin cited in at least two of their publications (Hutson, 2012 and Parker, 2023) under-predicts the number of units that would require retrofits.

- This study – using the minimum margin cited by EPA in previous publications – projects a much higher annual cost for capital equipment to meet the proposed 0.010 lbs/MBtu - $169.7 M versus EPA's maximum estimate of $93.3 M. To meet the alternative PM rate of 0.006 lbs/MBtu, this study projects 50% more units (87 versus 65) must be retrofit with fabric filters or implement enhanced O&M to an existing fabric filter, incurring an annual cost of $1.96 B versus EPA's estimate of 633 M/yr – a three-fold increase.

- As a consequence, this study predicts the cost effectiveness to meet 0.010 lbs/MBtu will average $22,000,000 per ton of non-Hg metal HAP removed ($67,262 per ton of fPM), a 50% premium to EPA's estimate of $12,200,000 - $14,700,000/ton of non-Hg metal HAP ($37,300 – $44,900/ton of fPM) removed. This study projects the cost to meet the alternative rate of 0.006 lbs/MBtu will average $92,470,000/ton non-Hg metal HAP ($282,715/ton fPM) removed, almost a factor of three higher than EPA's estimate of $103,000/ton.

## 6.    Mercury Emissions: Lignite Coals

Section 6 addresses EPA's proposed action to reduce the limit for Hg for lignite-fired units to 1.2 lbs/TBtu.  (the following Section 7 addresses EPA's proposal to retain the present emission limit of 1.2 lbs/TBtu for units firing bituminous and subbituminous coals (i.e., non-low rank fuels).) This section critiques EPA's basis for proposing the lignite Hg emission rate of 1.2 lbs/MBtu, while supporting the proposal to retain the existing rate for non-low rank coals.

EPA states the following in support of their proposal regarding lignite:

*".....ash from lignite and subbituminous coals tends to be more alkaline (relative to that from bituminous coal) due to the lower amounts of sulfur and halogen and the presence of a more alkaline and reactive (non-glassy) form of calcium in the ash. The natural alkalinity of the subbituminous and lignite fly ash can effectively neutralize the limited free halogen in the flue gas and prevent oxidation of the $Hg^0$.*

Both lignite and subbituminous coal do contain less sulfur than bituminous coal, but other major differences in composition exist that EPA does not recognize.  These are Hg content and its variability, the sulfur content, and the alkalinity of inorganic matter. EPA's failure to recognize these differences manifests itself as (a) assuming activated carbon sorbent effectiveness observed on subbituminous coal (specifically PRB) extends to lignite, and (b) ignoring variability in Hg content, as well as the role of sulfur trioxide ($SO_3$), which compromises achieving 90%+ Hg removal as required to attain 1.2 lbs/TBtu.

Fuel properties are described separately for the North Dakota and Gulf Coast (Texas and Mississippi) lignite mines.

### 6.1   North Dakota Mines and Generating Units

Figures 6-1 to 6-4 present data provided by lignite suppliers from North Dakota mines that describe the variability for Hg and other constituents key to Hg removal. These figures present data as a "box and whisker" plot, which portrays the mean value, the 25th and 75th percentile of the observed data, and the near-minimum (5%) and near-maximum (95%) extremities. Figure 6-1 shows the variability of Hg and Figure 6-2 the variability of sulfur content. Figure 6-3 shows variability of fuel alkalinity compared to sulfur content – specifically, the ratio of calcium (Ca) and sodium (Na) to sulfur – i.e., the (Ca + Na)/S metric.



Figure 6-1. Mercury Content Variability for Eight North Dakota Lignite Mines



Figure 6-2. Fuel Sulfur Content Variability for Eight North Dakota Lignite Mines



Figure 6-3. Fuel Alkalinity/Sulfur Ratio for Eight North Dakota Mines

Figure 6-1 compares the Hg content and variability to the fixed value of 7.7-7.8 lbs/TBu, assumed by EPA as representing North Dakota lignite, as summarized in Table 11 of the Tech Memo. Figure 6-1 shows – with the exception of the Tavis seam – all mean values of Hg content exceed EPA's assumed value that serves as the basis of EPA's evaluation. More notably, the 75th percentile value of Hg for each seam - slightly more than one standard deviation variance from the mean – in all cases significantly exceeds the value assumed by EPA.

Of note is that the variability of Hg depicted in Figure 6-1 is not necessarily observed only over extended periods of time – such as months or quarters – it can be witnessed over period of days or weeks.  This is attributable to the sharp contrast in Hg content of seams that are geographically proximate and thus are mined within an abbreviated time period.  Figure 6-4 presents a physical map showing the location of "boreholes" in a lignite field with imbedded text describing (in addition to the borehole code) the Hg content as ppm.  The text boxes report this Hg content in terms of lbs/TBtu. These example boreholes – separated by typically 660 feet- and the factor of 3 to 6 variation of Hg content present a meaningful visualization of Hg variability in a lignite mine, and the consequences for the delivered fuel.



Figure 6-4. Spatial Variation of Hg in a Lignite Mine

Data from Figure 6-1 is summarized in Table 6-1 for units at four stations in North Dakota – Coal Creek, Antelope Valley, Coyote, and Leland Olds. Both Figures 6-1 and Table 6-1 show Hg variability exceed that assumed by EPA in their evaluation. Table 6-1 shows that achieving a 1.2 lbs/TBu requires an Hg removal rate of approximately 93-95% for unavoidable instances where coal Hg content is at the 95th percentile of observed value. The approximate 93-95% Hg removal requirements well exceed the 85% Hg removal based on the IPM-assigned Hg content.

Table 6-1. Hg Variability for Select North Dakota Reference Stations

| Station | Mine | Seams | IPM Designated Hg Rate (lbs/TBtu) | Inferred EIA 2021 Hg Rate (lbs/TBtu) | Hg Fuel Content at 95th Percentile (lbs/TBtu) | Hg Removal (%) for 1.2 lbs/TBtu at 95th Percentile |
|---|---|---|---|---|---|---|
| Coal Creek | Falkirk | UTAV, HGB1 and HGA1/HGA2 (Mostly Haga A seam) | 7.81 | 7.80 | 25.1 | 95.2 |
| Antelope Valley | Freedom | Freedom Mine Belauh Seam | 7.81 | 7.76 | 23.0 | 94.8 |
| Coyote | Coyote Creek | Coyote Upper Belauh | 7.81 | 7.79 | 19.2 | 93.8 |
| Leland Olds | Freedom | Kinneman Creek, Hagel A, Hagel B | 7.81 | 7.79 | 23.0 | 94.8 |

6.2    Texas Gulf Coast Mines and Generating Units

Figures 6-5 to 6-7 present data from Texas and Mississippi lignite mines describing the content and variability for Hg, sulfur, and the (Ca + Na)/S metric, as delivered to generating units in Texas.  Analogous to the data cited for North Dakota, the "box and whisker" depiction represents the same metrics.



Figure 6-5. Mercury Variability for Two Gulf Coast Sources: Mississippi, Texas

Table 6-2 compares the Hg removal required to meet the proposed 1.2 lbs/TBtu rate considering the variability of Hg in Texas and Mississippi coals, instead of the IPM-assigned Hg coal content.  For three Texas plants that fired 100% lignite – Major Oak Units 1 and 2, Oak Grove Units 1 and 2, and San Miguel – EPA assigned inlet Hg values from 12.44 to 14.88 lbs/TBtu, implying Hg removal of 90-92% to achieve 1.2 lbs/TBtu.  However, based on the 95th percentile value of the Texas lignite Hg values from Figure 6-5, the required Hg removal would be 96-97%.



Figure 6-6. Sulfur Variability for Mississippi, Texas Lignite Mines19.1



Figure 6-7. Fuel Alkalinity/Sulfur Ratio for Mississippi, Texas Lignite Mines

Table 6-2. Hg Variability for Select Texas Reference Stations

| Station | Mines | IPM Designated Hg Rate (lbs/TBtu) | Inferred EIA 2021 Hg Rate (lbs/TBtu) | Hg Fuel Content at 95th Percentile (lbs/TBtu) | Hg Removal (%) for 1.2 lbs/TBtu at 95th Percentile |
|---|---|---|---|---|---|
| **Major Oak 1,2** | Calvert | 14.65 | 14.62 | 38.12 | 96.9 |
| **Oak Grove 1, 2** | Kosse Strip | 14.88 | 14.6 | 38.12 | 96.9 |
| **Red Hills 1, 2** | Red Hills | 12.44 | 12.4 | 67.6 | 98.2 |
| **San Miguel** | San Miguel Lignite | 14.65 | 14.62 | 38.1 | 96.9 |

## 6.3   Role of Flue Gas SO3

EPA equates PRB and lignite coal in terms of constituents that affect Hg capture by carbon sorbent. Data from North Dakota and Gulf Coast mines, displayed in the previous Figures 6-1 to 6-7, show these fuels also contain higher sulfur content than PRB - by a factor or two or more. This relationship is verified by data acquired from EIA Form 960, as provided by power station owners.  These fuel data, combined with inherent alkalinity, identifies the problematic role of flue gas $SO_3$ content.

### 6.3.1   EIA Hg-Sulfur Relationship

Figure 6-8 compares the seam-by-seam Hg and sulfur content from various power stations firing lignite coals, representing approximately 60 lignite mines and 40 PRB mines. Figure 6-8 shows, even excluding the outlier values of Hg (approximating 50 lbs/TBtu), lignite presents significantly greater variability in Hg and sulfur than PRB. Moreover, lignite coals have a much higher sulfur content than PRB and in many instances have twice the Hg content. The higher sulfur content of lignite equates to greater production rates of sulfur $SO_3$.



Figure 6-8. Lignite Hg and Sulfur Content Variability: 2021 EIA Submission

An additional factor is the amount of "inherent" alkalinity compared to sulfur – with higher value surpassing the $SO_3$ content in flue gas. As introduced previously, one metric of this feature is the ratio of Na and Ca to sulfur – on a mole basis.

Figures 6-3 and 6-7 show North Dakota and Gulf Coast lignite present a similar ratio of alkalinity to sulfur content as does PRB – approximating a value of 2. By this metric, lignite fuels in Figure 6-3 present similar means to "buffer" $SO_3$ as PRB. Notably, Texas lignite in Figure 6-7 is disadvantaged in this metric as the alkalinity to sulfur ratio is half that of PRB – reducing the buffering" effect of inherent ash.

Consequently, the higher sulfur content of lignite combined with equal or lower total alkali relative to sulfur allows measurable levels of $SO_3$ in lignite-generated flue gas, as evidenced by field measurements. EPA does not recognize this distinguishing difference, and states the following regarding lignite and subbituminous coal:[30]

*As mentioned earlier, EGUs firing subbituminous coal in 2021 emitted Hg at an average annual rate of 0.6 lb Hg/TBtu with measured values as low as 0.1 lb/TBtu. Clearly EGUs firing subbituminous coal have found control options to demonstrate compliance with the 1.2 lb/TBtu emission standard despite the challenges presented by the low natural halogen content of the coal and production of difficult-to-control elemental Hg vapor in the flue gas stream.*

This passage contains two major flaws – that the effectiveness of Hg removal techniques with PRB-generated flue gas can be replicated with lignite, and that average annual Hg emission rates are the metric for comparison. EPA fails to recognize that Hg removal in PRB is in the presence of very little (essentially unmeasurable) $SO_3$, and 30-day rolling averages exhibit variability not captured by the annual average.

### 6.3.2   $SO_3$: Inhibitor to Hg Removal

The ability of $SO_3$ to interfere with sorbent Hg removal is well-known.[31] Most notably, EPA's contractor for the technology assessments used in the IPM[32] – Sargent & Ludy –for EPA issued assessment on Hg control technology. This document states[33]

*With flue gas SO3 concentrations greater than 5 - 7 ppmv, the sorbent feed rate may be increased significantly to meet a high Hg removal and 90% or greater mercury removal may not be feasible in some cases. Based on commercial testing, capacity of activated carbon can be cut by as much as one half with an SO3 increase from just 5 ppmv to 10 ppmv.*

This passage from the S&L technology assessment – funded by EPA to support the IPM model - describes that Hg absorption capacity of carbon can be cut in half by an increase in $SO_3$ from 5 to 10 ppm. In addition, the presence of $SO_3$ asserts a secondary role in terms of gas temperature – units with measurable $SO_3$ are designed with higher gas temperature at the air heater exit – typically where sorbent is injected – to avoid corrosion. Special-purpose tests on a fabric filter

---

[30] Tech Memo page 21

[31] Sjostrom 2019. See graphics 21-25

[32] Documentation for EPA's Power Sector Modeling Platform v6: Using the Integrated Planning Model, May 2018.

[33] IPM Model – Updates to Cost and Performance for APC Technologies: Mercury Control Cost Development Methodology, Prepared by Sargent & Lundy, Project 12847-002, March 2013.

pilot plant showed an increase in gas temperature from 310ºF to 340ºF lowered sorbent Hg removal from 81% to 68%.[34]   The role of $SO_3$ is not considered in assumed carbon injection rates for EPA's economic analysis in Tables 12 and 13 of the Tech Memo.

Publicly available field test data demonstrate the role of $SO_3$ on carbon sorbent effectiveness. Figure 6-9 presents results from a lignite-fired plant describing Hg removal across the ESP with sorbent injection.[35] This 900 MW unit is reported to fire a higher sulfur lignite in which more than 20 ppm of $SO_3$ in flue gas is observed preceding the air heater, subsequently decreasing to 10 ppm $SO_3$ existing the air heater.



Figure 6-9. Sorbent Hg Removal in ESP in Lignite-Fired Unit: Effect of Injection Location

Data in Figure 6-9 show the role of $SO_3$ in compromising sorbent performance - highest Hg removal is attained with lower $SO_3$ (downstream APH) with 60-68% Hg removal achieved (at an injection rate corresponding to 0.6 lbs/MACF).

Attaining a total system 92% Hg removal – the target as described by EPA – is likely not achievable given the trajectory of the curves as shown in Figure 6-9.

## 6.4   EPA Cost Calculations Ignore FGD

EPA ignores the major role of wet or dry FGD in removing Hg – a fundamental flaw in their analysis. EPA's premise that sorbent addition is the sole compliance technology is incorrect – 18 of 22 units in the lignite fleet listed in Table 9 of the RTR Tech Memo are equipped with FGD.

---

[34] Sjostrom 2016.  See graphic 16.

[35] Satterfield, J., Optimizing ACI Usage to Reduce Costs, Increase Fly Ash Quality, and Avoid Corrosion, presentation to the Powerplant Pollutant and Effluent Control Mega Symposium, August, 2018.

Of these 18 units, 4 are equipped with dry FGD and 14 with wet FGD.  This process equipment asserts a major role in Hg removal as discussed in the next section.

The calculation of cost-effectiveness for the model plant as presented in Section (e)(i) of the RTR Tech memo addresses only sorbent addition, thus does not reflect the Hg compliance strategy of 18 units in the lignite fleet. EPA assumes (a) upgrade of sorbent from "conventional" activated carbon to the halogenated form, and (b) increasing sorbent injection from 2.5 to 5.0 lbs/MAFH elevates Hg reduction from 73% to 92%.[36]  This assumption is not relevant – at least in this specific form – to 18 of 22 units in the lignite fleet, as wet or dry FGD will contribute to Hg removal. EPA's approach could underestimate the cost per ton incurred, as tons of Hg removed by the FGD could be credited to sorbent injection (the denominator of the $/ton calculation is larger than it should be).

The variable of FGD Hg removal cannot be ignored, and undermines the legitimacy of the cost estimates as Hg removed by FGD cannot be ascribed to sorbent injection. Thus, depending on how or if the sorbent injection rate changes, costs could increase beyond EPA's estimate (as the denominator in the $/ton calculation is reduced.

6.5    Conclusions

- EPA's proposal that Hg emissions of 1.2 lbs/TBtu can be attained for lignite-fired units by increasing sorbent injection rate and adding halogens (to compensate for loss of refined coal) is incorrect, as it assumes sorbent injection Hg removal observed with PRB is achievable on lignite.

- Flue gas generated from lignite exhibits measurable $SO_3$ in quantities that– as summarized by EPA's contractor for IPM model inputs - reduce the effectiveness of sorbent by 50% and in some cases presents a barrier to 90% Hg removal.

- Accounting for the variability of Hg content in lignite for most North Dakota and Texas lignite fuels, more than 90% Hg removal is required to meet 1.2 lbs/MBtu, exceeding the nominally 80% removal estimated by EPA, and over a 30-day rolling average basis is unlikely to be attained.

- EPA's calculation of cost–effectiveness for lignite fuels ignores the role of FGD, present in 18 of the 22 reference stations, in removing Hg. The result of this erroneous assumption could be an under-estimation of the cost for additional Hg removal.

---

[36] EPA uses the incorrect constant in the calculation of gas flow rate to translate sorbent injection from a mass per time basis (lb//hr) to mass per unit volume of gas (lbs/MACF). The calculation on page 24 uses the value of 9,860 scf/MBtu to quantify flue gas generated from lignite coal.  Per EPA-454/R-95-015 (Procedure for Preparing Emission Factor Documents, OAQPS, November 1997) this value reflects the dry volume of gas produced from lignite coal, per MBtu.  The flue gas rate that is processed by the environmental controls is the authentic "wet" basis and about 20% higher per MBtu (12,000 scf/MBtu). Use of the correct, latter constant lowers the value of sorbent per MACF by the same magnitude.

7.    Mercury Emissions: Non-Low Rank Fuels

Section 7 addresses EPA's proposal to retain the present Hg limit of 1.2 lbs/TBtu for units firing bituminous and subbituminous coals.

EPA recognizes that Hg emission rates - as determined on an annual average basis - have decreased significantly since the initial MATS rule was issued, with bituminous–fired units averaging 0.4 lbs/TBtu (and ranging between 0.2 and 1.2 lbs/TBtu) and subbituminous-fired units averaging 0.6 lbs/TBtu (ranging between 0.1 to 1.2 lbs/TBtu).[37] EPA states these Hg emission rates represent between a 77 and 98% Hg removal from an assumed Hg inlet value of 5.5 lbs/TBtu. EPA notes they did not acquire detailed information on compliance steps such as the type of sorbent injected, the rate of sorbent injection, and the role of SCR NOx control and wet FGD and the myriad factors that determine Hg removal "co-benefits."

This section addresses the reported Hg removal and basis for EPA's position.

7.1   Hg Removal

EPA's discussion of the annual average of Hg removal does not consider the 30-day rolling average, the more challenging metric to attain – and the metric mandated for compliance. The 30-day rolling average reflects variability in Hg coal content and process conditions, both of which can experience daily or hourly changes, which obviously is not captured in annual averages.

Figures 7-1 and 7-2 report two metrics of Hg emission rate variability.[38] Figure 7-1 presents the mean and standard deviation of Hg annual average emissions for eleven categories of control technology and fuel rank. For six of these eleven categories, the sum of the mean and the standard deviation approach the Hg limit of 1.2 lbs/TBtu.

Figure 7-2 describes for six categories of control technology and 2 or 3 fuel ranks (depending on the technology) the number of units that for at least one operating day exceed 1.2 lbs/TBtu on a 30-day rolling average. Figure 7-2 shows for all categories of control technology and fuel rank experience 10% to 20% of units exceed this 30-day average.

In summary, EPA's report of annual Hg emission rate - significantly reduced compared from 2012 – does not provide a basis for further reductions as annual data does not account for variability.

---

[37] Prepublication Version, page 85

[38] Cichanowicz, J. E. et. al., Mercury Emissions Rate:  The Evolution of Control Technology Effectiveness, Presented at the Power Plant Pollutant and Effluent Control MEGA Symposium: Best Practices and Trends, August 20-23, 2018, Baltimore, MD.



Figure 7-1. Mean, Standard Deviation of Annual Hg Emissions: 2018



Figure 7-2. Mean, Standard Deviation of Annual Hg Emissions: 2018

## 7.2   Role of Fuel Composition and Process Conditions

Hg emissions are defined by variability in coal composition and process conditions, the latter including sorbent type, and injection rate, and the "co-benefit" Hg removal imparted by SCR NOx control and wet or dry FGD.

Although EPA did not elicit detailed process information from owners via Section 114, several key insights are presented in a 2018 survey conducted by ADA.[39]

### 7.2.1   Coal Variability

EPA cites observing for Hg emissions "a control range of 98 to 77 percent (assuming an average inlet concentration of 5.5 lb/TBtu)."[40]  It is not clear if EPA assigns the average Hg content value of 5.5 lbs/TBtu to both bituminous and subbituminous coal, or solely the latter.

Figure 7-3 shows an average value of 5.5 lbs/TBtu does not represent either coal rank well. Figure 7-3 presents – on an annual average basis – data from more than 70 units reporting Hg content to the EIA.  Numerous units report up to 10 lbs/TBtu - almost twice the average value EPA assigns, with 10 additional units reporting Hg content exceeding 10 lbs/TBtu.  Northern Appalachian bituminous coals appear to contain higher Hg content than coals from other regions.



Figure 7-3. Annual Average of Fuel Hg, Sulfur Content in Coal

---

[39] Sjostrom, S. et. al., Mercury Control in the U.S.: 2018 Year in Review
[40] RTR Tech Memo, page 19.

Consequently, EPA's calculation of 98 to 77% Hg removal is likely inaccurate as the assumed coal Hg content is too low.

### 7.2.2   Process Conditions

The process conditions for Hg removal: sorbent composition, sorbent injection rate, and the "co-benefits" of SCR NOx control and wet FGD are highly variable, due to a combination of factors. The following provides several examples.

<u>Refined Coal.</u> The absence of Refined Coal – no longer a viable option - complicates projecting future Hg emissions. A survey of Hg compliance activities for 2018 reported Refined Coal as a compliance step;[41] EIA fuel records show this trend persisted through 2021. EPA's assumption that adding halogens to the fuel or flue gas compensates for the unavailability of Refined Coal is speculative and without basis. *Without assurances of the benefits from the halogen content of Refined Coal, it is not possible to assess the viability of lowering Hg emissions.*

<u>Sorbent Injection</u>.  Sorbent injection is a key compliance step for 70% of subbituminous-fired units, for some augmented with coal additives and Refined Coal. For bituminous-fired units, 18% of coal use is treated by some combination of sorbent injection and coal additives.

As described by EPA, increasing the rate of sorbent injection increases Hg removal – but with diminishing returns as sorbent mass is added. An example of this relationship is provided by full-scale tests at Ameren's PRB-fired Labadie Unit 3.  These tests explored the effectiveness of both conventional and brominated activated carbon.  These tests, purposely conducted in PRB-generated flue gas to define sorbent performance in the absence of $SO_3$, show Hg removal of 90% or more is feasible and that halogen addition can lower sorbent rate.[42]

This relationship is complicated by the role of Refined Coal, coal additives, and (as described below) the contribution of "co-benefits".  *Devising a reasoned prediction of Hg removal under variable conditions, including coal composition and the impact of changing sorbents is not possible with current available information.*

<u>SCR, FGD Co-Benefits</u>.  The capture of Hg by wet FGD – in many cases prompted by the role of SCR catalysts to oxidize elemental Hg – can be a primary mean for Hg capture.  However, such co-benefits are highly variable, and depend on the ratio of elemental to oxidized Hg in the flue gas, and the consequential Hg "re-emission" by a wet FGD. There are means to remedy this variability in some instances, but broad success cannot be assured. *Without the specifics of FGD design and operation, Hg removal via wet FGD cannot be predicted.*

---

[41] Sjostrom, S. et. al., Mercury Control in the U.S.: 2018 Year in Review.  Hereafter Sjostrom 2019.

[42] Senior, C. et. al., *Reducing Operating Costs and Risks of Hg Control with Fuel Additives*, Presentation to the Power Plant Pollutant Control and Carbon Management Mega Symposium, August 16-18, 2016.

Hg Re-Emission. The fate of Hg entering a wet FGD is uncertain.[43] If in the oxidized state, Hg upon entering the FGD solution can (a) remain in solution and be discharged with the FGD-cleansing step of "blowdown" (b) precipitate as a solid and be removed with the byproduct (typically gypsum), or (c) be reduced from the oxidized to the elemental state, thus re-emitted in the flue gas. Several means to minimize Hg re-emission exist, including injection of sulfite and controlling the scrubber liquor oxidation/reduction potential (ORP). These means can limit Hg remission but are additional process steps that are superimposed upon the task of achieving high efficiency $SO_2$ removal. *The extent these means can be universally applied without compromising $SO_2$ removal is uncertain.*

Role of Variability Due to Load Changes.  An in-plant study showed that increasing load for a wet FGD-equipped unit can elevate Hg re-emission, eventually exceeding 1.2 lbs/TBtu.[44]  This observation can be due to loss of the control over the ORP, defined in the previous paragraph as a key factor in FGD Hg removal. Chemical additives can adjust ORP but complete and autonomous control may not be available.  For example, in a systematic evaluation of FGD operating variables conducted at a commercial power station, factors such as limestone composition and the extent to which units must operate in zero-water discharge – as perhaps mandated by the pending Effluent Limitation Guideline – can affect ORP and thus Hg-re-emission.[45]

Upsets in wet FGD process conditions can prompt Hg re-emission. Specifically, one observer noted two units that "….experienced a scrubber reemission event causing the mercury stack emissions to increase dramatically above the MATS limit and significantly higher than the incoming mercury in the coal and the event lasting for several days."[46]  This high Hg event was eventually remedied over the short-term operation, but long-term performance is not available.

### 7.3   Conclusions: Mercury Emissions - Non-Low Rank Coals

There is inadequate basis to further lower the Hg emissions rate below the present limit of 1.2 lbs/TBtu, as variability in fuel and process operations outside the control of the operator can elevate emissions to approach or in some cases exceed that rate.

---

[43] Gadgil, M., 20 Years of Mercury Re-emission – What do we Know?, Presentation to the Power Plant Pollutant Control and Carbon Management Mega Symposium, August 16-18, 2016.

[44] Blythe, G. et. al., Maximizing Co-Benefit Mercury Capture for MATS Compliance on Multiple Coal-Fired Units, Presentation to the Power Plant Pollutant Control and Carbon Management Conference Mega Symposium, August 16-18, 2016.

[45] Blyte, G. et. al., Investigation of Toxics Control by Wet FGD Systems, Presentation to the Power Plant Pollutant Control and Carbon Management Conference Mega Symposium, August 16-18, 2016.

[46] Pavlisch, J. et. al., Managing Mercury Reemission and Managing MATS compliance Using a sorbent Approach, Presentation to the Power Plant Pollutant Control and Carbon Management Conference Mega Symposium, August 16-18, 2016.

# 8.  EPA IPM RESULTS: EVALUATION AND CRITIQUE

EPA used the Integrated Planning Model (IPM) to establish a Baseline Scenario from which to measure compliance impacts of the proposed rule.  This Baseline Scenario is premised upon IPM's Post-IRA 2022 Reference Case. In this Post-IRA simulation, IPM evaluated a number of tax credit provisions of the Inflation Reduction Act of 2022 (IRA), which address application of Carbon Capture and Storage (CCS) and other means to mitigate carbon dioxide ($CO_2$). These are the (i) New Clean Electricity Production Tax Credit (45Y); (ii) New Clean Electricity Investment Credit (48E); Manufacturing Production Credit (45X); CCS Credit (45Q); Nuclear Production Credit (45U); and Production of Clean Hydrogen (45V). Also, the Post-IRA 2022 Reference Case includes compliance with the proposed Good Neighbor Policy (Transport Rule).[47]

A critique of EPA's methodology and findings is described subsequently.

## 8.1  IPM 2030 Post-IRA 2022 Reference Case: A Flawed Baseline

The IPM Post-IRA 2022 Reference Case for the years 2028 and 2030 comprises a flawed baseline to measure compliance impacts of the proposed rule.  This flawed baseline centers around IPM projected coal retirements in both 2028 and 2030 as well as units projected to deploy CCS in 2030. Specifically, IPM has erroneously retired numerous coal units expected to operate beyond 2028 and 2030 based upon current announced retirement plans; consequently, these units are subject to the proposed rule beginning in 2028.  There are numerous challenges and limitations to deploying CCS as EPA has projected on 27 coal units in 2030.  These units would also be subject to the proposed. Consequently, IPM's compliance impacts of the proposed rule is likely understated.

### 8.1.1  Analytical Approach

This analysis identifies those units IPM modeled as coal retirements, CCS retrofits and coal to gas (C2G) conversions in both 2028 and 2030, and compares them to announced plans for unit retirements, technology retrofits and C2G conversions. To identify errors for 2028, the parsed file for the 2028 Post-IRA 2022 Reference Case was used. Since EPA did not provide a parsed

---

[47] In addition to the IRA and GNP, the Post-IRA 2022 Reference Case takes into account compliance with the following:  (i) Revised Cross-State Air Pollution Rule (CSAPR) Update Rule; (ii) Standards of Performance for Greenhouse Gas Emissions from New, Modified and Reconstructed Stationary Sources: Electric Utility Generating Units; (iii) MATS Rule which was finalized in 2011; (iv) Various current and existing state regulations; (v) Current and existing RPS and Current Energy Standards; (vi) Regional Haze Regulations and Guidelines for Best Available Retrofit Technology (BART); and, (vii) Platform reflects California AB 32 and RGGI. Three non-air federal rules affecting EGUs: (i) Cooling Water Intakes (316(b) Rule; (ii) Coal Combustion Residuals (CCR), which reflects EPA's July 29, 2020 position on retrofitting or closure of surface impoundments; and, (iii) Effluent Limitation Guidelines, which includes the 2020 Steam Electric Reconsideration Rule (cost adders were applied starting in 2025).

file of the 2030 Post-IRA 2022 Reference Case, an abbreviated parsed file was created using four different IPM files. These are: (i) 2028 parsed file of the Post-IRA 2022 Reference Case; (ii) Post-IRA 2022 Reference Case RPE File for the year 2030; (iii) Post-IRA 2022 Reference Case RPT Capacity Retrofits File for the year 2030; and, (iv) National Electrical Energy Data System (NEEDS) file for the Post-IRA 2022 Reference Case. These parsed files allow identifying IPM modeled retirements in 2028 and 2030, CCS retrofits in 2030 and C2G in both 2028 and 2030. These modeled retirements and conversions were compared to announced information in the James Marchetti Inc ZEEMS Data Base.

### 8.1.2   Coal Retirements

The 2028 IPM modeling run retired 112 coal units (53.6 GW) from 2023 to 2028. In the 2030 analysis, IPM retired an additional 52 coal units (25.5 GW).  The total number of retirements for the two modeling run years is 164 coal units (79.1 GW).

Table 8-1 summarizes the IPM retirement errors in the 2028 and 2030 modeling runs. Specifically, IPM incorrectly retired 29 coal units (14.0 GW) by 2028 and an additional 23 coal units (14.1 GW) in 2030. In addition, there are 3 coal units (1.6 GW) that EPA listed in the NEEDS file as being retired before 2028 that will operate beyond 2030.  In total, there are 55 coal units that IPM erroneously retired in the 2028 and 2030 modeling runs that will be operating and subject to some aspect of the proposed rule beginning in 2028.

Table 8-1. Coal Retirement Errors

| Year | Description | Number |
|:---:|---|:---:|
| **2028** | Retiring after 2028 | 29 |
| **2030** | Retiring after 2030 | 23 |
| **2030** | NEEDS retirements that should be in the 2030 modeling platform | 3 |
| **Total** | | 55 |

 Tables 8-2 to 8-6 lists each of the coal units IPM has incorrectly retired, incorrectly deployed CCS, or switched to natural gas.

Table 8-2. IPM Coal Retirement Errors: 2028 Post-IRA 2022 Reference Case Run

| No. | RegionName | StateName | ORISCode | UnitID | PlantName | Capacity | Observation |
|-----|-----------|-----------|----------|--------|-----------|----------|-------------|
| 1 | WECC_Arizona | Arizona | 6177 | U1B | Coronado | 380 | To be retired by 2032 and continued seasonal curtailemts, |
| 2 | SPP West | Arkansas | 6138 | 1 | Flint Creek | 528 | Retire January 1, 2039 - Entergy LL 2023 IRP (March 31, 2023). |
| 3 | MISO_Arkansas | Arkansas | 6641 | 1 | Independence | 809 | Agreement with Sierra Club and NPCA to cease coal by Dec 31, 2030. |
| 4 | MISO_Arkansas | Arkansas | 6641 | 2 | Independence | 842 | Agreement with Sierra Club and NPCA to cease coal by Dec 31, 2030. |
| 5 | SERC_Central_TVA | Kentucky | 1379 | 2 | Shawnee | 134 | TVA planning assumption retirement (5/21) - December 31, 2033 |
| 6 | SERC_Central_TVA | Kentucky | 1379 | 3 | Shawnee | 134 | TVA planning assumption retirement (5/21) - December 31, 2033 |
| 7 | SERC_Central_TVA | Kentucky | 1379 | 5 | Shawnee | 134 | TVA planning assumption retirement (5/21) - December 31, 2033 |
| 8 | SERC_Central_TVA | Kentucky | 1379 | 6 | Shawnee | 134 | TVA planning assumption retirement (5/21) - December 31, 2033 |
| 9 | SERC_Central_TVA | Kentucky | 1379 | 7 | Shawnee | 134 | TVA planning assumption retirement (5/21) - December 31, 2033 |
| 10 | SERC_Central_TVA | Kentucky | 1379 | 8 | Shawnee | 134 | TVA planning assumption retirement (5/21) - December 31, 2033 |
| 11 | SERC_Central_TVA | Kentucky | 1379 | 9 | Shawnee | 134 | TVA planning assumption retirement (5/21) - December 31, 2033 |
| 12 | MISO_Minn/Wisconsin | Minnesota | 6090 | 3 | Sherburne County | 876 | PSC approved closure (2/8/22); Upper Midwest Resource Plan (6/25/21) for 2030. |
| 13 | MISO_Missouri | Missouri | 2103 | 1 | Labadie | 593 | 2022 IRP Update retire in 2042 (6/24/22). |
| 14 | MISO_Missouri | Missouri | 2103 | 2 | Labadie | 593 | 2022 IRP Update retire in 2042 (6/24/22). |
| 15 | MISO_Missouri | Missouri | 2103 | 3 | Labadie | 593 | 2022 IRP Update (6/24/22) retirement in 2036 |
| 16 | MISO_Missouri | Missouri | 2103 | 4 | Labadie | 593 | 2022 IRP Update (6/24/22) retirement in 2036 |
| 17 | MISO_Missouri | Missouri | 2107 | 1 | Sioux | 487 | 2022 IRP Update (6/24/22) - To be retired in 2030 |
| 18 | MISO_Missouri | Missouri | 2107 | 2 | Sioux | 487 | 2022 IRP Update (6/24/22) - To be retired in 2030 |
| 19 | SERC_VACAR | North Carolina | 2712 | 3A,3B | Roxboro | 694 | 2022 Carbon Reduction Plan per PSC retirement Jan. 1, 2028-34 (12/30/22). |
| 20 | SERC_VACAR | North Carolina | 2712 | 4A, 4B | Roxboro | 698 | 2023 Carbon Reduction Plan per PSC retirement Jan. 1, 2028-34 (12/30/22). |
| 21 | ERCOT_Rest | Texas | 298 | LIM1 | Limestone | 831 | EIA 860 has retirement December 2029 |
| 22 | ERCOT_Rest | Texas | 298 | LIM2 | Limestone | 858 | EIA 860 has retirement December 2029 |
| 23 | WECC_Utah | Utah | 7790 | 1-1 | Bonanza | 458 | Unit is planned to retire in 2030, |
| 24 | WECC_Utah | Utah | 8069 | 2 | Huntington | 450 | Retire in 2032 - 2023 IRP (3/31/23) |
| 25 | PJM_Dominion | Virginia | 7213 | 1 | Clover | 440 | Dominion 2023 IRP - Retirement Date 2040 (5/1/23) |
| 26 | PJM_Dominion | Virginia | 7213 | 2 | Clover | 437 | Dominion 2023 IRP - Retirement Date 2040 (5/1/23) |
| 27 | PJM_AP | West Virginia | 3943 | 1 | Fort Martin | 552 | EPA Settlement on wastewater upgrades (8/9/22), 2020 IRP through 2035 |
| 28 | PJM_AP | West Virginia | 3943 | 2 | Fort Martin | 546 | EPA Settlement on wastewater upgrades (8/9/22), 2020 IRP through 2036 |
| 29 | WECC_Wyoming | Wyoming | 6101 | BW91 | Wyodak | 332 | Retire in 2039 - IRP (3/31/23) |

Table 8-3. IPM Coal Retirement Errors: 2030 Post IRA 2022 Reference Case Modeling Run

| No. | RegionName | StateName | ORISCode | UnitID | PlantName | Capacity | Observations |
|---|---|---|---|---|---|---|---|
| 1 | WECC_Arizona | Arizona | 6177 | U2B | Coronado | 382 | To be retired by 2032 and contined seasonal curtailments |
| 2 | FRCC | Florida | 628 | 4 | Crystal River | 712 | To be retired in 2034 (2020 Sustainability Report) |
| 3 | FRCC | Florida | 628 | 5 | Crystal River | 710 | To be retired in 2034 (2020 Sustainability Report) |
| 4 | SERC_Southeastern | Georgia | 6257 | 1 | Scherer | 860 | ELG Compliance - Wastewater Treatment - No Announced Retirement |
| 5 | SERC_Southeastern | Georgia | 6257 | 2 | Scherer | 860 | ELG Compliance - Wastewater Treatment - No Announced Retirement |
| 6 | PJM West | Indiana | 1040 | 1 | Whitewater Valley | 35 | Biased to peak load duty, 2020 IRP Base Case has retirement May 31, 2034 |
| 7 | MISO_Iowa | Iowa | 1167 | 9 | Muscatine Plant #1 | 163 | ELG compliance options for FGDW and BATW, possible 2028 retirement |
| 8 | SPP North | Kansas | 6068 | 1 | Jeffrey Energy Center | 728 | To be retired at the end of 2039 (2021 IRP) |
| 9 | SPP North | Kansas | 1241 | 2 | La Cygne | 662 | To be retired at the end of 2039 (2021 IRP) |
| 10 | SERC_Central_Kentucky | Kentucky | 1356 | 1 | Ghent | 474 | To be retired 2034 |
| 11 | SERC_Central_Kentucky | Kentucky | 1356 | 3 | Ghent | 485 | To be retired 2037. |
| 12 | SERC_Central_Kentucky | Kentucky | 1356 | 4 | Ghent | 465 | To be retired 2037. |
| 13 | SPP North | Missouri | 6065 | 1 | Iatan | 700 | To be retired at the end of 2039 (2021 IRP) |
| 14 | SPP North | Missouri | 6195 | 1 | John Twitty | 184 | Beyond 2030 retirement date - new 2022 IRP |
| 15 | SERC_VACAR | North Carolina | 8042 | 1 | Belews Creek | 1110 | 1/1/2036 retirement per 2022 Carbon Reduction Plan |
| 16 | SERC_VACAR | North Carolina | 8042 | 2 | Belews Creek | 1110 | 1/1/2036 retirement per 2022 Carbon Reduction Plan |
| 17 | SERC_VACAR | North Carolina | 2727 | 3 | Marshall (NC) | 658 | 2022 Carbon Reduction Plan accepted by PSC retirement Jan. 1, 2033 (12/30/22) |
| 18 | SERC_VACAR | North Carolina | 2727 | 4 | Marshall (NC) | 660 | 2022 Carbon Reduction Plan accepted by PSC retirement Jan. 1, 2033 (12/30/22) |
| 19 | MISO_MT_SD_ND | North Dakota | 8222 | B1 | Coyote | 429 | Active perl reliability concerns in MISO. End of depreciable life - 2041 |
| 20 | SERC_VACAR | South Carolina | 6249 | 1 | Winyah | 275 | 2023 IRP: operate unit through 2030 for reliability (4/19/23) |
| 21 | SERC_VACAR | South Carolina | 6249 | 2 | Winyah | 285 | 2024 IRP: operate unit through 2030 for reliability (4/19/23) |
| 22 | SERC_VACAR | South Carolina | 6249 | 3 | Winyah | 285 | 2025 IRP: operate unit through 2030 for reliability (4/19/23) |
| 23 | SERC_VACAR | South Carolina | 6249 | 4 | Winyah | 285 | 2026 IRP: operate unit through 2030 for reliability (4/19/23) |
| 24 | PJM West | West Virginia | 3935 | 1 | John E Amos | 800 | Approved ELG upgrades to keep plant open until 2040. |
| 25 | PJM West | West Virginia | 3935 | 2 | John E Amos | 800 | Approved ELG upgrades to keep plant open until 2040. |
| 26 | PJM_AP | West Virginia | 3954 | 1 | Mt Storm | 554 | Dominion 2023 IRP - Retirement Date 2044 (5/1/23) |
| 27 | PJM_AP | West Virginia | 3954 | 2 | Mt Storm | 555 | Dominion 2023 IRP - Retirement Date 2044 (5/1/23) |

Table 8-4 Units in the NEEDS to Be Operating in 2028

| No. | Region Name | State Name | ORIS Plant | Unit ID | Plant Name | Capacity (MW) | NEEDS Retirement | Year | Observations |
|---|---|---|---|---|---|---|---|---|---|
| 1 | SPP_N | Kansas | 1241 | 1 | La Cygne | 736 | 2025 | | 2022 IRP Update to be retired in 2032 |
| 2 | MIS_LA | Louisiana | 6190 | 3-1, 3-2 | Brame Energy Center | 626 | 2027 | | No plans to retire. Evaluating CCS |
| 3 | WECC_WY | Wyoming | 4158 | BW44 | Dave Johnston | 330 | 2027 | | Retire in 2039 - 2023 IRP (3/31/23). |

Table 8-5 Units IPM Predicts CCS By 2030

| No. | Region Name | StateName | ORISCode | UnitID | PlantName | Capacity | Observations |
|---|---|---|---|---|---|---|---|
| 1 | ERCOT_Rest | Texas | 6179 | 3 | Fayette Power Project | 286.05 | |
| 2 | ERCOT_Rest | Texas | 7097 | BLR2 | J K Spruce | 537.93 | Board voted to convert to natural gas by 2027 (1/23/23) |
| 3 | ERCOT_Rest | Texas | 6180 | 1 | Oak Grove (TX) | 572.77 | |
| 4 | ERCOT_Rest | Texas | 6180 | 2 | Oak Grove (TX) | 570.97 | |
| 5 | ERCOT_Rest | Texas | 6183 | SM-1 | San Miguel | 237.74 | |
| 6 | FRCC | Florida | 645 | BB04 | Big Bend | 292.27 | |
| 7 | MISO_Indiana | Indiana | 6113 | 1 | Gibson | 594.24 | |
| 8 | PJM West | Kentucky | 6018 | 2 | East Bend | 399.00 | |
| 9 | PJM West | West Virginia | 3948 | 1 | Mitchell (WV) | 537.77 | |
| 10 | PJM West | West Virginia | 3948 | 2 | Mitchell (WV) | 537.77 | |
| 11 | SERC_Southeastern | Alabama | 6002 | 4 | James H Miller Jr | 477.05 | |
| 12 | SPP_WAUE | North Dakota | 6469 | B1 | Antelope Valley | 289.22 | |
| 13 | SPP_WAUE | North Dakota | 6469 | B2 | Antelope Valley | 288.38 | |
| 14 | SPP_WAUE | North Dakota | 2817 | 2 | Leland Olds | 279.16 | |
| 15 | WECC_Arizona | Arizona | 8223 | 3 | Springerville | 281.05 | |
| 16 | WECC_Arizona | Arizona | 8223 | 4 | Springerville | 281.05 | |
| 17 | WECC_Colorado | Colorado | 470 | 3 | Comanche (CO) | 501.15 | To be retired Dec 31 2030 (10/31/22) |
| 18 | WECC_Colorado | Colorado | 6021 | C3 | Craig (CO) | 305.66 | To be retired Dec 2029 - Electric Resource Plan (12/1/20) |
| 19 | WECC_Utah | Utah | 6165 | 1 | Hunter | 319.80 | Retire in 2031- 2023 IRP (3/31/23) |
| 20 | WECC_Utah | Utah | 6165 | 2 | Hunter | 292.44 | Retire in 2032 - 2023 IRP (3/31/23). |
| 21 | WECC_Utah | Utah | 6165 | 3 | Hunter | 314.06 | Retire in 2032 - 2023 IRP (3/31/23). |
| 22 | WECC_Utah | Utah | 8069 | 1 | Huntington | 311.54 | Retire in 2032 - 2023 IRP (3/31/23). |
| 23 | WECC_Wyoming | Wyoming | 8066 | BW73 | Jim Bridger | 354.02 | Convert to natural gas in 2030 - 2023 IRP (3/31/23) |
| 24 | WECC_Wyoming | Wyoming | 8066 | BW74 | Jim Bridger | 349.78 | Convert to natural gas in 2030 - 2023 IRP (3/31/23) |
| 25 | WECC_Wyoming | Wyoming | 6204 | 1 | Laramie River Station | 385.22 | |
| 26 | WECC_Wyoming | Wyoming | 6204 | 2 | Laramie River Station | 382.92 | |
| 27 | WECC_Wyoming | Wyoming | 6204 | 3 | Laramie River Station | 383.45 | |

Table 8-6 Units IPM Erroneously Predicts Switch to Natural Gas

| No. | RegionName | StateName | ORISCode | UnitID | PlantName | Year | Capacity | Observations |
|---|---|---|---|---|---|---|---|---|
| 1 | SPP West (Oklahoma | Arkansas | 56564 | 1 | John W Turk Jr Power Plant | 2030 | 609 | Retire Jan 1, 2068 - SWEPCO 2023 IRP (March 29, 2023) |
| 2 | PJM West | Kentucky | 6041 | 2 | H L Spurlock | 2028 | 510 | No announced C2G or co-firing |
| 3 | ERCOT_Rest | Texas | 56611 | S01 | Sandy Creek Energy Station | 2030 | 933 | No announced conversion |

### 8.1.3   Coal CCS

Table 8-5 identifies the 27 units IPM projected to retrofit CCS by 2030; none of these have been involved in any Front-End Engineering and Design (FEED) Studies. However, 9 of the units identified by IPM will be either be retired or converted to natural gas in and around 2030. There are major questions addressing infrastructure and project implementation that present challenges to IPM's CCS projection for 2030. Indeed, it is next to impossible for these units to be in position to retrofit CCS by 2030.

### *8.1.4*   Coal to Gas Conversions (C2G)

The 2028 IPM modeling run converted 36 coal units to gas (14.3 GW). In the 2030 IPM modeling run an additional 2 coal units (1.5 GW) were converted to gas (Turk and Sandy Creek). As shown in Table 8.6, three of these units have no announced plans to convert to gas by 2028 or 2030 and will be subject to the proposed rule.

## 8.2   Summary

The major issues associated with EPA's IPM modeling of the 2028 and 2030 Post-IRA 2022 Reference Case are summarized as follows:

- The 2028 and 2030 Baseline (Post-IRA 2022 Reference Case) used to measure the compliance impacts of proposed rule is flawed and needs to be revised
- Most notably, IPM erred in retiring 55 coal units that will be subject to the proposed rule beginning in 2028.
- IPM retrofitted 27 units with CCS in 2030, 19 of which will be subject to the proposed rule. It is next to impossible for these units to retrofit CCS by 2030.
- The IPM modeled compliance impacts for the proposed rule in 2028 and 2030 is very likely understated.

# Appendix A: Additional Cost Study Data

Figure A-1. Unit ESP Investment (per EPA's Cost Assumptions): PM of 0.010 lbs/MBtu



Note: Colstrip costs reflect EPA's approch of retrofitting a fabric filter, as an ESP is not installed at that site.

Table A-1. Technology Assignment for 0.010 lbs/MBtu PM Rate: Industry Study

| ESP Minor | ESP Typical | ESP Major Upgrade | FF Cleaning | FF Retrofit |
|---|---|---|---|---|
| **Alcoa/Warrick** | East Bend | D B Wilson | Boswell Energy Center | Colstrip 3, 4 |
| **Big Bend** | General James M Gavin | Labadie | Clover Power Project | |
| **Coronado** | Gibson | Labadie | Ghent | |
| **Coronado** | Martin Lake 2 | Labadie | Gilberton Power/John B Rich | |
| **Crystal River** | Milton R Young | Labadie | H L Spurlock | |
| **Crystal River** | Mt Storm | Martin Lake 1 | Iatan | |
| **Jeffrey Energy Center** | Mt Storm | | Marion | |
| **Laramie River Station** | | | Mt Carmel Cogen | |
| **Martin Lake** | | | St Nicholas Cogen Project | |
| **San Miguel** | | | Walter Scott Jr Energy Center | |
| **Seminole** | | | WPS Westwood Generation LLC | |

Table A-2  Technology Assignment for 0.006 lbs/MBtu PM Rate: Industry Study

| FF O&M Enhancement | FF Retrofit | FF Retrofit |
|---|---|---|
| Antelope Valley | Alcoa/Warrick | Laramie River Station |
| Bonanza | Belews Creek | Leland Olds 1, 2 |
| Boswell Energy Center Clay Boswell | Big Bend | Martin Lake 1-3 |
| Clover Power Project | Cardinal | Merrimack |
| Comanche | Colstrip 3, 4 | Milton R Young |
| Ghent | Coronado 1, 2 | Monroe 1, 2 |
| Gilberton Power/John B Rich | Crystal River 4, 5 | Mt Storm 1, 2 |
| H L Spurlock | D B Wilson | Naughton |
| Huntington | East Bend | Nebraska City |
| Iatan | General James M Gavin | R D Green |
| Louisa | Gibson 1, 3 | R S Nelson |
| Marion | Gibson | Sam Seymour Fayette 1, 2 |
| Mt Carmel Cogen | Independence | San Miguel |
| Oak Grove 1 | IPL - AES Petersburg | Schiller |
| Sandy Creek Energy Station | James H Miller Jr | Seminole |
| Scrubgrass Generating 1, 2 | Jeffrey Energy Center 1, 2, 3 | Trimble County |
| St Nicholas Cogen Project | Jim Bridger 3, 4 | Whelan Energy Center |
| Twin Oaks Power 1, 2 | Labadie 1 -4 | White Bluff 1, 2 |
| Walter Scott Jr Energy Center | | |
| Weston | | |
| WPS Westwood Generation LLC | | |

Appendix B: Example Data Chart

Appendix A presents additional examples of units for which EPA's PM sampling and evaluation approach distorted results. These charts contain both mean and 99th percentile data. Data is presented for the following units, for which observations are offered as follows:

- TVA Gallatin Unit 1. EPA selected 0.0030 lbs/MBtu as the reference PM rate, using Q4 of 2019. Few of the 16 quarters that report lower PM emissions.

- TVA Gallatin Unit 2. EPA selected 0.0031 lbs/MBtu as the reference PM rate, also using Q4 of 2019. Few of the 16 quarters that report lower PM, similar to Unit 1.

- TVA Gallatin Unit 3. EPA selected 0.0016 lbs/MBtu as the reference PM rate, again using Q4 of 2019. Only one quarter (Q3 of 2019) reports lower PM rate.

- TVA Gallatin Unit 4. EPA selected 0.0022 lbs/MBtu as the reference PM rate, using Q1 of 2021. Of the 14 quarters reporting data, two quarters report PM rates equal to this rate, while two are below this rate.

- LG&E/KU Ghent 1. EPA selected 0.005 lbs/MBtu as the reference PM rate, using Q2 of 2019. This PM rate represents that reported in previous quarters, but with one exception all subsequent quarters through 2021 report higher PM.

- LG&E/KU Mill Creek Unit 4. EPA selected 0.0035 lbs/MBtu as the reference PM rate, using Q4 of 2021. With the exception of the previous quarter, this value is the lowest of any reported since 2017 by a significant margin.

- Alabama Power Gaston Unit 5. EPA selected 0.005 lbs/MBtu as the reference PM rate, using Q1 of 2021. Data for this unit is displayed from Q1 2017 through Q4 2022. Of the 24 reporting quarters (1Q 2017 through 4QW 2022) only 6 quarters have lower PM rates.

- Alabama Power Miller Unit 1. EPA selected 0.004 lbs/MBtu as the reference PM rate, using Q3 of 2017. Data for this unit is displayed from Q1 2017 through Q4 2022. The designated rate represents a significant reduction from approximately half of the reporting quarters since Q1 2020.



















# ATTACHMENT C

**MEMORANDUM**

**Date:**       December 16, 2011

**Subject:**    Emission Reduction Costs for Beyond-the-floor Mercury Rate for Existing Units
                Designed to Burn Low Rank Virgin Coal

**From:**       Kevin Culligan, SPPD/OAQPS

**To:**         EPA-HQ-OAR-2009-0234


       For the final rule, EPA has recalculated the beyond the floor control costs for existing
units designed to burn low rank virgin coal using a methodology similar to that used in the IPM
analysis done for the MATS proposal.  In the final rule, we have not recalculated control costs
based on the other methodology used in the proposal which used ACI capital and operating costs
provided in the ICR.   We have not used that approach because it was based upon an assumption
that all units would need to have a baghouse (also known as a fabric filter – FF – either existing
or newly installed) in order to meet the MACT PM standard and that the ACI would be used with
the baghouse.  EPA has considered and used additional information demonstrating that high
levels of mercury removal can be achieved with injection of brominated activated carbon and the
addition of a FF is not necessary.  Furthermore, based on additional analysis related to the PM
standard, EPA believes that most lignite units will not need to install new FF, therefore, EPA
believes a costing methodology based on this assumption would be inappropriate.

       For this analysis, EPA calculated beyond-the-floor costs for mercury controls by
assuming injection of brominated activated carbon at a rate of 3.0 lb/MACF for units with ESPs
and injection rates of 2.0 lb/MACF for units with baghouses (also known as fabric filters).   The
rate of 2.0 lb/MACF for fabric filters is consistent with the rate assumed in all other IPM
analyses for this rule.  The rate of 3.0 lb/MACF for units with ESPs is lower than the rate of 5.0
lb/MACF assumed in the IPM analysis.  EPA believes that this rate is appropriate, because a
higher rate would likely result in reductions beyond those needed to meet the BTF standard of
4.0 lb/TBtu.  Figure 1 in "Activated Carbon Injection for Mercury: Overview"[1] suggests that >
90% control can be achieved at lignite-fired units at a < 2.0 lb/MACF injection rate for units with
installed FF and using treated (i.e., brominated) AC.  The figure also suggests that > 90% Hg
control can be achieved at lignite-fired units at < 3.0 lb/MACF injection rate for units with
installed ESPs and using treated AC.  As Table 1 below shows, based on the IPM analysis, all
units would need to achieve reductions of less than 90%, therefore lower assumed injection rates
are appropriate.

---

[1] *Fuel Processing Technology* 89 (2010) 1310

**Table 1 – Emission Reduction Rates Required to Meet Standard of 4 lb/TBtu.**

| Plant Name | Unit ID | Hg Controls | Existing Controls | Base Hg lbs/Tbtu | Reduction Required, % | Policy Hg lbs/Tbtu |
|---|---|---|---|---|---|---|
| Big Brown | 1 | ACI | Cold-side ESP + Fabric Filter + SNCR | 9.09 | 55.98 | 1.01 |
| Big Brown | 2 | ACI | Cold-side ESP + Fabric Filter + SNCR | 9.09 | 55.98 | 1.01 |
| Lewis & Clark | B1 | ACI | Wet Scrubber | 7.68 | 47.92 | 0.75 |
| Martin Lake | 1 | ACI | Cold-side ESP + Wet Scrubber | 5.41 | 26.09 | 0.56 |
| Martin Lake | 2 | ACI | Cold-side ESP + Wet Scrubber | 5.41 | 26.09 | 0.56 |
| Martin Lake | 3 | ACI | Cold-side ESP + Wet Scrubber | 5.41 | 26.09 | 0.56 |
| Monticello | 3 | | Cold-side ESP + SNCR + Wet Scrubber | 6.30 | 36.53 | 0.96 |
| R M Heskett | B1 | | Cold-side ESP | 7.81 | 48.77 | 0.45 |
| R M Heskett | B2 | | Cold-side ESP + Cyclone | 4.76 | 16.00 | 0.75 |
| Leland Olds | 1 | | Cold-side ESP | 7.68 | 47.93 | 0.77 |
| Leland Olds | 2 | | Cold-side ESP | 7.81 | 48.77 | 0.78 |
| Milton R Young | B1 | | Cold-side ESP + SCR + Wet Scrubber | 4.21 | 4.93 | 0.75 |
| Milton R Young | B2 | | Cold-side ESP + SCR + Wet Scrubber | 4.21 | 4.93 | 0.75 |
| Stanton | 1 | | Cold-side ESP | 7.81 | 48.77 | 0.78 |
| Stanton | 10 | | Fabric Filter + Dry Scrubber | 7.51 | 46.76 | 0.75 |
| Limestone | LIM1 | | Cold-side ESP + Wet Scrubber | 6.75 | 40.76 | 1.13 |
| Limestone | LIM2 | | Cold-side ESP + Wet Scrubber | 6.75 | 40.76 | 1.13 |
| Dolet Hills | 1 | | Cold-side ESP + Wet Scrubber | 8.33 | 51.98 | 1.35 |
| Coal Creek | 1 | | Cold-side ESP + Wet Scrubber | 4.21 | 5.07 | 0.76 |
| Coal Creek | 2 | | Cold-side ESP + Wet Scrubber | 4.21 | 5.07 | 0.76 |
| Laramie River Station | 1 | | Cold-side ESP + Wet Scrubber | 5.31 | 24.71 | 0.56 |
| Laramie River Station | 2 | | Cold-side ESP + Wet Scrubber | 5.31 | 24.71 | 0.56 |
| Antelope Valley | B1 | | Fabric Filter + Dry Scrubber | 7.51 | 46.76 | 0.75 |
| Antelope Valley | B2 | | Fabric Filter + Dry Scrubber | 7.51 | 46.76 | 0.75 |
| Twin Oaks Power One | U1 | | Fabric Filter | 5.82 | 31.33 | 1.35 |
| Twin Oaks Power One | U2 | | Fabric Filter | 5.82 | 31.33 | 1.35 |
| Pirkey | 1 | | Cold-side ESP + Wet Scrubber | 7.59 | 47.27 | 1.35 |
| Coyote | B1 | | Fabric Filter + Dry Scrubber | 7.64 | 47.66 | 0.75 |
| Great River Energy Spiritwood Station | 1 | | Cold-side ESP + Fabric Filter + SNCR + Dry Scrubber | 7.68 | 47.92 | 0.75 |

EPA also assumed a disposal cost of $25/ton for ash comingled with activated carbon. This cost is consistent with a range of studies. DOE/NETL, in a recent study examining the costs of ACI, assumed total disposal costs of $17/ton for non-hazardous fly ash. They assumed $35/ton for fly ash that would have otherwise been sold for beneficial reuse (lost revenue of $18/ton plus disposal costs of $17/ton for non-hazardous fly ash). [2] In an EPA study, $25 - $30 per ton were assumed as total disposal costs.[3]

EPA recently modeled site-specific disposal costs for the RIA[4] for the proposed rule regulating coal combustion residuals (CCRs), including fly ash. Those costs were examined for units burning low rank virgin coal. The disposal costs varied by state/region. For Texas the incremental costs attributable to Hg control were $18.13/ton, while for North Dakota and Montana, the incremental costs attributable to Hg control were $32.31/ton.

---

[2] *Environmental Sci. Technol.* 2007, 41, 1365].
[3] *Environmental Sci. Technol.* 2006, 1385
[4] Regulatory Impact Analysis For EPA's Proposed RCRA Regulation Of Coal Combustion Residues (CCR) Generated by the Electric Utility Industry. Prepared by US Environmental Protection Agency Office of Resource Conservation & Recovery (ORCR) (formerly Office of Solid Waste) 1200 Pennsylvania Avenue NW (Mailstop 5305P) Washington DC, 20460 USA. Available at http://www.regulations.gov/ docket number EPA-HQ-RCRA-2009-0640-0003, Appendix H.

Based on these key assumptions, EPA projects an average reduction cost of $27,017 per pound of Hg removed. Unit by unit costs are provided in Table 2.

**Table 2 – Unit by unit cost estimates for achieving an emission rate of 4 lb/TBtu Hg**

| Plant Name | Unit ID | Capacity (MW) | Heat Rate (Btu/kWh) | Existing PM Controls | (Base to Policy) Hg remv'd (lbm) | (2007$) unit $/lbm Hg | Total Cost |
|---|---|---|---|---|---|---|---|
| Big Brown | 1 | 575 | 11001 | Cold-side ESP + Fabric Filter + SNCR | -396 | 3954 | 1565723 |
| Big Brown | 2 | 575 | 10931 | Cold-side ESP + Fabric Filter + SNCR | -393 | 3980 | 1565723 |
| Lewis & Clark | B1 | 52.3 | 13787 | Wet Scrubber | -31 | 22920 | 704682 |
| Martin Lake | 1 | 750 | 11512 | Cold-side ESP + Wet Scrubber | -332 | 32175 | 10671737 |
| Martin Lake | 2 | 750 | 11202 | Cold-side ESP + Wet Scrubber | -323 | 32174 | 10383770 |
| Martin Lake | 3 | 750 | 10784 | Cold-side ESP + Wet Scrubber | -311 | 32309 | 10038209 |
| Monticello | 3 | 750 | 11246 | Cold-side ESP + SNCR + Wet Scrubber | -359 | 29249 | 10487787 |
| R M Heskett | B1 | 29.37 | 11985 | Cold-side ESP | -17 | 38871 | 652353 |
| R M Heskett | B2 | 75.5 | 11386 | Cold-side ESP + Cyclone | -22 | 53992 | 1206545 |
| Leland Olds | 1 | 221 | 11404 | Cold-side ESP | -109 | 25792 | 2812406 |
| Leland Olds | 2 | 448 | 11021 | Cold-side ESP | -217 | 23822 | 5176973 |
| Milton R Young | B1 | 250 | 10661 | Cold-side ESP + SCR + Wet Scrubber | -64 | 51542 | 3272935 |
| Milton R Young | B2 | 455 | 10661 | Cold-side ESP + SCR + Wet Scrubber | -116 | 49018 | 5665257 |
| Stanton | 1 | 130.3472 | 10990 | Cold-side ESP | -77 | 26601 | 2050240 |
| Stanton | 10 | 57.35278 | 10320 | Fabric Filter + Dry Scrubber | -31 | 30538 | 935770.1 |
| Limestone | LIM1 | 831 | 10102 | Cold-side ESP + Wet Scrubber | -372 | 29034 | 10797351 |
| Limestone | LIM2 | 858 | 10108 | Cold-side ESP + | -384 | 28982 | 11134608 |

| | | | | Wet Scrubber | | | |
|---|---|---|---|---|---|---|---|
| Coal Creek | 1 | 554 | 11219 | Cold-side ESP + Wet Scrubber | -162 | 48056 | 7781365 |
| Coal Creek | 2 | 560.3 | 10818 | Cold-side ESP + Wet Scrubber | -158 | 47982 | 7576786 |
| Laramie River Station | 1 | 565 | 11312 | Cold-side ESP + Wet Scrubber | -235 | 34742 | 8170580 |
| Laramie River Station | 2 | 570 | 10953 | Cold-side ESP + Wet Scrubber | -230 | 34737 | 7980115 |
| Antelope Valley | B1 | 450 | 10988 | Fabric Filter + Dry Scrubber | -264 | 22315 | 5888636 |
| Antelope Valley | B2 | 450 | 11206 | Fabric Filter + Dry Scrubber | -269 | 22269 | 5993120 |
| Twin Oaks Power One | U1 | 152 | 9497 | Fabric Filter | -50 | 38215 | 1900963 |
| Twin Oaks Power One | U2 | 153 | 10364 | Fabric Filter | -55 | 37778 | 2064287 |
| Coyote | B1 | 427 | 11639 | Fabric Filter + Dry Scrubber | -228 | 22122 | 5043515 |
| Pirkey | 1 | 675 | 10693 | Cold-side ESP + Wet Scrubber | -349 | 26185 | 9140141 |
| Great River Energy Spiritwood Station | 1 | 99 | 8937 | Cold-side ESP + Fabric Filter + SNCR + Dry Scrubber | -46 | 11694 | 535381.6 |
| Dolet Hills | 1 | 650 | 10674 | Cold-side ESP + Wet Scrubber | -351 | 27064 | 9500464 |
| | | | | | | | |
| | | | | Total | -5948 | | 1.61E+08 |
| | | | | Average | | 27016 | |

# ATTACHMENT D

Fuel 89 (2010) 1320–1322



Contents lists available at ScienceDirect

# Fuel



journal homepage: www.elsevier.com/locate/fuel



# Activated carbon injection for mercury control: Overview

Sharon Sjostrom *, Michael Durham, C. Jean Bustard, Cameron Martin

*ADA Environmental Solutions, 8100 Southpark Way, Unit B, Littleton, CO 80120, USA*

ARTICLE INFO

*Article history:*
Received 1 July 2009
Received in revised form 29 October 2009
Accepted 13 November 2009
Available online 8 January 2010

*Keywords:*
Mercury control
Activated carbon
ACI

ABSTRACT

Full-scale evaluations of the commercial feasibility of activated carbon injection (ACI) for mercury control in coal-fired power plants have been underway in North America since 2001 through DOE, EPRI and industry-funded projects. Commercial injection systems began to be sold to the power generation industry in 2005 and ACI is now considered the most robust technology for mercury control at many coal-fired units. Successful widespread implementation of this technology throughout this industry will require continued development efforts including: (1) understanding the impacts of technologies to control other pollutants, such as $SO_3$, for the enhancement of particulate control or selective catalytic reduction (SCR) for $NO_x$ control, (2) options to continue using ash containing activated carbon in concrete, (3) techniques to assure the quality of delivered carbon, (4) techniques to improve the effectiveness of activated carbon, and (5) facilities to produce additional carbon supply. An overview of activated carbon injection for mercury control will be presented including the range of expected control levels, costs, balance-of-plant issues, recent developments to reduce overall control costs for many common air pollution control configurations, and developments to overcome complications caused by some new control configurations. An update on carbon supply and progress on ADA's activated carbon manufacturing facility will also be provided.

© 2009 Elsevier Ltd. All rights reserved.

## 1. Introduction

The power industry in the US is faced with meeting state imposed regulations, as well as expected federal legislation, to reduce the emissions of mercury compounds from coal-fired plants. In 2005 the Federal Clean Air Mercury Rule (CAMR) was signed into law and included mercury control requirements for new sources and a phased in implementation schedule for existing sources. Although the CAMR was vacated by the US District court in 2008, new plants permitted between 2005 and 2008 include mercury control equipment. In addition, over 100 existing plants have installed or are planning to install mercury control equipment in response to state regulations or consent decrees negotiated between a state and a power producer.

Several options have been considered to control mercury from coal-fired power plants. At some plants, effective mercury control is achieved as a result of synergistic effects with pollution control equipment designed primarily to remove other pollutants. For example, a plant firing bituminous coal with a selective catalytic reduction (SCR), which has been installed to reduce nitrogen oxides ($NO_x$) into $N_2$ and $H_2O$, can be effective at converting elemental mercury into oxidized mercury, which is water soluble. If the plant also uses a flue gas desulfurization (FGD) system where the flue gas contacts a wet alkaline slurry to remove sulfur dioxide ($SO_2$), a large fraction of the water-soluble mercury is also removed. However, plants firing western fuels that have SCRs and FGD systems do not achieve high mercury removal levels. Therefore, many plants, especially those firing western fuels, will need separate mercury removal systems to achieve the necessary emissions levels. For such plants, activated carbon injection (ACI) has been shown to be a cost-effective, reliable option.

In March 2009, the Institute of Clean Air Companies (ICAC) reported that mercury control systems had been ordered for 135 plants in the US and Canada, representing more than 55 GW of generation. Of these, 54 GW, or more than 98%, are ACI systems. The majority of the ACI systems ordered, 41 GW, were planned for units firing western coals (lignite or subbituminous) where ACI is most effective. It is expected that new federal regulations will be implemented in the future that will require mercury control systems on additional units.

## 2. Background: activated carbon injection for mercury control

Activated carbon is an effective sorbent for mercury capture from flue gas. Many years of research, development and over 50 full-scale demonstrations have shown that ACI can greatly reduce mercury emissions from most configurations, even where native mercury removal is low. ACI is the commercial mercury-specific air pollution control option of choice, but success at specific sites

---

* Corresponding author. Tel.: +1 303 734 1727; fax: +1 303 734 0330.
  *E-mail address:* sharons@adaes.com (S. Sjostrom).

0016-2361/$ – see front matter © 2009 Elsevier Ltd. All rights reserved.
doi:10.1016/j.fuel.2009.11.016

requires an understanding of factors that can impact effectiveness. Some of these can be addressed through careful system design, such as ensuring even distribution of the sorbent in the flues gas, providing sufficient time for the sorbent to contact and adsorb the mercury, and optimizing plant operation to maintain operating temperatures within an favorable range. Some challenges will require continued development efforts, such as improved sorbents, unless a change in fuel or the existing particulate control equipment can be implemented.

Activated carbon distribution is determined by the injection grid design, which requires access to ports in select locations, and is affected by mixing in the duct at the injection location, the particle size of the sorbent injected, and the amount of conveying air used to enhance distribution. Residence time varies with the configuration of the plant and distance to the particulate collection device as well as the type of particulate collection device (electrostatic precipitator (ESP) vs. fabric filter (FF)).

The effectiveness of activated carbon for mercury control is temperature dependent. Specifically, the mercury capacity of a particular sorbent typically increases as the flue gas temperature decreases. The flue gas temperature is primarily determined by plant design and operating factors. Depending on plant specifics such as flue gas constituents and operation of the particulate control device, mercury removal is relatively effective at temperatures below 350 °F. For most plants, typical air preheater outlet temperatures are between 250 and 400 °F and temperature can become a factor to consider when projecting mercury removal effectiveness.

Some flue gas constituents can aid mercury removal (i.e. halogens), while others can hinder it (i.e. $SO_3$ or $NO_2$). Halogens and hydrogen halides (primarily chlorine and bromine) are present in the flue gas from the coal or can be introduced through coal or flue gas additives. In low-halogen flue gas, halogen-treated activated carbon can be very effective at capturing mercury.

Examples of the impact of sulfur, specifically $SO_3$, on mercury control are presented in Fig. 1. This graph is a compilation of results from several activated carbon injection demonstration programs sponsored by the US DOE and industry. Several trends can be observed from the data in Fig. 1, including:

1. Fabric filters, including TOXECON™ units, which include fabric filters installed downstream of ESPs, are more effective when used in conjunction with activated carbon injection than ESPs alone.
2. Sites with low-halogen flue gas, including subbituminous coals from the Powder River Basin (PRB) and those with spray dryer absorbers (SDA) can achieve high levels of mercury removal using halogen-treated activated carbon.

3. ACI at sites firing western fuels, such as PRB coals or lignite (Lig.) coals, results in higher mercury removal than sites firing bituminous (Bit.) coals.
4. As the sulfur level of the coal increases, or when the $SO_3$ concentration is increased as a result of other pollution control devices, as will be discussed in the next section, the effectiveness of the activated carbon for mercury control decreases.

## 3. Industry-wide feasibility of activated carbon injection for mercury control

Although activated carbon injection is already a commercial mercury control option for many sites firing western fuels, continued development efforts have the potential to further expand implementation at sites where ACI is already an appropriate option and to increase applicability for other sites. Continued improvements in the technologies will involve: (1) reducing impacts created by other air pollution control equipment and operations, (2) continued improvements by activated manufacturers and equipment designers, (3) additional solutions to eliminate the impact of activated carbon on fly ash sales for use in concrete production, (4) procedures to ensure the quality of delivered carbon, and (5) increasing the production to sufficient quantities of activated carbon to meet industry-wide demand.

Interferences in the performance of ACI are often associated with increased levels of $SO_3$ and $NO_2$ created by equipment designed to reduce the emissions of other flue gas constituents. For example, some older-generation catalysts in SCR systems convert $SO_2$ to $SO_3$, sufficient amounts of which have been observed to impact the effectiveness of ACI for mercury control. These systems are being phased out and will not pose a problem for most sites. However, across the US, approximately 25 GW of power are produced from units firing PRB and low-sulfur bituminous coal that inject nominally 5–15 ppm $SO_3$ to improve ESP performance. $SO_3$ is used to "condition" the flue gas to improve particulate capture in ESPs on units firing low-sulfur coal. Chemicals to replace $SO_3$ for flue gas conditioning that do not detrimentally impact activated carbon performance are under evaluation. If such replacements are successfully utilized, it will increase the number of plants where ACI can be implemented.

The primary cost of mercury control with ACI is the sorbent. Additional reductions in costs can be achieved through proper system design, plant operation to maintain acceptable temperatures, and limiting $SO_3$ and $NO_2$ in the flue gas. Sorbent usage can be further decreased by lowering the mass mean diameter, and thus increasing the bulk surface area, of the activated carbon. During recent tests on units firing western subbituminous coal from the Powder River Basin (PRB), milling activated carbon resulted in a reduction of over 50% in activated carbon requirements [1,2]. Further tests are necessary to determine if the activated carbon usage can be further reduced, and the resulting effect on mercury removal.

Many units firing western fuels sell their fly ash as a replacement for Portland cement in the manufacture of concrete. In 2006, over 72 million tons of fly ash were produced in the US, 46% of which were used in concrete, concrete products, and grout [3]. Minute air bubbles entrained in the concrete matrix improve the durability of the concrete over freeze/thaw cycles. Carbon in fly ash is typically not desirable because it adsorbs chemicals designed to maintain air content in the concrete as it sets. Plants that sell their ash and choose to utilize ACI risk losing ash sales and potentially face landfilling the ash. Fly ash land filling costs are significant and can become one of the largest operating costs for plants after labor and fuel [4]. Options to preserve ash sales, while using ACI for mercury control, include separating the activated carbon-laden ash from the bulk of the fly ash by using



Fig. 1. Compilation of results from DOE mercury control programs.

EPRI-patented techniques such as TOXECON™ [5] or TOXECON II™ [6], reducing the amount of powdered activated carbon required through techniques such as on-site milling, or use of a specialized ash compatible activated carbon. These specialized activated carbon sorbents are fairly new to the market and are being evaluated for their mercury control effectiveness and their impact on concrete properties. Another option being evaluated is the use air entraining agents that are not impacted by activated carbon. In addition, there are groups evaluating the effectiveness of separating the carbon and the ash through novel means such as triboelectrostatic separation.

Widespread use of ACI in the power industry will require that sufficient quantities are available and the quality and consistency of delivered activated carbon is maintained. During demonstration programs from 2001 through 2009, activated carbon deliveries of consistent quality were typically experienced. In a few cases, as vendors responded to the increased demand, key characteristics of the activated carbon varied, such as the density of the bulk material, bromine level, particle size, or the abrasive qualities of the sorbent [7]. These changes often led on significant impacts to the mercury removal, quantity of sorbent required, calibration of the feed equipment, and/or conveying system operation.

ADA Environmental Solutions (ADA), a leading developer of activated carbon injection technology and commercial activated carbon equipment supplier, estimates that upcoming federal and state regulations will result in tripling of the annual US demand for activated carbon to nearly 1.5 billion pounds from approximately 450 million pounds, requiring rapid expansion of production capacity. This will exceed the existing supply because the US activated carbon production plants that are already operating at near-capacity. ADA is currently constructing the largest activated carbon production plant ever built using state-of-the art components. Other manufacturers are also discussing expansion of their existing production capability. As production expands, it will be critical to work with reputable vendors and to develop internal processes to assure the quality of the as-delivered product.

## 4. Summary

The development and commercialization of ACI is a clear example of the dedication of emissions control technology developers, the power generation industry, and the DOE working together to meet the challenge of reducing mercury emissions from coal-fired power plants. ACI offers promise as a primary mercury control technology option for many configurations and an important trim technology for others that are not able to achieve 90% mercury capture by other means. As state regulations are implemented and the potential for a federal rule becomes more imminent, technologies are being developed to further reduce costs and limit the balance-of-plant impacts associated with ACI. In conjunction with the technology development, additional activated carbon production facilities and quality assurance procedures are being developed to assure that industries needs are met.

## References

[1] Durham Michael, Martin Cameron. Apparatus and process for preparing sorbents for mercury control at the point of use, ADA Environmental Solutions, LLC. US Patent 7361209, April 22, 2008 [filed April 2, 2004].
[2] Sjostrom Sharon et al. TOXECON II™ and other options for preserving ash sales. Presented at the power plant air pollutant control MEGA symposium, Baltimore MD, Paper #08-A-172; August 25–28, 2008.
[3] ACAA 2006 CCP Production and Use Survey; August 24, 2007. <http://www.acaa-usa.org/associations/8003/files/2006_CCP_Survey_(Final-8-24-07).pdf> [accessed July 2008].
[4] Wen Haifang. High carbon fly ash finds uses in highway construction. ASH at work, issue 2; 2008.
[5] Chang Ramsay. Method for removing pollutants from a combustor flue gas and system for same, Electric Power Research Institute. US Patent 5,505,766; November 9, 1996 [filed July 12, 1994].
[6] Chang Ramsay. Method and apparatus for removing particulate and vapor phase contaminants from a gas stream, Electric Power Research Institute. US Patent 7,141,091; November 28, 2006 [filed December 17, 2003].
[7] Cichanowicz E, Stewart R, Baldrey K, Sjostrom S, Bustard J, Chang R, et al. Powdered activated carbon (PAC) characterization tests for coal-fired utility application. Presented at the power plant air pollutant control mega symposium, Baltimore, MD, Paper #08-A-175; August 25–28, 2008.

# ATTACHMENT E



**Minnkota Power Cooperative, Inc.**
**Milton R. Young Station Unit 2**

# Particulate & Mercury Control Technology Evaluation & Risk Assessment for Proposed MATS Rule

**Final**

**June 23, 2023**

**Project No.: A14559.010**

S&L Nuclear QA Program Applicable:

☐ Yes

☒ No

55 East Monroe Street

Chicago, IL 60603-5780 USA

312-269-2000

www.sargentlundy.com



# 1. INTRODUCTION

## 1.1. PURPOSE

Sargent & Lundy (S&L) was retained by Minnkota Power Cooperative, Inc. (Minnkota) to evaluate potential filterable particulate matter (PM) and mercury (Hg) emissions reductions in response to the proposed rule to amend the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Coal-and Oil-Fired Electric Utility Steam Generating Units (EGUs), commonly known as Mercury and Air Toxics Standards (MATS) published on April 24, 2023 that would require additional filterable PM and Hg emissions reductions on the Milton R. Young (MRY) Station Unit 2. These proposed revisions are the result of EPA's review of the residual risk and technology review (RTR) from May 22, 2020. Based on the proposed rule, EPA is planning to revise the filterable PM standards from 0.030 lb/MMBtu to 0.010 lb/MMBtu and is soliciting comments to consider even more stringent standard of 0.006 lb/MMBtu or lower. For lignite-fired units, EPA is also proposing to revise and tighten mercury emission standard from 4.0 lb/TBtu to 1.2 lb/TBtu to make it same as other units firing bituminous and subbituminous coal.

S&L reviewed the existing MRY Unit 2 PM and Hg control technologies to determine potential optimizations that could achieve incremental emission reductions as well as consider new PM and Hg control technologies. S&L prepared an evaluation of available control technologies including technical feasibility and effectiveness, and costs based on the current emissions from the unit. S&L's evaluation was completed based on past experience on similar projects, as well as input from established original equipment manufacturers (OEMs) regarding predicted performance for the lignite application at MRY Unit 2.

## 1.2. FACILITY BACKGROUND

The MRY station is located approximately seven (7) miles southeast of Center, North Dakota or forty (40) miles northwest of Bismarck, North Dakota on ND Highway 25 at 3401 24th Street SW, Center, North Dakota 58530. MRY station provides energy to the Midcontinent Independent System Operator (MISO) system. MRY station consists of two (2) units. Both MRY units are lignite-fired Babcock and Wilcox (B&W) cyclone boilers. The Unit 1 single wall cyclone boiler was placed into service in 1970 and has a typical output capacity rating of 257 MWg (gross). The Unit 2 opposed wall cyclone boiler (Carolina type, radiant pump assisted natural circulation) was placed into service in 1977 and has a typical output capacity rating of 470 MWg (gross). Both boilers fire North Dakota lignite coal supplied from BNI Coal, Ltd.'s Center Mine located in close proximity to the plant. Both units utilize selective non-catalytic reduction (SNCR) and separated overfire air (SOFA) systems for NOx control, fuel additive (halide injection) system and non-halogenated powdered activated carbon (PAC) for Hg control, dry electrostatic precipitators (ESP) for PM emissions control, and wet flue gas desulfurization (WFGD) systems for sulfur dioxide (SO₂) control.

## 1.3. DIFFERENCES IN MRY UNIT 1 AND 2 DESIGN & OPERATION

MRY Unit 1 and 2 have the same air pollution control equipment in series; however, the design of the equipment differ in ways other than unit MWg size. Of particular note, the Unit 2 ESP design attributes are superior to Unit 1, with use of a wider plate spacing (12 vs. 9 inches), and a higher specific collection area (375 ft²/1000 actual cubic feet per minute (acfm) vs. 288 ft²/1000 acfm). However, the Unit 2 ESP design consists of the first 2 fields' specific corona power = 160 W/1000 acfm and the last 2 fields = 240 W/1000 acfm,



which is consistent with historic ESP designs where transformer-rectifier (T/R) sets were typically selected to provide lower current density at the inlet sections, where the dust concentration will tend to suppress the corona current, and to provide higher current density at the outlet sections, where there is a greater percentage of fine particles. In comparison, the Unit 1 ESP design does not follow this approach, with all fields' specific corona power = 493 W/1000 acfm and is currently achieving significantly lower PM emissions than Unit 2. The single Unit 1 WFGD vessel has four (4) slurry recycle pumps (SRPs). Each of the two (2) WFGD vessels on Unit 2 have five (5) SRPs.

Furthermore, manual cleaning of the boiler on Unit 1 is also able to include air preheater (APH) cleaning, whereas the large hoppers below the Unit 2 APH prevent APH washes from being completed during short-term boiler cleaning outages. The Unit 1 offline cleaning occurs on average every 110-115 days and requires the unit to be offline typically for three (3) days. The Unit 2 offline cleaning (only including APH tube rodding) occurs on average every 85-90 days and requires the unit to be offline typically for four (4) days.

## 1.4. CURRENT BASELINE EMISSIONS

Minnkota provided the past five (5) years of emissions to establish baseline emissions used for this evaluation. The baseline emissions were developed using data submitted by Minnkota to the EPA between January 01, 2018 through December 31, 2022 as part of emissions reporting requirements. For PM emissions, a 30-boiler operating day rolling average was selected as the baseline PM emission calculation methodology to be in-line with the permit reporting requirements. For Hg emissions, the maximum 30-boiler operating day experienced during the evaluation period was selected as the baseline Hg emission.

### Table 1-1 — Baseline Unit 2 PM & Hg Emissions

| Parameter | Units | Unit 2 |
|---|---|---|
| PM Emissions | lb/MMBtu | 0.015 |
| Hg Emissions | lb/TBtu | 3.90 |

# 2. PARTICULATE TECHNOLOGY EVALUATION

As part of this evaluation, PM control technologies were evaluated based on achieving post-upgrade emissions limits in accordance with the proposed emissions included in the April 24, 2023, MATS proposed rule, 0.010 lb/MMBtu and potentially 0.006 lb/MMBtu. The description and assessment of each control option are discussed in the sections below.

## 2.1. OPTIONS TO REACH 0.010 LB/MMBTU

### 2.1.1. Increased Boiler Cleaning Outages

When manual cleaning of the boiler occurs, the following unit operation indicates reduced economizer outlet temperatures and subsequently APH outlet temperatures. The fly ash resistivity is reduced at lower temperatures making it easier to capture in the ESP. The decrease in temperature would also slightly reduce the volumetric flow through the ESP, which may also allow for improved flow and velocity through the ESP, subsequently improving the ESP overall performance. Although scheduling short term outages to complete cleaning of the boiler on a regular basis (regardless of near-term long-term outages) has shown the ability to maintain emissions below the baseline emissions, a PM emission of 0.010 lb/MMBtu likely cannot be achieved and therefore this option was not considered further.

### 2.1.2. Flow & Distribution Devices

Uniform gas and dust distribution to each ESP casing will allow for uniform treatment/conditions of each casing to facilitate optimal performance of each. Concentrated flow and/or dust to a casing will require that casing to work harder than the others, ultimately contributing to and/or causing other operating inefficiencies within the ESP to reduce its PM removal capabilities. Replacement of existing inlet and outlet flow & dust distribution devices to achieve the latest standards of the Institute of Clean Air Companies (ICAC) Publication No. EP-7 will improve the ESP overall performance. Implementation of other flow correction devices to minimize sneakage between cells and/or around collecting fields as well as to minimize particle re-entrainment from hoppers and collecting surfaces when rapped can also be implemented, as required, to meet best industry practices, if not already implemented as part of ESP designs.

A detailed assessment including computational flow dynamic (CFD) analysis and physical flow model studies would be performed to determine the design and placement of all flow and dust distribution devices. New designs of perforated plates (with rappers) would be implemented to allow for the easy removal of fly ash into the first field hopper to minimize the potential fly ash accumulation in the inlet plenum. Although PM emissions reductions are expected to be achieved with this option, a PM emission of 0.010 lb/MMBtu likely cannot be achieved and therefore this option was not considered further.

### 2.1.3. Increased Power Supply

In an ESP, the collection efficiency is proportional to the amount of corona power supplied to the unit, assuming the corona power is applied effectively (maintains a good sparking rate). The resulting corona current charges the PM in the flue gas which are then attracted to the grounded, oppositely charged collecting plates. For a given flow rate, the collection efficiency will increase as the corona power is increased. To achieve a high collection efficiency, corona power is usually between 100 and 500 W/1000 acfm, but newer ESP installations



have been designed for as much as 800-900 W/1000 acfm.

Increasing the power delivered into the ESP casing for this option would be done by replacing the T/R sets with higher rated power supplies, e.g. switch mode power supplies (SMPS), also referred as high frequency T/R sets, or 3-phase power supplies. Replacement of the T/R sets will require new cables, as the existing cables for 2-phase will need to be upgraded to accommodate 3-phase; cables are assumed to be able to be pulled while the unit continues to operate. Further assessment would be required to determine all electrical infrastructure modifications required, including the ability to reuse the existing MCC and T/R set controls. Although PM emissions reductions are expected to be achieved with this option, a PM emission limit of 0.010 lb/MMBtu with adequate operating margin likely cannot be achieved and therefore this option was not considered further.

### 2.1.4. Additional ESP Field

As ESP performance does depend on the number of fields in the direction of flue gas flow, the addition of another field will increase the amount of power that can be supplied to the ESP and provide incremental removal of the filterable PM. As approximately 80% of the ash is expected to be collected in the first field, with decreasing degrees of particulate removal in the following fields, the last field in the ESP casing is expected to have the least amount of fly ash removed. This option can be implemented by either increasing the sectionalization of the last field (adding a T/R set) or potentially by utilizing the ESP outlet nozzle to retrofit another independently operated ESP field.

Sectionalization in the direction of gas flow is not feasible without a rebuild of the fields to be sectionalized as the current high voltage frames span the entire length of the field. Therefore, this option is only feasible if a new field is added at either the inlet or outlet of the existing ESP casing (assuming space available). However, the retrofit implications of this option would be considered to be a large capital retrofit project in lieu of an equipment optimization. This option is not anticipated to provide significant enough cost savings compared to the other large capital retrofit options that will be evaluated later in this evaluation. Therefore, this option is not considered further.

### 2.1.5. Additional ESP Casing

Installation of additional ESP casings in parallel to the existing Unit 2 ESP casings would increase the specific collecting area (SCA) and improve the velocity and treatment time of the existing ESP casings. The smaller wing ESP casings would be installed adjacent to the existing ESP casings, one added to north of Casing A and one added to the south of Casing B. The new wing casings will utilize a separate support structure and new power supplies to be independent, stand-alone structures. It is anticipated that modifications to the inlet and outlet ductwork would be required to evenly balance the flow to the new casings. The hoppers of the new ESP casings would be tied into the existing fly ash handling system. Although PM emissions reductions are expected to be achieved with this option, a PM emission limit of 0.010 lb/MMBtu with adequate operating margin likely cannot be achieved and therefore this option was not considered further.

### 2.1.6. ESP Rebuild

Rebuilding the existing Unit 2 ESP would involve replacement of all internals, while only reusing the outer shell/walls, hoppers, support structures, and ash conveying system. To accomplish the rebuild of the ESP



casings, the roof, T/R sets, high voltage bus ducts, top end frames, intermediate roof beams, the top section of the inlet and outlet nozzles and all internal components of the existing ESPs will be removed, and replaced with new equipment. The flow distribution and correction devices in the inlet and outlet plenums would be replaced to optimize the flue gas and fly ash distribution to the casings. The hot and cold roofs would also be replaced as well to accommodate construction activities.

Before moving forward with rebuild, a structural integrity and thickness study should be completed on the entire structure to ensure that the steel has not thinned as a result of normal long-term option. The design of the support structure (casing, structural members, and determination of ESP loads to steel), support steel and foundation will need to be reviewed to verify if acceptable for reuse or if modifications are required for the weight change in the ESP casings as a result of the rebuild, which may result in additional reinforcement required. The existing ash handling systems would be reused without requiring any modifications for the incremental increase in the amount of ash collected. It would be assumed that the complete rebuild of the ESP casings and optimization of the flow distribution/collection devices in the inlet and outlet nozzles should be capable of achieving no net increase in the current pressure drop across the ESP and therefore would not require modifications or replacement of the existing ID fans.

The level of rebuild and repair to the existing ESP casings will require a longer construction outage, most likely requiring a twelve (12) week outage, if not longer. Limited access to the Unit 2 casings will also limit the construction sequence, and may cause delays, further extending the outage. Winter weather conditions experienced at the site could also prolong the construction process. Additional construction personnel would likely be required to complete work in multiple areas in an effort to reduce the outage duration.

With this option, the PM emissions are estimated to potentially achieve an emission rate of 0.008 lb/MMBtu. However, vendors would likely have to complete a more detailed qualitative study in order to provide a guarantee and would require baseline testing to qualify ESP inlet and outlet emissions.

## 2.2. OPTIONS TO REACH 0.006 LB/MMBTU

To achieve PM emissions that would allow for compliance with the more stringent proposed standard, a baghouse would be required. It should be noted that a baghouse will likely not provide sufficient operating margin to achieve the proposed 0.006 lb/MMBtu emission rate. It will likely be challenging to obtain a guarantee below 0.006 lb/MMBtu from baghouse OEMs. However, a baghouse is not considered to be economically feasible[1] and is therefore not evaluated further. The baghouse installation options that could be considered, described below, and the expected timeline for implementation of this control option, described in Table 2-2, are included for reference only.

- Conversion of ESP to Baghouse:
    - The existing ESP casings would be reused and ESP internals and all roof mounted equipment would be removed. A vertical partition wall, running in the direction of gas flow from the hopper bend line to the tube sheet, would be constructed in the center of each ESP casing.
- Polishing Baghouse (Downstream of ESP):
    - The existing ESP would continue to operate. Due to the reduced inlet ash loading, a polishing

---

[1] A high-level estimation of the cost effectiveness of a baghouse retrofit on MRY Unit 2 is approximately $162k/ton, based on the annualized capital and O&M costs ($/yr) divided by the annual reduction in annual emissions (ton/yr).



baghouse can be designed using a 6.0 air-to-cloth (AC) ratio, which allows for a reduced footprint compared to a 4.0 AC ratio sized to handle the entire unit fly ash loading.
  o There is not adequate space available adjacent to the existing ESP casings for placement of a baghouse. Therefore, long tie-in ductwork will be required to route flue gas to an open area where the baghouse can be constructed. As such, the reduced size of the polishing baghouse is not anticipated to provide significant enough cost savings when compared to a baghouse that utilizes a 4.0 AC ratio.
• Baghouse (Primary PM Collection):
  o The existing ESP would be abandoned in place (could be demolished at a later date). As mentioned previously, long tie-in ductwork will be required to route flue gas to an open area where the baghouse can be constructed while the unit continues to operate in order to minimize the tie-in outage duration.

A baghouse is expected to have a pressure drop of 8 in. w.c., but could be higher depending on the location of the baghouse in relation to the tie-in to the existing flue gas path. The current axial fans are already operated very close to their stall curve, and do not have any pressure drop operating margin. Therefore, either replacement of the existing ID fans or installation of new booster fans would be required to accommodate the additional pressure drop through the baghouse.

## 2.3. PARTICULATE EMISSIONS SUMMARY

Table 2-1 below provides a summary of the post-upgrade achievable emission rate for the feasible PM control option evaluated to achieve a proposed PM emission limit of 0.010 lb/MMBtu. The estimated emission rates included in the following tables are considered to be representative of an average emission rate that could be achieved under normal operating conditions. The emission rates provided **should not be** construed to represent an enforceable regulatory or proposed permit limit. Corresponding regulatory and/or permit limits must be evaluated on a control system-specific basis taking into consideration normal operating variability (i.e., a minimum additional 20% margin would likely be needed to account for operating margin).

### Table 2-1 — Unit 2 PM Emissions Summary

| Parameter | Control Efficiency [Note 1] | Projected Emissions [Note 2] (lb/MMBtu) | Expected Emissions (ton/year) |
|---|---|---|---|
| Baseline (Dry ESP) | -- | 0.015 | 254 |
| ESP Rebuild | 46.7% | 0.008 | 135 |

Note 1 – Control efficiency is based on incremental improvement achieved with the option in addition to baseline dry ESP operation (e.g. not to be misconstrued as a total percent removal from uncontrolled PM emissions).
Note 2 – No compliance margin is included in these estimates. The emissions rate projections should not be used as an achievable limit for these upgrades.

## 2.4. TIMELINE FOR INSTALLATION

A high-level implementation schedule that outlines the time needed for the project steps necessary for the implementation of the feasible control options are summarized below. It should be noted that although a baghouse is not considered to be economically feasible, the control option is included in the summary below for reference on the expected timeline required for implementation of this control option. Other project-related



activities, such as the time needed to obtain internal project approval, financing or permitting, if required, are not included. It should be noted that these time frames are separate from the regulatory time frames for EPA to take final action on the Proposed MATS RTR.

Lead times of equipment that would be used in these types of retrofits have been observed to be double or triple the lead times typically provided by suppliers before the COVID pandemic, with longer durations observed for electrical and instrumentation and control equipment. With continued supply-chain issues, it is anticipated that longer and longer lead times may be required that are difficult to quantify at this time. Therefore, timelines represented are estimated based on past project durations and not reflective of post-pandemic market delays nor the limited number of experienced OEMs capable of providing the equipment.

### Table 2-2 — PM Control Implementation Schedule

| PM Control Option | Design/ Specification/ Procurement (months) | Detail Design/ Fabrication (months) | Construction/ Commissioning/ Startup (months) | Minimum Total (months) |
|---|---|---|---|---|
| ESP Rebuild | 8 | 16 | 12 | 36 |
| Baghouse | 10 | 20 | 18 | 48 |

# 3. MERCURY TECHNOLOGY EVALUATION

## 3.1. MERCURY EMISSIONS BACKGROUND

### 3.1.1. Mercury Speciation

Mercury (Hg) is contained in varying concentrations in different coal supplies. During combustion, Hg is released in the form of elemental Hg in the high temperature combustion zone of a boiler. As the combustion gases cool, a portion of the elemental Hg transforms or oxidizes to ionic Hg. However, the amount of elemental Hg that oxidizes is dependent on the cooling rate of the gas and the presence of halogens in the flue gas. Ultimately, there are three possible forms of Hg:

- Elemental ($Hg^0$):
  - The conversion of elemental Hg to the other forms depends upon several factors including cooling rate of the gas, presence of halogens or sulfur trioxide ($SO_3$) in the flue gas, amount and composition of fly ash, presence of unburned carbon, and the installed APC equipment.
  - $Hg^0$ is insoluble in water and therefore removal requires injected sorbents or must be converted to another form to be captured, depending on the installed APC equipment.
- Ionic or Oxidized ($Hg^{++}$ or $Hg^{2+}$):
  - In contrast to elemental Hg, ionic Hg is highly water soluble, allowing for collection in water streams that may be utilized in certain APC equipment and subsequently leave the process with the solid by-product or as a constituent in the purge water.
- Particulate-bound:
  - Particulate-bound Hg typically is bound to fly ash or unburned carbon. Particulate-bound Hg is efficiently removed from the flue gas by the particulate control device, making it desirable to convert as much Hg as possible to particulate-bound Hg.
  - High $SO_3$ levels have been shown to inhibit the binding of ionic Hg to fly ash or Hg sorbents. The addition of halogens increase the conversion of elemental and ionic Hg to particulate-bound Hg.

The proportion of the various Hg forms is referred to as Hg speciation. As such, Hg speciation testing has indicated that the distribution of Hg species varies with coal type. The effectiveness of post-combustion Hg control technologies is highly influenced by the Hg speciation in the flue gas, with gaseous oxidized (or ionic) Hg compounds (i.e. $HgCl_2$) being easier to capture by downstream APC equipment.

### 3.1.2. Lignite Coal Variability

Industry experience has shown that lignite coal deposits vary significantly in quality, including fuel combustion performance, mineral content, and Hg content, resulting in a coal that can change on a day-to-day basis depending on the coal seam being mined at the time. For example, during the 2005 Energy & Environmental Research Center (EERC) sixty (60) day testing on MRY Unit 2,[2] the coal samples analyzed ranged from 6.22

---

[2] Refer to the EERC "Large-Scale Mercury Control Technology Testing for Lignite-Fired Utilities - Oxidation Systems for Wet FGD" report (Cooperative Agreement No. DE-FC26-03NT41991) dated March 2007 for further details on the testing completed from March 15, 2005 to May 15, 2005 on MRY Unit 2.

lb/TBtu to 10.9 lb/TBtu (Hg content varied from 0.05 to 0.25 ppm, and averaged 0.112 ± 0.014 ppm on a dry coal basis). As such, units firing lignite coal with lower heating values have to accommodate frequently changing coal quality and require a wide range of flexibility to account for instances of firing high Hg seams of coal to consistently achieve adequate operating margin below the required Hg emission limit.[3]

The variability of the projected lignite coal quality received from the Center Mine from 2025 through 2036 is shown in Table 3-1.

**Table 3-1 — Center Mine Ultimate Coal Analyses (As-Received)**

| Fuel Parameter | Units | Average | Minimum | Maximum |
|---|---|---|---|---|
| Carbon | wt.% | 40.53 | 39.73 | 41.24 |
| Hydrogen (fuel-based) | wt.% | 2.78 | 2.71 | 2.82 |
| Nitrogen | wt.% | 0.30 | 0.26 | 0.34 |
| Sulfur | wt.% | 0.86 | 0.68 | 1.07 |
| Oxygen (by difference) | wt.% | 9.97 | 9.47 | 10.83 |
| Moisture | wt.% | 38.83 | 38.53 | 39.25 |
| Ash | wt.% | 6.73 | 6.00 | 7.87 |
| Higher Heating Value (HHV) | Btu/lb | 6,625 | 6,489 | 6,739 |
| Mercury Content | ppm | 0.091 | 0.053 | 0.184 |
| Estimated Hg Emission | lb/TBtu | 8.41 | 4.79 | 17.42 |

### 3.1.3. Hg Removal with ESPs

For ACI on ESP applications, 80% of Hg capture occurs in the flue gas, and 20% occurs on the dust within the ESP (as the dust on the collecting plates are consistently removed as part of the process). Therefore, for ESP applications, achieving ideal mixing and residence time to allow for elemental Hg to oxidize to ionic Hg and for Hg to be adsorbed on the carbon particles (of the PAC or unburned carbon content in the fly ash) is critical. It should be noted that this ratio is the exact opposite for baghouse applications, i.e. 20% capture in-duct and 80% capture on the dust of the filter cake accumulated in the baghouse. For this reason, fabric filters can result in extremely high Hg capture and can improve the capture with any Hg sorbent.

### 3.1.4. Existing System Limitations

Documented evidence of a lignite unit achieving 1.2 lb/TBtu or below has not been found/reviewed at the time of this report. Minnkota personnel recently completed short-term parametric testing in May 2023 to determine the Hg emissions that could be achieved by maximizing the existing fuel additive and PAC injection. Even when maximizing the fuel additive rate in addition to maximizing the non-halogenated ACI addition, an emission rate of 1.2 lb/TBtu was not able to be achieved. Due to the variability of the coal, a longer period of testing would be required to gauge the Hg emissions that could be achieved just using the capacity within the existing equipment.

---

[3] Based on Response of Minnkota Power Cooperative Clean Air Act Section 114 Request, dated July 29, 2022.

## 3.2.  INCREMENTAL HG CONTROL ON A LIGNITE UNIT

As mentioned previously, S&L is not aware of any documented evidence of a lignite unit achieving 1.2 lb/TBtu or below. As such, the following sections describe issues that need to be resolved/tested to establish if it is feasible to achieve a 1.2 lb/TBtu Hg emission rate with sufficient operating margin on a lignite unit and if so, develop an overall Hg compliance approach that likely would consist of a suite of control approaches. It should be noted that any achievable Hg emission should not be construed to represent an enforceable regulatory or proposed permit limit. Corresponding regulatory and/or permit limits must be evaluated on a control system-specific basis taking into consideration normal operating and coal variability (i.e., a minimum additional 20% margin or higher would likely be needed to account for coal fluctuations and operating margin).

### 3.2.1. Increased Oxidation of Elemental Hg

Recent 2011 Hg speciation data measured at the Unit 2 stack, with no control technologies, indicated the Hg emissions consisted of approximately 98.3% elemental Hg, 0.8% oxidized Hg, and 0.9% particulate Hg. Recent operating data from a retired Hg process monitor indicates that the Unit 2 Hg emissions, with the currently installed Hg control technologies, consisted of approximately 86% elemental Hg, and 14% oxidized Hg. Because the current Hg emissions are made up mostly of elemental Hg, the unit emissions would benefit from an increased amount of halogen in an attempt to oxidize the elemental Hg in the flue gas. The additional halogen (chlorine, iodine, and bromine) can be added to the PAC, to the coal, or both.

The current fuel additive injection could be increased and/or replaced with a different halogen-based additive. In addition, the current non-halogenated PAC would be replaced with a more expensive halogenated PAC. The increased amount of halogen present is expected to increase the amount of elemental Hg that is oxidized to be more easily captured on the surface area of the PAC and in downstream APC.[4]

### 3.2.2. Increased PAC

It is anticipated that additional halogenated PAC (i.e. more than the current capabilities of the existing equipment) will need to be injected for the increased amount of oxidized Hg to be efficiently captured. However, preliminary feedback received from PAC suppliers have indicated that demonstration testing would be required to determine a PAC dosage rate and the emissions rate that can be achieved when considering the Hg content variability of the lignite. Therefore, additional modifications that may be required cannot be concluded at this time; however, it is likely that the existing lances and transport piping would need to be replaced to accommodate a higher injection rate. As the existing PAC storage silo is shared by Units 1 and 2, it is likely that a separate silo would be required for Unit 2 to ensure adequate supply, turndown flexibility, and reliability is achieved to maintain compliance with a defined Hg emission limit.

The degree of increased PAC injection rates can have an impact on the ESP performance as the increased amount of carbon particles that have low resistivity will decrease the overall resistivity of the fly ash (can cause particles to rapidly lose their charge on arrival at the collecting plate and become re-entrained). If/when

---

[4] It should be noted that the existing PAC silo is not currently compatible to store halogenated PAC due to the material of construction of the fluidizing air nozzles and may also require an internal coating of the silo to prevent corrosion. Additional assessment will be required to determine modifications required to reuse the existing silo, and may be subject to the brominated PAC utilized.

additional testing is completed to determine the supplier recommended brominated PAC injection rate, PM emissions should also be closely monitored to confirm no longer term impacts are caused by the increased ACI rate. In order to mitigate potential increases or deviations for the current PM emissions, it would be reasonable to anticipate some ESP upgrades (operational changes and/or equipment optimizations) to be required to ensure the ESP maintains its current performance.

### 3.2.3. Increased Contact

Increasing the degree of flue gas and PAC mixing can optimize the sorbent utilization to ensure adequate mixing of the oxidized Hg and PAC is achieved, which potentially could result in the use of less PAC to achieve the same Hg emission rate. Similarly, additional testing and evaluation would be required to determine the beneficial incremental Hg removal improvement that could be achieved. Additional mixing could be implemented by either adding static mixers into the flue gas path and/or using a more advanced injection lance design to increase sorbent dispersion relative to a straight lance design to optimize sorbent usage.

Increased contact time could also be achieved by relocating the injection lances upstream of the APH.[5] Hg reduction effectiveness with PAC has been shown to be temperature limited, as the absorption capacity of the carbon is reduced at temperatures above approximately 350°F. Although flue gas temperatures downstream of the APH are more ideal for capture, temperatures upstream of the APH are within an ideal zone for mercuric halogens to be formed, taking advantage of the additional halogen introduced with the PAC. Furthermore, for applications with $SO_3$ concentrations above 5 ppm in the flue gas (as-is on the MRY units), carbon active sites may be preferentially occupied by $SO_3$. Although adsorption rates slow down above 350°F, injection upstream of the APH is sometimes considered to lower the impact of $SO_3$ competition. Furthermore, tubular APH designs will not offer as much mixing compared to Ljungstrom type APHs; therefore, relocating the injection lances upstream of the APH will likely only achieve added residence time for adsorption to occur in lieu of additional mixing. Therefore, the high temperature environment and resulting residence time for injection at the APH inlet would need to be evaluated further.

### 3.2.4. WFGD Re-Emission Control

Oxidized Hg is highly water soluble and exists in vapor phase at back-end equipment flue gas temperatures. WFGDs readily capture approximately 90% of oxidized Hg because it is highly soluble, but will not remove elemental Hg. However, re-emission of Hg is possible in some circumstances when Hg precipitates out in scrubber solids (mercuric sulfide or equivalent) and the scrubber slurry converts some of the oxidized Hg back into elemental form. Re-emission of elemental Hg can be mitigated through the use of a sulfide-donating liquid reagent additive that enhances the Hg capture within the WFGD by decreasing soluble Hg in the WFGD slurry. Testing would be required to determine the amount of re-emission currently occurring based on recent operating conditions.

### 3.3. MERCURY EMISSIONS SUMMARY

Presently, there is not any publicly available information to determine if improvements to any of the above categories (individually or in combination) can achieve a Hg emission of 1.2 lb/TBtu or below on a lignite unit.

---

[5] It should be noted that this approach is patented by Alstom, and use of this approach would need to consider intellectual property implications.

Therefore, additional testing would be required to establish if it is feasible to achieve a 1.2 lb/TBtu Hg emission rate with sufficient operating margin on a lignite unit and if so, develop an overall Hg compliance approach that likely would consist of a suite of control approaches to achieve this rate on MRY Unit 2.

In summary, additional testing would include, but not be limited to, the following:

- Hg speciation data upstream of the ESP, upstream of the WFGD and at the stack (with no controls, current operation and maximum capacity of existing Hg control equipment, and test conditions for other listed items)
- Performance with increased concentrations of current fuel additive system, including additional injection locations, as well as potentially testing other halogen-based fuel additives than what is currently used.
- Performance with halogenated PAC, considering capabilities of existing Hg control equipment and increased injection rates (while also considering other test conditions for other listed items). Note that due to the limitations of the existing equipment, a separate test skid will be required to facilitate this testing campaign.
- If WFGD re-emission is determined to be occurring based on Hg speciation upstream and downstream of the WFGD, the performance of a re-emission additive can also be tested.

As mentioned previously, PAC suppliers have indicated that testing would be required in order to obtain any guaranteed performance. Therefore, recommended consumption and/or injection rates to determine the modifications and/or new systems required are not available at this time to develop the subsequent cost of the suite of Hg controls needed to achieve adequate operating margin below a 1.2 lb/TBtu Hg emission limit on MRY Unit 2.

# 4.SUMMARY

The existing MRY Unit 2 PM and Hg control technologies were found to not be capable of achieving the proposed emissions included in the April 24, 2023, MATS rule: filterable PM emissions limit of 0.010 lb/MMBtu and potentially 0.006 lb/MMBtu and Hg emissions limit of 1.2 lb/TBtu.

The evaluation of available PM control technologies found that an ESP rebuild would be required to achieve the proposed PM emission limit of 0.010 lb/MMBtu considering the need for adequate operating margin. However, testing to determine the baseline ESP inlet flow profile, ESP inlet and outlet emissions, and amount of PM removal occurring across the WFGD will likely be required in order for a vendor to complete a detailed qualitative study required to provide a PM emission guarantee. A baghouse will likely not provide sufficient operating margin for compliance with the more stringent 0.006 lb/MMBtu proposed emission limit; furthermore, this alternative was not considered to be economically feasible, and OEMs may not offer a PM emission guarantee with sufficient operating margin. A significant outage will be required to complete an ESP rebuild on MRY Unit 2, likely requiring the unit to be offline 12 weeks or longer as part the retrofit. Due to current post-pandemic market delays and the limited number of experienced OEMs capable of completing an ESP rebuild, it is highly likely that the implementation of this large-scale capital project will take longer than the estimated 36-month implementation schedule.

At the time of this evaluation, no evidence or examples demonstrating that an operating lignite unit could achieve the proposed Hg emission limit of 1.2 lb/TBtu were found. As the Hg content of the lignite coal fired at MRY Unit 2 can range from as low as 4.8 lb/TBtu to as high as 17.4 lb/TBtu, a wide range of flexibility in Hg control to account for instances of firing high Hg seams of coal to consistently achieve adequate operating margin below the proposed Hg emission limit will be required. Additional testing will also be required to navigate the challenges of Hg speciation, flue gas temperature, flow profile/mixing, residence time, and coal variability for application on a lignite fired unit to establish if it is feasible to achieve a 1.2 lb/TBtu Hg emission rate with sufficient operating margin. Furthermore, PAC suppliers have indicated that testing would be required in order to obtain any guaranteed performance. Once testing is completed, recommended consumption/injection rates, required flexibility of the suite of Hg control approaches and the subsequent costs of the modifications and/or new systems required to achieve adequate operating margin below a 1.2 lb/TBtu Hg emission limit on MRY Unit 2 can be developed.

# ATTACHMENT F



# INDUSTRIAL COMMISSION OF NORTH DAKOTA
## NORTH DAKOTA TRANSMISSION AUTHORITY

Analysis of

Proposed EPA MATS Residual Risk and Technology Review and

Potential Effects on Grid Reliability in North Dakota

## Claire Vigesaa, Director
## North Dakota Transmission Authority

April 3, 2024

Assisted by:

Isaac Orr and Mitch Rolling

Center of the American Experiment

# Contents

Executive Summary......................................................................................................3

Section A: North Dakota's Power Environment ...............................................................4

   Generation Adequacy, Transmission Capacity & Load Forecast Studies.........................5

   Current North Dakota Generation Resources.................................................................6

   Electric Generation Market & Utilization .......................................................................8

   Grid Resource Adequacy and Threats to Growth Opportunities .....................................9

   Grid Reliability Is Already Vulnerable .........................................................................10

   NERC's 2023 Reliability Risk Assessment ..................................................................11

   MISO's Response to the Reliability Imperative (2024) .................................................12

   Conclusion: The Long Term Reliability of the MISO Grid is Already Precarious ..............14

Section B: The Proposed MATS Rule Will Dramatically Affect North Dakota Lignite Electric Generating Units .........................................................................................................14

   The Proposed MATS Rule Eliminates the Lignite Subcategory for Mercury Emissions ....15

   The Proposed MATS Rule Will Not Provide Meaningful Human Health or Environmental Benefits ...................................................................................................................16

   The Administrative Record Indicates the Mercury Standard of 1.2 lb./TBtu is Technically Unachievable for EGUs using North Dakota Lignite Coal.............................................20

   The Administrative Record Indicates the Lower PM Standard May Also Not Be Technically Feasible ...................................................................................................................23

Section C: Impact of MATS Regulations- Power Plant Economics and Grid Reliability .......24

   Power Plant Economic Impacts .................................................................................24

   Grid Reliability Impacts .............................................................................................27

Section D: Modeling Results .......................................................................................31

   Summary .................................................................................................................31

   Modeling the Reliability and Cost of the MISO Generating Fleet Under Three Scenarios 32

   Reliability in each scenario........................................................................................33

      Extent of the Capacity Shortfalls ...........................................................................34

      Unserved MWh in Each Scenario ...........................................................................37

      The Social Cost of Blackouts Using the Value of Lost Load (VoLL) ...........................37

Hours of Capacity Shortfalls .................................................................. 39

Cost of replacement generation.............................................................. 39

Conclusion:.................................................................................................. 48

Appendix 1: Modeling Assumptions......................................................... 49

Appendix 2: Capacity Retirements and Additions in Each Scenario ............. 53

Appendix 3: Replacement Capacity Based on EPA Methodology for Resource Adequacy
.................................................................................................. 58

Appendix 4: Resource Adequacy in Each Scenario .................................... 59

# Executive Summary

On behalf of the North Dakota Transmission Authority (NDTA), the Center of the American Experiment prepared this study to analyze the potential impacts of EPA's proposed revisions to the Mercury and Air Toxics Standards (MATS) Rule on North Dakota's power generation and power grid reliability.

Our primary finding, which is drawn substantially from the Rule's administrative record, is that the proposed changes are likely not technologically feasible for lignite-based power generation facilities, will foreseeably result in the retirement of lignite power generation units, and will negatively impact consumers of electricity in the Midcontinent Independent Systems Operator (MISO) system by reducing the reliability of the electric grid and increasing costs for ratepayers.

Our analysis builds upon grid reliability data and forecasts from the Federal Energy Regulatory Commission (FERC) and the North American Electric Reliability Corporation (NERC), and it assesses what is likely to happen to grid reliability if the MATS Rule forces some or all of North Dakota's lignite power generation units to retire. We determined that the closure of lignite-fired powered power plants in the MISO footprint would increase the severity of projected future capacity shortfalls, i.e. rolling blackouts, in the MISO system even if these resources are replaced with wind, solar, battery storage, and natural gas plants. In reaching that determination, we have accepted EPA's estimates for capacity values of intermittent and thermal resources.

Moreover, building such replacement resources would come at a great cost to MISO ratepayers. The existing lignite facilities are largely depreciated assets that generate large quantities of dispatchable, low-cost electricity. Replacing these lignite facilities with new wind, solar, natural gas, and battery storage facilities would cost an additional $1.9 billion to $3.8 billion through 2035, compared to operating the current lignite facilities under status quo conditions.

MISO residents would also suffer economic damages from the increased severity of rolling blackouts. Accounting for projected increases in demand for electricity, we assess that if the MATS Rule goes into effect in the near future, by 2035, the MISO grid will experience up to an additional 73,699 megawatt hours (MWh) of unserved load, with an economic cost of up to $1.05 billion based on the Value of Lost Load (VoLL) criteria, which can be thought of as the Social Cost of Blackouts.

# Section A: North Dakota's Power Environment

## North Dakota Transmission Authority (NDTA)

The North Dakota Transmission Authority (NDTA) was established in 2005 by the North Dakota Legislative Assembly at the behest of the North Dakota Industrial Commission. Its primary mandate is to facilitate the growth of transmission infrastructure in North Dakota. The Authority serves as a pivotal force in encouraging new investments in transmission by aiding in facilitation, financing, development, and acquisition of transmission assets necessary to support the expansion of both lignite and wind energy projects in the state.

Operating as a 'builder of last resort,' the NDTA intervenes when private enterprises are unable or unwilling to undertake transmission projects on their own. Its membership, as stipulated by statute, comprises the members of the North Dakota Industrial Commission, including Governor, Attorney General, and Agriculture Commissioner.

Statutory authority for the North Dakota Transmission Authority (NDTA) is enshrined in Chapter 17-05 of the North Dakota Century Code. Specifically, Section 17-05-05 N.D.C.C. outlines the powers vested in the Authority, which include:

1. Granting or loaning money.

2. Issuing revenue bonds, with an upper limit of $800 million.

3. Entering into lease-sale contracts.

4. Owning, leasing, renting, and disposing of transmission facilities.

5. Entering contracts for the construction, maintenance, and operation of transmission facilities.

6. Conducting investigations, planning, prioritizing, and proposing transmission corridors.

7. Participating in regional transmission organizations.

In both project development and legislative initiatives, the North Dakota Transmission Authority (NDTA) plays an active role in enhancing the state's energy export capabilities and expanding transmission infrastructure to meet growing demand within North Dakota. Key to its success is a deep understanding of the technical and political complexities associated with energy transmission from generation sources to end-users. The Authority conducts outreach to existing transmission system owners, operators, and potential developers to grasp the intricacies of successful transmission infrastructure development. Additionally, collaboration with state and federal officials is essential to ensure that legislation and public policies support the efficient movement of electricity generated from North Dakota's abundant energy resources to local, regional, and national markets.

As the energy landscape evolves with a greater emphasis on intermittent generation resources, transmission planning becomes increasingly intricate. Changes in the generation mix and the redistribution of generation resource locations impose strains on existing transmission networks,

potentially altering flow directions within the network. A significant aspect of the Authority's responsibilities involves closely monitoring regional transmission planning efforts. This includes observing the activities of regional transmission organizations (RTOs) recognized by the Federal Energy Regulatory Commission (FERC), which oversee the efficient and reliable operation of the transmission grid. While RTOs do not own transmission assets, they facilitate non-discriminatory access to the electric grid, manage congestion, ensure reliability, and oversee planning, expansion, and interregional coordination of electric transmission.

Many North Dakota service providers are participants in the Midcontinent Independent System Operator (MISO), covering the territories of several utilities and transmission developers. Additionally, some entities are part of the Southwest Power Pool (SPP), broadening the scope of transmission planning. Together, North Dakota utilities and transmission developers contribute to a complex system overseeing the transmission of over 200,000 megawatts of electricity across 100,000 miles of transmission lines, serving homes and businesses in multiple states.

MISO and SPP also operate power markets within their respective territories, managing pricing for electricity sales and purchases. This process determines which generating units supply electricity and provide ancillary services to maintain voltage and reliability. Overall, the NDTA's involvement in regional transmission planning and coordination is crucial for ensuring the reliability, efficiency, and affordability of electricity transmission across North Dakota and beyond.



*FERC-Recognized Regional Transmission Organizations and Independent System Operators*

*(www.ferc.gov)*

## Generation Adequacy, Transmission Capacity & Load Forecast Studies

The North Dakota Transmission Authority (NDTA) conducts periodic independent evaluations to assess the adequacy of transmission infrastructure in the state. In 2023, the NDTA commissioned two generation resource adequacy studies, one for the Midcontinent Independent System Operator (MISO) and another for the Southwest Power Pool (SPP). Additionally, the NDTA recently completed a generation resource adequacy study examining the impact of the EPA's proposed Mercury and Air Toxics Standards (MATS) Rule. A transmission capacity study commissioned by the NDTA is scheduled for completion in the summer of 2024.

Regular load forecast studies are also commissioned by the NDTA, with the most recent study

completed in 2021. This study, conducted by Barr Engineering, provided an update to the Power Forecast 2019, projecting energy demand growth over the next 20 years. The 2021 update incorporates factors such as industries expressing interest in locating in North Dakota, abundant natural gas availability from the Bakken wells, and the potential for carbon capture and sequestration from various sources. The 2021 update and the full study can be obtained from the North Dakota Industrial Commission website: Power Forecast Study – 2021 Update, https://www.ndic.nd.gov/sites/www/files/documents/Transmission-Authority/Publications/ta-annualreport-21.pdf

The Power Forecast 2021 Update projects a 10,000 GWhr increase in energy demand over the next two decades under the consensus scenario, requiring approximately 2200 to 2500 MW of additional capacity to meet demand. These projections are closely tied to industrial development forecasts and are coordinated with forecasts used by the North Dakota Pipeline Authority. These projections were highly dependent on industrial development and are premised on new federal regulations not forcing the early retirement of even more electric generation units.

Meeting this growing demand poses significant challenges for utilities responsible for providing reliable service. While there is considerable interest in increasing wind and solar generation, natural gas generation is also essential to provide stability to weather-dependent renewable sources. Importantly, load growth across the United States is driven by the electrification of transportation, heating/cooling systems, data centers, and manufacturing initiatives.

Studies consistently highlight the critical importance of maintaining existing dispatchable generation to prevent grid reliability failures. Ensuring uninterrupted power supply is paramount for national security, public safety, food supply, and overall economic stability. The NDTA's ongoing assessments and proactive planning are crucial for meeting the evolving energy needs of North Dakota while maintaining grid reliability and resilience.

The timing and implementation of resources to meet this growing demand is a significant challenge for the utilities. Importantly, electric demand growth across the United States over the next several decades is projected to be dramatic due to the electrification of transportation, home heating/conditioning, data center and artificial intelligence centers, as well as the effort to bring manufacturing back to the USA. Studies by NDTA and others all point to the critical need to keep all existing dispatchable generation online to avoid catastrophic grid reliability failures, and have been warning that the push to force the retirement of reliable, dispatchable fossil fuel generation units is occurring before it is projected there will be sufficient intermittent units in place to cover the anticipated increase in demand. And when demand for electricity exceeds the dispatchable supply, the foreseeable result will be blackouts or energy rationing.

## Current North Dakota Generation Resources

Here is the current breakdown of North Dakota's generation resources:

1. Renewable Generation:
   - Wind Generation: North Dakota has 4,250 MW of wind generation capacity in service, making it a significant contributor to the state's renewable energy portfolio. The average capacity factor for these generating facilities is 40% to 42%.
   - The 4,000 MW of wind generation receives a reduced capacity accreditation in the ISO of approximately 600 MW since it is intermittent. This is representative of the

amount that is estimated to be available for the peak demand in the summer.
- Solar Generation: Although North Dakota currently lacks utility-scale solar generation facilities in operation, some projects are in the queues of regional transmission organizations like MISO and SPP, indicating potential future development in this area.

2. Thermal Coal Generation:
   - North Dakota currently operates thermal coal generation at six locations, comprising a total of 10 generating units with a combined capacity of approximately 4,048 MW.
   - The average capacity factor for these generating plants ranged from 65% to 91% in 2021, excluding the retired Heskett Station.
   - Rainbow Energy operates the Coal Creek Station and the DC transmission line that transports ND produced energy to the Minneapolis region. Rainbow Energy is assessing a $CO_2$ capture project for the facility. In addition, approximately 400 MW of wind generation is planned for that area of McLean County to utilize the capacity on the DC line.

3. Hydro Generation:
   - North Dakota has one hydro generation site equipped with 5 units, boasting a total capacity of 614 MW.
   - However, the average capacity factor declined to approximately 43% in 2021 due to limitations imposed by water flow in the river, particularly during drought years.

4. Natural Gas Generation:
   - North Dakota operates three sites for electric generation utilizing natural gas, comprising 21 generating units with a total capacity of 596.3 MW.
   - These units include reciprocating engines and gas turbines, with variation in summer capacity influenced by the performance of gas generators in hot weather.
   - Total natural gas generation in North Dakota remained steady from 2019 through 2021, amounting to 1.445 GWhr in 2021.

5. Total Generation:
   - The combined total capacity of all types of utility-scale generation in North Dakota is approximately 8,863 MW.
   - Wind generation receives a reduced capacity accreditation in the ISO of approximately 600 MW due to its intermittent nature, down from 4,250MW of installed capacity, representing the estimated amount available during peak summer demand. However, newer installations have demonstrated slightly higher capacity for accreditation.

This comprehensive overview underscores the diverse mix of generation resources in North Dakota, with significant contributions from wind, coal, hydro, and natural gas. Continued assessment and adaptation to evolving energy needs and market dynamics are essential for ensuring a reliable and sustainable energy future for the state.



energy sites of
# NORTH DAKOTA

| | | | |
|---|---|---|---|
| Natural Gas Processing | Coal-Based Generation | Lignite Mine | Hydro Power |
| Wind Farm | Synfuels Plant | Ethanol Plant | Petroleum Refinery |
| Solar Farm | Biodiesel Plant | Recovered Energy Generation | Peaking Station |
| Renewable Diesel Refinery | Bakken Formation | Oil Fields | |

+ Map courtesy of Bismarck State College National Energy Center of Excellence.

## Electric Generation Market & Utilization

In recent decades, North Dakota has emerged as a significant exporter of electricity, primarily fueled by the development of thermal lignite generation in the western part of the state since the 1960s. Concurrently, transmission infrastructure has been expanded to facilitate the export of electricity to markets predominantly situated to the east. Moreover, North Dakota has garnered recognition as an excellent source of wind generation, leading to additional transmission development to accommodate the transmission of this renewable energy to markets.

According to data from the Energy Information Administration, in 2020, North Dakota generated a total of 42,705 MWh of electricity from all sources, with 46% of this total being exported beyond the state's borders over two large high voltage direct current lines (HVDC), which serve load in the neighboring state of Minnesota and multiple 345kv and 230kv alternating current (AC) transmission lines serving surrounding states. Wind generation accounted for 31% of North Dakota's total electricity generation in 2020, highlighting the growing significance of renewable

energy in the state's energy portfolio. Notably, industrial demand in North Dakota experienced substantial growth, expanding by nearly 11% in 2020.

While demand for electricity in markets outside of North Dakota, and in most areas within the state, has remained relatively stable in recent years, the Bakken region has witnessed notable demand growth. Over the past 16 years, total electricity generation in North Dakota has increased from 29,936 MWh to 42,705 MWh, with retail sales climbing from 10,516 MWh to 22,975 MWh. This growth is primarily attributed to the burgeoning development of the Bakken oil fields. Industrial consumption in North Dakota also witnessed a robust increase of over 11% in 2020, with power forecasts projecting a continued upward trajectory in demand.



## Grid Resource Adequacy and Threats to Growth Opportunities

In 2023, both the MISO and SPP grid operators issued warnings about the adequacy of generation resources to meet peak demand situations. This highlights a growing concern that the desired pace of change towards a more sustainable energy future is outpacing the achievable pace of transformation. This concern is underscored by the stark increase in grid events necessitating the activation of emergency procedures. **For instance, prior to 2016, MISO had no instances requiring the use of emergency procedures, but since then, there have been 48 Maximum Generation events.**

Many experts in the industry project that, despite ambitious goals, realistic scenarios still foresee a substantial dependence on fossil fuel energy—potentially up to 50%—even by 2050. While efforts to decarbonize fossil fuel resources are underway, achieving complete carbon neutrality or a fully renewable energy grid by 2050 appears increasingly unlikely. The scalability and

affordability of storage technology, particularly for renewable energy sources, remain significant challenges.

In response to these challenges, Governor Burgum has issued a visionary goal for North Dakota to achieve carbon neutrality in its combined energy and agriculture sectors by 2030. Governor Burgum's approach emphasizes innovation over mandates, aiming to attract industries and technologies that support this goal to the state. The initiative seeks to leverage advancements in carbon capture and sequestration technologies to retain conventional generation in North Dakota while also promoting sustainable agricultural practices and other innovative solutions, such as $CO_2$ sequestration from ethanol production and enhanced oil recovery. These efforts demonstrate a commitment to proactive and pragmatic solutions to address the complexities of achieving carbon neutrality in the energy and agriculture sectors.

The state's vision for a decarbonized energy generation future faces significant challenges due to the individual and cumulative impact of expansive federal rulemakings. These regulations would curtail the flexibility to achieve the 2030 goal through the deployment of carbon capture and sequestration (CCS) technologies. Furthermore, they would impose financial burdens on electric cooperatives and utilities with limited resources, diverting investment away from future growth options toward retrofitting existing facilities with costly emissions technologies to comply with new federal requirements.

This regulatory burden not only impedes progress towards decarbonization but also introduces opportunity costs for utilities and cooperatives. The funds that would otherwise be allocated for future growth and innovation in clean energy solutions are instead diverted to compliance measures, hindering the state's ability to transition to a more sustainable energy future efficiently and effectively.

Ultimately, the restrictive nature of these federal rulemakings poses a significant obstacle to North Dakota's efforts to achieve its decarbonization goals and undermines the state's vision for a cleaner and more sustainable energy generation landscape. It highlights the need for a balanced approach to regulation that supports innovation and investment in carbon reduction technologies while also allowing for continued economic growth and development in the energy sector.

## Grid Reliability Is Already Vulnerable

The fragility of grid reliability is already evident as warnings have been issued due to the declining ratio of dispatchable and intermittent generation supplies. This concerning trend poses significant threats to public safety, economic stability, and national security. Grid reliability is vital for ensuring continuous access to essential services, such as food production and military operations. Dispatchable reliable generation forms the backbone of grid stability, enabling the balancing of supply and demand fluctuations. Failure to address these reliability concerns will compromise critical infrastructure and expose society to substantial risks. Urgent action is required to safeguard grid reliability and mitigate the potential consequences for public safety and national security.

## NERC's 2023 Reliability Risk Assessment

The North American Electric Reliability Council's 2023 Reliability Risk Assessment[1] are concerning as demonstrated in the slides below. The electrification of the US economy, data & AI center growth and the build it at home initiatives will substantially increase the demand for electricity generation and transmission.

NERC's 2023 Summer Reliability Assessment warns that two-thirds of North America is at risk of energy shortfalls this summer during periods of extreme demand. While there are no high-risk areas in this year's assessment, the number of areas identified as being at elevated risk has increased. The assessment finds that, while resources are adequate for normal summer peak demand, if summer temperatures spike, seven areas — the U.S. West, SPP and MISO, ERCOT, SERC Central, New England and Ontario — may face supply shortages during higher demand levels.

"Increased, rapid deployment of wind, solar and batteries have made a positive impact," said Mark Olson, NERC's manager of Reliability Assessments. "However, generator retirements continue to increase the risks associated with extreme summer temperatures, which factors into potential supply shortages in the western two-thirds of North America if summer temperatures spike."

The North American Electric Reliability Corporation (NERC) recently released its 2023 Long-Term Reliability Assessment (LTRA), which found MISO is the region most at risk of capacity shortfalls in the years spanning from 2024 to 2028 due to the retirement of thermal resources with inadequate reliable generation coming online to replace them.[2]

---

[1] NERC. "North American Reliability Assessment." North American Electric Reliability Corporation, May 2023, https://www.nerc.com/news/Headlines%20DL/Summer%20Reliability%20Assessment%20Announcement%20May%202023.pdf.
[2] North American Electric Reliability Corporation, "2023 Long-Term Reliability Assessment," December, 2023, https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf.



**Figure 1: Risk Area Summary 2024–2028[8]**

*MISO is the region most at risk of rolling blackouts in the near future.*

In 2028, MISO is projected to have a 4.7 GW capacity shortfall if expected generator retirements occur despite the addition of new resources that total over 12 GW, leaving MISO at risk of load shedding during normal peak conditions. This is because the new wind and solar resources that are being built have significantly lower accreditation values than the older coal, natural gas, and nuclear resources that are retiring.[3]

## MISO's Response to the Reliability Imperative (2024)

On February 26, 2024, the Midcontinent Independent System Operator (MISO) released "MISO's Response to the Reliability Imperative[4]," a report which is updated periodically to reflect changing conditions in the 15-state MISO region that extends through the middle of the U.S. and into Canada. MISO's new report explains the disturbing outlook for electric reliability in its footprint unless urgent action is taken. The main reasons for this warning are the pace of premature retirements of dispatchable fossil generation and the resulting loss of accredited capacity and reliability attributes.

From 2014 to 2024, surplus reserve margins in MISO have been exhausted through load growth and unit retirements. Since 2022, MISO has been operating near the level of minimum reserve

---

[3] Midcontinent Independent Systems Operator, "MISO's Response to the Reliability Imperative," February, 2024, https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20Final504018.pdf?v=20240221104216.

[4] MISO. "MISO'S Response to the Reliability Imperative Updated February 2024." MISO, February 2024, https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20Final504018.pdf?v=20240221104216.

margin requirements.[5]

According to the Reliability Imperative, MISO uses an annual planning tool called the OMS-MISO Survey to compile information about new resources utilities and states plan to build and older assets they intend to retire. The 2023 survey shows the region's level of "committed" resources declining going forward, with a potential shortfall of 2.1 GW occurring as soon as 2025 and growing larger over time.

MISO lists U.S. Environmental Protection Agency (EPA) regulations that prompt existing coal and gas resources to retire sooner than they otherwise would as a compounding reason for growing challenges to grid reliability. From the report, there is a section titled, "EPA Regulations Could Accelerate Retirements of Dispatchable Resources," which states:

> "While MISO is fuel- and technology-neutral, MISO does have a responsibility to inform state and federal regulations that could jeopardize electric reliability. **In the view of MISO, several other grid operators, and numerous utilities and states, the U.S. Environmental Protection Agency (EPA) has issued a number of regulations that could threaten reliability in the MISO region and beyond.**
>
> In May 2023, for example, EPA proposed a rule to regulate carbon emissions from all existing coal plants, certain existing gas plants and all new gas plants. As proposed, the rule would require existing coal and gas resources to either retire by certain dates or else retrofit with costly, emerging technologies such as carbon-capture and storage (CCS) or co-firing with low-carbon hydrogen.
>
> MISO and many other industry entities believe that while CCS and hydrogen co-firing technologies show promise, they are not yet viable at grid scale — and there are no assurances they will become available on EPA's optimistic timeline. **If EPA's proposed rule drives coal and gas resources to retire before enough replacement capacity is built with the critical attributes the system needs, grid reliability will be compromised.** The proposed rule may also have a chilling effect on attracting the capital investment needed to build new dispatchable resources."

Despite these reliability warnings issued by MISO, EPA did not consider the reliability impacts of the proposed MATS rules required emission control upgrades and additions to units. It is likely that many units that would have to incur millions of dollars to retrofit emissions controls to comply with this proposal would not do so.[6]

In light of these shortcomings, the NDTA contracted with Center of the American Experiment to model the impacts of the MATS rules on resource adequacy, reliability, and cost of electricity to consumers. The findings of this analysis are detailed in Section D.

---

[5] Midcontinent Independent Systems Operator, "MISO's Response to the Reliability Imperative," February, 2024, https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20Final504018.pdf?v=20 240221104216.
[6] Rae E. Cronmiller, "Comments on Proposed National Emission Standards for Hazardous Air Pollution: Coal-and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," The National Rural Electric Cooperative Association, June 23, 2023, Attention Docket ID NO. EPA-HQ-OAR-2018-0794.

## Conclusion: The Long Term Reliability of the MISO Grid is Already Precarious

As the state agency responsible for the strategic buildout and framework of electricity distribution, the North Dakota Transmission Authority (NDTA) is deeply concerned about the potential impact of federal rulemakings on the generation fleet in North Dakota and the ability to support future growth initiatives. The current strain on the electric transmission system due to load growth is already posing significant challenges to grid reliability, particularly in areas facing transmission constraints and limited access to dispatchable generation.

The escalating frequency of grid events requiring emergency procedures, such as the 48 Maximum Generation events in MISO since 2016 and the increasing number of alerts issued by SPP, over 194 alerts issued in 2022, underscores the urgency of addressing transmission congestion and bolstering reliable generation capacity. The economic growth and security of North Dakota are directly tied to the timely development of new transmission facilities in tandem with dependable dispatchable electric generation.

The impacts of grid strain extend beyond the energy sector, affecting multiple industries, ratepayers, and overall economic stability. Volatile wholesale prices and transmission congestion undermine business operations and investment confidence, hindering economic growth and prosperity. Moreover, reliable electricity supply is critical for essential services, including Department of Defense facilities, underscoring the broader implications of grid reliability issues. Achieving a balanced generation portfolio requires careful consideration of reliability and resilience under all weather conditions, especially amidst the electrification of America and the imperative to safeguard public welfare and security.

Additionally, over 50% of the electricity generated in North Dakota is exported to neighboring states, magnifying the ripple effects of any regulations impacting dispatchable electricity generation resources. By responsibly managing the generation portfolio and prioritizing generation adequacy, North Dakota and the nation can seize significant opportunities for economic growth, innovation, and sustainable development.

## Section B: The Proposed MATS Rule Will Dramatically Affect North Dakota Lignite Electric Generating Units

The revised MATS Rule includes a proposal to eliminate the "low rank coal" subcategory established for lignite-powered facilities by requiring these facilities to comply with the same mercury emission limitation that currently applies to Electric Generating Units (EGUs) combusting bituminous and subbituminous coals, which is 1.2 pounds per trillion British thermal units of heat input (lb/TBtu). EPA's proposal is a substantial lowering of the current mercury

limitation for lignite fired EGUs, which is 4.0 lb/TBtu.[7,8]  The proposal also includes a significant reduction in the particulate matter standard applicable to all existing units from 0.03 lb/mmBtu to 0.01 lb/mmBtu.  Because North Dakota is somewhat unique to the degree in which its power generation relies upon lignite coal, the compliance costs for this Rule, while likely to substantial for coal plants all around the country, will be most acutely inflicted upon North Dakota's lignite-based power generation facilities.

Numerous comments in the administrative record, including from the regulated facilities in North Dakota and the North Dakota Department of Environmental Quality, provided EPA with notice that the new emission standards are not technologically feasible, will impose crippling compliance costs that may require facility retirement, and will result in a significant portion of the dispatchable power provided by coal-generation facilities being taken off the grid.  This report will summarize some of those concerns in the section that follows, however, a full study of the technological feasibility of complying with the new emissions standards is beyond the scope of this report.  For purposes of this report, we assume the regulated facilities and state regulator were forthright in their concerns about the feasibility of lignite-based facilities meeting the new standards.

## The Proposed MATS Rule Eliminates the Lignite Subcategory for Mercury Emissions

Although the Proposed Rule affects all coal electrical generating utilities (EGUs), reducing the lignite emissions standards to levels of other coal ranks effectively eliminates the lignite sub-category and would have drastic consequences for North Dakota's lignite EGU industry.[9] EPA original decision to regulate separately a subcategory of lignite units was well-supported with documented information and a thorough analysis.  In its comments filed in this Docket, on June 22, 2023, the North Dakota Department of Environmental Quality (hereafter DEQ) encouraged EPA to review that prior determination and reaffirm the need for a lignite subcategory and the associated emissions standards.[10]

Specifically, DEQ summarized the original MATS proposal in 2011 and final MATS rule in 2012, in which EPA presented a body of evidence in support of the lignite category. For example, the EPA wrote:

> "For Hg emissions from coal-fired units, we have determined that different emission
> limits for the two subcategories are warranted. There were no EGUs designed to burn
> a non-agglomerating virgin coal having a calorific value (moist, mineral matter free

---

[7] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[8] 8 J. Cichanowicz et al., *Technical Comments on National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-fired Electric Utility Steam Generating Units Review of Residual Risk and Technology*, (June 2, 2023) ("Cichanowicz Report").

[9] EPA characterizes lignite as "low rank virgin coal". 88 Fed. Reg. 24,854, 24,875. For this comment letter, lignite will be used in place of low rank virgin coal.

[10] David Glatt, P.E., "Comments on the Proposed Rulemaking Titled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review" (Docket ID No. EPA-HQOAR-2018-0794)," On Behalf of the North Dakota Department of Environmental Quality, June 22, 2023.

basis) of 19,305 kJ/kg (8,300 Btu/lb) or less in an EGU with a height-to-depth ratio of 3.82 or greater among the top performing 12 percent of sources for Hg emissions, indicating a difference in the emissions for this HAP from these types of units.

The boiler of a coal-fired EGU designed to burn coal with that heat value is larger than a boiler designed to burn coals with higher heat values to account for the larger volume of coal that must be combusted to generate the desired level of electricity. Because the emissions of Hg are different between these two subcategories, we are proposing to establish different Hg emission limits for the two coal-fired subcategories."

As explained by DEQ, EPA has not provided any scientific justification to support abandoning the lignite subcategory and requiring those facilities to comply with the emission standards applicable to other coal types. The most EPA identified in support of its proposal was a reference to information nearly 30 years old, which predated EPA's original determination.

## The Proposed MATS Rule Will Not Provide Meaningful Human Health or Environmental Benefits

Section 112(f)(2) of the CAA directs EPA to assess the remaining residual public health and environmental risks posed by hazardous air pollutants (HAPs) emitted from the EGU source category.[11] Further regulation under MATS is required only if that residual risk assessment demonstrates that a tightening of the current HAP emission limitations is necessary to protect public health with an ample margin of safety or protect against adverse environmental effects.

When reviewing whether to revise the MATS Rule, EPA determined that further regulation of mercury and other HAPs would be unnecessary to address any remaining residual risk from any affected EGU within the source category. The stringent standards based on state-of-the-art control technologies that are currently imposed on coal-fired EGUs have already achieved significant reductions in HAP emissions. As EPA itself noted, the MATS rule has achieved steep reductions in HAP emission levels since 2010, including a 90 percent reduction in mercury, 96 percent reduction in acid gas HAPs, and an 81 percent reduction in non-mercury metal HAPs.[12]

Data from EPA and the U.N Global Mercury Assessment show mercury emissions from U.S. power plants are now so low they accounted for only 0.12 percent of global mercury emissions in 2022, assuming all other sources remained constant at 2018 levels.[13] These data demonstrate that

---

[11] J. Cichanowicz et al., *Technical Comments on National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-fired Electric Utility Steam Generating Units Review of Residual Risk and Technology*, at 29, Figure 6-7 (June 2, 2023) ("Cichanowicz Report").

[12] Fact Sheet, *EPA's Proposal to Strengthen and Update the Mercury and Air Toxics Standards for Power Plants*, https://www.epa.gov/system/files/documents/2023-04/Fact%20Sheet_MATS%20RTR%20Proposed%20Rule.pdf

[13] United Nations, "Global Mercury Assessment 2018," UN Environment Programme, August 21, 2019, https://wedocs.unep.org/bitstream/handle/20.500.11822/27579/GMA2018.pdf?sequence=1&isAllowed=y

US mercury emissions from power plants are lower than global cremation emissions, and North Dakota coal facilities emitted 9.25 times less mercury in 2021 than global cremations in 2018.[14]

| Mercury Emissions Estimates by Sector 2018 vs U.S. and N.D. Coal Plant Emissions | | |
|---|---|---|
| Category | US Tons | Percent of Global Emissions |
| Artisanal and small-scale mining | 921.42 | 37.68 |
| Global stationary combustion of coal | 517.45 | 21.16 |
| Non-ferrous metals production | 359.32 | 14.69 |
| Cement production | 256.48 | 10.49 |
| Waste from products | 161.63 | 6.61 |
| Vinyl chlorine monomer | 64.09 | 2.62 |
| Biomass burning | 57.05 | 2.33 |
| Ferrous metals production | 43.89 | 1.79 |
| Chlor alkali production | 16.66 | 0.68 |
| Waste incineration | 16.44 | 0.67 |
| Oil refining | 15.81 | 0.65 |
| Stationary combustion of oil and gas | 7.84 | 0.32 |
| Cremation | 4.14 | 0.17 |
| US stationary combustion of coal | 2.90 | 0.12 |
| North Dakota coal combustion | 0.46 | 0.018 |

As the above chart indicates: the annual mercury emissions from global cremations (where the mercury primarily comes from individuals with dental fillings) exceed the mercury annually emitted by all coal-fired EGUs in the United States combined, and is orders of magnitude more than the mercury emissions from all coal-fired EGUs in North Dakota.[15]

Moreover, the Administrative Record indicates EPA has performed a comprehensive and detailed risk assessment that clearly documents the negligible remaining residual risks posed by the very low amount of HAPs now being emitted by coal-fired EGUs. EPA first performed that risk assessment in 2020, which concluded that "both the actual and allowable inhalation cancer risks to the individual most exposed were below 100-in-1 million, which is the presumptive limit of

[14] ERM Sustainability Initiative, "Benchmarking Air Emissions of the 100 Largest Power Producers in the United States," Interactive Tool, accessed February 29, 2024, https://www.sustainability.com/thinking/benchmarking-air-emissions-100-largest-us-power-producers/
[15] UN Environmental Programme. (2018). Global Mercury Report 2018, Technical Background Report to the Global Mercury Assessment. https://www.unenvironment.org/resources/publication/global-mercury-assessment-technical-background-report

acceptability" for protecting public health with an adequate margin of safety.[16] Similarly, EPA's risk assessment supports the conclusion that residual risks of HAP emissions from the EGU source category are "acceptable" for other potential public health effects, including both chronic and acute non-cancer effects.[17]

These conclusions have been confirmed by the detailed reevaluation of the 2020 risk assessment that the Agency is now completing as part of the current rule-making action. That EPA reevaluation clearly demonstrates that the 2020 risk assessment did not contain any significant methodological or factual errors that could call into question the results and conclusions reached in the 2020 risk assessment. Most notably, EPA used well-accepted approaches and methodologies for performing a residual risk analysis that adhere to the requirements of the statute and are consistent with prior residual risk assessments performed by EPA over the years for other industry sectors.[18]

The results from both residual risk assessments can lead to only one rational conclusion: the current MATS limitations provide an ample margin of safety to protect public health in accordance with CAA section 112.

The DEQ filed comments addressing these points and asking EPA to provide a better health benefit justification than the rationale currently included in the Regulatory Impacts Analysis (RIA).[19] In particular, DEQ noted that EPA cannot rely on non-HAPs' co-benefits to justify the Proposed Rule, and EPA has not identified any HAP-related benefits that would be sufficient to justify the Proposed Rule. The agency also voiced skepticism over what it called EPA's suspect characterization of the health benefits that it identified, which is quoted below:

> While the screening analysis that EPA completed suggests that exposures associated with mercury emitted from EGUs, including lignite-fired EGUs, are below levels of concern from a public health standpoint, further reductions in these emissions should further decrease fish burden and exposure through fish consumption including exposures to subsistence fishers.[20]

DEQ's well-founded concern is that EPA's admission that current exposure associated with mercury is below levels of concern is directly inconsistent with, not support of, EPA's proposal for a lower standard.

DEQ commented that this theme, unfortunately, is consistent across the entire "Benefits Analysis" section of the RIA, citing another example of this inconsistency, which is quoted below:

> "Regarding the potential benefits of the rule from projected HAP reductions, we note that these are discussed only qualitatively and not quantitatively

---

[16] 88 Fed. Reg. at 24,865.

[17] *Id*. at 24,865-66.

[18] 88 Fed. Reg. at 24,865.

[19] Regulatory Impact Analysis for the Proposed National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review (Apr. 2023), Docket ID: EPA-HQ-OAR-2018-0794-5837.

[20] *Id.* At p. 0-8.

....Overall, the uncertainty associated with modeling potential of benefits of mercury reduction for fish consumers would be sufficiently large as to compromise the utility of those benefit estimates-though importantly such uncertainty does not decrease our confidence that reductions in emissions should result in reduced exposures of HAP to the general population, including methylmercury exposures to subsistence fishers located near these facilities. Further, estimated risks from exposure to non-mercury metal HAP were not expected to exceed acceptable levels, although we note that these emissions reductions should result in decreased exposure to HAP for individuals living near these facilities."[21]

Comments filed by the Lignite Energy Council (LEC) further emphasize the point. LEC stated that according to the risk review EPA conducted in 2020, which EPA has proposed to reaffirm, the risks from current emissions of hazardous air pollutants (HAP) emitted by coal-fired power plants are several orders of magnitude below what EPA deems sufficient to satisfy the Clean Air Act.[22] LEC points out that EPA has for decades found risks to be acceptable with an ample margin of safety if maximum individual excess cancer risks presented by any single facility is less than "100-in-1 million." In comparison, EPA's analysis of the coal- and oil-fired electric utility source category recognizes the risk it presents is now at one tenth of that acceptable level, with a maximum risk from any individual facility of "9-in-1 million."

However, even that value vastly overstates the risk associated with coal-fired power plants. The "9-in-1 million" risk level identified by EPA is only associated with a single, uncontrolled, residual oil-fired facility located in Puerto Rico.[23] What EPA's discussion of risk fails to recognize, but its analysis clearly shows, is that the highest level of risk presented by any coal-fired power plant is actually "0.3-in-1 million," more than 300 times lower than the threshold EPA deems acceptable.[24]

The level of risk presented by North Dakota lignite-powered plants is lower still. According to EPA's risk review, the maximum risks presented by any North Dakota lignite-fired power plant is "0.08-in-1 million," yet another order of magnitude lower than the highest risk from any coal-fired plant, and more than three orders of magnitude lower than EPA's "acceptable" level of risk with an "ample margin of safety."

---

[21] *Id.* at pp. 4-1 - 4-2.
[22] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.
[23] *Residual Risk Assessment for the Coal- and Oil-Fired EGU Source Category in Support of the 2020 Risk and Technology Review Final Rule*, Docket ID No. EPA-HQ-OAR-2018-0794-4553, App. 10, Tbls. 1 & 2a (Sept. 2019) ("Risk Assessment") (note that Table 2a is printed upside down in the final September 2019 version of the Residual Risk Assessment posted at www.regulations.gov, which may interfere with search commands; a searchable version of the same table is available in the December 2018 draft version, Docket ID No. ). *See also* 84 Fed. Reg. at 2699 ("There are only 4 facilities in the source category with cancer risk at or above 1-in-1 million, and all of them are located in Puerto Rico.").
[24] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

The risks from North Dakota lignite are so low that they are more easily expressed, not in a million, but in a ***billion***—EPA has determined that the excess cancer risks from all North Dakota lignite plants fall between 5- and 80-in-1 billion.[25] Moreover, EPA's analysis indicates that those maximum risks are not associated with mercury.[26]

In fact, EPA's own analysis confirms the risks from North Dakota lignite-powered plants are so low they are little more than a rounding error that does not even qualify as a significant digit. In its analysis of the still low but relatively higher risk from the Puerto Rican oil-fired plants, EPA determined that one of those facilities presented a risk no greater than "1-in-1 million," even though EPA's modeling actually returned a risk level of "1.**09**-in-1 million."6 EPA discarded the extra ".09," apparently finding it too small to matter. However, that extra ".09" risk equates to "90-in-1 billion," and it is therefore higher than the ***entire*** risk identified for any North Dakota lignite plant.

## The Administrative Record Indicates the Mercury Standard of 1.2 lb./TBtu is Technically Unachievable for EGUs using North Dakota Lignite Coal

The Administrative Record for the proposed rule suggests EPA made numerous critical mistakes in assuming lignite fired EGUs can achieve a 1.2 Hg/lb limit with 90% Hg removal. As detailed in the Cichanowicz Report, Section 6, EPA assumed the characteristics of lignite and subbituminous coals are similar such that the Hg removal by emission controls capabilities is similar. In this light, EPA did not consider that the high presence of sulfur trioxide (SO3) in lignite coal combustion flue gas that significantly limits the Hg emissions reduction potential of emissions controls.[27]

Similarly, as noted by LEC, EPA's proposal references data obtained via an information collection request as indicative of the level of performance achievable at North Dakota lignite facilities, but that data only reflects relatively short-term testing that does not fully capture the significant variability of lignite coals. Also, unlike other types of facilities that may be able to blend coals to achieve greater consistency in the character of their fuel, all North Dakota lignite units are located at mine-mouth facilities without access to other coal types, and therefore depend entirely on the fuel extracted from the neighboring mine. As a result, changes in constituents between seams of lignite coal can result in a high level of variability in the emission rates that result from use of the coal as it is mined over time.[28]

While LEC agreed with EPA that the injection of activated carbon is the most effective means of reducing mercury emissions from lignite-powered units, LEC also criticized EPA for ignoring the well-known diminishing returns of injecting more carbon. With each marginal increase in carbon

---

[25] Risk Assessment, Tbl. 2a (indicating cancer risks of 8.07e-08, 3.09e-08, 1.31e-08, 1.21e-08, and 5.12e-09 for Facility NEI IDs 380578086511, 380578086311, 380558011011, 380578086511, 380578086611 (Milton R. Young, Leland Olds, Coal Creek, Antelope Valley, and Coyote).

[26] *Id.*, at Tbl. 2a (indicating the target organ of the risk associated with the plants identified in note 5 is "respiratory").

[27] J. Cichanowicz et al., *Technical Comments on National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-fired Electric Utility Steam Generating Units Review of Residual Risk and Technology*, at 29, Figure 6-7 (June 2, 2023) ("Cichanowicz Report").

[28] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

injection, the incremental increase in emission reduction capability falls. Thus, injecting more and more carbon will not necessarily result in greater emission reductions beyond a certain injection level. LEC asked EPA to evaluate the effect of diminishing returns on its conclusion that North Dakota lignite-powered facilities can achieve the standard designed for all other units of 1.2 lb/TBtu.

EPA does not appear to have taken the above concerns into account in claiming lignite-powered facilities can achieve the performance levels achieved at subbituminous plants. As a result, EPA has significantly underestimated the level of control needed to achieve the proposed standard of 1.2 lb/TBtu. Contrary to the analysis EPA relies upon to justify lowering the standard for lignite plants, control efficiencies of greater than 90 percent would be needed for North Dakota lignite-powered facilities.[29] LEC's comments asked EPA to reconsider its proposal in light of these concerns, and in light of EPA's legal obligation to ensure all standards are "achievable," which means they "must be capable of being met under most adverse conditions which can reasonably be expected to recur."[30]

The Administrative Record indicates a key reason why EPA's proposed standards are unachievable is the chemical composition of North Dakota lignite. For example, lignite has different heat and moisture content than subbituminous coals. As a result, a greater volume of fuel and air is needed at lignite plants to produce the same heat input compared to subbituminous plants. Due to higher fuel and air flows, a much greater volume of sorbent is needed to achieve similar emission reductions, and the additional sorbent dramatically increases cost, and therefore reduces the cost-effectiveness, of the controls.[31]

Another distinguishing difference EPA appeared to overlook in its proposal is the higher sulfur concentration in North Dakota lignite relative to subbituminous Powder River Basin coal, which in turn produces a higher level of sulfur trioxide ("SO3"). In the past, EPA has worked with a consultant that recognized this reality as follow:

> With flue gas SO3 concentrations greater than 5-7 ppmv, the sorbent feed rate may be increased significantly to meet a high Hg removal and 90% or greater mercury removal may not be feasible in some cases. Based on commercial testing, capacity of activated carbon can be cut by as much as one half with an SO3 increase from just 5 ppmv to 10 ppmv.[32]

Cichanowicz et al. highlighted this passage from the S&L technology assessment and also noted that the presence of SO3 often affects capture rates in another way—by requiring units with measurable SO3 to be designed with higher gas temperature at the air heater exit to avoid corrosion that would otherwise occur if the SO3 is allowed to cool and condense on equipment

---

[29] Cichanowicz Report, at 25, Table 6-1.

[30] *White Stallion Energy Center, LLC v. EPA*, 748 F.3d 1222, 1251 (2014) (citing *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 431 n. 46 (D.C. Cir.1980)).

[31] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[32] Sargent & Lundy, *IPM Model – Updates to Cost and Performance for APC Technologies: Mercury Control Cost Development Methodology*, Project 12847-002, at 3 (Mar. 2013).

components. However, that higher exit gas temperature also impacts the effectiveness of sorbent injection systems—special-purpose tests on a fabric filter pilot plant showed an increase in gas temperature from 310ºF to 340ºF lowered sorbent Hg removal from 81% to 68%.[33]  The higher levels of $SO_3$ formed by the higher sulfur content found in lignite fuels will inhibit the ability of injected sorbents to reduce mercury emissions at lignite plants to a far greater extent than at subbituminous plants.

LEC agreed with these concerns in its comments and raised another important consideration — the fact that, unlike subbituminous plants, selective catalytic reduction (SCR) is technically infeasible on North Dakota lignite, due to its chemical composition.  Although SCR systems are primarily installed for the control of nitrogen oxides ($NO_X$), SCR can enhance the oxidation of elemental mercury ("$Hg^{0}$") which facilitates removal in downstream control equipment, such as wet flue gas desulfurization (FGD) systems.[34] The higher level of mercury control achievable with an SCR is almost certainly why the one lignite plant (Oak Grove) evaluated by EPA as part of its review of the MATS RTR appears capable of achieving the mercury limit set for other coal ranks—it has an SCR that cannot be installed on North Dakota lignite facilities.[35]

LEC's comments also highlighted the experience of two LEC members that recently evaluated the difference in mercury control achieved by plants using subbituminous coal equipped with an SCR and plants using lignite coal without an SCR.  Based on those evaluations, North Dakota lignite-powered facilities were found to have much greater difficulty reducing mercury emissions, despite using more than three times the amount of halogenated activated carbon than the subbituminous plant.

In the past, EPA has questioned whether SCR is technically feasible for North Dakota lignite-powered facilities, and recent research has confirmed that the significant challenges associated with using SCR on North Dakota lignite remain unresolved.[36]  Although SCR has been demonstrated on the types of lignite found in other parts of the country, North Dakota lignite differs substantially in chemical makeup because it contains a much higher concentration of alkali metals (*e.g.*, sodium and potassium) that render the catalyst ineffective.[37]

In particular, the relatively high concentration of sodium in North Dakota lignite forms vapor, condenses, and then coats other particles, or it forms its own particles at a size range of 0.02-0.05 µm.  As a vapor or as a very small particle, the sodium will pass through any upstream emissions control equipment (*e.g.*, electrostatic precipitators and scrubbers), and thus will reach the SCR regardless of whether the SCR is located before other emission control devices (high-dust configuration) or after those other controls (low-dust or tail-end configurations).[38]

---

[33] Sjostrom 2016.

[34] 88 Fed. Reg. at 24875.

[35] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[36] *See* Draft SIP, App. D, at D.2.c-5 (citing Benson, Schulte, Patwardhan, Jones (2021) "The Formation and Fate of Aerosols in Combustion Systems for SCR $NO_X$ Control Strategies" A&WMA's 114th Annual Conference, #983723).

[37] *Id.*

[38] *Id.*

Once the sodium particles reach the SCR, they plug the pores of the catalyst, which are the key feature that allows for improved oxidation of other pollutants. The sodium also poisons the catalyst both inside the pores and on the surface, rendering the active component of the catalyst inactive. Recent efforts to address these concerns through either cleaning or regeneration of the catalyst have not been successful, even at pilot scale. A study recently cited by DEQ in its regional haze plan provides additional details on these efforts and the unsolved technical challenges that remain regarding the impact of alkali metals in North Dakota lignite on the technical feasibility of SCR.[39]

According to LEC, its members report that efforts to identify a willing vendor for an SCR on a North Dakota lignite unit have been unsuccessful—all vendors have declined to offer SCR for use on North Dakota lignite once they have closely reviewed the unique characteristics that make SCR infeasible on that particular fuel.[40]

In short, the Administrative Record and other available evidence indicates that North Dakota lignite-powered facilities will likely not be able to meet the revised emission standards EPA is proposing for the MATS Rule.

## The Administrative Record Indicates the Lower PM Standard May Also Not Be Technically Feasible

In addition to imposing a more stringent mercury standard on lignite by essentially eliminating the subcategory, EPA's proposal also lowers the standard on fPM for all existing units to the level previously deemed achievable only by new units. However, like its proposed Hg standard for lignite, EPA's proposal to revise the PM standard for all coal types remains unjustified by any demonstration of potential human health or environmental benefits.

The LEC's comments detail particular concerns associated with EPA's failure to provide a reasonable justification for so dramatically reducing the PM limit.[41] As LEC noted, the risks that the MATS Rule is designed to address have already been eliminated, down to several orders of magnitude below the level at which Congress directed EPA to stop regulating. The highest residual risk for the entire source category, which is based on an oil-fired unit, is just one tenth of EPA's acceptable level of risk, and the highest risk from any coal plant is more than an order of magnitude below the risk presented by oil-fired units.

Furthermore, the Administrative Record suggests that EPA's analysis of the achievability of the new 0.01 lb/mmBtu standard is based on an arbitrary data set, and that analysis also suffers from a lack of transparency. Specifically, commenters observed that EPA relies on a Sargent & Lundy memorandum that lacks sufficient detail or supporting documentation to verify the assumptions made, essentially hiding much of the agency's thought process behind the claim that the

---

[39] *Id.*

[40] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[41] *Id.*

information on which it is based is not available in public forums.[42] In doing so, EPA seemingly commits what it has previously cited as error in plans developed by states and industry—failing to provide sufficient information to understand the reasoning underlying key conclusions.[43]

Moreover, the Administrative Record indicates the combined effect of both the proposal to require universal use of CEMS and the lower standard of 0.01 lb/mmBtu will present a compounded challenge if finalized as proposed. Commenters indicated that the difficulty in demonstrating achievement of the new standard will be exacerbated by the requirement to use the less accurate CEMS, and the difficulty in using CEMS will be exacerbated by the dramatically lower standard.[44] In particular, serious concerns remain with respect to whether a fPM CEMS can effectively estimate emission rates at such low levels, or whether emissions that low will be too small for a CEMS to differentiate compliance from a false reading.[45] EPA attempts to allay these fears by claiming existing units can simply follow in the footsteps of new units, since new units have been subject to a CEMS requirement with a fPM emission limit of 0.090 lb/megawatt-hour since the inception of MATS.[46] **But that assurance provides no comfort—there are no new units.[47]**

In light of these shortcomings, the NDTA contracted with Center of the American Experiment to model the impacts of the MATS rules on resource adequacy, reliability, and cost of electricity to consumers. The findings of this analysis are detailed in Section D.

# Section C: Impact of MATS Regulations- Power Plant Economics and Grid Reliability

## Power Plant Economic Impacts

The economic impacts for a lignite power plant from the Mercury and Air Toxics Standards (MATS) finalized rule can be substantial. The updated MATS rule, if implemented by the

---

[42] *PM Incremental Improvement Memo*, Doc. ID EPA-HQ-OAR-2018-0794-5836 (March 2023) ("Improvements to existing particulate control devices will be dependent on a range of factors including the design and current operation of the units, which is not documented in public forums. … Unfortunately, the details of how those units' ESP designs, upgrades, and operation are not publicly available …. In order to evaluate the applicability of one or more of these potential improvements, information would need to be known about the existing ESPs and their respective operation which is not documented in public forums.").

[43] *See, e.g., Approval and Promulgation of Implementation Plans; Louisiana; Regional Haze State Implementation Plan*, 82 Fed. Reg. 32,294, 32,298 (July 13, 2017) ("Entergy's DSI and scrubber cost calculations were based on a propriety [sic] database, so we were unable to verify any of the company's costs. … Because of these issues, we developed our own control cost analyses ….").

[44] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[45] *Id.*

[46] 88 Fed. Reg. at 24874. The electrical output-based limit for new EGUs translates to approximately 0.009 lb/mmBtu, which is slightly below EPA's proposed limit of 0.010 lb/mmBtu.

[47] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

Environmental Protection Agency (EPA), aims to reduce mercury and other hazardous air pollutant emissions from coal-fired power plants. Coal-firing power plants, and lignite-firing power plants in particular, may face specific challenges and economic consequences in complying with these regulations, which could result in their forced retirement. Some potential economic impacts include:

1. **Escalating Operational Expenditures:** Under this rule, lignite power plants will face an excessive economic burden from a significant uptick in operational costs due to the integration of pollution control equipment. The installation of advanced technologies like activated carbon injection (ACI) and flue gas desulfurization (FGD) systems necessitates continuous monitoring and maintenance to ensure optimal performance. Design specifications vary from plant to plant which increases the complexities of the operating systems that require regular cleaning, replacement of consumables, and calibration, all of which incur additional expenses. Moreover, the implementation of pollution control, measures may necessitate alterations in combustion processes or the introduction of supplementary fuel, further driving up operational costs. As a result, lignite power plants are burdened with substantial ongoing expenditures, while also lacking a positive cost benefit analysis, which will undermine their economic viability and competitiveness in the energy market**.**

2. **Dilemma of Plant Retrofitting or Retirement:** Lignite power plants are confronted with the challenging prospect of either retrofitting existing facilities or contemplating retirement in response to the stringent requirements of the Mercury and Air Toxics Standards (MATS). Plant retrofitting involves substantial investment in upgrading equipment and implementing advanced pollution control technologies to achieve compliance with regulatory mandates. However, these retrofitting endeavors entail significant additional costs, potentially straining the financial resources of plant owners and operators. Moreover, the uncertainty surrounding the long-term economic viability of retrofitted plants further complicates decision-making processes**.**

3. **Impact on Electricity Prices:** The implementation of pollution control technologies to comply with MATS regulations can impose significant financial burdens on lignite power plants. These costs, encompassing the installation, maintenance, and operation of such technologies, would ultimately be transferred to consumers in the form of higher electricity prices. As power plants seek to recoup the expenses incurred in meeting regulatory requirements, consumers will experience an uptick in their electricity bills. This escalation in electricity prices will have far-reaching implications for households, businesses, and industries reliant on affordable energy. It will affect household budgets, impact the competitiveness of businesses, and influence consumer spending patterns. Additionally, higher electricity prices will introduce challenges for industries sensitive to energy costs, potentially leading to shifts in production, investment, and employment patterns within the broader economy. Therefore, the economic impact of elevated electricity prices resulting

from MATS compliance should be carefully considered within the context of the energy market, taking into account the implications for consumers, businesses, and overall economic growth.

4. **Employment Effects:** The escalation in costs and the possibility of plant retrofitting or retirement can reverberate through the lignite industry and associated sectors, potentially leading to job losses. As lignite power plants grapple with increased operational expenses and the financial strain of compliance with regulatory requirements, they may be compelled to streamline operations or even cease production altogether. Such decisions can have a ripple effect on employment within the community, impacting not only plant workers but also individuals employed in ancillary industries such as mining, transportation, and manufacturing. Job losses in these sectors can contribute to economic challenges, including reduced consumer spending, increased unemployment rates, and a decline in overall economic activity. Furthermore, the social and psychological impacts of job loss on affected individuals and communities cannot be understated, as they may face financial insecurity, stress, and uncertainty about their future prospects. Therefore, the potential job impacts stemming from increased costs and plant adjustments underscore the broader economic implications of regulatory compliance measures in the lignite industry.

5. **Regional Economic Consequences:** Lignite power plants are often linchpins of regional economies, exerting substantial influence on employment, tax revenue, and economic activity. Any shifts in the economic viability of these plants, whether due to increased costs, regulatory compliance burdens, or operational adjustments, will trigger broader consequences for local economies. The potential closure or downsizing of lignite power plants can result in the loss of direct and indirect employment opportunities, affecting not only plant workers but also individuals and businesses reliant on plant-related activities. Moreover, the decline in plant operations will lead to reduced tax revenue for local governments, impacting their ability to fund essential services and infrastructure projects. Additionally, the loss of economic activity associated with lignite power plants will ripple through the supply chain, affecting suppliers, vendors, and service providers in the region. This domino effect will exacerbate economic challenges, including decreased consumer spending, increased business closures, and a general downturn in economic vitality. Therefore, changes in the economic landscape of the lignite industry will have far-reaching consequences for regional economies, underscoring the interconnectedness between energy production, employment, and overall economic well-being at the local level.

6. **Impact on Investment Decisions:** The economic ramifications of the MATS rule can significantly shape investment decisions within the lignite industry. Plant owners and prospective investors must carefully evaluate the long-term economic feasibility and potential returns on investment in light of stringent regulatory compliance mandates. The substantial costs associated with MATS compliance, including technology upgrades and operational adjustments, may deter investment in lignite power plants or prompt

divestment from existing assets. Investors may reassess the risk-return profile of lignite-related ventures, considering factors such as regulatory uncertainty, market volatility, and shifting energy trends. Moreover, the potential for increased operational costs and regulatory burdens may incentivize investment in alternative energy sources or cleaner technologies, which align more closely with evolving environmental and sustainability objectives. Therefore, the economic implications of the MATS rule play a pivotal role in shaping investment decisions within the lignite industry, influencing capital allocation, project planning, and strategic resource allocation strategies.

7. **Legal and Regulatory Costs:** Meeting MATS requirements often entails significant legal and regulatory costs associated with monitoring, reporting, and ensuring continued compliance. Lignite power plants must allocate resources to navigate complex regulatory frameworks, engage legal counsel, and implement robust monitoring and reporting systems to adhere to emissions standards. These additional expenses contribute to the overall economic strain on lignite power plants, exacerbating the financial challenges associated with regulatory compliance. As a result, the burden of legal and regulatory costs further underscores the financial pressures faced by lignite power plant operators, shaping their strategic decision-making and resource allocation efforts.

## Grid Reliability Impacts

Compliance with the Mercury and Air Toxics Standards (MATS) rule will likely have grid reliability impacts on regional power grids that rely on lignite- or other coal-firing power plants. The impacts on grid reliability for power grids that rely on lignite- or other coal-firing power plants can include:

1. **Operational Adaptations and Flexibility Constraints**: The implementation of pollution control technologies like activated carbon injection (ACI) and flue gas desulfurization (FGD) systems necessitates operational modifications within lignite power plants. These adjustments may include alterations to combustion processes, fuel handling procedures, and overall plant operations to accommodate the integration of new equipment and systems. However, such operational changes can compromise the inherent flexibility of lignite power plants to respond effectively to fluctuating load conditions and grid demands. The need for continuous operation of pollution control systems, coupled with potential limitations in responsiveness, may impede the plant's ability to ramp up or down quickly in response to changes in electricity demand or supply. Consequently, the reliability of lignite power plants to maintain grid stability and meet grid operator requirements may be compromised, raising concerns about their ability to ensure consistent and secure electricity supply. Thus, while MATS compliance aims to mitigate environmental impacts, the operational adaptations required may introduce challenges to the reliability and flexibility of lignite power plants in supporting a resilient and dynamic energy grid.

2.  **Disruptions Due to Equipment Installation**: The installation and retrofitting of pollution control equipment often necessitate temporary shutdowns or reduced operating capacities within lignite power plants. These planned downtime periods are essential for integrating new equipment, conducting modifications, and ensuring compliance with regulatory requirements. However, the interruptions in plant operations during these installation phases will have adverse effects on the overall reliability and availability of the plant. The temporary cessation of power generation activities will disrupt electricity supply, potentially affecting grid stability and reliability. Moreover, extended downtime periods may lead to revenue losses for plant operators and suppliers, as well as inconvenience for consumers and end-users reliant on consistent electricity provision. Therefore, while essential for achieving compliance with MATS regulations, the equipment installation process poses challenges to the reliability and continuity of lignite power plant operations, emphasizing the importance of efficient planning and management to minimize disruptions.

3.  **Efficiency Implications**: The introduction of pollution control technologies, especially those targeting mercury emissions reduction, will potentially undermine the overall efficiency of lignite power plants. While these technologies play a crucial role in meeting regulatory standards, they often require additional energy inputs and introduce operational complexities that can compromise plant efficiency. For instance, activated carbon injection (ACI) systems necessitate the injection of powdered carbon into the flue gas stream, which can increase resistance and pressure drops within the system, thus reducing overall efficiency. Similarly, flue gas desulfurization (FGD) systems require energy-intensive processes such as limestone slurry preparation and circulation, further impacting plant efficiency. The reduction in efficiency can translate to decreased electricity output per unit of fuel input, potentially affecting the plant's ability to generate electricity reliably and meet demand fluctuations. Consequently, while pollution control measures are essential for environmental protection, the associated efficiency implications underscore the need for careful optimization and balancing of environmental and operational considerations to ensure reliable power generation from lignite plants.

4.  **Elevated Maintenance Demands**: The incorporation of MATS-compliant equipment, including ACI and FGD systems, often translates to heightened maintenance requirements within lignite power plants. The intricate nature of these pollution control technologies necessitates more frequent inspections, cleaning, and servicing to ensure optimal performance and regulatory compliance. However, the increased maintenance needs can result in extended periods of downtime, during which the plant may be unable to generate electricity, impacting its reliability and availability. Moreover, the allocation of resources and manpower to address maintenance tasks diverts attention and resources away from other operational activities, potentially affecting overall plant efficiency and productivity. Therefore, while essential for environmental compliance, the elevated maintenance

demands associated with MATS-compliant equipment pose challenges to the reliability and operational continuity of lignite power plants, highlighting the importance of proactive maintenance planning and execution to minimize disruptions.

5. **Inherent Fuel Supply Hurdles:** Lignite power plants grapple with inherent challenges associated with the utilization of lignite coal, particularly in meeting stringent emission standards. Lignite, characterized by its lower rank and elevated moisture content, poses unique obstacles in combustion processes. The variability in chemical composition across different seams of coal extracted from mines further complicates the task of ensuring consistent and efficient combustion. Each seam presents distinct combustion characteristics, necessitating meticulous adjustments in operational parameters to maintain compliance with emission regulations. Consequently, lignite power plants encounter difficulties in securing a reliable and uniform fuel supply, which undermines their ability to consistently meet emission targets and operational efficiency goals. The intricacies of managing diverse coal qualities exacerbate the complexities of pollution control measures, posing significant operational challenges for lignite power plants.

6. **Integration Challenges**: The introduction of new pollution control technologies into operational lignite power plants may encounter compatibility hurdles. Ensuring seamless integration with existing infrastructure is paramount for preserving reliability. Compatibility issues can emerge from differences in technology specifications, operational parameters, or control systems between the new equipment and the plant's established infrastructure. Unaddressed disparities may lead to operational inefficiencies, malfunctions, or system failures. Thus, meticulous planning and coordination are vital to mitigate compatibility risks and uphold the reliability of lignite power plants. Failure to address these challenges will compromise plant performance, emphasizing the need for thorough assessment and integration procedures when adopting new technologies.

7. **System Coordination and Grid Stability:** Adjustments in operating conditions and responses to fluctuating load demands can disrupt system coordination and compromise grid stability. Lignite power plants must coordinate closely with grid operators to maintain reliable electricity supply while adhering to MATS requirements. Changes in plant operations, such as implementing pollution control technologies or adjusting output levels, can affect the overall balance of supply and demand within the grid. Without effective coordination, these changes may lead to imbalances, voltage fluctuations, or frequency deviations, posing risks to grid stability. Therefore, robust communication and collaboration between lignite power plants and grid operators are essential to ensure seamless integration of plant operations with broader grid dynamics. By coordinating effectively, lignite power plants can contribute to grid stability while meeting regulatory obligations, ensuring the reliable delivery of electricity to consumers.

8. **Continuous Compliance Management**: Adhering to emission limits mandated by MATS necessitates ongoing monitoring and fine-tuning of pollution control equipment. The chemical properties of lignite can vary even within coal seams from the same mine, posing challenges in preparation and adjustment for plant operations. This variability complicates efforts to maintain consistent compliance, requiring dynamic adjustments in day-to-day plant operations. Consequently, ensuring reliable compliance becomes a dynamic process, demanding meticulous attention to detail and proactive management of pollution control systems. Consistent monitoring and adjustment are essential to mitigate emissions effectively while sustaining the operational reliability of lignite power plants amidst the inherent variability of lignite coal properties.

9. **Supply Chain Vulnerabilities:** The consolidation in the power plant equipment sector over the past decade has reduced the number of suppliers available. Relying on specific suppliers for pollution control equipment and technologies introduces supply chain risks. Disruptions in the supply chain, such as shortages, delays, or quality issues, will impede the timely installation and operation of essential equipment, jeopardizing reliability. Lignite power plants must carefully assess and manage these supply chain vulnerabilities to ensure uninterrupted access to critical components and technologies necessary for regulatory compliance and operational integrity. Proactive measures, such as diversifying suppliers or implementing contingency plans, are crucial for mitigating supply chain risks and maintaining the reliability of lignite power plants.

10. **Long-Term Viability and Aging Infrastructure:** Compliance with MATS regulations will raise concerns about the long-term viability of older lignite power plants. Aging infrastructure may struggle to adapt to the requirements of new pollution control technologies, posing challenges that will impact reliability. The integration of these technologies into outdated systems may require extensive retrofitting or upgrades, which can strain resources and prolong downtime. Moreover, the operational lifespan of aging infrastructure may be limited, leading to questions about the economic feasibility of investing in costly compliance measures. Plant owners must carefully assess the cost-benefit ratio of compliance efforts and consider the potential impact on reliability when evaluating the long-term viability of older lignite power plants. Failure to address these challenges will compromise the reliability and competitiveness of these facilities in the evolving energy landscape.

# Section D: Modeling Results

## Summary

The EPA did not conduct a reliability analysis for its proposed MATS rules or its Post IRA base case, instead it conducted a Resource Adequacy and reserve margin analysis, which EPA has claimed is necessary but not sufficient to grid reliability.[48]

EPA's lack of reliability modeling prompted several entities to voice concerns in the original docket for the Proposed MATS rule would negatively impact grid reliability, including the National Rural Electric Coop Association, the American Coal Council, The Lignite Energy Council, PGen, the American Public Power Association, and the National Mining Association.[49,50,51,52,53,54]

To provide this necessary perspective, Center of the American Experiment modeled the reliability and cost impacts of the proposed Mercury and Air Toxics Standards (MATS) in the subregions consisting of the Midcontinent Independent Systems Operator (MISO) as it relates to the elimination of the subcategory for lignite-fired power plants.[55,]

Our analysis determined that the closure of lignite-fired powered power plants in the MISO footprint would increase the severity of projected future capacity shortfalls, i.e. rolling blackouts, in the MISO system if these resources are replaced with wind, solar, battery storage, and natural gas plants consistent with the EPA's estimates for capacity values for intermittent and thermal resources.

Building these replacement resources would come at a great cost to MISO ratepayers. The existing lignite facilities are largely depreciated assets that generate large quantities of dispatchable, low-cost electricity. Our modeling determined the total cost of replacement generation capacity in the Status Quo, Partial, and Full scenarios will cost $12.93 billion, $14.88 billion, and $16.76 billion, respectively, from 2024 through 2035, resulting in incremental costs of $1.9 billion in the Partial

---

[48] Resource Adequacy Analysis Technical Support Document, New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule Proposal Docket ID No. EPA-HQ-OAR-2023-0072 U.S. Environmental Protection Agency Office of Air and Radiation April 2023.

[49] NRECA Comments, EPA-HQ-OAR-2018-0794-5956, at 5-6.

[50] American Coal Council Comments, EPA-HQ-OAR-2018-0794-6808, at 3.

[51] LEC Comments, EPA-HQ-OAR-2018-0794-5957, at 17.

[52] PGen Comments, EPA-HQ-OAR-2018-0794-5994, at 5.

[53] APPA Comments, EPA-HQ-OAR-2018-0794-5958, at 33.

[54] NMA Comments, EPA-HQ-OAR-2018-0794-5986, at 29.

[55] U.S. Environmental Protection Agency, "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 88 FR 24854, April 24, 2023, https://www.federalregister.gov/documents/2023/04/24/2023-07383/national-emission-standards-for-hazardous-air-pollutants-coal--and-oil-fired-electric-utility-steam.

scenario and $3.8 billion in the Full scenario through 2035, compared to operating the current lignite facilities under status quo conditions.

MISO residents would also suffer economic damages from the increased severity of rolling blackouts, which can result in food spoilage, property damage, lost labor productivity, and loss of life. American Experiment calculated the economic damages associated with the increase in unserved electricity demand using a metric called the Value of Lost Load (VoLL) criteria, which can be thought of as the Social Cost of Blackouts.

Our analysis found that the MATS rule would cause an additional 73,699 additional megawatt hours (MWh) of unserved load in the in the Full MATS Retirement scenario in 2035 using 2019 hourly electricity demand and wind and solar capacity factors. Using a conservative value for the VoLL of $14,250 per MWh, we conclude the MATS rule would produce economic damages of $1.05 billion under these conditions.

Therefore, the incremental costs stemming from the closure of the 2,264 MW of lignite fired capacity in MISO under the Full scenario exceeds the projected net present value benefits of $3 billion from 2028 through 2037 using a 3 percent discount rate modeled by EPA in its Regulatory Impact Analysis.

## Modeling the Reliability and Cost of the MISO Generating Fleet Under Three Scenarios

Our analysis examined the impact of the proposed MATS rules on the reliability of the MISO system through 2035 by comparing two lignite retirement scenarios to a "Status Quo" scenario that represents "business as usual" that assumes no changes to the generating fleet occur due to the MATS rule, or any other of EPA's pending regulations.[56]

**Status Quo scenario:** Installed generator capacity assumptions for MISO in the Status Quo scenario are based on announced retirements from U.S. Energy Information Administration (EIA) database and utility Integrated Resource Plans (IRPs) through 2035 compiled by Energy Ventures Analysis on behalf America's Power, a trade association whose sole mission is to advocate at the federal and state levels on behalf of the U.S. coal fleet.[57] This database is also used by the NERC LTRA suggesting it is among the most credible databases available for this analysis.[58] It should be noted that this database leaves considerably more coal and natural gas on its system than the MISO grid EPA assumes will be in service in the coming years in its Proposed Rule Supply Resource

---

[56] See Appendix 2: Capacity Retirements and Additions in Each Scenario.
[57] America's Power, "Proprietary data base maintained by Energy Ventures Analysis, an energy consultancy with expertise in electric power, natural gas, oil, coal, renewable energy, and environmental policies" Personal Communication, November 3, 2023.
[58] North American Electric Reliability Corporation, "2023 Long-Term Reliability Assessment," December, 2023, https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf.

Utilization file, meaning our reliability assessment will be more conservative than if we used EPA's capacity projections.

Retired thermal resources in the Status Quo scenario are replaced by solar, wind, battery storage, and natural gas in accordance with the current MISO interconnection queue to maintain resource adequacy based on capacity values given to these generators in EPA's Proposed Rule Supply Resource Utilization file.[59] These capacity values are described in greater detail in the section labeled Replacement Capacity Based on EPA Methodology for Resource Adequacy.

**Partial MATS Retirement scenario:** The Partial MATS retirement scenario assumes 1,150 megawatts (MW) of lignite fired capacity in North Dakota is retired in addition to incorporating all of the announced retirements in the Status Quo. This value was chosen because it represents the retirement of one lignite facility in North Dakota that serves the MISO market. These resources are replaced with wind, solar, battery storage, and natural gas capacity using the methodology described greater detail in the section labeled Replacement Capacity Based on EPA Methodology for Resource Adequacy.[60]

**Full MATS scenario:** The Full MATS retirement scenario assumes the MATS regulations will cause all 2,264 MW of lignite-fired generators in the MISO system to retire, in addition to incorporating the retirements in the Status Quo scenario will occur.[61] These resources are replaced with wind, solar, battery storage, and natural gas capacity using the methodology described greater detail in the section labeled Replacement Capacity Based on EPA Methodology for Resource Adequacy.[62]

## Reliability in each scenario

The EPA did not conduct a reliability analysis for its proposed MATS rules or its Post IRA base case. Instead, it conducted a Resource Adequacy analysis of its proposed rule, compared to the Post IRA base case.

Resource Adequacy and reserve margin analyses can be useful tools for determining resource adequacy and reliability, but the shift away from dispatchable thermal resources (fossil fuel) toward intermittent resources (wind and solar) increases the complexity and uncertainty in these analyses and makes them increasingly dependent on the quality of the assumptions used to construct capacity accreditations.[63]

---

[59] U.S. Environmental Protect Agency, "Proposed Regulatory Option," Zip File,
https://www.epa.gov/system/files/other-files/2023-04/Proposed%20Regulatory%20Option.zip
[60] See Appendix 3: Replacement Capacity Based on EPA Methodology for Resource Adequacy.
[61] These figures represent the rated summer capacity as indicated by the U.S. Energy Information Administration.
[62] See Appendix 3: Replacement Capacity Based on EPA Methodology for Resource Adequacy.
[63] See Appendix 4: Resource Adequacy in Each Scenario.

This is likely a key reason why EPA has distinguished between resource *adequacy* and resource *reliability* in its Resource Adequacy Technical Support Document for its proposed carbon dioxide regulations on new and existing power plants.[64],[65] EPA stated:

> "As used here, the term **resource adequacy** is defined as the provision of adequate generating resources to meet projected load and generating reserve requirements in each power region, while **reliability** includes the ability to deliver the resources to the loads, such that the overall power grid remains stable." **[emphasis added].**" EPA goes on to say that "resource adequacy … is necessary (but not sufficient) for grid reliability.[66]

As the grid becomes more reliant upon non-dispatchable generators with lower reliability values, it is crucial to "stress test" the reliability outcomes of systems that use the EPA's capacity value assumptions in their Resource Adequacy analyses by comparing historic hourly electricity demand and wind and solar capacity factors against installed capacity assumptions in the Status Quo, Partial, and Full scenarios.

We conducted such an analysis by comparing EPA's modeled MISO generation portfolio to the historic hourly electricity demand and hourly capacity factors for wind and solar in 2019, 2020, 2021, and 2022. These data were obtained from the U.S. Energy Information Administration (EIA) Hourly Grid Monitor to assess whether the installed resources would be able to serve load for all hours in each Historic Comparison Year (HCY).[67]

For our analysis, hourly demand and wind and solar capacity factors were adjusted upward to meet EPA's peak load, annual generation, and capacity factor assumptions. These assumptions are generous to the EPA because they increase the annual output of wind and solar generators to levels that are not generally observed in MISO.

## Extent of the Capacity Shortfalls

While our modeling determined that the retirement of lignite facilities had a minimal impact on the number of hours of capacity shortfalls observed in the Partial and Full scenarios, retiring the lignite facilities makes the extent of capacity shortfalls worse.

---

[64] EPA did not produce a Resource Adequacy Technical Support Document for the MATS rules.
[65] U.S. Environmental Protection Agency, "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 88 FR 24854, April 24, 2023, https://www.federalregister.gov/documents/2023/04/24/2023-07383/national-emission-standards-for-hazardous-air-pollutants-coal--and-oil-fired-electric-utility-steam.
[66] Resource Adequacy Analysis Technical Support Document, New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule Proposal Docket ID No. EPA-HQ-OAR-2023-0072 U.S. Environmental Protection Agency Office of Air and Radiation April 2023.
[67] U.S. Energy Information Administration, "Hourly Grid Monitor," https://www.eia.gov/electricity/gridmonitor/dashboard/electric_overview/US48/US48.

For example, Figure D-1 shows largest capacity shortfalls in the Status Quo scenario, which occur in 2035 using the 2021 Historical Comparison Year for hourly electricity demand and wind and solar capacity factors.

Each resource's hourly performance is charted in the graph below. Thermal units are assumed to be 100 percent available, which is consistent with EPA's capacity accreditation for these resources, and wind and solar are dispatched as available based on 2021 fluctuations in generation. Blue sections reflect the use of "Load Modifying Resources," which are reductions in electricity consumption by participants in the MISO market.

Purple areas show time periods where the batteries are discharged. These batteries are recharged on January 8th and 9th using the available natural gas and oil-fired generators. Red areas represent periods where all of the resources on the grid are unable to serve load due to low wind and solar output and drained battery storage systems. At its peak, the largest capacity shortfall is 15,731 MW.



*Figure D-1. This figure shows the generation of resources on the MISO grid in the Status Quo during a theoretical week in 2035. The purple portions of the graph show the battery storage discharging to provide electricity during periods of low wind and solar generation. Unfortunately, the battery storage does not last long enough to avoid blackouts during a wind drought.*

These capacity shortfalls become more pronounced in the Partial and Full scenarios as less dispatchable capacity exists on the grid to serve load. Figure D-2 shows the three capacity shortfall events in Figure D-1. It depicts the blackouts observed in the Status Quo scenario in green, and

the additional MW of unserved load in the Partial and Full scenarios in yellow and red, respectively.



*Figure D-2. Capacity shortfalls increase during a hypothetical January 9th, 2035 from 15,731 MW at their peak in the Status Quo to 16,493 MW in the Partial scenario and 17,229 MW in the Full scenario.*

Table D-1 shows the largest capacity shortfall, in terms of MW, for each scenario in each of the four Historical Comparison Years studied and the incremental increase in the largest shortfall due to the lignite closures stemming from the MATS rule for the Partial and Full scenarios.

The largest incremental increase in capacity shortfalls would occur in the 2020 HCY in the Full scenario as the blackouts would increase from 552 MW in the Status Quo scenario to 3,295 in the Full scenario, a difference of 2,743 MW.

| Maximum MW Shortfalls in 2035 in Each HCY | | | | | |
|---|---|---|---|---|---|
| Data Year | Status Quo | Partial | Partial Difference | Full | Full Difference |
| 2019 | 15,130 | 15,842 | 712 | 16,530 | 1,400 |
| 2020 | 552 | 2,587 | 2,034 | 3,295 | 2,743 |
| 2021 | 15,731 | 16,493 | 762 | 17,229 | 1,498 |
| 2022 | 10,615 | 11,409 | 794 | 12,177 | 1,562 |

*Table D-1. This table shows the largest capacity shortfall, in terms of MW, for each scenario in each of the four Historical Comparison Years studied and the incremental increase in the largest shortfalls due to the lignite closures stemming from the MATS rule for the Partial and Full scenarios.*

It is important to note that this difference is larger than the amount of lignite-fired capacity that is retired in the Full scenario (2,264 MW) because the retirement of these facilities reduces the amount of capacity available to charge battery storage resources.

## Unserved MWh in Each Scenario

The amount of unserved load in each scenario can also be measured in megawatt hours (MWh). This metric is a product of the number of hours with insufficient energy resources multiplied by the hourly energy shortfall, measured in MW. This metric may be a more tangible way to understand the impact that the unserved load will have on families, businesses, and the broader economy.  Each MWh reflects an increment of time where electric consumers in the MISO grid will not have access to power.

Table D-2 shows the number of MWhs of unserved load in each scenario for the four HCYs studied. In some HCYs, the incremental number of unserved MWhs is fairly small, but in other years they are substantial. In the 2020 HCY, the Partial scenario had 2,042 more MWhs of unserved load than the Status Quo scenario, and the Full scenario had 4,265 MWh of additional unserved load, compared to the Status Quo Scenario.

| Total MWh Shortfalls in 2035 in Each HCY | | | | | |
|---|---|---|---|---|---|
| Data Year | Status Quo | Partial | Partial Difference | Full | Full Difference |
| 2019 | 168,723 | 204,050 | 35,327 | 242,393 | 73,669 |
| 2020 | 582 | 2,624 | 2,042 | 4,847 | 4,265 |
| 2021 | 244,743 | 273,927 | 29,184 | 304,021 | 59,278 |
| 2022 | 53,458 | 62,223 | 8,765 | 71,304 | 17,846 |

*Table D-2. The incremental MWh of unserved load ranges from 2,042 to 35,327 in the Partial scenario, and from 4,265 to 73,669 in the Full scenario.*

In the 2019 HCY, the Partial scenario experienced an additional 35,327 MWh of unserved load and the Full scenario experienced 73,669 MWh of unserved load. These additional MWh of unserved load will impose hardships on families, businesses, and the broader economy.

## The Social Cost of Blackouts Using the Value of Lost Load (VoLL)

Blackouts are costly. They frequently result in food spoilage, lost economic activity, and they can also be deadly. Regional grid planners attempt to quantify the cost of blackouts with a metric called the Value of Lost Load (VoLL). The VoLL is a monetary indicator *expressing the costs associated with an interruption of electricity supply*, expressed in dollars per megawatt hour (MWh) of unserved electricity.

MISO currently assigns a Value of Lost Load (VOLL) of $3,500 per megawatt hour of unserved load. However, Potomac Economics, the Independent Market Monitor for MISO, recommended

a value of $25,000 per MWh for the region.[68] For this study, we used a midpoint value of $14,250 per MWh of unserved load to calculate the social cost of the blackouts under each modeled scenario.

Table D-3 shows the economic damage of blackouts in each scenario in model year 2035 and shows the incremental increase in the VOLL in the Partial and Full scenarios. Incremental VOLL costs are highest using the 2019 HCY where MISO experiences an additional $503.4 million in economic damages due to blackouts in the Partial scenario, and an additional $1.05 billion in the Full scenario.

| Value of Lost Load for Capacity Shortfalls in 2035 in Each HCY | | | | | |
|---|---|---|---|---|---|
| Data Year | Status Quo | Partial | Partial Difference | Full | Full Difference |
| 2019 | $2,404,309,657 | $2,907,716,665 | $503,407,008 | $3,454,098,692 | $1,049,789,035 |
| 2020 | $8,296,505 | $37,389,117 | $29,092,612 | $69,074,216 | $60,777,712 |
| 2021 | $3,487,594,170 | $3,903,464,847 | $415,870,677 | $4,332,301,464 | $844,707,294 |
| 2022 | $761,782,023 | $886,680,023 | $124,898,001 | $1,016,083,680 | $254,301,657 |

*Table D-3. MISO would experience millions of dollars in additional economic damage if the lignite fired power plants in its footprint are shut down in response to the MATS regulations.*

It is important to note that these VOLL figures are not the total estimated cost impacts of blackouts for the MATS regulations. Rather, they are a snapshot of a range of possible outcomes for the year 2035 based on variations in electricity demand and wind and solar productivity.

The VOLL demonstrates harm of the economy in a multitude of ways. For the industrial/commercial sector, direct costs from losing power (and therefore benefits from avoiding power outages) can be (1) opportunity cost of idle resources, (2) production shortfalls / delays, (3) damage to equipment and capital, and (4) any health or safety impacts to employees. There are also indirect or macroeconomic costs to downstream businesses/consumers who might depend on the products from a company who experiences a power outage.[69]

For the residential sector, the direct costs are different. They can include (1) restrictions on activities (e.g. lost leisure time, lost work time, and associated stress), (2) financial costs through property damage (e.g. damage to real estate via bursting pipes, food spoilage), and (3) health and safety issues (e.g. reliance on breathing machines, air filters).[70]

---

[68] David B. Patton, "Summary of the 2022 MISO State of the Market Report," Potomac Economics, July 13, 2023, https://cdn.misoenergy.org/20230713%20MSC%20Item%2006%20IMM%20State%20of%20the%20Market%20Recommendations629500.pdf.

[69] Will Gorman, "The Quest to Quantify the Value of Lost Load: A Critical Review of the Economics of Power Outages," The Electricity Journal Volume 35, Issue 8, October 2022, https://www.sciencedirect.com/science/article/pii/S1040619022001130.

[70] Will Gorman, "The Quest to Quantify the Value of Lost Load: A Critical Review of the Economics of Power Outages," The Electricity Journal Volume 35, Issue 8, October 2022, https://www.sciencedirect.com/science/article/pii/S1040619022001130.

## Hours of Capacity Shortfalls

Comparing hourly historic electricity demand and wind and solar output to MISO grid in the Status Quo scenario, our modeling found that MISO would have capacity shortfalls in the 2019, 2021, and 2022 HCYs which can be seen in Table D-4 below.

There would be additional capacity shortfalls in all of the HCYs modeled in the Partial and Full scenarios, where the Partial scenario would experience four additional hours of blackouts in 2019 HCY, one additional hour of blackouts in the 2020 HCY, four additional hours of blackouts in 2021 HCY, and one additional hour of blackouts in the 2022 HCY. In the Full scenario, there would be five additional hours of blackouts in the 2019 HCY, one additional hour of blackouts in the 2020 HCY, eight additional hours in the 2021 HCY, and two additional hours in the 2022 HCY, compared to the Status Quo Scenario.

| Hours of Capacity Shortfalls in 2035 in Each HCY | | | | | |
|---|---|---|---|---|---|
| Data Year | Status Quo | Partial | Partial Difference | Full | Full Difference |
| 2019 | 28 | 32 | 4 | 33 | 5 |
| 2020 | 2 | 3 | 1 | 3 | 1 |
| 2021 | 24 | 28 | 4 | 32 | 8 |
| 2022 | 13 | 14 | 1 | 15 | 2 |

*Table D-4. Capacity shortfalls occur in three of the four HCYs in the Status Quo scenario and all four HCYs for the Partial and Full scenarios.*

## Cost of replacement generation

Our VOLL analysis demonstrates that the MATS rules will cause significant economic harm in MISO by reducing the amount of dispatchable capacity on the grid due to lignite plant closures stemming from the removal of the lignite subcategory.

However, load serving entities (LSEs) will also begin to incur costs as they build replacement generation to maintain resource adequacy if lignite resources are forced to retire in response to the proposed MATS rules. These costs will be passed on to electricity consumers and must be calculated to produce accurate estimates of the true cost of the MATS regulations.

We modeled the cost of the replacement generation under the Status Quoe, Partial and Full scenarios. The cost of the Partial and Full scenarios, when compared to the Status Quo scenario, is used to determine the additional economic burden that the MATS regulations will impose onto MISO electricity customers.

Our modeling determined the total cost of replacement generation capacity in the Status Quo, Partial, and Full scenarios will cost $12.93 billion, $14.88 billion, and $16.76 billion, respectively, from 2024 through 2035 (see Figure D-3).



*Figure D-3. The Partial scenario will cost $1.95 billion more than the Status Quo scenario from 2024 through 2035 and the Full scenario will cost $3.8 billion more than the Status Quo scenario in this timeframe.*

Figure D-4 shows the incremental cost of the Partial and Full scenarios from 2024 through 2030, the period reflecting the up-front costs of complying with the regulations. From 2024 through 2028, LSEs would incur $337 million by building replacement generation in the Partial scenario, compared to the Status Quo scenario, and $654 million in the Full scenario, relative to the Status Quo. It should be noted that these costs are only the cost of building replacement generation and do not factor in the cost of decommissioning or remediating existing power plants or mine sites.



*Figure D-4. This figure shows the annual cost of building the replacement capacity needed to maintain resource adequacy after the retirement of the lignite plants based on EPA's capacity accreditation values for wind, solar, storage, and thermal resources.*

We describe the total costs of replacement generation capacity for each scenario in greater detail below. The assumptions used to calculate the cost of replacement generation can be found in Appendix 1: Modeling Assumptions.

**Status Quo scenario:**

The Status Quo scenario results in the retirement of 28,756.8 MW of coal resources, 7,852 MW of natural gas capacity, and 462 MW of petroleum capacity. These retirements are already projected to occur without imposition of the new MATS Rule or other federal regulations. This retired capacity is replaced with 4,306 MW of natural gas, 19,436 MW of wind, 29,652 MW of solar, and 3,304 MW of storage.[71]

The total cost of replacement generation for the Status Quo scenario is $12.9 billion. The majority of these expenses consist of additional fixed costs of building new wind, solar, and battery storage facilities, such as fixed operational and maintenance (O&M), capital costs, and utility returns.

Compared to the current grid, the Status Quo scenario saves $32 billion in fuel costs, $11.5 billion in variable operations and maintenance costs, and $5 billion in taxes. However, these savings are

---

[71] See Appendix 2: Capacity Retirements and Additions in Each Scenario.

far outweighed by $5.1 billion in additional fixed costs, $16 billion in capital costs, $2.1 billion in transmission costs, and $38.2 billion in utility profits (see Figure D-5).



*Figure D-5. The Status Quo scenario saves consumers money from lower fuel costs, fewer variable operations and maintenance costs, and lower taxes (due to federal subsidies) but these savings are outweighed by the additional costs. As a result, building the grid in the Status Quo scenario would increase costs by $12.93 billion compared to today's costs.*

These additional costs will have an impact on electricity rates. Our cost modeling determined that electricity costs for MISO ratepayers would be 9.89 cents per kWh in the Status Quo scenario, an increase of nearly 3.5 percent relative to current costs of 9.56 cents per kWh.[72]

**Partial MATS Retirement scenario:**

The Partial scenario results in the closure of 1,151 MW of lignite capacity and necessitates an incremental increase in replacement capacity of 1,015 MW wind, 1,549 MW solar, and 173 MW storage, compared to the Status Quo scenario.[73]

The total cost of replacement generation for the Partial scenario is $14.9 billion, and the total incremental cost is $1.9 billion compared to the Status Quo scenario. The majority of these

---

[72] Annual Electric Power Industry Report, Form EIA-861 detailed data files, https://www.eia.gov/electricity/data/eia861/.
[73] See Appendix 2: Capacity Retirements and Additions in Each Scenario.

expenses consist of additional fixed costs of building new wind, solar, and battery storage facilities, such as fixed operational and maintenance (O&M), capital costs, and utility returns.

Compared to the current grid, the Partial scenario saves $32.7 billion in fuel costs, $11.6 billion in variable operations and maintenance costs, and $5.1 billion in taxes. However, these savings are far outweighed by $5.3 billion in additional fixed costs, $17.1 billion in capital costs, $2.2 billion in transmission costs, and $39.7 billion in utility profits (see Figure D-6).



*Figure D-6. The Partial scenario results in an $14.88 billion in additional costs compared to the current grid due to additional capital costs, fixed operations and maintenance costs, additional transmission costs, and additional utility profits.*

Compared to the Status Quo scenario, the incremental savings are $664 million in fuel costs, $119.7 million in variable operations and maintenance costs, and $102.2 million in taxes, which are outweighed by $178.7 million in additional fixed costs, $1.1 billion in capital costs, $116.5 million in transmission costs, and $1.4 billion in utility profits (see Figure D-7).



*Figure D-7. The Partial scenario will cost MISO ratepayers an additional $1.9 billion from 2024 through 2035.*

These incremental costs mean Load Serving Entities will incur an additional $1.9 billion because of these rules. These costs will start incurring before the compliance deadline is finalized in 2028, totaling $337 million of additional expenses compared to the Status Quo scenario (see Figure D-8).



*Figure D-8. This figure shows the annual incremental cost incurred by LSEs as a result of the lignite closures in the Partial scenario.*

These additional costs will have an impact on electricity rates. Our cost modeling determined that electricity costs for MISO ratepayers would be 9.95 cents per kWh in the Partial scenario, an increase of nearly 3.9 percent relative to current costs of 9.58.

**Full MATS scenario:**

Under the Full scenario, 2,264 MW of lignite capacity would be forced to retire resulting results in an incremental increase in replacement capacity of 1,997 MW wind, 3,048 MW solar, and 304 MW storage compared to the Status Quo scenario.

The total cost of replacement generation for the Full scenario is $16.8 billion, and the total incremental cost is $3.8 billion compared to Status Quo scenario. The majority of these expenses consist of additional fixed costs of building new wind, solar, and battery storage facilities, such as fixed operational and maintenance (O&M), capital costs, and utility returns.

Compared to the current grid, the Full scenario saves $33.3 billion in fuel costs, $11.7 billion in variable operations and maintenance costs, and $5.2 billion in taxes. However, these savings are far outweighed by $5.4 billion in additional fixed costs, $18.1 billion in capital costs, $2.4 billion in transmission costs, and $41.1 billion in utility profits (see Figure D-9).



*Figure D-9. The Full scenario results in an increase of $16.76 billion in costs compared to the current grid.*

Compared to the Status Quo scenario, the incremental savings are $1.3 million in fuel costs, $235.1 million in variable operations and maintenance costs, and $202 million in taxes, which are outweighed by $350.8 million in additional fixed costs, $2.1 billion in capital costs, $229.1 million in transmission costs, and $2.8 billion in utility profits (see Figure D-10).



*Figure D-10. This figure itemizes the expenses incurred in the Full scenario, which will cost an additional $3.8 billion compared to the Status Quo scenario.*

These incremental costs mean Load Serving Entities will incur an additional $3.8 billion in the Full scenario because of these rules. These costs will start incurring before the compliance deadline is finalized in 2028, totaling $654 million of additional expenses compared to the Status Quo scenario (see Figure D-11).



*Figure D-11. LSEs would incur an additional $654 million in additional expenses, compared to the Status Quo scenario, as a result of the proposed MATS rules.*

These additional costs will have an impact on electricity rates. Our cost modeling determined that electricity costs for MISO ratepayers would be 9.97 cents per kWh in the Full scenario, an increase of nearly 4.1 percent relative to current costs of 9.58.

## Conclusion:

By effectively eliminating the subcategory for lignite power plants and ignoring the breadth of evidence demonstrating that these regulations are not reasonably attainable, the MATS rules will increase the severity of capacity shortfalls in the MISO region, resulting in economic damages from the ensuing blackouts ranging from $29 million to $1.05 billion, depending on the HCY used, and imposing $1.9 billion to $3.8 billion in the cost of replacement generation capacity in the Partial and Full scenarios, respectively.

Therefore, the costs stemming from the closure of the 2,264 MW of lignite fired capacity in MISO exceeds the projected net present value benefits of $3 billion from 2028 through 2037 using a 3 percent discount rate modeled by EPA in its Regulatory Impact Analysis.[74]

---

[74] Regulatory Impact Analysis for the Proposed National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review (Apr. 2023), Docket ID: EPA-HQ-OAR-2018-0794-5837.

# Appendix 1: Modeling Assumptions

**Electricity Consumption Assumptions**

Annual electricity consumption in each model year is increased in accordance with EPA's assumptions in the IPM in each of the MISO subregions.

**Peak Demand and Reserve Margin Assumptions**

The modeled peak demand and reserve margin in each of the model years are increased in accordance with the IPM in each of the MISO subregions.

**Time Horizon Studied**

This analysis studies the impact of the proposed MATS rules from 2024 through 2035 to accurately account for the costs LSEs would incur by building replacement generation in response to the potential shutdown of lignite capacity.

This timeline downwardly biases the cost of compliance with the regulations because power plants are long term investments, often paid off over a 30-year time period. This means the changes to the resource portfolio in MISO resulting from these rules will affect electricity rates for decades beyond 2035.

**Hourly Load, Capacity Factors, and Peak Demand Assumptions**

Hourly load shapes and wind and solar generation were determined using data for the entire MISO region obtained from EIA's Hourly Grid Monitor. Load shapes were obtained for 2019, 2020, 2021, and 2022. [75] These inputs were entered into the model to assess hourly load shapes and assess possible capacity shortfalls in 2035 using each of the historical years.

Capacity factors used for wind and solar facilities were adjusted upward to match EPA assumptions that new wind and solar facilities will have capacity factors as high as 42.2 percent and 24.7 percent, respectively. These are generous assumptions because the current MISO-wide capacity factor of existing wind turbines is only 36 percent, and solar is 20 percent.

Our analysis upwardly adjusted observed capacity factors to EPA's estimates despite the fact that EPA's assumptions for onshore wind are significantly higher than observed capacity factors reported from Lawrence Berkeley National Labs, which demonstrates that new wind turbines entering operation since 2015 have never achieved annual capacity factors of 42.2 percent (See Figure D-12). [76]

---

[75] Energy Information Administration, "Hourly Electric Grid Monitor," Accessed August 12, 2022, https://www.eia.gov/ electricity/gridmonitor/dashboard/electric_overview/balancing_authority/MISO

[76] Lawrence Berkely National Labs, "Wind Power Performance," Land Based Wind Report, Accessed July 27, 2023, https://emp.lbl.gov/wind-power-performance.



Figure D-12. This *figure shows capacity factors for U.S. onshore wind turbines by the year they entered service. In no year do these turbines reach EPA's assumed 42.2 percent capacity factor on an annual basis.*

Another generous assumption is that we did not hold natural gas plants accountable to other EPA rules, such as the Carbon Rule, that may be in effect in addition to the MATS rule and would cap natural gas generators at 49 percent capacity factors to avoid using carbon capture and sequestration or co-firing with hydrogen. Doing so would have resulted in even more capacity shortfalls.

**Line Losses**

Line losses are assumed to be 5 percent of the electricity transmitted and distributed in the United States based on U.S. on EIA data from 2017 through 2021.[77]

**Value of Lost Load**

The value of lost load (VoLL) is a monetary indicator *expressing the costs associated with an interruption of electricity supply*, expressed in dollars per megawatt hour (MWh) of unserved electricity.

---

[77] Energy Information Administration, "How Much Electricity is Lost in Electricity Transmission and Distribution in the United States," Frequently Asked Questions, https://www.eia.gov/tools/faqs/faq.php?id=105&t=3

Our analysis uses a conservative midpoint estimate of $14,250 per MWh for VoLL. This value is higher than MISO's previous VoLL estimate of $3,500 per MWh, but significantly lower than the Independent Market Monitor's suggested estimate of $25,000 per MWh. [78]

## Plant Retirement Schedules

Our modeling utilizes announced coal and natural gas retirement dates from U.S. EIA databases and announced closures in utility IRPs using a dataset collected by NERA economic consulting.

## Plant Construction by Type

The resource adequacy and reliability portions of this analysis use MISO Interconnection Queue data to project into the future. EPA capacity values are applied to each newly constructed resource until the MISO system hits its target reserve margin based on EPA's peak demand forecast in its IPM.

## Load Modifying Resources, Demand Response, and Imports

Our model allows for the use of 7,875 MW of Load Modifying Resources (LMRs) and 3,638 MW external resources (imports) in determining how much reliable capacity will be needed within MISO to meet peak electricity demand under the new MATS rules.

## Utility Returns

Most of the load serving entities in MISO are vertically integrated utilities operating under the Cost-of-Service model. The amount of profit a utility makes on capital assets is called the Rate of Return (RoR) on the Rate Base. For the purposes of our study, the assumed rate of return is 9.9 percent with debt/equity split of 48.92/51.08 based on the rate of return and debt/equity split of the ten-largest investor-owned utilities in MISO.

## Transmission

This analysis assumes the building of transmission estimated at $10.3 billion, which is consistent with MISO tranche 1 for the Status Quo Scenario. For the Full and Partial scenarios, transmission costs are estimated to be $223,913 per MW of new installed capacity to account for the increased wind, solar, storage, and natural gas capacity additions.

## Taxes and Subsidies

Additional tax payments for utilities were calculated to be of 1.3 percent of the rate base. The state income tax rate of 7.3 percent was estimated by averaging the states within the MISO region. The

---

[78] Potomac Economics, "2022 State of the Market Report for the MISO Electricity Markets," Independent Market Monitor for the Midcontinent ISO, June 15, 2023, https://www.potomaceconomics.com/wp-content/uploads/2023/06/2022-MISO-SOM_Report_Body-Final.pdf.

Federal income tax rate is 21 percent. The value of the Production Tax Credit (PTC) is $27.50. The Investment Tax Credit (ITC) 30 percent through 2032, 26 percent in 2033, and 22 percent in 2034.

**Battery Storage**

Battery storage assumes a 5 percent efficiency loss on both ends (charging and discharging).

Maximum discharge rates for the MISO system model runs were held at the max capacity of the storage fleet, less efficiency losses. Battery storage is assumed to be 4-hour storage, while pumped storage is assumed to be 8-hour storage.

**Wind and Solar Degradation**

According to the Lawrence Berkeley National Laboratory, output from a typical U.S. wind farm shrinks by about 13 percent over 17 years, with most of this decline taking place after the project turns ten years old. According to the National Renewable Energy Laboratory, solar panels lose one percent of their generation capacity each year and last roughly 25 years, which causes the cost per megawatt hour (MWh) of electricity to increase each year.[79] However, our study does not take wind or solar degradation into account.

**Capital Costs, and Fixed and Variable Operation and Maintenance Costs**

Capital costs for all new generating units are sourced from the EIA 2023 Assumptions to the Annual Energy Outlook (AOE) Electricity Market Module (EMM). These costs are held constant throughout the model run. Expenses for fixed and variable O&M for new resources were also obtained from the EMM. MISO region capital costs were used, and national fixed and variable O&M costs were obtained from Table 3 in the EMM report.[80]

**Discount Rate**

A discount rate of 3.76 percent is used in accordance with EPA's assumptions in the IPM.

**Unit Lifespans**

Different power plant types have different useful lifespans. Our analysis takes these lifespans into account. Wind turbines are assumed to last for 20 years, solar panels are assumed to last 25 years, battery storage for 15 years. Natural gas plants are assumed to last for 30 years.

**Repowering**

Our model assumes wind turbines, solar panels, and battery storage facilities are repowered after they reach the end of their useful lives. Our model also excludes economic repowering, a growing

---

[79] Liam Stoker, "Built Solar Assets Are 'Chronically Underperforming,' and Modules Degrading Faster than Expected, Research Finds," PV Tech, June 8, 2021, https://www.pv-tech.org/built-solar-assets-are-chronically-underperforming-andmodules-degrading-faster-than-expected-research-finds/.

[80] U.S. Energy Information Administration, "Electricity Market Module," Assumptions to the Annual Energy Outlook 2022, March 2022, https://www.eia.gov/outlooks/aeo/assumptions/pdf/electricity.pdf.

trend whereby wind turbines are repowered after just 10 to 12 years to recapture the wind Production Tax Credit (PTC). This trend will almost certainly grow in response to IRA subsidies.

EPA does not appear to take repowering into consideration because the amount of existing wind on its systems never changes. If our understanding of EPA's methodology is accurate, this a large oversight that must be corrected.

**Fuel Cost Assumptions**

Fuel costs for existing power facilities were estimated using FERC Form 1 filings and adjusted for current fuel prices.[81,82] Fuel prices for new natural gas power plants were estimated by averaging annual fuel costs within the MISO region according to EPA.[83] Existing coal fuel cost assumptions of $17.82 per MWh were based on 2020 FERC Form 1 filings.

**Inflation Reduction Act (IRA) Subsidies**

Our analysis assumes all wind projects will qualify for IRA subsidies and elect the Production Tax Credit, valued at $27.50 per MWh throughout the model run. Solar facilities are assumed to select the Investment Tax Credit in an amount of 30 percent of the capital cost of the project.

## Appendix 2: Capacity Retirements and Additions in Each Scenario

This section details the capacity additions and retirements in the MISO region under each scenario.

**Status Quo scenario:** The Status Quo scenario results in the retirement of 28,756.8 MW of coal resources, 7,852 MW of natural gas capacity, and 462 MW of petroleum capacity. Additions in the Status Quo scenario consist of 4,306 MW of natural gas, 19,436 MW of wind, 29,652 MW of solar, and 3,304 MW of storage.

Annual retirement and additions can be seen in Figure D-13 below.

---

[81] Trading Economics, "Natural Gas," https://tradingeconomics.com/commodity/natural-gas.
[82] https://data.nasdaq.com/data/EIA/COAL-us-coal-prices-by-region
[83] U.S. Energy Information Administration, "Open Data," https://www.eia.gov/opendata/v1/qb.php?category=40694&sdid=SEDS.NUEGD.WI.A



*Figure D-13. This graph shows the annual capacity additions and subtractions needed to maintain resource adequacy using EPA's capacity accreditation metrics.*

**Partial scenario:** The Partial scenario results in the retirement of 29,908 MW of coal resources, 7,852 MW of natural gas capacity, and 462 MW of petroleum capacity. To replace this retired capacity, additions in the Partial scenario consist of 4,306 MW of natural gas, 20,451 MW of wind, 31,201 MW of solar, and 3,477 MW of storage (see Figure D-14). The incremental closure of 1,151 MW of lignite capacity results in an incremental increase in a replacement capacity of 1,015 MW wind, 1,549 MW solar, and 173 MW storage (see Figure D-15).[84]

---

[84] Replacement capacity is more than the retiring 1,151 MW of coal capacity because intermittent resources like wind and solar have lower capacity values than coal capacity.



*Figure D-14. This graph shows the annual capacity additions and subtractions needed to maintain resource adequacy using EPA's capacity accreditation metrics.*



*Figure D-15. This figure shows the incremental capacity retirements and additions in the MISO region under the Partial scenario.*

**Full Scenario:** The Full scenario results in the retirement of 31,021 MW of coal resources, 7,852 MW of natural gas capacity, and 462 MW of petroleum capacity. To replace this retired capacity, additions in the Full scenario consist of 4,306 MW of natural gas, 21,433 MW of wind, 32,700 MW of solar, and 3,644 MW of storage (see Figure D-16). The incremental closure of 2,264 MW of lignite capacity results in an incremental increase in a replacement capacity of 1,997 MW wind, 3,048 MW solar, and 304 MW storage, compared to the Status Quo scenario (see Figure D-17).



*Figure D-16. This graph shows the annual capacity additions and subtractions needed to maintain resource adequacy using EPA's capacity accreditation metrics.*



*Figure D-17. This figure shows the incremental capacity closures and additions in the Full scenario.*

Figure D-18 shows the capacity retirements and additions in the Partial and Full scenarios.

**Comparison:**



*Figure D-18 comparison. This figure demonstrates the incremental retirements and additions in each scenario.*

## Appendix 3: Replacement Capacity Based on EPA Methodology for Resource Adequacy

The capacity selected in our model to replace the retiring resources is based on two main factors. The first factor is the MISO interconnection queue, which is predominantly filled with solar and wind projects and a relatively small amount of natural gas. The second factor is the EPA's resource adequacy (RA) accreditation values in the Integrating Planning Model's (IPM) Proposed Rule Supply Resource Utilization file and Post-IRA Base Case found in the Regulatory Impact Analysis.

The IMP assumes a capacity accreditation of 100 percent for thermal resources, and variable intermittent technologies (primarily wind and solar) receive region-specific capacity credits to help meet target reserve margin constraints. Due to their variability, resources such as wind and solar received a lower capacity accreditation when solving for resource adequacy (see Table D-4).

**EPA Integrated Planning Model**

**Capacity Accreditation in MISO**

58

| Resource | Capacity Value |
|---|---|
| Existing Wind | 19% |
| Existing Solar | 55% |
| New Onshore Wind 2035 | 17% |
| New Solar 2035 | 52% |
| Thermal | 100% |
| Battery Storage | 100% |

*Table D-4. This figure shows the capacity values for each resource based on EPA's estimates in its IPM.*

In order to determine whether the available blend of power generation sources will be able to meet projected demand, each available generation source is multiplied against its capacity value, and the available resources are then "stacked" to determine if there is enough accredited power generation capacity to meet projected demand and maintain resource adequacy.

It should be noted that EPA's accreditation values from the IPM are generous compared to the accreditation values given by RTOs. For example, in the MISO region, grid planners assume that dispatchable thermal resources like coal, natural gas, and nuclear power plants will be able to produce electricity 90 percent of the time when the power is needed most, resulting in a UCAP rating of 90 percent. In contrast, MISO believes wind resources will only provide about 18.1 percent of their potential output during summer peak times, and solar facilities will produce 50 percent of their potential output. This report uses the generous capacity values provided by EPA; however, if the capacity values used by the RTOs were to be utilized, the projected energy shortfalls and blackouts would be even worse.

## Appendix 4: Resource Adequacy in Each Scenario

We performed a Resource Adequacy analysis on each of the three scenarios modeled to determine the potential impact to grid reliability in MISO region if implementation of the MATS Rule results in the forced retirement of lignite power plants.

**Status Quo scenario**

Under the Status Quo scenario, there is enough dispatchable capacity in MISO to meet the projected peak demand and target reserve margin established by EPA in the RIA documents

Proposed Rule Supply Resource Utilization file until the end of 2025, shown in the black font in the table in Figure D-19.[85]



Estimated firm capacity using EPA's accreditation values for wind, solar, storage, and thermal resources (100%). EPA assumes a 16.8 percent reserve margin. Different than MISO cleared UCAP (unforced [accredited] capacity). Red indicates intermittent generation is necessary to meet Target Reserve Margins. The rest of the reserve margin not covered in the table consists of load modifying resources.

- 2023 – 2025: Adequate dispatchable capacity
- 2026 – 2029: Reserve margin depends on W/S/B
- 2030 – 2035: Peak Demand depends on W/S/B

*Figure D-19. By 2030, MISO will rely on wind, solar, and battery storage to meet its projected peak demand and target reserve margin.*

Beginning in 2026, MISO becomes reliant upon wind, solar, imports, or demand response (DR) to meet its target reserve margin, but the RTO still has enough dispatchable capacity to meet its projected peak demand. By 2030, the MISO region will rely on thermal resources and 4-hour battery storage to meet its peak demand, and by 2031 the region will no longer have enough dispatchable capacity or storage to meet its projected peak demand, and it will rely exclusively on non-dispatchable resources and imports to meet its target reserve margin.[86]

The trend of falling dispatchable capacity relative to projected peak demand can be seen more clearly in Figure D-20 below. By 2035, dispatchable capacity consisting of thermal generation and battery storage will only be able to provide 91 percent of the projected peak demand, necessitating the use of wind and solar to maintain resource adequacy.

---

[85] Analysis of the Proposed MATS Risk and Technology Review (RTR) | US EPA, https://www.epa.gov/power-sector-modeling/analysis-proposed-mats-risk-and-technology-review-rtr
[86] While battery storage is considered dispatchable in this analysis for the sake of simplicity, battery resources are not a substitute for generation because as grids become more reliant upon wind and solar, battery resources may not be sufficiently charged to provide the needed dispatchable power.





*D-20. By 2035, dispatchable generators will only constitute 87 percent of projected peak demand, with storage accounting for four percent of peak demand capacity.*

**Partial scenario**

Like the Status Quo Scenario, there is enough dispatchable capacity in MISO under the Partial scenario to meet the projected peak demand and target reserve margin established by EPA in the RIA documents Proposed Rule Supply Resource Utilization file until the end of 2025, shown in the black font in the table in Figure D-21.



Figure D-21. By 2029, MISO will rely on wind, solar, and battery storage to meet its projected peak demand and target reserve margin.

MISO becomes reliant upon wind, solar, imports, or demand response (DR) to meet its target reserve margin in 2025, but the RTO still has enough dispatchable capacity to meet its projected peak demand. The percentage of MISO's projected peak demand that will be met by dispatchable resources in 2028 declines from 106 percent in the Status Quo scenario to 105 percent in the Partial scenario, reflecting the loss of 1,151 MW of lignite power plants in North Dakota.

In this scenario, the MISO region will no longer have enough dispatchable capacity to meet its projected peak demand in 2029, a year earlier than the Status Quo scenario, and it will rely on non-dispatchable resources, imports, or storage to meet its target reserve margin.

The trend of falling dispatchable capacity relative to projected peak demand can be seen more clearly in Figure D-22 below. By 2035, dispatchable capacity will only be able to provide 86 percent of the projected peak demand.



| Year | %<br>Intermittent | %<br>Storage | %<br>Dispatchable |
|------|------|------|------|
| 2023 | 6% | 2% | 131% |
| 2024 | 7% | 2% | 128% |
| 2025 | 9% | 3% | 122% |
| 2026 | 13% | 4% | 112% |
| 2027 | 14% | 4% | 109% |
| 2028 | 15% | 4% | 105% |
| 2029 | 17% | 4% | 99% |
| 2030 | 17% | 4% | 98% |
| 2031 | 18% | 4% | 93% |
| 2032 | 18% | 4% | 92% |
| 2033 | 18% | 4% | 90% |
| 2034 | 18% | 4% | 88% |
| 2035 | 18% | 4% | 86% |

Estimated firm capacity using EPA's accreditation values for wind, solar, storage (100%), and thermal resources (100%).

- *2023 – 2025: Adequate dispatchable capacity*
- *2026 – 2028: Reserve margin depends on W/S/B*
- *2029 – 2035: Peak Demand depends on W/S/B*

*Figure D-22. The percentage of peak electricity demand being served by dispatchable resources drops by one percent in 2028, relative to the Status Quo scenario, due to the closure of lignite capacity in MISO due to the MATS rule.*

**Full scenario**

Like the Status Quo scenario and Partial scenario, there is enough dispatchable capacity in MISO under the Full scenario to meet the projected peak demand and target reserve margin established by EPA in the RIA documents Proposed Rule Supply Resource Utilization file until the end of 2025, shown in the black font in the table in Figure D-23.



**Full Scenario RA is Maintained by Replacing Retiring Capacity with New Resources Using EPA Capacity Values, But…**

| Year | % Intermittent | % Storage | % Dispatchable |
|---|---|---|---|
| 2023 | 6% | 2% | 131% |
| 2024 | 7% | 2% | 128% |
| 2025 | 9% | 3% | 122% |
| 2026 | 13% | 4% | 112% |
| 2027 | 14% | 4% | 109% |
| 2028 | 16% | 4% | 104% |
| 2029 | 18% | 4% | 98% |
| 2030 | 18% | 4% | 97% |
| 2031 | 19% | 5% | 92% |
| 2032 | 19% | 4% | 91% |
| 2033 | 19% | 4% | 89% |
| 2034 | 19% | 4% | 87% |
| 2035 | 19% | 4% | 85% |

Estimated firm capacity using EPA's accreditation values for wind, solar, storage (100%), and thermal resources (100%). EPA assumes a 16.8 percent reserve margin. Different than MISO cleared UCAP (unforced [accredited] capacity). Red indicates intermittent generation is necessary to meet Target Reserve Margins. The rest of the reserve margin not covered in the table consists of load modifying resources.

- 2023 – 2025: Adequate dispatchable capacity
- 2026 – 2028: Reserve margin depends on W/S/B
- 2029 – 2035: Peak Demand depends on W/S/B

*Figure D-23. The amount of dispatchable capacity available to meet projected peak demand in 2028 falls from 106 percent in the Status Quo scenario to 104 percent in the Full scenario, reflecting the closure of all the lignite capacity in MISO that year.*

MISO becomes reliant upon wind, solar, imports, or demand response (DR) to meet its target reserve margin in 2025, but the RTO still has enough dispatchable capacity to meet its projected peak demand. The percentage of MISO's projected peak demand that will be met by dispatchable resources in 2028 declines from 106 percent in the Status Quo scenario to 104 percent in the Full scenario, reflecting the loss of 2,264 MW of lignite power plants in North Dakota.

In this scenario, the MISO region will no longer have enough dispatchable capacity to meet its projected peak demand in 2029, a year earlier than the Status Quo scenario, and it will rely on non-dispatchable resources, imports or storage to meet its target reserve margin.

The trend of falling dispatchable capacity relative to projected peak demand can be seen more clearly in Figure D-24 below. By 2035, dispatchable capacity will only be able to provide 85 percent of the projected peak demand, a two percent decline relative to the Status Quo scenario, necessitating the use of wind and solar to maintain resource adequacy.



*Figure D-24. The amount of peak demand that can be met with dispatchable resources in 2028 falls from 106 in the Status Quo scenario to 104 in the Full scenario.*

# EXHIBIT 10

## DECLARATION OF STACY L. TSCHIDER

1.      I am the Chief Executive Officer for Rainbow Energy Center, LLC ("Rainbow"). As CEO, I oversee and direct all aspects of operations and development at Rainbow.  Rainbow is the owner and operator of Coal Creek Station, a 1,151 MW lignite coal-fired power plant near Underwood, North Dakota, and participates in the Midcontinent Independent System Operator ("MISO") market as an Independent Power Producer.  I provide this declaration in support of the motion to stay the rule promulgated on April 25, 2024 by the U.S. Environmental Protection Agency ("EPA" or "Agency") and officially published in the *Federal Register* on May 7, 2024.  *See* National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38,508 (May 7, 2024) ("Final Rule").

2.      The Final Rule requires that Rainbow install costly, duplicative, and unnecessary controls at its Coal Creek Station coal-fired power plant.  First, installation of controls to comply with emission limits for mercury ("Hg") and the newly required particulate matter continuous emission system ("PM CEMS") to monitor filterable particulate matter ("fPM") emissions will require immediate costly capital expenditures.  Second, the fPM emission rate required by the Final Rule cannot be maintained under all operating conditions, putting Rainbow at risk of being unable to demonstrate compliance through the newly required use of PM

1

CEMS.  Third, in accordance with EPA's Section 111(d) Guidelines, Rainbow is working to install full-scale post-combustion carbon capture and sequestration system ("CCS"), which will result in the near elimination of fPM emissions from Coal Creek Station—rendering the Final Rule unnecessarily costly and duplicative. In sum, this Final Rule, if not stayed, will have damaging and irreparable impacts on Rainbows operations, as described below.

3.      This declaration is based on my personal knowledge of facts and on analyses conducted by my staff.

4.      I am submitting this declaration because the Final Rule imposes immediate harm to Rainbow and its operations.

**BACKGROUND ON RAINBOW'S OPERATIONS**

5.      Rainbow is a wholesale power generation company headquartered in Bismarck, North Dakota.  Rainbow has owned and operated Coal Creek Station since May 1, 2022.

6.      Coal Creek Station has been generating and distributing energy in North Dakota and the upper Midwest region of the United States since 1979.  Coal Creek Station produces up to 1,151 megawatts of electricity per hour by combusting over seven million tons of beneficiated lignite (coal originally purchased from Falkirk Mining Company which then gets beneficiated in-house with a patented

pollution control technology, "DryFining™," further described below). It directly employs over 200 people at its facility near Underwood, North Dakota.

7. Since it began its commercial operation in 1979, Coal Creek Station has continuously improved its methods for controlling air pollution. Coal Creek Station stands out from other coal-fired power plants to the point that it has been acknowledged by the federal government multiple times for its environmental stewardship.[1]

8. As just one example, the Department of Energy selected Coal Creek Station to participate in a government-industry partnership, where Coal Creek Station "will help U.S. coal-fired electricity generating plants to meet both existing environmental objectives as well as those emerging in the near future."[2] The resultant multi-pollutant control technology, "DryFining™," improves the heating value of the coal while removing constituents that cause harmful pollution, mainly nitrogen oxide (NOx) and sulfur dioxide ($SO_2$). This technology is the first of its kind and remains a pioneering technology in the industry.

---

[1] *See, e.g.*, 76 Fed. Reg. 58,570, 58,584 (Sept. 21, 2011) (discussing Coal Creek Station's involvement in the Clean Coal Power Initiative).

[2] National Energy Technology Laboratory, Topical Report No. 27, at 4 (June 2012) (provided as Attachment A to this Declaration).

**IMPACT OF THE FINAL RULE ON RAINBOW**

9.       The Final Rule, under Section 112 of the Clean Air Act, revises the national emission standards for hazardous air pollutants for coal- and oil-fired electric utility system generating units.  Such a category of units would include Coal Creek Station.

10.       Among other changes, the Final Rule reduces the emission limit for Hg, reduces the emission limit for fPM, and requires the use of PM CEMS to demonstrate compliance with the fPM standard.  Under the Final Rule, Rainbow will have to install Hg controls, and it will also have to install PM CEMS.  Given its lack of experience with using PM CEMS and uncertainty as to whether it could comply with the fPM standard using this measurement system, Rainbow may also install fPM controls.

11.       Because the Final Rule imposes a short compliance timeline, Rainbow cannot delay action during the pendency of litigation, and it must begin implementing the required controls and monitoring system immediately.

12.       To comply with the new Hg emission limit, Rainbow will need to install new controls, specifically an activated carbon injection ("ACI") system.

13.       Rainbow will need to install an ACI system, with the capital cost of the ACI system costing around $5 million.

14.    Rainbow estimates the activated carbon product alone will cost approximately $145 *per hour per unit* to meet the Hg emission limit, which equates to $2.4 million per year in total for both units.  This is on top of the capital expense and the operations and maintenance costs.

15.    In addition, Rainbow will have to install PM CEMS to demonstrate compliance with the fPM emission limits.

16.    Prior to the Final Rule, Rainbow demonstrated the emissions from both units at Coal Creek were less than half of the existing rule's limit of 0.03 lb/mmBtu and qualified the units as Low Emitting EGUs ("LEE") for fPM as defined in the rule, by demonstrating fPM emission rates of less than 0.015 lb/mmBtu over the course of 12 consecutive quarterly emissions tests. Thus, ongoing LEE qualification tests were only required every three years and have been successfully completed in 2021 and 2024.  This emissions testing is completed using EPA approved methods and directly measure actual fPM in the flue gas.

17.    By contrast, PM CEMS provides continuous monitoring of a parameter calculated based on a correlation developed during its certification rather than direct measurement of the fPM.

18.    The results from the currently required fPM stack testing at Coal Creek Station have demonstrated that fPM emissions could reach the Final Rule's emissions limit, but it is not technologically sound to assume that Coal Creek could

maintain the emissions limit on a continuous basis with a reasonable margin of compliance. fPM emissions test results indicate variability in fPM emissions, based on numerous operational parameters which include fuel quality, load, coal drying operations and ash resistivity. The additional impact of adding ACI to the system has also not been evaluated and will result in increased fPM loading to the existing pollution control equipment.

19.    By design, stack tests measure unit performance under a strict set of operating conditions—not during periods of startup, shutdown, malfunction, and the cycling driven by the high penetration of renewables within MISO. Coal Creek does not operate at a single, baseload level, or even at predictable levels, due to the amount and variability of renewable generation. Thus, testing performed under controlled conditions does not adequately reflect real world unit operation.

20.    PM CEMS are a more expensive and less accurate method of measuring compliance with low emission rates. Unlike stack tests, which take a direct measurement of the flue gas to measure the actual amount of particulate matter it may contain, PM CEMS do not take direct measurements. Instead, they rely on measuring some other characteristic of the flue gas to estimate fPM based on changes in that characteristic, such as light scatter or beta attenuation. Also, the indirect nature of the PM CEMS necessitates a correlation test consisting of a minimum of 15 parallel stack test runs spanned across three different fPM levels to ensure the

readings of the CEMS are as closely correlated as possible to actual fPM emission rates measured via Method 5.[3] This recuring testing is necessary for the PM CEMS's periodic calibration and certification and will lead to increased fPM emissions to the CCS system, which will complicate CCS's removal of the fPM and result in premature fowling of the system.

21.    Ultimately, the inaccuracy of the PM CEMS combined with the lower fPM emission limit presents a compound situation for Rainbow.  The difficulty in demonstrating achievement of the new standard will be exacerbated by the requirement to use the less accurate PM CEMS, and the difficulty in using PM CEMS will be exacerbated by the dramatically lower standard.  Serious concerns remain with respect to whether a PM CEMS can effectively estimate emission rates at such low levels, or whether emissions that low will be too small for a PM CEMS to differentiate compliance from a false reading.  Ongoing quality assurance testing is needed to ensure the PM CEMS data is valid, which in turn increases the cost of PM CEMS.  Initial quotes received indicate the necessary annual audit would cost $48,000 for both units, and the three-year audit would cost $175,000 for both units.

22.    Rainbow estimates PM CEMS installation on each unit at Coal Creek Station would cost $345,000-$410,000. This includes $150,000 for the analyzer, $60,000-$100,000 for stack and electrical port upgrades, $35,000 for

---

[3] 40 C.F.R. Part 60 App. B, Performance Specification 11.

commissioning, and $100,000-$125,000 for initial certification. By contrast, because of its LEE qualification, Rainbow currently spends $3,000-4,000 per unit annually for fPM testing.

23.    Given PM CEMS's inaccuracies and uncertainties, Rainbow may be unable to meet the fPM emissions limit using PM CEMS. As a result, Rainbow may have to install fPM controls at Coal Creek Station to comply with the Final Rule's compliance deadline of July 8, 2027, three years after the effective date of July 8, 2024.

24.    All these fPM-related costs and expenditures are ultimately duplicative because Rainbow is actively working to install CCS at Coal Creek Station. CCS would virtually eliminate all fPM emissions from Coal Creek Station. fPM emissions correlate directly with amine degradation. Minimizing fPM emissions into the CCS system is needed for performance of the system. Rainbow completed a FEED study for the CCS and is currently undergoing a bridge study to determine what emission controls will be installed upstream of the CCS which will further reduce fPM and decrease amine degradation.

25.     Although the highly effective fPM control of CCS is recognized by EPA's own Section 111(d) Guidelines, the Final Rule does not align the timeline for installation of fPM controls with that for implementation for CCS.[4]

26.     Accordingly, under the timeline for compliance with the Final Rule, Rainbow will have to begin work and thus incurring unrecoverable costs immediately.

27.     Investment costs for costly and duplicative emission control methods present unique challenges to Rainbow due to its status as a "merchant power producer" in the power market. Most power in the United States is provided by either investor-owned utilities or public utilities. Both utilities operate under a vertically integrated monopoly framework. Because of their vertically integrated monopoly structure, these utilities are also heavily regulated by the government to ensure that the interests of the consumers are preserved. Such regulatory measure includes rate-setting.  State regulatory commissions set the rates at a level so that the regulated utility could cover its cost of service plus a reasonable "rate of return" (profit) on the capital the utility invested on its plants, whether that be the original construction or improvements to the facility.

---

[4] EPA, *Greenhouse Gas Mitigation Measures for Steam Generating Units Technical Support Document,* at 22, 59-60, available at: https://www.epa.gov/stationary-sources-air-pollution/greenhouse-gas-standards-and-guidelines-fossil-fuel-fired-power.

28.     In contrast to what has been discussed above, Rainbow (through Coal Creek Station) is a privately owned "merchant power producer."  Rainbow is not an investor-owned utility, nor is it a public utility.  Unlike the traditional structure of many utility companies, Rainbow does not have a vertically integrated monopoly system where it controls everything from electricity generation all the way to distribution of power to the end-use consumers who, often times, could not switch electricity providers.  Instead, merchant power producers would sell all the generated power into the wholesale open market.

29.     Accordingly, this means Rainbow has no "captive ratepayer."  While investor-owned utilities and public utilities have a set customer base (similar to how normal household consumers cannot select/switch their utility company), Rainbow has none. Rainbow does not have a monopoly over its end-use consumers; the market (and its participants) could always favor a different electricity producer if Rainbow's power production costs are too high.

30.     Second, unlike investor-owned utilities and public utilities which have a chartered right—guaranteed by the state government—to recover costs (usually through rate-setting orders as discussed above), Rainbow cannot recover any capital or operational costs from its end-use customers.  Rainbow has no "rate base," i.e., the right to earn a specified rate of return backed by the state energy commission, and never will as a merchant power producer.

## CONCLUSION

31.    For the reasons described above, Rainbow is facing imminent and substantial harm from the Final Rule.

I, Stacy L. Tschider, declare under penalty of perjury that the foregoing is true and correct.

Executed on May 12, 2024

_____
Stacy L. Tschider
Chief Executive Officer

# ATTACHMENT A









# Clean Coal Power Initiative
# Round 1 Demonstration Projects

*Applying Advanced Technologies to Lower Emissions
and Improve Efficiency*

2

A report on three projects conducted under separate cooperative agreements between the U.S. Department of Energy and:

• Great River Energy

• NeuCo. , Inc.

• WeEnergies

Cover Photos:

• Top left: Great River Energy's Coal Creek Station

• Top right: We Energy's Presque Isle Power Plant

• Bottom: Dynegy's Baldwin Energy Complex

   



# Clean Coal Power Initiative
# Round 1 Demonstration Projects

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  *Clean Coal Technology Demonstration Program* . . . . . . . . . . . . . . . 5
  *CCPI Program* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Demonstration of Integrated Optimization Software at
the Baldwin Energy Complex** . . . . . . . . . . . . . . . . . . . . . . 9
  *Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  *Project Objectives* . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  *Project Description* . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    **CombustionOpt and SCR-Opt** . . . . . . . . . . . . . . . . . . . . . 10
    **SootOpt** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    **PerformanceOpt** . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    **MaintenanceOpt** . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  *Results* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
  *Benefits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  *Conclusions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Increasing Power Plant Efficiency: Lignite Fuel Enhancement** . . . . . . 15
  *Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
  *Project Objectives* . . . . . . . . . . . . . . . . . . . . . . . . . . 16
  *Project Description* . . . . . . . . . . . . . . . . . . . . . . . . . . 16
  *Results* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  *Benefits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  *Conclusions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**TOXECON™ Retrofit for Mercury and Multi-Pollutant Control
on Three 90 MW Coal-Fired Boilers** . . . . . . . . . . . . . . . . . . 19
  *Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  *Project Objectives* . . . . . . . . . . . . . . . . . . . . . . . . . . 20
  *Project Description* . . . . . . . . . . . . . . . . . . . . . . . . . . 20
  *Results* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
  *Benefits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
  *Conclusions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**CCPI-1 Program Conclusions** . . . . . . . . . . . . . . . . . . . . . . 25

**Bibliography** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Acronyms and Abbreviations** . . . . . . . . . . . . . . . . . . . . . . 27

# Executive Summary

Coal is both plentiful and affordable in the United States (U.S.) and is expected to maintain its nearly 50 percent share of total electricity generation as demand increases. Our nation's energy security and environmental management depend on the resolution of environmental concerns associated with increased coal use. Cost-effective and efficient technologies developed to ensure the environmentally clean utilization of this resource have been designated as "clean coal technologies."

Clean coal technology research and development (R&D) began in the 1970s. Many promising technologies had emerged by the 1980s, but were not implemented at the commercial scale due to the financial and technical risks associated with the first commercial-scale installation. A pathway to facilitate the further development of these technologies was initiated by Congress and implemented by the U.S. Department of Energy (DOE) in 1985 with the creation of the Clean Coal Technology Demonstration Program (CCTDP). The CCTDP forged cost-sharing partnerships between DOE, non-federal public entities, technology suppliers, and clean coal technology stakeholders to reduce the financial and technical risks preventing their commercial-scale implementation and demonstration.

Building on the successes of CCTDP, DOE implemented the Power Plant Improvement Initiative (PPII) in 2001 to focus on enhancing the reliability of the nation's power grid. PPII was followed by the Clean Coal Power Initiative (CCPI) in 2002.

The CCPI is an industry/government cost-shared partnership program that furthers efficient clean coal technologies for use in new and existing U.S. electric power generating facilities. CCPI is a technology demonstration program implemented through a series of solicitations (rounds) that target priority areas of interest to meet DOE's Roadmap goals. Technologies emerging from the program will help U.S. coal-fired electricity generating plants to meet both existing environmental objectives as well as those emerging in the near future. CCPI is planned and managed by the DOE Office of Fossil Energy (FE) and implemented by the National Energy Technology Laboratory (NETL).

CCPI Round 1 (CCPI-1) criteria for candidate projects was very broad in that the solicitation was open to "any technology advancement related to coal-based power generation that results in efficiency, environmental, and economic improvement compared to currently available state-of-the-art alternatives." CCPI Round 2 (CCPI-2) encouraged proposals to demonstrate advances in coal gasification systems, technologies that permit improved management of carbon emissions, and advancements that reduce mercury (Hg) and other power plant emissions. CCPI Round 3 (CCPI-3) required projects that could demonstrate the capture, recovery, and sequestration or beneficial use of carbon dioxide ($CO_2$) from coal-fired power plants.

Future CCPI rounds will build upon the successes of previous rounds, demonstrating advanced technologies that strengthen the nation's energy and economic security with minimal impacts to the environment and consumer.

This report describes three projects that have successfully demonstrated emissions and plant control system upgrades that support the CCPI-1 objective of ensuring that the U.S. has clean, reliable, and affordable electricity. The Baldwin Energy Complex project utilized an artificial intelligence (AI) system that increases the plant's thermal efficiency while reducing emissions. The Great River Energy (GRE) project increased boiler efficiency by reducing the fuel moisture content. The TOXECON™ project removed Hg from the flue gas stream without affecting the marketability of the fly ash.

The **Demonstration of Integrated Optimization Software at the Baldwin Energy Complex** project demonstrated the integration of advanced, on-line, combustion/emission control optimization software. The demonstration showed that an integrated process optimization approach can increase the thermal efficiency and reliability of the plant, with the concurrent benefit of a corresponding reduction of airborne emissions such as nitrogen oxides ($NO_x$), $CO_2$, and particulates.

The Cooperative Agreement for the project at the Baldwin Energy Complex was awarded on February 18, 2004. The project duration was 45 months and was completed on November 17, 2007. The project cost was $19,094,733 with a DOE share of $8,592,630 (45 percent). Project goals were met with the exception of the heat rate improvement target. However, it is believed that the heat rate goal could have been met had plant personnel not placed a higher priority on cyclone flame stability and $NO_x$ reduction. To date, the participant has reported well over 50 sales of its optimization modules.

In GRE's **Increasing Power Plant Efficiency: Lignite Fuel Enhancement** project, waste heat from a power plant was used to lower the moisture content of the lignite fuel it consumes. Reducing the moisture content of the lignite increases the energy efficiency of the boiler, which means less fuel is required for a given load. Emissions reductions were achieved as a result of increased fuel quality, segregation of iron sulfide (pyrite) and mercury in the drying process, and increased oxidation of mercury resulting in greater mercury removal in the flue gas desulfurization (FGD) system.

A Cooperative Agreement for the Lignite Fuel Enhancement project was awarded on July 9, 2004. The project duration was 69 months with an operations completion date of March 2010. The estimated project costs were $31,512,215 with a DOE share of $13,518,737 (43 percent). The moisture content of the coal was reduced by the target amount of 8.5 percent, which resulted in a higher heating value (HHV) improvement from 6290 British thermal units/pound (Btu/lb) to 7043 Btu/lb. Also, the moisture removal process and the resulting increased fuel quality resulted in mercury (Hg) emissions being reduced by 41 percent, with $NO_x$ and sulfur dioxide ($SO_2$) reduced by 32 and 54 percent, respectively. GRE has reported that 120 organizations have signed the necessary secrecy agreements to obtain detailed information on the technology. Some studies have been carried out to evaluate the technology for specific applications.

The **TOXECON™ Retrofit for Mercury and Multi-Pollutant Control on Three 90 MW Coal-Fired Boilers** project (TOXECON™) was an integrated Hg, particulate matter, $SO_2$, and $NO_x$ emissions control demonstration program for application on coal-fired power generation systems. The TOXECON™ process utilized sorbents that were injected into a pulse-jet baghouse to control emissions. The technology was configured to not affect fly ash quality and its potential to be sold for constructive use. **TOXECON™** has been installed at seven plants in addition to Presque Isle Power Plant (PIPP) and robust sales of the Hg Continuous Emissions Monitor (CEM) have been reported. The recently released new Hg standard is expected to provide additional impetus for future application.

The total project cost was $47,512,830, with DOE providing $23,756,415 (50 percent). The demonstration began operation in January 2006, and was completed in September 2009. The project achieved the emissions reduction goals of 90 percent for Hg and 70 percent for $SO_2$ individually; however, the concurrent reduction of these emissions through an integrated treatment process was not consistently achieved. All remaining project goals, except for $NO_x$ reduction, were met.

## Clean Coal Technology Demonstration Program (CCTDP)

According to the Energy Information Administration's Annual Energy Outlook 2011, the demand for electricity in the United States is projected to increase by 25 percent by the year 2035. Because coal is both plentiful and affordable, the generation of electricity from this abundant resource is expected to continue to account for nearly 50 percent share of total generation. The nation's energy and economic security and environmental quality depend on the resolution of environmental concerns associated with increased coal use. These concerns can be addressed through the development of technology-based solutions that ensure environmentally clean energy utilization. These solutions must be both cost-effective and efficient to support economic growth. This new generation of technologies has been designated as "clean coal technologies."

The R&D of clean coal technologies began in the 1970s, with many promising technologies having emerged by the 1980s. The technologies were, however, unproven in a commercial setting and not implemented due to financial and technical risks. A pathway was needed to prove their technical performance and cost competitiveness in a commercial setting in order to facilitate their acceptance and reduce the risk of implementation. This pathway was initiated by Congress and implemented by the DOE beginning in 1985 with the creation of the Clean Coal Technology Demonstration Program (CCTDP). The CCTDP forged cost-sharing partnerships among the DOE, non-federal public entities, technology suppliers, and other clean coal technology stakeholders to reduce the financial and technical risks preventing the demonstration and commercialization of these technologies. As a condition of participation, CCTDP demonstrations were required to be at a scale and in an operational environment sufficient to determine their potential for satisfying marketplace technical, economic, and environmental needs.

Building on the successes of CCTDP, DOE implemented the Power Plant Improvement Initiative (PPII) in 2001, which called for technologies that could be rapidly implemented to enhance the reliability of the

## THE CLEAN COAL TECHNOLOGY PROGRAM

The DOE commitment to clean coal technology development has progressed through three phases. The first phase was the Clean Coal Technology Demonstration Program (CCTDP), a model of government and industry cooperation that advanced the DOE mission to foster a secure and reliable energy system. With 33 projects completed, the CCTDP has yielded technologies that provide a foundation for meeting future energy demands that utilize the vast U.S. reserves of coal in an environmentally sound manner. Begun in 1985, the CCTDP represents a total investment value of over $3.25 billion. The DOE share of the total cost is about $1.30 billion, or approximately 40 percent. The project industrial participants (non-DOE) have provided the remainder, nearly $2 billion.

Two programs have built on the successes of the CCTDP. The first is the Power Plant Improvement Initiative (PPII), a cost-shared program patterned after the CCTDP and directed toward improved reliability and environmental performance of the nation's coal-burning power plants. Authorized by the U.S. Congress in 2001, the PPII concluded with four successfully completed projects that focused on technologies enabling coal-fired power plants to meet increasingly stringent environmental regulations at the lowest possible cost. The total value of these projects is $71 million, with DOE contributing $31 million or 42.7 percent.

The second follow-on program is the Clean Coal Power Initiative (CCPI). Authorized in 2002, the CCPI had a goal of accelerating commercial deployment of advanced technologies to ensure that the nation has clean, reliable, and affordable electricity. The first CCPI solicitation (CCPI-1) was open to "any technology advancement related to coal-based power generation that results in efficiency, environmental, and economic improvement compared to currently available state-of-the-art alternatives." Of five projects awarded, two were discontinued and three were successfully completed. The total cost of the five projects was approximately $121 million, with the DOE share being $54 million or 44.8 percent. In February 2004, the second CCPI solicitation (CCPI-2) was issued seeking proposals to demonstrate advances in coal gasification systems, technologies that permit improved management of carbon emissions, and advances that reduce mercury and other power plant emissions. In October 2004, four projects were selected. One project withdrew prior to award, one is complete, and two are ongoing. The three awarded projects are valued at over $4 billion with a DOE share of $322 million. On August 11, 2008, DOE issued the Funding Opportunity Announcement for the third solicitation (CCPI-3A). CCPI-3A specifically focused on the capture and sequestration, or beneficial reuse, of $CO_2$ emissions from coal-based electricity production (minimum 50 percent gross energy output as electricity). Following the passage of ARRA, DOE announced the re-opening of the third solicitation. On June 9, 2009, DOE issued an amendment that provided for a second application due date (CCPI-3B) of August 24, 2009. A total of $1.4 billion was made available for awards under CCPI-3A and -3B. Of the total amount, approximately $800 million was provided under ARRA with the remainder provided through the annual congressional appropriations process. Of the four projects awarded, one withdrew and three are ongoing. The three ongoing projects are valued at over $6 billion with a DOE share of approximately $1 billion.

nation's power grid. PPII was followed by the Clean Coal Power Initiative (CCPI) in 2002. CCPI ensures the ongoing development of advanced systems for commercial power production emerging from DOE's core fossil-fuel research programs.

## CCPI Program

As coal is likely to remain one of the nation's—and world's—lowest-cost electric power resources for the foreseeable future, a new commitment to further reduce the environmental challenges of its continued use through even more advanced clean coal technologies is required. CCPI is an innovative technology demonstration program initiated to foster more efficient, advanced, clean coal technologies in the 21st century for use in new and existing electric power generating facilities in the U.S. CCPI solicitations began in 2002. As of this report, three solicitations have been issued (CCPI-1, CCPI-2, and CCPI-3). After the submission of proposals for the initial CCPI-3 solicitation (CCPI-3A), the solicitation was re-opened with minor amendments for a second round of proposals (CCPI-3B). Projects selected under CCPI-3A and -3B could be funded, in whole or in part, from funds appropriated under the American Recovery and Reinvestment Act of 2009 (ARRA).

CCPI builds on the successes of the original CCTDP and encompasses a broad spectrum of research and large-scale projects that target today's most pressing environmental challenges. CCPI is an industry/government cost-shared partnership that accelerates commercial deployment of advanced technologies to ensure a reliable and affordable supply of electricity while simultaneously protecting the environment. CCPI is planned and managed by DOE's Office of Fossil Energy (FE) and implemented by the National Energy Technology Laboratory (NETL).

The CCPI mission is to enable and accelerate deployment of advanced technologies to ensure that the United States has clean, reliable, and affordable electricity. This mission is executed through the CCPI program goals of reinvigorating private sector development of new coal-based power technologies that can meet increasingly stringent environmental regulations, and establishing the technological foundation for "zero" emission coal-based energy facilities within the nation's power industry.

REGULATORY HISTORY*

Title III of the 1990 Clean Air Act Amendments (CAAA) identified 189 substances emitted by fossil fuel combustion that may be toxic or hazardous. These 189 substances are usually referred to as hazardous air pollutants (HAPs) or air toxics. The CAAA required the Environmental Protection Agency (EPA) to evaluate these pollutants by source as well as their potential harm to human health and the environment. The EPA was also required to determine the need to control the emission of HAPs. DOE's NETL, in collaboration with the Electric Power Research Institute (EPRI), comprehensively addressed the CAAA requirements specific to the electric power industry with a series of projects from 1990 to 1997. In the course of these projects, it was found that non-mercury toxic metals were captured by existing particulate removal equipment and that they were emitted at or near their detection limit. These projects provided the majority of the data for two Congressionally-mandated EPA Reports to Congress. The first report, the "Mercury Study Report to Congress," was issued in 1997 and found that coal-fired power plants were the largest U.S. source of anthropogenic mercury emissions. The second report, the "Study of Hazardous Air Pollutant Emissions from Electric Utility Steam Generating Units–Final Report to Congress" was issued in 1998. This second report concluded that mercury from coal-fired power plants was the HAP of "greatest potential concern." This conclusion lead to the initial emphasis on regulating mercury and the development of mercury capture technologies and that additional research and monitoring was warranted for the other HAPs.

In 1999 and 2000, the EPA, in cooperation with DOE, issued an Information Collection Request (ICR). The purpose of the ICR was two-fold. One aim was to refine the mercury emission inventory from coal-fired power plants. The other was to determine the mercury control capabilities of existing and new, potentially viable technologies. In the same timeframe, the National Academy of Sciences (NAS) conducted an evaluation of the health impacts of mercury. Based on the ICR and the NAS evaluation, the EPA determined that there was a "plausible link" between emissions of mercury from coal-fired power plants and the bioaccumulation of mercury in fish, as well as animals that eat fish. Since consumption of fish is the primary pathway for human exposure to mercury, the EPA determined that it was necessary to reduce mercury emissions from fossil fuel combustion in power plants. The EPA issued its decision to regulate mercury in December of 2000.

The EPA issued the Clean Air Mercury Rule (CAMR) on March 15, 2005. This was the first regulation to specifically address mercury emissions from coal-fired power plants. The CAMR complemented the Clean Air Interstate Rule (CAIR), which was issued to reduce the emissions of $NO_x$ and $SO_2$, since technologies designed to remove other pollutants often coincidentally remove some mercury. The net effect of these two rules was expected to be a 70 percent reduction in mercury emissions, which are currently estimated at 48 tons per year. The CAMR intended to create a market-based cap-and-trade program to reduce mercury emissions. The reduction would have taken place in two phases. Mercury emissions were to be capped at 38 tons per year in 2010. This level of emissions would have been achieved by coincidental mercury capture in technologies whose primary purpose is the control of other pollutants. By 2018, total mercury emissions from all coal-fired power plants were to be limited to 15 tons per year. In addition, new coal-fired units would have to meet New Source Performance Standards.

The CAMR was applicable to all coal-fired utility boilers with a heat input of 73 MW (thermal) or 250 million Btu per hour. Industrial cogeneration boilers would have been regulated if they sell over 25 MW of electrical power and more than one third of their maximum output to a power distribution system. In 2008, the D.C. Circuit Court vacated the CAMR and remanded the CAIR. The EPA Administrator signed a new rule on December 16, 2011, and it was published in the Federal Register on February 16, 2012. This rule, Mercury and Air Toxics Standards (MATS), regulates mercury, HCl, and a number of non-mercury air toxic metals emitted from power plants. These are antimony (Sb), arsenic (As), beryllium (Be), cadmium (Cd), chromium (Cr), cobalt (Co), lead (Pb), manganese (Mn), nickel (Ni), and selenium (Se). MATS include separate standards for existing plants and new or refurbished generating units. Each unit is also regulated differently depending on whether it burns low rank or non-low rank coal. All power plants have three years to comply and the deadline can be extended one year by state agencies—an option expected to be broadly available.

MATS establishes alternative quantitative emission standards, including $SO_2$ (as a surrogate for HCl). Filterable particulate matter serves as a surrogate for non-mercury air toxic metals, which can also meet a standard based on the total emissions of the eight non-mercury air toxic metals or the plant may meet a separate standard for each of these metals. The standards set work practices instead of numerical limits to limit emissions of organic air toxics, including dioxin/furan, from existing and new coal- and oil-fired power plants. In MATS the emission standards for new or refurbished plants are expressed as pounds per megawatt hours or pounds per gigawatt hours. Existing plants can meet standards based on either electric power output or the heat content of the coal fed to the boiler.

According to "Clean Coal Technology Programs: Program update 2006", CCPI Round 1 (CCPI-1) criteria for candidate projects was very broad in that the solicitation was open to "any technology advancement related to coal-based power generation that results in efficiency, environmental and economic improvement compared to currently available state-of-the-art alternatives." The broad approach taken by CCPI-1 was intended to benefit from the full range of technological advancements made since the last major clean coal technology solicitation had been issued in 1992. Of the eight projects initially selected under CCPI-1, five awards were made. Two of the awarded projects ended prior to successful completion. The remaining three projects are complete and are the subject of this report.

CCPI-2 encouraged proposals that demonstrate advances in coal gasification systems, technologies that permit improved management of carbon emissions, and advancements that reduce Hg and other power plant emissions. The choice of the CCPI-2 solicitation categories reflected DOE's judgment of the most pressing technological needs confronting the nation's power industry in the 2010 to 2020 time frame.

CCPI Round 3 (CCPI-3) required projects that could demonstrate the capture and sequestration or the beneficial use of carbon dioxide ($CO_2$) from coal-fired power plants. The technologies to be demonstrated could consist of new, integrated facilities or retrofits of existing plants. After an initial round of projects was awarded, a second round of projects was awarded under CCPI-3 in December 2009 with funds made available under ARRA.

The CCPI is closely linked with R&D activities paving the way for ultra-clean, fossil-fuel based energy complexes in the 21st century. The Clean Coal Technology Roadmap was developed in January 2004 with the cooperation of the coal and power industry to address short- and long-term coal technology needs, which support the clean coal initiatives. Projects selected under the CCPI advance efficiency, environmental performance, and cost competitiveness well beyond that of technologies that are currently in commercial service, which is consistent with the Energy Policy Act of 2005.



*A History of Innovative Projects*

Fleet of Tomorrow

**Industry/Government Partnership**

Industrial Carbon Capture & Sequestration 2009–2015

Clean Coal Power Initiative 2002–2015+

Power Plant Improvement Initiative 2001–2009

Clean Coal Technology Demonstration Program 1985–2006

Existing Fleet

**DOE's Coal Demonstration Programs**

# Demonstration of Integrated Optimization Software at the Baldwin Energy Complex

## Introduction

A coal-fired power plant is a complex grouping of dynamic and interrelated systems. An effort to optimize one aspect of the operation of a system has the potential, in some cases, to adversely affect other operational aspects of the same or different systems. An example would be that reducing the heat rate of a power plant through an increase in combustion efficiency might also result in an increase in the rate of NO$_x$ formation due to possible higher combustion temperatures. Therefore, overall plant optimization must include the ability to monitor individual systems and ensure their operation is not adversely impacted by changes in the same or related systems.

NeuCo, Inc. (NeuCo) of Boston, Massachusetts, demonstrated overall plant performance optimization by utilizing sophisticated computational techniques to increase power plant efficiency and reduce air emissions at the Dynegy Midwest Generation Baldwin Energy Complex (BEC). The BEC consists of three 600 megawatt electric (MWe) coal-fired units located in Randolph County, Illinois, which are designed to fire high-sulfur bituminous coal. All three units switched to Powder River Basin (PRB) coal in 2002 to reduce SO$_2$ emissions.

The Cooperative Agreement was awarded on February 18, 2004, and the project was completed on November 17, 2007. The project cost was $19,094,733 with a DOE share of $8,592,630 (45 percent).

## Project Objectives

Project objectives were to reduce the BEC NO$_x$ emissions by five percent, increase efficiency by 1.5 percent, and increase net annual electrical power production by 1.5 percent by improving reliability and availability. Additional objectives were to reduce greenhouse gases, Hg, and particulates, and to increase profitability through lower costs, improved reliability, and greater commercial availability. The overarching objective for the application of integrated optimization software to coal-fired power plant operations was

to improve coal-based generation's emission profile, efficiency, maintenance requirements, and plant asset life such that the abundant coal resources of the United States remain viable well into the foreseeable future.

The need for integrated optimization software arose, in part, due to the dynamic complexity of the systems present in both modern and retrofitted coal-fired power plants. The optimization process differs significantly from that of normal power plant system operation. Typically, operators make occasional adjustments to the various controls to maintain a process output within an acceptable range based on their understanding of how the adjustment will affect unit performance. While this method keeps operating parameters within an acceptable range, it does not optimize unit operation. However, a control system with optimization capability can explore the relationships between the variables in a system and manage performance more dynamically. An integrated optimization system adds another level of control at the combined system level to optimize not only each system, but the overall performance of all managed systems as well. With the objective of integrated optimization in mind, five separate but integrated optimization modules were developed that addressed the following plant systems: combustion, sootblowing, selective catalytic reduction (SCR) operations, overall unit thermal performance, and plant-wide availability optimization.

## Project Description

The NeuCo project at BEC consisted of the design, installation, and demonstration of five integrated AI-based optimization modules for coal-fired power plant operations. Performance optimization modules were developed and implemented for three plant systems: combustion, sootblowing, and SCR operations. In addition, supervisory modules were demonstrated for overall unit thermal performance and plant-wide maintenance optimization. The five individual optimization modules were linked together and coordinated by NeuCo's proprietary ProcessLink® technology.

These optimization modules, although separate, communicated through NeuCo's ProcessLink technology. The modules on Units 1, 2, and 3 did not use theoretical or empirical relationships to model respective unit operations, but rather the technology "learned" these relationships from actual unit operations. The learning capability of the technology was based on the use of neural networks (NNs), first principles, expert systems,



**Overview of the Optimizers at BEC**

direct search optimization, and fuzzy logic (FL) in addition to enterprise software and a robust calculation engine to link the individual optimization modules and achieve the optimum overall result.

The demonstration technology operated in two modes: closed loop and an advisory mode. The closed loop mode permitted the optimization modules to directly control the plant in real-time. The advisory mode provided guidance to the operator, who then decided whether or not to implement the technology.

## CombustionOpt and SCR-Opt

CombustionOpt and SCR-Opt were tightly integrated and are described together. CombustionOpt and SCR-Opt used neural network technology to learn relationships among system variables without the need for prior understanding of what those relationships might be. Once the relationships were learned, CombustionOpt used this Information to change input variables to achieve the performance objectives determined by the plant operators. The learning process was ongoing and based on real-time and recent data so as to constantly update the relationship between system input variables and the desired performance objectives. Important system variable relationships for the CombustionOpt module

included plant heat rate, the rate of $NO_x$ formation in the furnace, and ammonia ($NH_3$) consumption for the SCR system installed on Units 1 and 2.

CombustionOpt calculated the control settings that improved the mixing of the fuel and air in the furnace in real-time for literally dozens of different dampers and actuators, leading to reduced furnace $NO_x$ production while maintaining combustion efficiency. Additionally, the calculations were repeated every minute resulting in more numerous, but smaller changes based on current boiler conditions. Not only were process outputs kept within an acceptable range of operation, they were optimized within that range to meet performance objectives established by plant operators.

If a unit is equipped with an SCR, CombustionOpt and SCR-Opt are integrated to mix the fuel and air in the furnace to reduce furnace $NO_x$ production and maintain critical combustion parameters such as combustion efficiency, while increasing SCR efficiency. The integrated goals of these models are to maintain Cyclone Main Flame Scanner Quality and reduce SCR inlet $NO_x$, which results in lower $NH_3$ flow to the SCR system. Therefore, by using an integrated control approach, both furnace and SCR performance are optimized.

## SootOpt

A sootblowing operation utilizes steam (or other media) for cleaning the boiler tubes. It does so at the expense of unit efficiency because energy is required to generate the cleaning media. Sootblowing also results in wear on the boiler parts being cleaned. However, slagging and fouling can also result in lower furnace efficiency, increased $NO_x$ production, and excessive flue gas exit temperatures. SootOpt optimized cleaning action effectiveness and achieved improved boiler performance by minimizing the energy expended to generate cleaning media.

SootOpt combined sophisticated optimization methods in conjunction with a control system to optimize the power plant boiler soot blowing operation. SootOpt replaced the traditional schedule-based and operator-controlled soot blowing philosophy, which was basically a disadvantageous hit-or-miss approach.

## PerformanceOpt

PerformanceOpt provided a predictive performance management capability that identified efficiency and capacity losses so that operators could lower operating costs by remedying their cause. PerformanceOpt identified problems that were causing plant performance limitations by comparing actual plant performance to predicted performance. The predictive component of PerformanceOpt performed mass and energy balances on a minute-by-minute basis and computed the results for thousands of variables by utilizing a detailed first-principles model of the unit with scenario generation capability to quantify what was achievable under current operating conditions. PerformanceOpt continuously monitored key equipment and unit-level performance factors and detected, in real-time, when actual performance deviated from what had been predicted. For each problem identified, PerformanceOpt calculated the efficiency and capacity benefit that could be realized by resolving that problem. PerformanceOpt also ensured model accuracy and reliability through sensor validation mechanisms and equipment out-of-service logic.

## MaintenanceOpt

MaintenanceOpt continuously monitored process and equipment data to identify anomalies that might indicate reliability, capacity, or efficiency problems. In addition to potential problem detection, MaintenanceOpt added value by suggesting the most likely causes of problems and estimating the impacts on efficiency, reliability, and capacity. These estimates formed a basis for MaintenanceOpt to prioritize the order in which to address the problems.

MaintenanceOpt provided plant engineers with a suite of diagnostic tools that assisted them with the process of problem correction and increased its effectiveness. Among the knowledge tools available were diagnostics, recommended actions, and the identification of potential



**PerformanceOpt Components in Problem Identification**

impacts and risks. MaintenanceOpt demonstrated the capability to detect both slowly developing problems as well as those that could have a critical near-term reliability impact. Sufficient information was available within MaintenanceOpt to assist plant engineers in determining the legitimacy of the problem—whether it is real or the result of a sensor malfunction. And finally, MaintenanceOpt supported the diagnosis and resolution of problems found by other optimizers such as PerformanceOpt, CombustionOpt, and SootOpt.

## Results

The optimizer modules were developed and refined during the project period. The optimization modules, in concert with NeuCo's proprietary ProcessLink® technology, directly controlled the plant in closed loop mode or advised plant operators of suggested actions in an advisory mode. The results discussed in this section were obtained with the technology operating in the closed loop mode.

Different combinations of the optimization modules were installed on each of the three BEC units. Unit 1, which is a cyclone-fired unit, was equipped with the CombustionOpt, SCR-Opt, PerformanceOpt, and MaintenanceOpt modules. Unit 2, which is also a cyclone-fired unit, was equipped with the CombustionOpt, SCR-Opt, SootOpt, PerformanceOpt, and MaintenanceOpt modules. Unit 3, a tangentially-fired unit, was equipped with CombustionOpt, SootOpt, and MaintenanceOpt modules.

The reported average $NO_x$ emission reduction of between 12 and 14 percent exceeded the original goal of five percent. This significant reduction in $NO_x$ emissions was attributed to a priority trade-off made by plant personnel that is discussed in detail later in this section. The modules attributed to the $NO_x$ reduction actions were CombustionOpt, SootOpt, and SCR-Opt. An additional benefit was a drop in $NH_3$ consumption in the selective catalytic reduction (SCR) system.

NeuCo reported that the goal of increasing available megawatt hours (MWhs) by 1.5 percent was met through the information provided by the optimization modules for plant personnel use and by improved process management. The switch from high-sulfur, high-Btu Illinois coal to PRB coal had the potential to lower plant performance because of plant design and operating experience issues. With the optimization modules providing prioritized alerts and knowledge-based diagnostics for a wide array of plant equipment and process anomalies, it is reasonable to assume that the plant was able to avoid some of the unit output derating it might have encountered otherwise. Additionally, the demonstration technology also improved the management of cyclone flame quality through heightened monitoring of cyclone conditions, which likely avoided some degree of unit output derating resulting from cyclone slag build-up.

The goal of demonstrating commensurate reductions in greenhouse gases, mercury (Hg), $SO_2$, and particulates was achieved because of the improved heat rate brought about by reduced coal consumption.



**MaintenanceOpt Workflow for Problem Detection, Diagnosis, and Resolution**

The goal of achieving commensurate increases in profitability resulting from lower costs, improved reliability, and greater commercial availability was achieved as the direct result of the full or partial completion of all other goals. Improvement in plant heat rate resulted in less coal consumption, which ultimately led to reduced costs at constant net output. Also, reducing plant generation derates as a result of both improved operating knowledge and equipment/process management resulted in enhanced plant reliability and availability.

The application of the various performance optimization modules resulted in an overall improvement in plant heat rate of 0.7 percent. The 0.7 percent improvement was roughly half the target because competing priorities prevented full achievement of the goal. The two competing priorities were set by plant personnel. The first was to place a high priority on furnace cyclone stability/availability, as the cyclones were designed to operate with bituminous coal instead of the PRB currently used. The second was to place a higher priority on minimizing $NO_x$ production. Given the flexibility of the modules to exceed the $NO_x$ reduction goal, it is likely that the 1.5 percent heat rate improvement goal would have been achieved had $NO_x$ reduction not

been given a higher priority. An additional factor that may have contributed to the lower improvement in heat rate was the deteriorating fuel quality received by the BEC that may have resulted in an actual increase of the baseline heat rate had the optimization packages not been used.

## Benefits

The NeuCo project demonstrated an artificial intelligence (AI)-based optimization technology that can be applied to many existing coal-fired power plant boilers as well as boilers fired by other fossil fuels. The modular optimization technology was integrated with plant instrumentation and controls and provided a flexible suite of controls and diagnostic functionality that enhanced plant operations, reduced emissions, and rendered maintenance activity more effective.

The technology demonstrated the ability to respond the priority placed on $NO_x$ reduction by plant personnel by exceeding the $NO_x$ reduction goal while still improving, but not meeting, the heat rate goal. It is believed that, had the objectives been prioritized differently, the project would have achieved the target $NO_x$ reduction and heat rate improvement goals.



**Baldwin Energy Complex**

## *ARTIFICIAL INTELLIGENCE*

Artificial intelligence (AI) is commonly defined as the science and engineering of making intelligent machines, especially intelligent computer programs. Relative to applications with coal-fired power plants, AI consists of aspects or considerations that deal with the following:

- Neural networks, which mimic the capacity of the human brain to handle complex nonlinear relationships and "learn" new relationships in the plant environment.

- Advanced algorithms or expert systems that follow a set of pre-established rules written in code or computer language.

- Fuzzy logic (FL), which involves evaluation of process variables in accordance with approximate relationships that have been determined to be sufficiently accurate to meet the needs of plant control systems.

Neural networks (NNs) are a class of algorithms that simulate the operation of biological neurons. The NN learns the relationships among operating conditions, emissions, and performance parameters by processing the test data. In the training process, the NN develops a complex nonlinear function that maps the system inputs to the corresponding outputs. This function is passed on to a mathematical minimization algorithm that finds optimum operating conditions.

Neural networks are composed of a large number of highly interconnected processing elements that work in parallel to solve a specific problem. These networks, with their extensive ability to derive meaning from complicated or imprecise data, can be used to extract patterns and detect trends that are too complex to be detected by either humans or other computer techniques. Neural networks are trainable systems that can "learn" to solve complex problems and generalize the acquired knowledge to solve unforeseen problems. A trained NN can be thought of as an expert in the category of information it has been given to analyze. Neural networks are considered by some to be best suited as advisors, i.e., advanced systems that make recommendations based on various types of data input. These recommendations, which will change as power plant operations change, suggest ways in which plant equipment or technologies can be optimized.

Advanced algorithms, on the other hand, are programmed to incorporate established relationships between input and output information based on detailed knowledge of a specific process. They are used by computers to process complex information or data using a step-by-step, problem-solving procedure. In particular, genetic algorithms provide a search technique to find true or approximate solutions to optimization problems. These algorithms must be rigorously defined for any computational process since an established procedure is required for solving a problem in a finite number of steps. Algorithms must tell the computer what specific steps to perform and in what logical order so that a specified task can be accomplished. Advanced algorithms are now part of the sophisticated computational techniques being successfully applied to power plants to increase plant efficiency and reduce unwanted emissions.

Fuzzy logic (FL), the least specific type of AI software, is equipped with a set of approximate rules used whenever "close enough is good enough." Fuzzy logic is a problem-solving control-system methodology that has been used successfully with large, networked, multi-channel computers or workstation-based data-acquisition and control systems. Fuzzy logic can be implemented via hardware, software, or a combination of both. Elevators and camera auto-focusing systems are primary examples of FL systems. Fuzzy logic stops an elevator at a floor when it is within a certain range, not at a specific point.

Fuzzy logic has proven to be an excellent choice for many control system applications since it mimics human control logic. By using an imprecise but very descriptive language, FL deals with input data much like a human operator. Fuzzy logic is very robust and provides a simple way to arrive at a definite conclusion based upon vague, ambiguous, imprecise, or missing input information. However, while the FL approach to solving control problems mimics human decision-making, FL is much faster. The FL model is empirically based, relying on operator experience rather than technical understanding of the system.

While the heat rate improvement goal was not met, a significant improvement was demonstrated, resulting in a potential fuel cost savings benefit. Further potential savings would be achieved by utilizing the system equipment performance diagnostic capabilities.

The demonstration of NeuCo optimization technology at the BEC resulted in improved reliability, higher output, and lower maintenance costs, but these benefits were difficult to quantify precisely. Environmental conditions and coal properties changes, as well as equipment wear and many other factors, could have obscured some portion of the optimization systems' benefits.

Improved reliability, reduced maintenance costs, and higher efficiency will not only benefit the power plant, but reduce consumer costs while the improved environmental performance contributes to a cleaner environment. The participant validated the technical and cost benefits described above by the sale of 57 optimization packages through December 31, 2011. These sales were all for application on coal-fired units. Although there is no available sales data, the participant has indicated that some of the optimization packages are capable of comparable or better improvements on other fossil fueled generating units.

## Conclusions

The five plant optimization products developed and demonstrated during the course of the project have the potential to provide operational, economic, and environmental benefits for many types of power plant boilers. These systems operate with existing control equipment and sensors thus minimizing system installation cost. In addition, installation does not require substantial plant downtime.

NeuCo indicated that the payback period for the demonstration technology is well under a year for a typical U.S. fossil-fired plant. The actual benefits realized and payback period required may vary depending on the circumstances at specific power plants. The performance benefits, low cost, and inherent flexibility of the technology have generated significant interest within the fossil fuel-fired electrical generation industry.

# Increasing Power Plant Efficiency: Lignite Fuel Enhancement

## *Introduction*

U.S. lignite coals have a moisture content ranging from 25 to 40 percent, and can require approximately seven percent of the fuel heat input in the furnace to evaporate it. This level of moisture places additional requirements on power plants to compensate for higher fuel flow rates and the subsequent upstream and downstream effects (such as higher processing power requirements, higher maintenance, and lower plant efficiency) when compared to the use of eastern bituminous coals. Despite their high moisture content, western lignite coals, as well as subbituminous coals, are attractive due to their low cost, lower emissions when combusted, and high reactivity.

Coal dewatering and drying processes developed thus far are complex, expensive, and require high-grade heat to remove moisture. Consequently, these processes have not gained industry acceptance. A promising low-temperature coal drying process has been developed by Great River Energy (GRE) that utilizes plant waste heat to reduce the lignite moisture content in a fluidized bed dryer (FBD) at GRE's Coal Creek Station (CCS) in Underwood, North Dakota.

The National Environmental Policy Act (NEPA) requirement for the GRE project was met with an Environmental Assessment and issuance of a Finding of No Significant Impact (FONSI) on January 16, 2004. A Cooperative Agreement was awarded on July 9, 2004. The commercial demonstration completed operations in March 2010. The estimated project costs are $31,512,215. The DOE share is $13,518,737 (43 percent) and the GRE share is $17,993,478 (57 percent).



**Coal Creek Station**

## Project Objectives

The overarching objective of GRE's project was to increase the value of lignite as a fuel by reducing its moisture content using an innovative coal dryer concept that conserved low grade heat from the power plant that would otherwise be discharged to the environment. The Lignite Fuel Enhancement project supported this objective through the demonstration of a 5 to 15 percentage point reduction in lignite moisture content (a moisture content reduction from approximately 40 to 30 percent, which is about 25 percent of the total moisture content) at GRE's CCS.

The project demonstration was conducted in two phases. During Phase 1, a coal dryer prototype was designed and installed at CCS Unit 2 and a testing program was initiated. The objectives of prototype testing were to acquire operating experience with the dryer, confirm pilot results, and quantify the effect of dryer operational parameters so that optimal performance would be achieved. An additional objective was to incorporate the lessons learned during prototype testing into the design of the dryers being installed during Phase 2 of the project. The prototype was operated from 2006 to 2009 to obtain data for the design of full-size dryers.

The Phase 2 project objectives were to design, build, and install a full-scale coal drying system on the nominal 546 MW Unit 2, and to conduct a full-scale, long-term, operational moisture reduction test. The moisture reduction testing included determining the magnitude of Unit 2 efficiency improvement, quantifying the emissions reduction, and assessing the effects of burning dried coal on unit operation.

## Project Description

This project has its roots in lignite drying technology R&D conducted by GRE and others since the 1990s. As the R&D work progressed, GRE became convinced of the viability of the lignite drying concept. After identifying a fluidized-bed coal dryer (FBCD) in 2002 as their coal drying technology of choice, GRE submitted an application to DOE under CCPI-1 to continue development of the technology with the commercial demonstration of a prototype FBCD, and, using the lessons learned from the prototype, to develop and install a full-size coal drying system on one unit at CCS. A Cooperative Agreement was negotiated with DOE for funding under CCPI-1 in July 2004.

CCS is a two unit, lignite-fired power plant that supplies electricity to 38 member cooperatives in Minnesota. The plant consists of two identical tangentially fired Combustion Engineering (CE) boilers, each supplying a single steam turbine. Both units are nominally rated at 546 MW. The station burns approximately seven million tons of lignite per year. The design steam conditions are 1,005 degrees Fahrenheit (ºF) for main and reheat steam temperature at 2,520 pounds per square inch-absolute (psia) throttle pressure. The CCS has eight pulverizers per unit (seven active and one spare). The station has two single-reheat General Electric G-2 turbines. The plant rejects heat to the environment through three mechanical draft cooling towers. Lignite, with an HHV of 6,200 Btu/lb and total moisture content of approximately 38 percent, is supplied from the nearby Falkirk mine.

In the lignite drying process cooling water leaves the condenser carrying the waste heat rejected by the steam turbine. Before the water reaches the cooling tower, where its heat would normally be discharged to the environment, it first passes through an air heater. In the air heater, a fan-driven air stream picks up some of the waste heat from the cooling water. The heated air is then sent to the FBCD, which is configured for two-stage drying to optimize heat transfer. Before arriving at the FBCD, the air stream picks up additional heat from the unit flue gas through another heat exchanger. The twice-heated air stream then enters the FBCD. After picking up moisture from the coal, the moisture laden air stream passes through a dust collector to remove coal dust liberated during the drying process before being discharged to the atmosphere. Additional heat is added to the FBCD through coils fed with water heated by the unit's flue gas. This additional heat is added to the FBCD to optimize fluidized bed operating characteristics. After leaving the FBCD, dried coal enters a coal storage bunker (not shown) before being sent to a pulverizer for size reduction prior to being delivered to the boiler.

The GRE project at CCS was implemented in two phases. The first phase of the project involved the installation and operation of one prototype dryer, rated at 112.5 tons/hour (225,000 lb/hour) capacity. The prototype dryer was designed to reduce the lignite moisture content from 38 percent to 29.5 percent, which corresponds to an increase in higher heating value from 6,200 Btu/lb to 7,045 Btu/lb.

The prototype coal drying system was designed with completely automated control capability, which included startup, shutdown, and emergency shutdown sequences. The heat input to the FBCD is automatically controlled to remove a specified amount of moisture from the lignite feed stream.



**Schematic of Lignite Coal Drying Process**

Following the prototype dryer installation and startup, around-the-clock operations and data collection began in March 2006. The moisture content of the lignite processed through the prototype coal drying system was reduced from about 38.5 percent to 29.5 percent. In addition to the measured reductions in $SO_x$, $NO_x$, and $CO_2$ emissions in the flue gas, two modes of Hg reduction were also achieved. First, the heavy components of lignite that were collected in the first stage of the dryer (and removed) possessed a higher Hg concentration, reducing the amount of Hg in the coal fed to the boiler. In addition, Hg oxidation was enhanced as coal moisture was reduced, thereby facilitating additional capture in the flue gas desulfurization unit. Both modes of reduced Hg emissions were confirmed with semi-continuous emission monitors at the inlet and outlet of the flue gas desulfurization unit.

GRE initiated design activities for full-scale dryers (135 tons/hr) in September 2006, which incorporated lessons learned from prototype operation. The full-scale dryer system design was completed in December 2007 and GRE subsequently installed four dryers on Unit 2. Due to the success of the prototype demonstration, GRE installed four more dryers on Unit 1 with its own funds. The final result was that Unit 1 and Unit 2 of the CCS were simultaneously retrofitted with lignite coal dryers.

Fabrication and on-site assembly were finished in May 2008 and major dryer internal components for the Unit 2 dryers were completed by December 2008. GRE completed the construction of the dryer system and began testing in late 2009.

## Results

The project achieved the goal of lowering the moisture content of the lignite by 8.5 percentage points (approximately one fourth of the as-received moisture). Test results were obtained from the technology installed on Unit 1, which is identical to that of Unit 2. Unit 2 was out of service at the time of testing for reasons not associated with the lignite drying technology. During performance testing, Unit 1 provided the combined station load for Units 1 and 2 while also supplying extraction steam for an auxiliary process. This plant configuration resulted in an efficiency impact to the testing results that could not be accurately extrapolated to periods of normal operation. While those particular data could not be obtained by GRE, other data for moisture reduction and emissions were obtained.

The demonstrated 8.5 percent moisture reduction of the lignite resulted in an HHV improvement in the fuel from 6290 Btu/lb to 7043 Btu/lb. Also demonstrated were emissions reductions in Hg by 41 percent, $NO_x$ by 32 percent, and $SO_2$ by 54 percent.

## Benefits

Reducing the coal moisture content improved the lignite HHV, which arguably reduced unit heat rate. This improvement was due primarily to lower stack loss and decreased auxiliary power use (e.g., lower fan, pulverizer, cooling tower, and coal handling power). As the boiler efficiency increases and the auxiliary power requirement was reduced, additional electrical energy was available for export to the grid. The reduction in coal flow rate also produced an incremental improvement in coal handling and processing equipment wear rates, which resulted in a maintenance-related cost benefit.

Performance of the back-end environmental control systems (i.e., electrostatic precipitator) also improved with the use of reduced moisture coal in the furnace. The reduction in coal flow rate to the boiler resulted in a lower flue gas flow rate that gave the flue gas a longer residence time within the emissions control equipment, incrementally improving its performance. Similarly, the reduction in required coal-flow rate to the boiler and the resulting modified temperature profile within the boiler directly translated into lower emissions of $NO_x$, $SO_2$, and particulates. While not directly measured, $CO_2$ emissions were calculated to have been decreased by approximately 3.8 percent. Units equipped with wet scrubbers also exhibited a reduction in Hg emissions resulting from firing reduced moisture coal. This reduction resulted from an increase in the oxidation of elemental Hg to forms that can be removed in a scrubber.

A potential benefit of the coal drying system for new plants would be a reduction in capital costs. A decrease in the coal firing rate could result in smaller capacity requirements for coal handling and coal processing systems as well as those associated with combustion, flue gas transport, and flue gas cleaning.

The potential market for GRE's coal-drying technology is significant. Currently, more than 100 GW of U.S. installed capacity is burning coal with inherently high moisture content. This technology could not only reduce emissions from coal-fired power plants, but also extend abundant U.S. coal supplies, thereby enhancing the nation's energy security.

In 2009, GRE signed an agreement with Worley Parsons, an engineering firm, giving them preferred engineer status to license DryFining™, the trademark name for the technology. GRE will also process and ship DryFined coal to the Spiritwood Station nearing completion 10 miles east of Jamestown, North Dakota. By the conclusion of the project, GRE had 120 confidentiality agreements signed by vendors and suppliers of equipment and 19 by utilities. Companies in the United States, Canada, Australia, China, India, Indonesia, and Europe have signed GRE confidentiality agreements. These agreements are required before GRE will provide details of the technology to interested parties. In addition, three preliminary evaluations have been completed that show the comparative improvements that can be realized at those stations. DryFining™ earned the "Best Coal-Fired Project" award for 2010 from the editors of the prestigious *Power Engineering* magazine.

## Conclusions

The operation of full-scale lignite drying equipment was demonstrated and the remaining project performance goals were met, which included an improvement in lignite quality and the reduction of emissions.

**Typical PRB Coal Analysis**

| Property | Typical Value |
|---|---|
| Higher Heating Value, Btu/lb | 9,052 |
| Analysis, Weight Percent | |
| Moisture | 25.85 |
| Carbon | 52.49 |
| Hydrogen | 3.65 |
| Nitrogen | 0.75 |
| Sulfur | 0.28 |
| Ash | 4.64 |
| Oxygen | 12.33 |
| Chlorine | 0.01 |

# TOXECON™ Retrofit for Mercury and Multi-Pollutant Control on Three 90 MW Coal-Fired Boilers

## *Introduction*

Powder River Basin (PRB) coal has become widely used and is typical of other western subbituminous coals in that it produces a high percentage of elemental mercury (Hg) in the flue gas upon combustion. Elemental Hg is more difficult to remove from the flue gas stream than solid state oxides of Hg (the form more common in bituminous coals). The injection of powdered activated carbon (PAC) into the flue gas stream for Hg capture is one promising control technology.

A potential disadvantage of injecting PAC for Hg control in plants where PAC injection occurs upstream of the particulate control system is its impact on the salability of ash for making concrete. If the ash cannot be sold, it must be sent to a landfill, which increases the plant's operating costs and decreases available disposal capacity. The TOXECON™ configuration injects the activated carbon downstream from the primary ash collection equipment, thus ensuring the ash remains acceptable for sale.

DOE selected the TOXECON™ technology in 2003 as a CCPI-1 Hg control demonstration project. The demonstration was carried out at Wisconsin Electric Power Company's (We Energies) Presque Isle Power Plant (PIPP) located in Marquette, Michigan.

The total project cost was $47,512,830 with DOE providing $23,756,415 or 50 percent. We Energies provided the remaining 50 percent. NEPA was satisfied with a FONSI in September 2003. The demonstration began operation in January 2006 and was completed in September 2009.

## Project Objectives

The project objectives were to demonstrate, over the long-term (three years), 90 percent removal of Hg from power plant flue gas using activated carbon injection; demonstrate a reliable Hg continuous emission monitoring system (CEMS) suitable for use in flue gas created by coal-fired power plants; advance commercialization of the technology through successful operation and integration with the power plant; evaluate trona (a naturally occurring sodium bicarbonate mineral) injection to reduce $NO_x$ and capture 70 percent of $SO_2$ emissions via the new bag house; demonstrate recovery of Hg from the spent sorbent; reduce particulate matter (PM) emissions via the new bag house; and allow the continued reuse and sale of fly ash captured by the existing hot-side ESP.

## Project Description

The TOXECON™ demonstration technology was installed on the combined flue gas streams of PIPP Units 7, 8, and 9, which are rated at 90 MW each. There are a total of nine units at the PIPP site that were installed between 1955 and 1979. Units 7, 8, and 9 are of the Riley Turbo design and are dry-bottom, opposed-wall-fired boilers.

Steam conditions at the superheater are 1625 psig and 1005 °F, and conditions at the reheater are 390 psig and 1005 °F. Each of the three units is equipped with Joy-Western hot side electrostatic precipitators (ESPs). $NO_x$ emissions are managed with low-$NO_x$ burners and a combustion optimization software package. $SO_2$ emission limits are met on Units 7, 8, and 9 by burning low sulfur PRB coal. The coal typically has an HHV of 9,052 Btu/lb, a sulfur content of 0.28 percent, and an average Hg content of 0.13µg/g.

For the demonstration at PIPP, the TOXECON™ technology was installed downstream of the air preheater. The TOXECON™ process consisted of two systems that included (1) a sorbent injection system that includes the in-duct injection lances and the sorbent receiving, handling, and storage facilities; and (2) a baghouse with secondary systems for ash removal and supplying compressed air for bag cleaning.

The TOXECON™ technology is intended for installation in a downstream location from an existing cold-side or hot-side ESP. When applied to a host plant that is configured with a hot-side ESP, the TOXECON™ system is installed immediately downstream of the air preheater. In the case of a cold-side ESP installation, the TOXECON™ system is located just downstream of the ESP.



**Presque Isle Power Plant**



**TOXECON™ Flow Schematic at PIPP**

The TOXECON™ installation at PIPP was relatively simple. The PAC system consisted of storage, transport, and injection subsystems. Because the PIPP installation includes a hot-side precipitator, PAC is injected downstream from each of Units 7, 8, and 9 air preheaters through three separate trains. The design and location of the PAC injection lances ensure thorough mixing of the PAC sorbent with the flue gas.

Each of the three PAC duct injection trains handled 200 lb/hr of sorbent material and consisted of a feed hopper, feeder, eductor, injection lance, and blower. The design injection rate of 216 lb/hr permitted optional reinjection of some PAC/fly ash from the baghouse. A similar injection train was also installed to evaluate the effectiveness of a sodium-based sorbent for the removal

of 70 percent of $SO_2$ as well as some $NO_x$. After the sorbents were injected into the flue gas from Units 7, 8, and 9, the flows were directed to a single duct leading to the baghouse. Flue gas leaving the baghouse splits into three streams and is discharged through three separate flues enclosed by a single stack.

The PAC entrained in the flue gas captured some of the Hg present as the gas stream traveled to the baghouse. Once in the baghouse, the PAC and residual fly ash were removed from the gas stream by forming a dust cake layer on the surface of the bags. The PAC in the dust cake continued to remove Hg from the gas stream as long as it remained on the bags, which was also the case when sodium-based sorbent was used for $SO_2$ and $NO_x$ control. Because removing the dust cake layer



**TOXECON™ System Installed at PIPP**

reduced collection efficiency, the design and operation of the baghouse maximized the amount of time the dust cake remained on the bags within the limits of sound operating practices.

At the beginning of the project in 2003, there were no Hg continuous emission monitors (CEMs) available that had Environmental Protection Agency (EPA) certification and could be operated independent of full-time technical support. As part of the project, Hg CEMs were developed and tested that could be reliably used in the power plant environment and measure Hg with good sensitivity.

Two thermal laboratory-scale technologies having the potential to remove Hg from TOXECON™ baghouse ash were identified during the first quarter of 2008. One of the processes used microwave energy as the energy source while the other used heated air. Both methods were reported to exceed 90 percent recovery of Hg from the baghouse ash in laboratory tests.

One laboratory study irradiated ash with microwave energy for three minutes under a nitrogen gas flow. The evaporated Hg was carried by the gas flow to a condenser. Mercury that was not condensed was scrubbed from the nitrogen with a potassium permanganate solution.

The second technology used a chemical absorbent to chemically capture Hg while it was in the gas phase. The chemical absorbent developed for this study exhibited excellent Hg capture performance; however, it proved too expensive for commercial applications. Subsequently, a commercially produced absorbent was identified and tested. The commercially available absorbent captured the Hg that was released from the fly ash by thermal desorption. The resulting sorbent/Hg material was found to be both thermally and chemically stable, presenting no risk to the environment.

## Results

TOXECON™ performance testing confirmed a reliable minimum Hg removal rate of 90 percent from the flue gas leaving the hot-side ESP. This performance was verified using several different types of PAC. During testing, Hg removal was observed to vary inversely (linear) with baghouse temperature, which is a well-documented correlation in the TOXECON™ baghouse.

The goal of developing a reliable Hg CEM capable of operating in a power plant environment was met. Toward the conclusion of the demonstration, the CEM developed by Thermo Fisher and ADA-ES exhibited high availability for monitoring Hg at the inlet and outlet duct. It is commercially available from Thermo Fisher and has reportedly been selling well.

The baghouse and associated equipment were successfully integrated into plant operations. The spent PAC handling equipment was upgraded and the operation of the system was optimized during the demonstration project. Early in the project, there was a problem with hot embers/fires in the baghouse hoppers. A combination of laboratory work and operational adjustments corrected the problem and there was no recurrence during long-term testing.

Sulfur dioxide and potential $NO_x$ removal rates were investigated by injecting trona ($Na_3H(CO_3)_2 \cdot 2H_2O$), a sodium-based sorbent, into the flue gas stream. While the goal of 70 percent $SO_2$ removal was met, there was no perceptible impact on $NO_x$ emissions. When both trona and PAC were injected simultaneously, Hg removal efficiency decreased significantly, with a slight (approximately one percent) effect on opacity. Even with an increase in the brominated PAC injection rate [1.5 lb/MMacf (million actual cubic feet) to 4.5 lb/MMacf], achieving 90 percent Hg control while maintaining 70 percent $SO_2$ removal could not be consistently achieved.

The goal to recover 90 percent of Hg captured in the sorbent was met in laboratory tests. The Hg content in the consumed sorbents was reduced from 14.8 ppm to 0.252 ppm (98.3 percent reduction) after the microwave treatment methodology, which was one of the two methods identified to accomplish this goal. The other process used a natural gas-fired kiln and reduced the Hg content from 31 ppm to a level that was not measureable. The Hg released during these tests was captured by another process, leaving the sorbent and fly ash to be constructively reused.

The goal of increasing the plant's collection efficiency of PM [particularly for $PM_{2.5}$ (particulate matter less than 2.5 microns in diameter)] was met due to the high capture efficiency of the baghouse.

The utilization goal for fly ash captured in the hotside ESP was met due to the introduction of PAC downstream of the primary particulate control device. While the actual utilization of fly ash was outside the scope of the project, the project goal to enable fly ash utilization by preserving its quality was met.

## CONTROLLING MERCURY

While research continues to find better and cheaper ways to remove mercury from the flue gas of coal-fired boilers, electric generating units (EGUs) already have several viable options. The mercury found in flue gas can be found in several physical and/or chemical states. It can be in the form of elemental mercury vapor or in an oxidized state. These chemical states can either be attached to fly ash particles or free-floating. No matter which technology is used, elemental mercury is more difficult to remove than oxidized mercury.

The current leading technology specific to mercury removal consists of injecting powdered activated carbon (PAC) into the flue gas to adsorb the mercury. In some cases, the system itself is very simple, consisting of equipment to receive, handle, store, and inject the carbon. The carbon is injected into the flue gas between the air heater and the particulate control device. The particulate control device, either a baghouse or an electrostatic precipitator, removes the carbon and adsorbed mercury along with the fly ash. Continued use of the existing baghouse or ESP assumes that the existing particulate control device can handle the additional particulate load without degradation of performance. A disadvantage of this simple system is that the fly ash is contaminated with activated carbon. In 2004, approximately 40 percent of the fly ash was sold for constructive uses. Fly ash with high carbon content is difficult to sell and EGU operators are reluctant to risk losing their market, since they would incur disposal costs rather than receive payment for the fly ash. If the boiler being retrofitted with activated carbon injection (ACI) is equipped with a hot-side ESP, the power plant can install the ACI system downstream of the air heater and install a new particulate removal system to remove the PAC and any residual fly ash. A baghouse is generally preferred due to its high efficiency, especially for respirable particulates. This method ensures that the bulk of the fly ash removed by the existing ESP is not contaminated with additional carbon.

While ACI is the most effective method of capturing mercury, power plants can often achieve significant coincidental mercury removal with their particulate and SO2 controls. The effectiveness of achieving adequate mercury removal in equipment intended to control other pollutants varies significantly from plant to plant. As stated above, elemental mercury is less likely to be captured by any removal system, although ACI is less sensitive to the state of the mercury. The state of mercury in flue gas is affected by the type of boiler and coal and variations in boiler operation. Operators can influence the state of mercury in the boiler by optimizing combustion conditions to maximize oxidation of the mercury while maintaining satisfactory overall operation. By increasing the portion of the mercury that is oxidized, its removal in the ESP, baghouse, and/or flue gas desulfurization (FGD) system is enhanced.

Increased oxidation of mercury is also a co-benefit of a selective catalytic reduction (SCR) system. The SCR catalyst tends to oxidize a portion of the mercury in the flue gas, leading to higher removal rates in the particulate control system and/or the FGD system.

## Benefits

The TOXECON™ process provides a technology pathway to significant Hg control and has the potential to widen the use of PRB, as well as other western subbituminous coals, especially in light of the Mercury and Air Toxics Standards (MATS) established in December 2011. Additional benefits are derived from the inherently high particulate removal efficiency of a baghouse. While trona injection resulted in a 70 percent reduction of $SO_2$, concurrent PAC/trona injection greatly reduced previously demonstrated Hg removal efficiency. However, it is anticipated that other sorbents will be able to be used to further control pollutants and be complementary to Hg removal efficiency.

The TOXECON™ process was configured to treat the plant flue gas after the bulk of fly ash is captured in the HESP, thus preserving its quality for use as a concrete additive as well as for other beneficial uses. A secondary benefit is the preservation of landfill capacity, as the fly ash will have a beneficial use and not require disposal.

As part of the TOXECON™ process design, the baghouse downstream of an existing ESP removes the injected sorbent and the adsorbed pollutants. An additional benefit of this configuration is the significant reduction of both $PM_{2.5}$ and $PM_{2.5}$ precursor emissions (e.g., $SO_2$).

## Contacts for Participants in CCT Projects

**John McDermott**,
Vice President, Product Management
NeuCo, Inc.
33 Union Street, Floor #4
Boston, MA 02108
617-587-3198
mcdermott@neuco.net

**Charles Bullinger**
Great River Energy
2875 Third St., SW
Underwood, ND 58576-9659
701-442-7662
cbullinger@grenergy.com

**Steven T. Derenne**,
Project Manager
Wisconsin Electric Power Company
333 West Everett Street
Milwaukee, WI 53203
414-221-4443
steve.derenne@wepowerllc.com

The TOXECON™ process is considered suitable for application on 167 GW of coal-fired generating capacity and may prove to be the primary Hg control choice for western coals, especially when fired in units having hot-side ESPs. TOXECON™ systems were installed at seven plants in addition to PIPP. Although exact numbers are not available, it has been reported that a substantial market has developed for the Hg CEMS developed during this project. When the CAMR was vacated by the courts, there was uncertainty regarding the final Hg rule, which likely led to power plants deferring their decision on the selection of an Hg control technology. The final standards for Hg were published in mid-February 2012. The success of the TOXECON™ demonstration has provided the owners of those 167 GW with a viable technology to meet the three year deadline for compliance with the new Hg standard.

## Conclusions

The TOXECON™ process demonstrated significant Hg control for units having a hot-side ESP and firing a western subbituminous coal. The technology should be applicable to all coal-fired power plants. The placement of the TOXECON™ baghouse downstream of the existing ESP preserved fly ash quality for beneficial use while removing Hg from the plant flue gas stream. Fly ash that is used constructively will not require disposal in a landfill, thereby eliminating disposal costs and conserving landfill space. The baghouse also removed much of the very fine particulate that passed through the ESP.

# CCPI-1 Program Conclusions

The goal of CCPI-1 was to "*advance technology related to coal-based power generation that results in efficiency, environmental, and economic improvement compared to currently available state-of-the-art alternatives.*" The three projects discussed in this report have directly contributed to the CCPI objectives through more efficient operation that extends the nation's abundant coal reserves, further reduces emissions, resulting in cleaner air, and lowers generation costs, which can help to keep electricity affordable. Below is a brief summary of the contributions of each CCPI-1 project.

- The plant optimization capability developed during the course of the Demonstration of Integrated Optimization Software at the Baldwin Energy Complex project could benefit many types of power plant boilers. The NO$_x$ reduction target of five percent was exceeded and actually reached the 12 to 14 percent range, while heat rate improvement only reached half of the targeted improvement. However, the improvement achieved in heat rate should translate into slightly lower fuel consumption (and hence fuel cost) with a commensurate decrease in overall emissions. The demonstrated environmental, efficiency, and cost improvements confirm that the project has met the CCPI-1 program goals.

- The GRE Increasing Power Plant Efficiency: Lignite Fuel Enhancement demonstration has shown benefits from the full-scale coal drying system at Coal Creek Station (CCS) that utilizes waste heat. Lignite quality has improved and plant emissions have decreased due to a reduction in the amount of lignite being burned and the reduced Hg content of the fuel brought about by the density separation in the first drying stage. An additional benefit for new plants could be a reduction in capital costs due to subsystems being favorably impacted by decreased plant fuel requirements. These advancements demonstrate that CCPI-1 program goals have been achieved.

- TOXECON™ Retrofit for Mercury and Multi-Pollutant Control on Three 90-MW Coal-Fired Boilers controls Hg and other pollutants in the flue gas stream with sorbent injection while preserving the marketability of the captured fly ash. A reliable Hg CEM, capable of withstanding harsh power plant conditions, was also developed during this project. The results obtained from this project contribute to the achievement of the CCPI-1 program goals.

The application of technologies resulting from the DOE CCPI-1 solicitation will help resolve environmental concerns regarding the increased use of coal. These contributions to coal's viability will help ensure that the United States continues to generate clean, reliable, and affordable electricity from this plentiful and valuable resource.

*DOE Contacts for CCT Projects*

**Michael McMillian**,
Project Manager
TOXECON™
National Energy Technology Laboratory
3610 Collins Ferry Road
P.O. Box 880
Morgantown, WV 26507-0880
304-285-4669
michael.mcmillian@netl.doe.gov

**Sai Gollakota**,
Project Manager
Lignite Fuel Enhancement
National Energy Technology Laboratory
3610 Collins Ferry Road
P.O. Box 880
Morgantown, WV 26507-0880
304-285-4151
sai.gollakota@netl.doe.gov

**George Pukanic**,
Project Manager (ret.)
Demonstration of Integrated
Optimization Software
National Energy Technology Laboratory
626 Cochrans Mill Road
P.O. Box 10940
Pittsburgh, PA 15236-0940
412-386-6085
george.pukanic@netl.doe.gov

**Frederick Sudhoff**,
Project Manager
Demonstration of Integrated
Optimization Software
National Energy Technology Laboratory
3610 Collins Ferry Road
Morgantown, WV 26507-0880
Phone (304) 285-4560
fred.sudhoff@netl.doe.gov

# Bibliography

Sarunac, Nenad, Ness, Mark and Bullinger, Charles. "One Year of Operating Experience with a Fluidized Bed Dryer at Coal Creek Generating Station." 3rd International Conference on Clean Coal Technologies for Our Future, Sardinia, Italy, May 2007. http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/pubs/GRE/GRE%20Clean%20Coal%20Conf%20Sardinia%20Paper%20May%202007_1.pdf.

Bullinger, Charles, Ness, Mark and Armor, Tony. "Coal Creek Prototype Fluidized Bed Dryer: Performance Improvements, Emissions Reduction, and Operating Experience," EPRI's Coal Fleet for Tomorrow Meeting, San Francisco, CA February, 2007. http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/pubs/GRE/GRE%20Presentation%20EPRI%20Meeting%20February%202007_1.pdf.

James, Rob., John McDermott, Sanjay Patnaik, and Steve Piché. "Demonstration of Integrated Optimization Software at the Baldwin Energy Complex," Final Report. September, 2008. http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/pubs/41768R016.pdf.

Derenne, Steven T., "TOXECON™ Retrofit for Mercury and Multi-Pollutant Control on Three 90 MW Coal-Fired Boilers," Quarterly Technical Progress Report, Reporting Period: January 1, 2009–March 31, 2009. April, 2009. http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/pubs/41768R016.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Clean Coal Power Initiative (CCPI) Fact Sheet," December 2006. http://www.netl.doe.gov/publications/factsheets/program/Prog052.pdf

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Clean Coal Power Initiative (Status Report and Program Review)," Project Brief, April 2004. http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/pubs/CCPI%20%28Status%20Report%20and%20Program%20Review%29.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Demonstration of Integrated Optimization Software at the Baldwin Energy Complex," A DOE Assessment, September 2008. http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/pubs/NeuCo%20PPAfinal%20%20091108_1.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Demonstration of Integrated Optimization Software at the Baldwin Energy Complex," Project Brief, March 2009. http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/project_briefs/NeuCo.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Demonstration of Integrated Optimization Software at the Baldwin Energy Complex," Project Fact Sheet, December 2008. http://www.netl.doe.gov/publications/factsheets/project/Proj221.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Clean Coal Technology Programs: Program Update 2006, Status as of June 2006." September, 2006, http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/pubs/2006_program_update.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Lignite Fuel Enhancement," A DOE Assessment, April 2011. http://www.netl.doe.gov/technologies/coalpower/cctc/topicalreports/pdfs/GRE-PPA%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.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Lignite Fuel Enhancement," Project Brief, March 2009. http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/project_briefs/Lignite%20Fuel%20Enhancement.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Increasing Power Plant Efficiency: Lignite Fuel Enhancement," Project Fact Sheet, September 2008. http://www.netl.doe.gov/publications/factsheets/project/Proj219.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Mercury Control Demonstration Projects, Topical Report #26," February 2008. http://www.netl.doe.gov/technologies/coalpower/cctc/topicalreports/pdfs/topical26.pdf

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Power Plant Optimization Demonstration Projects, Topical Report #25," January 2008. http://www.netl.doe.gov/technologies/coalpower/cctc/topicalreports/pdfs/topical25.pdf.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "Energy Department Approves Full-Scale Demonstration of Coal Dryer," Fossil Energy Techline, November 2006. http://www.fossil.energy.gov/news/techlines/2006/06066-Coal_Dryer_Demonstration_Begins.html.

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "TOXECON™ Retrofit for Mercury and Multi-Pollutant Control on Three 90 MW Coal-Fired Boilers," Project Fact Sheet, October 2008. http://www.netl.doe.gov/publications/factsheets/project/Proj224.pdf

U.S. Department of Energy, Office of Fossil Energy, National Energy Technology Laboratory. "TOXECON™ Retrofit for Mercury and Multi-Pollutant Control on Three 90 MW Coal-Fired Boilers," Project Brief, April 2009. http://www.netl.doe.gov/technologies/coalpower/cctc/ccpi/project_briefs/Toxecon.pdf

# Acronyms and Abbreviations

ACI — Activated Carbon Injection

AI — Artificial Intelligence

ARRA — American Recovery and Reinvestment Act

BEC — Baldwin Energy Complex

BTU — British thermal unit

CAAA — Clean Air Act Amendments

CAIR — Clean Air Interstate Rule

CAMR — Clean Air Mercury Rule

CCPI — Clean Coal Power Initiative

CCS — Coal Creek Station

CCT — Clean Coal Technology

CCTDP — Clean Coal Technology Demonstration Program

CE — Combustion Engineering

CEM — Continuous Emissions Monitor

$CO_2$ — Carbon dioxide

DOE — Department of Energy

EA — Environmental Assessment

EPRI — Electric Power Research Institute

EPA — Environmental Protection Agency

ESP — Electrostatic Precipitator

FBCD — Fluidized Bed Coal Dryer

FBD — Fluidized Bed Dryer

FE — Office of Fossil Energy

FGD — Flue Gas Desulfurization

FL — Fuzzy Logic

FONSI — Finding of No Significant Impact

g — Gram

GRE — Great River Energy

GW — Gigawatt

HAPS — Hazardous Air Pollutants

Hg — Mercury

HHV — Higher Heating Value

ICR — Information Collection Request

Lb — Pound

MATS — Mercury and Air Toxics Standards

MMacf — million actual cubic feet

NAS — National Academy of Sciences

NEPA — National Environmental Policy Act

NETL — National Energy Technology Laboratory

$NH_3$ — Ammonia

NN — Neural Network

MW — Megawatts

MWh — Megawatt-hours

$NO_x$ — Nitrogen Oxides

PAC — Powdered Activated Carbon

PIPP — Presque Isle Power Plant

PM — Particulate Matter

$PM_{2.5}$ — Particulate Matter less than 2.5 microns in diameter

PPII — Power Plant Improvement Initiative

PRB — Powder River Basin

PSIA — Pounds per Square Inch Absolute

R&D — Research & Development

SCR — Selective Catalytic Reduction

$SO_2$ — Sulfur dioxide

µg — Microgram

U.S. — United States

We Energies — Wisconsin Electric Power Company



**National Energy Technology
Laboratory**

1450 Queen Avenue SW
Albany, OR  97321-2198
541-967-5892

2175 University Avenue South, Suite 201
Fairbanks, AK  99709
907-452-2559

3610 Collins Ferry Road
P.O. Box 880
Morgantown, WV  26507-0880
304-285-4764

626 Cochrans Mill Road
P.O. Box 10940
Pittsburgh, PA  15236-0940
412-386-4687

13131 Dairy Ashford, Suite 225
Sugar Land, TX  77478
281-494-2516

Visit the NETL website at:
**www.netl.doe.gov**

Customer Service:
**1-800-553-7681**



Printed in the United States on recycled paper  

June 2012

# EXHIBIT 11

## GAVIN A. MCCOLLAM
## DECLARATION OF HARM IN SUPPORT OF MOTION FOR A
## STAY PENDING REVIEW

1.    My name is Gavin A. McCollam. I am the Senior Vice President and Chief Operating Officer of Basin Electric Power Cooperative ("Basin Electric"). I am over the age of 18 years, and I am competent to testify concerning the matters in this declaration. I have personal knowledge of the facts set forth in this declaration, and if called and sworn as a witness, could and would competently testify to them.

2.    I have more than 35 years of experience in electricity generation. I have been employed at Basin Electric since 1989. I hold an associate's degree from Bismarck (North Dakota) State College, a bachelor's degree in mechanical engineering from North Dakota State University, and a master's degree in systems management from the University of Southern California. I am also a registered professional engineer. As the Senior Vice President and Chief Operating Officer at Basin Electric, my responsibilities include ensuring access to safe, reliable, affordable and sustainable electricity for Basin Electric's member-owner cooperatives. This includes oversight of Basin Electric's coal-fired electric generating units in North Dakota and Wyoming.

3.     I am providing this Declaration in support of the motions to stay challenging the U.S. Environmental Protection Agency's ("EPA") National Emission Standards for Hazardous Air Pollutants: Coal and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508 (May 7, 2024), known as the Mercury and Air Toxics Standards Risk and Technology Review ("Final Rule" or "MATS RTR").

4.     Basin Electric is a not-for-profit generation and transmission cooperative incorporated in 1961 to provide supplemental power to a consortium of rural electric cooperatives. Those member cooperatives— 140 of them—are Basin Electric's owners. Through them, Basin Electric serves approximately three million consumer members in an area that covers roughly 500,000 square miles across nine states: Colorado, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, South Dakota, and Wyoming. Basin Electric's end-use consumer members across these nine states include residential, farm, commercial, industrial, and irrigation electric consumers. As of the end of 2023, Basin Electric had an asset base of $8 billion and operated 5,219 megawatts ("MW") of wholesale electric generating capability and had 8,112 MW of generating

capacity within its portfolio. Those owned electric generation facilities are located in the states of Iowa, Montana, North Dakota, South Dakota, and Wyoming. Three of Basin's electric generation facilities are expected to be significantly impacted by the MATS RTR: Antelope Valley Station, Leland Olds Station, and Laramie River Station.

5.    Basin Electric is one of the few utilities that supplies electricity on both sides of the national electric system separation. In the Eastern Interconnection, Basin Electric's system is part of two assessment areas overseen by two System Operators: the Southwest Power Pool ("SPP") and the Midcontinent Independent System Operator ("MISO"). In the Western Interconnection, Basin Electric's system is overseen by the Northwest Power Pool ("NWPP") and the Rocky Mountain Reserve Group ("RMRG"). These System Operators regulate the multiple energy and capacity markets that exist within each regional grid. They also require utilities like Basin Electric to maintain a certain amount of capacity to ensure reliability during periods of high demand.

6.    Basin Electric, which has two North Dakota facilities that are fueled by lignite coal, is a member of the Lignite Energy Council ("LEC"). LEC represents the regional lignite industry in North Dakota, an $18

billion industry critical to the economy of the Upper Midwest and the reliability of its electrical grid. The primary objective of LEC is to maintain a viable lignite coal industry and enhance development of the region's lignite resources. Members of LEC include mining companies, utilities that use lignite to generate electricity, synthetic natural gas, and other valuable byproducts, and businesses that provide goods and services to the lignite industry. LEC has advocated for its members since 1974 to protect, maintain, and enhance development of our region's abundant lignite resources. LEC is committed to environmental stewardship and understands the importance of protecting North Dakota's natural beauty.

7.   Basin Electric is also member of the National Rural Electric Cooperative Association ("NRECA"). NRECA represents the interests of rural electric cooperatives across the country.

8.   Lignite is frequently utilized at mine-mouth power generation facilities, which are coal-fired power plants built near a coal mine that use coal from that mine as fuel.

9.   The MATS RTR threatens the viability of lignite-powered plants. It also threatens the reliability of the entire grid across the region,

places burdens on the power sector as a whole, and causes harm to industries dependent on a reliable electric grid.

## ANTELOPE VALLEY STATION

10.   Basin Electric is the operator and part owner of the Antelope Valley Station ("Antelope Valley"), a two-unit power plant located in Mercer County, North Dakota. Each EGU is rated at 450 MW. Antelope Valley began commercial operation in 1984. Antelope Valley Station is fueled by lignite coal from the nearby Freedom Mine.

11.   At Antelope Valley, sulfur dioxide ("SO2") emissions from the Combustion Engineering tangentially fired boiler are controlled by a dry scrubber. Nitrogen oxide ("NOx") emissions were originally controlled by low NOx burners and close-coupled-over-fired air. Then, in spring 2016, an additional separated over fired air system was installed and reduced NOx emissions lower. Other pollution control equipment installed at Antelope Valley includes a fabric-filter system for particulate control and sorbent injection for mercury control.

## LELAND OLDS STATION

12.   Basin Electric is the operator and owner of the Leland Olds Station ("Leland Olds"), a two-unit power plant located in Mercer County,

North Dakota. The two units together generate 660 MW. Unit 1 began commercial operation in 1966 and Unit 2 began commercial operation in 1975. Leland Olds is fueled by lignite coal delivered by rail from the Freedom Mine.

13.    At Leland Olds Unit 1, SO2 emissions from the Babcock & Wilcox wall-fired boiler are controlled by a wet scrubber. NOx emissions were originally controlled by low NOx burners. Then, in spring 2017, a selective non-catalytic reduction ("SNCR") system was installed and reduced NOx emissions lower. Other pollution control equipment installed at Unit 1 includes an electrostatic precipitator ("ESP") system for particulate control and activated carbon (sorbent) injection for mercury control.

14.    At Leland Olds Unit 2, NOx emissions from the boiler are controlled by low-NOx burners, separated over-fired air, and SNCR. A wet scrubber is used to control SO2 emissions and an ESP is used for control of particulate matter ("PM") emissions. An activated carbon injection system is used to control mercury emissions.

## LARAMIE RIVER STATION

15.    Basin Electric is the operator and a minority co-owner of the Laramie River Station ("Laramie River"), a three-unit power plant located in Wheatland, Wyoming. The three units together generate approximately 1,700 MW, of which Basin Electric owns about 42%, for a total of roughly 714 MW. Unit 1 began commercial operation in 1980, Unit 2 began commercial operation in 1981, and Unit 3 began commercial operation in 1982. Laramie River is fueled by subbituminous coal from the Powder River Basin in Wyoming.

16.    At Laramie River Unit 1, the NOx emissions from the boiler are controlled by low-NOx burners and separated over-fired air. A wet scrubber is used to control SO2 emissions and an ESP is used for control of PM emissions. An activated carbon injection system is used to control mercury emissions.

17.    At Laramie River Unit 2, the NOx emissions from the boiler are controlled by low-NOx burners and separated over-fired air. In 2019, Unit 2 began operation of a SNCR. A wet scrubber is used to control SO2 emissions and an ESP is used for control of PM emissions. An activated carbon injection system is used to control mercury emissions.

18.     At Laramie River Unit 3, the NOx emissions from the boiler are controlled by low-NOx burners and separated over-fired air. A dry scrubber is used to control SO2 emissions and an ESP is used for control of PM emissions.  An activated carbon injection system is used to control mercury emissions.

## MATS RTR RULE REVISIONS

19.     The MATS RTR eliminates the low rank coal subcategory for lignite-powered facilities and changes the limit for mercury from lignite-fired power plants from 4.0 lb/TBtu to 1.2 lb/TBtu (the "New Mercury Limitation").

20.     The MATS RTR decreases the limit for filterable particulate matter ("fPM") to 0.010 lbs/MMBtu (the "New fPM Limitation").

21.     Compliance with the New Mercury and New fPM Limitations is required on or before three years after the Final Rule's effective date.

22.     The MATS RTR provides that Continuous Emission Monitoring Systems ("CEMS") are the only method to demonstrate compliance with the fPM limit.

## LIGNITE COMBUSTION

23. It is well-known and consistent with Basin Electric's experience that lignite deposits vary significantly in quality, including fuel combustion performance and mineral content. Mercury content in the lignite varies because different seams within the mine yield lignite with diverse attributes (including mercury) on a day-to-day basis. A compliance margin is critical to allow for continuous compliance with the Final Rule especially considering coal quality variability.

24. Lignite varies in composition and the distribution of mercury within individual coal samples is not uniform, unlike other types of coals. The amount of mercury within one seam of coal can vary drastically, not to mention mercury content fluctuations between seams at the same mine.

25. An important difference between mine-mouth coal plants and typical coal-fired power plants is the control over fuel composition. Non-mine-mouth facilities purchase coal of a specified quality to be delivered to the facility. Unlike other types of facilities that may be able to blend coals to achieve greater consistency in the character of their fuel, many North Dakota lignite units are located at mine-mouth facilities without

access to other coal types. Antelope Valley cannot use bituminous coal or other types of coal because the boilers were designed specifically for burning high moisture coal such as lignite. If Antelope Valley were to burn coal with lower moisture content, it would cause severe maintenance issues with heat transfer to the rear pendants and could result in a loss of produced electricity. Because Antelope Valley is a mine-mouth facility, having to rail in coal would significantly change the fuel cost and therefore significantly increase the cost that Basin Electric bids Antelope Valley into the market.

26.    Leland Olds uses lignite coal from the nearby Freedom Mine, which is loaded at Antelope Valley and delivered via rail. If Leland Olds were to change coal types, it would need to be transported much further and would not be cost effective.

27.    When high mercury batches of coal are combusted, the original MATS mercury emission limitation from 2012 provided lignite power plants enough leeway to account for higher mercury emissions due to the mercury content in the coal.

## ELIMINATION OF THE MERCURY SUBCATEGORY FOR LIGNITE CAUSES IMMEDIATE AND IRREPARABLE HARM TO THE NORTH DAKOTA LIGNITE INDUSTRY AND TO BASIN ELECTRIC

28. EPA established the lignite subcategory for mercury because lignite units and lignite coal are markedly different than bituminous and subbituminous coals. Lignite has a higher mercury content in many instances and presents greater variability than other coals. The higher sulfur content found in lignite fuels inhibits the ability of injected sorbents to reduce mercury emissions at lignite plants. The mercury content also results in higher levels of $SO_3$ formed, which significantly limits the mercury emission reduction potential of emission controls at lignite plants.

29. Basin Electric has used the same technology (combination of sorbent injection plus a chemical additive (oxidizing agent)) as its primary mercury control strategy since the MATS rule came into effect and is not aware of more effective control technology.

30. There is no evidence that the units at Antelope Valley and Leland Olds could achieve compliance with the New Mercury Limitation on a sustained basis with the currently installed equipment as is required to meet a 30-day rolling basis while operating at full load.

31. The MATS RTR sets a mercury limitation for lignite units without any technical basis that it can be met on a continuous basis, in general, and provides no compliance margin to account for the variability in unit performance and emissions control capabilities from unit to unit.

32. Basin Electric is irreparably harmed by the final MATS RTR because it is unknown if Antelope Valley and Leland Olds' existing mercury controls can achieve the New Mercury Limitation of 1.2 lb/Tbtu on a sustained basis at full load.

33. The Final Rule places Basin Electric in an impossible position, given the Rule's impending compliance date. Noncompliance with the Clean Air Act is not an option.

34. To have any possibility of meeting the New Mercury Limitation, Basin Electric must modify the existing system at both Antelope Valley and Leland Olds to produce a higher injection rate and make the systems more robust. Even though EPA has not demonstrated that the New Mercury Limitation will provide any health benefits, Basin Electric must complete this modification project to lower the emission rate. The modification costs and ongoing operation expenses are significant. Specifically, these technologies will require over

$4,000,000.00 in capital expenditures upfront for the four units collectively, as well as increased labor costs for installation, operation, and maintenance of the technology and equipment and associated training, along with additional sorbent injection, will result in increased operating costs over the long term. We must begin expending these dollars immediately, and certainly before the resolution of this case, in order to meet the deadlines set out in the Final Rule.

35. Costs to comply with the New Mercury Limitation are exorbitant and damage Basin Electric. Costs will be passed along to its member cooperatives and end users who are harmed via higher electricity prices. The capital and operational costs to Basin Electric, its member cooperatives, and end users cannot be recouped.

## THE NEW FPM LIMITATION WILL CAUSE IMMEDIATE AND IRREPARABLE HARM TO THE ELECTRIC COOPERATIVES AND TO BASIN ELECTRIC

36. EPA's New fPM limit of 0.010 lb/MMBtu will require upgrades at Leland Olds and Laramie River.

37. Basin Electric's harm is immediate. Basin Electric would need to begin engineering and constructing, at a minimum, ESP upgrades at Leland Olds and Laramie River as soon as possible to have any

opportunity to meet the new compliance date for the MATS RTR. If ESP upgrades are required, Basin Electric would need 36 months to complete. It is likely that the 36-month estimate will be further protracted due to the lack of contractors available to perform the work.

38.   If ESP upgrades were not sufficient, baghouse technology would be required. If a baghouse is required, Basin Electric would need approximately 48 months to convert to baghouse technology.

39.   Costs of compliance with the New fPM Limitation are overly burdensome, for the following reasons.

40.   ESP retrofits are expensive. They may cost an estimated $67,262 per fPM ton removed. *See* Cichanowicz Technical Report.

41.   Baghouse installation is extremely costly. It is estimated to cost $282,715 per fPM ton removed. *See* Cichanowicz Technical Report.

42.   Electric cooperatives have limited financial resources to undertake projects of this magnitude coincident with other environmental compliance projects.

43.   To comply with the MATS RTR, Basin Electric is forced to take measures that immediately increase compliance and operational costs. The MATS RTR impacts Basin Electric's ability to supply

affordable, reliable energy to its customers. Added costs will place upward pressure on rates for rural customers, particularly when combined with the effects of EPA's other recent electric utility sector-focused rules.

## THE MATS RTR CREATES GRID RELIABILITY CONCERNS

44.     Lignite power plants, which provide a significant source of electric power in North Dakota, are important to the regional economy.

45.     Thus, the Final Rule, with its reversal of EPA's position on lignite-fired sources, impacts North Dakota more profoundly than other areas of the country. These concentrated impacts affect the ability of the North Dakota utilities to maintain adequate generation resources.

46.     Most (if not all) of the lignite plants in North Dakota must make some changes as result of the Final Rule. These changes will require an immense amount of coordination between different regulated facilities and likely involve serious risks to the reliability of electric grids providing power to the region while the removal equipment at each of the impacted facilities are taken offline to undergo the additions and upgrades required by the Final Rule.

47.     The North American Electric Reliability Corporation has predicted continued future shortfalls in North Dakota.[1] The MATS RTR intensifies an already tenuous, overburdened grid in transition.

## SUMMARY OF HARM TO BASIN ELECTRIC

48.     Basin Electric is harmed because it must immediately commence costly compliance testing and project development to evaluate whether it can meet the MATS RTR emissions limits and applicable compliance deadline.

49.     The MATS RTR could potentially cause Antelope Valley, Leland Olds and Laramie River which are dispatchable, reliable generating resources, to operate differently at a substantial cost and permanent loss to Basin Electric.

50.     Even if the MATS RTR is overturned, the direct costs to Basin Electric, its member cooperatives, and end users cannot be recouped once spent. These damages are permanent.

* * * *

[Signature Follows on Next Page]

---

[1] NERC, 2024 Summer Reliability Assessment (May 2024),
https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2024.pdf.

I declare under penalty of perjury that the foregoing is true and correct.

Gavin A. McCollam

Dated: 6/5/2024

# EXHIBIT 12

## DECLARATION OF CHRISTOPHER D. FRIEZ

I, Christopher D. Friez, declare as follows:

1. My name is Christopher D. Friez, and I am the Vice President-Land, Associate General Counsel and Assistant Secretary of NACCO Natural Resources Corporation ("NACCO NR").

2. NACCO NR, a subsidiary of NACCO Industries, Inc., through its subsidiary North American Coal, LLC, mines and markets lignite coal primarily as fuel for power generation and provides selected value-added mining services for other natural resources companies. Its corporate headquarters is located in Plano, Texas near Dallas. NACCO NR operates surface lignite coal mines in North Dakota, Mississippi, and Louisiana.

3. NACCO NR is one of the United States' largest miners of lignite coal and among the largest coal producers in the country, producing approximately 23.9 million tons of lignite in 2023.

4. Because lignite has a higher moisture content and a lower heat content than other types of coal, and therefore cannot be transported long distances in a cost-effective manner, most lignite is sold to power plants adjacent or near to the producing mine. If a power plant served by a lignite mine closes, I am not aware of any reasonably viable new market opportunities for the lignite coal.

5. EPA's MATS rule ("MATS") will cause immediate, irreparable injury to NACCO NR, its workers, and the communities in which it mines coal in several ways. According to modeling analysis conducted by the North Dakota Transmission Authority ("NDTA"), dated April 3, 2024, a true and correct copy of which is attached as Attachment A, the changes required by MATS are likely not technologically feasible for lignite-based power generation facilities. The MATS rule eliminates the "units designed for low rank virgin

coal" subcategory established for lignite-powered facilities by causing these facilities to comply with the same mercury emission limitation that currently apply to electric generating units combusting bituminous and subbituminous coals. Numerous comments in the administrative record provide that the new emission standards are not technologically feasible and will impose crippling compliance costs that may require facility retirement. Even if compliance is technologically feasible, the added cost to comply, and unknown long term operational issues caused by the increased use of materials needed to comply, may cause plant retirements and mine closures. The EPA itself indicates, within the MATS rule, that the following plants, among others, will potentially be impacted by filterable particulate matter (fPM) and the mercury standard: Red Hills Generating Facility (MS; lignite); Antelope Valley Station (ND; lignite); Coal Creek Station (ND; lignite); Coyote Station (ND; lignite); Leland Olds (ND; lignite); and Spiritwood Station (ND; lignite). NACCO NR sells nearly all of its lignite coal production to these facilities. The retirement of these facilities would cause NACCO NR to close the coal mines which currently supply these facilities, resulting in the write off of tens of millions of dollars of investment by NACCO NR. These closures would result in hundreds of millions of dollars of stranded investment at these facilities and mines, much of which would likely be passed through to North Dakota and Minnesota ratepayers, cooperative members, and small municipalities. The closure of the Red Hills Mine would result in the loss of over $50 million of direct investment made by NACCO NR to date. In addition, early closure of these plants would result in the loss of over a thousand jobs and the loss of revenue which NACCO NR is contracted to receive well into the future. NACCO NR believes that all of these injuries are preventable if the court stays and ultimately overturns the rule.

**North Dakota—Coyote Creek Mine**

6. Through a wholly-owned subsidiary, Coyote Creek Mining Company, L.L.C. ("CCMC"), NACCO NR developed the Coyote Creek Mine in Mercer County, North Dakota, located about 70 miles northwest of Bismarck. The Coyote Creek Mine began making lignite deliveries to the 427-megawatt (MW) Coyote Station in 2016.

7. If Coyote Station cannot meet the requirements of the MATS rule, it will be required to close. The purpose of the Coyote Creek Mine is to support, and to provide a fuel source for, Coyote Station. Thus, if Coyote Station closes, Coyote Creek Mine would close as well. Mine closure would result in a layoff of the 90-person workforce, CCMC would go out of business, and the local community and the State of North Dakota would be deprived of the valuable attendant benefits and taxes and royalties described below in paragraphs 13 and 14.

8. To develop the mine and comply with its contractual obligations, CCMC permitted an area large enough to supply coal for the 25-year life of the contract with Coyote Station. CCMC spent over $6 million to permit the acreage needed for 25 years. If the power plant and mine must close in 2027, less than half of the acreage permitted will have been mined and CCMC will lose over $3 million in permitting costs spent to permit lands that will never be mined. In addition, $30 million of mine development costs are being amortized over the life of the mine. If that life is cut in half due to implementation of the MATS rule, another $15 million in such costs are lost.

9. In addition to permitting and mine development costs, CCMC incurred equipment costs of around $80 million to support mine startup and operation through the life of the mine. Again, these costs are being amortized over the life of the mine, and if the mine is forced to close early, nearly $40 million of those costs are lost because full amortization cannot

be realized. And the equipment will likely have a very low resale value because of the closure of other mines at the same time. Finally, if Coyote Station shuts down and the mine closes in 2027, the contractual arrangement between CCMC and the power plant owners requires CCMC to purchase the dragline and rolling stock for approximately $30 million, due to the early closure of the mine.

10. Due to the cost-plus nature of the contract under which CCMC supplies fuel to Coyote Station, many of CCMC's costs and obligations are passed through to the public utilities that jointly own Coyote Station—Otter Tail Power Company, Northern Municipal Power Agency, Montana-Dakota Utilities Company, and NorthWestern Corporation. In the end, the utilities, and more specifically their ratepayers and members, will pay these costs. In return, the ratepayers and members to whom the costs of Coyote Station are passed on will not have received the benefit of the low-cost and reliable power that otherwise would be delivered by Coyote Station. Their stranded investment in the Coyote Creek Mine will be lost.

**North Dakota—Falkirk Mine**

11. NACCO NR, through its wholly-owned subsidiary, The Falkirk Mining Company ("Falkirk"), operates the Falkirk Mine near Underwood, North Dakota, about 50 miles north of Bismarck. The Falkirk Mine annually produces between 7 million and 9 million tons of lignite for Coal Creek Station, a two-unit 1100-megawatt power plant owned by Rainbow Energy Center.

12. Coal Creek Station is impacted by the MATS rule.

13. A layoff at Falkirk Mine will be acute on numerous levels. According to an economic report prepared by North Dakota State University, a true and correct copy of which is

attached as Attachment B, in 2021, the latest year for which actual data is currently available, "The combination of coal mining, coal conversion, coal-fired electricity generation, and electricity transmission and distribution was estimated to have 3,300 direct jobs in North Dakota in 2021." "The lignite industry also generated over $1 billion in labor income, which represents wages, salaries, benefits, and sole proprietor's income." For the five hundred plus employees that stand to lose their jobs if Coal Creek Station closes, their lives, and their families' lives, may be drastically impacted.

14. Also, a shutdown would have a substantial impact across several counties and cities in North Dakota. Like all mining companies, Falkirk pays a coal severance tax of 37.5 cents on each ton of lignite mined. In 2023, Falkirk paid approximately $2,500,000 in coal severance taxes. NACCO NR's neighboring Freedom Mine paid approximately $4,500,000 in coal severance taxes. Under North Dakota law, 30% of revenue from the 37.5 cent tax is used to fund a Constitutional Trust Fund administered by the Board of University and School Lands. The other 70% is shared among the coal producing counties in the State, which is further apportioned as follows: 40% to the county general fund; 30% to the cities within the county, and 30% to the school districts. Absent a stay of the MATS rule, if these mines are forced to shut down, this will impact education, law enforcement, and social services throughout the State.

15. Even if the parties prevail in litigation efforts and the MATS rule does not ultimately go into effect, the MATS rule is already immediately impacting the operation of the mine to the detriment of the local community. At the Falkirk Mine, hiring decisions must be made with a long term vision in mind, and the decision to fill open positions or hire for new positions cannot be made with the current uncertainty the MATS rule creates. In addition, the uncertainty created by the MATS rule makes it difficult to attract and retain employees

who know they may not have a job in a few years. These difficulties are real and locations like the Falkirk Mine are experiencing them right now and will continue to experience them during the litigation of the MATS rule if a stay is not granted.

16. Decisions regarding large capital expenditures for equipment must be made years in advance due to the amount of time it takes to finance, acquire, transport, assemble and test equipment. A decision must be made now as to whether to acquire an additional dragline for the Falkirk Mine to meet customer demands and contractual obligations. A used dragline would need to be acquired now—at a cost of approximately $30 million—so the dragline can be purchased, transported, reconstructed and placed into service by late 2026 to meet these customer demands and contractual obligations. Due to their enormous size and complexity, it takes years for a used dragline to become operational at a new location. Draglines weigh millions of pounds and must be disassembled for transport (by rail and truck) to their new location. The parts and equipment constituting the dragline are transported in dozens of modular units to the new location. Upon arrival, the equipment is refurbished, re-assembled, erected, and tested. This work is done by private contractors, including truckers, welders, electricians, mechanical and electrical engineers, and software programmers.

17. Because of this extensive and time-consuming process, Falkirk must make a decision acquire to the $30 million dragline now, in order for the dragline to become operational by late 2026 to meet customer demand. If Falkirk makes this necessary decision and then is obligated to close the mine in 2027, it would lose almost all of its substantial investment in this piece of equipment, which will be worth only scrap value if the mine is shut down. Given the lead time required and the uncertainty created by the MATS rule, it is difficult to make an informed decision on such a large capital expenditure.

## North Dakota – Coteau Freedom Mine

18. NACCO NR, through its wholly-owned subsidiary, The Coteau Properties Company ("Coteau"), operates the Freedom Mine near Beulah, North Dakota, about 75 miles northwest of Bismarck. The Freedom Mine annually produces between 12 million and 14 million tons of lignite for Antelope Valley Station ("AVS"), a two-unit 900-megawatt power plant, Leland Olds Station ("LOS"), a 660-megawatt power plant, and Dakota Gasification Company ("DGC"), a Synfuels plant, all owned by Basin Electric Power Cooperative.

19. AVS and LOS are both impacted by the MATS rule.

20. Similar to Falkirk, a layoff at Freedom Mine would be devastating to the local community. The combination of over 400 high paying jobs at the Freedom Mine alone, along with approximately 600 more at the combined facilities of AVS, LOS, and DGC are the backbone of a 100 mile radius of families' livelihoods and economic activity for central North Dakota, including the neighboring towns of Beulah and Hazen. Without the employment provided by these facilities, the towns of Beulah and Hazen could vanish, along with any economic activity in the region.

21. A shut down or curtailment of coal usage at AVS or LOS also affect the economics and operating costs of DGC. DGC enjoys a lower price for its lignite coal input based upon sharing in the volume of coal needed to operate AVS and LOS. Because of economies of scale and shared costs over a larger number of tons, if AVS and LOS are shut down, the coal costs for DGC increase exponentially, causing the economics of that facility to be strained as well.

22. NACCO NR, at its Freedom Mine, currently has about $130 million worth of property, plant, and equipment which would require accelerated depreciation if the mine is closed early because of the MATS rule. In addition to that, there is another $70 million in lease depreciation that would be unrealized, along with approximately $37 million in warehouse inventory that would have little to no value if the mine were closed early. Finally, a shut down of the Freedom Mine would result in a lost payroll of over $60 million annually.

23. Beyond the impacts of a shut down, the MATS rule is creating an immediate impact on the operation of the mine to the detriment of Coteau. At the Freedom Mine, as with Falkirk, decisions regarding large capital expenditures must be made years in advance due to the amount of time it takes to finance, acquire, transport, assemble and test equipment, and to determine how much and which types of equipment are necessary for different mine plans. There are numerous decisions relating to equipment purchases, repairs, mine plans and other capital requirements that must be delayed or decisions altered for short term requirements rather than long term decision-making, creating higher future costs and less efficient operations. Equipment purchases, or equipment maintenance, that are delayed pending the outcome of the MATS rule will add additional cost in the future. Additionally, Coteau is currently facing major mine plan decisions that depend on the length of time the mine will be in operation, but the uncertainty of the MATS rule (especially when coupled with the additional announced rules) causes great difficulty in making these decisions.

**Mississippi**

24. NACCO NR has owned and operated the Red Hills Mine near Ackerman, Mississippi, since 2002. On an annual basis, the Red Hills Mine produces approximately 2.4-2.8 million tons of lignite. Lignite from the Red Hills Mine is used as a fuel supply at the adjacent Red

Hills Generating Facility, a 440-megawatt power plant that provides electricity to the Tennessee Valley Authority.

25. Based on current projections, NACCO NR believes the Red Hills Generating Facility is particularly vulnerable to meeting the filterable particulate matter standard required by the MATS rule.

26. NACCO NR provides lignite to the Red Hills Generating Facility pursuant to a supply agreement that runs through 2032. The agreement, however, also includes two ten-year extension options that, if exercised, would extend the agreement to 2052.

27. Based on NACCO NR's geological data, there are enough proven lignite reserves in the vicinity of the Red Hills Mine to support mining until at least 2052. The most efficient way to mine the reserves would have been to shift approximately 6 miles of Mississippi Highway 9, which bisects the Red Hills Mine area in a north-south direction, about 2 miles to the east. However, because of previous regulatory uncertainty (much like the uncertainty that would result if the MATS rule is not stayed) the decision was made to cross Mississippi Highway 9 by constructing an underpass, rather than moving the highway. Similar operational decisions are made on a regular basis and, without a stay here, inefficient and shorter term decisions will be required. These decisions will collectively add up to significant and unnecessary financial harm.

28. NACCO NR currently has assets valued at over $50 million at the Red Hills Mine that will likely be lost as stranded investments if the MATS rule is implemented.

29. The effects of the MATS rule cannot be considered in a vacuum. EPA promulgated revisions to the New Source Performance Standards rule (greenhouse gas emissions requirements) on May 9, 2024 that require significant reductions in emissions from coal-fired power plants, including requirements for carbon capture and storage or co-firing on

alternative fuel sources, or shut down by January 1, 2032. Unfortunately, in addition to numerous other issues, the compliance dates for the two rules are misaligned. To comply with the fPM and/or mercury standards, power plants need to decide whether to spend the significant capital required to attempt to comply with MATS, if compliance is even possible, while at the same time weighing whether they can even operate past January 1, 2032 anyway. If facilities must presume they are required to shut down before January 1, 2032 anyway, it is unlikely they will invest capital to comply with the MATS rule.

30. Finally, absent a stay of the MATS rule and facing significant compliance costs over a very short implementation timeframe (if compliance is even technologically feasible), coupled with the effect of the other rules as mentioned above, a number of facilities are expected to elect not to install additional control equipment and emission monitors. If the rule is not stayed, facility owners may decide to shut down or curtail output rather than spend significant dollars with such an uncertain outcome, and NACCO NR will suffer tremendous immediate harm.

31. I, Christopher D. Friez, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Christopher D. Friez
NACCO Natural Resources Corporation

Dated: May 30, 2024

**Attachment A**

to the Declaration of Christopher D. Friez



# INDUSTRIAL COMMISSION OF NORTH DAKOTA
## NORTH DAKOTA TRANSMISSION AUTHORITY

Analysis of

Proposed EPA MATS Residual Risk and Technology Review and

Potential Effects on Grid Reliability in North Dakota

## Claire Vigesaa, Director
## North Dakota Transmission Authority

April 3, 2024

Assisted by:

Isaac Orr and Mitch Rolling

Center of the American Experiment

# Contents

Executive Summary ............................................................................................................. 3

Section A: North Dakota's Power Environment ............................................................... 4

    Generation Adequacy, Transmission Capacity & Load Forecast Studies ........................ 5

    Current North Dakota Generation Resources .............................................................. 6

    Electric Generation Market & Utilization .................................................................... 8

    Grid Resource Adequacy and Threats to Growth Opportunities .................................. 9

    Grid Reliability Is Already Vulnerable ........................................................................ 10

    NERC's 2023 Reliability Risk Assessment .................................................................. 11

    MISO's Response to the Reliability Imperative (2024) ................................................ 12

    Conclusion: The Long Term Reliability of the MISO Grid is Already Precarious .............. 14

Section B: The Proposed MATS Rule Will Dramatically Affect North Dakota Lignite Electric
Generating Units ............................................................................................................. 14

    The Proposed MATS Rule Eliminates the Lignite Subcategory for Mercury Emissions .... 15

    The Proposed MATS Rule Will Not Provide Meaningful Human Health or Environmental
    Benefits ................................................................................................................... 16

    The Administrative Record Indicates the Mercury Standard of 1.2 lb./TBtu is Technically
    Unachievable for EGUs using North Dakota Lignite Coal ............................................. 20

    The Administrative Record Indicates the Lower PM Standard May Also Not Be Technically
    Feasible ................................................................................................................... 23

Section C: Impact of MATS Regulations- Power Plant Economics and Grid Reliability ....... 24

    Power Plant Economic Impacts ................................................................................. 24

    Grid Reliability Impacts ............................................................................................ 27

Section D: Modeling Results ........................................................................................... 31

    Summary ................................................................................................................. 31

    Modeling the Reliability and Cost of the MISO Generating Fleet Under Three Scenarios 32

    Reliability in each scenario ....................................................................................... 33

        Extent of the Capacity Shortfalls ........................................................................ 34

        Unserved MWh in Each Scenario ....................................................................... 37

        The Social Cost of Blackouts Using the Value of Lost Load (VoLL) ........................ 37

Hours of Capacity Shortfalls .................................................................. 39

Cost of replacement generation............................................................. 39

Conclusion:.................................................................................................. 48

Appendix 1: Modeling Assumptions ........................................................... 49

Appendix 2: Capacity Retirements and Additions in Each Scenario ............ 53

Appendix 3: Replacement Capacity Based on EPA Methodology for Resource Adequacy
.................................................................................................................. 58

Appendix 4: Resource Adequacy in Each Scenario ..................................... 59

# Executive Summary

On behalf of the North Dakota Transmission Authority (NDTA), the Center of the American Experiment prepared this study to analyze the potential impacts of EPA's proposed revisions to the Mercury and Air Toxics Standards (MATS) Rule on North Dakota's power generation and power grid reliability.

Our primary finding, which is drawn substantially from the Rule's administrative record, is that the proposed changes are likely not technologically feasible for lignite-based power generation facilities, will foreseeably result in the retirement of lignite power generation units, and will negatively impact consumers of electricity in the Midcontinent Independent Systems Operator (MISO) system by reducing the reliability of the electric grid and increasing costs for ratepayers.

Our analysis builds upon grid reliability data and forecasts from the Federal Energy Regulatory Commission (FERC) and the North American Electric Reliability Corporation (NERC), and it assesses what is likely to happen to grid reliability if the MATS Rule forces some or all of North Dakota's lignite power generation units to retire. We determined that the closure of lignite-fired powered power plants in the MISO footprint would increase the severity of projected future capacity shortfalls, i.e. rolling blackouts, in the MISO system even if these resources are replaced with wind, solar, battery storage, and natural gas plants. In reaching that determination, we have accepted EPA's estimates for capacity values of intermittent and thermal resources.

Moreover, building such replacement resources would come at a great cost to MISO ratepayers. The existing lignite facilities are largely depreciated assets that generate large quantities of dispatchable, low-cost electricity. Replacing these lignite facilities with new wind, solar, natural gas, and battery storage facilities would cost an additional $1.9 billion to $3.8 billion through 2035, compared to operating the current lignite facilities under status quo conditions.

MISO residents would also suffer economic damages from the increased severity of rolling blackouts. Accounting for projected increases in demand for electricity, we assess that if the MATS Rule goes into effect in the near future, by 2035, the MISO grid will experience up to an additional 73,699 megawatt hours (MWh) of unserved load, with an economic cost of up to $1.05 billion based on the Value of Lost Load (VoLL) criteria, which can be thought of as the Social Cost of Blackouts.

# Section A: North Dakota's Power Environment

## North Dakota Transmission Authority (NDTA)

The North Dakota Transmission Authority (NDTA) was established in 2005 by the North Dakota Legislative Assembly at the behest of the North Dakota Industrial Commission. Its primary mandate is to facilitate the growth of transmission infrastructure in North Dakota. The Authority serves as a pivotal force in encouraging new investments in transmission by aiding in facilitation, financing, development, and acquisition of transmission assets necessary to support the expansion of both lignite and wind energy projects in the state.

Operating as a 'builder of last resort,' the NDTA intervenes when private enterprises are unable or unwilling to undertake transmission projects on their own. Its membership, as stipulated by statute, comprises the members of the North Dakota Industrial Commission, including Governor, Attorney General, and Agriculture Commissioner.

Statutory authority for the North Dakota Transmission Authority (NDTA) is enshrined in Chapter 17-05 of the North Dakota Century Code. Specifically, Section 17-05-05 N.D.C.C. outlines the powers vested in the Authority, which include:

1. Granting or loaning money.

2. Issuing revenue bonds, with an upper limit of $800 million.

3. Entering into lease-sale contracts.

4. Owning, leasing, renting, and disposing of transmission facilities.

5. Entering contracts for the construction, maintenance, and operation of transmission facilities.

6. Conducting investigations, planning, prioritizing, and proposing transmission corridors.

7. Participating in regional transmission organizations.

In both project development and legislative initiatives, the North Dakota Transmission Authority (NDTA) plays an active role in enhancing the state's energy export capabilities and expanding transmission infrastructure to meet growing demand within North Dakota. Key to its success is a deep understanding of the technical and political complexities associated with energy transmission from generation sources to end-users. The Authority conducts outreach to existing transmission system owners, operators, and potential developers to grasp the intricacies of successful transmission infrastructure development. Additionally, collaboration with state and federal officials is essential to ensure that legislation and public policies support the efficient movement of electricity generated from North Dakota's abundant energy resources to local, regional, and national markets.

As the energy landscape evolves with a greater emphasis on intermittent generation resources, transmission planning becomes increasingly intricate. Changes in the generation mix and the redistribution of generation resource locations impose strains on existing transmission networks,

potentially altering flow directions within the network. A significant aspect of the Authority's responsibilities involves closely monitoring regional transmission planning efforts. This includes observing the activities of regional transmission organizations (RTOs) recognized by the Federal Energy Regulatory Commission (FERC), which oversee the efficient and reliable operation of the transmission grid. While RTOs do not own transmission assets, they facilitate non-discriminatory access to the electric grid, manage congestion, ensure reliability, and oversee planning, expansion, and interregional coordination of electric transmission.

Many North Dakota service providers are participants in the Midcontinent Independent System Operator (MISO), covering the territories of several utilities and transmission developers. Additionally, some entities are part of the Southwest Power Pool (SPP), broadening the scope of transmission planning. Together, North Dakota utilities and transmission developers contribute to a complex system overseeing the transmission of over 200,000 megawatts of electricity across 100,000 miles of transmission lines, serving homes and businesses in multiple states.

MISO and SPP also operate power markets within their respective territories, managing pricing for electricity sales and purchases. This process determines which generating units supply electricity and provide ancillary services to maintain voltage and reliability. Overall, the NDTA's involvement in regional transmission planning and coordination is crucial for ensuring the reliability, efficiency, and affordability of electricity transmission across North Dakota and beyond.



*FERC-Recognized Regional Transmission Organizations and Independent System Operators*

*(www.ferc.gov)*

## Generation Adequacy, Transmission Capacity & Load Forecast Studies

The North Dakota Transmission Authority (NDTA) conducts periodic independent evaluations to assess the adequacy of transmission infrastructure in the state. In 2023, the NDTA commissioned two generation resource adequacy studies, one for the Midcontinent Independent System Operator (MISO) and another for the Southwest Power Pool (SPP). Additionally, the NDTA recently completed a generation resource adequacy study examining the impact of the EPA's proposed Mercury and Air Toxics Standards (MATS) Rule. A transmission capacity study commissioned by the NDTA is scheduled for completion in the summer of 2024.

Regular load forecast studies are also commissioned by the NDTA, with the most recent study

completed in 2021. This study, conducted by Barr Engineering, provided an update to the Power Forecast 2019, projecting energy demand growth over the next 20 years. The 2021 update incorporates factors such as industries expressing interest in locating in North Dakota, abundant natural gas availability from the Bakken wells, and the potential for carbon capture and sequestration from various sources. The 2021 update and the full study can be obtained from the North Dakota Industrial Commission website: Power Forecast Study – 2021 Update, https://www.ndic.nd.gov/sites/www/files/documents/Transmission-Authority/Publications/ta-annualreport-21.pdf

The Power Forecast 2021 Update projects a 10,000 GWhr increase in energy demand over the next two decades under the consensus scenario, requiring approximately 2200 to 2500 MW of additional capacity to meet demand. These projections are closely tied to industrial development forecasts and are coordinated with forecasts used by the North Dakota Pipeline Authority. These projections were highly dependent on industrial development and are premised on new federal regulations not forcing the early retirement of even more electric generation units.

Meeting this growing demand poses significant challenges for utilities responsible for providing reliable service. While there is considerable interest in increasing wind and solar generation, natural gas generation is also essential to provide stability to weather-dependent renewable sources. Importantly, load growth across the United States is driven by the electrification of transportation, heating/cooling systems, data centers, and manufacturing initiatives.

Studies consistently highlight the critical importance of maintaining existing dispatchable generation to prevent grid reliability failures. Ensuring uninterrupted power supply is paramount for national security, public safety, food supply, and overall economic stability. The NDTA's ongoing assessments and proactive planning are crucial for meeting the evolving energy needs of North Dakota while maintaining grid reliability and resilience.

The timing and implementation of resources to meet this growing demand is a significant challenge for the utilities. Importantly, electric demand growth across the United States over the next several decades is projected to be dramatic due to the electrification of transportation, home heating/conditioning, data center and artificial intelligence centers, as well as the effort to bring manufacturing back to the USA. Studies by NDTA and others all point to the critical need to keep all existing dispatchable generation online to avoid catastrophic grid reliability failures, and have been warning that the push to force the retirement of reliable, dispatchable fossil fuel generation units is occurring before it is projected there will be sufficient intermittent units in place to cover the anticipated increase in demand. And when demand for electricity exceeds the dispatchable supply, the foreseeable result will be blackouts or energy rationing.

## Current North Dakota Generation Resources

Here is the current breakdown of North Dakota's generation resources:

1. Renewable Generation:
   - Wind Generation: North Dakota has 4,250 MW of wind generation capacity in service, making it a significant contributor to the state's renewable energy portfolio. The average capacity factor for these generating facilities is 40% to 42%.
   - The 4,000 MW of wind generation receives a reduced capacity accreditation in the ISO of approximately 600 MW since it is intermittent. This is representative of the

amount that is estimated to be available for the peak demand in the summer.
- Solar Generation: Although North Dakota currently lacks utility-scale solar generation facilities in operation, some projects are in the queues of regional transmission organizations like MISO and SPP, indicating potential future development in this area.

2. Thermal Coal Generation:
   - North Dakota currently operates thermal coal generation at six locations, comprising a total of 10 generating units with a combined capacity of approximately 4,048 MW.
   - The average capacity factor for these generating plants ranged from 65% to 91% in 2021, excluding the retired Heskett Station.
   - Rainbow Energy operates the Coal Creek Station and the DC transmission line that transports ND produced energy to the Minneapolis region. Rainbow Energy is assessing a CO2 capture project for the facility. In addition, approximately 400 MW of wind generation is planned for that area of McLean County to utilize the capacity on the DC line.

3. Hydro Generation:
   - North Dakota has one hydro generation site equipped with 5 units, boasting a total capacity of 614 MW.
   - However, the average capacity factor declined to approximately 43% in 2021 due to limitations imposed by water flow in the river, particularly during drought years.

4. Natural Gas Generation:
   - North Dakota operates three sites for electric generation utilizing natural gas, comprising 21 generating units with a total capacity of 596.3 MW.
   - These units include reciprocating engines and gas turbines, with variation in summer capacity influenced by the performance of gas generators in hot weather.
   - Total natural gas generation in North Dakota remained steady from 2019 through 2021, amounting to 1.445 GWhr in 2021.

5. Total Generation:
   - The combined total capacity of all types of utility-scale generation in North Dakota is approximately 8,863 MW.
   - Wind generation receives a reduced capacity accreditation in the ISO of approximately 600 MW due to its intermittent nature, down from 4,250MW of installed capacity, representing the estimated amount available during peak summer demand. However, newer installations have demonstrated slightly higher capacity for accreditation.

This comprehensive overview underscores the diverse mix of generation resources in North Dakota, with significant contributions from wind, coal, hydro, and natural gas. Continued assessment and adaptation to evolving energy needs and market dynamics are essential for ensuring a reliable and sustainable energy future for the state.



energy sites of
NORTH DAKOTA

| | | | |
|---|---|---|---|
| Natural Gas Processing | Coal-Based Generation | Lignite Mine | Hydro Power |
| Wind Farm | Synfuels Plant | Ethanol Plant | Petroleum Refinery |
| Solar Farm | Biodiesel Plant | Recovered Energy Generation | Peaking Station |
| Renewable Diesel Refinery | Bakken Formation | Oil Fields | |

+ Map courtesy of Bismarck State College National Energy Center of Excellence.

## Electric Generation Market & Utilization

In recent decades, North Dakota has emerged as a significant exporter of electricity, primarily fueled by the development of thermal lignite generation in the western part of the state since the 1960s. Concurrently, transmission infrastructure has been expanded to facilitate the export of electricity to markets predominantly situated to the east. Moreover, North Dakota has garnered recognition as an excellent source of wind generation, leading to additional transmission development to accommodate the transmission of this renewable energy to markets.

According to data from the Energy Information Administration, in 2020, North Dakota generated a total of 42,705 MWh of electricity from all sources, with 46% of this total being exported beyond the state's borders over two large high voltage direct current lines (HVDC), which serve load in the neighboring state of Minnesota and multiple 345kv and 230kv alternating current (AC) transmission lines serving surrounding states. Wind generation accounted for 31% of North Dakota's total electricity generation in 2020, highlighting the growing significance of renewable

energy in the state's energy portfolio. Notably, industrial demand in North Dakota experienced substantial growth, expanding by nearly 11% in 2020.

While demand for electricity in markets outside of North Dakota, and in most areas within the state, has remained relatively stable in recent years, the Bakken region has witnessed notable demand growth. Over the past 16 years, total electricity generation in North Dakota has increased from 29,936 MWh to 42,705 MWh, with retail sales climbing from 10,516 MWh to 22,975 MWh. This growth is primarily attributed to the burgeoning development of the Bakken oil fields. Industrial consumption in North Dakota also witnessed a robust increase of over 11% in 2020, with power forecasts projecting a continued upward trajectory in demand.



## Grid Resource Adequacy and Threats to Growth Opportunities

In 2023, both the MISO and SPP grid operators issued warnings about the adequacy of generation resources to meet peak demand situations. This highlights a growing concern that the desired pace of change towards a more sustainable energy future is outpacing the achievable pace of transformation. This concern is underscored by the stark increase in grid events necessitating the activation of emergency procedures. **For instance, prior to 2016, MISO had no instances requiring the use of emergency procedures, but since then, there have been 48 Maximum Generation events.**

Many experts in the industry project that, despite ambitious goals, realistic scenarios still foresee a substantial dependence on fossil fuel energy—potentially up to 50%—even by 2050. While efforts to decarbonize fossil fuel resources are underway, achieving complete carbon neutrality or a fully renewable energy grid by 2050 appears increasingly unlikely. The scalability and

affordability of storage technology, particularly for renewable energy sources, remain significant challenges.

In response to these challenges, Governor Burgum has issued a visionary goal for North Dakota to achieve carbon neutrality in its combined energy and agriculture sectors by 2030. Governor Burgum's approach emphasizes innovation over mandates, aiming to attract industries and technologies that support this goal to the state. The initiative seeks to leverage advancements in carbon capture and sequestration technologies to retain conventional generation in North Dakota while also promoting sustainable agricultural practices and other innovative solutions, such as CO2 sequestration from ethanol production and enhanced oil recovery. These efforts demonstrate a commitment to proactive and pragmatic solutions to address the complexities of achieving carbon neutrality in the energy and agriculture sectors.

The state's vision for a decarbonized energy generation future faces significant challenges due to the individual and cumulative impact of expansive federal rulemakings. These regulations would curtail the flexibility to achieve the 2030 goal through the deployment of carbon capture and sequestration (CCS) technologies. Furthermore, they would impose financial burdens on electric cooperatives and utilities with limited resources, diverting investment away from future growth options toward retrofitting existing facilities with costly emissions technologies to comply with new federal requirements.

This regulatory burden not only impedes progress towards decarbonization but also introduces opportunity costs for utilities and cooperatives. The funds that would otherwise be allocated for future growth and innovation in clean energy solutions are instead diverted to compliance measures, hindering the state's ability to transition to a more sustainable energy future efficiently and effectively.

Ultimately, the restrictive nature of these federal rulemakings poses a significant obstacle to North Dakota's efforts to achieve its decarbonization goals and undermines the state's vision for a cleaner and more sustainable energy generation landscape. It highlights the need for a balanced approach to regulation that supports innovation and investment in carbon reduction technologies while also allowing for continued economic growth and development in the energy sector.

## Grid Reliability Is Already Vulnerable

The fragility of grid reliability is already evident as warnings have been issued due to the declining ratio of dispatchable and intermittent generation supplies. This concerning trend poses significant threats to public safety, economic stability, and national security. Grid reliability is vital for ensuring continuous access to essential services, such as food production and military operations. Dispatchable reliable generation forms the backbone of grid stability, enabling the balancing of supply and demand fluctuations. Failure to address these reliability concerns will compromise critical infrastructure and expose society to substantial risks. Urgent action is required to safeguard grid reliability and mitigate the potential consequences for public safety and national security.

## NERC's 2023 Reliability Risk Assessment

The North American Electric Reliability Council's 2023 Reliability Risk Assessment[1] are concerning as demonstrated in the slides below. The electrification of the US economy, data & AI center growth and the build it at home initiatives will substantially increase the demand for electricity generation and transmission.

NERC's 2023 Summer Reliability Assessment warns that two-thirds of North America is at risk of energy shortfalls this summer during periods of extreme demand. While there are no high-risk areas in this year's assessment, the number of areas identified as being at elevated risk has increased. The assessment finds that, while resources are adequate for normal summer peak demand, if summer temperatures spike, seven areas — the U.S. West, SPP and MISO, ERCOT, SERC Central, New England and Ontario — may face supply shortages during higher demand levels.

"Increased, rapid deployment of wind, solar and batteries have made a positive impact," said Mark Olson, NERC's manager of Reliability Assessments. "However, generator retirements continue to increase the risks associated with extreme summer temperatures, which factors into potential supply shortages in the western two-thirds of North America if summer temperatures spike."

The North American Electric Reliability Corporation (NERC) recently released its 2023 Long-Term Reliability Assessment (LTRA), which found MISO is the region most at risk of capacity shortfalls in the years spanning from 2024 to 2028 due to the retirement of thermal resources with inadequate reliable generation coming online to replace them.[2]

---

[1] NERC. "North American Reliability Assessment." North American Electric Reliability Corporation, May 2023, https://www.nerc.com/news/Headlines%20DL/Summer%20Reliability%20Assessment%20Announcement%20May%202023.pdf.
[2] North American Electric Reliability Corporation, "2023 Long-Term Reliability Assessment," December, 2023, https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf.



**Figure 1: Risk Area Summary 2024–2028[8]**

*MISO is the region most at risk of rolling blackouts in the near future.*

In 2028, MISO is projected to have a 4.7 GW capacity shortfall if expected generator retirements occur despite the addition of new resources that total over 12 GW, leaving MISO at risk of load shedding during normal peak conditions. This is because the new wind and solar resources that are being built have significantly lower accreditation values than the older coal, natural gas, and nuclear resources that are retiring.[3]

## MISO's Response to the Reliability Imperative (2024)

On February 26, 2024, the Midcontinent Independent System Operator (MISO) released "MISO's Response to the Reliability Imperative[4]," a report which is updated periodically to reflect changing conditions in the 15-state MISO region that extends through the middle of the U.S. and into Canada. MISO's new report explains the disturbing outlook for electric reliability in its footprint unless urgent action is taken. The main reasons for this warning are the pace of premature retirements of dispatchable fossil generation and the resulting loss of accredited capacity and reliability attributes.

From 2014 to 2024, surplus reserve margins in MISO have been exhausted through load growth and unit retirements. Since 2022, MISO has been operating near the level of minimum reserve

---

[3] Midcontinent Independent Systems Operator, "MISO's Response to the Reliability Imperative," February, 2024, https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20Final504018.pdf?v=20 240221104216.

[4] MISO. "MISO'S Response to the Reliability Imperative Updated February 2024." MISO, February 2024, https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20Final504018.pdf?v=20 240221104216.

margin requirements.[5]

According to the Reliability Imperative, MISO uses an annual planning tool called the OMS-MISO Survey to compile information about new resources utilities and states plan to build and older assets they intend to retire. The 2023 survey shows the region's level of "committed" resources declining going forward, with a potential shortfall of 2.1 GW occurring as soon as 2025 and growing larger over time.

MISO lists U.S. Environmental Protection Agency (EPA) regulations that prompt existing coal and gas resources to retire sooner than they otherwise would as a compounding reason for growing challenges to grid reliability. From the report, there is a section titled, "EPA Regulations Could Accelerate Retirements of Dispatchable Resources," which states:

> "While MISO is fuel- and technology-neutral, MISO does have a responsibility to inform state and federal regulations that could jeopardize electric reliability. **In the view of MISO, several other grid operators, and numerous utilities and states, the U.S. Environmental Protection Agency (EPA) has issued a number of regulations that could threaten reliability in the MISO region and beyond.**
>
> In May 2023, for example, EPA proposed a rule to regulate carbon emissions from all existing coal plants, certain existing gas plants and all new gas plants. As proposed, the rule would require existing coal and gas resources to either retire by certain dates or else retrofit with costly, emerging technologies such as carbon-capture and storage (CCS) or co-firing with low-carbon hydrogen.
>
> MISO and many other industry entities believe that while CCS and hydrogen co-firing technologies show promise, they are not yet viable at grid scale — and there are no assurances they will become available on EPA's optimistic timeline. **If EPA's proposed rule drives coal and gas resources to retire before enough replacement capacity is built with the critical attributes the system needs, grid reliability will be compromised.** The proposed rule may also have a chilling effect on attracting the capital investment needed to build new dispatchable resources."

Despite these reliability warnings issued by MISO, EPA did not consider the reliability impacts of the proposed MATS rules required emission control upgrades and additions to units. It is likely that many units that would have to incur millions of dollars to retrofit emissions controls to comply with this proposal would not do so.[6]

In light of these shortcomings, the NDTA contracted with Center of the American Experiment to model the impacts of the MATS rules on resource adequacy, reliability, and cost of electricity to consumers. The findings of this analysis are detailed in Section D.

---

[5] Midcontinent Independent Systems Operator, "MISO's Response to the Reliability Imperative," February, 2024, https://cdn.misoenergy.org/2024%20Reliability%20Imperative%20report%20Feb.%2021%20Final504018.pdf?v=20240221104216.

[6] Rae E. Cronmiller, "Comments on Proposed National Emission Standards for Hazardous Air Pollution: Coal-and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," The National Rural Electric Cooperative Association, June 23, 2023, Attention Docket ID NO. EPA-HQ-OAR-2018-0794.

## Conclusion: The Long Term Reliability of the MISO Grid is Already Precarious

As the state agency responsible for the strategic buildout and framework of electricity distribution, the North Dakota Transmission Authority (NDTA) is deeply concerned about the potential impact of federal rulemakings on the generation fleet in North Dakota and the ability to support future growth initiatives. The current strain on the electric transmission system due to load growth is already posing significant challenges to grid reliability, particularly in areas facing transmission constraints and limited access to dispatchable generation.

The escalating frequency of grid events requiring emergency procedures, such as the 48 Maximum Generation events in MISO since 2016 and the increasing number of alerts issued by SPP, over 194 alerts issued in 2022, underscores the urgency of addressing transmission congestion and bolstering reliable generation capacity. The economic growth and security of North Dakota are directly tied to the timely development of new transmission facilities in tandem with dependable dispatchable electric generation.

The impacts of grid strain extend beyond the energy sector, affecting multiple industries, ratepayers, and overall economic stability. Volatile wholesale prices and transmission congestion undermine business operations and investment confidence, hindering economic growth and prosperity. Moreover, reliable electricity supply is critical for essential services, including Department of Defense facilities, underscoring the broader implications of grid reliability issues. Achieving a balanced generation portfolio requires careful consideration of reliability and resilience under all weather conditions, especially amidst the electrification of America and the imperative to safeguard public welfare and security.

Additionally, over 50% of the electricity generated in North Dakota is exported to neighboring states, magnifying the ripple effects of any regulations impacting dispatchable electricity generation resources. By responsibly managing the generation portfolio and prioritizing generation adequacy, North Dakota and the nation can seize significant opportunities for economic growth, innovation, and sustainable development.

## Section B: The Proposed MATS Rule Will Dramatically Affect North Dakota Lignite Electric Generating Units

The revised MATS Rule includes a proposal to eliminate the "low rank coal" subcategory established for lignite-powered facilities by requiring these facilities to comply with the same mercury emission limitation that currently applies to Electric Generating Units (EGUs) combusting bituminous and subbituminous coals, which is 1.2 pounds per trillion British thermal units of heat input (lb/TBtu). EPA's proposal is a substantial lowering of the current mercury

limitation for lignite fired EGUs, which is 4.0 lb/TBtu.[7,8] The proposal also includes a significant reduction in the particulate matter standard applicable to all existing units from 0.03 lb/mmBtu to 0.01 lb/mmBtu. Because North Dakota is somewhat unique to the degree in which its power generation relies upon lignite coal, the compliance costs for this Rule, while likely to substantial for coal plants all around the country, will be most acutely inflicted upon North Dakota's lignite-based power generation facilities.

Numerous comments in the administrative record, including from the regulated facilities in North Dakota and the North Dakota Department of Environmental Quality, provided EPA with notice that the new emission standards are not technologically feasible, will impose crippling compliance costs that may require facility retirement, and will result in a significant portion of the dispatchable power provided by coal-generation facilities being taken off the grid. This report will summarize some of those concerns in the section that follows, however, a full study of the technological feasibility of complying with the new emissions standards is beyond the scope of this report. For purposes of this report, we assume the regulated facilities and state regulator were forthright in their concerns about the feasibility of lignite-based facilities meeting the new standards.

## The Proposed MATS Rule Eliminates the Lignite Subcategory for Mercury Emissions

Although the Proposed Rule affects all coal electrical generating utilities (EGUs), reducing the lignite emissions standards to levels of other coal ranks effectively eliminates the lignite sub-category and would have drastic consequences for North Dakota's lignite EGU industry.[9] EPA original decision to regulate separately a subcategory of lignite units was well-supported with documented information and a thorough analysis. In its comments filed in this Docket, on June 22, 2023, the North Dakota Department of Environmental Quality (hereafter DEQ) encouraged EPA to review that prior determination and reaffirm the need for a lignite subcategory and the associated emissions standards.[10]

Specifically, DEQ summarized the original MATS proposal in 2011 and final MATS rule in 2012, in which EPA presented a body of evidence in support of the lignite category. For example, the EPA wrote:

> "For Hg emissions from coal-fired units, we have determined that different emission
> limits for the two subcategories are warranted. There were no EGUs designed to burn
> a non-agglomerating virgin coal having a calorific value (moist, mineral matter free

[7] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[8] [8] J. Cichanowicz et al., *Technical Comments on National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-fired Electric Utility Steam Generating Units Review of Residual Risk and Technology*, (June 2, 2023) ("Cichanowicz Report").

[9] EPA characterizes lignite as "low rank virgin coal". 88 Fed. Reg. 24,854, 24,875. For this comment letter, lignite will be used in place of low rank virgin coal.

[10] David Glatt, P.E., "Comments on the Proposed Rulemaking Titled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review" (Docket ID No. EPA-HQOAR-2018-0794)," On Behalf of the North Dakota Department of Environmental Quality, June 22, 2023.

basis) of 19,305 kJ/kg (8,300 Btu/lb) or less in an EGU with a height-to-depth ratio of 3.82 or greater among the top performing 12 percent of sources for Hg emissions, indicating a difference in the emissions for this HAP from these types of units.

The boiler of a coal-fired EGU designed to burn coal with that heat value is larger than a boiler designed to burn coals with higher heat values to account for the larger volume of coal that must be combusted to generate the desired level of electricity. Because the emissions of Hg are different between these two subcategories, we are proposing to establish different Hg emission limits for the two coal-fired subcategories."

As explained by DEQ, EPA has not provided any scientific justification to support abandoning the lignite subcategory and requiring those facilities to comply with the emission standards applicable to other coal types. The most EPA identified in support of its proposal was a reference to information nearly 30 years old, which predated EPA's original determination.

## The Proposed MATS Rule Will Not Provide Meaningful Human Health or Environmental Benefits

Section 112(f)(2) of the CAA directs EPA to assess the remaining residual public health and environmental risks posed by hazardous air pollutants (HAPs) emitted from the EGU source category.[11] Further regulation under MATS is required only if that residual risk assessment demonstrates that a tightening of the current HAP emission limitations is necessary to protect public health with an ample margin of safety or protect against adverse environmental effects.

When reviewing whether to revise the MATS Rule, EPA determined that further regulation of mercury and other HAPs would be unnecessary to address any remaining residual risk from any affected EGU within the source category. The stringent standards based on state-of-the-art control technologies that are currently imposed on coal-fired EGUs have already achieved significant reductions in HAP emissions. As EPA itself noted, the MATS rule has achieved steep reductions in HAP emission levels since 2010, including a 90 percent reduction in mercury, 96 percent reduction in acid gas HAPs, and an 81 percent reduction in non-mercury metal HAPs.[12]

Data from EPA and the U.N Global Mercury Assessment show mercury emissions from U.S. power plants are now so low they accounted for only 0.12 percent of global mercury emissions in 2022, assuming all other sources remained constant at 2018 levels.[13] These data demonstrate that

---

[11] J. Cichanowicz et al., *Technical Comments on National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-fired Electric Utility Steam Generating Units Review of Residual Risk and Technology*, at 29, Figure 6-7 (June 2, 2023) ("Cichanowicz Report").

[12] Fact Sheet, *EPA's Proposal to Strengthen and Update the Mercury and Air Toxics Standards for Power Plants, https://www.epa.gov/system/files/documents/2023-04/Fact%20Sheet_MATS%20RTR%20Proposed%20Rule.pdf*

[13] United Nations, "Global Mercury Assessment 2018," UN Environment Programme, August 21, 2019, https://wedocs.unep.org/bitstream/handle/20.500.11822/27579/GMA2018.pdf?sequence=1&isAllowed=y

US mercury emissions from power plants are lower than global cremation emissions, and North Dakota coal facilities emitted 9.25 times less mercury in 2021 than global cremations in 2018.[14]

| Mercury Emissions Estimates by Sector 2018 vs U.S. and N.D. Coal Plant Emissions | | |
|---|---|---|
| **Category** | **US Tons** | **Percent of Global Emissions** |
| Artisanal and small-scale mining | 921.42 | 37.68 |
| Global stationary combustion of coal | 517.45 | 21.16 |
| Non-ferrous metals production | 359.32 | 14.69 |
| Cement production | 256.48 | 10.49 |
| Waste from products | 161.63 | 6.61 |
| Vinyl chlorine monomer | 64.09 | 2.62 |
| Biomass burning | 57.05 | 2.33 |
| Ferrous metals production | 43.89 | 1.79 |
| Chlor alkali production | 16.66 | 0.68 |
| Waste incineration | 16.44 | 0.67 |
| Oil refining | 15.81 | 0.65 |
| Stationary combustion of oil and gas | 7.84 | 0.32 |
| Cremation | 4.14 | 0.17 |
| US stationary combustion of coal | 2.90 | 0.12 |
| North Dakota coal combustion | 0.46 | 0.018 |

As the above chart indicates: the annual mercury emissions from global cremations (where the mercury primarily comes from individuals with dental fillings) exceed the mercury annually emitted by all coal-fired EGUs in the United States combined, and is orders of magnitude more than the mercury emissions from all coal-fired EGUs in North Dakota.[15]

Moreover, the Administrative Record indicates EPA has performed a comprehensive and detailed risk assessment that clearly documents the negligible remaining residual risks posed by the very low amount of HAPs now being emitted by coal-fired EGUs. EPA first performed that risk assessment in 2020, which concluded that "both the actual and allowable inhalation cancer risks to the individual most exposed were below 100-in-1 million, which is the presumptive limit of

[14] ERM Sustainability Initiative, "Benchmarking Air Emissions of the 100 Largest Power Producers in the United States," Interactive Tool, accessed February 29, 2024, https://www.sustainability.com/thinking/benchmarking-air-emissions-100-largest-us-power-producers/
[15] UN Environmental Programme. (2018). Global Mercury Report 2018, Technical Background Report to the Global Mercury Assessment. https://www.unenvironment.org/resources/publication/global-mercury-assessment-technical-background-report

acceptability" for protecting public health with an adequate margin of safety.[16] Similarly, EPA's risk assessment supports the conclusion that residual risks of HAP emissions from the EGU source category are "acceptable" for other potential public health effects, including both chronic and acute non-cancer effects.[17]

These conclusions have been confirmed by the detailed reevaluation of the 2020 risk assessment that the Agency is now completing as part of the current rule-making action. That EPA reevaluation clearly demonstrates that the 2020 risk assessment did not contain any significant methodological or factual errors that could call into question the results and conclusions reached in the 2020 risk assessment. Most notably, EPA used well-accepted approaches and methodologies for performing a residual risk analysis that adhere to the requirements of the statute and are consistent with prior residual risk assessments performed by EPA over the years for other industry sectors.[18]

The results from both residual risk assessments can lead to only one rational conclusion: the current MATS limitations provide an ample margin of safety to protect public health in accordance with CAA section 112.

The DEQ filed comments addressing these points and asking EPA to provide a better health benefit justification than the rationale currently included in the Regulatory Impacts Analysis (RIA).[19] In particular, DEQ noted that EPA cannot rely on non-HAPs' co-benefits to justify the Proposed Rule, and EPA has not identified any HAP-related benefits that would be sufficient to justify the Proposed Rule.  The agency also voiced skepticism over what it called EPA' s suspect characterization of the health benefits that it identified, which is quoted below:

> While the screening analysis that EPA completed suggests that exposures associated with mercury emitted from EGUs, including lignite-fired EGUs, are below levels of concern from a public health standpoint, further reductions in these emissions should further decrease fish burden and exposure through fish consumption including exposures to subsistence fishers.[20]

DEQ's well-founded concern is that EPA's admission that current exposure associated with mercury is below levels of concern is directly inconsistent with, not support of, EPA's proposal for a lower standard.

DEQ commented that this theme, unfortunately, is consistent across the entire "Benefits Analysis" section of the RIA, citing another example of this inconsistency, which is quoted below:

> "Regarding the potential benefits of the rule from projected HAP reductions, we note that these are discussed only qualitatively and not quantitatively

---

[16] 88 Fed. Reg. at 24,865.
[17] *Id*. at 24,865-66.
[18] 88 Fed. Reg. at 24,865.
[19] Regulatory Impact Analysis for the Proposed National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review (Apr. 2023), Docket ID: EPA-HQ-OAR-2018-0794-5837.
[20] *Id.* At p. 0-8.

....Overall, the uncertainty associated with modeling potential of benefits of mercury reduction for fish consumers would be sufficiently large as to compromise the utility of those benefit estimates-though importantly such uncertainty does not decrease our confidence that reductions in emissions should result in reduced exposures of HAP to the general population, including methylmercury exposures to subsistence fishers located near these facilities. Further, estimated risks from exposure to non-mercury metal HAP were not expected to exceed acceptable levels, although we note that these emissions reductions should result in decreased exposure to HAP for individuals living near these facilities."[21]

Comments filed by the Lignite Energy Council (LEC) further emphasize the point. LEC stated that according to the risk review EPA conducted in 2020, which EPA has proposed to reaffirm, the risks from current emissions of hazardous air pollutants (HAP) emitted by coal-fired power plants are several orders of magnitude below what EPA deems sufficient to satisfy the Clean Air Act.[22] LEC points out that EPA has for decades found risks to be acceptable with an ample margin of safety if maximum individual excess cancer risks presented by any single facility is less than "100-in-1 million." In comparison, EPA's analysis of the coal- and oil-fired electric utility source category recognizes the risk it presents is now at one tenth of that acceptable level, with a maximum risk from any individual facility of "9-in-1 million."

However, even that value vastly overstates the risk associated with coal-fired power plants. The "9-in-1 million" risk level identified by EPA is only associated with a single, uncontrolled, residual oil-fired facility located in Puerto Rico.[23] What EPA's discussion of risk fails to recognize, but its analysis clearly shows, is that the highest level of risk presented by any coal-fired power plant is actually "0.3-in-1 million," more than 300 times lower than the threshold EPA deems acceptable.[24]

The level of risk presented by North Dakota lignite-powered plants is lower still. According to EPA's risk review, the maximum risks presented by any North Dakota lignite-fired power plant is "0.08-in-1 million," yet another order of magnitude lower than the highest risk from any coal-fired plant, and more than three orders of magnitude lower than EPA's "acceptable" level of risk with an "ample margin of safety."

---

[21] *Id.* at pp. 4-1 - 4-2.
[22] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.
[23] *Residual Risk Assessment for the Coal- and Oil-Fired EGU Source Category in Support of the 2020 Risk and Technology Review Final Rule*, Docket ID No. EPA-HQ-OAR-2018-0794-4553, App. 10, Tbls. 1 & 2a (Sept. 2019) ("Risk Assessment") (note that Table 2a is printed upside down in the final September 2019 version of the Residual Risk Assessment posted at www.regulations.gov, which may interfere with search commands; a searchable version of the same table is available in the December 2018 draft version, Docket ID No. ). *See also* 84 Fed. Reg. at 2699 ("There are only 4 facilities in the source category with cancer risk at or above 1-in-1 million, and all of them are located in Puerto Rico.").
[24] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

The risks from North Dakota lignite are so low that they are more easily expressed, not in a million, but in a *billion*—EPA has determined that the excess cancer risks from all North Dakota lignite plants fall between 5- and 80-in-1 billion.[25] Moreover, EPA's analysis indicates that those maximum risks are not associated with mercury.[26]

In fact, EPA's own analysis confirms the risks from North Dakota lignite-powered plants are so low they are little more than a rounding error that does not even qualify as a significant digit. In its analysis of the still low but relatively higher risk from the Puerto Rican oil-fired plants, EPA determined that one of those facilities presented a risk no greater than "1-in-1 million," even though EPA's modeling actually returned a risk level of "1.**09**-in-1 million."6 EPA discarded the extra ".09," apparently finding it too small to matter. However, that extra ".09" risk equates to "90-in-1 billion," and it is therefore higher than the *entire* risk identified for any North Dakota lignite plant.

## The Administrative Record Indicates the Mercury Standard of 1.2 lb./TBtu is Technically Unachievable for EGUs using North Dakota Lignite Coal

The Administrative Record for the proposed rule suggests EPA made numerous critical mistakes in assuming lignite fired EGUs can achieve a 1.2 Hg/lb limit with 90% Hg removal. As detailed in the Cichanowicz Report, Section 6, EPA assumed the characteristics of lignite and subbituminous coals are similar such that the Hg removal by emission controls capabilities is similar. In this light, EPA did not consider that the high presence of sulfur trioxide (SO3) in lignite coal combustion flue gas that significantly limits the Hg emissions reduction potential of emissions controls.[27]

Similarly, as noted by LEC, EPA's proposal references data obtained via an information collection request as indicative of the level of performance achievable at North Dakota lignite facilities, but that data only reflects relatively short-term testing that does not fully capture the significant variability of lignite coals. Also, unlike other types of facilities that may be able to blend coals to achieve greater consistency in the character of their fuel, all North Dakota lignite units are located at mine-mouth facilities without access to other coal types, and therefore depend entirely on the fuel extracted from the neighboring mine. As a result, changes in constituents between seams of lignite coal can result in a high level of variability in the emission rates that result from use of the coal as it is mined over time.[28]

While LEC agreed with EPA that the injection of activated carbon is the most effective means of reducing mercury emissions from lignite-powered units, LEC also criticized EPA for ignoring the well-known diminishing returns of injecting more carbon. With each marginal increase in carbon

---

[25] Risk Assessment, Tbl. 2a (indicating cancer risks of 8.07e-08, 3.09e-08, 1.31e-08, 1.21e-08, and 5.12e-09 for Facility NEI IDs 380578086511, 380578086311, 380558011011, 380578086511, 380578086611 (Milton R. Young, Leland Olds, Coal Creek, Antelope Valley, and Coyote).

[26] *Id*., at Tbl. 2a (indicating the target organ of the risk associated with the plants identified in note 5 is "respiratory").

[27] J. Cichanowicz et al., *Technical Comments on National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-fired Electric Utility Steam Generating Units Review of Residual Risk and Technology*, at 29, Figure 6-7 (June 2, 2023) ("Cichanowicz Report").

[28] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

injection, the incremental increase in emission reduction capability falls. Thus, injecting more and more carbon will not necessarily result in greater emission reductions beyond a certain injection level. LEC asked EPA to evaluate the effect of diminishing returns on its conclusion that North Dakota lignite-powered facilities can achieve the standard designed for all other units of 1.2 lb/TBtu.

EPA does not appear to have taken the above concerns into account in claiming lignite- powered facilities can achieve the performance levels achieved at subbituminous plants. As a result, EPA has significantly underestimated the level of control needed to achieve the proposed standard of 1.2 lb/TBtu. Contrary to the analysis EPA relies upon to justify lowering the standard for lignite plants, control efficiencies of greater than 90 percent would be needed for North Dakota lignite-powered facilities.[29] LEC's comments asked EPA to reconsider its proposal in light of these concerns, and in light of EPA's legal obligation to ensure all standards are "achievable," which means they "must be capable of being met under most adverse conditions which can reasonably be expected to recur."[30]

The Administrative Record indicates a key reason why EPA's proposed standards are unachievable is the chemical composition of North Dakota lignite. For example, lignite has different heat and moisture content than subbituminous coals. As a result, a greater volume of fuel and air is needed at lignite plants to produce the same heat input compared to subbituminous plants. Due to higher fuel and air flows, a much greater volume of sorbent is needed to achieve similar emission reductions, and the additional sorbent dramatically increases cost, and therefore reduces the cost-effectiveness, of the controls.[31]

Another distinguishing difference EPA appeared to overlook in its proposal is the higher sulfur concentration in North Dakota lignite relative to subbituminous Powder River Basin coal, which in turn produces a higher level of sulfur trioxide ("SO3"). In the past, EPA has worked with a consultant that recognized this reality as follow:

> With flue gas SO3 concentrations greater than 5-7 ppmv, the sorbent feed rate may be increased significantly to meet a high Hg removal and 90% or greater mercury removal may not be feasible in some cases. Based on commercial testing, capacity of activated carbon can be cut by as much as one half with an SO3 increase from just 5 ppmv to 10 ppmv.[32]

Cichanowicz et al. highlighted this passage from the S&L technology assessment and also noted that the presence of SO3 often affects capture rates in another way—by requiring units with measurable SO3 to be designed with higher gas temperature at the air heater exit to avoid corrosion that would otherwise occur if the SO3 is allowed to cool and condense on equipment

---

[29] Cichanowicz Report, at 25, Table 6-1.

[30] *White Stallion Energy Center, LLC v. EPA*, 748 F.3d 1222, 1251 (2014) (citing *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 431 n. 46 (D.C. Cir.1980)).

[31] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[32] Sargent & Lundy, *IPM Model – Updates to Cost and Performance for APC Technologies: Mercury Control Cost Development Methodology*, Project 12847-002, at 3 (Mar. 2013).

components. However, that higher exit gas temperature also impacts the effectiveness of sorbent injection systems—special-purpose tests on a fabric filter pilot plant showed an increase in gas temperature from 310ºF to 340ºF lowered sorbent Hg removal from 81% to 68%.[33] The higher levels of $SO_3$ formed by the higher sulfur content found in lignite fuels will inhibit the ability of injected sorbents to reduce mercury emissions at lignite plants to a far greater extent than at subbituminous plants.

LEC agreed with these concerns in its comments and raised another important consideration — the fact that, unlike subbituminous plants, selective catalytic reduction (SCR) is technically infeasible on North Dakota lignite, due to its chemical composition. Although SCR systems are primarily installed for the control of nitrogen oxides ($NO_X$), SCR can enhance the oxidation of elemental mercury ("$Hg^0$") which facilitates removal in downstream control equipment, such as wet flue gas desulfurization (FGD) systems.[34] The higher level of mercury control achievable with an SCR is almost certainly why the one lignite plant (Oak Grove) evaluated by EPA as part of its review of the MATS RTR appears capable of achieving the mercury limit set for other coal ranks—it has an SCR that cannot be installed on North Dakota lignite facilities.[35]

LEC's comments also highlighted the experience of two LEC members that recently evaluated the difference in mercury control achieved by plants using subbituminous coal equipped with an SCR and plants using lignite coal without an SCR. Based on those evaluations, North Dakota lignite-powered facilities were found to have much greater difficulty reducing mercury emissions, despite using more than three times the amount of halogenated activated carbon than the subbituminous plant.

In the past, EPA has questioned whether SCR is technically feasible for North Dakota lignite-powered facilities, and recent research has confirmed that the significant challenges associated with using SCR on North Dakota lignite remain unresolved.[36] Although SCR has been demonstrated on the types of lignite found in other parts of the country, North Dakota lignite differs substantially in chemical makeup because it contains a much higher concentration of alkali metals (*e.g.*, sodium and potassium) that render the catalyst ineffective.[37]

In particular, the relatively high concentration of sodium in North Dakota lignite forms vapor, condenses, and then coats other particles, or it forms its own particles at a size range of 0.02-0.05 μm. As a vapor or as a very small particle, the sodium will pass through any upstream emissions control equipment (*e.g.*, electrostatic precipitators and scrubbers), and thus will reach the SCR regardless of whether the SCR is located before other emission control devices (high-dust configuration) or after those other controls (low-dust or tail-end configurations).[38]

---

[33] Sjostrom 2016.

[34] 88 Fed. Reg. at 24875.

[35] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[36] *See* Draft SIP, App. D, at D.2.c-5 (citing Benson, Schulte, Patwardhan, Jones (2021) "The Formation and Fate of Aerosols in Combustion Systems for SCR $NO_X$ Control Strategies" A&WMA's 114th Annual Conference, #983723).

[37] *Id.*

[38] *Id.*

Once the sodium particles reach the SCR, they plug the pores of the catalyst, which are the key feature that allows for improved oxidation of other pollutants. The sodium also poisons the catalyst both inside the pores and on the surface, rendering the active component of the catalyst inactive. Recent efforts to address these concerns through either cleaning or regeneration of the catalyst have not been successful, even at pilot scale. A study recently cited by DEQ in its regional haze plan provides additional details on these efforts and the unsolved technical challenges that remain regarding the impact of alkali metals in North Dakota lignite on the technical feasibility of SCR.[39]

According to LEC, its members report that efforts to identify a willing vendor for an SCR on a North Dakota lignite unit have been unsuccessful—all vendors have declined to offer SCR for use on North Dakota lignite once they have closely reviewed the unique characteristics that make SCR infeasible on that particular fuel.[40]

In short, the Administrative Record and other available evidence indicates that North Dakota lignite-powered facilities will likely not be able to meet the revised emission standards EPA is proposing for the MATS Rule.

## The Administrative Record Indicates the Lower PM Standard May Also Not Be Technically Feasible

In addition to imposing a more stringent mercury standard on lignite by essentially eliminating the subcategory, EPA's proposal also lowers the standard on fPM for all existing units to the level previously deemed achievable only by new units. However, like its proposed Hg standard for lignite, EPA's proposal to revise the PM standard for all coal types remains unjustified by any demonstration of potential human health or environmental benefits.

The LEC's comments detail particular concerns associated with EPA's failure to provide a reasonable justification for so dramatically reducing the PM limit.[41] As LEC noted, the risks that the MATS Rule is designed to address have already been eliminated, down to several orders of magnitude below the level at which Congress directed EPA to stop regulating. The highest residual risk for the entire source category, which is based on an oil-fired unit, is just one tenth of EPA's acceptable level of risk, and the highest risk from any coal plant is more than an order of magnitude below the risk presented by oil-fired units.

Furthermore, the Administrative Record suggests that EPA's analysis of the achievability of the new 0.01 lb/mmBtu standard is based on an arbitrary data set, and that analysis also suffers from a lack of transparency. Specifically, commenters observed that EPA relies on a Sargent & Lundy memorandum that lacks sufficient detail or supporting documentation to verify the assumptions made, essentially hiding much of the agency's thought process behind the claim that the

---

[39] *Id.*

[40] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[41] *Id.*

information on which it is based is not available in public forums.[42] In doing so, EPA seemingly commits what it has previously cited as error in plans developed by states and industry—failing to provide sufficient information to understand the reasoning underlying key conclusions.[43]

Moreover, the Administrative Record indicates the combined effect of both the proposal to require universal use of CEMS and the lower standard of 0.01 lb/mmBtu will present a compounded challenge if finalized as proposed. Commenters indicated that the difficulty in demonstrating achievement of the new standard will be exacerbated by the requirement to use the less accurate CEMS, and the difficulty in using CEMS will be exacerbated by the dramatically lower standard.[44] In particular, serious concerns remain with respect to whether a fPM CEMS can effectively estimate emission rates at such low levels, or whether emissions that low will be too small for a CEMS to differentiate compliance from a false reading.[45] EPA attempts to allay these fears by claiming existing units can simply follow in the footsteps of new units, since new units have been subject to a CEMS requirement with a fPM emission limit of 0.090 lb/megawatt-hour since the inception of MATS.[46] **But that assurance provides no comfort—there are no new units.[47]**

In light of these shortcomings, the NDTA contracted with Center of the American Experiment to model the impacts of the MATS rules on resource adequacy, reliability, and cost of electricity to consumers. The findings of this analysis are detailed in Section D.

# Section C: Impact of MATS Regulations- Power Plant Economics and Grid Reliability

## Power Plant Economic Impacts

The economic impacts for a lignite power plant from the Mercury and Air Toxics Standards (MATS) finalized rule can be substantial. The updated MATS rule, if implemented by the

---

[42] *PM Incremental Improvement Memo*, Doc. ID EPA-HQ-OAR-2018-0794-5836 (March 2023) ("Improvements to existing particulate control devices will be dependent on a range of factors including the design and current operation of the units, which is not documented in public forums. … Unfortunately, the details of how those units' ESP designs, upgrades, and operation are not publicly available …. In order to evaluate the applicability of one or more of these potential improvements, information would need to be known about the existing ESPs and their respective operation which is not documented in public forums.").

[43] *See, e.g., Approval and Promulgation of Implementation Plans; Louisiana; Regional Haze State Implementation Plan*, 82 Fed. Reg. 32,294, 32,298 (July 13, 2017) ("Entergy's DSI and scrubber cost calculations were based on a propriety [sic] database, so we were unable to verify any of the company's costs. … Because of these issues, we developed our own control cost analyses ….").

[44] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

[45] *Id.*

[46] 88 Fed. Reg. at 24874. The electrical output-based limit for new EGUs translates to approximately 0.009 lb/mmBtu, which is slightly below EPA's proposed limit of 0.010 lb/mmBtu.

[47] Jason Bohrer, "Comments on *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24854 (Apr. 24, 2023), June 23, 2024.

Environmental Protection Agency (EPA), aims to reduce mercury and other hazardous air pollutant emissions from coal-fired power plants. Coal-firing power plants, and lignite-firing power plants in particular, may face specific challenges and economic consequences in complying with these regulations, which could result in their forced retirement. Some potential economic impacts include:

1. **Escalating Operational Expenditures:** Under this rule, lignite power plants will face an excessive economic burden from a significant uptick in operational costs due to the integration of pollution control equipment. The installation of advanced technologies like activated carbon injection (ACI) and flue gas desulfurization (FGD) systems necessitates continuous monitoring and maintenance to ensure optimal performance. Design specifications vary from plant to plant which increases the complexities of the operating systems that require regular cleaning, replacement of consumables, and calibration, all of which incur additional expenses. Moreover, the implementation of pollution control, measures may necessitate alterations in combustion processes or the introduction of supplementary fuel, further driving up operational costs. As a result, lignite power plants are burdened with substantial ongoing expenditures, while also lacking a positive cost benefit analysis, which will undermine their economic viability and competitiveness in the energy market.

2. **Dilemma of Plant Retrofitting or Retirement:** Lignite power plants are confronted with the challenging prospect of either retrofitting existing facilities or contemplating retirement in response to the stringent requirements of the Mercury and Air Toxics Standards (MATS). Plant retrofitting involves substantial investment in upgrading equipment and implementing advanced pollution control technologies to achieve compliance with regulatory mandates. However, these retrofitting endeavors entail significant additional costs, potentially straining the financial resources of plant owners and operators. Moreover, the uncertainty surrounding the long-term economic viability of retrofitted plants further complicates decision-making processes.

3. **Impact on Electricity Prices:** The implementation of pollution control technologies to comply with MATS regulations can impose significant financial burdens on lignite power plants. These costs, encompassing the installation, maintenance, and operation of such technologies, would ultimately be transferred to consumers in the form of higher electricity prices. As power plants seek to recoup the expenses incurred in meeting regulatory requirements, consumers will experience an uptick in their electricity bills. This escalation in electricity prices will have far-reaching implications for households, businesses, and industries reliant on affordable energy. It will affect household budgets, impact the competitiveness of businesses, and influence consumer spending patterns. Additionally, higher electricity prices will introduce challenges for industries sensitive to energy costs, potentially leading to shifts in production, investment, and employment patterns within the broader economy. Therefore, the economic impact of elevated electricity prices resulting

from MATS compliance should be carefully considered within the context of the energy market, taking into account the implications for consumers, businesses, and overall economic growth.

4. **Employment Effects:** The escalation in costs and the possibility of plant retrofitting or retirement can reverberate through the lignite industry and associated sectors, potentially leading to job losses. As lignite power plants grapple with increased operational expenses and the financial strain of compliance with regulatory requirements, they may be compelled to streamline operations or even cease production altogether. Such decisions can have a ripple effect on employment within the community, impacting not only plant workers but also individuals employed in ancillary industries such as mining, transportation, and manufacturing. Job losses in these sectors can contribute to economic challenges, including reduced consumer spending, increased unemployment rates, and a decline in overall economic activity. Furthermore, the social and psychological impacts of job loss on affected individuals and communities cannot be understated, as they may face financial insecurity, stress, and uncertainty about their future prospects. Therefore, the potential job impacts stemming from increased costs and plant adjustments underscore the broader economic implications of regulatory compliance measures in the lignite industry.

5. **Regional Economic Consequences:** Lignite power plants are often linchpins of regional economies, exerting substantial influence on employment, tax revenue, and economic activity. Any shifts in the economic viability of these plants, whether due to increased costs, regulatory compliance burdens, or operational adjustments, will trigger broader consequences for local economies. The potential closure or downsizing of lignite power plants can result in the loss of direct and indirect employment opportunities, affecting not only plant workers but also individuals and businesses reliant on plant-related activities. Moreover, the decline in plant operations will lead to reduced tax revenue for local governments, impacting their ability to fund essential services and infrastructure projects. Additionally, the loss of economic activity associated with lignite power plants will ripple through the supply chain, affecting suppliers, vendors, and service providers in the region. This domino effect will exacerbate economic challenges, including decreased consumer spending, increased business closures, and a general downturn in economic vitality. Therefore, changes in the economic landscape of the lignite industry will have far-reaching consequences for regional economies, underscoring the interconnectedness between energy production, employment, and overall economic well-being at the local level.

6. **Impact on Investment Decisions:** The economic ramifications of the MATS rule can significantly shape investment decisions within the lignite industry. Plant owners and prospective investors must carefully evaluate the long-term economic feasibility and potential returns on investment in light of stringent regulatory compliance mandates. The substantial costs associated with MATS compliance, including technology upgrades and operational adjustments, may deter investment in lignite power plants or prompt

divestment from existing assets. Investors may reassess the risk-return profile of lignite-related ventures, considering factors such as regulatory uncertainty, market volatility, and shifting energy trends. Moreover, the potential for increased operational costs and regulatory burdens may incentivize investment in alternative energy sources or cleaner technologies, which align more closely with evolving environmental and sustainability objectives. Therefore, the economic implications of the MATS rule play a pivotal role in shaping investment decisions within the lignite industry, influencing capital allocation, project planning, and strategic resource allocation strategies.

7. **Legal and Regulatory Costs:** Meeting MATS requirements often entails significant legal and regulatory costs associated with monitoring, reporting, and ensuring continued compliance. Lignite power plants must allocate resources to navigate complex regulatory frameworks, engage legal counsel, and implement robust monitoring and reporting systems to adhere to emissions standards. These additional expenses contribute to the overall economic strain on lignite power plants, exacerbating the financial challenges associated with regulatory compliance. As a result, the burden of legal and regulatory costs further underscores the financial pressures faced by lignite power plant operators, shaping their strategic decision-making and resource allocation efforts.

## Grid Reliability Impacts

Compliance with the Mercury and Air Toxics Standards (MATS) rule will likely have grid reliability impacts on regional power grids that rely on lignite- or other coal-firing power plants. The impacts on grid reliability for power grids that rely on lignite- or other coal-firing power plants can include:

1. **Operational Adaptations and Flexibility Constraints**: The implementation of pollution control technologies like activated carbon injection (ACI) and flue gas desulfurization (FGD) systems necessitates operational modifications within lignite power plants. These adjustments may include alterations to combustion processes, fuel handling procedures, and overall plant operations to accommodate the integration of new equipment and systems. However, such operational changes can compromise the inherent flexibility of lignite power plants to respond effectively to fluctuating load conditions and grid demands. The need for continuous operation of pollution control systems, coupled with potential limitations in responsiveness, may impede the plant's ability to ramp up or down quickly in response to changes in electricity demand or supply. Consequently, the reliability of lignite power plants to maintain grid stability and meet grid operator requirements may be compromised, raising concerns about their ability to ensure consistent and secure electricity supply. Thus, while MATS compliance aims to mitigate environmental impacts, the operational adaptations required may introduce challenges to the reliability and flexibility of lignite power plants in supporting a resilient and dynamic energy grid.

2. **Disruptions Due to Equipment Installation**: The installation and retrofitting of pollution control equipment often necessitate temporary shutdowns or reduced operating capacities within lignite power plants. These planned downtime periods are essential for integrating new equipment, conducting modifications, and ensuring compliance with regulatory requirements. However, the interruptions in plant operations during these installation phases will have adverse effects on the overall reliability and availability of the plant. The temporary cessation of power generation activities will disrupt electricity supply, potentially affecting grid stability and reliability. Moreover, extended downtime periods may lead to revenue losses for plant operators and suppliers, as well as inconvenience for consumers and end-users reliant on consistent electricity provision. Therefore, while essential for achieving compliance with MATS regulations, the equipment installation process poses challenges to the reliability and continuity of lignite power plant operations, emphasizing the importance of efficient planning and management to minimize disruptions.

3. **Efficiency Implications**: The introduction of pollution control technologies, especially those targeting mercury emissions reduction, will potentially undermine the overall efficiency of lignite power plants. While these technologies play a crucial role in meeting regulatory standards, they often require additional energy inputs and introduce operational complexities that can compromise plant efficiency. For instance, activated carbon injection (ACI) systems necessitate the injection of powdered carbon into the flue gas stream, which can increase resistance and pressure drops within the system, thus reducing overall efficiency. Similarly, flue gas desulfurization (FGD) systems require energy-intensive processes such as limestone slurry preparation and circulation, further impacting plant efficiency. The reduction in efficiency can translate to decreased electricity output per unit of fuel input, potentially affecting the plant's ability to generate electricity reliably and meet demand fluctuations. Consequently, while pollution control measures are essential for environmental protection, the associated efficiency implications underscore the need for careful optimization and balancing of environmental and operational considerations to ensure reliable power generation from lignite plants.

4. **Elevated Maintenance Demands**: The incorporation of MATS-compliant equipment, including ACI and FGD systems, often translates to heightened maintenance requirements within lignite power plants. The intricate nature of these pollution control technologies necessitates more frequent inspections, cleaning, and servicing to ensure optimal performance and regulatory compliance. However, the increased maintenance needs can result in extended periods of downtime, during which the plant may be unable to generate electricity, impacting its reliability and availability. Moreover, the allocation of resources and manpower to address maintenance tasks diverts attention and resources away from other operational activities, potentially affecting overall plant efficiency and productivity. Therefore, while essential for environmental compliance, the elevated maintenance

demands associated with MATS-compliant equipment pose challenges to the reliability and operational continuity of lignite power plants, highlighting the importance of proactive maintenance planning and execution to minimize disruptions.

5. **Inherent Fuel Supply Hurdles:** Lignite power plants grapple with inherent challenges associated with the utilization of lignite coal, particularly in meeting stringent emission standards. Lignite, characterized by its lower rank and elevated moisture content, poses unique obstacles in combustion processes. The variability in chemical composition across different seams of coal extracted from mines further complicates the task of ensuring consistent and efficient combustion. Each seam presents distinct combustion characteristics, necessitating meticulous adjustments in operational parameters to maintain compliance with emission regulations. Consequently, lignite power plants encounter difficulties in securing a reliable and uniform fuel supply, which undermines their ability to consistently meet emission targets and operational efficiency goals. The intricacies of managing diverse coal qualities exacerbate the complexities of pollution control measures, posing significant operational challenges for lignite power plants.

6. **Integration Challenges**: The introduction of new pollution control technologies into operational lignite power plants may encounter compatibility hurdles. Ensuring seamless integration with existing infrastructure is paramount for preserving reliability. Compatibility issues can emerge from differences in technology specifications, operational parameters, or control systems between the new equipment and the plant's established infrastructure. Unaddressed disparities may lead to operational inefficiencies, malfunctions, or system failures. Thus, meticulous planning and coordination are vital to mitigate compatibility risks and uphold the reliability of lignite power plants. Failure to address these challenges will compromise plant performance, emphasizing the need for thorough assessment and integration procedures when adopting new technologies.

7. **System Coordination and Grid Stability:** Adjustments in operating conditions and responses to fluctuating load demands can disrupt system coordination and compromise grid stability. Lignite power plants must coordinate closely with grid operators to maintain reliable electricity supply while adhering to MATS requirements. Changes in plant operations, such as implementing pollution control technologies or adjusting output levels, can affect the overall balance of supply and demand within the grid. Without effective coordination, these changes may lead to imbalances, voltage fluctuations, or frequency deviations, posing risks to grid stability. Therefore, robust communication and collaboration between lignite power plants and grid operators are essential to ensure seamless integration of plant operations with broader grid dynamics. By coordinating effectively, lignite power plants can contribute to grid stability while meeting regulatory obligations, ensuring the reliable delivery of electricity to consumers.

8. **Continuous Compliance Management**: Adhering to emission limits mandated by MATS necessitates ongoing monitoring and fine-tuning of pollution control equipment. The chemical properties of lignite can vary even within coal seams from the same mine, posing challenges in preparation and adjustment for plant operations. This variability complicates efforts to maintain consistent compliance, requiring dynamic adjustments in day-to-day plant operations. Consequently, ensuring reliable compliance becomes a dynamic process, demanding meticulous attention to detail and proactive management of pollution control systems. Consistent monitoring and adjustment are essential to mitigate emissions effectively while sustaining the operational reliability of lignite power plants amidst the inherent variability of lignite coal properties.

9. **Supply Chain Vulnerabilities:** The consolidation in the power plant equipment sector over the past decade has reduced the number of suppliers available. Relying on specific suppliers for pollution control equipment and technologies introduces supply chain risks. Disruptions in the supply chain, such as shortages, delays, or quality issues, will impede the timely installation and operation of essential equipment, jeopardizing reliability. Lignite power plants must carefully assess and manage these supply chain vulnerabilities to ensure uninterrupted access to critical components and technologies necessary for regulatory compliance and operational integrity. Proactive measures, such as diversifying suppliers or implementing contingency plans, are crucial for mitigating supply chain risks and maintaining the reliability of lignite power plants.

10. **Long-Term Viability and Aging Infrastructure:** Compliance with MATS regulations will raise concerns about the long-term viability of older lignite power plants. Aging infrastructure may struggle to adapt to the requirements of new pollution control technologies, posing challenges that will impact reliability. The integration of these technologies into outdated systems may require extensive retrofitting or upgrades, which can strain resources and prolong downtime. Moreover, the operational lifespan of aging infrastructure may be limited, leading to questions about the economic feasibility of investing in costly compliance measures. Plant owners must carefully assess the cost-benefit ratio of compliance efforts and consider the potential impact on reliability when evaluating the long-term viability of older lignite power plants. Failure to address these challenges will compromise the reliability and competitiveness of these facilities in the evolving energy landscape.

# Section D: Modeling Results

## Summary

The EPA did not conduct a reliability analysis for its proposed MATS rules or its Post IRA base case, instead it conducted a Resource Adequacy and reserve margin analysis, which EPA has claimed is necessary but not sufficient to grid reliability.[48]

EPA's lack of reliability modeling prompted several entities to voice concerns in the original docket for the Proposed MATS rule would negatively impact grid reliability, including the National Rural Electric Coop Association, the American Coal Council, The Lignite Energy Council, PGen, the American Public Power Association, and the National Mining Association.[49,50,51,52,53,54]

To provide this necessary perspective, Center of the American Experiment modeled the reliability and cost impacts of the proposed Mercury and Air Toxics Standards (MATS) in the subregions consisting of the Midcontinent Independent Systems Operator (MISO) as it relates to the elimination of the subcategory for lignite-fired power plants.[55,]

Our analysis determined that the closure of lignite-fired powered power plants in the MISO footprint would increase the severity of projected future capacity shortfalls, i.e. rolling blackouts, in the MISO system if these resources are replaced with wind, solar, battery storage, and natural gas plants consistent with the EPA's estimates for capacity values for intermittent and thermal resources.

Building these replacement resources would come at a great cost to MISO ratepayers. The existing lignite facilities are largely depreciated assets that generate large quantities of dispatchable, low-cost electricity. Our modeling determined the total cost of replacement generation capacity in the Status Quo, Partial, and Full scenarios will cost $12.93 billion, $14.88 billion, and $16.76 billion, respectively, from 2024 through 2035, resulting in incremental costs of $1.9 billion in the Partial

[48] Resource Adequacy Analysis Technical Support Document, New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule Proposal Docket ID No. EPA-HQ-OAR-2023-0072 U.S. Environmental Protection Agency Office of Air and Radiation April 2023.

[49] NRECA Comments, EPA-HQ-OAR-2018-0794-5956, at 5-6.

[50] American Coal Council Comments, EPA-HQ-OAR-2018-0794-6808, at 3.

[51] LEC Comments, EPA-HQ-OAR-2018-0794-5957, at 17.

[52] PGen Comments, EPA-HQ-OAR-2018-0794-5994, at 5.

[53] APPA Comments, EPA-HQ-OAR-2018-0794-5958, at 33.

[54] NMA Comments, EPA-HQ-OAR-2018-0794-5986, at 29.

[55] U.S. Environmental Protection Agency, "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 88 FR 24854, April 24, 2023, https://www.federalregister.gov/documents/2023/04/24/2023-07383/national-emission-standards-for-hazardous-air-pollutants-coal--and-oil-fired-electric-utility-steam.

scenario and $3.8 billion in the Full scenario through 2035, compared to operating the current lignite facilities under status quo conditions.

MISO residents would also suffer economic damages from the increased severity of rolling blackouts, which can result in food spoilage, property damage, lost labor productivity, and loss of life. American Experiment calculated the economic damages associated with the increase in unserved electricity demand using a metric called the Value of Lost Load (VoLL) criteria, which can be thought of as the Social Cost of Blackouts.

Our analysis found that the MATS rule would cause an additional 73,699 additional megawatt hours (MWh) of unserved load in the in the Full MATS Retirement scenario in 2035 using 2019 hourly electricity demand and wind and solar capacity factors. Using a conservative value for the VoLL of $14,250 per MWh, we conclude the MATS rule would produce economic damages of $1.05 billion under these conditions.

Therefore, the incremental costs stemming from the closure of the 2,264 MW of lignite fired capacity in MISO under the Full scenario exceeds the projected net present value benefits of $3 billion from 2028 through 2037 using a 3 percent discount rate modeled by EPA in its Regulatory Impact Analysis.

## Modeling the Reliability and Cost of the MISO Generating Fleet Under Three Scenarios

Our analysis examined the impact of the proposed MATS rules on the reliability of the MISO system through 2035 by comparing two lignite retirement scenarios to a "Status Quo" scenario that represents "business as usual" that assumes no changes to the generating fleet occur due to the MATS rule, or any other of EPA's pending regulations.[56]

**Status Quo scenario:** Installed generator capacity assumptions for MISO in the Status Quo scenario are based on announced retirements from U.S. Energy Information Administration (EIA) database and utility Integrated Resource Plans (IRPs) through 2035 compiled by Energy Ventures Analysis on behalf America's Power, a trade association whose sole mission is to advocate at the federal and state levels on behalf of the U.S. coal fleet.[57] This database is also used by the NERC LTRA suggesting it is among the most credible databases available for this analysis.[58] It should be noted that this database leaves considerably more coal and natural gas on its system than the MISO grid EPA assumes will be in service in the coming years in its Proposed Rule Supply Resource

---

[56] See Appendix 2: Capacity Retirements and Additions in Each Scenario.

[57] America's Power, "Proprietary data base maintained by Energy Ventures Analysis, an energy consultancy with expertise in electric power, natural gas, oil, coal, renewable energy, and environmental policies" Personal Communication, November 3, 2023.

[58] North American Electric Reliability Corporation, "2023 Long-Term Reliability Assessment," December, 2023, https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf.

Utilization file, meaning our reliability assessment will be more conservative than if we used EPA's capacity projections.

Retired thermal resources in the Status Quo scenario are replaced by solar, wind, battery storage, and natural gas in accordance with the current MISO interconnection queue to maintain resource adequacy based on capacity values given to these generators in EPA's Proposed Rule Supply Resource Utilization file.[59] These capacity values are described in greater detail in the section labeled Replacement Capacity Based on EPA Methodology for Resource Adequacy.

**Partial MATS Retirement scenario:** The Partial MATS retirement scenario assumes 1,150 megawatts (MW) of lignite fired capacity in North Dakota is retired in addition to incorporating all of the announced retirements in the Status Quo. This value was chosen because it represents the retirement of one lignite facility in North Dakota that serves the MISO market. These resources are replaced with wind, solar, battery storage, and natural gas capacity using the methodology described greater detail in the section labeled Replacement Capacity Based on EPA Methodology for Resource Adequacy.[60]

**Full MATS scenario:** The Full MATS retirement scenario assumes the MATS regulations will cause all 2,264 MW of lignite-fired generators in the MISO system to retire, in addition to incorporating the retirements in the Status Quo scenario will occur.[61] These resources are replaced with wind, solar, battery storage, and natural gas capacity using the methodology described greater detail in the section labeled Replacement Capacity Based on EPA Methodology for Resource Adequacy.[62]

## Reliability in each scenario

The EPA did not conduct a reliability analysis for its proposed MATS rules or its Post IRA base case. Instead, it conducted a Resource Adequacy analysis of its proposed rule, compared to the Post IRA base case.

Resource Adequacy and reserve margin analyses can be useful tools for determining resource adequacy and reliability, but the shift away from dispatchable thermal resources (fossil fuel) toward intermittent resources (wind and solar) increases the complexity and uncertainty in these analyses and makes them increasingly dependent on the quality of the assumptions used to construct capacity accreditations.[63]

[59] U.S. Environmental Protect Agency, "Proposed Regulatory Option," Zip File, https://www.epa.gov/system/files/other-files/2023-04/Proposed%20Regulatory%20Option.zip
[60] See Appendix 3: Replacement Capacity Based on EPA Methodology for Resource Adequacy.
[61] These figures represent the rated summer capacity as indicated by the U.S. Energy Information Administration.
[62] See Appendix 3: Replacement Capacity Based on EPA Methodology for Resource Adequacy.
[63] See Appendix 4: Resource Adequacy in Each Scenario.

This is likely a key reason why EPA has distinguished between resource _adequacy_ and resource _reliability_ in its Resource Adequacy Technical Support Document for its proposed carbon dioxide regulations on new and existing power plants.[64,65] EPA stated:

> "As used here, the term **resource adequacy** is defined as the provision of adequate generating resources to meet projected load and generating reserve requirements in each power region, while **reliability** includes the ability to deliver the resources to the loads, such that the overall power grid remains stable." **[emphasis added].**" EPA goes on to say that "resource adequacy … is necessary (but not sufficient) for grid reliability.[66]

As the grid becomes more reliant upon non-dispatchable generators with lower reliability values, it is crucial to "stress test" the reliability outcomes of systems that use the EPA's capacity value assumptions in their Resource Adequacy analyses by comparing historic hourly electricity demand and wind and solar capacity factors against installed capacity assumptions in the Status Quo, Partial, and Full scenarios.

We conducted such an analysis by comparing EPA's modeled MISO generation portfolio to the historic hourly electricity demand and hourly capacity factors for wind and solar in 2019, 2020, 2021, and 2022. These data were obtained from the U.S. Energy Information Administration (EIA) Hourly Grid Monitor to assess whether the installed resources would be able to serve load for all hours in each Historic Comparison Year (HCY).[67]

For our analysis, hourly demand and wind and solar capacity factors were adjusted upward to meet EPA's peak load, annual generation, and capacity factor assumptions. These assumptions are generous to the EPA because they increase the annual output of wind and solar generators to levels that are not generally observed in MISO.

## Extent of the Capacity Shortfalls

While our modeling determined that the retirement of lignite facilities had a minimal impact on the number of hours of capacity shortfalls observed in the Partial and Full scenarios, retiring the lignite facilities makes the extent of capacity shortfalls worse.

---

[64] EPA did not produce a Resource Adequacy Technical Support Document for the MATS rules.
[65] U.S. Environmental Protection Agency, "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 88 FR 24854, April 24, 2023, https://www.federalregister.gov/documents/2023/04/24/2023-07383/national-emission-standards-for-hazardous-air-pollutants-coal--and-oil-fired-electric-utility-steam.
[66] Resource Adequacy Analysis Technical Support Document, New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule Proposal Docket ID No. EPA-HQ-OAR-2023-0072 U.S. Environmental Protection Agency Office of Air and Radiation April 2023.
[67] U.S. Energy Information Administration, "Hourly Grid Monitor," https://www.eia.gov/electricity/gridmonitor/dashboard/electric_overview/US48/US48.

For example, Figure D-1 shows largest capacity shortfalls in the Status Quo scenario, which occur in 2035 using the 2021 Historical Comparison Year for hourly electricity demand and wind and solar capacity factors.

Each resource's hourly performance is charted in the graph below. Thermal units are assumed to be 100 percent available, which is consistent with EPA's capacity accreditation for these resources, and wind and solar are dispatched as available based on 2021 fluctuations in generation. Blue sections reflect the use of "Load Modifying Resources," which are reductions in electricity consumption by participants in the MISO market.

Purple areas show time periods where the batteries are discharged. These batteries are recharged on January 8th and 9th using the available natural gas and oil-fired generators. Red areas represent periods where all of the resources on the grid are unable to serve load due to low wind and solar output and drained battery storage systems. At its peak, the largest capacity shortfall is 15,731 MW.



*Figure D-1. This figure shows the generation of resources on the MISO grid in the Status Quo during a theoretical week in 2035. The purple portions of the graph show the battery storage discharging to provide electricity during periods of low wind and solar generation. Unfortunately, the battery storage does not last long enough to avoid blackouts during a wind drought.*

These capacity shortfalls become more pronounced in the Partial and Full scenarios as less dispatchable capacity exists on the grid to serve load. Figure D-2 shows the three capacity shortfall events in Figure D-1. It depicts the blackouts observed in the Status Quo scenario in green, and

the additional MW of unserved load in the Partial and Full scenarios in yellow and red, respectively.



*Figure D-2. Capacity shortfalls increase during a hypothetical January 9ᵗʰ, 2035 from 15,731 MW at their peak in the Status Quo to 16,493 MW in the Partial scenario and 17,229 MW in the Full scenario.*

Table D-1 shows the largest capacity shortfall, in terms of MW, for each scenario in each of the four Historical Comparison Years studied and the incremental increase in the largest shortfall due to the lignite closures stemming from the MATS rule for the Partial and Full scenarios.

The largest incremental increase in capacity shortfalls would occur in the 2020 HCY in the Full scenario as the blackouts would increase from 552 MW in the Status Quo scenario to 3,295 in the Full scenario, a difference of 2,743 MW.

| Maximum MW Shortfalls in 2035 in Each HCY | | | | | |
|---|---|---|---|---|---|
| Data Year | Status Quo | Partial | Partial Difference | Full | Full Difference |
| 2019 | 15,130 | 15,842 | 712 | 16,530 | 1,400 |
| 2020 | 552 | 2,587 | 2,034 | 3,295 | 2,743 |
| 2021 | 15,731 | 16,493 | 762 | 17,229 | 1,498 |
| 2022 | 10,615 | 11,409 | 794 | 12,177 | 1,562 |

*Table D-1. This table shows the largest capacity shortfall, in terms of MW, for each scenario in each of the four Historical Comparison Years studied and the incremental increase in the largest shortfalls due to the lignite closures stemming from the MATS rule for the Partial and Full scenarios.*

It is important to note that this difference is larger than the amount of lignite-fired capacity that is retired in the Full scenario (2,264 MW) because the retirement of these facilities reduces the amount of capacity available to charge battery storage resources.

## Unserved MWh in Each Scenario

The amount of unserved load in each scenario can also be measured in megawatt hours (MWh). This metric is a product of the number of hours with insufficient energy resources multiplied by the hourly energy shortfall, measured in MW. This metric may be a more tangible way to understand the impact that the unserved load will have on families, businesses, and the broader economy. Each MWh reflects an increment of time where electric consumers in the MISO grid will not have access to power.

Table D-2 shows the number of MWhs of unserved load in each scenario for the four HCYs studied. In some HCYs, the incremental number of unserved MWhs is fairly small, but in other years they are substantial. In the 2020 HCY, the Partial scenario had 2,042 more MWhs of unserved load than the Status Quo scenario, and the Full scenario had 4,265 MWh of additional unserved load, compared to the Status Quo Scenario.

| Total MWh Shortfalls in 2035 in Each HCY | | | | | |
|---|---|---|---|---|---|
| Data Year | Status Quo | Partial | Partial Difference | Full | Full Difference |
| 2019 | 168,723 | 204,050 | 35,327 | 242,393 | 73,669 |
| 2020 | 582 | 2,624 | 2,042 | 4,847 | 4,265 |
| 2021 | 244,743 | 273,927 | 29,184 | 304,021 | 59,278 |
| 2022 | 53,458 | 62,223 | 8,765 | 71,304 | 17,846 |

*Table D-2. The incremental MWh of unserved load ranges from 2,042 to 35,327 in the Partial scenario, and from 4,265 to 73,669 in the Full scenario.*

In the 2019 HCY, the Partial scenario experienced an additional 35,327 MWh of unserved load and the Full scenario experienced 73,669 MWh of unserved load. These additional MWh of unserved load will impose hardships on families, businesses, and the broader economy.

## The Social Cost of Blackouts Using the Value of Lost Load (VoLL)

Blackouts are costly. They frequently result in food spoilage, lost economic activity, and they can also be deadly. Regional grid planners attempt to quantify the cost of blackouts with a metric called the Value of Lost Load (VoLL). The VoLL is a monetary indicator *expressing the costs associated with an interruption of electricity supply*, expressed in dollars per megawatt hour (MWh) of unserved electricity.

MISO currently assigns a Value of Lost Load (VOLL) of $3,500 per megawatt hour of unserved load. However, Potomac Economics, the Independent Market Monitor for MISO, recommended

a value of $25,000 per MWh for the region.[68] For this study, we used a midpoint value of $14,250 per MWh of unserved load to calculate the social cost of the blackouts under each modeled scenario.

Table D-3 shows the economic damage of blackouts in each scenario in model year 2035 and shows the incremental increase in the VOLL in the Partial and Full scenarios. Incremental VOLL costs are highest using the 2019 HCY where MISO experiences an additional $503.4 million in economic damages due to blackouts in the Partial scenario, and an additional $1.05 billion in the Full scenario.

| Value of Lost Load for Capacity Shortfalls in 2035 in Each HCY | | | | | |
|---|---|---|---|---|---|
| Data Year | Status Quo | Partial | Partial Difference | Full | Full Difference |
| 2019 | $2,404,309,657 | $2,907,716,665 | $503,407,008 | $3,454,098,692 | $1,049,789,035 |
| 2020 | $8,296,505 | $37,389,117 | $29,092,612 | $69,074,216 | $60,777,712 |
| 2021 | $3,487,594,170 | $3,903,464,847 | $415,870,677 | $4,332,301,464 | $844,707,294 |
| 2022 | $761,782,023 | $886,680,023 | $124,898,001 | $1,016,083,680 | $254,301,657 |

*Table D-3. MISO would experience millions of dollars in additional economic damage if the lignite fired power plants in its footprint are shut down in response to the MATS regulations.*

It is important to note that these VOLL figures are not the total estimated cost impacts of blackouts for the MATS regulations. Rather, they are a snapshot of a range of possible outcomes for the year 2035 based on variations in electricity demand and wind and solar productivity.

The VOLL demonstrates harm of the economy in a multitude of ways. For the industrial/commercial sector, direct costs from losing power (and therefore benefits from avoiding power outages) can be (1) opportunity cost of idle resources, (2) production shortfalls / delays, (3) damage to equipment and capital, and (4) any health or safety impacts to employees. There are also indirect or macroeconomic costs to downstream businesses/consumers who might depend on the products from a company who experiences a power outage.[69]

For the residential sector, the direct costs are different. They can include (1) restrictions on activities (e.g. lost leisure time, lost work time, and associated stress), (2) financial costs through property damage (e.g. damage to real estate via bursting pipes, food spoilage), and (3) health and safety issues (e.g. reliance on breathing machines, air filters).[70]

---

[68] David B. Patton, "Summary of the 2022 MISO State of the Market Report," Potomac Economics, July 13, 2023, https://cdn.misoenergy.org/20230713%20MSC%20Item%2006%20IMM%20State%20of%20the%20Market%20Recommendations629500.pdf.
[69] Will Gorman, "The Quest to Quantify the Value of Lost Load: A Critical Review of the Economics of Power Outages," The Electricity Journal Volume 35, Issue 8, October 2022, https://www.sciencedirect.com/science/article/pii/S1040619022001130.
[70] Will Gorman, "The Quest to Quantify the Value of Lost Load: A Critical Review of the Economics of Power Outages," The Electricity Journal Volume 35, Issue 8, October 2022, https://www.sciencedirect.com/science/article/pii/S1040619022001130.

## Hours of Capacity Shortfalls

Comparing hourly historic electricity demand and wind and solar output to MISO grid in the Status Quo scenario, our modeling found that MISO would have capacity shortfalls in the 2019, 2021, and 2022 HCYs which can be seen in Table D-4 below.

There would be additional capacity shortfalls in all of the HCYs modeled in the Partial and Full scenarios, where the Partial scenario would experience four additional hours of blackouts in 2019 HCY, one additional hour of blackouts in the 2020 HCY, four additional hours of blackouts in 2021 HCY, and one additional hour of blackouts in the 2022 HCY. In the Full scenario, there would be five additional hours of blackouts in the 2019 HCY, one additional hour of blackouts in the 2020 HCY, eight additional hours in the 2021 HCY, and two additional hours in the 2022 HCY, compared to the Status Quo Scenario.

| Hours of Capacity Shortfalls in 2035 in Each HCY | | | | | |
|---|---|---|---|---|---|
| Data Year | Status Quo | Partial | Partial Difference | Full | Full Difference |
| 2019 | 28 | 32 | 4 | 33 | 5 |
| 2020 | 2 | 3 | 1 | 3 | 1 |
| 2021 | 24 | 28 | 4 | 32 | 8 |
| 2022 | 13 | 14 | 1 | 15 | 2 |

*Table D-4. Capacity shortfalls occur in three of the four HCYs in the Status Quo scenario and all four HCYs for the Partial and Full scenarios.*

## Cost of replacement generation

Our VOLL analysis demonstrates that the MATS rules will cause significant economic harm in MISO by reducing the amount of dispatchable capacity on the grid due to lignite plant closures stemming from the removal of the lignite subcategory.

However, load serving entities (LSEs) will also begin to incur costs as they build replacement generation to maintain resource adequacy if lignite resources are forced to retire in response to the proposed MATS rules. These costs will be passed on to electricity consumers and must be calculated to produce accurate estimates of the true cost of the MATS regulations.

We modeled the cost of the replacement generation under the Status Quoe, Partial and Full scenarios. The cost of the Partial and Full scenarios, when compared to the Status Quo scenario, is used to determine the additional economic burden that the MATS regulations will impose onto MISO electricity customers.

Our modeling determined the total cost of replacement generation capacity in the Status Quo, Partial, and Full scenarios will cost $12.93 billion, $14.88 billion, and $16.76 billion, respectively, from 2024 through 2035 (see Figure D-3).



*Figure D-3. The Partial scenario will cost $1.95 billion more than the Status Quo scenario from 2024 through 2035 and the Full scenario will cost $3.8 billion more than the Status Quo scenario in this timeframe.*

Figure D-4 shows the incremental cost of the Partial and Full scenarios from 2024 through 2030, the period reflecting the up-front costs of complying with the regulations. From 2024 through 2028, LSEs would incur $337 million by building replacement generation in the Partial scenario, compared to the Status Quo scenario, and $654 million in the Full scenario, relative to the Status Quo. It should be noted that these costs are only the cost of building replacement generation and do not factor in the cost of decommissioning or remediating existing power plants or mine sites.



*Figure D-4. This figure shows the annual cost of building the replacement capacity needed to maintain resource adequacy after the retirement of the lignite plants based on EPA's capacity accreditation values for wind, solar, storage, and thermal resources.*

We describe the total costs of replacement generation capacity for each scenario in greater detail below. The assumptions used to calculate the cost of replacement generation can be found in Appendix 1: Modeling Assumptions.

**Status Quo scenario:**

The Status Quo scenario results in the retirement of 28,756.8 MW of coal resources, 7,852 MW of natural gas capacity, and 462 MW of petroleum capacity. These retirements are already projected to occur without imposition of the new MATS Rule or other federal regulations. This retired capacity is replaced with 4,306 MW of natural gas, 19,436 MW of wind, 29,652 MW of solar, and 3,304 MW of storage.[71]

The total cost of replacement generation for the Status Quo scenario is $12.9 billion. The majority of these expenses consist of additional fixed costs of building new wind, solar, and battery storage facilities, such as fixed operational and maintenance (O&M), capital costs, and utility returns.

Compared to the current grid, the Status Quo scenario saves $32 billion in fuel costs, $11.5 billion in variable operations and maintenance costs, and $5 billion in taxes. However, these savings are

---

[71] See Appendix 2: Capacity Retirements and Additions in Each Scenario.

far outweighed by $5.1 billion in additional fixed costs, $16 billion in capital costs, $2.1 billion in transmission costs, and $38.2 billion in utility profits (see Figure D-5).



*Figure D-5. The Status Quo scenario saves consumers money from lower fuel costs, fewer variable operations and maintenance costs, and lower taxes (due to federal subsidies) but these savings are outweighed by the additional costs. As a result, building the grid in the Status Quo scenario would increase costs by $12.93 billion compared to today's costs.*

These additional costs will have an impact on electricity rates. Our cost modeling determined that electricity costs for MISO ratepayers would be 9.89 cents per kWh in the Status Quo scenario, an increase of nearly 3.5 percent relative to current costs of 9.56 cents per kWh.[72]

**Partial MATS Retirement scenario:**

The Partial scenario results in the closure of 1,151 MW of lignite capacity and necessitates an incremental increase in replacement capacity of 1,015 MW wind, 1,549 MW solar, and 173 MW storage, compared to the Status Quo scenario.[73]

The total cost of replacement generation for the Partial scenario is $14.9 billion, and the total incremental cost is $1.9 billion compared to the Status Quo scenario. The majority of these

---

[72] Annual Electric Power Industry Report, Form EIA-861 detailed data files, https://www.eia.gov/electricity/data/eia861/.
[73] See Appendix 2: Capacity Retirements and Additions in Each Scenario.

expenses consist of additional fixed costs of building new wind, solar, and battery storage facilities, such as fixed operational and maintenance (O&M), capital costs, and utility returns.

Compared to the current grid, the Partial scenario saves $32.7 billion in fuel costs, $11.6 billion in variable operations and maintenance costs, and $5.1 billion in taxes. However, these savings are far outweighed by $5.3 billion in additional fixed costs, $17.1 billion in capital costs, $2.2 billion in transmission costs, and $39.7 billion in utility profits (see Figure D-6).



*Figure D-6. The Partial scenario results in an $14.88 billion in additional costs compared to the current grid due to additional capital costs, fixed operations and maintenance costs, additional transmission costs, and additional utility profits.*

Compared to the Status Quo scenario, the incremental savings are $664 million in fuel costs, $119.7 million in variable operations and maintenance costs, and $102.2 million in taxes, which are outweighed by $178.7 million in additional fixed costs, $1.1 billion in capital costs, $116.5 million in transmission costs, and $1.4 billion in utility profits (see Figure D-7).



*Figure D-7. The Partial scenario will cost MISO ratepayers an additional $1.9 billion from 2024 through 2035.*

These incremental costs mean Load Serving Entities will incur an additional $1.9 billion because of these rules. These costs will start incurring before the compliance deadline is finalized in 2028, totaling $337 million of additional expenses compared to the Status Quo scenario (see Figure D-8).



*Figure D-8. This figure shows the annual incremental cost incurred by LSEs as a result of the lignite closures in the Partial scenario.*

These additional costs will have an impact on electricity rates. Our cost modeling determined that electricity costs for MISO ratepayers would be 9.95 cents per kWh in the Partial scenario, an increase of nearly 3.9 percent relative to current costs of 9.58.

**Full MATS scenario:**

Under the Full scenario, 2,264 MW of lignite capacity would be forced to retire resulting results in an incremental increase in replacement capacity of 1,997 MW wind, 3,048 MW solar, and 304 MW storage compared to the Status Quo scenario.

The total cost of replacement generation for the Full scenario is $16.8 billion, and the total incremental cost is $3.8 billion compared to Status Quo scenario. The majority of these expenses consist of additional fixed costs of building new wind, solar, and battery storage facilities, such as fixed operational and maintenance (O&M), capital costs, and utility returns.

Compared to the current grid, the Full scenario saves $33.3 billion in fuel costs, $11.7 billion in variable operations and maintenance costs, and $5.2 billion in taxes. However, these savings are far outweighed by $5.4 billion in additional fixed costs, $18.1 billion in capital costs, $2.4 billion in transmission costs, and $41.1 billion in utility profits (see Figure D-9).



*Figure D-9. The Full scenario results in an increase of $16.76 billion in costs compared to the current grid.*

Compared to the Status Quo scenario, the incremental savings are $1.3 million in fuel costs, $235.1 million in variable operations and maintenance costs, and $202 million in taxes, which are outweighed by $350.8 million in additional fixed costs, $2.1 billion in capital costs, $229.1 million in transmission costs, and $2.8 billion in utility profits (see Figure D-10).



*Figure D-10. This figure itemizes the expenses incurred in the Full scenario, which will cost an additional $3.8 billion compared to the Status Quo scenario.*

These incremental costs mean Load Serving Entities will incur an additional $3.8 billion in the Full scenario because of these rules. These costs will start incurring before the compliance deadline is finalized in 2028, totaling $654 million of additional expenses compared to the Status Quo scenario (see Figure D-11).



*Figure D-11. LSEs would incur an additional $654 million in additional expenses, compared to the Status Quo scenario, as a result of the proposed MATS rules.*

These additional costs will have an impact on electricity rates. Our cost modeling determined that electricity costs for MISO ratepayers would be 9.97 cents per kWh in the Full scenario, an increase of nearly 4.1 percent relative to current costs of 9.58.

## Conclusion:

By effectively eliminating the subcategory for lignite power plants and ignoring the breadth of evidence demonstrating that these regulations are not reasonably attainable, the MATS rules will increase the severity of capacity shortfalls in the MISO region, resulting in economic damages from the ensuing blackouts ranging from $29 million to $1.05 billion, depending on the HCY used, and imposing $1.9 billion to $3.8 billion in the cost of replacement generation capacity in the Partial and Full scenarios, respectively.

Therefore, the costs stemming from the closure of the 2,264 MW of lignite fired capacity in MISO exceeds the projected net present value benefits of $3 billion from 2028 through 2037 using a 3 percent discount rate modeled by EPA in its Regulatory Impact Analysis.[74]

---

[74] Regulatory Impact Analysis for the Proposed National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review (Apr. 2023), Docket ID: EPA-HQ-OAR-2018-0794-5837.

# Appendix 1: Modeling Assumptions

**Electricity Consumption Assumptions**

Annual electricity consumption in each model year is increased in accordance with EPA's assumptions in the IPM in each of the MISO subregions.

**Peak Demand and Reserve Margin Assumptions**

The modeled peak demand and reserve margin in each of the model years are increased in accordance with the IPM in each of the MISO subregions.

**Time Horizon Studied**

This analysis studies the impact of the proposed MATS rules from 2024 through 2035 to accurately account for the costs LSEs would incur by building replacement generation in response to the potential shutdown of lignite capacity.

This timeline downwardly biases the cost of compliance with the regulations because power plants are long term investments, often paid off over a 30-year time period. This means the changes to the resource portfolio in MISO resulting from these rules will affect electricity rates for decades beyond 2035.

**Hourly Load, Capacity Factors, and Peak Demand Assumptions**

Hourly load shapes and wind and solar generation were determined using data for the entire MISO region obtained from EIA's Hourly Grid Monitor. Load shapes were obtained for 2019, 2020, 2021, and 2022. [75] These inputs were entered into the model to assess hourly load shapes and assess possible capacity shortfalls in 2035 using each of the historical years.

Capacity factors used for wind and solar facilities were adjusted upward to match EPA assumptions that new wind and solar facilities will have capacity factors as high as 42.2 percent and 24.7 percent, respectively. These are generous assumptions because the current MISO-wide capacity factor of existing wind turbines is only 36 percent, and solar is 20 percent.

Our analysis upwardly adjusted observed capacity factors to EPA's estimates despite the fact that EPA's assumptions for onshore wind are significantly higher than observed capacity factors reported from Lawrence Berkeley National Labs, which demonstrates that new wind turbines entering operation since 2015 have never achieved annual capacity factors of 42.2 percent (See Figure D-12). [76]

---

[75] Energy Information Administration, "Hourly Electric Grid Monitor," Accessed August 12, 2022, https://www.eia.gov/ electricity/gridmonitor/dashboard/electric_overview/balancing_authority/MISO

[76] Lawrence Berkely National Labs, "Wind Power Performance," Land Based Wind Report, Accessed July 27, 2023, https://emp.lbl.gov/wind-power-performance.



Figure D-12. This *figure shows capacity factors for U.S. onshore wind turbines by the year they entered service. In no year do these turbines reach EPA's assumed 42.2 percent capacity factor on an annual basis.*

Another generous assumption is that we did not hold natural gas plants accountable to other EPA rules, such as the Carbon Rule, that may be in effect in addition to the MATS rule and would cap natural gas generators at 49 percent capacity factors to avoid using carbon capture and sequestration or co-firing with hydrogen. Doing so would have resulted in even more capacity shortfalls.

**Line Losses**

Line losses are assumed to be 5 percent of the electricity transmitted and distributed in the United States based on U.S. on EIA data from 2017 through 2021.[77]

**Value of Lost Load**

The value of lost load (VoLL) is a monetary indicator *expressing the costs associated with an interruption of electricity supply*, expressed in dollars per megawatt hour (MWh) of unserved electricity.

---

[77] Energy Information Administration, "How Much Electricity is Lost in Electricity Transmission and Distribution in the United States," Frequently Asked Questions, https://www.eia.gov/tools/faqs/faq.php?id=105&t=3

Our analysis uses a conservative midpoint estimate of $14,250 per MWh for VoLL. This value is higher than MISO's previous VoLL estimate of $3,500 per MWh, but significantly lower than the Independent Market Monitor's suggested estimate of $25,000 per MWh.[78]

## Plant Retirement Schedules

Our modeling utilizes announced coal and natural gas retirement dates from U.S. EIA databases and announced closures in utility IRPs using a dataset collected by NERA economic consulting.

## Plant Construction by Type

The resource adequacy and reliability portions of this analysis use MISO Interconnection Queue data to project into the future. EPA capacity values are applied to each newly constructed resource until the MISO system hits its target reserve margin based on EPA's peak demand forecast in its IPM.

## Load Modifying Resources, Demand Response, and Imports

Our model allows for the use of 7,875 MW of Load Modifying Resources (LMRs) and 3,638 MW external resources (imports) in determining how much reliable capacity will be needed within MISO to meet peak electricity demand under the new MATS rules.

## Utility Returns

Most of the load serving entities in MISO are vertically integrated utilities operating under the Cost-of-Service model. The amount of profit a utility makes on capital assets is called the Rate of Return (RoR) on the Rate Base. For the purposes of our study, the assumed rate of return is 9.9 percent with debt/equity split of 48.92/51.08 based on the rate of return and debt/equity split of the ten-largest investor-owned utilities in MISO.

## Transmission

This analysis assumes the building of transmission estimated at $10.3 billion, which is consistent with MISO tranche 1 for the Status Quo Scenario. For the Full and Partial scenarios, transmission costs are estimated to be $223,913 per MW of new installed capacity to account for the increased wind, solar, storage, and natural gas capacity additions.

## Taxes and Subsidies

Additional tax payments for utilities were calculated to be of 1.3 percent of the rate base. The state income tax rate of 7.3 percent was estimated by averaging the states within the MISO region. The

---

[78] Potomac Economics, "2022 State of the Market Report for the MISO Electricity Markets," Independent Market Monitor for the Midcontinent ISO, June 15, 2023, https://www.potomaceconomics.com/wp-content/uploads/2023/06/2022-MISO-SOM_Report_Body-Final.pdf.

Federal income tax rate is 21 percent. The value of the Production Tax Credit (PTC) is $27.50. The Investment Tax Credit (ITC) 30 percent through 2032, 26 percent in 2033, and 22 percent in 2034.

**Battery Storage**

Battery storage assumes a 5 percent efficiency loss on both ends (charging and discharging).

Maximum discharge rates for the MISO system model runs were held at the max capacity of the storage fleet, less efficiency losses. Battery storage is assumed to be 4-hour storage, while pumped storage is assumed to be 8-hour storage.

**Wind and Solar Degradation**

According to the Lawrence Berkeley National Laboratory, output from a typical U.S. wind farm shrinks by about 13 percent over 17 years, with most of this decline taking place after the project turns ten years old. According to the National Renewable Energy Laboratory, solar panels lose one percent of their generation capacity each year and last roughly 25 years, which causes the cost per megawatt hour (MWh) of electricity to increase each year.[79] However, our study does not take wind or solar degradation into account.

**Capital Costs, and Fixed and Variable Operation and Maintenance Costs**

Capital costs for all new generating units are sourced from the EIA 2023 Assumptions to the Annual Energy Outlook (AOE) Electricity Market Module (EMM). These costs are held constant throughout the model run. Expenses for fixed and variable O&M for new resources were also obtained from the EMM. MISO region capital costs were used, and national fixed and variable O&M costs were obtained from Table 3 in the EMM report.[80]

**Discount Rate**

A discount rate of 3.76 percent is used in accordance with EPA's assumptions in the IPM.

**Unit Lifespans**

Different power plant types have different useful lifespans. Our analysis takes these lifespans into account. Wind turbines are assumed to last for 20 years, solar panels are assumed to last 25 years, battery storage for 15 years. Natural gas plants are assumed to last for 30 years.

**Repowering**

Our model assumes wind turbines, solar panels, and battery storage facilities are repowered after they reach the end of their useful lives. Our model also excludes economic repowering, a growing

---

[79]    Liam Stoker, "Built Solar Assets Are 'Chronically Underperforming,' and Modules Degrading Faster than Expected, Research Finds," PV Tech, June 8, 2021, https://www.pv-tech.org/built-solar-assets-are-chronically-underperforming-andmodules-degrading-faster-than-expected-research-finds/.
[80] U.S. Energy Information Administration, "Electricity Market Module," Assumptions to the Annual Energy Outlook 2022, March 2022, https://www.eia.gov/outlooks/aeo/assumptions/pdf/electricity.pdf.

trend whereby wind turbines are repowered after just 10 to 12 years to recapture the wind Production Tax Credit (PTC). This trend will almost certainly grow in response to IRA subsidies.

EPA does not appear to take repowering into consideration because the amount of existing wind on its systems never changes. If our understanding of EPA's methodology is accurate, this a large oversight that must be corrected.

**Fuel Cost Assumptions**

Fuel costs for existing power facilities were estimated using FERC Form 1 filings and adjusted for current fuel prices.[81,82] Fuel prices for new natural gas power plants were estimated by averaging annual fuel costs within the MISO region according to EPA.[83] Existing coal fuel cost assumptions of $17.82 per MWh were based on 2020 FERC Form 1 filings.

**Inflation Reduction Act (IRA) Subsidies**

Our analysis assumes all wind projects will qualify for IRA subsidies and elect the Production Tax Credit, valued at $27.50 per MWh throughout the model run. Solar facilities are assumed to select the Investment Tax Credit in an amount of 30 percent of the capital cost of the project.

## Appendix 2: Capacity Retirements and Additions in Each Scenario

This section details the capacity additions and retirements in the MISO region under each scenario.

**Status Quo scenario:** The Status Quo scenario results in the retirement of 28,756.8 MW of coal resources, 7,852 MW of natural gas capacity, and 462 MW of petroleum capacity. Additions in the Status Quo scenario consist of 4,306 MW of natural gas, 19,436 MW of wind, 29,652 MW of solar, and 3,304 MW of storage.

Annual retirement and additions can be seen in Figure D-13 below.

---

[81] Trading Economics, "Natural Gas," https://tradingeconomics.com/commodity/natural-gas.
[82] https://data.nasdaq.com/data/EIA/COAL-us-coal-prices-by-region
[83] U.S. Energy Information Administration, "Open Data," https://www.eia.gov/opendata/v1/qb.php?category=40694&sdid=SEDS.NUEGD.WI.A



*Figure D-13. This graph shows the annual capacity additions and subtractions needed to maintain resource adequacy using EPA's capacity accreditation metrics.*

**Partial scenario:** The Partial scenario results in the retirement of 29,908 MW of coal resources, 7,852 MW of natural gas capacity, and 462 MW of petroleum capacity. To replace this retired capacity, additions in the Partial scenario consist of 4,306 MW of natural gas, 20,451 MW of wind, 31,201 MW of solar, and 3,477 MW of storage (see Figure D-14). The incremental closure of 1,151 MW of lignite capacity results in an incremental increase in a replacement capacity of 1,015 MW wind, 1,549 MW solar, and 173 MW storage (see Figure D-15).[84]

---

[84] Replacement capacity is more than the retiring 1,151 MW of coal capacity because intermittent resources like wind and solar have lower capacity values than coal capacity.



*Figure D-14. This graph shows the annual capacity additions and subtractions needed to maintain resource adequacy using EPA's capacity accreditation metrics.*



*Figure D-15. This figure shows the incremental capacity retirements and additions in the MISO region under the Partial scenario.*

**Full Scenario:** The Full scenario results in the retirement of 31,021 MW of coal resources, 7,852 MW of natural gas capacity, and 462 MW of petroleum capacity. To replace this retired capacity, additions in the Full scenario consist of 4,306 MW of natural gas, 21,433 MW of wind, 32,700 MW of solar, and 3,644 MW of storage (see Figure D-16). The incremental closure of 2,264 MW of lignite capacity results in an incremental increase in a replacement capacity of 1,997 MW wind, 3,048 MW solar, and 304 MW storage, compared to the Status Quo scenario (see Figure D-17).



*Figure D-16. This graph shows the annual capacity additions and subtractions needed to maintain resource adequacy using EPA's capacity accreditation metrics.*



*Figure D-17. This figure shows the incremental capacity closures and additions in the Full scenario.*

Figure D-18 shows the capacity retirements and additions in the Partial and Full scenarios.

**Comparison:**



*Figure D-18 comparison. This figure demonstrates the incremental retirements and additions in each scenario.*

## Appendix 3: Replacement Capacity Based on EPA Methodology for Resource Adequacy

The capacity selected in our model to replace the retiring resources is based on two main factors. The first factor is the MISO interconnection queue, which is predominantly filled with solar and wind projects and a relatively small amount of natural gas. The second factor is the EPA's resource adequacy (RA) accreditation values in the Integrating Planning Model's (IPM) Proposed Rule Supply Resource Utilization file and Post-IRA Base Case found in the Regulatory Impact Analysis.

The IMP assumes a capacity accreditation of 100 percent for thermal resources, and variable intermittent technologies (primarily wind and solar) receive region-specific capacity credits to help meet target reserve margin constraints. Due to their variability, resources such as wind and solar received a lower capacity accreditation when solving for resource adequacy (see Table D-4).

**EPA Integrated Planning Model**

**Capacity Accreditation in MISO**

| Resource | Capacity Value |
|---|---|
| Existing Wind | 19% |
| Existing Solar | 55% |
| New Onshore Wind 2035 | 17% |
| New Solar 2035 | 52% |
| Thermal | 100% |
| Battery Storage | 100% |

*Table D-4. This figure shows the capacity values for each resource based on EPA's estimates in its IPM.*

In order to determine whether the available blend of power generation sources will be able to meet projected demand, each available generation source is multiplied against its capacity value, and the available resources are then "stacked" to determine if there is enough accredited power generation capacity to meet projected demand and maintain resource adequacy.

It should be noted that EPA's accreditation values from the IPM are generous compared to the accreditation values given by RTOs. For example, in the MISO region, grid planners assume that dispatchable thermal resources like coal, natural gas, and nuclear power plants will be able to produce electricity 90 percent of the time when the power is needed most, resulting in a UCAP rating of 90 percent. In contrast, MISO believes wind resources will only provide about 18.1 percent of their potential output during summer peak times, and solar facilities will produce 50 percent of their potential output. This report uses the generous capacity values provided by EPA; however, if the capacity values used by the RTOs were to be utilized, the projected energy shortfalls and blackouts would be even worse.

## Appendix 4: Resource Adequacy in Each Scenario

We performed a Resource Adequacy analysis on each of the three scenarios modeled to determine the potential impact to grid reliability in MISO region if implementation of the MATS Rule results in the forced retirement of lignite power plants.

**Status Quo scenario**

Under the Status Quo scenario, there is enough dispatchable capacity in MISO to meet the projected peak demand and target reserve margin established by EPA in the RIA documents

Proposed Rule Supply Resource Utilization file until the end of 2025, shown in the black font in the table in Figure D-19.[85]



| Year | % Intermittent | % Storage | % Dispatchable |
|------|----------------|-----------|----------------|
| 2023 | 6% | 2% | 131% |
| 2024 | 7% | 2% | 128% |
| 2025 | 9% | 3% | 122% |
| 2026 | 13% | 4% | 112% |
| 2027 | 14% | 4% | 109% |
| 2028 | 14% | 4% | 106% |
| 2029 | 17% | 4% | 100% |
| 2030 | 16% | 4% | 98% |
| 2031 | 18% | 4% | 94% |
| 2032 | 18% | 4% | 92% |
| 2033 | 18% | 4% | 90% |
| 2034 | 18% | 4% | 89% |
| 2035 | 18% | 4% | 87% |

Estimated firm capacity using EPA's accreditation values for wind, solar, storage, and thermal resources (100%). EPA assumes a 16.8 percent reserve margin. Different than MISO cleared UCAP (unforced [accredited] capacity). Red indicates intermittent generation is necessary to meet Target Reserve Margins. The rest of the reserve margin not covered in the table consists of load modifying resources.

- 2023 – 2025: Adequate dispatchable capacity
- 2026 – 2029: Reserve margin depends on W/S/B
- 2030 – 2035: Peak Demand depends on W/S/B

*Figure D-19. By 2030, MISO will rely on wind, solar, and battery storage to meet its projected peak demand and target reserve margin.*

Beginning in 2026, MISO becomes reliant upon wind, solar, imports, or demand response (DR) to meet its target reserve margin, but the RTO still has enough dispatchable capacity to meet its projected peak demand. By 2030, the MISO region will rely on thermal resources and 4-hour battery storage to meet its peak demand, and by 2031 the region will no longer have enough dispatchable capacity or storage to meet its projected peak demand, and it will rely exclusively on non-dispatchable resources and imports to meet its target reserve margin.[86]

The trend of falling dispatchable capacity relative to projected peak demand can be seen more clearly in Figure D-20 below. By 2035, dispatchable capacity consisting of thermal generation and battery storage will only be able to provide 91 percent of the projected peak demand, necessitating the use of wind and solar to maintain resource adequacy.

---

[85] Analysis of the Proposed MATS Risk and Technology Review (RTR) | US EPA, https://www.epa.gov/power-sector-modeling/analysis-proposed-mats-risk-and-technology-review-rtr
[86] While battery storage is considered dispatchable in this analysis for the sake of simplicity, battery resources are not a substitute for generation because as grids become more reliant upon wind and solar, battery resources may not be sufficiently charged to provide the needed dispatchable power.





| Status Quo Scenario: Intermittent and Dispatchable Capacity As Percentage of Peak Load | Year | % Intermittent | % Storage | % Dispatchable |
|---|---|---|---|---|
| | 2023 | 6% | 2% | 131% |
| | 2024 | 7% | 2% | 128% |
| | 2025 | 9% | 3% | 122% |
| | 2026 | 13% | 4% | 112% |
| | 2027 | 14% | 4% | 109% |
| | 2028 | 14% | 4% | 106% |
| | 2029 | 17% | 4% | 100% |
| | 2030 | 16% | 4% | 98% |
| | 2031 | 18% | 4% | 94% |
| | 2032 | 18% | 4% | 92% |
| | 2033 | 18% | 4% | 90% |
| | 2034 | 18% | 4% | 89% |
| | 2035 | 18% | 4% | 87% |

Estimated firm capacity using EPA's accreditation values for wind, solar, storage (100%), and thermal resources (100%).

- 2023 – 2025: Adequate dispatchable capacity
- 2026 – 2029: Reserve margin depends on W/S/B
- 2030 – 2035: Peak Demand depends on W/S/B

*D-20. By 2035, dispatchable generators will only constitute 87 percent of projected peak demand, with storage accounting for four percent of peak demand capacity.*

**Partial scenario**

Like the Status Quo Scenario, there is enough dispatchable capacity in MISO under the Partial scenario to meet the projected peak demand and target reserve margin established by EPA in the RIA documents Proposed Rule Supply Resource Utilization file until the end of 2025, shown in the black font in the table in Figure D-21.



Figure D-21. By 2029, MISO will rely on wind, solar, and battery storage to meet its projected peak demand and target reserve margin.

MISO becomes reliant upon wind, solar, imports, or demand response (DR) to meet its target reserve margin in 2025, but the RTO still has enough dispatchable capacity to meet its projected peak demand. The percentage of MISO's projected peak demand that will be met by dispatchable resources in 2028 declines from 106 percent in the Status Quo scenario to 105 percent in the Partial scenario, reflecting the loss of 1,151 MW of lignite power plants in North Dakota.

In this scenario, the MISO region will no longer have enough dispatchable capacity to meet its projected peak demand in 2029, a year earlier than the Status Quo scenario, and it will rely on non-dispatchable resources, imports, or storage to meet its target reserve margin.

The trend of falling dispatchable capacity relative to projected peak demand can be seen more clearly in Figure D-22 below. By 2035, dispatchable capacity will only be able to provide 86 percent of the projected peak demand.





| Year | % Intermittent | % Storage | % Dispatchable |
|------|----------------|-----------|----------------|
| 2023 | 6% | 2% | 131% |
| 2024 | 7% | 2% | 128% |
| 2025 | 9% | 3% | 122% |
| 2026 | 13% | 4% | 112% |
| 2027 | 14% | 4% | 109% |
| 2028 | 15% | 4% | 105% |
| 2029 | 17% | 4% | 99% |
| 2030 | 17% | 4% | 98% |
| 2031 | 18% | 4% | 93% |
| 2032 | 18% | 4% | 92% |
| 2033 | 18% | 4% | 90% |
| 2034 | 18% | 4% | 88% |
| 2035 | 18% | 4% | 86% |

Estimated firm capacity using EPA's accreditation values for wind, solar, storage (100%), and thermal resources (100%).

- 2023 – 2025: Adequate dispatchable capacity
- 2026 – 2028: Reserve margin depends on W/S/B
- 2029 – 2035: Peak Demand depends on W/S/B

*Figure D-22. The percentage of peak electricity demand being served by dispatchable resources drops by one percent in 2028, relative to the Status Quo scenario, due to the closure of lignite capacity in MISO due to the MATS rule.*

**Full scenario**

Like the Status Quo scenario and Partial scenario, there is enough dispatchable capacity in MISO under the Full scenario to meet the projected peak demand and target reserve margin established by EPA in the RIA documents Proposed Rule Supply Resource Utilization file until the end of 2025, shown in the black font in the table in Figure D-23.



Figure D-23. The amount of dispatchable capacity available to meet projected peak demand in 2028 falls from 106 percent in the Status Quo scenario to 104 percent in the Full scenario, reflecting the closure of all the lignite capacity in MISO that year.

MISO becomes reliant upon wind, solar, imports, or demand response (DR) to meet its target reserve margin in 2025, but the RTO still has enough dispatchable capacity to meet its projected peak demand. The percentage of MISO's projected peak demand that will be met by dispatchable resources in 2028 declines from 106 percent in the Status Quo scenario to 104 percent in the Full scenario, reflecting the loss of 2,264 MW of lignite power plants in North Dakota.

In this scenario, the MISO region will no longer have enough dispatchable capacity to meet its projected peak demand in 2029, a year earlier than the Status Quo scenario, and it will rely on non-dispatchable resources, imports or storage to meet its target reserve margin.

The trend of falling dispatchable capacity relative to projected peak demand can be seen more clearly in Figure D-24 below. By 2035, dispatchable capacity will only be able to provide 85 percent of the projected peak demand, a two percent decline relative to the Status Quo scenario, necessitating the use of wind and solar to maintain resource adequacy.



| Year | % Intermittent | % Storage | % Dispatchable |
|------|---------------|-----------|----------------|
| **2023** | **6%** | **2%** | **131%** |
| **2024** | **7%** | **2%** | **128%** |
| **2025** | **9%** | **3%** | **122%** |
| **2026** | **13%** | **4%** | **112%** |
| **2027** | **14%** | **4%** | **109%** |
| **2028** | **16%** | **4%** | **104%** |
| **2029** | **18%** | **4%** | **98%** |
| **2030** | **18%** | **4%** | **97%** |
| **2031** | **19%** | **5%** | **92%** |
| **2032** | **19%** | **4%** | **91%** |
| **2033** | **19%** | **4%** | **89%** |
| **2034** | **19%** | **4%** | **87%** |
| **2035** | **19%** | **4%** | **85%** |

*Figure D-24. The amount of peak demand that can be met with dispatchable resources in 2028 falls from 106 in the Status Quo scenario to 104 in the Full scenario.*

**Attachment B**

to the Declaration of Christopher D. Friez

# North Dakota Lignite Energy Industry
## Economic Contribution Analysis

## Report Content

- ❖ Industry Highlights
- ❖ Understanding the Numbers
- ❖ Industry Composition
- ❖ Industry Contribution 2021
- ❖ Industry Contribution 2022
- ❖ Government Revenues 2021
- ❖ Government Revenues 2022
- ❖ Share of State Economy
- ❖ Supplemental Materials

## Preface

This report is the latest biennial assessment of the economic contribution of the North Dakota lignite energy industry.

Data for this study came from industry surveys, state and federal agencies, and other secondary sources,

The definition of the lignite energy industry and methods used to estimate its economic contribution are consistent with studies examining the economic contribution of other industries in the state.  As usual, these studies are snapshots in time and economic contributions often vary from year to year with commodity-based industries.

## Industry Highlights

The following figures are based on activity during 2021 and projections of industry output in 2022.  All values include direct and secondary economic effects.

**North Dakota Lignite Energy Industry in 2021**
- ❖ $5.64 billion gross business volume
    - ❖ $0.9 billion from mining
    - ❖ $3.2 billion from coal conversion and electricity generation
    - ❖ $1.5 billion from transmission/distribution
- ❖ 12,800 jobs (direct and secondary)
    - ❖ 3,300 jobs supported by mining
    - ❖ 8,400 jobs supported by coal conversion and electricity generation
    - ❖ 1,050 jobs supported by transmission/distribution
- ❖ $119 million in local and state government revenues

**North Dakota Lignite Energy Industry in 2022**
- ❖ $5.75 billion gross business volume
    - ❖ $0.8 billion from mining
    - ❖ $3.2 billion from coal conversion and electricity generation
    - ❖ $1.7 billion from transmission/distribution
- ❖ 12,000 jobs (direct and secondary)
    - ❖ 3,250 jobs supported by mining
    - ❖ 7,725 jobs supported by coal conversion and electricity generation
    - ❖ 1,060 jobs supported by transmission/distribution
- ❖ $104 million in local and state government revenues

*Copyright 2023 by Bangsund and Hodur.  All rights reserved.  Acknowledgments are presented at the end of this summary.

**Bangsund is a Research Scientist, Department of Agribusiness and Applied Economics and Hodur is Director, Center for Social Research, North Dakota State University

# Understanding the Numbers

**Economic contribution** assessments measure the gross size of an industry or economic sector.

*Size* is estimated by combining *direct* or first-round effects (i.e., sales, spending, and/or employment) with economic modeling to estimate secondary effects of business-to-business transactions (*indirect*) and household spending for goods and services (*induced*).

Economic measures frequently used in economic contribution assessments:
* ❖ **Labor income** – earnings of workers and sole proprietors
* ❖ **Employment** – wage and salary jobs and sole proprietor/self-employed jobs
* ❖ **Gross business volume** – includes direct sales of products and services of the industry being measured, and sum of all business-to-business and household-to-business transactions associated with indirect and induced economic activity
* ❖ **Value-added** – represents share of gross state product

An overview and additional information on study methods, data sources, and economic definitions are appended to the end of this report.

# Composition of Lignite Energy Industry

**Coal Mining**: this segment involves the process of extracting lignite coal and delivering it to conversion facilities.

**Coal Gasification:** this segment involves converting lignite coal into chemicals and other products. It is grouped with electricity generation segment of the industry.

**Electricity Generation**: this segment burns lignite coal to produce electricity.

**Transmission and Distribution**: this segment includes moving electricity to local (in-state) distributors and exporting electricity to out-of-state markets.

# Industry Contribution 2021

Coal mining had 1,131 direct jobs; business activity relating to coal mining operations supported another 1,220 jobs. Personal spending on goods and services by employees working in the coal mining sector and employees of businesses affected by coal mining supported an additional 960 jobs. The combined effects on statewide employment from coal mining was estimated at 3,300 jobs. Other economic effects from coal mining included $300 million in labor income and $915 million in gross business volume.

Coal conversion and electricity generation from lignite was estimated to have nearly 1,700 direct jobs, and business activity relating to those lignite operations supported another 4,680 jobs. Personal spending on goods and services by employees working in the coal conversion and generation activities and employees of businesses affected by those activities supported an additional 2,070 jobs. The combined direct, indirect, and induced effects on statewide employment from coal conversion and electricity generation was estimated at 8,400 jobs. Other economic effects from coal conversion and electricity generation included $670 million in labor income and nearly $3.2 billion in gross business volume.

Electricity transmission and generation from lignite-based activities was estimated to have 480 direct jobs; business activity relating to those lignite operations supported another 290 jobs. Personal spending on goods and services by employees working in coal-related electricity transmission and distribution and employees of businesses affected by those activities supported an additional 280 jobs. The combined direct, indirect, and induced effects on statewide employment from coal-related electricity transmission and distribution was estimated at 1,060 jobs. Other economic effects from transmission and distribution included $84 million in labor income and $1.5 billion in gross business volume.

The combination of coal mining, coal conversion, coal-fired electricity generation, and electricity transmission and distribution was estimated to have 3,300 direct jobs in North Dakota in 2021. These lignite coal activities supported about 6,190 jobs through business purchases of goods and services in the state. The combined personal spending of employees in the Lignite Industry, and employees of businesses involved with supplying goods and services to the industry supported another 3,310 jobs. Collectively, the industry was estimated to support 12,800 jobs in the state.

The lignite industry also generated over $1 billion in labor income, which represents wages, salaries, benefits, and sole proprietor's income. The industry also contributed $2 billion to the state's gross domestic product, and the industry's gross business volume was estimated at $5.6 billion.

| Direct, Indirect, and Induced Economic Effects, Key Economic Metrics, North Dakota Lignite Industry, 2021 | | | | |
|---|---|---|---|---|
| Industry Segment/Type of Economic Effect | Employment[1] | Labor Income | Value-added | Output |
| Coal Mining | --------------------- millions 2021 $ --------------------- | | | |
|    Direct effects | 1,131 | 165 | 227 | 560 |
|    Indirect effects | 1,220 | 84 | 152 | 270 |
|    Induced effects | 960 | 51 | 84 | 85 |
|     Total economic effects | 3,311 | 300 | 463 | 915 |
| Electricity Generation and Coal Conversion | | | | |
|    Direct effects | 1,694 | 228 | 240 | 1,728 |
|    Indirect effects | 4,680 | 332 | 568 | 1,120 |
|    Induced effects | 2,070 | 110 | 182 | 331 |
|     Total economic effects | 8,444 | 671 | 990 | 3,178 |
| Electricity Transmission and Distribution | | | | |
|    Direct effects | 483 | 50 | 453 | 1,386 |
|    Indirect effects | 290 | 19 | 69 | 111 |
|    Induced effects | 285 | 15 | 25 | 45 |
|     Total economic effects | 1,058 | 84 | 547 | 1,543 |

[1] Employment represents total jobs, and does not represent employment in FTE.





| Direct, Indirect, and Induced Economic Effects, Key Economic Metrics, North Dakota Lignite Industry, 2021 | | | |
|---|---|---|---|
| Type of Economic Effect | Employment[1] | Labor Income | Value-added | Output |
| ND Lignite Industry | -------------------- millions 2021 $ -------------------- | | | |
| Direct | 3,308 | 443 | 919 | 3,674 |
| Indirect | 6,190 | 436 | 789 | 1,501 |
| Induced | 3,310 | 177 | 291 | 461 |
| **Total** | **12,808** | **1,056** | **1,999** | **5,636** |
| [1] Employment represents total jobs, and does not represent employment in FTE. | | | | |

# Industry Contribution 2022 (projected)

The following figures and values were based on an industry survey soliciting estimates of calendar year 2022 business activities, although the survey was administered prior to yearend. Firms were asked to estimate what their 2022 revenues and expenditures would be based on data available at the time of the survey and augment that information with expected activities for the remaining months in 2022. Data provided by the industry for 2022 is treated as a projection. However, the projection is considered a reasonable estimate of 2022 since, in many cases, the estimates included actual revenues and expenditures for 10 to 11 months of 2022.

Coal mining had 1,170 direct jobs; business activity relating to coal mining operations supported another 1,090 jobs. Personal spending on goods and services by employees working in the coal mining sector and employees of businesses affected by coal mining supported an additional 990 jobs. The combined effects on statewide employment from coal mining was estimated at 3,250 jobs. Other economic effects from coal mining included $300 million in labor income and $830 million in gross business volume.

Coal conversion and electricity generation from lignite was estimated to have 1,630 direct jobs, and business activity relating to those lignite operations supported another 4,240 jobs. Personal spending on goods and services by employees working in the coal conversion and generation activities and employees of businesses affected by those activities supported an additional 1,850 jobs. The combined direct, indirect, and induced effects on statewide employment from coal conversion and electricity generation was estimated at 7,720 jobs. Other economic effects from coal conversion and electricity generation included $620 million in labor income and over $3.2 billion in gross business volume.

Electricity transmission and generation from lignite-based activities was estimated at 470 direct jobs; business activity relating to those lignite operations supported another 300 jobs. Personal spending on goods and services by employees working in coal-related electricity transmission and distribution and employees of businesses affected by those activities supported an additional 280 jobs. The combined direct, indirect, and induced effects on statewide employment from coal-related electricity transmission and distribution was estimated at 1,050 jobs. Other economic effects from transmission and distribution included $86 million in labor income and $1.7 billion in gross business volume.

The combination of coal mining, coal conversion, lignite coal-fired electricity generation, and electricity transmission and distribution was estimated to have 3,270 direct jobs in North Dakota in 2022. These lignite coal activities supported about 5,630 jobs through business purchases of goods and services in the state. The combined personal spending of employees in the Lignite Industry, and employees of businesses involved with supplying goods and services to the industry supported another 3,120 jobs. Collectively, the industry was estimated to support 12,020 jobs in the state.

The lignite industry also generated over $1 billion in labor income, which represents wages, salaries, benefits, and sole proprietor's income. The industry also contributed nearly $2.2 billion to the state's gross domestic product, and the industry's gross business volume was estimated at $5.8 billion.

| Direct, Indirect, and Induced Economic Effects, Key Economic Metrics, North Dakota Lignite Industry, Projected 2022 | | | | |
|---|---|---|---|---|
| Industry Segment/Type of Economic Effect | Employment[1] | Labor Income | Value-added | Output |
| Coal Mining | -------------------- millions 2022 $ -------------------- | | | |
|    Direct effects | 1,168 | 177 | 219 | 537 |
|    Indirect effects | 1,090 | 76 | 123 | 207 |
|    Induced effects | 990 | 53 | 87 | 88 |
|      Total economic effects | 3,248 | 306 | 430 | 832 |
| | | | | |
| Electricity Generation and Coal Conversion | | | | |
|    Direct effects | 1,633 | 225 | 510 | 2,008 |
|    Indirect effects | 4,240 | 295 | 534 | 935 |
|    Induced effects | 1,850 | 99 | 163 | 297 |
|      Total economic effects | 7,723 | 619 | 1,208 | 3,239 |
| | | | | |
| Electricity Transmission and Distribution | | | | |
|    Direct effects | 473 | 51 | 473 | 1,525 |
|    Indirect effects | 300 | 20 | 47 | 116 |
|    Induced effects | 280 | 15 | 25 | 45 |
|      Total economic effects | 1,053 | 86 | 545 | 1,687 |

[1] Employment represents total jobs, and does not represent employment in FTE.



Gross Business Volume, Lignite Energy Industry, 2022

Transmission and Distribution 29%

Mining 15%

Conversion 56%



| Direct, Indirect, and Induced Economic Effects, Key Economic Metrics, North Dakota Lignite Industry, 2022 (projected) | | | |
|---|---|---|---|
| Type of Economic Effect | Employment[1] | Labor Income | Value-added | Output |
| ND Lignite Industry | -------------------- millions 2022 $ -------------------- | | | |
| Direct | 3,274 | 453 | 1,202 | 4,070 |
| Indirect | 5,630 | 391 | 704 | 1,258 |
| Induced | 3,120 | 167 | 275 | 430 |
| **Total** | **12,024** | **1,011** | **2,182** | **5,758** |
| [1] Employment represents total jobs, and does not represent employment in FTE. | | | | |

# Government Revenues 2021

Government revenues are often used as a measure of how effectively an industry supports public services.  In North Dakota, the most common sources of in-state public revenues are severance taxes, sales and use taxes, property taxes, and income taxes.  A host of other taxes and revenue sources are often tracked in economic contribution and impact assessments, but those sources have varying levels of contribution to government revenue.

The lignite industry was estimated to contribute $64.5 million in government revenues directly from the firms in the industry.  Tax revenues arising from secondary business activity were estimated to generate an additional $54.5 million in state and local government revenues.  A total of $119 million in state and local tax revenues were generated by the Lignite Industry in North Dakota in 2021.

Coal conversion and coal severance taxes were estimated at $26.5 million.  Other substantial contributions to state and local government revenues from secondary economic effects were from sales taxes ($25 million) and property taxes ($19.5 million).

| State and Local Government Revenues, Lignite Industry, North Dakota, 2021 | | | |
|---|---|---|---|
| Government Revenue | Paid Directly by the Industry | Collected from Indirect and Induced Activity | Total Collections |
| | ---------------------- 000s 2021 $ ---------------------- | | |
| Coal Severance Tax | 10,518 | --- | 10,518 |
| Coal Conversion Tax | 15,991 | --- | 15,991 |
| Sales, Property, and Corporate Income Taxes (reported in survey data) | 25,861 | --- | 25,861 |
| | | | |
| Social Insurance Tax | 1,952 | 1,247 | 3,200 |
| Personal Income Tax | 3,039 | 2,377 | 5,416 |
| Sales Tax | see above | 25,336 | 25,336 |
| Property Tax | see above | 19,531 | 19,531 |
| Corporate Income Tax | see above | 1,362 | 1,362 |
| Other Taxes | 2,666 | 1,438 | 4,104 |
| Non Taxes | 4,568 | 3,222 | 7,789 |
| | | | |
| **Totals** | **64,595** | **54,512** | **119,107** |

# Government Revenues 2022 (projected)

The lignite industry was projected to contribute $53 million in government revenues directly from the firms in the industry. Tax revenues arising from secondary business activity, based on projections of industry activity, were estimated to generate an additional $50.6 million in government revenues. A projected total of $103.5 million in state and local tax revenues were created by the Lignite Industry in North Dakota in 2022.

Coal conversion and coal severance taxes were estimated at $15.8 million. Other substantial contributions to state and local government revenues from secondary economic effects were from sales taxes ($23.5 million) and property taxes ($18 million).

| State and Local Government Revenues, Lignite Industry, North Dakota, 2022 (projected) | | | |
|---|---|---|---|
| Government Revenue | Paid Directly by the Industry | Collected from Indirect and Induced Activity | Total Collections |
| | ---------------------- 000s 2022 $ ---------------------- | | |
| Coal Severance Tax | 10,450 | --- | 10,450 |
| Coal Conversion Tax | 5,360 | --- | 5,360 |
| Sales, Property, and Corporate Income Taxes (reported in survey data) | 25,667 | --- | 25,667 |
| | | | |
| Social Insurance Tax | 1,996 | 1,183 | 3,179 |
| Personal Income Tax | 3,107 | 2,264 | 5,371 |
| Sales Tax | see above | 23,457 | 23,457 |
| Property Tax | see above | 18,082 | 18,082 |
| Corporate Income Tax | see above | 1,310 | 1,310 |
| Other Taxes | 2,349 | 1,331 | 3,680 |
| Non Taxes | 4,024 | 3,003 | 7,027 |
| | | | |
| **Totals** | **52,953** | **50,630** | **103,583** |

# Share of State Economy

A key means of placing an industry contribution study into context is showing its share of a broader economy. The lignite energy industry represents an important share of the North Dakota's economy. The lignite energy industry represented 2.6 percent of the state's gross state product and 4 percent of the state's gross business volume. The industry represented about 2.8 percent of the state's total labor income. The industry represents about 1.2 percent of all state and local government revenues.

The lignite energy industry share of employment was 2.3 percent of statewide employment. Those shares are based on a state total for both wage and salary jobs and sole proprietors/self employed jobs. The industry's share of the state economy was not estimated for 2022 as state-level data was unavailable prior to completing the study.

| ANNUAL SHARE OF STATE TOTALS, North Dakota Lignite Energy Industry | | | | |
|---|---|---|---|---|
| Industry Segment | Labor Income | Value-added (GSP) | Total Output | State and Local Government Revenues |
| State-level Values for 2021 | $37.3 billion | $77.0 billion | $142.7 billion | $9.954 billion |
| Mining | 0.81% | 0.60% | 0.64% | --- |
| Conversion | 1.80% | 1.29% | 2.23% | --- |
| Transmission and Distribution | 0.23% | 0.71% | 1.08% | --- |
| | | | | |
| All Segments | 2.83% | 2.60% | 3.95% | 1.20% |

| ANNUAL SHARE OF STATE EMPLOYMENT, North Dakota Lignite Energy Industry | | | |
|---|---|---|---|
| Industry Segment | Total Employment | Wage and Salary | Self-employed |
| State-level Values for 2021 | 557,702 | 434,811 | 122,691 |
| Mining | 0.59 | 3B4# | 3T5# |
| Conversion | 1.51 | 3k<# | 3;9# |
| Transmission and Distribution | 0.19 | 3L4:# | 3B;# |
| | | # | # |
| All Segments | 2.30% | 4D:(# | 4E9(# |

# Supplemental Materials

**Economic Contribution Analysis**

An economic contribution assessment measures the gross size of some aspect or component of an economy, and is usually measured in conjunction with the overall size of a given economy over a specified period. Size is estimated by combining direct or first-round effects (e.g., industry expenditures, business sales, new employment) with economic modeling to estimate how those first round effects generate business-to-business transactions and household spending on consumer goods and services. Both of those conduits for economic output can be framed using labor income, employment, value-added, gross business volume and government revenues.



**Key Terms and Concepts**

Direct Effects:  First-round of payments for services, labor, and materials and/or sales of an industry's products.

Indirect Effects:  Economic activity created through purchases of goods and services by businesses.

Induced Effects:  Economic activity created through purchases of goods and services by households.

Industry Output and Gross Business Volume:  Industry output is the value of all goods and services produced and supported by an industry. In most industries, output is largely synonymous with sales; however, for some sectors output also includes changes in product inventory. For lignite energy industry, direct output includes both sales and inventory adjustments.

When output from business-to-business transactions (*indirect*) and households-to-businesses (*induced*) are measured, they also are described as the *sum of gross receipts* as annual adjustments to inventories are largely unquantified and not distinguished from sales. *Gross business volume* (GBV) therefore includes direct output/sales and includes secondary sales from indirect and induced economic activity.

<u>Value-added</u>:  Value-added is synonymous with measures of gross domestic product (GDP) and gross state product (GSP), are some of the most commonly used economic measures to indicate the economic size and change in economic output.  However, official government estimates of GDP and GSP do not include secondary economic effects generated by any industry.  For lignite energy industry, official government estimates are primarily limited to coal mining, coal conversion, and transmission/distribution.  Economic contribution assessments include secondary economic effects, and include GSP from those effects, thereby providing a more realistic and representative portrait of an industry.

Key components of value-added include labor income, consumption of fixed capital, profits, business current transfer payments (net), and income derived from dividends, royalties, and interest.  In nontechnical terms, value-added is equal to product value minus production inputs.  For example, value-added from coal mining would be the value of coal sold less the value of the inputs consumed in mining the coal.  Depreciation charged to durable assets (e.g., buildings, pipelines, processing equipment) are not included in value-added measures.

<u>Employment Compensation</u>:  Wages, salaries, and benefits earned by an employee.

<u>Proprietor Income</u>:  Payments received by self-employed individuals and unincorporated business owner/operators.

<u>Labor Income</u>:  Wages, salaries, and benefits for employees and compensation for self-employed individuals.

<u>Input-output Analysis (I-O)</u>:  Mathematical application of the interdependence among producing and consuming sectors in an economy.

<u>I-O Matrix</u>:  Depiction of an economy using a grid of rows and columns that represents consumption and production for each economic sector in an economy.

<u>Intermediate Inputs</u>:  Goods and services consumed in one year to produce another good or service.  Intermediate inputs do not include expenditures for capital inputs used for multiple production seasons (e.g., machinery, buildings).

<u>Capital Inputs</u>: Represent the use of inputs to produce another good or service that are not consumed in one production season and are subject to depreciation.  *Capital expenditures* represent the purchase of those depreciable assets.

<u>Industry Balance Sheet</u>:  Dividing an industry or economic sector into various components for use in estimating the economic effects using input-output analysis.  Components of the balance sheet include measures of output, wage and salary employment, self-employment, payroll and proprietor income, other property type income, taxes on production and imports, and intermediate inputs.

<u>Institutions</u>:  Represent governments and other non-private entities consuming goods and services in an economy.

<u>Households</u>:  Represent one or more individuals in a specific living arrangement for which income from all sources is used to purchase goods and services.

<u>North American Industry Classification System (NAICS)</u>:  Government classification system for all goods and services produced in the economy.

Agribusiness & Applied Economics, NDSU  |  701.231.7441  |  https://www.ndsu.edu/agriculture  |  ndsu.agribusiness@ndsu.edu

**Employment Sources and Measures**

Employment is broadly measured in two distinct categories: covered and uncovered. Covered workers are those that are employed by a business, institution, or government agency, receive a wage or salary, and are subject to unemployment insurance (UI). Jobs that fall under an UI program are called 'covered' employment. Quarterly Census of Employment and Wages (QCEW) employment reported by Job Service North Dakota is 'covered' employment. QCEW data are collected for each state and reported by the U.S. Bureau of Labor Statistics (BLS). Therefore, employment statistics for self-employed individual cannot be derived from QCEW data.



**Developing Economic Sector Profiles**

An industry balance sheet or economic profile is one of the most important elements in economic contribution studies.  Nearly all key economic metrics have their origin within an industry's economic profile/sector. Information and data to create economic sector profiles were collected from surveys of industry firms and data from government agencies.

While the IMPLAN modeling platform provides baseline economic profiles generated from proprietary estimation techniques applied to government data, this study relied on state-sourced data and industry input to create a customized IO matrix.  The process of developing study-specific economic profiles and then modifying an IO matrix is time consuming and requires considerable empirical analysis, but the results from those efforts produce a credible and transparent evaluation of an industry's role in an economy.



General Transposition of Financial Information into IMPLAN Economic Sector Profiles

Source:  DA Bangsund, Department of Agribusiness and Applied Economics, NDSU

**Treatment of Traditional Economic Sectors Supporting Lignite Energy Industry**

This summary omits specific details of how the secondary economic effects are distributed among the state's numerous economic sectors and sub-sectors.  Several economic sectors support the lignite energy industry by providing inputs and services to various segments of the industry.  Examples include manufacturing, financial institutions, legal representation, business services, industrial equipment and machinery, among others.  Under some definitions, those activities and sectors are presented as "direct" segments of the industry. However, from the perspective of how this study's input-output analysis was structured, those sectors represent "indirect" economic output of the industry, meaning those sectors are supported and sustained from purchases relating to lignite energy industry mining, conversion, and transportation/distribution.

# Acknowledgments

Special thanks are extended to Jason Bohrer, President, Lignite Energy Council, for his leadership, guidance, and information throughout the study, and to Kay LaCoe, Vice President of Communications, Lignite Energy Council who assisted with the surveys and soliciting industry cooperation for the study.

The study authors and study sponsors would like to thank all the companies and individuals that took the time to complete and return the survey materials. This study, with its reliance on industry data, would not have been possible without industry cooperation.

Financial support was provided by the North Dakota Lignite Energy Council. We express our appreciation for their support.

We wish to thank Edie Nelson, Department of Agribusiness and Applied Economics, for document preparation.

The authors assume responsibility for any errors of omission, logic, or otherwise. Any opinions, findings, and conclusions expressed in this publication are those of the authors and do not necessarily reflect the view of the NDSU Department of Agribusiness and Applied Economics or the NDSU Center for Social Research.

North Dakota State University does not discriminate on the basis of age, color, disability, gender expression/identity, genetic information, marital status, national origin, public assistance status, race, religion, sex, sexual orientation, or status as a U.S. veteran. This publication is available electronically at this web site: http://agecon.lib.umn.edu/. Please address your inquiries regarding this publication to: Department of Agribusiness & Applied Economics, P.O. Box 6050, Fargo, ND 58108 6050, Phone: 701 231 7441, Fax: 701 231 7400, Email: ndsu.agribusiness@ndsu.edu.

NDSU is an equal opportunity institution.

Copyright 2023 by Bangsund and Hodur. All rights reserved. Readers may make verbatim copies of the document for non-commercial purposes by any means, provided this copyright notice appears on all such copies.

# EXHIBIT 13

**DECLARATION OF MIKE HOLMES**
**IN SUPPORT OF PETITIONERS' MOTION TO STAY FINAL RULE**

I, Mike Holmes, hereby declare and state under penalty of perjury that the following is true and correct to the best of my knowledge and is based on my personal knowledge or information available to me in the performance of my official duties:

1.   My name is Mike Holmes, and my business address is 1016 Owens Avenue, Bismarck, North Dakota, 58502. I am over the age of 18, have personal knowledge of the subject matter, and am competent to testify concerning the matters in this declaration.

2.   I have served as the Vice President of the Lignite Energy Council and the Director and Technical Advisor for North Dakota's Lignite Research, Development and Marketing program since December 2017. I am providing this declaration due to concerns about the closure of Lignite Energy Council member facilities which would cause irreparable harm to the regional industry and electricity consumers given the unachievable standards EPA has imposed upon these facilities.

3.   The Lignite Research, Development and Marketing program is a grant program focused on developing technology to optimize efficiency, control emissions, maintain reliability and low costs for the region's lignite generated baseload electricity.

4.    I have Bachelor of Science degrees in mathematics and chemistry from Mayville State University, and a Master of Science degree in chemical engineering from the University of North Dakota. I have worked in technology development for over 35 years including project manager roles on multiple research and development projects focused on mercury capture spanning lignite, subbituminous, and bituminous coals.

5.    I am submitting this declaration in support of Petitioners' Motion to Stay the Final Rule published by the U.S. Environmental Protection Agency (EPA) on May 7, 2024, entitled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review," 89 Fed. Reg. 38508 (Final Rule).

6.    I have significant concerns that the Final Rule is based on inaccurate assumptions and ignores the complex science associated with mercury capture from lignite coals in general and specifically North Dakota lignite.

7.    In the Final Rule, EPA lowered the emission limit for mercury for Lignite-fired units from the current limit of 4.0 lb/$10^{12}$ Btu to 1.2 lb/$10^{12}$ Btu, even though technology hasn't been demonstrated to have reached the point of consistently achieving those levels of removal.

8.      As support for the Rule, EPA relies heavily on two reports by Andover Technology Partners, one submitted to EPA in 2023 entitled "Assessment of Potential Revisions to the Mercury and Air Toxics Standards," Docket ID No. EPA-HQ-OAR-2018-0794 (June 15, 2023) ("Andover 2023 Report"), and one submitted to EPA in 2021 entitled "Analysis of PM and Hg Emissions and Controls from Coal-Fired Power Plants," Docket ID No. EPA-HQ-OAR-2018-0794-4583 (Aug. 19, 2021) ("Andover 2021 Report") (together the "Andover Reports").

9.      To assess whether EPA was using accurate facts as its justification for the Final Rule's feasibility determinations, the Lignite Energy Council (LEC) requested an independent review of EPA's reliance on the Andover Reports from RLR Consulting, LLC, submitted here as Exhibit A to my declaration (RLR Memorandum).

10.     The major conclusions of the RLR Memorandum critique of the Andover Reports, with which I agree, include the following:

        a.  *Control costs.*  The Andover 2023 Report parrots EPA's clearly erroneous cost effectiveness result for its 800MW model plant of $8,703 per pound from EPA's proposed rule without providing any additional support for that conclusion.  In its comments, the Lignite Energy Council (LEC) identified a significant math error in EPA's

analysis and showed that a correct calculation even using EPA's aggressive assumptions would be $28,200 per pound of mercury removed. Lignite Energy Council Cmt. at 11, EPA-HQ-OAR-2018-0794-5957. EPA agreed and revised its analysis to a cost of $28,176. 89 Fed Reg at 38548. However, the Andover 2023 Report does not recognize EPA's original error or the correction EPA made in the final rule. Therefore, the cost-effectiveness conclusions made in the Andover 2023 Report remain demonstrably incorrect based on EPA's own admission.

b.  *Control efficiency needed to comply and capability of facilities to meet such efficiencies.* The Andover 2023 Report claims EPA is correct that a control efficiency of 76-92% at lignite plants would be sufficient to comply with the Final Rule but provides no additional factual or analytical support for agreeing with that conclusion. The Andover 2023 Report also claims that compliance with those numbers is "well within" the capabilities of lignite fired plants because they are all equipped with scrubbers. These statements are clearly incorrect for several reasons explained in detail in the RLR Memorandum. In summary, the Andover 2023 Report merely assumes without analysis that the control efficiencies identified are achievable on lignite coal because the

facilities have scrubbers. However, as noted in the RLR Memorandum, scrubbers are only effective at removing mercury from exhaust with high halogen (chlorine) levels such as bituminous, *not lignite or subbituminous* coal, because the halogens help oxidize the mercury into a form more easily captured in a scrubber. While both subbituminous and lignite facilities have low halogen levels, subbituminous facilities are able to use SCR to help oxidize the mercury to facilitate capture in a scrubber, whereas SCR is infeasible on North Dakota lignite. As previously recognized by the North Dakota Department of Environmental Quality,[1] the low melting point and high alkaline metal levels of lignite ash causes masking, blinding, and deactivation, of the SCR catalyst and can plug the gas passages in the reactor in an extremely short period of time. The Andover 2023 Report fails to recognize these facts, rendering baseless its opinions on the effectiveness of emission controls at lignite facilities.

c. *SO₃ Levels*. EPA relies on the Andover 2021 Report to ignore the differences in $SO_3$ levels among different coal types that can significantly affect the mercury control effectiveness of carbon

---

[1] *See* North Dakota State Implementation Plan for Regional Haze, App. D, at D.2.c-5 (citing Benson, Schulte, Patwardhan, Jones (2021) "The Formation and Fate of Aerosols in Combustion Systems for SCR NOx Control Strategies" A&WMA's 114th Annual Conference, #983723) (*available at* https://deq.nd.gov/AQ/planning/RegHaze.aspx).

injection controls systems. Specifically, EPA relies on the Andover 2021 Report to claim that there are commercially available advanced "$SO_3$ tolerant" Hg sorbents and other technologies that are specifically designed for Hg capture in high $SO_3$ flue gas environments. The only support for this statement is EPA's citation to Tables 8 and 9 in the Andover 2021 Report. However, RLR reviewed Tables 8 and 9 in that Andover 2021 Report, and did not find any support for EPA's claim of $SO_3$ tolerance because the high sulfur cases evaluated were only bituminous coals, not lignite. The RLR Memorandum provides information that the Andover 2021 Report ignores entirely. The RLR Memorandum notes that one of the major challenges in controlling mercury from combustion of lignite versus subbituminous coal is sulfur content. The higher (on average) sulfur content of lignite leads to the formation of sulfur trioxide ($SO_3$) in the combustion zone. The $SO_3$ in the flue gas competes with the mercury for adsorption sites on any injected activated carbon. Since the $SO_3$ concentration in the flue gas is on the order of parts per million (ppm) by volume while the mercury concentration is on the order of parts per trillion (ppt) by volume, $SO_3$ overwhelms the adsorptive capacity of activated carbon injection to

control mercury emissions from lignite facilities. The Andover 2021 Report does not address these facts.

d. *Lower emission rates are achieved at a lower cost than higher emission rates.* The RLR Memorandum explains how the errors in the Andover 2023 Report summarized above result in the authors' counter-intuitive conclusion that greater emissions reductions will cost less to achieve. Moreover, as with the rest of the Andover Reports, none of the assumptions or equations that are used to produce its conclusions are shown so there is no way to replicate the calculations.

11. It is my opinion that EPA's reliance on the Andover Report is bootstrapping at its worst. In three steps: (1) EPA made unsubstantiated claims in its proposal about how lignite could meet the standard designed for other coals, then (2) the Andover report indicates agreement with EPA's analysis and conclusions, but likewise without providing any factual support, and finally (3) EPA claimed in the final rule that the Andover Reports provide the factual support for its otherwise unjustified conclusions.

12. In my opinion, the errors made in the Andover Reports, upon which EPA relies entirely for many of its determinations, result in the erroneous conclusion that the new mercury limit is achievable by cost-effective controls at lignite facilities. Once those errors are corrected, the data and information

available in the record for EPA's rule confirms the opposite conclusion—most lignite facilities cannot cost-effectively achieve the new mercury limit imposed by EPA and may not be able to achieve the limit at all, regardless of cost. This conclusion likewise confirms the declarations made by members of LEC that the new mercury limit presents a significant threat of forcing the premature closure of lignite-fired electric generating units, and that the timing of EPA's rule requires actions to address that threat immediately, resulting in harm to LEC's members.

Executed in Bismarck, North Dakota, on June 4, 2024.


Mike Holmes
Director and Technical Advisor
North Dakota Lignite Research
Development and Marketing Program

# EXHIBIT A

# RLR Consulting, LLC

5401 Aztec Dr
Raleigh, North Carolina 27612

Phone  (919) 696-7008
Fax     (919) 788-0878

## M E M O R A N D U M

**TO**:        Jonathan Fortner, LEC

**FROM**:    Ralph L. Roberson, P.E.

**DATE**:     June 3, 2024

**SUBJECT**:   Review Comments – 2023 Andover Report

## INTRODUCTION

Last year, the Environmental Protection Agency (EPA) proposed significant revisions to the Agency's Mercury and Air Toxics Standards (MATS) rule.[1]  These revisions were proposed in response to EPA's previously announced review of its 2020 Risks and Technology and Review (RTR).[2]  During the public comment period, a report titled "Assessment of Potential Revisions to the Mercury and Air Toxics Standards" was submitted to EPA's rulemaking docket.[3]

The Lignite Energy Council (LEC) asked RLR Consulting LLC (RLR) to review and comment on the 2023 Andover Report and to primarily focus on the section of the report that deals with controlling mercury (Hg) emissions from lignite-fired units.

## SUMMARY OF FINAL RULE -- LIGNITE

On May 7, 2024, EPA published a final version of the Agency's MATS RTR.[4]  While the Agency appears to have made some revisions to its analysis, EPA nevertheless lowered the Hg emission limit for lignite-fired units from the current limit of 4.0 lb/$10^{12}$ Btu to 1.2 lb/$10^{12}$ Btu.

## DISCUSSION OF 2023 ANDOVER REPORT

One of the first things we noticed is that the 2023 Andover Report simply parrots EPA's cost effectiveness result for its 800 MW model plant of $8,703 per pound.  In its comments on the proposed rule, LEC identified a significant computational error in EPA's analysis and showed that a correct calculation, using EPA's own assumptions, would yield $28,200 per pound of Hg removed.[5]  EPA apparently agreed with LEC's comment and revised its analysis to arrive at a

---

[1] 88 Fed. Reg., 24854 (April 24, 2023).
[2] 87 Fed. Reg., 7624 (February 9, 2022).
[3] "Assessment of Potential Revisions to the Mercury and Air Toxics Standards," prepared by Andover Technology Partners, Manchester-by-the-Sea, MA June 15, 2023, Docket ID: EPA-HQ-OAR-2018-0794-6903 (cited hereafter as "2023 Andover Report").
[4] 89 Fed. Reg., 38508 (May 7, 2024).
[5] Lignite Energy Council public comments. Docket ID: EPA-HQ-OAR-2018-0794-5957.

cost of \$27,176 per pound of Hg removed.[6]  It is difficult to reconcile how the Andover author who professes so much Hg control expertise would not spot an error of this magnitude.

The 2023 Andover Report categorically proclaims that lignite-fired units are capable of achieving the proposed Hg emission standard.

> The data in EPA's analysis demonstrated that emission capture between about 76% and 92% would be necessary for lignite units to meet the proposed limit of 1.2 lb/TBtu.  This is well within the capabilities of these facilities.  Every one of these facilities is equipped with some form of FGD (scrubbers) and/or a baghouse.[7]

The first question is:  where are the references and/or data to support the statement, "[t]his is well within the capabilities of these facilities?"  Second, the statement that all lignite-fired units are equipped with FGD systems and/or baghouses suggests the author really doesn't understand the fundamentals of Hg control.  If we were evaluating units that burn bituminous coal, then the presence of scrubbers and/or baghouses would be germane to the discussion.  That is, bituminous coals contain significant halogen (e.g., chlorine) content, which means that upon combustion, the Hg in the coal tends to form oxidized compounds (e.g., $HgCl_2$).  Since $HgCl_2$ is very soluble in water, a wet scrubber becomes an excellent Hg control technology.  Oxidized Hg compounds also tend to be "sticky" and can be collected in the ash layer that forms on the surface of bag filters.  Unfortunately, this is not true for the lower coal ranks (i.e., subbituminous and lignite).

Subbituminous and lignite are characterized by very low halogen content.  Accordingly, the combustion of lower rank coals produces mainly elemental Hg ($Hg^0$), which is considerably more difficult to capture.  However, there are several factors that cause Hg control from lignite to be considerably more challenging than from subbituminous coal.  First, the native Hg content in subbituminous coals tends to be lower than that for lignite, especially when the content is expressed in units of the emission limit – lb $Hg/10^{12}$ Btu heat input.  That is, lignite can have higher Hg concentrations in the coal and definitely has lower heating value than subbituminous coal.  To achieve the same emission limitation, a lower Hg removal efficiency would be required for subbituminous than lignite.  Second, many units that burn subbituminous coal are also equipped with selective catalytic reduction (SCR) systems for the control of nitrogen oxides ($NO_X$).  The SCR systems can be helpful for Hg control because the catalyst will convert some of the elemental Hg to oxidized Hg, and we have already explained how much easier the oxidized form is to collect than elemental.  Apparently, neither Andover nor EPA understands that SCR systems have not been installed on North Dakota units because of concern over catalyst plugging.

Perhaps the major challenge in controlling Hg from combustion of lignite versus subbituminous coal is sulfur content.  The higher (on average) sulfur content of lignite leads to the formation of sulfur trioxide ($SO_3$) in the combustion zone.  The $SO_3$ in the flue gas competes with the $Hg^0$ for

---

[6] EPA Memorandum, "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category (2024 Technical Memo)," January 2024, Docket ID: EPA-HQ-OAR-2018-0794-6919.
[7] 2023 Andover Report, p. 30-31.

adsorption sites on any injected activated carbon.  Since the $SO_3$ concentration in the flue gas is on the order of parts per million (ppm) by volume while the Hg concentration is on the order of parts per trillion (ppt) by volume, it is clear why the $SO_3$ can overwhelm the adsorptive capacity of activated carbon injection.

While slightly outside RLR's scope, we believe that in responding to public comments, EPA gave the $SO_3$ impact on Hg control from lignite very short shrift.  In the preamble EPA states, "coal-fired EGUs utilizing bituminous coal—which also experience significant rates of $SO_3$ formation in the flue gas stream—have also successfully demonstrated the application of Hg control technologies to meet a standard of 1.2 lb/TBtu."[8]  While this statement may be valid, it is not particularly relevant to the issue of $SO_3$ and lignite.  As we discussed earlier, combustion of bituminous coal, which always contain significant levels of halogens, produces mostly oxidized Hg which is collected both (1) on particles that are collected in the particulate control device and (2) in wet FGD systems that most all bituminous units operate.  Therefore, activated carbon injection (ACI) does not play a significant role in controlling Hg emissions from units that burn bituminous coal.  EPA also argues that the Agency has determined that there are commercially available advanced ''$SO_3$ tolerant'' Hg sorbents and other technologies that are specifically designed for Hg capture in high $SO_3$ flue gas environments.[9]  As support for this statement, EPA cites to Tables 8 and 9 in a 2021 Andover Technology Partners Report.[10]  RLR reviewed Tables 8 and 9 in that 2021 Andover Report, and we do not find any support for EPA's claim of $SO_3$ tolerance.

Lastly, the 2023 Andover Report contains some statements regarding the control cost of Hg from units burning lignite that are simply incomprehensible.  For example:

> As shown, at an fPM emission rate of 0.006 lb/MMBtu and a Hg emission rate of 0.5 lb/TBtu, the impact to generation cost is $1.33/MWhr.  At an fPM emission rate of 0.0024 lb/MMBtu and a Hg emission rate of 0.5 lb/TBtu, the impact to generation cost is $0.24/MWhr.[11]

Apparently, the author wants us to believe that a lower emission rate (i.e., 0.0024 lb/MMBtu) can be achieved at a lower cost to industry than a higher emission rate (i.e., 0.006 lb/MMBtu).  This nonsense is also reflected in Figure 15 that shows the annualized cost of the 0.006/0.5 set of limits to be approximately $63 million while the considerably lower rate (0.0024/.5) can be achieved for a mere $11 million.[12]  Of course, as with most of the 2023 Andover Report, none of the assumptions or equations that are used to produce the tables and figures are shown so there is no way to replicate the calculations.

[8] 89 Fed. Reg. at 38546.
[9] 89 Fed. Reg. at 38539.
[10] "Analysis of PM and Hg Emissions and Controls from Coal-Fired Power Plants," prepared by Andover Technology Partners, Manchester-by-the-Sea, MA August 19, 2021, Docket ID: EPA-HQ-OAR-2018-0794-4583 (cited hereafter as "2021 Andover Report"), pp. 49-50, Tables 8-9.
[11] 2023 Andover Report, p. 37.
[12] *Id.*

**CONCLUSIONS**

In RLR's opinion, the 2023 Andover Report expresses mostly opinions about Hg control and Hg control cost.  The report fails to provide data and/or references to buttress the majority of the opinions expressed.

# EXHIBIT 14

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| STATE OF NORTH DAKOTA, STATE OF WEST VIRGINIA, STATE OF ALASKA, STATE OF ARKANSAS, STATE OF GEORGIA, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, COMMONWEALTH OF KENTUCKY, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF UTAH, COMMONWEALTH OF VIRGINIA, AND STATE OF WYOMING, | Case No. 24-1119 |
| *Petitioners*, | |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY | |
| *Respondent*. | |

**DECLARATION OF STEVEN A. BENSON IN SUPPORT OF PETITIONERS' MOTION TO STAY FINAL RULE**

I, Steven A. Benson, hereby declare and state under penalty of perjury that the following is true and correct and is based on personal knowledge and information available to me in the performance of my professional duties:

1

1. My name is Steven A. Benson. I am over 18 years of age, have personal knowledge of the subject matter, and am fully competent to testify concerning this Declaration.

2. My current position is the President of Microbeam Technologies Incorporated where I manage a team of engineers and scientists who work on energy related projects conducted for government and industry clients. I have a Bachelor of Science degree in chemistry from Minnesota State University and a PhD in Materials Science and Engineering, with a specialty in Fuel Science, from Pennsylvania State University.

3. I have over 35 years of research and development experience related to the development of efficient and clean energy production systems. My principal areas of interest and expertise include development and management of complex multidisciplinary programs including technologies to improve the performance of fuel resource recovery, refining, conversion and environmental control systems; transformations and fate of fuel impurities in combustion and gasification systems; carbon dioxide separation and capture technologies; advanced analytical techniques to measure the chemical and physical transformations of inorganic species in gases; computer-based models to predict the emissions and fate of pollutants from combustion and gasification systems; and advanced materials for power systems.

4. Based on my position and expertise, I have personal knowledge and experience to understand the characteristics of North Dakota lignite coal, the operation of lignite coal-fired electric generating units (EGU's) and the associated combustion products. In addition, I have personal experience related to the understanding of Powder River Basin coals and operations of EGU's that utilize them.

5. In 1993, three other colleagues and I researched the mercury characteristics of North Dakota lignite. The goal of the study was to provide an accurate and current appraisal of mercury

content of North Dakota lignites, and, in particular, to contrast North Dakota lignites to Powder River Basin subbituminous coals.

6. We submitted a report on our study to the Fuel Processing Technology journal, which accepted it on November 24, 1993. The report titled "Mercury in North Dakota lignite" was published in 1994 and is attached to this Declaration as **Exhibit A**.[1] The results demonstrated the importance of using up-to-date information when assessing emissions at electric utilities or other sources. The sample size was not sufficiently large for statistical validity. The results show that mercury content can vary significantly among coals within a region and even within a particular coal seam. In order to draw accurate conclusions regarding mercury content of North Dakota lignites, sampling should have been distributed across western North Dakota in proportion to the amounts of lignites produced by each mine or county. Any future evaluations of the ability of North Dakota lignite and other coals to meet mercury emissions standards should be made using recent data in quantities sufficient to ensure statistical validity.

7. On page 38 of EPA's "2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category", the Environmental Protection Agency (EPA) used the report to establish that North Dakota lignite and Powder River Basin subbituminous coals had similar mercury contents without acknowledging the limitations of the report.

8. EPA did not acknowledge the report's crucial findings, limitations, and recommendations, as outlined in paragraph 6 above, and it is using the report for a purpose the authors never intended. The report demonstrated the importance of using up-to-date information. This information is over 30-years old, clearly not up-to-date. The report concluded that there was no statistical validity of

---

1. "Mercury in North Dakota lignite", Katrinak, K. A.; Benson, S.A.; Henke, K. R.; Hassett, D. J., 39 *Fuel Processing Technology,* 35 (1994)    https://www.academia.edu/22624241/Mercury in_North_Dakota_lignite).

the results and, therefore, should never have been considered and used for federal, regulatory rulemaking purposes.[2]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of May, 2024.

_____
Steven A. Benson

---

2. *Id.* at 43 (stating, "Based on the recent data presented herein, efforts to decrease mercury emissions by using less North Dakota lignite in utility plants are unnecessary. Any future evaluation of the ability of North Dakota lignite and other coals to meet mercury emissions standards should be made using recent data in quantities sufficient to ensure statistical validity.").

# EXHIBIT A





FUEL
PROCESSING
TECHNOLOGY

# Mercury in North Dakota lignite

Karen A. Katrinak*, Steven A. Benson, Kevin R. Henke, David J. Hassett

*Energy & Environmental Research Center, University of North Dakota, Grand Forks, ND 58202-9018, USA*

(Received 14 May 1993; accepted in revised form 24 November 1993)

## Abstract

Recent data indicate that North Dakota lignites are similar in mercury content to subbituminous coals from Montana and Wyoming. Studies dating back to the 1970s and early 1980s had shown that North Dakota lignites contain significantly higher levels of mercury than subbituminous coals from the Powder River Basin (10.1 mg/MMBtu for lignite compared to 6.2 mg/MMBtu for subbituminous).

New data suggest significantly lower mercury concentrations for both North Dakota lignites and Powder River Basin subbituminous coals. These results indicate that North Dakota lignites contain an average of 4.2 mg Hg/MMBtu, whereas Powder River Basin subbituminous coals have an average of 3.7 mg Hg/MMBtu. Thus, the two types of coal appear to be very similar in average mercury concentrations. The difference between the new and older data likely results, in part, from recent improvements in sample collection and laboratory procedures.

If North Dakota lignites do have average mercury concentrations similar to those of Montana and Wyoming coals, as indicated by the recently obtained data, it is likely that fuel switching would not significantly affect mercury emissions. These results demonstrate the importance of using up-to-date information when assessing emissions at electric utilities or other sources.

## 1. Introduction

Fossil fuel combustion is an important anthropogenic source of mercury in the environment [1–3]. Control of emissions from coal-fired power plants may be required to meet the goals of the 1990 Amendments to the Clean Air Act of 1970, as outlined in Section 301(n)(1)(B) of the Amendments. Other anthropogenic sources include waste incinerators, fungicide and paint volatilization, manufacturing processes, metal smelting, pesticides, and the breakdown of discarded objects such as batteries and fluorescent lamps [1, 3–5]. Forms of mercury in the environment include elemental mercury ($Hg^\circ$), mercury chloride ($HgCl_2$), and methylmercury chloride ($CH_3HgCl$) [6].

---

* Corresponding author. Fax (701)777-5181.

0378-3820/94/$07.00 © 1994 Elsevier Science B.V. All rights reserved
*SSDI* 0378-3820(94)00018-O

Fossil fuel combustion as a source of mercury emissions is of particular concern because mercury is one of the most volatile elements in coal. During combustion, much of the mercury in coal can be emitted as vapor from the stacks [7–9]. The volatility of mercury results in the release of a portion of total mercury to the ambient air, although 90 to 99% of total mercury can be retained through dry scrubbing or other appropriate control technologies [10–11]. Most mercury is released in vapor-phase form [12], primarily as elemental Hg [3, 13–15]. The average atmospheric residence time for mercury may be as high as 1 yr [8, 16]. Dispersion of mercury in the environment is thus much greater than for most other metals associated with fossil fuel combustion [17–19], making source apportionment difficult.

Most studies concerning the mercury content of North Dakota lignites were published in the mid-1980s or earlier. Baria [20] conducted an extensive survey of trace elements in North Dakota lignite, largely from Mercer County, and in effluent streams from combustion facilities. For the lignite samples that were analyzed, a range < 0.1–0.2 ppm mercury was reported. In another early study, North Dakota lignites were reported to have a range of mercury concentrations of 0.1–0.4 ppm [21–22].

The largest data set concerning mercury in North Dakota lignites was compiled by the U.S. Geological Survey (USGS) [23], which lists data originally published in several other formats [24–28]. North Dakota lignites were reported to contain significantly higher concentrations of mercury than subbituminous coals from the Powder River Basin (10.1 vs. 6.2 mg of mercury per million British thermal units [mg Hg/MMBtu], respectively) [23]. The argument has been made that mercury emissions from coal-fired power plants can be lowered by switching to lower-mercury fuels, such as Powder River Basin coals [29]. Powder River Basin coals, with their low cost and relatively high heating value, are an attractive substitute for lignite in North Dakota's power plants. Values range from 0.46 to 81.4 mg Hg/MMBtu for 326 samples of North Dakota lignite. The standard deviation is 10.1 mg Hg/MMBtu. A standard deviation that is as large as the mean value, as is the case here, indicates that the sampling size was not sufficiently large for statistical validity.

Adding to the uncertainties associated with the previous results for North Dakota lignites is the fact that mercury content can vary significantly among coals within a region and even within a particular coal seam. Samples used to evaluate a potential mercury emissions problem should thus be selected to reflect accurately the coal source area of interest. The data presented in earlier reports include samples primarily from Dunn and Mercer Counties [23, 29] and do not reflect current lignite usage. New data have been obtained from McLean, Mercer, Oliver, and Richland Counties, reflecting lignite usage in North Dakota in 1991 and 1992. The goal of this study is to provide an accurate and current appraisal of mercury content of North Dakota lignites, and, in particular, to contrast North Dakota lignites with Powder River Basin subbituminous coals.

## 2. Methods

Sample collection and analytical methods used for the measurement of mercury concentrations in coal are continually being improved. The American Society for

Testing and Materials (ASTM) Method D-3684 is currently used. Lignite analyses reported by the USGS were performed between 1973 and 1982, using primarily a double-gold amalgamation method coupled with cold-vapor atomic absorption (AA) spectroscopy [23]. More recently, this method has been replaced by a single-gold amalgamation technique, as well as by numerous dissolution methods, which result in more precise and accurate data. Detection limits have also recently been lowered through the introduction of improved instrumentation, including atomic fluorescence spectroscopy. There have also been improvements in sample preparation methods as well as in speciation techniques that enable a much more precise and accurate determination of mercury content.

With the improvements in sample collection and analytical methods, data obtained in the past have been shown to be flawed with both positive and negative biases [30–33]. These biases have many possible causes. Mercury compounds are thermally unstable, and, thus, loss can occur during ashing [34, 35]. Mercury solutions allowed to stand in polyethylene or glass containers can lose mercury through absorption onto container walls, or, if the atmosphere is mercury-enriched, as is typical of many laboratories, a gain in mercury may occur by absorption into the solution through the walls of many plastic containers. Laboratory reagents may also be contaminated with mercury [36]. It is not possible to ascertain which (if any) of these or other possible sources of error apply to specific coal analyses performed in the past.

An additional point of interest is the treatment of coal samples prior to analysis. The standard USGS procedure is to grind and air dry the samples prior to analysis [37]. Air drying removes only surficial water from the coal, rather than the structurally bound water within the coal. The determined mercury concentration then is not truly a value for either as-received or moisture-free coal, but is usually termed an "as-detected" value. Other data, such as the recent results presented below, are commonly presented as moisture-free values. Information on air-dry water loss is not available for all of the USGS samples, and, in addition, an unknown amount of mercury may be lost during air drying. It is thus not possible to recalculate the mercury concentrations to moisture-free values. For those North Dakota lignites with air-dry data reported by the USGS, moisture loss varied widely, ranging up to 30% or more [23]. Lignites have a greater moisture content than subbituminous coals, so correction to moisture-free values, if it were possible, would probably result in a relatively greater decrease in their reported mercury concentrations, thus making the difference in average mercury concentrations between the North Dakota lignites and Powder River Basin subbituminous coals in the USGS database smaller. For these reasons, mercury content of coal is best represented as per-Btu values.

## 3. Results

New data shown in Table 1 indicate substantially lower mercury levels in North Dakota lignites, similar to concentrations in Powder River Basin coals. Data are presented for a total of 76 samples, representing 14.3 million short tons of coal burned

Table 1
Mercury content of North Dakota lignites

| Date | Utility | County | Mine | Seam | Short tons | Hg, ppm, dry | Hg, mg/MMBtu |
|---|---|---|---|---|---|---|---|
| 11/91 | Basin | Mercer | Freedom | Beulah-Zap | 487,959 | 0.07 | 2.9 |
| 12/91 | Basin | Mercer | Freedom | Beulah-Zap | 741,185 | 0.07 | 2.9 |
| 1/92 | Basin | Mercer | Freedom | Beulah-Zap | 977,983 | 0.10 | 4.2 |
| 2/92 | Basin | Mercer | Freedom | Beulah-Zap | 851,244 | 0.13 | 5.4 |
| 3/92 | Basin | Mercer | Freedom | Beulah-Zap | 837,360 | 0.08 | 3.5 |
| 4/92 | Basin | Mercer | Freedom | Beulah-Zap | 930,645 | 0.07 | 3.0 |
| 5/92 | Basin | Mercer | Freedom | Beulah-Zap | 859,277 | 0.05 | 2.1 |
| 6/92 | Basin | Mercer | Freedom | Beulah-Zap | 874,642 | 0.11 | 4.7 |
| 7/92 | Basin | Mercer | Freedom | Beulah-Zap | 715,188 | 0.09 | 4.0 |
| 8/92 | Basin | Mercer | Freedom | Beulah-Zap | 895,839 | 0.12 | 5.3 |
| 9/92 | Basin | Mercer | Freedom | Beulah-Zap | 933,763 | 0.11 | 4.6 |
| 12/91 | Basin | Mercer | Glenharold | Hagel | 136,418 | 0.11 | 4.9 |
| 1/92 | Basin | Mercer | Glenharold | Hagel | 98,178 | 0.14 | 5.7 |
| 2/92 | Basin | Mercer | Glenharold | Hagel | 164,297 | 0.16 | 6.9 |
| 3/92 | Basin | Mercer | Glenharold | Hagel | 179,131 | 0.06 | 2.8 |
| 4/92 | Basin | Mercer | Glenharold | Hagel | 159,164 | 0.09 | 4.1 |
| 5/92 | Basin | Mercer | Glenharold | Hagel | 127,644 | 0.06 | 2.8 |
| 6/92 | Basin | Mercer | Glenharold | Hagel | 86,201 | 0.45 | 6.6 |
| 7/92 | Basin | Mercer | Glenharold | Hagel | 133,293 | 0.13 | 5.8 |
| 8/92 | Basin | Mercer | Glenharold | Hagel | 106,777 | 0.19 | 8.2 |
| 3/1/92 | Coop. Power | McLean | Falkirk | Hagel | 145,677 | 0.10 | 4.4 |
| 3/8/92 | Coop. Power | McLean | Falkirk | Hagel | 154,780 | 0.09 | 4.3 |
| 3/15/92 | Coop. Power | McLean | Falkirk | Hagel | 155,042 | 0.06 | 3.0 |

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3/22/92 | Coop. Power | McLean | Falkirk | Hagel | 138,240 | 0.06 | 2.5 |
| 3/29/92 | Coop. Power | McLean | Falkirk | Hagel | 151,531 | 0.16 | 7.1 |
| 4/5/92 | Coop. Power | McLean | Falkirk | Hagel | 152,930 | 0.10 | 4.5 |
| 4/12/92 | Coop. Power | McLean | Falkirk | Hagel | 151,773 | 0.14 | 6.5 |
| 4/19/92 | Coop. Power | McLean | Falkirk | Hagel | 153,805 | 0.11 | 4.9 |
| 4/26/92 | Coop. Power | McLean | Falkirk | Hagel | 149,366 | 0.08 | 3.6 |
| 5/3/92 | Coop. Power | McLean | Falkirk | Hagel | 134,863 | 0.13 | 6.1 |
| 5/10/92 | Coop. Power | McLean | Falkirk | Hagel | 68,350 | 0.06 | 3.0 |
| 5/17/24 | Coop. Power | McLean | Falkirk | Hagel | 84,857 | 0.13 | 6.1 |
| 5/24/92 | Coop. Power | McLean | Falkirk | Hagel | 90,605 | 0.07 | 3.5 |
| 5/31/92 | Coop. Power | McLean | Falkirk | Hagel | 127,221 | 0.10 | 4.6 |
| 6/7/92 | Coop. Power | McLean | Falkirk | Hagel | 115,157 | 0.10 | 4.5 |
| 6/14/92 | Coop. Power | McLean | Falkirk | Hagel | 106,776 | 0.11 | 5.1 |
| 6/21/92 | Coop. Power | McLean | Falkirk | Hagel | 107,513 | 0.07 | 3.1 |
| 6/28/92 | Coop. Power | McLean | Falkirk | Hagel | 121,684 | 0.08 | 3.7 |
| 7/5/92 | Coop. Power | McLean | Falkirk | Hagel | 137,018 | 0.11 | 5.2 |
| 7/12/92 | Coop. Power | McLean | Falkirk | Hagel | 145,254 | 0.09 | 4.1 |
| 7/19/92 | Coop. Power | McLean | Falkirk | Hagel | 131,400 | 0.05 | 2.1 |
| 7/26/92 | Coop. Power | McLean | Falkirk | Hagel | 133,435 | 0.05 | 2.5 |
| 8/2/92 | Coop. Power | McLean | Falkirk | Hagel | 136,801 | 0.06 | 3.0 |
| 8/9/92 | Coop. Power | McLean | Falkirk | Hagel | 142,696 | 0.09 | 4.1 |
| 8/16/92 | Coop. Power | McLean | Falkirk | Hagel | 141,558 | 0.08 | 3.9 |
| 8/23/92 | Coop. Power | McLean | Falkirk | Hagel | 146,400 | 0.13 | 5.9 |
| 8/30/92 | Coop. Power | McLean | Falkirk | Hagel | 135,504 | 0.11 | 5.1 |
| 9/6/92 | Coop. Power | McLean | Falkirk | Hagel | 142,886 | 0.12 | 5.6 |
| 9/13/92 | Coop. Power | McLean | Falkirk | Hagel | 140,572 | 0.14 | 6.5 |
| 1/14/92 (1)* | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 291 | 0.15 | 6.4 |
| 1/14/92 (2) | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 291 | 0.14 | 5.8 |
| 1/14/92 (3) | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 291 | 0.11 | 4.6 |
| 1/14/92 (4) | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 291 | 0.11 | 4.6 |
| 1/14/92 (5) | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 7,176 | 0.13 | 5.4 |

(Continued on next page)

Table 1 (continued)
Mercury content of North Dakota lignites

| Date | Utility | County | Mine | Seam | Short tons | Hg, ppm, dry | Hg, mg/MMBtu |
|---|---|---|---|---|---|---|---|
| 11/3/92 | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 7,176 | 0.14 | 5.8 |
| 11/4/92 | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 7,176 | 0.08 | 3.4 |
| 11/5/92 | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 7,176 | 0.08 | 3.1 |
| 11/6/92 | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 7,176 | 0.11 | 4.7 |
| 11/9/92 | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 7,176 | 0.09 | 3.7 |
| 11/10/92 | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 7,176 | 0.09 | 3.7 |
| 11/11/92 | Mont.–Dak. | Oliver/Mercer | Beulah | Beulah-Zap | 7,176 | 0.09 | 3.6 |
| 11/12/92 | Mont.–Dak. | Richland | Savage | Last | 7,176 | 0.15 | 6.3 |
| 11/13/92 | Mont.–Dak. | Richland | Savage | Last | 7,176 | 0.06 | 2.4 |
| 11/16/92 | Mont.–Dak. | Richland | Savage | Last | 7,176 | 0.07 | 2.9 |
| 11/17/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 7,176 | 0.14 | 5.9 |
| 11/18/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 7,176 | 0.08 | 3.3 |
| 11/19/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 7,176 | 0.1 | 4.1 |
| 11/20/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 7,176 | 0.09 | 3.8 |
| 11/23/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 7,176 | 0.11 | 4.4 |
| 11/24/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 7,176 | 0.08 | 3.4 |
| 11/10/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 11,177 | 0.06 | 2.7 |
| 11/19/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 10,356 | 0.10 | 2.8 |
| 11/24/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 10,548 | 0.06 | 2.3 |
| 4/14/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 194 | 0.07 | 2.9 |
| 10/30/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 5,279 | 0.17 | 7.3 |
| 11/6/92 | Mont.–Dak. | Mercer | Beulah | Beulah-Zap | 5,833 | 0.12 | 5.4 |

aNumbers in parentheses follow the date when more than one sample was collected on that date. Total number of samples: 76; Total tonnage: 14.3 million tons; Mean mercury concentrations: 4.4 mg/MMBtu on a per-sample basis, 4.2 mg/MMBtu on a tonnage basis. Coop. Power = Cooperative Power, Mont.–Dak. = Montana–Dakota.

Table 2
Mercury content of Powder River Basin coals

| Date | Seam | Short tons | Hg, ppm, dry | Hg, mg/MMBtu |
|------|------|------------|--------------|--------------|
| 1/92 | Buckskin | 104,613 | 0.15 | 5.7 |
| 3/92 | Buckskin | 209,086 | 0.10 | 3.7 |
| 4/92 | Buckskin | 116,435 | 0.10 | 3.6 |
| 6/92 | Buckskin | 151,775 | 0.14 | 5.4 |
| 7/92 | Buckskin | 116,690 | 0.10 | 3.8 |
| 8/92 | Buckskin | 105,375 | 0.10 | 3.7 |
| 9/92 | Buckskin | 11,627 | 0.09 | 3.5 |
| 12/91 | Dry Fork | 294,488 | 0.09 | 3.5 |
| 1/92 (1)[a] | Dry Fork | 146,390 | 0.07 | 2.8 |
| 1/92 (2)[a] | Dry Fork | 108,587 | 0.09 | 3.3 |
| 2/92 | Dry Fork | 309,350 | 0.16 | 6.1 |
| 3/92 | Dry Fork | 252,667 | 0.09 | 3.3 |
| 4/92 | Dry Fork | 286,186 | 0.07 | 2.8 |
| 5/92 | Dry Fork | 211,820 | 0.07 | 2.5 |
| 6/92 | Dry Fork | 203,298 | 0.08 | 3.0 |
| 7/92 (1)[a] | Dry Fork | 214,344 | 0.18 | 6.8 |
| 7/92 (2)[a] | Dry Fork | 202,318 | 0.09 | 3.3 |
| 8/92 | Dry Fork | 254,646 | 0.10 | 3.7 |
| 9/92 (1)[a] | Dry Fork | 202,148 | 0.09 | 3.5 |
| 9/92 (2)[a] | Dry Fork | 136,474 | 0.11 | 4.0 |
| 12/91 | Rawhide | 271,364 | 0.06 | 2.2 |
| 1/92 (1)[a] | Rawhide | 104,281 | 0.12 | 4.5 |
| 1/92 (2)[a] | Rawhide | 94,691 | 0.08 | 3.1 |
| 2/92 | Rawhide | 209,364 | 0.09 | 3.4 |
| 3/92 | Rawhide | 189,114 | 0.10 | 3.7 |
| 4/92 | Rawhide | 170,311 | 0.07 | 2.7 |
| 5/92 | Rawhide | 140,264 | 0.09 | 3.4 |
| 6/92 | Rawhide | 127,327 | 0.08 | 2.9 |
| 7/92 | Rawhide | 107,356 | 0.11 | 4.0 |
| 8/92 (1)[a] | Rawhide | 108,522 | 0.08 | 2.9 |
| 8/92 (2)[a] | Rawhide | 146,899 | 0.11 | 4.0 |
| 9/92 | Rawhide | 95,396 | 0.07 | 2.7 |

[a] Numbers in parentheses follow the date when more than one sample was collected on that date. Total number of samples: 32; Total tonnage: 5.4 million tons; Mean mercury concentration: 3.7 mg/MMBtu on both a per-sample and tonnage basis.

in 1991 and 1992. The mean mercury concentrations are 4.4 mg/MMBtu if calculated on a per-sample basis, and 4.2 mg/MMBtu calculated on a tonnage basis.

New data were also obtained for 32 samples of Powder River Basin coals used by power plants in North Dakota in 1992. These samples represent a total of 5.4 million short tons. The data are presented in Table 2. The mean mercury concentration is 3.7 mg/MMBtu on both a per sample and tonnage basis.

The results in Tables 1 and 2 were obtained by using up-to-date analytical techniques and are thus considered likely to be more reliable than data from older

reports. An important statement should be made, however, regarding the number of analyzed samples. The value of 10.1 mg Hg/MMBtu for North Dakota lignites, as reported by the USGS [23], is based on analysis of 326 coal samples, which is much greater than the 76 samples represented by the new data. However, composite samples were used to obtain the new data, allowing representation of a larger amount of coal. The USGS data also has less statistical significance per sample because for most of the data points, individual coal beds, usually less than five feet thick, were sampled. Sampling conducted by the USGS is also generally biased towards the most accessible existing mines [38].

## 4. Discussion

Fig. 1, a plot of mercury data for all of the analyzed North Dakota lignites discussed in this report, shows the older USGS data and the newer results. The USGS data span a wider range and have a greater mean value than the newer results. These differences are probably caused by changes in sampling locale and improvements in analytical methods and illustrate the difficulty in comparing old and new data.

An additional complicating factor in the interpretation of the results is that the distribution of mercury within individual coal samples is not very uniform [39]. Mercury and other trace elements are generally associated with mineral grains [40]. In particular, mercury tends to associate with pyrite and accessory sulfide minerals [41–44]. Some mercury in coal may also be organically associated [44–45].

Although the new data were obtained using currently accepted techniques and, for that reason, can be considered to be of better quality than the old data, a larger sample



Fig. 1. Mercury content of North Dakota lignites.

set is still desirable for statistical validity. In order to draw conclusions regarding the average mercury content of North Dakota lignites, sampling should be distributed across western North Dakota in proportion to the amounts of lignite produced by each mine or county.

## 5. Conclusions

Recent results suggest that the mercury levels of North Dakota lignites are similar to those of Powder River Basin subbituminous coals. The high values in earlier reports on North Dakota lignites may be the result of the inaccuracies of the analytical techniques that were used before the mid-1980s. Even if these high values are accurate, they represent coal used in the 1970s and early 1980s, and are thus not relevant to current emissions situations. New data on North Dakota lignites and other coals, obtained using presently accepted analytical techniques, are necessary to evaluate accurately the mercury concentrations of these fuels. Additional new data points are needed to ensure that all locations of lignite mining are adequately represented.

Based on the recent data presented herein, efforts to decrease mercury emissions by using less North Dakota lignite in utility plants are unnecessary. Any future evaluation of the ability of North Dakota lignite and other coals to meet mercury emissions standards should be made using recent data in quantities sufficient to ensure statistical validity.

## Acknowledgments

Financial support from the ND Lignite Energy Council and the United States Department of Energy is gratefully acknowledged. Members of the Lignite Energy Council, including the Cooperative Power Association, Basin Electric Power Cooperative, Montana–Dakota Utilities Company, and Minnkota Power Cooperative, also provided new data on mercury in North Dakota lignites and in Powder River Basin coals. The assistance of Rick Patzman of Montana–Dakota Utilities is sincerely appreciated.

## References

[1] Nriagu, J.O. and Pacyna, J.M., 1988. Quantitative assessment of worldwide contamination of air, water and soils by trace metals. Nature, 333: 134–139.
[2] Porcella, D.B., 1992. Mercury in the environment. In: D.S. Charlton and J.A. Harju (Eds.), Workshop on Mercury Contamination at Natural Gas Industry Sites, Gas Research Institute, Chicago, No. GRI-92/0214, pp. 31–43.
[3] Clarke, L.B. and Sloss, L.L., 1992. Trace elements – Emissions from coal combustion and gasification. IEA Coal Research, London, No. IEACR/49, p. 111
[4] Douglas, J., 1991. Mercury in the environment. EPRI Journal, December: 4–11.

[5] Kiser, J.V.L. and Sussman, D.B., 1991. Municipal waste combustion and mercury: The real story. Waste Age, November: 41–44.

[6] Brosset, C., 1983. Transport of airborne mercury emitted by coal burning into aquatic systems. Water Sci. Tech., 15: 59–66.

[7] Pacyna, J.M. and Muench, J., 1991. Anthropogenic mercury emissions in Europe. Water, Air, and Soil Pollution, 56: 51–63.

[8] Solid Waste Association of North America, 1993. Mercury emissions from municipal solid waste combustors: An assessment of the current situation in the United States and forecast of future emissions. Natural Renewable Energy Laboratory, Golden, Colorado, p. 99.

[9] Sato, K. and Sada, K., 1992. Effects of emissions from a coal-fired power plant on surface soil trace element concentrations. Atmos. Environ., 26A(2): 325–331.

[10] Smith, I.M., 1987. Trace elements from coal combustion: Emissions. IEA Coal Research, London, No. IEACR/01, p. 87.

[11] Felsvang, K., Gleiser, R., Juip, G. and Nielsen, K.K., 1993. Air toxics control by spray dryer absorption. In: Proceedings of the 1993 $SO_2$ Control Symposium, August 24–27, Boston, Massachusetts, Vol. 2, Sessions 5A, 5B, 6A, 6B.

[12] Bignoli, G., 1989. Health and environmental impact of chromium released from coal ash. J. Coal Quality, 8(3): 72–81.

[13] Ratafia-Brown, J.A., 1994. Overview of trace element partitioning in flames and furnaces of utility coal-fired boilers. Fuel Proc. Technol., this volume.

[14] Lindqvist, O. and Schroeder, W.H., 1989. Cycling of mercury in the environment with emphasis on the importance of the element in acid rain studies. In: J.M. Pacyna and B. Ottar (Eds.), Control and Fate of Atmospheric Trace Metals, Kluwer, Boston, pp. 303–310.

[15] Nater, E.A. and Grigal, D.F., 1992. Regional trends in mercury distribution across the Great Lakes states, North Central USA. Nature, 358: 139–141.

[16] Fitzgerald, W.F., 1989. Chapter 57: Atmospheric and ocean cycling of mercury. In: Chemical Oceanography, Vol. 10. Academic Press, New York.

[17] Meij, R., 1991. The fate of mercury in coal-fired power plants and the influence of wet flue-gas desulphurization. Water, Air, and Soil Pollution, 56: 21–33.

[18] Klein, D.H. and Russell, P., 1973. Heavy metals: Fallout around a power plant. Environ. Sci. Technol., 7(4): 357–358.

[19] Klein, D.H., 1972. Mercury and other metals in urban soils. Environ. Sci. Technol., 6(6): 560–562.

[20] Baria, D.N., 1975. A survey of trace elements in North Dakota lignite and effluent streams from combustion and gasification facilities. Engineering Experiment Station, Grand Forks, North Dakota, p. 64.

[21] Gronhovd, G.H. and Sondreal, E.A., 1976. Technology and use of low-rank coals in the U.S.A., Presented at the seminar on Technologies for the Utilization of Low-Calorie Fuels, Varna, Bulgaria, April 20–22, 1976.

[22] Ruby, J.D. and Huettenhain, H., 1981. Western subbituminous coals and lignites. Bechtel National, Inc., San Francisco, Research Project 1030-11, Final Report #EPRI-C7-1768.

[23] Tewalt, S.J., Hildebrand, R.T. and Finkelman, R.B., 1989. Analyses of lignites and associated rocks from the Fort Union region, North Dakota and Montana. U.S. Geological Survey Open-File Report 89-285, p. 162.

[24] Affolter, R.H. and Hatch, J.R., 1980. Chemical analyses of lignite from the Fort Union Formation, McCone, Richland, Dawson, and Wibaux Counties, Montana and Golden Valley County, North Dakota. U.S. Geological Survey Open-File Report 80-179, p. 40.

[25] Affolter, R.H. and Kirschbaum, M.A., 1982. Chemical analyses of lignite from the Sentinel Butte Member of the Paleocene Fort Union Formation, North Beulah EMRIA study site, Mercer County, North Dakota. U.S. Geological Survey Open-File Report 82-131, p. 21.

[26] Hatch, J.R. and Affolter, R.H., 1978. Chemical analyses of lignite from the Sentinel Butte Member of the Fort Union Formation, Dunn Center Field, Dunn County, North Dakota. U.S. Geological Survey Open-File Report 78-1078, p. 42.

[27] U.S. Geological Survey and Montana Bureau of Mines and Geology, 1976. Preliminary report of coal drill-hole data and chemical analyses of coal beds in Campbell, Converse, and Sheridan Counties, Wyoming; and Big Horn, Richland, and Dawson Counties, Montana. U.S. Geological Survey Open-File Report 76-450, p. 382.

[28] U.S. Geological Survey and Montana Bureau of Mines and Geology, 1977. Preliminary report on 1976 drilling of coals in Campbell and Sheridan Counties, Wyoming; and Big Horn, Dawson, McCone, Richland, Roosevelt, Rosebud, Sheridan, and Wibaux Counties, Montana. U.S. Geological Survey Open-File Report 77-283, p. 403.

[29] Neme, C., 1991. Electric utilities and long-range transport of mercury and other toxic air pollutants. Center for Clean Air Policy, Washington, DC, p. 125.

[30] Lindqvist, O., 1991. Mercury in the Swedish environment, recent research on causes, consequences and corrective methods. Kluwer, Netherlands.

[31] Fitzgerald, W.F. and Watras, C.J., 1989. Mercury in superficial waters of rural Wisconsin lakes. Sci. Tot. Environ., 87/88: 223.

[32] Gill, G.A. and Fitzgerald, W.F., 1985. Mercury sampling of open ocean waters at the picomolar level. Deep Sea Res., 32: 287.

[33] Matsunaga, K., Konishi, S. and Nishimura, M., 1979. Possible errors caused prior to measurement of mercury in natural waters with special reference to seawater. Environ. Sci. Technol., 13: 63.

[34] Sager, M., 1993. Determination of arsenic, cadmium, mercury, stibium, thallium, and zinc in coal and coal fly-ash. Fuel, 72(9): 1327–1330.

[35] Schlesinger, M.D. and Schultz, H., 1971. Analysis for mercury in coal. U.S. Bureau of Mines Technical Progress Report, 43, p. 4.

[36] Bloom, N.S., Sampling and analysis for mercury in environmental media of importance to the natural gas industry. Gas Research Institute, Chicago, in preparation.

[37] Walthall, F.G. and Fleming, S.L. II, 1989. Preparation of coal for analysis. In: D.W. Golightly and F.O. Simon (Eds.), Methods for Sampling and Inorganic Analysis of Coal. U.S. Geological Survey Bulletin, 1823: 15–19.

[38] Swanson, V.E., Medlin, J.H., Hatch, J.R., Coleman, S.L., Wood, G.H. Jr., Woodruff, S.D. and Hildebrans, R.T., 1976. Collection, chemical analysis, and evaluation of coal samples in 1975. U.S. Geological Survey Open-File Report 76-468, p. 503.

[39] O'Gorman, J.V., Suhr, N.H. and Walker, P.L. Jr., 1972. The determination of mercury in some American coals. Applied Spectroscopy, 26(1): 44–48.

[40] Kuhn, J.K., Fiene, F.L., Cahill, R.A., Gluskoter, H.J. and Shimp, N.F., 1980. Abundance of trace and minor elements in organic and mineral fractions of coal. Illinois State Geological Survey Environmental Geology Notes, 88, p. 67.

[41] Ruch, R.R., Gluskoter, H.J. and Shimp, N.F., 1974. Occurrence and distribution of potentially volatile trace elements in coal. Illinois Geological Survey Environmental Geology Notes, 72.

[42] Zubovic, P., Stadnichenko, T. and Sheffey, N.B., 1960. The association of some minor elements with organic and inorganic phases of coal. U.S. Geological Survey Professional Paper, 400-B.

[43] Tkach, B.I., 1966. Geochemical peculiarities of mercury distribution in coal measures of the Lisichan region (Donbass). Geochemistry International, 3(3): 470.

[44] Tkach, B.I., 1975. On the role of organic matter in concentration of mercury. Geochemistry International, 11(5): 973–975.

[45] Ruch, R.R., Gluskoter, H.J. and Kennedy, E.J., 1971. Mercury content of Illinois coals. Illinois State Geological Survey Environmental Geology Notes, 43, p. 15.

# EXHIBIT 15

# Declaration of Frank H. Chang

I, Frank H. Chang, declare as follows:

1. I am over the age of 18, of sound mind, and otherwise competent to sign this declaration.

2. I am an attorney at the law firm Consovoy McCarthy PLLC and counsel for Petitioner State of North Dakota.

3. Attached to the declaration is a true and accurate copy of a PowerPoint presentation (Bates stamp ED_006414_00000550-001-ED_006414_00000550-011)—entitled "Power Sector Strategy: Climate, Public Health, Environmental Justice, Briefing for Gina McCarthy and Ali Zaidi (Feb. 4, 2021)"—that EPA produced in response to a FOIA request submitted by Energy Policy Advocates, a nonprofit organization focused on educating the public about energy and environmental policies.

4. I obtained the PowerPoint slides from Energy Policy Advocates' litigation counsel, Mr. Christopher C. Horner.

5. According to EPA, these powerpoint slides were created by Joe Goffman, then-Principal Deputy Assistant Administrator of EPA's Office of Air and Radiation, for a briefing with Gina McCarthy (then-National Climate Advisor) and Ali Zaidi (then Deputy National Climate Advisor) in the White House Office of Domestic Climate Policy. *See* Decl. of John Shoaff ¶9, *Energy Pol'y Advocs. v. EPA*, No. 1:22-cv-00298-TJK (D.D.C. Jan 27, 2023), ECF 16-3.

6.      EPA heavily redacted these slides by asserting the deliberative-process privilege under Exemption 5. In order to justify redacting these PowerPoint slides, however, EPA had to explain what the redacted portions are about in litigation before the U.S. District Court for the District of Columbia. In doing so, EPA confirmed that the slides were used "to brief and consult with the White House on potential policy options for regulating power plant emissions." EPA-MSJ-Br. at 12, *Energy Pol'y Advocs. v. EPA*, No. 1:22-cv-00298-TJK (D.D.C. Jan. 27, 2023), ECF 16-1.

7.      EPA explained that one of the slides presented to the White House Office of Domestic Climate Policy discusses the Biden Administration's strategies for using the "Air Toxics Standards (e.g., MATS Rule)" to reduce power plant emissions. *See* Decl. of John Shoaff ¶27, *Energy Pol'y Advocs. v. EPA*, No. 1:22-cv-00298-TJK (D.D.C. Jan. 27, 2023), ECF 16-3 ("Slide 6 (page 6) of the PowerPoint identifies potential strategies for reducing emissions through Air Toxics Standards, including potential future rulemakings and other regulatory actions under the Air Toxics program….") (referencing ED_006414_00000550-006).

8.      EPA further explained that other slides appearing in that powerpoint presentation to the White House Office of Domestic Climate Policy discuss other regulatory tools—including the nonattainment provisions under the Clean Air Act (CAA), Section 111(d) of the CAA, Section 111(b) of the CAA, and the Regional Haze program, etc.—are also about "regulating power sector emissions." Decl. of John

Shoaff ¶¶30, 33, 36, *Energy Pol'y Advocs. v. EPA*, No. 1:22-cv-00298-TJK (D.D.C. Jan. 27, 2023), ECF 16-3.

9.     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 24, 2024

_____
Frank H. Chang

# ATTACHMENT

# Power Sector Strategy: Climate, Public Health, Environmental Justice

## The Building Blocks

Briefing for Gina McCarthy and Ali Zaidi

February 4, 2021

ED_006414_00000550-00001

# EPA Has Responsibility Across Multiple Media to Address Environmental Effects of the Power Sector

- Air
  - Toxics
  - NAAQS Pollutants
  - GHGs
  - Regional Haze
- Water
  - Effluent Limitation Guidelines
  - Cooling water requirements
- Solid Waste
  - Coal Combustion Residuals

# Key Considerations - Timing

- Timing

**Ex. 5 Deliberative Process (DP)**

- Air Toxics Standards (Flagged in EO)

**Ex. 5 Deliberative Process (DP)**

# Key Constraints - Geographic Scope

- Some authorities apply to all units across the country while others only apply to a subset of units
  - National Rules Include
    - Air Toxics Standards
    - GHG Standards
    - Water Standards
    - Coal Combustion Residual Standards
  - Authorities that would cover a subset of units include
    - Non-attainment provisions (transport provisions would generally cover a greater number of units than provisions for non-attainment areas)
    - Regional Haze

Effluent Limitation Guidelines and
Coal Combustion Residuals

**Ex. 5 Deliberative Process (DP)**

# Air Toxics Standards (e.g., MATS Rule)

**Ex. 5 Deliberative Process (DP)**

# Non-attainment Provisions

**Ex. 5 Deliberative Process (DP)**

# 111(d) CO2 Standards

- National in scope, but requires two step process (EPA guidelines followed by State Plans)

**Ex. 5 Deliberative Process (DP)**

Regional Haze

**Ex. 5 Deliberative Process (DP)**

# Next Steps for Coal-Fired Units

**Ex. 5 Deliberative Process (DP)**

# New Natural Gas Units and 111(b)

## Ex. 5 Deliberative Process (DP)

# EXHIBIT 16

# JERRY PURVIS
# DECLARATION OF HARM IN SUPPORT OF MOTION FOR A STAY PENDING REVIEW

1.     My name is Jerry Purvis. I am Vice President of Environmental Affairs at East Kentucky Power Cooperative, Inc. (East Kentucky). I am over the age of 18 years, and I am competent to testify concerning the matters in this declaration. I have personal knowledge of the facts set forth in this declaration, and if called and sworn as a witness, could and would competently testify to them.

2.     I have 30 years of experience in electrical power generation. I have been employed at East Kentucky since 1994. I hold a bachelor's degree in Chemistry from Morehead State University and a bachelor's degree in Chemical Engineering from the University of Kentucky. I have a Master of Business Administration from Morehead State University. As Vice President, I am responsible for promoting proactive environmental policies, implementing comprehensive compliance strategies, and supporting East Kentucky's sustainability goals. I manage East Kentucky's staff and outside consultants in pursuit of these goals.

3.     I am providing this Declaration in support of the motions to stay challenging the U.S. Environmental Protection Agency's (EPA) National Emission Standards for Hazardous Air Pollutants: Coal and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508 (May 7, 2024), known as the Mercury and Air Toxics Standards Risk and Technology Review (the Final Rule or the MATS RTR).

4.     East Kentucky is a not-for-profit electric generation and transmission cooperative headquartered in Winchester, Kentucky. East Kentucky is owned, operated, and governed by its members, who use the energy and services East Kentucky provides. These owner-member cooperatives provide energy to 520,000 homes, farms, and businesses across 87 counties in Kentucky. East Kentucky's purpose is to generate electricity and transmit it to 16 Owner-Member cooperatives that distribute it to retail, end-use consumers (Owner-Members). East Kentucky provides wholesale energy and services to Owner-Member distribution cooperatives through baseload units, peaking units, hydroelectric power, solar panels,

landfill gas to energy units and distributed generation resource power purchases – transmitting power across the rural Kentucky areas via more than 2,900 miles of transmission lines. East Kentucky's Owner-Members' collective customer base is comprised largely of residential customers (93%). And, in 2019, 57% of East Kentucky's owner-member retail sales were to the residential class. Electricity is the primary method for water heating and home heating for this class of customers.

5.      East Kentucky is a member of PJM Interconnection (PJM). PJM is a regional transmission organization (RTO) that coordinates the movement of wholesale electricity in 13 states and the District of Columbia.

6.      East Kentucky is a member of the National Rural Electric Cooperative Association (NRECA). NRECA represents the interests of rural electric cooperatives across the country.

7.      Demand for electricity is increasing in Kentucky. East Kentucky predicts increased demand during the time span in which this Final Rule would impact. East Kentucky forecasts net total energy requirements to increase from 13.5 to 16.7 million MWh (megawatt hours), an average of 1.5

percent per year over the 2021 through 2035 period.[1] Residential sales will increase by 0.7 percent per year, and small commercial sales (customers with ≤1000 KVA (kilo-volt-amperes)) will increase by 0.9 percent per year. The greatest area of growth will be for large commercial and industrial sales (customers with >1000 KVA), projected to increase by 3.3 percent per year.

8. East Kentucky is the voice for a substantial number of end users of electricity in its service territory that live in impoverished communities. These communities place a high value on affordable energy costs. East Kentucky's service territory includes rural areas with some of the lowest economic demographics in the United States. In these areas, families are literally faced with a daily choice between food, electricity, and medicine. Of the 87 counties that East Kentucky's Owner-Member cooperatives serve, 40 counties experience persistent poverty, as reported by the USDA.

---

[1] East Kentucky Integrated Resource Plan, Load Forecast 2021-2035 (Dec. 2020) (IRP 2020).

9.     Many of these hardworking Americans have been plagued by unemployment from mines, trucking companies, restaurants and other businesses. The unemployment rate is 60% higher than the national average. They rely on government assistance to survive; anywhere from 30% to 54% of total income in most of the counties that East Kentucky serves comes from governmental assistance programs. Forty-two percent of these electricity users are elderly (65 years or older). Many are on fixed incomes and reside in energy-leaking mobile homes. Recent brutal cold weather has caused their monthly electric bills to skyrocket. East Kentucky has a strong interest in keeping energy affordable to assist its 16 Owner-Member cooperatives in serving people facing the harsh realities of today's economy.

10.     The MATS RTR threatens the viability of one of East Kentucky's essential coal-fired assets. It places burdens on the power sector, as a whole, and causes harm to our customers, including rural families, dependent on affordable, reliable electricity.

## EAST KENTUCKY'S IMPACTED ELECTRIC GENERATING UNITS

11.     East Kentucky owns electric generating units (affected EGUs) that fall within the Final Rule's scope of coverage and thus must comply with the Final Rule's stringent new filterable particulate matter (fPM) standard for coal-fired units. The Final Rule requires East Kentucky to expend substantial costs to comply with the fPM portion of the Rule that, ultimately, the rural ratepayers in East Kentucky's service area, must bear. Moreover, the Final Rule is so stringent that the margin between compliance and non-compliance is so thin that even a minor glitch would very likely cause a forced outage that would otherwise unnecessarily expose East Kentucky and its ratepayers to performance penalties in PJM and substantial exposure in the energy markets. Given the rapid growth in demand for electricity from large data centers and other new and expanding loads – coupled with the EPA's other chorus of new rules that target greenhouse gas emissions, coal combustion residuals, effluents,

ozone and particulates – the cumulative impact of the Final Rule will be to further jeopardize grid stability and reliability.

12. Spurlock Station, East Kentucky's flagship plant, is located near Maysville, Kentucky on the Ohio River. All four units at Spurlock have state-of-the-art NOx, SO₂, PM, and Hg controls. Spurlock Station combusts bituminous coal.

13. Spurlock Unit 3 is a coal-fired circulating fluidized bed boiler (CFB) unit (278 MW), which is designed to emit less NOx and SO₂ in the combustion process. Unit 3 has a SNCR to control NOx, a dry FGD to control SO₂/SO₃, and a filter fabric baghouse to control fPM. In essence, as fPM passes out of the Unit 3 boiler, it passes through a structure filled with 8,256 fabric bags that collect the fPM for later disposal. The limits for this type of emission are measured in hundredths of a pound of material per million British Thermal Units of energy produced (lb./mmBtu). Unit 3 is adversely affected by the Final Rule.

14. Spurlock Unit 3 has a stellar MATS compliance record with no historical exceedances of MATS Rule requirements. The Final Rule

confirms that the existing fPM and other MATS limits, are sufficiently protective of human health and the environment. Therefore, East Kentucky's existing fPM controls provide ample protection to ensure the communities surrounding Spurlock Station enjoy clean air.

15.    East Kentucky has made substantial investments in Spurlock Station due to recent EPA environmental rules, including a conversion to dry bottom ash, ash pond clean closure by removal, and a new waste water treatment system with evaporation to ensure the plant is fully compliant with Effluent Limitation Guidelines (ELGs) and the 2015 Coal Combustion Residuals (CCR) rule. Altogether, EKPC has invested $1.8 billion in environmental control equipment.

16.    EKPC is presently evaluating the need for further extraordinary expenditures due to the EPA Rules released on April 25, 2024.[2] Collectively,

---

[2] New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions From Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule, 89 Fed. Reg. 39798 (May 9, 2024) (Greenhouse Gas Power Sector Rule); Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; Legacy CCR

these rules impose egregious financial impacts on EKPC, its members, and end users. This Final Rule's costs must be considered as cumulative environmental costs that will detrimentally impact the cost to heat and cool the homes of rural ratepayers in disadvantaged communities and to power the job-creating businesses that provide employment to these individuals.

## MATS RTR RULE REVISIONS

17. The MATS RTR decreases the limit for fPM from 0.030 lb/mmBtu to 0.010 lb/mmBtu (the New fPM Limitation) – an unprecedented 67% reduction that imposes substantial risks to unit performance in PJM with little to no environmental benefit. The Final Rule

---

Surface Impoundments, 89 Fed. Reg. 38950 (May 8, 2024); Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category, 89 Fed. Reg. 40198 (May 9, 2024); National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508 (May 7, 2024).

exceeds the point where the law of diminishing returns suggests that the additional limitations are not warranted.

18.     The Final Rule also requires adoption of continuous emission monitoring systems (CEMS) as the only method to demonstrate compliance with the New fPM Limitation, eliminating the option to use quarterly stack testing and also eliminating the Low Emitting EGU (LEE) program. These requirements will increase the costs associated with program compliance without offering any substantial benefit beyond what the current measurement and verification procedures already afford.

19.     Compliance with the New fPM Limitation and installation of PM CEMS are required on or before three years after the effective date of the Final Rule. To be able to meet these deadlines, East Kentucky and other utilities must begin work now to be in a position to comply.

20.     The MATS RTR also eliminates the low rank coal subcategory for lignite-powered facilities and revises the limit for mercury from lignite-fired power plants from 4.0 lb/TBtu to 1.2 lb/TBtu (the New Mercury

Limitation). The New Mercury Limitation does not affect East Kentucky

because the cooperative's coal-fired plants do not combust lignite fuels.

## THE NEW fPM LIMITATION WILL CAUSE IMMEDIATE AND IRREPARABLE HARM TO EAST KENTUCKY

21.     Spurlock Unit 3 is not presently capable of meeting the New

fPM Limitation of 0.010 lb/mmBtu on a sustained basis. Although no data

exists to confirm that compliance can in fact be achieved, East Kentucky

has devised an initial strategy to improve fPM removal performance of the

Spurlock Unit 3 baghouse.

22.     To attempt to meet the New fPM Limitation, Spurlock Unit 3

must expeditiously begin a study and upgrades to its baghouse (the

Baghouse Upgrade Project). The cost of the Baghouse Upgrade Project

causes additional financial harm to East Kentucky and its owner-members.

23.     Given the requirements associated with designing, permitting,

financing and securing state regulatory approval for the Baghouse

Upgrade Project, work must begin during the early pendency of this

litigation due to the compliance date for the Final Rule.

24.     It is unknown to what extent the Baghouse Upgrade Project will improve Unit 3's fPM emission rates. Regardless of the potential improvements of the Project, the 2005-vintage baghouse installed at Unit 3 was not designed to meet 0.010 lb/mmBtu. The baghouse is undersized to achieve the fPM Limitation and must operate flawlessly to attain compliance. In East Kentucky's experience with baghouse operation at CFB units, the Unit 3 baghouse will certainly fail, despite best engineering and maintenance practices, due to the lack of any margin to meet the aggressively low new fPM Limitation.

25.     Therefore, East Kentucky anticipates being harmed by increased Unit 3 forced outages, resulting in potential penalties and exposure to market volatility in the PJM market. Lower fPM emission limitations, in general, put environmental control equipment under more stress in the summer and winter on peak days. Since the limit for fPM was reduced immensely (67%), there is little margin for error. **To put the effect of the Final Rule in context, a single hole the size of a human pinky finger in one of over 8,000 fabric filter bags within the baghouse can**

**cause an exceedance of the new standard and, thereby, force the unit
offline.** It is simply unreasonable to think that a baghouse will perform
perfectly under every operating condition in every period of the year.
Even if Unit 3 and its upgraded baghouse achieve initial compliance with
the Final Rule, the new and stricter fPM limitations on peak demand days –
when PJM is calling for all available generators to produce power in order
to avoid blackouts - stress the fPM controls to the point of a forced outage.
Forced outages in PJM are unforgiving and highly penalized with the
added injury of having to pay market prices for power during periods
when it is least available and, therefore, most expensive. East Kentucky
estimated, as an example, the penalty and damages caused by one forced
outage event on Spurlock Unit 3 could easily exceed $31 million per seven-
day outage. For a non-profit cooperative such as EKPC, an entire year's
worth of margins could be wiped out in a single weekend of extreme
weather.

**Cost of Spurlock Unit 3 Seven Day Outage**

| PJM Market Pricing Conditions | Cost of Replacement Power for Unit 3 | Lost Capacity Payment | PJM PAI Non-Performance Penalty | Total |
|---|---|---|---|---|
| Winter Average Cost | $1,640,785 | $232,066 | 0 | $1,872,851 |
| Summer Average Cost | $1,600,361 | $232,066 | 0 | $1,832,427 |
| Winter High Cost | $3,371,164 | $232,066 | 0 | $3,503,230 |
| Winter Storm Event | $13,203,225 | $232,066 | $17,595,000 | $31,030,291 |

Note 1: Winter Average Cost is based on replacement power at an average day-ahead price for January 2023
Note 2: Winter High Cost is based on replacement power at an average 168 highest hours of real-time LMP in January 2024
Note 3: Winter Storm Event is based on replacement power at an average 168 highest hours of real-time LMP in December 2022 around and including Winter Storm Elliott
Note 4: All prices include 7-days of power
Note 5: PJM Performance Assessment Interval (PAI) Non-Performance Penalty is assessed during a reliability event due to certain triggering events identified in the PJM Tariff, such as during a manual load shed event. The cost calculation assumes a 23 Hour PAI event.

26.  The table above illustrates that, for an unplanned forced outage in PJM, EKPC could experience up to a $31,030,291 dollar penalty for not showing up as a result from a hole in the baghouse the size of a pinky finger. This illustrates the dissonance between the very marginal environmental impact of the Final Rule and the very real, tangible and irreparable harm that would result from a forced outage coming at an inopportune moment.

27.  Of course, the foregoing analysis assumes that replacement power is even available for purchase from the PJM market during a Final

Rule-induced forced outage. PJM has signaled that EPA's new environmental regulations – particularly the Greenhouse Gas Power Sector Rule – will reduce the dispatchable capacity in the PJM system. PJM states, "[I]n the very years when we are projecting significant increases in the demand for electricity, the [Greenhouse Gas Power Sector] Rule may work to drive premature retirement of coal units that provide essential reliability services . . ." Plainly, any unit downtime exacerbates an already precarious reliability situation, especially considering the increasing demand for electricity in Kentucky and elsewhere in the PJM region.

28.     East Kentucky, as a non-profit electric cooperative, has limited financial resources to risk PJM penalties of this magnitude, especially when layered with other environmental compliance projects due to EPA's recent rulemaking agenda. All of these projects must take place during the same time period. These costs will place upward pressure on rates for rural customers and impact East Kentucky's ability to supply affordable, reliable energy to customers.

## THE MATS RTR CREATES GRID RELIABILITY CONCERNS

29.     Compliance costs and increased maintenance needs associated with the Final Rule create a significant risk of energy reliability and economic hardship.

30.     Spurlock Unit 3 would not be available during forced outage time periods because the baghouse is not designed to provide sufficient margin for compliance with the New fPM Limitation, such that even a pinky-sized hole in one of the baghouse bags would cause an exceedance. During these time periods, existing generation resources may not be adequate in Kentucky to sustain the grid. Multiple new EPA environmental regulations directly and profoundly impact generation resources in Kentucky, causing multiple unit retirements in a short time frame. This Final Rule makes it more likely that Spurlock Unit 3 will be forced off-line when PJM depends upon it the most, contributing to cumulative reliability concerns.

31.     If the interruption of power delivery from a grid failure occurs, East Kentucky, its members, the economy, and the public health of end

users in its service territory would be immediately harmed. Kentuckians rely on electricity to heat and cool their homes. Affordable and consistent power supports essential health services to the elderly, infirm, and to vulnerable individuals with chronic health conditions. Evidence from the grid failure during winter storm Elliott in the PJM area shows the documented health impacts and morbidity caused by those events. Other concrete damages would occur such as business shutdowns, food spoilage, property damage, and lost labor productivity.

32.    Further economic development in Kentucky is at risk without the ability to provide sufficient energy to support new factories, data centers, and other infrastructure necessary to attract industry, and, in turn, create new jobs. Energy powers the economy from which the government derives tax revenues. The MATS RTR imposes tremendous new risks on East Kentucky and the power grid while offering benefits that are, at best, marginal.

## SUMMARY OF HARM TO EAST KENTUCKY

33.    At this time, Spurlock Unit 3 cannot currently meet the New fPM Limitation on a sustained basis.

34.    East Kentucky must immediately expend several million dollars to determine how Spurlock Unit 3's fPM performance can be improved. Irrespective of the Project improvements, the Unit 3 baghouse's design provides virtually no compliance margin. However, the reality of the current state-of-the-art dictates that there will be failures from time to time.  A very small hole in a single bag is the margin of error between compliance and enormous risk of exposure to PJM performance penalties and energy market exposures.

35.    East Kentucky is harmed by the MATS RTR because it must expend financial resources to commence the Baghouse Upgrade Project sooner than later to lower its fPM emissions and to meet the MATS RTR compliance deadline. The Final Rule's unyielding mandates will result in less reliability and greater costs with no significant improvement in air quality.

36.     These costs cannot be deferred or delayed until the courts reach a final determination on the merits of the Petition for Review and all appeals are exhausted. East Kentucky expects that could take several years. If the Final Rule remains in effect while challenges are pending, East Kentucky will have no choice but to incur significant non-refundable compliance costs as well as to shoulder the many other substantial, immediate, and irreparable harms described above. The consumers who rely on power generated by East Kentucky might find themselves with less reliable power or without the means to pay for it or both.

* * * *

[Signature Follows on Next Page]

I declare under penalty of perjury that the foregoing is true and correct.

Jerry Purvis

Dated: 6/5/2024