U.S. COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

State of North Dakota, et al.,

Petitioners,

v.

U.S. Environmental Protection Agency,

Respondent.

_____

Petitions for Review of a Final Rule of
the U.S. Environmental Protection Agency

_____

**EPA's Combined Opposition to Motions to Stay Final Rule**

_____

Todd Kim
Assistant Attorney General

Sue Chen
Redding Cofer Cates
U.S. Department of Justice
Environment & Natural Resources Div.
*Of counsel*                                     Environmental Defense Section
Matthew McNerney                      P.O. Box 7611
U.S. Environmental Protection Agency   Washington, D.C. 20044
Office of General Counsel                202.305.0283
Washington, D.C.                            sue.chen@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

As required by D.C. Circuit Rule 27(a)(4), EPA certifies:

## A. Parties and amici

Petitioners are:

- Case No. 24-1119: the State of North Dakota, State of West Virginia, State of Alaska, State of Arkansas, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, and State of Wyoming;

- Case No. 24-1154: NACCO Natural Resources Corporation;

- Case No. 24-1179: National Rural Electric Cooperative Association, Lignite Energy Council, National Mining Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative Inc., Basin Electric Power Cooperative, and Rainbow Energy Center, LLC;

- Case No. 24-1184: Oak Grove Management Company LLC and Luminant Generation Company LLC;

- Case No. 24-1190: Talen Montana, LLC;

- Case No. 24-1194: Westmoreland Mining Holdings LLC, Westmoreland Mining LLC, and Westmoreland Rosebud Mining LLC;

- Case No. 24-1201: America's Power and Electric Generators MATS Coalition;

- Case No. 24-1217: NorthWestern Corporation; and

- Case No 24-1223: Midwest Ozone Group.

Respondents are the U.S. Environmental Protection Agency and Michael S. Regan, Administrator.

Intervenor for Petitioners is San Miguel Electric Cooperative, Inc.

Intervenors for Respondent are Air Alliance Houston, Alliance of Nurses for Healthy Environments, American Academy of Pediatrics, American Lung Association, American Public Health Association, Chesapeake Climate Action Network, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Montana Environmental Information Center, Natural Resources Council of Maine, Natural Resources Defense Council, the Ohio Environmental Council, Physicians for Social Responsibility, and Sierra Club; and the Commonwealth of Massachusetts, State of Minnesota, State of Connecticut, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of New Jersey, State of New York, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island,

State of Vermont, State of Wisconsin, District of Columbia, City of Baltimore, City of Chicago, and City of New York.

## B. Rulings under review

Under review is EPA's action "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review." 89 Fed. Reg. 38508 (May 7, 2024).

## C. Related cases

No related case is or was before this or any other court.

/s/ Sue Chen
Counsel for EPA

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ............................... ii

Table of Authorities ................................................................... vii

Glossary .................................................................................. xii

Introduction ................................................................................ 1

Background ................................................................................. 2

    I.      A short history of Section 7412 ............................................. 2

    II.     Regulating air-toxics emissions from power plants. ............... 4

    III.    The 2024 rule. ....................................................................... 5

    IV.    Procedural history .................................................................. 7

Standard of Review ....................................................................... 7

Argument ...................................................................................... 9

    I.      Movants are unlikely to succeed on the merits. ...................... 9

          A.    The technology review complies with Section
               7412(d)(6). .................................................................. 9

               1.     "Developments" in practices, processes, and
                        technology include improvements in those areas. ............ 9

               2.     Section 7412 directs the technology review to
                        proceed independently of the risk review ...................... 13

          B.    The technology review is sound. ............................... 16

               1.     EPA reasonably considered feasibility and costs. .......... 16

                   a.     Surrogate standard. .................................... 16

v

b.      Mercury standard. .......................................24

2.      EPA properly did not rely on an analysis of benefits and costs, but reasonably considered them anyway. ...........................................................30

3.      EPA reasonably concluded that the rule would not imperil grid reliability. ......................................34

C.      The 2024 rule is not a pretext for regulating greenhouse gases. ....................................................................37

D.      Section 7412 directs EPA to regulate, not exempt, sources with obsolete controls that "could" retire. ...................39

II.      Movants show no irreparable harm. ......................................42

A.      Movants speculate about threats to the grid. .............................42

B.      Movants offer no evidence that they will incur great costs imminently. ...............................................................44

1.      Regulated Movants. ...........................................45

2.      Non-regulated Movants. ....................................47

III.      A stay would harm the public interest. .................................49

IV.      Any stay should be narrowly tailored. ................................50

Conclusion .........................................................................50

Certificates of Compliance and Service. ....................................52

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) ...........................................................................48

*Ass'n of Battery Recyclers v. EPA*,
   716 F.3d 667 (D.C. Cir. 2013)............................................................14

*Bd. of Regents of Univ. of Wash. v. EPA*,
   86 F.3d 1214 (D.C. Cir. 1996)................................................ 29, 32, 37

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
   772 F.2d 972 (D.C. Cir. 1985)..............................................................7

*Ctr. for Auto Safety v. Peck*,
   751 F.2d 1336 (D.C. Cir. 1985)..........................................................33

*CTS Corp. v. EPA*,
   759 F.3d 52 (D.C. Cir. 2014)..............................................................38

*Davis v. Pension Benefit Guar. Corp.*,
   734 F.3d 1161 (D.C. Cir. 2013)..................................................... 29, 37

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ...........................................................................38

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ...........................................................................31

*Gill v. Whitford*,
   585 U.S. 48 (2018) .............................................................................50

*La. Env't Action Network v. EPA*,
   955 F.3d 1088 (D.C. Cir. 2020)..................................................... 13, 39

*Authorities upon which we chiefly rely are marked with asterisks

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ............................................................... 8, 9, 12

*Michigan v. EPA,*
    576 U.S. 743 (2015) ................................................................... 4, 30

*Miss. Comm'n on Env't Quality v. EPA,*
    790 F.3d 138 (D.C. Cir. 2015) ......................................................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................... 8

*\*Nat'l Ass'n for Surface Finishing v. EPA,*
    795 F.3d 1 (D.C. Cir. 2015) .............................................. 3, 11, 12, 13

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................. 8, 47, 48

*NRDC v. EPA,*
    529 F.3d 1077 (D.C. Cir. 2008) ...................................................... 12

*Ohio v. EPA,*
    144 S. Ct. 2040 (2024) ......................................................... 9, 44, 48

*Pub. Utils. Comm'n of State of Cal. v. FERC,*
    24 F.3d 275 (D.C. Cir. 1994) ......................................................... 35

*Sierra Club v. EPA,*
    353 F.3d 976 (D.C. Cir. 2004) ......................................................... 2

*Sinclair Wyo. Refin. Co. v. EPA,*
    101 F.4th 871 (D.C. Cir. 2024) ...................................................... 32

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ...................................................................... 9

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ..................................................... 34, 44

*United States v. Chem. Found.*,
  272 U.S. 1 (1926) ...................................................................37

*United States v. Oakland Cannabis Buyers' Co-op.*,
  532 U.S. 482 (2001) .................................................................49

*USPS v. Gregory*,
  534 U.S. 1 (2001) ....................................................................37

*White Stallion Energy Center LLC v. EPA*,
  748 F.3d 1222 (D.C. Cir. 2014)..............................................4, 17

*Winter v. NRDC*,
  55 U.S. (2008) .........................................................................8

*\*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985)........................... 42, 44, 45, 48

**Statutes**

16 U.S.C. § 824a(c)....................................................................36

42 U.S.C. § 7412 .....................................................................1, 2

42 U.S.C. § 7412(b)(1)-(2) ...........................................................2

42 U.S.C. § 7412(d) ......................................................................2

42 U.S.C. § 7412(d)(2)......................................................... 3, 16, 34

42 U.S.C. § 7412(d)(3).............................................................3, 12

42 U.S.C. § 7412(d)(6)......................................................... 3, 9, 11, 14

42 U.S.C. § 7412(f)(2) ................................................................13

42 U.S.C. § 7412(f)(2)(A)..............................................................3

42 U.S.C. § 7412(n)(1)....................................................................................34

42 U.S.C. § 7412(n)(1)(A)...........................................................................4, 30

42 U.S.C. § 7491..........................................................................................21

42 U.S.C. § 7607(d)(7)(A) ....................................................................8, 38, 42

42 U.S.C. § 7607(d)(9)..................................................................................42

**Code of Federal Regulations**

40 C.F.R. Part 51, App. Y. § IV.D.4.k........................................................21

40 C.F.R. Part 63, subpart UUUUU ...............................................................4

40 C.F.R. § 63.10009....................................................................................46

**Federal Registers**

66 Fed. Reg. 38108 (July 20, 2001).............................................................21

69 Fed. Reg. 48338 (Aug. 9, 2004)..............................................................14

71 Fed. Reg. 76603 (Dec. 21, 2006) ............................................................14

73 Fed. Reg. 66964 (Nov. 12, 2008).............................................................15

77 Fed. Reg. 9304 (Feb. 16, 2012) .............................................................4, 6

80 Fed. Reg. 75178 (Dec. 1, 2015)...............................................................20

81 Fed. Reg. 24420 (Apr. 25, 2016) ..............................................................5

85 Fed. Reg. 31286 (May 22, 2020) ..............................................................5

86 Fed. Reg. 7037 (Jan. 25, 2021)................................................................38

87 Fed. Reg. 7624 (Feb. 9, 2022) .................................................................36

88 Fed. Reg. 13956 (Mar. 6, 2023) ..........................................................5, 30

88 Fed. Reg. 24854 (Apr. 24, 2023) ................................................................25

89 Fed. Reg. 38508 (May 7, 2024) ............................................ 2, 4, 5, 6, 7, 10, 12,
...................................................... 13, 14, 15, 16, 17, 18, 19,
...................................................... 20, 22, 23, 24, 25, 26, 27,
...................................................... 28, 29, 30, 31, 32, 33, 34
...................................................... 35, 36, 37, 39, 40, 41, 46, 50

89 Fed. Reg. 39798 (May 9, 2024) ................................................................21

# GLOSSARY

| | |
|---|---|
| 2023 Andover Report | Andover Technology Partners, Assessment of Potential Revisions to the Mercury and Air Toxics Standards (June 15, 2023), attached as Lassiter Decl. Ex. A |
| 2023 Technology Memo | EPA, Memorandum on 2023 Technology Review for the Coal- and Oil-Fired EGU Source Category (Jan. 2023), attached as Lassiter Decl. Ex. B |
| 2024 Technical Memo | EPA, Memorandum on 2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category (Jan. 2024), attached as Lassiter Decl. Ex. C |
| 2024 Technical Memo Att. 1 | Attachment 1 to 2024 Technical Memo, attached as Lassiter Decl. Ex. D |
| 2024 Technical Memo Att. 2 | Attachment 2 to 2024 Technical Memo, attached as Lassiter Decl. Ex. E |
| Am. Power Mot. | Petitioners' Motion for Stay Pending Judicial Review (July 8, 2024) in Case No. 24-1201, filed by America's Power and Electric Generators MATS Coalition |
| Cichanowicz Report | J. Edward Cichanowicz et al., Technical Comments National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-fired Electric Utility Steam Generating Units Review of Residual Risk and Technology (June 19, 2023), attached as Lassiter Decl. Ex. F |
| EPA | U.S. Environmental Protection Agency |

| | |
|---|---|
| lb/MMBtu | pounds per million British thermal units of heat input |
| lb/TBtu | pounds per trillion British thermal units of heat input |
| Lignite Council Comment | Comment from Lignite Energy Council (June 23, 2023), attached as Lassiter Decl. Ex. G |
| Midwest Ozone Mot. | Motion for Stay (July 8, 2024) filed by Midwest Ozone Group in Case No. 24-1223 |
| PM CEMS Memo | EPA, Memorandum: PM CEMS Random Error Contribution by Emission Limit (Mar. 22, 2023), attached as Lassiter Decl. Ex. H |
| Reg. Impact Analysis | EPA, Regulatory Impact Analysis for the Final National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review (Apr. 2024), attached as Lassiter Decl. Ex. I |
| Resource Adequacy Memo | EPA, Resources Adequacy Analysis: Vehicle Rules, Final 111 EGU Rules, ELG and MATS RTR: Technical Memo (Apr. 2024), attached as Lassiter Decl. Ex. J |
| Resp. to Comments | EPA, Summary of Public Comments and Responses on Proposed Rule (Apr. 2024), attached as Lassiter Decl. Ex. K |
| Rural Mot. | Petitioners' Motion for Stay of the Final Rule (June 21, 2024) in Case No. 24-1179, filed by National Rural Electric Cooperative Association et al. |

Sargent & Lundy Report

Sargent & Lundy, PM Incremental Improvement Memo (Mar. 2023), attached as Lassiter Decl. Ex. L

States Mot.

Petitioners' Amended Motion for Stay (June 7, 2024) in Case No. 24-1119, filed by North Dakota et al.

Talen Mot.

Petitioner Talen Montana, LLC and Petitioner NorthWestern Corporation's Joint Motion for Stay (June 27, 2024) in Case Nos. 24-1190 and 24-1217

Westmoreland Mot.

Petitioner's Motion for Stay of the Final Rule (June 27, 2024) in Case No. 24-1194, filed by Westmoreland Mining Holdings LLC, Westmoreland Mining LLC, and Westmoreland Rosebud Mining LLC

**INTRODUCTION**

Congress's view on toxic air pollution is simple: Less is better. To that end, Congress decided that emission standards would be revised to reflect developments in emission-control practices, processes, and technologies.

The Clean Air Act's air-toxics program, 42 U.S.C. § 7412, embodies that approach. So does EPA's action here tightening two standards for power plants. Better and cheaper emission controls have made stricter standards feasible and their costs reasonable. So much so that almost all regulated entities can already meet those standards, while a small group of laggards emits an outsized share of toxic pollution. EPA, in line with Section 7412, thus reasonably adopted stricter standards.

Six sets of petitioners, in filings totaling over 2,400 pages, move to stay EPA's action. But quantity is not quality, and Movants offer no meritorious claim of a legal or record-based flaw in the standards. Nor can they show a clear and present need for the extraordinary relief they seek. The most that Movants can say is that the standards "may" (or may not) affect electricity grids, while the compliance date is three years away (with a one-year extension also available). That reticence confirms that there is no emergency to justify a stay. The Court should deny the motions.

# BACKGROUND

## I.     A short history of Section 7412.

The Clean Air Act regulates emissions of hazardous air pollutants (or colloquially, air toxics) under 42 U.S.C. § 7412.  These pollutants include neurotoxins like mercury, human carcinogens like arsenic and chromium, and a host of other toxic chemicals.  *See id.* § 7412(b)(1)-(2); 89 Fed. Reg. 38508, 38515/2-3 (May 7, 2024).

Section 7412 began as a risk-based program.  Under that regime, EPA had to assess a pollutant's risk before setting emission limits.  *See Sierra Club v. EPA*, 353 F.3d 976, 979 (D.C. Cir. 2004).  That approach proved "disappointing" because risk analysis was hard and slow going.  *Id.*; *see* 89 Fed. Reg. at 38513/3. It took EPA 20 years to regulate just 7 air toxics.  89 Fed. Reg. at 38514/1.

Frustrated with EPA's sluggish pace in curbing air-toxics emissions, Congress in 1990 revamped Section 7412, transforming it into a technology-driven regime.  *Sierra Club*, 353 F.3d at 979-80.  The new regime, designed to swiftly slash emissions based on what is technologically achievable, uses a two-phase regulatory process.  89 Fed. Reg. at 38513/2.

In phase one, EPA sets emission standards for categories of sources that emit air toxics.  42 U.S.C. § 7412(d).  The standards, based on maximum achievable control technologies rather than risk, are set by examining what the best-

performing 12 percent of existing sources can do. *Id.* § 7412(d)(3). These standards (dubbed the "MACT floor") serve as the stringency floor.

EPA can go beyond that floor and set stricter standards if they are "achievable." *Id.* § 7412(d)(2). In this analysis, EPA considers "the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements…." *Id.* Once EPA sets initial emission standards (be it the floor or beyond the floor), phase one ends.

Phase two entails reviewing existing standards. Section 7412 requires two reviews that proceed on "distinct, parallel" tracks. *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015). The first is a risk review, required within eight years after standards are promulgated for a source category. 42 U.S.C. § 7412(f)(2)(A). In the risk review, EPA considers whether the standards provide "an ample margin of safety" to protect public health and the environment. *Id.* If they do not, EPA must tighten the standards. *Id.*; *see Surface Finishing*, 795 F.3d at 5. Section 7412(f)(2), however, does not require EPA to eliminate all risk to public health and the environment.

The other review—at issue here—is a technology review. This is a recurring review that happens at least every eight years. 42 U.S.C. § 7412(d)(6). In the technology review, EPA considers "developments in practices, processes, and control technologies" and "revise[s the standards] as necessary." *Id.* Because

3

technology reviews necessarily contemplate going beyond the floor, EPA also looks to factors enumerated in Section 7412(d)(2) to determine whether stricter standards are achievable. *See* 89 Fed. Reg. at 38531/1 (explaining that technology reviews consider "costs, technical feasibility, and other factors").

## II.     Regulating air-toxics emissions from power plants.

Coal- and oil-fired power plants are among the largest domestic emitters of mercury, arsenic, chromium, lead, and other air toxics. *Id.* at 38509/3. In 2012 EPA found that it was "appropriate and necessary" to regulate air-toxics emissions from coal- and oil-fired electric utility steam-generating units (that is, power plants), and promulgated standards to do so. 77 Fed. Reg. 9304 (Feb. 16, 2012); 42 U.S.C. § 7412(n)(1)(A); 40 C.F.R. Part 63, subpart UUUUU.

This Court upheld the 2012 rule. *See White Stallion Energy Ctr. LLC v. EPA*, 748 F.3d 1222, 1247-51 (D.C. Cir. 2014) (per curiam). On petitions for certiorari, the Supreme Court limited review to the threshold issue of whether EPA had to consider costs in its "appropriate and necessary" finding. *Michigan v. EPA*, 576 U.S. 743 (2015). Because EPA did not do so, the Supreme Court reversed this Court's judgment. *Id.* at 760. The Supreme Court never opined on the 2012 standards themselves, and this Court remanded the rule to EPA while leaving those standards in place. Order, *White Stallion*, Case No. 12-1100 (D.C. Cir. Dec. 15, 2015).

On remand, EPA completed supplemental "appropriate and necessary" findings that address costs. 81 Fed. Reg. 24420 (Apr. 25, 2016); *see* 88 Fed. Reg. 13956, 13962/1-3 (Mar. 6, 2023) (summarizing administrative history). Most recently, in 2023 EPA considered costs and found that it is appropriate and necessary to regulate air-toxics emissions from coal- and oil-fired power plants. 88 Fed. Reg. at 13956/1. No one challenged that finding.

Meanwhile, in 2020, EPA completed its risk review and first technology review. 85 Fed. Reg. 31286 (May 22, 2020). In the risk review, EPA concluded that the 2012 standards provided an ample margin of safety and thus need not be revised. *Id.* at 31314/3. In the technology review, EPA found no developments in practices, processes, or control technologies to warrant revision. *Id.*

## III. The 2024 rule.

In 2024, EPA reviewed the 2020 action. 89 Fed. Reg. at 38508/1. It did not reopen the 2020 risk review. *Id.* at 38518/1-2. But EPA disagreed with the 2020 technology review: It determined there are developments in practices, processes, and control technologies that warrant revising the 2012 standards. *Id.* at 38518/3. Although the fundamental nature of emission-control technologies had not changed since 2012, better practices, along with technical and operational improvements, made those controls more efficient and cheaper to use. *Id.* at 38530/1-2, 38537/3;

*see id.* at 38541/3 (noting that the 2020 review did not address these developments).

Movants focus on two standards that EPA revised for coal-fired units:

*Surrogate standard for non-mercury metals*:  The 2012 rule set emission standards for non-mercury metals like arsenic, chromium, and lead.  *Id.* at 38510/1 & n.2.  It also gave regulated entities the option to use a surrogate standard based on filterable particulate matter, the control of which also reduces non-mercury metals.  *Id.* at 38510/1.  Almost all coal-fired units chose to use the surrogate standard in lieu of the metals standards.  *Id.*  In the 2024 rule, EPA tightened the surrogate standard to a level that almost 90 percent of coal-fired units could already meet.  *Id.* at 38510/1, 38524/3.  The stricter standard would thus bring the stragglers in line with the rest of the industry.

*Mercury standard for lignite units*:  Lignite coal, mined mostly in North Dakota and Texas, ranks lowest among all coals in terms of quality because it has the lowest energy content.  2024 Technical Memo 37.  In 2021, lignite accounted for only about 8 percent of domestic coal production.  *Id.*  By contrast, bituminous and subbituminous coal, both ranked higher than lignite, together accounted for over 90 percent.  *Id.*

The 2012 rule set two mercury standards, one for units burning lignite coal, and a stricter standard for units burning all other types of coal.  77 Fed. Reg. 9304,

9367 (table 3) (Feb. 16, 2012); 89 Fed. Reg. at 38537/2.  In the 2024 rule, EPA determined that cost-effective controls are available for lignite units to meet the same mercury limit that has applied to other coal-fired units, and it tightened the standard for lignite units accordingly.  89 Fed. Reg. at 38537/3-49/2.

*       *       *

The rule took effect on July 8, 2024.  *Id.* at 38508/1.  Power plants have three years, until July 2027, to comply, and their permitting authorities can grant a one-year extension when necessary.  *Id.* at 38519/3.

## IV.    Procedural history.

States, power plants, mining companies, and others filed nine petitions for review of the 2024 rule.  Six stay motions followed.  States Mot. (June 7, 2024); Rural Mot. (June 21, 2024); Talen Mot. (June 27, 2024); Westmoreland Mot. (June 27, 2024); Midwest Ozone Mot. (July 8, 2024); Am. Power Mot. (July 8, 2024); *see* Petitioner NACCO Natural Resources Corp.'s Joinder in the State Petitioners' Motion for Stay (June 14, 2024).  The Court granted EPA's request to file a consolidated response.  Order (July 1, 2024).

## STANDARD OF REVIEW

"On a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy."  *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985) (per curiam), *abrogated on other*

*grounds by Winter v. NRDC*, 555 U.S. 7 (2008).  Movants must show (1) a likelihood of success on the merits; (2) irreparable injury to them if relief is denied; (3) lack of substantial harm to others; and (4) where the public interest lies.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  The last two criteria merge here.  *Id.* at 435.

On the merits, the disputed standards are reviewed under the same arbitrary-and-capricious standard as under the Administrative Procedure Act.  *See* 42 U.S.C. § 7607(d)(9)(A); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (per curiam).  The review is a "narrow" one and "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) ("Section 706 [of the Administrative Procedure Act] does mandate that judicial review of agency policymaking and factfinding be deferential." (emphasis omitted)).  The Court should uphold a decision when the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made.  *State Farm*, 463 U.S. at 43.  That is true even when the decision has "less than ideal clarity" so long as "the agency's path may reasonably be discerned."  *Id.* (internal quotation marks omitted).

Finally, an agency's "interpretations and opinions," made in pursuance of official duty and based on special experience, constitute a "'body of experience

and informed judgment to which courts and litigants could properly resort for guidance,' even on legal questions." *Loper Bright*, 144 S. Ct. at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944) (internal brackets omitted)).

## ARGUMENT

No stay should issue. Movants have not shown a likelihood of success on the merits. Nor do they have "strong arguments about the harms they face and equities involved." *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024). To the contrary, Movants' claims of irreparable harm lack evidence and the equities disfavor a stay.

## I. Movants are unlikely to succeed on the merits.

Movants are unlikely to prevail on the merits. First, their reading of Section 7412 clashes with circuit precedent, not to mention statutory text and design. Second, their record-based arguments ignore much of the record. Third, though Movants accuse EPA of improper motive in the rulemaking, the record belies that fiction. Finally, Movants' arguments as to the Colstrip facility flout Section 7412.

### A. The technology review complies with Section 7412(d)(6).

#### 1. "Developments" in practices, processes, and technology include improvements in those areas.

Section 7412(d)(6) requires EPA to revise existing emission standards as necessary, "taking into account developments in practices, processes, and control technologies." In the 2024 rule, EPA identified a "clear trend in control efficiency,

costs, and technological improvements" since 2012—a trend that the 2020 technology review overlooked.  89 Fed. Reg. at 38521/1, 38541/3; *contra* Rural Mot. 18.  These improvements include more durable filter-bag material, better monitoring practices, and the development of sulfur-resistant chemicals designed to capture mercury from bituminous and lignite coals.  89 Fed. Reg. at 38521/1, 38530/2, 38541/3.  All these changes improved how effectively coal-fired units can reduce their air-toxics emissions.  Partly due to those improvements, meeting the 2012 standards costs less money than expected.  *Id.* at 38530/1.

Movants' contention that no "development" occurred runs aground on the facts and the law.  On the facts, Movants either overlook new products (like sulfur-resistant chemicals) or downplay other advances.  *E.g.*, States Mot. 7; Rural Mot. 9-11; Talen Mot. 6-10; Westmoreland Mot. 17-18.  But dismissing improvements as trivial does not make them so.  For example, more durable filter bags lower both the risk that a control might fail, and the wear and tear that impairs efficacy.  89 Fed. Reg. at 38530/2; *contra* Westmoreland Mot. 17-18.  That is a meaningful improvement.  It is unclear what kind of "validat[ion]" Movants demand, for Section 7412(d)(6) does not require EPA to "quantify" improved efficacy.  Talen Mot. 8.

At bottom, Movants' dismissive attitude is rooted in a misunderstanding of the law.  "Developments," Movants urge, means changes that are both "*new* and

*significant*." Westmoreland Mot. 16. On that view, in technology reviews EPA can consider only practices, processes, and technologies that differ fundamentally from what came before. *See* Rural Mot. 9-11; States Mot. 6-7; Talen Mot. 6-10. But that is not what Section 7412(d)(6) says. "Developments," in its ordinary usage, means "the act, process, or result of developing," which in turn means "to cause to evolve or unfold gradually." *See* "Development" and "Developing," Merriam-Webster;[1] Talen Mot. 7 (offering similar definition). The statute thus encompasses incremental changes over time. And that is how progress happens in the real world, where true overnight revolutions in technology are rare; much more common are modest changes that gradually but meaningfully improve the status quo.

This Court rejected Movants' view years ago in *Surface Finishing*. Though petitioners there did not directly challenge the meaning of "developments," they argued that EPA had failed to identify specific developments that warranted revising standards. 795 F.3d at 11. The Court disagreed, holding that EPA permissibly accounted for developments under Section 7412(d)(6)—developments that, as interpreted by EPA, covered "not only wholly new methods," but also "technological improvements," "improvements in efficiency," and "reduced costs." *Id.* (internal quotation marks omitted). In so holding, the Court necessarily agreed

---

[1] *Available at* https://perma.cc/K9LL-9SQP; https://perma.cc/2TE7-GNUB.

with EPA's reading of "developments" to include technologies that, though "not brand new," underwent "improvements [that] resulted in emissions reductions." *Id.*; *contra* Talen Mot. 7. The improvements identified in the 2024 rule—longer-lasting filter bags, new chemicals to control mercury emissions, improved processes—fall squarely within the kind of developments this Court recognizes as valid under Section 7412(d)(6).[2] *See* 89 Fed. Reg. at 38521/1-2.

To be sure, *Surface Finishing* applied the *Chevron* framework, which the Supreme Court recently overruled. *Loper Bright*, 144 S. Ct. at 2273; *see* 795 F.3d at 7. But *Loper Bright* did "not call into question prior cases that relied on the *Chevron* framework" despite the "change in interpretive methodology." 144 S. Ct. at 2273. So *Surface Finishing*'s holding that EPA's action was lawful remains good law. *Cf.* Talen 28(j) Letter (July 17, 2024) (advising Court of *Loper Bright*).

---

[2] In *NRDC v. EPA*, this Court did not rewrite the statute by reading "developments" to mean only "technological improvements." 529 F.3d 1077 (D.C. Cir. 2008); *contra* States Mot. 7; Talen Mot. 7; Westmoreland Mot. 18; Talen 28(j) Letter 1-2. There, the Court said that technology reviews do not involve resetting the MACT floor. 529 F.3d at 1084. But even if they did, the Court added, petitioners had not identified any "technological innovations" overlooked by EPA. *Id.* The Court never purported to interpret "developments."

And the 2024 rule did not reset MACT floors. *Contra* Rural Mot. 11. That process entails analyzing what the best-performing 12 percent of existing sources can do. 42 U.S.C. § 7412(d)(3). EPA analyzed almost all sources here. *See* 2024 Technical Memo 9, 28; 89 Fed Reg. at 38553/3 & n.88 (noting that EPA lacked relevant data for only about 6 percent of coal-fired units).

EPA's—and the Court's—reading of "developments" aligns not only with statutory text, but also statutory design. Congress rewrote Section 7412 as a technology-based regime. Whereas it ordered a one-time risk review, Congress specified that technology reviews recur at least every eight years. The goal is to ensure that, over time, EPA maintains standards that are "on pace with emerging developments that create opportunities to do even better." *La. Env't Action Network v. EPA*, 955 F.3d 1088, 1093 (D.C. Cir. 2020) (*LEAN*). Congress, in other words, wanted to keep reducing air-toxics emissions when technology allows. 89 Fed. Reg. at 38514/3. It would stymie congressional intent to ignore incremental advances that fall short of being "brand-new." Rural Mot. 10-11; *see* States Mot. 7; Talen Mot. 7-10; Westmoreland Mot. 16.

### 2. Section 7412 directs the technology review to proceed independently of the risk review.

Also meritless is Movants' insistence that EPA cannot tighten standards found to have an ample margin of safety in the risk review. *E.g.*, Am. Power Mot. 5-9; Midwest Ozone Mot. 5; States Mot. 6, 8; Rural Mot. 17-18; Talen 28(j) Letter 2. Once again, Movants overlook statutory text and design.

Section 7412 imposes separate and distinct requirements on risk and technology reviews. *Surface Finishing*, 795 F.3d at 5. The risk review asks whether, given currently available information, existing standards offer an ample margin of safety to protect public health and the environment. 42 U.S.C.

§ 7412(f)(2).  It also directs EPA to require that margin within eight years of promulgating the original standards.  *Id.*

In contrast, the technology review asks—on a recurring basis—whether advances in emission controls warrant stricter standards.  *Id.* § 7412(d)(6).  It applies to all standards, including those that provide ample margins of safety.  Congress, in other words, wanted EPA to consider tightening standards based on developments in controls even after safety margins are in place.  Otherwise, it would not have required the technology review to recur once the risk review was complete.  Nor does Section 7412(d)(6) require technology reviews to account for safety margins or health and environmental risks.  *See Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013) (per curiam) ("[N]othing in section [74]12(d)(6)'s text suggests that EPA must consider" public-health factors); 89 Fed. Reg. at 38525/2-3.[3]  Rather, technology reviews consider factors like feasibility and costs.  *See* 89 Fed. Reg. at 38531/1.

This setup reflects Congress's decision that technological progress should drive the regulation of air toxics independent of EPA's risk assessment.  *Id.* at

---

[3] EPA often tightens Section 7412 standards with ample margins of safety.  *See* 89 Fed. Reg. at 38525 n.29 (giving examples).  So what it did here was not a "change of position."  Rural Mot. 18.  Granted, EPA has, in its discretion, considered risk during technology reviews.  States Mot. 4 (citing 69 Fed. Reg. 48338 (Aug. 9, 2004); 71 Fed. Reg. 76603 (Dec. 21, 2006)); Westmoreland Mot. 13.  But as the agency noted on one such occasion, an ample margin of safety does not bar tightening standards under Section 7412(d)(6).  71 Fed. Reg. at 76609/2.

38525/3.  After all, in revamping Section 7412, Congress made clear that air-toxics emissions are inherently dangerous and sought to reduce those emissions as much as achievable using technology.  *Id.* at 38513/3-14/3.  And the reality is that scientific advances and newly available data sometimes show that things we had thought "safe" are in fact risky.  *See, e.g.*, 73 Fed. Reg. 66964, 66975/2 (Nov. 12, 2008) (updating air-quality standards for lead based on new evidence of neurotoxicity at low doses).  In choosing technology-based standards, Congress declined to tether the air-toxics program to risk assessments that could become outdated.

Further, an "ample margin of safety" determination does not mean zero risk.  *Contra* States Mot. 1, 6, 10; Rural Mot. 17-18; Talen Mot. 14-15; Westmoreland Mot. 12-13.  Coal-fired units emit air toxics that cause serious health problems.  Though risks are now much lower, they still exist—and these risks mattered to Congress.  89 Fed. Reg. at 38556/3, 38541/3; *see id.* at 38524/3 (noting disparity in exposure to nearby communities from well-controlled sources versus other sources); Reg. Impact Analysis 4-5, 4-7.  That is why Congress directed EPA to continue to require achievable reductions in air-toxics emissions as much as possible, even when standards offer an ample margin of safety.

**B.      The technology review is sound.**

**1.      EPA reasonably considered feasibility and costs.**

EPA considers "costs, technical feasibility, and other factors when evaluating whether it is necessary to revise existing emission standards under [Section 7412](d)(6) to ensure the standards 'require the maximum degree of emission reductions…achievable.'"  89 Fed. Reg. at 38531/1 (quoting 42 U.S.C. § 7412(d)(2)).  Here, deference is due EPA's reasonable conclusion that the two challenged standards are achievable given its consideration of those factors.

**a.      Surrogate standard.**

The rule lowered the surrogate standard for non-mercury metals from 0.030 lb/MMBtu to 0.010 lb/MMBtu, measured on a rolling-average basis.  *Id.* at 38510/2 & n.4, 38566/1.  This new standard is achievable because it is feasible and its costs are reasonable.  *See id.* at 38531/1.  At a minimum, EPA acted reasonably in so concluding.

The standard is feasible because almost all coal-fired units showed that they could already meet it.  *Id.* at 38530/1-3.  In this analysis, EPA considered the units' ability to emit at or below 0.010 lb/MMBtu, and to do so over time.

First, quarterly emissions data showed that even before EPA proposed 0.010 lb/MMBtu as a standard, most coal-fired units could achieve that level.  The data covers 275 out of 314 coal-fired units.  2023 Technology Memo 2; 2024 Technical

Memo 8; 89 Fed. Reg. at 38553/3. Because electricity demand—and thus emissions—peaks in winter and summer, EPA focused on data from those quarters. 2024 Technical Memo 3; Resp. to Comments 24; *cf.* Rural Mot. 14-15 (quoting *White Stallion*, 748 F.3d at 1251, to argue that "achievable" means "capable of being met under most adverse conditions which can reasonably be expected to recur"); *contra id.* at 12 (misstating that EPA reviewed data "from quarters with the lowest emission rates"); Am. Power Mot. 9-10. The winter and summer data showed that 91 percent of the units achieved emission rates of 0.010 lb/MMBtu or less. 89 Fed. Reg. at 38530/2; 2023 Technology Memo 4-8.

Then, in response to comments, EPA also considered data from other quarters. 89 Fed. Reg. at 38530/2. It reviewed all quarterly emissions data it had for 62 coal-fired units. *Id.* This review, which accounts for the lower-emitting seasons of spring and autumn, found that an even greater percentage of units—93 percent—achieved 0.010 lb/MMBtu or less. *Id.*

Second, EPA considered average emission rates at 296 coal-fired units. 2024 Technical Memo 9. Because emission rates can vary, it is important to consider average rates, which show a unit's ability to emit at 0.010 lb/MMBtu on a sustained basis. *See* Resp. to Comments 30-31 (noting that average rates account for unit variability); *cf.* Am. Power Mot. 9-17 (sidestepping this analysis); Rural Mot. 12-13 (same). The data showed that 263 units (or 89 percent) can

consistently achieve that level of control.  89 Fed. Reg. at 38530/3, 38533/3; *see id.* at 38522/1 (noting that Movant National Rural Electric Cooperative Association's estimate came close); 2024 Technical Memo 17 & Att. 2; *contra* Am. Power Mot. 15-16.  Indeed, the median of the average rates was only 0.004 lb/MMBtu.  89 Fed. Reg. at 38522/1.  Even among the 33 units (11 percent) that did not average 0.010 lb/MMBtu or less, more than half achieved that level at some point.  *See* 2024 Technical Memo Att. 1 at 50-51 (column F).

Given that almost all regulated units could, with existing technology, consistently emit at or below 0.010 lb/MMBtu, EPA reasonably set the surrogate standard at that level.  Of course, among units that averaged 0.010 lb/MMBtu or less, emissions at times exceeded that level.  *See* Am. Power Mot. at 12-15 (spotlighting Coronado facility); Resp. to Comments 25 (noting that Coronado's rolling-average emissions were at or below 0.010 lb/MMBtu about 70 percent of the time).  Those higher levels are unsurprising because they happened when the standard was still 0.030 lb/MMBtu.  There was nothing special about 0.010 lb/MMBtu then, and one would not expect regulated units to try to keep their emissions below that level.  *See* Resp. to Comments 36; 89 Fed. Reg. at 38510/1 n.3.  So the sporadic higher levels do not alter either the fact that regulated units could, using existing controls, average 0.010 lb/MMBtu, or the conclusion that the 0.010 lb/MMBtu standard is feasible.  *Contra* Am. Power Mot. 15-16.

EPA also explained why the standard's compliance costs are reasonable. 89 Fed. Reg. at 38533/1-34/1. First, even before EPA adopted the new standard, almost all coal-fired units had invested in the necessary emission controls to meet it. *Id.* at 38533/3. Had costs been unreasonable, those investments would not have happened. Second, compliance costs are only 0.03 percent of coal-fired units' revenue. *Id.* at 38533/2. Third, EPA accounted for factors that skewed its cost estimate: Two units at the Colstrip facility in Montana are the only coal-fired units in the country without modern emission controls. *Id.* at 38533/3. To meet the standard, those two would have to install better controls. *Id.* The cost of their upgrades accounts for over 40 percent of total annual costs. *Id.*[4] At the same time, of the 33 units that would incur compliance costs, 20 account for only 1 percent of total annual costs. *Id.* at 38533/3-34/1; *see* Resp. to Comments 31, 37; 2024 Technical Memo 15; *contra* Am. Power Mot. 11-12. So for most of the affected units, EPA's annual-cost estimates greatly overstate their actual costs.

Some Movants focus on the surrogate standard's cost-effectiveness (meaning the cost per ton or pound of pollution reduction). *E.g.*, States Mot. 10. That figure, they say, far exceeds what EPA had rejected for other air-toxics standards in industries as disparate as petroleum refining, iron-ore processing, and

---

[4] EPA assumed that Colstrip would install fabric filters. 2023 Technology Memo 9. Filter-bag vendors have "historically offered…guarantees [of emission rates] at 0.010 lb/MMBtu." Sargent & Lundy Report 2, 9; *contra* Talen Mot. 18.

portland-cement manufacturing. *Id.*; Westmoreland Mot. 10-12; *see* 89 Fed. Reg. at 38522/2-3. Yet what it reasonably costs to reduce a pound of pollutants in one industry may be unreasonable in a very different industry. 89 Fed. Reg. at 38523/3-24/3.[5] Cost-effectiveness is also just one metric that EPA considers alongside many others. *Id.* at 38523/3-24/1. Those other metrics here—the broad adoption of necessary controls, the modest cost-to-revenue ratio, and the skewed cost estimate toward one high-emitting facility—show that EPA reasonably imposed costs on a small group of coal-fired units so they can catch up to everyone else. *Id.* at 38530/3.

In calculating cost-effectiveness, EPA also properly declined to assume that most coal-fired units would retire soon. *Contra* Am. Power Mot. 22-26. Though Movants predict that EPA's recently finalized greenhouse-gas rule (a separate action not at issue here) would lead coal-fired units to retire in five years, *id.* at 23-24, nothing in that rule compels retirement. *See* Respondents' Opp. to Mots. to Stay Final Rule, *West Virginia v. EPA*, Case No. 24-1120 and consolidated cases

---

[5] There is no inconsistency in how EPA distinguished petroleum refineries from power plants. *Contra* Westmoreland Mot. 16. In the petroleum-refineries review, two high-performing sources used existing technologies. After considering the cost-effectiveness of tightening the applicable standard, EPA decided against setting a standard for the industry based on only two high performers. 80 Fed. Reg. 75178, 75201/1-2 (Dec. 1, 2015); 89 Fed. Reg. at 38524/1-2. By contrast, here almost the entire industry performed well. EPA did not claim, as Movants seem to imply, to use different approaches in estimating cost-effectiveness in the two rules. The difference follows from different context in the two industries.

(D.C. Cir. June 11, 2024), Argument § I.B.  It instead requires states to develop plans that establish feasible technology-based greenhouse-gas emission standards for coal-fired power plants that do not intend to retire by January 1, 2032.  *See* 89 Fed. Reg. 39798, 39840/2-902/3 (May 9, 2024).

To support their retirement argument, Movants cite proposed guidelines that address the Clean Air Act's regional-haze program.  *See* Am. Power Mot. 23 (citing 66 Fed. Reg. 38108, 38126 (July 20, 2001)); 66 Fed. Reg. at 38108/1; 42 U.S.C. § 7491.  Those guidelines do not apply to this air-toxics dispute.  In any event, they do not require accounting for hypothetical retirement dates when calculating costs.  *See* 66 Fed. Reg. at 38126/2 (basing "remaining useful life" assessment on closing date that "must be assured by a federally-enforceable restriction preventing further operation"); 40 C.F.R. Part 51, App. Y. § IV.D.4.k (final guidelines).  So that document is not evidence of arbitrary action.

Nor did EPA err in calculating cost-effectiveness for Colstrip.  *Contra* Talen Mot. 18.  EPA estimated that fabric filters can slash Colstrip's emissions by 90 percent, to just above 0.002 lb/MMBtu.  2023 Technology Memo 10.  That reduction amount was used to calculate cost-effectiveness.  *Id.* at 9-10.  Movants, however, act as if fabric filters can reduce Colstrip's emissions to 0.010 lb/MMBtu and no more.  Talen Mot. 18.  But fabric filters cannot be easily fine-tuned to reduce pollutants by a specified amount and stop there.  So Movants' method, in

undercounting the amount of reduced pollution, distorts cost-effectiveness (and omits the compliance margin they urge elsewhere). *See* Am. Power Mot. 17-20; Rural Mot. 13. EPA also reasonably declined to assume that Colstrip would retire soon when Colstrip itself had not—and apparently still has not—decided to retire. *Contra* Talen Mot. 18-19; *see* Lebsack Decl.

Movants' other arguments are easily refuted. First, in the feasibility analysis, EPA properly considered units that use both coal and natural gas. *Contra* Rural Mot. 12-13. EPA's goal is to evaluate the performance of units that would be subject to the surrogate standard. That includes coal-fired units that also burn natural gas. *See* 2023 Technology Memo 5-6 (table 1). Indeed, one control strategy for coal-fired units is to use some natural gas. *Cf.* 89 Fed. Reg. at 38538/3 (explaining this in context of mercury standard). Because EPA considered emissions data from units that use emission controls, for consistency it was reasonable to consider emissions from coal-fired units that also use natural gas. *Id.*

Second, citing a report they commissioned, Movants decry EPA's supposed underestimate of control-retrofit costs by 50 percent and say that annual costs are $1.96 billion. *See* Rural Mot. at 13 (citing Cichanowicz Report at 21). In reality, the report estimated those costs for a standard of 0.006 lb/MMBtu—much lower than what EPA finalized. *See* Cichanowicz Report at 21 ("To meet the alternative PM rate of 0.006 lb/MMBtu, this study projects 50% more units (87 versus 65)

must be retrofit with fabric filters or implement enhanced O&M to an existing fabric filter, incurring an annual cost of $1.96 B").

Finally, the surrogate standard accounts for compliance margins. *Contra* Am. Power Mot. 17-20; Rural Mot. 13. Power plants often target emission levels below what standards require. 89 Fed. Reg. at 38521/3. Doing so creates a margin for error in case their equipment malfunctions or breaks down. *Id*. That margin is baked into the standard in two ways.

One is by setting the emission limit above what most coal-fired units were emitting on average. Recall that EPA considered average emission rates of 296 coal-fired units. 2024 Technical Memo 9. Averages account for operational variability and degradation of emission controls over time. Resp. to Comments 31. In this way, averages capture the kind of equipment problems and variabilities that regulated units must normally contend with. In fact, most of the 296 units in EPA's analysis averaged well below 0.010 lb/MMBtu: The median emission rate was only 0.004 lb/MMBtu, 60 percent below the new standard. 89 Fed. Reg. at 38522/1. This difference—between what most regulated units can do and what the standard requires them to do—serves as a built-in compliance margin that accounts for most causes of emission spikes.

The other place that the standard builds in a margin is on the compliance side. It assesses a given facility's compliance using 30-day rolling averages:

Compliance on any day is based on the facility's average emissions over the last 30 days when fuel was combusted. *See id.* at 38566/1. Rolling averages dampen isolated emission spikes. *Cf. id.* at 38544 (Figure 1) (illustrating this effect for mercury standards). That in turn gives regulated entities a flexibility that allows for normal hiccups in operations.

Movants are thus wrong that EPA ignored compliance margins. Am. Power Mot. 17-20. The surrogate standard accounts for those margins along the same lines that EPA did in Movants' examples, by factoring in variability and allowing compliance flexibility. *See id.* at 18.[6] And because the surrogate standard in effect has a built-in compliance margin, that margin's cost was necessarily part of EPA's cost analysis. *Contra id.* at 18-22; Rural Mot. 13; *see* 89 Fed. Reg. at 38522/1.[7]

### b.      Mercury standard.

The rule also lowered the mercury standard for lignite units from 4.0 lb/TBtu to 1.2 lb/TBtu, the limit that has applied to every other coal-fired unit since 2012. 89 Fed. Reg. at 38518/3. In the 2012 rule, EPA treated lignite units differently, but

_____

[6] EPA declined to pick a specific compliance margin because power plants have different compliance strategies and thus different preferred compliance margins. *See* 89 Fed. Reg. at 38521/3; Am. Power Mot. 19-20. Movants are wrong that a specific compliance margin is mandated by an EPA memorandum about proper instrument calibration. *See* Am. Power Mot. 19 (citing PM CEMS Memo).
[7] EPA did a sensitivity analysis that considered a 20 percent compliance margin. 89 Fed. Reg. at 38521/3. But because that analysis would have not changed EPA's decision to tighten the surrogate standard, *id.*, Movants' emphasis of it misses the point. Am. Power Mot. 20-22.

not based on any unique property of lignite. Rather, limited data showed that lignite-fired units were not among the best performers. 89 Fed. Reg. at 38541/1-2. In the 2024 rule, however, EPA saw that cost-effective controls are available to lignite units. *Id.* at 38537/2-49/2. The record thus supports EPA's conclusion that the stricter standard is feasible and its costs reasonable for lignite units. *Id.* at 38541/3. Again, EPA acted reasonably.

Start with feasibility. EPA considered both commercially available mercury controls and emission levels that lignite units have actually achieved. As background, when coal burns, it releases mercury in the elemental state. Elemental mercury, however, cannot be captured by controls, be they fabric filters or electrostatic precipitators. To be captured, elemental mercury must first be oxidized, typically by halogens, a group of elements that includes chlorine and bromine. *See* 89 Fed. Reg. at 38539/1; 88 Fed. Reg. 24854, 24875/1 (Apr. 24, 2023). Chemical powders (usually made of carbon and called "sorbents") are then injected into coal-combustion flue gas, where they bind to the oxidized mercury, allowing it to be captured and removed. 89 Fed. Reg. at 38540/2. Controlling mercury from coal with low halogen content, like lignite, is thus harder.

Harder, but still feasible: Subbituminous coal's halogen content is comparable to lignite's, and subbituminous units have long been complying with the 1.2 lb/TBtu limit, often emitting at "considerably lower" levels. *Id.* at 38539/1-

2 (noting that high alkalinity in subbituminous and lignite coals exacerbates effects of low halogen content); *see id.* at 38543 (tables 5-6). They have done so by injecting additional halogens (via brominated sorbents) into flue gas. *Id.* at 38545/3. Subbituminous units' success shows it is feasible to capture mercury from low-halogen coal like lignite. *Id.* at 38539/1-2, 38545/3-46/1.

Other characteristics of lignite coal—higher sulfur content, and higher and variable mercury content—can also make it hard to control mercury emissions. *Id.* at 38541/1. But as with halogen content, these characteristics are also found in other types of coal. *Id.* at 38541/2. Some bituminous coals have sulfur levels comparable to that of lignite. *Id.* at 38543 (tables 5-6). But all bituminous units have been complying with the 1.2 lb/TBtu limit, thanks to a range of sulfur-resistant sorbents and other controls designed for high-sulfur environments. *Id.* at 38546/2-47/1; *see id.* at 38541/3 (noting the development of these sorbents).

And though some lignite coal can have high mercury content, not all lignite coal does. For example, North Dakota lignite has lower and less variable mercury content than Pennsylvania bituminous coal. *Id.* at 38543 (tables 5-6). But again, all bituminous units have been complying with the stricter standard for years.

To be sure, lignite has a unique set of characteristics. But each kind of coal has its own unique set of characteristics that, for one reason or another, makes it hard to control mercury emissions. *Id.* at 38549/1. Given the availability of

controls that other coal-fired units have successfully used to comply with the 1.2 lb/TBtu limit, EPA reasonably concluded that the standard is feasible for lignite units. *See* Rural Mot. 13-14 (ignoring EPA's analysis of available controls).

Lest there be any doubt about whether lignite units can achieve 1.2 lb/TBtu, *cf. id.*, the record shows that two such units at the Twin Oaks facility have already done so—even before that level became the standard. 89 Fed Reg. at 38540/1 (reporting emission levels of 0.63 to 1.1 lb/TBtu). And two lignite units at the Red Hills facility have come reasonably close. *See id.* (reporting emission levels of 1.73 to 1.75 lb/TBtu). Notably, Twin Oaks uses Texas lignite and Red Hills uses Mississippi lignite. *Id.* at 38539/3-40/1. And both Texas and Mississippi lignite have much higher mercury content than North Dakota lignite. *Id.* at 38543 (table 5). Yet Twin Oaks and Red Hills have managed to meet or come close to the new standard. In this way, EPA assessed feasibility by considering the toughest scenarios for controlling lignite's mercury emissions. *Contra* Rural Mot. 14-15.

Movants are wrong that Twin Oaks is an "outlier" that uses controls not "technically feasible" at other units. *Id.* at 14. For a start, Movants mix up different power plants with "Oak" in their names: They cite a comment contending that selective catalytic reduction, used by Oak Grove's lignite plant, would not work at facilities burning North Dakota lignite. *Id.* (citing Lignite Council Comment 8). Oak Grove, however, is not Twin Oaks. And Twin Oaks,

which meets the stricter standard, does not use selective catalytic reduction. *See* 89 Fed. Reg. at 38540/1 (noting that Twin Oaks uses selective *non*-catalytic reduction).

What Twin Oaks does use are sulfur controls and brominated sorbents—the most effective sorbents. *Id.* That sets it apart from many lignite units that are not using brominated or sulfur-resistant sorbents to control mercury, a fact that Movants disregard. *Id.* at 38540/2; Rural Mot. 14-15. Indeed, some lignite units could at times meet the 4.0 lb/TBtu standard without injecting any sorbents. 89 Fed. Reg. at 38540/2.[8] That further shows it is feasible for lignite units to meet the stricter standard: They need not install new controls; they simply need to use effective sorbents in the controls they already have. *See id.* at 38540/2. Doing so would also allow lignite units to inject sorbents at lower rates, something else that Movants disregard. Rural Mot. 15.[9]

This modest demand on lignite units is reflected in the cost estimate. Control costs are expected to be a "small fraction" of their revenue. 89 Fed. Reg. at 38549/1. And the standard's cost-effectiveness is $10,895 to $28,176 per

---

[8] These units could be burning lignite coal with low mercury levels or spraying oxidizing chemicals onto lignite before burning it.

[9] Even though Section 7412(d)(6) does not require EPA to identify more than one control technology, the agency did so, considering controls like brominated sorbents and chemicals designed for high-sulfur environments. *See* 89 Fed. Reg. at 38546/2-47/1; Resp. to Comments 84; *contra* Rural Mot. 13-14.

additional pound of mercury removed. *Id.* at 38548/2-3. That is comparable to and, if anything, less than the 2012 standard's cost (about $27,000 per pound). *Id.* at 38549/1 n.82.[10] At the same time, a disproportionate share of coal-fired units' mercury emissions comes from lignite units. *Id.* at 38549/1. Given all these factors, EPA properly concluded that costs are reasonable and the standard is achievable. *Id.* at 38547/2-49/2.

\*　　\*　　\*

Movants' remaining contention is remarkable only for its brevity. Though Movants say that EPA failed to give a "reasoned explanation" of its feasibility conclusion and was put "on notice" that it is "flawed," they do not elaborate on what the supposed flaw was, proffering only a string cite of comments. States Mot. 11 & n.4. Such "obscure" briefing—"merely stating [an argument], in conclusory fashion and without visible support"—forfeited the argument. *Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996); *see Davis v. Pension Benefit Guar. Corp.*, 734 F.3d 1161, 1166-67 (D.C. Cir. 2013) (disregarding argument made by incorporation, which skirts limits on brief length).

---

[10] Even if lignite units need to install new equipment, EPA estimated that costs would be relatively low. *See* 89 Fed. Reg. at 38549/1.

In the end, actual performance by regulated entities shows that the standards are feasible and will incur reasonable costs. Movants' contrary arguments, which ignore EPA's extensive analyses, are unlikely to succeed.

### 2. EPA properly did not rely on an analysis of benefits and costs, but reasonably considered them anyway.

Movants latch onto an analysis of monetized benefits and costs that EPA conducted to comply with Executive Order 12866. 89 Fed. Reg. at 38553/2. But in choosing the standards' stringency, EPA did not (and did not have to) use the monetized analysis done under the executive order. It relied instead on statutory factors. *Id.*; *see supra* Argument § I.A-B.1. Neither Section 7412(d)(6) nor legal precedent requires EPA to compare monetized benefits and costs in a technology review. *Cf. Michigan*, 576 U.S. at 759.

Meanwhile, in the analysis required by the executive order, EPA considered "all the costs and benefits" and concluded that the rule is a "worthwhile" exercise of its Section 7412(d)(6) authority.[11] 89 Fed. Reg. at 38553/3; *cf. Michigan*, 576 U.S. at 753 ("reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions" (emphasis omitted)).

---

[11] To be clear, the relevant costs and benefits come from the delta between the 2012 rule and the 2024 rule. 89 Fed. Reg. at 38553/2-3. Their scope is thus narrower than what EPA considered in finding that it is appropriate and necessary to regulate coal- and oil-fired power plants, a finding that no one challenged and is not at issue here. 42 U.S.C. § 7412(n)(1)(A); 88 Fed Reg. at 13956/1.

Movants focus on the monetized part of this analysis as evidence of arbitrary conduct. *E.g.*, States Mot. 6, 8-10; Westmoreland Mot. 14; Talen 28(j) Letter 2. The complete analysis, however, shows that EPA acted reasonably.

In benefit-cost analyses, it is easy to see a proposed action's net benefits (or net costs) when everything can be monetized. But when many things cannot, the agency's task becomes much harder. Here, EPA could not monetize the rule's chief benefit—reduced emissions of air toxics. 89 Fed. Reg. at 38553/2, 38515/3-16/2. Good epidemiological data on air toxics often does not exist: Exposure to these pollutants is often highly concentrated, but in smaller populations than those exposed to non-hazardous air pollutants. The small population size means that studies lack enough statistical power to detect effects of exposure. *Id.* at 38511/2, 38515/3-16/2; *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) (noting that it is not unusual for agencies to "not have perfect empirical or statistical data"). Without good data, economists cannot monetize harms from exposure or benefits from avoiding those harms. By contrast, the rule's costs *were* monetized, along with some ancillary benefits like reduced emissions of non-hazardous air pollutants. *See* 89 Fed. Reg. at 38515/3-16/1, 38558 (table 10).

Movants emphasize that costs exceed *monetized* benefits, resulting in high "'negative net monetized benefit.'" States Mot. 8 (quoting 89 Fed. Reg. at 38511/1); *see* Rural Mot. 19; Westmoreland Mot. 7, 14; Talen 28(j) Letter 2; *cf.*

Talen Mot. 23; Midwest Ozone Mot. 9-11.  Yet as this Court warned in another

Clean Air Act context, "simply weighing the monetizable costs against the

monetizable benefits—and thereby excluding the primary benefits for which

Congress created the [p]rogram—will yield a misleading result."  *Sinclair Wyo.*

*Refin. Co. v. EPA*, 101 F.4th 871, 889 (D.C. Cir. 2024).  EPA, for its part,

cautioned that the monetized analysis is "ill-suited" to air-toxics regulation because

key benefits cannot be monetized.  89 Fed. Reg. at 38511/1, 38553/2.

EPA did, however, consider *all* costs and benefits, including unmonetized

ones.  *Id.* at 38553/1-59/1.[12]  "That those benefits are not easily monetizable does

not mean they are less valuable."  *Sinclair*, 101 F.4th at 889.  But without context,

simply comparing costs with unmonetized benefits was meaningless.  So EPA did

what most of us do when deciding whether it is worthwhile to buy something

without monetizing its benefits, be it shopping for groceries, hiring a dogwalker, or

planning a vacation:  We look to indicia of reasonableness like market price,

affordability, and the advantages of having the good or service.

Here, costs reflect the relevant market price.  As EPA explained in its

technology review, almost all regulated units already have paid for the necessary

controls to meet the surrogate standard, and the mercury standard's cost is

---

[12] In its public-interest argument, one Movant notes in passing that EPA ignored
certain upstream costs and benefits.  Midwest Ozone Mot. 10.  That argument is
too obscure to be preserved.  *See Univ. of Wash. v. EPA*, 86 F.3d at 1221.

32

comparable to that of the 2012 standard.  *Supra* Argument § I.B.1.  Those costs are also a small fraction of regulated entities' revenue.  *Id.*  Meanwhile, the new standards' chief benefit—less air-toxics emissions—is the point of Section 7412.  Those standards, expected to cut mercury by 9,500 pounds and non-mercury metals by 49 tons, would reduce human exposure to toxic chemicals and thus risk.  89 Fed. Reg. at 38511 (table 1), 38556/3; *see* Reg. Impact Analysis at 4-5 (noting the "lack of quantifiable risks" from mercury emissions, but that reductions are expected to affect overall mercury levels in fish (and thus the people who eat them)); 89 Fed. Reg. at 38515/2 (noting mercury's neurotoxic effects on children).  The standards can also "enhance ecosystem services and improve ecological outcomes."  89 Fed. Reg. at 38556/3.

Considering all the benefits and costs, EPA noted that the final rule is worthwhile, though the choice of standards was based on statutory factors, not the benefit-cost analysis.  *Id.* at 38553/3.  Even if the rule had to be based on such an analysis, this is the sort of policy judgment that Congress instructed courts to leave to agencies.  *See Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985).  Movants, having overlooked the complete benefit-cost analysis, are unlikely to succeed here.

### 3. EPA reasonably concluded that the rule would not imperil grid reliability.

EPA looked to statutory factors to choose the standards' stringency. It then modeled the rule's potential effect on the power sector. Reg. Impact Analysis 3-1 to 3-28. Based on that modeling, EPA concluded that the rule is not expected to impair reliability of the nation's electricity grid. 89 Fed. Reg. at 38526/1-2. Fixating on the conclusion rather than the analysis, Movants miss the point.

To begin, EPA has expertise to assess the impacts of its regulations on grid reliability. *Contra* States Mot. 11-12 (citing *Texas v. EPA*, 829 F.3d 405, 432 (5th Cir. 2016)). After all, Congress entrusted EPA to set standards for sources like power plants. 42 U.S.C. § 7412(d)(2), (n)(1). And EPA has been successfully regulating the power sector for years without causing blackouts or soaring electricity prices. *See* 89 Fed. Reg. at 38519/3, 38526/2-3 (giving examples of past rules). Movants' contrary take would bar EPA from tightening standards for power plants unless it consults certain energy-regulatory authorities—a condition found nowhere in Section 7412. Anyway, EPA did consult "other Federal agencies, reliability experts, and grid operators" here. Resp. to Comments 156 (also noting ongoing consultation with the Department of Energy, under a joint memorandum of understanding, on grid-reliability issues); *contra* States Mot. 12.

To assess the rule's potential energy impact, EPA used a state-of-the-art, peer-reviewed model. *See* Reg. Impact Analysis 3-1 to 3-4 (noting that industry

also uses the model, which reflects information about the electricity market from utilities, industry experts, gas- and coal-market experts, financial institutions, and governments).  The model projected that the rule would not lead any coal-fired capacity to retire.  *Id.* at 3-18.  On that basis, EPA concluded that the rule is not expected to affect grid reliability.  89 Fed. Reg. at 38526/1-2.[13]

This analysis discredits the bulk of Movants' grid arguments, which target EPA's conclusion about grid reliability.  States Mot. 11-14.  But Movants say little about the zero-retirement projection that undergirds that conclusion.  Their only critique of the projection is that EPA allegedly underestimated retirements in the *2012* rule.  *Id.* at 12-13; *cf.* Rural Mot. 25.

That critique is both irrelevant and wrong.  It is irrelevant because an agency's failure to accurately predict the future does not make the underlying action—let alone a later action like the 2024 rule—unreasonable.  *See Pub. Utils. Comm'n of State of Cal. v. FERC*, 24 F.3d 275, 281 (D.C. Cir. 1994) ("Predictions regarding the actions of regulated entities are precisely the type of policy judgments that courts routinely and quite correctly leave to administrative agencies.").  And Movants' critique is wrong because although more coal-fired units retired than EPA had predicted in 2012, studies show that those retirements

---

[13] EPA also analyzed cumulative impacts of its recent power-plant rules, including this one, and concluded that they are unlikely to impair the power sector's ability to meet demand.  *See* Resource Adequacy Memo; *contra* States Mot. 13-14.

were largely due to reduced demand for coal-fired electricity, driven by lower electricity demand and cheaper natural gas—coal's direct competitor. *See* 89 Fed. Reg. at 38526/1-27/1; 87 Fed. Reg. 7624, 7653/1-3 (Feb. 9, 2022). Of course, substituting natural gas for coal does not affect grid reliability.

And even though EPA projected that the rule would not cause retirements, it took commenters' grid concerns seriously. It explained that the kind of blackouts feared by commenters are unlikely to happen because power plants cannot unilaterally retire. Before they can shut down, power plants generally must undergo extensive processes imposed by state regulators and regional transmission organizations. 89 Fed. Reg. at 38526/2. These processes typically require analyses of the proposed retirement's impacts and identification of mitigation options. *Id.*; *see* Resp. to Comments 52-53 (noting that one of Colstrip's owners is in a regional program that addresses reliability planning). Sometimes, regulators offer temporary funding to keep the power plant open until longer-term measures are in place. 89 Fed. Reg. at 38526/2. And the Department of Energy, when facing an emergency electricity shortage, can issue orders allowing power plants to temporarily operate above their emission standards. *See id.* (citing 16 U.S.C. § 824a(c)).

Though Movants dismiss these failsafes as "unworkable," they do not explain why, either for Colstrip or more generally. Talen Mot. 13, 16-17; States

Mot. 20.  An argument so skeletal is forfeited.  *See Univ. of Wash.*, 86 F.3d at 1221; *Davis*, 734 F.3d at 1166-67.  Besides, EPA did not rely on emergency resources in the rulemaking.  It projected that the rule would not impair the grid.  And it cited these resources in response to comments.  89 Fed. Reg. at 38526/1-2.  Giving accurate responses is not arbitrary or capricious.  *Contra* States Mot. 20.

### C.    The 2024 rule is not a pretext for regulating greenhouse gases.

EPA tightened the mercury standard and surrogate standard (for non-mercury metals) to reduce power plants' air-toxics emissions.  The standards are not, as Movants imagine, a pretext for EPA to cut emissions of another pollutant—greenhouse gases—by "forc[ing] a nationwide transition away from coal."  States Mot. 14.

Courts presume that, absent clear contrary evidence, agencies properly discharged their duties.  *See United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926); *USPS v. Gregory*, 534 U.S. 1, 10 (2001).  Movants offer no contrary evidence.  Though they spin an elaborate tale of EPA's scheming, the record shows that it is nonsense.  States Mot. at 14-16.  EPA considered—and rejected—calls for even tougher standards.  89 Fed. Reg. at 38532 (table 4), 38538/1-2.  It instead chose standards that are expected to result in zero coal-fired retirements.  Reg. Impact Analysis 3-18.  EPA cannot possibly be trying to shut down coal-fired units by not shutting them down at all.

Nor was the 2024 rule spurred by an "Executive Order *on climate change*." States Mot. 14; *see id.* at 3-4. That executive order, issued by President Biden in early 2021, broadly states his Administration's policy goals for protecting public health and the environment. 86 Fed. Reg. 7037, 7037 (Jan. 25, 2021). The goals cover more than just climate change and include "ensur[ing] access to clean air" and "limit[ing] exposure to dangerous chemicals." *Id.*

As for various statements by the White House and the Administrator that Movants assembled in service of their tale, States Mot. at 14-16, the Court cannot consider such extra-record material. *See* 42 U.S.C. § 7607(d)(7)(A) (defining scope of the record for judicial review); *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014). Anyhow, nothing in those statements alters the conclusion that EPA's technology review complies with Section 7412.[14] *Cf. Dep't of Com. v. New York*,

---

[14] Movants also misread the extra-record material. Take the PowerPoint they cite as evidence of EPA's supposed intent to use different statutory authorities to "implement the Administration's climate agenda." States Mot. 15. In reality, the PowerPoint addresses all kinds of environmental problems created by power plants, and the statutes (like the Clean Air Act) that direct EPA to tackle them. *See* Chang Decl. Att. Likewise, the Administrator's PBS interview discussed power-plant regulations addressing not just climate concerns but also "waste and discharges in water" and "health-based pollution." Transcript, PBS interview with Michael S. Regan (June 30, 2022), *available at* https://www.pbs.org/newshour/show/epa-administrator-michael-regan-discusses-supreme-court-ruling-on-climate-change (last visited on July 20, 2024); States Mot. 15-16 & n.9.

588 U.S. 752, 781 (2019) ("a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons.").

### D. Section 7412 directs EPA to regulate, not exempt, sources with obsolete controls that "could" retire.

Section 7412 aims to reduce air-toxics emissions through better technology. Yet Movants urge that the surrogate standard should not apply to Colstrip because it has obsolete controls and might retire at some point. *See, e.g.*, Talen Mot. 8, 10, 13-14; Westmoreland Mot. 12-15. That perverse view, if adopted, would upend the statutory scheme.

Technology reviews play a key role in Section 7412's technology-based regime. They allow EPA to tighten standards to keep up with technological advances. *See LEAN*, 955 F.3d at 1093. Deciding whether to tighten standards often means looking at what the best-performing sources are doing. Stricter standards, in turn, mean bringing stragglers in line with their peers. So of course technology reviews can impose costs on just a subset of regulated sources—but only because everyone else already paid those costs in the usual course of business. *See* Resp. to Comments 41; *e.g.*, Talen Mot. 10.

That was so here. Colstrip is the only U.S. coal-fired power plant without fabric filters or electrostatic precipitators, leaving it the highest emitter. Resp. to Comments 41. Indeed, Colstrip "struggled to meet the original 0.030 lb/MMBtu" standard and, in 2018, violated its permit by exceeding that level. 89 Fed. Reg. at

38531/2.  Even so, Colstrip continues to use scrubbers that cannot reduce

emissions to meet the 0.010 lb/MMBtu surrogate standard.  Resp. to Comments 41,

52.  In adopting a standard that almost all coal-fired units could already meet, EPA,

in line with Section 7412, simply sought to bring Colstrip (and a small group of

other laggards) to where the industry is as a whole.  *Id.*

Movants think that Colstrip's choice—against industry trends—to use

inferior controls ought to exempt it from the stricter standard.  Because Colstrip

would incur disproportionate costs to meet that standard, they say, it deserves a

break.  Talen Mot. 8, 10, 15-16; Westmoreland Mot. 7, 10, 14-15.  Or, simply put,

Movants want to reward those who hang on to outdated controls.  The Court

should reject their attempt to subvert Section 7412.

Similarly, EPA reasonably declined to exempt Colstrip on account of

possible retirement.[15]  The agency examined the potential interaction between the

surrogate standard and the greenhouse-gas rule.  *Contra* Talen Mot. 11-12.  In that

context, it considered whether to create a subcategory for units facing near-term

retirements.  Resp. to Comments 38; 89 Fed. Reg. at 38527/1-3.  EPA reasonably

declined because "only a few facilities" would be eligible for a near-term

---

[15] Though Movants blame EPA for "compelling" Colstrip to retire by 2031, the specter of retirement has long haunted that facility.  Talen Mot. 11.  Disagreement among Colstrip's owners about how and when to retire has led to years of litigation and even involvement by the Montana state legislature.  Lebsack Decl. ¶¶ 25- 26.

retirement subcategory: Less than a quarter of coal-fired units had preexisting plans to retire between 2029 and 2032; only three could not comply with the stricter standard. 89 Fed. Reg. at 38527/3. Colstrip did not figure in this tally, having never said that it would retire. Lebsack Decl. ¶¶ 25-31; *see* Talen Mot. 13-14 (conflating Colstrip with units that announced retirement); Westmoreland Mot. 15 (faulting EPA for ignoring impact from hypothetical retirement). So a retirement subcategory would not have materially reduced overall compliance costs and would have had "little utility." 89 Fed. Reg. at 38527/3.

Nor was it a viable alternative to exempt units that, like Colstrip's, "could decide to retire" but have no publicly stated plans to do so. Talen Mot. 14 (emphasis omitted); *see id.* at 13. If EPA had done that, then every coal-fired unit would be exempted, for they will all retire at some point. *Cf.* Resp. to Comments 38 ("The Agency has not previously subcategorized based on retirements under [Section 7412], and do[es] not find it appropriate to do so at this time."). EPA reasonably declined to exempt potentially retiring units from its standards.

Ultimately, Section 7412 aims to continue to reduce air-toxics emissions through better technology. EPA tightened the surrogate standard to bring a few units up to par with the rest of the industry. It would defeat Section 7412's text and design to allow those units to keep using obsolete controls until whenever they decide to retire. Movants' contrary argument is unlikely to succeed.

## II. Movants show no irreparable harm.

The only kind of injury that justifies the extraordinary remedy of a stay is an irreparable one. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). An irreparable injury "must be both certain and great." *Id.* It must have such "*imminence*" that there is a "clear and present need for equitable relief…." *Id*. (internal quotation marks omitted). Movants fall short of that high bar: They speculate about possible grid problems, and they offer no evidence of great, imminent harm.

### A. Movants speculate about threats to the grid.

Rehashing their merits arguments, Movants say that the 2024 rule threatens grid reliability. *E.g.*, Rural Mot. 23-24; States Mot. 18-21; Talen Mot. 21-22; Midwest Ozone Group Mot. 7-8. EPA showed that the rule is not expected to cause any retirements. Reg. Impact Analysis 3-18. When Movants' claims of harm conflict with the record, the Court should focus on the record and consider the applicable arbitrary-and-capricious standard. 42 U.S.C. § 7607(d)(7)(A), (9). The Court is not well-positioned, especially at the stay stage, to weigh the credibility of Movants' extra-record declarations against EPA's record findings.

Nor do the declarations pass muster under *Wisconsin Gas*. They are long on possibilities but short on certainty, dwelling on the parade of horribles that could ensue if—*if*—coal-fired units were to retire. *E.g.*, Barkey Decl. ¶ 5; Cottrell Decl.

¶¶ 23-24; Friez Decl. ¶¶ 5, 7; Hines Decl. ¶ 23; Lane Decl. ¶¶ 11, 21, 23, 26;

Lebsack Decl. ¶ 11.e-f; Nowakowski Decl. ¶ 7; Tschider Decl. ¶ 23.  But the

declarants do not specify whether and when that contingency would ever occur.

So, as these examples show (with emphases added), they hedge:

- "*If* the Final Rule forces even more coal generation sources to shut down,

  …it will significantly impact grid reliability…."  Vigesaa Decl. ¶ 20.

- "[Lignite Energy Council]'s members are actively trying to determine *if* they

  will be able to comply…and still remain commercially viable."  Bohrer

  Decl. ¶ 18.

- "I am concerned that the reduced level of allowable fPM *could* lead coal-

  unit owners…to retire those units…."  Rickerson Decl. ¶ 12.

- "The Final Rule *may* cause coal plants in the MISO and PJM grids to close."

  Huston Decl. ¶ 14.

- "The level of annualized costs to comply with the MATS Final Rule *may* be

  cost prohibitive and lead to a premature retirement of Colstrip."  Lebsack

  Decl. ¶ 46.

Movants' briefing likewise resorts to *if*s, *could*s, and *may*s to argue harm.

*E.g.*, States Mot. 1, 20; Talen Mot. 21.  But as EPA explained, regulators have

extensive processes and backstops and other measures to protect grid reliability.

89 Fed. Reg. at 38526/2.  So there is no credible evidence that the rule will cause

43

power plants to abruptly shut down and imperil the grid. Movants thus flunk *Wisconsin Gas*'s certainty requirement. And the Fifth Circuit's analysis of different declarations in a different case cannot alter the conclusion that follows from *Wisconsin Gas*'s binding precedent. States Mot. 21-22 (citing *Texas*, 829 F.3d at 416, 434).

### B. Movants offer no evidence that they will incur great costs imminently.

Despite their voluminous submissions, Movants fail to show that they will incur hefty costs during the judicial-review period. No one here disputes that some coal-fired units will have to spend money to comply with the standards, or that in some cases those costs may pass on to ratepayers in the form of higher electricity bills. The question on a stay motion is whether Movants have shown that their harm is so "great" and "imminen[t]" that the Court should suspend a duly promulgated regulation before full merits briefing. *Wis. Gas*, 758 F.2d at 674 (emphasis omitted); *cf. Ohio*, 144 S. Ct. at 2053 (recognizing that stay applicants would incur hundreds of millions of dollars in compliance costs "during the pendency of this litigation"). No such harm exists for either regulated Movants who own or operate coal-fired units, or non-regulated Movants like states and mining companies.

### 1.    Regulated Movants.

Though the power companies declare that they must start compliance work right now, they offer neither evidence nor reason for the rush.  Their threadbare, conclusory assertions are not "proof indicating that the harm is certain to occur in the near future."  *Wis. Gas*, 758 F.2d at 674.

For one thing, the rule's compliance deadline is three years away.  89 Fed. Reg. at 38519/3.  On top of that, power plants can apply—to their permitting authorities, many of whom are represented by Movants—for a one-year extension (until July 2028).  *Id.*  The record also shows that compliance work to meet the surrogate standard typically takes two years or less, and the mercury standard, under a year.  *See* Sargent & Lundy Report 7; 2023 Andover Report 48-49.  Yet Movants offer no evidence of why power plants need to work on compliance right away, or why the one-year extension is unavailable to them.  *See, e.g.*, Bohrer Decl. ¶¶ 18, 22-23; Bridgeford Decl. ¶ 8; Courter Decl. ¶ 12; Lebsack Decl. ¶¶ 35-37; McCollam Decl. ¶¶ 34, 37; McLennan Decl. ¶¶ 37-38, 45, 52; Purvis Decl. ¶¶ 19, 22-23; Rural Mot. 20, 22, 24-25; States Mot. 18; Talen Mot. 20-21; *see also* Order, *Denka Performance Elastomer LLC v. EPA*, Case No. 24-1135 (D.C. Cir. July 17, 2024) (denying petition for reconsideration of order denying stay motion, because movant failed to show irreparable harm "given that it could but has not

requested from respondents an extension of the deadline to comply with the rule under review").[16]

The purported rush is all the more baffling when many power plants can show compliance using emissions averaging. That is, a qualifying facility can average emissions from its regulated units. *See* 40 C.F.R. § 63.10009; 89 Fed Reg. at 38521/3. So long as those units' average emission rate meets the standard, the entire facility is in compliance. Averaging, in short, allows some units to emit above the standard.[17]

Take the Spurlock facility, owned by Movant East Kentucky Power Cooperative. Though Mr. Purvis's declaration (at ¶¶ 13-15, 21-26, 33-34, 36) focuses on Spurlock Unit 3's high emissions, Spurlock's other units seem to emit at rates well below the surrogate standard. *See* 2024 Technical Memo Att. 2 at 71-79.[18] Yet Mr. Purvis never explains why Spurlock chooses not to average its units'

---

[16] Some Movants cite the rule's monitoring requirements as a cause of their alleged harm. *See* Tschider Decl. ¶ 20; Midwest Ozone Mot. 6-7 (mentioning costs of Continuous Emissions Monitoring Systems); Rural Mot. 20 (referring to "PM CEMS"). But Movants never attack the monitoring requirement on the merits, thus giving this Court no reason to stay it. So any harm from that requirement cannot factor in the stay analysis.

[17] The technology review did not account for emissions averaging as a compliance strategy. In this way, EPA overestimated compliance costs to the benefit of regulated entities.

[18] *See also* https://cfpub.epa.gov/webfire/reports/esearch.cfm (last visited July 22, 2024) (under Air Emission Reports, search facility under "Submitting Organization and/or Facility Name").

emissions.  Publicly available data suggests that other Movants' facilities may also be eligible for emissions averaging.  *See* n.18; Collam Decl. (Basin Electric); McLennan Decl. (Minnkota); Tschider Decl. (Rainbow).

Together, the three-year deadline, the one-year extension, and the availability of emissions averaging vitiate Movants' imminence claims.

### 2.    Non-regulated Movants.

Though they submit declarations from power companies, Movants like states and mining companies are not regulated by the rule.  So they cannot count any harm to the power companies as their own.  *See Nken*, 556 U.S. at 426 (asking "whether *the applicant* will be irreparably injured" (emphasis added)).  Instead, these Movants must prove their own great, imminent harm.  They fail to do so.

First, Movants offer no evidence that pass-through compliance costs would result in any great electricity-rate increase to them.  *See* States Mot. 17.  EPA projected that rate increases would be minimal, between 0.1 to 0.5 percent—and in line with one declarant's estimate.  Reg. Impact Analysis 3-25 to 27; *see* Fedorchak Decl. ¶ 26 (predicting "at least a 0.5 percent increase"); *contra* States Mot. 17.  Other declarants admit that some ratepayers can switch providers to avoid higher rates.  Tschider Decl. ¶ 29; Lebsack Decl. ¶¶ 14-15.  And though Movants try to inflate the bill by counting what non-Movant ratepayers would have to pay, only harm to the stay applicant counts.  States Mot. 17; *see, e.g.*, Lane Decl.

¶ 23 (stating that compliance "will cost West Virginia customers nearly $40 million in added rates"); Vigesaa Decl. ¶ 24 (counting all ratepayers across multiple states); *Nken*, 556 U.S. at 426; *cf. Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as *parens patriae* to bring an action against the Federal Government.").

Second, though state-regulator declarants vaguely object to devoting resources to understand, implement, and mitigate the rule, those exertions do not count because they are based on speculation that the rule would imperil the grid. *See* Fedorchak Decl. ¶ 7; Lane Decl. ¶¶ 18, 30; States Mot. 17-18.  Nor do the declarants explain why those tasks must happen now (or prove any costs).  This silence is especially odd when many state regulators have a say in compliance timing because they can grant one-year extensions.  Suffice to say, then, that their conclusory statements are not proof of irreparable harm.[19]  *See Wis. Gas*, 758 F.2d at 674.  That is also true of conclusory assertions of harm by Movant Midwest Ozone Group (at 5-7), which has neither identified its members nor explained how it has standing to seek a stay.

Finally and most fundamentally, non-regulated Movants tie various alleged harms to how power companies would respond to the standards.  *E.g.*, Cottrell

---

[19] State Movants do not allege harm to their sovereign interests, let alone that those interests are "expressly recognize[d]" by the Clean Air Act.  *Ohio*, 144 S. Ct. at 2053; States Mot. 17-22.

Decl. ¶ 23; Fedorchak Decl. ¶ 26; Friez Decl. ¶¶ 11-17; Raad Decl. ¶ 9; States Mot. 17; Westmoreland Mot. 19-20. But their piggybacking attempts fail because the power companies cannot show imminence. *See supra* Argument § II.B.1. So non-regulated Movants cannot either.

### III. A stay would harm the public interest.

In Section 7412, Congress decided that less toxic air pollution is better, and that it is worthwhile to keep reducing pollution through improved technology—even when existing standards offer an ample margin of safety. To Congress, technological progress, not just our ability to assess risk, drives the regulation of air toxics. The 2024 rule delivers those benefits. Staying the rule would deny the public the benefits that Congress sought to confer. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation." (internal quotation marks omitted)).

Movants' refrain that earlier standards are safe enough ignores statutory design and congressional intent. Midwest Ozone Mot. 8-10; Rural Mot. 26; States Mot. 22-23. Their other arguments recycle debunked merits and harm arguments. Midwest Ozone Mot. 9-10; Rural Mot. 26; States Mot. 22; Talen Mot. 22-23; Westmoreland Mot. 21-22. Movants, in short, cannot show that a stay would serve public interest.

## IV.    Any stay should be narrowly tailored.

Movants are not entitled to a stay.  But if the Court were to disagree, relief must be narrowly tailored.  *See Gill v. Whitford*, 585 U.S. 48, 68 (2018).  Movants' merits arguments target only the rule's surrogate standard for non-mercury metals and mercury standard for lignite units.  They do not address the rule's other provisions, such as revisions to monitoring requirements.  *See* 89 Fed. Reg. at 38509/3 (summarizing the rule's key provisions).  Any stay thus should be limited to the two severable standards.  *See id.* at 38518/3.

Likewise, were the Court to conclude that only some Movants meet their burden under *Nken*, a stay should pause the rule's application only as to the successful parties.  For example, Talen's and Westmoreland's motions address only Colstrip, which burns subbituminous coal.  Lebsack Decl. ¶ 8.  Any stay based on their motions should apply only to Colstrip and certainly should not touch the mercury standard for lignite units.  Similarly, any stay based on arguments about the mercury standard should not touch the surrogate standard.

## CONCLUSION

For all their objections, Movants are out of step with the power-plant industry.  The vast majority of coal-fired units can meet the standards.  Only a small group needs to up its game by using better controls.  And that—using better technology to reduce toxic air pollution—is what Congress amended Section 7412

to do.  There is no error or emergency to justify the extraordinary relief Movants

seek.  The Court should deny the stay motions.

Submitted on July 22, 2024.

<div style="margin-left: 50%;">

Todd Kim
Assistant Attorney General

  _/s/ Sue Chen_

</div>

| | |
|---|---|
| *Of counsel* | Sue Chen |
| Matthew McNerney | Redding Cofer Cates |
| U.S. Environmental Protection Agency | U.S. Department of Justice |
| Office of General Counsel | Environment & Natural Resources Div. |
| Washington, D.C. | Environmental Defense Section |
| | P.O. Box 7611 |
| | Washington, D.C. 20044 |
| | 202.305.0283 |
| | sue.chen@usdoj.gov |

**CERTIFICATES OF COMPLIANCE AND SERVICE**

I certify that this document complies with Fed. R. App. P. 32(a)(5) and (6) because it uses 14-point Times New Roman, a proportionally spaced font.

I also certify that this document complies with the Court's July 1, 2024, Order because by Microsoft Word's count, it has 11,909 words, excluding the parts exempted under Fed. R. App. P. 32(f).

Finally, I certify that on July 22, 2024, I electronically filed this document with the Court's CM/ECF system, which will serve each party.

<div align="right">

*/s/ Sue Chen*
_____

</div>