ORAL ARGUMENT NOT YET SCHEDULED
Case No. 24-1119 (and consolidated cases)

# United States Court of Appeals For the District of Columbia Circuit

STATE OF NORTH DAKOTA, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

On Petition for Judicial Review of Final Agency Action of the United States Environmental Protection Agency, 89 Fed. Reg. 38508 (May 7, 2024)

**FINAL REPLY BRIEF OF INTERVENOR SAN MIGUEL ELECTRIC COOPERATIVE, INC.**

Jennifer Freel
D.C. Bar No. 65257
Michael J. Nasi
Cody Lee Vaughn
JACKSON WALKER LLP
100 Congress Avenue, Suite 1100
Austin, Texas 78701
[T] (512) 236-2222
[F] (512) 391-2194
jfreel@jw.com
mnasi@jw.com
cvaughn@jw.com

Counsel for San Miguel Electric Cooperative, Inc.

# Table of Contents

Table of Authorities ................................................................................................. ii

Glossary of Abbreviations and Acronyms............................................................... iii

Introduction ...............................................................................................................4

Argument...................................................................................................................4

    A.    EPA *assumes* that control technologies may be "dialed up," ignoring comments and its own technical documents that point out control technologies end up "leveling off." (Resp. at 67–71)....................................4

    B.    EPA misconstrues San Miguel's point on bad data—nothing in EPA's Response changes that the general standard assumes too low of a mercury inlet value. (Resp.71–72)..............................................................9

    C.    EPA failed to comply with the procedural requirements of the Regulatory Flexibility Act (Resp. at 85–86)..............................................11

Conclusion ..............................................................................................................14

Certificate of Compliance .......................................................................................16

Certificate of Service ..............................................................................................17

i

# Table of Authorities

Page(s)

**Cases**

*Allied Loc. & Reg'l Mfrs. Caucus v. E.P.A.*,
  215 F.3d 61 (D.C. Cir. 2000) ................................................................. 13

*Core Commc'ns, Inc. v. F.C.C.*,
  592 F.3d 139 (D.C. Cir. 2010) ............................................................... 13

*Michigan v. E.P.A.*,
  576 U.S. 743 (2015) ................................................................................ 7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
  Co.*,
  463 U.S. 29 (1983) ............................................................................ 6, 11

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
  734 F.3d 1115 (D.C. Cir. 2013) ............................................................... 9

*Nat'l Ass'n of Regul. Util. Comm'rs v. I.C.C.*,
  41 F.3d 721 (D.C. Cir. 1994) ................................................................. 13

*Ohio v. E.P.A.*,
  603 U.S. 279 (2024) ............................................................................... 10

*Sinclair Wyo. Ref. Co. v. E.P.A.*,
  114 F.4th 693 (D.C. Cir. 2024) ............................................................ 5, 6

*White Stallion Energy Ctr., LLC v. E.P.A.*,
  748 F.3d 1222 (D.C. Cir. 2014) ............................................................... 7

**Statutes**

5 U.S.C. § 604(a) ......................................................................................... 11

5 U.S.C. § 605(b) ................................................................................... 11, 13

## Glossary of Abbreviations and Acronyms

| | |
|---|---|
| APA | Administrative Procedure Act |
| EGU | Electric Generating Unit |
| EPA | Environmental Protection Agency |
| Hg | Mercury |
| MATS | Mercury and Air Toxics Standard |
| RFA | Regulatory Flexibility Act |
| TBtu | Trillion British Thermal Unit |

# INTRODUCTION

EPA takes issue with three points raised by San Miguel, but San Miguel has the better of each. *First*, EPA dismissed comments and its own technical analysis that Hg capture becomes more difficult around 90%, calling into question the feasibility of the Rule. EPA, instead, flatly claims control technologies can be "dialed up" from current levels, so the Rule is feasible. That response does not consider the leveling effect that makes it difficult to remove Hg at higher percentages, and so the new Rule is arbitrary and capricious. *Second*, San Miguel pointed out problems with EPA's data for the mercury inlet values in setting the standard. EPA responds that its data choice was reasonable without any substantive justification, just as it did during the comment period. The APA and this Court require more of an explanation. For this reason, too, the Rule is arbitrary and capricious. *Third*, EPA does its best to evade the merits of the Regulatory Flexibility Act analysis but cannot because its preservation arguments are wrong. Its position on the merits also fails because EPA does not grapple with its unreasonable small-entity impact analysis. For these reasons, and those stated in the Petitioners' briefs, this Court should vacate the Rule.

# ARGUMENT

A. **EPA *assumes* that control technologies may be "dialed up," ignoring comments and its own technical documents that point out control technologies end up "leveling off." (Resp. at 67–71).**

The Rule claims its standard is achievable because "[m]ost Hg control technologies—for example, sorbents or chemical additives have injection rates that can

4

be 'dialed' up or down to achieve a desired Hg emission rate." JA.0044 [89 Fed.Reg. at 38,540]. EPA makes it sound as simple as just adding more sorbent[1] means less mercury in the air.

Not so. Like Petitioners, San Miguel criticized EPA's claim by pointing out the effectiveness of control technologies "levels off" at higher removal percentages. Pet.Op.Br. at 75–79; SM.Op.Br. at 22–23. Petitioners explain that this likely occurs before 90%, contra to EPA's assumption. *See* Pet.Op.Br. at 75–79. Regardless, even EPA's own technical document acknowledges that leveling off begins at 90%. JA.1578 [EPA 2024 Technical Analysis Memo, EPA-HQ-OAR-2018-0794-6919, at 34]. EPA responds by claiming this subject is too technical for the Court to understand, and that this Court should believe EPA because it says the required removal is possible. Resp. at 71. But this Court can understand the basic idea of diminishing returns, which commenters pointed out, EPA's technical documents recognized, and then EPA entirely failed to consider. That is a textbook arbitrary and capricious problem. *See Sinclair Wyo. Ref. Co. v. E.P.A.*, 114 F.4th 693, 711 (D.C.

---

[1] "Dialing up" the amount of sorbent is not the same thing as adding more laundry detergent to the wash. San Miguel will need to buy and install a new liquid chemical feed system and new dry sorbent storage and injection system. The liquid feed system includes a bulk 10,000-gallon tank, pumps, and a building to go around the tank. The dry chemical feed system would require a 500-ton storage silo with attendant equipment. Operating costs for this "dial up" run about $10.5 to $12.7M a year, or about $10,000/lb of Hg removed, or $20,000,000 per ton. JA.0882–83 [San Miguel, EPA-HQ-OAR-2018-0794-5965, at 9–10]. *See* JA.1694–95 [Response to Comments at 99–100] in which EPA acknowledges some equipment upgrades may be needed; *contra* EPA Br. at 73–74 ("units need only utilize those [existing] systems").

5

Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In *Sinclair*, this Court rolled up its sleeves and evaluated whether EPA's claim of what was *generally* true plays out in practice and in particular. *See id.* at 714. There, at issue was whether "RIN prices are immediately passed through to the refineries' customers." *Id.* EPA relied on a "study, which concluded that RIN prices *generally* are passed through from refineries to their customers." *Id.* But a closer look at the study showed "evidence of a lag in price adjustment [that] undercuts EPA's assumption that a refinery can *assure* RIN cost passthrough" immediately. *Id.* (emphasis in original). And so, this Court does not merely take EPA's word and gestures to the administrative record that what is true in general applies specifically. Rather it looks at what the record shows.

Here, EPA's technical analysis concludes that *generally* adding more sorbents leads to greater Hg removal, *but* once removal levels reach "somewhere greater than 90%" "leveling off takes place" when looking at "full-scale demonstration testing of Hg sorbents." JA.1578 [EPA 2024 Technical Analysis Memo, EPA-HQ-OAR-2018-0794-6919, at 34]. Still, without any solid evidentiary basis and missing sorbent and mercury inlet information, for several plants, including San Miguel, EPA is expecting lignite EGUs to meet standards well-above 90% mercury removal to meet the Rule's emission standard of 1.2 lb/TBtu of mercury. *See, e.g.*, JA.0041 [89 Fed. Reg. 38,548 (Table 7, fourth column)] (requiring San Miguel to reach 95.9% mercury removal).

6

In neither the Rule nor its Response brief does EPA actually address or analyze the "leveling off" concern raised by commenters and its own technical documents. Instead, EPA points to one plant, Twin Oaks, with two units that have achieved such removal levels. Resp. at 68–70. It then without analysis, citing only the Rule it is defending rather than any record evidence, says every other plant can do it, too. *Id.* That just doubles down on the problem with the Rule.

To be "achievable," a standard "must be capable of being met under most adverse conditions which can reasonably be expected to recur." *White Stallion Energy Ctr., LLC v. E.P.A.*, 748 F.3d 1222, 1251 (D.C. Cir. 2014), rev'd on other grounds sub nom. *Michigan v. E.P.A.*, 576 U.S. 743 (2015). What EPA has not done, either in the Rule or in this case, is explain why Twin Oaks meeting the standard only during limited 30-day performance tests works for a continuous standard and for every other lignite plant. *See* Pet.Op.Br. at 73; SM.Op.Br. at 30; *see also* Pet. Reply at 38. And, as for boiler technologies, EPA just says take its own word that it does not matter that Twin Oaks uses brand new and different boiler technology, despite Petitioners' arguments to the contrary. Resp. at 70; *contra* Pet.Br. at 94. That doesn't meet this Court's standards for an achievability analysis. *See* SM.Op.Br. at 30–31.

Finally, EPA speculates about a different additive that lignite units could use to meet the standard. Switching from traditional brominated activated carbon sorbents, EPA proposes lignite units to try sulfur trioxide-tolerant sorbent technologies. Resp. at 67 ("lignite-fired units can add . . . to control more mercury . . . if

7

brominated activated-carbon sorbents are insufficient to meet the revised standard."); *see also* JA.0039–40 [89 Fed. Reg. at 38546–47]. But EPA provides no real-world examples of, nor any data on, the use of these other sorbent technologies by lignite-fired units. Instead, EPA finds bituminous coal-fired units have used these sorbents successfully and assumes the sorbents should also work for lignite units. Resp. at 67. As explained in Petitioners' Reply brief, EPA's assumption improperly ignores the unique characteristics of lignite, which are distinct from bituminous coal. *See* Pet. Reply at 38.

Also, *even if* such sorbents could help a lignite unit achieve 90% removal, EPA has not presented any data to suggest that use of these sulfur trioxide-tolerant sorbent technologies will help facilities achieve emission reductions over 90%—the Rule's fundamental problem with achievability. EPA admits that several large Texas units, including the units at Major Oak Power, Oak Grove, and San Miguel—which together account for 22% of the total capacity of all lignite units—must achieve mercury reductions **over 95%** to meet the new standard. JA.0041 [89 Fed. Reg. at 38548 (Table 7)]. Yet, EPA has done nothing to try and demonstrate that sulfur trioxide-tolerant sorbents, used alone or in combination with brominated sorbents, will enable lignite-fired units to achieve over 90% mercury reduction, much less over 95%.

8

> **B. EPA misconstrues San Miguel's point on bad data—nothing in EPA's Response changes that the general standard assumes too low of a mercury inlet value. (Resp.71–72).**

Setting aside EPA's "dial up" problem, San Miguel took aim at the lignite mercury standard for underestimating the burdens of the standard another way. EPA tries two tacks to defend its indefensible use of data. One, it simply says its data was reasonable without explaining why, just as it did in the Rule. Two, it misconstrues San Miguel's complaint about the 1.2lb/TBtu standards.

For one, San Miguel explained that EPA's 1.2lb/TBtu standard is based on a modeling assumption of 25lb/TBTu of mercury inlet. SM.Op.Br. at 24–27. That modeling assumption, in turn, was based on a dataset from 1999 that is substantially different from recent real-world data. *See id.* at 26 (citing JA.1539 [1998 ICR, EPA-HQ-OAR-2018-0794-6910, at 3]). But San Miguel pointed out that dataset had mercury inlet content of 7lb/TBtu while recent data shows the average has been 34lb/TBtu. *See id.* at 26 (citing JA.0879 [San Miguel, EPA-HQ-OAR-2018-0794-5965, at 6]). EPA, in neither the Rule nor Response brief, addresses this mismatch or why it is not a concern. *See, e.g.*, Resp. at 71 (merely asserting its choice reasonable without explaining why). It, therefore, has "failed to articulate a rational connection between the facts found and the choice made" in its modeling assumption, making its choice arbitrary and capricious. *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1145 (D.C. Cir. 2013); *see also id.* at 1154 (EPA cannot cover up "a deficiency in its dataset" with supposed technical expertise).

9

For two, EPA claims San Miguel is confused about which data EPA used for its facility. Resp. at 72. San Miguel understood that EPA used the 28.9lb/TBtu *average* for its removal percentage. *Compare* SM.Op.Br. at 21 (citing JA.0041 [89 Fed.Reg. 38,548 (Table 7, fourth column)] *with* Resp. at 72 (citing same). Indeed, that's entirely San Miguel's point. EPA's analysis for its 1.2lb/TBtu standard was based on a *lower* value of 25lb/perTBtu, which already required greater than a 95% removal rate. Meanwhile, real world data, including Section 114 data requested from EPA, showed that San Miguel and other EGUs faced higher mercury inlet values than that 25lb/TBtu inlet rate, and EPA ignored that data and assumed 25lb/TBtu for its across-the-board standard anyway. *See* SM.Op.Br at 26–27.

San Miguel also pointed out that this was *average* inlet data, meaning, assuming a normal distribution, about half the time the mercury inlet values will be even higher. *See id.* at 27. To make the point, take EPA's 25lb/TBtu modeling assumption that fits well to Oak Grove's own average inlet values of 24.8lb/TBtu. *See* JA.1580–81 (Oak Grove at 24.9 lb [EPA 2024 Technical Analysis Memo, EPA-HQ-OAR-2018-0794-6919, at 36–37 (Table 10)]). But Oak Grove's inlet values varied around the average from 20.53lb/TBtu at the bottom up to 33.31lb/TBtu at the top. *See* SM.Op.Br. at 27 (citing JA.1012–13 [Luminant, EPA-HQ-OAR-2018-0794-5982, at 22–23, tbls. 2–3]). Even assuming a 95.2% control rate, Oak Grove would fall short of EPA's 1.2lb/TBtu standard when operating at the high level. *See id.* Coming full circle, EPA dismisses this problem as conveniently addressable through just dialing up the sorbent. *See* Resp. at 72. But again, saying it is so without a *reasoned* explanation is the definition of an arbitrary and capricious action.

10

*See, e.g.*, *Ohio v. E.P.A.*, 603 U.S. 279, 293–94 (2024); *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm. Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, the Rule is arbitrary and capricious for how it handles the Mercury inlet for lignite-fueled EGUs.

### C. EPA failed to comply with the procedural requirements of the Regulatory Flexibility Act (Resp. at 85–86).

In its opening brief, San Miguel explained how EPA failed to account for how the Rule would affect small entities, rendering the Rule arbitrary and capricious. SM.Op.Br. at 32–36. The Regulatory Flexibility Act (RFA) requires federal agencies to determine whether any proposed or final rule will have "significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). And if an agency finds that a final rule will have such an impact, it must "prepare a final regulatory flexibility analysis" that describes, among other things, "a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues," and "the steps the agency has taken to minimize the significant economic impact on small entities." *Id.* at § 604(a).

As a small rural cooperative, San Miguel is the type of entity this process is supposed to protect. But the EPA failed to meet its duties under the RFA by greatly underestimating compliance costs, causing it to erroneously conclude that no final regulatory flexibility analysis was warranted. For San Miguel, the EPA projected net compliance costs to be $2.0 million in 2028, while San Miguel projected those costs to be at least $17.5 million. SM.Op.Br. at 33.

11

EPA's egregious underestimating of compliance costs led directly to its failure to conduct a final regulatory flexibility analysis. EPA received several comments pointing out flaws with EPA's threshold analysis of compliance costs and affected small entities. *See, e.g.*, JA.0667–68 [NRECA, EPA-HQ-OAR-2018-0794-5956, at 1–2]; JA.0960–61 [SBA comments, EPA-HQ-OAR-2018-0794-5979]; JA.0480 [APPA, EPA-HQ-OAR-2018-0794-5958, at 1]; JA.0508 [EKPC comments, EPA-HQ-OAR-2018-0794-5917] at 13 ("EPA must consider the cost impacts of this Rule on smaller utilities, consistent with other RTR reviews"); JA.0933 [Minnkota comments, EPA-HQ-OAR-2018-0794-5978] at 16 ("EPA does not give adequate consideration of the cost impacts of the Proposed Rule on cooperatives . . . EPA should consider the specialized impacts on small utilities."). But EPA took no action when faced with those comments.

EPA asks this Court to disregard its blunders under the RFA, claiming Petitioners did not adequately address the RFA issue. Resp. at 85. But the Petitioners *did* inform the Court that EPA had "fail[ed] to consider the Rule's impacts on small entities under the Regulatory Flexibility Act." Pet.Op.Br. at 55 n.9. Petitioners explained that EPA "determined 'there is not a significant economic impact on a substantial number of small entities,' without offering any meaningful response to numerous commenters warning small entities will experience costs greater than EPA estimated." *Id.* at 20 (internal record cite omitted). And Petitioners explained that cooperatives, like San Miguel, would be particularly "vulnerable" under the Rule. *Id.* Petitioners also repeatedly criticized EPA's cost analysis. *See, e.g.*, *id.* at 54–60, 80, 90.

12

Contrary to EPA's assertions, this is not an "Intervenor-only argument" Resp. at 85; the RFA issue was "raised by the principal parties." *Cf. Nat'l'Ass'n of Regul. Util. Comm'rs v. I.C.C.*, 41 F.3d 721, 729 (D.C. Cir. 1994) (refusing to consider intervenor issue not "raised" by petitioners). While the Petitioners did inform the Court that the Intervenor's Brief would address the RFA argument (Pet.Op.Br. at 55 n.9.), that statement does not mean the RFA argument is absent in Petitioners' opening brief. *Cf. Core Commc'ns, Inc. v. F.C.C.*, 592 F.3d 139, 146 (D.C. Cir. 2010) (refusing to consider issue raised by intervenor that bore "no substantive connection" to the challenges petitioners raised in their initial briefs). Indeed, San Miguel's Intervenor's Brief directly relies on Petitioner's arguments about EPA lowballing costs to explain why EPA's conclusion that the Rule will not have a significant impact is flawed. *See* SM.Op.Br. at 33 (citing Pet.Op.Br. at Part II.A).

EPA's defense of its actions under the RFA fares no better than its forfeiture argument. EPA asserts that the RFA's requirements do not apply because EPA "certified that the Rule will not . . . have a significant economic impact on a substantial number of small entities." Resp. at 86 (citing 5 U.S.C. § 605(b). But EPA ignores the crux of the problem. While failing to satisfy the RFA usually presents a procedural problem, here EPA's wholesale refusal to respond to comments about the RFA renders the decision-making arbitrary and capriciousness. This Court may consider the failure to correctly apply RFA procedures when determining whether EPA's decision-making was arbitrary and capricious. *Allied Loc. & Reg'l Mfrs.*

13

*Caucus v. E.P.A.*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("For an agency's decisionmaking to be rational, it must respond to significant points raised during the public comment period.").

San Miguel wholeheartedly disagrees with EPA's assertion that its cost analysis amounts to "a reasonable, good-faith effort." Resp. at 86. Rather, it ignored numerous criticisms about the Rule's impacts on small entities and electric cooperatives to claim that the Rule would have no significant impact. So, when faced with comments detailing flaws in the compliance cost and affected small entities, EPA did nothing. That failure to respond is what renders the Rule arbitrary and capricious.

## **CONCLUSION**

Because of the above, and reasons in San Miguel's opening brief, the Rule is both contrary to statute, arbitrary and capricious, and unachievable. San Miguel asks the Court to vacate the Rule.

Respectfully Submitted,

*/s/ Jennifer Freel*
Jennifer Freel
D.C. Bar No. 65257
Michael J. Nasi
Cody Lee Vaughn
JACKSON WALKER LLP
100 Congress Avenue, Suite 1100
Austin, Texas 78701
[Tel.] (512) 236-2222
[Fax] (512) 391-2194

jfreel@jw.com
mnasi@jw.com
cvaughn@jw.com

*Counsel for San Miguel Electric Cooperative, Inc.*

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel states that this brief complies with Fed. R. App. P. 27(d)(2)(A) because it contains 2,841 words, excluding the caption and signature blocks, as counted by Microsoft Word for Microsoft 365 word processing system and, therefore, is within the 4550 word limit. The motion also complies with typeface and type-style requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface, Times New Roman in 14-point or larger font.

> */s/ Jennifer Freel*
> Jennifer Freel
> *Counsel for San Miguel Electric Cooperative, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of this brief was served this 10th day of December, 2024, through CM/ECF on all registered counsel.

*/s/ Jennifer Freel*
Jennifer Freel