ORAL ARGUMENT NOT YET SCHEDULED

**Case No. 24-1119 (and consolidated cases)**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF NORTH DAKOTA, ET AL.,

*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

ON PETITION FOR REVIEW OF FINAL AGENCY ACTION OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, 89 FED. REG. 38,508 (MAY 7, 2024)

**FINAL BRIEF OF RESPONDENT-INTERVENORS MASSACHUSETTS,
MINNESOTA, CONNECTICUT, ILLINOIS, MAINE, MARYLAND,
MICHIGAN, NEW JERSEY, NEW YORK, OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, WISCONSIN, DISTRICT OF COLUMBIA,
CITY OF BALTIMORE, CITY OF CHICAGO, AND CITY OF NEW YORK**

KEITH ELLISON
  *Attorney General for the*
  *State of Minnesota*
PETER SURDO
CAT RIOS-KEATING
  *Special Assistant Attorneys General*
OFFICE OF THE ATTORNEY GENERAL
  OF MINNESOTA
445 Minnesota Street
Town Square Tower Suite 1400
Saint Paul, Minnesota 55101
(651) 757-1061
peter.surdo@ag.state.mn.us
catherine.rios-keating@ag.state.mn.us

December 10, 2024

ANDREA JOY CAMPBELL
  *Attorney General for the*
  *Commonwealth of Massachusetts*
TRACY TRIPLETT
  *Senior Enforcement Counsel*
JULIA JONAS-DAY
ALEXANDER WEISS
  *Assistant Attorneys General*
Energy and Environment Bureau
OFFICE OF THE ATTORNEY GENERAL
  OF MASSACHUSETTS
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200
tracy.triplett@mass.gov
julia.jonas-day@mass.gov
alexander.weiss@mass.gov

*(Complete counsel listing appears on signature pages)*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

**A.   Parties and Amici**

<u>Petitioners</u>

The following parties appear as petitioners:

Case No. 24-1119: the State of North Dakota, State of West Virginia, State of Alaska, State of Arkansas, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, and State of Wyoming;

Case No. 24-1154: NACCO Natural Resources Corporation;

Case No. 24-1179: National Rural Electric Cooperative Association, Lignite Energy Council, National Mining Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative Inc., Basin Electric Power Cooperative, and Rainbow Energy Center, LLC;

Case No. 24-1184: Oak Grove Management Company LLC and Luminant Generation Company LLC;

Case No. 24-1190: Talen Montana, LLC;

Case No. 24-1194: Westmoreland Mining Holdings LLC, Westmoreland Mining LLC, and Westmoreland Rosebud Mining LLC;

Case No. 24-1201: America's Power and Electric Generators MATS Coalition;

Case No. 24-1217: NorthWestern Corporation; and

Case No 24-1223: Midwest Ozone Group.

Respondents

The United States Environmental Protection Agency and Michael S. Regan, EPA Administrator, are respondents in these consolidated cases.

Intervenors

Intervenor for Petitioners is San Miguel Electric Cooperative, Inc.

Intervenors for Respondents are Air Alliance Houston, Alliance of Nurses for Healthy Environments, American Academy of Pediatrics, American Lung Association, American Public Health Association, Chesapeake Climate Action Network, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Montana Environmental Information Center, Natural Resources Council of Maine, Natural Resources Defense Council, the Ohio Environmental Council, Physicians for Social Responsibility, and Sierra Club; and the Commonwealth of Massachusetts, State of Minnesota, State of Connecticut, State of Illinois, State of

Maine, State of Maryland, State of Michigan, State of New Jersey, State of New York, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, State of Wisconsin, District of Columbia, City of Baltimore, City of Chicago, and City of New York.

<u>Amici</u>

Amicus for Respondents is the Institute for Policy Integrity at New York University School of Law.

## B.    Rulings Under Review

The agency action under review is a rule entitled "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review." 89 Fed. Reg. 38508 (May 7, 2024).

## C.    Related Cases

The rule at issue has not been previously reviewed in this or any other court and there are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

//

//

//

//

//

Dated: December 10, 2024

/s/ *Julia Jonas-Day*
Julia Jonas-Day
Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
  of Massachusetts
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200
Julia.Jonas-Day@mass.gov
*Counsel for State Respondent-*
*Intervenors*

# TABLE OF CONTENTS

*Page*

Certificate as to Parties, Rulings, and Related Cases ............................... i

Table of Authorities ............................................................................ vi

Glossary of Terms ............................................................................... ix

Glossary of Citations ......................................................................... ix

Introduction ........................................................................................1

Statutes and Regulations ....................................................................2

Statement of the Case.........................................................................2

     Power-Plant Emissions of Mercury and Other Toxic Metals ......................2

     Statutory and Regulatory Background ...........................3

     The Rule.........................................................5

Summary of Argument ........................................................................7

Argument............................................................................................8

    I.    EPA Reasonably Considered the Rule's Substantial Benefits ....................8

        A.    The Rule Provides Important Health Benefits that Congress Sought to Achieve ..................................................9

        B.    EPA Correctly Considered the Rule's Significant Non-Monetized Benefits.........................................13

    II.    EPA Sufficiently Considered the Rule's Costs ...........................................17

        A.    EPA Reasonably Considered Cost-Effectiveness in Setting the Surrogate Standard ........................................17

        B.    EPA Correctly Concluded That the Rule Will Not Threaten Grid Reliability....................................................19

Conclusion .......................................................................................21

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) ...............................................................................21

*Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559 (D.C. Cir. 2019)...................................................................................21

Mexican Gulf Fishing Co. v. U.S. Department of Commerce 60 F.4th 956, (5th Cir. 2023)...............................................................12

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015)...................................................................................15

*Michigan v. EPA*, 576 U.S. 743 (2015) ..............................................4, 17

*NRDC v. EPA*, 749 F.3d 1055 (D.C. Cir. 2014) ...........................18

*Sinclair Wyo. Ref. Co. v. EPA*, 101 F.4th 871 (D.C. Cir. 2024)...........................17

*Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) (per curiam) .............................21

**Statutes**

33 U.S.C. § 1313(d) .......................................................................16

33 U.S.C. § 1313(d)(1)...................................................................16

42 U.S.C. § 7412(c)(3)...................................................................15

42 U.S.C. § 7412(c)(6)......................................................................3

42 U.S.C. § 7412(c)(9)(B)(i)............................................................3

42 U.S.C. § 7412(e)(2).....................................................................15

42 U.S.C. § 7412(i)(3)(A)–(B) .......................................................19

42 U.S.C. § 7412(n)(1)(A)................................................................4

**Table of Authorities – Continued** *Page*

42 U.S.C. § 7412(n)(1)(C) ...................................................................3

42 U.S.C. § 7607(d)(7)(B) ................................................................20

**Other Authorities**

Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat.
1676 (Dec. 31, 1970) (codified as amended at 42 U.S.C. § 7412
(1988)) ...........................................................................................9

EPA, Regulatory Impact Analysis for the Final MATS Review of the
Residual Risk and Technology Review (Apr. 2024), EPA-HQ-
OAR-2018-0794-6966 ............................................. 2, 7, 10, 11, 13, 14, 15, 19, 21

EPA, Resource Adequacy Analysis: Vehicle Rules, Final 111 EGU
Rules, ELG and MATS (Apr. 2024), EPA-HQ-OAR-2018-0794-
6971 ..............................................................................................20

EPA, Study of Hazardous Air Pollutant Emissions from Electric
Utility Steam Generating Units -- Final Report to Congress (Feb.
1998) (vol.I), https://tinyurl.com/3trucr26 ..............................10

EPA's Power Sector Modeling Platform 2023 Using IPM (Apr. 25,
2024), EPA-HQ-OAR-2018-0794-6967 (available at
https://tinyurl.com/wph4cjup) ..................................................21

Office of Management and Budget, Circular No. A-4 (Nov. 9, 2023),
https://www.whitehouse.gov/wp-
content/uploads/2023/11/CircularA-4.pdf .................... 15, 17

S. Rep. No. 101-228 (1989), *reprinted at* 1990 U.S.C.C.A.N. 3385 ......................3

Sarah Benish et al., U.S. EPA/OAR, 2024 Update to the 2023
Proposed Technology Review for the Coal- and Oil-Fired EGU
Source Category (Jan. 2024), EPA-HQ-OAR-2018-0794-6919 ......................10

**Rules and Proposed Rules**

65 Fed. Reg. 79,825, 79,830 (Dec. 20, 2000) ...........................................4

**Table of Authorities – Continued** *Page*

67 Fed. Reg. 77,830 (Dec. 19, 2002) ........................................................13

76 Fed. Reg. 24,976 (May 3, 2011) ...................................................... 3, 13

77 Fed. Reg. 9304 (Feb. 16, 2012) ........................................................ 4, 19

81 Fed. Reg. 24,420 (Apr. 25, 2016) ........................................................5

85 Fed. Reg. 31,286 (May 22, 2020) ........................................................5

87 Fed. Reg. 7624 (Feb. 9, 2022) ...................................................... 5, 9, 13

88 Fed. Reg. 13,956 (Mar. 6, 2023) .................................................... 5, 14

88 Fed. Reg. 24,854 (Apr. 24, 2023) .................................................... 2, 5

89 Fed. Reg. 38,508 (May 7, 2024)1, 2, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20

**Executive Orders**

Executive Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) ........................15

Executive Order No. 13,563, 76 Fed. Reg. 3821, 3821 (Jan. 21, 2011) ..................15

# GLOSSARY OF TERMS

| | |
|---|---|
| Act | Clean Air Act |
| EPA | Environmental Protection Agency |
| IPM | Integrated Planning Model |
| JA | Joint Appendix |
| MATS | Mercury and Air Toxics Standards |
| RTR | Residual Risk and Technology Review |
| Rule | National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review EGUs, 89 Fed. Reg. 38,508 (May 7, 2024) |
| 1990 Amendments | Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399 (Nov. 15, 1990) (codified as amended at 42 U.S.C. § 7412 (2018)) |

# GLOSSARY OF CITATIONS

| | |
|---|---|
| ERCOT Cmts. | Comments of the Electric Reliability Council of Texas, Inc. (June 23, 2023), EPA-HQ-OAR-2018-0794-5976 |
| Env't Health Cmts. | Comments of Public Health and Environmental Organizations (June 23, 2023), EPA-HQ-OAR-2018-0794-5996 |
| Env't Resp.-Interv. Br. | Final Brief of Environmental and Public Health Respondent-Intervenors, in *North Dakota v. EPA* (D.C. Cir. No. 24-1119) (Dec. 10, 2024) |

| | |
|---|---|
| EPA Br. | Final Brief for Respondents, in *North Dakota v. EPA* (D.C. Cir. No. 24-1119) (Dec. 10, 2024) |
| E.O. No. 12,866 | Executive Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) |
| E.O. No. 13,563 | Executive Order No. 13,563, 76 Fed. Reg. 3821, 3821 (Jan. 21, 2011) |
| Fond du Lac Band Cmts. | Comments of the Fond du Lac Band of Lake Superior Chippewa, Grand Traverse Band of Ottawa and Chippewa Indians, and Little Traverse Bay Bands of Odawa Indians (June 23, 2023), EPA-HQ-OAR-2018-0794-6001 |
| IPM Documentation | EPA's Power Sector Modeling Platform 2023 Using IPM (Apr. 25, 2024), EPA-HQ-OAR-2018-0794-6967 (available at https://tinyurl.com/wph4cjup) |
| Mercury Scientists Cmts. | Comments of Emmett Environmental Law & Policy Clinic on behalf of Elsie M. Sunderland, Charles T. Driscoll, Jr., Joel Blum, and Celia R. Chen (Apr. 11, 2022), EPA-HQ-OAR-2018-0794-4954, Attachment 3 to Env't Health Cmts. |
| Mille Lacs Band Cmts. | Comments of the Mille Lacs Band of Ojibwe (June 23, 2023), EPA-HQ-OAR-2018-0794-5993 |
| NESCAUM Cmts. | Comments of the Northeast States for Coordinated Air Use Management (June 23, 2023), EPA-HQ-OAR-2018-0794-5944 |
| Northern Cheyenne Cmts. | Comments of the Northern Cheyenne Tribe (June 23, 2023), EPA-HQ-OAR-2018-0794-5984 |
| NorthWestern Cmts. | Comments of NorthWestern Corporation d/b/a NorthWestern Energy (June 23, 2023), EPA-HQ-OAR-2018-0794-5980 |
| NTAA Cmts. | Comments of the National Tribal Air Association (June 12, 2023), EPA-HQ-OAR-2018-0794-5894 |

| | |
|---|---|
| OMB Circular A-4 | Office of Management and Budget, Circular No. A-4 (Nov. 9, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf |
| Pets. Br. | Opening Brief of Petitioners North Dakota, et al., in *North Dakota v. EPA* (D.C. Cir. No. 24-1119) (Oct. 1, 2024) |
| Power Plant Study | EPA, Study of Hazardous Air Pollutant Emissions from Electric Utility Steam Generating Units – Final Report to Congress (Feb. 1998) (vol.I), https://tinyurl.com/3trucr26 |
| Resource Adequacy Study | EPA, Resource Adequacy Analysis: Vehicle Rules, Final 111 EGU Rules, ELG and MATS (Apr. 2024), EPA-HQ-OAR-2018-0794-6971 |
| Resp. to Cmts. | EPA, Summary of Public Comments and Reponses on Proposed Rule (88 FR 24854 April 24, 2023) (Apr. 2024), EPA-HQ-OAR-2018-0794-6922 |
| RIA | EPA, Regulatory Impact Analysis for the Final MATS Review of the Residual Risk and Technology Review (Apr. 2024), EPA-HQ-OAR-2018-0794-6966 |
| States Cmts. | Comments of the Commonwealth of Massachusetts, et al. (June 23, 2023), EPA-HQ-OAR-2018-0794-5988 |
| Tech. Mem. | Sarah Benish et al., U.S. EPA/OAR, 2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category (Jan. 2024), EPA-HQ-OAR-2018-0794-6919 |
| 1970 Amendments | Clean Air Act Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (Dec. 31, 1970) (codified as amended at 42 U.S.C. § 7412 (1988)) |

# INTRODUCTION

Some pollutants, like mercury, arsenic, and lead, are so inherently dangerous—so intimately tied to the harms they cause—that less is always better for human health. Congress recognized that well-demonstrated fact and codified that recognition in section 112 of the Clean Air Act (Act).

Petitioners do not dispute that those and other hazardous "air toxics" are dangerous or that Congress required emission standards for them that reflect the "maximum [achievable] degree of reduction in emissions" under subsection 112(d) of the Act. Nor do they dispute that the Rule[1] challenged here requires the nation's most polluting coal-fired power plants to reduce their emissions of those air toxics, which pollute the nation's air, land, and waters. That pollution has endangered the health of nearby communities, necessitated widespread fish consumption advisories, and damaged recreational and commercial fisheries in State Respondent-Intervenors' jurisdictions and beyond.

Yet Petitioners argue that because EPA did not put a dollar figure on all the health benefits of the Rule's emission reductions, EPA's action was contrary to the Act and arbitrary and capricious. Because their arguments rest on that, and other, flawed propositions, they fail. Accordingly, the petitions should be denied.

---

[1] 89 Fed. Reg. 38,508 (May 7, 2024).

## STATUTES AND REGULATIONS

The pertinent statutes and regulations are attached to the briefs of Petitioners and Respondents.

## STATEMENT OF THE CASE

State Respondent-Intervenors adopt EPA's and the Environmental and Public Health Respondent-Intervenors' Statements of the Case, EPA Br. 4-17; Env't Resp.-Interv. Br. 2-6, and add the following:

### Power-Plant Emissions of Mercury and Other Toxic Metals

Power plants are the largest domestic emitter of mercury.  88 Fed. Reg. 24,854, 24,857 (Apr. 24, 2023).  Mercury is a potent and persistent toxic metal that causes neurological, immunological, cardiovascular, and other health harms.  89 Fed. Reg. at 38,515, 38,556.  Fetuses and young children are especially vulnerable to mercury's harmful neurological effects because of their developing brains.  *Id.*

Power plants are also major sources of other toxic metals, including arsenic, chromium, and lead, which are associated with a wide range of serious health harms including cancers and chronic disorders affecting the kidneys and the pulmonary and central nervous systems.  89 Fed. Reg. at 38,515; RIA 4-6 to 4-11 (JA 1822-27).  Exposure to mixtures of those metals is especially dangerous.  *See* Env't Health Cmts. 39-47 (JA 1415-23).  As with mercury, children are uniquely vulnerable to

harms from exposure to the non-mercury metals subject to the Rule.  76 Fed. Reg. 24,976, 25,018 (May 3, 2011); States Cmts. 6-7 (JA 1120-21).

**Statutory and Regulatory Background**

Congress was particularly concerned with reducing mercury emissions when amending the Act in 1990 to address, among other things, hazardous air pollutants ("air toxics").  *See, e.g.*, S. Rep. No. 101-228, at 131 (1989), *reprinted at* 1990 U.S.C.C.A.N. 3385, 3515 (describing widespread contamination of fish in northern lakes "attributable to mercury emissions from coal-fired power plants").  Accordingly, Congress directed EPA to set standards on an accelerated schedule for major sources of a small number of priority persistent pollutants, including mercury. 42 U.S.C. § 7412(c)(6).

The 1990 Amendments also demonstrated that Congress sought to ensure that EPA protect persons most sensitive to the effects of air toxics.  *See, e.g.*, 42 U.S.C. § 7412(c)(9)(B)(i) (delisting criteria based on harm to "the individual in the population who is most exposed to emissions of such pollutants"); *id.* § 7412(n)(1)(C) (requiring study to determine the level of mercury that can be consumed even by sensitive populations).  Congress sought also to address the "equity concern" that "Americans living within the vicinity" of polluting facilities were at relatively high risk from exposure to toxic air pollution.  S. Rep. No. 101-228, at 129-32 (1989), *reprinted at* 1990 U.S.C.C.A.N. at 3514-17.

- 3 -

Because other requirements in the 1990 Amendments were expected to reduce power-plant air-toxics emissions, Congress directed EPA to conduct a study of the hazards from remaining emissions after other relevant regulations had been implemented before determining whether EPA should regulate those plants under section 112. *See Michigan v. EPA*, 576 U.S. 743, 748 (2015); 42 U.S.C. § 7412(n)(1)(A).

Once completed, that study revealed that coal-fired power plants were the largest nationwide source of mercury emissions, and were a significant source of other air-toxics emissions. Power Plant Study ES-5 tbl.ES-1, 1-7 (JA 0104, 0112). EPA thus concluded that it was "appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A), to regulate toxic power-plant emissions. 65 Fed. Reg. 79,825, 79,830 (Dec. 20, 2000). In 2012, EPA reaffirmed that finding and promulgated standards under subsection 112(d) to reduce power-plant emissions of mercury and other air toxics. *See* 77 Fed. Reg. 9304 (Feb. 16, 2012).

On review of that finding, the Supreme Court held that the "appropriate and necessary" determination under paragraph 112(n)(1) requires consideration of costs. *Michigan v. EPA*, 576 U.S. at 752. After considering costs pursuant to *Michigan* and balancing them against substantial (and almost completely unmonetized) benefits, EPA in 2016 issued a supplemental finding that it was "appropriate and necessary" to regulate power-plant air-toxics emissions, 81 Fed. Reg. 24,420 (Apr.

- 4 -

25, 2016), which it re-affirmed in 2023, 88 Fed. Reg. 13,956 (Mar. 6, 2023).  That 2023 determination was not challenged.

In 2020, eight years after EPA promulgated the first standards for toxic power-plant emissions, EPA conducted the residual risk assessment required under paragraph 112(f)(2) of the Act and the technology review required under paragraph 112(d)(6).  85 Fed. Reg. 31,286, 31,313-14 (May 22, 2020).  EPA concluded that the 2012 standards met the public health risk reduction threshold, so did not require revisions on that basis.  *Id.* at 31,314.  EPA's technology review concluded that no developments warranted revisions to the 2012 standards.  *Id.*

In 2022, EPA solicited information on the performance and cost of new or improved technologies and operations to control power-plant air-toxics emissions. 87 Fed. Reg. 7624, 7672 (Feb. 9, 2022).  Informed by comments from the public and regulated power plants as well as technical data and modeling, EPA proposed to amend the emission standards for mercury and other air toxics.  88 Fed. Reg. at 24,867-82.

**The Rule**

The Rule, finalized on May 7, 2024, revisits the 2020 technology review.  It concludes, consistent with the paragraph 112(d)(6) criteria, that developments in practices, processes, and control technology warrant revisions to the 2012 standards. 89 Fed. Reg. at 38,518.  Specifically, EPA found that improved pollution control

- 5 -

materials and practices and new types of pollution-control additives have made reducing emissions of mercury and toxic non-mercury metals more efficient and less expensive. *See, e.g., id.* at 38,521, 38,530, 38,537, 38,541. The Rule thus tightens the filterable-particulate-matter surrogate standard for emissions of non-mercury metals ("surrogate standard") for all coal-fired power plants, *id.* at 38,520, and requires lignite coal-fired power plants to meet the same mercury standard that the vast majority of coal plants met in 2016, *id.* at 38,537.

EPA found that these updated standards would reduce mercury and other toxic metal emissions by thousands of pounds each year. *Id.* at 38,510 tbl.1, 39,554 tbl.8. EPA further found that the updated standards would remedy the inequity Congress sought to address—that communities located near the "handful of facilities with largely outdated or underperforming controls" experience disproportionately high levels of exposure to air toxics. *Id.* at 38,524.

In addition to those benefits, EPA considered the Rule's costs. EPA evaluated several cost metrics, including cost-effectiveness, total capital costs, and total costs of compliance as a fraction of power sector revenues. *Id.* at 38,523-24, 38,532-33, 38,548-49. EPA also considered other cost factors, including the small number of facilities impacted and the fact that most facilities have already demonstrated the updated standards' achievability. *Id.* at 38,524, 38,539-40, 38,549. In particular, EPA determined that the updated mercury standard was unlikely to require any units

to make "significant additional capital investment[s]." *Id.* at 38,549. And only 13 of the 33 units affected by the updated surrogate standard would need to make capital investments (mostly, upgrades to existing control technology) to comply. *Id.* at 38,522. EPA concluded that, given the Rule's numerous benefits, its costs are reasonable. *Id.* at 38,533-34, 38,553, 38,548-49.

EPA also analyzed the Rule's impact on grid reliability. EPA considered the small number of affected plants, those plants' ability to meet the updated standards without significant hardship, and the mechanisms in place to protect grid reliability even if a plant were to shut down instead of complying. *Id.* at 38,526. EPA also accounted for the fact that it was issuing multiple regulations affecting the power sector simultaneously, and therefore "consulted a wide range of stakeholders, including other Federal agencies, reliability experts, and grid operators," to better understand potential cumulative electric grid impacts. Resp. to Cmts. 156-57 (JA 1751-52). EPA concluded the Rule would not lead to any changes in power generation capacity or plant retirements. RIA ES-6, 3-16 to 3-22 (JA 1783, 1800-06); *see also* 89 Fed. Reg. at 38,526, 38,555-56.

## SUMMARY OF ARGUMENT

The Rule provides significant reductions in mercury and other air-toxics emissions, achieving health and environmental benefits of precisely the kind Congress mandated. Paragraph 112(d)(6) of the Act does not require EPA to make

public-health findings to revise technology-based emission standards, but rather to identify developments in control technologies, as explained in Environmental and Public Health Respondent-Intervenors' and EPA's briefs, which State Respondent-Intervenors join.

Following Congressional and Executive Branch directives, EPA did consider the Rule's significant benefits—including non-monetized and qualitative benefits—and carefully weighed those benefits against the Rule's reasonable costs.  And EPA thoroughly analyzed the Rule's likely effects on the regulated industry, and its potential for impacting the electric grid.  As the vast majority of coal-fired power plants already comply with the Rule's updated standards, EPA rationally concluded that compliance by the last remaining holdouts is unlikely to threaten grid reliability.

## ARGUMENT

## I.    EPA Reasonably Considered the Rule's Substantial Benefits

Contrary to Petitioners' contentions, the Rule provides substantial health benefits.  *See, e.g.,* Pets. Br. 1, 2-3, 35-38, 56-57, 83, 96.  Those numerous health benefits undercut Petitioners' argument that EPA lacked a public health justification for the updated standards, Pets. Br. 35-38, even if such a justification were required (it is not, *see* EPA Br. 22-37; Env't Resp.-Interv. Br. 7-16).  And, as addressed below, those benefits—along with the Rule's other significant benefits, both

monetized and nonmonetized—also defeat Petitioners' claim that the Rule lacks cost-offsetting benefits. *See* Pets. Br. 54-60.

### A.    The Rule Provides Important Health Benefits that Congress Sought to Achieve

As Congress has long recognized, air toxics, such as mercury and the non-mercury metals subject to the Rule, pose serious risks to human health. *See* 1970 Amendments § 4(a) (defining "hazardous air pollutant" as one that "may cause, or contribute to," "an increase in mortality or [] serious irreversible, . . . or incapacitating reversible, illness"). Accordingly, in 1990 Congress directed EPA to expeditiously reduce emissions of those harmful metals. *See* Env't Resp.-Interv. Br. 2-5. The Rule is consistent with that directive, and, as EPA determined, provides significant quantifiable and unquantifiable health and other benefits. *See* 89 Fed. Reg. at 38,556-59.

The Rule will substantially reduce toxic power-plant emissions—by at least 9,500 pounds of mercury (a toxin about which Congress expressed specific concern) and 98,000 pounds of other toxic metals between 2028 and 2037. *Id.* at 38,510-11 tbl.1. These are not "tiny" or "minuscule" reductions. *Contra* Pets. Br. 56. EPA's reference dose for mercury—the lifetime daily ingestion amount, across the general population, above which certain harmful effects are likely to occur—is only 0.1 micrograms (or *one ten-millionth* of a gram) per kilogram per day. 87 Fed. Reg. at 7638; 89 Fed. Reg. at 38,556. And despite affecting relatively few holdout plants,

those reductions are significant because power plants are the nation's highest stationary-source emitters of mercury, and most of the highest mercury-polluting plants are lignite-fired ones subject to the Rule's updated mercury standard. *See* 89 Fed. Reg. at 38,537 (sixteen of the twenty highest mercury-emitting plants in 2021 were lignite-fired); *see also id.* at 38,524 (Rule estimated to provide "significantly greater [air-toxics] emission reductions" than prior rulemakings for other source categories).

Far from "[i]gnoring" the Rule's benefits, Pets. Br. 38, EPA explained that those emission reductions will reduce human exposure to mercury and the other regulated metals and the serious health risks posed by such exposure. RIA 4-5, 4-7 (JA 1821, 1823); 89 Fed. Reg. at 38,556-59. After being emitted from power plants, mercury deposits to waterbodies, where it transforms into methylmercury and bioaccumulates in the aquatic food chain. 89 Fed. Reg. at 38,515. The Rule will thus reduce mercury levels in fish and, in turn, reduce human mercury intake through consumption of contaminated fish, *id.*, the primary source of human mercury exposure, Power Plant Study ES-15 (JA 0105). Further, the highly polluting and previously underregulated lignite plants subject to the Rule are concentrated in Texas and North Dakota, creating a disproportionate risk to subsistence fishers in nearby communities. *See* 89 Fed. Reg. at 38,556; Tech. Mem. 28 tbl.7, 30-32 tbl.8 (JA 1572, 1574-76); States Cmts. 9 (JA 1123) (such plants' 2020 emissions were

capable of causing reference-dose exceedances for some nearby high-frequency fish consumers).  Similarly, decreased power-plant emissions of non-mercury metals will reduce human exposure, particularly in nearby populations.  89 Fed. Reg. at 38,524; RIA 4-7 (JA 1823).

Importantly, the Rule will yield significant benefits for the sensitive and disproportionately impacted populations that concerned Congress.  *See* Stmt. Part B. EPA recognized that the health risks from consuming mercury-contaminated fish are "often particularly pronounced in vulnerable communities with people of color and low-income populations that have historically faced economic and environmental injustice and are overburdened by cumulative levels of pollution," so the benefits of the reductions will be felt most in those communities.  89 Fed. Reg. at 38,515; *see* RIA 4-5 (JA 1821).[2]  Thus, tribal communities in North Dakota, neighboring Minnesota, and nearby Wisconsin, for whom fish and fishing are of great cultural importance and who already face higher mercury exposures than the general population, will benefit from lignite-plant emission reductions.  89 Fed. Reg. at 38,531, 38,560 (American Indian populations are disproportionately likely to live near affected lignite plants); Fond du Lac Band Cmts. 1-2 (JA 1534-35); NTAA Cmts. 1-2 (JA 0482-83); Mille Lacs Band Cmts. 1-2 (JA 1262-63); States Cmts. 6, 9-10, Exh.1 5-6 (JA 1120, 1123-24, 1149-50) (methylmercury exposure in Great-

---

[2] *See also* States Cmts. 9-10 (JA 1123-24).

Lakes-Region tribal communities three to ten times higher than in general population); Env't Health Cmts. 58 (JA 1434).

The Rule's non-mercury-metal reductions will similarly benefit residents of the Northern Cheyenne Reservation, who have been disproportionately harmed by emissions from the Colstrip power plant in Montana. Northern Cheyenne Cmts. 1-2 (JA 1043-44) (Rule will mitigate "acute health effects—including premature deaths—that Colstrip's toxic emissions have on Northern Cheyenne tribal members"). That community is located 20 miles from the Colstrip facility, which, due to its outdated controls, is the nation's highest power-plant emitter of those pollutants. 89 Fed. Reg. at 38,522, 38,531; Resp. to Cmts. 41 (JA 1636).

Consistent with Congress's intent, EPA appropriately concluded that the Rule will provide significant health benefits by substantially reducing highly toxic power-plant emissions, especially in locations where vulnerable populations reside. This case is thus nothing like *Mexican Gulf Fishing Co. v. U.S. Department of Commerce*, where the court could identify "no meaningful benefit" to requiring expensive and intrusive GPS-monitoring devices on every chartered fishing vessel without "*any legitimate* conservation purpose." 60 F.4th 956, 965-66 (5th Cir. 2023). *Contra* Pets. Br. 54-55.

**B.    EPA Correctly Considered the Rule's Significant Non-Monetized Benefits**

EPA thoroughly considered the substantial health, welfare, and environmental benefits of the Rule quantitatively, where feasible, and qualitatively as part of its regulatory impact analysis.  89 Fed. Reg. at 38,553; RIA 4-1 to 4-64 (JA 1817-80).  That EPA was unable to quantify or monetize all of those benefits "does not mean [they] are small, insignificant, or nonexistent," RIA 4-12 (JA 1828), as Petitioners claim, *see, e.g.*, Pets. Br. 55 ("no relevant and quantifiable benefits").  Rather, just as Congress recognized in the 1990 Amendments, *see* Env't Resp.-Interv. Br. 3-5, difficulties inherent both in quantifying the health risks posed by air-toxics emissions and in valuing the benefits of reducing those risks currently make monetization of every benefit infeasible.

EPA has repeatedly confirmed what Congress made clear long ago: "quantifying the economic value" of health harms from air-toxics emissions "remains challenging."  89 Fed. Reg. at 38,315; 87 Fed. Reg. at 7645 ("EPA has long acknowledged the difficulty of quantifying and monetizing [air-toxics emissions' costs].");  76 Fed. Reg. at 24,999 (recognizing EPA "h[as] insufficient information to quantify" all air-toxics' health and environmental harms);  67 Fed. Reg. 77,830, 77,852 (Dec. 19, 2002) (discussing inability to quantify certain health benefits from air-toxics reductions).  It is particularly difficult to conduct the epidemiological studies typically used to estimate population-level exposure risk

because air-toxics exposures tend to be highly concentrated among relatively few individuals—such as subsistence fishers living near power plants. 89 Fed. Reg. at 38,556; States Cmts. 6 (JA 1120). Those conditions limit robust statistical detection of exposure-related health effects. 89 Fed. Reg. at 38,315-16.

Furthermore, any attempts at quantification of risk must account for cumulative exposures from different sources, 88 Fed. Reg. at 13,971, such as in northern Minnesota where Tribal communities rely on fisheries contaminated by mercury from North Dakotan power plants and the region's taconite industry. States Cmts. 9-10 (JA 1123-24). Such efforts also must consider exposures to mixtures of multiple toxins emitted by power plants, which, in combination, can cause harms that are not yet fully understood, Env't Health Cmts. 39-47 (JA 1415-23). *See* 88 Fed. Reg. at 13,971. Finally, it is challenging to monetize the costs of non-fatal harms, especially those that manifest over an individual's lifetime—like the wide range of learning harms suffered by children exposed to mercury, States Cmts., Exh.1 33-34 (JA 1177-78)—due to "insufficient economic research to support valuation" of such harms, 89 Fed. Reg. at 38,511. *See also id.* at 38,515-16.

Considering these limitations, EPA analyzed health benefits from the Rule's anticipated reduction in air-toxics emissions qualitatively. *Id.* at 38,511, 38,515-16; RIA 4-1 to 4-12 (JA 1817-28). Doing so was not just consistent with, but mandated by, the directives of the Office of Management and Budget and multiple Executive

Orders.  *See, e.g.*, OMB Circular A-4 3, 44 ("[Agencies] should carefully identify and assess [a regulation's] non-monetized and unquantified benefits and costs."); E.O. No. 12,866 § 1 (requiring consideration of "qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider"); E.O. No. 13,563 § 1; *see also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 560-61 (D.C. Cir. 2015) (describing importance of unquantifiable benefits).

Moreover, where it could monetize benefits, EPA did.  For example, EPA calculated $300 million in health benefits stemming from reductions in fine particulate matter ($PM_{2.5}$) emissions (which contain toxic non-mercury metals)[3] and ozone pollution.  89 Fed. Reg. at 38,561 tbl.11; *see also* RIA 4-35 tbl.4-5 (JA 1851). EPA additionally assessed the wide range of non-health benefits provided by the Rule's air-toxics reductions, including environmental benefits, which Congress also prioritized under section 112.  RIA 4-5 to 4-6, 4-12 (JA 1821-22, 1828); *see, e.g.*, 42 U.S.C. § 7412(c)(3) (area sources listed based on adverse effect on health or environment); 42 U.S.C. § 7412(e)(2) (prioritizing standards based on listed pollutants' anticipated adverse effects to health and environment).

Such benefits, especially reduced contamination of waterbodies, wildlife, and fisheries, are important to State Respondent-Intervenors and the people they

---

[3] These reductions stem from lower precursor and direct emissions of fine particulate matter.  89 Fed. Reg. at 38,557; RIA 4-14 (JA 1830).

represent. Mercury contamination of waterbodies—largely due to deposition of mercury from sources like coal-fired power plants—is ubiquitous across the nation. States Cmts. 4-5 (JA 1118-19); Mercury Scientists Cmts. 8, 10 (JA 0207, 0209). Tens of thousands of river and stream miles and millions of acres of lakes, reservoirs, and ponds are impaired under Clean Water Act section 303(d), 33 U.S.C. § 1313(d), due to mercury contamination, including many located on state lands or held in public trust within our jurisdictions. States Cmts., Exh.1 12 (JA 1156). That contamination harms State Respondent-Intervenors' valuable recreational and commercial fishing industries. States Cmts., Exh.1 8, 12-13 (JA 1152, 1156-57). It also has necessitated development of state- and region-wide "total maximum daily loads" in at least 13 states to meet federal water quality standards, 33 U.S.C. § 1313(d)(1), and widespread fish consumption advisories to protect our residents. States Cmts. 4-5, 4 n.19 (JA 1118-19); NESCAUM Cmts. 2 (JA 0660).

Here, midwestern states downwind of North Dakotan lignite-burning plants, in particular, will benefit from the Rule's significant mercury emission reductions. Those states include neighboring Minnesota and nearby Michigan, both of which have state-wide mercury total maximum daily loads in place. States Cmts. 4 n.19 (JA 1118).

Finally, contrary to Petitioners' contentions, EPA's inability to quantify or monetize all of the myriad and substantial benefits of the Rule does not run afoul of

its reasoned decision-making obligation.  *See*, *e.g.*, OMB Circular A-4 3, 44.  In essence, Petitioners believe that EPA cannot revise standards under paragraph 112(d)(6) absent a net-positive, monetized benefit-cost analysis.  *See* Pets. Br. 54-56.  That view is inconsistent with the statutory text and Congress's move away from the ineffective risk-based approach that preceded the 1990 Amendments.  *See* EPA Br. 23-37, 53-54; Env't Resp.-Interv. Br. 8-12.  And it is inconsistent with *Michigan v. EPA*, where the Court, interpreting the "capacious[]" term "appropriate," expressly declined to require "a formal cost-benefit analysis" relying solely on "monetary value."  576 U.S. at 752, 759; *see* EPA Br. 56.  Thus, Petitioners are left to "fault[] EPA for the fact that the statute Congress drafted is designed to yield benefits that it deemed important but understood are not easily monetizable." *Sinclair Wyo. Ref. Co. v. EPA*, 101 F.4th 871, 889 (D.C. Cir. 2024).  The Rule's consideration of both monetized and nonmonetized benefits simply implements that Congressional policy choice.  *See* EPA Br. 54-55.

## II.     EPA Sufficiently Considered the Rule's Costs

### A.     EPA Reasonably Considered Cost-Effectiveness in Setting the Surrogate Standard

EPA promulgated the updated surrogate standard after determining, based on several relevant and well-established cost metrics, that its costs are reasonable.  89 Fed. Reg. at 38,522-24, 38,533.  In making that determination, EPA considered numerous factors, including the negligible impact that the standard will have on the

vast majority of coal-fired facilities, and the standard's demonstrated achievability. *Id.* at 38,522-24, 38,529-30, 38,533-34.

Petitioners nonetheless argue that the Rule is arbitrary and capricious because the standard is estimated to be less cost-effective than previous rules which EPA concluded were not cost-effective.  Pets. Br. 58-60.  But section 112 does not constrain EPA's cost evaluations solely to consideration of cost-effectiveness, and Petitioners do not argue otherwise.  *See NRDC v. EPA*, 749 F.3d 1055, 1060-61 (D.C. Cir. 2014).  Indeed, it would be inconsistent with past practice for EPA to now allow cost-effectiveness estimates to prevail over all other metrics and reject the Rule on that basis.  *See* 89 Fed. Reg. at 38,523-24.

Here, EPA expressly and reasonably differentiated the updated surrogate standard from previous rulemakings with similar cost-effectiveness estimates.  *Id.* at 38,524-25.  EPA explained that the power industry has already demonstrated achievability of the updated standard; the standard will produce benefits not contemplated in previous rulemakings; and there are inherent differences between the power sector and other industries previously regulated under section 112.  *Id*. at 38,524, 38,534.  EPA also noted several reasons that it may have underestimated the standard's cost-effectiveness.  *Id.* at 38,524-25, 38,534.

**B.     EPA Correctly Concluded That the Rule Will Not Threaten Grid Reliability**

EPA determined that the Rule will not "threaten resource adequacy or otherwise degrade electric system reliability" and amply supported that conclusion. 89 Fed. Reg. at 38,526.  EPA explained that the Rule is expected to require only a small fraction of the nation's generating capacity—2 percent in 2028—to reduce emissions rates to reach compliance.  *Id.* at 38,555.  Indeed, EPA projected that, in response to the surrogate standard, only 33 units will need to improve operations, upgrade controls, or, in the case of just two units at one hold-out facility, add new controls.  *Id.* at 38,522.  Likewise, the updated mercury standard affects only 22 units.  *Id.* at 38,539.  In contrast, the 2012 standards, which were implemented "without challenges to grid reliability," *id.* at 38,519, affected 600 power plants and required a significantly larger share of U.S. power generation to reduce emissions, 77 Fed. Reg. at 9444; 89 Fed. Reg. at 38,526 & n.34.

EPA concluded, based on projections made using IPM, a "state-of-the-art, peer-reviewed . . . model," RIA 3-1 (JA 1785), that the Rule will not cause any plants to retire or reduce operational capacity, 89 Fed. Reg. at 38,555-56.  Several factors bolster that conclusion, including that facilities will have three years to comply with the Rule, with the option of a one-year extension and additional time if needed.  *Id.* at 38,519, 38,526; 42 U.S.C. § 7412(i)(3)(A)-(B).  Further, multiple state and

regional regulatory safeguards prevent potentially problematic plant retirements and mitigate any adverse impacts of retirements that do occur. 89 Fed. Reg. at 38,526.

EPA sufficiently considered, and adequately responded to, concerns about grid reliability raised in the comment letters cited by Petitioners. *See* Pets. Br. 61-62. Most of those comments express speculative and unsubstantiated concerns regarding reliability, without challenging EPA's methodology or conclusions. For example, NorthWestern's comment letter concludes that the Rule most likely will *not* lead to retirement of the Colstrip plant, and does not explain with any specificity why the Rule nonetheless will threaten grid reliability. NorthWestern Cmts. 21 (JA 0985); *see also* ERCOT Cmts. 1 (JA 0913) ("[S]ome portion of the affected units *could* simply retire instead of coming into compliance with the new requirements" (emphasis added)). Where commenters raised specific issues with EPA's grid-reliability projections, EPA adequately responded. *See* Resp. to Cmts. 128-29 (JA 1723-24) (addressing EPA's decision to account for existing statutes in its baseline projections); Resource Adequacy Study 3-4, 9 (JA 1928-29, 1934) (evaluating cumulative impact of recent rules affecting power sector).

Nor are Petitioners entitled to relief based on their characterization of IPM as merely "a predictive algorithm" which "adds enough new hypothetical resources in the future to guarantee resource adequacy." Pets. Br. 62. Petitioners failed to raise that argument before EPA and have thus waived it. *See* 42 U.S.C. § 7607(d)(7)(B);

*Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 588-89 (D.C. Cir. 2019). In any event, IPM does not hypothesize zero-cost resource generation, but rather accounts for constraints imposed by the fossil-fuel and coal-supply systems—like mining costs, coal reserves, and regional transmission limitations—using empirical data to model those systems. RIA 3-1 to 3-2 (JA 1785-86); IPM Documentation, 7-10 to 7-31 (JA 1904-25). EPA therefore considered resource adequacy concerns before concluding that the Rule will result in "no significant incremental changes in [generating] capacity" or retirements for any fuel type. RIA 3-17 to 3-18 (JA 1801-02).

## CONCLUSION

For the reasons set forth above, the Petitions should be denied. If the Court grants the Petitions (it should not), remand without vacatur would be the appropriate remedy as vacatur of the Rule would "risk significant harm to the public health or the environment," including in State Respondent-Intervenors' jurisdictions. *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) (per curiam); *accord Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

Dated: December 10, 2024

Respectfully submitted,

STATE OF MINNESOTA

COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

By its attorneys,

KEITH ELLISON
   *Attorney General for the*
   *State of Minnesota*

ANDREA JOY CAMPBELL
   *Attorney General for the*
   *Commonwealth of Massachusetts*

/s/ *Peter Surdo*
PETER SURDO
CATHERINE RIOS-KEATING
   *Special Assistant Attorneys General*
OFFICE OF THE ATTORNEY GENERAL
  OF MINNESOTA
445 Minnesota Street
Town Square Tower Suite 1400
Saint Paul, Minnesota 55101
(651) 757-1061
peter.surdo@ag.state.mn.us
catherine.rios-keating@ag.state.mn.us

/s/ *Julia Jonas-Day*
TRACY TRIPLETT
   *Senior Enforcement Counsel*
JULIA JONAS-DAY
ALEXANDER WEISS
   *Assistant Attorneys General*
Energy and Environment Bureau
OFFICE OF THE ATTORNEY GENERAL
  OF MASSACHUSETTS
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200
tracy.triplett@mass.gov
julia.jonas-day@mass.gov
alexander.weiss@mass.gov

FOR THE STATE OF
CONNECTICUT

WILLIAM TONG
ATTORNEY GENERAL

*/s/ Scott N. Koschwitz*
MATTHEW I. LEVINE
Deputy Associate Attorney General
SCOTT N. KOSCHWITZ
Assistant Attorney General
Connecticut Office of the Attorney
General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Scott.Koschwitz@ct.gov

FOR THE STATE OF MAINE

AARON M. FREY
ATTORNEY GENERAL

*/s/ Emma Akrawi*
EMMA AKRAWI
Assistant Attorney General
Natural Resources Division
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.akrawi@maine.gov

FOR THE STATE OF
ILLINOIS

KWAME RAOUL
ATTORNEY GENERAL

*/s/ Jason E. James*
MATTHEW J. DUNN
Chief, Environmental Enf./
Asbestos Litigation Div.
JASON E. JAMES
Assistant Attorney General
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
Jason.James@ilag.gov

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
ATTORNEY GENERAL

*/s/ Michael F. Strande*
MICHAEL F. STRANDE
Assistant Attorney General
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
Office of the Attorney General
1800 Washington Boulevard
Baltimore, MD 21230
(410) 537-3421
Michael.strande@maryland.gov
Sgoldstein@oag.state.md.us

FOR THE STATE OF MICHIGAN

DANA NESSEL
ATTORNEY GENERAL

*/s/ Jennifer Matuja*
JENNIFER MATUJA
Assistant Attorney General
Michigan Department of the Attorney General
Environment, Natural Resources and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
matujaj@michigan.gov

FOR THE STATE OF NEW YORK

LETITIA JAMES
ATTORNEY GENERAL

*/s/ Ester Murdukhayeva*
ESTER MURDUKHAYEVA
Deputy Solicitor General
MICHAEL J. MYERS
Senior Counsel
ANDREW FRANK
Assistant Attorney General
Office of the New York Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6279
(212) 416-8271
Ester.Murdukhayeva@ag.ny.gov

FOR THE STATE OF NEW JERSEY

MATTHEW J. PLATKIN
ATTORNEY GENERAL

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, NJ 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

*/s/ Paul Garrahan*
PAUL A. GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4540
Paul.Garrahan@doj.oregon.gov
Steve.Novick@doj.oregon.gov

FOR THE COMMONWEALTH OF
PENNSYLVANIA

MICHELLE HENRY
ATTORNEY GENERAL

*/s/ Ann R. Johnston*
ANN R. JOHNSTON
Senior Deputy Attorney General
Office of the Attorney General
Civil Environmental Enforcement Unit
Strawberry Square, 14th Floor
Harrisburg, PA 17120
(717) 497-3678
ajohnston@attorneygeneral.gov

FOR THE STATE OF RHODE
ISLAND

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Randelle L. Boots*
RANDELLE L. BOOTS
Special Assistant Attorney General
Rhode Island Office of the Attorney
General
150 South Main Street
Providence, RI 02903
(401) 274-4400
rboots@riag.ri.gov

FOR THE STATE OF VERMONT

CHARITY R. CLARK
ATTORNEY GENERAL

*/s/ Hannah Yindra*
HANNAH YINDRA
Hannah YindraAssistant Attorney
General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
ATTORNEY GENERAL

*/s/ Gabe Johnson-Karp*
GABE JOHNSON-KARP
Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53702-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

FOR THE DISTRICT OF
COLUMBIA

BRIAN L. SCHWALB
Attorney General

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General
400 Sixth Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
Caroline.vanzile@dc.gov

FOR THE CITY OF
BALTIMORE

EBONY M. THOMPSON
ACTING CITY SOLICITOR

/s/ Dawn Lettman
DAWN LETTMAN
Chief Solicitor
Baltimore City Law Department
100 North Holliday Street, Suite 101
Baltimore, MD 21202
(410) 396-8393
dawn.lettman@baltimorecity.gov

*Attorney for the Mayor and City
Counsel of Baltimore, Maryland*

FOR THE CITY OF CHICAGO

MARY RICHARDSON-LOWRY
CORPORATION COUNSEL

/s/ Myriam Zreczny Kasper
MYRIAM ZRECZNY KASPER
Deputy Corporation Counsel – Appeals
Division
City of Chicago Law Department
2 North LaSalle Street, Suite 540
Chicago, IL 60602
(312) 744-3564
Myriam.Kasper@cityofchicago.org

FOR THE CITY OF NEW YORK

MURIEL GOODE-TRUFANT
ACTING CORPORATION COUNSEL
FOR THE CITY OF NEW YORK

/s/Christopher King
CHRISTOPHER KING
Senior Counsel
Office of the Corporation Counsel
New York City Law Department
100 Church Street, Room 6-143
New York, NY 10007
(212) 356-2074
CKing@law.nyc.gov

- 26 -

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a) and Fed. R. App. P. 29(a)(5), because this brief contains 4536 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1); and thus complies with the limit of 9,100 words shared between the State Respondent-Intervenors and Environmental and Public Health Respondent-Intervenors.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in 14-point, Times New Roman-style font.

Dated: December 10, 2024             /s/ *Julia Jonas-Day*
                                     Julia Jonas-Day

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on December 10, 2024, and that parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system.

Dated: December 10, 2024         /s/ *Julia Jonas-Day*
                                 Julia-Jonas Day