NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-1119 and consolidated cases

U.S. COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

State of North Dakota, et al.,

Petitioners,

v.

U.S. Environmental Protection Agency, et al.,

Respondents.

———————————

Petitions for Review of a Final Rule of
the U.S. Environmental Protection Agency

———————————

**Final Brief for Respondents**

———————————

|  | Todd Kim |
|  | Assistant Attorney General |
|  | Environment & Natural Resources Div. |
| *Of Counsel:* | |
| Matthew McNerney | Redding Cofer Cates |
| U.S. Environmental Protection Agency | Sue Chen |
| Office of General Counsel | David D. Mitchell |
| 1200 Pennsylvania Ave., NW | U.S. Department of Justice |
| Washington, D.C. 20460 | Environmental Defense Section |
|  | P.O. Box 7611 |
|  | Washington, D.C. 20044 |
|  | 202-514-0165 (Mitchell) |
|  | david.mitchell@usdoj.gov |
|  | |
|  | Counsel for Respondents |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

As required by D.C. Circuit Rule 28(a)(1), Respondents certify:

### A. Parties and amici

Petitioners are:

- Case No. 24-1119: the State of North Dakota, State of West Virginia, State of Alaska, State of Arkansas, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, and State of Wyoming;

- Case No. 24-1154: NACCO Natural Resources Corporation;

- Case No. 24-1179: National Rural Electric Cooperative Association, Lignite Energy Council, National Mining Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative Inc., Basin Electric Power Cooperative, and Rainbow Energy Center, LLC;

- Case No. 24-1184: Oak Grove Management Company LLC and Luminant Generation Company LLC;

- Case No. 24-1190: Talen Montana, LLC;

ii

- Case No. 24-1194: Westmoreland Mining Holdings LLC, Westmoreland Mining LLC, and Westmoreland Rosebud Mining LLC;

- Case No. 24-1201: America's Power and Electric Generators MATS Coalition;

- Case No. 24-1217: NorthWestern Corporation; and

- Case No 24-1223: Midwest Ozone Group.

Respondents are the U.S. Environmental Protection Agency and Michael S. Regan, Administrator.

Intervenor for Petitioners is San Miguel Electric Cooperative, Inc.

Intervenors for Respondents are Air Alliance Houston, Alliance of Nurses for Healthy Environments, American Academy of Pediatrics, American Lung Association, American Public Health Association, Chesapeake Climate Action Network, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Montana Environmental Information Center, Natural Resources Council of Maine, Natural Resources Defense Council, the Ohio Environmental Council, Physicians for Social Responsibility, and Sierra Club; and the Commonwealth of Massachusetts, State of Minnesota, State of Connecticut, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of New Jersey, State of New York, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island,

State of Vermont, State of Wisconsin, District of Columbia, City of Baltimore, City of Chicago, and City of New York.

**B. Rulings under review**

Under review is EPA's action "National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review."  89 Fed. Reg. 38508 (May 7, 2024).

**C. Related cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

> */s/ David Mitchell*
> David D. Mitchell
>
> Counsel for Respondents

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

TABLE OF AUTHORITIES ................................................................. viii

GLOSSARY ..................................................................................... xiv

INTRODUCTION ................................................................................1

JURISDICTION..................................................................................2

STATUTES AND REGULATIONS......................................................2

STATEMENT OF THE ISSUES..........................................................2

STATEMENT OF THE CASE.............................................................4

    I.     Statutory and regulatory background .....................................4

        A.    The ineffective 1970 risk-based approach to controlling air-toxics emissions and the 1990 technology-based approach ................................................................................4

        B.    Establishing, reviewing, and revising air-toxics emission standards..............................................................................7

    II.    Regulation of power plants ...................................................9

        A.    EPA's initial appropriate-and-necessary findings and the 2012 Rule ....................................................................10

        B.    The 2024 Rule ..........................................................13

SUMMARY OF THE ARGUMENT ....................................................17

STANDARD OF REVIEW ................................................................21

ARGUMENT ...................................................................................22

I.  The Clean Air Act does not mandate that EPA identify a residual risk to public health under existing MACT air-toxics emission standards before finding that revised standards are "necessary." .........................................................................22

    A.  EPA properly applied the contextual meaning of "necessary." ...............................................................23

    B.  Petitioners err in construing "necessary" in Section 7412(d)(6) as demanding a finding of residual health risk to revise MACT standards. ........................................29

II. EPA identified qualifying "developments" in practices, processes, and control technologies in the technology review and properly found that "developments" include improvements in those areas. ........................................................37

III. The Rule is not arbitrary or capricious. ...............................47

    A.  EPA determined the revised standards were achievable based on a reasonable consideration of costs, and EPA evaluated all the Rule's advantages and disadvantages, including the costs and benefits. ..............................48

        1.  EPA reasonably assessed costs applying multiple metrics and analyses. ........................................48

        2.  Petitioners' attacks on EPA's cost judgments lack merit. ..............................................................53

    B.  EPA determined the revised standards were achievable based on reasonable feasibility findings and cost estimates. ..................................................................57

        1.  EPA's feasibility finding and cost estimate for the revised surrogate standard were reasonable. .................57

      2.      EPA's feasibility finding and cost estimate for the revised lignite standard were reasonable. ....................... 64

C.      EPA reasonably considered the Rule's effects on the nation's power grid. ................................................. 75

D.      EPA reasonably treated the Colstrip plant like other power plants. ............................................................ 79

E.      The Rule is not a pretext to regulate greenhouse gas emissions. .................................................................. 83

F.      EPA complied with the procedural requirements of the Regulatory Flexibility Act. ....................................... 85

CONCLUSION ..................................................................... 87

CERTIFICATES OF COMPLIANCE AND SERVICE ......................................... 88

# TABLE OF AUTHORITIES

## CASES

*Am. Acad. of Pediatrics v. Regan*,
  No. 20-1221, 2023 WL 4540440 (D.C. Cir. July 13, 2023)..........................12, 13

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019) ..............................................................................85

*Am. Trucking Ass'n v. U.S. Dep't of Trans.*,
  166 F.3d 374 (1999).............................................................................................29

*Appalachian Power Co. v. EPA*,
  135 F.3d 791 (D.C. Cir. 1998) ............................................................................76

*Appalachian Power Co. v. EPA*,
  251 F.3d 1026 (D.C. Cir. 2001) ..........................................................................75

*Armour & Co. v. Wantock*,
  323 U.S. 126 (1944) .............................................................................................23

*Ass'n of Battery Recyclers, Inc. v. EPA*,
  716 F.3d 667 (D.C. Cir. 2013) ..................8, 25, 26, 27, 29, 30, 31, 32, 41, 43, 48

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
  566 U.S. 399 (2012) .............................................................................................36

*Cement Kiln Recycling Coal. v. EPA*,
  255 F.3d 855 (D.C. Cir. 2001) ........................................................................6, 36

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019)........................................................................................83, 84

*Fox v. Gov't of D.C.*,
  794 F.3d 25 (D.C. Cir. 2015) ............................................................41, 46, 47, 58

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ....................................................................21, 22, 30, 31

*Louisiana Env't Action Network v. EPA ("LEAN"),*
  955 F.3d 1088 (D.C. Cir. 2020) ...................................... 7, 8, 24, 27, 32, 33, 40, 54

*Marsh v. Oregon Nat. Res. Council,*
  490 U.S. 360 (1989) ...................................................................................22, 57

*McCulloch v. Maryland,*
  17 U.S. 316 (1819) ................................................................................................23

*Michigan v. EPA,*
  576 U.S. 743 (2015) ...................................................... 6, 10, 12, 34, 54, 56, 57, 69

*Miss. Comm'n on Env't Quality v. EPA,*
  790 F.3d 138 (D.C. Cir. 2015) (per curiam) .........................................................21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................................................................21, 22

*Nat'l Ass'n for Surface Finishing v. EPA,*
  795 F.3d 1 (D.C. Cir. 2015) ...................................... 7, 8, 9, 26, 32, 35, 38, 40, 41,
  ........................................................................... 42, 44, 45, 48, 49, 53, 54, 61

*Nat'l Ass'n of Clean Water Agencies v. EPA,*
  734 F.3d 1115 (D.C. Cir. 2013) ...........................................................................48

*Nat'l Lime Ass'n v. EPA,*
  233 F.3d 625 (D.C. Cir. 2000) ...................................................................22, 57

*Nat'l Tel. Co-op. Ass'n v. FCC,*
  563 F.3d 536 (D.C. Cir. 2009) ...........................................................................86

*New Jersey v. EPA,*
  517 F.3d 574 (D.C. Cir. 2008) ...............................................................10, 11, 34

*NRDC v. EPA,*
  529 F.3d 1077 (D.C. Cir. 2008) ...............................................................35, 36, 61

ix

*Sierra Club v. EPA*,
353 F.3d 976 (D.C. Cir. 2004) ............................... 4, 5, 6, 7, 24, 25, 32, 36, 50, 54

*Sierra Club v. EPA*,
884 F.3d 1185 (D.C. Cir. 2018) ...........................................................11, 12

*Sinclair Wyoming Refin. Co. v. EPA*,
101 F.4th 871 (D.C. Cir. 2024)...........................................................55

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)............................................................................22

*United States Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024)..............................................8, 33, 40

*United States v. Chem. Found.*,
272 U.S. 1 (1926)...............................................................................83

*U.S. Cellular Corp. v. FCC*,
254 F.3d 78 (D.C. Cir. 2001) ............................................................86

*West Virginia v. EPA*,
362 F.3d 861 (D.C. Cir. 2004) .........................................................76

*White Stallion Energy Ctr. LLC v. EPA*,
748 F.3d 1222 (D.C. Cir. 2014) (per curiam),
*rev'd on other grounds*, 576 U.S. 743 (2015)...........................10, 11, 12, 34, 35,
.........................................................................57, 69, 71, 74, 75

*White Stallion Energy Ctr., LLC* v. *EPA*,
No. 12-1100, 2015 WL 11051103 (D.C. Cir. 2015) (per curiam)
*stay denied*, 2016 WL 11900291, No. 15A886 (Mar. 3, 2016)...........................12

**STATUTES**

5 U.S.C. § 605(b) ....................................................................................86

16 U.S.C. § 824a(c)...............................................................................78

42 U.S.C. § 7412(a)(8) ................................................................. 9

42 U.S.C. § 7412(b)(1)-(2) ........................................................ 4

42 U.S.C. § 7412(b)(2) ............................................................... 5

42 U.S.C. § 7412(b)(5) ............................................................. 46

42 U.S.C. § 7412(c)(1) ............................................................... 6

42 U.S.C. § 7412(c)(9) ................................................... 10, 11, 34

42 U.S.C. § 7412(d)(2) ............................. 6, 7, 8, 14, 18, 22, 23, 24, 25, 27, 28, 31,
................................................. 35, 36, 37, 40, 41, 43, 46, 48, 53, 54, 75, 83

42 U.S.C. § 7412(d)(2)-(3) .............................................. 6, 23, 24

42 U.S.C. § 7412(d)(3) ................................................ 6, 7, 8, 35, 36, 44

42 U.S.C. § 7412(d)(5) .......................................................... 24, 36

42 U.S.C. § 7412(d)(6) ......................... 2, 7, 8, 9, 13, 14, 17, 18, 22, 23, 24, 25, 26,
................................................. 27, 28, 29, 30, 31, 32, 35, 36, 37, 38, 39, 40,
................................................. 41, 42, 43, 44, 45, 46, 48, 52, 53, 83, 84, 85

42 U.S.C. § 7412(d)(8) .......................................................... 24, 36

42 U.S.C. § 7412(f)(2) ........................................................ 8, 9, 31

42 U.S.C. § 7412(f)(2)(A) ......................................................... 7

42 U.S.C. § 7412(n)(1) ............................................ 11, 12, 33, 34, 35, 75

42 U.S.C. § 7412(n)(1)(A) ................................................ 10, 30, 33, 56

42 U.S.C. § 7412(r)(7) ............................................................ 60

42 U.S.C. § 7414(a)(1)(C) ....................................................... 17, 46

42 U.S.C. § 7414((b)(5) ............................................................................46

42 U.S.C. § 7602(k) ...........................................................................45, 46

42 U.S.C. § 7607(b) ....................................................................................2

42 U.S.C. § 7607(d) ..................................................................................21

42 U.S.C. § 7607(d)(7)(A) .........................................................................84

42 U.S.C. § 7607(d)(9)...............................................................................21

42 U.S.C. § 7607(d)(9)(A) .........................................................................21

42 U.S.C. §§ 7651-51o .........................................................................10, 75

Pub. L. No. 91-604, 84 Stat. 1676 (1970)...................................................4

Pub. L. No. 101-549, 104 Stat. 2399 (1990)...............................................5

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 63.10005(h) ............................................................................69

40 C.F.R. § 63.10006(b) ............................................................................69

## FEDERAL REGISTER

65 Fed. Reg. 79825 (Dec. 20, 2000) ..........................................................11

67 Fed. Reg. 6521 (Feb. 12, 2002) .............................................................11

70 Fed. Reg. 15994 (Mar. 29, 2005)...........................................................11

71 Fed. Reg. 34422 (June 14, 2006) ...........................................................31

73 Fed. Reg. 66964 (Nov. 12, 2008) ..........................................................28

77 Fed. Reg. 9304 (Feb. 16, 2012) ............................... 10, 11, 43, 44, 54, 64, 68, 70

81 Fed. Reg. 24420 (Apr. 25, 2016) ........................................................12

85 Fed. Reg. 31286 (May 22, 2020) ...................................................12, 13

85 Fed. Reg. 49084 (Aug. 12, 2020) .....................................................28

88 Fed. Reg. 13956 (Mar. 6, 2023)................................................12, 13, 34

88 Fed. Reg. 24854 (Apr. 24, 2023) ........................ 8, 10, 31, 38, 42, 43, 45, 66, 67

89 Fed. Reg. 38508 (May 7, 2024) ............... 4, 5, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17,
.................................................... 24, 27, 28, 29, 31, 32, 33, 34, 38, 43,
.................................................... 44, 45, 46, 47, 48, 49, 50, 51, 52, 53,
.................................................... 54, 55, 57, 58, 59, 60, 62, 63, 64, 65,
.................................................... 66, 67, 68, 69, 70, 71, 72, 73, 74, 76,
.................................................... 77, 78, 79, 80, 81, 82, 83, 84, 86

89 Fed. Reg. 39798 (May 9, 2024) ...................................................76, 80

## EXECUTIVE ORDER

Exec. Order No. 13990 86 Fed. Reg. 7037 (Jan. 25, 2021).....................................13

## LEGISLATIVE HISTORY

H.R. Rep. No. 101-490, pt. 1 (1990) ........................................................5

S. Rep. No. 101-228 (1989), *reprinted at* 1990 U.S.C.C.A.N. 3385 ...................4, 5

## GOVERNMENT DOCUMENTS

OMB Circular A-4 ...................................................................51

## DICTIONARY

4 *The Oxford English Dictionary* 563-64 (2d ed. 1989)..........................................39

# GLOSSARY

| | |
|---|---|
| 2021 Andover Report | Andover Technology Partners, Analysis of PM and Hg Emissions and Controls from Coal-Fired Power Plants (August 19, 2021) |
| 2023 Technical Memo | EPA, Memorandum on 2023 Technology Review for the Coal- and Oil-Fired EGU Source Category (Jan. 2023) |
| 2024 Technical Memo | EPA, Memorandum on 2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category (Jan. 2024) |
| EPA | U.S. Environmental Protection Agency |
| Inter. Br. | Opening Brief of Intervenor San Miguel Electric Cooperative, Inc., Case. No. 24-1119 (and consolidated cases) |
| JA | Joint Appendix |
| lb/MMBtu | pounds per million British thermal units of heat input |
| lb/TBtu | pounds per trillion British thermal units of heat input |
| MACT | maximum achievable control technology |
| Pet. Br. | Opening Brief of Petitioners, Case. No. 24-1119 (and consolidated cases) |
| Reg. Impact Analysis | EPA, Regulatory Impact Analysis for the Final National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating |

xiv

|                        | Units Review of the Residual Risk and Technology Review (Apr. 2024) |
| Resp. to Comments      | EPA, Summary of Public Comments and Responses on Proposed Rule (Apr. 2024) |
| San Miguel Comment     | Comment from San Miguel Electric Cooperative, Inc. (June 23, 2023) |
| Talen Comment          | Comment from Talen Montana, LLC (June 23, 2024) |

## INTRODUCTION

The Clean Air Act regulates a large set of hazardous air pollutants.  These dangerous "air toxics" are known or suspected to cause cancer and other severe health effects.  In 1990, having concluded that a predominantly risk-based approach to regulating air toxics was inadequate, Congress amended the Act to require standards that secure the maximum degree of emission reduction that is achievable through controls, up to and including a total prohibition on any emission.  And to ensure that air-toxics emission standards keep pace with developments in practices, processes, and control technologies, Congress further required that EPA review them at least every eight years, and revise them as necessary to realize additional emission reductions those developments make achievable.

Here, EPA revised air-toxics emission standards for coal-fired power plants. These plants are among the largest emitters of mercury, arsenic, chromium, and other air toxics.  The revised standards followed EPA's review of 12 years of developments in emission-control practices, processes, and technologies within the industry.  Specifically, EPA revised the standard for toxic metals (other than mercury), setting an achievable new standard that over 90% of power plants can already meet without incurring significant costs.  And EPA revised the mercury

1

standard for a small category of coal plants—lignite plants—setting an achievable new standard that all other coal plants have been meeting since 2016.

EPA's Rule is lawful. Petitioners argue for constraints on EPA's authority to review and revise air-toxics emission standards that are unsupported by the statutory text or other indicia of congressional intent, and that contravene this Court's precedents. And EPA's technical and scientific judgments are well-supported by record evidence. The petitions should be denied.

## JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 7607(b).

## STATUTES AND REGULATIONS

Relevant statutes and regulations appear in the addendum to this brief.

## STATEMENT OF THE ISSUES

1. Whether the Clean Air Act mandates that EPA identify a residual risk to public health under existing air-toxics emission standards before determining that revised maximum achievable control technology standards are "necessary," 42 U.S.C. § 7412(d)(6).

2. Whether "developments in practices, processes, and control technologies," 42 U.S.C. § 7412(d)(6), may include improvements in emission-monitoring practices; emission-control products, equipment, or other technologies; and the cost-effectiveness of existing emission controls.

2

3.   Whether EPA reasonably revised the standard for non-mercury metals emitted by coal-fired power plants to an achievable level that over 90% of power plants have demonstrated they can meet.

4.   Whether EPA reasonably revised the mercury standard for lignite-fired power plants to the same achievable level that other coal-fired power plants already meet.

5.   Whether EPA reasonably found the Rule to be cost-reasonable where most coal-fired power plants will not incur any compliance costs and the Rule's total costs are negligible compared to sector revenue.

6.   Whether EPA reasonably concluded the Rule would not adversely affect electric-grid reliability where EPA's state-of-the-art, peer-reviewed model predicted the Rule would not cause any plant to retire.

7.   Whether Petitioners have identified clear evidence that rebuts the presumption that EPA acted with a proper purpose, where EPA explained that the Rule would realize additional reductions of air toxics and there is no record evidence that the Rule is a pretext to regulate different air pollutants.

8.   Whether EPA complied with the procedural requirements of the Regulatory Flexibility Act by explaining why the Rule will not have a significant economic impact on a substantial number of small entities.

## STATEMENT OF THE CASE

### I.    Statutory and regulatory background

The Clean Air Act establishes several regulatory programs to control air pollution from stationary sources such as power plants.  This case involves the Act's program under Section 7412 to control emissions of "hazardous air pollutants," which are particularly dangerous pollutants colloquially referred to as "air toxics."  Air toxics include neurotoxins like mercury, human carcinogens like arsenic and chromium, and a host of other toxic substances.  *See* 42 U.S.C. § 7412(b)(1)-(2); 89 Fed. Reg. 38508, 38515 (May 7, 2024).  Air toxics are associated with severe health effects like cancer, neurological disorders, and reproductive dysfunctions.  89 Fed. Reg. at 38514.

### A. The ineffective 1970 risk-based approach to controlling air-toxics emissions and the 1990 technology-based approach

Section 7412 began in 1970 as a risk-based program.  Under that regime, EPA had to assess a pollutant's risk before setting emission standards.  *See Sierra Club v. EPA*, 353 F.3d 976, 979 (D.C. Cir. 2004).  EPA was required to list air toxics and then establish emission standards "at the level which in [EPA's] judgment provides an ample margin of safety to protect the public health . . . ."  Pub. L. No. 91-604, § 112(a)(1), (b)(1), 84 Stat. 1676, 1685 (1970).

That approach was ineffective because the challenges associated with risk analysis were paralyzing.  *See Sierra Club*, 353 F.3d at 979 (citing S. Rep. No.

4

101-228, at 3 (1989), *reprinted at* 1990 U.S.C.C.A.N. 3385, 3389 ("Very little has been done since the passage of the 1970 [CAA] to identify and control [air toxics].")); H.R. Rep. No. 101-490, pt. 1, at 151 (1990) ("Listing decisions have been few and far between. . . . No decision — is the history of this program."); 89 Fed. Reg. at 38513.  From 1970 to 1990, EPA listed only eight air toxics and established emission standards for seven.  *Sierra Club*, 353 F.3d at 979 (citation omitted); 89 Fed. Reg. at 38514.  "The ineffectiveness of the risk-based approach created a 'broad consensus that the program to regulate [air toxics] under section [74]12 of the Clean Air Act should be restructured to provide EPA with authority to regulate with *technology-based* standards.' "  *Sierra Club*, 353 F.3d at 979 (citation and ellipsis omitted) (emphasis in original).

The Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399 (1990), aimed to end to EPA's inaction.  Congress made two fundamental changes to Section 7412.  First, instead of waiting for EPA to list new air toxics, Congress identified 191 air toxics requiring emission standards and directed EPA to add more under specified criteria.  *See* 42 U.S.C. § 7412(b)(2); *Sierra Club*, 353 F.3d at 979-80.  Second, Congress replaced the risk-based emission standards approach with a mandate for EPA to require reductions "based on the maximum reduction in emissions which can be achieved by application of the best available control technology."  *Sierra Club*, 353 F.3d at 980 (citation omitted).

Congress generally directed that EPA promulgate technology-based emission standards that are commonly referred to as "maximum achievable control technology" or "MACT" standards. 42 U.S.C. § 7412(d)(2)-(3). EPA "first divide[s] sources covered by the [air-toxics] program into categories and subcategories in accordance with statutory criteria." *Michigan v. EPA*, 576 U.S. 743, 748 (2015); *see* 42 U.S.C. § 7412(c)(1) (requiring EPA to list source categories). For each source category, EPA "shall require the maximum degree of reduction in [air-toxics] emissions," up to and including a total prohibition, that EPA "determines is achievable." 42 U.S.C. § 7412(d)(2). To assess achievability, EPA must consider "the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements." *Id.*

Congress also specified minimum standards based on actual emission rates of the best-performing sources. *See* 42 U.S.C. § 7412(d)(3); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 861-62 (D.C. Cir. 2001). Air-toxics emission standards for existing sources cannot be less stringent than "the average emission limitation achieved by the best performing 12 percent" or "the best performing 5 sources . . . for categories or subcategories with fewer than 30 sources." 42 U.S.C. § 7412(d)(3). Thus, at a minimum, all sources in a category or subcategory must "clean up their emissions to the level that their best performing peers have shown can be achieved." *Sierra Club*, 353 F.3d at 980.

6

**B. Establishing, reviewing, and revising air-toxics emission standards**

EPA establishes initial MACT air-toxics emission standards using a two-step process. First, EPA calculates the category-specific minimum standards, commonly called "floor standards," that Congress prescribed under Section 7412(d)(3). *Sierra Club*, 353 F.3d at 988; 89 Fed. Reg. at 38513. Next, EPA evaluates the factors set forth in Section 7412(d)(2) to determine whether more stringent standards, commonly called "beyond-the-floor" standards, are necessary. *Sierra Club*, 353 F.3d at 988 (describing EPA's obligation as considering "whether beyond-the-floor standards are necessary under Section 7412(d)(2)"); 89 Fed. Reg. at 38513.

After establishing initial emission standards for a source category, EPA must conduct a risk review "within 8 years after promulgation of standards," 42 U.S.C. § 7412(f)(2)(A), as well as "a recurring 'technology review'" at least every eight years. *Nat'l Ass'n for Surface Finishing* v. *EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015). The technology review is required by Section 7412(d)(6)—the provision most central to this case—which states that EPA "shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under [Section 7412] no less often than every 8 years." 42 U.S.C. 7412(d)(6). The recurring technology review "ensures that, over time, EPA maintains source standards compliant with the law

7

and on pace with emerging developments that create opportunities to do even better." *Louisiana Env't Action Network v. EPA ("LEAN")*, 955 F.3d 1088, 1093 (D.C. Cir. 2020); *see also United States Sugar Corp. v. EPA*, 113 F.4th 984, 995 (D.C. Cir. 2024). Because MACT emission standards revised under technology reviews are beyond-the-floor standards (i.e. standards more stringent than required by section 7412(d)(3)), EPA determines whether further emissions reductions are achievable using the Section 7412(d)(2) factors. *See Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 673-74 (D.C. Cir. 2013) (holding the Section 7412(d)(6) review considers Section 7412(d)(2) factors but does not require recalculation of Section 7412(d)(3) MACT floors); 89 Fed. Reg. at 38531; 88 Fed. Reg. 24854, 24862-63 (Apr. 24, 2023).

There also is a separate risk review required by Section 7412(f)(2). Unless Congress acts first, EPA must, within eight years of promulgating the first standards for a source category, review the "lingering public health risk that the initial standard did not eliminate." *Surface Finishing*, 795 F.3d at 5. EPA must establish new standards if "required in order to provide an ample margin of safety to protect public health in accordance with [Section 7412] or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect." 42 U.S.C. § 7412(f)(2)(A).

The recurring Section 7412(d)(6) technology reviews and the Section

8

7412(f)(2) risk review are separate and distinct, and EPA must complete both. *Surface Finishing*, 795 F.3d at 5; 89 Fed. Reg. at 38513, 38523, 38525. Even after completing the risk review and any resulting revision of emission standards, EPA must complete a technology review, and revise the standards as necessary pursuant to that review, at least every eight years. *See* 42 U.S.C. § 7412(d)(6); *Surface Finishing*, 795 F.3d at 5.

## II. Regulation of power plants

These petitions involve EPA's regulation of coal- and oil-fired power plants.[1] Power plants emit enormous amounts of air toxics, including acid gases, metals, and organics. 89 Fed. Reg. at 38515, 38556. Mercury emissions are particularly dangerous because, once deposited, mercury can transform into methylmercury, which has adverse neurological effects on fetuses and children and can bioaccumulate up the food chain from fish to humans. *See id.* Power plants are also among the largest emitters of other air-toxics metals, including arsenic, chromium, nickel, and cobalt, among others. *Id.* Exposure to metal air toxics is associated with chronic health disorders in the lungs and central nervous system, and several are classified as known or probable carcinogens. *Id.*

---

[1] For simplicity, this brief uses the term "power plant" or "units" as a shorthand for the statutory term "electric utility steam generating unit," referring to any "fossil fuel fired combustion unit[] of more than 25 megawatts that serves a generator that produces electricity for sale." 42 U.S.C. § 7412(a)(8).

## A. EPA's initial appropriate-and-necessary findings and the 2012 Rule

The 1990 Clean Air Amendments "subjected power plants to various regulatory requirements" separate from the air-toxics program, *Michigan*, 576 U.S. at 748, most notably a program to control power plant emissions that contribute to acid rain, 42 U.S.C. §§ 7651-51o. These separate programs were expected to reduce air toxics, but the scope of the potential reductions was unclear. *Id.* Therefore, Congress required EPA to study the threats to public health posed by power plant air-toxics emissions after imposition of the Clean Air Act's other programs. *Id.* § 7412(n)(1)(A). After considering the study results, Congress directed that EPA "shall regulate [power plants] under [Section 7412], if [EPA] finds such regulation is appropriate and necessary." *Id.* If EPA finds regulation is both appropriate and necessary, then power plants are "regulated in the same manner as other categories for which the statute requires regulation." *White Stallion Energy Ctr. LLC v. EPA*, 748 F.3d 1222, 1243-44 (D.C. Cir. 2014) (per curiam) (quoting 77 Fed. Reg. 9304, 9330 (Feb. 16, 2012) and upholding EPA's interpretation), *rev'd on other grounds sub nom. Michigan v. EPA*, 576 U.S. 743 (2015); *see also New Jersey v. EPA*, 517 F.3d 574, 581-82 (D.C. Cir. 2008) (applying Section 7412(c)(9) delisting requirements to power plants); 88 Fed. Reg. at 24859.

10

EPA completed the required study in 1998 and determined in 2000 that it was appropriate and necessary to regulate air-toxics emissions from power plants. *See* 65 Fed. Reg. 79825 (Dec. 20, 2000).  EPA then listed power plants as a source category under Section 7412(c).  *See* 67 Fed. Reg. 6521-22, 6524 (Feb. 12, 2002). In 2005, EPA reversed course and found that air-toxics regulation was neither appropriate nor necessary under Section 7412(n)(1) and delisted power plants as a source category.  *See* 70 Fed. Reg. 15994 (Mar. 29, 2005).  This Court vacated EPA's delisting action because EPA had not satisfied the Section 7412(c)(9) delisting requirements.  *New Jersey*, 517 F.3d at 581-82.

In the 2012 Rule, EPA confirmed its 2000 appropriate-and-necessary finding, affirmed that power plants were properly listed as a source category under Section 7412(c), and established emission standards for air toxics under Section 7412(d).  *See White Stallion*, 748 F.3d at 1232; 77 Fed. Reg. 9304.  At the same time, EPA set the initial standards for power-plant emissions of mercury and non-mercury air-toxics metals.  89 Fed. Reg. at 38509-10.  The 2012 Rule also set an alternative emission standard for filterable particulate matter that power plants could comply with in lieu of the non-mercury metals standard.  *Id.*  The filterable-particulate-matter standard acts as a "surrogate" for non-mercury metals where control of filterable particulate matter corresponds to reductions of non-mercury metals.  *Sierra Club v. EPA*, 884 F.3d 1185, 1192 (D.C. Cir. 2018) (discussing

11

regulation by surrogate as a "tool available to EPA" for reduction of air-toxics emissions). The filterable-particulate-matter alternative standard is called the "surrogate standard." 89 Fed. Reg. at 38509-10.

This Court upheld all aspects of the 2012 Rule, including but not limited to EPA's appropriate-and-necessary finding under Section 7412(n)(1). *See White Stallion*, 748 F.3d at 1229. The Supreme Court reversed the appropriate-and-necessary finding because EPA had not considered costs. *Michigan*, 576 U.S. at 751-54, 760. On remand to EPA, this Court left in place the emission standards (which the Supreme Court had not reviewed). *See* Order, *White Stallion Energy Ctr., LLC v. EPA*, D.C. Cir. No. 12-1100, 2015 WL 11051103 (Dec. 15, 2015) (per curiam), *stay denied*, No. 15A886, 2016 WL 11900291 (Mar. 3, 2016) (Roberts, C.J.).

On remand from *Michigan*, EPA completed a supplemental "appropriate and necessary" finding that addressed costs. 81 Fed. Reg. 24420 (Apr. 25, 2016). The only judicial challenge to EPA's supplemental finding was voluntarily dismissed. *See Murray Energy Corp. v. EPA*, No. 16-1127 (D.C. Cir.). In 2020, EPA reversed the supplemental appropriate-and-necessary finding but continued to enforce the 2012 emission standards. *See* 85 Fed. Reg. 31286 (May 22, 2020); 88 Fed. Reg. 13956, 13962 (Mar. 6, 2023) (summarizing administrative history). The only judicial challenge to EPA's reversal of the supplemental finding was voluntarily

12

dismissed.  *See Am. Acad. of Pediatrics v. Regan*, No. 20-1221, 2023 WL 4540440 (D.C. Cir. July 13, 2023).  In 2023, EPA once again found that it is appropriate and necessary to regulate air-toxics emissions from power plants.  *See* 88 Fed. Reg. 13956.  EPA's 2023 appropriate-and-necessary finding was not challenged.

Meanwhile, EPA conducted both the required risk review and the first technology review by 2020, meeting the eight-year statutory deadline based on the 2012 initial standards.  42 U.S.C. § 7412(d)(6), (f)(2); see 85 Fed. Reg. at 31313-14.  In the risk review, EPA found that the 2012 standards provided "an ample margin of safety" and thus concluded that revision based on public-health risk was not required.  85 Fed. Reg. at 31314.  In the recurring technology review, EPA found no developments in practices, processes, or control technologies that would "achieve further cost-effective reductions beyond the current standards," and therefore concluded that revision was not necessary on that basis either.  *Id.* at 31298, 31314.

## B. The 2024 Rule

In 2024, EPA issued the rule challenged here ("Rule") after reviewing EPA's 2020 risk and technology reviews.  89 Fed. Reg. 38508; *see* Exec. Order No. 13990, § 2(a)(iv), 86 Fed. Reg. 7037, 7038 (Jan. 25, 2021) (directing a review of the 2020 rule).  On reconsideration, EPA did not reopen the risk review.  89 Fed. Reg. at 38518.  However, EPA reopened the technology review after

determining that the 2020 review had failed to consider developments in the cost-effectiveness of proven technologies or evaluate the current performance of emissions-reduction equipment and control strategies. *Id.* at 38517, 38541.

In the Rule, EPA determined that existing technologies were performing better and cheaper than expected and identified improvements in emissions controls for mercury and filterable particulate matter. *See, e.g.*, *id.* at 38521, 38541. For example, more durable fabric-filter-bag materials and better monitoring practices for electrostatic precipitators improved emissions controls for filterable particulate matter, and new sulfur-resistant sorbents improved emissions controls for mercury emissions. *Id.* at 38530, 38541, 38546, 38549. Thus, EPA concluded there were developments under Section 7412(d)(6). *See id.* at 38518, 38521, 38529-30, 38541. Based on these developments, and consideration of the Section 7412(d)(2) factors, 89 Fed. Reg at 38510, 38531, 38533, EPA revised the emission standards for coal-fired power plants in two ways challenged here.

*First*, the Rule tightens the emission standards for non-mercury metals (such as arsenic and chromium) emitted from coal-fired power plants. 89 Fed. Reg. at 38520. Specifically, the Rule reduces the surrogate standard from 0.030 to 0.010 pounds per million British thermal units ("lb/MMBtu"), with proportional changes to the alternative individual and total non-mercury-metals emission limits. *Id.* at

38510, 38520, 38529-35.[2]

Most coal-fired power plants have already invested in the technology necessary to achieve the new standard.  EPA determined that more than 90% of coal-fired power plants already "are demonstrating the ability to meet" the surrogate standard "with existing controls."  *Id.* at 38530.  EPA determined that only 33 coal-fired units exceed the new limit.  *Id.*  And EPA determined that only two units at a single facility, the Colstrip facility in Montana, "would need to install [new technologies] to achieve the [revised standard]."  *Id.* at 38531, 38533.  EPA noted that while other coal plants invested in the most modern particulate matter control technology—electrostatic precipitators and/or fabric filters—to meet the 2012 standard, the Colstrip facility did not.  *Id.* at 38531.

*Second*, the Rule requires power plants using lignite (a type of coal) to meet the same mercury standard that the 2012 Rule already applied to power plants using other types of coal, including bituminous coal, subbituminous coal, or coal refuse.  89 Fed. Reg. at 38510, 38537-49.  Specifically, the Rule requires lignite-fired power plants to reduce mercury emissions from 4.0 to 1.2 pounds per trillion

---

[2] The 2012 Rule allowed power plants to comply with either (1) emissions limits for ten separate non-mercury air-toxics metals, (2) an emissions limit for total non-mercury air-toxics metals, or (3) the surrogate limit (i.e., a limit on emissions of all filterable particulate matter, as a surrogate for reduction of non-mercury metal emissions).  89 Fed. Reg. at 38510.  Nearly all power plants chose to comply with the surrogate (filterable-particulate-matter) limit.  *Id.*

15

British thermal units (lb/TBtu).  *Id.* at 38537.

EPA found that power plants using lignite can meet the revised mercury emission standard.  89 Fed. Reg. at 38539-40, 38542-47.  EPA noted that two units at one facility have already demonstrated an ability to meet the new standard.  *Id.* at 38539.  And EPA determined that other units could meet the new standard by injecting brominated activated-carbon sorbents into the emissions gas generated by power plants.[3]  *Id.* at 38547.  Sorbents are a "dial up" technology where power plants can increase or decrease the mercury emissions control level based on how much sorbent is used.  *Id.* at 38540.  EPA acknowledged lower halogen and higher sulfur content in lignite make controlling mercury emissions more challenging.  *Id.* at 38545-46.  But EPA observed that those characteristics "are also found in non-lignite fuels" and that power plants using these other coals have been meeting the 1.2 lb/TBtu standard.  *Id.* at 38541.  And EPA identified improvements in technology that mitigate the effects of lower halogen and higher sulfur content in lignite.  *Id.* at 38545-47.

EPA in the Rule also revised the compliance demonstration options for the surrogate standard.  The 2012 Rule had allowed power plants to demonstrate

---

[3] To remove mercury emissions, power plants usually inject fine chemical powders (usually made of carbon and called "sorbents") that bind to mercury gas and allow electrostatic precipitators (filterless devices that remove particles) and fabric filters to remove them.  89 Fed. Reg. at 38547; JA 0389-92 (EPA-HQ-OAR-2018-0794-5789, 2023 Technical Memo 14-17).

16

compliance using quarterly stack testing or, alternatively, by using a particulate matter continuous-emissions-monitoring system.[4]  89 Fed. Reg. at 38510, 38535. The Rule requires continuous-emissions-monitoring systems and eliminates the stack-testing option.  *Id.*

EPA made this change under Section 7412(d)(6) and Section 7414(a)(1)(C). 89 Fed. Reg. at 38535.  Section 7414(a)(1)(C) allows EPA to require "any person who owns or operates any emissions source [subject to the Clean Air Act] . . . to install, use, and maintain [] monitoring equipment."  42 U.S.C. § 7414(a)(1)(C). EPA explained that continuous emissions monitoring was reliable at the new 0.010 lb/MMBtu standard; would reduce emissions through quicker detection and correction of operational problems in emissions reduction equipment and processes; and would provide greater transparency to the public.  89 Fed. Reg. at 38535-37.

## SUMMARY OF THE ARGUMENT

EPA lawfully interpreted and applied Section 7412(d)(6) in revising air-toxics emission standards for power plants, and its technical judgments are well-supported by record evidence.

---

[4] Stack testing measures the amount of a pollutant in emissions directly from the smokestack.  Continuous-emissions-monitoring systems measure pollutants in short intervals (typically 15 minutes) to continuously measure emissions from a source.

I.    EPA lawfully determined that revisions to certain standards were "necessary." The Act directs that, regardless of any margin of safety, EPA must "require the maximum degree of reductions of emissions," of air toxics (up to total "prohibition") that EPA "determines is achievable" based on intervening "developments." 42 U.S.C. § 7412(d)(2), (6). Here, EPA identified "developments" in the technology review that created opportunities to secure further emissions reductions. In finding revisions "necessary" to secure the maximum degree of achievable reductions the statute requires, EPA did not have to separately find that existing standards failed to provide an adequate margin of safety to protect public health. Petitioners' contrary position conflicts with the text and structure of Section 7412, which reflects Congress' policy choice to require technology-based standards because the risk-based was ineffective.

II.    The changed circumstances identified by EPA constitute "developments in practices, processes, and control technologies." 42 U.S.C. § 7412(d)(6). They include technological improvements to make filter-bag material more durable, refinements of monitoring practices, and the creation of sulfur-resistant sorbents designed to capture mercury from bituminous and lignite coals. These developments improved how effectively, and cost-reasonably, power plants can control air-toxics emissions. Petitioners' crabbed interpretation of

18

"development" departs from its ordinary meaning and would impose extra-textual constraints on EPA's findings.

III.    In setting revised emission standards, EPA appropriately considered all statutory factors and engaged in reasoned decision-making.

a.    EPA reasonably considered costs.  EPA used several metrics to evaluate anticipated compliance costs to realize the achievable emissions reductions EPA identified.  For the surrogate standard, EPA concluded that over 90% of power plants had already made the needed capital investments and that additional costs would constitute a very small fraction of revenues for the power sector.  For the mercury standard, EPA concluded that lignite-fired power plants need only expend modest costs to better implement their existing controls.  EPA additionally compared all the Rule's advantages to its disadvantages and reasonably found that the advantages of the Rule are worth securing.  EPA had no obligation, under *Michigan v. EPA* or otherwise, to rely on a fully quantified cost-benefit analysis and to ignore unquantified benefits.

b.    EPA reasonably determined that the revised surrogate and mercury standards were feasible and reasonably estimated costs.  EPA's technical findings are well-grounded in record evidence.  EPA considered broad data sets and applied rational methodologies that were adequately explained.  EPA determined that over 90% of power plants can already meet the revised surrogate

19

standard, and that the remaining power plants can too. EPA further determined that the relatively few lignite-fired units affected by the revised mercury standard will be able to meet the same emission standard all other coal-fired power plants have been attaining for years, using similar control strategies. Petitioners' and Intervenor's attacks on EPA's feasibility determination and cost estimates are unfounded, and EPA's well-supported technical judgments are owed deference.

        c.    EPA thoroughly and reasonably assessed the Rule's potential effects on electric-grid reliability. Using a state-of-the-art, peer-reviewed model that considers costs of control and operation, demand, and other factors, EPA determined that the Rule would not result in any power-plant retirements. That conclusion was not arbitrary or capricious. And EPA addressed Petitioners' concerns with EPA's approach.

        d.    EPA acted reasonably in treating the Colstrip facility the same as every other power plant. Colstrip will incur more compliance costs than other plants only because it is the sole power plant that has not installed modern particulate-matter emissions-control technology. EPA did not err in declining to exempt Colstrip from the emission standards applicable to other facilities.

        e.    Petitioners' allegations of pretext fall flat. There is no record basis to overcome the ordinary presumption that EPA acted with a proper purpose.

The Rule on its face reflects that EPA properly discharged its statutory responsibilities.

       f.    Intervenor's Regulatory Flexibility Act argument should not be considered because it goes beyond Petitioners' claims.  Regardless, EPA satisfied the procedural demands of the Regulatory Flexibility Act.

## STANDARD OF REVIEW

The Rule is subject to the rulemaking provisions in 42 U.S.C. § 7607(d). The Court "may reverse" EPA's action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  42 U.S.C. § 7607(d)(9).  The Court applies "the same standard of review" as under the Administrative Procedure Act.  *See* 42 U.S.C. § 7607(d)(9)(A); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (per curiam).  The standard is a "narrow" one, and "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) ("Section 706 [of the Administrative Procedure Act] does mandate that judicial review of agency policymaking and factfinding be deferential." (emphasis omitted)).  The Court should uphold a decision when the agency considered the relevant factors and articulated a "rational connection between the facts found and the choices made."  *State Farm*, 463 U.S. at 43 (citation omitted).

That is true even when the decision has "less than ideal clarity" so long as "the agency's path may reasonably be discerned." *Id.* (internal quotation marks omitted).  An agency's factual findings that "require[] a high level of technical expertise" receive deference. *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 635 (D.C. Cir. 2000) (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989)).

An agency's "interpretations and opinions," on legal issues made in pursuance of official duty and based on special experience, constitute a "'body of experience and informed judgment to which courts and litigants could properly resort for guidance.'" *Loper Bright*, 144 S. Ct. at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944) (internal brackets omitted)).

## ARGUMENT

### I.    The Clean Air Act does not mandate that EPA identify a residual risk to public health under existing MACT air-toxics emission standards before finding that revised standards are "necessary."

EPA properly concluded that revisions to maximum achievable control technology standards for power plant air toxics emissions were "necessary" under Section 7412(d)(6).  EPA identified developments in practices, processes, and control technologies that allowed power plants to realize additional air-toxics emissions reductions.  *See infra* 38-39.  EPA then considered costs and the other factors relevant to MACT standards under Section 7412(d)(2), and EPA

22

determined the revised standards are achievable. EPA's action adopting achievable standards is consistent with the text and structure of Section 7412 and follows from Congress' choice to require technology-based standards. Petitioners do not argue that EPA failed to consider costs or any of the other considerations set forth in Section 7412(d)(2). But they contend that revised standards can be "necessary" under Section 7412(d)(6) only if EPA finds that the revisions achieve a "meaningful health benefit." Petitioners' position contravenes the text and structure of Section 7412 and would impose a policy that Congress rejected.

## A. EPA properly applied the contextual meaning of "necessary."

The statutory text, structure, and purpose of Section 7412 support EPA's approach to revising MACT standards after a Section 7412(d)(6) technology review. At least once every eight years, EPA "shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards . . . ." 42 U.S.C. § 7412(d)(6). The word "necessary" must be understood in the context in which it appears. *See Armour & Co. v. Wantock*, 323 U.S. 126, 129-30 (1944) ("[T]he word 'necessary' . . . has always been recognized as a word to be harmonized with its context."); *McCulloch v. Maryland*, 17 U.S. 316, 413-14 (1819) ("The word 'necessary' . . . has not a fixed character, peculiar to itself. It admits of all degrees of comparison."). Because EPA promulgates several types of emission standards under Section

23

7412(d), *see* 42 U.S.C. § 7412(d)(2)-(3), (5), (8), what revisions are "necessary" in a Section 7412(d)(6) review is determined by reference to the standard being reviewed.

The "emission standards" that EPA reviewed and revised here under Section 7412(d)(6) are MACT standards initially promulgated under Section 7412(d)(2). Congress mandated that initial standards promulgated under Section 7412(d)(2) "shall require" the "maximum degree of reduction in emissions" that EPA determines is achievable. *See* 42 U.S.C. § 7412(d)(2). During the Section 7412(d)(6) technology review, EPA looks for any developments that allow for further achievable emissions reductions. *LEAN*, 955 F.3d at 1093. The statute thus ties the "necess[ity]" of revising MACT standards to whether relevant "developments" make more stringent standards "achievable" within the meaning of Section 7412(d)(2). 42 U.S.C. § 7412(d)(2), (6). Put differently, EPA must ensure that MACT standards initially set continue to realize achievable emissions reductions. *See LEAN*, 955 F.3d at 1093. Thus, for a Section 7412(d)(6) technology review of MACT standards, EPA must consider the same factors that Section 7412(d)(2) makes applicable to EPA's initial determination whether beyond-the-floor standards are necessary. 89 Fed. Reg. at 38510, 38530-31; *cf. Sierra Club*, 353 F.3d at 988 (characterizing Section 7412(d)(2) as requiring EPA

24

to determine whether beyond-the-floor standards are "*necessary*") (emphasis added).

Nothing in Section 7412(d) requires EPA to consider health risks in the Section 7412(d)(6) technology review. *Battery Recyclers*, 716 F.3d at 672 (internal citation omitted). Section 7412(d)(2) requires EPA to consider "cost," "non-air quality"-related concerns, and "energy requirements," not health risk. 42 U.S.C. § 7412(d)(2). Section 7412(d)(6) requires consideration of "developments in practices, processes, and control technologies," not health effects. *Id.* § 7412(d)(6). Congress thus focused on securing achievable emissions reductions of air toxics and realizing opportunities to do better, even where an ample margin of safety already exists. Indeed, that is the entire point of the "*technology-based*" approach that Congress adopted in 1990 and applied to MACT standards under Section 7412(d). *Sierra Club*, 353 F.3d at 979.

Petitioners' contrary position effectively conflates the technology-based approach in Section 7412(d) with the legacy risk-based approach in Section 7412(f). Under the latter, EPA "shall, within 8 years," promulgate revised emission standards "if promulgation of such standards is required in order to provide an ample margin of safety to protect public health . . . or to prevent . . .  an adverse environmental effect." 42 U.S.C. § 7412(f)(2)(A). Section 7412(f) thus specifically addresses circumstances in which revised emission standards are

25

needed to provide an ample margin of safety to protect public health and the environment based on the risks identified in EPA's risk analysis. But nothing in Section 7412(f)'s text suggests that this grant of authority should limit or establish an exception to EPA's separate authority (and duty) under Section 7412(d) to determine what emission limits are "achievable" in reviewing and revising MACT standards.

Indeed, this Court has recognized that the Section 7412(d) and (f) requirements relating to risk and technology reviews, respectively, are wholly distinct. *Surface Finishing*, 795 F.3d at 5. The Section 7412(d) technology review asks—on a recurring basis—whether advances in emission controls warrant stricter standards. 42 U.S.C. § 7412(d)(6). Congress required EPA to conduct this review even *after* EPA had set standards under Section 7412(f) to address any remaining risk after application of the initial standards and to provide an ample margin of safety. Congress, in other words, wanted EPA to consider tightening standards based on new developments in control technology even after adequate safety margins are in place. Otherwise, Congress would not have required the technology review to recur—or would have required EPA to consider residual risk to public health as part of the technology review—once the risk review was complete.

Nor, as this Court has noted, does Section 7412(d)(6) require technology reviews to account for adequate margins or other health risks. In *Association of*

*Battery Recyclers v. EPA*, this Court considered and rejected the argument that Petitioners make here—that EPA must consider health benefits under Section 7412(d)(6). 716 F.3d at 672. The Court reasoned that "nothing in section [74]12(d)(6)'s text suggests that EPA must consider [public-health factors] . . . the statute directs EPA to 'tak[e] into account developments in practices, processes, and control technologies' . . . not public health objectives or risk reduction achieved by additional controls." *Id.*; 89 Fed. Reg. at 38525. *Battery Recyclers* is controlling here.

*Battery Recyclers* also recognized the close relationship between Section 7412(d)(6) and Section 7412(d)(2), holding that the direction in section 7412(d)(2) to consider costs provides EPA authority to consider costs in revising emission standards under Section 7412(d)(6). 716 F.3d at 673-74. In *LEAN v. EPA*, this Court was even more explicit, holding that in reviewing emission standards under Section 7412(d)(6), EPA must address air toxics for which standards were never promulgated under Section 7412(d)(2). 955 F.3d at 1097. The Court characterized Section 7412(d)(6) as a mandate "to address the adequacy of each emission standard on the books against the statutory demand of section [74]12(d)(2) . . . ." *Id.*

The statutory structure reflects Congress' policy decision that technological progress should drive further regulation of air toxics independent of EPA's risk

assessment.  89 Fed. Reg. at 38525.  In choosing technology-based standards and requiring their periodic review, Congress declined to tether the air-toxics program to risk assessments.  Instead, Congress directed EPA to require the "maximum degree of reduction in emissions" that is achievable.  42 U.S.C. § 7412(d)(2).  This policy recognizes that scientific advances and newly available data can show that what was once thought "safe" may actually be risky.  *See, e.g.*, 85 Fed. Reg. 49084, 49088-89, 49097-98 (Aug. 12, 2020) (establishing residual-risk standards for ethylene oxide emissions from miscellaneous organic chemical manufacturing sources based on new evidence of cancer risks at significantly lower doses than previously estimated); 73 Fed. Reg. 66964, 66975 (Nov. 12, 2008) (updating air-quality standards for lead based on new evidence of neurotoxicity at low doses).  Indeed, quantifying the risks to human health from exposure to air toxics is difficult because the distribution of public exposure is uneven and the severe health effects associated with air toxics, like cancer, often occur long after exposure.  89 Fed. Reg. at 38515-16.

In short, EPA properly interpreted and applied Section 7412(d)(6) in determining that revisions to Section 7412(d)(2) emission standards are "necessary" if EPA determines following the technology review that developments make tightened standards achievable, considering costs and the other statutory

28

factors.  That is the only sensible reason to require a *recurring* technology review *separate* from a risk review.

### B. Petitioners err in construing "necessary" in Section 7412(d)(6) as demanding a finding of residual health risk to revise MACT standards.

Petitioners' contrary interpretation of the word "necessary" is wrong.  But before challenging EPA's interpretation, Petitioners first contend that EPA did not sufficiently articulate its Section [74]12(d)(6) "necessary" findings.  Pet. Br. 31-32.  The record shows otherwise.  EPA identified the applicable legal standard (i.e., that standards must be strengthened "as necessary"), addressed how that standard should be applied in the context of Section 7412(d)(6), and explained why EPA was determining that revisions were necessary.  *See, e.g.*, 89 Fed. Reg. at 38513-14, 38525-26, 38530-31.  EPA's reasons for why revised standards are necessary can be "reasonably discerned" in the Rule.  *See Am. Trucking Ass'n v. U.S. Dep't of Trans.*, 166 F.3d 374, 384 (D.C. Cir. 1999).

Petitioners next argue that revisions cannot be deemed "necessary" under Section 7412(d)(6) unless EPA determines that existing levels of emission are above "levels of concern from a public health standpoint."  Pet. Br. 35.  But as explained above, that position was rejected by this Court in *Battery Recyclers*, overlooks the structure of the statute, and disregards the purpose of technology-based standards.  *See supra* 23-29; *Battery Recyclers*, 716 F.3d at 672 ("[N]othing

in section [74]12(d)(6)'s text suggests that EPA must consider [public-health objectives].").

       Petitioners fail to distinguish *Battery Recyclers*.  Petitioners first argue that *Battery Recyclers* did not specifically interpret the scope of the word "necessary." Pet. Br. 42-43.  But in clarifying which factors must be considered under Section 7412(d)(6), this Court delineated which factors should inform revision of the standards.  *Battery Recyclers*, 716 F.3d at 672.  Petitioners next suggest that the Supreme Court's decision in *Michigan* undermines *Battery Recyclers*.  Pet. Br. 43. But as discussed more fully below, *Michigan* was addressing a different question and statutory provision: what factors should inform EPA's threshold determination under Section 7412(n)(1)(A) that it is "appropriate and necessary" to regulate air-toxics emissions from power plants.  *See infra* 56.  Petitioners finally try to discredit *Battery Recyclers* as inappropriately deferring to EPA's interpretation. Pet. Br. 43 (citing *Loper Bright*, 144 S. Ct. at 2273).  However, this Court did not defer to EPA in concluding that "nothing in" Section 7412(d)(6)'s text suggests that EPA must consider public-health objectives; this Court relied on the traditional tools of statutory construction to reject the petitioners' interpretation—the same interpretation Petitioners advance here—that Section 7412(d)(6) requires consideration of health risk.  *See Battery Recyclers*, 716 F.3d at 672.

Petitioners complain that EPA's interpretation has not been consistent over time and that EPA has considered residual-risk levels in prior Section 7412(d)(6) rulemakings. Pet. Br. 39. EPA acknowledges that it has taken somewhat inconsistent prior positions about what "necessary" means in Section 7412(d)(6). *Compare* 89 Fed. Reg. at 38530-31 (adopting interpretation applied in the Rule) *with* 71 Fed. Reg. 34422, 34437 (June 14, 2006) (adopting interpretation that residual-risk determinations under Section 7412(f)(2) should be considered). But *Battery Recyclers* made clear that public-health goals and risk reduction are not relevant to Section 7412(d)(6) review of MACT standards. 716 F.3d at 672. EPA's approach here is a direct consequence of this Court's holding in *Battery Recyclers*. *See* 88 Fed. Reg. at 24866 n.17. Regardless, EPA applied the best interpretation of "necessary" in the Rule; revisions to standards promulgated under Section 7412(d)(2) are necessary under Section 7412(d)(6) if EPA determines that developments make them achievable within the meaning of Section 7412(d)(2), considering costs and the other statutory factors.[5] 89 Fed. Reg. at 38530-31; 88 Fed. Reg. at 24862-63. Post-*Loper Bright*, the best interpretation is what matters, not what EPA said before. *See* 144 S. Ct. at 2273.

---

[5] Because the question is not presented in this case, the Court need not address or resolve whether EPA could, as a matter of discretion, consider residual risk as a basis for strengthening emission standards under Section 7412(d)(6) in a circumstance where EPA finds existing standards do not provide an ample margin of safety to protect human health.

In contrast, Petitioners' statutory construction is badly flawed. Petitioners attempt to import into the Section 7412(d)(6) technology review the separate residual-risk review required under Section 7412(f). But as discussed above, Congress structured Section 7412 in a way that clearly separates the technology-based approach in Section 7412(d) from the legacy risk-based approach in Section 7412(f), with no indication that either should limit the other. And as this Court has noted, these requirements are separate and distinct. *See Surface Finishing*, 795 F.3d at 5. In Section 7412(d)(6), Congress required EPA to ensure that emissions limits continue to meet the standards of the statutory criteria under which they were promulgated as developments create opportunities to do better. *See LEAN*, 955 F.3d at 1093. That inquiry for MACT standards does not consider health benefits. *See Battery Recyclers*, 716 F.3d at 672.

Further, to the extent that Section 7412(d) sometimes results in control of toxic emissions to a greater degree than may be required to address assessed risks to public health, that reflects Congress' deliberate policy choice. Congress imposed technology-based standards in the 1990 Amendments because the previous risk-based approach on its own was ineffective, resulting in regulation of only seven air toxics in 20 years. *See supra* 4-6; *Sierra Club*, 353 F.3d at 979-80. Congress decided that requiring faster achievable emissions reductions of air toxics was better than tightly tailoring reductions to health benefits. *See LEAN*, 955 F.3d

at 1098 ("A principal focus of the 1990 Clean Air Act Amendments was to hasten EPA's regulation of [air toxics].").

Congress thus declined to tether the air-toxics program to risk assessments that are limited by available epidemiological science or could become outdated. Section 7412(d) does not wait for evolving health science; it requires air-toxics emission standards to keep pace with technology as opportunities to do better arise. *See LEAN*, 955 F.3d at 1093; *Sugar Corp.*, 113 F.4th at 995 ("Section [74]12 requires EPA to reevaluate existing emission standards—and promulgate new ones if facts on the ground have changed—every eight years, as *technology* allows for cleaner-burning sources.") (emphasis added). Consistent with Congress' statutory design, EPA often tightens emission standards even where ample margins of safety already exist. See 89 Fed. Reg. at 38525 n.29 (listing examples).

Petitioners, pointing to Section 7412(n)(1) and the Supreme Court's decision in *Michigan*, contend that power plants are different than other sources subject to air-toxics emission standards. Therefore, they argue, revised standards for power plants are not necessary unless there is a meaningful public-health benefit. Pet. Br. 33-34, 41-42. This argument is also wrong.

To be sure, under Section 7412(n), EPA may regulate power plant air-toxics emissions only if the agency makes a threshold determination that regulation is "appropriate and necessary." 42 U.S.C. 7412(n)(1)(A). That broad language

33

requires EPA to consider costs, benefits (including to public health and the environment), and other criteria in making the threshold determination. *See Michigan*, 576 U.S. at 751-54. But EPA already did that, and no party challenged the appropriate-and-necessary determination that EPA made in 2023. *See* 88 Fed. Reg. 13956. Therefore, it is a given here that regulating power plants is appropriate and necessary.

Petitioners insist that EPA must find a meaningful health benefit to revise power-plant emission standards because, in their view, power plants are regulated under Section 7412(n)(1) and not Section 7412(d). Pet. Br. 42. That argument is both wrong and foreclosed by this Court's decision in *White Stallion*. *See* 748 F.3d at 1243-44. As this Court made clear there, if EPA determines that it is appropriate and necessary to regulate power plants, then power plants are regulated just like other sources under Section 7412, including setting standards under Section 7412(d). *Id.*; *see New Jersey*, 517 F.3d at 581-82 (holding that power plants, once listed, are subject to the delisting requirements in Section 7412(c)(9)).[6] Further, Section 7412(n)(1) requires EPA to conduct a study of expected health effects from air toxics from power plant emissions after imposition of the Clean Air Act's

---

[6] Contrary to Petitioners' implication that EPA did not list power plants as a source category, Pet. Br. 42, EPA did list power plants under Section 7412(c). 67 Fed. Reg. at 6522; *see* 89 Fed. Reg. at 38514-15 (describing the source category and subcategories).

34

other programs and specifies that EPA "shall regulate [power plants] under this section . . . if . . . appropriate and necessary after considering the results of the study under this subparagraph." 42 U.S.C. § 7412(n)(1). The text and syntax make clear that the appropriate-and-necessary finding is as a one-time determination on whether to regulate based on EPA's review of the required study, with other provisions of Section 7412 then governing the scope and manner of any regulation. *See White Stallion*, 748 F.3d at 1243-44.

Petitioners are also incorrect in claiming that EPA's interpretation of Section 7412(d)(6)—under which MACT emission standards are reviewed and revised using the Section 7412(d)(2) achievability standard—would require EPA to recalculate floor standards under Section 7412(d)(3). Pet. Br. 41. This Court has already held that the Section 7412(d)(6) technology review does not require EPA to recalculate floor standards. *See, e.g.*, *Surface Finishing*, 795 F.3d at 7-9. But that is not because the achievability standard in Section 7412(d)(2) is inapplicable to the technology review for MACT standards. It is because Section 7412(d)(6)'s requirement to "review and revise as necessary" does not require EPA to "start from scratch." *See NRDC v. EPA*, 529 F.3d 1077, 1084 (D.C. Cir. 2008).

Section 7412(d)(6)'s direction to "review and revise as necessary" implies some discretion to exercise judgment. In this sense, the Section 7412(d)(6) standard-setting process is much more analogous to the Section 7412(d)(2) process

35

for setting beyond-the-floor standards than to the highly prescriptive floor-setting process in Section 7412(d)(3).  *See Sierra Club*, 353 F.3d at 979-80.  Indeed, setting a new floor under Section 7412(d)(3) after every technology review would render consideration of technological developments, as Congress specifically directed in Section 7412(d)(6), mostly or wholly irrelevant.  Emission standards would be automatically raised to the level of the top performers.  *Cement Kiln*, 255 F.3d at 861-62.  That view of the statute has been properly rejected by this Court.  *See NRDC*, 529 F.3d at 1084 (deeming unreasonable an interpretation of Section 7412(d)(6) requiring recalculation of emissions floors).

Petitioners argue that if Congress had wanted EPA to reduce emissions as much as "achievable," it would have used that word in Section 7412(d)(6), not the word "necessary."  Pet. Br. 40.  But "the mere possibility of clearer phrasing cannot defeat the most natural reading of a statute."  *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012).  Further, Petitioners overlook that EPA sets different kinds of air-toxics standards for different kinds of sources, including "generally available control technology" standards for area sources.  *See* 42 U.S.C. § 7412(d)(5).  Standards that are not MACT standards have different criteria for promulgation, and thus different standards for revision "as necessary."  *Compare* 42 U.S.C. § 7412(d)(2) *with id.* § 7412(d)(5), (8).  Directing EPA to revise standards "as achievable" would not capture this distinction.  The word

"necessary" in Section 7412(d)(6) accounts for EPA's review and revision of standards that are not "maximum achievable" standards set under Section 7412(d)(2).

Petitioners state that Section 7412(f) sets health-based floor standards that achieve an adequate margin of safety, and that the technology review must have a "ceiling" for further tightening standards. Pet. Br. 43-44. They then provide their preferred ceiling, the level at which "further revisions will achieve no demonstrable public health benefits." *Id.* at 44. That could be a reasonable policy choice. But Congress rejected it. *See supra* 27-28. Petitioners again erroneously conflate the residual-risk review with the recurring technology review. *See supra* 25-27. In fact, Congress did specify the ceiling for necessary emissions limits: a total prohibition, where achievable. *See* 42 U.S.C. § 7412(d)(2). It is an untenable textual construction to conclude that Congress specified its objective of a total prohibition on emissions (where achievable) but intended that objective to apply only when EPA promulgates initial standards.

## II. EPA identified qualifying "developments" in practices, processes, and control technologies in the technology review and properly found that "developments" include improvements in those areas.

Section 7412(d)(6) requires EPA to revise existing emission standards as necessary "taking into account *developments* in practices, processes, and control technologies." 42 U.S.C. § 7412(d)(6) (emphasis added). EPA properly construed

37

and applied the statutory term "developments" in revising existing emission standards under Section 7412(d)(6). Developments under Section 7412(d)(6) include not only "wholly new methods," but also "technological improvements," "improvements in efficiency," and "reduced costs." *Surface Finishing*, 795 F.3d at 11; 88 Fed. Reg. at 24863.

EPA identified a "clear trend in control efficiency, costs, and technological improvements" since 2012. 89 Fed. Reg. at 38521. Those improvements include better practices for monitoring the operation of electrostatic precipitators (a type of control to limit filterable particulate matter as a surrogate for non-mercury metals); more durable filter-bag materials for fabric filters (another type of control for filterable particulate matter), such as Teflon or P84 felt, rather than fiberglass; the development of "sulfur tolerant" injected sorbents to capture mercury emissions, such as Fluepac ST (a brominated activated carbon); and the development of sodium- and halogen-salt-based solutions, like SBS Injection and HBS Injection, and their co-injection to better control mercury emissions. *Id.* at 38521, 38530, 38541, 38546-47. EPA also noted the reduced costs and improved efficiency of existing technologies. *See id.* Those collective developments improve how effectively coal-fired units can reduce emissions of air toxics and make tighter emission standards achievable. *Id.* at 38530. Put simply, EPA identified a range of "developments" in practices, processes, and control technologies and

appropriately concluded that more stringent standards are achievable in view of them.

Petitioners' position that EPA did not identify qualifying "developments" within the meaning of Section 7412(d)(6) is groundless.  *See* Pet. Br. 45-53. According to Petitioners, a "development" means "some meaningful change or evolution in control technology."  *See id.* at 48.  But this definition makes no sense in light of the text, which requires EPA to consider developments in "practices" and "processes," in addition to "control technologies."  42 U.S.C. § 7412(d)(6) (emphasis added).  Practice and process developments include, for example, improvements in the way existing technology is used, maintained, and operated. *Id.*

Petitioners' formulation also departs from the ordinary meaning of "development," which encompasses incremental changes over time and does not require any significant advancement.  A "development," for example, includes "a gradual unfolding," an "evolution," a "growth and unfolding," and a "gradual advancement."  4 *The Oxford English Dictionary* 563-64 (2d ed. 1989) (capitalization omitted) (definitions 1 through 4).  And true overnight revolutions in technology are rare; much more common—even on an eight-year timescale— are modest changes that gradually improve the status quo over time.  Where incremental improvements make further emission reductions achievable,

39

recognizing EPA's authority to update the standards is consistent with both the text and the purpose of Section 7412(d)(6).

More fundamentally, EPA's interpretation of Section 7412(d)(6) does not impose any threshold constraint on qualifying developments, it simply requires assessment of whether the identified developments warrant the revised emission standards. After all, the aim of the technology review is not to identify "developments" for their own sake, it is to ensure emission standards keep up with what is achievable. *See LEAN*, 955 F.3d at 1093, 1097 (noting the purpose of the technology review is to ensure emission standards keep pace with "emerging developments that create opportunities to do even better" considering the statutory mandate of section [74]12(d)(2)); *Sugar Corp.*, 113 F.4th at 995. There is no reasonable basis to conclude that Congress meant to make the perceived magnitude of a development a basis for arguing that it does not qualify as a development under Section 7412(d)(6), rather than understanding that EPA would have to analyze the development's effect on emission standards subject to judicial review under the Clean Air Act's arbitrary-or-capricious standard.

This Court's analysis in *Surface Finishing* further refutes Petitioners' position. 795 F.3d at 11. There, the Court explained that Section 7412(d)(6) "does not require EPA to identify a nexus between each distinct development and the revised standards." *Surface Finishing*, 795 F.3d at 11. Instead, EPA must simply

40

"assess and discuss the collective impact of the developments it has identified, and to revise standards appropriately in light thereof." *Id.* *Surface Finishing* makes clear that Section 7412(d)(6) is concerned with the overall effect of developments on emissions, not with arbitrarily foreclosing EPA's consideration of some developments based on their relative magnitude. *See id.* EPA's action was lawful in *Surface Finishing* because EPA explained the emissions levels that could be achieved considering the developments identified. *See id.* The same is true here.

Petitioners are also wrong in contending that an improvement in the cost-effectiveness of existing technology cannot qualify as a development under Section 7412(d)(6).[7] Improvement in the cost-effectiveness of control technology means the controls can reduce emissions to a greater degree at the same cost. That is a control-technology "development" in the ordinary sense of the word. For EPA to ignore developments in control-technology cost effectiveness is not the best interpretation of Section 7412(d)(6), or even a reasonable one, when the statute makes cost a relevant factor in considering whether revisions are achievable. *See* 42 U.S.C. § 7412(d)(2); *Battery Recyclers*, 716 F.3d at 673; c*f.* Pet. Br. 54-60 (arguing the revised standards are arbitrary and capricious based on cost

---

[7] Petitioners do not challenge EPA's finding that there have been improvements in the cost-effectiveness of existing emissions-reduction technologies for filterable particulate matter and mercury. *See* Pet. Br. 48-49. Any such arguments therefore are forfeited. *See Fox v. Gov't of D.C.*, 794 F.3d 25, 29 (D.C. Cir. 2015) (collecting cases).

considerations).  Thus, the improvements EPA identified in the cost-effectiveness of filterable particulate matter and mercury control technologies—improvements that Petitioners do not dispute—constituted a "development" under Section 7412(d)(6).

Petitioners' specific objections to the developments EPA identified in the technology review also do not survive scrutiny.  Initially, Petitioners state that "incremental" changes in technology cannot justify "dropping emission[] standards by 66-70%."  Pet. Br. 49.  But again, the perceived magnitude of the developments is not itself an end dictating a revised emission standard.  *See supra* 40-41.  An entirely new technology would not justify a 90% emissions reduction if only a 10% reduction were achievable.  And EPA would not be limited to modest reductions if relatively minor improvements in existing technology could achieve 90% reductions.  Put generally, EPA need not tailor further emissions reductions to Petitioners' perceived magnitude of the developments EPA identified.  *Surface Finishing*, 795 F.3d at 11.

Petitioners argue that evidence that sources are already meeting the revised standards is not, in and of itself, a development in practices, processes, or control technologies.  Fair enough.  But that misses the point.  The improvement in the performance of control technology, including reduced costs and improved efficiency, certainly is a development.  *Surface Finishing*, 795 F.3d at 11; 88 Fed.

42

Reg. at 24863.  Better performance means lower emissions rates are achievable, especially when costs go down.  *See* 42 U.S.C. § 7412(d)(2); *Battery Recyclers*, 716 F.3d at 673.  Power-plant practices and processes applying control technology that improve their expected performance—in the service of meeting existing emission standards—*are* developments.  *See* 42 U.S.C. § 7412(d)(6).  EPA did not simply observe that power plants had met existing emission standards; it identified specific practice, process, and control technology "developments" that contributed to improved emissions controls.  *See supra* 38.

Petitioners quibble with some (but not all) of the other developments that EPA identified.  Pet. Br. 49-51.[8]  They focus on filter bags and brominated activated-carbon injection technology.  *Id.* at 49-51.  Petitioners argue increased durability in filter-bag materials is irrelevant to emission reductions because the emission standards already assume that no malfunctions would occur.  *Id.* at 50.  That is wrong.  The section of the preamble to 2012 Rule that Petitioners reference discusses EPA's position that emissions levels during periods when controls malfunction (e.g., filter bags fail) are not considered when setting air-toxics

---

[8] Petitioners make no effort to challenge industry's adoption of better monitoring practices for filterable particulate matter using electrostatic precipitators, or new sulfur-resistant sorbents and sodium- and halogen-salt-based solutions that improve emissions controls for mercury emissions.  89 Fed. Reg. at 38530, 38546-49.  These are real improvements that make emissions controls work better and cost less.  *See id.*

standards, and specifically when determining the average emissions limitation achieved when setting Section 7412(d)(3) floor standards. *See* 77 Fed. Reg. at 9382. That is not the same as assuming filter bags will never malfunction. And filter-bag durability is not an abstraction. More durable filter bags do reduce the risk of failure and limit wear and tear that impairs efficiency. 89 Fed. Reg. at 38530. Better filter bags allow for further emissions reductions. *See id.* Even if Petitioners were right that more durable filter bags only affect replacement frequency, that is a development. Less frequent replacement (and easier cleaning), 89 Fed. Reg. at 38530, are developments in "practices." And they potentially reduce costs, which is a development in control technology. *See supra* 41-42.

Petitioners next assert that the effectiveness of brominated activated-carbon injection cannot be a development because activated-carbon injection was available before the 2012 Rule. Pet. Br. 50. But developments are not limited to wholly new technologies. *See* 42 U.S.C. § 7412(d)(6); *Surface Finishing*, 795 F.3d at 11. Petitioners' myopic focus on the existence of activated-carbon injection misses the development that EPA identified. Sulfur-resistant sorbents—including new and better-performing options—and sodium- and halogen-salt-based solutions, allow activated-carbon injection to work better. 89 Fed. Reg. at 38541, 38545-47. These new and better-performing products are developments, but so is

adopting them for use.  42 U.S.C. § 7412(d)(6) (developments in practices and processes included); *Surface Finishing*, 795 F.3d at 11; 88 Fed. Reg. at 24863.

Petitioners also argue that a continuous-emissions-monitoring system is not a development.  Pet. Br. 51.  EPA did not identify continuous monitoring as a development authorizing revision of the surrogate standard.  EPA chose continuous monitoring as the compliance demonstration for the surrogate standard.  *See* 89 Fed. Reg. at 38535-37.  For the reasons discussed below, that action is lawful.  *See infra* 45-47.  The developments EPA identified in monitoring practices are not the mere use of continuous monitoring.  89 Fed. Reg. at 38530; JA 0138, 0148 (EPA-HQ-OAR-2018-0794-4583, 2021 Andover Report 6, 16).

In short, EPA properly interpreted "developments" in Section 7412(d)(6); identified developments in practices, processes, and control technologies; and lawfully revised the standards considering those developments.  Finally, in passing, Petitioners assert that EPA lacks statutory authority to revise air-toxics compliance-monitoring requirements under Section 7412(d)(6), which is limited only to an "emission standard."  Pet. Br. 25, 51.[9]  But the Act's definition of "emission standard" includes "any requirement relating to the operation or

---

[9] Petitioners argue on page 51 that there are not developments justifying EPA's revision of the surrogate and mercury standards.  Only at page 25 do Petitioners briefly assert, in their Summary of Argument, that EPA lacks statutory authority for the monitoring requirement.

maintenance of a source to assure continuous emission reduction . . . ."  42 U.S.C. § 7602(k).  Requiring a source to operate with continuous monitoring to verify required emissions reductions meets this definition.

Petitioners fail to offer any argument for why a compliance monitoring requirement falls outside the Act's definition of "emission standard."  Instead, they cite EPA's independent authority to require test measures and other analytic procedures for monitoring at Section 7412(b)(5).  Pet. Br. 25.  Section 7412(b)(5) relates to the listing of air toxics and provides EPA the ability to gather data necessary to listing.  *See* 42 U.S.C. § 7414(b)(5) (providing broad authority to require monitoring and measuring of "ambient concentrations, deposition, and bioaccumulation" of air toxics).  Even if Section 7412(b)(5) is an additional authority that would allow EPA to require power plants to use continuous emissions monitoring, it does not limit EPA's authority to set source-specific emission standards that include compliance-monitoring requirements under Section 7412(d)(2) or to revise them under Section 7412(d)(6).

In any event, EPA promulgated the continuous monitoring requirement under Section 7414(a)(1)(C) as well.  89 Fed. Reg. at 38535.  This subparagraph authorizes EPA to require a facility to "install, use, and maintain [] monitoring equipment."  42 U.S.C. § 7414(a)(1)(C).  Petitioners forfeit any argument about EPA's invocation of that authority to require continuous monitoring.  *See Fox v.*

46

*Gov't of D.C.*, 794 F.3d 25, 29 (D.C. Cir. 2015) (collecting cases); Case No 24-1119, ECF No. 2072376 at 2 ("Petitioners should raise all issues and arguments in the opening brief.").[10]

## III.    The Rule is not arbitrary or capricious.

Petitioners' sundry arbitrary-and-capricious and procedural arguments miss the mark.  First, EPA reasonably considered costs.  EPA also evaluated the Rule's advantages and disadvantages, determining that the Rule was worthwhile overall.  Second, EPA's feasibility findings and compliance cost estimates were reasonable.  Deference is due these technical determinations.  Third, sophisticated modeling showed that the Rule would not cause any power plants to retire.  That result supports EPA's conclusion that the Rule would not impair the nation's electric grid.  Fourth, the Rule reasonably treats Colstrip like every other power plant.  Fifth, the Rule is not a pretext for regulating greenhouse gases.  Sixth, EPA complied with the Regulatory Flexibility Act.

---

[10] EPA determined (and Petitioners do not dispute) that the Rule's continuous-monitoring provisions are severable from the revised surrogate-standard emission limit.  89 Fed. Reg. at 38518.  Thus, if this Court invalidates the surrogate-standard emission limit, it should leave the continuous-monitoring provisions undisturbed.

**A. EPA determined the revised standards were achievable based on a reasonable consideration of costs, and EPA evaluated all the Rule's advantages and disadvantages, including the costs and benefits.**

Review and revision of MACT standards under Section 7412(d)(6) includes considering costs to determine whether revised standards are achievable. *See* 42 U.S.C. § 7412(d)(2); *Battery Recyclers,* 716 F.3d at 673; 89 Fed. Reg. at 38530-31. EPA's consideration of the costs to realize the emissions reductions identified in the Rule was reasonable, as was EPA's consideration of all the Rule's advantages and disadvantages. Petitioners' claim that EPA was required to rely on a fully monetized cost-benefit analysis is not the law.

**1. EPA reasonably assessed costs applying multiple metrics and analyses.**

EPA reasonably assessed costs as part of the Section 7412(d)(6) review. Contrary to Petitioners' suggestion, EPA has considerable discretion in how to consider costs and balance them against other relevant standard-setting factors. *See Surface Finishing*, 795 F.3d at 10 (citations omitted) (reviewing action under Section 7412(d)(6) and noting that the statute does not mandate a particular method of cost-benefit analysis); *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1157 (D.C. Cir. 2013) (noting Section 7412(d)(2) does not "mandate a specific method of cost analysis"). And this Court defers to EPA's cost analysis and balancing decisions when EPA provides "a transparent, reasoned explanation of its decisions, considering all relevant information in the record." *Surface*

48

*Finishing*, 795 F.3d at 10 (citations omitted).  Here, EPA reasonably exercised its discretion to balance costs against benefits while mindful of its obligation to set standards achieving the maximum degree of emissions reductions.  Based on this analysis, EPA appropriately concluded that the costs power plants would incur were reasonable to achieve the emissions reductions EPA identified in the Rule.

EPA determined that the Rule is expected to cut mercury by 9,500 pounds and non-mercury metals by 49 tons, which would reduce human exposure to these toxic metals.  89 Fed. Reg. at 38511 (Table 1), 38556.  In determining the emissions levels that produce these benefits, EPA evaluated costs in many ways, including assessing metrics such as total capital costs, annual costs, costs compared to total revenues, and cost effectiveness.  89 Fed. Reg. at 38533, 38548-49.

Likewise for the surrogate standard, EPA found the costs reasonable.  First, even before EPA adopted the new standard, almost all coal-fired units had invested in the emission controls required to meet it.  *Id.* at 38533.  Had costs been unreasonable, those investments would not have happened.  Second, EPA determined that compliance costs are likely to be only 0.03 percent of coal-fired power plants' revenue.  *Id.*  Thus, compliance costs would not be prohibitively expensive for the power sector or prevent the affected power plants from realizing the air-toxics emissions reductions that developments had made achievable.  Third, EPA accounted for factors that skewed its cost estimate:  Two units at the Colstrip

49

facility in Montana are the only coal-fired units in the country without modern particulate matter emission controls.  *Id.*  To meet the standard, those units would have to install better controls; EPA assumed Colstrip would install fabric filters. *Id.* at 38522.  The cost of these upgrades accounts for over 40 percent of the nationwide annual costs of the Rule.  *Id.* at 38533.  At the same time, of the 33 units that would incur compliance costs, 20 account for only 1% of total annual costs.  *Id.* at 38533-34; *see* JA 1558-61 (EPA-HQ-OAR-2018-0794-6919, "2024 Technical Memo" 14-17); JA 1626, 1632 (EPA-HQ-OAR-2018-0794-6922, "Resp. to Comments" 31, 37).

EPA acknowledged that the cost-effectiveness value of the revised surrogate standard ($10.5 million per ton of non-mercury metals, or $34,520 per ton of filterable particulate matter) was "higher than cost-effectiveness values that the EPA concluded were not cost-effective and weighed against implementing more stringent standards for some prior rules."  89 Fed. Reg. at 38523.  But then, EPA explained that comparisons to those prior rulemakings were inapt because the earlier rules involved different industries like petroleum refining, iron-ore processing, iron and steel manufacturing, and Portland cement manufacturing.  *Id.* at 38522-24; *see Sierra Club*, 353 F.3d at 986 (explaining that EPA's justification for Clean Air Act standards must be evaluated on an industry-by-industry basis considering the industry-specific record before the court).

50

The facts warranted a different approach here. For the mercury standard, additional compliance costs are expected to be a "small fraction" of power plants' revenue. 89 Fed. Reg. at 38549. And the standard's cost-effectiveness is $10,895 to $28,176 per additional pound of mercury removed. *Id.* at 38548. That is comparable to—if anything, less than—the $27,000/pound cost of meeting the 2012 standard. *Id.* at 38549 n.82.

Thus, EPA explained that the costs of achieving the revised standards are reasonable, because almost all power plants already have paid for the necessary controls to meet the surrogate standard, and because the mercury standard's cost is comparable to that of the 2012 standard applicable to all other coal-fired power plants. Essentially, the Rule requires the few higher-emitting power plants to finally do what the rest of industry has already done.

Separate and apart from the consideration of cost under Section 7412, EPA also considered the advantages and disadvantages of the Rule holistically and determined the Rule was worthwhile. This holistic analysis considered, among other things, the Regulatory Impact Analysis, where EPA considered a cost-benefit analysis that was prepared to comply with Executive Order 12866. A cost-benefit analysis is a particular type of systematic, economic analysis conducted according to Office of Management and Budget criteria to meet the requirements of the Executive Order. *See* OMB Circular A-4 at 27-57. Cost-benefit analysis is distinct

51

from a general consideration of advantages and disadvantages of rulemaking.

Here, considering the cost-benefit analysis, along with other analyses in the record,

EPA "contemplated and carefully considered both the advantages and

disadvantages of the revisions," "including qualitative and quantitative benefits of

the regulation and the costs of compliance," and EPA concluded that "when all of

the costs and benefits are considered," the final rule "is a worthwhile exercise of

EPA's section [74]12(d)(6) authority." 89 Fed. Reg. at 38553.

Among other findings, and as noted above, EPA determined that the Rule is

expected to realize over 100,000 pounds of air-toxics emissions reductions[11] and

reduce attendant risk to human health and the environment. 89 Fed. Reg. at 38511

(Table 1) 38556; *see* JA 1821 (EPA-HQ-OAR-2018-0794-6966, Reg. Impact

Analysis 4-5) (noting the "lack of quantifiable risks" from mercury emissions, but

that reductions are expected to affect overall mercury levels in fish (and thus the

people who eat them)); 89 Fed. Reg. at 38515 (noting mercury's neurotoxic effects

on children). EPA further noted the potential for mercury and other air toxics

reductions to "enhance ecosystem services and improve ecological outcomes." 89

Fed. Reg. at 38556.

---

[11] EPA identified emissions reductions of 9,500 pounds of mercury and 98,000
pounds of non-mercury metals. 89 Fed. Reg. at 38511 (Table 1), 38556.

In short, the assorted analyses and methodologies employed in the Rule, described above, satisfied EPA's obligation to consider costs, both in the context of EPA's individual standard-setting determinations under Section 7412(d)(6), and in the context of the Rule as a whole.

### 2.  Petitioners' attacks on EPA's cost judgments lack merit.

Petitioners contend that EPA acted arbitrarily by not comparing costs to monetized benefits.  Pet. Br. 54-58.  EPA is not required to do that.  *Surface Finishing*, 795 F.3d at 10.  Regardless, EPA *did* compare the Rule's advantages to its disadvantages, including unquantified (and unquantifiable) benefits, and EPA reasonably concluded that the final rule is a "worthwhile exercise" of EPA's authority.  89 Fed. Reg. at 38553.  And contrary to Petitioners' position, EPA did not err in considering the benefits that mattered to Congress: achievable reductions of air-toxics emissions.  *See* 42 U.S.C. § 7412(d)(2); *supra* 23-29.

 Petitioners contend that the Rule will produce no meaningful benefit because EPA determined that emissions of air toxics from coal-fired power plants are already low enough to provide an ample margin of safety for public health (for example, because the cancer risk is less than one in one million).  Thus, according to Petitioners, any further reduction in air-toxics emissions from power plants is superfluous.  Not so.  First, Petitioners' position restates their argument that the revised standards are not "necessary," and lacks merit for the same reasons.  *See*

*supra* 29-37.  Petitioners overlook that *Congress* determined that realizing

achievable emissions reductions, and thus reducing human exposure to air toxics,

is a benefit.  *See* 42 U.S.C. § 7412(d)(2); *supra* 23-29.  That is why Congress

required "the maximum degree of reduction in emissions" (up to and including

"prohibition") of air toxics that EPA "determines is achievable."  42 U.S.C. §

7412(d)(2); *Sierra Club*, 353 F.3d at 979-80*; LEAN*, 955 F.3d at 1093.  EPA

rightly valued the benefit that Congress designed the air-toxics program to realize.

Second, Petitioners are wrong not to credit the Rule's chief benefits—lower

air-toxics emissions—merely because they were not monetized.  Pet. Br. 56.

Monetizing reduced air-toxics emissions is not required.  *Surface Finishing*, 795

F.3d at 10.  And it was not even possible.  As EPA explained, it could not monetize

the benefits of lower emissions given the lack of relevant and robust epidemiologic

studies on air toxics.  89 Fed. Reg. at 38515-16, 38553.  Without this information,

EPA could not estimate the monetary value of harms from exposure or benefits

from avoiding those harms.[12]  *Id.*  And to be clear, in considering "all the costs and

---

[12] EPA did not quantify, as Petitioners claim, the "public health benefits" of
reducing air-toxics emissions in the 2012 Rule.  Instead, it estimated that the
annual monetary value of avoided IQ losses from mercury-emissions reductions
was $4 million to $6 million.  77 Fed. Reg. at 9427-28.  But "these calculated
benefits are a small subset of the benefits of reducing [mercury] emissions." *Id.* at
9428.  So EPA did not monetize the benefits of air-toxics emissions in 2012; it
monetized one benefit (avoided IQ loss) for one air toxic (mercury).  The Supreme
Court recognized in *Michigan* that EPA "could not fully quantify the benefits of
reducing power plants' emissions of [air toxics]."  576 U.S. at 749.

benefits," EPA did place weight on such unmonetized benefits. 89 Fed. Reg. at 38552-59. Just because "those benefits are not easily monetizable does not mean they are less valuable." *Sinclair Wyoming Refin. Co. v. EPA*, 101 F.4th 871, 889-90 (D.C. Cir. 2024).

Indeed, this Court recently rejected in *Sinclair* the same kind of argument Petitioners make here. There, the petitioners challenged EPA's regulations under the Clean Air Act's Renewable Fuel Standards Program. The refiner petitioners claimed, as do Petitioners here, that EPA's cost consideration was flawed because EPA credited "nonmonetized benefits over monetized costs." *Id.* at 889. This Court rejected that claim, which "faults EPA for the fact that the statute Congress drafted is designed to yield benefits that it deemed important but understood are not easily monetizable." *Id.* The Court stressed that "Congress made a policy choice" in the Renewable Fuel Standards Program to reap the benefits of greater energy independence and reduced greenhouse gas emissions; that "those benefits are not easily monetizable does not mean they are less valuable." *Id.* Similarly, Congress made a policy choice here to secure maximum achievable reductions in air-toxics emissions, a policy that it designed to yield the benefit of reduced exposure to air toxics, even if exposure levels fall below levels that are currently assessed to be a public health concern.

Further, nothing in *Michigan v. EPA*, cited repeatedly by Petitioners, undermines the reasonableness of EPA's consideration of costs and other statutory factors, or its balancing of the Rule's advantages and disadvantages. *Michigan* addressed whether EPA could entirely ignore costs in deciding whether it was "appropriate and necessary" under a different provision of the Clean Air Act, Section 7412(n)(1)(A), to regulate air toxics. *See* 576 U.S. at 752. While the Supreme Court found that the capacious phrase "appropriate and necessary" was most naturally read to require at least some consideration of cost, *id.*, it did not hold that EPA was required to rely on comparison of monetized costs and benefits and to ignore nonmonetized benefits. Just the opposite: "We need not and do not hold that the law unambiguously required the Agency . . . to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value." *Id.* at 579. The Court stressed that "[i]t will be up to [EPA] to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Id.* EPA reasonably considered costs here. *See supra* 48-53. And to the extent *Michigan* has any application, EPA's broad weighing of the Rule's advantages and disadvantages is fully consistent with the Court's holding. Nothing in *Michigan* suggests that EPA was required to prepare, and rely upon, an analysis that monetized and weighed costs and benefits against each other.

56

**B. EPA determined the revised standards were achievable based on reasonable feasibility findings and cost estimates.**

EPA reasonably determined that the revised surrogate and mercury standards were achievable.  As discussed above, EPA thoroughly and reasonably considered costs.  *See supra* 48-53.  EPA also reasonably determined that the revised standards were feasible.  EPA's cost estimates were reasonable too.  These findings were based on reasonable methodologies and data sets that EPA adequately explained.  Petitioners' and Intervenor's attacks on EPA's feasibility findings and cost estimates are wrong.  Their claims are factual disagreements on technical issues where this Court defers to EPA's reasoned judgment.  *Nat'l Lime*, 233 F.3d at 635 (quoting *Marsh*, 490 U.S. at 377).  This Court should uphold EPA's reasonable conclusions.

**1. EPA's feasibility finding and cost estimate for the revised surrogate standard were reasonable.**

The Rule lowered the surrogate standard for non-mercury metals from 0.030 lb/MMBtu to 0.010 lb/MMBtu and required emissions to be measured as a 30-day rolling average using continuous monitoring.  89 Fed. Reg. at 38510 & n.4, 38566.  This new standard is feasible, and EPA's cost estimates were reasonable.  *See id.* at 38531.  EPA's explanations are sufficient to uphold its technical judgments.  *See White Stallion*, 748 F.3d at 1251, *rev'd on other grounds sub nom. Michigan v. EPA*, 576 U.S. 743 (2015).

57

Initially, Petitioners do not appear to challenge EPA's feasibility finding for the surrogate standard. Rather, Petitioners argue that EPA undercounted the number of power plants that will incur compliance costs and underestimated those costs. *See* Pet. Br. 64-72. Thus, any such challenge to EPA's feasibility finding for the revised surrogate standard is forfeited. *See Fox*, 794 F.3d at 29 (collecting cases).

Regardless, the revised surrogate standard is, in fact, feasible. EPA gathered compliance data for the 275 power plants expected to be operational on January 1, 2029. JA 1552 (2024 Technical Memo 8). Because electricity demand—and thus emissions—peaks in winter and summer, EPA focused on data from those quarters. JA 1547 (*id.* 3); JA 1619 (Resp. to Comments 24). About 91% of the units achieved emission rates of 0.010 lb/MMBtu or less 99% of the time in at least one quarter. 89 Fed. Reg. at 38530; JA 0379-80 (EPA-HQ-OAR-2018-0794-5789, "2023 Technical Memo" 4-5). Then, in response to comments, EPA considered data from other quarters and updated the number of affected units to include more power plants. 89 Fed. Reg. at 38530. It reviewed all quarterly emissions data it had for 62 coal-fired units. *Id.* This review, which accounts for the lower-emitting seasons of spring and autumn for those 62 coal-fired units, included 296 units total, and found that an even greater percentage of units—93%—met the 0.010 lb/MMBtu standard at least 99% of the time in at least one quarter. *Id.*

58

EPA also considered average-emission rates at the 296 coal-fired units. JA 1552-53 (2024 Technical Memo 8-9).  Because emission rates can vary, it was important to consider average rates, which show a unit's ability to emit at 0.010 lb/MMBtu on a sustained basis.  *See* JA 1625-26 (Resp. to Comments 30-31) (noting that average rates account for unit variability).  The data showed that 263 units (or 89 percent) can consistently meet the revised standard.  89 Fed. Reg. at 38530, 38533 (noting 33 of 296 units would incur compliance costs); *see id.* at 38522 (noting that National Rural Electric Cooperative Association's estimate came close); JA 1595 (2024 Technical Memo, Attachment 1, Unit Level Information & Inputs, Column U).  It was reasonable for EPA to conclude that the revised surrogate standard was feasible when most of industry already had met it.

EPA's cost estimate also was reasonable.  EPA based its estimate on a rational analysis of what power plants would need to do to comply with the revised surrogate standard.  JA 1558-60 (2024 Technical Memo 14-16).  *Contra* Pet. Br. 65-66 (arguing EPA relied on unsupported assumptions).  EPA determined that the 263 power plants with average emissions rates below the revised standard would not incur compliance costs.  89 Fed. Reg. at 38533-34; JA 1558 (2024 Technical Memo 14).  Past performance consistently meeting the revised standard indicated these power plants would continue to do so.  Units that had met the revised standard 99% of the time in at least one quarter, but did not on average, would

59

incur operation and maintenance costs to ensure existing emissions controls were performing their best. *Id.* It made sense for EPA to predict that control technology will perform better if repaired promptly, and if monitored and maintained properly. *See* JA 0149-50 (2021 Andover Report 17-18); *cf.* 42 U.S.C. § 7412(r)(7) (directing EPA to establish repair and maintenance requirements to prevent accidental releases). If a power plant had not achieved the revised standard for 99% of the time in any quarter, investments in improvements to existing systems would be necessary. 89 Fed. Reg. at 38533-34; JA 1558 (2024 Technical Memo 14).

Thus, EPA found that 11 power plants with electrostatic precipitators for emissions control would incur unit-specific costs to upgrade their existing systems. 89 Fed. Reg. at 38533. Ten more units with electrostatic precipitators would incur about $100,000 per year in operation-and-maintenance costs. *Id.*; JA 1558 (2024 Technical Memo 14). Ten facilities operating with fabric filters would incur unit-specific costs to use more effective filter bags or replace the bag more frequently. 89 Fed. Reg. at 38533. *Contra* Pet. Br. 66 (arguing EPA assigned $100,000 in operation-and-maintenance costs to all units EPA predicted to incur such costs). Two units at the Colstrip facility would need to acquire a new emissions control system, which alone would account for about 42% of industrywide compliance costs. 89 Fed. Reg. at 38522, 38533.

60

Petitioners assail EPA's data as fatally incomplete. Pet. Br. 65-68. Not so. "EPA typically has wide latitude in determining the extent of data-gathering necessary to solve a problem." *See NRDC*, 529 F.3d at 1086 (internal quotation marks omitted). Here, EPA considered data from all 296 facilities expected to operate when compliance begins in 2029, including all available data from 62 units at 33 facilities. JA 1547, 1552-53 (2024 Technical Memo 3, 8-9). When EPA significantly expanded its data set in response to comments, the number of facilities that demonstrated an ability to meet the revised surrogate standard increased. *See supra* 58. Thus, the expanded data set affirmed EPA's analysis based on the initial smaller data set.

Petitioners say that EPA should have used data from "*every quarter* that [power plants] have operated since 2017." Pet. Br. 65 (emphasis in original). Gathering that volume of data was not reasonably feasible or essential: Given how the data was stored, gathering it would have required EPA to download 6,000 separate files and then convert everything into a readable format. JA 1547-48 (2024 Technical Memo 3-4); JA 1620 (Resp. to Comments 25). EPA reasonably decided to proceed on adequate information rather than invest substantial resources to compile an exhaustive data set. *See Surface Finishing*, 795 F.3d at 12-13; *NRDC*, 529 F.3d at 1086.

Petitioners provide Coronado Generating Station as evidence that EPA's

cost estimates were arbitrary and capricious.  Pet. Br. 66-67.  This single example

proves the reasonableness of EPA's estimates.  The units at the Coronado facility

had met the revised standard 99% of the time in at least one quarter.  JA 1595

(2024 Technical Memo, Attachment 1, Unit Level Information & Inputs, Rows

174-75, Column T).  Their average emissions rates over 31 quarters (over 7 years)

were 0.009 lb/MMBtu, just below the revised surrogate standard of 0.010

lb/MMBtu.  JA 1595 (*Id.*, Attachment 1, Unit Level Information & Inputs, Rows

174-75, Columns O and U).  Petitioners' graph shows that average emissions were

below 0.010 lb/MMBtu for 15 of 20 quarters and at or above that rate for only 5

quarters.  Pet. Br. 67.  Those higher levels are unsurprising because they happened

when the standard was still 0.030 lb/MMBtu.  There was nothing special about

0.010 lb/MMBtu then, so there was no reason Coronado would have tried to keep

emissions below that level.  *See* 89 Fed. Reg. at 38510 n.3; JA 1631 (Resp. to

Comments 36).  Thus, Coronado's sporadic higher levels do not impugn EPA's

conclusion that power plants with average emissions under the revised standard

could meet it without additional costs.  Further, of the 263 units with average

emissions at or below 0.010 lb/MMBtu, only Coronado and five other units had

average emissions rates between 0.009 and 0.010 lb/MMBtu.  JA 1595 (2024

Technical Memo, Attachment 1, Unit Level Information & Inputs, Column U).  At

worst, Coronado is an edge case that does not undermine the reasonableness of

EPA's entire cost analysis.

Finally, Petitioners claim that EPA underestimated compliance costs because EPA did not account for a compliance margin.  *See* Pet. Br. 69.  But that argument ignores how EPA accounted for a compliance margin in the revised surrogate standard.  Power plants often target emission levels below what standards require. 89 Fed. Reg. at 38521.  Doing so creates a margin for error in case their equipment malfunctions or breaks down.  *Id*.  That margin is baked into the standard in two ways.

First, EPA set the emission limit above what most coal-fired units were emitting on average.  Recall that EPA considered average emission rates of 296 coal-fired units.  JA 1552-53 (2024 Technical Memo 8-9).  Averages account for operational variability and degradation of emission controls over time.  JA 1626 (Resp. to Comments 31).  In this way, averages capture typical equipment problems and variable performance in emissions controls.  In fact, most of the 296 units in EPA's analysis averaged well below 0.010 lb/MMBtu.  JA 1595 (2024 Technical Memo, Attachment 1, Unit Level Information & Inputs, Column U). The median emission rate was only 0.004 lb/MMBtu, 60 percent below the new standard.  89 Fed. Reg. at 38522.  This difference—between what most regulated units can do and what the standard requires them to do—serves as a built-in compliance margin that accounts for most causes of emissions spikes.

63

Second, EPA built in a margin on the compliance side.  Facility compliance

with the surrogate standard is assessed using 30-day rolling averages:  Compliance

on any day is based on the unit's average emissions over the last 30 operating days.

*See id.* at 38566.  Rolling averages dampen isolated emission spikes.  *Cf. id.* at

38544 (Figure 1) (illustrating this effect for mercury standards); JA 1587-89 (2024

Technical Memo 43-45).  That gives regulated entities a flexibility that allows for

normal hiccups in operations.

Petitioners thus are wrong that EPA ignored compliance margins.  The

surrogate standard accounts for those margins along the same lines that EPA did in

Petitioners' examples, by factoring in variability and allowing compliance

flexibility.  And because the surrogate standard has a built-in compliance margin,

that margin's cost was necessarily part of EPA's cost analysis.  *See* 89 Fed. Reg. at

38522.

### 2. EPA's feasibility finding and cost estimate for the revised lignite standard were reasonable.

In the 2012 Rule, EPA created a subcategory for lignite-fired power plants[13]

based on observations that lignite-fired units' mercury emissions were not among

the best performers.  77 Fed. Reg at 9378-79.  Consequently, lignite-fired power

plants today account for 30% of all mercury emissions from the power sector but

---

[13] The subcategory is defined as units firing low-rank virgin coal but that means
lignite coal in practice.

generate just 7% of total megawatt-hours of electricity.  89 Fed. Reg. at 38537.

EPA's finding in the Rule that lignite-fired power plants can meet the 1.2 lb/TBtu

standard follows from nearly a decade of data from compliance and developments

in industry practices and control technology that EPA identified in the technology

review.  That determination was reasonable, and so was EPA's cost estimate.

For background, when coal is burned, the mercury contained in the coal is

released as a gas, not as fine particulate matter that electrostatic precipitators and

fabric filters can remove.  89 Fed. Reg. at 38545-46.  Thus, mercury emission

control strategies usually involve adding a sorbent or chemical additive that can

bind to mercury gas (or chemically alter it) and allow emission control devices to

remove it.  *Id.*  These emissions controls are "dial up" technologies.  That means

power plants can increase or decrease the amount used to achieve higher or lower

emissions controls or account for more or less mercury in coal.  89 Fed. Reg. at

38540.  EPA reasonably determined that lignite-fired power plants could "dial up"

sorbent use to meet the revised standard.

Specifically, EPA determined that lignite-fired power plants could use

brominated activated-carbon sorbents to meet the revised mercury standard.  89

Fed. Reg. at 38547.  Bromine is a halogen, and adding it is necessary because

lignite coal has a low halogen content, which decreases the efficacy of the sorbents

used to bind mercury.  89 Fed. Reg. at 38545.  When coal (of any type) is burned,

65

the mercury contained in the coal is converted into the elemental state (elemental mercury vapor). *Id.* The sorbents used to bind it do not work on elemental mercury. *Id.* It must be oxidized (for simplicity here, converted) into another chemical state, divalent mercury. *Id.* Halogens (most commonly chlorine) facilitate oxidation of elemental mercury to divalent mercury. *Id.* Less halogens means less oxidation and thus less mercury that can be removed by emissions controls. *Id.*

Like lignite coal, subbituminous coal has low halogen levels, and power plants firing it have used halogenated sorbents or other effective chemical additives to long meet the 1.2 lb/TBtu standard. 89 Fed. Reg. at 38545-46. In fact, their average rates were 0.6 lb/TBtu, well below the standard. *See* 88 Fed. Reg. at 24878. And subbituminous-fired power plants were able to do so even with comparable mercury content, halogen content, and variability as lignite. *See* 89 Fed. Reg. at 38542-44. So EPA concluded that lignite-fired power plants can also use halogenated sorbents at sufficient rates to meet the standard. *Id.* at 38547.

EPA also considered the twin challenges of low halogen and high sulfur content in lignite coal. *Contra* Pet. Br. 78-79. EPA recognized that higher sulfur content makes controlling mercury emissions more challenging because sulfur content can result in more sulfur trioxide in the emissions gas. 89 Fed. Reg. at 38546. That impairs the effectiveness of the sorbents used to bind and remove

mercury.  *Id.*  Yet power plants firing bituminous coal have long met the 1.2 lb/TBtu standard.  *Id.* at 38546-47.  In fact, their average rates were 0.4 lb/TBtu, well below the standard.  *See* 88 Fed. Reg. at 24878.  And bituminous coal has comparable mercury content, sulfur content, and variability to lignite.  *See* 89 Fed. Reg. at 38542-44.

Bituminous coal-fired units have been successfully controlling their mercury emissions thanks, in part, to products that mitigate the effect of sulfur trioxide.  *Id.* at 38546-47.  One such product removes sulfur trioxide before emissions reach the electrostatic precipitators, fabric filters, or other emissions control devices.  *Id.* at 38546.  Another is sulfur-resistant sorbents injected to bind mercury.  *Id.*  To name one, ADA-ES offers FastPAC$^{TM}$ Platinum 80, an activated-carbon sorbent specifically engineered to tolerate sulfur trioxide.  *Id.* at 38547.  There are many products commercially available to effectively remove mercury when burning coal with higher sulfur content.  If needed, lignite-fired units can add these products to control more mercury in emissions gas that contains higher sulfur trioxide levels if brominated activated-carbon sorbents are insufficient to meet the revised standard.

Ample other evidence in the record supports EPA's conclusion that lignite-fired units can reduce mercury emissions sufficient to meet the revised standard.  *Contra* Pet. Br. 75-79; Inter. Br. 20-24.  EPA's analysis determined that 15 of the 22 lignite-fired units could achieve the standard with less than 90% control.  *See* 89

Fed. Reg. at 38547 (Table 7). Brominated activated-carbon sorbents can realize mercury emissions reductions over 90%. *Id.* at 38547; 77 Fed. Reg. at 9304 (noting in 2012 Rule preamble three of four lignite-fired units tested using brominated activated-carbon sorbents achieved over 95% reduction in mercury emissions). Only seven units would need to realize reductions over 90%. 89 Fed. Reg. at 38547 (Table 7). These facilities needing emissions reductions over 90% are in Texas and Mississippi where mined lignite has a higher mercury content than the other facilities, which are in North Dakota using lignite mined in North Dakota. *Id.* at 38542; JA 1574-76 (2024 Technical Memo 30-32).

However, two units at the Twin Oaks facility firing Texas lignite with its high mercury content already have met the standard. 89 Fed Reg. at 38540 (reporting emission levels of 0.63 to 1.1 lb/TBtu). And those units removed up to 97.5% of the mercury in the fired lignite. 89 Fed. Reg. at 38547 (Table 7); JA 1579-80 (2024 Technical Memo 35-36).[14] *Contra* Pet. Br. 75-79 (arguing EPA does not have evidence that mercury control over 90% is feasible); Inter. Br. 20-24 (same). That is well above what is needed to comply for the units firing North Dakota lignite with its lower mercury content. *See* 89 Fed. Reg. at 38547 (Table 7); JA 1574-76, 1579-80 (2024 Technical Memo 30-32, 35-36). And it is also

---

[14] The Twin Oaks facility is referenced in these sources by the name of its owner, Major Oaks Power.

above what the other units firing Texas lignite need to comply. *Id.* Further, the only units firing Mississippi lignite, the two at the Red Hills facility, have come reasonably close to the standard and would need about 92% removal efficiency to meet it. *See* 89 Fed. Reg. at 38547 (Table 7) (reporting emission levels of 1.73 to 1.75 lb/TBtu); JA 1574-76, 1579-80 (2024 Technical Memo 30-32, 35-36). The Twin Oaks and Red Hills facilities are performing the best, meeting and nearly meeting the standard while firing lignite with the highest mercury content. It is reasonable to conclude the other facilities firing lignite with the same or less mercury content can too. *White Stallion*, 748 F.3d at 1251 ("To be achievable, a standard must be capable of being met under most adverse conditions which can reasonably be expected to recur.") (citation and internal quotation omitted), *rev'd on other grounds sub nom. Michigan v. EPA*, 576 U.S. 743 (2015).

Further, the Twin Oaks facility was participating in the low-emitting-unit program that reduces the required compliance stack-testing frequency when a power plant can achieve emissions less than 10% of the applicable mercury standard or emit less than 29 lb of mercury per year.[15] 89 Fed. Reg. at 38510, 38539-40. To qualify for the program, the Twin Oaks units needed to achieve

---

[15] The Rule eliminates the low-emitting-unit program for the surrogate standard because stack testing is no longer an option. 89 Fed. Reg. at 38510. The low-emitting-unit program continues for the mercury standard. *See* 40 C.F.R. §§ 63.10005(h), 63.10006(b).

emissions levels around 1.79 lb/TBtu.  *Id.* at 38540.  With the motivation supplied by regulations, Twin Oaks was able to do even better and achieve the 1.2 lb/TBtu standard.  *Id.*  Higher emissions from the other lignite-fired facilities were not surprising.  There was no reason for these facilities to try to operate lower than the prior 4.0 lb/TBtu standard.  Thus, EPA's conclusion that lignite-fired units can meet the revised standard is not undermined by higher emissions from these facilities.

Moreover, Twin Oaks used sulfur controls and was equipped to use brominated activated-carbon sorbents to meet the 1.2 lb/TBtu standard.  *Id.* at 38540.  That set it apart from many lignite-fired units that were not using these strategies to control mercury emissions.  *Id.* at 38540.  In fact, some lignite-fired units could meet the 4.0 lb/TBtu standard at times without injecting any sorbents.  *Id.*  That further shows lignite-fired units can meet the stricter standard:  Lignite-fired units need not install new controls; they simply need to use effective sorbents in sufficient amounts in their existing controls.  *See id.* at 38540.

Petitioners' and Intervenor's emphasis on Twin Oaks "unique" boiler is misplaced.  Pet. Br. 74; Inter. Br. 30.  EPA concluded in 2012 that boiler design did not justify treating lignite-fired power plants differently than other coal-fired units.  *See* 77 Fed. Reg. at 9378-79.  And Petitioners' passing reference to the Twin Oaks boiler provides no justification to question that determination.  *See* Pet. Br.

74; *see also* Inter. Br. 30.

Intervenor protests EPA's conclusion that lignite-fired power plants can achieve over 90% mercury removal. *See* Inter. Br. 20-24; *see also* Pet. Br. 76. The effectiveness of control technology is the kind of factual dispute on a technical matter where this Court defers to EPA's reasonable judgment. *See White Stallion*, 748 F.3d at 1251 (deferring to EPA on effectiveness of activated-carbon sorbents for lignite in the 2012 Rule). The Court should defer to EPA's reasonable judgment here because EPA's finding is supported by ample evidence in the record. *See supra* 64-70.

Taking another approach, Intervenor tries to undermine EPA's feasibility analysis by attacking EPA's mercury inlet values (the amount of mercury naturally in coal) to determine how much mercury a facility would have to remove to meet the revised standard. Inter. Br. 24-27. But EPA used a reasonable range of data, including historical coal analyses, results from demonstration tests, publicly available mercury emissions data, and data and information obtained from EPA's Section 7414 information survey and provided in comments on the proposed rule. 89 Fed. Reg. at 38542-45, 38547; JA 1679-80 (Resp. to Comments 84-85). *Contra* Pet. Br. 64, 73-74; Inter. Br. 28-29 (arguing EPA used cherry-picked data). And EPA significantly adjusted the mercury content values in response to comments from industry using the data it provided. 89 Fed. Reg. at 38538-39 n.81; JA 1676-

77, 1696-97 (Resp. to Comments 81-82, 101-02). *Compare* JA 0395 (2023 Technical Memo 20) *with* JA 1579-80 (2024 Technical Memo 35-36). *Contra* Inter. Br. 28-29 (arguing EPA ignored industry comments about mercury content values). Setting inlet values based on EPA's broad data set and adjusting them to account for mercury content values that industry provided in comments was reasonable and adequate here.

Further, Intervenor confuses the data EPA used for Intervenor's facility. Intervenor claims that EPA used a 25 lb/TBtu mercury content value to estimate the reductions Intervenor's San Miguel facility would need to comply with the revised standard. Inter. Br. 26. In fact, EPA used 28.9 lb/TBtu. 89 Fed. Reg. at 38547 (Table 7). EPA used this value because Intervenor told EPA that "San Miguel has recently averaged around 25-29 lb/TBtu inlet mercury." JA 0879 (EPA-HQ-OAR-2018-0794-5965, San Miguel Comment 6); JA 1676-77, 1696-97 (Resp. to Comments 81-82, 101-02).

Intervenor's focus on the performance of the Oak Grove facility is also misplaced. Inter. Br. 26-27. Oak Grove was already achieving mercury emissions reductions well below the prior 4.0 lb/TBtu standard. 89 Fed. Reg. at 38547 (Table 7) (noting achieved rates of 2.23 and 2.53 lb/TBtu). To achieve these levels, Oak Grove was using brominated activated-carbon sorbent in amounts far below what EPA estimated would meet the revised standard. *See id.* at 38548-49.

72

Oak Grove can control more mercury emissions to meet the standard using more of its sorbent. *See id.*; *see also id* at 38540 (noting sorbents are a "dial up" control technology). Oak Grove's past performance does not undermine EPA's reasonable conclusion that lignite-fired units can meet the revised standard.

Ultimately, each kind of coal has its own unique set of characteristics that, for one reason or another, makes it hard to control mercury emissions. *Id.* at 38542-43, 38549. But with the industry best-practice of using halogenated sorbents to address low halogen content and products developed to mitigate the impact of high sulfur, power plants firing non-lignite coal have been meeting the 1.2 lb/TBtu standard for years. Therefore, EPA determined that lignite-fired power plants could adopt brominated activated-carbon sorbents to comply with the same standard, and, if necessary, measures to address high sulfur content. The Twin Oaks facility already did so while firing Texas lignite with the highest mercury content. *See supra* 68-70.

This modest demand on lignite-fired units is reflected in how EPA calculated its cost estimate. EPA calculated cost-effectiveness using a model plant applying brominated activated-carbon sorbents at sufficient rates. *See* 89 Fed. Reg. at 38548. EPA reasonably declined to include capital costs to install or modify emissions-control equipment. *Contra* Pet. Br. 80-81. Every lignite-fired power plant uses an activated-carbon sorbent injection system. JA 1574-76 (2024

73

Technical Memo 30-32).  And the record supports EPA's conclusion that units need only utilize those systems with the most effective sorbents in sufficient quantities.  *See supra* 64-70.

Intervenor wrongly impugns EPA's cost-effectiveness estimates based on "the role of flue gas sulfurization systems."  Inter. Br. 35.  EPA's model plant estimated the cost and incremental cost-effectiveness of using brominated activated-carbon sorbents to meet the revised standard holding all other variables stable.  *See* 89 Fed. Reg. at 38548.  Desulfurization systems are a different emissions-control technology.  Inter. Br. 34; JA 1574-76 (2024 Technical Memo 30-32) (noting use of activated-carbon injection systems and desulfurization systems at power plants).  The role of a theoretical desulfurization system in EPA's model plant is irrelevant.  Further, power plants are not required to meet the lignite standard in a specific way.  If a power plant can (and wants to) achieve the 1.2 lb/TBtu standard in a different way than EPA identified, it may.  That does not make EPA's cost estimate unreasonable.

*         *         *         *         *

EPA's feasibility and cost estimates are highly technical.  The challenges in these petitions are factual disputes about the performance of power plants' emissions-control technology and likely compliance costs.  EPA's conclusions that power plants can meet the revised standards were reasonable and adequately

74

explained and supported in the record.  The resulting cost-estimates were too.  This Court should defer to EPA's considered technical judgments.  *White Stallion*, 748 F.3d at 1251.

### C. EPA reasonably considered the Rule's effects on the nation's power grid.

Petitioners allege that EPA failed to "meaningfully" consider the Rule's impacts on the electric-power grid.  Pet. Br. 60, 62.  But the record reveals that EPA did meaningfully and sufficiently evaluate the likely effects of the Rule on power-plant retirements and grid reliability.

To begin, EPA has expertise to assess the impacts of its regulations on grid reliability.  *Contra* Pet. Br. 60.  After all, Congress entrusted EPA to regulate air emissions from power plants.  *See* 42 U.S.C. § 7412(d)(2), (n)(1); *see also id.* §§ 7651-51o (acid-rain program).  Courts defer to EPA's reasonable projections of "matters over which Congress has given it authority."  *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1037 (D.C. Cir. 2001).  And EPA *did* consult "other Federal agencies, reliability experts, and grid operators" here.  JA 1751 (Resp. to Comments 156) (also noting ongoing consultation with the Department of Energy, under a joint memorandum of understanding, on grid-reliability issues).[16]

---

[16] Petitioners complain that the existence of the memorandum of understanding does not demonstrate that "any such alleged 'coordination' happened for *this* Rule."  Pet. Br. 63.  But that complaint purposefully misreads EPA's explanation

*Cont.*

To assess the Rule's potential energy impact, EPA used a state-of-the-art, peer-reviewed model of the U.S. power sector.  That model, which is also routinely used by other government agencies and by industry, simulates market responses to various scenarios based on the best available information, including from utilities and industry experts.  *See* JA 1785-88 (Reg. Impact Analysis 3-1 to 3-4) (noting that industry also uses the model, which reflects information about the electricity market from utilities, industry experts, gas- and coal-market experts, financial institutions, and governments).  EPA has been using the model for almost three decades, including in prior rulemakings.  *See id.*  And this Court has repeatedly upheld EPA's reliance on the model.  *E.g.*, *West Virginia v. EPA*, 362 F.3d 861, 870-71 (D.C. Cir. 2004); *Appalachian Power Co. v. EPA*, 135 F.3d 791, 814-15 (D.C. Cir. 1998).  Using the model, EPA has been successfully regulating the power sector for years without causing blackouts or soaring electricity prices.  *See* 89 Fed. Reg. at 38519, 38526.  The model projected that the Rule would not cause *any* coal-fired power plant to retire.  *Id.* at 38526.  Accordingly, EPA concluded that the Rule is not expected to affect grid reliability.  *See* 89 Fed. Reg. at 38526; *see also* 89 Fed. Reg. 39798, 40012-13, 40020 (May 9, 2024) (concluding that this Rule and other recent power-plant rules together would not affect grid reliability).

---

that pursuant to the memorandum "there have been numerous events and engagements" that are not limited "to any one regulatory effort or action." JA 1751 (Resp. to Comments 156).

Despite EPA's use of its broadly accepted model, Petitioners claim EPA's analysis of potential grid impacts was not "meaningful" because EPA "brushed" their concerns aside.  Pet. Br. 62.  But EPA did respond to Petitioners' concerns; it simply determined they were unfounded.  EPA observed that "[c]ommenters provided no credible information supporting the argument that this final rule would result in a significant number of retirements or a larger amount of capacity needing controls."  89 Fed. Reg. at 38526.  In addition, it explained that the kind of blackouts feared by commenters are unlikely to happen because power plants cannot unilaterally retire.  Before they can shut down, power plants generally must undergo extensive processes imposed by state regulators and regional transmission organizations.  *Id.*  These processes typically require analyses of the impacts of a power plant's proposed retirement and identification of options to mitigate the effects of lost electricity generation capacity.  *See id.*; JA 1647-48 (Resp. to Comments 52-53) (noting that one of Colstrip's owners is in a regional program that addresses reliability planning).  Sometimes, regulators offer temporary funding to keep the power plant open until longer-term measures are in place.  89 Fed. Reg. at 38526.  And the Department of Energy, when facing an emergency electricity shortage, can issue orders allowing power plants to temporarily operate above their

emission standards.  *See id.* (citing 16 U.S.C. § 824a(c)).[17]

Petitioners point to several comments asserting that EPA must account "for the interrelated impacts of myriad other EPA rules impacting coal-fired power plants."  Pet. Br. 63.  But Petitioners ignore EPA's clear and reasonable responses to these concerns.  EPA analyzed the cumulative impacts of its recent power-plant rules, including this rule, for the final greenhouse gas rule under Section 7411.  JA 1752 (Resp. to Comments 157).  EPA concluded that these rules are unlikely to prevent the power sector from meeting demand.  *Id.*

Finally, EPA noted that litigants challenging other rules affecting power plants raised similar concerns about reliability, all of which "proved to be groundless."  *Id.*  Indeed, the same concerns were raised about the 2012 Rule, but EPA "ha[s] seen no evidence in the last decade to suggest that the implementation of [those standards] caused power sector adequacy and reliability problems."  89 Fed. Reg. at 38526-27.

EPA's use of its model to assess the Rule's potential impacts on the electric grid was reasonable, and EPA addressed Petitioners' concerns with EPA's

---

[17] Petitioners claim that EPA reviewed and explained these backstop protections as justification to avoid "any further analysis of grid reliability."  Pet. Br. 64.  But EPA *did not* rely on emergency measures and authorities for the Rule.  It projected that the Rule would not impair the grid.  EPA did not "pass the entire issue off" on state regulators or the Department of Energy.  And it cited these emergency resources in response to comments.  89 Fed. Reg. at 38526.

approach and explained why it did not share their concerns.

### D. EPA reasonably treated the Colstrip plant like other power plants.

EPA reasonably applied the same emission standards to the Colstrip plant that EPA applied to the rest of the industry.  EPA reasonably declined to exempt Colstrip from the revised standards on the ground that Colstrip has not installed the same particulate-matter control technology that the rest of industry is already using.

Colstrip is the only U.S. coal-fired power plant without fabric filters or electrostatic precipitators, leaving it the nation's highest emitter.  JA 1636 (Resp. to Comments 41).  As a result, Colstrip has "struggled to meet the original 0.030 lb/MMBtu standard," and, in 2018, it violated its permit by exceeding that level.  89 Fed. Reg. at 38531.  JA 1636, 1647 (Resp. to Comments 41, 52).  In the Rule, EPA readily acknowledged that Colstrip—having failed to invest in modern controls that the rest of industry has used for over a decade—would likely face higher costs to comply with the revised standards.  89 Fed. Reg. at 38533.  But contrary to Petitioners' characterization, the fact that Colstrip is lagging the rest of the industry and therefore needs to do more to catch up does not make Colstrip a "poignant example" or reflect any arbitrary treatment in holding Colstrip to the same standards as every other power plant.  Pet. Br. 81, 97.  On the contrary, it would have been arbitrary for EPA to treat Colstrip more favorably on account of

79

its laggard status.  EPA adopted a standard that over 90% of power plants can already meet.  89 Fed. Reg. at 38530.  The Rule brings Colstrip (and the other higher emitters) to emissions levels that the rest of industry is already achieving. *Id.*  The higher compliance costs for Colstrip simply reflects Colstrip's decision not to invest in modern particulate matter controls over the last decade, when all its peers already have.  It was reasonable for EPA not to reward Colstrip's prior failure to implement modern, adequate controls.

EPA considered Colstrip's statement that it *might* retire and reasonably declined to exempt Colstrip on that basis.  Disagreement among Colstrip's owners about how and when to retire has led to years of litigation and has even involved the Montana state legislature.  Case No. 24-1119, ECF No. 2062093, Lebsack Decl. ¶¶ 25-26.  EPA reasonably declined to assume that Colstrip would retire when Colstrip itself had not decided to retire.

EPA examined the potential interaction between the surrogate standard and a roughly contemporaneous EPA rule that requires use of carbon capture and sequestration by certain coal-fired power plants.  *See* 89 Fed. Reg. at 40012-13, 40020.  *Contra* Pet. Br. 84-85.  In that context, it considered whether to create a subcategory for units with announced near-term retirements.  89 Fed. Reg. at 38527; JA 1633 (Resp. to Comments 38).  EPA reasonably declined to create such a subcategory because "only a few facilities" would be eligible for a near-term

80

retirement subcategory. Less than a quarter of coal-fired power plants had preexisting plans to retire between 2029 and 2032; only three of those could not already meet the stricter standard. 89 Fed. Reg. at 38527. And Colstrip was not one of the plants with preexisting retirement plans because its owners had never stated that Colstrip would actually retire. *Id.* EPA further noted that allowing units to operate without best-performing controls for an additional number of years would lead to higher levels of emissions and continued exposure to those emission in surrounding communities. *Id.* Thus, a retirement subcategory would not have materially reduced overall compliance costs and would have had "little utility." *Id.*

EPA reasonably concluded that it was not a viable alternative to exempt "potentially" retiring units, like Colstrip, from its standards. If EPA had exempted all "potentially" retiring units, then every coal-fired unit would presumably be exempted, as all plants will retire at some point. *Cf.* JA 1633 (Resp. to Comments 38) ("The Agency has not previously subcategorized based on retirements under [Section 7412], and do[es] not find it appropriate to do so at this time.").

Nor did EPA err in calculating cost-effectiveness for Colstrip. EPA estimated that fabric filters can slash Colstrip's emissions by 90 percent, to just above 0.002 lb/MMBtu. JA 1560 (2024 Technical Memo 16); JA 0384-85 (2023 Technical Memo 9-10). That reduction was used to calculate cost-effectiveness. *Id.* Petitioners assume fabric filters can reduce Colstrip's emissions only to 0.010

81

lb/MMBtu.  Pet. Br. 90; JA 1089-94 (EPA-HQ-OAR-2018-0794-5987, Talen

Comment 16-21).  But fabric filters cannot be fine-tuned to reduce air toxics by a

specified amount.  So Petitioners' method, in undercounting reduced pollution (the

benefits), distorts cost-effectiveness.  *See id*.

Finally, Petitioners contend that Colstrip is not actually a straggler and that

there "is no meaningful health risk from Colstrip's current [air toxics] emissions."

Pet. Br. 82.  Petitioners claim that unique properties of the coal Colstrip fires

causes the surrogate filterable particulate matter monitoring to overestimate

emissions of non-mercury metals.  *Id.*  But if that were true, then Colstrip could

demonstrate compliance by directly reporting emissions of non-mercury metals,

rather than measuring filterable particulate matter under the surrogate standard.

*See* 89 Fed. Reg. at 38520, 38535.[18]

Ultimately, Section 7412 aims to reduce air-toxics emissions through better

technology and to require sources to realize opportunities to do better.  EPA

tightened the surrogate standard to bring emissions from higher-emitting units,

including Colstrip, to levels the rest of the industry had proven were achievable.  It

would defeat Section 7412's text and design to allow the bottom 10% of power

plants—or here, the absolute worst-performing plant—to dictate whether emission

---

[18] So far, Colstrip has chosen to utilize the "more easily measurable surrogate"—as
has all but one coal-fired power plant—and even paid a large fine for violating the
surrogate threshold.  89 Fed. Reg. at 38531, 38535.

standards revisions are necessary. Congress mandated that EPA realize the

"maximum degree of reduction in emissions" that EPA "determines is achievable."

42 U.S.C. § 7412(d)(2).

**E. The Rule is not a pretext to regulate greenhouse gas emissions.**

EPA tightened the surrogate and mercury standards to reduce power plants'

air-toxics emissions.  The standards are not, as Petitioners imagine, a pretext for

EPA to "force the premature retirement of coal plants and accomplish its clean

energy agenda."  Pet. Br. 99.  As discussed above, EPA reasonably explained why

it was promulgating the two revised standards following its technology review

under Section 7412(d)(6).  *See supra* 48-75.  That explanation is entitled to respect

and is not subject to "judicial inquiry into 'executive motivation,'" which

"represents 'a substantial intrusion' into the workings of another branch of

Government and should normally be avoided."  *Dep't of Commerce v. New York,*

588 U.S. 752, 781 (2019) (citation omitted).  A "presumption of regularity

supports the official acts of public officers, and, in the absence of clear evidence to

the contrary, courts presume that they have properly discharged their official

duties."  *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926).

The supposed hidden motive is also belied by the record.  The standards are

expected to result in zero coal-fired retirements.  *See* JA 1802 (Reg. Impact

Analysis 3-18).  And EPA rejected calls for stricter standards.  89 Fed. Reg. at

38532 (Table 4), 38538.

Petitioners' reliance on extra-record evidence such as news interviews and

internal documents also fails.  A court is "ordinarily limited to evaluating the

agency's contemporaneous explanation in light of the existing administrative

record."  *Dep't of Commerce*, 588 U.S. at 780.  And Congress made that ordinary

rule mandatory here.  *See* 42 U.S.C. § 7607(d)(7)(A) (providing that the "record

for judicial review shall consist exclusively of the material" in the administrative

record).  Petitioners give no compelling reason to consider their extra-record

material.

Even if this Court were to consider Petitioners' extra-record material, none

of it demonstrates pretext.  For example, the Administrator's statement in a PBS

interview about "coupl[ing] the regulation of climate pollution with the regulation

of health-based pollution" was a response to a question about "the kind of tools

that you believe you still can use to regulate [the power] industry," not some

revelation of a hidden motive.  Pet. Br. 101 (citation and emphasis omitted).  This

Court in *Department of Commerce* affirmed a lower court's remand to the agency

on the ground that the proffered "explanation for agency action" was "incongruent

with what the record reveals about the agency's priorities and decisionmaking

process."  588 U.S. at 785.  EPA's explanation for the Rule is straightforward and

entirely consistent with the record: EPA conducted a technology review under Section 7412(d)(6) and revised emission standards as Congress directed. Nothing in the Petitioners' extra-record evidence is "incongruent" with that explanation.

## F. EPA complied with the procedural requirements of the Regulatory Flexibility Act.

Intervenor repackages its challenges to EPA's cost estimates for the Rule as a violation of the Regulatory Flexibility Act. Inter. Br. 32-36. Intervenor essentially argues that EPA undercounted the number of small entities significantly affected because EPA "is deliberately low-balling costs." *Id.* at 33-34.

Petitioners did not challenge the Rule or offer argument based on violations of the Regulatory Flexibility Act. Petitioners' only reference to any such argument was to notify the Court that "the Rule's impacts on small entities under the Regulatory Flexibility Act is addressed in Petitioner-Intervenor San Miguel's forthcoming brief." Pet. Br. 55 n.9. However, an intervenor "may only argue issues that have been raised by the principal parties." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 590 (D.C. Cir. 2019) (cleaned up). Because Intervenor declined to file its own petition, it "forfeited any guarantee to judicial review of its claim." *Id.* Intervenor has failed to establish, or even allege, any "extraordinary" reason for the court to consider its intervenor-only argument, nor has Intervenor provided any "excuse" for its failure to file a petition. *Id.* (cleaned up). Thus, the Court should disregard this Intervenor-only argument.

Regardless, the requirements of the Regulatory Flexibility Act do not apply to agency rules if the agency head certifies that the rule "will not . . . have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). The Act is "purely procedural." *Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) (citing *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001)). "[T]he Act in and of itself imposes no substantive constraint on agency decisionmaking." *Id.* Thus, an agency need only make a reasonable, good-faith effort to comply. *See U.S. Cellular*, 254 F.3d at 88.

EPA conducted a detailed analysis in the Regulatory Impact Analysis in concluding that "only one entity may experience compliance cost increases greater than one percent of revenue under the [Rule]." 89 Fed. Reg at 38562; JA 1893-900 (Reg. Impact Analysis 5-1 to 5-8). Therefore, EPA certified that the Rule will not have a significant economic impact on a substantial number of small entities. 89 Fed. Reg at 38562. And contrary to Intervenor's claims, EPA reasonably estimated compliance costs. *See supra* 57-75 (discussing EPA's compliance costs estimates). *Contra* Inter. Br. 35-36. Intervenor just disagrees with EPA's estimates. Intervenor's complaints about the substance of EPA's cost-estimates are not a cognizable claim that EPA failed to comply with the procedural requirements of the Regulatory Flexibility Act.

## CONCLUSION

The Court should deny these petitions.

Respectfully submitted,

Todd Kim
Assistant Attorney General
Environment & Natural Resources Div.

*Of Counsel:*

*/s/ David Mitchell*

Matthew McNerney
U.S. Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

Redding Cofer Cates
Sue Chen
David D. Mitchell
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044

DATE: December 10, 2024

202-514-0165 (Mitchell)
david.mitchell@usdoj.gov

Counsel for Respondents

87

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) and this Court's briefing order because this brief contains 19,454 words, excluding the parts of the brief exempt under Fed. R. App. P. 32 (a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in proportionally spaced typeface using Microsoft Word 14-point Times New Roman type.  Finally, I certify that on December 10, 2024, I electronically filed this document with the Court's CM/ECF system, which will serve each party.

DATE: December 10, 2024         */s/ David Mitchell*_____
                                David D. Mitchell

                                Counsel for Respondents