**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 24-1119 (and consolidated cases)**

# United States Court of Appeals
# For the District of Columbia Circuit

STATE OF NORTH DAKOTA, ET AL.,

Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY

Respondent.

On Petition for Judicial Review of Final Agency Action of the United States
Environmental Protection Agency, 89 Fed. Reg. 38508 (May 7, 2024)

## FINAL OPENING BRIEF OF PETITIONERS

PATRICK MORRISEY
Attorney General

MICHAEL R. WILLIAMS
Solicitor General
State Capitol Bldg. 1, Room E-26
Charleston, WV 25301
Phone: 304.558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

DREW H. WRIGLEY
Attorney General

PHILIP AXT
Solicitor General
600 E Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: 701.328.2210
pjaxt@nd.gov

NESSA HOREWITCH COPPINGER
DAVID M. FRIEDLAND
Special Assistant Attorneys General
1900 N Street NW, Suite 100
Washington, DC 20036
ncoppinger@bdlaw.com
dfriedland@bdlaw.com

*Counsel for State of North Dakota*

*Additional Counsel Listed on Following Pages*

TREG TAYLOR
Attorney General

GARRISON TODD
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Ave.
Suite 200
Anchorage, AK 99501
(907) 269-5100
Garrison.Todd@alaska.gov

*Counsel for State of Alaska*

CHRISTOPHER M. CARR
Attorney General

STEPHEN J. PETRANY
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

TIM GRIFFIN
Attorney General

NICHOLAS J. BRONNI
Solicitor General
DYLAN L. JACOBS
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
nicholas.bronni@arkansasag.gov

*Counsel for State of Arkansas*

RAÚL R. LABRADOR
Attorney General

ALAN M. HURST
Solicitor General
Office of Idaho Attorney General
P.O. Box. 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@aga.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
Attorney General

JAMES A. BARTA
Solicitor General
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

KRIS W. KOBACH
Attorney General

ANTHONY J. POWELL
Solicitor General
Office of Kansas Attorney General
120 SW 10th Avenue, 2ndFloor
Topeka, Kansas 66612
(785) 368-8539
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

ELIZABETH B. MURRILL
Attorney General

J. BENJAMIN AGUIÑAGA
Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70802
(225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for State of Louisiana*

BRENNA BIRD
Attorney General

ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

RUSSELL COLEMAN
Attorney General

MATTHEW F. KUHN
Solicitor General
JACOB M. ABRAHAMSON
Assistant Solicitor General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for Commonwealth of Kentucky*

LYNN FITCH
Attorney General

JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW T. BAILEY
Attorney General

SAMUEL C. FREEDLUND
Deputy Solicitor General
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, Missouri 63101
(314) 340-4869
Samuel.Freedlund@ago.mo.gov

*Counsel for State of Missouri*


MICHAEL T. HILGERS
Attorney General

GRANT D. STROBL
Assistant Solicitor General
Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.strobl@nebraska.gov

*Counsel for State of Nebraska*



ALAN WILSON
Attorney General

THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*

AUSTIN KNUDSEN
Attorney General

CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707
Christian.Corrigan@mt.gov

*Counsel for State of Montana*


GENTNER DRUMMOND
Attorney General

GARRY M. GASKINS, II
Solicitor General
JENNIFER L. LEWIS
Deputy Attorney General
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*


MARTY J. JACKLEY
Attorney General

STEVE BLAIR
Deputy Attorney General
Office of the Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
(605) 773-3215
atgservice@state.sd.us
steven.blair@state.sd.us

*Counsel for State of South Dakota*

JONATHAN SKRMETTI
Attorney General

WHITNEY HERMANDORFER
Director of Strategic Litigation
MATTHEW RICE
Solicitor General
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Matthew.Rice@ag.tn.gov

*Counsel for State of Tennessee*


SEAN REYES
Attorney General

STANFORD PURSER
Solicitor General
Office of the Utah Attorney General
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(385) 366-4334
Spurser@agutah.gov

*Counsel for State of Utah*

KEN PAXTON
Attorney General

JOHN R. HULME
Assistant Attorney General
BRENT WEBSTER
First Assistant Attorney General
JAMES LLOYD
Deputy Attorney General for Civil
Litigation
KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
John.hulme@oag.texas.gov

*Counsel for State of Texas*

JASON MIYARES
Attorney General

KEVIN M. GALLAGHER
Principal Deputy Solicitor General
BRENDAN T. CHESTNUT
Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Commonwealth of Virginia*

BRIDGET HILL
Attorney General

D. DAVID DEWALD
Deputy Attorney General
Wyoming Attorney General's Office
Water & Natural Resources Division
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for State of Wyoming*


Charles T. Wehland
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60601-1692
Tel: (312) 269-4388
ctwehland@jonesday.com

Jeffery D. Ubersax
KUSHNER & HAMED CO., LPA
1375 East Ninth Street, Suite 1390
Cleveland, OH 44114
Tel: (216) 696-6700
jdubersax@kushnerhamed.com

Yaakov M. Roth
Brinton Lucas
Madeline W. Clark
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 879-7658
yroth@jonesday.com
blucas@jonesday.com
mclark@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

Elizabeth C. Williamson
BALCH & BINGHAM LLP
601 Pennsylvania Ave. N.W.
Suite 825 South
Washington, D.C. 20004
(202) 661-6342
(202) 347-6001 (fax)
ewilliamson@balch.com

Claire B. Johnson
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
cbjohnson@balch.com

*Counsel for National Rural Electric
Cooperative Association, Minnkota
Power Cooperative, Inc., East Kentucky
Power Cooperative, Inc., Associated
Electric Cooperative, Inc., Basin
Electric Power Cooperative*

Misha Tseytlin
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe St, Suite 3900
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

Carroll Wade McGuffey III
TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree St. N.E., Suite 3000
Atlanta, GA 30308
(404) 885-3698
mack.mcguffey@troutman.com

*Counsel for Lignite Energy Council
and National Mining Association*

Megan H. Berge
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-1308

*Counsel for Rainbow Energy Center,
LLC*

C. Grady Moore III
P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
gmoore@balch.com

*Counsel for Oak Grove Management
Company LLC and Luminant
Generation Company LLC*

Joshua B. Frank
C. Joshua Lee
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
Tel.: (202) 639-7748
(202) 639-1130
joshua.frank@bakerbotts.com
joshua.lee@bakerbotts.com

*Counsel for Talen Montana, LLC*

Mark W. DeLaquil
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1527
mdelaquil@bakerlaw.com

Martin T. Booher
Joshua T. Wilson
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

*Counsel for Westmoreland Mining
Holdings LLC, Westmoreland Mining,
and Westmoreland Rosebud Mining,
LLC*

Makram B. Jaber
Allison D. Wood
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-1700
mjaber@mcguirewoods.com
awood@mcguirewoods.com
aflynn@mcguirewoods.com

*Counsel for America's Power and
Electric Generators MATS Coalition*

David M. Flannery
Kathy G. Beckett
Keeleigh S. Huffman
STEPTOE & JOHNSON PLLC
707 Virginia Street, East
P.O. Box 1588
Charleston, WV 25326
(304) 353-8000
Dave.Flannery@steptoe-johnson.com
Kathy.Beckett@steptoe-johnson.com
Keeleigh.Huffman@steptoe-
johnson.com

Creighton R. Magid #49713
DORSEY & WHITNEY LLP
1401 New York Avenue NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3555
Fax: (202) 315-3852
magid.chip@dorsey.com

*Counsel for NorthWestern Corporation,
d/b/a NorthWestern Energy*

Edward L. Kropp
STEPTOE & JOHNSON PLLC
P.O. Box 36425
Indianapolis, Indiana 46236
317-946-9882
Skipp.Kropp@steptoe-johnson.com

*Counsel for Midwest Ozone Group*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners state as follows:

**A.    Parties**

**1.    Petitioners**

The following parties appear as Petitioners:

No. 24-1119: State of North Dakota, State of West Virginia, State of Alaska, State of Arkansas, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, and State of Wyoming.

No. 24-1154: NACCO Natural Resources Corporation.

No. 24-1179: National Rural Electric Cooperative Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative Inc., Basin Electric Power Cooperative, Lignite Energy Council, National Mining Association, and Rainbow Energy Center, LLC.

No. 24-1184: Oak Grove Management Company LLC and Luminant Generation Company LLC.

No. 24-1190: Talen Montana, LLC.

No. 24-1194: Westmoreland Mining Holdings LLC, Westmoreland Mining, and Westmoreland Rosebud Mining, LLC.

i

No. 24-1201: America's Power and Electric Generators MATS Coalition.

No. 24-1217: NorthWestern Corporation, d/b/a NorthWestern Energy.

No. 24-1223: Midwest Ozone Group.

## 2.    Respondents

The following party appears as Respondent: United States Environmental Protection Agency (in all case numbers) and Michael S. Regan, in his official capacity as Administrator of the Environmental Protection Agency (in Nos. 24-1154, 24-1179, 24-1184, 24-1190, 24-1194, 24-1217, 24-1223).

## 3.    Intervenors

Petitioner Intervenor: San Miguel Electric Cooperative, Inc.

Respondent Intervenors: (1) Air Alliance Houston, Alliance of Nurses for Healthy Environments, American Academy of Pediatrics, American Lung Association, American Public Health Association, Chesapeake Climate Action Network, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Montana Environmental Information Center, Natural Resources Council of Maine, Natural Resources Defense Council, the Ohio Environmental Council, Physicians for Social Responsibility, and Sierra Club; and (2) State of Massachusetts, State of Minnesota, State of Connecticut, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of New Jersey, State of New

York, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Wisconsin, District of Columbia, City of Baltimore, City of Chicago, City of New York.

### 4. Amici

Amici Curiae in support of Petitioners: None at present.

Amici Curiae in support of Respondents: None at present.

## B. Rule Under Review

The rule at issue before this Court is the United States Environmental Protection Agency's final action entitled: National Emission Standards for Hazardous Air Pollutants: Coal-and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review.  J.A.0001(89 Fed.Reg. 38508 (May 7, 2024)).

## C. Related Cases

Multiple petitioners have applications for a stay of the Rule pending before the Supreme Court.  *See* Supreme Court Nos. 24A178, 24A179, 24A180, 24A186, 24A197, 24A199, 24A203.  These consolidated cases have otherwise not been before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENTS

## RULE 26.1 DISCLOSURE STATEMENT FOR NACCO NATURAL RESOURCES CORPORATION

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner NACCO Natural Resources Corporation (NACCO) submits the following corporate disclosure statement:

1.      NACCO is a wholly owned subsidiary of NACCO Industries, Inc.

2.      NACCO is not publicly held, but NACCO Industries, Inc., its parent, is a publicly traded corporation that owns more than 10% of the stock of NACCO.

3.      No other publicly held corporation owns more than 10% of the stock of NACCO.

4.      The general nature and purpose of NACCO, insofar as relevant to this litigation, is the mining and delivery of lignite coal as fuel for power generation and the provision of mining services to natural resources companies.

Dated: October 1, 2024                  Respectfully submitted,

                                        /s/ Charles T. Wehland

Jeffery D. Ubersax                      Charles T. Wehland
KUSHNER & HAMED CO., LPA                JONES DAY
1375 East Ninth Street, Suite 1390      110 North Wacker Drive, Suite 4800
Cleveland, OH 44114                     Chicago, IL 60601-1692
Tel: (216) 696-6700                     Tel: (312) 269-4388
jdubersax@kushnerhamed.com              ctwehland@jonesday.com

                                        Yaakov M. Roth
                                        Brinton Lucas
                                        Madeline W. Clark
                                        JONES DAY

iv

51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 879-7658
yroth@jonesday.com
blucas@jonesday.com
mclark@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

**RULE 26.1 DISCLOSURE STATEMENTS FOR NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION, LIGNITE ENERGY COUNCIL, NATIONAL MINING ASSOCIATION, MINNKOTA POWER COOPERATIVE, INC., EAST KENTUCKY POWER COOPERATIVE, INC., ASSOCIATED ELECTRIC COOPERATIVE INC., BASIN ELECTRIC POWER COOPERATIVE, AND RAINBOW ENERGY CENTER, LLC**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners National Rural Electric Cooperative Association, Lignite Energy Council, National Mining Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative Inc., Basin Electric Power Cooperative, and Rainbow Energy Center, LLC, submit the following corporate disclosure statements:

**National Rural Electric Cooperative Association (NRECA)** is the national association for nearly 900 not-for-profit rural electric cooperatives and public power districts that provide electric service to roughly one in eight Americans, covering 56% of the Nation's landmass.  Rural electric cooperatives serve millions of businesses, homes, schools, farms, irrigation systems, and other establishments in 2,500 of the nation's over 3,100 counties, including 92% of the nation's persistent poverty counties.  America's electric cooperatives are owned by the people they serve, and they comprise a unique sector of the electric industry.  Electric cooperatives are focused on providing affordable, reliable, and safe electric power in an environmentally responsible manner.  NRECA is not a publicly held

corporation, and NRECA has no parent corporation.  No publicly held company has 10% or greater ownership interest in NRECA.

**Lignite Energy Council (LEC)** is a regional, nonprofit organization whose primary mission is to promote the continued development and use of lignite coal as an energy resource.  LEC's membership includes producers of lignite coal who have an ownership interest in and who mine lignite, users of lignite who operate lignite-fired electric generating plants, and suppliers of goods and services to the lignite coal industry.  LEC has no outstanding shares or debt securities in the hand of the public and has no parent company.  No publicly held company has a 10% or greater ownership interest in LEC.

**National Mining Association (NMA)** is a nonprofit national trade association that represents the interests of the mining industry, including every major coal company operating in the United States.  NMA has over 280 members, whose interests it represents before Congress, the administration, federal agencies, the courts, and the media.  NMA is a "trade association" within the meaning of Circuit Rule 26.1(b).  NMA is not a publicly held corporation and has no parent corporation. No publicly held company has 10% or greater ownership interest in NMA.

**Minnkota Power Cooperative, Inc. (Minnkota)** is a corporation organized under the laws of the State of Minnesota, and its corporate headquarters are located at 5301 32nd Avenue South, Grand Forks, North Dakota 58201.  Minnkota is owned

by 11 rural electric cooperatives: Beltrami Electric Cooperative, Cass County Electric Cooperative, Cavalier Rural Electric Cooperative, Clearwater-Polk Electric Cooperative, Nodak Electric Cooperative, North Star Electric Cooperative, PKM Electric Cooperative, Red Lake Electric Cooperative, Red River Valley Co-op Power, Roseau Electric Cooperative, and Wild Rice Electric Cooperative.  No publicly held corporation owns 10% or more of Minnkota's stock.

**East Kentucky Power Cooperative, Inc. (East Kentucky)** is a corporation organized under the laws of the Commonwealth of Kentucky, and its corporate headquarters are located at 4775 Lexington Road, Winchester, Kentucky 40392. East Kentucky is owned by 16 rural electric cooperatives: Big Sandy Rural Electric Cooperative, Blue Grass Energy Cooperative, Clark Energy Cooperative, Cumberland Valley Electric, Farmers Rural Electric Cooperative, Fleming-Mason Energy Cooperative, Grayson Rural Electric Cooperative, Inter-County Energy, Jackson Energy Cooperative, Licking Valley Rural Electric Cooperative, Nolin Rural Electric Cooperative, Owen Rural Electric Cooperative, Salt River Electric Cooperative, Shelby Energy Cooperative, South Kentucky Rural Electric Cooperative, and Taylor County Rural Electric Cooperative.  No publicly held corporation owns 10% or more of East Kentucky's stock.

**Associated Electric Cooperative Inc.** is a corporation organized under the laws of the State of Missouri.  Associated Electric Cooperative Inc. has no parent

companies, non-wholly owned subsidiaries, or affiliates that have issued shares to the public.

**Basin Electric Power Cooperative (Basin Electric)** is a cooperative corporation organized under the laws of the State of North Dakota, and its corporate headquarters are located at 1717 East Interstate Avenue, Bismarck, North Dakota 58503. Basin Electric is owned by 141 rural electric cooperatives. Its Class A members include: Central Montana Electric Power Cooperative, Central Power Electric Cooperative, Corn Belt Power Cooperative, Crow Wing Power, East River Electric Power Cooperative, Grand Electric Cooperative, KEM Electric Cooperative, L&O Power Cooperative, Members 1st Power Cooperative, Minnesota Valley Cooperative Light & Power Association, Minnesota Valley Electric Cooperative, Mor-Gran-Sou Electric Cooperative, Northwest Iowa Power Cooperative, Rosebud Electric Cooperative, Rushmore Electric Power Cooperative, Tri-State Generation and Transmission Association, Upper Missouri Power Cooperative, Wright-Hennepin Cooperative Electric Association, Wyoming Municipal Power Agency. No publicly held company has 10% or greater ownership interest in Basin Electric.

**Rainbow Energy Center, LLC (Rainbow)** is a North Dakota limited liability company, is a wholesale power generation company headquartered in Bismarck, North Dakota. Rainbow is a wholly owned subsidiary of REMC Assets, LP, a North

Dakota limited partnership.  REMC Group, LLC, a North Dakota limited liability company, holds the 1% general partner controlling interest in REMC Assets, LP.  No publicly held corporation has a 10% or greater ownership interest in REMC Assets, LP or in REMC Group, LLC.

Dated: October 1, 2024

Respectfully submitted,

*/s/ Elizabeth C. Williamson*
Elizabeth C. Williamson
BALCH & BINGHAM LLP
601 Pennsylvania Ave. N.W.
Suite 825 South
Washington, D.C. 20004
(202) 661-6342
(202) 347-6001 (fax)
ewilliamson@balch.com

Claire B. Johnson
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
cbjohnson@balch.com

*Counsel for National Rural Electric Cooperative Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative, Inc., Basin Electric Power Cooperative*

*/s/ Misha Tseytlin*
Misha Tseytlin
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL 60606
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

Carroll Wade McGuffey III
TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree St. N.E., Suite 3000
Atlanta, GA 30308
(404) 885-3698
mack.mcguffey@troutman.com

*Counsel for Lignite Energy Council and National Mining Association*

*/s/ Megan Berge*
Megan H. Berge
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-1308

*Counsel for Rainbow Energy Center, LLC*

### RULE 26.1 DISCLOSURE STATEMENT FOR OAK GROVE MANAGEMENT COMPANY LLC AND LUMINANT GENERATION COMPANY LLC

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Oak Grove Management Company LLC and Luminant Generation Company LLC submit the following corporate disclosure statement:

**Oak Grove Management Company LLC** and **Luminant Generation Company LLC** are each wholly owned subsidiaries of Vistra Asset Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Operations Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Intermediate Company LLC, a Delaware limited liability company, which in turn is a wholly owned subsidiary of Vistra Corp., a publicly held corporation incorporated under the laws of Delaware. Vistra Corp. is publicly traded on the NYSE under the symbol "VST." To Petitioners' knowledge, except for BlackRock Inc. and The Vanguard Group, Inc., in each case together with their respective affiliates and managed entities, there are no publicly traded corporations that own more than 10% of Vistra Corp.'s stock.

Dated: October 1, 2024    Respectfully submitted,

*/s/ C. Grady Moore III*
C. Grady Moore III
P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500

xi

Birmingham, Alabama 35203
205-251-8100
gmoore@balch.com

*Counsel for Oak Grove Management Company*
*LLC and Luminant Generation Company LLC*

**RULE 26.1 DISCLOSURE STATEMENT FOR TALEN MONTANA, LLC**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner submits the following required Disclosure Statement.

**Talen Montana, LLC (Talen)** is a power generation company, which operates and partially owns Colstrip Unit 3 (and has an economic interest in Colstrip Unit 4), which are power plant units affected by EPA's final action subject to this Petition for Review.  Talen is an indirect, wholly owned subsidiary of Talen Energy Corporation.  Talen Energy Corporation is a publicly traded corporation.  No publicly held company owns more than 10% of Talen Energy Corporation's stock.

Dated: October 1, 2024

Respectfully submitted,

*/s/ Joshua B. Frank*
Joshua B. Frank
C. Joshua Lee
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
Tel.: (202) 639-7748
(202) 639-1130
joshua.frank@bakerbotts.com
joshua.lee@bakerbotts.com

*Counsel for Talen Montana, LLC*

## RULE 26.1 DISCLOSURE STATEMENTS FOR WESTMORELAND MINING HOLDINGS LLC, WESTMORELAND MINING LLC, AND WESTMORELAND ROSEBUD MINING LLC

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners submit the following corporate disclosure statements:

**Westmoreland Mining Holdings LLC** has no parent corporation and no publicly held corporations own 10% or more of its stock.  The company has an extensive portfolio of coal mining operations in the United States and Canada.

**Westmoreland Mining LLC** has no parent corporation and no publicly held corporations own 10% or more of its stock.  The company has an extensive portfolio of coal mining operations in the United States and Canada.

**Westmoreland Rosebud Mining LLC** has no parent corporation and no publicly held corporations own 10% or more of its stock.  The company has an extensive portfolio of coal mining operations in the United States and Canada.

Dated: October 1, 2024          Respectfully submitted,

                                */s/ Mark W. DeLaquil*
                                Mark W. DeLaquil
Martin T. Booher               Baker & Hostetler LLP
Joshua T. Wilson               1050 Connecticut Ave., N.W., Suite 1100
Baker & Hostetler LLP          Washington, D.C. 20036
2000 Key Tower                 Tel: (202) 861-1527
127 Public Square              mdelaquil@bakerlaw.com
Cleveland, Ohio 44114

*Counsel for Petitioners Westmoreland Mining Holdings LLC,*
*Westmoreland Mining LLC, and Westmoreland Rosebud Mining LLC*

## RULE 26.1 DISCLOSURE STATEMENTS FOR AMERICA'S POWER AND ELECTRIC GENERATORS MATS COALITION

**America's Power.**  Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, America's Power submits the following statement:

America's Power is a nonprofit membership corporation organized under the laws of the District of Columbia and is recognized as a tax-exempt trade association by the Internal Revenue Service under Section 501(c)(6) of the Internal Revenue Code.  America's Power is the only national trade association whose sole mission is to advocate at the federal and state levels on behalf of coal-fueled electricity, the coal fleet, and its supply chain.  America's Power supports policies that promote the use of coal to assure a reliable, resilient, and affordable supply of electricity to meet our nation's demand for energy.

America's Power is a "trade association" within the meaning of Circuit Rule 26.1(b).  It has no parent corporation, and no publicly held company owns a 10 percent or greater interest in America's Power.

**Electric Generators MATS Coalition.**  Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Electric Generators MATS Coalition submits the following statement:

Electric Generators MATS Coalition is an *ad hoc* coalition of electric generating companies that have joined together for the purpose of filing this petition

for review.  The members of the *ad hoc* coalition own and operate electric generating units that are subject to the final rule at issue in this case.  The members of the *ad hoc* coalition are the Salt River Project Agricultural Improvement and Power District; Talen Energy Supply, LLC; and NorthWestern Energy Public Service Corporation.

Electric Generators MATS Coalition has no parent corporation, and no publicly held corporation has a 10% or greater ownership in it.

Dated: October 1, 2024

Respectfully submitted,

/s/ *Makram B. Jaber*
Makram B. Jaber
Allison D. Wood
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-1700
mjaber@mcguirewoods.com
awood@mcguirewoods.com
aflynn@mcguirewoods.com

*Counsel for America's Power and Electric Generators MATS Coalition*

## RULE 26.1 DISCLOSURE STATEMENT FOR NORTHWESTERN CORPORATION

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, **NorthWestern Corporation** submits the following required Disclosure Statement.

NorthWestern Corporation d/b/a NorthWestern Energy ("NorthWestern Energy") is a wholly owned subsidiary of NorthWestern Energy Group, a publicly traded company (Nasdaq: NWE) that is incorporated in Delaware. Based on a June 21, 2024, review of the most recent statements filed with the Securities and Exchange Commission pursuant to Sections 13(d), 13(f), and 13(g) of the Securities Exchange Act of 1934, two publicly held companies own 10% or more of NorthWestern Energy Group's stock: BlackRock Inc. and Vanguard Group Inc.

Dated: October 1, 2024

Respectfully submitted,

*/s/ Creighton R. Magid*
Creighton R. Magid #49713
DORSEY & WHITNEY LLP
1401 New York Avenue NW
Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3555
Fax: (202) 315-3852
magid.chip@dorsey.com

*Counsel for NorthWestern Corporation,*
*d/b/a NorthWestern Energy*

xvii

# RULE 26.1 DISCLOSURE STATEMENT OF MIDWEST OZONE GROUP

Pursuant to Federal Rules of Appellate Procedure and Circuit Rule 26.1 and Circuit Rule 26.1, the **Midwest Ozone Group**, files the following statement:

Midwest Ozone Group is a continuing association of individuals operated for the purpose of promoting the general interests of its membership.  Midwest Ozone Group has no outstanding shares or debt securities in the hand of the public and has no parent company.

No publicly held company has a 10% or greater ownership interest in the Midwest Ozone Group.

Dated: October 1, 2024

Respectfully submitted,

*/s/ David M. Flannery*

Edward L. Kropp
Steptoe & Johnson PLLC
P.O. Box 36425
Indianapolis, Indiana 46236
317-946-9882
Skipp.Kropp@steptoe-johnson.com

David M. Flannery
Kathy G. Beckett
Keeleigh S. Huffman
Steptoe & Johnson PLLC
707 Virginia Street, East
P.O. Box 1588
Charleston, WV 25326
(304) 353-8000
Dave.Flannery@steptoe-johnson.com
Kathy.Beckett@steptoe-johnson.com
Keeleigh.Huffman@steptoe-johnson.com

*Counsel for Midwest Ozone Group*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....................................................................................i

    A.    Parties ..............................................................................i

        1.    Petitioners...........................................................i

        2.    Respondents ...................................................... ii

        3.    Intervenors ....................................................... ii

        4.    Amici............................................................... iii

    B.    Rule Under Review ........................................................ iii

    C.    Related Cases ............................................................. iii

CORPORATE DISCLOSURE STATEMENTS ........................................iv

TABLE OF CONTENTS ...............................................................xix

TABLE OF AUTHORITIES ....................................................... xxiii

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ................................xxx

INTRODUCTION ....................................................................1

JURISDICTION.....................................................................5

STATEMENT OF ISSUES ..........................................................5

STATUTES AND REGULATIONS....................................................7

STATEMENT OF THE CASE.......................................................8

    A.    Setting and Revising Emission Standards Under Section 112 ...........................................................................8

        1.    The 2012 Mercury and Air Toxics (MATS) Rule ....................10

        2.    *Michigan v. EPA* and Subsequent Appropriate and Necessary Determinations ........................................11

3.     The 2020 Section 112(f)(2) and Section 112(d)(6) Reviews and the Executive Order on Climate Change.............................................................12

B.    The 2023 Section 112(f)(2) and 112(d)(6) Re-Reviews and the 2024 Revisions to the MATS Rule...........................................13

1.     Revision to the Surrogate fPM Emission Standard ..................14

2.     Revision to the Mercury Emission Standard for Lignite-Fired EGUs.................................................................16

3.     Mandate to Demonstrate Compliance with the Lowered Surrogate fPM Standard Using CEMS......................18

C.    EPA's Cost-Benefit and Cost-Effectiveness Analyses for the 2024 MATS Rule ...........................................................19

D.    EPA's Grid Reliability Analysis .......................................21

SUMMARY OF THE ARGUMENT ....................................................23

STANDING .......................................................................................28

STANDARD OF REVIEW ..................................................................30

ARGUMENT .....................................................................................31

I.     The Rule Is Contrary To Statute................................................31

A.    The Rule is Not "Necessary" .............................................32

1.     Section 112(d)(6) Permits EPA to Revise Power Plant Emission Standards Only Where "Necessary" to Protect Public Health ......................................32

2.     EPA's Own Analysis Shows that its Revisions to the MATS Rule are Not "Necessary" .......................................35

3.     EPA's Interpretation of "Necessary" Misreads the Statute and Contradicts the Agency's Interpretation in Numerous Other Rulemakings.......................39

B.    EPA Has Not Identified a "Development" that
      Authorizes Further Rulemaking Under Section 112(d)(6) ...............45

      1.    Meeting the Current Emission Standards is Not a
            "Development" Supporting Revision .......................................46

      2.    Achieving the Standard at Costs Lower Than
            Estimated in 2012 is Not a "Development" for
            Section 112(d)(6) ....................................................................48

      3.    EPA's Purported "Incremental" Developments are
            a Makeweight that Do Not Support Revising the
            Standards ................................................................................50

      4.    *Surface Finishing* Does Not Justify EPA's
            Interpretation .........................................................................52

II.    The Rule is Arbitrary and Capricious..........................................................54

      A.    EPA's Consideration of Costs is Arbitrary and
            Capricious.......................................................................................54

            1.    The Rule Imposes Substantial Costs Without Any
                  Demonstrated Benefit from the Reduction in HAP
                  Emissions ...............................................................................55

            2.    EPA's Cost-effectiveness Analysis is Arbitrary
                  and Capricious........................................................................58

      B.    EPA's Failure to Meaningfully Consider the Rule's
            Impacts on the Power Grid is Arbitrary and Capricious....................61

      C.    The Rule Is Based on Unreliable and Insufficient
            Arbitrarily Truncated Data and Unsupported
            Assumptions ....................................................................................65

            1.    EPA's fPM Analysis is Deeply Flawed....................................66

                  a.    The Revised fPM Standard Relies on Unsupported
                        Assumptions that Run Counter to the Empirical Data ...66

                  b.    EPA's Refusal to Account for a Compliance Margin
                        is Unreasonable..............................................................70

2.    EPA's Mercury Emission Analysis is Based on
       Biased, Insufficient and Unreliable Data .................................73

       a.    Mercury Data Emissions from Lignite Facilities
              Do Not Support the 1.2 lb/TBtu Mercury Limit ............74

       b.    EPA's Mercury Analysis Fails to Show the New Limit
              is Feasible Due to Data Deficiencies and Flawed
              Assumptions .................................................................76

       c.    The Rule's Mercury Cost Analysis is Defective ...........81

D.    The Colstrip Power Plant Exemplifies EPA's Arbitrary
       and Capricious Decisionmaking in the Rule .......................................82

       1.    EPA Failed to Properly Assess the Risks of
              Colstrip's Retirement .................................................85

              a.    Colstrip Petitioners Articulated Substantial Risks
                     from the Rule .................................................85

              b.    EPA Declined to Meaningfully Consider Those
                     Risks .................................................89

       2.    EPA Rejected, Without Reasonable Basis, Colstrip
              Petitioners' Request for a Retirement Subcategory
              Aimed at Ameliorating Those Risks ........................................95

E.    The Rule is Pretextual .......................................................98

CONCLUSION ...................................................................................105

CERTIFICATE OF COMPLIANCE.......................................................116

CERTIFICATE OF SERVICE .................................................................117

## TABLE OF AUTHORITIES

### Cases

*Air All. Houston v. EPA*,
    906 F.3d 1049 (D.C. Cir. 2018) ...........................................................29

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*,
    522 U.S. 359 (1998)............................................................... 74, 82

*Appalachian Power Co. v. EPA*,
    251 F.3d 1026 (D.C. Cir. 2001) ...........................................................93

*Armour & Co. v. Wantock*,
    323 U.S. 126 (1944)...........................................................................32

*Ass'n of Battery Recyclers, Inc. v. EPA*,
    716 F.3d 667 (D.C. Cir. 2013) ............................................... 42, 58, 93

*AT&T Corp. v. Iowa Utils. Bd.*,
    525 U.S. 366 (1999)...........................................................................33

*AT&T Wireless Servs., Inc. v. FCC*,
    270 F.3d 959 (D.C. Cir. 2001) ...........................................................89

*Biden v. Nebraska*,
    600 U.S. 477 (2023)...........................................................................28

*BST Holdings, LLC v. OSHA*,
    17 F.4th 604 (5th Cir. 2021).............................................................104

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962)...........................................................................32

*Career Coll. and Sch. of Tex. v. Dep't of Educ.*,
    98 F.4th 220 (5th Cir. 2024).............................................................104

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971).........................................................................104

*Clean Wis. v. EPA*,
    964 F.3d 1145 (D.C. Cir. 2020) ...........................................................29

*Del. Dep't of Natural Res. & Envtl. Control v. EPA*,
785 F.3d 1 (D.C. Cir. 2015) ............................................................ 61, 64, 65, 93

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019).......................................... 29, 98, 99, 104, 105

*Duke Power Co. v. Fed. Power Comm'n*,
401 F.2d 930 (D.C. Cir. 1968) ....................................................93

*Ergon-West Virginia, Inc. v. EPA*,
896 F.3d 600 (4th Cir. 2018)......................................................93

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009)....................................................................60

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................................................................32

*FEC v. Cruz*,
569 U.S. 289 (2022)....................................................................53

*GPA Midstream Ass'n v. DOT*,
67 F.4th 1188 (D.C. Cir. 2023) ..................................................57

*GTE Serv. Corp. v. FCC*,
205 F.3d 416 (D.C. Cir. 2000) ....................................................33

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................................................................29

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
626 F.3d 84 (D.C. Cir. 2010) ................................................ 90, 98

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024)............................................ 31, 44, 46, 52, 53

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................................................................28

*Maryland v. EPA*,
958 F.3d 1185 (D.C. Cir. 2020) ..................................................30

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)........................................................................29

*McCulloch v. Maryland*,
    17 U.S. 316 (1819)..........................................................................32

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
    60 F.4th 956 (5th Cir. 2023)..........................................................55

*Miami-Dade Cnty. v. EPA*,
    529 F.3d 1049 (11th Cir. 2008)......................................................71

*Michigan v. EPA*,
    576 U.S. 743 (2015)...................... 8, 11, 25, 33, 34, 38, 41, 42, 43, 54, 58, 89, 94

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29, 43 (1983)......................................... 31, 32, 53, 70, 84, 94

*Nat'l Ass'n for Surface Finishing v. EPA*,
    795 F.3d 1 (D.C. Cir. 2015) ...................................................... 41, 48

*Nat'l Shooting Sports Found. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) .......................................................95

*New York v. Dep't of Commerce*,
    351 F.Supp.3d 502 (S.D.N.Y. 2019) ...............................................99

*NRDC v. EPA*,
    529 F.3d 1077 (D.C. Cir. 2008) ........................................ 9, 44, 48, 73

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024).................................................. 64, 67, 80, 84

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) ...................................................... 64, 91

*Rowan Cos., Inc. v. U.S.*,
    452 U.S. 247 (1981)........................................................................34

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981). ......................................................66

*Sierra Club v. EPA*,
    884 F.3d 1185 (D.C. Cir. 2018) ........................................................76

*Sinclair Wyo. Ref. Co. v. EPA*,
    ---F.4th---, 2024 WL 3801747 (D.C.Cir. Jul. 26, 2024)| ....................31

*Small Ref. Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ..........................................................61

*Sweet v. DeVos*,
    495 F.Supp.3d 835 (N.D. Cal. 2020) .................................................99

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016)..............................................................61

*Texas v. United States*,
    86 F.Supp.3d 591 (S.D. Tex. 2015)..................................................104

*U.S. Sugar Corp. v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016) ..........................................................66

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014)...........................................................................40

*Webster v. Fall*,
    266 U.S. 507 (1925)...........................................................................52

*West Virginia v. EPA,*
    597 U.S. 697 (2022)........................................................ 5, 101, 102

*White Stallion Energy Ctr., LLC. v. EPA*,
    748 F.3d 1222 (D.C. Cir. 2014) ........................................................11

*Whitman v. Am. Trucking Ass'ns, Inc*,
    531 U.S. 457 (2001)...........................................................................47

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
    82 F.4th 1273 (D.C. Cir. 2023) .........................................................91

*Wyoming v. Dep't of Interior*,
    493 F.Supp.3d 1046 (D. Wyo. 2020) .................................................38

## Statutory Authorities

42 U.S.C. § 7411(g)(4)(B) ...........................................................................................40

42 U.S.C. § 7412(b)(2) ...............................................................................................8

42 U.S.C. § 7412(b)(3) ...............................................................................................8

42 U.S.C. § 7412(b)(3)(B) .........................................................................................33

42 U.S.C. § 7412(b)(5) ...............................................................................................51

42 U.S.C. § 7412(c)(9) .......................................................................................... 57, 84

42 U.S.C. § 7412(c)(9)(B)(i) ...................................................................................9, 36

42 U.S.C. § 7412(d)(1) ...............................................................................................8

42 U.S.C. § 7412(d)(3) ...............................................................................................8

42 U.S.C. § 7412(d)(2) ......................................................................................... 40, 42

42 U.S.C. § 7412(d)(6) ........................................................... 2, 9, 23, 25, 31, 43, 52

42 U.S.C. § 7412(f)(2) ................................................................................................9

42 U.S.C. § 7412(n)(1)(A) ......................................................................................8, 34

42 U.S.C. § 7607(b) ....................................................................................................5

42 U.S.C. § 7607(d)(1)(C) ........................................................................................42

42 U.S.C. § 7607(d)(9)......................................................................................... 30, 61

## Rules and Regulations

10 C.F.R. § 205.371....................................................................................................92

40 C.F.R. Part 63 .................................................................................................. 27, 41

65 Fed.Reg. 79825 (Dec. 20, 2000) ...................................................................... 10, 35

69 Fed.Reg. 48338 (Aug. 9, 2004).............................................................................14

70 Fed.Reg. 19992 (Apr. 15, 2005) ....................................................................... 39, 47

71 Fed.Reg. 17729 (Apr. 7, 2006) ........................................................39

71 Fed.Reg. 34422 (Jun. 14, 2006) ......................................................14

71 Fed.Reg. 76603 (Dec. 21, 2006) .....................................................39

72 Fed.Reg. 50716 (Sept. 4, 2007) ......................................................39

73 Fed.Reg. 62384 (Oct. 20, 2008) ......................................................39

75 Fed.Reg. 54970 (Sept. 9, 2010) ......................................................70

76 Fed.Reg. 24976 (May 3, 2011) ................................................. 50, 69

76 Fed.Reg. 81328 (Dec. 27, 2011) .....................................................49

77 Fed.Reg. 49490 (Aug. 16, 2012) .....................................................59

77 Fed.Reg. 58220 (Sept. 19, 2012) .......................................... 46, 59, 69

77 Fed.Reg. 9304 (Feb. 16, 2012) .................. 10, 11, 18, 22, 34, 50, 56, 74

80 Fed.Reg. 14248 (Mar. 18, 2015) .....................................................59

80 Fed.Reg. 37366 (Jun. 30, 2015) ......................................................59

80 Fed.Reg. 50386 (Aug. 19, 2015) .....................................................59

80 Fed.Reg. 75178 (Dec. 1, 2015) .......................................................58

81 Fed.Reg. 24420 (Apr. 25, 2016) ......................................................11

84 Fed.Reg. 2670 (Feb. 7, 2019) .........................................................55

85 Fed.Reg. 31286 (May 22, 2020) .............................................. 12, 45

85 Fed.Reg. 42074 (Jul. 13, 2020) .......................................................58

86 Fed.Reg. 7037 (Jan. 20, 2021) ........................................................13

87 Fed.Reg. 1616 (Jan. 11, 2022) ........................................................59

87 Fed.Reg. 27002 (May 6, 2022) ........................................................59

88 Fed.Reg. 11556 (Feb. 23, 2023) ......................................................59

88 Fed.Reg. 24854 (Apr. 24, 2023) .................................. 12, 13, 14, 15, 17, 45, 52

89 Fed.Reg. 26835 (Apr. 16, 2024) ........................................................................36

89 Fed.Reg. 38508 (May 7, 2024) ... 1, 11, 15, 16, 17, 18, 19, 20, 21, 37, 38, 39, 40, 41, 50, 54, 55, 56, 57, 58, 59, 60, 61, 62, 64, 65, 71, 72, 73, 74, 75, 76, 78, 79, 80, 81, 82, 84, 86, 88, 89, 90, 94, 95, 96, 99

89 Fed.Reg. 39798 (May 9, 2024) .................................................................... 85, 95

**Other Authorities**

Am. Heritage Dictionary (5th ed. 2011) ................................................................48

Merriam Webster's Collegiate Dictionary (10th ed. 1994) ....................................32

Random House Collegiate Dictionary (rev. ed. 1980)............................................32

**Additional Materials**

Chemnick et al., *What the EPA's New Plans for Regulating Power Plants Mean for Carbon*, Sci. Am. (Mar. 11, 2022), https://tinyurl.com/49f7n377 ..... 102

EPA, *Biden-Harris Administration Finalizes Suite of Standards to Reduce Pollution from Fossil Fuel-Fired Power Plants* (Apr. 25, 2024), https://tinyurl.com/y5u92sx3 ................................................................13

Geman, B. *EPA floats path on electricity CO2 emissions—with an asterisk*, Axios (Mar. 11, 2022), https://tinyurl.com/yud7weey ......................................101

Milman, O. *New US climate rules for pollution cuts 'probably terminal' for coal-fired plants*, The Guardian (May 2, 2024), https://tinyurl.com/ykmb9xvn.............................................................105

Nat'l Weather Serv., NOAA, *How Dangerous is Lightning?*, https://perma.cc/QB6R-JSXQ ...............................................................36

PBS NEWS, *EPA Administrator Michael Regan discusses Supreme Court ruling on climate change* (June 30, 2022), https://tinyurl.com/4vsn3mcr.............................................................. 103

White House, *Press Gaggle by Principal Deputy Press Secretary Karine Jean-Pierre & Env't Prot. Agency Adm'r Michael Regan* (Feb. 17, 2022), https://tinyurl.com/bddpr22j ...............................................................101

## GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ACI | Activated Carbon Injection |
| CAA | Clean Air Act |
| CEMS | Continuous Emission Monitoring System |
| EGU | Electric Generating Unit |
| EPA | Environmental Protection Agency |
| fPM | Filterable Particulate Matter |
| HAP | Hazardous Air Pollutant |
| Hg | Mercury |
| MATS | Mercury and Air Toxics Standard |
| RIA | Regulatory Impact Analysis |

# INTRODUCTION

This Court should vacate the Mercury and Air Toxics Standards (MATS) Rule (Rule) challenged here as both contrary to statute and arbitrary and capricious. *See* J.A.0001(89 Fed.Reg. 38508 (May 7, 2024)). Section 112 of the Clean Air Act (CAA) grants the Environmental Protection Agency (EPA) rulemaking authority to set emission standards for hazardous air pollutants (HAPs) for a specific purpose: to protect public health from the adverse effects of those HAP emissions. The Rule loses sight of that purpose entirely.

The Rule forces coal-fired power plants to reduce their already low emissions from certain HAPs by another 66-70%. Even assuming all plants will be able to comply with those standards (which remains an open question), EPA calculates the Rule will impose compliance costs of nearly $1 billion. Yet by EPA's own analysis, there are no meaningful public health benefits to be gained from the Rule's mandated reduction in HAP emissions. None. Indeed, HAP emissions from coal-fired power plants are already well below any threshold that would impact public health—so low, in fact, that by statute, EPA could stop regulating the plants under Section 112 entirely.

Worse still, the Rule will harm the very communities EPA asserts the Rule is meant to serve. According to EPA, reduced emissions will benefit vulnerable communities that live near coal-fired power plants. But these communities already

1

face no appreciable risk from power plant HAP emissions and will suffer grave economic harm if EPA's rule stands—including increased electricity costs and threats to the viability of the power plants, not-for-profit rural cooperatives, and mining companies that provide those vulnerable communities with much-needed jobs and resources.

Congress demanded better. Under Section 112(d)(6), EPA may only revise the MATS rule "as necessary (taking into account developments in practices, processes, and control technologies)." 42 U.S.C. § 7412(d)(6). The operative statutory phrase is "as necessary," yet EPA never explained how its Rule met this statutory requirement. Nor could it. A Section 112(d)(6) rule that achieves no meaningful public health benefits and imposes significant costs could hardly be "necessary." EPA's failure to establish that the Rule is "necessary" renders it unlawful right out of the gate.

Absent any benefit that would make the Rule "necessary," EPA asserts the Rule is nonetheless justified because there have been "developments" under Section 112(d)(6). Principally, EPA claims that power plants have been able to meet the 2012 standards at lower cost than anticipated. But meeting those standards is not a "development" under Section 112(d)(6). It is compliance with the law. Emission control technologies have not materially changed in the last decade, and alleged cost efficiencies for using those long-existent control technologies is similarly not a

2

"development" that justifies the Rule's dramatic ratcheting down of the standards. Consequently, even setting aside that the Rule cannot be "necessary" where it provides no meaningful health benefit, EPA's interpretation of "development" conflicts with the statutory text.

The Rule is also arbitrary and capricious multiple times over. *First*, EPA's consideration of the costs of its Rule is indefensible.   By EPA's own flawed estimates, the Rule's mandated reduction in HAP emissions will impose nearly $1 billion in direct compliance cost in exchange for no meaningful public health benefits.  And in terms of costs per quantity of HAP emissions reduced, the cost-effectiveness of the Rule is significantly higher than cost-effectiveness ratios EPA has expressly rejected in the past.  EPA has never before used its Section 112(d)(6) rulemaking authority to impose costs of such a magnitude without any corresponding public health benefit.

*Second*, EPA failed to adequately consider the Rule's significant and foreseeable impacts on our nation's already-strained power grids.  EPA expressly promulgated this Rule as part of a "suite" of rules targeting coal-fired power plants with substantial regulatory costs.  EPA's perfunctory conclusion that the tremendous costs of this Rule (and related rules) will have no effect on the power sector does not reflect reasoned analysis because the modeling it relies upon is incapable of evaluating grid reliability.  EPA is not an expert on the power grid, and, despite the

Rule's foreseeable impact on the power grid, EPA did not seek input from the Federal Energy Regulatory Commission (FERC), the North American Electric Reliability Corporation (NERC), or any other similar entity that could have apprised it of this Rule's likely impact on long term grid reliability.

*Third*, the Rule's revised MATS emission standards are based on fundamentally flawed technical assumptions. The underlying data is clearly and demonstrably insufficient, inaccurate, and incapable of supporting the conclusions reached through any process of neutral and rational decision-making. For the filterable particulate matter (fPM) standard, EPA used a truncated dataset and made the completely unsupported assumption that if a unit ever emitted less than the new standard, it could meet that standard continuously. And for the mercury standard, EPA presented no verified testing data or evidence demonstrating that lignite units can meet the Rule's new standard with any continuity. Moreover, EPA's compliance cost analyses for both fPM and mercury emissions severely understate the costs to meet the new standards by using flawed methodology and skipping entire categories of costs. Although commenters highlighted this parade of errors, EPA's dismissive responses were conclusory and failed to correct the many demonstrable issues.

*Fourth*, both on its own merits, and as illustrative of the Rule's general failings, EPA failed to meaningfully address the outsized impact the Rule would have on the Colstrip Power Plant, as well as the communities that rely upon it. Petitioners

highlighted the substantial risk of Colstrip's premature retirement due to the Rule's high compliance costs when combined with a parallel rule burdening the coal industry.  Rather than meaningfully assessing such risks (and a proposed regulatory alternative that could alleviate those risks), EPA brushed off comments regarding the Rule's impacts on Colstrip as "not credible" with no meaningful explanation.

Last, there is considerable evidence that EPA's stated reason for engaging in this rulemaking is pretextual.  Contrary to EPA's stated purpose of further protecting public health from HAP emissions (which the Rule does not do), available evidence indicates that EPA used its Section 112(d)(6) rulemaking authority as part of a coordinated regulatory effort to impose retirement-inducing costs on coal-fired power plants to force a nationwide transition away from coal—pursuing a national policy the Supreme Court expressly held the agency lacks authority to make in *West Virginia v. EPA*, 597 U.S. 697 (2022).

## JURISDICTION

Petitioners timely petitioned for review of the Rule.  This Court has jurisdiction pursuant to 42 U.S.C. § 7607(b).

## STATEMENT OF ISSUES

1.    Whether the Rule's revisions to the MATS emission standards are contrary to Section 112(d)(6) because EPA neither found nor could have determined

that the revisions were "necessary," as the mandated emission reductions do not result in any meaningful public health benefit.

2.  Whether the Rule's revisions to the MATS emission standards are contrary to Section 112(d)(6) because they are not based upon any legally relevant "development" in practices, processes or control technologies.

3.  Whether the Rule is arbitrary and capricious when EPA can demonstrate no meaningful public health or environmental benefits from the mandated reduction in HAP emissions, and all alleged benefits from the Rule are ancillary to the Rule's purpose.

4.  Whether the Rule is arbitrary and capricious when the cost per ton of pollutant removed is orders of magnitude higher than ratios EPA has previously rejected as cost ineffective.

5.  Whether the Rule is arbitrary and capricious because EPA failed to reasonably address and respond to comments warning that the Rule would have a significant impact on power grid reliability around the country, and that EPA's conclusion to the contrary was based on inaccuracies and faulty assumptions.

6.  Whether the Rule is arbitrary and capricious because its revised emission standard for surrogate fPM is based on insufficient and unreliable data and fails to account for a necessary compliance margin.

7.     Whether the Rule is arbitrary and capricious because its revised mercury emission standard for lignite-firing power plants is based on insufficient and unreliable data, uses faulty methodologies, and is unsupported by data from nearly all lignite power plants in operation.

8.     Whether the Rule is arbitrary and capricious because EPA miscalculated the costs that are required to comply with the new mercury and fPM emissions limitations.

9.     Whether the Rule is arbitrary and capricious because of its failure to meaningfully address the outsized impacts it would have on the Colstrip Power Plant, as well as its failure to meaningfully address the risk of Colstrip Power Plant's premature retirement and the regulatory alternative presented to alleviate those risks.

10.     Whether the Rule is arbitrary and capricious because it pretextually uses EPA's rulemaking authority under Section 112(d)(6) to impose retirement-inducing costs on coal-fired power plants as part of a coordinated regulatory effort to do indirectly what the Supreme Court has held EPA cannot do directly: "force a nationwide transition away from the use of coal." *West Virginia,* 597 U.S. at 735.

## STATUTES AND REGULATIONS

The pertinent statutes and regulations are bound separately.

## STATEMENT OF THE CASE

Section 112 of the CAA (codified at 42 U.S.C. § 7412) provides EPA statutory authority to set emission standards for certain specified HAPs.  In general, the purpose of regulating HAPs under Section 112 is to prevent the "threat of adverse human health effects" or "adverse environmental effects."  42 U.S.C. § 7412(b)(2)-(3).  Carbon dioxide and similar greenhouse gases are not HAPs subject to Section 112, and combating climate change is not the purpose of Section 112.  *See id.*

EPA has promulgated HAP standards for hundreds of emission source categories under Section 112.  *See generally* 40 C.F.R. Part 63.  This Rule regulates certain HAP emissions from coal- and oil-fired power plants (also called EGUs).

Section 112 "treats power plants differently from other sources" of HAP emissions.  *Michigan v. EPA*, 576 U.S. 743, 751 (2015).  Before EPA could regulate power plants under Section 112, EPA had to determine it was "appropriate and necessary" to do so "after considering the results" of "a study of the hazards to public health reasonably anticipated to occur as a result of [HAP] emissions by [power plants]."  42 U.S.C. § 7412(n)(1)(A).

### A.    Setting and Revising Emission Standards Under Section 112

In general, when regulating HAP emissions under Section 112, EPA first sets standards based on what is achievable with current technology (known as MACT standards).  *See* 42 U.S.C. § 7412(d)(1)-(3).

8

Thereafter, the statute directs EPA to review its standards every eight years to determine whether revisions are "necessary." 42 U.S.C. § 7412(d)(6). In conducting that review, EPA must consider, among other things, "developments in practices, processes and control technology." *Id.* Coinciding with the first of those eight-year reviews, EPA must also evaluate whether residual health risks remain. 42 U.S.C. § 7412(f)(2).

EPA treats a health risk as "'presumptively acceptable'" for purposes of Section 112(f)(2) if "no individual would face an excess lifetime cancer risk of greater than 100-in-one million." *NRDC v. EPA*, 529 F.3d 1077, 1080 (D.C. Cir. 2008). If risks are acceptable, EPA also evaluates whether there is an "ample margin of safety" by considering the number of persons subject to a greater than one-in-one million risk and other relevant factors, including costs, economic impacts, and technological feasibility. *Id.* at 1082.

EPA may delete a source category from regulation under Section 112 if its HAP emissions do not "cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed." 42 U.S.C. § 7412(c)(9)(B)(i); *see also NRDC*, 529 F.3d at 1082 (noting the one-in-one million standard is the CAA's "aspirational goal"). Under the preexisting MATS emission standards, the lifetime cancer risk of the person most exposed to coal-fired HAP

9

emissions in the country is 0.344-in-a-million—significantly lower than the one-in-a-million threshold.[1]

### 1.    The 2012 Mercury and Air Toxics (MATS) Rule

In 2000, after completing the study required by Section 112(n)(1), EPA concluded that regulating power plants under Section 112 was "appropriate and necessary." J.A.1982(65 Fed.Reg. 79825 (Dec. 20, 2000)). Flip-flopping ensued over the next decade, but EPA ultimately reverted to that finding in 2012 in the original MATS rule for coal- and oil-fired EGUs. J.A.2173(77 Fed.Reg. 9304 (Feb. 16, 2012)). In making that determination, EPA understood "necessary" to mean the public health risks from power plant HAP emissions were not already addressed by other CAA requirements. J.A.2175(*Id*. at 9310).

The original MATS rule set emission levels for mercury (Hg) and other specified HAPs. For mercury, that rule set different MACT standards for EGUs that use lignite coal compared to other types of coal. EPA drew that distinction because lignite has more variability in heat, moisture, and mercury and sulfur content than other types of coal, so the same technology cannot consistently achieve the same control levels. *See* J.A.2179(*Id*. at 9393). For the non-mercury metal HAPs, the original MATS rule allowed for measuring each HAP's emissions individually or

---

[1] *See* J.A.1489(NACCO Cmts. at 15) (citing EPA, *Residual Risk Assessment for the Coal- and Oil-Fired EGU Source Category in Support of the 2020 Risk and Technology Review Final Rule* (Sept. 2019) (RRA), Appx. 10, Tbls. 1, 2a).

measuring filterable particulate matter as a surrogate for HAP emissions. J.A.2186(*Id.* at 9490, Tbl. 2).  The rule also allowed EGUs to demonstrate compliance with non-mercury metal HAP emission standards by using either stack testing or a CEMS.  J.A.2178, 2185(*Id.* at 9384, 9469).[2]

### 2.    *Michigan v. EPA* and Subsequent Appropriate and Necessary Determinations

The 2012 MATS rule was challenged in litigation, with multiple petitioners alleging that EPA's "appropriate and necessary" determination was improper.  This Court rejected those challenges, *see White Stallion Energy Ctr., LLC. v. EPA*, 748 F.3d 1222  (D.C. Cir. 2014), but the Supreme Court ultimately held EPA interpreted Section 112 "unreasonably" in finding that power plant regulation was "appropriate and necessary" because EPA had "deemed cost irrelevant to the decision to regulate power plants." *Michigan*, 576 U.S. at 760.

In 2016, on remand from this Court, EPA issued a Supplemental Finding concluding that it was "appropriate and necessary" to regulate EGUs under Section 112 after considering cost.  J.A.2307(81 Fed.Reg. 24420 (Apr. 25, 2016)).  But in 2020, EPA reversed that conclusion, finding the costs of regulating EGUs under Section 112 outweighed the benefits—particularly because alleged ancillary benefits

---

[2] Stack testing directly measures the presence of individual non-mercury metal HAPs or fPM in exhaust gases on a periodic basis.  By contrast, CEMS indirectly measures fPM in exhaust gases through light scattering or beta attenuation and does so continuously on a 1-minute basis.  J.A.0022(89 Fed.Reg. at 38529).

should not be considered when determining whether to regulate HAP emissions under Section 112.  J.A.2375, 2388(85 Fed.Reg. 31286, 31299 (May 22, 2020)).

Then in 2023, EPA reversed itself yet again, reinstating its determination that it was "appropriate and necessary" to regulate HAP emissions from EGUs under Section 112.  J.A.0333, 0338(88 Fed.Reg. 24854, 24859 (Apr. 24, 2023)).

### 3.    The 2020 Section 112(f)(2) and Section 112(d)(6) Reviews and the Executive Order on Climate Change

While EPA vacillated on whether it was "appropriate and necessary" to regulate EGUs under Section 112, it also conducted the reviews required under Sections 112(f)(2) and 112(d)(6).  In its 2020 Section 112(f)(2) review, EPA found the "risk due to emissions of air toxics to be acceptable from [coal- and oil-fired EGUs] and determined that the current [standard] provides an ample margin of safety to protect public health and prevent an adverse environmental effect." J.A.2403(85 Fed.Reg. at 31314).  And in its 2020 Section 112(d)(6) review, EPA determined there were no "developments" in emissions control technologies, practices, or processes that could support revising the MATS Rule under Section 112(d)(6).  *See* J.A.2387(*Id*. at 31298).  Accordingly, EPA proposed no revisions to the original MATS rule.  *Id.*

But six months later there was a change in presidential administration, and the current Administration issued Executive Order 13990—"Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis"—directing

all executive agencies to "immediately commence work to confront the climate crisis." J.A.2414(86 Fed.Reg. 7037 (Jan. 20, 2021)). That Order directed EPA to consider "suspending, revising, or rescinding" various agency actions, including the 2020 Section 112(f)(2) and 112(d)(6) reviews for the MATS rule. J.A.2415(*Id.* at 7038, Sec. 2 (iv)). It did so even though EPA's statutory authority for promulgating the MATS rule has nothing to do with climate change—Section 112 regulates HAP emissions, not greenhouse gases.

## B. The 2023 Section 112(f)(2) and 112(d)(6) Re-Reviews and the 2024 Revisions to the MATS Rule

EPA therefore re-examined its 2020 Section 112(f)(2) and (d)(6) reviews for the MATS rule and issued the Rule challenged here. EPA expressly promulgated this Rule as one part of a "suite" of rules that impose substantial regulatory costs on coal-fired power plants—including the profoundly impactful GHG Rule. *See* EPA, *Biden-Harris Administration Finalizes Suite of Standards to Reduce Pollution from Fossil Fuel-Fired Power Plants* (Apr. 25, 2024), https://tinyurl.com/y5u92sx3.

For its Section 112(f)(2) re-review, EPA reached the conclusion it had reached only a few years prior—there are no residual risks to public health or the environment remaining after implementation of the original MATS rule. J.A.0345(88 Fed.Reg. at 24866); *see also* J.A.0374(*id.* at 24895) ("the residual risk assessment showed all modeled exposures to HAP to be below thresholds for public health concern").

In other Section 112(d)(6) reviews, EPA has taken the position that if its standards already "provide an ample margin of safety to protect public health and prevent adverse environmental effects, one can reasonably question whether further reviews of technological capability are 'necessary.'" J.A.1989, 2002(69 Fed.Reg. 48338, 48351 (Aug. 9, 2004)); *see also* J.A.2044, 2059(71 Fed.Reg. 34422, 34437 (Jun. 14, 2006)).   For its 2023 re-review, however, EPA claimed there were "developments" that would allow it to mandate lower HAP emission standards for coal-fired EGUs even in the absence of *any* demonstrated public health benefit from further reducing those HAP emissions.

As relevant to this lawsuit, EPA concluded that there had been "developments," purportedly missed by the agency in 2020, which justified revising the MATS rule by: (1) reducing the surrogate fPM emission standard for all coal-fired EGUs by 66%; (2) reducing the mercury emission standard for lignite coal-fired EGUs by 70%; and (3) mandating that compliance with the newly-lowered surrogate fPM standard be demonstrated with CEMS rather than allowing the use of stack testing for fPM or for the individual non-Hg HAPs.

## 1.    Revision to the Surrogate fPM Emission Standard

In the proposed rule, EPA again found "no new practices, processes, or control technologies for non-Hg metal HAP…" J.A.0347(88 Fed.Reg. at 24868).   The primary control technologies used in 2012 are the same as today.  *See* J.A.0376(*2023*

*Technology Review for the Coal- and Oil-Fired EGU Source Category* (Jan. 2023)

(2023 Tech. Review) at 1).

EPA nevertheless proposed to ratchet down the surrogate fPM standards based principally on its interpretation that the following constituted Section 112(d)(6) "developments": many existing coal-fired EGUs were (1) emitting below the original fPM emission limit and (2) meeting those emission standards at costs lower than estimated when promulgating the original MATS rule. *See* J.A.0345-0351(88 Fed.Reg. at 24866-72). Specifically, in the proposed rule, EPA stated:

- Although "review of fPM compliance data for coal-fired EGUs indicated no new practices, processes, or control technologies for non-Hg metal HAP, it revealed two important developments … First, it revealed that most existing coal-fired EGUs are reporting fPM well below the current fPM emission limit … Second, it revealed that the fleet is achieving these performance levels at lower costs than assumed during promulgation of the original MATS fPM emission limit." J.A.0347(88 Fed.Reg. at 24868).

And in the Rule, EPA similarly stated:

- "[O]ur judgments regarding developments in fPM control technology … largely reflect that the fleet was reporting fPM emission rates well below the current standard and with lower costs than estimated during promulgation of the 2012 MATS Final Rule." J.A.0012(89 Fed.Reg. at 38519).

EPA's technical memorandum made clear that the same technologies that underlay the original emission standard for the control of fPM in 2012—electrostatic precipitators and fabric filters—were still the primary devices for controlling fPM in 2023. J.A.0383-0384(2023 Tech. Review at 8-9). And the performance of those

15

control devices is the same now as it was in 2012—electrostatic precipitators remain capable of collection efficiencies of 99% and fabric filters remain capable of collection efficiencies of 99.9%. *Id.*

In the Rule, EPA also claimed as "developments" industry best practices associated with monitoring electrostatic precipitator operation, and that more "durable" materials for fabric filters had been developed since the original MATS rule. J.A.0023(89 Fed.Reg. at 38530); *see also* J.A.0383-0384(2023 Tech. Review at 8-9) (basing the conclusion there had been a "development" upon a report which attributed fPM emission reductions to "wider deployment today of technologies that may have existed but not widely used in 2011, improved practices due to more regular and robust monitoring, and improvements to monitoring and [electrostatic precipitator/fabric filter] technology"). In other words, EPA claimed that technologies existing and used in 2011 had become less expensive and more widely used in the intervening decade. *Id.* Based on those alleged "developments," the Rule mandates that all coal-fired EGUs reduce their emissions of surrogate fPM by 66%, dropping the standard from 0.030 lb/MMBtu to 0.010 lb/MMBtu. J.A.0023(89 Fed.Reg. at 38530).

## 2. Revision to the Mercury Emission Standard for Lignite-Fired EGUs

For mercury emissions, the primary control technology used by all coal-fired EGUs remains activated carbon injection (ACI)—the same technology that EPA

acknowledges was available at the time of the original MATS rule.  *See* J.A.0359(88 Fed.Reg. at 24880); J.A.0396-0397(2023 Tech. Review at 21-22).  EPA justified ratcheting down the mercury standard further with the same technology by concluding that:

> … units could meet the final, more stringent, emission standard of 1.2 lb/TBtu by utilizing brominated activated carbon at the injection rates suggested in the beyond-the-floor memorandum from the 2012 MATS Final Rule.

J.A.0040(89 Fed.Reg. at 38547).

But EPA offered no credible evidence to support this finding.  Notably, EPA continued to rely on information available *at the time of the original MATS rule* by pointing to ACI rates from a 2012 Beyond-the-Floor Memorandum to claim lignite units can somehow meet a more stringent standard in 2024 by removing mercury at a 90% removal efficiency based on one lignite unit in a Department of Energy (DOE) study.  J.A.0040(*Id.* citing J.A.0090(*NESHAP, Beyond-the-Floor Analysis for Revised Proposed Emission Standards for New Source Coal- and Oil-fired Electric Utility Steam Generating Units* (Nov. 16, 2012) (2012 Beyond-the-Floor Memorandum) at 4)).  The only recent data EPA offered supporting this claim is a single lignite plant in Texas (Twin Oaks) that has occasionally achieved the new emissions limit.  EPA provided no explanation for its decision to treat a single plant as representative of the emission controls that will work on all lignite-firing EGUs.  Instead, EPA summarily claimed that data "clearly demonstrate[s] the achievability

17

of the proposed 1.2 lb/TBtu emission standard [for all] lignite-fired EGUs." J.A.0033(89 Fed.Reg. at 38540). And on these grounds, the Rule mandates further reducing mercury emissions from lignite-fired power plants by 70%, dropping the standard from 4.0 lb/TBtu to 1.2 lb/TBtu. J.A.0079(89 Fed.Reg. at 38586).

To further justify its decision, EPA compared characteristics of bituminous coal with subbituminous and lignite coals, but failed to consider how subbituminous and lignite coals differ *from each other*. J.A.0033-0034(89 Fed.Reg. at 38540-41); *see also* J.A.0734-0735(Lignite Energy Council Cmts. at 6-7). As noted *supra*, lignite has different heat, moisture, and sulfur content than subbituminous coals, reducing the efficacy of injecting activated carbon (the best available control technology for mercury). *See* J.A.0734(*Id*. at 6). While both lignite and subbituminous coals typically have low halogens, and both lignite and bituminous coals typically have high sulfur, only lignite has both of these characteristics that make mercury removal far more difficult than for either bituminous or subbituminous coal. Lignite also has far greater variability, increasing the need for a larger compliance margin. J.A.0735(*Id*. at 7).

### 3. Mandate to Demonstrate Compliance with the Lowered Surrogate fPM Standard Using CEMS

In the original MATS Rule, EPA allowed EGUs to demonstrate compliance with the surrogate fPM standard by periodic stack testing (of fPM or of metal HAPs) or by using CEMS. J.A.2178(77 Fed.Reg. at 9384). But in the Rule, EPA mandates

18

that CEMS is the only option to demonstrate compliance for non-integrated coal gasification combined cycle boilers, even though it is not a direct measurement of fPM.  J.A.0084(89 Fed.Reg. at 38591, Tbl. 7).

### C.    EPA's Cost-Benefit and Cost-Effectiveness Analyses for the 2024 MATS Rule

To comply with an Executive Order, EPA prepared a Regulatory Impact Analysis (RIA) that purported to calculate the costs and benefits of its Rule.  Under EPA's own calculations (which assume all power plants can comply with the Rule), the Rule imposes nearly $1 billion in costs.  J.A.0005(89 Fed.Reg. at 38512).  And on the other side of the ledger, EPA claimed it was unable to quantify *any* improvement in public health or the environment from the further reduction in HAP emissions mandated by the Rule.  J.A.1785,1817-1818(EPA, *Regulatory Impact Analysis for the Final National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review* (Apr. 2024) (RIA) at 3-1, 4-1–4-2); *see also* J.A.0011(89 Fed.Reg. at 38518).  So, considered in light of the purpose for which EPA was given Section 112 rulemaking authority, the quantifiable "benefit" of this Rule is zero.

Facing no quantified public health benefit from the Rule's mandated reduction in HAP emissions, EPA pivoted to the purported benefits of alleged reductions in criteria pollutants and greenhouse gases.  J.A.0054-0055(89 Fed.Reg. at 38561-62

(quantifying alleged particulate matter, ozone, and climate benefits)); *see also* J.A.1832-1833(RIA at 4-16–4-17) (assessing climate impacts in its benefits analysis).  But even considering those alleged ancillary benefits to the climate or ozone from non-HAP pollutant reductions, EPA acknowledges the Rule *still* has a "negative net monetized benefit"—meaning the costs of the Rule still outweigh the benefits by at least $440 million.  J.A.0004(89 Fed.Reg. at 38511).[3]

EPA also determined "there is not a significant economic impact on a substantial number of small entities," J.A.1900(RIA at 5–8), without offering any meaningful response to numerous commenters warning small entities will experience costs greater than EPA estimated—particularly cooperatives that serve low-income communities especially vulnerable to rate increases.  J.A.0501(East Kentucky Power Coop. Cmts. at 6); J.A.0923(Minnkota Power Coop. Cmts. at 16).

Unable to demonstrate a net benefit of the Rule even when considering alleged ancillary benefits that cannot drive a Section 112(d)(6) rulemaking, EPA asserts that it "did not rely" on its cost-benefit "analysis in choosing the appropriate standard[s]"

---

[3] Moreover, while the Rule applies to coal-fired power plants nationwide, a substantial burden falls on the Colstrip Power Plant in rural Montana.  By EPA's calculations, Colstrip will bear almost half of the Rule's annual compliance costs. *See* J.A.1561(2024 Technical Memo at 17) (estimating total annualized costs of over $87 million, with over $38.8 million annually at Colstrip alone).  But the costs are of course not limited to Colstrip; small rural cooperatives, which are member-owned, not-for-profit electric utilities, and other EGUs will also face significant costs from the Rule.  *E.g.*, J.A.0668, 0671-0672(NRECA Cmts. at 2, 5-6); J.A.0923(Minnkota Power Coop. Cmts. at 16).

in the Rule.  J.A.0016(89 Fed.Reg. at 38523).  It did, however, rely on an assessment of "cost effectiveness," that is, cost per ton of HAP removed, in revising the standards under Section 112(d)(6).    J.A.0024(89 Fed.Reg. at 38531-52); J.A.1561(EPA, *2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category* (Jan. 2024) (2024 Technical Memo) at 17).  For surrogate fPM emissions, EPA calculated costs at $10.5 million per ton of HAP removed.    J.A.0025-0026(89 Fed.Reg. at 38532-33).    This cost is substantially higher than ratios EPA itself has *rejected* as being excessive in other Section 112 rulemakings.  J.A.0540(Westmoreland Cmts. at 4) (compiling examples); *see also* J.A.0016(89 Fed.Reg. at 38523) ("EPA acknowledges that the cost-effectiveness values for these standards are higher than cost-effectiveness values that the EPA concluded were not cost-effective … for some prior rules.").

### D.    EPA's Grid Reliability Analysis

EPA also did not meaningfully address power outages or grid reliability in its RIA, avoiding any detailed analysis in favor of a conclusory statement that the Rule will have no significant impact on the power grid or energy prices because it will not cause any plant retirements.  J.A.0048(89 Fed.Reg. at 38555).

21

EPA received many comments warning that its assumptions about the Rule having no foreseeable impact on power grid reliability were significantly mistaken.[4] But EPA did not meaningfully respond to those comments, other than to refer back to its own modeling which presumed the Rule would not cause a single plant retirement. *See* J.A.1785-1816(RIA Section 3); J.A.1663-1668, 1751-1752(EPA, *Summary of Public Comments and Responses on Proposed Rule* (Apr. 24, 2024) (Response to Comments) at 68-73, 156-57). EPA claims that it consulted with the DOE about potential grid impacts of the Rule. *See* ECF No. 2065849 (EPA Stay Opp. Br.) at 34; *see also* Response of the Federal Respondents in Opposition to the Applications for a Stay, No. 24A178 (U.S. Sep. 13, 2024) (EPA SCOTUS Opp. Br.) at 31. However, in support of that statement the agency points only to a generic Memorandum of Understanding with DOE regarding interagency cooperation. *See id.* (citing J.A.1751-1752(Response to Comments at 156-57)) ("This process is not linked to any one regulatory effort or final action."). Nothing in the record indicates EPA consulted with DOE (or any other grid operator or reliability experts, such as FERC or NERC) on *this specific rule.*

---

[4] *E.g.*, J.A.1247(Rainbow Energy Cmts. at 4); J.A.0919-0920(Minnkota Power Cmts. at 2-3); J.A.1275, 1345-1350(Power Generators Air Coalition (PGen) Cmts. at 12, Cichanowicz Report at 39-44), J.A.0671-0672(NRECA Cmts. at 5-6); J.A.1061-1071(NMA Cmts. at 17-27).

Finally, EPA promulgated this Rule against the backdrop of its failure to accurately estimate the impact the last MATS Rule would have on power plant operations. The last time a MATS Rule was litigated, EPA claimed it would only cause about 5,000 MW of generation to go offline. J.A.2181(77 Fed.Reg. at 9407) ("…expected retirements of coal-fueled units as a result of this Rule (4.7 GW) are fewer than was estimated at proposal and much fewer than some have predicted"). EPA was wrong. It ended up being closer to 60,000 MW.[5]

## SUMMARY OF THE ARGUMENT

The MATS Rule is based on legal interpretations and factual inaccuracies that violate the CAA and defy common sense.

**The Rule is Contrary to the Statute.** Section 112(d)(6) requires EPA to review its Section 112 standards and revise them "as necessary (taking into account developments in the practices, processes and control technologies)." 42 U.S.C. § 7412(d)(6). In other words, for EPA to revise a standard under Section 112(d)(6), EPA must demonstrate that such action is "necessary" and that there are

---

[5] *See* J.A.1046-1047(NMA Cmts. at 2, n.4); *see also, e.g.*, U.S. Energy Info. Admin., *Planned coal-fired power plant retirements continue to increase* (Mar. 20, 2014), bit.ly/4dbYwfM (between 2012 and 2020, "about 60 gigawatts of coal-fired capacity is projected to retire … assum[ing] implementation of the MATS standards"); Pratson et. al., *Fuel Prices, Emission Standards, and Generation Costs for Coal v. Natural Gas Power Plants*, Am. Chem. Soc'y, Env'l Sci. & Tech., 4929 (Mar. 2013), bit.ly/3w7yLN2 (most coal-fired EGU retirements in the wake of the original MATS Rule were due to "stronger regulations," not unrelated market forces).

"developments" that make such revision of the standards possible. This Rule is built on a misreading of both of those terms.

*First,* the Rule is not "necessary." It is telling that nowhere in the Rule or its supporting administrative record does EPA affirmatively assert that the Rule meets the statutory requirement of being "necessary." Nor could it given that there are no meaningful public health benefits from the Rule's mandated reduction in HAP emissions. As a matter of statutory interpretation, the term "necessary" requires answering the question: necessary *for what*? And in the context of regulating power plant HAP emissions under Section 112(d)(6), the "for what" is advancing the statute's objective, which is protecting the public from harmful regulated HAP emissions. Accordingly, given that EPA has not (and cannot) point to *any* meaningful public health benefit from the Rule's mandated emission reductions, the Rule cannot be "necessary."

*Second*, aside from the lack of health benefits, EPA's interpretation of "development" stretches the statute beyond its breaking point. In 2020 and again in 2023, EPA concluded that there were no new practices, processes or control technologies that would justify tightening the standards in the 2012 MATS rule; and that the control technologies are the same today as they were during those reviews. Nonetheless, EPA concluded that because power plants were using those technologies to meet the existing standards at a lesser cost than anticipated in 2012,

24

that constitutes a "development" sufficient to ratchet down the emission standards by 66-70%.  But that is not a "development" under Section 112(d)(6).  Power plants must build in margins to ensure they can maintain 100% compliance, and it defies common sense to call that compliance margin a "development" that warrants further ratcheting down of the standard.  For there to be a "development" under Section 112(d)(6), there must be a meaningful change in control technology, practices or processes that directly correlates to the mandated reduction in emission levels.  EPA's capacious interpretation of the term is a power grab that would allow it to force nearly any disfavored emission source out of the market.

In addition, EPA violated the statutory structure of the CAA by purporting to use its Section 112(d)(6) authority to alter the monitoring requirements for HAP emission limits.  Section 112(d)(6) only addresses revisions to the "emission standards."  42 U.S.C. § 7412(d)(6).  Monitoring requirements are addressed by another statutory section, Section 112(b)(5), which EPA does not invoke in the Rule.

**Arbitrary and Capricious.**  The Rule is also arbitrary and capricious for several reasons, each of which warrant vacatur.

*First*, EPA's consideration of costs is indefensible.  *Michigan v. EPA* made clear that considering costs necessarily entails considering benefits.  But the Rule imposes nearly $1 billion in compliance costs while providing no quantifiable benefits from the Rule's mandated reduction in HAP emissions.  Likewise, the

Rule's cost-effectiveness for fPM emissions (measured in cost-per-ton of HAP emissions removed) is substantially higher than cost-per-ton ratios EPA *has expressly rejected* in other Section 112(d)(6) rulemakings (involving the exact same HAPs) as cost-ineffective. And even when considering alleged ancillary benefits (like alleged climate benefits and criteria pollutant reductions), the Rule *still* has a negative net benefit of over $400 million. In short, if considering advantages and disadvantages of a rule has any meaning at all, this Rule fails.

*Second*, EPA failed to adequately consider the Rule's significant and foreseeable impacts on our nation's already strained power grids. Despite numerous commenters putting EPA on notice that this Rule would likely force power plant retirements, significantly increase electricity costs, and risk grid reliability—both individually and when considered in conjunction with EPA's "suite" of regulations targeting coal-fired power plants—EPA simply proclaimed the Rule would cause no retirements and no impacts on power grid reliability. This was not reasoned decision-making. EPA has no expertise on grid reliability and did not seek out such expertise from the federal agencies that do, such as FERC and NERC. EPA failed to consider an important aspect of the problem when it failed to meaningfully consider the Rule's foreseeable impact on grid reliability.

*Third*, EPA relied on fundamentally flawed technical assumptions that undermine the Rule's evaluation of feasibility and costs. EPA used a biased,

truncated and arbitrary fPM dataset and a defective methodology that assumes units can achieve continuous compliance based on a few datapoints. And for mercury, EPA presents no verified testing data or evidence demonstrating that lignite units can meet the new standard with any continuity. Furthermore, the cost analyses for both fPM and mercury significantly underestimate the costs necessary to comply with the Rule due to biased methodologies, missing cost estimates, and flawed feasibility assumptions. EPA did not correct these errors or sufficiently explain why they did not, despite many comments and detailed technical reports in the record.

*Fourth*, as emblematic of its widespread issues, the rule is arbitrary and capricious in its treatment of the Colstrip Power Plant in Montana. According to EPA's calculations, almost half of the Rule's regulatory costs are imposed on Colstrip alone. Yet, EPA failed to meaningfully assess the risks of Colstrip's premature retirement given that this Rule, in conjunction with EPA's parallel GHG Rule, would not provide sufficient time for Colstrip to recover its necessary compliance costs. And when Colstrip proposed a compliance alternative, EPA arbitrarily rejected it. EPA failed to meaningfully respond to comments addressing the severe and disproportionate impact the Rule will have on Colstrip, and failed to properly assess the risks of Colstrip's retirement and the collateral consequences for grid reliability and the Montana economy.

27

*And finally*, there is considerable evidence that EPA's stated reasons for engaging in this rulemaking are pretextual.  Contrary to EPA's statements that it promulgated this Rule to further protect public health from HAP emissions, available evidence demonstrates that EPA instead used its Section 112(d)(6) rulemaking authority as part of a broader regulatory effort to force a nationwide transition away from coal for putative climate change reasons.  Using rulemaking authority given to an agency for achieving a specific purpose to achieve entirely different ends is the embodiment of arbitrary and capricious action, and that is especially the case where, as here, the end being pursued is a national policy choice the agency lacks authority to make.

## STANDING

Article III standing requires an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by the court.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  Only one Petitioner need establish standing.  *Biden v. Nebraska*, 600 U.S. 477, 488-89 (2023).

Petitioners who own coal-fired power plants, including Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative, Inc., Basin Electric Power Cooperative, Rainbow Energy Center, LLC, Oak Grove Management Company LLC, Luminant Generation Company LLC,

28

Talen Montana, LLC, and NorthWestern Corporation, d/b/a Northwestern Energy, have standing because they are directly regulated by the Rule. *See Lujan* at 561-62.

Petitioner Associations, whose members own coal-fired power plants, including the Lignite Energy Council, National Rural Electric Cooperative Association, National Mining Association, America's Power, Electric Generators MATS Coalition, and Midwest Ozone Group, have associational standing to represent their members who are injured. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342-45 (1977).

Petitioners who own coal mines, including NACCO Natural Resources Corporation and the Westmoreland entities, have standing because the Rule will directly harm their economic interests. *See* J.A.0537-0538(Westmoreland Cmts. at 1-2); *Dep't of Commerce v. New York*, 588 U.S. 752, 767-68 (2019) (standing where "predictable effect of Government action on decision of third parties" will cause harm to the plaintiff).

And Petitioner States have standing because the Rule will cause direct harm to their economic interests and ability to protect the public health of its citizens. *Air All. Houston v. EPA,* 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) (state standing where agency action would cause state expenses to mitigate harms that could have been prevented); *see also, e.g., Massachusetts v. EPA*, 549 U.S. 497, 522 (2007); *Clean Wis. v. EPA,* 964 F.3d 1145, 1159 (D.C. Cir. 2020). The Rule targets all coal-powered

EGUs with new emission standards that impose substantial costs and will likely result in the retirement of power plants needed to maintain grid reliability in Petitioner States. *E.g.*, J.A.0658(Montana Chamber of Commerce Cmts. at 1); J.A.0527-0528(N.D. Dep't of Environmental Quality Cmts. at 1-2). These retirements will have an inevitable downstream effect on the coal mines that supply these EGUs. J.A.1046-1047(NMA Cmts. at 1-2). And even where coal-fired EGUs and coal mines may be able to absorb the Rule's costs without shutting down, they will have to pass along significant additional costs to power consumers, including Petitioner States themselves. *E.g.*, J.A.0761(American Public Power Ass'n Cmts. at 11); J.A.0751(America's Power Cmts. at 1).

Petitioners' injuries are traceable to the Rule, which imposes the increased costs and jeopardizes the stability of power grids upon which Petitioners rely. *E.g.,* J.A.0913-0914(Electric Reliability Council of Texas, Inc. (ERCOT) Cmts. at 1-2); J.A.0900(Indiana Municipal Power Agency Cmts. at 10). A favorable court decision vacating the Rule would redress Petitioners' foreseeable injuries.

## STANDARD OF REVIEW

Under the CAA, the Court must reverse a rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … in excess of statutory … authority[] or limitations[;] … or without observance of procedure required by law." 42 U.S.C. § 7607(d)(9). The CAA's review standards track the review

standards of the Administrative Procedure Act. *Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020).

"Agency action is arbitrary and capricious if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sinclair Wyo. Ref. Co. v. EPA*, ---F.4th---, 2024 WL 3801747, *10 (D.C. Cir. Jul. 26, 2024) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). Agencies do not receive deference for their interpretation of a statute, or for their application of the law to the facts at hand. *Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2244 (2024).

## ARGUMENT

## I.    THE RULE IS CONTRARY TO STATUTE

Under CAA Section 112(d)(6), EPA may only revise the 2012 MATS emission standards if doing so is "necessary." In making that determination, EPA must consider, among other things, "developments" in control technologies, practices or processes. 42 U.S.C. § 7412(d)(6). The Rule does not meet either of these statutory requirements. The Rule also exceeds EPA's authority under Section 112(d)(6) by mandating the use of CEMS as a testing method.

A.    The Rule is Not "Necessary"

Section 112(d)(6) of the CAA permits EPA to revise HAP standards only "as necessary."  42 U.S.C. § 7412(d)(6) (directing EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years").  "[A]s necessary" is the operative statutory phrase.  However, nowhere in the Rule (or in its administrative record) did EPA articulate that the Rule was "necessary" under Section 112(d)(6).  That alone warrants vacating the Rule. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.[6]  But even if EPA's failure to assert that the Rule was "necessary" could be overcome or overlooked, it would still not clear that bar.

1.    Section 112(d)(6) Permits EPA to Revise Power Plant Emission Standards Only Where "Necessary" to Protect Public Health

"It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). That is particularly true when it comes to "the word 'necessary,' which has always

---

[6] Any argument that EPA now proffers regarding a "necessary finding" is post hoc rationalization by counsel that cannot justify the Rule.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action.").

been recognized as a word to be harmonized with its context." *Armour & Co. v. Wantock*, 323 U.S. 126, 129-30 (1944). Something may be "necessary" if it is "absolutely needed," *Merriam Webster's Collegiate Dictionary* (10th ed. 1994), or "essential, indispensable, or requisite," *Random House Collegiate Dictionary* (rev. ed. 1980). Sometimes "necessary" implies a looser fit, such as "convenient" or "useful." *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819). But however tight or loose, it is impossible to evaluate necessity without appreciating the relationship between the thing in question and a goal or end. In other words, an action or intervention can only be "necessary" with respect to some "desired goal." *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000).

Statutory context supplies that goal. It answers the obvious question posed by any use of the word "necessary"—"needed" or "essential" or "convenient" *for what*? *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999) (statutory direction that the FCC consider whether an action is "necessary" required the FCC to apply a standard "related to the goals of the Act").

Determining whether revisions are "needed" under Section 112(d)(6) therefore requires understanding the statutory scheme of Section 112. And the clear purpose of Section 112 is to regulate sources of HAP emissions to protect the public from adverse effects of the regulated HAPs. *See, e.g.*, 42 U.S.C. §§ 7412(b)(3)(B),

(C) (substances shall be included or deleted from regulation under Section 112 based on "adverse effects to human health or adverse environmental effects").

That purpose is especially clear for power plants, which are treated "differently from other sources for purposes of the hazardous-air-pollutants program." *Michigan*, 576 U.S. at 751.  Before EPA could regulate power plants under Section 112, Congress required it to find that "such regulation is appropriate and necessary" after considering the results of "a study of the *hazards to public health* reasonably anticipated to occur as a result of [their] emissions."  42 U.S.C. § 7412(n)(1)(A) (emphasis added).  EPA itself has recognized that power plant regulation is "necessary" pursuant to Section 112(n)(1)(A) only where hazardous pollutants from those sources are "reasonably anticipated to pose hazards to public health."  J.A.2176(77 Fed.Reg. at 9363); *see also* J.A.2175(*Id*. at 9310).

Given that Congress permitted EPA to regulate power plants only to address hazards to public health, it follows that Congress sought for EPA to again use public-health benefits as the benchmark when deciding whether revisions to power plant regulations are "necessary" under Section 112(d)(6).  *See Rowan Cos., Inc. v. U.S.*, 452 U.S. 247, 255 (1981) (consistent use of a term in a statutory scheme is "strong evidence" Congress intended the term to mean the same thing).  Put differently, in asking whether revisions are "necessary" within the meaning of this statute, the

34

inquiry must be whether the revisions are "needed" or "essential" or even (at the looser end) "useful" *for protecting public health*.

Interpreting "necessary" to require EPA to consider whether its regulation will yield meaningful health benefits also accords with the regulatory backdrop against which Congress enacted Section 112(d)(6). As the Supreme Court explained in taking EPA to task for considering only benefits and ignoring costs in deciding the 2012 MATS rule was "appropriate and necessary" in the first place: "One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health benefits." *Michigan*, 576 U.S. at 753. It follows that it would likewise not be "rational," or "necessary," to impose a regulation that would yield no marginal benefits to the statutory goal of protecting public health from HAP emissions.

## 2. EPA's Own Analysis Shows that its Revisions to the MATS Rule are Not "Necessary"

By EPA's own assessment, the Rule will impart no meaningful public health benefits from the mandated reduction in HAP emissions. EPA's primary justification for regulating power plants under Section 112 in the first place was to reduce mercury emissions. *See* J.A.1984(65 Fed.Reg. at 79827). But now, due to either the 2012 standards or for other reasons, exposures to mercury emissions from power plants are, in EPA's words, "below levels of concern from a public health standpoint." J.A.1784(RIA at ES-12). Exposure is so low that EPA itself

35

acknowledged a "lack of quantifiable risks" from power plants' mercury emissions. J.A.1821(*Id.* at 4-5). This is true even for the "vulnerable populations" that engage in subsistence fishing; even for this group, methylmercury exposure is well "below the presumptive acceptable cancer risk threshold and noncancer health-based thresholds" and cannot be reliably extrapolated to the "broader population of fish consumers." *Id.*

Likewise, EPA identified no meaningful health risks from non-mercury metal HAP emissions, concluding that the cancer risk from these emissions already "fall[s] within the acceptable range," and it could not "identify or quantify noncancer benefits" from a further reduction. J.A.1823(*Id.* at 4-7).

EPA's determination that cancer risks from power plant HAP emissions are "below the presumptive acceptable cancer risk threshold" and "within the acceptable range" means that the risk is already *extremely* low. For the coal-fired EGUs affected by this Rule, maximum individual lifetime cancer risks range from 0.002 to 0.344 in one million—orders of magnitude below Congress' threshold for deregulating the *source category entirely*. J.A.0118-0130(RRA, Appx. 10, Tbls. 1, 2a); 42 U.S.C. § 7412(c)(9)(B)(i) (providing that EPA may delist a category when none of its sources emits carcinogens at a level that "may cause a lifetime risk of cancer greater than

36

one in one million" to the "most exposed" individual).[7]   To put that number in perspective, the risk of being struck by lightning during one's lifetime is 65 in one million—over 200 times higher than the cancer risk from any coal plant's emissions. *See* Nat'l Weather Serv., NOAA, *How Dangerous is Lightning?*, https://perma.cc/QB6R-JSXQ.

EPA's cost-benefit analysis (performed per Executive Order, separate from EPA's justifications for the Rule) confirms that the Rule does not even pretend to advance the statutory goal. Despite its own determination that mercury exposure levels are "unlikely to be associated with appreciable risk of deleterious effects across the population," EPA plowed ahead, summarily declaring that there was not "zero risk" and that therefore reductions must "further reduce" methylmercury exposure to subsistence fishers near power plants affected by the Rule. J.A.0049(89 Fed.Reg. at 38556). EPA's analysis with respect to non-mercury metal HAP emissions was just as sparse, with the agency stating only that the emissions reductions projected under the Rule would "reduce human exposure." *Id.*

---

[7] The same is true for the risks associated with non-carcinogenic HAPs. *See* J.A.2526, 2529(89 Fed.Reg. 26835, 26838 (Apr. 16, 2024)) (explaining that EPA will delist sources of non-carcinogen HAP emissions if the "hazard quotient" is less than one); J.A.0118-0130(RRA, Appx. 10, Tbls. 1, 2a) (the hazard quotient for non-carcinogen HAP emissions from coal-fired power plants is one to several orders of magnitude below the delisting threshold).

For neither mercury nor for non-mercury metal HAPs was EPA able to determine that there were any meaningful (or quantified) public health benefits to be gained from the Rule's mandated reduction in HAP emissions, or that the already-large margin of safety would increase in any material or measurable way. In other words, the only "benefit" EPA could muster from mandating further HAP reductions was the unsupported platitude that "less is better." EPA Stay Opp. Br. at 1; *see also* J.A.0018(89 Fed.Reg. at 38525) (asserting that "Congress sought to minimize the emission of hazardous air pollution wherever feasible"). But less is not better when less does not yield any meaningful public health benefits, and it is not the standard set by statute.

Thus, under its cost-benefit analysis performed per Executive Order, EPA was left to point to alleged benefits from reductions in *criteria pollutant and greenhouse gas emissions*—that is, benefits that are ancillary to and entirely unrelated to the HAP emissions that Section 112 was enacted to regulate. J.A.0046-0052(89 Fed.Reg. at 38553-59). But, as Chief Justice Roberts noted during the *Michigan v. EPA* oral argument, it would be improper for EPA to use its Section 112 authority to "get at the criteria pollutants that you otherwise would have to go through a much more difficult process to regulate. In other words, you can't regulate the criteria pollutants through the HAP program[.]" J.A.2265-2266(Transcript of Oral Argument at 59:19–60:5, *Michigan v. EPA*, Nos. 14-46 (Mar. 25, 2015)); *cf., e.g.,*

*Wyoming v. Dep't of Interior*, 493 F.Supp.3d 1046, 1079 (D. Wyo. 2020) (an agency "cannot rationally claim the Rule's objective is waste prevention while justifying its considerable costs almost entirely on climate change benefits").

Ultimately, by EPA's own account, the Rule will impart no meaningful public health benefits from further reductions in HAP emissions that it mandates. Ignoring a rule's (lack of) benefits makes no more sense than ignoring its costs—which led to the Supreme Court's rebuke in *Michigan* the last time around. This time, EPA has simply blinded itself to the *other* side of the scale. Because EPA plowed ahead with this (costly) Rule in the absence of any meaningful public health benefits, the Rule must be set aside.

### 3.    EPA's Interpretation of "Necessary" Misreads the Statute and Contradicts the Agency's Interpretation in Numerous Other Rulemakings

For decades, EPA noted that the findings underlying an evaluation of whether a regulation already provides an ample margin of safety for public health "should be key factors" in deciding whether regulation is "necessary" under Section 112(d)(6). J.A.2010, 2027(70 Fed.Reg. 19992, 20009 (Apr. 15, 2005)) ("[W]e believe that the findings that underlie a section 112(f) determination should be key factors in making any subsequent section 112(d)(6) determinations for the related section 112(d) standard."); *see also* J.A.2034, 2036-2037, 2041(71 Fed.Reg. 17729, 17731-32, 17736 (Apr. 7, 2006)) (same); J.A.2082, 2096(72 Fed.Reg. 50716, 50730 (Sept. 4,

2007)) (finding certain controls unnecessary under 112(d)(6) due in part to "the relatively small reductions in health risks"); J.A.2109, 2129(73 Fed.Reg. 62384, 62404 (Oct. 20, 2008)) ("the instruction to revise 'as necessary' indicates that EPA" may consider "relevant factors" beyond technology, "such as costs and risk"); J.A.2069, 2072(71 Fed.Reg. 76603, 76606 (Dec. 21, 2006)) (considering the "effect in reducing public health risk" in determining that it was not "necessary" to revise HAP emission standards).

Consequently, even the Rule acknowledges (with considerable understatement), that "EPA has considered risks as a factor in some previous [Section 112(d)(6)] reviews." J.A.0018(89 Fed.Reg. at 38525).

Nonetheless, EPA defends the Rule's refusal to account for the absence of any meaningful public health benefits by characterizing Section 112(d)(6) as a technology-based statute that reflects Congress's goal to reduce emissions as much as "achievable." J.A.0024(89 Fed.Reg. at 38531). But Section 112(d)(6) uses the word "necessary," not the word "achievable," and where Congress wanted EPA to reduce emissions as much as "achievable," it said so. For instance, in regulating power plants under the neighboring Section 111 of the CAA, Congress directed EPA to "revise" an emission standard for new plants if the existing limit "no longer reflects the greatest degree of emission limitation achievable." 42 U.S.C. § 7411(g)(4)(B). And even within other locations of Section 112 itself, such as the

40

provision for initially setting MACT-based emission levels, Congress knew how to direct "the maximum degree of reduction … achievable."  42 U.S.C. § 7412(d)(2).  Section 112(d)(6)'s deliberately different use of the term "necessary" must be given meaning.  *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 316 (2014) ("[W]e, and EPA, must do our best, bearing in mind the "'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" ") (citation omitted).

Moreover, although Section 112(d)(6) tells EPA to take technological developments "into account" as part of its necessity evaluation, that language requires only that EPA account for whether technological developments have made revisions possible while evaluating whether revisions are "necessary" in light of the statute's public-health goals.  It does not require that EPA impose tighter standards simply because developments make them possible.  Had Congress wanted the latter, it would not have limited EPA to "necessary" revisions—those for which there is a "need."  *Michigan*, 576 U.S. at 757.  To paraphrase, "[i]t is unreasonable to infer that, by expressly making [technological change] relevant," this provision "implicitly makes [public health benefits] irrelevant."  *Id*. at 755.

In its stay motion briefing, EPA has claimed that Section 112(d)(6)'s use of the term "necessary" for recurring reviews incorporates Sections 112(d)(2), which directs that *initial* HAP emission standards should be set based on what is

"achievable." EPA SCOTUS Opp. Br. at 3; *see also* J.A.0024(89 Fed.Reg. at 38531).

But that reading would require EPA to re-calculate the MACT floor *every* time that

it conducts a Section 112(d)(6) review, and this Court has expressly rejected such a

reading of the statute multiple times. *See Ass'n of Battery Recyclers, Inc. v. EPA*,

716 F.3d 667, 673-74 (D.C. Cir. 2013) (rejecting argument that EPA must recalculate

MACT in accordance with CAA Sections 112(d)(2) and (d)(3) in a 112(d)(6)

review); *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 7-9 (D.C. Cir. 2015)

(similar).

Moreover, even if EPA was correct that Section 112(d)(6) reviews require re-

calculating the "achievable" MACT standards every eight years, EPA's attempt to

tie Section 112(d)(6)'s use of the term "necessary" to Section 112(d)(2) fails to

comport with the special treatment afforded to power plants under Section 112(n)(1).

Section 112(d)(6) applies only to initial MACT standards "promulgated *under this*

*subsection*." 42 U.S.C. § 7412(d)(2) (emphasis added). Those are standards for the

HAP emission sources that Congress required EPA to regulate based, in general, on

"how much pollution the source emits." *Michigan*, 576 U.S. at 747. Section

112(d)(1) specifies that these standards apply only to major and area sources "listed

for regulation pursuant to subsection (c)." Power plants, in contrast, are defined

separately and become subject to Section 112 regulation under subsection (n). *Cf.*

42 U.S.C. § 7607(d)(1)(C) (referring separately to actions "under section 7412(d)"

and ones "under section 7412(m) or (n)"). EPA revisits its power plant standards every eight years, since they are still "promulgated under *this section*," 42 U.S.C. § 7412(d)(6), meaning Section 112 more generally. But, in doing so, the agency must look back to Section 112(n)(1)(A)'s special "appropriate and necessary" framework for power plants. At a minimum, EPA cannot ignore Section 112(n)(1)(A) when asking if revisions are "necessary."

Contrary to EPA's assertion, this Court's decision in *Battery Recyclers* does not support EPA's argument here. *See* J.A.1739(Response to Comments at 144). *Battery Recyclers* held that it was not arbitrary for EPA to revise emissions standards for lead smelting facilities under Section 112(d)(6) without "consider[ing] public health objectives," reasoning that "nothing in" that provision's "text suggests that EPA must consider such factors." 716 F.3d at 672. But that decision does not address the meaning of the statutory term "necessary" at all. Moreover, this Court decided *Battery Recyclers* before the Supreme Court clarified in *Michigan* that a statutory command to consider whether "*regulation* is appropriate and necessary" *requires* "paying attention to the advantages *and* the disadvantages of agency decisions"— meaning EPA can no longer close its eyes to the one side of the scale. *Michigan*, 576 U.S. at 753. This Court also decided *Battery Recyclers* before the Supreme Court held agencies deserve no deference in their statutory interpretations because courts should determine the "best" reading of the statute, not just whether the

agency's reading is permissible.  *Loper Bright*, 144 S. Ct. at 2273.  And *Battery Recyclers* did not involve the regulation of power plants; it involved emission sources that Congress directed EPA to regulate without first considering the public health benefits of such regulation.  716 F.3d at 670.

Finally, in its Supreme Court briefing, EPA also contended that limiting "necessary" revisions to only those that provide a demonstrable benefit to public health "conflates the technology-based approach in subsection (d) with the separate legacy risk-based approach in subsection (f)."  EPA SCOTUS Opp. Br. at 17.  But this too is mistaken.  Section 112(f)(2) directs the agency to tighten emission standards if the initial MACT standard did not achieve an adequate margin of safety—*i.e.*, no one faces an excess lifetime cancer risk over 100-in-1-million. *NRDC*, 529 F.3d at 1080.  Section 112(d)(6) then allows the agency to further tighten the standards in subsequent reviews when there are "developments" that would make it possible to do so—but the command that such revisions also be "necessary" still requires the agency to demonstrate at least some relevant public health benefit for doing so.  For example, if current standards presented a cancer risk of 90-in-one million, Section 112(f)(2) may not compel tightening them, since there was already an ample margin of safety.  But if technological developments allowed the risk to be reduced by 90% (to 9-in-one million), where the benefits of regulation merited the

costs of the rule, Section 112(d)(6) may empower EPA to impose that health-improving revision.

In other words, Section 112(f) is a floor. But that does not mean there is no ceiling. Rather, EPA hits the "necessary" ceiling under Section 112(d)(6) where risks are already so low that any further revisions will achieve no demonstrable public health benefits from mandating a further reduction in HAP emissions—as is the case here.

*   *   *   *

In short, Section 112(d)(6) only permits EPA to revise the MATS rule when doing so is "necessary." That statutory term must be given meaning. And in the context of Section 112—particularly when regulating power plants—revisions can only be "necessary" when the mandated reduction in HAP emissions results in some meaningful public health benefit. But for this Rule it does not. Consequently, the Rule exceeds EPA's rulemaking authority under Section 112(d)(6).

## B. EPA Has Not Identified a "Development" that Authorizes Further Rulemaking Under Section 112(d)(6)

Even assuming that EPA could mandate revising emission standards under Section 112(d)(6) without demonstrating a benefit to public health from the revised

45

HAP emission levels, EPA would still need to identify a "development" and explain why that development warrants a revision to the standard.

Since promulgating the original rule in 2012, EPA has twice determined there have not been new practices, processes, or control technologies for the MATS rule—first in 2020 and again in 2023. *See* J.A.2403(85 Fed.Reg. at 31314 (2020)); J.A.0347(88 Fed.Reg. at 24868 (2023)) ("our review of fPM compliance data for coal-fired EGUs indicated no new practices, processes, or control technologies for non-Hg metal HAP…"). In the Rule, however, EPA reverses course and concludes that because EGUs have been meeting current standards at lower costs than estimated in 2012, that is a "development" that supports ratcheting down the emission standards by 66-70%. But it is not.

### 1.    Meeting the Current Emission Standards is Not a "Development" Supporting Revision

The fact that coal-fired EGUs are meeting the current surrogate fPM and mercury emission standards cannot, under any reasonable reading of the term (let alone the "best reading of the statute" required under *Loper Bright*) be considered a "development."

Under the CAA, all regulated sources must comply with a HAP emission standard once it is issued. However, to avoid exceeding those emission limits even momentarily, plants must operate at a level that emits *less* than the applicable standard to account for variability in fuel source and typical fluctuations in emissions

levels.  *See* J.A.2193, 2204(77 Fed.Reg. 58220, 58231 (Sept. 19, 2012)).  In other words, plants must set their targets below the HAP emission standard in order to comply with a Section 112 rule, and they must build this compliance margin into their operations to ensure that the source can meet the emissions standard 100% of the time.  *See* J.A.0462-0463(*PM CEMS Random Error Contribution by Emission Limit* (Mar. 22, 2023) (PM CEMS Memo)) (finding margin of 50% was appropriate for the MATS Rule).

Under EPA's theory, if meeting an emission standard with a compliance margin qualified as a "development," then the agency could continually tighten HAP emissions standards until the regulated source could no longer comply with the standard 100% of the time.  This ever-tightening squeeze is not what Congress intended, and even EPA has previously recognized that Section 112(d)(6) puts meaningful constraints on its ability to continuously ratchet down HAP emission standards.  *E.g.,* J.A.2026(70 Fed.Reg. at 20008) ("We reiterate that there is no indication that Congress intended for section 112(d)(6) to inexorably force existing source standards progressively lower and lower in each successive review…").

EPA's interpretation would have far-reaching impacts, well beyond just those EGUs regulated by the MATS Rule.  There are more than 100 source-category MACT standards that cut across a wide swath of American industry, from power plants to petroleum refineries and glass, steel, paper, and chemical manufacturing,

47

landfills, and all types of incinerators. *See generally* 40 C.F.R. Part 63. If the Court upholds EPA's interpretation, it would empower EPA to drive any disfavored source out of business by tightening HAP emission limits until an emission source is unable to comply. But the sweeping authority that EPA claims here cannot be found in Section 112(d)(6). *Whitman v. Am. Trucking Ass'ns, Inc,* 531 U.S. 457, 468 (2001) (requiring EPA to show a "textual commitment of authority" for its actions). And, EPA's legal theory here directly contradicts what it concluded in 2020—the fact that there were no new practices, processes or control technologies means there were no developments that would allow revising the MATS Rule under Section 112(d)(6). J.A.0010-0011(89 Fed.Reg. at 38517-18).

### 2. Achieving the Standard at Costs Lower Than Estimated in 2012 is Not a "Development" for Section 112(d)(6)

For the same reasons, the fact that EGUs may be able to meet emissions standards *at lower costs* than EPA estimated when it promulgated the 2012 MATS Rule cannot constitute a "development" under Section 112(d)(6).

As used in the context of Section 112(d)(6), the best interpretation of the term "development" is some meaningful change or evolution in control technology that is related to emissions of the pollutant. *E.g.*, *Am. Heritage Dictionary* (5th ed. 2011), *Development* ("A significant event, occurrence, or change"). And interpreting Section 112(d)(6)'s use of the term "development" to mean some sort of meaningful technological change also conforms with this Court's caselaw and EPA's own prior

48

position.  *See, e.g.*, Final Brief for EPA, *Nat'l Ass'n for Surface Finishing v. EPA*, No. 12-1459, Entry 1514442 at 40-41 (D.C. Cir. Sep. 29, 2014) (describing a "development" as among other things, a "significant event, occurrence, or change").

This Court has stated the "core requirement" for revising emission standards under Section 112(d)(6) is for EPA to identify *technological* developments.  *NRDC,* 529 F.3d at 1084 (stating that Section 112(d)(6) requires "the Administrator to 'review, and revise as necessary' the *technology-based* standards in light of *technological developments*") (emphasis added).  And EPA itself has previously recognized this, defining "developments" for purposes of Section 112(d)(6) as: "(1) Any add-on control technology or other equipment that was not identified and considered during development of the [prior standard]; (2) Any improvements in add-on control technology or other equipment (that were identified and considered during development of the [prior standard]) that could result in significant additional emissions reductions; (3) Any work practice or operational procedure that was not identified or considered during development of the [prior standard]; and (4) Any process change or pollution prevention alternative that could be broadly applied to the industry and that was not identified or considered during development of the [prior standard]").  J.A.2142, 2155(76 Fed.Reg. 81328, 81341 (Dec. 27, 2011)).

Alleged cost-effective compliance using long-existent technologies does not meet any of these definitions, and it is not a "development" that would support the Rule's dramatic emission reductions here.[8]

### 3. EPA's Purported "Incremental" Developments are a Makeweight that Do Not Support Revising the Standards

EPA also passingly asserts there have been "incremental" changes in technology that justify revising the emission standards.  EPA Stay Opp. Br. at 11.  But those alleged incremental developments cannot justify dropping the emission standards by 66-70%.

For surrogate fPM emissions, EPA claims that increased durability in filter-bag material for baghouse controls is an incremental development that warrants a ratcheting down of the fPM standard.  J.A.0023(89 Fed.Reg. at 38530).  But improvements in filter durability cannot be a development under the CAA, because in setting the HAP emission standard, EPA already presumed that no malfunctions will occur.  *See* J.A.2179(77 Fed.Reg. at 9393).  In other words, the original standards already assume that filter-bags will *never* break, so any alleged improvement in their durability is not a "development" that can have any impact on emissions or justify further tightening the standard.  J.A.2177(*Id.* at 9382).  More

---

[8] Indeed, EPA already determined that the primary control technologies used today—electrostatic precipitation and ACI—were not cost prohibitive a decade ago when issuing the original MATS rule.

durable bags only affect the frequency with which the bags must be replaced, not the efficiency of any individual bag or the baghouse controls overall.

Similarly, EPA's reliance on the effectiveness of brominated powdered ACI to prove that there has been a "development" in mercury emissions control technology is misplaced.  ACI has been used since 2011, was available for control of mercury emissions under the original MATS rule in 2012, and is the same technology used to control mercury emissions today.  *See* J.A.0040(89 Fed.Reg. at 38547); J.A.2139, 2140(76 Fed.Reg. 24976, 25014 (May 3, 2011)) (both defining dry sorbent injection as ACI, including brominated ACI).  Consequently, the use of brominated ACI is not a "development" (incremental or otherwise) that would justify ratcheting down the mercury emission standard for lignite-fired EGUs by 70% in the absence of any meaningful change in technology.

EPA cannot claim that the use of CEMS is a development.  Aside from the lack of developments in CEMS technology itself, J.A.0671(NRECA Comments at 5), monitoring technologies are not developments under Section 112(d)(6).  The CAA provides authority for EPA to regulate HAP test methods under Section 112(b)(5)—a section entirely separate from EPA's obligation to evaluate developments in technology under Section 112(d)(6).  *See* 42 U.S.C. § 7412(b)(5).  Section 112(d)(6) review requires EPA to consider control technologies that impact emissions; there is no requirement to review monitoring methodology in that review.

51

42 U.S.C. § 7412(d)(6). And this makes sense—monitoring does not directly correlate to improvements in emissions control.

### 4.    *Surface Finishing* Does Not Justify EPA's Interpretation

EPA has previously relied upon this Court's decision in *National Association for Surface Finishing*, to justify its capacious interpretation of the term "development." *See* EPA Stay Opp. Br. at 13 (citing 795 F.3d 1 (D.C. Cir. 2015)). But for a variety of reasons, EPA's invocation of that decision is not persuasive.

For one, in *Surface Finishing*, this Court specifically noted that the petitioner trade association *did not challenge* EPA's broad interpretation of the term "developments" under Section 112(d)(6). 795 F.3d at 8. Consequently, the Court did not address, let alone rule upon, the validity of EPA's interpretation of the term. *Cf. Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). Here, Petitioners *do* challenge EPA's interpretation, and the Court must review that legal interpretation *de novo*. *Loper Bright*, 144 S. Ct. at 2273.

Second, the *Surface Finishing* court relied upon "the familiar deferential standard announced in *Chevron*." 795 F.3d at 7. But after the Supreme Court's *Loper Bright* decision, courts must now "exercise their independent judgment in

deciding whether an agency has acted within its statutory authority, as the APA requires."  144 S. Ct. at 2273.

And third, in *Surface Finishing* EPA identified several new actual advances in technologies—emissions elimination devices, HEPA filters, enclosing tank hoods and fume suppressants—in support of its determination that there had been "developments" that warranted a reduction.  795 F.3d at 11.  By contrast, EPA has not identified any such new technologies here.  Electrostatic precipitators and fabric filters were the primary control technologies available for surrogate fPM control under the original MATS rule in 2012, and EPA determined those are the same technologies used today.   J.A.0344(88 Fed.Reg. at 24865).   And like in 2012, electrostatic precipitators remain capable of collection efficiencies of 99%, and fabric filters remain capable of collection efficiencies of 99.9%.   J.A.0383-0384(2023 Tech. Review at 8-9).  The same holds true for the activated carbon used to control mercury emissions.   J.A.0394-0395(*Id*. at 19-23).   EPA offers no explanation how technologies that were available during the promulgation of the 2012 MATS rule now qualify as Section 112(d)(6) "developments."

\*   \*   \*   \*

In short, there has been no "development" that could support the Rule's dramatic revisions to the MATS emission standards, and EPA's interpretation of the statutory term is not a reasonable one, let alone the "best one." *Loper Bright*, 144 S.

Ct. at 2273.   Consequently, EPA lacks authority to revise the MATS Rule under Section 112(d)(6), and its promulgation of the Rule was unlawful.  *See FEC v. Cruz*, 569 U.S. 289, 301 (2022) (an agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute") (citations omitted).

## II.    THE RULE IS ARBITRARY AND CAPRICIOUS

An agency's rulemaking is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem … or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  This Rule is arbitrary and capricious for many reasons, each of which warrants vacating it.

### A.    EPA's Consideration of Costs is Arbitrary and Capricious

To satisfy the baseline requirement of "reasoned decisionmaking," let alone whether regulation is "necessary," EPA must account for the Rule's costs, which "requires paying attention to the advantages *and* the disadvantages" of the Rule. *Michigan*, 576 U.S. at 750, 753, 756.  To the extent EPA considers costs and benefits in the Rule, that consideration is arbitrary and capricious in at least two distinct ways.

1. **The Rule Imposes Substantial Costs Without Any Demonstrated Benefit from the Reduction in HAP Emissions**

*Michigan* makes clear that considering costs necessarily entails considering benefits, and the agency's failure to consider both is arbitrary and capricious. 576 U.S. at 752. EPA estimates that the Rule will impose at least $860 million in direct compliance costs. J.A.0005(89 Fed.Reg. at 38512). As discussed *supra*, those costs of nearly a billion dollars are weighed against zero dollars in monetized benefits from the mandated reduction in HAP emissions, and no demonstrated risk reduction. *See* J.A.0004-0005(89 Fed.Reg. at 38511-12). It is not "rational … to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits," *Michigan*, 576 U.S. at 752, let alone where there is "no meaningful benefit." *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 966 (5th Cir. 2023).[9]

To claim some "benefits" of the Rule, EPA pivots to alleged ancillary benefits that are unrelated to HAP emissions. J.A.0005(89 Fed.Reg. at 38512) (claiming $300 million in health benefits from reductions of non-HAP pollutants and $130

---

[9] EPA's calculation of $860 million in compliance costs is a significant underestimate. *See infra* Section II.C. EPA also ignores the downstream costs of premature closures. *See infra* Section II.B. And EPA's failure to consider the Rule's impacts on small entities under the Regulatory Flexibility Act is addressed in Petitioner-Intervenor San Miguel's forthcoming brief. But even taking EPA's claimed costs at face value, they are indefensible.

million in other climate benefits).  However, as EPA previously acknowledged, "it would be highly illogical for the Agency to make a determination that regulation under CAA section 112, which is expressly designed to deal with HAP, is justified principally on the basis of the criteria pollutant impacts."  J.A.2340, 2346(84 Fed.Reg. 2670, 2676 (Feb. 7, 2019)).  EPA should have applied the same principle here.  But even accounting for those alleged ancillary benefits, the Rule *still* has a "negative net monetized benefit" of $440 million.  J.A.0004-0005(89 Fed.Reg. at 38511-38512).[10]

Faced with no relevant and quantifiable benefits that would justify the Rule, EPA next claimed the Rule had nonmonetized and unquantified health benefits from HAP reductions.  J.A.0046, 0048(89 Fed.Reg. at 38553, 38555).  But those alleged "non-monetized benefits" from HAP reductions do not justify disregarding the hundreds of millions of dollars in cost (even accepting EPA's calculations).  *Id*.

For one, although EPA claims that the benefits of the Rule's mandated reduction in HAP emissions escape quantification, J.A.0052(89 Fed.Reg. at 38559), quantifying the public health benefits of reducing HAP emissions is entirely possible.  In fact, EPA did just that the last time it promulgated a MATS Rule.  *See*

---

[10] EPA's reliance on climate benefits adds another layer of arbitrariness because those benefits are based on unreliable projections of frequency, scope, and severity of future international conflicts and human migrations for the next *300 years*, and ignore benefits of energy production, among other flaws.  J.A.0541-0548(Westmoreland Cmts. at 5-12.)

J.A.2182(77 Fed.Reg. at 9425) (concluding the 2012 MATS rule's reduction of 20 tons of mercury emissions would provide $4-6 million in benefits).  Given that this Rule will only reduce net mercury emissions by an additional 900 to 1,000 pounds—a tiny fraction of the 2012 MATS Rule—EPA's refusal to quantify the relevant benefits of the Rule appears to stem more from the minuscule size of those benefits, rather than their inherent nature.  *See* J.A.0005(89 Fed.Reg. at 38512).

And for another, EPA's claim that the mandated reduction in HAP emissions yields unquantifiable benefits runs headlong into the fact that EPA *has* quantified the lifetime cancer risk associated of HAP exposure from coal-fired power plants, and EPA makes no determination how the already tiny 0.344-in-a-million risk for the person most exposed would be further reduced by the Rule's mandated reduction in HAP emissions.  EPA does not claim, for example, that risk will be reduced to some value below 0.344-in-a-million.[11]  And, as noted *supra*, that level of risk is already far below the aspirational goal of the CAA, whereby EPA could discontinue regulating coal-fired plants under Section 112 entirely.  42 U.S.C. § 7412(c)(9).

---

[11] To the contrary, while EPA found that reducing HAP emissions under the Rule would reduce *exposure*, it did not find that reducing HAP emissions would cause *health benefits*.  *See* J.A.0004(89 Fed.Reg. at 38511) (EPA "expects that emission reductions under the final rulemaking will result in reduced exposure to Hg and non-Hg HAP metals.  The EPA also projects health benefits due to improvements in particulate matter…(PM2.5) and ozone and climate benefits from reductions in carbon dioxide (CO2) emissions.").

Ultimately, all EPA offers is its assurance that there is some relevant benefit to the Rule—though it cannot (or will not) quantify it, and it cannot (or will not) explain how it reduces the risk of adverse health effects. *Cf. GPA Midstream Ass'n v. DOT*, 67 F.4th 1188, 1200 (D.C. Cir. 2023) ("Without quantified benefits to compare against costs, it is not apparent just how the agency went about weighing the benefits against the costs.").

EPA expressly disclaims reliance on its cost-benefit analysis as a basis for the Rule. J.A.0047(89 Fed.Reg. at 38554). But just as it is unlawful to promulgate a Rule that imposes nearly a billion dollars in costs in exchange for no meaningful benefits, it is likewise unlawful to ignore the Rule's lack of benefits resulting from the Rule's reduction of HAP emissions. By failing to actually "consider whether the costs of its decision outweighed the benefits," *Michigan*, 576 at 750, EPA failed in its obligation to engage in reasoned decisionmaking.

### 2. EPA's Cost-effectiveness Analysis is Arbitrary and Capricious

Having arbitrarily ignored the Rule's adverse cost benefit analysis, EPA claimed to consider cost using other cost metrics including cost-effectiveness. But EPA's treatment of cost-effectiveness is also arbitrary and capricious. EPA's uniform, historic practice is to consider cost effectiveness as part of its [Section 112(d)(6)] review. *See, e.g., Ass'n of Battery Recyclers, Inc.*, 716 F.3d at 674. For surrogate fPM emissions, by EPA's own math, the cost-effectiveness of the Rule is

$10.5 million per ton of HAP removed.  J.A.0025-0026(89 Fed.Reg at 38532-33). EPA acknowledges, with a degree of understatement, that the "cost-effectiveness values for [the Rule] are higher than cost-effectiveness values that the EPA concluded were not cost-effective . . . [in] prior rules." J.A.0016(89 Fed.Reg. at 38523).

In fact, when compared on an apples-to-apples basis to EPA actions for the same pollutants from other industries, this Rule appears to be among the least cost-effective rules ever enacted by EPA, especially considering the absence of any demonstrated health or environmental risk being remedied by the Rule. J.A.0539-40(Westmoreland Cmts. at 3-4).  And EPA has expressly *rejected* far smaller cost-effectiveness ratios for being excessive in other Section 112(d)(6) rulemakings. *See, e.g.,* J.A.2305-2306(80 Fed.Reg. 75178, 75201 (Dec. 1, 2015) (petroleum refining) ($10 million/ton of non-Hg metal HAP)); J.A.2410-2411(85 Fed.Reg. 42074, 42088 (Jul. 13, 2020) (Iron and Steel Manufacturing) ($7 million/ton of metal HAP)); J.A.2484, 2493(88 Fed.Reg. 11556, 11565 (Feb. 23, 2023) (lead-acid battery manufacturing) ($4.7M/ton of lead)).

To dodge the Rule's cost-ineffectiveness, EPA purports to "consider cost" via a grab-bag of alternative cost metrics including "typical capital and total expenditures for the power sector," "total power sector sales," and "total PM upgrade control costs and emissions of the coal fleet."  J.A.0025-0026(89 Fed.Reg. at 38532-

33).  But EPA's claim that this approach is consistent with historic practice is wrong. *Cf*. J.A.0025(*Id.* n.52). In reality, *every* rulemaking cited by EPA either found cost-effectiveness to be within the range of values EPA had accepted historically, before considering other cost metrics,[12] or *declined* to enact a standard due to facility-specific determinations of "poor cost effectiveness" even after considering the other cost metrics EPA now seeks to rely on.[13]  Furthermore, the Rule considers those alternative cost comparisons solely on an industrywide basis that has the effect of spreading costs over a far wider range of units than those that would incur them, J.A.0025(89 Fed.Reg. at 38532), and differs from *every* historic example EPA cited accounting for *facility specific* calculations. EPA cannot claim to act consistent with its past practice while doing the precise opposite.  *FCC v. Fox Television Stations,* 556 U.S. 502, 515 (2009).

*    *    *    *

---

[12] J.A.2461, 2467(87 Fed.Reg. 27002, 27008 (May 6, 2022)); J.A.2421, 2440(87 Fed.Reg. 1616, 1635 (Jan. 11, 2022)); J.A.2267, 2282(80 Fed.Reg. 37366, 37381 (Jun. 30, 2015)); J.A.2227, 2233-2235(80 Fed.Reg. 14248, 14254-56 (Mar. 18, 2015)); J.A.2193, 2199-2201(77 Fed.Reg. 58220, 58226-28 (Sept. 19, 2012)); *see also* J.A.2190, 2192(77 Fed.Reg. 49490, 49523 (Aug. 16, 2012) (most of this rule, cited by EPA, was not based on Section 112(d)(6), *see, e.g., id*. at 49501; but regardless, EPA relied on cost effectiveness for the one change that was made under Section 112(d)(6))).

[13] J.A.2421, 2438(87 Fed.Reg. 1616, 1633 (Jan. 11, 2022)); J.A.2303-2304(80 Fed.Reg. 50386, 50398 (Aug. 19, 2015)).

In short, even if this Rule had some relevant public health or environmental benefit to justify it, the costs it imposes (even according to EPA's flawed calculations) so greatly exceed any such benefits and depart from EPA's own past practice that the Rule is arbitrary and capricious.

## B.    EPA's Failure to Meaningfully Consider the Rule's Impacts on the Power Grid is Arbitrary and Capricious

For rulemaking under Section 112, "'[c]osts' can mean many different things, including the cost associated with increased risk" of grid unreliability. *Del. Dep't of Natural Res. & Envtl. Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015). But "EPA has no expertise on grid reliability." *Texas v. EPA*, 829 F.3d 405, 432 (5th Cir. 2016). Due to that lack of expertise on grid reliability, "EPA must support its arguments [regarding grid reliability] more thoroughly than in those areas in which it has considerable expertise and knowledge." *Id*.

EPA's perfunctory conclusions that the significant costs this Rule imposes on coal-fired EGUs will not cause *any* premature retirements and have *no* negative impacts to the reliability of the nation's power grids do not reflect the reasoned analysis that the CAA requires. J.A.0048-0049(89 Fed.Reg. at 38555-56); 42 U.S.C. § 7607(d)(9); *cf. Small Ref. Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 535 (D.C. Cir. 1983) (The "agency must 'explain the assumptions and methodology used in preparing [a] model' and if the methodology is challenged, must provide a 'complete analytic defense.'") (citation omitted). Numerous commenters provided

detailed comments putting EPA on notice that the Rule would foreseeably have significant impacts on power grid reliability.  Consequently, EPA's conclusory statements that commenters proffered "no credible information" that the Rule would lead to premature retirements, and that the Rule would not "threaten resource adequacy or otherwise degrade electric system reliability," J.A.0019(89 Fed.Reg. at 38526), ignore the substantial evidence in the record.

As just one example, NorthWestern provided substantial comments detailing how (1) upgrades to Colstrip would be cost-prohibitive, (2) the diversion of funds for compliance alone would complicate meeting generation demand, and (3) closing Colstrip before the mid-2030s would cause a grid reliability crisis.  *See* J.A.0966-0967, 0977-0983(NorthWestern Cmts. at 2–3, 13–19).  And NorthWestern was not alone in warning EPA that its conclusions about power plant retirements and grid reliability were flawed.  *See also, e.g.,* J.A.1062-1068(NMA Cmts. at 18-24); J.A.0525-0526(Midwest Ozone Group Cmts. at 10-11); J.A.0912(Ameren Cmts. at 11); J.A.0671-0672(NRECA Cmts. at 5-6); J.A.0744-0745(Lignite Energy Council Cmts. at 16-17); J.A.1246-1247(Rainbow Energy Center Cmts. at 3-4).  Indeed, ERCOT, the regional transmission organization covering much of Texas, expressed concerns about the impact that premature retirements of coal-fired power plants due to the Rule's high cost of compliance would have on the Texas power grid, especially before new generation comes online.  J.A.0913-0914(ERCOT Cmts. at 1-2); *see also*

J.A.0485-0486(Montana Public Service Commission Cmts. at 1-2); J.A.0900(Indiana Municipal Power Agency Cmts. at 10); J.A.0761(American Public Power Ass'n Cmts. at 11); J.A.0487(America's Power Cmts. at 1).

Rather than meaningfully engaging with and responding to those many concerns, EPA summarily brushed them off, claiming that it "used a state-of-the-art, peer-reviewed model" to determine that the Rule would not lead to any retirements and consequently not cause any grid reliability concerns. *See* J.A.1785-1788, 1817-1818(RIA at 3-1-3-4, 3-18); J.A.0019(89 Fed.Reg. at 38526). But EPA's model is a predictive algorithm that estimated future hypothetical generation capacity based on the inputs it was provided. *See* J.A.1785-1788(RIA at 3-1-3-4). In other words, the model adds enough new hypothetical resources in the future to guarantee resource adequacy, meaning the model EPA uses will *never* project a resource adequacy problem. And here, numerous commenters put EPA on notice that the assumptions underlying its inputs were wrong. *See supra; see also* J.A.1345(Cichanowicz Report at 39) (outlining flaws in EPA's grid reliability modeling).

Moreover, many commenters put EPA on notice that the power grid reliability impacts of this Rule could not be modeled or considered in isolation, but instead had to account for the interrelated impacts of myriad other EPA rules impacting coal-fired power plants that were being promulgated in rapid succession—including the profoundly impactful GHG Rule that this Rule was expressly bundled with and

promulgated alongside.  J.A.0923(Minnkota Power Coop. Cmts. at 16); J.A.0872-0873(Ohio EPA Cmts. at 1-2); J.A.1284(PGen Cmts. at 21); J.A.1245-46(Rainbow Energy Cmts. at 2-3); J.A.0752-0753(American Public Power Ass'n Cmts. at 2-3); J.A.1061-1071(NMA Cmts. at 17-27); *cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (EPA acts arbitrarily and capriciously when it fails to meaningfully "acknowledge and account for" the impacts of "contemporaneous and closely related rule[s]").

EPA's failure to offer any meaningful response to the many comments warning that the assumptions and inputs underlying its grid reliability model were flawed consequently renders the Rule arbitrary and capricious—in promulgating the Rule EPA "cannot simply ignore 'an important aspect of the problem.'"  *Ohio v. EPA*, 144 S. Ct. 2040, 2051 (2024) (citation omitted); *see also Del. Dep't of Natural Res*., 785 F.3d at 14 (holding that "EPA should have, but did not, respond properly to their well-founded concerns" about grid reliability).

EPA attempted to overcome this problem by referencing a generic Memorandum of Understanding with the DOE for interagency cooperation. However, EPA fails to demonstrate any such alleged "coordination" happened for *this* Rule.  *See* J.A.1751-1752(Response to Comments at 156-57) (noting the Memorandum of Understanding is "not linked to any one regulatory effort or final action.").  Nothing in the record indicates that EPA consulted with DOE, or any other

64

grid operator or reliability expert on this specific rule, whether in isolation or in the context of the multiple rules EPA proposed nearly simultaneously with potential impacts on the nation's power grids. *Cf. Del. Dep't of Natural Res.*, 785 F.3d at 18 ("On remand, we encourage EPA to solicit input from FERC, as necessary").

In a final attempt to excuse its failure to meaningfully address concerns related to power grid reliability, EPA suggests that it did not need to undertake any further analysis of grid reliability because if the agency ends up being wrong, and the Rule causes coal-fired EGUs to no longer be commercially viable, State and regional regulators will be able to use temporary emergency powers to prevent them from retiring. J.A.0019(89 Fed.Reg. at 38526). But EPA's reliance on State and regional regulators being able to use emergency stopgap powers to prevent the Rule from breaking the grid is emblematic of the dismissive way EPA treated grid reliability concerns throughout the notice and comment process. And in any event, "EPA [cannot] excuse its inadequate responses by passing the entire issue off onto a different agency." *Del. Dep't of Natural Res.*, 785 F.3d at 16.

## C.     The Rule Is Based on Unreliable and Insufficient Arbitrarily Truncated Data and Unsupported Assumptions

A significant reason why EPA's grid reliability model failed is its reliance on cherry-picked data, unsupported assumptions, and flawed fPM and mercury technical analyses that developed the data going into the model, and which underly EPA's conclusions about the feasibility of coal-fired power plants meeting the

revised emission standards, and the costs for doing so.  Those data issues infect nearly every aspect of the Rule and render it arbitrary and capricious.

1.    **EPA's fPM Analysis is Deeply Flawed**

a.    **The Revised fPM Standard Relies on Unsupported Assumptions that Run Counter to the Empirical Data**

EPA based its analysis underlying the revised fPM emission standard on an irrationally truncated and arbitrary selection of data.  In its proposed Rule, for most units, EPA reviewed the fPM rates measured in two quarters from 2017, 2019, and for a handful of units another quarter from 2021.  J.A.0377(2023 Tech. Review at 2).  EPA did not explain why it selected these quarters, even though EPA has compliance data for *every quarter* that EGUs have operated since 2017.  *See generally* J.A.0001(89 Fed.Reg. 38508).  Commenters noted the lack of a rationale for EPA's selection and how unrepresentative EPA's selection was.  *See, e.g.,* J.A.1274-1279(PGen Cmts. at 11-16 (citing Cichanowicz Report)).

In the Rule, EPA conceded the data it selected were not representative and that a broader (and more appropriate) set of data "exhibited large variability within quarters and annually."  J.A.1549(2024 Technical Memo at 5).  But EPA then devised a brand-new methodology to parse a new, but still-truncated dataset, rather than consider all data.[14]  This methodology rested on a new key assumption: if a unit has

---

[14] EPA continued to refuse to look at all the data it has, because it was too "time-consuming."  J.A.1547(2024 Technical Memo at 3).  But "[t]he technical complexity

66

*ever* emitted less than a standard, it was assumed to be able to meet that standard *continuously* either (1) without *any* new expenditures (if the unit's average emissions rate, based on whatever truncated dataset EPA considered for it, was less than the standard), or (2) with an additional, small operations and maintenance expenditure of $100,000 per year (if the unit's average emission rate was more than the proposed standard).  J.A.1559(*Id.* at 15).

As with its methodology in the proposed rule, EPA did not explain or support this new methodology or the fundamental assumptions underlying it.  It is just a naked statement in a memorandum, nothing more.  *Cf. Ohio*, 144 S. Ct. at 2055, 2056  (staying rule where EPA's response "in no way grappled with [commenters'] concern" and "did not address the … concern so much as sidestep it."); *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) ("EPA had a duty here to examine and justify the 'key assumptions' underlying its decision, and it failed to do so.").

Data from the Salt River Project's (SRP's) Coronado Generating Station illustrate the lack of support and justification for EPA's key assumptions:

---

of the analysis does not relieve the agency of the burden to consider all relevant factors."  *Sierra Club v. Costle*, 657 F.2d 298, 333 (D.C. Cir. 1981).



Coronado Generating Station 20 Operating Quarters

J.A.1316(Cichanowicz Report at 10).

In the proposal, EPA looked at two quarters in the above chart, 17Q3 and 19Q3, and selected 19Q3 as "representative" (circled above).  J.A.0377(2023 Tech. Review at 2).  Commenters then showed Coronado's 19Q3 performance was not representative and, indeed, unusual.  J.A.0646-0648(SRP Cmts. at 3-5).  Sixteen of twenty quarters reported showed fPM rates exceeding the 19Q3 rates, some by 100%.  J.A.1278(PGen Cmts. at 15 (citing Cichanowicz Report at 9-10)); *see also* J.A.1354-1359(*id.* at Appx. B (providing similar examples demonstrating variability as shown for Coronado)).

68

Then in the Rule, EPA jettisoned its previous analysis entirely, in favor of a new methodology that simply assumed Coronado can meet the limit of 0.010 lb/mmBtu at all times, without even increased maintenance, because, in one of the 20 quarters, Coronado had a rate lower than the new standard and had an overall average across all 20 quarters of slightly under 0.010 lb/mmBtu.   J.A.1595(2024 Technical Memo, Attachment 1).   That conclusion utterly ignores the fact that Coronado had an entire year (20Q3 to 21Q2), with rates well above 0.010 lb/mmBtu. J.A.1354-1359(PGen Cmts., Appx. B); *see also* J.A.0648(SRP Cmts. at 5) (30-day rates between 2017 and 2023 exceeded 0.010 lb/MMBtu 23% of time).   EPA does not explain why Coronado could have met the revised standard without substantial work under that year's conditions; just a bald statement *assuming* Coronado can meet the standard in the future because it did it once or twice previously.

These unsupported assumptions are central to the Rule and are not harmless error.   Because EPA's data selection and assumptions are arbitrary and unsupported, its conclusion for the number of units that have to upgrade to meet the new standard is also arbitrary and unsupported; its conclusion for the cost of upgrades across the industry is arbitrary and unsupported; and its conclusion for the cost-effectiveness of the Rule are arbitrary and unsupported.

69

### b. EPA's Refusal to Account for a Compliance Margin is Unreasonable

EPA based its cost calculations for the new fPM emission standard on its assumption that if a unit ever met an emission rate of 0.010 lb/mmBtu in the past, it can meet that standard again, continuously, without upgrading controls. But EPA knows no prudent operator runs a unit without a compliance margin. Nevertheless, EPA refused to account for it, and thereby undercounted the number of units that must upgrade controls as well as the expense and magnitude of fPM upgrade projects. EPA's rationale for ignoring compliance margins is little more than an admission it is abdicating its responsibility to fully consider the problem before it. That is unlawful. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

EPA has long recognized the central importance of compliance margins: "when developing standards [under Section 112], we take into account the uncertainty associated with measuring emissions and we assume that plants operate with a compliance buffer to minimize the likelihood of exceeding the standard." J.A.2204(77 Fed.Reg. at 58231). In its 2011 MATS proposal, EPA explained "the numerical standard should … provide sufficient compliance margin for owners/operators …." J.A.2141(76 Fed.Reg. at 25066). And EPA recognized the need for a compliance margin in other aspects of the original MATS rulemaking: "facility operators normally target an operating level that is 25 to 50 percent lower than the emission limit in order to create a 'margin of error.'" J.A.0094(EPA,

*NESHAP, Analysis of Control Technology Needs for Revised Proposed Emission Standards for New Source Coal-fired Electric Utility Steam Generating Units* (Nov. 16, 2012) at 1); *see also* J.A.2137-2138(75 Fed.Reg. 54970, 54984 (Sept. 9, 2010)) (establishing a standard "at a level higher than all measured values (to account for the inability to reliably measure any lower standard) and [to] … provide[] an ample compliance margin").

Here, commenters alerted EPA that the proposal lacked any compliance margin, leading to a severe undercount of units that will have to upgrade controls and, therefore, a substantial underestimation of the Rule's costs and inaccurate cost-effectiveness. *See* J.A.1642-1643(Response to Comments at 47-48); *see also* J.A.0464(Sargent & Lundy, *Particulate & Mercury Control Technology Evaluation & Risk Assessment for Proposed MATS Rule* (June 23, 2023) (Sargent & Lundy Study) at 6) ("a minimum additional 20% margin" is needed). Indeed, in a memorandum seeking to shore up its decision to require fPM continuous monitoring systems in *this* Rule, EPA again found a compliance margin of 50% was appropriate. J.A.0463(PM CEMS Memo at 2) (noting "an operational target limit … [of] one-half of the emission limit" and setting "target compliance levels" at half the limit).

And in its Supreme Court stay motion briefing, EPA conceded that a compliance margin is necessary. EPA SCOTUS Opp. Br. at 22.

Nonetheless, EPA refused to account for a compliance margin in setting the Rule's new fPM emission standard.  EPA's excuse was that (1) whether to adopt a compliance margin is in "the sole decision of owners and operators," and (2) EPA does not have data showing all sources will adopt the same compliance margin. J.A.0014(89 Fed.Reg. at 38521).  But this is true for *every* rulemaking; it never stopped EPA before.  EPA must account for relevant factors, including those outside its control.  *See Miami–Dade Cnty. v. EPA*, 529 F.3d 1049, 1065 (11th Cir. 2008) ("EPA is compelled to exercise its judgment in the face of scientific uncertainty unless that uncertainty is so profound that it precludes any reasoned judgment.").

Demonstrating its ready ability to account for a compliance margin, EPA assumes for the sake of argument, and then summarily dismisses, a 20% margin.  *See* J.A.0014(89 Fed.Reg. at 38521).  According to EPA's own analysis, accounting for this small compliance margin would (1) increase the Rule's annual compliance cost by approximately 70% ("from $87.2M to $147.7M"), and (2) almost double the number of units that would have to upgrade their controls, at great cost ("the number of electrostatic precipitator upgrades (previously 11) … would also increase (to 20 …)").  *Id.*  Those numbers are substantial, and proper consideration of this information could have resulted in a very different rulemaking.

In fact, the Rule's already dramatic cost-effectiveness, discussed *supra*, would be even more stark if EPA accounted for a 50% compliance margin, which it

elsewhere recognizes as the likely "target" rate.  J.A.0463(PM CEMS Memo at 2).

EPA did not do that analysis, but it did consider an alternative, proposed standard of

0.006 lb/mmBtu, which is the equivalent of the final standard of 0.010 lb/mmBtu

with a compliance margin of 40%.  *See* J.A.0011(89 Fed.Reg. at 38518).  And based

on EPA's own analysis, accounting for a 40% compliance margin at this standard

would (1) increase the Rule's annualized cost almost 5-fold (from $87.2M to

$398.8M), and (2) almost triple the number of units (from 33 to 94) required to incur

costs by the Rule.  *See* J.A.1560-1561(2024 Technical Memo at 16-17, Tbl. 4).

But instead, without any analysis or explanation, EPA concluded: "Therefore,

cost-effectiveness values for fPM and individual and total non-[mercury] HAP

metals would only increase slightly."  J.A.1560-1561(*Id.*).  This conclusion does not

follow and is not reasoned decision-making.  EPA must, at a minimum, "identify the

stepping stones to its final decision."  *Costle*, 657 F.2d at 333.  It must explain its

reasons for the determinations it has made, not proclaim the outcome.

### 2.  EPA's Mercury Emission Analysis is Based on Biased, Insufficient and Unreliable Data

The Rule dramatically cuts the mercury limit for lignite-firing power plants

by 70% without any evidence showing that it is feasible for these plants to meet the

new standard of 1.2 lb/TBtu.  The record is clear that only one lignite facility has,

on occasion, achieved the new standard.  J.A.0032(89 Fed.Reg. 38539).  Relying on

this single facility, EPA's new limit, which must be achieved continuously by an

entire subcategory, exceeds the bounds of reasonable agency action.  *See NRDC*, 529

F.3d at 1086.  The mercury data analyses that underpin the Rule also do not reach a

logical or a rational result.  *See Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522

U.S. 359, 374 (1998).

### a.    Mercury Data Emissions from Lignite Facilities Do Not Support the 1.2 lb/TBtu Mercury Limit

The Rule's revised standard of 1.2 lb/TBtu limit for mercury emissions from

lignite coal-fired plants is entirely unsupported.  EPA purports to have considered

data from 12 lignite facilities, but that data does not support the conclusion reached

for multiple reasons.  First, the mercury values from 11 of 12 lignite facilities are

above 1.2 lb/TBtu despite EPA's use of biased facility-specific data from EPA-

handpicked time periods.  J.A.1595(2024 Technical Memo, Attachment 1).  EPA

acknowledges that the average annual rate of North Dakota lignite units is 3.0

lb/TBtu, which is almost 200% higher than the new mercury limitation.  J.A.1582(*Id.*

at 38).  And the average annual rate of Gulf Coast lignite units (in Texas and

Mississippi) is 2.0 lb/TBtu, almost 70% higher than the new limitation.  J.A.1583(*Id.*

at 39).  But EPA turns around and justifies the feasibility of the new standard based

on data from only two facilities (neither of which are North Dakota lignite facilities).

J.A.0032-0033(89 Fed.Reg. 38539-40). Only one of those facilities has at times met

the new standard (Twin Oaks) and EPA does not even claim the other facility (Red

Hills) has met the standard.  J.A.0033(*Id.* at 38540).

Data for Twin Oaks alone certainly does not demonstrate that the limit is technically feasible for the other 11 lignite-fueled plants.  As commenters made clear, a single lignite-fired plant in Texas is not representative of other lignite-fired plants because of key differences in mercury and sulfur content of different lignite seams.  *See* J.A.0734(Lignite Energy Council Cmts. at 6) (comparing Hg emission rates for lignite-fired EGUs in North Dakota and Texas); J.A.1029(Luminant Cmts. Attachment 1, Fig. 3-1) (showing lignite mercury and sulfur content variability).  Moreover, the data for Twin Oaks are 30-boiler operating day performance tests conducted during a limited operating period.  J.A.0734(*Id.*).  These short-term results are not sufficient to show continuous achievement of a 1.2 lb/TBtu standard.  Twin Oaks also employs a different type of boiler technology (circulating fluidized bed (CFB)) than most other lignite units.  J.A.2180(77 Fed.Reg. at 9397).

EPA appears to recognize that relying on a single facility's performance is insufficient because it next points to Red Hills.  J.A.0033(89 Fed.Reg. at 38540).  But with mercury emissions rates at 1.33 and 1.35 lb/TBtu (2021) and 1.73 and 1.75 lb/TBtu (2022) (for units 1 and 2, respectively), this only undermines EPA's claim.  J.A.0033(*Id.*).    EPA errs by claiming, inexplicably, that these data "*clearly* demonstrate the achievability of the proposed 1.2 lb/TBtu emissions standard by lignite-fired EGUs."  J.A.0033(*Id.* (emphasis added)).  Red Hills' emissions data from 2022 exceed the new limitation by **over 40%**, even though it employs the same

unusual boiler technology as Twin Oaks.  J.A.0033(*Id.*).  In short, EPA's conclusion runs "counter to the only empirical evidence EPA ha[s] before it."  *See Sierra Club v. EPA*, 884 F.3d 1185, 1198 (D.C. Cir. 2018).

Responding to numerous comments that the new mercury limit is not achievable, EPA either refers to Twin Oaks, J.A.1678(Response to Comments at 83), or makes unexplained conclusory announcements, *see* J.A.1694(*Id.* at 99) ("EPA has shown . . . EGUs have demonstrated an ability to meet the 1.2 lb/TBtu Hg emission limit while firing on lignite coal.").  As discussed above, the data does not support that conclusion, and EPA is simply mandating identical standards for lignite and non-lignite units without any real analysis.  *See* J.A.1580(2024 Technical Memo at 36) (summarily concluding based on "available literature and other studies and available information" that lignite units can meet the same standard as non-lignite coals).

> **b.**    **EPA's Mercury Analysis Fails to Show the New Limit is Feasible Due to Data Deficiencies and Flawed Assumptions**

Recognizing that one facility's data cannot support an entire subcategory standard, EPA grasps for another theory.  EPA asserts that the mercury controls on lignite units can just be "dialed up or down to achieve a desired Hg emission rate," J.A.0033(89 Fed.Reg. at 38540), irrespective of emissions data in the record.  EPA predicates its theory on the supposition that lignite units can achieve "greater than 90 percent" mercury removal using ACI with powdered activated carbon.

J.A.0040(*Id.* at 38547).  In other words, EPA assumes that units can just inject more brominated powdered activated carbon at increased rates to achieve sufficient reductions.  J.A.0040-0041(*Id.* at 38547-48) (presenting estimated mercury control percentages to achieve 1.2 lb/TBtu without any data whatsoever to back up these estimates); *see also* J.A.1545-1594(2024 Technical Memo) (same).  But this unreasonable conclusion is exposed by EPA's own admission that there is a "leveling off" effect at which increasing the amount of sorbent results in diminishing returns.  J.A.1577(*Id*. at 34).

Nowhere does the record demonstrate that 90% mercury removal is feasible for most lignite-fired units, or that this "leveling off" does not occur at removal levels well below 90%.  EPA has provided zero evidence to show this level of removal is even possible for all lignite-fired units, or that units would be capable of doing so without malfunctioning.  *See* J.A.0464-0479(Sargent & Lundy Study).  Instead, EPA relies on a 2012 Beyond-the-Floor Memorandum for this key 90% assumption.  *See* J.A.0040(89 Fed.Reg. at 38547); J.A.1578(2024 Technical Memo at 34).

As discussed *supra*, nothing in that 2012 Beyond-the-Floor Memorandum can be considered a "development" to support revisions to the standards in 2024.  But regardless, even relying on that 2012 Memorandum, the data it contains does not support the more stringent standard for lignite-fired units imposed by the Rule.

The 2012 Beyond-the-Floor Memorandum cites a trade publication as its primary support. J.A.0090(citing S. Sjostrom et al., *Activated Carbon Injection for Mercury Control: Overview, Fuel*, (2010) (ACI Fuel 2010 Article) at 1320-22). That fourteen-year-old publication presents a scatterplot with mercury removal test results from DOE control systems. *Id*. In that scatterplot (reproduced below), results from only *one* lignite unit are presented to support the 90% removal assumption upon which the Rule now centers, *see* J.A.2135(*id.* at 1321) (the "SDA+FF,Lig." data points (circled in red) represent the only data from a lignite unit).



**Fig. 1.** Compilation of results from DOE mercury control programs.

The Rule record does not contain any of the raw testing data or testing conditions from the DOE study reported in the ACI Fuel 2010 Article, rendering it impossible to assess the legitimacy of the data graphed and affirming the threshold error that EPA cannot consider this a "development." Nonetheless, EPA bootstraps pre-2010 data from one unit to prop up the conclusion that 90% removal can be achieved by lignite units industry wide. J.A.0032-0033(89 Fed.Reg. 38539-40); *Cf.* J.A.0131-0199(Andover Technology Partners, *Analysis of PM and Hg Emissions and Controls from Coal-Fired Power Plants* (Aug. 19, 2021)).

As its next basis for concluding lignite-firing units are capable of meeting the reduced emission standard, EPA contrives a hypothesis: despite acknowledging that lignite has both low halogen and also high sulfur levels, each of which makes mercury control more difficult, J.A.0042(89 Fed.Reg. at 38549), EPA claims subbituminous coals also must manage the first concern (low halogens) and that bituminous coals also must manage the second concern (high sulfur), therefore, units firing lignite should also be able to manage these challenges and meet the same 1.2 lb/TBtu standard. J.A.0039-0040(*Id.* at 38546-47). However, only lignite has *both* characteristics, which makes mercury removal far more challenging for lignite units than for units firing the other two coal types. J.A.0734-0735(Lignite Energy Council Cmts. at 6-7). EPA's only response is that "many of the properties of lignite that challenge the control of Hg are shared by other coal types that are able to meet the

1.2 lb/TBtu emission limit." J.A.1682(Response to Comments at 87). That response completely sidesteps the issue: that the *combination* of the characteristics of subbituminous coal (low halogens) and bituminous coal (high sulfur content) makes any comparison of lignite to either type of coal completely unjustified. *Cf. Ohio*, 144 S. Ct. at 2055 (staying rule where "EPA's response did not address the [Petitioners'] concern so much as sidestep it"). EPA's theory for claiming all coals should be regulated alike fails to hold together even on its own terms.

Finally, setting aside whether 90% control efficiency is possible for lignite-firing EGUs, EPA's own data show that several units must achieve mercury control well in excess of 90% in order to meet the standard—over 95% in reality. J.A.0041(89 Fed.Reg. at 38548, Tbl.7). Yet EPA glosses over this difference, simply noting that its 2012 beyond-the-floor analysis "*suggested* that greater than 90 percent Hg control can be achieved at lignite-fired units," therefore, EPA "expect[s] that the units could meet the final, more stringent, emission standard of 1.2 lb/TBtu." J.A.0040(*Id.* at 38547) (emphasis added). This is not a trivial difference; achieving 95% removal would require plants to cut emissions in half as compared to emissions at 90% removal. Going beyond what the record even purports to examine without additional support is arbitrary and capricious.

In summary, EPA's analysis justifying the Rule's 70% lower mercury standard for lignite-firing plants condenses down to a trade article dated from before the

80

original MATS rule, the limited and intermittent results taken from one unusual plant (Twin Oaks), and a willful ignorance of the established differences among the various types of coal.

### c.    The Rule's Mercury Cost Analysis is Defective

The Rule's mercury cost analysis is also flawed in multiple other ways.  As a preliminary matter, determining that the new emissions limitation can be attained by lignite-firing units is a prerequisite to the proper calculation of cost.  Otherwise, EPA could not determine the amount of sorbent injection needed, the ACI equipment additions or modifications necessary to inject it, or the enhancements to other controls necessary to augment the mercury control.  These variables each come at a considerable cost.  *See* J.A.1694-1695(Response to Comments at 99-100).

EPA's estimate of costs is based on a calculation of how much more brominated powdered activated carbon a hypothetical unit might need and the costs of that powdered activated carbon.  J.A.0040-0041(89 Fed.Reg. 38547-48). That estimate depends entirely on the unproven assumption that existing ACI systems can simply add more powdered activated carbon to achieve 1.2 lb/TBtu.  *Id.*  In so doing, EPA errs.  The cost calculations assume existing ACI systems can inject powdered activated carbon at high rates outside of original system designs, injection points, and piping size.  As a result, the Rule's cost analysis does not include any costs of equipment modifications or additions.  Yet, inapposite with the cost analysis, EPA

81

admits that ACI equipment modifications may be required. J.A.1695(Response to Comments at 100) ("[S]ome modifications to existing control technology may be needed to meet the revised emissions standard."). EPA's cost analysis completely overlooks modification costs and, regardless, feasibility to meet 1.2 lb/Tbtu must be demonstrated before EPA can assign a cost. Otherwise, the calculation is equivalent to estimating the cost of building a house without a floor plan.

EPA attempted to rehabilitate its flawed cost analysis in the Rule. J.A.1694(Response to Comments at 99). But it is too little, too late. The reprisal remains solely sorbent-based, ignoring necessary equipment modifications. Accordingly, EPA's cost analysis has no rational connection to the Rule's actual costs and is yet another reason to vacate the Rule. *See Allentown*, 522 U.S. at 374.

### D.    The Colstrip Power Plant Exemplifies EPA's Arbitrary and Capricious Decisionmaking in the Rule

The Rule will have broad industry-wide effects, and the Colstrip Power Plant in Montana is a poignant example of EPA's disregard for public input and the significant impacts of the Rule. In many ways, the Rule's treatment of Colstrip epitomizes the numerous agency failures described above.

Colstrip supplies power throughout Montana and the Pacific Northwest and is essential to maintaining grid reliability and to Montana's economy. Even under EPA's flawed calculations, *see supra*, almost half of the Rule's regulatory costs (42%) are imposed on Colstrip. J.A.0026(89 Fed.Reg. at 38533). According to EPA,

"only two [electric generating units] at one facility (Colstrip)" must install "the costliest" control technology.  J.A.0015(*Id*. at 38522).  For Colstrip, the Rule will mean installation of fabric filters (also known as baghouses) by the July 2027 compliance date, at an estimated cost exceeding $350 million.  J.A.1092(Talen Montana, LLC (Talen) Cmts. at 19) ("$351.2M").

These exorbitant costs are imposed on Colstrip even though there is no meaningful health risk from Colstrip's current HAP emissions.  J.A.0118-0130(RRA, Appx. 10, Tbls. 1, 2a).  While EPA claims that "higher levels of toxic metal emissions" in communities around Colstrip are "what the revised standards seek to remedy," J.A.0017(89 Fed.Reg. at 38524), that claim is defeated by the Agency's own data, which admits that Colstrip's fPM emissions are offset by the far lower-than-average metal HAP content of that fPM, resulting in metal HAP emissions around the industry average.  J.A.1595(2024 Technical Memo, Attach. 1). In other words, EPA's characterization of Colstrip as a public health "laggard" is purely because of the Agency's decision to use fPM as a compliance surrogate instead of actual HAP emissions.[15]   In reality, the public health effects from Colstrip's HAP emissions (like all other coal-fired power plants in the country) are

---

[15] Westmoreland flagged this discrepancy in their comments, J.A.0554-0555(Westmoreland Cmts. at 18, 19, n.27, n.29), which in turn was met with silence. This silence reflects yet another arbitrary and capricious agency action, for Section 112 only authorizes EPA to regulate HAP emissions, not fPM.

so minimal that if those plants were their own category, EPA would have discretion to remove them from the HAP program altogether. *See* 42 U.S.C. § 7412(c)(9) (discussing the cancer and non-cancer risk threshold for a source category to be delisted).

As it did with essentially all comments related to the Rule's potential impacts on coal-fired power plants and power grid reliability, EPA failed to materially grapple with comments that a premature retirement of Colstrip would not only impose direct costs on Colstrip Petitioners,[16] but would also threaten grid reliability, imperil the jobs of thousands of Montanans, and have severe economic consequences for Montana and beyond—all in return for no meaningful benefit. EPA's refusal to engage with these comments was arbitrary and capricious because it failed to "consider an important aspect of the problem" and "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation omitted); *see also Ohio*, 144 S. Ct. at 2054.

---

[16] Colstrip Petitioners are made up of Talen Montana, LLC, Westmoreland Mining Holdings LLC, Westmoreland Mining, and Westmoreland Rosebud Mining, LLC, and NorthWestern Corporation, d/b/a NorthWestern Energy.

1.    **EPA Failed to Properly Assess the Risks of Colstrip's Retirement**

a.    **Colstrip Petitioners Articulated Substantial Risks from the Rule**

Colstrip Petitioners asked EPA not to finalize a rule reducing the fPM limit to 0.010 lb/MMBtu given the particularly exorbitant costs of compliance for Colstrip, "especially where EPA has not found any unacceptable risk related to Colstrip's (or any other affected facility's) operation under the current fPM standard." J.A.1074(Talen Cmts. at 1). EPA estimated that annualized costs at Colstrip of new equipment would be more than $38 million per year. See J.A.0455(2023 Tech. Review, Appx. D). Talen Montana estimated capital costs of $350 million for a baghouse, yielding annualized costs of $56.5 million per year. J.A.1092(Talen Cmts. at 19). In the proposal, Colstrip was expected to bear nearly half of the costs of the proposed rule. J.A.1074-1075(Talen Cmts. 1¬2); *cf.* J.A.0026(89 Fed.Reg. at 38533) (under the Rule Colstrip would bear "42 percent of the total annualized costs").

Colstrip Petitioners also asked EPA to consider the substantial risk of Colstrip's premature retirement due to the Rule, especially when considered alongside other contemporaneous rulemakings, most notably EPA's GHG Rule. Colstrip Petitioners explained that "[t]he high costs associated with installing, testing, and implementing new controls, coupled with limited time and electric

85

generation for the recovery of those costs, may cause Colstrip to shut down prematurely if the owners deem that it is not economically feasible to install the necessary controls to comply with the proposed fPM standard." J.A.1074(Talen Cmts. at 1). Similarly, "[g]iven the reduced lifespan and generation that may be on the horizon for Colstrip, it will be extremely difficult to justify installing new controls to meet [] the fPM limit in the Proposed Rule. J.A.1079(Talen Cmts. at 6). NorthWestern stated that there was a significant risk that the Montana Public Service Commission would not allow recovery of the compliance costs. J.A.0985(NorthWestern Cmts. at 21). If new controls are not installed, then Colstrip must retire before the compliance date (July 2027).

The reduced lifespan for recovery of costs is due to the interaction of the MATS Rule with the GHG Rule. In their comments, Colstrip Petitioners highlighted the negative interaction between the two rules: "For instance, EPA's Proposed GHG Rule, if finalized, would make it challenging for Colstrip to meaningfully operate past 2034, or even 2031…But the Proposed Rule would require the Colstrip owners to spend hundreds of millions of dollars to install [controls] by 2027 or 2028, only to potentially shut down or curtail operations by 2031 due to the Proposed GHG Rule." J.A.1090(Talen Cmts. at 17). Thus, due to the interaction between the two rules, Colstrip would have only approximately 4 years to operate between the compliance deadline for the Rule (July 2027) and a retirement or severe curtailment

under the GHG Rule by the end of 2031.[17]  As Colstrip Petitioners commented, "it is highly improbable that the Colstrip owners would shell out those huge sums of money to operate for three or four more years, as the owners would not be able to recoup those costs," *Id.*, meaning that Colstrip risks premature retirement in 2027.

Colstrip Petitioners also challenged the Rule's cost-effectiveness analysis in light of the premature retirement problem.  Detailed technical explanations showed that EPA overestimated how much the new control technology at Colstrip would reduce fPM.  J.A.1087-1094(Talen Cmts. at 14-21) (technical comments on cost-effectiveness calculation).  Second, EPA assumed costs would be spread out for 15 to 18 years, J.A.0003, 0019(89 Fed.Reg. at 38510, 38526), ignoring the impact of its other rules and premature retirement risk.  As with the GHG Rule, Talen Montana commented that this is not a reasonable assumption: "EPA should have considered that the costs to upgrade Colstrip may only be spread over three to four years." J.A.1090(Talen Cmts. at 17).  "This would yield astronomically high annualized costs," J.A.1090(*id.*), and demonstrate much lower cost effectiveness of the rule.

---

[17] The final GHG Rule exacerbated the situation raised in comments because EPA removed the reduced load option for operation through 2034.  To operate beyond 2031, the final GHG Rule requires co-firing with natural gas or installation of carbon capture.  J.A.2538-2539(89 Fed.Reg. 39798, 39801 (May 9, 2024)).  As those are not realistic options at Colstrip, the final GHG Rule effectively mandates Colstrip's retirement by the end of 2031.

Colstrip Petitioners also highlighted significant follow-on risks to grid reliability resulting from premature retirement.  In particular, NorthWestern, a utility serving Montana customers, submitted 25 pages of comments focused primarily on those very risks, alerting EPA that "if Colstrip is closed in the near term, NorthWestern cannot provide adequate and reliable electric service for its Montana customers without new baseload capacity...and there are no near-term feasible means to replace Colstrip's capacity...."  J.A.0966(NorthWestern Cmts. at 2).  Further, "[t]he 2025 and 2030 closure scenarios expose NorthWestern to extreme degrees of market risk, resulting [in] high probabilities of ruinous market electricity purchases and grid instability."  J.A.0967(*Id*. at 3).  These statements were followed by detailed information on NorthWestern's generation portfolio and available capacity, challenges in meeting demand, transmission limitations on the ability to import power, and the cost and safety hazards of closing Colstrip prematurely.  J.A.0969-0984(*Id*. at 5-20).

Colstrip Petitioners further commented that a premature shutdown of Colstrip would have severe economic impacts beyond Colstrip.  Talen Montana cited a study demonstrating that an early retirement of Colstrip Units 3 and 4 would produce an economy with 3,300 fewer jobs, lost income of Montana households of between $250 and $350 million per year, and declines in economic output of between $700 and $800 million per year.  J.A.1079(Talen Cmts. at 6).  Similarly, Westmoreland

provided detailed information on the closure risks to its Rosebud Mine if Colstrip retires, which would cause a loss of over 1,800 jobs and lost revenue of $330 million per year.  J.A.0550-0551(Westmoreland Cmts. at 14-15).

**b.    EPA Declined to Meaningfully Consider Those Risks**

Despite these detailed comments, EPA gave the Rule's risks to Colstrip and the surrounding region little attention.  EPA either ignored these comments entirely or dismissed them with generalities or superficial and conclusory responses.  At base, it appears that EPA simply assumed that there was no Colstrip retirement risk, and thus the severe consequences that would result from a premature retirement were irrelevant.  That alone was arbitrary and capricious.  *Michigan*, 576 U.S. at 753 ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions").

Those failures are even more egregious when the Agency is imposing such enormous and outsized costs on Colstrip with no counter-veiling benefits.  Even if EPA did not recognize it should stop at finding no benefits, *see supra*, it should have at least analyzed whether the Rule—with its lack of benefits—was necessary when balanced against the enormous costs and severe downside risks to Colstrip.  EPA's "[c]onclusory explanations for matters involving a central factual dispute" notwithstanding "considerable evidence" alone constitutes an error sufficient to rule

89

that EPA's action was unlawful.  *AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001) (agency failed to provide "a reasoned justification" for rejecting technical argument, providing insufficient and conclusory explanations).

At every step of the way, EPA failed to reasonably grapple with Colstrip Petitioners' comments.  With respect to the risk of retirement, EPA declared that commenters proffered "no credible information" that the Rule would lead to premature retirements.  J.A.0019(89 Fed.Reg. at 38526).  On its face, this is absurd.  Colstrip Petitioners' comments plainly highlighted the retirement risk as well as the heightened risk due to the interaction of the proposed rule with the GHG Rule.  J.A.1079(Talen Cmts. at 6).  Even if EPA thought that it was not *certain* Colstrip would retire because of the Rule, that does not excuse EPA from assessing the significant risks that Colstrip would retire and weighing those risks against the benefits of the rule.  EPA's "failure to address these comments, or at best its attempt to address them in a conclusory manner, is fatal."  *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin*., 626 F.3d 84, 94 (D.C. Cir. 2010).

In response to Colstrip Petitioners' requests to EPA to adequately consider the interactions with the GHG Rule on Colstrip, EPA summarily stated that it "generally considers finalized, rather than proposed, rules in the baseline of its analyses."  J.A.0020(89 Fed.Reg. at 38527); *see also* J.A.1722(Response to Comments at 127).  EPA also contended that the two rules had no impact on each other because they are

authorized from different sections of the CAA. J.A.1633, 1660(Response to Comments at 38, 65). Tellingly, the Rule expressly references the GHG Rule only once, when rejecting Colstrip Petitioners' request that EPA coordinate them. *See* J.A.0020, 0026(89 Fed.Reg. at 38527, 38533). But this Court has already held that "a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking" is something the agency must consider when finalizing its rules. *See Portland Cement,* 665 F.3d at 187. The GHG Rule requires major transformation of the sector and Colstrip; the two rules cannot be dissociated. In the real world, Colstrip must plan for compliance with both rules together. EPA failed to seriously grapple with Petitioners' comments on this key issue, and the Court should reject EPA's "ostrich-like approach." *See id*. at 177, 185 & n.2.

With respect to Talen Montana's comments regarding the failures in EPA's cost-effectiveness analysis, EPA failed to respond whatsoever. There is thus no analysis in the record as to whether the Rule would still be justified if the cost-effectiveness of the rule were corrected from $39,192/ton of fPM to $92,400/ton, and "astronomically" higher if the limited life of Colstrip under the GHG Rule were accounted for and costs were amortized over four-and-a-half years as opposed to fifteen to eighteen years as assumed by EPA. J.A.1089-1094, 1100, 1100-1102(Talen Cmts. at 16-21, Attachs. B, C). These numbers demonstrate the cost-

ineffectiveness of the Rule as to Colstrip, but EPA wholly disregarded the comments. *See Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1288-89 (D.C. Cir. 2023) (finding "serious flaw" in agency's cost analysis because the agency failed to address a data discrepancy issue "that was repeatedly brought to its attention").

As noted above, in response to Colstrip Petitioners' extensive comments about grid reliability, EPA declared commenters offered "no credible information" that the Rule would lead to premature retirements and further "disagree[d] that this rule would threaten resource adequacy or otherwise degrade electric system reliability." J.A.0019(89 Fed.Reg. at 38526).  Similarly, in EPA's Resource Adequacy Memo, EPA evaluated the impact of certain power sector rules on the power grid, and made only generalized observations on reliability and retirement, *see, e.g.*, J.A.1934(EPA, *Resource Adequacy Analysis: Vehicle Rules, Final 111 EGU Rules, ELG and MATS RTR,* Technical Memo (Apr. 2024) (EPA Resource Adequacy Memo) at 9), not even mentioning Colstrip or Montana.  But Colstrip Petitioners raised significant comments about clear and demonstrated retirement risks and ensuing "serious" grid reliability impacts engendered by the Rule.  *See, e.g.*, J.A.1074, 1095(Talen Cmts. at 1, 21); J.A.0968-0984(NorthWestern Cmts. at 4-20).  Additionally, Colstrip Petitioners focused on regional grid impacts in Montana, as opposed to EPA's nationwide focus.  J.A.0977(NorthWestern Cmts. at 13).  Instead of meaningfully

considering Petitioners' detailed comments, EPA disregarded them in favor of generalized nationwide modeling. EPA's "failure to 'examine the relevant data and articulate a satisfactory explanation for its action'" makes the Agency's grid reliability analysis and discussion arbitrary and capricious with respect to Colstrip. *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1034 (D.C. Cir. 2001); *see also Ergon-West Virginia, Inc. v. EPA*, 896 F.3d 600, 613 (4th Cir. 2018) (ignoring specific information that contradicted industry-wide study was arbitrary and capricious).

Moreover, EPA's unsupported claim that the DOE might allow the plant to continue operating without controls through an unprecedented application of emergency authority under the Federal Power Act, *see* J.A.1647(Response to Comments at 52), lacks any reasonable foundation. *See, e.g.*, J.A.1074(Talen Cmts. at 1). Such authority has rarely been used and is not a reasonable solution for EPA's poor rulemaking. *See, e.g.*, *Duke Power Co. v. Fed. Power Comm'n*, 401 F.2d 930, 944 (D.C. Cir. 1968) (discussing how the Federal Power Act Section 202(c) "relate[s] exclusively to temporary interconnections during national emergencies"); 10 C.F.R. § 205.371 (defining "emergency" as an "unexpected inadequate supply of electricity" arising from an "unforeseen" event); *Del. Dep't of Natural Res.*, 785 F.3d at 16 ("EPA seeks to excuse its inadequate responses by passing the entire issue off onto a different agency. Administrative law does not permit such a dodge.").

Finally, EPA arbitrarily refused to consider crippling costs and societal harms associated with the premature retirement of Colstrip, which is made very likely by the combination of the Rule and the GHG Rule. EPA must consider "costs" in determining necessity under Section 112(d)(6). *See Ass'n of Battery Recyclers, Inc.*, 716 F.3d at 673-74. As the Supreme Court made clear in *Michigan*, "'cost' includes more than the expense of complying with regulations; any disadvantage could be termed a cost." 576 U.S. at 752. EPA ignored comments from Colstrip's owners, and its coal supplier Westmoreland, that the Rule threatens the viability of Colstrip and the Rosebud mine, threatens their workers' livelihoods, and threatens the welfare of the Colstrip community. *E.g.*, J.A.0550(Westmoreland Cmts. at 14), J.A.1079(Talen Cmts. at 6). As above, closure of the Rosebud mine alone would inflict a multi-billion-dollar blow on the State of Montana, destroying over 1,800 well-paid jobs, eliminating over $330 million in annual revenue to Montana businesses, and reducing state government revenue by $40 million per year. J.A.0542(Westmoreland Cmts. at 6). If Colstrip closes, the damage to Montana would be even greater, costing the state over $17 billion in lost economic production between 2028-2043. J.A.1079(Talen Cmts. at 6). EPA entirely ignored these comments, failing to even acknowledge them in the Rule or response to comments. These economic costs to the State of Montana and its citizens are a critical part of the "costs" of the Rule that would not allow EPA to reasonably find the Rule to be

"necessary" under Section 112(d)(6). And at the very least, EPA's failure to consider this "important aspect of the problem" merits reversal. *E.g., Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43.

> **2.    EPA Rejected, Without Reasonable Basis, Colstrip Petitioners' Request for a Retirement Subcategory Aimed at Ameliorating Those Risks[18]**

To ameliorate the harms of premature retirement, Talen Montana and NorthWestern proposed that EPA create a retirement subcategory that would permit units to opt-in and commit to retiring by a date certain in exchange for not having to install new pollution controls that would soon be retired. J.A.1094-1095(Talen Cmts. at 21-22) (explaining that a retirement subcategory would "greatly assist companies with moving forward on retirement plans without running the risk of being forced to retire early, which could create reliability concerns"); J.A.0988(NorthWestern Cmts. at 24). Colstrip Petitioners commented that such a subcategory would be consistent with the approach EPA has taken in other rulemakings. J.A.0988(*Id.*). Agencies must consider—and explain the rejection of—"significant and viable" and "obvious" alternatives. *Nat'l Shooting Sports*

---

[18] This Section of the brief is joined only by Talen Montana, LLC, Westmoreland Mining Holdings LLC, Westmoreland Mining, and Westmoreland Rosebud Mining, LLC, and NorthWestern Corporation, d/b/a NorthWestern Energy, and Electric Generators MATS Coalition.

*Found. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). EPA's rationale for rejecting a retirement subcategory falls far short of this standard.

First, EPA rejected Petitioners' requests for a retirement subcategory by assuming, without explanation, that only facilities that had announced retirement would be part of any future retirement subcategory. J.A.0020(89 Fed.Reg. at 38527). According to EPA, 67 of the 296 EGUs "have announced retirements between 2029 and 2032" and "all but three" could comply with the revised standard. EPA thus inferred "little utility to a near-term retirement subcategory...." J.A.0020(*Id.*). Essentially, EPA argued that units already announcing retirements can comply with the Rule, so there is no reason to provide retiring units relief from the revised standard.

However, Colstrip Petitioners asked EPA to consider a retirement subcategory because: (1) Colstrip does not have an announced/planned retirement date; and (2) if a suitable retirement subcategory were provided, Colstrip could opt to retire in an orderly fashion and avoid facing a choice between a premature retirement with potentially catastrophic consequences or installing controls that would soon be retired. That EPA considered only those units that already announced retirement and not ones that could decide to retire is the essence of arbitrary rulemaking, particularly given Colstrip Petitioners' comments on this very topic. Moreover, EPA's refusal to consider a retirement subcategory is contrary to EPA's approach in the GHG Rule

where EPA is allowing facilities to commit to retirement after the effective date of the rule.   *See* J.A.2540-2541(89 Fed.Reg. at 39841-42).   EPA failed in any meaningful way to address the alternative suggested by Colstrip Petitioners, instead inventing and shooting down a strawman.

Second, EPA concluded that even if it established a retirement subcategory that "would not change the costs of the rule in a meaningful way."   J.A.0020(89 Fed.Reg. at 38527).   But that is nonsense.   If EPA established a retirement subcategory and Colstrip were to retire, EPA would avoid imposing nearly half (42 percent) of the costs that it calculated the Rule would impose.   *See* J.A.0026(*Id.* at 38533).   EPA arrives at this conclusion only by assuming the subcategory would be open only to units that have already announced retirement, which is contrary to other retirement subcategories and lacks any rational foundation.

Finally, EPA makes a one-sentence assertion in the Rule's preamble that allowing units to operate longer without additional controls would lead to "continued exposure to those emissions in the communities around these units during that timeframe." J.A.0020(*Id.* at 38527).   That statement was backed only by a reference to the Northern Cheyenne Tribe's unsupported, conclusory claim that its Tribal members may be harmed.   J.A.0024(*Id.* at 38531).   Yet EPA made no attempt to assess the risks of exposure for such limited timeframes around Colstrip, a sparsely populated area in eastern Montana.   Indeed, EPA ignored its own quantitative

modeling showing no harm in favor of the Tribe's unsupported, conclusory claim. As discussed *supra*, those "continued exposures" impose no meaningful health risks. Moreover, in relying on the Tribe's claimed harms, EPA failed to account for the countervailing benefits of permanent cessation of all emissions associated with a planned retirement compared with continuing emissions in compliance with the Rule. Thus, EPA's claim that Petitioners' suggested subcategorization would lead to a higher HAP emissions impact is conclusory and unsupported. EPA's "failure to address these comments, or at best its attempt to address them in a conclusory manner, is fatal." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).

\* \* \* \*

While Colstrip is emblematic of the broader failures of this Rule, EPA's actions with respect to Colstrip are also arbitrary and capricious on a stand-alone basis.

### E.    The Rule is Pretextual

As an independent problem, the Court should also set aside the Rule because EPA's stated justifications are pretextual. Agencies must "pursue their goals reasonably," and "[r]easoned decisionmaking … calls for an explanation for agency action." *Dep't of Commerce*, 588 U.S. at 785. As the Supreme Court has explained, that "reasoned explanation requirement" obligates the agency to "offer genuine

justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 784-85. But when "the evidence tells a story that does not match the explanation," the mismatch indicates the agency's rationale is "contrived." *Id.* at 784. Accepting "contrived reasons" would vitiate the reasoned-explanation requirement and convert judicial review into an "empty ritual." *Id.* at 785.; *see also, e.g.*, *Sweet v. DeVos*, 495 F.Supp.3d 835, 844-47 (N.D. Cal. 2020) ("[p]retext is the paradigm of agency bad faith … Courts will not suffer pretext in the review of agency conduct").

In such cases, courts evaluate allegations of pretext in light of "all the evidence in the record before the court." *Dep't of Commerce*, 588 U.S. at 782. That can include evidence outside the typical administrative record. *See New York v. Dep't of Commerce*, 351 F.Supp.3d 502, 662 (S.D.N.Y. 2019) (applying "common-sense evidentiary principle[s]" when considering evidence outside the administrative record that suggested the agency's reason for engaging in rulemaking was pretextual).

Because the pretext analysis stems from the requirement that an agency disclose the basis of its action, it does not turn on whether the agency ultimately has the authority to do what it's purporting to do. *See Dep't of Commerce*, 588 U.S. at 780 (citation omitted). Instead, what matters for the pretext analysis is whether the

justification offered by the agency matches the reality of its actions. *See id.* at 785-786.

For example, in *New York v. Dep't of Commerce*, the Supreme Court agreed with the government that the Enumeration Clause allows the Commerce Secretary to "inquire about citizenship on the census questionnaire." 588 U.S. at 785. And the Court even concluded that the Secretary "considered the relevant factors, weighed risks and benefits, and articulated a satisfactory explanation for his decision" to include the citizenship question. *Id.* at 775. Nevertheless, the Court set aside the Secretary's decision to include the citizenship question on the basis that the agency's stated reason for doing so was pretextual, as evidence suggested that the Secretary had already reached his conclusion when he "entered office," instructed his staff to make it happen, asked the Attorney General to ask the Commerce Department to include the citizenship question, and only "adopted the Voting Rights Act rationale late in the process." *Id.* at 783. Available evidence demonstrates similar dynamics also underlie the Rule challenged here.

EPA claims it issued this Rule to protect public health from adverse effects of the covered HAP emissions. *See* J.A.0002-0003(89 Fed.Reg. at 38509-10). But available evidence shows that EPA promulgated this Rule for the express purpose of advancing a climate change-related policy of reducing carbon dioxide emissions through a "suite" of regulations designed to impose retirement-inducing cost on

coal-fired power plants. *Contra West Virginia*, 597 U.S. at 735 (declaring it "not plausible" the CAA empowers EPA to "force a nationwide transition away from the use of coal to generate electricity").

For one, the current EPA Administrator has made no secret that EPA would use all the statutory tools it had in its arsenal to force the premature retirement of coal plants and accomplish its clean energy agenda, regardless of whether the Supreme Court curtailed its authority to do so under the CAA when establishing emissions guidelines for greenhouse gas emissions. For example, while *West Virginia v. EPA* was pending before the Supreme Court, Administrator Regan expressly suggested EPA could still achieve its climate goal of reducing greenhouse gas emissions by using authorities given to the agency to protect the public from mercury and other air toxins. *See, e.g.*, Geman, *EPA floats path on electricity CO2 emissions—with an asterisk*, Axios (Mar. 11, 2022) (reporting that Administrator Regan stated EPA would implement a "suite of rules" with the "co-benefit" of reducing carbon dioxide emissions).[19]

Administrator Regan said similar things when participating in joint press conferences with the White House:

> **Reporter**: *** if the Supreme Court limits the EPA's ability to regulate greenhouse gas emissions, *** how will you decarbonize the power sector?

---

[19] https://tinyurl.com/yud7weey.

> **Regan**: *** we're paying close attention to this Supreme Court case. *** But nevertheless, you know, EPA has bread-and-butter regulations that also focus on the power sector as well.  We focus on regional haze, regulating mercury, coal ash contamination. *** they'll have to determine whether or not those investments warrant the longevity of these coal plants.

White House, *Press Gaggle by Principal Deputy Press Secretary Karine Jean-Pierre & Env't Prot. Agency Adm'r Michael Regan* (Feb. 17, 2022).[20]  Such statements were not isolated instances.  *See also, e.g.*, Chemnick et al., *What the EPA's New Plans for Regulating Power Plants Mean for Carbon*, Sci. Am. (Mar. 11, 2022) (reporting that Administrator Regan said if the Supreme Court dealt a blow to the agency's climate change policies, EPA could still achieve greenhouse gas reductions using regulations on mercury and other toxic air pollution).[21]

And in a PBS interview shortly after the *West Virginia v. EPA* decision, Administrator Regan doubled down on that sentiment, expressly saying his agency would "couple" climate regulations with "health-based" regulations in order to regulate greenhouse gases and get around the Supreme Court's decision.

> **PBS**: How much of a set back is [the *West Virginia v. EPA* decision] to your efforts to regulate greenhouse gases?

> **Regan**: *** The decision does constrain what we do. But let me be clear. It doesn't take us out of the game. We still will be able to regulate climate pollution. And we're going to use all of the tools in our toolbox to do so….

> ***

---

[20] https://tinyurl.com/bddpr22j.
[21] https://tinyurl.com/49f7n377.

**PBS**:  Well, can you give us a couple of examples of the kind of tools that you believe you still can use to regulate this industry?

**Regan**: *** We also have a suite of regulations that are facing the power sector. And so, *as we couple the regulation of climate pollution with the regulation of health-based pollution*, we are providing the power sector with a very clear picture of what regulations they're facing so that they can make the right investment decisions. And we're hoping that, when they look at the regulation of waste and discharges in water, climate pollution, health-based pollution, they will see that it's not worth investing in the past and they will continue to do what they're doing now, which is invest in the future.  And that future is a clean energy economy.

Transcript, PBS interview with Michael S. Regan (June 30, 2022) (emphasis added).[22]

Such public comments match internal documents that have been produced through FOIA indicating that EPA planned to revise the MATS Rule as a means of reducing power plant emissions for climate change reasons.  For example, in February 2021, EPA prepared a presentation for the White House *Climate Advisor*. *See* J.A.1966(*Power Sector Strategy: Climate, Public Health, Environmental Justice, Briefing for Gina McCarthy and Ali Zaid*i (Feb. 4, 2021)).  While heavily redacted, the document evidences EPA's intent to use its regulatory authority under various programs, including the MATS Rule, for reducing power plant emissions to implement the Administration's climate agenda.  Indeed, one slide that was briefed

---

[22] https://tinyurl.com/4vsn3mcr.

to the White House *Climate Advisor* expressly discusses the "Air Toxics Standards (e.g., MATS Rule)." *Id.* at 6.[23]

EPA's public statements and internal documents consequently indicate that EPA's stated reason for the Rule—protecting the public from exposure to the regulated HAPs—was likely "contrived." *Dep't of Commerce.*, 588 U.S. at 784. And this is not a case where the Court must risk substantial intrusion into Administrator Regan's "mental processes," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), as his public statements already lay bare his motivations. *See also BST Holdings, LLC v. OSHA*, 17 F.4th 604, 612 (5th Cir. 2021) (discussing a White House official's tweet); *Texas v. United States*, 86 F.Supp.3d 591, 668 (S.D. Tex. 2015) (discussing President Obama's public statements about DAPA), *aff'd* 809 F.3d 135 (5th Cir.), *aff'd by an equally divided court,* 579 U.S. 547 (2016).

Finally, to the extent there is any doubt regarding why EPA promulgated this Rule, the myriad problems described above—including that EPA can identify no quantifiable public health benefits from the Rule's mandated reduction in HAP

---

[23] During stay motion briefing, EPA argued "the PowerPoint addresses all kinds of environmental problems created by power plants." EPA Stay Opp. Br. at 38 n.14. EPA would apparently have the courts believe that a briefing given by EPA to the White House *Climate Advisor* was about something other than climate policy. And in any event, when given the opportunity to remove the document's redactions and show that the PowerPoint does not evidence what it so clearly seems to, EPA chose instead to keep most of the document redacted and obscured from public view.

emissions, and instead claims millions of dollars in climate benefits—only reinforce the conclusion that EPA did not promulgate this Rule to protect public health from any adverse effects of the regulated HAP emissions. *Cf. Career Coll. and Sch. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 226 n.1 (5th Cir. 2024) ("given the manifest legal shortcomings of the challenged portions of this Rule, it seems to be of a piece with the Executive Branch's larger goal to sidestep, to the greatest extent possible, the Supreme Court decision holding Presidential student loan discharges illegal").

Pretext explains why EPA is using its HAPs authority to impose tremendous costs on coal-fired power plants with no public health benefit from mandating a further reduction in HAPs. The purpose for EPA's "suite" of rules targeting coal-fired plants is recognized around the world, *e.g.,* Milman, *New US climate rules for pollution cuts 'probably terminal' for coal-fired plants*, Guardian (May 2, 2024),[24] and this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce*, 588 U.S. at 785 (citation omitted).

## CONCLUSION

For the reasons set forth, the Rule is contrary to statute and arbitrary and capricious. Petitioners ask the Court to vacate the Rule.

---

[24] https://tinyurl.com/ykmb9xvn.

Dated: December 10, 2024                Respectfully submitted,

PATRICK MORRISEY                         DREW H. WRIGLEY
Attorney General                         Attorney General

/s/ Michael Williams                     /s/ Philip Axt
MICHAEL R. WILLIAMS                      PHILIP AXT
Solicitor General                        Solicitor General
State Capitol Bldg. 1, Room E-26         600 E Boulevard Ave., Dept. 125
Charleston, WV 25301                     Bismarck, ND 58505
Phone: 304.558-2021                      Phone: 701.328.2210
michael.r.williams@wvago.gov             pjaxt@nd.gov

*Counsel for State of West Virginia*     NESSA HOREWITCH COPPINGER
                                         DAVID M. FRIEDLAND
                                         Special Assistant Attorneys General
                                         1900 N Street NW, Suite 100
                                         Washington, DC 20036
                                         ncoppinger@bdlaw.com
                                         dfriedland@bdlaw.com

                                         *Counsel for State of North Dakota*


TREG TAYLOR                              TIM GRIFFIN
Attorney General                         Attorney General

/s/ Garrison Todd                        /s/ Nicholas J. Bronni
GARRISON TODD                            NICHOLAS J. BRONNI
Assistant Attorney General               Solicitor General
Alaska Department of Law                 DYLAN L. JACOBS
1031 W. 4th Ave.                         Deputy Solicitor General
Suite 200                                Office of the Arkansas Attorney
Anchorage, AK 99501                      General
(907) 269-5100                           323 Center Street, Suite 200
Garrison.Todd@alaska.gov                 Little Rock, AR 72201
                                         (501) 682-2007
*Counsel for State of Alaska*            nicholas.bronni@arkansasag.gov

                                         *Counsel for State of Arkansas*

CHRISTOPHER M. CARR
Attorney General

*/s/ Stephen J. Petrany*
STEPHEN J. PETRANY
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

RAÚL R. LABRADOR
Attorney General

*/s/ Alan M. Hurst*
ALAN M. HURST
Solicitor General
Office of Idaho Attorney General
P.O. Box. 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@aga.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
Attorney General

*/s/ James A. Barta*
JAMES A. BARTA
Solicitor General
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

BRENNA BIRD
Attorney General

*/s/ Eric H. Wessan*
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

107

KRIS W. KOBACH
Attorney General

*/s/ Anthony J. Powell*
ANTHONY J. POWELL
Solicitor General
Office of Kansas Attorney General
120 SW 10thAvenue, 2ndFloor
Topeka, Kansas 66612
(785) 368-8539
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

RUSSELL COLEMAN
Attorney General

*/s/ Matthew F. Kuhn*
MATTHEW F. KUHN
Solicitor General
JACOB M. ABRAHAMSON
Assistant Solicitor General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for Commonwealth of Kentucky*

ELIZABETH B. MURRILL
Attorney General

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General
Louisiana Department of Justice 1885
N. Third Street
Baton Rouge, Louisiana 70802
(225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW T. BAILEY
Attorney General

*/s/ Samuel C. Freedlund*
SAMUEL C. FREEDLUND
Deputy Solicitor General
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, Missouri 63101
(314) 340-4869
Samuel.Freedlund@ago.mo.gov

*Counsel for State of Missouri*

MICHAEL T. HILGERS
Attorney General

*/s/ Grant D. Strobl*
GRANT D. STROBL
Assistant Solicitor General
Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.strobl@nebraska.gov

*Counsel for State of Nebraska*

AUSTIN KNUDSEN
Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406)444-2707
Christian.Corrigan@mt.gov

*Counsel for State of Montana*

GENTNER DRUMMOND
Attorney General

*/s/ Garry M. Gaskins, II*
GARRY M. GASKINS, II
Solicitor General
JENNIFER L. LEWIS
Deputy Attorney General
Office of the Attorney General of
Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*

ALAN WILSON
Attorney General

*/s/ Thomas T. Hydrick*
THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*


JONATHAN SKRMETTI
Attorney General

*/s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER
Director of Strategic Litigation
MATTHEW RICE
Solicitor General
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Matthew.Rice@ag.tn.gov

*Counsel for State of Tennessee*

MARTY J. JACKLEY
Attorney General

*/s/ Steve Blair*
STEVE BLAIR
Deputy Attorney General
Office of the Attorney General of South
Dakota
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
(605) 773-3215
atgservice@state.sd.us
steven.blair@state.sd.us

*Counsel for State of South Dakota*

KEN PAXTON
Attorney General

*/s/ John R. Hulme*
JOHN R. HULME
Assistant Attorney General
BRENT WEBSTER
First Assistant Attorney General
JAMES LLOYD
Deputy Attorney General for Civil
Litigation
KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
John.hulme@oag.texas.gov

*Counsel for State of Texas*

SEAN REYES
Attorney General

*/s/ Stanford Purser*
STANFORD PURSER
Solicitor General
Office of the Utah Attorney General
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(385) 366-4334
Spurser@agutah.gov

*Counsel for State of Utah*


BRIDGET HILL
Attorney General

*/s/ D. David DeWald*
D. DAVID DEWALD
Deputy Attorney General
Wyoming Attorney General's Office
Water & Natural Resources Division
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 phone
david.dewald@wyo.gov

*Counsel for State of Wyoming*

JASON MIYARES
Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER
Principal Deputy Solicitor General
BRENDAN T. CHESTNUT
Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Commonwealth of Virginia*

<u>*/s/ Charles T. Wehland*</u>

| | |
|---|---|
| Charles T. Wehland | Jeffery D. Ubersax |
| JONES DAY | KUSHNER & HAMED CO., LPA |
| 110 North Wacker Drive, Suite 4800 | 1375 East Ninth Street, Suite 1390 |
| Chicago, IL 60601-1692 | Cleveland, OH 44114 |
| Tel: (312) 269-4388 | Tel: (216) 696-6700 |
| ctwehland@jonesday.com | jdubersax@kushnerhamed.com |

Yaakov M. Roth
Brinton Lucas
Madeline W. Clark
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 879-7658
yroth@jonesday.com
blucas@jonesday.com
mclark@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

/s/ Elizabeth C. Williamson
Elizabeth C. Williamson
BALCH & BINGHAM LLP
601 Pennsylvania Ave. N.W.
Suite 825 South
Washington, D.C. 20004
(202) 661-6342
(202) 347-6001 (fax)
ewilliamson@balch.com

Claire B. Johnson
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
cbjohnson@balch.com

*Counsel for National Rural Electric Cooperative Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative, Inc., Basin Electric Power Cooperative*

/s/ Misha Tseytlin
Misha Tseytlin
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

Carroll Wade McGuffey III
TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree St. N.E., Suite 3000
Atlanta, GA 30308
(404) 885-3698
mack.mcguffey@troutman.com

*Counsel for Lignite Energy Council and National Mining Association*

/s/ C. Grady Moore III
C. Grady Moore III
P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
gmoore@balch.com

*Counsel for Oak Grove Management Co., LLC and Luminant Generation Co., LLC*

/s/ Megan Berge
Megan H. Berge
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-1308

*Counsel for Rainbow Energy Center, LLC*

/s/ Mark W. DeLaquil
Mark W. DeLaquil
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1527
mdelaquil@bakerlaw.com

Martin T. Booher
Joshua T. Wilson
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

*Counsel for Westmoreland Mining
Holdings LLC, Westmoreland
Mining, and Westmoreland Rosebud
Mining, LLC*

/s/ Joshua B. Frank
Joshua B. Frank
C. Joshua Lee
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
Tel.: (202) 639-7748
(202) 639-1130
joshua.frank@bakerbotts.com
joshua.lee@bakerbotts.com

*Counsel for Talen Montana, LLC*

/s/ Creighton R. Magid
Creighton R. Magid #49713
DORSEY & WHITNEY LLP
1401 New York Avenue NW
Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3555
Fax: (202) 315-3852
magid.chip@dorsey.com

*Counsel for NorthWestern
Corporation, d/b/a NorthWestern
Energy*

/s/ Makram B. Jaber
Makram B. Jaber
Allison D. Wood
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-1700
mjaber@mcguirewoods.com
awood@mcguirewoods.com
aflynn@mcguirewoods.com

*Counsel for America's Power and
Electric Generators MATS Coalition*

<u>/s/ David M. Flannery</u>

| | |
|---|---|
| Edward L. Kropp | David M. Flannery |
| STEPTOE & JOHNSON PLLC | Kathy G. Beckett |
| P.O. Box 36425 | Keeleigh S. Huffman |
| Indianapolis, Indiana 46236 | STEPTOE & JOHNSON PLLC |
| 317-946-9882 | 707 Virginia Street, East |
| Skipp.Kropp@steptoe-johnson.com | P.O. Box 1588 |
| | Charleston, WV 25326 |
| | (304) 353-8000 |
| | Dave.Flannery@steptoe-johnson.com |
| | Kathy.Beckett@steptoe-johnson.com |
| | Keeleigh.Huffman@steptoe-johnson.com |

*Counsel for Midwest Ozone Group*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), (f) and (g) and Circuit Rule 32(e)(1), because it contains 23,995 words, excluding exempted parts, according to the count of Microsoft Word 365.

I further certify that the foregoing brief also complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in 14-point proportionally spaced Times New Roman font.

*/s/ Philip Axt*_____
PHILIP AXT
Solicitor General of North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2024, the foregoing Final Opening Brief of Petitioners was served electronically on all registered counsel through the Court's CM/ECF system.


/s/ Philip Axt
PHILIP AXT
Solicitor General of North Dakota

117