**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 24-1119 (and consolidated cases)**

# United States Court of Appeals
# For the District of Columbia Circuit

STATE OF NORTH DAKOTA, ET AL.,

Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY

Respondent.

On Petition for Judicial Review of Final Agency Action of the United States
Environmental Protection Agency, 89 Fed. Reg. 38508 (May 7, 2024)

### FINAL REPLY BRIEF OF PETITIONERS

PATRICK MORRISEY
Attorney General

MICHAEL R. WILLIAMS
Solicitor General
State Capitol Bldg. 1, Room E-26
Charleston, WV 25301
Phone: 304.558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

DREW H. WRIGLEY
Attorney General

PHILIP AXT
Solicitor General
600 E Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: 701.328.2210
pjaxt@nd.gov

NESSA HOREWITCH COPPINGER
DAVID M. FRIEDLAND
Special Assistant Attorneys General
1900 N Street NW, Suite 100
Washington, DC 20036
ncoppinger@bdlaw.com
dfriedland@bdlaw.com

*Counsel for State of North Dakota*

*Additional Counsel Listed on Following Pages*

TREG TAYLOR
Attorney General

GARRISON TODD
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Ave.
Suite 200
Anchorage, AK 99501
(907) 269-5100
Garrison.Todd@alaska.gov

*Counsel for State of Alaska*

CHRISTOPHER M. CARR
Attorney General

STEPHEN J. PETRANY
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

TIM GRIFFIN
Attorney General

NICHOLAS J. BRONNI
Solicitor General
DYLAN L. JACOBS
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
nicholas.bronni@arkansasag.gov

*Counsel for State of Arkansas*

RAÚL R. LABRADOR
Attorney General

ALAN M. HURST
Solicitor General
Office of Idaho Attorney General
P.O. Box. 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@aga.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
Attorney General

JAMES A. BARTA
Solicitor General
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

KRIS W. KOBACH
Attorney General

ANTHONY J. POWELL
Solicitor General
Office of Kansas Attorney General
120 SW 10th Avenue, 2ndFloor
Topeka, Kansas 66612
(785) 368-8539
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

ELIZABETH B. MURRILL
Attorney General

J. BENJAMIN AGUIÑAGA
Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70802
(225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for State of Louisiana*

BRENNA BIRD
Attorney General

ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

RUSSELL COLEMAN
Attorney General

MATTHEW F. KUHN
Solicitor General
JACOB M. ABRAHAMSON
Assistant Solicitor General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for Commonwealth of Kentucky*

LYNN FITCH
Attorney General

JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

iii

ANDREW T. BAILEY
Attorney General

SAMUEL C. FREEDLUND
Deputy Solicitor General
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, Missouri 63101
(314) 340-4869
Samuel.Freedlund@ago.mo.gov

*Counsel for State of Missouri*


MICHAEL T. HILGERS
Attorney General

GRANT D. STROBL
Assistant Solicitor General
Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.strobl@nebraska.gov

*Counsel for State of Nebraska*




ALAN WILSON
Attorney General

THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*


AUSTIN KNUDSEN
Attorney General

CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707
Christian.Corrigan@mt.gov

*Counsel for State of Montana*


GENTNER DRUMMOND
Attorney General

GARRY M. GASKINS, II
Solicitor General
JENNIFER L. LEWIS
Deputy Attorney General
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*


MARTY J. JACKLEY
Attorney General

STEVE BLAIR
Deputy Attorney General
Office of the Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
(605) 773-3215
atgservice@state.sd.us
steven.blair@state.sd.us

*Counsel for State of South Dakota*

JONATHAN SKRMETTI
Attorney General

WHITNEY HERMANDORFER
Director of Strategic Litigation
MATTHEW RICE
Solicitor General
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Matthew.Rice@ag.tn.gov

*Counsel for State of Tennessee*

SEAN REYES
Attorney General

STANFORD PURSER
Solicitor General
Office of the Utah Attorney General
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(385) 366-4334
Spurser@agutah.gov

*Counsel for State of Utah*

KEN PAXTON
Attorney General

JOHN R. HULME
Assistant Attorney General
BRENT WEBSTER
First Assistant Attorney General
JAMES LLOYD
Deputy Attorney General for Civil
Litigation
KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
John.hulme@oag.texas.gov

*Counsel for State of Texas*

JASON MIYARES
Attorney General

KEVIN M. GALLAGHER
Principal Deputy Solicitor General
BRENDAN T. CHESTNUT
Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Commonwealth of Virginia*

v

BRIDGET HILL
Attorney General

D. DAVID DEWALD
Deputy Attorney General
Wyoming Attorney General's Office
Water & Natural Resources Division
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for State of Wyoming*


Charles T. Wehland
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60601-1692
Tel: (312) 269-4388
ctwehland@jonesday.com

Jeffery D. Ubersax
KUSHNER & HAMED CO., LPA
1375 East Ninth Street, Suite 1390
Cleveland, OH 44114
Tel: (216) 696-6700
jdubersax@kushnerhamed.com

Yaakov M. Roth
Brinton Lucas
Madeline W. Clark
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 879-7658
yroth@jonesday.com
blucas@jonesday.com
mclark@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

Elizabeth C. Williamson
BALCH & BINGHAM LLP
601 Pennsylvania Ave. N.W.
Suite 825 South
Washington, D.C. 20004
(202) 661-6342
(202) 347-6001 (fax)
ewilliamson@balch.com

Claire B. Johnson
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
cbjohnson@balch.com

*Counsel for National Rural Electric
Cooperative Association, Minnkota
Power Cooperative, Inc., East Kentucky
Power Cooperative, Inc., Associated
Electric Cooperative, Inc., Basin
Electric Power Cooperative*

Misha Tseytlin
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe St, Suite 3900
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

Carroll Wade McGuffey III
TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree St. N.E., Suite 3000
Atlanta, GA 30308
(404) 885-3698
mack.mcguffey@troutman.com

*Counsel for Lignite Energy Council
and National Mining Association*

Megan H. Berge
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-1308

*Counsel for Rainbow Energy Center,
LLC*

C. Grady Moore III
P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
gmoore@balch.com

*Counsel for Oak Grove Management
Company LLC and Luminant
Generation Company LLC*

Joshua B. Frank
C. Joshua Lee
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
Tel.: (202) 639-7748
(202) 639-1130
joshua.frank@bakerbotts.com
joshua.lee@bakerbotts.com

*Counsel for Talen Montana, LLC*

Mark W. DeLaquil
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1527
mdelaquil@bakerlaw.com

Martin T. Booher
Joshua T. Wilson
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

*Counsel for Westmoreland Mining
Holdings LLC, Westmoreland Mining,
and Westmoreland Rosebud Mining,
LLC*

Makram B. Jaber
Allison D. Wood
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-1700
mjaber@mcguirewoods.com
awood@mcguirewoods.com
aflynn@mcguirewoods.com

*Counsel for America's Power and
Electric Generators MATS Coalition*

David M. Flannery
Kathy G. Beckett
Keeleigh S. Huffman
STEPTOE & JOHNSON PLLC
707 Virginia Street, East
P.O. Box 1588
Charleston, WV 25326
(304) 353-8000
Dave.Flannery@steptoe-johnson.com
Kathy.Beckett@steptoe-johnson.com
Keeleigh.Huffman@steptoe-
johnson.com

Creighton R. Magid #49713
DORSEY & WHITNEY LLP
1401 New York Avenue NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3555
Fax: (202) 315-3852
magid.chip@dorsey.com

*Counsel for NorthWestern Corporation,
d/b/a NorthWestern Energy*

Edward L. Kropp
STEPTOE & JOHNSON PLLC
P.O. Box 36425
Indianapolis, Indiana 46236
317-946-9882
Skipp.Kropp@steptoe-johnson.com

*Counsel for Midwest Ozone Group*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS .......................................................................x

TABLE OF AUTHORITIES.......................................................... xii

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ................... xvi

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................5

I.  THE RULE IS CONTRARY TO STATUTE. ...............................5

    A.  EPA Has Not Demonstrated that the Rule is "Necessary." .................6

        1.  EPA Reads "Necessary" Out of the Statute. .............................7

        2.  EPA Overlooks the Act's Unique Treatment of
            Power Plants.........................................................................8

        3.  EPA Fails to Justify Ignoring the Absence of Any Relevant
            Meaningful Public Health Benefit. ...........................................13

    B.  EPA Did Not Identify Any "Development" in the Rule that
        Authorizes Revising Emission Standards Under
        Section 112(d)(6)....................................................................16

II.  THE RULE IS ARBITRARY AND CAPRICIOUS. ...................21

    A.  EPA Improperly Disregarded its Cost-Benefit Analysis
        Demonstrating the Absence of Any Meaningful Benefits. .................22

    B.  EPA's Cost-Effectiveness Analysis is Arbitrary and Capricious.........26

    C.  EPA's Grid Reliability Analysis is Arbitrary and Capricious..............28

    D.  The Record Does Not Support the Rule's Revised fPM and Mercury
        Emission Standards. ...............................................................31

        1.  EPA's fPM Analysis Is Fatally Flawed. ...................................31

        2.  EPA's Mercury Standards are Infeasible and
            Fatally Flawed.......................................................................35

    E.  EPA's Response Addressing Colstrip-Specific Issues Demonstrates
        the Agency's Arbitrary and Capricious Rulemaking..........................39

        1.  EPA Vilifies Colstrip to Distract from the Rule's Defects........40

        2.  EPA's Response Highlights the Arbitrary and Capricious
            Nature of EPA's Action. .........................................................43

| | | | |
|---|---|---|---|
| | a. | Retirement Risk ................................................................ | 43 |
| | b. | Retirement Subcategory .................................................. | 44 |
| | c. | Cost-Effectiveness ........................................................... | 47 |
| F. | | The Rule is Pretextual. ..................................................... | 48 |

CONCLUSION .................................................................................... 51

CERTIFICATE OF COMPLIANCE ................................................... 62

CERTIFICATE OF SERVICE ............................................................ 63

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Appalachian Power Co. v. EPA*,
    251 F.3d 1026 (D.C. Cir. 2001) ................................................................ 29, 30

*Ass'n of Battery Recyclers, Inc. v. EPA*,
    716 F.3d 667 (D.C. Cir. 2013) ...............................................................14

*AT&T Wireless Servs., Inc. v. FCC*,
    270 F.3d 959 (D.C. Cir. 2001) ...............................................................44

*Bowen v. Georgetown University Hosp.*,
    488 U.S. 204 (1988) ...............................................................17

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ...............................................................50

*Clean Wis. v. EPA*,
    964 F.3d 1145 (D.C. Cir. 2020) ................................................................ 31, 39

*Del. Dep't of Natural Res. & Envtl. Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015) ..................................................... 28, 29, 30

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019) ................................................................ 49, 50

*EPA v. New Jersey*,
    555 U.S. 1162 (2009) ...............................................................11

*Envtl. Action, Inc. v. FERC*,
    939 F.2d 1057 (D.C. Cir. 1999) ...............................................................30

*GPA Midstream Ass'n v. DOT*,
    67 F.4th 1188 (D.C. Cir. 2023) ...............................................................23

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    626 F.3d 84 (D.C. Cir. 2010) ...............................................................40

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ...............................................................20

*Louisiana Environmental Action Network v. EPA,*
    955 F.3d 1088 (D.C. Cir. 2020) ...........................................................15

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
    60 F.4th 956 (5th Cir. 2023) ................................................................24

*Michigan v. EPA*,
    576 U.S. 743 (2015) .................................... 3, 10, 12, 14, 22, 23, 24, 42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29, 43 (1983) .................................................................7, 22

*Nat'l Ass'n for Surface Finishing v. EPA*,
    795 F.3d 1 (D.C. Cir. 2015) ...................................................... 8, 13, 20

*Ne. Md. Waste Disposal Auth. v. EPA*,
    358 F.3d 936 (D.C. Cir. 2004) .............................................................46

*NRDC v. EPA,*
    529 F.3d 1077 (D.C. Cir. 2008) ...........................................................34

*NRDC v. EPA,*
    755 F.3d 1010 (D.C. Cir. 2014) ...........................................................42

*New Jersey v. EPA*,
    517 F.3d 574, 582 (D.C. Cir. 2008) ....................................................12

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) ........................................................................29

*SEC v. Chenery,*
    318 U.S. 80 (1943) ..............................................................................40

*SEC v. Chenery Corp*,
    332 U.S. 194 (1947) ...............................................................................7

*Sierra Club v. Costle,*
    657 F.2d 298 (D.C. Cir. 1981) ............................................................34

*Sierra Club v. EPA,*
    353 F.3d 976 (D.C. Cir. 2004) ............................................................26

*Sinclair Wyo. Ref. Co. v. EPA*,
  101 F.4th 871 (D.C. Cir. 2024) ............................................................24

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ....................................................... 28, 29

*U.S. Sugar Corp. v. EPA*,
  830 F.3d 579 (D.C. Cir. 2016) ............................................................48

*White Stallion Energy Ctr., LLC. v. EPA*,
  748 F.3d 1222 (D.C. Cir. 2014) ..........................................9, 10, 11, 38

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
  82 F.4th 1273 (D.C. Cir. 2023) ............................................................47

*Ysleta Del Sur Pueblo v. Texas*,
  596 U.S. 685, 699 (2022) ......................................................................7

**Statutory Authorities**

42 U.S.C. § 7412(b)(2) ..............................................................................25

42 U.S.C. § 7412(d)(1) ..............................................................................46

42 U.S.C. § 7412(n)(1)(A) ............................................................... 6, 9, 10

42 U.S.C. § 7414(a)(1)(C) .........................................................................21

42 U.S.C. § 7602(k) ...................................................................................21

**Rules and Regulations**

40 C.F.R. § 63.2 ........................................................................................21

70 Fed.Reg. 19992 (Apr. 15, 2005) ...........................................................18

76 Fed.Reg. 81328 (Dec. 27, 2011) ...........................................................19

77 Fed.Reg. 9304 (Feb. 16, 2012) ...................................................... 25, 37

85 Fed.Reg. 31286 (May 22, 2020) .................................................... 24, 42

85 Fed.Reg. 49084 (Aug. 12, 2020) ...........................................................13

88 Fed.Reg. 24854 (Apr. 24, 2023) ..................................................... 16

89 Fed.Reg. 38508 (May 7, 2024) ................ 1, 17, 22, 23, 26, 28, 32, 38, 39, 42, 43

**Additional Materials**

A Legislative History Of The Clean Air Act Amendments Of 1990,
   Vol. 1 (1993) ..........................................................................................10

## <u>GLOSSARY OF ABBREVIATIONS AND ACRONYMS</u>

| | |
|---|---|
| CEMS | Continuous Emission Monitoring System |
| EGU | Electric Generating Unit |
| EPA | Environmental Protection Agency |
| fPM | Filterable Particulate Matter |
| HAP | Hazardous Air Pollutant |
| Hg | Mercury |
| MATS | Mercury and Air Toxics Standard |

# INTRODUCTION

EPA's defenses of this Rule are a mixture of strained interpretations of Section 112(d)(6) of the Clean Air Act, *post hoc* rationalizations, and responses to arguments that Petitioners never made. Those defenses are notably short on record support, responses to the arguments that Petitioners *did* make, and a sound legal basis for EPA's (re-)interpretation of Section 112(d)(6).

On the issue of statutory interpretation, EPA and Respondent-Intervenors misunderstand the purpose and text—they claim Congress intended for EPA to continually strive toward "total prohibition" of hazardous air pollutant (HAP) emissions because "less is always better." Not so. Less is better under Section 112 only when lower emissions are needed *to protect public health*. The structure and text of Section 112, including 112(d)(6) itself, clearly demonstrate Congress did not intend for a push to zero HAPs at any cost. Indeed, Section 112(c)(9) of the Clean Air Act confirms that Congress allowed EPA to stop regulating HAP emissions from a source entirely once risks reached low enough levels.

EPA's misunderstanding of Congress's objective also infects its interpretation of the two key terms in Section 112(d)(6). All parties agree that EPA may revise the existing MATS emission limits under Section 112(d)(6) only if such revisions are "necessary" considering relevant "developments." But viewing Section 112(d)(6) through its "total prohibition" and "less is always better" lens, EPA mistakenly

1

concludes that any "development," however marginal or costly, is always "necessary." That is not the best reading of the statute. Although initial MACT standards may be set regardless of public health risk, the statute directs EPA to consider public health in subsequent steps, including in its review of whether further regulation is "necessary" considering any "developments." EPA has met neither statutory requirement in this rulemaking.

Regarding "necessary," EPA did not make any "necessary" determination in the record, and for that reason alone the Court should vacate the Rule. Even setting that infirmity aside, EPA claims that it only need show that its Rule is "achievable" to be "necessary," pointing to the Section 112(d)(2) standard for promulgating an initial MACT standard. That statutory construction, however, entirely reads the word "necessary" out of Section 112(d)(6). The best reading of Section 112(d)(6), especially when applied to power plants, is that revisions are "necessary" only where the revised emission standards would effect meaningful public health benefits, which EPA does not and cannot find here.

EPA claims that Petitioners would only allow for revisions under Section 112(d)(6) if EPA found residual risks under Section 112(f)(2). That, however, is not Petitioners' argument. Rather, Petitioners argue that Section 112(d)(6)'s use of the word "necessary" requires at least some statutorily relevant benefit to balance against the action's costs, and that EPA failed to find such a benefit here.

Regarding "developments," EPA's defense is largely *post hoc* rationalization by counsel that bears little resemblance to how the agency actually characterized the putative developments in the Rule. There, EPA claimed as "developments" the fact that electric generating units (EGUs) meet the existing emission standards, allegedly at lower costs than previously estimated. Those are not developments under Section 112(d)(6).

The Rule is also arbitrary and capricious for numerous reasons.

First, EPA's consideration of the Rule's costs and benefits is not reasoned decision-making. EPA argues that it need not fully monetize every cost and benefit of the Rule. But again, that is not what Petitioners argued. The problem is not that EPA failed to monetize the benefits of HAP emission reductions. The problem is that there are *no* meaningful public health benefits from the Rule's HAP emission reductions, regardless of whether they were monetized or otherwise. Reducing exposure does not *ipso facto* mean there will be health benefits—especially when exposure is already infinitesimally low. Taking EPA's cost estimates at face value, the Rule will impose nearly a billion dollars in costs. EPA's decision to promulgate a Rule with no meaningful relevant benefits that imposes significant costs is not rational decision-making. *Michigan v. EPA,* 576 U.S. 746, 752 (2015). Moreover, EPA does not dispute that this Rule is among the most cost-*ineffective* rules it has ever promulgated.

3

Second, the record does not support EPA's revised emission standards.  For filterable particulate matter (fPM), the Rule relies on inaccurate and cherry-picked data that does not support slashing the emission standard by such a large percentage. And for mercury emissions from lignite-firing plants, EPA's conclusions are similarly flawed, based on outdated performance data, inapposite characteristics of non-lignite coal, and data from a single facility that cannot continuously meet the standard.  Further, EPA's analyses of compliance costs severely undercount the impacts of the Rule.

Third, EPA dismisses Petitioners' arguments about power grid impacts by pointing to its own model and asserting there is nothing to worry about.  That response is a non sequitur where, as here, Petitioners demonstrated that EPA failed to consider how its inputs to that model are flawed.  A model based on undercounted compliance costs and flawed assumptions has little value.  And EPA's argument that it has a generic memorandum of understanding with agencies that are experts in the electric grids, such as FERC, cannot cure EPA's flawed model, especially where EPA has not demonstrated (and nothing in the record indicates) that it actually sought, let alone considered, any input on the impact of *this specific* Rule from those agencies.

Fourth, just as it did in the rulemaking itself, EPA fails to meaningfully respond to Colstrip Petitioners' arguments.  The Colstrip Petitioners raised serious questions about the Rule's impact during the comment period and in the opening

brief.  EPA's Response either repeats the flawed analysis from the rulemaking docket that Petitioners have shown to be wrong or is *post hoc* rationalization by counsel that the Court must reject.

Finally, the question remains why EPA chose to target coal-fired power plants with even more stringent emission standards that impose massive costs without achieving any relevant public health benefits.  The EPA Administrator has already provided the answer: this Rule is not about protecting the public from health risks attributable to HAP emissions.  It is about implementing the Administration's climate change agenda using every tool in the federal government's toolkit—even if some of those tools, like Section 112(d)(6), were given to EPA for an entirely different purpose.  The Court should reject EPA's attempt to accomplish through the back door what Congress and the Supreme Court told the agency it could not accomplish through the front door.

## ARGUMENT

## I.    THE RULE IS CONTRARY TO STATUTE.

Section 112(d)(6) permits EPA to revise emission standards only if doing so is "necessary" after considering, among other things, "developments" in control technologies, practices, or processes.  As Petitioners have explained, the Rule flunks both statutory requirements.  Pet. Br. 31-53.

### A.     EPA Has Not Demonstrated that the Rule is "Necessary."

EPA admits that HAP emissions from coal-fired power plants are already below levels of public health concern.  *See* Pet Br. 35-38.  It nevertheless maintains that these tightened standards are "necessary" because they are "achievable" under Section 112(d)(2).  EPA Br. 31.  That misconstrues Section 112(d), reading one word ("achievable") into the statute and deleting the word that is actually there ("necessary").  Moreover, even if EPA were correct as to other source categories, it ignores that Congress singled out power plants for special treatment, subjecting them to regulation only as "appropriate and necessary" for "public health."  42 U.S.C. § 7412(n)(1)(A).  Section 112(d)(6)'s "necessary" inquiry cannot lose sight of that.

Nor can EPA escape its failure to articulate anywhere in the Rule or record that its revisions are "necessary" under Section 112(d)(6).  Pet. Br. 31-32.  Indeed, in light of EPA's failure to determine expressly in the record that a revised standard is necessary (EPA Br. 29), this Court should reject EPA's argument on the "necessary" prong as *post hoc* rationalization by counsel.  EPA's request that this Court "discern" a statutory basis for its Rule is unavailing because the problem is not a minor lack of clarity in EPA's reasoning or the record, it is the absence of any actual determination of necessity.  EPA's stance also cannot be reconciled with the fundamental principle that a Court "may not supply a reasoned basis for the agency's

action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

### 1.    EPA Reads "Necessary" Out of the Statute.

Section 112(d)(6) makes clear that developments alone, even where they exist, are insufficient to revise a Section 112 standard—the revision must also be "necessary."  In reading "necessary" to require consideration of only whether further emission reductions are "achievable," EPA reads the statutory "as necessary" restriction on EPA's discretion out of the statute.  EPA's interpretation cannot be reconciled with the rule that statutes should be construed so that no word "will be inoperative or superfluous, void or insignificant." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 699 (2022).

Moreover, contrary to EPA's contention (EPA Br. 27-28), Petitioners' interpretation of the statute makes perfect sense.  Congress directed EPA to set initial MACT standards for existing sources based on what was achievable at the time, and to use that initial standard as a baseline from which to consider further revisions based on either the one-time risk assessments under Section 112(f) or as necessary thereafter under Section 112(d)(6).  But that does not mean a Section 112(d)(6) review must be identical to setting an initial MACT floor under Section 112(d)(2). In fact, both EPA and this Court have said otherwise. *See Nat'l Ass'n for Surface*

*Finishing v. EPA*, 795 F.3d 1, 7-8 (D.C. Cir. 2015) (upholding EPA's position that Section 112(d)(6) does not require the "recalculation" of MACT floors).

Indeed, it is *EPA's* interpretation that would lead to absurd results.  If Section 112(d)(6) is no more than a recurring Section 112(d)(2) analysis that requires revisions whenever EPA "determines that developments make them achievable," then EPA would be forbidden from considering "risks to public health" at this stage. EPA Br. 31.  Indeed, the organizational Respondent-Intervenors recognize as much. *See* NGO Br. 10, 14-15.  But EPA itself has long taken the position that it can consider public health in Section 112(d)(6) reviews, *see* Pet. Br. 39 (compiling examples of EPA previously taking that position), and it seeks to preserve its discretion to do so even now.  EPA Br. 31 & n.5.

## 2.    EPA Overlooks the Act's Unique Treatment of Power Plants.

EPA's interpretation makes even less sense when it comes to Section 112(d)(6) reviews of power plant regulations.  EPA agrees that the standard under Section 112(d)(6) is whether revisions are "necessary," and it agrees that what counts as "necessary" depends on the specific context of "the [emission] standard being reviewed."  EPA Br. 23-24.  But EPA then drains the term "necessary" of any meaning by ignoring the context of Section 112 power plant regulations.

Section 112(n)(1)(A) directs EPA to "regulate" power plants "under this section" *only if* "appropriate and necessary" after studying "*the hazards to public*

*health* reasonably anticipated to occur as a result of" their emissions.  42 U.S.C. § 7412(n)(1)(A) (emphases added).  The statute thus announces, on its face, Congress's objective when it comes to regulating hazardous air pollutants from power plants: protecting public health.  The specific context of power plant emission standards therefore demands that in order for the MATS rule revisions to be "necessary" they must protect public health.

EPA contends (EPA Br. 33-34) that once it satisfies its "threshold" obligation under Section 112(n)(1)(A) to decide whether to regulate power plants in the first place, that provision goes out the window and has no role to play in subsequent review of these same power plant standards.  That does not comport with either common sense or congressional command.

To understand why Congress would have elected unique treatment for power plants throughout their entire lifecycle of regulation under Section 112, it is critical to grasp why Congress subjected power plants to distinct treatment in the first place. Mindful of the "extremely high costs" that power plants were facing under other provisions of the Clean Air Act, Congress decided not to "automatically regulate" them under Section 112(d).  *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1264 (D.C. Cir. 2014) (Kavanaugh, J., dissenting).

Instead, Congress directed EPA to study the effect of power plant HAP emissions on public health after imposition of the Act's other requirements, and then

to "regulate" power plants under Section 112 only if "appropriate and necessary."
42 U.S.C. § 7412(n)(1)(A). This congressional compromise—unique to power
plants—sought to "provide 'protection of the public health while avoiding the
imposition of excessive and unnecessary costs on … consumers of electricity.'" *Id.*
(quoting 1 A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990,
at 1417 (1993) (LEGISLATIVE HISTORY). The Supreme Court has squarely held that
the "appropriate and necessary" finding must account for both the benefits and costs
of regulating power plants under Section 112. *See Michigan*, 576 U.S. at 752-53.

EPA is therefore wrong to claim that Congress's "deliberate policy choice"
was to allow "…control of toxic emissions to a greater degree than may be required
to address assessed risk to public health…" EPA Br. 32. When it comes to power
plants, Congress's "deliberate policy choice" was instead to balance the need to
protect public health against the need to protect ordinary consumers from
"'unwarranted financial burdens.'" *White Stallion*, 748 F.3d at 1264 (Kavanaugh,
J., dissenting) (quoting LEGISLATIVE HISTORY at 1416). This congressional
compromise would have little force if EPA could revise emission limits meant to
address public health under a different standard, to advance other goals, after the
original public health objective was met.

Statutory text confirms that Congress intended protection of public health to
remain central to Section 112 power plant regulation even after EPA's threshold

"appropriate and necessary" finding. Again, Section 112(n)(1)(A) instructs EPA to "regulate" power-plant emissions under Section 112 only if "regulation is appropriate and necessary" in light of "public health." As EPA itself has previously explained, under "any usual understanding of the statutory term, EPA 'regulates' power plants under Section 112 not only at the moment when it lists them as a covered source category, but on an ongoing basis thereafter for so long as power plants are subject to the requirements and prohibitions that Section 7412 imposes." Pet. for Certiorari at 13, *EPA v. New Jersey*, 555 U.S. 1162 (2009) (No. 08-512), 2008 WL 4619509 (brackets omitted). And that makes sense, because revising a power-plant emission standard under Section 112(d)(6) is just as regulatory as the initial determination. EPA therefore cannot blind itself to the public-health objective of Section 112(n)(1)(A) in determining whether regulation is "necessary" at that later stage.

To be clear, this does not mean EPA must revisit its "appropriate and necessary" finding during every Section 112(d)(6) review. *Contra* EPA Br. 35. It simply means, in considering whether revisions of power plant regulations are "necessary" under Section 112(d)(6), EPA cannot ignore the objective of power plant regulation under Section 112—protecting public health.

Circuit precedent does not suggest otherwise. *White Stallion* addressed only the initial Section 112(d) standards for power plants. It held that EPA "reasonably

concluded" that once it found the regulation of power plants to be "appropriate and necessary" under Section 112(n)(1)(A), it should list the plants under Section 112(c) and follow the Section 112(d) framework for setting *initial* standards. 748 F.3d at 1243-44. It does not follow, however, that Section 112(n)(1)(A) becomes irrelevant to *revising* those power plant regulations during the Section 112(d)(6) reviews.

And *New Jersey v. EPA* held that once EPA lists power plants under Section 112(c), it must satisfy the delisting criteria in Section 112(c)(9) before it can deregulate those sources. 517 F.3d 574, 582 (D.C. Cir. 2008). But that decision was based on the specific language of Section 112(c)(9), which applies the *delisting* criteria to "*any* source category" listed under Section 112(c). *Id.* Nothing in *New Jersey* demands that Congress's unique framework for power plants be entirely abandoned, especially in light of Congress's use of the context-dependent term "necessary" in Section 112(d)(6).

Ultimately, in trying to read Section 112 "in a way that 'harmonizes' the program's treatment of power plants with its treatment of other sources," EPA repeats its error from *Michigan v. EPA*. 576 U.S. at 756. And in doing so, EPA again "overlooks the whole point of having a separate provision about power plants: treating power plants *differently* from other stationary sources." *Id*. EPA's "preference for symmetry cannot trump an asymmetrical statute." *Id.* at 757.

12

### 3.     EPA Fails to Justify Ignoring the Absence of Any Relevant Meaningful Public Health Benefit.

In arguing otherwise, EPA first goes after a strawman, emphasizing that its Section 112(d)(6) review is "separate and distinct" from its one-time residual risk review under Section 112(f), and that neither "should limit the other." EPA Br. 32 (citing *Surface Finishing*, 795 F.3d at 5). But Petitioners' argument is different: Even if the current standards "provide an ample margin of safety" under Section 112(f) (typically meaning no one faces an excess lifetime cancer risk of over 100-in-1 million),[1] EPA remains free to potentially tighten them under Section 112(d)(6) to further reduce public-health risks—*under appropriate circumstances*. Pet. Br. 43-44. But what EPA may not do is revise standards under Section 112(d)(6) where, as here, there is no demonstration that revising the standard will result in any relevant meaningful public health benefit. At a minimum, EPA cannot determine whether revised standards are "necessary" without identifying in the record the factors that it believes outweigh the absence of any relevant public health benefits.

Perhaps recognizing this problem, EPA's Intervenors and Amici insist that the revised standards *do* advance public health. *E.g.*, Mass. Br. 9-12; Inst. Policy Integrity Br. 28-31. Tellingly, EPA does not (and cannot) make that argument to justify the Rule—it rested solely on the mantra that fewer emissions are better,

---

[1] Sometimes, even 200-in-1 million. *E.g.*, J.A.2412, 2413(85 Fed.Reg. 49084, 49102 (Aug. 12, 2020)).

without demonstrating any meaningful health benefits from reduced HAP emissions. "EPA's action must be measured by what it did, not by what it might have done." *Michigan*, 576 U.S. at 759 (alterations omitted). And Respondent-Intervenors cannot show that EPA determined the Rule's marginal HAP emission reductions would have any meaningful effect on public health. *See* Pet. Br. 35-38.

EPA next argues that Circuit precedent forecloses Petitioners' argument that Section 112(d)(6)'s use of the word "necessary" requires some consideration of demonstrated benefit to public health. Not so. As Petitioners explained (Pet. Br. 43), *Association of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667 (D.C. Cir. 2013) did not interpret the term "necessary;" it predated *Loper Bright*; and it preceded the Supreme Court's admonition in *Michigan* that "reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." 576 U.S. at 753.

Even more critically, *Battery Recyclers* says nothing about how EPA should apply Section 112(d)(6) in the distinct context of *power plants*. *Battery Recyclers* addressed lead smelting facilities, for which Congress did not establish a special framework. Indeed, EPA itself recognizes that *Battery Recyclers* does not limit *all* Section 112(d)(6) reviews to consideration of only the Section 112(d)(2) factors. *See* EPA Br. 36 ("Standards that are not MACT standards have different criteria for

14

promulgation, and thus different standards for revision 'as necessary.'").  The same is true for power plant emission standards.

As for *Louisiana Environmental Action Network v. EPA*, 955 F.3d 1088 (D.C. Cir. 2020) (*LEAN*), that case addressed EPA's review of the emission standards for pulp mill combustion sources.  *Id.* at 1090.  The court held that EPA must, in its Section 112(d)(6) review, add emission limits for HAPs that EPA did not regulate during its initial Section 112(d)(2) regulatory process.  *Id.* at 1096.  *LEAN* had nothing to do with the *revision of existing* emission standards generally, and nothing to do with power plants specifically.  *LEAN* consequently provides no support for EPA's position that Section 112(d)(2)'s achievability requirement should play any role in a Section 112(d)(6) analysis.

\*     \*     \*

Section 112(d)(6) gives EPA no license to ignore the absence of public health benefits when revising Section 112 regulations, especially power plant regulations. Congress chose to treat power plants differently from other stationary sources to protect the public from excessive electricity costs, and thus allowed EPA to regulate power plants only if necessary to protect public health.  Both with respect to the initial decision to regulate power plants under Section 112, and for the decision whether to revise them, EPA's inquiry into what is "necessary" must consider benefits to public health.  EPA's contrary interpretation would disregard Congress's

careful treatment of power plants in Section 112 and impose financial burdens on consumers that Congress sought to avoid.

### B.   EPA Did Not Identify Any "Development" in the Rule that Authorizes Revising Emission Standards Under Section 112(d)(6).

EPA now claims in its brief that the "developments" that support its revision of the emission standards include trends in control efficiency, costs, and technological improvements since 2012.  EPA Br. 38.

But that is not what EPA stated in the rulemaking.  EPA's rationale was as follows:

In the proposed rule, EPA said:

Although our review of fPM compliance data for coal-fired EGUs indicated no new practices, processes, or control technologies for non-Hg metal HAP, it revealed two important developments that inform the EPA's decision to propose revisions to the standard.  ***First,*** it revealed that most existing coal-fired EGUs are reporting fPM well below the current fPM limit … ***Second,*** it revealed that the fleet is achieving these performance levels at lower costs than assumed during promulgation of the original MATS fPM emission limit.  J.A.0333, 0347(88 Fed.Reg. 24854, 24868 (Apr. 24, 2023)) (emphasis added).

In particular, with respect to the standard for fPM … and the standard for Hg from EGUs that burn lignite coal, the EPA proposes to conclude that developments since 2012 – and in particular the fact that the majority of sources are vastly outperforming the MACT standards with control technologies that are cheaper and more effective than the EPA forecast … warrant strengthening these standards. J.A.0335(88 Fed.Reg. at 24856).

And in the final Rule, EPA said:

…our judgments regarding developments in fPM control technology for the revised fPM standards as a surrogate for non-Hg HAP metals largely reflect that the fleet was reporting fPM emission rates well below the current standard

16

and with lower costs than estimated during promulgation of the 2012 MATS Final Rule … J.A.0001, 0019(89 Fed.Reg. 38508, 38519 (May 7, 2024)).

In other words, EPA's theory about what may lawfully constitute a "development" under Section 112(d)(6) is that (1) power plants have been meeting the 2012 standards (2) at lower costs than previously estimated. That is fundamentally different from what the agency now claims in its brief (i.e., trends in control efficiency, etc.). The Court should reject EPA's *post hoc* rationalizations. *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 213 (1988).

Furthermore, what constitutes a "development" under Section 112(d)(6) is a question of statutory construction to which the court owes EPA no deference under *Loper Bright*. This Court must evaluate whether EPA's interpretation of Section 112(d)(6) is "the best reading of the statute"—and, for all of the reasons set forth in Petitioners' brief, it is not. Pet. Br. 46-49.[2]

If EPA's statutory interpretation is upheld, it would strip away the limits on EPA's authority that Congress intentionally imposed under Section 112(d)(6). Regulated entities must meet MACT standards at all times, and they must do so with a compliance margin. Interpreting that compliance as a "development" would allow

---

[2] EPA acknowledges that simply meeting the prior emission standards is not, in and of itself, a "development," stating: "Fair enough. But that misses the point." EPA Br. 42. Petitioners do not miss the point; they make precisely the right point. And EPA apparently concedes that the statutory construction utilized by the agency in the Rule itself is not reasonable, let alone "the best."

(or perhaps require) EPA to revise downward every one of the hundreds of MACT standards at least every 8 years in perpetuity. EPA itself has acknowledged that is not what Congress intended. J.A.2010, 2026(70 Fed.Reg. 19992, 20008 (Apr. 15, 2005)) ("We reiterate that there is no indication that Congress intended for section 112(d)(6) to inexorably force existing source standards progressively lower and lower in each successive review.").

Perhaps recognizing this flaw in its statutory interpretation, EPA now claims, in its briefing, that there have been "incremental" technological and other improvements that constitute "developments" here. The Court should reject EPA's new argument for several reasons.

First, it is *post hoc* argumentation. Although the Rule included passing references to the alleged "improvements" EPA now hangs its hat on, they were not the basis on which the standard was set, as described above.

Second, EPA does not dispute that the technologies for meeting the fPM and mercury standards (electrostatic precipitators and fabric filters for fPM and activated carbon injection for mercury) that formed the basis for the 2012 rule are the same today. Conceding this, EPA argues that "incremental improvements" in the performance of these technologies are a "development." EPA Br. 39-40. But such improvements do not pass EPA's own prior articulation of the test (*see* Pet. Br. 48-49)—they are not (1) technology that was not considered during development of the

18

original standard; (2) improvements in technology that could result in "*significant additional emissions reductions*"; (3) work practices not considered in the original rule; or (4) process changes that could be applied broadly to the industry that were not considered in the original rule. J.A.2142, 2155(76 Fed.Reg. 81328, 81341 (Dec. 27, 2011)) (emphasis added).

Third, as Petitioners explained in their brief (Pet. Br. 49), those purported incremental developments are simply "makeweights," because EPA did not correlate its ratcheting down of the emission standards to any of the alleged developments. EPA did not, for example, say in the record that it was basing the lower fPM standard on emission reductions achieved by increased baghouse durability or that it was the lowering the mercury emission limit based on improvements in brominated carbon injection. In other words, EPA did not demonstrate any rational connection between the emission reductions it requires and the developments it now purports to find.

In response, EPA cites *Surface Finishing*'s statement that Section 112(d)(6) does not require EPA to identify a nexus between each distinct development and the revised standards. EPA Br. 40. However, at least as to the nexus requirement, *Surface Finishing* actually supports Petitioners' interpretation. The Court in *Surface Finishing* noted EPA had "examined what emissions levels could be achieved using various add-on control devices and fume suppressants … [and] provide[d] details regarding the costs and emissions reductions identified, and evaluated in the course

of arriving at its conclusion that specified…best-available control technologies could cost-effectively meet more stringent emissions standards."  795 F.3d at 11. But here, EPA never performed an analysis of what reductions would be expected based solely on the "developments" that it now claims serve as the basis for revising the standards.  If the Court accepts EPA's "no nexus" approach to Section 112(d)(6), it will create a precedent whereby EPA could roam trade journals looking for theoretical improvements in technology, then ratchet down emission standards by amounts untethered to any demonstration that such reductions are justified.

EPA also relies on *Surface Finishing* to support its capacious interpretation of the word "development."  EPA Br. 41-42.  Petitioners already addressed those arguments in their opening brief.  *See* Pet. Br. 51-53.  It is worth reiterating that the *Surface Finishing* court explicitly applied "the familiar deferential standard announced in *Chevron*."  795 F.3d at 7.  Today, however, this Court must exercise its independent judgment in deciding whether EPA's interpretation of "development" is the best reading of the Clean Air Act.  *Loper Bright*, 144 S. Ct. 2244, 2273 (2024).

Petitioners also argued that mandating the use of CEMS for fPM compliance monitoring is not authorized by Section 112(d)(6), and EPA responded that CEMS is an "emission standard."  EPA Br. 45-46.  But the definition of emission standard EPA quotes includes: "any requirement relating to the operation or maintenance of a source to assure continuous emission reduction."  *Id.* (quoting 42 U.S.C.

§ 7602(k)).  CEMS do not "assure" continuous emission reduction.  The operative part of the definition, which EPA does not cite, refers to a "requirement … which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis ...".  42 U.S.C. § 7602(k).  A monitoring device has no capability to reduce emissions; it only *measures* reductions.  It is not therefore an emission standard.  If there is any doubt, EPA's interpretation here contravenes its own regulations.  40 C.F.R. § 63.2 (CEMS "is used for demonstrating compliance with an applicable regulation on a continuous basis…").  EPA has no authority to revise CEMS under Section 112(d)(6), nor does a general monitoring authorization provision prop up EPA's position.  *Contra* EPA Br. 46 (citing 42 U.S.C. § 7414(a)(1)(C)).

Regardless, EPA did not address Petitioners' argument that there have been no developments in CEMS technology.  Therefore, EPA's about-face to mandate the use of CEMS was not allowed under Section 112(d)(6).  Pet. Br. 51.

## II.    THE RULE IS ARBITRARY AND CAPRICIOUS.

The Rule is arbitrary and capricious because EPA's own record demonstrates that its enormous costs are balanced against no relevant meaningful public health benefit.  The Rule is also arbitrary and capricious because EPA's revised emission limits are based on unsupported and arbitrary data, EPA did not adequately consider

the rule's substantial impacts on the power grid, and the Rule is pretextual.  *See Motor Vehicle Mfrs. Ass'n v. State Farm,* 463 U.S. at 43.

### A.    EPA Improperly Disregarded its Cost-Benefit Analysis Demonstrating the Absence of Any Meaningful Benefits.

As explained above, EPA's failure to consider the relevant public health benefits (or lack thereof) of the Rule is contrary to the statute.  Even setting that aside, under ordinary principles of administrative law, it is arbitrary and capricious and not "rational … to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."  *Michigan*, 576 U.S. at 752.

EPA acknowledges that rulemaking under Section 112(d)(6) requires appropriate consideration of both costs and benefits.  EPA Br. 48-49; *see also* J.A.0046(89 Fed.Reg. at 38553) (claiming that "when all of the costs and benefits are considered (including nonmonetized benefits), this final rule is a worthwhile exercise of" the agency's authority).  Yet EPA does not dispute that:

- The Rule does not produce a single quantified benefit related to the mandated reduction in HAP emissions.  J.A.0004(89 Fed.Reg. at 38511);

- EPA may not rely on the alleged ancillary benefits of the Rule to justify its costs (Pet. Br. 20)—indeed, EPA does not even mention the alleged ancillary benefits of in its response; and

22

- Even if alleged ancillary benefits are counted, the costs outweigh the quantified benefits by more than $400 million.  Pet. Br. 55.

Instead, EPA responds by saying that a quantified cost-benefit analysis is unnecessary.  EPA Br. 48, 53.  Petitioners never disputed this point.  Pet. Br. 54-55.  Rather, Petitioners argued that reasoned decision-making requires substantive attention to advantages and disadvantages, and that it is arbitrary to require massive costs for de-minimis (if any) relevant benefits.  *Id.*  There is no dispute that EPA has concluded that, without the Rule's more stringent standards, public health is already protected, with an ample margin of safety.  In fact, risk to public health was so immaterial, it was an order of magnitude below the level at which Congress has said EPA could deregulate the source under Section 112 entirely.  Pet. Br. 13-14.  And EPA's refusal to quantify the Rule's alleged relevant benefits, should cast a shadow of skepticism, because "[w]ithout quantified benefits to compare against costs, it is not apparent just how the agency went about weighing the benefits against the costs." *GPA Midstream Ass'n v. DOT,* 67 F.4th 1188, 1200 (D.C. Cir. 2023); *see also Michigan,* 576 U.S. at 752.

EPA's response is to simply posit that emission reductions would result in less exposure to the substances in the emissions.  EPA Br. 52-53; J.A.0004(89 Fed.Reg. at 38511) (EPA "expects that emission reductions under the final rulemaking will result in reduced exposure to Hg and non-Hg HAP metals.").  But EPA failed to close

23

the loop and make any determination that the Rule's lower levels of HAP exposure would result in *any* actual public health benefit, let alone one that could rationally justify the costs of the Rule.

Indeed, given the *extremely* low levels of HAP emissions at issue, EPA's inability to demonstrate any public health benefit from further reduced exposure is unsurprising. There is no record evidence that the already miniscule 0.344-in-a-million cancer risk of adverse health effects (i.e. the risk for which HAPs are listed or delisted) will be further reduced by the mandated reduction in HAP emissions. J.A.1489-1490(NACCO Cmts. at 15-16 (citing RRA, Appx. 10, Tbls. 1, 2a)). Nor can the alleged non-cancer health impacts EPA discusses (EPA Br. 4) change the calculus, given that EPA has previously noted the non-quantifiable, non-morbidity costs related to HAPs are themselves a "small fraction" of already-miniscule cancer risks. J.A.2375, 2385-2386, 2393(85 Fed.Reg. 31286, 31296-97, 31304 (May 22, 2020)). If arbitrary and capricious review is to be given any meaning, a rule must be vacated where an agency imposes substantial costs with "no meaningful benefit." *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 966 (5th Cir. 2023); *see also Michigan*, 576 U.S. at 752.

Even the case law on which EPA principally relies does not support its position. *See* EPA Br. 55 (discussing *Sinclair Wyo. Refining Co. v. EPA*, 101 F.4th 871 (D.C. Cir. 2024)). *Sinclair* considered challenges to the Renewable Fuel

Standards Program, which was enacted by Congress to encourage greater energy independence and reduce greenhouse gas emissions. *Id.* at 889. This Court found that in establishing the Renewable Fuel Standards Program, "the statute Congress drafted is designed to yield benefits that it deemed important but understood are not easily monetizable." *Id.* Because renewable fuels are more expensive, "Congress adopted a 'market forcing policy' intended to 'overcome constraints in the market' by creating demand pressure to increase consumption of renewable fuels." *Id.* Even so, EPA still monetized the benefits that it could and supplied "an array of calculations to help contextualize the Final Rule." *Id.* at 890.

*Sinclair* stands in sharp contrast to both the statutory background and EPA's actions here. There is no indication that Congress intended Section 112 to be a "market forcing policy" that created "demand pressure" such that the agency should consider, let alone prioritize, benefits that were not easily monetized. To the contrary, Congress's stated purpose under Section 112 is to protect against the "threat of adverse human health effects" or "adverse environmental effects" by regulating specifically enumerated HAPs. 42 U.S.C. § 7412(b)(2). These are "effects" that EPA regularly monetizes in considering whether and how to regulate. *E.g.*, J.A.2182 (77 Fed.Reg. at 9425). Notably, EPA did monetize at least some such benefits in the original MATS rule but chose not to do so here. Pet. Br. 56.

25

**B.      EPA's Cost-Effectiveness Analysis is Arbitrary and Capricious.**

There is no dispute that the Rule is among the least cost-effective rules EPA has ever adopted in terms of costs imposed per amount of HAP emissions reduced. Pet. Br. 58; J.A.0016(89 Fed.Reg. at 38523).  Indeed, the Rule explicitly recognized that the cost-effectiveness values here are significantly higher than ratios EPA has found to be not cost-effective in prior rules.  *Id.*  Those prior rules addressed the same pollutants and under the same Section 112(d)(6) standard.  *Id.*

EPA engages in handwaving to dismiss the stark cost-ineffectiveness of the Rule's revised fPM standard, stating that comparing this Rule to prior rulemakings is "inapt" because the latter regulated different industries.  EPA Br. 50.  But EPA does not offer any explanation of why prior rulemakings should not be taken into account, especially as EPA "will often consider what estimates it has deemed cost effective in prior rulemakings" when evaluating the cost-effectiveness of a rule. J.A.0017(89 Fed.Reg. at 38524).  Indeed, EPA did so in *every* rulemaking it pointed to as support for its novel cost considerations in this Rule. Pet. Br. 59.  The whole point of a cost-effectiveness calculation is to compare multiple factors, including cost-effectiveness across different industries and in prior rulemakings.  *Sierra Club v. EPA*, 353 F.3d 976, 986 (D.C. Cir. 2004).

Moreover, EPA's defense of its cost-effectiveness ratio is made worse by the fact that it egregiously undercounts the number of facilities that must install

additional controls.  For instance, EPA claims that only 33 units will incur compliance costs.  J.A.1560-1561(2024 Technical Memo at 16-17, Tbl. 4).  But far more than 33 units will need to incur costs to comply with the revised fPM standard; it is simply untrue that most power plants have already paid for the necessary controls.  *Compare* EPA Br. 51 *with* Pet. Br. 69 and *infra* Section II.C.  EPA has continually failed to engage with the crucial points Petitioners raise, and instead promulgated a historically cost-ineffective rule with no reasoned justification.

Further, EPA's argument that compliance costs will be a "'small fraction' of power plants' revenue" is misleading at best.  EPA Br. 51.  "Power plants' revenue" is not a relevant measure when EPA itself claims that 90% of the power sector will not incur costs of the Rule.  But EPA cannot have it both ways; either EPA is correct that only 33 units must incur compliance costs, in which case the revenue of an entire industry is an irrelevant measure, or Petitioners are correct that many more facilities must install additional costly emissions controls, in which case EPA has failed to acknowledge (much less consider) that costs are necessarily much higher than EPA claims.  Pet. Br. 70; *infra* at Section II.C.

Nor can the cost-ineffectiveness of the revised fPM standard be justified by pointing to the supposed cost-effectiveness of the revised mercury standard.  But that is precisely how EPA tries to justify its cost-effectiveness ratio here.  EPA Br.

51.  That is nonsensical, and also inaccurate, considering the numerous flaws in EPA's mercury cost analysis discussed *infra*, Section II.C.

Finally, perhaps most egregious is EPA's new claim that it "accounted for a compliance margin in the revised surrogate standard," and therefore did not underestimate compliance costs.  EPA Br. 63.  This *post hoc* rationalization directly contradicts the Rule's statement that "EPA disagrees with commenters that a compliance margin needs to be considered in the cost analysis."  J.A.0015-0016(89 Fed.Reg. at 38522-23).[3]  And EPA's failure to include a compliance margin in its cost estimates means that it underestimated costs, making the costs of the Rule even larger.

## C.    EPA's Grid Reliability Analysis is Arbitrary and Capricious.

EPA's briefing on grid reliability, much like its response to comments during the rulemaking process, fails to engage with the facts and law presented.  EPA does not dispute that for Section 112, "'[c]osts' can mean many different things, including the cost associated with increased risk" of grid unreliability.  *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015).  EPA claims that it "has expertise to assess the impacts of its regulations on grid reliability," but cites nothing to support that statement other than the existence of the Clean Air Act.  EPA Br. 75.

---

[3] It is further belied by EPA purporting to analyze—*arguendo*—the effect of accounting for a 20% compliance margin but then arbitrarily ignoring the results. *See* Pet. Br. 71.

In reality, "EPA has no expertise on grid reliability." *Texas v. EPA*, 829 F.3d. 405, 432 (5th Cir. 2016). Due to that lack of expertise on grid reliability, "EPA 'must support its arguments more thoroughly than in those areas in which it has considerable expertise and knowledge.'" *Id*. EPA does not do so.

EPA's insistence on pushing aside warnings from grid operators, states, and industry that its assumptions regarding power grid reliability were incorrect "simply ignore[s] 'an important aspect of the problem,'" which is the hallmark of arbitrary and capricious decision-making. *Ohio v. EPA*, 144 S. Ct. 2040, 2051 (2024) (citation omitted); *see also Del. Dep't of Nat. Res.*, 785 F.3d at 14 ("EPA should have, but did not, respond properly to their well-founded concerns" about grid reliability). The record is devoid of evidence showing that EPA meaningfully considered input from the current grid operators or power plants in its grid reliability modeling inputs, or that it changed those inputs in response to comments.

EPA's defense of its "state-of-the-art, peer-reviewed model," is yet another strawman argument. EPA Br. 75-76. Petitioners' argument is not that EPA's model was inappropriate, but instead that EPA unreasonably ignored real-world evidence that the model inputs were glaringly incorrect. Pet. Br. 62-63. Even the best model falls prey to "garbage in, garbage out." Consequently, EPA's reliance on *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1037 (D.C. Cir. 2001) is misplaced.

29

*Appalachian Power* does not suggest that an agency can ignore problems with the inputs to its model, even where the model is otherwise appropriate.[4]

Although EPA claims that it "*did* consult other Federal agencies, reliability experts, and grid operators," EPA Br. 75, there is still no evidence in the record that it did so. EPA's sole response is to point to an interagency cooperation memo that pre-dates this rulemaking and does not document any specific inter-agency consultations in connection with *this* Rule. EPA Br. 75. In fact, the record shows that EPA ignored the grid operators' warnings about the proposed rule. Pet. Br. 61-62. Specifically, the evidence fails to show EPA meaningfully considered information that the nation's power grids are in a materially different and more precarious position than they were in 2012. *Id.* at 63.[5]

---

[4] Notably, *Appalachian Power* cites to *Environmental Action, Inc. v. FERC*, 939 F.2d 1057, 1064 (D.C. Cir. 1999) for the statement that "it is within the scope of the agency's expertise to make such a prediction about the market it regulates." But the agency in that case was not EPA—*it was FERC*. FERC has expertise in grid reliability; EPA does not.

[5] EPA doubles down on the assertion that blackouts and grid reliability issues are unlikely because if EPA ends up being wrong, and the Rule causes coal-fired EGUs to no longer be commercially viable, State and regional regulators would be able to use temporary emergency powers to prop them up and prevent them from retiring. EPA Br. 76-77. But "EPA [cannot] excuse its inadequate responses by passing the entire issue off onto a different agency." *Del. Dep't of Nat. Res*., 785 F.3d at 16.

**D.    The Record Does Not Support the Rule's Revised fPM and Mercury Emission Standards.**

EPA's insistence that power plants can meet the Rule's revised standards in the face of its own contrary record is arbitrary and capricious. *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1167 (D.C. Cir. 2020) ("unexplained decision to disregard [evidence in the record] was arbitrary and capricious").

**1.    EPA's fPM Analysis Is Fatally Flawed.**

EPA's fPM analysis is woefully inadequate and its assumptions and conclusions are unsupported, or even run counter to, the (truncated) evidence in the record. Most notably, EPA's determination that coal-fired power plants can meet the revised fPM standard based on an analysis of an average of quarterly emissions data suffers from at least two fundamental flaws: first, EPA selectively examined only a fraction of the quarterly data from a small fraction of coal-fired power plants; and second, EPA either doesn't understand, or misconstrues, what the "average" means.

As to its selective use of quarterly data, despite having access to all quarterly emissions data for the last eight years, EPA admits it only examined all quarterly data for just 20% (62 of 296) of coal-fired units. EPA Br. 62. For 70% of coal-fired units, EPA only reviewed somewhere between one and four quarters of the 28 quarters of available data (between 3.5% and 14% of available information). *See* J.A.1595(2024 Technical Memo, Attach. 1). Further, for units that reported data based on performance stack tests, EPA only generally examined a single stack test,

31

which encompasses three one-hour runs worth of data, and then extrapolated those results to the last *eight years* of operation. J.A.0029(89 Fed.Reg. at 38536). EPA tries to defend using this arbitrarily and inconsistently truncated dataset by claiming it is an "expanded" dataset that "affirmed [in the final Rule] EPA's analysis based on the initial smaller data set" in the proposed rule. EPA Br. 61. But EPA's "expanded" data set still accounted for less than a quarter of all coal-fired units. That one shoddy analysis "affirms" an even shoddier analysis does not make either reasonable.

EPA then averaged the quarterly data it considered for each unit and, based on the *average* emissions from this inadequately small data sample, concluded that 89% of units "can *consistently* meet the revised standard." EPA Br. 58 (emphasis added). But this is not what an average means. An average represents the mid-value of a data set. It does not indicate the value of most of the data points, and does not reflect consistent achievability.

As an illustrative example, assume that EPA is considering a proposed gas mileage standard for a car of 25 miles-per-gallon and that EPA has data on the actual gas mileage of the car for three separate days. The results are: 20, 23, and 32 miles-per-gallon. The average, based on these three days, is 25 miles-per-gallon. By EPA's reasoning, this car has "consistently achieved" a daily mileage standard of 25 miles-per-gallon, and therefore can meet the new standard indefinitely with no upgrades. This is nonsense. Unless the data is simply a series of identical measurements of

32

25, then at least some of the data must be less than 25. This alone makes it impossible for an average to demonstrate continuous compliance. The car has not "consistently" achieved a gas mileage of 25 miles-per-gallon. Indeed, it performed in compliance with that "average" standard only once, or 33% of the time.

EPA attempts to distract from the flaws in using an average to represent what a unit can "consistently" achieve by claiming that Salt River Project's Coronado Generating Station has "consistently" achieved a rate lower than 0.010 lb/MMBtu and had an average quarterly emissions rate that exceeded 0.010 lb/MMBtu in "only 5 quarters" out of 20. EPA Br. 62. But 5 quarters is still 25% of the time. That is not "sporadic," as EPA claims (*id.*), and empirically demonstrates that Coronado did *not* "consistently" achieve 0.010 lb/MMBtu. Worse, EPA's brief misinterprets (or mischaracterizes) the data. What EPA analyzed, averaged, and then based all of its calculations upon in *the rulemaking* is the 99th percentile rate of each quarter, *not* the average rate in the quarter. In other words, the Coronado data shows that Coronado had a 99th percentile quarterly rate (the green bars in the Coronado Chart) higher than 0.010 lb/MMBtu in 12 out of 20 quarters—more than half the quarters. The straight quarterly averages (the grey bars in the Coronado Chart that EPA counsel latches upon) do not represent consistent emissions performance.

In a final attempt to bridge the gap between the data and its conclusions, EPA simply declares that because the 0.010 lb/MMbtu limit was not in place, "there was

no reason Coronado would have tried to keep emissions" below that limit; therefore, Coronado likely *could* meet the limit if it was trying. EPA Br. 62. EPA's claim is pure conjecture and lacking in any record support.

The record contains no evidence that EPA investigated whether there were factors that contributed to the facility meeting the revised standard for the few quarters that it did, versus those that contributed to it *not* meeting the standard on the vast majority of days. Had it done so, EPA would have realized that fPM controls, like gas mileage, can be affected by a myriad of factors.

When faced with these issues during the comment period, EPA refused to examine all the data because it was too "time-consuming." J.A.1547(2024 Technical Memo at 3). But EPA does not have unfettered discretion to select an unreasonable dataset, particularly where full data is available *and in its possession*, because the agency just didn't want to spend the time to look at the full data set. EPA Br. 61. *See Sierra Club v. Costle*, 657 F.2d 298, 333 (D.C. Cir. 1981). EPA's reliance on *NRDC v. EPA* to support its position is misplaced. EPA Br. 60-61. The issue in *NRDC* was that EPA chose one of two data sets to rely on, and when Petitioners disagreed with EPA's choice, the Court upheld EPA's selection. 529 F.3d 1077, 1086 (D.C. Cir. 2008). Here, there is one data set, and the issue is whether EPA can arbitrarily rely on a small and unrepresentative fraction of that dataset. EPA cherry-picked a fraction of available data and is using that sub-set as the sole basis for its

revised emissions limit.  Accordingly, EPA's assertion that a unit that has previously met the emissions rate on average will "consistently meet the revised standard" (EPA Br. 59) is arbitrary and capricious.

Finally, in response to Petitioners' assertion that any standard must include a compliance margin, EPA states that it did consider a compliance margin by setting the emission limit above what most coal-fired units were emitting on average.  EPA Br. 63.  This argument is *post hoc* rationale, made only in EPA's brief, and cannot justify the rule.  *See supra* at II.A.  Regardless, any compliance margin based on the average performance of the units is meaningless, for the same reasons that an average does not represent what a unit can "consistently" achieve.

### 2.    EPA's Mercury Standards are Infeasible and Fatally Flawed.

The new mercury emission standard for lignite-fired units is also infeasible and based on a reverse-engineered justification entirely unsupported by the record.

When stripped of its varnish, EPA's revised mercury limit for lignite-fired power plants is based on: (1) 90% removal assumptions derived from a fourteen-year-old study reporting results from only one lignite unit; (2) data from a single lignite facility (Twin Oaks) that has occasionally, *but not continuously*, achieved the revised standard; and (3) conflating the unique characteristics of lignite with the characteristics of non-lignite coal.  EPA's decision to lower the mercury standard is arbitrary and capricious because there is *no* data in the record that demonstrates

achievability or underpins the selection of 1.2 lb/Tbtu as the new mercury standard. That EPA's "analysis" for lignite units landed precisely on the same emissions rate as for non-lignite units shows that EPA started with the end in mind and simply attempted to justify its pre-determined goal.

It is revealing that EPA's brief fails to defend the complete lack of data supporting its 90% mercury removal assumption, which forms the entire foundation for its conclusion that the revised standard is feasible. Pet. Br. 66. Instead, EPA reiterates its unproven theory that lignite-fired plants can simply "dial-up" levels of the control technology by injecting large quantities of brominated activated carbon injection (or "sorbent") to remove mercury. EPA Br. 65. But there is no evidence in the record to support EPA's theory. EPA concedes that "dialing up" sorbent will not remove mercury past 90% in lignite units—the removal efficiency which EPA claims is needed to meet the revised limit. J.A.1577(2024 Technical Memo at 34). Although EPA's house of cards relies on this important 90% assumption, EPA provides only one source to support its claim—the 2012 Beyond-the-Floor Memo, which references a trade publication article (Sjostrom (2010)), that does not report the underlying emissions data. EPA's conclusion that lignite facilities can simply "dial-up" the technology to the levels required in the Rule lacks any basis.

EPA reverts back to the preamble of the 2012 MATS Rule that references three lignite units that EPA found achieved 95% reduction based on a 2010 Information

Collection Request (ICR) data. EPA Br. 68 (citing J.A.2173(77 Fed.Reg. at 9304)). What EPA omits is important context. First, the Final Rule did not rely on these three units as a basis for reducing the mercury standard. Second, EPA conceded in its 2012 MATS Rule that the mercury removal percentages from the ICR data are not reliable. J.A.2179(77 Fed.Reg. at 9393) ("[W]e are not sure whether these [ICR] data accurately reflect the total percent reduction mine-to-stack because we do not have all the data necessary to make that determination"). And third, those facilities that purportedly achieved 95% reduction only did so to meet the 4.0 lb/TBtu standard—*not the new standard of 1.2 lb/TBtu*. *Id.*

EPA also claims that lignite units achieve sufficient mercury emission reductions based on its calculations that only seven units would need to achieve over 90% removal. EPA Br. 67-68 (citing Final Rule, Table 7). However, EPA still does not have mercury inlet data (lignite coal content) for many of these units, so this estimate is also unreliable. *See* Pet.-Inter. Br. 20-24. The mercury inlet data EPA used is merely an average which EPA made up and plugged in. *Id*. at 24-27.

EPA next attempts to justify its revised mercury emission limit by using data from one facility in Texas, Twin Oaks, which has occasionally achieved the revised standard, Pet. Br. 73, to extrapolate that the revised limitation is feasible across the entire industry. EPA Br. 68. However, much like the scarce fPM data, these data are based on short-term demonstration testing results that do not establish whether

37

lignite-fired plants can meet the standard on a continuous basis. J.A.0032-0033(89 Fed.Reg. at 38539-40). EPA also does not account for the variations between different lignite seams nationwide and different boiler technologies used between facilities. *See* Pet. Br. 74. The record indicates that Twin Oaks has only met the standard at certain times, Pet. Br. 73, and it is unreasonable for EPA to assume, based only on a few data points from one facility, that every lignite-fired facility in the country can continuously meet the standard under more adverse conditions. *See White Stallion*, 748 F.3d at 1251 ("To be 'achievable,' a standard must be capable of being met under most adverse conditions which can reasonably be expected to recur").

Finally, EPA looks to other types of coal to support the revised standard for lignite-fired units. First, it looks to subbituminous coal. EPA Br. 66. However, while both subbituminous and lignite coal have low halogen content, lignite coal has a much higher sulfur content than subbituminous coal which decreases the effectiveness of sorbents used to control mercury emissions. Pet. Br. 78. EPA claims that it considered the additional challenges faced by lignite coal (EPA Br. 16), but then only points to the success of bituminous coal plants—an entirely different type of coal that has different characteristics than both subbituminous and lignite coal— as evidence that lignite-fired plants can also meet the revised standard. EPA Br. 66-67. In so doing, EPA blends characteristics of bituminous and subbituminous coal,

but ignores that lignite has established compositional differences from *both* (which EPA has itself acknowledged, J.A.0033(89 Fed.Reg. at 38540)). In short, EPA fails to address whether *lignite* units can actually meet the revised limit based on the characteristics of *lignite*.

EPA's mercury compliance cost estimate is equally deficient. Petitioners highlighted how the cost analysis fails to include the cost of upgrading mercury control equipment. Pet. Br. 68. EPA itself acknowledged that some equipment upgrades may be needed to inject sorbent at a higher rate. *See* J.A.1694-1695(Response to Comments at 99-100). But EPA's brief directly conflicts with its prior position. EPA Br. 73-74 ("And the record supports EPA's conclusion that units need only utilize those [existing] systems...."). In any case, equipment costs were not considered, Pet. Br. 69, which is a significant omission that results in substantially undercounting compliance costs.

To summarize, the record does not establish that lignite-firing units will be able to meet the Rule's revised mercury emission standard. And EPA's decision to lower the mercury standard through inadequate and mischaracterized data should be rejected. *Clean Wisconsin*, 964 F.3d at 1167 ("unexplained decision to disregard [evidence in the record] was arbitrary and capricious").

### E.   EPA's Response Addressing Colstrip-Specific Issues Demonstrates the Agency's Arbitrary and Capricious Rulemaking.

EPA's response fails to seriously engage with, or sometimes even address,

Petitioners' Colstrip-specific arguments.  It either rehashes the Agency's poor analysis from the record, or to bolster it, uses extra-record facts or *post hoc* rationalizations that fare no better (and which the Court should not consider).  *SEC v. Chenery*, 318 U.S. 80, 95 (1943).  This is unsurprising given EPA's failure to meaningfully address Colstrip Petitioners' comments on these same points in the record.  EPA's conclusory responses to comments, and failure to meaningfully analyze issues raised by Colstrip Petitioners, is textbook arbitrary and capricious rulemaking.  *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).  This requires reversal, or at minimum will require EPA to address these shortcomings on remand.

EPA's response asserts that Colstrip Petitioners seek special treatment.  Yet the Rule affects Colstrip in a unique way.  EPA was informed that this Rule, in conjunction with the GHG rule, risks Colstrip retiring prematurely from which severe consequences would follow.  Under those circumstances, it was incumbent on EPA to analyze the information provided in comments and seriously consider whether the Agency adequately evaluated the risks/benefits.  Instead, EPA dismissed Colstrip as a bad actor and ignored Colstrip's comments in favor of its own (unfounded) assumptions.  This Court's precedent requires more.

### 1.     EPA Vilifies Colstrip to Distract from the Rule's Defects.

EPA begins the short Colstrip section of its brief vilifying Colstrip as a

laggard.   The relevance of this is questionable.   But the premise is also incorrect.  Colstrip has invested in effective control technology to comply with the existing standard.   The record demonstrates that Colstrip's baseline emission rate was 0.018 lb/mmBtu for Unit 3 and 0.021 for Unit 4, both well below the standard of 0.03 lb/mmBtu.  J.A.0421(2023 Technical Memo at 46).  EPA's response invokes a single compliance issue resolved more than six years ago, but EPA ignores that Colstrip undertook a lengthy and costly process to improve the control technology's performance to ensure ongoing compliance with the existing standard.   Colstrip has over-complied since then.  J.A.1077-1078(Talen Cmts. 4-5).

EPA acknowledges that facilities are economically rational.  EPA Br. 49 ("Had costs [to meet the existing standard] been unreasonable, those investments would not have happened.").  Yet EPA treats Colstrip like a bad actor that deserves to have its comments ignored.   For example, EPA states that Colstrip faces higher compliance costs given its "decision not to invest in modern particulate matter controls … when all its peers already have."  EPA Br. 80.  EPA also states that "even before EPA adopted the new standard, almost all coal-fired units had invested in the emission controls required to meet it."  *Id.* at 64.  These statements are disingenuous at best.  Colstrip, like other units, invested in controls necessary to meet the current standard—not some future hypothetical standard.  The fact that other units chose a different technology does not make Colstrip a bad actor.  Colstrip acted prudently to

take necessary actions to comply with applicable standards. This compliance decision was even more justified since EPA itself had determined that no further controls were necessary as recently as 2020. J.A.2375(85 Fed.Reg. 31286 (May 22, 2020)).

EPA's response makes even less sense because it ignores that there is no meaningful health risk from Colstrip's current HAP emissions. Pet. Br. 82; *see also* J.A.0118-0130(RRA, Appx. 10, Tables 1 and 2a) (one cancer case every 17,182 years). Importantly, EPA's response carefully ties its aspersions to "particulate matter," not the Rule's original assertion that "higher levels of *toxic metal emissions*" in communities around Colstrip are "what the revised standards seek to remedy." J.A.0017(89 Fed.Reg. at 38524) (emphasis added). EPA's abandonment of the Rule's rationale in the face of Petitioners' comments and briefing is dispositive, since the Rule can be upheld "only on the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758.[6] EPA's vilification is meant to distract this Court from EPA's failure to grapple with Colstrip Petitioners' comments.

---

[6] The only (extra-record) response EPA now provides is that Colstrip could demonstrate compliance through testing speciated HAPs instead. EPA Br. 82. This Court should ignore EPA's *post hoc* rationalization, which merely is an attempt to flip the burden of proof to Colstrip. *NRDC v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014) (discussing EPA's "duty to examine 'key assumptions as part of its affirmative burden of promulgating and explaining" a rule).

### 2. EPA's Response Highlights the Arbitrary and Capricious Nature of EPA's Action.

#### a. Retirement Risk

In comments, Colstrip Petitioners highlighted the risk that Colstrip would be forced to prematurely retire due to the interactions between this Rule and the GHG Rule, with the potential for severe economic disruption and impacts on grid reliability and transmission. *See* Pet. Br. 83-87. Because EPA's nationally-focused model projected no power plant retirements, J.A.0019(89 Fed.Reg. at 38526); EPA Br. 76-77, 80, EPA never assessed the risks of Colstrip's premature retirement and the known and serious consequences that would follow. Even if retirement is not certain, it is sufficiently probable given information submitted by Colstrip Petitioners, that EPA could have—and should have—weighed those identified *risks* against the Rule's purported benefits to determine whether the Rule was warranted. EPA arbitrarily failed to undertake that analysis.

Nor did EPA meaningfully consider the interactions between the Rule and the GHG Rule on Colstrip. The record is silent, and EPA's response has one conclusory sentence on this point—that the Agency "examine[d]" such interaction. EPA Br. 80. EPA provides no details of that supposed examination—whether it assessed the risks identified by Colstrip Petitioners and how it weighed those risks in deciding to move forward with the Rule. EPA's silence here further demonstrates the Rule's arbitrary nature.

43

When EPA addresses retirement risks, it is only in the broad context of addressing grid reliability nationally for *all* power plants affected. *Id.* at 75-78. EPA failed to address regional grid impacts in Montana. Pet. Br. 90-92. And EPA's claims here are merely conclusory statements, *e.g.*, EPA Br. 77 (claiming petitioners proffered "no credible information" on grid reliability), especially when it comes to Colstrip-specific concerns. If NorthWestern's 500+ page comment letter package can be brushed aside as "not credible," it is unclear what would suffice.[7] Courts have rejected such an approach. *AT&T Wireless Servs., Inc.* v. *FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001).

### b.    Retirement Subcategory[8]

Given the premature retirement risks, Colstrip Petitioners requested a subcategory that could ameliorate those risks and allow an orderly shutdown in coordination with the GHG Rule, resulting in complete cessation of emissions. But because EPA did not assess the risks stemming from Colstrip's retirement, EPA also brushed off the subcategory in its rulemaking documents without reasoned analysis.

---

[7] State Respondent- Intervenors attempt to save EPA's lack of analysis by cherry-picking NorthWestern's comments. Mass. Br. 20. NorthWestern's comments advanced the *risk* of Colstrip's retirement multiple times. J.A.0966-0967, 0969, 0975, 0983-0984(NorthWestern Cmts. 2-3, 5, 11, 19-20).

[8] This Section is joined only by Colstrip Petitioners and Electric Generators MATS Coalition.

EPA's response rehashes the same flawed reasoning and attacks on strawmen, *post hoc* rationalizations, and justifications using non-record evidence.

EPA argues it "reasonably" declined to create a retirement subcategory because "only a few facilities" would be eligible.  EPA Br. 80-81.  Again, EPA ignored the rationale for the requested subcategory.  If not for these rules, Colstrip would not be retiring; the rules pressure Colstrip's retirement, necessitating a subcategory that Colstrip and other sources could opt into.  EPA never assessed whether such a subcategory would be positive or negative.  Instead, it created a different subcategory (one applying only to already announced retirements) that nobody suggested and rejected it.  And its statement that a retirement subcategory "would not have materially reduced overall compliance costs," EPA Br. 81, is nonsensical when Colstrip accounts for 42% of EPA's calculation of the Rule's costs.

EPA then strikes down another strawman.  EPA claims it "reasonably concluded that it was not a viable alternative to exempt 'potentially' retiring units, like Colstrip," since "[i]f EPA had exempted all 'potentially' retiring units … every coal-fired unit would presumably be exempted, as all plants will retire at some point."  EPA Br. 81.  This *post hoc* argument is found nowhere in the rulemaking record.[9]  For good reason: Colstrip Petitioners requested a subcategory that would

---

[9]  The organizational Respondent-Intervenors' one-sentence assertion that the proposed subcategory does not qualify as "classes, types, and sizes" under 42 U.S.C.

require retirement by a *date certain*.  Pet. Br. 93; J.A.1094-1095(Talen Cmts. 21-22) (by "December 31, 2035").  EPA resorts to strawmen because of the absence of anything meaningful in the record.  Indeed, the response's "Cf." citation to a hollow Response to Comment passage says it all.  EPA Br. 81 (citing J.A.1633(Response to Comments 38) ("The Agency has not previously subcategorized based on retirements under [Section 7412], and do[es] not find it appropriate to do so at this time.")).  Such dearth of explanation further highlights the need for a reversal.

Finally, EPA states it "considered" Colstrip's "statement that it *might* retire and reasonably declined to exempt Colstrip on that basis."  EPA Br. 80.  EPA again provides no record cite because there is not a single record statement that demonstrates any such consideration or presents that consideration as a basis for rejecting the retirement subcategory.  EPA's response seeks to bolster that alleged consideration by pointing to disagreements among Colstrip's owners concerning retirement.  *See id.* (citing to a declaration filed with Talen's stay motion).  Aside from being irrelevant because the retirement subcategory was meant to provide flexibility, EPA's reliance on this extra-record evidence underscores the Agency's

---

§ 7412(d)(1) similarly is not found in the rulemaking record.  NGO Br. 23.  It is also wrong.  *See Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 947 (D.C. Cir. 2004) (discussing EPA's flexibility in subcategorizing based on "class").  In the GHG Rule litigation, EPA agrees: "The word 'class' is capacious ... and easily covers distinctions between plants based on their operating horizon."  Brief of EPA 132-33, *West Virginia v. EPA*, No. 24-1120 (D.C. Cir. Nov. 1, 2024), ECF No. 2083166.

shortcomings in evaluating the request for a retirement subcategory. EPA cannot *post hoc* reason its way out of its failure to answer Colstrip Petitioners' comments.

### c.    Cost-Effectiveness

Colstrip Petitioners also commented on several flaws in EPA's cost-effectiveness evaluation and re-addressed them in the Opening Brief. Pet. Br. 86, 90. Colstrip Petitioners alerted EPA it had overestimated the amount of emission reductions that Colstrip would achieve if new controls were installed, leading EPA to underestimate the cost per ton removed. J.A.1087-1094(Talen Cmts. 14-21). EPA did not respond to these comments in the record. This is fatal because the comments challenge a core premise behind EPA's reasoning that the Rule was warranted. *See Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1288-89 (D.C. Cir. 2023). EPA's response contends it was justified in estimating that new fabric filters at Colstrip would slash emissions "by 90 percent, to just above 0.002 lb/MMBtu." EPA Br. 81. The record shows, however, that EPA only "assumed" that fabric filters would reduce emissions by 90%. The 2023 Technical Memorandum, for example, repeats five times that the 90% reduction is an "assumed fPM" rate for fabric filters. *E.g.*, J.A.0384(2023 Technical Memo at 9 ("This cost analysis assumes that a new FF reduces fPM up to 90%")). The 2024 Technical Memorandum, which is the Agency's more recent analysis (updated to address

comments), similarly lacks any Colstrip-specific analysis of emission reductions. J.A.1553-1554(2024 Technical Memo at 9-10).

EPA's response fails to articulate why the Agency ignored, without reason, Colstrip's technical, vendor-backed comments challenging EPA's *assumptions* pertaining to fabric filter emission reductions. *E.g.,* J.A.1087-1088, 1093(Talen Cmts. 14-15, 20) (challenging EPA's "assumption" given EPA's lack of engineering justification, Colstrip-specific information, and EPA's own contrary technical reports). EPA failed to meaningfully engage with these comments. It therefore did not assess whether a far less favorable cost-effectiveness would continue to warrant the Rule or impact the Agency's view of a retirement subcategory.

Furthermore, EPA's response fails to address other cost-effectiveness arguments raised regarding Colstrip. Most critically, EPA's response is silent as to Colstrip Petitioners' argument that EPA erred in failing to consider a far more reduced remaining life that would "yield astronomically high annualized costs" and thus poor cost-effectiveness. Pet. Br. 86, 90. These failures are fatal. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) (discussing EPA's duty "to examine and justify the [decision's] 'key assumptions'").

### F.     The Rule is Pretextual.

Finally, there is considerable evidence that EPA engaged in this rulemaking to impose retirement-inducing costs on coal-fired power plants as part of a regulatory

campaign to force a nationwide transition away from coal for putative climate change reasons. That evidence includes multiple public statements from the EPA Administrator, where he readily made it known that EPA would attempt to get around the Supreme Court's decision in *West Virginia v. EPA* by using "health-based" regulations—including MATS—to achieve climate change-related policy goals. It also includes materials produced through FOIA indicating that EPA briefed the White House Climate Office on a suite of rulemaking authorities that EPA could use against the power sector, including the MATS Rule.

To defend its actions in light of the Administrator's repeated statements, EPA invokes the presumption of regularity and asserts that the agency's explanation for its decision to promulgate this Rule—to reduce HAP emissions—should be taken at face value and not subjected to judicial scrutiny. EPA Br. 83-84. It's true that only in "unusual circumstances" will courts examine whether any agency's decision-making process for promulgating a rule matches its stated reason. *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). But given EPA's own record and public statements demonstrating that its basis for promulgating the Rule is not aligned with the reasons provided in the Rule, this is such a case.

Consequently, EPA's contention that the Court cannot consider extra-record evidence like press statements (EPA Br. 84), is mistaken. *Id.* at 782 (evaluating "pretext in light of all the evidence in the record before the court, including the extra-

49

record discovery"). Moreover, this is not a case where the Court must risk substantial intrusion into the Administrator's "mental processes," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), as his public statements already lay bare those motivations.

EPA also makes the conclusory claim the Administrator's statements and other extra-record materials don't evidence pretext, as "nothing in the Petitioner's extra-record evidence is 'incongruent'" with its explanation of the purpose of the Rule. EPA Br. 84-85. But there cannot be a "mismatch between the decision the [agency] made and the rationale [it] provided." *Dep't of Commerce*, 588 U.S. at 781. EPA's attempt to recast the Administrator's statements in the PBS interview as something innocuous (EPA Br. 84) conveniently ignores that the answer was in response to a question about how much of a setback *West Virginia v. EPA* was to EPA's "efforts to regulate greenhouse gases." Pet. Br. 101. And that is only one of several examples Petitioners cited (most of which EPA's brief doesn't even try to defend).

Though EPA may wish otherwise, its Administrator has said, publicly and repeatedly, that his agency would use "bread and butter" health-based regulations like MATS to get around the Supreme Court's *West Virginia* decision to target criteria pollutants and climate change. Pet. Br. 99-101. And then EPA did so with this MATS Rule, while claiming that the Rule was instead being promulgated to better protect against HAP emissions (which it doesn't do). Pretext explains why EPA is using

rulemaking authority for HAPs to impose nearly a billion dollars in additional costs on a disfavored source of energy with no demonstrable benefit from the Rule's mandated reduction in HAP emissions.

## CONCLUSION

For the reasons set forth above, the Rule is contrary to statute and arbitrary and capricious.  The Court should vacate the Rule.

Dated: December 10, 2024                Respectfully submitted,

PATRICK MORRISEY                         DREW H. WRIGLEY
Attorney General                         Attorney General

*/s/ Michael Williams*                   */s/ Philip Axt*
MICHAEL R. WILLIAMS                      PHILIP AXT
Solicitor General                        Solicitor General
State Capitol Bldg. 1, Room E-26         600 E Boulevard Ave., Dept. 125
Charleston, WV 25301                     Bismarck, ND 58505
Phone: 304.558-2021                      Phone: 701.328.2210
michael.r.williams@wvago.gov             pjaxt@nd.gov

*Counsel for State of West Virginia*     NESSA HOREWITCH COPPINGER
                                         DAVID M. FRIEDLAND
                                         Special Assistant Attorneys General
                                         1900 N Street NW, Suite 100
                                         Washington, DC 20036
                                         ncoppinger@bdlaw.com
                                         dfriedland@bdlaw.com

                                         *Counsel for State of North Dakota*


TREG TAYLOR                              TIM GRIFFIN
Attorney General                        Attorney General

*/s/ Garrison Todd*                     */s/ Nicholas J. Bronni*
GARRISON TODD                           NICHOLAS J. BRONNI
Assistant Attorney General              Solicitor General
Alaska Department of Law                DYLAN L. JACOBS
1031 W. 4th Ave.                        Deputy Solicitor General
Suite 200                               Office of the Arkansas Attorney
Anchorage, AK 99501                     General
(907) 269-5100                          323 Center Street, Suite 200
Garrison.Todd@alaska.gov                Little Rock, AR 72201
                                        (501) 682-2007
*Counsel for State of Alaska*           nicholas.bronni@arkansasag.gov

                                        *Counsel for State of Arkansas*

52

CHRISTOPHER M. CARR
Attorney General

*/s/ Stephen J. Petrany*
STEPHEN J. PETRANY
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

RAÚL R. LABRADOR
Attorney General

*/s/ Alan M. Hurst*
ALAN M. HURST
Solicitor General
Office of Idaho Attorney General
P.O. Box. 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@aga.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
Attorney General

*/s/ James A. Barta*
JAMES A. BARTA
Solicitor General
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

BRENNA BIRD
Attorney General

*/s/ Eric H. Wessan*
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

KRIS W. KOBACH
Attorney General

*/s/ Anthony J. Powell*
ANTHONY J. POWELL
Solicitor General
Office of Kansas Attorney General
120 SW 10thAvenue, 2ndFloor
Topeka, Kansas 66612
(785) 368-8539
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

RUSSELL COLEMAN
Attorney General

*/s/ Matthew F. Kuhn*
MATTHEW F. KUHN
Solicitor General
JACOB M. ABRAHAMSON
Assistant Solicitor General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for Commonwealth of Kentucky*

ELIZABETH B. MURRILL
Attorney General

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General
Louisiana Department of Justice 1885
N. Third Street
Baton Rouge, Louisiana 70802
(225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW T. BAILEY
Attorney General

*/s/ Samuel C. Freedlund*
SAMUEL C. FREEDLUND
Deputy Solicitor General
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, Missouri 63101
(314) 340-4869
Samuel.Freedlund@ago.mo.gov

*Counsel for State of Missouri*


MICHAEL T. HILGERS
Attorney General

*/s/ Grant D. Strobl*
GRANT D. STROBL
Assistant Solicitor General
Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.strobl@nebraska.gov

*Counsel for State of Nebraska*


AUSTIN KNUDSEN
Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406)444-2707
Christian.Corrigan@mt.gov

*Counsel for State of Montana*


GENTNER DRUMMOND
Attorney General

*/s/ Garry M. Gaskins, II*
GARRY M. GASKINS, II
Solicitor General
JENNIFER L. LEWIS
Deputy Attorney General
Office of the Attorney General of
Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*

55

ALAN WILSON
Attorney General

*/s/ Thomas T. Hydrick*
THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*


JONATHAN SKRMETTI
Attorney General

*/s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER
Director of Strategic Litigation
MATTHEW RICE
Solicitor General
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Matthew.Rice@ag.tn.gov

*Counsel for State of Tennessee*

MARTY J. JACKLEY
Attorney General

*/s/ Steve Blair*
STEVE BLAIR
Deputy Attorney General
Office of the Attorney General of South
Dakota
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
(605) 773-3215
atgservice@state.sd.us
steven.blair@state.sd.us

*Counsel for State of South Dakota*


KEN PAXTON
Attorney General

*/s/ John R. Hulme*
JOHN R. HULME
Assistant Attorney General
BRENT WEBSTER
First Assistant Attorney General
JAMES LLOYD
Deputy Attorney General for Civil
Litigation
KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
John.hulme@oag.texas.gov

*Counsel for State of Texas*

SEAN REYES
Attorney General

*/s/ Stanford Purser*
STANFORD PURSER
Solicitor General
Office of the Utah Attorney General
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(385) 366-4334
Spurser@agutah.gov

*Counsel for State of Utah*


BRIDGET HILL
Attorney General

*/s/ D. David DeWald*
D. DAVID DEWALD
Deputy Attorney General
Wyoming Attorney General's Office
Water & Natural Resources Division
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 phone
david.dewald@wyo.gov

*Counsel for State of Wyoming*


JASON MIYARES
Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER
Principal Deputy Solicitor General
BRENDAN T. CHESTNUT
Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Commonwealth of Virginia*

*/s/ Charles T. Wehland*

Charles T. Wehland                          Jeffery D. Ubersax
JONES DAY                                   KUSHNER & HAMED CO., LPA
110 North Wacker Drive, Suite 4800          1375 East Ninth Street, Suite 1390
Chicago, IL 60601-1692                      Cleveland, OH 44114
Tel: (312) 269-4388                         Tel: (216) 696-6700
ctwehland@jonesday.com                      jdubersax@kushnerhamed.com

Yaakov M. Roth
Brinton Lucas
Madeline W. Clark
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 879-7658
yroth@jonesday.com
blucas@jonesday.com
mclark@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

/s/ Elizabeth C. Williamson
Elizabeth C. Williamson
BALCH & BINGHAM LLP
601 Pennsylvania Ave. N.W.
Suite 825 South
Washington, D.C. 20004
(202) 661-6342
(202) 347-6001 (fax)
ewilliamson@balch.com

Claire B. Johnson
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
cbjohnson@balch.com

*Counsel for National Rural Electric Cooperative Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative, Inc., Basin Electric Power Cooperative*

/s/ Misha Tseytlin
Misha Tseytlin
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

Carroll Wade McGuffey III
TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree St. N.E., Suite 3000
Atlanta, GA 30308
(404) 885-3698
mack.mcguffey@troutman.com

*Counsel for Lignite Energy Council and National Mining Association*

/s/ C. Grady Moore III
C. Grady Moore III
P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
gmoore@balch.com

*Counsel for Oak Grove Management Co., LLC and Luminant Generation Co., LLC*

/s/ Megan Berge
Megan H. Berge
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-1308

*Counsel for Rainbow Energy Center, LLC*

/s/ Mark W. DeLaquil
Mark W. DeLaquil
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1527
mdelaquil@bakerlaw.com

Martin T. Booher
Joshua T. Wilson
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

*Counsel for Westmoreland Mining
Holdings LLC, Westmoreland
Mining, and Westmoreland Rosebud
Mining, LLC*

/s/ Joshua B. Frank
Joshua B. Frank
C. Joshua Lee
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
Tel.: (202) 639-7748
(202) 639-1130
joshua.frank@bakerbotts.com
joshua.lee@bakerbotts.com

*Counsel for Talen Montana, LLC*

/s/ Creighton R. Magid
Creighton R. Magid #49713
DORSEY & WHITNEY LLP
1401 New York Avenue NW
Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3555
Fax: (202) 315-3852
magid.chip@dorsey.com

*Counsel for NorthWestern
Corporation, d/b/a NorthWestern
Energy*

/s/ Makram B. Jaber
Makram B. Jaber
Allison D. Wood
Aaron M. Flynn
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-1700
mjaber@mcguirewoods.com
awood@mcguirewoods.com
aflynn@mcguirewoods.com

*Counsel for America's Power and
Electric Generators MATS Coalition*

|  |  |
|---|---|
|  | */s/ David M. Flannery* |
| Edward L. Kropp | David M. Flannery |
| STEPTOE & JOHNSON PLLC | Kathy G. Beckett |
| P.O. Box 36425 | Keeleigh S. Huffman |
| Indianapolis, Indiana 46236 | STEPTOE & JOHNSON PLLC |
| 317-946-9882 | 707 Virginia Street, East |
| Skipp.Kropp@steptoe-johnson.com | P.O. Box 1588 |
|  | Charleston, WV 25326 |
|  | (304) 353-8000 |
|  | Dave.Flannery@steptoe-johnson.com |
|  | Kathy.Beckett@steptoe-johnson.com |
|  | Keeleigh.Huffman@steptoe-johnson.com |

*Counsel for Midwest Ozone Group*

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), (f) and (g) and Circuit Rule 32(e)(1), because it contains 11,968 words, excluding exempted parts, according to the count of Microsoft Word 365.

I further certify that the foregoing brief also complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in 14-point proportionally spaced Times New Roman font.

*/s/ Philip Axt*
PHILIP AXT
Solicitor General of North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2024, the foregoing Final Reply Brief of Petitioners was served electronically on all registered counsel through the Court's CM/ECF system.

/s/ Philip Axt
PHILIP AXT
Solicitor General of North Dakota